# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | | |
|---|---|---|
| LEWIS COSBY, on behalf of himself and all others similarly situated, | ) ) ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| v. | ) ) | No. _____ |
| DELOY MILLER, SCOTT M. BORUFF, PAUL W. BOYD, CHARLES M. STIVERS, DAVID M. HALL, MERRILL A. McPEAK, JONATHAN S. GROSS, DAVID J. VOYTICKY, DON A. TURKLESON, GERALD HANNAHS, MARCEAU N. SCHLUMBERGER, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, CARL E. GIESLER, JR., A. HAIG SHERMAN, and KPMG, LLP, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

---

## CLASS ACTION COMPLAINT

---

Gordon Ball
TN BPR#001135
**GORDON BALL PLLC**
Ste. 600, 550 Main Street
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
Email: gball@gordonball.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.      NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      Individual Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      Auditor Defendant - KPMG, LLP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D.      Non-Parties and Co-Conspirators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.     PERTINENT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Background of Miller and Purchase of Alaska Assets.. . . . . . . . . . . . . . . . . . . 13

        B.      The False and Misleading Registration Statement. . . . . . . . . . . . . . . . . . . . . 16

        C.      Under Generally Accepted Accounting Principles, Miller Was Required to
                Record the Alaska Assets Acquisition at Fair Value. . . . . . . . . . . . . . . . . . . . 18

        D.      Miller's Reserve Report Failed to Represent the Fair Value of Alaska Assets
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        E.      The Fair Value of the Acquired Fixed Assets Was Double-Counted and
                Overstated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        F.      Miller Writes Down the Value of the Alaska Assets.. . . . . . . . . . . . . . . . . . . 27

        G.      SEC Enforcement Action Accuses Miller, Boyd, and Hall of Knowingly
                Artificially Inflating Value of Alaska Assets.. . . . . . . . . . . . . . . . . . . . . . . . . 28

        H.      Miller Settles With SEC, Files for Bankruptcy Protection, and Sees Shares
                De-listed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        I.      Allegations Against Outside Independent Auditor KPMG. . . . . . . . . . . . . . . 35

V.      CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VI.  CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

VII.  JURY TRIAL DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

VIII.  PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**NOW INTO COURT** comes the Plaintiff, Lewis Cosby ("Plaintiff"), through the undersigned attorneys, and on behalf of himself and all others similarly situated (the "Class"), brings this action for damages against the Defendants, pursuant to federal and common law.

This Complaint is alleged upon information and belief, and investigation of counsel, except as to those allegations which pertain to the named Plaintiff, which are alleged on Plaintiff's personal knowledge.[1]

## I. NATURE OF ACTION

1. This case involves financial accounting and reporting fraud and/or persistent audit failures by the Defendants, all of which is related to the grossly overstated valuation of certain oil and gas assets acquired by Miller Energy Resources, Inc. ("Miller Energy").

2. Plaintiff, Lewis Cosby ("Plaintiff") brings this federal securities class action under §§ 11, 12(a)(2) and 15 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o on behalf of himself and all other purchasers of Miller Energy common shares traceable to the September 6, 2012 Registration Statement and Prospectuses.

---

[1] This includes a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by Miller, media reports about Miller and court filings, the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and 2lc of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, *In the Matter of Miller Resources, Inc., et al.,* SEC Admin. Proc. File No. 3-16729 (Aug. 6, 2015), the SEC's Order Making Findings and Imposing a Cease-and-Desist Order and Penalties Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of the Securities Exchange Act of 1934 As to Miller Energy Resources, Inc., *In the Matter of Miller Resources, Inc., et al.,* SEC Admin. Proc. File No. 3-16729 (Jan. 12, 2016), filings *in ln re Miller Energy Resources, Inc., et al.,* No. 15-00313 (D. Alaska Bankr. Ct.), and media reports about the Company.

3.      Miller Energy purchased assets located in Alaska for $2.25 million in cash – and assumed certain liabilities it valued at approximately $2 million – during a competitive bid in a bankruptcy proceeding in December 2009 (hereinafter, the "Alaska Assets").  For the succeeding five years, Miller Energy, its officers, managers, Board of Directors, along with Sherb & Co., LLP ("Sherb") and KPMG, LLP ("KPMG"), Miller Energy's auditors, used a plethora of false statements, fraudulent accounting, and other fraudulent reporting devices to falsify the financial results of Miller Energy, conspiring to perpetrate a massive fraud on Plaintiff and others in members of the investing public.  Among other things:

- Miller Energy's officers, managers, and Board of Directors reported those assets at a substantially overstated value of $480 million;

- Miller Energy's officers, managers, and Board of Directors recognized a one-time "bargain purchase" gain of $277 million for its fiscal third quarter ended January 2010 and fiscal year ended April 2010;

- Miller Energy's officers, managers, and Board of Directors failed to fairly account for the acquisition of the Alaska Assets in accordance with generally accepted accounting principles ("GAAP");

- Miller Energy's officers, managers, and Board of Directors used a reserve report that contained expense numbers that were knowingly understated by the CEO of Miller Energy's Alaska operations;

- Miller Energy's officers, managers, and Board of Directors double-counted $110 million of certain fixed assets that were already included in the reserve report;

- Miller Energy's officers, managers, and Board of Directors filed a Form S-3 Registration Statement with the SEC on or about September 6, 2012, incorporating by reference previously filed materials that contained false or otherwise untrue statements of material facts or omissions and were not prepared in accordance with the rules and regulations governing their preparation;

■ the outside directors also bear legal responsibility for the success and extent of the fraudulent scheme, as they utterly failed to carry out their duties as members of the Audit Committee of the Board of Directors, blinding themselves to the possibility of improper acts by Miller Energy management;

■ after Miller Energy's previous auditor, Sherb & Co., LLP ("Sherb"), had issued an unqualified opinion of Miller Energy's 2010 annual report that falsely stated that its audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller Energy's financial statements were presented fairly and conformed with GAAP, KPMG issued unqualified reports that Miller Energy's financial statements were fairly presented, in all material respects, disregarding overwhelming evidence of egregious over-valuations and massive accounting errors; and

■ Sherb and KPMG, who were outside auditors for Miller Energy at different times during the Class Period, knew, but never reported to the relevant authorities, that Miller Energy had falsely reported its financial results for years.

4.      Financial statement information is the cornerstone of investment decisions.  All of Miller Energy's interim and annual financial reports issued between 2010 and 2015, relying upon a Reserve Report not prepared for the purpose,[2] overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by law.

---

[2]Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties.  Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable, and possible.  Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, for among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production.  However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."  *See* Paragraph 77 of the Basis  for Conclusion of SFAS 69 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

As a result, all of Miller Energy's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final prospectuses described herein were false and misleading.

5.     The grossly-inflated value helped Miller Energy transform itself from a penny stock into a New York Stock Exchange-listed company valued in 2013 at $393 million. Its stock reached a 2013 high of nearly $9 per share.

6.     On August 6, 2015, the United States Securities and Exchange Commission ("SEC") charged Miller Energy, former Chief Financial Officer Paul Boyd, and Chief Operating Officer David Hall with accounting fraud for overstating the value of Alaska Assets by more than $400 million. Not only did Miller Energy falsify financial statement information and grossly overstate the value of the Alaska Assets, but its independent auditors, initially the now-defunct Sherb firm and later KPMG, also repeatedly failed to conduct audits that complied with professional standards.

7.     In its fiscal 2010 audit of Miller Energy's financial statements, Sherb issued an unqualified opinion of Miller Energy's 2010 annual report and falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller Energy's financial statements were presented fairly and conformed with GAAP. KPMG followed these gross auditing deficiencies by issuing its own unqualified opinion that Miller Energy's 2011, 2012, 2013, and 2014 financial statements were fairly represented in all material respects, certifying statements that KPMG should known, exercising appropriate diligence, were substantially false and misleading to Miller Energy's shareholders.

8.     The false financial statements, followed by unqualified reports by auditors that those financial statements were fairly represented in all material respects, misled and deprived Plaintiff and

-4-

other shareholders of material information about Miller Energy's financial position, causing Plaintiff and those other shareholders to suffer injury to their property. Plaintiff alleges that two distinct groups are primarily culpable for the fraudulent, false, and grossly negligent repeated misstatements of Miller Energy's financial position between 2009 and 2015.

9. <u>First</u>, Plaintiff alleges that Miller Energy,[3] members of Miller Energy's senior management, Board of Directors, and Audit Committee, including Scott M. Boruff, Deloy Miller, Charles M. Stivers, David M. Hall, Merrill A. Mcpeak, Jonathan S. Gross, David J. Voytlcky, Don A. Turkleson, Gerald Hannahs, Marceau N. Schlumberger, Bob G. Gower, Joseph T. Leary, William B. Richardson, Carl E. Giesler, Jr., and A. Haig Sherman (collectively, the "Individual Defendants") repeatedly made false and misleading statements relating to Miller Energy's business and financial condition and the value of its assets, and violated GAAP in reporting and accounting for Miller Energy's assets, liabilities, revenues, expenses, net income and cash flow, which artificially-inflated the price of Miller Energy's common stock during the Class Period.

10. <u>Second</u>, Plaintiff alleges that Miller Energy's auditors, first Sherb, who served as Miller Energy's independent registered public accounting firm from August 2008 until February 2011, and later KPMG, committed a litany of errors and did little else but rubber-stamp Miller Energy management's gross over-valuations of the Alaska Assets, certifying Miller Energy's false and misleading financial statements and rendering unqualified opinions that those statements were

---

[3]Miller Energy sought protection under federal bankruptcy laws on October 1, 2015. Therefore, it is not named as a Defendant in this action.

fairly presented, in all material respects. Sherb, a small firm that primarily audited micro-capital companies, presented 2009 and 2010 audits which confirmed Miller Energy's financial statements for those years.

11.    Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in or do business with a public company. As part of Miller Energy's bid to be listed on the New York Stock Exchange, Miller Energy retained the services of KPMG to audit its financial statements for the fiscal year ended April 30, 2011. KPMG, a leading accounting firm in the oil and gas sector, had an opportunity with the restatement to protect the shareholders and investment community and to correct Miller Energy's rampant misstatements and untruths from previous years. However, given that chance, and notwithstanding the benefit of a year's worth of hindsight, KPMG methodically became, in many respects, even more culpable than Sherb, issuing unqualified reports that Miller Energy financial statements for the years ended April 30, 2011 through 2014 were fairly presented, in all material respects, the highest level of an audit report that a CPA can issue.

12.    Even in the face of the SEC orders revealing that the financial statements of Miller Energy were fraudulent and materially misstated and Miller Energy's acknowledgment of vast accounting errors involving its valuation of the Alaska Assets, KPMG has never withdrawn, amended, or otherwise altered its reports. Nor has KPMG alerted the SEC or Miller Energy's shareholders that its earlier reports were in error.

-6-

## II.  PARTIES

### A.  Plaintiff

13.    Plaintiff, Lewis Cosby ("Plaintiff"), purchased Miller Energy common shares traceable to the September 6, 2012 Registration Statement and was injured as a proximate result thereof.  Plaintiff purchased 500 common shares, at $3.53 per share, on October 27, 2014.  Plaintiff sold those common shares, at $1.73 per share, on December 2, 2014.

### B.  Individual Defendants

14.    Defendant Scott M. Boruff ("Boruff") has served as the Executive Chairman of the Board since September 14, 2014.  Previously, Boruff served as Miller Energy's Chief Executive Officer ("CEO") from August 6, 2008 to September 14, 2014 and as its President from June 2010 until June 9, 2011.

15.    Defendant Deloy Miller ("Miller") founded Miller Energy and served as the Chairman of its Board of Directors (the "Board") until  September 14, 2014.

16.    Defendant Paul W. Boyd ("Boyd") served as the CFO and treasurer of Miller Energy from 2008 to 2011 and as Miller Energy's Director of Risk Management  from 2011 until  2014. John Brawley is the new CFO.

17.    Defendant Charles M. Stivers ("Stivers") served as CFO from 2004 until 2006 and served as a member of the Board of Directors from 2004 until June 18, 2015.

18.     Defendant David M. Hall ("Hall") served as the Chief Operating Officer ("COO") of Miller Energy from July 18, 2013 until August 6, 2015.  Hall also served as a member of the Board of Directors from December 10, 2009 until August 6, 2015.  Hall also served as Chief Executive Officer of the Company's Cook Inlet Energy subsidiary.

19.     Defendant Merrill A. McPeak ("McPeak") served as a member of the Board of Directors from April 2010 until April 16, 2014.

20.     Defendant Jonathan S. Gross ("Gross") served as a member of the Board of Directors from April 2010 until 2012.  Gross has 29 years of experience in domestic and international oil and gas exploration.

21.     Defendant David J. Voyticky ("Voyticky") served as the President of Miller Energy from June 9, 2011 until August 12, 2014, as its Acting CFO from September 2011 until February 2014, and was a director from April 2010 to April  2014.  Voyticky has over 15 years of domestic and international mergers and acquisitions, restructuring and financing experience, including stints with Goldman, Sachs & Co. and J.P. Morgan.

22.     Defendant Don A. Turkleson ("Turkleson"") served as a member of the Board of Directors from January 2011 to April 16, 2014 and was chair of the Audit Committee.  Turkleson has over 35 years of accounting and financial experience with emphasis in the oil and gas business.  Turkleson is a Certified Public Accountant.

23.     Defendant Gerald Hannahs ("Hannahs") has served as a member of the Board of Directors since July, 2012 and was appointed to serve a member of the Audit Committee on August 2013.  Hannahs has over 30 years of experience in the investments and the oil and gas industry.

-8-

24.     Defendant Marceau N. Schlumberger ("Schlumberger") served as a member of the Board of Directors from July 2013 until August 28, 2014. He has nearly 20 years of investment banking experience, including international and domestic mergers and acquisitions, restructuring, strategic analysis, and financing experience.

25.     Defendant Bob G. Gower ("Gower") has served as a member of the Board of Directors since 2014. Dr. Gower has more than 50 years of business and senior management experience across a range of industries, including energy, chemical, and technology.

26.     Defendant Joseph T. Leary ("Leary") served as a member of the Board of Directors from 2014 until August 28, 2014. Leary has more than 40 years of experience in banking and finance with over 25 years in the energy business.

27      Defendant William B. Richardson ("Richardson") served as a member of the Board of Directors from April 2014 until September 11, 2015.

28.     Defendant Carl E. Giesler, Jr. ("Giesler") was appointed as Chief Executive Officer in September 2014. He has served as a member of the Board of Directors since October 1, 2014.

29.     Defendant A. Haig Sherman ("Sherman") has served as a member of the Board of Directors since September 14, 2014. Has diverse business experience, including roles as a practicing attorney, accountant, registered investment advisor and businessman. He is also a Certified Public Accountant.

30.     Defendants McPeak, Hannahs, Stivers and Turkleson served as directors of Miller Energy as of September 6, 2012 and signed the September 6, 2012 Registration Statement ("Registration Statement").

-9-

31.     Defendants Gower, Leary, Richardson and Schlumberger served as directors of Miller Energy during the Class Period, and engaged in actions that proximately resulted in injuries to Plaintiff and Class members, as described below.

### C.     Auditor Defendant – KPMG LLP

32.     Defendant KPMG LLP ("KPMG") is one of the "Big 4" international accounting firms with 179 offices across 19 countries and an employee base of 25,000.  KPMG is duly organized and existing under the laws of the State of Delaware, and has its main office located at 345 Park Avenue, New York, New York, and it maintains an office located in Melville, New York.

33.     KPMG has an office in Knoxville, Tennessee.  According to KPMG literature, the firm is a leader in the field of oil and gas with a goal to be the leading provider of professional services to the oil and gas sector.  Specifically, KPMG provides professional services to:

- ■ 76% of the top 50 oil and gas companies in the Forbes 2000;

- ■ 69% of oil and gas companies in the FT Global 500;

- ■ 70% of the largest refining companies on the Fortune Global 500

KPMG's U.S.-based clients include Haliburton, Occidental Petroleum, and Valero Energy.

34.     KPMG was retained as Miller Energy's independent auditor on February 1, 2011.  KPMG issued unqualified reports on Miller Energy's financial statements for the years ending April 30, 2011, April 30, 2012, April 30, 2013 and April 30, 2014, certifying, inter alia, that it had audited the financial statements in accordance with generally accepted auditing standards ("GAAS") and that, in its opinion, the financial statements presented the financial position of Miller Energy fairly and in conformity with GAAP.  Fees billed to Miller Energy by KPMG for its audits of Miller

-10-

Energy's financial statements were in excess of $3,296,470 through the period ending April 30, 2014. KPMG also submitted an unsecured claim against Miller Energy in the bankruptcy, seeking $448,000.00.

35.     Every report by KPMG's of its audits of Miller Energy's financial statements for the foregoing periods was a "clean opinion," an unqualified report that Miller Energy's financial statements were fairly presented, in all material respects. This is the highest level of an audit report that a CPA can issue.

### D.     Non-Parties and Co-Conspirators

36.     Non-party Miller Energy Resources, Inc. (a/k/a Miller Petroleum, Inc.) ("Miller Energy") is an independent exploration and production company that explores for, develops, and operates oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller Energy common stock traded on the NYSE under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO."

37.     As of September 29, 2015, Miller Energy had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On September 11, 2015, Miller Energy caused its common stock, Series C and Series D to be de-listed from the NYSE. On October 1, 2015, Miller Energy filed a petition seeking relief under the federal bankruptcy statutes. In light of the automatic stay in the bankruptcy proceedings, Miller Energy is not named as a Defendant herein.

38.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at Miller Energy's former independent outside auditing firm, non-party Sherb, a now defunct CPA firm that was

suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller Energy, which had served as Miller Energy's outside audit firm since 2008. Vogt led an audit team that audited Miller Energy's financial statements for fiscal years ended 2009 and 2010. Vogt led the Sherb audit team that audited Miller Energy's financial statements for the 2009 and 2010 fiscal years.

39.     Various entities not named as Defendants in this lawsuit have participated as co-conspirators with the named Defendants in the violations alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name some or all of these persons as Defendants at a later date. Plaintiff believes that there is a finite number of co-conspirators whose identities can be ascertained through Defendants' own records.

### III.   JURISDICTION AND VENUE

40.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction over any claims brought under state law pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

41.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. §78aa, §§ 10(b) and of 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

42.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because one or more of the Defendants is found or resides in this judicial district or had agents in this judicial district, transacted or is licensed to transact business in this judicial district, and because

-12-

a substantial portion of the affected trade and commerce described below has been carried out in this judicial district.  Also in connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

43.     This Court has personal jurisdiction over each of the Defendants named herein because they conducted substantial business in, were citizens of the State of Tennessee at during the Class Period (including Miller Energy, which maintained its principal place of business and offices throughout this State at the time).  The violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein, which  was disseminated  into this  State.

## IV.  PERTINENT FACTS

### A.     Background of Miller Energy and Purchase of Alaska Assets

44.     Miller Energy was founded in 1967 as an independent oil and gas exploration and production company.  Miller Energy, whose focus was originally on Tennessee's Appalachian Basin, initially became a publicly-traded company in connection with a reverse merger in 1996.  Between early 2002 and December 2009, Miller Energy was a small player operating on the fringes of the oil and gas exploration and production industry, as its stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007.  In August 2008, Miller Energy named a new CEO.  Soon thereafter, facing collapse, Miller Energy began acquiring additional oil and gas properties.

-13-

45. In the fall of 2009, Miller Energy became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based Pacific Energy Resources ("PER"). Beginning in December 2008, PER, with the help of a leading financial advisory and asset management firm, unsuccessfully marketed its operating assets in Alaska to 40 potential buyers. The assets were auctioned by the bankruptcy court in July 2009, but neither the winning bid ($8 million) nor the second bid( $7 million) ultimately closed. As a result, PER sought an order from the bankruptcy court allowing it to abandon title to the assets.

46. Due to renewed interest in the assets from Miller Energy, the bankruptcy court permitted PER to reacquire it's the assets and sell them to Miller Energy's operating subsidiary, Cook Inlet Energy ("CIE"), in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December I0, 2009.[4]

47. On December 16, 2009, Miller Energy announced that it had acquired certain oil and gas reserves and related assets in Alaska (the "Alaska Assets"), which it claimed were valued at more than $479 million, including oil and gas assets that included onshore and offshore production

---

[4]In its 2011 annual report, Miller Energy reported that on December 10, 2009, it had acquired 100% of the membership interests in Cook Inlet Energy, LLC, an Alaska limited liability company and had also acquired the former Alaskan operations of Pacific Energy Resources ("Pacific Energy"), "valued at more than $479 million through a Delaware Chapter 11 Bankruptcy proceeding." Miller Energy reported that the acquired Alaska Assets included "onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves and $31 million in possible energy reserves, providing total reserves of $368 million." Miller Energy reported the purchase of the West McArthur River oil field, the West Foreland natural gas field, and the Redoubt unit with the Osprey offshore platform, all located along the west side of the Cook Inlet, along with 602,000 acres of oil and gas leases, which includes 471,474 acres under the Susitna Basin Exploration License.

facilities, $215 million in proven energy reserves, $122 million in probable energy reserves, and $31 million in possible energy reserves, providing total reserves of $368 million.

48.     Shares of Miller Energy's common stock soared 93%, increasing in two days from $0.70 per share to a closing price of $1.35 per share.  On December 10, 2009, the date of the transaction, Miller Energy's stock closed at $0.61 per share.  By March 31, 2010, Miller Energy's stock closed 982% higher at $6.60 per share.  Weeks later, its stock began trading on NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

49.     On March 22, 2010, Miller Energy filed its quarterly report on Form 10-Q for its fiscal third quarter ended January 31, 2010 and reported a value of $480 million for the Alaska Assets, which amount was comprised of $368 million for oil and gas properties and $110 million for fixed assets.  Miller Energy also reported an after-tax $277 million "bargain purchase gain," which boosted net income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the previous year.  The newly-booked value of the Alaska Assets, which resulted in a nearly 5,000% increase in Miller Energy's total assets, had a significant impact on Miller Energy's stock price.[5]

50.     As it turned out, however, the claimed values for the Alaska Assets were vastly overstated, as they were based on (1) false values assigned to supposed "fixed assets" Miller Energy

---

[5]On July 25, 2010, Sherb announced the results of its audit of Miller Energy's balance sheets and related consolidated statements of operations, stockholders' equity (deficit), and cash flows for the year ended April 30, 2010, certifying the financial position of Miller Energy as of April 30, 2010.

acquired; and (2) enormous overstatement of the value of the oil and gas reserves. Miller Energy

materially overstated the value of its Alaska Assets by more than four hundred million dollars.

These inflated balance sheet and income statement numbers were repeated over the next year and

a half in numerous documents touting the success and high value of the Alaska Assets subsequently

filed with the SEC.[6]

51.    Miller Energy's overstatement of the Alaska Assets enabled it to overstate assets on

its balance sheet by $479 million and overstate shareholders' equity by $267 million. This made

Miller Energy appear larger, cumulatively more profitable, and inherently less risky to the investing

public.

**B.    The False and Misleading Registration Statement**

52.    On or about September 6, 2012, Miller Energy filed with the SEC a Form S-3

Registration Statement and prospectus using a "shelf" registration, or continuous offering process.[7]

Under the shelf registration, Miller Energy would sell securities described in various future

prospectus supplements in one or more offerings. The prospectus supplements would form part of

---

[6]In Miller Energy's 2011 annual report, it reported that on March 17, 2011, the Audit Committee of Miller Energy's Board of Directors had determined that its unaudited consolidated balance sheet at July 31, 2010, unaudited consolidated statement of operations for the three-month period ended July 31, 2010, unaudited consolidated balance sheet at October 31, 2010, and unaudited consolidated statement of operations for the three and six month periods ended October 31, 2010 could no longer be relied upon as a result of misstatements in those financial statements.

[7]A shelf registration is a regulation that a corporation can evoke to comply with SEC registration requirements for a new stock offering up to three years before doing the actual public offering. The corporation must still file the required annual and quarterly reports with the SEC. Sometimes current market conditions are not favorable for a specific firm to issue a public offering. By using shelf registration, firms can fulfill all registration-related procedures beforehand and go to market quickly when conditions become more favorable.

the registration statement for each offering. The securities were to be issued by Miller Energy. This Form S-3, which would later be utilized for all of the stock offerings, expressly incorporated by reference certain filings Miller Energy had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.

53. The SEC declared the shelf registration statement effective on September 18, 2012.

54. The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller Energy's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

55. All of Miller Energy's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, Business Combinations, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report."

-17-

56.     As a result, all of Miller Energy's interim and fiscal financial reports issued between 20IO and 2015, the Form S-3 filed on September 6, 2012, and each of the relevant final Prospectuses were false and misleading.[8]

**C.     Under Generally Accepted Accounting Principles ("GAAP"), Miller Energy Was Required to Record the Alaska Assets at Fair Value.**

57.     ASC 805, Business Combinations – formerly Statement of Financial Accounting Standards ("SFAS") 14l ® – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

58.     ASC 820, Fair Value Measurements (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an appropriate fair value using one or more of the valuation techniques described in accounting literature.

59.     ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to

---

[8]Miller Energy's false and misleading reports filed with SEC included: Forms 10-Q for the 3Q 2010 and all interim quarters for 2011-201 5; Forms 10-K for 2010 - 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and 15 Forms 8-K filed between March 2010 through at least December 2014.

-18-

convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

60. ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

61. ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[9]

62. When computing their estimate of fair value, Defendants Miller and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the Alaska Assets were worth substantially less than the $480 million value Miller Energy recorded. In failing to do so, Defendants Miller and Boyd materially overstated the value of the newly acquired Alaska Assets. As described detailed below, Miller Energy purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

---

[9]ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

-19-

**D. Miller Energy's Reserve Report Failed to Represent the Fair Value of Alaska Assets.**

63.     Shortly after the acquisition, Defendant Boyd asked Defendant Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller Energy's Form 10-Q for the quarter ended January 31, 2010.

64.     To record the value of the Alaska Assets, Defendants Miller and Boyd requested and improperly valued the Alaska Assets based on a reserve estimates report prepared by Ralph E. Davis & Associates, an independent petroleum engineering firm (the "Reserve Report").  Ralph E. Davis & Associates did not know that Miller Energy intended to use the Reserve Report for fair value purposes and believed that its purpose was for use as supplemental data in Miller Energy's SEC disclosures.[10]

---

[10]Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975 ("Rule 4-10"); and ASC 932-235-50-29 through 33 (formerly SFAS 19, Financial Accounting and Reporting by Oil and Gas Producing Companies, and SFAS 69, Disclosures About Oil and Gas Producing Activities ).  ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure,"which is the future after-tax net cash flows discounted at 10%.

A non-GAAP measure, known as "PV- 10," is similar to the standardized measure but is typically presented on a pretax basis.  The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows.  It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics."  Paragraph 83 of the Basis for Conclusions of SFAS 69.

65.     The Reserve Report was finalized in February 2010 and reflected a pre-tax present value of net cash flows discounted at 10% ("PV-10 ") of $368 million.  The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value.  Specifically, on page 3 of the report, it states that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."  Defendant Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineer firm about the Reserve Report.  Rather, upon receiving the Reserve Report, Defendant Boyd merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable, and possible reserves, which artificially increased the book value of Miller Energy's oil and gas properties on its balance sheet by $368 million.

66.     The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller Energy had made to its investors, including those incorporated by reference into the Registration Statement.  Specifically, in its fiscal 2010 Form 10-K, the first annual report to include the inflated values, Miller Energy expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves."  Notwithstanding that disclosure, Miller Energy had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

67.     The $368 million Reserve Report value failed to represent fair value for several reasons.  Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make adjustments for income taxes.  It also used a 10% discount rate that was inappropriate under GAAP for determining fair value.  And by failing to consider the discount rate using assumptions that market participants would use, Miller Energy materially overstated the

-21-

value of the Alaska Assets. The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Nor did the Reserve Report include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets. Finally, the $237 million of projected operating and capital expenses in the Reserve Report, provided by Miller Energy and the Alaska CEO, were intentionally understated, resulting in an overstated valuation.

68.     The CFO was aware that Miller Energy chose the new firm because a prior firm refused to assign any value to a property known as the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and the prior firm had explained that it would not put its "name on a report that implies value exists where it likely does not." The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller Energy – showed positive future cash flows in the Reserve Report primarily because the Alaska CEO gave Ralph E. Davis & Associates understated and unsubstantiated expense numbers. The CFO had previously been advised by Miller Energy's independent auditor that the lack of any controls over the Alaska CEO's expense estimates was a "concerning void."

69.     Defendants Miller and Hall provided expense projections that, in many cases, were significantly lower than past actual experience. For example, internal documents maintained by Defendant Hall indicate that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million. However, Defendant Hall told Ralph E. Davis & Associates to use a cost of $4.6 million per well in its Reserve Report. And instead of using recent expense data, Defendant Hall gave Ralph E. Davis & Associates nearly three-year old operating expense data, which he revised down on the

-22-

pretext that Miller Energy could run a leaner operation than former operators of the properties. Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves. That level of operating expenses was unreasonable in light its predecessor's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

70.     By understating the expense numbers, Miller Energy overvalued its Alaska Assets by tens of millions of dollars.

### E.     The Fair Value of the Acquired Fixed Assets Was Double-Counted and Overstated.

71.     In addition to the $368 million value recorded for the oil and gas properties, Defendant Miller Energy also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

72.     In a February 8, 2010 email, Defendant Boyd informed Defendant Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, Defendant Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

73.     With no additional analysis, Defendant Boyd recorded the amount in the revised insurance study on Miller Energy's balance sheet.

-23-

74.     The recording of assets at a value of $110 million was improper for several reasons. Miller Energy's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of those assets. The Reserve Report, which Miller Energy relied on to value the acquired Alaskan Assets, used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller Energy's case, the fixed assets in the insurance study were the same operating assets that were expected to generate the future cash flows discussed in the Reserve Report. Accordingly, they should not have been separately valued.

75.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility ("KPF") to the platform via a sub-sea line, which was connected to an underground power grid that ran throughout the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the KPF. Without the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring up-front capital expenditures to replace the platform and related infrastructure. Similarly, minus the other production facilities, the platform would have lacked power and a place to process its oil and gas.

76.     The Reserve Report recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate future cash flows.

77.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by

-24-

separately valuing the same operating assets, Miller Energy overstated the value of the Alaska Assets by as much as $110 million.

78.     The insurance study also did not reflect fair value because the version of the insurance study used by Defendant Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost does not qualify as fair value under GAAP.

79.     Miller Energy, at the direction of Defendants Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million was derived from a third party. The numbers in the fixed asset study were given to the insurance broker and its predecessor by its clients (*i.e.*, Miller Energy and the previous owners of the fixed assets) as long ago as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. Two employees at the insurance broker who were the most familiar with the original "Loss Estimates Study" confirmed to the SEC that they never tested or in any way double-checked the values provided.

80.     Defendants Boyd and Hall either knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

81.     February 8, 2010, Defendant Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, 20I0, and told Miller Energy in an email copied to Defendant Hall that it could not provide a report showing replacement costs.

82.     Miller Energy also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, 2010, the consulting firm informed Miller Energy that the insurance study was a "good reference" but did not state "value or

replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

83. Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including Defendant Hall, called Defendant Boyd. Defendant Boyd said that he could not wait weeks for a new report, but "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party." During the call, Defendants Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite Defendant Hall having been explicitly informed that it could not provide Miller Energy with replacement costs.

84. With the aim of making the report appear as though it reflected replacement costs, Defendant Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller Energy provided Sherb, omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the Revised Report were the ones provided to the broker by Defendant Miller Energy and its predecessors.

85. As a result of the foregoing, Miller Energy overvalued the Alaska Assets by more than $400 million.

86. As a result of the fraudulent valuation, Miller Energy filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement.

87. Under the rules and regulations governing the preparation of the Registration Statement, Miller Energy was required to disclose that the value of the Alaska Assets was materially overstated in its financial statements.

-26-

88.     The Registration Statement, however, contained no such disclosures.  Pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

89.     When Plaintiff and other Class members purchased their common stock, the Alaska Assets were materially overstated in Miller Energy's financial statements, which materially understated its true expenses and materially overstated its profits.  The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller Energy's profitability, and, therefore, were required to be disclosed in the Registration Statement.

**F.     Miller Energy Writes Down the Value  of the Alaska Assets.**

90.     The following series of disclosures revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on Miller Energy's books by hundreds of millions of dollars.

91.     On December 10, 2014, Miller Energy disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt  Shoal field.  On March 12, 2015, Miller Energy disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

-27-

92.    On April 29, 2015, Miller Energy disclosed that the SEC had notified it that the agency staff had made a preliminary determination to recommend civil action against Miller Energy related to its accounting for the 2009 Alaska Asset acquisition.

93.    On May 12, 2015, Miller Energy disclosed that the NYSE had notified Miller Energy that its shares were subject to de-listing due to its having failed to maintain listing requirements.

94.    On July 14, 2015, Miller Energy included a "going concern" disclosure in its 2014 Annual Report filed with the SEC on Form 10-K.

95.    On July 30, 2015, Miller Energy disclosed that its common stock would be de-listed from the NYSE.

**G.    SEC Enforcement Action Accuses Miller Energy, Boyd, and Hall of Knowingly Artificially Inflating Value of Alaska Assets.**

96.    On August 6, 2015, the SEC initiated civil administrative proceedings against Miller Energy (the "SEC Enforcement Action") accusing the Miller Energy and Defendants Boyd and Hall of knowingly artificially inflating the value of the Alaska Assets acquired in 2009 and then knowingly misstating Miller Energy's financial statements for the ensuing five-plus year period through and including July 2015 when Miller Energy's stock was de-listed.  Non-party Vogt was also charged in the SEC Enforcement Action.

97.    In its Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller Energy overstated their value by more than $400 million, boosting Miller Energy's net income and total assets. According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where its

-28-

common stock had reached a 2013 high of nearly $9 per share. In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards . . . . The SEC will aggressively prosecute such conduct."

98. According to the SEC, Miller Energy had paid $2.25 million and assumed certain liabilities to purchase the Alaska Assets. It later reported them at a value of $480 million. While accounting standards required Miller Energy to record the properties at "fair value," then-CFO Defendant Boyd allegedly relied on the Reserve Report, which did not reflect fair value for the assets, and he also was alleged to have double counted $110 million of fixed assets already included in the Reserve Report. The Reserve Report allegedly contained expense numbers that were knowingly understated by defendant Hall, then serving as the CEO of Miller Energy's Alaska subsidiary, CIE, and as Miller Energy's COO since July 2013. Defendant Hall was also alleged to have altered a second report to make it appear as though it reflected an outside party's estimate of value.

99. The SEC alleged that the fiscal 2010 audit of Miller Energy's financial statements was deficient due to the failure of non-party Vogt, the Sherb partner in charge of the Miller Energy audits, who issued an unqualified opinion of Miller Energy's 2010 annual report and was alleged to

-29-

have falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller Energy's financial statements were presented fairly and conformed with GAAP.

100. As the partner in charge of the fiscal year 2010 Miller Energy audit, Vogt failed to perform the 2010 Miller Energy audit in accordance with PCAOB Auditing Standards. These deficiencies included, among other items, failing properly to audit the fair value measurements, use the work of a specialist, plan, staff and supervise the audit, obtain sufficient competent audit evidence, exercise due care and professional skepticism, and perform required audit testing.

101. Vogt's failures related to the auditing of the Alaska Asset acquisition. Despite the materiality of the transaction on Miller Energy's financial statements, Vogt failed to adequately test the valuation of the assets and the related calculation of the gain on acquisition. Instead, he inappropriately relied on the aforementioned reserve report and the so-called asset replacement cost study to justify Miller Energy's $480 million valuation of the Alaska Assets. Vogt also erred as follows:

> ■ Vogt did not perform the necessary procedures to enable him to use the findings of the reserve report.
>
> ■ Vogt knew at the time of the accounting for the acquisition that Miller Energy had insufficient accounting staff and that any accounting was suspect. In a December 22, 2009 email to Miller Energy's senior management, Vogt indicated that he believed the Miller Energy's accounting staff was deficient, and that Defendant Boyd cut too many corners on the accounting documentation. Furthermore, Vogt stated that Hall's modeling of cash flows and expenses was "concerning" because there was no one taking a detailed look at his estimates.

-30-

■ Vogt also knew that the reserve report used suspect data and was completed on what he described as a "rushed basis," as Miller Energy "had very little time if none for any true due diligence of much depth into what [it] purchased."

■ Vogt, on behalf of Sherb, issued an audit report containing an unqualified opinion for use in Miller Energy's 2010 Form 10-K that stated falsely that the audit had been conducted in accordance with the PCAOB's standards and that Miller Energy's financial statements were presented fairly, in all material respects, in conformity with GAAP.

■ While Vogt performed some testing on the data used to create the Reserve Report, he failed to test key elements such as the discount rate utilized, the risk weighting of the probable and possible reserves, estimated oil prices, and operating and capital expenses. Vogt also never properly considered the relevancy of the reserve report, improperly relying exclusively on the report since the specialist, a petroleum engineer, was not engaged to estimate a fair valuation, as expressly indicated in the report. Nor did he consider the consistency of the evidence in light of the other evidence, such as Miller Energy's actual purchase price of the assets (reported at less than $5 million), and the fact that the assets had previously been abandoned during a bankruptcy proceeding. While Vogt and his staff reviewed some aspects of the specialist's valuation model, they failed to sufficiently review and evaluate the reasonableness of assumptions such as the discount rate, risk weighting of certain reserves, future oil prices, and operating and capital expenses.

■ Vogt also failed to obtain sufficient audit evidence to support the fair value of the fixed assets.

■ Vogt did not properly consider the petroleum engineer's experience in fair valuation of assets, which was nonexistent.

■ Vogt also failed to obtain an understanding of the objectives and scope and intended purpose of the petroleum engineer's engagement for Miller Energy, which was to produce a reserve report for reserve disclosure purposes, not a fair valuation of acquired assets.

-31-

■ Vogt, despite alerting Boyd and Miller Energy's then CEO of the lack of sufficient review and inquiry, failed to adequately test the operating and capital expense estimates provided to the specialist by Miller Energy, and took few audit steps, other than inquiry, to assess the reasonableness of the expense estimates.

■ Vogt performed no steps to evaluate the qualifications of the authors of the asset replacement cost study, or understand the methods or assumptions they used or the appropriateness of using the Asset replacement cost study to support the valuation of the fixed assets at $110 million.

■ Vogt failed to exercise due professional care regarding the audit of the Alaska acquisition valuation during the 2010 Miller Energy audit. Miller Energy had valued the assets purchased for a few million dollars at $480 million and had recorded a corresponding $277 million bargain purchase gain. Given the size of the transaction, Vogt should have focused more closely on the diligence required to gather and objectively evaluate the evidence supporting the fair value of the oil and gas properties acquired to comply with ASC 805 and common industry practice. He failed to adequately consider the competency and sufficiency of the Reserve Report as evidence of the fair value of the acquired oil and gas properties. Vogt also performed limited procedures and failed to sufficiently evaluate the evidentiary value of the asset replacement cost study, including failing to understand the source of the fixed asset values therein and the competency of the report authors.

■ Vogt's audit program to test Miller Energy's fair value assessment of the Alaska acquisition was insufficient. The planned procedures largely consisted of verifying the credentials of a specialist.

■ Vogt's supervision of his staff was also deficient. Vogt spent little time on-site while the field work was conducted, and he knew the staff auditors had insufficient oil and gas industry experience.

■ Vogt's knowledge of the magnitude of the Alaska acquisition, and his knowledge of the inadequacy of Miller Energy's accounting personnel, including Boyd, should have resulted in increased scrutiny of Miller Energy's valuation of the Alaska Assets. Yet Vogt assigned crucial audit procedures to staff who lacked appropriate industry and auditing experience, and did not sufficiently supervise their work.

-32-

■ Vogt over-relied on a reserve report and the asset replacement cost study, and took limited to no additional audit steps to test that audit evidence, Vogt failed to obtain sufficient evidence for the fair value of the Alaska acquisition.

102. As a result of the forgoing misconduct, the SEC alleged that:

■ Miller Energy violated §l7(a) of the Securities Act, § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

■ Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b-5 thereunder;

■ Defendant Boyd willfully violated, and defendant Hall violated, § 17(a) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

■ Miller Energy violated §13(a) of the Exchange Act and Rules 13a-l , 13a- 11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

■ Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of §13(a) of the Exchange Act and Rules 13a-l, 13a-11 and 13a-13 thereunder;

■ Miller Energy violated § 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

■ Defendant Boyd willfully aided and abetted and caused, and Defendant Hall caused, Miller Energy's violations of § 13(b)(2)(A) of the Exchange Act;

■ Miller Energy violated § 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements m accordance with GAAP;

■ Defendant Boyd willfully aided and abetted and caused, and Defendant Hall caused, Miller Energy's violations of § 13(b)(2)(B) of the Exchange Act;

■ Defendant Boyd willfully violated, and defendant Hall violated, § 13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in § 13(b)(2) of the Exchange Act;

■ Miller Energy violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

■ Defendant Boyd willfully aided and abetted and caused, and Defendant Hall caused, Miller Energy's violations of Rule 12b-20 under the Exchange Act; and

■ Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report.

103.     The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from Defendants Miller, Boyd and Hall.

104.     During August 2015, various of Miller Energy's creditors called for Miller Energy to file bankruptcy.

-34-

### H. Miller Energy Settles With SEC, Files for Bankruptcy Protection, and Sees Shares De-listed.

105. On August 20, 2015, Miller Energy disclosed that it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010. Miller Energy's restatement of its previously reported financial results was an admission that those results were false when filed.[11]

106. On October 1, 2015, Miller Energy filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller Energy's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations, Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller Energy said was precipitated by the SEC Enforcement Action.

### I. Allegations Against Outside Independent Auditor KPMG

107. As part of Miller Energy's bid to be listed on the NYSE, Miller Energy dismissed the Sherb firm as its auditor and retained the services of KPMG, LLP ("KPMG") to audit its financial statements for the fiscal year ended April 30, 2011.[12]

---

[11]As part of Miller Energy's settlement with the SEC, Miller Energy agreed to restate and correct all of these previously issued reports and financial statements. That has not been done.

[12]The valuation errors identified by the SEC in its August 6, 2015 action (for which Sherb was responsible), ¶ 101, infra, apply equally to KPMG.

-35-

108.     KPMG had an opportunity to protect Plaintiff and other shareholders and the investment community by correcting Miller Energy's rampant misstatements of previous years with the re-statement.  However, KPMG quickly became even more culpable than the defunct Sherb firm.

109.     In its August 6, 2015 Order Instituting Public Administrative and Cease-and Desist Proceedings, the SEC stated that all quarterly and annual filings with the SEC from the third quarter 2010 through third quarter 2015 – many given unqualified approval by KPMG – were based on fraudulent valuations and material misstatements of the assets and net income of Miller Energy.

110.     In fact, the fraudulent valuations rendered no fewer than 15 Form 8-K's filed between March 2010 through at least December 2014[13] materially false and misleading.[14]  Those filings – all of which passed audit scrutiny by Sherb and then KPMG – were relied upon by the public.

---

[13]KPMG was the outside auditor for the majority of that 57-month period.

[14]Specifically, according to the SEC, as a result of the fraudulent valuation, Miller Energy filed financial reports that materially misstated the value of its assets, as follows:

- Forms 10-Q for the third quarter of fiscal year 2010 and all three quarters of fiscal years 2011 through 2015;

- Forms 10-K for fiscal years ended 2010 through 2014;

- the Form S-1 filed on August 8, 2010;

- the Forms S-3 filed on September 6, 2012 and October 5, 2012; and

- prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424.

-36-

112.	The fraudulent valuation also resulted in Miller Energy filing financial reports with the SEC that materially misstated its net income.[15]

113.	Miller Energy's prior year's audited financial statements had been audited by Sherb. However, as part of its review of prior financial statements, KPMG required that Miller Energy re-state and correct previously issued quarterly reports and filings with the SEC and its shareholders, including the previously audited year-end April 30, 2010 financial statements in which the fraudulent and inflated value of the bargain purchase of the Alaska oil properties was initially recorded.  As reported in the April 30, 2011 Form 10-K, KPMG's reinstatement and correction of earlier certified financial statements had the net impact of decreasing Miller Energy's total assets by only $110,184.00, actually increasing Miller Energy's net income for the year by $1,487,386 to $250,940,566.00.

114.	Significantly, there was no revision or alteration to the previously fraudulent reported gain on acquisition of $461,111,924.  In fact the only thing KPMG required Miller Energy to do was to reclassify $107,585,556 of the $110,000,000 double-count of the equipment acquired in the

---

[15]Those reports included:

- Forms 10-Q for the third quarter of fiscal year 2010, all three quarters of fiscal 2011, and the first two quarter of 2012;

- Forms 10-K for fiscal years ended 2010 through 2012;

- the Form S-1 filed on August 8, 2010;

- the Forms S-3 filed on September 6, 2012 and October 5, 2012; and

- prospectus supplements filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424.

-37-

Alaskan purchase to net oil and gas properties. In effect, KPMG's work resulted in an actual increase in the value of the already grossly inflated value of the Alaskan oil and gas reserves by still another 29%.

115. KPMG, audited, certified and issued a "clean opinion" of Miller Energy's financial statements that were included in SEC Form 10-K for the years ended April 30, 2011, 2012, 2013, and 2014.[16] The fraudulent valuations of the Alaska Assets rendered by Miller Energy during those periods was never corrected.

116. On July 29, 2011, instead of correcting the over-valuations and misstatements associated with the Alaska Assets, KPMG restated and re-certified the December 2009 Cook Inlet purchase. On that date, KPMG announced the results of its audit of the consolidated balance sheet of Miller Energy and its subsidiaries as of April 30, 2011, along with the related consolidated statements of operations, stockholders' equity, and cash flows for the previous year. The KPMG audit purportedly examined the balance sheets and statements to determine whether the financial statements were free of material misstatement, assessed the accounting principles used and significant estimates made by Miller Energy's management, and evaluated Miller Energy's overall financial statement presentation. KPMG concluded that the consolidated financial statements "present fairly, in all material respects, the financial position of Miller Energy as of April 30, 2011, and the results of their operations and cash flows for the year ended April 30, 2011, in conformity with GAAP.

---

[16]KPMG's audit of the financial statements of Miller Energy for the year ended April 30, 2015 has never been issued.

117.    KPMG's July 15, 2013 audit report covering the three years ending April 30, 2013. KPMG concluded that its audit confirmed that Miller Energy's financial statements present fairly the financial position of Miller Energy's financial status in conformity with U.S. generally accepted accounting principles.  However, KPMG's audit of Miller Energy's internal control over financial reporting expressed an adverse opinion on the effectiveness of Miller Energy's internal control over financial reporting.

118.    KPMG reported no going concern issues and no impairment charges for the year ending April 30, 2014.  Miller Energy lost $42,000,000 in 2014 and lesser amounts in 2013 and 2012.

119.    Miller Energy's Form 10-Q, filed on December 10, 2014 for the second quarter ending October 31, 2014, was the first indication noted by Miller Energy that there was an issue related to carrying value of their oil and gas valuation.  They took an Impairment Charge citing the decrease in global oil and gas prices.  During the third quarter ended January 31, 2015, for the Form 10-Q filed March 12, 2015, Miller Energy took yet another Impairment Charge citing the continuing decrease in global oil and gas prices.  As of January 31, 2015, the carrying value of net oil and gas properties on Miller Energy's financial statements had been reduced from $ 644,827,000 on April 30, 2014 to $189,720,000 on January 31, 2015. There are no other financial statements available and issued by Miller Energy.  There were no indications by either Miller Energy nor KPMG that the valuation changes were related to a fraudulent and or material misstatement.

120.    KPMG has never withdrawn, changed or alerted the SEC or the Company shareholders that their earlier reports were in error, even after the SEC investigation said that the financial statements of Miller Energy were fraudulent and materially misstated.

-39-

121. KPMG's accounting practices were so deficient that their audits of Miller Energy's financial statements amounted to no audits at all, or at least an egregious refusal to see the obvious and to investigate the doubtful. KPMG's accounting judgments, described herein, were such that no reasonable accountant would have made the same decisions if confronted with the same facts. KPMG disregarded "red flags" and failed to adhere to generally accepted accounting principles and generally accepted auditing standards. These "red flags," identified specifically herein, should have placed a reasonable auditor on notice that Miller Energy was engaged in wrongdoing to the detriment of its investors.

122. By certifying the public reports that collectively depicted Miller Energy's financial status, KPMG assumed a public responsibility transcending any employment relationship with Miller Energy. KPMG should not have been content with Miller Energy's representations that its financial statements were adequate, as the KPMG was ethically and professionally obligated to ascertain for itself as far as possible whether Miller Energy's financial statements had been accurately stated.

## V. CLASS ACTION ALLEGATIONS

123. Plaintiff brings this action both on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on behalf of the following class (the "Class"):

> All those who purchased Miller Energy common shares traceable to the December 6, 2012 Registration Statement (the "Class").

> Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, defendants' parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

-40-

124.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants.  Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of Class members, geographically dispersed throughout the United States such that joinder of all Class members is impracticable.  Record owners and other members of the Class may be identified from records maintained by Miller Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.    Plaintiff's claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

126.    Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

(a)     whether Defendants violated the  Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of  damages.

127.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

128.    Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflict with any other members of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in class action and other complex litigation.

-41-

129.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

130.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

131.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.  CAUSES OF ACTION

### COUNT ONE

### Violation of §11 of the Securities Act, 15 U.S.C. § 77k

### (Against  All Defendants, Except Boyd)

132.     Plaintiff incorporates by reference and re-alleges each allegation contained above as though fully set forth herein.

133.     This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Boyd.

134.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

135.     Defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

-42-

136.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

137.    By reason of the conduct herein alleged, each of these Defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

138.    Plaintiff acquired Miller Energy common shares traceable to the September 6, 2012 Registration Statement.

139.    Plaintiff and the Class have sustained damages.

140.    At the time of their purchases of Miller Energy common shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT TWO

### Violation of §15 of the Securities Act

### (Against the Individual Defendants)

141.    Plaintiff incorporates by reference and re-alleges each allegation contained above as though fully set forth herein.

142.    This Cause of Action is brought pursuant to §15 of the Securities Act against the Individual Defendants.

-43-

143.     The Individual Defendants each were control persons of Miller Energy by virtue of their positions as directors and/or senior officers of Miller Energy.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller Energy.  Miller Energy controlled the Individual Defendants and all of Miller Energy's employees.

144.     The Individual Defendants each were culpable participants in the violations of § 11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process..

## COUNT THREE

### Breach of Fiduciary Duty

### (Against the Individual Defendants)

145.     Plaintiff incorporates by reference and re-alleges each allegation contained above as though fully set forth herein.

146.     The Individual Defendants owed and owe Plaintiff and other Miller Energy shareholders the highest fiduciary obligations of good faith, fair dealing, loyalty, and due care in managing Miller Energy's affairs.

147.     The Individual Defendants, individually and collectively, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision by:

> (a) approving and subscribing knowingly false and misleading financial statements filed with the SEC;

-44-

(b) allowing Miller Energy to maintain insufficient internal controls, which, in turn, caused Miller Energy to misstate material facts about the Alaska Assets to the investing public, and file financial statements that violated statutory requirements and GAAP; and

(c) participating in the continued obfuscation of the actual facts regarding the health of Miller Energy's business and/or ignoring obfuscation by management, knowing full well that Miller Energy's open and significant control deficiencies meant that Miller Energy was unable to accurately gauge the nature of its performance.

148.     As a direct and proximate result of the Individual Defendants' failure to perform their

fiduciary obligations, Plaintiff and other Class members sustained significant damages.

## COUNT FOUR

## Violation of § 10(b) of the Securities Exchange Act of 1934

## (Against KPMG)

149.     Plaintiff incorporates by reference and re-alleges each allegation contained above as

though fully set forth herein.

150.     This Count is asserted on behalf of purchasers of Miller Energy common stock as a

result of KPMG's unqualified audit reports rendered on Miller Energy's financial statements for the

years ended April 30, 2011 through 2014.

151.     KPMG, alone, and acting in concert with others, directly and indirectly, by the use

and means of instrumentalities of interstate commerce and of the mails, engaged and participated in

a continuous course of conduct to conceal adverse material information about Miller Energy which

resulted in misstatements and omissions of material facts in Miller Energy's financial reporting.

KPMG employed devices, schemes, and artifices to defraud while in possession of material, adverse

non-public information and engaged in acts, practices and a course of conduct that included the

-45-

making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Miller Energy not misleading.

152.     Specifically, KPMG knew or was reckless in not knowing that Miller Energy's reported annual financial results for fiscal years ended April 30, 2011 through April 30, 2014, which were disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP; and that the audits were not performed in accordance with GAAS and, therefore, KPMG's unqualified audit reports were materially false and misleading.

153.     As KPMG knew, or should have known, Miller Energy's financial statements for the relevant period were materially false and misleading.  KPMG failed to perform audits and reviews in accordance with accepted accounting principles and procedures.  KPMG

> (a) failed to meet professional obligations to obtain sufficient competent evidential matter necessary to satisfy an auditor that financial statements fairly presented Miller Energy's financial condition in all material respects;

> (b) misrepresented that audits were performed in accordance with generally accepted auditing standards and were complete when they issued unqualified opinions on Miller Energy's financial statements even though KPMG failed to exercise professional care and skepticism and knew, or were reckless in not knowing, that Miller Energy's financial statements failed to comply with generally accepted accounting principles and were otherwise misleading and misstated; and

> (c) failed to properly investigate or test Miller Energy's accounting practices, recorded transactions and controls and were easily satisfied and untested, self-serving, management explanations and representations with respect thereto, turning a blind eye to apparent discrepancies and deficiencies.

-46-

153.    As a result of KPMG's deceptive practices and false and misleading statements and omissions in its unqualified audit reports, the market price of Miller Energy's common stock was artificially inflated throughout the Class Period. Plaintiff and other members of the Class were ignorant of the fact that the market price of Miller Energy's publicly-traded securities was artificially-inflated during the Class Period. KPMG relied, directly or indirectly, on the false and misleading statements made by Miller Energy, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Miller Energy but not disclosed in public statements by Miller Energy during the Class Period. As a result, Plaintiff and other members of the Class acquired Miller Energy securities during the Class Period at artificially-high prices and were damaged thereby.

154.    All quarterly and annual filings by Miller Energy with the SEC (on which the public relies) from the third quarter, 2010, through the third quarter, 2015, were not only based on fraudulent valuations, but also materially-misstated the assets and net income of Miller Energy. In addition, the fraudulent valuations rendered no fewer than fifteen (15) Form 8-K's filed between March 2010 through at least December 2014 materially false and misleading. KPMG was the outside independent auditor for most of that period.

155.    KPMG's failure to detect these discrepancies and irregularities, and to take reasonable actions to correct them, demonstrates an extreme departure from the standards of ordinary care common to auditors, presenting an obvious danger of misleading investors that was known to KPMG or was so obvious that the inference that KPMG knew of the danger is inescapable.

156. Had KPMG not violated generally accepted accounting principles and generally accepted auditing standards, it would have detected the fraudulent valuations and material misstatements in Miller Energy's 2011-2014 financial statements.

157. KPMG acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided, (b) the false and misleading nature of the financial statements and its failure to conduct proper audit tests and examinations of the books, records and financial statements of Miller Energy, and (c) the false representations that the financial statements had been properly audited in accordance with generally accepted auditing standards.

158. As detailed herein, Miller Energy's disclosures with respect to its accounting practices were woefully inadequate. In violation of generally accepted auditing standards, KPMG failed to expand the scope of its audits in light of the fact that it actually knew about many of these issues or recklessly ignored the many inconsistencies, lack of documentation and red flags that would have put it on notice of the massive over-valuation and misstatements.

159. In accordance with generally accepted auditing standards, KPMG was required to consider whether Miller Energy's disclosures accompanying its financial statements were adequate. SAS No. 32, as set forth in AU §431.02-03.

160. In accordance with SAS No. 1 (AU § 230) and SAS No. 82 (effective Dec. 15, 1997) KPMG had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." If there is a material misstatement, whether by fraud or mistake, the auditors' procedures need to be designed and performed to detect it. Further, the auditor is required to view the audit evidence with professional skepticism.

-48-

161.     KPMG knowingly or recklessly failed to obtain reasonable assurances about whether Miller Energy's financial statements were free of material misstatements caused by fraud.  KPMG closed its eyes to the massive fraud detailed above. Instead, the fraud was detected by the SEC.

162.     One of KPMG's responsibilities as Miller Energy's independent auditor was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."  AU §§ 150,110.

163.     SAS No. 85, Client Representations, and AU § 333, Client Representations, state that representations from management are not a substitute for the application of these auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit.

164.     In violation of GAAS, and contrary to the representations in its report on Miller Energy's financial statements, KPMG did not obtain sufficient, competent, evidential matter to support Miller Energy's assertions regarding the valuation of the Alaska Assets.  Moreover, the auditors deliberately or recklessly ignored information indicating that Miller Energy's financial statements did not "present fairly" the Miller Energy's true financial position.

165.     In carrying out its engagement to audit the financial statements of Miller Energy and in rendering its unqualified report on those financial statements, KPMG violated, among others, the following generally accepted auditing standards:

> (a) The second general standard that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

-49-

(b) The third general standard that due professional care is to be exercised in the performance of the audit and preparation of the report;

(c) The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed; and

(d) The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

166.    KPMG's conduct represents an extreme departure from the professional standards that should have been applied.  SAS No. 80, Consideration of Fraud in a Financial Statement Audit, declares that "[d]ue professional care requires the auditor to exercise professional skepticism – that is, an attitude that includes a questioning mind and critical assessment of audit evidence." Had the auditors exercised due professional care and professional skepticism, they could have determined that Miller Energy's valuation of the Alaska Assets were based on fiction and that Miller Energy's books and records were consistently falsified to conceal the true value of the Alaska Assets.

167.    KPMG knew that its reports would be relied upon by present and potential investors in Miller Energy securities.

168.    By virtue of the foregoing, KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

169.    For the reasons set forth herein, KPMG is liable in whole or in part for the damages suffered by Plaintiff and Class members.

-50-

## VII. JURY TRIAL DEMAND

170. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff as the designated Class representative (and where appropriate, subclass representative) and Plaintiff's counsel designated as Interim Class Counsel;

B. Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C. Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D. Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E. Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

-51-

F.     Plaintiff and members of the Class receive such other and further relief as may be just and proper.

Respectfully submitted, this 14th day of March, 2016.


/s/ Gordon Ball_____
Gordon Ball
TN BPR#001135
**GORDON BALL PLLC**
Ste. 600, 550 Main Street
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
Email: gball@gordonball.com

*Counsel for Plaintiff*

-52-