**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| LEWIS COSBY and KENNETH R. MARTIN, as beneficiary of the Kenneth Ray Martin Roth IRA, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | CLASS ACTION |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | No. 3:16-cv-00121 |
| KPMG, LLP and SCOTT M. BORUFF, | ) ) | |
| Defendants. | ) ) | |

---

**AMENDED CLASS ACTION COMPLAINT**

---

Gordon Ball
**GORDON BALL PLLC**
550 W. Main Street
Suite 600
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
gball@gordonball.com

*Lead Counsel for Plaintiffs*

Steven J. Toll
**COHEN MILSTEIN**
**SELLERS & TOLL PLLC**
1100 New York Ave NW, Suite 500
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
stoll@cohenmilstein.com

*Counsel for Plaintiffs*

1

# TABLE OF CONTENTS

I. NATURE OF ACTION ................................................................................................6

II. JURISDICTION AND VENUE ..............................................................................9

III. PARTIES ................................................................................................................9

    A. Lead Plaintiffs ................................................................................................9

    B. Auditor Defendant – KPMG ........................................................................10

    C. Individual Defendant – Boruff .....................................................................11

    D. Non-parties Whose Acts/Omissions Are Pertinent to this Action ......................11

IV. MILLER'S UNPRECEDENTED PERIOD OF GROWTH: 2008-2011 ........................13

    A. Background of Miller Energy .......................................................................13

    B. The Purchase of the Alaska Assets ...............................................................13

    C. Boruff and Senior Management Grossly Overstated the Value of the Alaska Assets ................................................................................................14

    D. Initial Concerns Arise About Valuation of Alaska Assets ...................................15

    E. The Inflated Valuation of Alaska Assets Leads to an Unprecedented Period of Growth for Miller Energy .................................................................15

    F. Litigation By Shareholders Against Miller Energy and Senior Management for Overstating Value of Alaska Assets Filed and Settled ...................................17

    G. "The Blind Leading the Blind" - the Valuation of the Alaska Assets Was Based Upon a Reserves Report that Did Not Represent "Fair Value" ................19

V. KPMG'S ROLE IN THE MILLER ENERGY "HOUSE OF CARDS" ...........................21

    A. KPMG Is Retained on February 1, 2011 .......................................................21

    B. KPMG Knowingly or Recklessly Failed to Conduct a Proper Analysis of the Fair Value of the Alaska Assets by Merely Attempting to Justify Miller Energy's Own Valuation .....................................................................26

2

    C. KPMG Knowingly or Recklessly and Systematically Endorsed Miller
       Energy's Inflated Valuation of the Alaska Assets..................................................28

    D. KPMG Knowingly or Recklessly Concealed the Artificially-Inflated
       Valuation of the Alaska Assets ..............................................................................31

    E. KPMG Knowingly or Recklessly Serious "Red Flags" That Should Have
       Placed a Reasonable Auditor on Notice That Miller Energy Was Engaged
       in Wrongdoing to the Detriment of its Investors ..................................................33

VI. DISMANTLING OF THE MILLER ENERGY HOUSE OF CARDS: 2013-2016 .......40

VII. KPMG'S LACK OF INDEPENDENCE ....................................................................46

VIII. KPMG'S VIOLATIONS OF GENERALLY ACCEPTED AUDITING
    STANDARDS ("GAAS").........................................................................................52

    A. Overview of GAAS Requirements ......................................................................52

    B. KPMG's Audits Violated GAAS..........................................................................54

IX. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES REQUIRED
    BORUFFAND MILLER ENERGY TO RECORD THE ALASKA ASSETS
    AT FAIR VALUE........................................................................................................63

    A. Overview of GAAP Requirements ......................................................................63

    B. Miller Energy's Class Period Financial Statements Violated GAAP....................64

X. CLASS ACTION ALLEGATIONS ...............................................................................66

XI. ADDITIONAL SCIENTER ALLEGATIONS...............................................................69

XII. CAUSES OF ACTION ................................................................................................72

    COUNT ONE - Violation of Section 10(b) of the Exchange Act and
    Rule 10b-5(b) Promulgated Thereunder (Against Boruff Only) ..............................83

    COUNT TWO - Violation of Section 10(b) of the Exchange Act and
    Rule 10b-5(a) and (c) Promulgated Thereunder (Against Boruff Only) ..................86

    COUNT THREE - Violation of Section 20(a) of the Securities Exchange
    Act of 1934 (Against Boruff Only)............................................................................88

3

COUNT FOUR - Violation of § 10(b) of the Securities Exchange Act of
1934 (Against KPMG Only) .................................................................................89

COUNT FIVE - Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder (Against KPMG Only) .................93

XIII. JURY TRIAL DEMAND .............................................................................95

XIV. PRAYER FOR RELIEF ...............................................................................95

4

Plaintiffs, Lewis Cosby and Kenneth R. Martin (as beneficiary of the Kenneth Ray Martin Roth IRA) (hereinafter, "Plaintiffs"), through their undersigned attorneys, make the following allegations against the Defendants KPMG, LLP ("KPMG") and Scott M. Boruff ("Boruff"), based on their personal knowledge, on information and belief, and on the investigation of Plaintiffs' counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller Energy" or "the Company"), records of judicial proceedings in the United States District Court for the Eastern District of Tennessee, orders filed by the SEC *In the Matter of Miller Energy Resources, Inc., Paul W. Boyd, CPA, David M. Hall, and Carlton W. Vogt, III CPA*, SEC Admin. Proceeding File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), as well as regulatory filings and reports, press releases, public statements, news articles, other publications, securities analysts' reports and advisories about Miller Energy and other readily obtainable information. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF ACTION

*"It looks like a stock that's driven by a myth."*[1]

1. This Complaint describes how, throughout the Class Period,[2] KPMG and Miller Energy[3] perpetuated a fraudulent scheme on the investing public by building, and then assiduously maintaining, a financial house of cards centered on oil and gas assets in Alaska (the "Alaska Assets"). The scheme's initial phase began in late 2009, when Boruff and other senior management purchased the Alaska Assets for $2.25 million in cash and the assumption of $2 million in liabilities, and then promptly falsified Miller Energy's financials to portray the impression those Assets were worth a massively overstated $480 million. The acquisition of the Alaska Assets was by far the single most important event in Miller Energy's history, transforming it from a penny-stock company trading on the pink sheets, to one traded on the New York Stock Exchange ("NYSE"), with a stock price reaching nearly $9 per share.

2. In early 2011, KPMG entered the fraud, triggering the scheme's main phase. Specifically, in February 2011, KPMG undertook a years-long scheme in which it performed bookkeeping, appraisal, and valuation services for Miller Energy, including for the critical Alaska Assets, while simultaneously pretending to "audit" the results of those bookkeeping, appraisal, and valuation services, despite the fact that KPMG had completely abdicated and indeed destroyed the independence required of it as a purportedly independent auditor of a public

---

[1]*"Miller Energy: Digging Itself Into Another Deep Hole?,"The Street Sweeper* (Dec. 24, 2013) (quoting Robert Chapman, the former boss of David Voyticky, describing Miller Energy).

[2] The Class Period is from August 29, 2011, the date of the 2011Form 10-K in which KPMG issued an unqualified opinion, and ends on October 1, 2015, the date Miller Energy filed for bankruptcy.

[3]Miller Energy sought protection under federal bankruptcy laws on October 1, 2015. Therefore, it is not named as a Defendant in this action.

company.  KPMG then fraudulently issued a series of unqualified clean audit opinions vouching for the valuation of the Alaska Assets, even though, given its utter lack of independence, its egregious refusal to see the obviously fraudulent nature of the valuation, and its complete failure to investigate the doubtful assumptions underpinning the valuation, its audits amounted to essentially no audits at all.

3.      The scheme also involved other efforts by KPMG to use its imprimatur to falsely assure investors of the valuation given to the Alaska Assets. These efforts included sending two KPMG partners to Alaska to be paraded in front of investors as evidence of Miller Energy's credibility, and the drafting of letters for Miller Energy defending the valuation of the Alaska Assets to the SEC.

4.      KPMG's participation in the fraud began from virtually the moment it was retained in February 2011.  Indeed, because Miller Energy's internal controls and bookkeeping were so inadequate, KPMG had to first perform bookkeeping services for Miller Energy, to "fix" them before beginning its audit.  Furthermore, no later than April 2011, KPMG helped Miller Energy defend the valuation of the Alaska Assets to the SEC, *before* KPMG was even able to complete its audit of that valuation, which did not happen until *August* of that year.

5.      Unsurprisingly, given its culpability from the outset, and not wanting that culpability to be discovered, KPMG continued to prop up the Miller Energy house of cards as the years went on, causing enormous harm to investors.

6.     The Miller Energy house of cards finally began to collapse in December 2013, when it started to become clear that the Alaska Assets were worth nowhere near what KPMG and Miller Energy said they were, in large part because the assumptions about how much it would cost Miller Energy to actually extract hydrocarbons from those Assets were massively and fraudulently understated.  As this reality materialized, Miller Energy's stock price began to crumble.  Then, in December 2014, the Company disclosed it was taking a $265.3 million impairment charge on the Alaska Assets, in part because of issues relating to cost.  Three months later, the Company disclosed yet another impairment charge ($150 million) on the Alaska Assets, ultimately writing down almost all the goodwill from that acquisition.  By 2015, the Company's stock had been de-listed by the NYSE, the Company (along with two officers and its former outside auditor) faced an SEC-enforcement action targeting accounting practices regarding the valuation of the Alaska Assets, subsequent financial statements, and SEC-filings.  By year's end, the Company had settled with the SEC, agreeing to pay a $5 million fine, and was in bankruptcy.  By 2016, the Company emerged from bankruptcy, all of its stock voided, and its assets divided by its largest creditors.

7.     The Company finally admitted its fraud on March 29, 2016, when it disclosed that *none* of its financial statements regarding the valuation of the Alaska Assets should be relied upon.  However, this admission came far too late for shareholders, who by then had already suffered enormous losses on their investments.

8.     By this action, Plaintiffs, for themselves and other purchasers of Miller Energy common stock, seek damages against Boruff and KPMG for the wrongdoing outlined above, and described in more detail below.

8

## II.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.  The claims asserted herein arise under §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, and Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5).

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c) because one or more Defendants may be found or resides here or had agents in this district, transacted or is licensed to transact business in this district, and because a substantial portion of the affected trade and commerce described below has been carried out in this district.

11.     In connection with the acts and conduct alleged in this Amended Class Action Complaint ("Amended Complaint"), defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Lead Plaintiffs

12.     Lead Plaintiff, Lewis Cosby ("Cosby"), purchased shares of Miller Energy common stock and was damaged thereby.

13.     Lead Plaintiff, Kenneth R. Martin ("Martin" is the primary beneficiary of the Kenneth Ray Martin Roth IRA ("Martin Roth IRA"), which purchased 1,164,000 shares of Miller Energy common stock during the Class Period and was damaged thereby.

9

### B.    Auditor Defendant – KPMG

14.    KPMG is one of the "Big Four" international accounting firms, with 179 offices across 19 countries and 25,000 employees.  KPMG is duly organized and existing under the laws of the State of Delaware, and has its main office at 345 Park Avenue, New York, New York. KPMG also has an office in Knoxville, Tennessee.  While the firm's literature states that it is a leader in the field of oil and gas,[4] the firm's Knoxville office lacked significant experience in the oil and gas field.

15.    KPMG was retained by Miller Energy as the Company's independent auditor on February 1, 2011.  However, rather than acting as a truly independent auditor, KPMG instead began acting as the Company's bookkeeper and appraiser, while using its imprimatur to deceive investors on the Company's behalf.  KPMG also issued unqualified reports on Miller Energy's financial statements for the years ending April 30, 2011, April 30, 2012, April 30, 2013, and April 30, 2014, certifying that it had audited those statements in accordance with generally accepted auditing standards ("GAAS") and that the statements presented the financial position of Miller Energy fairly and in conformity with generally accepted accounting principles ("GAAP").[5]  Every audit report of Miller Energy's financial statements by KPMG for 2011-14 was a "clean opinion," an unqualified report that the financial statements were fairly presented in

---

[4]KPMG states that it provides professional services to 76% of the top 50 oil and gas companies in the Forbes 2000; 69% of oil and gas companies in the FT Global 500, and 70% of the largest refining companies on the Fortune Global 500
[5]KPMG billed Miller Energy in excess of $3,296,470 from the period beginning February 1, 2011 and ending April 30, 2014 for auditing the Company's financial statements. KPMG also submitted an unsecured claim against Miller Energy in bankruptcy, seeking payment of $448,000.00.

10

all material respects.  This is the highest level of audit report a CPA may issue.  These reports were all false and misleading.

### C.    Individual Defendant – Boruff

16.    Defendant Scott M. Boruff ("Boruff") was a member of the Miller Energy Board from August 6, 2008 to March 29, 2016.  He also served as the Executive Chairman of the Board until his departure.  Boruff served as the Company's CEO from August 6, 2008 to September 14, 2014 and as President from June 26, 2010 until June 14, 2011.  Boruff is the son-in-law of Deloy Miller, who founded Miller Energy in 1978.

17.    Defendants engaged in actions that proximately resulted in injuries to the Plaintiffs and proposed Class members. Defendants are liable under the Exchange Act.

### D.    Non-parties Whose Acts/Omissions Are Pertinent to this Action

18.    Non-party Miller Energy Resources, Inc. ("Miller Energy") was an independent exploration and production company that explores for, develops, and operates oil and gas wells in south-central Alaska and in Tennessee.  Miller Energy common stock was traded on the NYSE under the ticker symbol "MILL."

19.    As of September 29, 2015, Miller Energy had approximately 46.7 million shares of common stock outstanding.  On September 11, 2015, the Company caused its common stock to be de-listed from the NYSE.  On October 1, 2015, the Company filed a petition seeking relief under federal bankruptcy statutes.  On March 29, 2016, the bankruptcy court approved a reorganization plan.   The Company was reorganized into separate entities represented by its eleven (11) subsidiaries, all of the Company's existing equity interests were cancelled, including

outstanding shares of common stock, and a plan was in place to issue new common stock. Control of assets was given to the Company's main creditor, Apollo Investment Corp. Small investors were left empty-handed. The Company is not named as a Defendant herein.

20. Non-party David M. Hall ("Hall") served as the COO of Miller Energy from July 18, 2013 until August 6, 2015. Hall also served as a member of the Company's Board of Directors from December 10, 2009 until April 16, 2015. Hall had previously served as CEO of the Company's Alaska subsidiary, Cook Inlet Energy ("CIE"), and had worked with the Alaska Assets during the mid-1990s. Prior to joining the Company, Hall served from January 2008 to December 2009 as Vice President and General Manager of Alaska Operations for the immediate past owner of the Alaska Assets, Pacific Energy Resources, Ltd. ("PER").

21. Non-party David J. Voyticky ("Voyticky") served as the President of Miller Energy from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer from September 2011 until February 2014, and as a Director from April 2010 to August 12, 2014. Voyticky served as a member of the Audit Committee from 2010 to 2011. Voyticky had over 15 years of domestic and international mergers and acquisitions, restructuring and financing experience, including stints with Goldman, Sachs & Co. and J.P. Morgan.

22. Non-party Paul W. Boyd ("Boyd") served as Miller Energy's principal accounting officer and CFO from 2008 to 2011 and as the Company's Director of Risk Management from 2011 until 2014. Boyd has been a licensed CPA in Tennessee since 1993.[6]

---

[6]Members of the Miller Energy Audit Committee also played a role in the events alleged in this Complaint. The Audit Committee consisted of various directors at various times, including

12

23.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at Miller Energy's former outside auditing firm, non-party Sherb & Co., LLP ("Sherb"), a now defunct CPA firm suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller Energy.  Vogt led a Sherb audit team that audited the Company's financial statements for fiscal years ended 2009 and 2010.

24.     Non-party John Riordan ("Riordan") is a partner in KPMG's audit practice in Knoxville, Tennessee.  Riordan is currently the Managing Partner of KPMG's Knoxville office. Riordan was the engagement partner associated with KPMG's Miller Energy account.  Non-party Sam Bennett is also a partner in KPMG's audit practice in Knoxville and assisted Riordan in handling the Miller Energy account.

25.     Various entities not named as Defendants in this lawsuit participated in the violations alleged in this Complaint and have performed acts and made statements in furtherance of them.  Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

## IV.  MILLER'S UNPRECEDENTED PERIOD OF GROWTH: 2008-2011

### A.     Background of Miller Energy

26.     Founded in 1967, Miller Energy was an independent oil and natural gas exploration, production, and drilling company operating in multiple exploration and production basins in North America.  From early 2002 to December 2009, Miller Energy operated on the

Merrill A. McPeak (2010-2013), Voyticky (2010-2011), Don A. Turkleson (2011-2014, chair); Gerald Hannahs (2013-2015); Marceau N. Schlumberger (2013-2014); and Bob G. Gower (2014).

fringes of the oil and gas exploration and production industry, as its stock price regularly traded at less than a dollar per share, falling to a low of $0.04 per share in December 2007. At that time, the Company had approximately twenty (20) full-time employees, 363 stockholders, and ownership in fifteen (15) active oil wells and twenty-five (25) gas wells.

27.     In the midst of the financial recession, Miller Energy was in dire straits. In August 2008, the Company named Boruff, company founder Deloy Miller's son-in-law, as a new Director and CEO. Boruff allegedly told the Company's Board of Directors: "I am going to take this company big . . . if you hire me, you're going to do it my way, and I'm going to find other companies to acquire and we're going to grow Miller like crazy." Soon after, the Company began acquiring additional oil and gas properties.

28.     Though he lacked oil and gas experience, had never previously been a CEO, and had no comprehension of reporting responsibilities of publicly-traded companies, Boruff's mission was to make Miller Energy a relevant player in the oil and gas industry, using whatever means necessary. Through private stock-offerings and loans, Boruff began raising capital for his promised expansion. By 2009, the Company was ready to make a deal to put itself on the map.

**B.      The Purchase of the Alaska Assets**

29.     On December 10, 2009, the Company purchased certain oil and gas properties in Alaska ("Alaska Assets") in a competitive bankruptcy auction for $2.25 million in cash and the assumption of about $2 million in liabilities. The transaction closed on December 10, 2009. In the purchase, the Company acquired more than 600,000 acres of land, a massive offshore oil drilling platform, and hundreds of wells.

14

30.     In a December 16, 2009 Form 8-K and press release, Miller Energy announced

the acquisition of the Alaska Assets, claiming a fair value of $325 million.

**C.      Boruff and Senior Management Grossly Overstated the Value of the Alaska Assets.**

31.     Boruff and Miller Energy's senior management continued to tout the success and

value of the Alaska Assets, periodically issuing releases placing increasingly greater values on

those oil and gas reserves.

32.     For instance, on March 22, 2010, on Form 10-Q, for its fiscal third quarter ended

January 31, 2010, Miller Energy materially misstated the value of the Alaska Assets, listing it at

approximately $479 million (approximately $368 million for oil and gas properties and $110

million for fixed assets.[7] Over the next several years, although the value of the fixed assets was

re-categorized into the oil and gas properties category, the overall value of the Alaska Assets not

only remained fraudulently inflated, but that inflation actually *increased*.

**D.      Initial Concerns Arise About Valuation of Alaska Assets.**

33.     On April 14, 2011, the SEC sent a letter to Miller Energy asking for detailed

information about the December 10, 2009 acquisition of the Alaska Assets and the reported

value of the associated reserves, including "who performed the valuation of these reserves" and

"a detailed analysis of how the value of each component of acquired reserves was determined."

On June 7, 2011, the SEC sent another letter inquiring as to how Miller Energy's executives had

---

[7]The Company also reported an after-tax $277 million "bargain purchase gain," which boosted
its reported net income for the quarter to $272 million – an enormous increase over the $556,097
loss reported for the same period the year before.

managed to estimate the value of the Cook Inlet oilfields, considering the fact that the previous owner had disbanded its accounting staff long before the sale and the wells had been dormant – some unusable – for a period of months in what was commonly known to be a "high operating cost area." Although KPMG had not yet even completed its audit of the valuations being questioned by the SEC, it helped Miller Energy defend those valuations to the SEC by, among things, drafting answers to the SEC's questions.

34. On July 28, 2011, analysts from *TheStreetSweeper,* a financial website, published an investigative report on Miller Energy, providing analysis and quoting industry experts to demonstrate that the Company had grossly exaggerated the value of the Alaska Assets. The report stated that the assets were actually worth between *$25 million and $30 million, offset by $40 million of liabilities*.[8] The article quoted an experienced oilman, who stated: "That deal had been on the Street for over a year; everybody and their brother had looked at it," said Jordan "Digger" Smith, who managed energy projects for Nabors Industries (NYSE:NBR) – a $7.6 billion energy giant that had earlier declined to purchase the Alaska Assets.[9] "I'm a geologist," said Smith, "with 54 years of experience, and I can't see how anybody can write that up on their books for $350 million . . . . There are not $350 million worth of assets there."

[8]Melissa Davis & Janice Shell, *"Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 1)*, SEEKING ALPHA: THE STREET SWEEPER (July 28, 2011).
[9]Nabors Industries was audited by KPMG.

35.     Responding, Boruff publicly defended the Company's valuations and financial reports.  On August 1, 2011, in an open letter to shareholders, he disputed the accuracy of the *TheStreetSweeper* report, stating that his Company "consulted extensively with independent third parties in order to fairly and reliably value" the Alaskan subsidiary.

**E.      The Inflated Valuation of Alaska Assets Leads to an Unprecedented Period of Growth for Miller Energy.**

36.     The false valuation of the Alaska Assets enabled Miller Energy to overstate assets on its balance sheet by at least $479 million and overstate shareholders' equity by at least $267 million.  This made the Company appear larger, cumulatively more profitable, and inherently less risky to the investing public.

37.     The newly-booked value of the Alaska Assets resulted in a nearly *5,000% increase* in Miller Energy's total assets, and significantly impacted the price of common stock.[10]

38.     In 2012, the Company announced its shares would be traded on the New York Stock Exchange.  Boruff declared, "this milestone marks an important step in our ongoing growth efforts by raising the profile of the company within its industry."  After moving to the NYSE, Miller Energy stock reached an all-time high price on December 9, 2013 of $8.83 per share and achieved a market capitalization of $393 million.  However, that high would be short-lived, as the Miller Energy house of cards began to unfold around that time, when fresh questions about the assumptions underpinning the lofty valuation of the Alaska Assets, including cost assumptions, began to arise in December 2013, and continued throughout 2014.

---

[10]On December 10, 2009, the date of the purchase, Miller Energy's common stock closed at a price of $0.61 per share.  Following the acquisition, the price of the Company's common stock soared 93%, increasing in two days from $0.70 per share to a closing price of $1.35 per share.

17

39.     By the fall of 2014, Miller Energy's stock price had plummeted 70% as it repeatedly failed to meet projections and to economically extract hydrocarbons, and in December 2014, Company executives acknowledged for the first time an impairment to the value of the Alaskan Assets and recorded an Impairment Charge to the Company financial statements of $265.3 million dollars, triggered in part by what the Company admitted were issues relating to costs.

F.      **Litigation By Shareholders Against Miller Energy and Senior Management for Overstating Value of Alaska Assets Filed and Settled.**

40.     In 2011, multiple class actions were filed by shareholders against Miller Energy and senior management, including Boruff, Boyd, Voyticky, and Hall, in the Eastern District of Tennessee.  KPMG, who did not become Miller Energy's outside auditor until February 2011, was not a defendant in that litigation.  The cases were later consolidated into the *In re Miller Energy Resources, Inc. Securities Litig.,* No. 3:11-cv-386-TAV-CCS.  The plaintiff shareholders alleged that the defendants had violated federal securities laws by improperly accounting for and publicly reporting the value of the Alaska Assets, and improperly accounting for and publicly reporting royalty expenses, depletion, depreciation and amortization expenses related to wells and equipment, and income taxes, in violation of U.S. generally accepted accounting procedures, causing Miller Energy's published financial statements during fiscal years 2010 and 2011 to be materially false and misleading.  The class actions were settled in 2014 after the Company agreed to pay $2.95 million for the benefit of shareholders who had acquired company stock during the period beginning December 16, 2009 and ending August 8, 2011.

18

### G.    Miller Energy's Initial 2010 Valuation of the Alaska Assets Was Not Based Upon "Fair Value."

41.    In a sworn statement provided to Plaintiffs' counsel, Boyd, Miller Energy's former CFO and head of its accounting department, candidly characterized Miller Energy's accounting practices as "the blind leading the blind."

42.    To record the value of the acquired oil and gas properties, Boyd requested a reserves report prepared by independent petroleum engineering firm, Ralph E. Davis ("RE Davis"). Such reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. However, the figures used in reserves reports are expressly not to be considered "an estimate of fair market value."[11]

43.    The RE Davis reserves report was finalized on February 22, 2010 and reflected a pre-tax present value of net cash flows discounted at 10% ("PV-10") of $368 million. The report stated that the figures therein were not provided as an estimate of fair value.

44.    Upon receiving the report, Boyd, who undertook no additional analysis, simply recorded the $368 million figure as the fair value of the acquired oil and gas properties, resulting in an artificially-increased book value of Miller Energy's oil and gas properties on its balance sheet by $368 million. The $368 million value failed to represent fair value for several reasons:

■ First, the RE Davis reserves report failed to make adjustments for income taxes;

---

[11]*See* FASB, SFAS 69, Disclosures About Oil and Gas Producing Activities, Appendix C, Basis for Conclusions, 77 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

19

■ Second, the RE Davis reserves report also used a 10% discount rate that was inappropriate under GAAP for determining fair value. By failing to use the correct discount rate, Miller Energy materially overstated the value of the Alaska Assets;

■ Third, the valuation also overstated cash flows from certain categories of reserves estimates by failing to apply any risk weight to such reserves and the resulting cash flows;

■ Fourth, nor did the RE Davis reserves report include amounts for certain asset retirement obligations; and

■ Finally, the projected operating and capital expenses of $237 million in the RE Davis reserves report was intentionally understated, resulting in an overstated valuation.

45.    Ultimately, the expense projections that Hall, the head of the Alaska operations, provided for use in the RE Davis reserves report were also grossly understated, resulting in an overvaluation of the Alaska Assets by hundreds of millions of dollars.

46.    In addition to the $368 million value recorded for the oil and gas properties, a separate value of $110 million was also erroneously recorded for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves, as Boyd had double-counted the value of the fixed assets.  The fixed assets were the same operating assets expected to generate future cash flows discussed in the RE Davis reserves report and should not have been separately valued.

47.    As a result of all of this, Miller Energy and its outside auditor, Sherb & Co., LLP. over-booked the value of the Alaska Assets by more than $400 million and filed financial reports with the SEC that materially misstated the value of those assets.  By February 2011, however, the Company had a new external auditor, KPMG, who knew, or should have known, that the 2010 reports were fraudulent.  KPMG was capable of making all of the necessary corrections to

the Company's financial statements and insuring their accuracy going forward.

## V.    KPMG'S ROLE IN THE MILLER ENERGY "HOUSE OF CARDS"

### A.    KPMG Is Retained on February 1, 2011.

48.    Investors were seeking a more credible auditor and the Company dismissed the small Sherb firm as its auditor.

49.    Boyd interviewed three of the Big Four accounting firms in 2010 and recommended KPMG to the Company's Audit Committee.    According to Boyd, KPMG represented that "they were experts in the field in valuing oil and gas assets."    KPMG was retained to audit Miller Energy's financial statements for the fiscal year ended April 30, 2011.

50.    When retained, KPMG's John Riordan, the partner assigned to the Miller Energy account, understood that Boyd had no experience in the oil and gas sector.    According to Boyd, he

> "told John (Riordon) [of KPMG] . . . 'I want you to invoke your oil and gas division and take a look at our books, and especially the transaction, the Alaska transaction, and make it right . . .    If there's something wrong with these numbers, I want to know now so I can lower them or raise them.'"

51.    In a sworn statement to Plaintiffs' counsel on May 18, 2016, Paul Boyd responded to a series of questions concerning KPMG's restatement of the value of Alaska Assets.    The colloquy provides substantial context to KPMG's role in Miller Energy's Alaska Assets debacle.

52.    Boyd Statement, at page 59:

> Question:    Did they (KPMG) have oil and gas experience?
>
> Answer:    Oh, yeah.    Yeah.    They were – KPMG is the – I

21

don't – I think maybe they're the smallest of the Big 4, but they're still huge. And I think they had the most oil and gas experience of any of the Big 4. They had, you know, most of the bigger companies.

Question:    But did John (Riordan) and Sam (Bennett) say they had oil and gas experience? Personally.

Answer:    They said that they had other clients that were oil and gas companies, and that the KPMG had an entire division. So, like, 100 people in it concentrated on nothing else but oil and gas. And they were experts in the field in valuing oil and gas assets. And I said, that's perfect. I said, because, if there's something wrong with these numbers, I want to know now so I can lower them or raise them.

Question:    So when you hired KPMG, you expressed to them that you weren't-one, that you really had no experience in oil and gas?

Answer:    Oh, they knew that. They knew that completely.

53.    <u>Boyd Statement, at page 61</u>:

Answer:    And it was the biggest deal-for the company. It was the biggest deal they had ever done and ever would do probably. And so I made sure –

Question:    And you went from $ 2 million purchase to an asset of $480 million or something?

Answer:    That's right. And so I told John (Riordan), I said – I said, I want you to invoke your oil and gas division and take a look at our books, and especially the transaction, the Alaska transaction, and make it right.

54.    <u>Boyd Statement, at page 62</u>:

Question:    Did they ever catch the mistake you made?

Answer:    Yes, they did, pretty much right away. They said,

where did you get your number, Paul?  And I
showed them the report.  And they said, you should
have had the NYMEX report.  And so I ordered a
NYMEX report.

55.  <u>Boyd Statement, at page 63</u>:

Question:     And they gave me the report ( Ralph E. Davis).

Answer:       And they gave me the report.  That was the
              NYMEX.  That was based on this huge, you know,
              increase in oil and gas prices over the next, you
              know, 30 years.  And it was a huge number; it was a
              lot bigger number.  But then what you're supposed
              to do is, you're supposed to discount each of the
              sections in a reasonable way to come down to
              today's prices.

Question:     And who made that calculation?

Answer:       KPMG

Answer:       Well, first of all, they did did their own without
              using Davis's –

Question:     Ralph Davis's?
Answer:        – report; they did their own analysis.

56.  <u>Boyd Statement</u>, at page 64:

Answer:       And they looked at Davis's report and they said,
              well, Paul, good news/bad news, you used the
              wrong report to put these numbers down.  And my
              heart is sinking.  And they say, good news; if you
              used the right report, it would have been in the same
              ballpark; because of the rising scenario and
              discounting it back, it would have been pretty much
              the same, you know; as a matter of fact, our division
              came up with a range; here's what it's worth, and
              minimum/ maximum, and your numbers falls in the
              range, but it's in the range; It's on the very low side
              of the range, but it's in the range; so we're not going
              to recommend that you change your numbers.

23

We do have one stipulation; the assets, the $110 million, those were basically for the assets above the ground. And the reserve report – I don't care what your report says; they did not include the platform and all of that, all those assets that were above the ground. So it was not double counted. It needed to be included. I mean, I only wanted to do the right thing.

57. <u>Boyd Statement, at page 72</u>:

Question: Now I'm going back to the entry, you know, when KPMG said, you know, the good news is it's actually a bigger number.

Answer: Well, I mean, they didn't – they didn't act like it was a hugely bigger number, but they just said, the good news is it's in the same ball park. And our experts say that your number is in the ballpark, so we're not going to ask you to change your number, because, hey, it's an estimate; you know, it's your best guess; and maybe you used the wrong report to come up with it – but we can't disagree with it. And they said, we are going to ask you to put the $ 110 million in the oil and gas category. I mean it was one long-term asset to another long-term asset. Instead of fixed assets, it went into oil and gas assets.

58. <u>Boyd Statement, at page 74</u>:

Question: But the calculation of that entry, did they give that to you to book or did you make that calculation and book it?

Answer: They gave it to me.

59. <u>Boyd Statement, at page 76</u>:

Answer: It's not like we were changing the total balance sheet. You know, we were just moving some money from one category to another. And it was the the same kind of categories: it was long-term

24

assets.

|  |  |
|---|---|
| Question: | But the calculation of that was a worksheet that KPMG had done – |
| Answer: | That is correct. |
| Question: | Okay – as part of their audit? |
| Answer: | That's correct. |

60. <u>Boyd Statement, at page 213-214:</u>

|  |  |
|---|---|
| Question: | But when KPMG came on a year later, they should have caught this, shouldn't they? |
| Answer: | They did. When they went through to take a look at all of our books, and especially the acquisition of Alaska, they told me point blank, you used the wrong report to value the asset. They said, but we've got – we've – you need to order a new report, but we've got an idea from our experts in our oil and gas division that it's in the ballpark; but we want you to get the correct report, the NYMEX report. |
| Question: | Now, right there I want to stop right there. How – the local guys told you that, the local KPMG guys told you that? |
| Answer: | Uh-huh. |
| Question: | And their – they didn't have a new report to go by? |
| Answer: | They had their internal report. |
| Question: | And their own internal report was based on what? |
| Answer: | I didn't – |
| Question: | You didn't ask that? |
| Answer: | I never saw a copy of that. But they had their oil and gas division – |

25

| | |
|---|---|
| Question: | Bless it? |
| Answer: | Right. And so they must have taken a look at the geology surveys and areas around our area. And I don't know what all they did, but they somehow got comfortable giving that value. |
| Question: | And so the crux of the whole thing is, for going forward, that you relied on KPMG. If KPMG was wrong in the first report, they were wrong all the way through. |
| Answer: | That's correct. |
| Question: | And – but you never really saw that report that they had? |
| Answer: | Right. |

**B.      KPMG Failed to Conduct a Proper Audit of the Fair Value of the Alaska Assets by Merely Attempting to Justify Miller Energy's Own Valuation.**

61.      Boyd conceded to KPMG's Riordan that he relied upon the wrong report in

valuing the Alaska Assets, explaining,

> "I did make a mistake, just from my lack of knowledge . . . . You have to have the NYMEX report for acquisitions to book the fair market value of the acquisitions. But you need the SEC report to do a footnote." Boyd Statement, at page 53.

62.      Boyd showed Riordan the RE Davis Associates ("RE Davis") reserves report and

Riordan responded, "you should have had the NYMEX report." According to Boyd,

> "[w]hen [KPMG] went through to take a look at all of our books, and especially the acquisition of Alaska, they told me point blank, you used the wrong report to value the asset. They said . . . you need to order a new report, but we've got an idea from our experts in our oil and gas division that it's in the ballpark; but we want you to get the correct report, the NYMEX report." Boyd Statement, at

26

page 213.

63.     Boyd then ordered a NYMEX report.

64.     According to Boyd, KPMG "did their own analysis" and when asked who made the calculation necessary to arrive at the valuation for the Alaska Assets, Boyd answered, "KPMG."  Boyd Statement, at page 63.

65.     Riordan reviewed the RE Davis reserves report and said, "good news/bad news, you used the wrong report to put these numbers down," and

> "good news; if you used the right report, it would have been in the same ballpark; because of the rising scenario and discounting it back, it would have been pretty much the same, you know; as a matter of fact, our division came up with a range; here's what it's worth, and minimum/ maximum, and your numbers falls in the range, but it's in the range; It's on the very low side of the range, but it's in the range; so we're not going to recommend that you change your numbers."  Boyd Statement, at page 64.

66.     Riordan and Sam Bennett, another KPMG Knoxville-based partner assigned to the Miller Energy account, informed Boyd that the Company's "number falls in the range," so "we're not going to recommend that you change your numbers."  Boyd Statement, at page 64. Rather, the KPMG partners said, the Company should merely "reclassify some assets," Boyd Statement, at page 76, and "we are going to ask you to put the $110 million in the oil and gas category. . . .  Instead of fixed assets, it went into oil and gas assets."  Boyd Statement, at page 72.  Boyd explained, "It's not like we were changing the total balance sheet.  You know, we were just moving some money from one category to another."  Boyd Statement, at page 76.

67.     RE Davis, who had provided the reserves report, also provided the NYMEX report.  According to Boyd, that report

> "was based on this huge, you know, increase in oil and gas prices over the next, you know, 30 years. . . .  But then what you're supposed to do is, you're supposed to discount each of the sections in a reasonable way to come down to today's prices."   Boyd Statement, at page 63.

68.     Neither Boyd nor any other member of Miller Energy management made those calculations.  KPMG made them and then provided them to Boyd.

**C.      KPMG Knowingly or Recklessly and Systematically Endorsed Miller Energy's Inflated Valuation of the Alaska Assets.**

69.     KPMG had an opportunity to protect the Company's stockholders and the investing public by forcing its client to correct the Company's misstatements of previous years.  Instead, KPMG's conduct endorsed Miller Energy's previously-filed false financial statements, making KPMG even more culpable than the now-defunct Sherb firm.

70.     In an August 6, 2015 Order Instituting Public Administrative and Cease-and-Desist Proceedings, the SEC found that all quarterly and annual filings from the third quarter 2010 through third quarter 2015 – many of which were given KPMG's unqualified approval after it was retained in February 2011 – were based on fraudulent valuations and material misstatements of the assets and net income of Miller Energy.

71.     In fact, the fraudulent valuations rendered no fewer than eleven (11) Forms 10-Q and 10-K filed between March 2011, after KPMG began participating in the fraud, through at least December 2014 materially false and misleading.  Specifically, as a result of the fraudulent

28

valuation, during the Class Period, Miller Energy filed financial reports that materially misstated the value of its assets, all of which were reviewed by KPMG and signed by Boruff, as follows:

■ Forms 10-Q for the third quarter of fiscal year 2011 and for all three quarters of fiscal years 2012 through 2015; and

■ Forms 10-K for fiscal years ended 2011 through 2014.

72. These above-stated filings – all of which incredibly passed KPMG's audit-scrutiny – were relied upon by the public.

73. The fraudulent valuations also resulted in Miller Energy filing financial reports with the SEC that materially misstated its net income. Those reports included:

■ Forms 10-Q for the third quarter of fiscal year 2011 and for all three quarters of fiscal 2011, and the first two quarters of 2012; and

■ Forms 10-K for fiscal years ended 2011 through 2012.

74. Although Miller Energy's prior financial statements had been audited by the Sherb firm and its employee Carlton Vogt, as part of its review of prior financial statements, KPMG required Miller Energy to re-state and correct previously-issued quarterly reports and filings with the SEC and its shareholders, including the previously Sherb-audited year-end April 30, 2010 financial statement in which the fraudulent and artificially-inflated value of the Alaska Assets was initially recorded. As reported in the April 30, 2011 Form 10-K, KPMG's reinstatement and correction of earlier certified financial statements had the net impact of decreasing Miller Energy's total assets by just $110,184, and actually increasing Miller Energy's net income for the year by $1,487,386 to $250,940,566.

29

75.    There was no revision or alteration to the fraudulently reported gain on acquisition of $461,111,924.  In fact, the only thing KPMG required Miller Energy to do was to "reclassify" $107,585,556 of the $110,000,000 doubly-counted fixed assets acquired in the Alaskan purchase to net oil and gas properties.  In effect, KPMG's work resulted in an actual *increase in the value* of the already grossly inflated value of the Alaskan Assets by still another 29%.

76.    In the end, KPMG  audited, certified, and issued "clean opinions" of Miller Energy's annual financial statements that were included in Forms 10-K for the years ended April 30, 2011, 2012, 2013, and 2014.[12]  KPMG's first clean opinion was issued on August 29, 2011, the first day of the Class Period.  The false valuations of the Alaska Assets during those periods were never corrected.

77.    Miller Energy's Form 10-Q, filed on December 10, 2014 for the second quarter ending October 31, 2014, was the first acknowledgment by Miller Energy that there was an issue related the valuation of the Alaska Assets.  The Company took an impairment charge, citing the decrease in global oil and gas prices, and acknowledged on a conference call that costs were a factor as well.  During the third quarter ended January 31, 2015, for the Form 10-Q filed March 12, 2015, the Company took yet another impairment charge citing the continuing decrease in global oil and gas prices.  As of January 31, 2015, the carrying value of net oil and gas properties on the Company's financial statements had been reduced from $644,827,000 on April 30, 2014

---

[12]KPMG's audit of the financial statements of Miller Energy for the year ended April 30, 2015 has never been issued.

to $189,720,000 on January 31, 2015.

**D. KPMG Knowingly or Recklessly Concealed the Artificially-Inflated Valuation of the Alaska Assets.**

78. KPMG's conduct allowed Miller Energy's fraud from being revealed to the investing public. Absent KPMG's conduct in furthering the Company's fraud, the Company would not have been able to obtain the critical financing it needed to meet its short-term obligations and avoid bankruptcy in 2011.

79. Indeed, according to Miller Energy's former Senior Vice President of Investor Relations Bobby Gaylor ("Gaylor"), KPMG's Riordan and Bennett flew to Alaska to meet with investors, in which their sole function was to demonstrate to investors that KPMG was involved, and that therefore, Miller Energy could be trusted.

80. Through it all, KPMG was auditing its own work, serving as Miller Energy's *de facto* in-house accountant, bookkeeper, and appraiser while simultaneously serving as the Company's external auditor. KPMG's accounting and auditing practices were so deficient that its audits of the Company's financial statements amounted to no audits at all, or at least an inexplicable and egregious refusal to see the obvious and to investigate the doubtful, and no reasonable accountant or auditor would have made the same decisions if confronted with the same facts.

81. Not only did KPMG's clean opinions provide credibility to Miller Energy's valuation of the Alaska Assets, but they provided the Company "cover" and were relied upon by investors.

31

82.     KPMG issued a report of its audit of Miller Energy's financial statements for the fiscal years ended April 30, 2011, 2012, 2013 and 2014.  Each of those reports was a "clean opinion," an unqualified report that the Company's financial statements were fairly presented, in all material respects – *the highest level of an audit report that a CPA can issue*.

83.     KPMG knew full well the value of its imprimatur to Miller Energy and the Company's executives, creditors, and investors.  It knew that were it to subject the Alaska Assets to the scrutiny required of an independent public auditor, or to resign as Miller Energy's independent auditor, or to issue anything other than a clean, unqualified report, the Miller Energy house of cards would crumble, resulting in massive and widespread losses.

84.     The Miller Energy auditing debacle was not even the latest case involving improper conduct by KPMG, as KPMG's auditing staff continues to experience ethical and/or professional challenges.  For instance, in April 2017, KPMG announced that it had fired five partners, including the national managing partner for audit quality and professional practice, after KPMG improperly obtained information about which audits its regulator, the PCAOB, planned to inspect.  The PCAOB oversees firms that audit U.S.-traded public companies.

85.     According to the Wall Street Journal, among the Big 4 accounting firms, KPMG had the highest number of deficiencies cited by the accounting board in each of the past two years. In the previous year, 20 of KPMG's inspected audits, or 38% of those inspected, were found to be deficient. In 2015, the number of deficient audits was 28, or 54% of those

32

inspected.[13]

**E.    KPMG Ignored Serious "Red Flags" That Should Have Placed a Reasonable Auditor on Notice That Miller Energy Was Engaged in Wrongdoing to the Detriment of its Investors.**

86.    In a conversation with Boruff and Voyticky, Miller Energy's former Senior Vice President of Investor Relations Gaylor was told:

> "Bobby, our numbers are so screwed up, they (KPMG) had to go fix our numbers before they could even audit them."

87.    Nevertheless, instead of rigorously conducting the required audits, KPMG accepted Miller Energy's justifications and either knowingly or recklessly ignored innumerable conspicuous facts and red flags that should have alerted a truly independent auditor that the Alaska Assets were overvalued and the Company was engaged in wrongdoing to the detriment of its investors.

88.    KPMG had an obligation to exercise "due professional care" and "skepticism" in the performance of its Miller Energy audits and it was charged with evaluating the Company's internal controls and its financial disclosures.  However, in each area, KPMG's audits of the Company's financial statements were so deficient that the audits amounted to no audits at all, or intentional or reckless refusals to see the obvious or to investigate the doubtful.

89.    KPMG either recklessly or deliberately ignored multiple glaring "red flags," including those identified in the following paragraphs.

---

13

https://www.wsj.com/articles/usauditregulatorprobingleakofconfidentialinspectioninformationtokpmg1491922950.

90.    <u>Lack of Internal Control, Including Inexperienced Management and Inadequate</u>

<u>Accounting Staff</u>:

■ Management, including its CEO and CFO, were inexperienced in the oil and gas industry, in running the Alaska Assets operation, and in running an SEC-compliant company;

■ CEO Boruff lacked experience running a company, lacked experience in the oil and gas industry, and lacked experience meeting the substantial requirements of a publicly-traded company;

■ CFO Boyd was previously the CFO of a failed local company, Idle-Aire, his prior employment experience was in the banking industry, and although he was a CPA, he lacked significant auditing experience;

■ The accounting department was inadequately staffed and mainly consisted of Boyd and two part-time clerical staff;

■ The Company lacked any internal audit function;

■ Miller Energy stated that a late filing was required for the January 31, 2011 10-Q and that the earlier First and Second Quarter 2011 10-Qs could not be relied on due to errors. The Company failed to properly accrete their asset retirement obligations in each of the first two quarters of fiscal 2011. In these periods, the Company also failed to properly record depletion, depreciation, and amortization expenses related to leasehold costs, wells and equipment, fixed assets and asset retirement obligations, and did not properly record the state tax credits expected from its Alaska operations;

■ Miller Energy failed to comply with listed-company NYSE rules. Form 8-K, filed March 30, 2011, disclosed that Miller Energy would be moving from NASDAQ to the NYSE, effective April 12, 2011. The Company was required to form an Internal Audit Group one year after the NYSE listing. That group was never established; and

■ Miller Energy used the wrong reserve report from RE Davis to assess fair market value of Alaska Assets.

34

91.     <u>Prior Audits Should Have Spurred Concern</u>:

■ Miller Energy's previous auditor was a small firm that lacked oil and gas experience. That firm – Sherb & Company – folded after it was sanctioned by the SEC regarding audits of small China-based companies with stock trading in the United States;

■ Miller Energy had a prior history of "going concern" qualified audit opinions. Under a "going concern" opinion, the auditor questions whether the company has the ability to continue to exist and realize the valuation of assets in the normal course of business; and

■ Miller Energy's previous years' financial results reflected minimal revenue and operating losses. Sherb's audit opinion for the year-ended April 30, 2009 was qualified, based on "going concern."

92.     <u>Alaska Assets Purchase</u>:

■ Miller Energy's purchase of the Alaska Assets in December 2009 from the Bankruptcy Court, for $2.5 million in cash and assumption of $2.22 million to cure liabilities to the State of Alaska was written up to $492 million and recorded as a "bargain purchase" that resulted in reported net income of $250 million for the fiscal year-ended April 30, 2010; and

■ Sherb issued a clean audit opinion minus the earlier "going concern" qualified opinion.

93.     <u>Management Did Not Comply with Sarbanes-Oxley</u>:

■ Per April 30, 2011 10-K, management conceded "material weaknesses in our internal controls over financial reporting" and was unable to perform as assessment of effectiveness of internal controls to comply with the Sarbanes-Oxley Act. Among other statements, the 10-K discloses:

> We do not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training in the selection and application of U.S. GAAP and SEC reporting requirements commensurate with our financial

35

reporting requirements.

We do not maintain sufficient policies, procedures and controls to prevent and/or detect material misstatements in our consolidated financial statements.

We did not maintain adequate controls to ensure that the Company maintains compliance with various SEC rules and regulations regarding reporting.

Accordingly, management has concluded that we did not maintain effective internal control over financial reporting as of April 30, 2011, based on the "Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"); and

■ There is no opinion by KPMG regarding Miller Energy's internal controls for the 10-K for the fiscal year ended April 30, 2011.

94.    <u>Interest Rate for Debt Far Exceeded Normal Rate to Develop the Alaska Drill Operations</u>:

■ New financing that effective interest rates were in the 20% range.  In a release, Miller Energy failed to fully disclose cost of financing; and

■ Form 8-K filed on June 13, 2011, discloses $100 million line of credit with Guggenheim Corporate Financial.  Miller Energy failed to disclose the cost of the financing or the agreement to pay Mr. Paul Kessler a "consulting fee" of 3% of each draw, up to a maximum of $3 million dollars.

95.    <u>SEC's Inquiry about Valuation of the Alaska Assets</u>:

■ Form 8-K filed on June 21, 2011 discloses letter to SEC from Miller Energy attorney requesting extension to respond to inquiry from SEC staff regarding the 10-K for fiscal year ended April 30, 2010. SEC staff was inquiring about the recording of the Alaska

36

purchase, among other things. Boyd admits in his sworn statement that KPMG auditors drafted responses for the Company to the SEC-inquiry letters in 2011 regarding and defending the valuation of the Alaska Assets.

96.   Outside Parties Openly Question the Value of the Alaska Assets:

■ A July 28, 2011 Street Sweeper article raising numerous questions about Miller Energy's Alaska acquisition, management, board members, related party transactions, and financing. The article quotes "Digger" Smith, a veteran oil and gas geologist and businessman, who states the Alaska Assets are not worth $350 million. Smith valued the assets at between $35 to $40 million dollars offset by $40 million in liabilities. Smith's company had made a bid on the Cook Inlet properties and had allocated $875,000 of their bid toward those assets. One of Smith's companies had been hired by the State of Alaska to maintain the properties while in bankruptcy. Smith knew the assets, the costs of operating in Alaska, and the liabilities assumed. Smith was also a board member and audit committee chairman for numerous publicly-traded companies; and

■ Miller Energy was the subject of numerous other articles by The StreetSweeper, SeekingAlpha, and a January 18, 2012 Esquire magazine article. None of the articles were complimentary and all of them questioned the Alaska purchase.

97.   Competency of Boruff and Management: Filing of the 10-K and KPMG Audit for the Year Ended April 30, 2011:

■ On July 29, 2011, Boruff filed Form 10-K, including a KPMG unqualified opinion on Miller Energy's financial statements, at the last minute of the 15-day filing extension. KPMG had not completed their audit work and had included, but had not released, their opinion letter for purposes of preparing the 10-K submission;

■ On July 30, 2011, Boruff met with the Audit Committee to discuss the improper filing of the 10-K, which was made before KPMG actually signed off on the filing;

■ KPMG's John Riordan discussed the filing with KPMG's senior partners in New York and Atlanta, and drafted information to be filed by Miller Energy in a Form 8-K. Riordan informed Boyd that KPMG was at that time considering withdrawing from the account;

■ Form 8-K, dated August 1, 2011, is filed disclosing that the earlier 10-K should not be relied upon because the KPMG audit was not complete and the audit opinion had not been released. Miller Energy also disclosed that it expected financial statements to change;

■ 10-Qs for January 31, 2011, October 31, 2010, and July 31, 2010 would be restated for errors in accounting for royalty expense, compensation expense for stock equity awards, liability for derivatives, and did not include consolidated results of an entity that Miller Energy controlled. This means that the previously restated three quarter's 10-Q's were being restated again; and

■ Misstatements which led to these restatements resulted from a material weakness that existed on the date of Miller Energy management's most recently issued report on internal control over financial reporting.

98.    Extravagances of Management:

■ On June 2011, CEO Boruff purchased a 38,000 square foot home in Knoxville for $9.5 million, plus $1 million in furnishings.

■ America Express cards of officers were used heavily for personal use. At one time, Deloy Miller's personal balance was over $117,000; and

99.    Chairman and CEO Boruff's Letter to Shareholders:

■ Form 8-K filed on August 1, 2011, copy of letter from CEO Boruff to shareholders addressing what happened with the improperly filed 10-K and attempting to refute the latest Street Sweeper article.

100.    Litigation:

■ Before KPMG issued its first audit opinion, a August 16, 2011 class action lawsuit was filed against Miller Energy and officers

38

regarding the improperly filed 10-K and Alaska purchase which alleged that the Company had improperly valued the Alaska Assets on its books for 2009-11;

101.    Other Warnings:

■ Pattern of cash-flow problems;

■ KPMG's bill was always paid late.

■ KPMG was consistently concerned and raised "going concern" issues with Miller Energy, yet never qualified its reports. Boruff prepared Excel spread sheet projections to satisfy KPMG. The CFO did not participate in that process and never saw the projections. Assumptions used therein were not reflected by the Company's actual experience in operating the Alaska Assets;

■ Boruff was asked why Miller Energy was having problems timely filing SEC reports. Boruff responded that KPMG was doing the books because Boyd was in "over his head," *i.e.*, KPMG was auditing its own work;

■ Knoxville's KPMG office, which performed the Miller Energy audit field work did not have oil and gas experience. Oil and gas is a very specialized industry. The auditor must have industry knowledge. Staffing for the Company's audit did not meet the standards of GAAS, *i.e.*, "The auditor must have adequate technical training & proficiency to perform the audit;" and

■ Form 8-K filed on December 4, 2014 – Beginning November 26, 2014, Miller Energy entered an SEC "Black-out Period" prohibiting trades in security held by its officers and directors prior to release of quarterly financial results. On November 28, 2014, CEO Boruff received notice of a margin call on his personal account requiring the loan to be paid in full by December 1, 2014 due to a decline in the Company's stock price. Over a three-day period beginning December 4, 2014, 696,000 shares totaling $10,480,880 of Boruff's shares were sold. On December 10, 2014, the Company announced operating results of net loss of $172 million including the first impairment charge related to Alaska properties of $265.3 million.

102.    KPMG should not have been content with the Company's representations that its

39

financial statements were adequate, as KPMG was ethically and professionally obligated to ascertain for itself as far as possible whether the Company's financial statements had been fairly stated.

103.     KPMG's general disregard for known and identified problems rendered its opinions of the valuation numbers that Miller Energy had disclosed irrelevant and meaningless. By the end of 2013, however, Miller Energy's days as "hot stock" and growing oil and gas company were approaching an end.

## VI.     DISMANTLING OF THE MILLER ENERGY HOUSE OF CARDS: 2013-2016

104.     By late 2013, the Miller Energy house of cards began developing ever-widening cracks.  On December 17, 2013, self-described "concerned Miller Shareholders" sent an open letter to the Company criticizing management's handling of the Alaska Assets, causing the Company's stock to drop $1.53 over a three-day period ending on December 19, 2013.

105.     On Christmas Eve 2013, yet another report by *TheStreetSweeper*, entitled "*Miller Energy: Digging Itself Into Another Deep Hole?*," was published, pointing out that the Company had become "a bleeding energy firm buried underneath a mountain of expensive debt."  The report analyzed several events that pointed to the fact that the Individual Defendants' valuations of the Alaska Assets were a myth.

106.     On March 13, 2014, the Company filed a Form 8-K, including its earnings release for the third quarter of its fiscal year 2014 ending January 31, 2014, announcing an operating loss during the quarter of $6.6 million, a net loss of $6.8 million, and earnings per share of $-0.15.  It also announced increased expenses, including $5.8 million in oil and gas operating expenses, and increased depreciation, depletion and amortization ("DD&A") expenses, both

40

associated with oil-extraction costs. The Company also announced that it was taking on more debt.

107. On July 14, 2014, the Company filed its Form 10-K for the fiscal year 2014, and a Form 8-K attaching its earnings release for the fourth quarter and fiscal year-ended April 30, 2014, reporting increases in net loss and weaker–than-expected oil production.

108. On November 26, 2014, Miller Energy stock became the subject of margin calls and the Company's stock fell from a closing price of $3.16 on November 25, 2014, to $1.59 on December 1, 2014.

109. On December 10, 2014, in a quarterly report filed with the SEC, Form 10-Q, Miller Energy disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

110. The Company also announced a loss of $285.7 million and a $9 million loss of earnings, a 73% increase over the same quarter the previous year, as well as DD&A of $20.1 million, an increase of 123% compared to the same quarter the previous year. With this news, the Company's stock price fell from a closing price of $1.35 on December 9, 2014, to close at $1.16 on December 10, 2014.

111. On March 12, 2015, the Company announced another $149.1 million impairment charge on the Alaska Assets, increasing its total impairment to $414.4 million.

112. On April 29, 2015, Miller Energy disclosed that it had received a "Wells Notice"[14] from the SEC, indicating that the agency staff had made a preliminary determination to

_____

[14]"A Wells notice is a communication from the staff to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the

recommend civil action against the Company related to its accounting for the Alaska Asset acquisition. The Company stated that it "welcome[d] the opportunity to respond before any action [was] taken" and further "assert[ed] that it does not believe that an enforcement action was warranted in this case," thereby causing concealment of the defendants' violations of federal securities laws, as alleged herein, to continue.

113. On May 12, 2015, the Company disclosed that the NYSE had notified it that its shares were subject to de-listing due to its having failed to maintain listing requirements.

114. On July 14, 2015, Miller Energy filed a Notification of Late Filing of its Form 10-K with the SEC for the period ended April 30, 2015 on Form 12b-25, requesting an extension of time within which to file its annual report noting that "due to the constraining structure of the registrant's current debt, its continued capital repositioning process as well as potential factors not under the registrant's control, there is, from an accounting perspective, substantial doubt about its ability to continue as a going concern."

115. On July 31, 2015, Miller Energy filed Form 8-K with the SEC reporting that on that day it had received formal written notice from the NYSE that trading in the Company's common stock would be suspended before the market opens on July 31, 2015. By the end of the day, Miller Energy's stock price closed at $0.11.

116. On August 6, 2015, Hall resigned his positions as COO of the Company and as CEO of CIE and Miller Energy filed a Form 8-K with the SEC reporting, among other things,

---

[SEC] file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the [SEC] concerning the proposed recommendation." SEC Division of Enforcement, *Enforcement Manual* (October 28, 2016), https://www.sec.gov/divisions/enforcementmanual.pdf.

that the SEC had initiated civil administrative proceedings against the Company (the "SEC Enforcement Action") accusing the Company, Boyd and Hall, the Company's CFO and COO, respectively, at the time of the purchase, of knowingly inflating the value of the Alaska Assets and then knowingly misstating the Company's financial statements for the ensuing five-plus year period through and including July 2015 when the Company's stock was de-listed.[15]

117.    In its Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller Energy overstated their value by more than $400 million, boosting the Company's net income and total assets.  According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where its common stock had reached a 2013 high of nearly $9 per share.

118.    In a statement, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated, in pertinent part, as follows:

> "We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards . . . . The SEC will aggressively prosecute such conduct."

119.    The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from Miller Energy, Boyd, and Hall.

---

[15]Non-party Carlton Vogt, an auditor with Sherb, had blessed the findings in 2009-2010, according to the SEC.  Vogt was also charged in the SEC Enforcement Action.

43

120.    On August 20, 2015, Miller Energy filed a Form 8-K with the SEC which disclosed that on August 14, 2015, within eight days of the SEC having initiated the SEC Enforcement Action, it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010.   The Company's restatement of its previously reported financial results was an admission that those results were false when filed.[16]

121.    On October 1, 2015, Miller Energy filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which the Company's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations, Inc. and Schlumberger Technology Corp., with total claims of $2.79 million.   By the end of the following day, the Company's stock price closed at $0.035.

122.    On January 12, 2016, the SEC entered an Order Making Findings and Imposing a Cease-and-Desist Order and Penalties Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 as to Miller Energy Resources, Inc. ("January Order").  The January Order found as follows:

> ■ the Company violated Section 17(a)(2)and (3) of the Securities Act which prohibit fraudulent conduct in the offer or sale of securities;
>
> ■ the Company violated Section 13(a) of the Exchange Act, and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the [SEC], among other things, annual,

---

[16]As part of Miller Energy's settlement with the SEC, Miller Energy agreed to restate and correct all of these previously issued reports and financial statements.  That has not been done.

current, and quarterly reports as the [SEC] may require;

■ the Company violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

■ the Company violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP; and

■ the Company violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

123.     The Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims under the "Joint Plan of Reorganization" ("Plan").

124.     On January 28, 2016, the Bankruptcy Court confirmed the Plan. On March 29, 2016 ("Effective Date"), the Plan became effective and the debtors emerged from their Chapter 11 proceedings.  Also on that day, for the first time, in an SEC 8-K filing, the Company admitted the truth that KPMG, Boruff, and Miller Energy senior management had successfully suppressed for years, namely that the Alaska Assets were essentially worthless, and that the Company's financials to the contrary were a sham that could not be relied upon:

[T]he Company has conducted an asset impairment analysis on certain of its assets, . . .  and after further review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 and other

45

accounting matters, the Company has concluded that its financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon.

125.    Miller Energy also disclosed that it had consented on January 12, 2016 to the January Order with respect to the SEC Enforcement Action, and the Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims.

126.    On June 7, 2016, the SEC made findings and imposed remedial sanctions as to Boyd, Hall, and Vogt.

127.    An SEC investigation continues, and a target of that ongoing investigation is Miller Energy's outside auditor, KPMG, whose role in the Miller Energy saga and the fraud the Company and its senior management perpetrated on shareholders, began in February 2011. From that date, KPMG performed in-house accounting, bookkeeping, appraisal, and valuation services for the Company, obliterating any semblance of independence.

## VII.    KPMG'S LACK OF INDEPENDENCE

128.    By certifying the public reports that collectively depicted Miller Energy's financial status, KPMG assumed a public responsibility transcending any employment relationship with Miller Energy.  KPMG's lack of independence, in both mind and appearance, resulted in KPMG repeatedly certifying four years' worth of fraudulent financials.

129.    Auditors function as critical gatekeepers in the area of issuer reporting and disclosure. Comprehensive, accurate, and reliable financial reporting is the bedrock upon which our markets are based, and is essential to ensuring public confidence in them.  Auditors play a crucial role in the financial reporting process by serving a "public watchdog function" that

46

demands "total independence from the client at all times and requires complete fidelity to the public trust." *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

130. From virtually the moment KPMG was retained by Miller Energy, KPMG began knowingly or recklessly violating numerous of these standards, including the bedrock standard of independence, which requires that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor." AU Section 220 [AS 1005.01].[17]

131. The conceptual framework for the AICPA independence standards is provided within the AICPA's Code of Professional Conduct, and defines the two required components of independence as:

> a. Independence of mind – The state of mind that permits the performance of an attest service without being affected by influences that compromise professional judgment, thereby allowing an individual to act with integrity and exercise objectivity and professional skepticism.

> b. Independence in appearance – The avoidance of circumstances that would cause a reasonable and informed third party, having knowledge of all relevant information, including safeguards applied, to reasonably conclude that the integrity, objectivity, or professional skepticism of a firm or a member of the attest engagement team had been compromised.

132. In addition to certain specific situations that would render an auditor's independence impaired, AICPA ET (Ethics) Section 101 recognizes that it is not practical to list

---

[17] In 2015, the PCAOB revised its numbering system for auditing standards, replacing the previous system, which used "AU Section" followed by a three-digit number, or "AS No." followed by a single digit, with "AS" followed by a four-digit number. The revision did not "change the substance of the requirements," and was "intended to improve the usability of the Board's standards." *See* https://pcaobus.org/Rulemaking/Docket040/Release _2015_002_Reorganization.pdf. The revisions also removed certain standards that were "no longer necessary" given the reorganization. Citations here are to the numbering system in place during the Class Period, with a citation to the revised PCAOB system provided where applicable.

47

every circumstance that might result in the appearance of a lack of independence and accordingly, advises that "…a member should evaluate whether that circumstance would lead a reasonable person aware of all the relevant facts to conclude that there is an unacceptable threat to the member's and the firm's independence." The evaluation of threats to independence, and safeguards applied to eliminate, or reduce to an acceptable level such threats, are required to be documented. AICPA ET Section 101, Independence, ¶02 101-1.

133. From the outset of its engagement by Miller Energy, KPMG knowingly or recklessly failed "to maintain an independence in mental attitude in all matters relating to the engagement" and to the assignment at hand, including because KPMG performed independence-destroying bookkeeping, appraisal, and valuation services for the Company.

134. Indeed, Boyd said that he "hired KPMG to do our books once we started getting some money in," after "convincing Scott [Boruff] that we had to have some more help and we needed to upgrade our accounting," because "I needed somebody with oil and gas experience, because I knew I didn't have it." According to Boyd, after Boruff "started talking to some of the large investors, they said, . . . a Big 4 firm would be nice."

135. Indeed, even before KPMG completed its audit of Miller Energy's financial statements for fiscal year 2011, the Company began receiving letters from the SEC with questions and concerns regarding the Company's SEC filings, and KPMG was instrumental in preparing the Company's responses to these letters. In his sworn statement, Boyd was asked about Miller Energy's process for responding to SEC inquiries:

> Q        Did you go through KPMG?

48

A      Like, what I just said, I didn't do any of these in a vacuum or on my own. I didn't even prepare some of the answers on my own. I was just in charge of coordinating the response. So sometimes KPMG themselves would give me a draft of the answer to this particular -- you know, because they always sent, like, 10 or 20 questions. And so I would assign those questions to different people. I'd say, okay, who's got the most knowledge about this? Who can help me with this one, you know? And I said, I can do a couple of these myself, but I don't -- you know, I want everybody's help on this; this is a group effort. And so I would get KPMG's help on a lot of them to actually draft, and then they would sign off on the entire thing before it went.

136.    KPMG's undisclosed conduct in the drafting of the responses to these letters badly undermined KPMG's independence, as these letters included Miller Energy's justifications for the valuation of the Alaska Assets, which valuation KPMG was supposed to be auditing and scrutinizing, not defending.

137.    Along the same lines, and equally destructive to KPMG's independence, Boyd explained that while KPMG was auditing the Company's valuation of the Alaska Assets, KPMG "did their own analysis" of the fair market value of the Alaska Asset, using discount rates calculated by KPMG itself-not by Company management-and eventually generating an "internal report" that produced a range for the fair market value of the Alaska Assets. According to Boyd, "they [KPMG] somehow got comfortable giving that value" based on that internal report and analysis.

138.    Additionally, Boyd explained that KPMG told him that the $110 million that had previously been booked as fixed assets should instead be booked as oil & gas properties, and that KPMG prepared the actual adjusting journal entry to enter into Miller Energy's books.

49

139. Senior Vice President for Investor Relations Gaylor confirmed these events, explaining that when he asked Boruff and Voyticky why KPMG had such difficulty meeting the July 2011 deadline, they told him that Miller Energy's books and records were in such disarray that KPMG needed to "fix them . . . so they could audit them."

140. The foregoing acts by KPMG went well beyond providing auditing services, and instead constituted bookkeeping, appraisal, and valuation services, completely destroying KPMG's independence.

141. As the AICPA Plain English Guide to Independence explains:

> Because of self-audit concerns, performing any type of bookkeeping service for an SEC audit client is considered to impair independence under SEC rules unless it is reasonable to expect that the results of the auditor's services will not be subject to the firm's audit procedures. . . .
>
> This presumption of self-audit also applies to financial information design and implementation; <u>appraisals, valuations, fairness opinions</u>, or contribution-in-kind reports; actuarial-related advisory services; and internal audit outsourcing.[18]

142. Indeed, as the SEC itself explained in SEC Release No. 33-7919, published in connection with its revisions to, among other things, 17 C.F.R. 210 (which includes rules governing public auditing firms):

> Our rule lists services that, regardless of the size of the fees they generate, place the auditor in a position inconsistent with the necessary objectivity. Bookkeeping services, for example, place the auditor in the position of later having to audit his or her own work and identify the auditor too closely with the enterprise under

---

[18] American Institute of Certified Public Accountants, Inc., *AICPA Plain English Guide to Independence*, March 1, 2016, at 42, available at http://www.aicpa.org/interestareas/professionalethics/resources/tools/downloadabledocuments/plain%20english%20guide.pdf (emphasis added).

50

audit. It is asking too much of an auditor who keeps the financial books of an audit client to expect him or her to be able to audit those same records with an objective eye.

In much the same way, performing certain valuation services for the audit client is inconsistent with independence. An auditor who has appraised an important client asset at mid-year is less likely to question his or her own work at year-end. Similarly, an auditor who provides services in a way that is tantamount to accepting an appointment as an officer or employee of the audit client cannot be expected to be independent in auditing the financial consequences of management's decisions.[19]

143.    17 C.F.R. 210.2-01(c)(4), in turn, provides that "[a]n accountant is not independent if, at any point during the audit and professional engagement period, the accountant provides [certain] non-audit services to an audit client," including bookkeeping services, as set forth in 17 C.F.R. 210.2-01(c)(4)(i):

(i) *Bookkeeping or other services related to the accounting records or financial statements of the audit client.* Any service, unless it is reasonable to conclude that the results of these services will not be subject to audit procedures during an audit of the audit client's financial statements, including:

(A) Maintaining or preparing the audit client's accounting records;

(B) Preparing the audit client's financial statements that are filed with the Commission or that form the basis of financial statements filed with the Commission; or

(C) Preparing or originating source data underlying the audit client's financial statements.

144.    17 C.F.R. 210.2-01(c)(4)(iii) further provides that appraisal and valuation services also destroy independence:

---

[19] https://www.sec.gov/rules/final/33-7919.htm#P127_53448

(iii) *Appraisal or valuation services, fairness opinions, or contribution-in-kind reports*. Any appraisal service, valuation service, or any service involving a fairness opinion or contribution-in-kind report for an audit client, unless it is reasonable to conclude that the results of these services will not be subject to audit procedures during an audit of the audit client's financial statements.

145.    The wisdom of these rules is highlighted by the facts of this case.  As the above allegations make clear, from the outset, KPMG performed in-house accounting, bookkeeping, appraisal, and valuation services for Miller Energy.  It is no wonder that KPMG's "audits" of the figures generated through these services resulted in unqualified clean audit opinions.  Indeed, as Bobby Gaylor explained to Plaintiffs' counsel in a sworn statement, the reason KPMG "stuck around" as  the Company's auditor – despite the unauthorized Form 10-K filing on July 29, 2011 without KPMG's consent – was that "they are culpable at that point forward," by virtue of having "fixed"  the Company's accounting entries.

146.    In addition to lacking independence, KPMG also engaged in continuing violations of generally accepted auditing standards ("GAAS"), as described below.

## VIII.  KPMG'S VIOLATIONS OF GENERALLY ACCEPTED AUDITING STANDARDS ("GAAS")

### A.    Overview of GAAS Requirements

147.    Generally Accepted Auditing Standards, or GAAS, are established by the American Institute of Certified Public Accountants ("AICPA"), of which Defendant KPMG is a member. Under the categorization set forth by the AICPA, there are three categories of auditing standards: (1) "General Standards"; (2) "Standards of Field Work"; and (3) "Standards of Reporting."  Since 2002, as a result of the Sarbanes-Oxley Act, the Public Company Accounting

Oversight Board ("PCAOB") has been responsible for adopting auditing standards for public companies. The PCAOB initially adopted AICPA's GAAS as interim standards. These standards set the minimum level of performance and quality that auditors are expected to achieve.

148. GAAS is comprised of ten basic standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow those standards in each and every audit they conduct.

149. The GAAS standards fall into three basic categories: General Standards; Fieldwork Standards; and Reporting Standards. The General Standards require, among other things, that the auditor has adequate technical training, is independent, and conducts the audit with due professional care, which requires that the auditor exercise professional skepticism. The Field Work Standards require, among other things, that an auditor properly plan the audit, obtain a sufficient understanding of the entity's business and operating environment, including its internal controls to determine the nature, timing and extent of tests to be performed,.and to obtain sufficient evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit. Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

150. Pursuant to AU 316: "Consideration of Fraud in a Financial Statement Audit," KPMG was responsible for planning and performing its audit of Miller Energy's financial statements "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 316.01. For purposes of

53

planning and conducting its audits of the Company, KPMG was required to give special consideration to risk factors identified in "Fraud Risk Factors" that may have resulted in material misstatements of the Company's financial statements (AU 316.31-33, AU 316.85 Appendix A.2). Fraud risk factors may be relevant to economic circumstances in general, an industry, or to a particular entity. (AU 316.85 Appendix A.2). The illustrative risk factors given in AU 316.85 are classified based on the three conditions generally present when fraud exists: incentive/pressure to perpetrate fraud, an opportunity to carry out the fraud, and attitude/rationalization to justify the fraudulent action.

### B.  KPMG's Audits Violated GAAS

151.  KPMG knowingly or recklessly abdicated these audit responsibilities. Had KPMG conducted its audits in compliance with GAAS and PCAOB standards, it would have discovered Miller Energy's fraud. By issuing "clean opinions" for the 2011-14 fiscal years, KPMG knowingly or recklessly disregarded material weaknesses in the Company's internal controls, specifically internal controls relating to the way the Company valued the Alaska Assets, as described herein.

152.  Miller Energy's Forms 10-K for the fiscal years ending in April 2011 through April 2014 consistently reported material internal control weaknesses over financial reporting. KPMG issued audit reports in the same years on Miller Energy's financial reports, reporting that the Company had ineffective internal controls over financial reporting in the fiscal years ending in April 2011 through April 2014. KPMG further reported that Company's financial statements presented fairly, in all material respects, the financial position of the Company.

54

153.     From Miller Energy's Form 10-K for the year ended April 30, 2011,

Management's Report on Internal Control over Financial Reporting:

> We do not maintain a sufficient complement of personnel with an
> appropriate level of accounting knowledge, experience and training
> in the selection and application of U.S. GAAP and SEC reporting
> requirements commensurate with our financial reporting
> requirements.
>
> We do not maintain sufficient policies, procedures and controls to
> prevent and/or detect material misstatements in our financial
> statements.
>
> As a result of the above material weaknesses, material adjustments
> to the Company's consolidated financial statements were required
> for each of the Company's reported quarterly and annual periods in
> fiscal 2011 (see Supplemental Quarterly Financial Information on
> page F-36 regarding the financial statement captions impacted by
> the above material weaknesses).
>
> ***
>
> However, since management has not completed its assessment, we
> cannot provide assurance that the material weaknesses described
> above constitute a complete list of deficiencies.  Had management
> completed its assessment, additional internal control weaknesses as
> of April 30, 2011 may have been detected. In addition, because
> management did not complete its assessment, our independent
> registered public accounting firm was unable to render an opinion
> on the effectiveness of our internal control over financial reporting.

154.     KPMG's August 29, 2011 audit report states:

> In our opinion, the consolidated financial statements referred to
> above present fairly, in all material respects, the financial position
> of Miller Energy Resources, Inc. and subsidiaries as of April 30,
> 2011, and the results of their operations and their cash flows for
> the year ended April 30, 2011, in conformity with U.S. generally
> accepted accounting principles.

55

155. Miller Energy's Form 10-K for the year ended April 30, 2012 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2012:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. As a result of this material weakness, we made a number of adjustments in connection with our financial statement audit in order to prepare the consolidated financial statements and footnotes included in this Form 10-K. Additionally, there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements would not be prevented or detected on a timely basis. As a result of this material weakness, the Company's management has concluded that, as of April 30, 2012, its internal control over financial reporting was not effective based on criteria established in Internal Control–Integrated Framework issued by the COSO.

156. KPMG's July 16, 2012 audit report of Miller Energy's internal controls states:

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2012, based on the criteria established in Internal Control – Integrated Framework issued by the COSO.

157. KPMG's July 16, 2012 audit report of Miller Energy's financials states:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

158. Miller Energy' Form 10-K for the year ended April 30, 2013 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2013:

56

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. This material weakness resulted in numerous material adjustments to the preliminary financial statements that were corrected prior to their issuance.

As a result of this material weakness, the Company's management has concluded that, as of April 30, 2013, its internal control over financial reporting was not effective based on criteria established in Internal Control-Integrated Framework issued by the COSO.

159.　KPMG's July 15, 2013 audit report of Miller Energy's internal controls states:

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2013, based on the criteria established in Internal Control - Integrated Framework issued by the COSO.

160.　KPMG's July 15, 2013 audit report of Miller Energy's financials states:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and the results of their operations and their cash flows for each of the years in the three-year period ended April 30, 2013, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 15, 2013 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

161.    Miller Energy's Form 10-K for the year ended April 30, 2014 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2014:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. This material weakness resulted in numerous material adjustments to the preliminary financial statements that were corrected prior to their issuance.

As a result of this material weakness, the Company's management has concluded that, as of April 30, 2014, its internal control over financial reporting was not effective based on criteria established in Internal Control- Integrated Framework (1992) issued by the COSO.

162.    KPMG's July 14, 2014 audit report of Miller Energy's internal controls states:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2014.  This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2014 consolidated financial statements, and this report does not affect our report dated July 14, 2014, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2014, based on the criteria established in Internal Control - Integrated Framework (1992) issued by the COSO.

163. KPMG's July 14, 2014 audit report of Miller Energy's financial statements states:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the three-year period ended April 30, 2014, in conformity with U.S. generally accepted accounting principles.
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organization of the Treadway Commission, and our report dated July 14, 2014 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

164. Additionally, numerous Forms 8-K filed by Miller Energy stated the value of "all reserves," up until approximately April 14, 2014, after which the Company began to report only the PV-10 value for the Proved Oil Reserves Category. The Company's reserves – reported as $1.543 Billion on February 11, 2013, decreased to $1.4 Billion a year later. That was the last Form 8-K reporting all reserves.

| Date | Reported Value of Reserves |
| --- | --- |
| February 11, 2013 | Reserves $ 1.543 Billion |
| April 15, 2013 | Reserves $ 1.5 Billion |
| August 12, 2013 | Reserves $ 1.4 Billion |
| February 12, 2014 | Reserves $ 1.4 Billion Proved Oil Reserves $ 365.8 million |
| April 16, 2014 | Only reported Proved Oil Reserves of $365.8 million |
| June 24, 2014 | Only Reported Proved Oil Reserves of $ 365.8 million |
| October 30, 2014 | Only Reported Proved Oil Reserves of $ 447.6 million |

59

| | |
|---|---|
| December 17, 2014 | Only reported Proved Oil Reserves of $ 447 million |
| February 3, 2015 | Only Reported Proved Oil Reserves of $ 447 million |
| March 19, 2015 | Only Reported Proved Oil Reserves of $ 447 million |
| August 14, 2015 | Reached Agreement with SEC that Miller Energy had overstated the value of its assets. |

165.    Additionally, and as a result of its lack of independence, KPMG knowingly or recklessly failed to fulfill its duty to the public in at least the following ways when conducting its audits for the fiscal years ending April 30, 2011, April 30, 2012, April 30, 2013, and April 30, 2014:

■ KPMG failed to maintain an independence in mental attitude in all matters relating to the engagement, in violation of AU Section 220 [AS 1005];

■ KPMG failed to exercise due professional care in the performance of the audits and the preparation of the reports, in violation of AU Section 230 [AS 1015];

■ KPMG failed to adequately plan the audits, in violation of the first standard of fieldwork, AU Section 311 [AS 2101];

■ KPMG filed to adequately consider materiality in planning and performing the audits, in violation of AU Section 312 [AS 2105];

■ KPMG failed to adequately identify and assess risks of material misstatements, in violation of AU Section 314 [AS 2110];
■ KPMG failed to obtain a sufficient understanding of internal controls so as to plan the audits and determine the nature, timing and extent of tests to be performed, in violation of the second standard of fieldwork, AU Section 314 [AS 2110], and AU Section 318 [AS 2301]; and

■ KPMG failed to obtain sufficient appropriate audit evidence to afford a reasonable basis for its opinions on the financial statements under audit, in violation of the third standard of fieldwork, AU Section 150 [AS 1105].

60

166.    In addition, KPMG knowingly or recklessly failed to perform its work with the requisite amount of professional skepticism.  As AU Section 230.07 (and AS 1015.07) state:

> Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

167.    KPMG fraudulently, *i.e.*, knowingly or recklessly, failed to exercise the requisite amount of skepticism in auditing the fair market value of the Alaska Assets.  Instead, KPMG took the valuation that the Company had assigned those assets, and worked to justify that valuation, in an effort to please the Company and to win additional business, and later, to cover up its own culpability in connection with those inflated valuations.

168.    KPMG also knowingly or recklessly failed to assess the reasonableness of critical assumptions underpinning the valuation of the Alaska Assets, in violation of AU Section 342 [AS 2501].  In particular, KPMG knowingly or recklessly failed to assess the accuracy of the forecasts, including the cost and expense assumptions, used to obtain the fair market value of the Alaska Assets.  Instead, KPMG purposely did nothing whatsoever to test those fraudulently understated assumptions, thereby perpetuating the fraud. KPMG did so because it wanted to avoid exposing the fraud, and wanted to conceal its own culpability.

169.    KPMG also knowingly or recklessly failed to expand the scope of its audits, in violation of AS No. 9 [AS 2101]. AS No. 9,  15 (and AS 2101.15) states: "The auditor should modify the overall audit strategy and the audit plan as necessary if circumstances change significantly during the course of the audit, including changes due to a revised assessment of the

61

risks of material misstatement or the discovery of a previously unidentified risk of material misstatement." KPMG knowingly or recklessly failed to modify its audits to appropriately respond to numerous red flags, internal control failings, including management's failure to rectify the material weakness in internal controls, and other significant developments since its initial engagement in 2011. Instead, KPMG purposely and fraudulently kept its audit limited, to avoid exposing the fraud, and to conceal its own culpability.

170. KPMG also failed to obtain more persuasive audit evidence in light of pervasive and admitted material weaknesses in the Company's internal control over financial reporting, in violation of AS No. 13 [AS 2301]. AS No. 13, AS 2301.06 requires that the auditor "determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement," giving as an example the need to "[o]btain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment." KPMG knowingly or recklessly failed to obtain more persuasive evidence of the valuation of the Alaska Assets, despite years of pervasive material internal control failures at the Company. Instead, KPMG purposely and fraudulently avoided obtaining additional evidence to avoid exposing the fraud, and to conceal its own culpability.

171. KPMG failed to adhere to the requirements of AU 336, Using the Work of a Specialist. KPMG failed to obtain an understanding of the methods and assumptions that were used by RE Davis Associates, the specialist. Also, KPMG failed to make the appropriate tests of internal data that was provided to the specialist. [AU 336.12] KPMG ultimately failed to determine whether the specialists' findings supported the relevant assertions in the financial

statements. [AU 336.12].

172.    KPMG failed to obtain sufficient appropriate audit evidence to provide reasonable assurance that fair value measurements and the disclosures were in conformity with GAAP. KPMG failed to gain an understanding of its clients' process for determining fair value measurements, including the controls over that process. KPMG also failed to evaluate whether its clients' method of measuring its fair value of the Alaska Assets were appropriate in the circumstances and whether that method was applied consistently. [AU 328, *Auditing Fair Value Measurements and Disclosures.*

172.    As described above, KPMG's consistent audit-failures throughout the Class Period followed – and coincided with – Miller Energy's own accounting failures, as described below.

## IX.    GENERALLY ACCEPTED ACCOUNTING PRINCIPLES REQUIRED BORUFF AND MILLER ENERGY TO RECORD THE ALASKA ASSETS AT FAIR VALUE.

### A.    Overview of GAAP Requirements

173.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time. As set forth in  Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts  Statement") No. 1, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period  being presented. American Institute of Certified Public Accountants ("AICPA") Concepts Statement No. 1, ¶42 states:

63

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. [AU 110.03].

174. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

[F]inancial statements are management's responsibility…. [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**B.     Miller Energy's Class Period Financial Statements Violated GAAP.**

175. As a result of the over-valuation of the Alaska Assets, and their failure to comply with GAAP, Boruff and his senior management were able to falsely inflate Miller Energy's financial statements during the Class Period. Had Boruff and other senior management, and the Audit Committee complied with GAAP, the Company's reported financial results would have been materially different. By restating financial results, they conceded that the Company's previously reported financial statements were false and misleading when they were originally

64

issued, that the errors contained in them were material, and that there was contemporaneous information available to Boruff and others in senior management, and the Audit Committee that demonstrated the falsity of those statements at the time they were issued.

176. GAAP provides that previously issued financial statements, which are materially misstated as a result of an oversight or a misuse of facts that existed at the time, are to be restated. *See, e.g.*, SFAS 154 ¶¶2(h), 25, ASC 250-10-05-04. Thus, GAAP requires a restatement when the originally issued financial statements were based on fraudulent accounting practices (*i.e.*, "a misuse of facts that existed at the time.")

177. The acknowledgment that Miller Energy is required by GAAP to restate its financial statements is an admission that the financial statements originally issued were false based on information available to them at the time the results were originally reported, and that the misstatements contained therein were material.

178. The reported financial results also violate, among other things, the following provisions of GAAP, for which Boruff is necessarily responsible:

> ■ ASC 820,[20] Fair Value Measurements (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date under current market conditions." A reporting entity must determine an appropriate fair value using one or more of the valuation techniques described in accounting literature;

> ■ ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable

---

[20]Accounting Standards Codification "ASC."

assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future cash flows to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost;

■ ASC 820 also emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability;

■ ASC 820 further emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions;

■ ASC 820-10-55 for failing to record impairment of the Alaska Assets in a timely manner and for overstating the value of its oil and GAAS reserves. Oil and gas reserves are to be valued at an amount not to exceed the discounted net cash flows from the use of its reserves. The net cash flows include the future cash inflows from Miller's estimated sales of its oil and gas reserves, less direct selling expenses, production costs and capital expenditures;

■ ASC 350 for failing to record goodwill impairment in a timely manner. When the carrying value of a reporting unit exceeds its fair value, then goodwill is considered to be impaired; and

■ ASC 805, Business Combinations - formerly Statement of Financial Accounting Standards ("SFAS") 14l (R) - became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," e.g., entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement [ASC-805-30-25-2];

## X.      CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure

23(a) and 23(b) on their own behalf and on behalf of:

66

All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased Miller Energy common stock between August 29, 2011 and October 1, 2015 (the "Class") who lost money. Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

181.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Miller Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182.    Plaintiffs' claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

183.    Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

(a)     whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;

(b)     whether and to what extent Miller Energy's financial statements during the Class Period failed to comply with GAAP during the Class Period;

(c)     whether Defendants misrepresented the value of the Alaska Assets;

67

(d)     whether other statements made (or omissions) by the Defendants to the investing public during the Class Period misrepresented (or omitted to state) material facts about the business, operations and management of Miller Energy;

(e)     whether KPMG's audits of Miller Energy's financial statements during the Class Period were conducted in accordance with GAAS and the standards of the PCAOB;

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages; and

(f)     whether KPMG abandoned its duty of independence as Miller Energy's auditor.

184.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

185.    Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in class action and other complex litigation.

186.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

187.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

188.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

68

## XI.  ADDITIONAL SCIENTER ALLEGATIONS

189.    KPMG knew about false and misleading nature of the valuation of the Alaska Assets, and of the fraudulent and wrongful nature of KPMG's conduct, or at a minimum were reckless in not knowing the false, fraudulent, and wrongful nature of these matters.

190.    The Alaska Assets were extremely material to the Company.  Indeed, their fraudulent valuation was the only reason the Company was able to avoid bankruptcy in fiscal year 2010, and was responsible for generating the only "profit" ever experienced by the Company.  Because of the extreme, Company-defining significance of the Alaska Assets, Defendants had robust knowledge of all aspects of those Assets, and knew or recklessly disregarded that they were fraudulently overvalued.

191.    KPMG unfettered access to data that would have conclusively revealed the fraudulent valuation of those assets further evidences scienter, including to, among other things: (a) emails and records showing actual costs and expenses associated with recovering hydrocarbons from the Alaska Assets, which were significantly higher than the assumptions underlying their reported fair market value; and (b) emails and records using internal estimates of such costs and expenses that were significantly higher than the assumptions underlying the reported fair market value of the Alaska Assets.

192.    KPMG scienter is also supported by the fact that Defendants were repeatedly warned and put on notice that the Alaska Assets were likely to have been overvalued, including in numerous reports published by *TheStreetSweeper*, reports which included analysis from oil & gas experts and investors, as well as on-the-record statements by reputable executives in the energy industry; in correspondence from the SEC relating to the valuation of the Alaska Assets;

69

and in lawsuits alleging the fraudulent valuation of the Alaska Assets. Yet, instead of investigating these allegations, KPMG gave unqualified clean opinions. Only on the day the Company's bankruptcy became effective, on March 29, 2016, did the Company finally admit that the valuations were unsupportable, and that its past financial statements including those valuations could not be relied upon.

193. KPMG, Boruff, and Miller Energy's senior management also had enormous motive to perpetuate the fraud. Indeed, Boruff and other members of senior management were compensated in the form of warrants or options to purchase Company stock that were valuable only if the valuation of the Alaska Assets remained high, as the Company's stock price depended entirely on that valuation. For example, on May 5, 2010, Boruff filed a Form 3 indicating he had been awarded 250,000 options to purchase Miller Energy common stock at a strike price of $0.33, and an additional 500,000 options with a strike price of $5.94. As another example, on March 11, 2011, Boruff was awarded 2,500,000 options to purchase Miller Energy common stock with strike price of $6 per share. Similarly, on June 13, 2011, Voyticky was awarded 2,300,000 options to purchase Miller Energy common stock at a strike price of $5.35. As for KPMG, its Knoxville office, which held the Miller Energy account, was motivated by the fact that during the Class Period, there were not many businesses in Knoxville that could generate the millions of dollars in fees that the Miller Energy account was capable of generating and did in fact generate for that office. Indeed, a sense of the size of the fees generated by the Miller Energy account was revealed in documents filed in Miller Energy's bankruptcy proceedings, which showed, among other things, that just in the 90 days preceding Miller Energy's October 1, 2015 bankruptcy filing, it had paid KPMG $553,280, and still owed KPMG an additional

70

$448,000 on top of that amount. KPMG's Knoxville office was also motivated by the connections to Knoxville's business elite that could be developed through the Miller Energy account, and indeed, as Gaylor explained, Riordan and Bennett asked Gaylor to introduce them to Knoxville-area business leaders. As for opportunity, KPMG had every opportunity to either perpetuate the fraud by participating in it, or to expose the fraud. At every turn, KPMG chose the former, further demonstrating scienter.

194. KPMG's scienter is particularly acute, because KPMG's very job was to subject the Alaska Assets to scrutiny. It had virtually unfettered access to Company documents and records, and even the gentlest of probing would have revealed that the valuations assigned to the Alaska Assets throughout the Class Period were astronomically higher than fair market value. The fact that KPMG failed to undertake any such probe, and that KPMG did not subject the valuation of the Alaska Assets to any meaningful scrutiny, despite Miller Energy's admitted lack of any oil and gas accounting expertise and lack of internal controls, further evidences KPMG's scienter.

195. KPMG's ignorance of numerous other red flags also supports scienter. Among these are: (a) the fact that the Company filed the July 29, 2011 Form 10-K without KPMG's consent; (b) the fact that Boruff had no experience running an oil & gas company whatsoever; (c) the fact that the Company had a series of CFOs and senior accounting personnel, including Boyd, Voyticky, and Brawley, who had no experience or expertise in oil & gas accounting, or even basic accounting in the case of at least Voyticky; (d) the fact that the Company's accounting department consisted of inexperienced staff with inadequate accounting abilities, much less oil & gas accounting ability; (e) the fact that the Company had a history of "going concern" qualified

71

audit opinions prior to its acquisition of the Alaska Assets; (f) the fact that KPMG was brought in to become the Company's auditor on February 1, 2011, towards the end of the Company's fiscal year, which was April 30, 2011, despite the fact that the proxy dated January 28, 2011, stated that Sherb was being recommended for re-appointment; (g) the fact that Miller revealed on March 18, 2011 that it had to file that Form 10-Q late, and that it had failed to property record DD&A and other items relating to the Alaska Assets; (h) the fact that the Company never established an Internal Audit Group, in violation of NYSE rules; (i) the fact that Boruff financed the purchase of a home and furnishings worth $9.5 million using the rising price of Company stock, despite being paid only a $500,000 salary; (j) the fact that the Company repeatedly borrowed money at effective interest rates of over 20%; (k) the fact that, since at least 2011, the SEC had questioned the valuation of the Alaska Assets; (l) the fact that the Company always had cash flow problems and always paid its bills late; (m) the fact that the Company's founder, Deloy Miller, treated the Company like a family business, instead of a public company; (n) the fact that, according to Gaylor, KPMG personnel, including Riordan, personally witnessed enormous dysfunction within Miller Energy, including two members of the accounting staff getting intoxicated in the office, becoming angry and disorderly, and loudly complaining about their compensation.

## XII. LOSS CAUSATION AND ECONOMIC LOSS

196.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

197.     Throughout the Class Period, the price of the Company's securities was artificially-inflated and/or maintained at an artificially high level as a result of Defendants' fraudulent statements, omissions, and conduct.

198.     The price of the Company's securities declined significantly, and the Company's securities were eventually cancelled entirely, when the risks and truth concealed by Defendants' fraud materialized, leaked, or were disclosed.

199.     Defendants' failure to disclose their fraudulent conduct artificially-inflated the value of Miller Energy's stock, or maintained those shares at an artificially-high level.  The revelation or materialization of the information and risks concealed by such conduct resulted to substantial losses to Plaintiffs and the Class.

200.     Throughout the Class Period, Miller Energy took on more debt and issued more equity, all on the promise of its balance sheet, *i.e.*, on the valuation of the Alaska Assets. Meanwhile, it repeatedly missed earnings forecasts, failed to profitably generate meaningful revenue, and generated no profits or net income.  Nevertheless, Boruff and senior management were able to keep the Company's stock price from falling to zero or very nearly zero, by fraudulently insisting to the market that the Alaska Assets had a fair market value several hundred million dollars higher than their actual fair market value, and even repeatedly doubled down on that fraud.

201.     Boruff and his senior management thus built and assiduously maintained a house of cards out of Miller Energy, with the fraudulently overvalued Alaska Assets as its foundation, and held together by massive debt and false promises of valuable equity. Meanwhile, KPMG, Boruff, and others in senior management enriched themselves with the fruits of that fraud, in the

73

form of fees salaries, and bonuses. And they did this knowing, or recklessly disregarding, that the house of cards would collapse.

202. The truth was revealed to the market over the course of a series of events and disclosures, each of which revealed that, contrary to Miller Energy and KPMG's representations, the Company did not have the ability to profitably produce meaningful amounts of oil from the Alaska Assets, that the Company's valuations depended on patently untenable assumptions, that as a result, those valuations were not based on fair market value, that KPMG was not independent, that its unqualified clean audit opinions were false, and that KPMG and Miller Energy had engaged in a years-long scheme to defraud investors.

203. Beginning in December 2013, and through the time it filed for bankruptcy, the truth that Miller Energy was a fraud, and the risks concealed by that fraud, including by KPMG's participation in it, leaked out, were revealed, and materialized.

204. For example, on December 17, 2013, a group of shareholders calling themselves "Concerned Miller Shareholders" sent an open letter decrying, among other things, management's lack of expertise with respect to the Alaska Assets. On that day, the price of Miller Energy's stock dropped from a closing price of $8.60 on December 16, 2013, to a closing price of $7.07 on December 19, 2013.

205. Then, on December 24, 2013, a report entitled "*Miller Energy: Digging Itself Into Another Deep Hole?*" was published by The Street Sweeper. That report pointed out that Miller Energy was "a bleeding energy firm buried underneath a mountain of expensive debt." It featured an interview with "Robert Chapman, the former boss of Miller President/Acting CFO David Voyticky," who said that "Miller barely even resembles a normal energy firm since it

74

focuses so much of its attention on raising capital that it seems to market its stock as its primary product while selling a little bit of oil on the side."

206. Chapman explained that Miller Energy's "gross production numbers are not big – they're tiny – and the company is still cash-flow negative (from operations combined with necessary capitalized investments), so it has to keep selling this story about its monstrous reserves." Chapman described the Company as "a preferred-stock issuance machine that seems to be more in the business of raising money than making money," and "it looks like a stock that's driven by a myth."

207. As for the elevation of Voyticky – his former employee – to CFO, Chapman said that the Company had "placed its trust in an executive that (based on his own firsthand experience) lacks any substantial skills outside of his ability to raise capital by 'smooth-talking investors and lenders into parting with their funds.'"

208. The report analyzed several events relating to the valuations attached to the Alaska Assets. For instance, the report cited a October 31, 2013 press release titled "*Miller Energy Resources Provides Update on Alaska Operations*," released on the very last day of the second quarter of fiscal year 2014, in which the Company claimed to have achieved "record oil sales with over 200,000 barrels sold" for the quarter ending October 31, 2013. Over the next several weeks, that announcement drove up prices from a closing price on October 30, 2013 of $6.62 to over $8. However, the December 24 report noted that when the Company posted its actual results for that quarter on December 10, 2013, those results showed that the Company had not even produced that many barrels during that period.

209. The report also cited a hedge fund manager who explained that one of the "levers that you can pull when you're estimating to value of reserves to arrive at a really big number" is "how much it will cost you to produce it." Of course, that is precisely one of the levers pulled by Defendants, and one that KPMG was complicit in concealing.

210. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, Miller Energy's stock price fell from a closing price of $7.29 on December 23, 2013, to a closing price of $6.88 on December 26, 2013.

211. On March 13, 2014, before trading began, the Company filed a Form 8-K, including its earnings release for the third quarter of fiscal year 2014. In that release, the Company announced an operating loss during the quarter of $6.6 million, a net loss of $6.8 million, and earnings per share of $-0.15. It also announced increased expenses, including $5.8 million in oil and gas operating expenses, and also increased depreciation, depletion and amortization ("DD&A") expenses, both associated with the costs of extracting oil. The release also announced that the Company was taking on more debt.

212. After trading hours, an investor call was held to discuss those results. On the call were Boruff, Voytickey, Brawley, and Hall. During that call, the Company was repeatedly pressed by multiple analysts about the costs and expenses associated with its operations and per barrel of oil, including with respect to two new wells it had been touting, the RU-9 and the WMRU-2B wells. Hall revealed an estimate of $26 million for those two wells, while Boruff attempted to downplay operating costs more generally, including by downplaying the costs of extracting oil with the North Fork Unit, which the Company had recently acquired. The

76

Company also fielded questions about disappointing oil production volumes on a previous well it had been touting, the RU-7 well. The Company also announced that it would be looking to acquire more assets in Alaska, including because it had "more capital availability," *i.e.*, more debt financing.

213. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result, and Miller Energy's stock price fell from a closing price of $6.67 on March 12, 2014, to a closing price of $5.69 on March 17, 2014.

214. On July 14, 2014, after trading hours, the Company filed its Form 10-K for the fiscal year 2014. Included with the filing was KPMG's unqualified audit report, confirming that the Company's financial statements "present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries," including a whopping $644.8 million value in 2014 for the "Oil and Gas Properties, Net" item on the Company's balance sheet, and the previous year's $491.3 million value for that same item. Because the Company used the income approach to generate these figures, the costs associated with generating the anticipated income were critical to achieving such eye-popping valuations. In arriving at these valuations, however, fraudulent cost figures were used, which the Company and KPMG knew or recklessly disregarded.

215. Shortly thereafter, the Company filed a Form 8-K attaching its earnings release for the fourth quarter and fiscal year ended April 30, 2014. In those filings, the Company reported increases in net loss and weaker than expected oil production. On July 15, 2014, after trading hours, an investor call was held to discuss those results. During that call, CFO Brawley

acknowledged that costs and expenses were high, including DD&A expenses, and acknowledged that poor net income and earnings per share numbers were items that "a number of our shareholders focus on." Brawley also acknowledged that Miller Energy's internal controls were still deficient, but touted the hiring of "a junior accountant with big four accounting experience" as a reason for investors to be optimistic.

216. During the question and answer period, the very first question asked related to the "complete cost for each well" that had been previously touted on the call, on a net basis, including tax rebates. However, neither Boruff nor Hall were able to provide complete answers.

217. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result, and Miller Energy's stock price fell from a closing price of $5.79 on July 14, 2014, to a closing price of $4.95 on July 16, 2014.

218. On November 26, 2014, Miller Energy stock began to become the subject of margin calls. Those margin calls were the foreseeable consequence of Defendants' fraud, in that it was foreseeable that when the artificial inflation engendered by Defendants' fraud would inevitably dissipate and would result in margin calls, as margin calls are standard and foreseeable features of securities markets. On and around this day, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, in connection with these margin calls, and the Company's stock fell from a closing price of $3.16 on November 25, 2014, to $1.59 on December 1, 2014.

219. On December 4, 2014, after trading hours, Miller Energy filed a form 8-K revealing those margin calls. On and around this day, and on this news, risks or truth concealed

by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result, the Company's stock price fell from a closing price of $1.67 on December 4, 2014, to $1.22 on December 8, 2014.

220. On December 10, 2014, as the trading day began, Miller Energy filed a Form 8-K, attaching its earnings release for the second quarter of fiscal year 2015, ending October 31, 2014. In that release, the Company announced that during that quarter, it "recognized a $265.3 million non-cash impairment charge related to its Redoubt field proved and unproved properties. The proved and unproved properties were written down to their estimated fair value." On an earnings call that same day, CEO Giesler explained that "expense overruns," *i.e.*, costs, "factored into the impairment." The Company also announced a loss of $285.7 million.

221. The Company also announced $9 million in LOE, a 73% increase over the same quarter the previous year, as well as DD&A of $20.1 million, an increase of 123% compared to the same quarter the previous year.

222. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $1.35 on December 9, 2014, to close at $1.16 on December 10, 2014. Then, on March 12, 2015, the Company revealed it was taking another $149.1 million impairment charge on the Alaska Assets, increasing total impairment to $414.4 million.

223. On April 29, 2015, the Company filed a Form 8-K, attaching a press release in which it announced that it had received a "Wells Notice" from the SEC relating to the Alaska Assets. On and around this day, and on this news, risks or truth concealed by, or effects

associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $0.92 on April 29, 2015, to close at $0.72 on April 30, 2015.

224.     On July 14, 2015, Miller Energy filed a Form 8-K, attaching a press release in which it announced "substantial doubt about its ability to continue as a going concern."  On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were revealed, leaked out, or materialized, and as a result the Company's stock price fell from a closing price of $0.35 on July 13, 2015, to close at $0.20 on July 14, 2015.

225.     On July 30, 2015, Miller Energy disclosed that its common stock would be de-listed from the NYSE.  On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were revealed, leaked out, or materialized, and as a result the Company's stock price fell from a closing price of $0.30 on July 29, 2015, to close at $0.11 on July 31, 2015.

226.     On August 6, 2015, Hall resigned his positions as COO of the Company and as CEO of CIE.  That same day, the SEC commended an administrative proceeding against Miller Energy, Boyd, Hall, and Vogt, alleging fraudulent overvaluation of the Alaska Assets.  Also that same day, in response to the SEC action, creditors of CIE filed an involuntary petition for bankruptcy in the United States Bankruptcy Court for the District of Alaska.

227.     On October 1, 2015, Miller Energy itself filed for Chapter 11 bankruptcy. On and around this day, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were partially revealed, leaked out, or materialized, and as a result,  the Company's stock price fell from a closing price of $0.07 on September 30, 2015, to close at

80

$0.035 on October 2, 2015.

228.     On January 28, 2016, the United States Bankruptcy Court for the District of Alaska approved the Company's and CIE's Joint Plan of Reorganization ("Plan"). On March 29, 2016, the "Effective Date" under the Plan, the Company filed a Form 8-K, announcing that "all equity interests in Miller will be cancelled, including outstanding shares of common stock."

229.     Also on March 29, 2016, the Company finally admitted the truth that Boruff and senior management had successfully suppressed for so many years, namely that the Alaska Assets were essentially worthless, and that the Company's financials to the contrary were a sham that could not be relied upon:

> [T]he Company has conducted an asset impairment analysis on certain of its assets, . . . and after further review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 and other accounting matters, the Company has concluded that its financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon.

230.     On and around March 29, 2016, and on this news, risks or truth concealed by, or effects associated with, Defendants' fraud were revealed, leaked out, or materialized, and as a result, Miller Energy's stock was cancelled entirely, reducing their value to zero.

231.     Every step of the way, KPMG's conduct prevented Miller Energy's fraud from being revealed to the investing public. KPMG's conduct thus caused substantial losses to Plaintiffs and the Class, and these losses were the foreseeable consequences of KPMG's conduct.

232.     For instance, had KPMG been truly independent and properly audited Miller Energy's reports, the Company would not have been able to obtain the critical financing it needed to continue meeting its short-term obligations and to avoid bankruptcy.

81

233.    Indeed, KPMG's imprimatur lent much needed credibility to the valuation of the Alaska Assets in a variety of contexts, and was heavily relied upon by all market participants, including investors such as Plaintiffs and the Class.

234.    Indeed, according to Gaylor, Riordan and Bennett went to Alaska for a meeting with investors, in which their sole function was to demonstrate to investors that KPMG was involved, and that therefore Miller could be trusted.  As another example, in a September 2012 earnings call with investors, Boruff touted the fact that Miller Energy "received the clean opinion from KPMG regarding our audited financials for the past two years" in his opening remarks as evidence of Miller Energy's "having cured any remaining deficiencies in our other public filings," and of "the improvements that we achieved in our financial reporting."  And, in a December 2012 earnings call with investors, Boruff again touted as evidence of Miller Energy's financial credibility the fact that Miller Energy "worked closely with auditors and KPMG to achieve these improved results," and the fact that Miller Energy "received a clean opinion from KPMG regarding our financials for the past two years."

235.    KPMG's imprimatur was also critical to Miller Energy's ability to access the financing that fueled the Company, whose paltry revenues never even came close to exceeding expenses.

236.    All of these facts were known and foreseeable to KPMG.  KPMG knew the value of its imprimatur to Miller Energy and the Company's executives, creditors, and investors.  It knew that, at any time during the Class Period, were it to subject the Alaska Assets to the high level scrutiny required of an independent public auditor, or to resign as independent auditor, or to issue anything other than a clean report, the house of cards that was Miller Energy would

collapse, and cause massive and widespread losses.  As a result, all the foregoing losses were a foreseeable consequence of KPMG's misconduct.

## XIII.  CAUSES OF ACTION

**COUNT ONE**

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder
(Against Boruff Only)**

237.    Plaintiffs incorporate by reference and re-alleges each allegation contained above as though fully set forth herein.

238.    During the Class Period, Boruff carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Miller Energy's business, operations, management and the intrinsic value of Miller Energy common stock; and (ii) cause Plaintiffs and other members of the Class to purchase Miller Energy common stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course  of conduct, Boruff took the actions set forth herein.

239.    Boruff (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts,  practices, and a course of business which operated as a fraud and deceit upon the purchasers of Miller Energy common stock in an effort to maintain artificially-high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Boruff is sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person, as described herein.

83

240. Boruff directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal the value of the Alaska Assets in order to manipulate Miller Energy's reported financials, as specified herein.

241. Boruff employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Miller Energy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Miller Energy common stock during the Class Period.

242. Boruff's primary liability, and controlling person liability, arises from the following facts: (i) Boruff was a high-level executive and/or director at Miller Energy during the Class Period and a member of the Company's management team or had control thereof; (ii) Boruff, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (iii) Boruff enjoyed significant personal contact and familiarity with the other senior management and was advised of and had access to other members of the Company's management team, internal reports and other data and information

84

about the Company's finances, operations, production, and revenue at all relevant times; and (iv) Boruff was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

243. Boruff had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to him. Boruff's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Miller Energy's operating condition from the investing public and supporting the artificially-inflated price of its common stock. As demonstrated by Boruff's overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Boruff, if he did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

244. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the Alaska Assets, as set forth above, the market price of Miller Energy securities was artificially-inflated during the Class Period. In ignorance of the fact that market prices of the Company's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Boruff and senior management controlled by him, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Boruff but not disclosed in public statements by him during the

85

Class Period, Plaintiff and the other members of the Class acquired Miller Energy common stock during the Class Period at artificially-high prices and were damaged when the value of their securities declined or was extinguished upon disclosure of the truth about Boruff's false and misleading statements and omissions.

245.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Miller Energy's financial condition and results, which were not disclosed by Boruff, they would not have purchased or otherwise acquired their Miller Energy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices which they paid for their respective purchases and sales of the Company's securities during the Class Period.

## COUNT TWO

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder
(Against Boruff Only)**

246.     Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

247.     This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that Boruff made any misrepresentations or omissions of material fact for which he may also be liable under Rule 10b-5(b) and/or any other provisions of law.

248. During the Class Period, Boruff carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially-inflate the market price of Miller Energy common stock; and (iii) cause Plaintiffs to purchase Miller Energy common stock at artificially inflated prices.

249. In furtherance of this unlawful plan, scheme and course of conduct, Boruff employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Miller Energy common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

250. Boruff's fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included: (i) retaining and pressuring KPMG to act not as an independent auditor, but to perform bookkeeping, appraisal, and valuation services to Miller Energy that would justify the valuation assigned by Boruff and Miller Energy to the Alaska Assets; (ii) retaining and pressuring KPMG to help Miller Energy defend the valuation of the Alaska Assets to the SEC; and (iii) retaining and pressuring KPMG to meet with investors in order to enhance Miller Energy's credibility.

251. During the Class Period, Plaintiffs and the Class were unaware of Boruff's fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Boruff's unlawful scheme and unlawful course of conduct, they would not have purchased Miller Energy securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

87

252.    As a direct and proximate result of Boruff's scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Miller Energy common stock during the Class Period.

253.    By reason of the foregoing, Boruff violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and is liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Miller Energy securities during the Class Period.

## COUNT THREE

### Violation of Section 20(a) of the Securities Exchange Act of 1934
### (Against Boruff Only)

254.    Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

255.    Boruff acted as a controlling person of Miller Energy and KPMG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, and of the fraudulent scheme with KPMG, Boruff had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, and of KPMG, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, as well as the fraudulent scheme. Boruff was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be

88

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

256. In particular, Boruff had direct and supervisory involvement in the day-to-day operations of the Company, or the auditing of the Company's financial statements, or both, and, therefore, is presumed to have had the power to control or influence the particular conduct giving rise to the securities violations as alleged herein, and exercised the same.

257. As set forth above, the Company and KPMG each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of his position as a controlling person, Boruff is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Boruff's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities.

## COUNT FOUR

### Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) Promulgated Thereunder (Against KPMG Only)

258. Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

259. This Count is brought solely and exclusively under the provisions of Rule 10b-5(b). KPMG alone, and acting in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Miller Energy which resulted in misstatements and omissions of material facts in the Company's financial reporting. KPMG employed devices, schemes, and artifices to defraud while in possession of material,

89

adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company not misleading.

260. KPMG knew, or was reckless in not knowing, that Miller Energy's reported annual financial results for fiscal years ended April 30, 2011 through April 30, 2014, which were disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP; and that the audits were not performed in accordance with GAAS and, therefore, each of KPMG's unqualified audit reports were materially false and misleading.

261. KPMG knew, or should have known, Miller Energy's financial statements for the relevant period were materially false and misleading. As described above, KPMG failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

262. As a result of KPMG's clean opinions of Miller Energy's misstated financial reports and KPMG's own false and misleading statements and omissions in its unqualified audit reports, the market price of the Company's common stock was artificially-inflated throughout the Class Period.

263. Plaintiff and other members of the Class were ignorant of the fact that the market price of Miller Energy's securities was artificially-inflated during the Class Period. As a result, Plaintiff and other members of the Class acquired the Company's securities during the Class Period at artificially-high prices and were damaged thereby.

264.     All quarterly and annual filings by Miller Energy with the SEC (on which the public relies) from the third quarter of 2011 through the third quarter of 2015, were based on fraudulent valuations and materially-misstated the assets of Miller Energy.

265.     KPMG, the outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or to take reasonable actions to correct them.

266.     Had KPMG not violated principles and standards of GAAP and GAAS, it would have detected the fraudulent valuations and material misstatements in Miller Energy's 2011-2014 financial statements.

267.     Instead, KPMG acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided, (b) the false and misleading nature of the financial statements and its failure to conduct proper audit tests and examinations of the books, records and financial statements of Miller Energy, and (c) the false representations that the financial statements had been properly audited in accordance with generally accepted auditing standards.

268.     In violation of generally accepted auditing standards, KPMG failed to expand the scope of its audits notwithstanding its knowledge or reckless ignorance of innumerable red flags that should have put it on notice of the massive over-valuation and misstatements by Miller Energy.   For instance, in accordance with generally accepted auditing standards, KPMG was required to consider whether the Company's disclosures accompanying its financial statements were adequate.   SAS No. 32, as set forth in AU §431.02-03.   And in accordance with SAS No. 1 (AU § 230) and SAS No. 82 (effective Dec. 15, 1997), KPMG had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free

91

of material misstatement, whether caused by error or fraud." If there is a material misstatement, whether by fraud or mistake, the auditors' procedures need to be designed and performed to detect it. Further, the auditor is required to view the audit evidence with professional skepticism.

269. KPMG knowingly closed its eyes to the massive fraud detailed throughout this Complaint, which was ultimately detected by the SEC.

270. In violation of GAAS, and contrary to the representations in its report on Miller Energy's financial statements, KPMG failed to obtain sufficient, competent, evidential matter to support the Company's assertions regarding the valuation of the Alaska Assets. Moreover, KPMG, either deliberately or recklessly, ignored information indicating that the Company's financial statements did not "present fairly" the Company's true financial position.

272. In carrying out its engagement to audit the financial statements of Miller Energy and in rendering its unqualified report on those financial statements, KPMG violated, among others, the following generally accepted auditing standards:

> (a) The second general standard that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;
>
> (b) The third general standard that due professional care is to be exercised in the performance of the audit and preparation of the report;
>
> (c) The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed; and
>
> (d) The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

273.    KPMG's conduct represents an extreme departure from the professional standards that should have been applied.  Had KPMG exercised due professional care and professional skepticism, it would have determined that Miller Energy's valuation of the Alaska Assets were based on fiction and that the Company's books and records were consistently falsified to conceal the true value of the Alaska Assets.

274.    KPMG knew that its reports would be relied upon by present and potential investors in Miller Energy securities.

275.    By virtue of the foregoing, KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

276.    For the reasons set forth herein, KPMG is liable in whole or in part for the damages suffered by Plaintiffs and to Class members.

### COUNT FIVE

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder
(Against KPMG Only)**

277.    Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

278.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that KPMG (or Boruff) made any misrepresentations or omissions of material fact for which it may also be liable under Rule 10b-5(b) and/or any other provisions of law.

279.    During the Class Period, KPMG and Boruff pursued an unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and

93

the Class; (ii) artificially-inflate the market price of Miller Energy common stock; and (iii) cause Plaintiffs to purchase the Company's common stock at artificially-inflated prices.

280.    In furtherance of this unlawful course of conduct, KPMG employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Miller Energy common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

281.    KPMG's fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included: (i) acting not as Miller Energy's independent auditor, but as its bookkeeper and appraiser, and performing bookkeeping, appraisal, and valuations to justify the valuation assigned by Boruff and Miller Energy to the Alaska Assets; (ii) helping Miller Energy defend the valuation of the Alaska Assets to the SEC; and (iii) meeting with investors in order to enhance Miller Energy's credibility.

282.    During the Class Period, Plaintiffs and the Class were unaware of KPMG's conduct. Had Plaintiffs and the Class known of the unlawful scheme and unlawful course of conduct, they would not have purchased Miller Energy securities, or if they had, would not have done so at the artificially-inflated prices paid for such securities.

283.    As a direct and proximate result of KPMG's conduct, as described herein, Plaintiffs and the Class suffered damages in connection with their purchases of Miller Energy common stock during the Class Period.

284.    By reason of the foregoing, KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and is liable to Plaintiffs and the Class for

damages suffered in connection with their purchases of Miller Energy securities during the Class Period.

## XIV.  JURY TRIAL DEMAND

285.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

## XV.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiffs as the designated Class representatives and Plaintiffs' counsel designated as Co-Class Counsel;

B.      Plaintiffs and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiffs and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.     Plaintiffs and members of the Class receive such other and further relief as may be just and proper.

Respectfully submitted, this 8th day of May, 2017.

                                        */s/ Gordon Ball*
                                        Gordon Ball
                                        TN BPR#001135
                                        Lance K. Baker
                                        Tenn. Bar #: 032945
                                        **GORDON BALL PLLC**
                                        Ste. 600, 550 Main Street
                                        Knoxville, TN 37902
                                        Tel: (865) 525-7028
                                        Fax: (865) 525-4679
                                        Email: gball@gordonball.com

                                        *Lead Counsel for Plaintiffs*

Steven J. Toll
Times Wang
**COHEN MILSTEIN
   SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
stoll@cohenmilstein.com

*Counsel for Plaintiffs*

96

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing was submitted electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

This 8th day of May, 2017.


*/s/ Gordon Ball*
Gordon Ball