# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

-------------------------------------------------------------X
               :

LEWIS COSBY and KENNETH R. MARTIN, as    :    No. 3:16-cv-121
beneficiary of the Kenneth Ray Martin Roth IRA, on :
behalf of themselves and all others similarly situated, :
               :

              Plaintiffs,     :
               :

            v.          :
               :

KPMG, LLP and SCOTT M. BORUFF,     :
               :

             Defendants.    :
               :
-------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS OF KPMG LLP

Paul S. Davidson (TN BPR # 011789)
Tera Rica Murdock (TN BPR #028153)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: 615-244-6380
Email: paul.davidson@wallerlaw.com
Email: terarica.murdock@wallerlaw.com

Gary F. Bendinger (**pro hac vice pending**)
Gregory G. Ballard (**pro hac vice pending**)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: +1 212 839-5300
Facsimile: +1 212 839-5599
Email: gbendinger@sidley.com
Email: gballard@sidley.com

Attorneys for Defendant KPMG LLP

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ALLEGATIONS OF THE COMPLAINT.................................................................1

    A.    Miller Energy's Acquisition of the Alaska Assets in December 2009 ...................1

    B.    KPMG's Audits for Fiscal Years 2011 Through 2014 ...........................................3

    C.    Prior Securities Litigation Involving Miller Energy...............................................5

    D.    SEC Finding That Miller Energy Committed Securities Fraud.............................5

    E.    The Claims Against KPMG ...................................................................................5

ARGUMENT ...........................................................................................................6

    I.    Plaintiffs Fail to Plead Scienter.............................................................................6

    II.    Plaintiffs Fail to Plead Loss Causation ................................................................16

    III.    The Claims Are Time-Barred ...............................................................................18

    IV.    The "Scheme" Liability Claim (Count Five) Is Invalid.......................................20

CONCLUSION.......................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re aaiPharma Inc. Sec. Litig.*,
521 F. Supp. 2d 507 (E.D.N.C. 2007) .................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................8

*Buttonwood Tree Value Partners, LP v. Sweeney*,
910 F. Supp. 2d 1199 (C.D. Cal. 2012) ...............................................................16

*In re Comshare, Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ...............................................................................6, 8

*Dura Pharmaceuticals v. Broudo*,
544 U.S. 336 (2005) ...............................................................................1, 16, 17, 18

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ...................................................................................................6

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004) ...........................................................................8, 9, 10

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .............................................................................................6, 22

*In re Longtop Financial Technologies Limited Sec. Litig.*,
910 F. Supp. 2d 561 (S.D.N.Y. 2012) ..............................................................10, 16

*Louisiana School Employees' Retirement System v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) .........................................................................7, 8, 9, 10

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................................16

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) .................................................................................................19

*In re Miller Sec. Litig.*,
2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ...........................1, 5, 6, 16, 18, 22

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) .............................................................................7, 15

4829-0493-3195.1

*Reiger v. PricewaterhouseCoopers LLP*,
   117 F. Supp. 2d 1003 (S.D. Cal. 2000)........................................................9

*SEC v. Pricewaterhouse*,
   797 F. Supp. 1217 (S.D.N.Y. 1992)..........................................................9

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014).........................................................10

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2007)...............................................................1, 20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................7

*Zucker v. Sasaki*,
   963 F. Supp. 301 (S.D.N.Y. 1997)............................................................9

**Statutes**

15 U.S.C. § 78u-4(b)(2) ..........................................................................6

28 U.S.C. § 1658(b) ..........................................................................1, 18

15 U.S.C. §78u4(b)(3)(A) ........................................................................1

Securities Exchange Act of 1934 Section 10(b) .............................................1, 18

**Other Authorities**

Fed. R. Civ. P. 9(b) ..........................................................................8, 22

Fed. R. Civ. P. 12(b)(6)..........................................................................1

Rule 10b-5 ...................................................................................6, 20

KPMG LLP ("KPMG") respectfully submits this memorandum of law in support of its motion under Rule 12(b)(6) to dismiss the Amended Class Action Complaint (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiffs' two claims against KPMG, under Section 10(b) of the Securities Exchange Act of 1934, based on KPMG's work as auditors for Miller Energy Resources, Inc. ("Miller Energy" or the "Company"), must be dismissed. *First*, Plaintiffs have not alleged facts giving rise to the "strong" inference of scienter required by the Private Securities Litigation Reform Act, 15 U.S.C. §78u4(b)(3)(A). *Second*, Plaintiffs have not pleaded loss causation under *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005). *Third*, filed more than two years after discovery of the relevant facts, the claims are time-barred under 28 U.S.C. § 1658(b). *Fourth*, the "scheme" liability claim (Count Five) fails for the additional reason that it is invalid under *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2007).

## ALLEGATIONS OF THE COMPLAINT

### A.    Miller Energy's Acquisition of the Alaska Assets in December 2009

On December 10, 2009, Miller Energy acquired certain assets in Alaska (the "Alaska Assets"), along with related liabilities, for approximately $4.25 million from a bankrupt company. (Compl. ¶¶ 1, 29.) The Alaska Assets included 602,000 acres of oil and gas leases; hundreds of miles of geologic seismic data; pipelines, roads, pads, and equipment; onshore and offshore production and processing facilities including an offshore energy platform; and millions of barrels of proved, probable, and possible oil and gas reserves. (Ex. 1 (2010 Form 10-K).)[1]

---

[1] Citations in the form "Ex. __" are to exhibits to the Declaration of Tera Rica Murdock, which are documents integral to the complaint and/or public records that the Court may consider on this motion. *In re Miller Sec. Litig.*, 2014 WL 415730, at *13 (E.D. Tenn. Feb. 4, 2014).

Miller Energy accounted for the transaction in which it acquired the Alaska Assets and related liabilities as a "business combination" pursuant to generally accepted accounting principles ("GAAP"), which required it to estimate the fair values of those assets and liabilities and recognize any resulting "bargain purchase." Miller Energy valued the acquired assets at $478 million and the related liabilities at $203 million, and recorded a bargain purchase gain of $275 million. The Company disclosed its accounting treatment and valuations in its annual report on Form 10-K for the year ended April 30, 2010 ("Fiscal 2010"), filed on July 28, 2010. (Compl. ¶¶ 1, 29, 32 n.7; *see* Ex. 1.) Sherb & Co., LLP ("Sherb & Co.") audited the financial statements for Fiscal 2010 and issued an unqualified opinion. (*See* Compl. ¶ 92; *see* Ex. 1 at F-2.)

In 2011, the Securities and Exchange Commission (the "SEC") sent multiple letters to Miller Energy inquiring about the Alaska Assets. (Compl. ¶ 33.) In three letters from April to July 2011, the SEC's Division of Corporation Finance made comments and inquiries about Miller Energy's Form 10-K for Fiscal 2010.[2] The SEC inquired about the acquisition of the Alaska Assets, the bankruptcy proceedings out of which the Company purchased the assets, the Company's valuation of the assets, and the bargain purchase gain reported on the its financial statements. Miller provided detailed responses including supporting materials.[3] All of these letters to and from the SEC were publicly filed on the SEC's website for the benefit of investors and the public. On July 20, 2012, the SEC issued a letter to Miller indicating that it had completed its review. (Ex. 8 (SEC Letter on Completed Review, July 20, 2012) (filed on July 20, 2012). The Company appeared to have satisfactorily addressed the SEC's concerns.

---

[2] Ex. 2 (letter dated Apr. 14, 2011) (filed on Apr. 14, 2011); Ex. 3 (letter dated June 7, 2011) (filed on June 7, 2011); Ex. 4 (letter dated July 26, 2011) (filed on July 26, 2011).

[3] Ex. 5 (response dated May 9, 2011) (filed on May 9, 2011); Ex. 6 (response dated June 27, 2011) (filed on June 27, 2011); Ex. 7 (response dated Aug. 16, 2011) (filed on August 16, 2011).

**B.      KPMG's Audits for Fiscal Years 2011 Through 2014**

In February 2011, Miller Energy engaged KPMG to replace Sherb & Co. as the Company's auditors. The engagement entailed performing audits of Miller Energy's financial statements. The first audit report issued by KPMG was dated August 29, 2011 and related to the financial statements for Fiscal 2011. (Compl. ¶ 1 n.2; *see* Ex. 9 at 42.) KPMG was not engaged to re-audit the financial statements for Fiscal 2010, and KPMG did not render an opinion on those financial statements. Plaintiffs acknowledge that, once engaged, KPMG required Miller Energy to re-state its prior financial statements to correct certain errors: "[a]lthough Miller Energy's prior financial statements had been audited by the Sherb firm . . . , as part of its review of prior financial statements, KPMG required Miller Energy to re-state and correct previously-issued quarterly reports and filings with the SEC and its shareholders." (Compl. ¶ 74.)

KPMG did not issue unqualified or "clean" opinions on Miller Energy's internal controls over financial reporting; in each year, KPMG either did not issue an opinion or issued an *adverse* opinion on the Company's internal controls. (Compl. ¶¶ 156, 159, 162.) In KPMG's first year on the engagement, the Company's management had not completed its assessment of the effectiveness of its internal controls, and KPMG was not able to render an opinion on such controls. As a consequence, Miller Energy's Form 10-K for Fiscal 2011 was considered deficient. All of this was publicly disclosed in the Form 10-K:

> [O]ur management did not complete its assessment of the effectiveness of our internal control over financial reporting as April 30, 2011 in accordance with SEC rules, our independent registered public accounting firm has not been able to render an opinion on the effectiveness of our internal control over financial reporting, and our Form 10-K is considered deficient.

(Ex. 9 (Form 10-K/A (Amendment No. 2) at Explanatory Note & 43-44.)

In its audit reports on the Company's internal controls for Fiscal 2012, Fiscal 2013, and Fiscal 2014, KPMG disclosed that Miller Energy had identified a "material weakness" related to

"an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls" and reported KPMG's opinion that "because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has *not* maintained effective control over financial reporting." (Ex. 10 (Form 10-K) at 45 & F-1; Ex. 11 (Form 10-K) at 16, 49-50, F-1; Ex. 12 (Form 10-K) at 19, 59-60, F-2) (emphasis added).

KPMG conducted audits and issued audit reports on Miller Energy's financial statements for Fiscal Years 2011 through 2014. KPMG's audit reports stated that it had audited the financial statements in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB") which require auditors to perform audits to obtain "reasonable assurance" about whether the financial statements are free of material misstatement, and that an audit includes examining "on a test basis" evidence supporting amounts and disclosures in those statements. The audit reports noted that the financial statements "are the responsibility of the Company's management" and that KPMG's responsibility is "to express an opinion on these consolidated financial statements based on our audit." They further noted that KPMG believed that its audits provided "a reasonable basis for our opinion." Finally, they reported KPMG's "opinion" that the Company's financial statements presented fairly, in all material respects, its financial position in accordance with GAAP. (Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.) KPMG's audit reports on the financial statements for 2012, 2013, and 2014 reiterated that the internal controls audits had resulted in KPMG's issuance of "an adverse opinion on the effectiveness of the Company's internal control over financial reporting." (Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.)

**C.** **Prior Securities Litigation Involving Miller Energy**

In 2011, shareholders filed multiple class actions against Miller Energy, Paul Boyd, and others for violations of the federal securities laws. (Compl. ¶ 40.) These lawsuits, based on allegations that the Company improperly accounted for and valued the Alaska Assets, were settled in 2014 for $2.95 million. (Compl. ¶ 40.) Prior to settlement, in February 2014, this Court ruled on motions to dismiss, holding that the plaintiffs in those cases had adequately pleaded securities fraud claims under Section 10(b) against Miller Energy, Paul Boyd, and several other individuals. *In re Miller Sec. Litig.*, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) (Varlan, C.J.).

**D.** **SEC Finding That Miller Energy Committed Securities Fraud**

The SEC conducted an investigation and charged Miller Energy and certain individuals with securities law violations in connection with Miller Energy's accounting for the Alaska Assets. (Compl. ¶¶ 117-120, 122, 125-127.) In January 2016, the SEC entered an order making findings and imposing sanctions against Miller Energy for, among other things, federal securities fraud. (Compl. ¶ 122; *see* Ex. 13.) On June 7, 2016, the SEC entered orders making findings and imposing sanctions against the Company's chief executive officer (David M. Hall), its chief financial officer (Paul W. Boyd), and an outside auditor from Sherb & Co. (Carlton W. Vogt, III). (Compl. ¶ 126; *see* Exs. 14 - 16.) The SEC found that Mr. Hall and Mr. Boyd (but not Mr. Vogt) committed federal securities fraud. (Ex. 14 at ¶ 43; Ex. 15 at ¶ 47; Ex. 16 at ¶ 62.)[4]

**E.** **The Claims Against KPMG**

The complaint in this action was filed on March 14, 2016 and amended on May 8, 2017. The Complaint asserts two claims against KPMG (Counts Four and Five) for securities fraud under Section 10(b). (Compl. ¶¶ 258-284.) Count Four is a misstatement or omission claim based

---

[4] Mr. Boyd was Plaintiffs' source for many of their allegations. (Compl. ¶¶ 41, 49-67.)

on allegations that KPMG's audits did not comply with generally accepted auditing standards ("GAAS"), and that therefore its audit reports, which stated that KPMG complied with professional standards, were false. (Compl. ¶¶ 260, 272.) The specific statements on which Plaintiffs base this claim are KPMG's single-page audit reports on Miller Energy's financial statements for fiscal years 2011, 2012, 2013, and 2014, which were included in the Company's annual reports on Form 10-K for those years. (Compl. ¶¶ 76, 82, 260; *see* Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.)[5] Court Five is based on "devices, schemes and artifices" under subsections (a) and (c) of Rule 10b-5, promulgated by the SEC pursuant to Section 10(b); for this claim, Plaintiffs assert that they "need not allege in this Count nor prove in this case that KPMG . . . made any misrepresentations or omissions of material fact." (Compl. ¶¶ 278, 280.)

## ARGUMENT

## I.  Plaintiffs Fail to Plead Scienter

Plaintiffs' allegations do not give rise to the necessary strong inference that KPMG acted with the required mental state. Plaintiffs who attempt to assert a federal securities fraud claim under Section 10(b) must plead specific facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). The required state of mind is an "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness may suffice, and recklessness in this context is "understood as a mental state apart from negligence and akin to conscious disregard," *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999).

---

[5] In the Complaint, Plaintiffs mention reports on Form 10-Q and Form 8-K. (Compl. ¶¶ 71, 73, 164.) Plaintiffs do not attempt to, and cannot, base claims against KPMG on these because KPMG did not sign or make any statements in these filings (*see* Exs. 23 - 46). *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011) (liability attaches only to "maker" of statement); *In re Miller Sec. Litig.*, 2014 WL 415730, at *9 (E.D. Tenn. Feb. 4, 2014) (no liability for individual who did not sign or make a statement in the SEC filing).

The Court is to view the complaint "holistically" and "in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). The Court "must take into account plausible opposing inferences," including "plausible nonculpable explanations" for KPMG's conduct. *Id.* The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations," and the complaint may survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The standard is "especially stringent when the claim is brought against an outside auditor." *Louisiana School Employees' Retirement System v. Ernst & Young, LLP*, 622 F.3d 471, 481 (6th Cir. 2010). "Specifically, '[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (citation omitted). To satisfy the test, plaintiffs must show "that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* at 693-94 (citation omitted).

Under these standards, Plaintiffs' conclusory assertions that KPMG acted "knowingly or recklessly" (Compl. ¶¶ 130, 151, 165-170; *see also* Compl. ¶¶ 47, 189-190, 260-261, 267, 280) and that its audits "amounted to essentially no audits at all" (Compl. ¶¶ 2, 80, 88) are insufficient as a matter of law. The PSLRA requires that plaintiffs plead particularized facts that give rise to

a strong inference of scienter. Parroting the legal standard and alleging that KPMG violated it are not enough. *See, e.g., In re Comshare, Inc.*, 183 F.3d at 553.[6]

Plaintiffs' allegations that KPMG violated professional standards (Compl. ¶¶ 128-172, 268, 270, 272) are likewise inadequate. *Louisiana School Employees' Retirement System*, 622 F.3d at 481 ("failure to follow Generally Accepted Accounting Principles is, by itself, insufficient to establish scienter"); *id.* at 482 ("Mere allegations that an accountant negligently failed to closely review files or follow Generally Accepted Auditing Standards cannot raise a strong inference of scienter."); *Fidel v. Farley*, 392 F.3d 220, 230 (6th Cir. 2004) ("failure to follow generally accepted accounting procedures does not in and of itself lead to an inference of scienter") (overruled on other grounds).

Plaintiffs attempt to bolster their conclusory assertion that KPMG acted with scienter with a series of shop-worn allegations that courts in this circuit (and elsewhere) regularly reject as inadequate. For example, Plaintiffs allege that KPMG earned fees for its audit work and had a motive to continue to earn fees. (Compl. ¶¶ 15 n.5, 193.) Under the PSLRA, however, allegations of motive and an opportunity to commit fraud are not adequate. *See In re Comshare, Inc.*, 183 F.3d at 551 ("under a plain interpretation of the PSLRA as informed by well-settled law on the contours of the 'scienter' requirement, we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud"). And, as the Sixth Circuit has explained, "allegations that the auditor earned and wished

---

[6] Plaintiffs must also satisfy the particularity requirements of Fed. R. Civ. P. 9(b). Even under Rule 8, plaintiffs must plead facts that "raise a right to relief above the speculative level" with "more than labels and conclusions, and a formulaic recitation of the elements of a clause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

to continue earning fees from a client do not raise an inference that the auditor acted with the requisite scienter." *Fidel*, 392 F.3d at 232. In fact, "[e]ven a specific account that was one of the auditor's most lucrative would not imply scienter on the part of an auditor." *Louisiana School Employees' Retirement System*, 622 F.3d at 484.[7]

Plaintiffs allege that the Alaska Assets were "extremely material to the Company" (Compl. ¶ 190), but the Sixth Circuit has held that such allegations do not contribute to an inference of scienter. *Louisiana School Employees' Retirement System*, 622 F.3d at 484 ("We have addressed similar allegations of scienter based on the magnitude of fraud with respect to an outside auditor. 'We decline to follow the cases that hold that the magnitude of the financial fraud contributes to an inference of scienter on the part of the defendant.'") (quoting *Fidel*, 392 F.3d at 231). "Allowing such an inference would eviscerate the principle that accounting errors alone cannot support a finding of scienter." *Id.* (citing *Fidel* and *Stambaugh v. Corrpro Cos.*, 116 Fed. Appx. 592, 597 (6th Cir. 2004), which "declin[ed] to find a strong inference of scienter where, among other things, the plaintiff referenced the magnitude of the fraud and the fact that the fraud involved a 'material component' of the defendant's business").

Plaintiffs allege that KPMG had "unfettered access to data" and "Company documents and records" (Compl. ¶¶ 191, 194), but "[g]eneral allegations regarding an auditor's access to

_____

[7] *See also Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997) (it is "economically irrational" to assume an auditor would willingly condone a client's fraud "at the risk of jeopardizing its reputation and license as well as the possibility of damages in an amount much greater than its fee"); *SEC v. Pricewaterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees"); *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000) (because "a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud," scienter allegations must "overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client").

information do not raise an inference of scienter." *Louisiana School Employees' Retirement System*, 622 F.3d at 481; *In re aaiPharma Inc. Sec. Litig.*, 521 F. Supp. 2d 507, 513–14 (E.D.N.C. 2007) ("[M]erely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library. Merely alleging that [the auditor] had broad access to [company] operations at best supports an inference that [the auditor] was negligent, and more likely supports nothing at all.").

Finally, Plaintiffs allege that there were "red flags." (Compl. ¶¶ 86-103, 192-195.) Plaintiffs are wrong. Nothing in the "red flags" alleged by Plaintiffs constituted a red flag under the applicable case law, as the facts and circumstances alleged by Plaintiffs in these paragraphs were not indicative of fraud. *See Fidel*, 392 F.3d at 229.

Furthermore, the "red flags" alleged by Plaintiffs were not in fact red flags because they were facts and circumstances that were disclosed in public SEC filings or otherwise part of the public record at the time. *See In re Longtop Financial Technologies Limited Sec. Litig.*, 910 F. Supp. 2d 561, 576-77 (S.D.N.Y. 2012) (matters that are publicly disclosed are not red flags and do not give rise to an inference of scienter; "neither the SEC nor the investing public recognized Longtop's alleged fraud," which "raises the inference that these purported red flags are in fact red herrings"); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 431 (S.D.N.Y. 2014) ("red flags embedded in publicly available documents do not support an inference of scienter"). Below is a list of Plaintiffs' purported "red flags," along with dates of the public SEC filings and other documents disclosing those matters long ago:

| | |
|---|---|
| Limited experience of CEO Scott Boruff and CFO Paul Boyd in oil and gas industry (Compl. ¶ 90.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at 43 (describing Boruff's and Boyd's prior employment in fields unrelated to oil and gas). |

| | |
|---|---|
| The accounting department was inadequately staffed. (Compl. ¶ 90.) | *See, e.g.*, Ex. 1 (Form 10-K, filed July 28, 2010) at 41 ("We do not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training . . ."); Ex. 9 (Form 10-K/A (Amendment No. 2), filed Aug. 29, 2011) at 43 (same). |
| The January 31, 2011 Form 10-Q was filed late, and earlier quarterly reports could not be relied on. (Compl. ¶ 90.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at 42-43, F-26 (describing restatement of prior quarterly reports). |
| Miller Energy did not form an internal audit group. (Comp. ¶ 90.) | Ex. 10 at 45-46; Ex. 11 at 49-50; Ex. 12 at 19, 60. |
| Miller Energy used a reserve report from Ralph E. Davis Associates, Inc. ("RE Davis") to assess fair market value of the Alaska Assets. (Compl. ¶ 90.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at 5, F-11 & F-26 (disclosing use of RE Davis report); *id.* at Ex. 22.1 (consent of RE Davis); *id.* at Ex. 99.1 (RE Davis report). |
| Prior auditor was the small firm of Sherb & Co., which previously issued qualified opinions, and prior-year results reflected minimal revenues and operating losses. (Compl. ¶ 91.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at F-2 (Sherb & Co. report); *id.* at 52 (prior-year results reflecting minimal revenues and operating losses); *id.* at 20 (describing history of operating losses); Ex. 17 (Form 10-K for April 30, 2009, filed August 10, 2009) at F-1 (Sherb & Co.'s qualified opinion). |
| Miller Energy purchased the Alaska Assets for a few million dollars, valued them at several hundred million dollars and recorded a large "bargain purchase" gain. (Compl. ¶ 92.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at F-15-F-16 (reporting acquisition of Alaska Assets, valuation of reserves, purchase price, and bargain purchase gain). |

| | |
|---|---|
| Sherb & Co. issued an unqualified audit opinion on the prior-year financial statements. (Compl. ¶ 92.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at F-2 (Sherb & Co. report on fiscal 2010 financial statements); Ex. 9 (Form 10-K/A (Amendment No. 2), filed Aug. 29, 2011) at F-3 (Sherb & Co. report on prior-year financial statements). |
| There were material weaknesses in the Company's internal controls, and KPMG did not issue an opinion on the Company's internal controls for 2011. (Compl. ¶ 93.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at 41 (disclosing material weaknesses); Ex. 9 (Form 10-K/A (Amendment No. 2), filed Aug. 29, 2011) at Explanatory Note & 43-44 (disclosing KPMG did not issue an opinion on the Company's internal controls for 2011); Ex. 10 (Form 10-K, filed July 16, 2012) at 45 (disclosing material weakness) & F-1 (KPMG report on audit of internal controls, noting materials weakness); Ex. 11 (Form 10-K, filed July 15, 2013) at 16, 49-50, F-1 (same); Ex. 12 (2014 Form 10-K, filed July 14, 2014) at 19, 59-60, F-2 (same). |
| The Company had high borrowing costs. (Compl. ¶ 94.) | *See, e.g.,* Ex. 1 (Form 10-K, filed July 28, 2010) at 33-37 (describing loan and financing arrangements). |
| The SEC sent letters inquiring about the Alaska Assets (Compl. ¶ 95.) | Ex. 2 (SEC letter dated Apr. 14, 2011, filed on Apr. 14, 2011); Ex. 3 (SEC letter dated June 7, 2011, filed on June 7, 2011); Ex. 4 (SEC letter dated July 26, 2011, filed on July 26, 2011). |
| A Street Sweeper article raised questions about the Company. (Compl. ¶ 96.) | Ex. 18 (published on July 28, 2011). |
| Miller Energy improperly filed its Form 10-K on July 29, 2011 before KPMG had completed its audit work, and prior financial reports had to be restated. (Compl. ¶ 97.) | Ex. 19 (Form 10-K/A- Amendment No. 1, filed Aug. 9, 2011) at Explanatory Note (disclosing that Miller Energy had filed its Form 10-K on July 29, 2011 before KPMG had completed its audit work, and prior financial reports had to be restated). |
| The chief executive officer purchased an expensive home. (Compl. ¶ 98.) | Ex. 20 (press report published on June 9, 2011). |

| The Company filed a Form-8 attaching a letter responding to the Steetsweeper article. (Compl. ¶ 99.) | Ex. 21 (Form 8-K, filed on August 1, 2011, attaching letter responding to the Streetsweeper article). |
| --- | --- |
| Class action lawsuits were filed against the Company. (Compl. ¶ 100.) | *See, e.g.,* Ex. 22 (complaint filed August 16, 2011). |

Therefore, even giving Plaintiffs full credit for all of the allegations in the Complaint that they claim bear on KPMG's state of mind, and even without considering (as is required) opposing nonculpable explanations, there is no basis for drawing any inference of scienter on the part of KPMG, much less a "strong" one.

When the competing inferences that naturally flow from the allegations of the Complaint are added to the mix, the conclusion is all the more clear—there is no strong inference that KPMG acted with the required state of mind. For example, Plaintiffs acknowledge that the Company's purchase of the Alaska Assets took place in December 2009 and that the Company's independent auditor at the time was Sherb & Co., not KPMG. (Compl. ¶¶ 1, 29, 47.) Plaintiffs acknowledge that KPMG was not retained until over a year later, in February 2011. (Compl. ¶¶ 49, 70.) By the time KPMG was retained, the Company had already decided how the Alaska Assets were to be treated on its financial statements, and the Company's independent auditor at the time, Sherb & Co., had already audited those financial statements and issued its audit report on those statements. (Ex. 1 at F-2.) Thus, when KPMG came onto the engagement in February 2011, the purchase of the Alaska Assets had already been accomplished and accounted for in the Company's reported financial results, another year had passed, and the Company was in the midst of an effort to become listed on the New York Stock Exchange. (Compl. ¶ 38.) Nothing in these circumstances suggests that KPMG knew of some on-going fraud at the Company and decided to join it.

As noted above, courts recognize that it would be "economically irrational" for auditors to participate in a client's fraud, which means plaintiffs must overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud. (*See supra*, p. 9 n.7). Here the economic irrationality is even more pronounced, given that according to Plaintiffs' allegations, the Company embarked upon its fraud long before KPMG was retained; KPMG had even less of an incentive to join in a pre-existing alleged fraud. Yet, remarkably, this implausible scenario—KPMG is retained as the new auditor and immediately joins an ongoing fraud—is exactly what Plaintiffs allege. (Compl. ¶ 4 ("KPMG's participation in the fraud began from virtually the moment it was retained in February 2011.") In fact, having had no prior involvement with the Company, and having not had any role in the acquisition of the Alaska Assets or the prior accounting treatment of them, there would be no reason for KPMG to take on a new engagement and immediately join in an on-going fraud. The most natural inference to draw from these circumstances is that KPMG did not learn of, or intend to join, the Company's alleged fraud.

The fact that the SEC made several inquiries regarding the Company's treatment of the Alaska Assets from April 2011 through June 2011 and after receiving responses and supporting materials from the Company decided to close its inquiry on July 20, 2012, without making additional comments, demanding revisions to the Company's financial reports, or taking any further action (Compl. ¶ 33; *see* Exs. 2-8), supports an inference that there was no obvious fraud and that KPMG did not intentionally or recklessly join it.

Another allegation that counters an inference of scienter is that Sherb & Co. issued an unqualified opinion on the Company's financial statements for 2010. (*See* Compl. ¶ 92.) As the Company had acquired the Alaska Assets in December 2009, they were accounted for in the

Company's financial statements for Fiscal 2010. As noted above, to support an inference of scienter, plaintiffs must allege accounting practices so deficient that "no reasonable accountant" would have made the same decisions if confronted with the same circumstances. *PR Diamonds, Inc.*, 364 F.3d at 693-94. Plaintiff's allegations here—that two separate independent audit firms (Sherb & Co. and KPMG) audited the Company's financial statements after it acquired the Alaska Assets and found no material misstatement—make it more difficult for Plaintiffs to meet their burden.

Another fact alleged by Plaintiffs that supports an inference that KPMG acted without fraudulent intent is that in the first year of its engagement KPMG reviewed Miller Energy's prior financial statements, found errors, and "required Miller Energy to re-state and correct the previously-issued quarterly reports and filings with the SEC and shareholders, including the previously Sherb-audited year-end April 30, 2010 financial statements in which the fraudulent and artificially-inflated value of the Alaska assets was initially recorded." (Compl. ¶ 74.) Again, it would make no sense for KPMG, if it was intent on joining a pre-existing and ongoing fraud, to require the Company to restate prior financial results. Such actions are simply inconsistent with Plaintiffs' theory that KPMG eagerly joined in Miller Energy's fraud immediately after the Company engaged KPMG.

Still another critical fact, admitted by Plaintiffs, that supports a nonculpable explanation for KPMG's conduct is that KPMG issued *adverse* opinions on the Company's internal controls, finding and reporting publicly that Miller Energy "has not maintained effective internal control over financial reporting." (Compl. ¶¶ 152, 156, 159, 162; *see* Ex. 10 at F-1; Ex. 11 at F-1; Ex. 12 at F-2; *see also* Ex. 9 at Explanatory Note (no opinion from independent registered public accounting firm on the effectiveness of internal controls over financial reporting)). Again, if

KPMG was participating in the Company's fraud, it would make no sense to issue adverse opinions reporting that there were material weaknesses in the Company's internal controls. That KPMG did so supports an inference that KPMG was acting in good faith; it severely undermines any inference of fraudulent intent. *See Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012) (auditor's identification of material weakness in audit client's internal controls is "inconsistent with Plaintiffs' allegation that [the auditor] pandered to [the audit client's] management").[8]

## II.    Plaintiffs Fail to Plead Loss Causation

Loss causation—"a causal connection between the material misrepresentation and the loss"—is a necessary element of a Section 10(b) claim. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Allegations that Plaintiffs purchased at artificially inflated prices are not adequate to plead loss causation. *Id.* at 347. As the Supreme Court has explained:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But that is far from

---

[8] Additionally, the claims fail because Plaintiffs have not alleged that KPMG made a misrepresentation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (misrepresentation or omission and scienter are separate elements). Audit reports are statements of opinions. (*E.g.* Ex. 9 at F-2 ("Our responsibility is to express an opinion . . . . We believe that our audits provide a reasonable basis for our opinion. In our opinion, the consolidated financial statements . . .").) "[T]o allege that an auditor opinion is a misrepresentation, a complaint must show that the statement in question is grounded on a specific factual premise that is false, and that the speaker did not 'genuinely or reasonably believe' it." *In re Longtop Financial Technologies Limited Sec. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012); *see In re Miller Sec. Litig.*, 2014 WL 415730, at *15 (plaintiffs must plead "particular facts sufficient to demonstrate that the [defendants] did not believe those opinions at the time they were made"). Plaintiffs have not pleaded facts showing that KPMG did not believe its opinions.

inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 342-43. Rather, Plaintiffs must prove "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* at 346. Plaintiffs must plead not only that they suffered an economic loss, but also a "causal connection" between the defendant's misrepresentation or other fraudulent conduct and that loss. *Id.* at 347.

Plaintiffs allege that they purchased at artificially inflated prices and that they suffered economic losses as the share price declined when certain information made its way into the market. (Compl. ¶¶ 104, 108, 110), but Plaintiffs plead no causal connection between KPMG's alleged misrepresentations (its audit reports) or KPMG's other conduct and those economic losses. For example, in paragraph 104, Plaintiffs allege that on December 17, 2013, a concerned shareholder sent an open letter to the Company "criticizing management's handling of the Alaska Assets," which caused the Company's stock price to decline by $1.53 over a three-day period. But this was nothing new. By Plaintiffs' own admission, shareholders had been criticizing management's handling of the Alaska Assets for years; shareholder filed multiple lawsuit against the Company's management in 2011 based on management's handling of the Alaska Assets. (Compl. ¶ 40.) Moreover, nothing in this allegation reveals any causal connection between the alleged misrepresentations or other conduct of *KPMG* and Plaintiffs' loss. By their own admission, the disclosure at issue in paragraph 104 relates to Miller Energy's management, not KPMG or its audit reports or other conduct. In paragraph 108, Plaintiffs allege that on November 26, 2014, the Company's stock "became the subject of margin calls" and declined from $3.16 to $1.59 on December 1, 2014, but again Plaintiffs plead no causal connection

between KPMG's audit reports or other conduct and the price decline or any resulting economic loss. Finally, in paragraph 110, Plaintiffs allege that the Company announced "a loss of $285.7 million and a $9 million loss of earnings, a 73% increase over the same quarter the previous year, as well as DD&A of $20.1 million, an increase of 123% compared to the same quarter the previous year," at which point the stock price fell from a closing price of $1.35 on December 9, 2014 to $1.16 on December 10, 2014. Here too, Plaintiffs plead no causal connection between KPMG and the price decline or any resulting economic loss to Plaintiffs.

In the prior securities litigation, this Court held that the plaintiffs had adequately pleaded a causation connection between *Miller Energy's* and its *management's* alleged misrepresentations and the economic losses that followed from stock price declines. *In re Miller Sec. Litig.*, 2014 WL 415730, at *23. Indeed, the allegations in that case, and in the present case, appear to be directed at establishing a causal connection between Miller Energy's alleged misrepresentations about the value of the Alaska Assets and the alleged economic losses, not a causal connection between KPMG's audit reports (or other conduct) and such losses.

For these reasons, Plaintiffs have not pleaded that "the defendant's [KPMG's] misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura*, 544 U.S. at 346.

## III.     The Claims Are Time-Barred

The claims against KPMG[9] are time-barred under 28 U.S.C. § 1658(b), as Plaintiffs filed this case on March 14, 2016, more than two years after a reasonably diligent investigation would have revealed the facts allegedly constituting a violation under Section 10(b).

---

[9] KPMG's audit reports for 2011, 2012, and 2013 were issued more than two years before the filing of this action. The only audit report filed within the two-year period leading up to the filing of this action was the report for 2014, dated July 14, 2014. (Ex. 12 at 69.)

Under Section 1658(b), a plaintiff may bring a Section 10(b) claim no later than the earlier of two years after discovery of the facts constituting the violation or five years after the violation itself. In *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010), the Supreme Court held that the word "discovery" in this context "encompasses not only those facts the plaintiffs actually knew, but also those facts a reasonably diligent plaintiff would have known." The Court explained that "[i]n determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 653.

The facts constituting the violation in the present case, including alleged facts on which Plaintiffs base their contention that KPMG acted with scienter, were known, or would have been discovered by a reasonably diligent plaintiff, before March 14, 2014, two years prior to the filing of the present action. The underlying alleged facts and circumstances that form the basis Plaintiffs' claims of securities fraud relating to Miller Energy's valuation of and accounting for the Alaska Assets were publicly known many years ago, and indeed formed the basis for prior securities fraud lawsuits against Miller Energy and its chief executives that survived motions to dismiss years ago. The plaintiffs in those cases discovered facts they needed to file complaints (in 2011), and their claims against Miller Energy and most of the individual defendants survived motions to dismiss. Indeed, this Court's decision denying most of the motions to dismiss is dated February 4, 2014, more than two years before Plaintiffs filed the present case.

The only conceivable argument Plaintiffs might advance is that the facts constituting scienter on the part of KPMG were not known or discoverable by a reasonably diligent plaintiff by February 14, 2014, but any such argument is contradicted by the very allegations advanced by Plaintiffs in the Complaint. Plaintiffs' scienter allegations against KPMG are based on facts and circumstances that were publicly disclosed and a matter of public record before February 14, 2014. The fees that KPMG earned (Compl. ¶ 193) were a matter of public record, as audit fees were disclosed annually. (Ex. 9 at 60; Ex. 10 at 47; Ex. 11 at 51 (referencing Definitive Proxy Statement dated 31 March 2014, filed on Mar. 31, 2014); Ex. 12 at 62 (referencing Definitive Proxy Statement dated 28 August 2014, filed on Aug. 28, 2014)). The materiality of the Alaska Assets to Miller Energy (Compl. ¶ 190) was disclosed, and obvious, from the outset (Ex. 1 at 20). That KPMG as the Company's outside auditors had access to the Company's data and records (Compl. ¶¶ 191, 194) was known at all times, as all auditors must have such access to perform audits. And, as detailed above, the purported "red flags" that are the centerpiece of Plaintiffs contention that KPMG acted with scienter were publicly disclosed before February 14, 2014. *See supra* at 11-13.

## IV.    The "Scheme" Liability Claim (Count Five) Is Invalid

Plaintiffs' "scheme" liability claim (Count Five) is subject to dismissal for an additional reason beyond the three discussed above: it is precluded by the language of Section 10(b) and the Supreme Court's ruling in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), which squarely addressed the question of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)," *id.* at 156. In *Stoneridge*, the Supreme Court reiterated that Rule 10b-5 cannot be construed to impose liability beyond what Section 10(b), the authorizing statute, prohibits: "Rule 10b-5 encompasses only

conduct already prohibited by § 10(b)." *Id.* at 157. "In a typical § 10(b) private action," the Court observed, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* In *Central Bank*, the Court had "determined that §10(b) liability did not extend to aiders and abettors," again as the scope of liability under the rule is "delimited by the text" of the statute. *Id.* In *Stoneridge*, the Court affirmed the dismissal of a "scheme" liability claim, premised upon conduct rather than misstatements or omissions, because "respondents' acts or statements were not relied upon by the investors and . . . as a result, liability cannot be imposed upon respondents." *Id.* at 159. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action." *Id.* The Court explained, "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," and "Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.*

While Plaintiffs base their "scheme" liability claim not on misstatements or omissions, but rather on allegedly deceptive conduct (Compl. ¶¶ 278, 281), Plaintiffs admit that they were *unaware* of this conduct: "During the Class Period, Plaintiffs and the Class were unaware of KPMG's conduct" (Compl. ¶ 282). Thus, Plaintiffs admit they in fact did not know of (and therefore could not have relied on) KPMG's alleged conduct. Plaintiffs do not attempt to plead any presumption of reliance; nor could they, as such presumptions are available only where "there is an omission of a material fact by one with a duty to disclose" or under the fraud-on-the-market doctrine "when the statements at issue become public." *Stoneridge*, 552 U.S. at 159. As in *Stoneridge*, no plaintiffs "had knowledge, either actual or presumed, of [KPMG's allegedly]

deceptive acts during the relevant times," and Plaintiffs, "as a result, cannot show reliance upon any of [KPMG's] actions except in an indirect chain" that is "too remote for liability." *Id.*

Plaintiffs "scheme" liability claim fails for another reason as well: it is not truly based on "conduct" by KPMG unrelated to alleged misstatements or omissions, but is rather a classic example of attempting to impose liability on a defendant who had some role in contributing to or preparing a public statement, but was not the one who actually was the "maker" of the statement. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011). Plaintiffs allege that KPMG "performed bookkeeping, appraisal, and valuations to justify the valuation assigned by Boruff and Miller Energy to the Alaska Assets." (Compl. ¶ 281.) But, as Plaintiffs allege throughout their Complaint, the valuation of the Alaska Assets was contained in the annual, quarterly, and other reports filed by Miller Energy publicly with the SEC. With their "scheme" allegations, Plaintiffs are essentially alleging that KPMG has some behind-the-scenes role in generating, preparing, or drafting valuations that made their way into the Company's allegedly misleading public filings. That is exactly what the Supreme Court rejected in *Janus*. *Janus*, 564 U.S. at 142-43; *In re Miller Sec. Litig.*, 2014 WL 415730, at *9.[10]

## CONCLUSION

For the foregoing reasons, KPMG requests that the Court grant its motion to dismiss. Because Plaintiffs have already amended their complaint once, and because the grounds for dismissal are insurmountable, KPMG request that dismissal be with prejudice.

---

[10] Plaintiffs also allege that KPMG helped defend the Company's valuation of the Alaska Assets to the SEC (Compl. ¶ 281), conduct that similarly cannot be linked to public investors except through the affirmative statements made by Miller Energy in its public SEC filings. The third type of conduct Plaintiffs allege is "meeting with investors in order to enhance Miller Energy's credibility." (Compl. ¶ 281.) That conduct is on its face not deceptive; the mere attendance of a person at a meeting, devoid of any allegation about what any person said during the meeting, cannot be deemed deceptive. Allowing a claim to proceed under that theory would be at odds with numerous Supreme Court precedents, including *Janus*, as well as the PSLRA and Rule 9(b).

4829-0493-3195.1

Dated: July 7, 2017

Respectfully submitted,

s/ Paul S. Davidson
Paul S. Davidson (TN BPR # 011789)
Tera Rica Murdock (TN BPR #028153)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: 615-244-6380
Email: paul.davidson@wallerlaw.com
Email: terarica.murdock@wallerlaw.com

Gary F. Bendinger (**pro hac vice pending**)
Gregory G. Ballard (**pro hac vice pending**)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: +1 212 839-5300
Email: gbendinger@sidley.com
Email: gballard@sidley.com

**Attorneys for Defendant KPMG LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2017, a copy of the foregoing was filed electronically and served via the Court's CM/ECF system on the following:

Gordon Ball
Gordon Ball PLLC
550 West Main Street, Suite 600
Knoxville, TN 37902

Lance Kristopher Baker
The Baker Law Firm
550 West Main Street, Suite 600
Knoxville, TN 37902

Steven J Toll
Times Wang
Cohen, Milstein, Sellers & Toll PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005-3934

*Attorneys for Plaintiffs*

And via first-class mail upon the following:

SCOTT M. BORUFF
5628 Lyons View Pike
Knoxville, Tennessee 37919

s/ Paul S. Davidson
Paul S. Davidson