# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

LEWIS COSBY, KENNETH R. MARTIN,
as beneficiary of the Kenneth Ray Martin
Roth IRA, and MARTIN WEAKLEY on
behalf of themselves and all others
similarly situated,

                Plaintiffs,

vs.

KPMG, LLP,

                Defendants.

CLASS ACTION

JURY TRIAL DEMANDED

No. 3:16-cv-00121

---

## SECOND AMENDED CLASS ACTION COMPLAINT

---

Gordon Ball
Lance K. Baker
**GORDON BALL PLLC**
550 W. Main Street
Suite 600
Knoxville, TN  37902
Tel:  (865) 525-7029
Fax: (865) 525-4679
gball@gordonball.com
lkb@gordonball.com

Steven J. Toll
Times Wang
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
1100 New York Ave NW, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
stoll@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York  10005
Tel: (212) 838-7797
Fax  (212 838-7745
lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

I.  NATURE OF ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE ................................................................. 5

III.  PARTIES ...................................................................................................... 6
   A.  Lead Plaintiffs .................................................................................... 6
   B.  Defendant KPMG ............................................................................... 6
   C.  Relevant Non-Parties ......................................................................... 8

IV.  CLASS ACTION ALLEGATIONS ......................................................... 10

V.  EXCHANGE ACT ALLEGATIONS ....................................................... 12
   A.  Background of Miller Energy ........................................................... 12
   B.  Miller Energy Purchases the Alaska Assets .................................... 13
   C.  Miller Energy Grossly Overstates the Value of the Alaska Assets ........... 14
   D.  Miller Energy Hires KPMG as its Independent Public Auditor ................. 17
   E.  The SEC Begins Investigating and Public Concerns Arise Regarding the Valuation of the Alaska Assets ...................................... 18
   F.  The Inflated Valuation of the Alaska Assets Leads to an Unprecedented Period of Growth for Miller Energy ......................... 20
   G.  KPMG's Critical Role in yhe Miller Energy "House Of Cards" and its GAAS and PCAOB Violations .................................................. 20
   H.  Additional Scienter Allegations ....................................................... 58
   I.  KPMG's False and Misleading Statements ...................................... 61
   J.  The Truth Begins to Emerge ............................................................. 73
   K.  Loss Causation .................................................................................. 88
   L.  Inapplicability of the Statutory Safe Harbor ................................... 89
   M.  Presumption of Reliance ................................................................... 90
   N.  Claims for Relief Under the Exchange Act ...................................... 92

VI.  SECURITIES ACT ALLEGATIONS ...................................................... 97
   A.  The Offering Documents ................................................................... 98
   B.  False and Misleading Statements in the Offering Documents ...................... 100
   C.  Claim for Relief Under the Securities Act ..................................... 112

**VII.  JURY TRIAL DEMAND** ............................................................... **115**

**VIII.  PRAYER FOR RELIEF** ............................................................... **115**

ii

Plaintiffs, Lewis Cosby, Kenneth R. Martin (as beneficiary of the Kenneth Ray Martin Roth IRA), and Martin Weakley (hereinafter, "Plaintiffs"), through their undersigned attorneys, make the following allegations against Defendant KPMG, LLP ("KPMG"), based on their personal knowledge, on information and belief, and on the investigation of Plaintiffs' counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller Energy" or "the Company"), records of judicial proceedings in the United States District Court for the Eastern District of Tennessee, orders filed by the SEC *In the Matter of Miller Energy Resources, Inc., Paul W. Boyd, CPA, David M. Hall, and Carlton W. Vogt, III CPA*, SEC Admin. Proceeding File No. 3-16729 (August 6, 2015), the order filed by the SEC *In the Matter of KPMG LLP and John Riordan, CPA*, SEC Admin. Proceeding File No. 3-18110 (August 15, 2017), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), as well as regulatory filings and reports, press releases, public statements, news articles, other publications, securities analysts' reports and advisories about Miller Energy and other readily obtainable information. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF ACTION

1.    Throughout the Class Period,[1] KPMG[2] perpetuated a massive fraudulent scheme at Miller Energy on the investing public by maintaining a financial house of cards centered on oil and gas assets in Alaska (the "Alaska Assets"). In late 2009, Miller Energy purchased the

---

[1] The Class Period is from August 29, 2011, the date of the 2011 Form 10-K in which KPMG issued an unqualified opinion, and ends on October 1, 2015, the date Miller Energy filed for bankruptcy.

[2] Miller Energy sought protection under federal bankruptcy laws on October 1, 2015. Therefore, it is not named as a Defendant in this action.

Alaska Assets out of bankruptcy for $2.25 million in cash and the assumption of $2 million in liabilities. Miller Energy then promptly falsified its financials to portray the impression that those assets were worth a massively overstated $480 million. The overstatement of the Alaska Assets was by far the single most important event in Miller Energy's history; transforming it from a penny-stock company trading on the pink sheets, to one traded on the New York Stock Exchange ("NYSE"), with a stock price reaching nearly $9 per share.

2.    Under significant pressure from investors to hire a top public accounting firm, in February 2011, Miller Energy hired KPMG. Rather than abide by its obligations under Generally Accepted Accounting Standards ("GAAS"), KPMG intentionally or recklessly undertook a years-long scheme to assist Miller Energy in its fraud. Specifically, KPMG refused to see or even investigate the obviously fraudulent nature of the valuation of the Alaska Assets, yet issued year after year of unqualified clean audit opinions vouching for the valuation of those assets. Unbeknownst to the investing public, KPMG's clean audit opinions lacked any reasonable basis and were not conducted in accordance with GAAS, such that they amounted to no audits at all.

3.    KPMG's unreasonable, clean audit opinions propped-up the Miller Energy house of cards, causing enormous harm to investors.

4.    The Miller Energy house of cards finally began to collapse in December 2013, when it started to become clear that the Alaska Assets were worth nowhere near what KPMG and Miller Energy said they were, in large part because the assumptions about how much it would cost Miller Energy to actually extract hydrocarbons from those Alaska Assets were massively and fraudulently understated. As this reality materialized, Miller Energy's securities prices began to crumble. Then, in December 2014, the Company disclosed it was taking a

2

$265.3 million impairment charge on the Alaska Assets, in part because of issues relating to cost. Three months later, the Company disclosed yet another impairment charge of $150 million on the Alaska Assets, ultimately writing down almost all the goodwill from that acquisition. By 2015, the Company's securities had been de-listed by the NYSE, and the Company (along with two officers and its former outside auditor) faced an SEC-enforcement action targeting accounting practices regarding the valuation of the Alaska Assets. By year's end, the Company had settled with the SEC, agreeing to pay a $5 million fine, and was in bankruptcy. By 2016, the Company emerged from bankruptcy, all of its stock voided, and its assets divided by its largest creditors.

5.     The Company finally admitted its fraud on March 29, 2016, when it disclosed that *none* of its financial statements regarding the valuation of the Alaska Assets should be relied upon. However, this admission came far too late for shareholders, who by then had already suffered enormous losses on their investments.

6.     In addition to investigating Miller Energy's culpability, the SEC concurrently – and unbeknownst to the public – was investigating KPMG's role in the fraudulent overstatement of the Alaska Assets. In August 2017, KPMG and its lead partner on the Miller Energy engagement, John Riordan ("Riordan"), settled with the SEC ("KPMG Order"). In the KPMG Order, the SEC found that KPMG engaged in "improper professional conduct" and "securities law violations" relating to its "review and audit of the financial statements of Miller Energy Resources, Inc."

7.     Specifically, after an extensive investigation, including review of KPMG's Miller Energy audit workpapers and other internal documents, the SEC found, among other things, that: (1) KPMG's valuation of the Alaska Assets at an "inflated value of $480 million . . .violated

generally accepted accounting principles ("GAAP") and overstated the fair value of the assets by hundreds of millions of dollars"; (2) KPMG "failed to comply with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), chiefly with respect to the procedures relating to the oil and gas properties that contained the overstated asset values"; (3) KPMG "failed to obtain sufficient competent evidence regarding the impact of the opening balances of the Alaska Assets, despite knowing that no proper fair value assessment had been performed by management"; (4) KPMG "failed to appropriately consider the facts leading to Miller Energy's acquisition of the Alaska Assets, including the multiple offers received for those assets and the "abandonment" of the assets by the prior owner" in valuing the Alaska Assets; (5) KPMG "failed to sufficiently review certain forecasted costs associated with the estimation of the fair value of the Alaska Assets, which were understated, and to detect that certain fixed assets were double counted in the company's valuation"; (6) KPMG "failed to properly assess the risks associated with accepting Miller Energy as a client and to properly staff the audit"; (7) KPMG "overlooked evidence that indicated a possible overvaluation of the Alaska Assets"; (8) KPMG "failed to exercise the requisite degree of due professional care and skepticism" in auditing Miller Energy"; and (9) even after KPMG management and national office personnel became aware of the unusual and highly material valuation of the Alaska Assets, KPMG failed to "take sufficient action to determine that an appropriate response was taken by the engagement team regarding the risk of overvaluation of the Alaska Assets."

8.     The SEC further explained that:

> KPMG [] should have known that Miller Energy's financial statements were not in accordance with GAAP. They knew that the two reports the company relied on to substantiate the fair value of the Alaska Assets were not fair value estimates that were appropriate for financial reporting purposes. They should have known that the inclusion of the numbers in the insurance report

double counted as much as $110 million worth of the fixed assets. Moreover, throughout the 3Q2011 review and fiscal 2011 audit, KPMG [] were aware of the company's inadequate accounting staff, ineffectual internal controls, and management's possible incentive to overstate the value of the Alaska Assets. During the review and audit, they should have been aware of the understated forecasted costs in the reserve report. Yet KPMG [] failed to take reasonable steps to determine that the company's valuation for its Alaska acquisition was properly recorded pursuant to applicable GAAP.

9.     To settle the action, KPMG and Riordan agreed to pay the SEC fines of $1 million and $25,000, respectively.   In addition, KPMG agreed to pay disgorgement of $4,675,680, which represents the audit and audit-related fees paid to KPMG by Miller Energy over the course of their auditor-client relationship between 2011 and 2014, and prejudgment interest of $558,319.  The KPMG Order also censured KPMG, and denied Riordan the privilege or appearing or practicing before the SEC Commission as an accountant.

10.     By this action, Plaintiffs, for themselves and other purchasers of Miller Energy common and preferred stock, seek damages against KPMG for the wrongdoing outlined above, and described in more detail below.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 22 of the Securities Act.  The claims asserted herein arise under §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5), and under § 11 of the Securities Act (15 U.S.C. § 77k).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. §1391(b) and (c) because one or more Defendants may be found or resides here or had agents in this district, transacted or is licensed to

transact business in this district, and because a substantial portion of the affected trade and commerce described below has been carried out in this district.

13.    In connection with the acts and conduct alleged in this Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC"), Defendant KPMG, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

14.    Lead Plaintiff, Lewis Cosby ("Cosby"), purchased shares of Miller Energy common stock and was damaged thereby.

15.    Lead Plaintiff, Kenneth R. Martin ("Martin"), the primary beneficiary of the Kenneth Ray Martin Roth IRA ("Martin Roth IRA"), purchased shares of Miller Energy common stock during the Class Period and was damaged thereby.

16.    Named Plaintiff, Martin Weakley ("Weakley"), purchased shares of Miller Energy Series C Preferred Stock and Miller Energy Series D Preferred Stock on or traceable to the Offerings (*see* ¶ 284) during the Class Period and was damaged thereby.

### B.    Defendant KPMG

17.    KPMG is one of the "Big Four" international accounting firms, with 179 offices across 19 countries and 25,000 employees.  KPMG is duly organized and exists under the laws of the State of Delaware, with its main office at 345 Park Avenue, New York, New York. KPMG also has an office in Knoxville, Tennessee.  While the firm's literature states that it is a

leader in the field of oil and gas,[3] the firm's Knoxville office lacked significant experience in the oil and gas field.

18.     KPMG was retained by Miller Energy as the Company's independent auditor on February 1, 2011.  KPMG issued unqualified reports on Miller Energy's financial statements for the years-ending April 30, 2011, April 30, 2012, April 30, 2013, and April 30, 2014, certifying that it had audited those statements in accordance with GAAS and that the statements presented the financial position of Miller Energy fairly and in conformity with GAAP.[4]  Every audit report of Miller Energy's financial statements by KPMG for 2011-14 was a "clean opinion," an unqualified report that the financial statements were fairly presented in all material respects. This is the highest level of audit report a CPA may issue.  These reports were all false and misleading.

19.     In addition, KPMG consented to the use of its auditor reports in each of Miller Energy's six offerings of Series C and Series D Preferred Stock during the class period.

20.     In each of *the* unqualified auditor's reports on Miller Energy's 2011-2014 financial statements, KPMG certified that: (i) it had audited Miller Energy's financial statements in accordance with auditing standards generally accepted in the United States; (ii) it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (iii) in its opinion, Miller Energy's financial statements "present fairly, in all material respects, the consolidated financial position" of Miller

---

[3]KPMG states that it provides professional services to 76% of the top 50 oil and gas companies in the Forbes 2000; 69% of oil and gas companies in the FT Global 500, and 70% of the largest refining companies on the Fortune Global 500.

[4]According to KPMG's Class Period proxy statements, KPMG billed Miller Energy in excess of $3,296,470 from the period beginning February 1, 2011 and ending April 30, 2014 for auditing the Company's financial statements. KPMG also submitted an unsecured claim against Miller Energy in bankruptcy, seeking payment of $448,000.00.

7

Energy "in conformity with accounting principles generally accepted in the United States"; and (iv) its audits provided a "reasonable basis" for its opinions.

21.     During the years 2011 to 2014, the fees paid by Miller Energy to KPMG were reported to be as follows, totaling $3,296.470:

|  | **2014** | **2013** | **2012** | **2011** |
|---|---|---|---|---|
| **Audit Fees** | 1,214,000 | 852,000 | 578,000 | 451,000 |
| **Tax or Other Fees** | 163,470 | 38,000 | | |
| **Total** | 1,377,470 | 890,000 | 578,000 | 451,000 |

**C.     Relevant Non-Parties**

22.     Non-party Miller Energy Resources, Inc. ("Miller Energy") was an independent exploration and production company that explored for, developed, and operated oil and gas wells in south-central Alaska and Tennessee.  During the Class Period, Miller Energy stock was traded on the NYSE, with its common stock trading under the ticker symbol "MILL," and its preferred stock trading under the ticker symbols "MILLprC" (for Series C Preferred Stock) and "MILLprD" (for Series D Preferred Stock).

23.     As of September 29, 2015, Miller Energy had approximately 46.7 million shares of common stock outstanding and 6.7 million shares of preferred stock outstanding.  On September 11, 2015, the Company caused its common and preferred stock to be de-listed from the NYSE.  On October 1, 2015, the Company filed a petition seeking relief under federal bankruptcy statutes.  On March 29, 2016, the bankruptcy court approved a reorganization plan for Miller Energy.  The Company was reorganized into separate entities represented by its eleven (11) subsidiaries, all of the Company's existing equity interests were cancelled, including outstanding shares of common and preferred stock, and a plan was in place to issue new common

stock. Control of assets was given to the Company's main creditor, Apollo Investment Corp. Small investors were left empty-handed.

24. Non-party David M. Hall ("Hall") served as the COO of Miller Energy from July 18, 2013 until August 6, 2015. Hall also served as a member of the Company's Board of Directors from December 10, 2009 until April 16, 2015. Hall had previously served as CEO of the Company's Alaska subsidiary, Cook Inlet Energy ("CIE"), and had worked with the Alaska Assets during the mid-1990s. Prior to joining the Company, Hall served from January 2008 to December 2009 as Vice President and General Manager of Alaska Operations for the immediate past owner of the Alaska Assets, Pacific Energy Resources, Ltd. ("PER").

25. Non-party David J. Voyticky ("Voyticky") served as the President of Miller Energy from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer from September 2011 until February 2014, and as a Director from April 2010 to August 12, 2014. Voyticky served as a member of the Audit Committee from 2010 to 2011.

26. Non-party Paul W. Boyd ("Boyd") served as Miller Energy's principal accounting officer and CFO from 2008 to 2011, and as the Company's Director of Risk Management from 2011 until 2014. Boyd has been a licensed CPA in Tennessee since 1993.

27. Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at Miller Energy's former outside auditing firm, non-party Sherb & Co., LLP ("Sherb"), a now defunct CPA firm suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller Energy. Vogt led a Sherb audit team that audited the Company's financial statements for fiscal years ended 2009 and 2010.

9

28.     Non-party John Riordan ("Riordan") is a partner in KPMG's audit practice in Knoxville, Tennessee.  Riordan is currently the Managing Partner of KPMG's Knoxville office.  Riordan was the lead engagement partner on KPMG's Miller Energy account.

29.     Non-party John Brawley ("Brawley") was Miller Energy's CFO from February 2014 to November 2014.

30.     Non-party Sam Bennett is a partner in KPMG's audit practice in Knoxville and assisted Riordan in handling the Miller Energy account.

31.     Non-party Scott Boruff ("Boruff") was a member of the Miller Energy Board of Directors from August 6, 2008 to March 29, 2016.  He also served as the Executive Chairman of the Board until his departure.  Boruff served as Miller Energy's CEO from August 6, 2008 to September 14, 2014 and as President from June 26, 2010 to June 14, 2011.  Boruff is the son-in-law of Deloy Miller, who founded Miller Energy in 1978.

## IV.   CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased Miller Energy common and preferred stock between August 29, 2011 and October 1, 2015 (the "Class Period") and who were damaged thereby (the "Section 10(b) Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

33.     Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All those who purchased Miller Energy preferred shares pursuant to or traceable to the Offering Documents (the "Section 11 Class").

> Excluded from the Section 11 Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

34. The members of the Section 10(b) and Section 11 Classes are so numerous that joinder of all members is impracticable. While the exact number of members of the Section 10(b) and Section 11 Classes is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Section 10(b) and Section 11 Classes. Record owners and other members of the Section 10(b) and Section 11 Classes may be identified from records maintained by Miller Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35. Plaintiffs' claims are typical of the claims of the Section 10(b) and Section 11 Classes in that all Class members were damaged by KPMG's violation of the federal securities laws, and the relief sought—damages for losses caused by those violations—is common to the Section 10(b) and Section 11 Classes.

36. Numerous questions of law or fact arise from KPMG's conduct that are common to the Class, including but not limited to:

   a.    whether the federal securities laws were violated by KPMG acts during the Class Period;

   b.    whether and to what extent Miller Energy's financial statements during the Class Period, and incorporated in the Offering Documents, failed to comply with GAAP;

   c.    whether the value of the Alaska Assets was fraudulently overstated during the Class Period and in the Offering Documents;

   d.    whether statements made (or omissions) by KPMG to the investing public during the Class Period and in the Offering Documents misrepresented (or

11

omitted to state) material facts about the business, operations and management of Miller Energy;

e.  whether KPMG's audits of Miller Energy's financial statements during the Class Period, and incorporated into the Offering Documents, were conducted in accordance with GAAS and the standards of the PCAOB;

f.  whether KPMG abandoned its duty of independence as Miller Energy's auditor; and

g.  to what extent the members of the Section 10(b) and Section 11 Classes have sustained damages and the proper measure of damages.

37.  These and other questions of law and fact are common to the Section 10(b) and Section 11 Classes and predominate over any questions affecting only individual members of the Section 10(b) and Section 11 Classes.

38.  Plaintiffs will fairly and adequately represent the interests of the Section 10(b) and Section 11 Classes in that they have no conflict with any other members of the Classes. Furthermore, Plaintiffs have retained competent counsel experienced in class action and other complex litigation.

39.  This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## V.  EXCHANGE ACT ALLEGATIONS

### A.  Background of Miller Energy

40.  Founded in 1967, Miller Energy was an independent oil and natural gas exploration, production, and drilling company operating in multiple exploration and production basins in North America.  From early 2002 to December 2009, Miller Energy operated on the fringes of the oil and gas exploration and production industry, as its stock price regularly traded

12

at less than a dollar per share, falling to a low of $0.04 per share in December 2007. At that time, the Company had approximately twenty (20) full-time employees, 363 stockholders, and ownership in fifteen (15) active oil wells and twenty-five (25) gas wells.

41.     In the midst of the financial recession, Miller Energy was in dire straits. In August 2008, the Company named Scott Boruff ("Boruff"), company founder Deloy Miller's son-in-law, as a new Director and CEO. Boruff allegedly told the Company's Board of Directors: "I am going to take this company big . . . if you hire me, you're going to do it my way, and I'm going to find other companies to acquire and we're going to grow Miller like crazy." Soon after, the Company began acquiring additional oil and gas properties.

42.     Though he lacked oil and gas experience, had never previously been a CEO, and had no comprehension of the reporting responsibilities of publicly-traded companies, Boruff's mission was to make Miller Energy a relevant player in the oil and gas industry, using whatever means necessary. Through private stock-offerings and loans, Boruff began raising capital for his promised expansion. By 2009, the Company was ready to make a deal to put itself on the map.

**B.     Miller Energy Purchases the Alaska Assets**

43.     In the fall of 2009, Miller Energy learned that certain oil and gas interests located in Alaska (the "Alaska Assets") were in the process of being legally "abandoned" as part of the bankruptcy proceedings of a California-based energy company. The Alaska Assets consisted of leases covering 602,000 acres of mostly unproven exploratory oil and gas prospects. In addition to these prospects, the leases included five operative oil and gas wells located mainly on two fields, two major facilities, and an offshore platform.

44.     In late 2008, the former owner of the Alaska Assets began extensive public marketing efforts to sell those assets. These marketing efforts included hiring a leading financial advisory firm, which approached roughly 40 market participants and made available to them a

13

data room containing materials about the value and operations of the assets. In mid-2009, after these marketing efforts failed, the Alaska Assets were the subject of a public bankruptcy court sponsored auction, with the winning bidder agreeing to pay $8.1 million for the assets. A second entity, which bid $7 million, was designated as the backup bidder. However, after additional due diligence, neither bidder closed on the sale.

45.     Thereafter, the former owner sought, and obtained, as part of its public bankruptcy administration, an order allowing it to abandon title to the Alaska Assets. In approving the abandonment of the assets, the bankruptcy court publicly concurred with the former owner's assessment that the Alaska Assets were of "no value or other benefit" to the former owner. A primary purpose of the abandonment order was to relieve the former owner of virtually all financial obligations relating to the Alaska Assets.

46.     Following Miller Energy's expression of interest in acquiring the Alaska Assets, the abandonment order was rescinded so that the assets could be sold. Miller Energy ultimately obtained the Alaska Assets via a competitive auction by outbidding a subsidiary of an NYSE-listed company, which at the time was the largest land drilling contractor in the world. Miller Energy's winning bid consisted of $2.25 million in cash plus the assumption of certain liabilities (reported at $2.22 million). The transaction closed on December 10, 2009.

### C.     Miller Energy Grossly Overstates the Value of the Alaska Assets.

47.     AS Boyd, Miller Energy's former CFO and head of its accounting department, candidly admits, Miller Energy's accounting practices were "the blind leading the blind."

48.     In a December 16, 2009 press release, Miller Energy announced the acquisition of the Alaska Assets, claiming a fair value of $325 million.

49.     To record the value of the acquired oil and gas properties, Boyd requested a reserves report prepared by petroleum engineering firm, Ralph E. Davis ("RE Davis"). Such

14

reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. However, the figures used in reserves reports are expressly not to be considered "an estimate of fair market value."[5]

50.     The RE Davis reserves report was finalized on February 22, 2010, and reflected a pre-tax present value of net cash flows discounted at 10% ("PV-10") of $368 million. The report expressly stated that the figures therein **were not provided as an estimate of fair value**.

51.     The $368 million value in the RE Davis reserves report failed to represent fair value for several reasons, including that it:

   a.  failed to make adjustments for income taxes;

   b.  used a 10% discount rate that was inappropriate under GAAP for determining fair value;

   c.  overstated cash flows from certain categories of reserves estimates by failing to apply any risk weight to such reserves and the resulting cash flows;

   d.  failed to include amounts for certain asset retirement obligations;

   e.  understated the projected operating and capital expenses of $237 million; and

   f.  relied upon grossly understated expense projections provided by Miller Energy's head of Alaska operations.

52.     Upon receiving the report, Boyd, who undertook no additional analysis, simply recorded the $368 million figure in the Company's Form 10-Q for the quarter ending January 30, 2010 and filed with the SEC on March 22, 2010, as the fair value of the acquired oil and gas properties, resulting in an artificially-increased book value of Miller Energy's oil and gas properties on its balance sheet by $368 million. In addition to the $368 million value recorded

---

[5] *See* FASB, SFAS 69, Disclosures About Oil and Gas Producing Activities, Appendix C, Basis for Conclusions, 77 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

for the oil and gas properties, a separate value of $110 million was also erroneously recorded for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves, as Boyd had double-counted the value of the fixed assets. **In total, Miller Energy materially misstated the value of the Alaska Assets by approximately $479 million**. The fixed assets were the same operating assets expected to generate future cash flows discussed in the RE Davis reserves report and should not have been separately valued.[6]

53.     Thereafter, Miller Energy continued to tout the success and value of the Alaska Assets, periodically issuing releases placing increasingly greater values on those oil and gas reserves.

54.

55.     Indeed, over the next several years, although the value of the fixed assets was re-categorized into the oil and gas properties category, the overall value of the Alaska Assets not only remained fraudulently inflated, but that inflation actually *increased*.

56.     The SEC subsequently found that Miller Energy's financial reports for Forms 10-Q for the third quarter of fiscal year 2010 and for the first three quarters of fiscal years 2011 through 2015; Forms 10-K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 and August 20, 2014 pursuant to Rule 424, all "materially misstated the value of its assets." KPMG Order at 5.

57.     It is difficult to overstate the importance of the Alaska Assets to Miller Energy. Upon its acquisition, Miller Energy's balance sheet increased by more than ***5,000%***, and

---

[6] The Company also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

16

2275770.3

thereafter the Alaska Assets represented *95%* of Miller Energy's reported assets. Miller Energy's stock price was similarly impacted. On the date of the acquisition, December 10, 2009, Miller Energy's common stock closed at $0.61 per share. By March 31, 2010, it had increased *982%*, to $6.60 per share. Shortly thereafter, Miller Energy's common stock began trading on NASDAQ. A year later, it began trading on the NYSE, where it reached an all-time high on December 9, 2013 of $8.83 per share.

58.     Analyst coverage confirms how critical the Alaska Assets were to Miller Energy. For example, shortly after Miller Energy's acquisition and valuation of the Alaska Assets, Wunderlich Securities analysts Jason Wangler and Neal Dingmann stated on June 21, 2010: "We believe Miller pulled off a coup last year when the Alaskan assets were purchased for just $5 million," and citing as "Key Points" the facts that the "Alaska acquisition [was] literally a steal," and that there was "[a]mazing Alaskan production upside potential." They also stated that "We believe now is an ideal entry point to purchase Miller common stock, all else being equal, as the company has established a strong position in Alaska through a recent acquisition to complement its Tennessee producing properties."

59.     Similarly, on September 23, 2010, Caris & Company analyst Ann Kohler also cited the Alaska Assets as a driving factor, calling it a "transformational acquisition."

60.     On January 11, 2011, SunTrust's Robinson Humphrey stated that, "The Alaskan properties appear key given significant development and exploration opportunities."

61.     On November 27, 2012, MLV & Co LLC analyst Kim Pacanovsky also cited the fact that "Miller Energy made a once-in-a-lifetime firesale purchase of Alaskan assets" as the primary basis for MLV's investment thesis.

**D.     Miller Energy Hires KPMG as its Independent Public Auditor**

62.     Under pressure from its shareholders, at the end of calendar year 2010, Miller Energy began to research and interview new independent auditing firms.  Boyd interviewed three of the Big Four accounting firms, and recommended KPMG to the Company's Audit Committee. According to Boyd, KPMG represented to Miller Energy that "they were experts in the field in valuing oil and gas assets."  Boyd, p. 60.[7]

63.     On February 1, 2011, Miller Energy replaced its independent audit firm with KPMG.  KPMG staffed the engagement with personnel principally from its Atlanta, Georgia and Knoxville, Tennessee offices.

64.     The KPMG engagement team was led by Riordan and two senior managers. Riordan and one of the two senior managers on the three-person audit team had no oil and gas industry experience.

65.     KPMG knew that Boyd had no experience in the oil and gas sector.  According to sworn testimony from Boyd, he:

> [T]old John (Riordan) [of KPMG] . . . 'I want you to invoke your oil and gas division and take a look at our books, and especially the transaction, the Alaska transaction, and make it right . . .  If there's something wrong with these numbers, I want to know now so I can lower them or raise them.'

**E.     The SEC Begins Investigating and Public Concerns Arise Regarding the Valuation of the Alaska Assets**

66.     On April 14, 2011, the SEC sent a letter to Miller Energy asking for detailed information about the December 10, 2009 acquisition of the Alaska Assets and the reported value of the associated reserves, including "who performed the valuation of these reserves" and "a detailed analysis of how the value of each component of acquired reserves was determined."

---

[7] Citations to "Boyd, p. __" are to pages of a transcript of sworn testimony given by Boyd on May 18, 2016.

On June 7, 2011, the SEC sent another letter inquiring as to how Miller Energy's executives had managed to estimate the value of the Cook Inlet oilfields, considering the fact that the previous owner had disbanded its accounting staff long before the sale and the wells had been dormant – some unusable – for a period of months in what was commonly known to be a "high operating cost area."

67.     Shortly thereafter, Miller Energy provided KPMG with copies of these letters. Although KPMG had not yet even completed its audit of the valuations being questioned by the SEC, it helped Miller Energy defend its valuation of the Alaska Assets to the SEC by, among things, drafting answers to the SEC's questions.

68.     On July 28, 2011, analysts from *TheStreetSweeper,* a financial website, published an investigative report on Miller Energy, claiming that the Company had grossly exaggerated the value of the Alaska Assets. The report stated that the assets were actually worth between *$25 million and $30 million, offset by $40 million of liabilities*.[8]  The article quoted Jordan "Digger" Smith, an experienced oilman who managed energy projects for Nabors Industries (NYSE:NBR) – a $7.6 billion energy giant that had earlier declined to purchase the Alaska Assets,[9] who stated: "That deal had been on the Street for over a year; everybody and their brother had looked at it." "I'm a geologist," said Smith, "with 54 years of experience, and I can't see how anybody can write that up on their books for $350 million . . . .  There are not $350 million worth of assets there."

69.     Responding, Boruff publicly defended the Company's valuations and financial reports. On August 1, 2011, in an open letter to shareholders, he disputed the accuracy of the

---

[8]Melissa Davis & Janice Shell, *"Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 1)*, SEEKING ALPHA: THE STREET SWEEPER (July 28, 2011).

[9]Nabors Industries was audited by KPMG.

*TheStreetSweeper* report, stating that his Company "consulted extensively with independent third parties in order to fairly and reliably value" the Alaskan subsidiary.

**F.    The Inflated Valuation of the Alaska Assets Leads to an Unprecedented Period of Growth for Miller Energy**

70.    Throughout the Class Period, the false valuation of the Alaska Assets enabled Miller Energy to overstate assets on its balance sheet by at least $479 million—or between 266% and 1,696%, depending on the year—and overstate shareholders' equity by at least $267 million, or between 1,088% and 1,880%, depending on the year.  This made the Company appear larger, cumulatively more profitable, and inherently less risky to the investing public.

71.    The newly-booked value of the Alaska Assets resulted in a nearly *5,000% increase* in Miller Energy's total assets, and significantly impacted the price of its common stock.[10]

72.    In 2012, the Company announced its shares would be traded on the New York Stock Exchange.  Boruff declared, "this milestone marks an important step in our ongoing growth efforts by raising the profile of the company within its industry."  After moving to the NYSE, Miller Energy stock reached an all-time high price on December 9, 2013 of $8.83 per share and achieved a market capitalization of $393 million.

**G.    KPMG's Critical Role in yhe Miller Energy "House Of Cards" and its GAAS and PCAOB Violations**

73.    KPMG issued audit reports containing unqualified opinions on Miller Energy's annual financial statements for fiscal years 2011 through 2014.  Those audit reports were

---

[10]On December 10, 2009, the date of the purchase, Miller Energy's common stock closed at a price of $0.61 per share.  Following the acquisition, the price of the Company's common stock soared 93%, increasing in two days from $0.70 per share to a closing price of $1.35 per share.

included in Miller Energy's Form 10-K filings that contained materially inflated asset values for the Company's oil and gas properties.

74.     KPMG also provided review services related to Miller Energy's quarterly financial statements beginning in the third quarter of 2011.  During the third quarter of 2011 review and fiscal 2011 audit, the value of the Alaska Assets recorded by Miller Energy was substantially the same as the $480 million value initially reported by Miller Energy following the acquisition of those assets in December 2009.

75.     As set forth below, KPMG knowingly or recklessly abdicated its responsibilities in connection with its audits of Miller Energy's financial statements for fiscal years 2011 through 2014.  Had KPMG conducted its audits in compliance with GAAS and PCAOB standards, it would have discovered Miller Energy's fraud.  By issuing "clean opinions" for the 2011-14 fiscal years, KPMG knowingly or recklessly disregarded significant material weaknesses in the Company's internal controls, specifically internal controls relating to the way the Company valued the Alaska Assets, as described herein.

### Overview of GAAS Requirements

76.     Generally Accepted Auditing Standards, or GAAS, are established by the American Institute of Certified Public Accountants ("AICPA"), of which Defendant KPMG is a member. Under the categorization set forth by the AICPA, there are three categories of auditing standards: (1) "General Standards"; (2) "Standards of Field Work"; and (3) "Standards of Reporting."  Since 2002, as a result of the Sarbanes-Oxley Act, the Public Company Accounting Oversight Board ("PCAOB") has been responsible for adopting auditing standards for public companies.  The PCAOB initially adopted AICPA's GAAS as interim standards.  These standards set the minimum level of performance and quality that auditors are expected to achieve.

77. GAAS is comprised of ten basic standards (the "General Standards") that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow those standards in each and every audit they conduct.

78. The General Standards require, among other things, that the auditor has adequate technical training, is independent, and conducts the audit with due professional care, which requires that the auditor exercise professional skepticism. The auditor also has the responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.

79. The Field Work Standards require, among other things, that an auditor properly plan the audit, obtain a sufficient understanding of the entity's business and operating environment, including its internal controls to determine the nature, timing and extent of tests to be performed and to obtain sufficient evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit.

80. Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

81. As set forth below, throughout the Class Period, KPMG repeatedly and materially violated GAAS in each of its audits, failed to properly plan and perform its audits to obtain reasonable assurance that Miller Energy's financial statements were free of material misstatements, and, therefore, had no basis on which to state that Miller Energy's financial statements were presented in conformity with GAAP.

**KPMG Failed to Properly Risk Assess the Miller Energy Engagement**

22

82.     The PCAOB's quality control standards require, among other things, that at the outset of an engagement, an accounting firm establish policies and procedures for deciding whether to accept or continue a client relationship and whether to perform a specific engagement for that client. QC 20.14.[11] They also require, among other things, that audit firms establish policies and procedures to provide reasonable assurance that each firm appropriately considers the risks associated with providing professional services in the particular circumstances. *See* QC 20.14-.15.

83.     Throughout the Class Period, KPMG's failed to adequately assess the significant risks associated with the Miller Energy engagement. According to the SEC, among other things, KPMG failed to adequately consider Miller Energy's bargain purchase, its recent history as a penny-stock company, its lack of experienced executives and qualified accounting staff, its existing material weaknesses in internal control over financial reporting, its long history of reported financial losses, and its pressing need to obtain financing to operate the newly acquired Alaska Assets.

84.     For example, KPMG knew that Miller Energy's CEO, Boruff, lacked experience running a company, lacked experience in the oil and gas industry, and lacked experience meeting the substantial requirements of a publicly-traded company. Similarly, KPMG knew that Miller Energy's CFO, Boyd, was previously the CFO of a failed local company, Idle-Aire, his prior employment experience was in the banking industry, and although he was a CPA, he lacked significant auditing experience. Indeed, according to Boyd, KPMG knew from the beginning of its Miller Energy engagement that Boyd had no experience in the oil and gas industry:

---

[11] Citations to "QC __" are to the numbering system for the quality control standards adopted by the PCAOB.

| Question: | So when you hired KPMG, you expressed to them that you weren't-one, that you really had no experience in oil and gas? |
|---|---|
| Answer: | Oh, they knew that. They knew that completely. |

Boyd, p. 59.

85.     KPMG also knew that Miller Energy's accounting department was inadequately staffed, consisting primarily of Boyd and two part-time clerical staff, and lacked any internal audit function.

86.     Further, according to Boyd, KPMG knew "pretty much right away" that Miller Energy had made a significant mistake in its valuation of the critical Alaska Assets:

| Question: | Did they ever catch the mistake you made? |
|---|---|
| Answer: | Yes, they did, pretty much right away. They said, where did you get your number, Paul? And I showed them the report. And they said, you should have had the NYMEX report. And so I ordered a NYMEX report. |

Boyd, p. 62.

87.     In addition, from the very start of its engagement with Miller Energy, KPMG knew that Miller Energy needed to late-file its January 31, 2011 Form 10-Q, and to restate its First and Second Quarter 2011 10-Qs due to errors. Specifically, during those two quarters, the Company failed to properly accrete their asset retirement obligations; to properly record depletion, depreciation, and amortization expenses related to leasehold costs, wells and equipment, fixed assets and asset retirement obligations; or to record the state tax credits expected from its Alaska operations.

88.     Similarly, KPMG knew that Miller Energy's Forms 10-K for the fiscal years ending in April 2011 through April 2014 consistently reported material internal control weaknesses and ineffective internal controls over financial reporting.

24

2275770.3

89. Miller Energy's Form 10-K for the year-ended April 30, 2011, states:

We do not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training in the selection and application of U.S. GAAP and SEC reporting requirements commensurate with our financial reporting requirements.

We do not maintain sufficient policies, procedures and controls to prevent and/or detect material misstatements in our financial statements.

As a result of the above material weaknesses, material adjustments to the Company's consolidated financial statements were required for each of the Company's reported quarterly and annual periods in fiscal 2011

\*\*\*

However, since management has not completed its assessment, we cannot provide assurance that the material weaknesses described above constitute a complete list of deficiencies. Had management completed its assessment, additional internal control weaknesses as of April 30, 2011 may have been detected. In addition, because management did not complete its assessment, our independent registered public accounting firm was unable to render an opinion on the effectiveness of our internal control over financial reporting.

90. Miller Energy's Form 10-K for the year-ended April 30, 2012 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2012:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. As a result of this material weakness, we made a number of adjustments in connection with our financial statement audit in order to prepare the consolidated financial statements and footnotes included in this Form 10-K. Additionally, there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements would not be prevented or detected on a timely basis. As a result of this material weakness, the Company's management has concluded that, as of April 30, 2012, its internal control over financial reporting was not effective based on criteria established in Internal Control–Integrated Framework issued by the COSO.

25

91.     KPMG's July 16, 2012 audit report of Miller Energy's internal controls states:

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2012, based on the criteria established in Internal Control – Integrated Framework issued by the COSO.

92.     Miller Energy' Form 10-K for the year-ended April 30, 2013 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2013:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. This material weakness resulted in numerous material adjustments to the preliminary financial statements that were corrected prior to their issuance.

As a result of this material weakness, the Company's management has concluded that, as of April 30, 2013, its internal control over financial reporting was not effective based on criteria established in Internal Control-Integrated Framework issued by the COSO.

93.     KPMG's July 15, 2013 audit report of Miller Energy's internal controls states:

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2013, based on the criteria established in Internal Control - Integrated Framework issued by the COSO.

94.     KPMG's July 15, 2013 audit report of Miller Energy's financials states:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 15, 2013 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

26

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2014:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. This material weakness resulted in numerous material adjustments to the preliminary financial statements that were corrected prior to their issuance.

As a result of this material weakness, the Company's management has concluded that, as of April 30, 2014, its internal control over financial reporting was not effective based on criteria established in Internal Control- Integrated Framework (1992) issued by the COSO.

95.     Miller Energy' Form 10-K for the year-ended April 30, 2014 states:

Management identified the following material weakness in the Company's internal control over financial reporting as of April 30, 2014:

We did not maintain a sufficient complement of corporate accounting and finance personnel necessary to consistently operate management review controls. This material weakness resulted in numerous material adjustments to the preliminary financial statements that were corrected prior to their issuance.

As a result of this material weakness, the Company's management has concluded that, as of April 30, 2014, its internal control over financial reporting was not effective based on criteria established in Internal Control - Integrated Framework (1992) issued by the COSO.

96.     KPMG's July 14, 2014 audit report of Miller Energy's internal controls states:

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2014, based on the criteria established in Internal Control - Integrated Framework (1992) issued by the COSO.

97.     KPMG's July 14, 2014 audit report of Miller Energy's financial statements states:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States),

27

Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organization of the Treadway Commission, and our report dated July 14, 2014 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

98. KPMG also knew that Miller Energy failed to comply with listed-company NYSE rules. In a Form 8-K, filed March 30, 2011, Miller Energy disclosed that it would be moving from NASDAQ to the NYSE, effective April 12, 2011, necessitating the formation of an Internal Audit Group one year after the NYSE listing. That group was never established.

99. Despite all of these significant risks and issues, KPMG accepted Miller Energy as a client and, according to the SEC, incorrectly designated it as a "low" risk client. Further, based on the information in the initial evaluation, KPMG assigned the Miller Energy engagement an overall risk grade of "medium," which was not reevaluated and changed to "high" until after KPMG issued its unqualified opinion on the Company's fiscal 2011 financial statements.

### KPMG Failed to Ensure Adequate Personnel Management, Competency and Proficiency on the Miller Energy Engagement

100. PCAOB Quality Control Standards require an auditing firm to establish policies and procedures which provide the firm with reasonable assurance that work is assigned to personnel having the degree of technical training and proficiency required in the circumstances. *See* QC 20.13 and QC 40.02. These standards also state that firms should establish policies and procedures providing reasonable assurance that the practitioner-in-charge of an engagement possesses the competencies necessary to fulfill his or her engagement responsibilities (QC 40.06), and that practitioners in-charge of an engagement possess an understanding of the industries in which their clients operate. *See* QC 40.08. When the client's business involves

unique and complex accounting, as in the case of the oil and gas industry, the need for the engagement partner to understand the client's industry is even more critical.

101. In addition, PCAOB auditing standards require that the audit be performed by "a person or persons having adequate technical training and proficiency as an auditor." AU § 210.01.[12] Similarly, PCAOB quality control standards require that, "[p]olicies and procedures should be established to provide the firm with reasonable assurance that the work performed by engagement personnel meets applicable professional standards, regulatory requirements, and the firm's standards of quality." QC 20.17. Firm policies and procedures should also provide reasonable assurance that the policies and procedures established for the elements of quality controls described in the standard are "suitably designed and are being effectively applied." QC 20.20; *see also* AU § 161.

102. Throughout the Class Period, KPMG's failed to comply with these requirements. According to the SEC, KPMG did not have in place specific policies requiring an assessment of the engagement partner's competencies in the circumstances. Further, KPMG's client acceptance procedures failed to adequately address the audit team's lack of industry experience. Although a client acceptance evaluation form completed by Riordan noted that the assigned engagement partner and senior manager had no prior experience with oil and gas companies like Miller Energy, it stated that there were no concerns regarding the overall skills and experience of the engagement team. Notably, however, KPMG falsely told Miller Energy that it, and Riordan and Bennett specifically, were highly experience in the oil and gas industry:

---

[12] Citations to "AU § __" and "AS No. __" are to a numbering system for auditing standards in effect prior to 2015. In 2015, the PCAOB revised the numbering system for auditing standards, but did not "change the substance of the requirements," and was "intended to improve the usability of the Board's standards." *See* https://pcaobus.org/Rulemaking/Docket040/Release_2015_002_Reorganization.pdf.

29

| | | |
|---|---|---|
| Question: | Did they (KPMG) have oil and gas experience? | |

| | |
|---|---|
| Answer: | Oh, yeah. Yeah. They were – KPMG is the – I don't – I think maybe they're the smallest of the Big 4, but they're still huge. And I think they had the most oil and gas experience of any of the Big 4. They had, you know, most of the bigger companies. |

| | |
|---|---|
| Question: | But did John (Riordan) and Sam (Bennett) say they had oil and gas experience? Personally. |

| | |
|---|---|
| Answer: | They said that they had other clients that were oil and gas companies, and that the KPMG had an entire division. So, like, 100 people in it concentrated on nothing else but oil and gas. And they were experts in the field in valuing oil and gas assets. And I said, that's perfect. |

Boyd, p. 59.

103. Consequently, according to the SEC, KPMG assigned to the engagement team personnel who had insufficient expertise to appropriately address the risks presented by Miller Energy. Riordan lacked the necessary experience to serve as the partner-in-charge of the engagement, resulting in departures from professional standards. In light of the high degree of risk associated with the Miller Energy engagement and the unusual bargain purchase transaction of the Alaska Assets in 2009, KPMG should not have assigned a partner-in-charge who had no experience auditing companies in the oil and gas industry.

**KPMG Failed to Properly Plan the Miller Energy Audits**

104. AU § 311, *Planning and Supervision*, requires that in order to properly plan an audit, an auditor obtain a level of knowledge of its clients' business sufficient to enable it to "obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements." AU § 311.06. In planning an audit, PCAOB standards state that an auditor should consider the nature, extent and timing of work to be performed in planning the audit and should prepare a written audit program which sets forth

in reasonable detail the audit procedures necessary to accomplish the audit objectives. AU § 311.05. Auditors must also consider audit risk and materiality in planning the audit and designing audit procedures. AU § 312.12. In doing so, they should plan the audit so that audit risk will be limited to a low level appropriate for expressing an opinion on the financial statements. AU § 312.13. Auditors are also required to consider identified significant risks of material misstatement of the financial statements in: (1) determining the nature, timing or extent of procedures; (2) assigning staff; or (3) requiring appropriate levels of supervision. AU § 312.17.

105.    KPMG failed to properly plan its Miller Energy audits. Specifically, according to the SEC, KPMG failed to adequately plan the work relating to the Alaska Assets, including the work to be performed by a unit within KPMG known as "Economic and Valuation Services" ("EVS") and the core engagement team's review of EVS's conclusions. For example, prior to EVS beginning its testwork, KPMG gave insufficient consideration to the nature and scope of the specialists' work, as well as the extent of the specialists' involvement. This was contrary to KPMG policies requiring the effective delineation of the responsibilities between the core engagement team and the KPMG specialists. There was no agreement at the onset of the valuation testwork concerning who was specifically responsible for the significant assumptions in Miller Energy's valuation. In addition, on several important issues, such as the consideration of observable inputs and the accounting treatment for the fixed assets, there was no agreement regarding the respective roles and responsibilities of EVS and the core engagement team.

106.    In addition, when developing its audit strategy and audit plan, KPMG failed to properly evaluate Miller Energy's internal control deficiencies, including the ineffectiveness of the Company's internal controls over financial reporting. AS No. 9 par. 7. Had KPMG properly

evaluated Miller's internal control deficiencies, they would have been required to extend or modify their audit tests. AU § 311.03.

### KPMG Failed to Adequately Assess Whether Miller Energy's Valuation of the Alaska Assets Conformed with GAAP

107.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented. American Institute of Certified Public Accountants ("AICPA") Concepts Statement No. 1, ¶42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

108.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

109.    AU § 328 requires auditors to obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. AU § 328.03, *Auditing Fair Value Measurements and Disclosures*. The standard provides that, "[t]he auditor should test the data used to develop the fair value measurements and disclosures and evaluate whether the fair value measurements have been properly determined from such data and management's assumptions." This includes, "whether the data on which the

32

fair value measurements are based, including the data used in the work of a specialist, is accurate, complete and relevant . . . ." AU § 328.39. In addition, "[t]he auditor should evaluate the sufficiency and competence of the audit evidence obtained from auditing fair value measurements and disclosures as well as the consistency of that evidence with other audit evidence obtained and evaluated during the audit." AU § 328.47; *see also* AU § 342.07 (the auditor's objective is, *inter alia,* to obtain sufficient competent evidential matter to provide reasonable assurance the accounting estimates are presented in conformity with applicable accounting principles). If a valuation model is used, the auditor reviews the model and evaluates whether the assumptions used are reasonable. AU § 328.40.

110. According to the SEC, KPMG failed to obtain sufficient competent audit evidence to provide reasonable assurance that Miller Energy's fair value measurements and disclosures relating to the Alaska Assets were in conformity with GAAP, and that management's accounting estimates were reasonable in the circumstances.

111. ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC 820 establishes a fair value hierarchy that distinguishes between observable inputs, *i.e.,* those inputs that reflect the assumptions market participants would use in pricing the asset or liability based on market data obtained from sources independent of the reporting entity, and unobservable inputs, *i.e.*, inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. Under ASC 820, the use of unobservable inputs should be minimized in favor of observable inputs whenever possible.

112.     As part of its procedures to obtain sufficient competent evidence to assess the impact of the opening balance of the Alaska Assets on the current period's financial statements, KPMG was required to review and understand how Miller Energy estimated the fair value that was ultimately recorded in its financial statements. AU § 342, provides that, "[i]n evaluating reasonableness, the auditor should obtain an understanding of how management developed the estimate." AU § 342.10; *see also* AU § 328.09 ("The auditor should obtain an understanding of the entity's process for determining fair value measurements . . . ."). Similarly, KPMG's policies required its engagement teams to "obtain an understanding" of "the requirements of the applicable financial reporting framework relevant to accounting estimates" and "how management makes the accounting estimates, and an understanding of the data on which they are based . . . ."

113.     According to the SEC, KPMG failed to obtain a sufficient understanding of the Company's fair value measurement and to appropriately consider observable inputs relating to Miller Energy's acquisition of the Alaska Assets as part of their procedures relating to the impact of the opening balances. Although the prior owner sold the Alaska Assets while in bankruptcy, there were several facts suggesting that the sale price and history should have been considered in determining the fair value of those assets. These facts included the extensive, but ultimately unsuccessful, marketing efforts (which occurred during part of a roughly year-long period when the assets were made available for sale), the subsequent and ultimately unsuccessful purchase offers for the assets (each of which was for less than $10 million), the bankruptcy court-approved abandonment of the assets (which relieved the prior owner of substantially all financial obligations for the assets), and Miller Energy's acquisition of the Alaska Assets in a competitive auction for a fraction of Miller Energy's recorded value. In addition, a review of the bankruptcy

34

records also would have revealed evidence, such as the facts contrary to the Company's nearly half-billion-dollar asset valuation. All of these facts were readily ascertainable from the publicly available bankruptcy records of the prior owner of the Alaska Assets.

114. According to the SEC, KPMG also failed to appropriately assess the assumptions underlying the reserve report and the insurance report which Miller Energy used in its estimation of the fair value of the Alaska Assets. KPMG knew that the two reports the Company used to support its fair value determination for the Alaska Assets were not appropriate for ascertaining fair value and knew that using the assumptions in the reserve report for fair value purposes was inappropriate.

115. AU § 336 provides guidance to auditors when they seek to use the work of a specialist as evidential matter to support financial statement assertions. Among other items, the standard requires the auditor to evaluate the professional qualifications of the specialist to determine that he or she possesses the necessary skill and knowledge in the type of work under consideration. *See* AU § 336.08. It also provides that the auditor should obtain an understanding of the nature, scope, and objectives of the work performed by the specialist, including the appropriateness of using the specialist's work for the intended purpose. *See* AU § 336.09. In addition, AU § 336.12 states that an auditor should evaluate the appropriateness and reasonableness of the specialist's methods and assumptions by: (a) obtaining an understanding of those methods and assumptions; (b) making appropriate tests of data provided to the specialist; and (c) evaluating whether the specialist's findings support the related assertions in the financial statements.

116. Despite the fact that KPMG knew that the insurance broker was not an expert, KPMG's workpapers refer to the insurance broker as "a third party valuation specialist" that

"performed the appraisal of the fixed assets." Other workpapers also list the insurance broker among the "specialists" whose work KPMG used as audit evidence and note that "EVS concluded that the methodologies used and conclusions reached by [the insurance broker] were reasonable." KPMG, however, had no information – other than the Company's representations – about the insurance broker's methodology. The insurance report Miller Energy used for the fixed assets contained no description of any methodology, and KPMG never contacted the insurance broker to ascertain its supposed methodology.

117. Under these circumstances, where management used as fair value numbers from reports that were known by KPMG to have been prepared for other purposes, KPMG was unreasonable in applying certain limited procedures to Miller Energy's fair value estimate and then issuing an unqualified opinion on the Company's financial statements based on those procedures.

118. As a result of the conduct described above, KPMG failed to comply with these professional standards in connection with testing Miller Energy's fair value assertions for the Alaska Assets. KPMG departed from AU § 328 by, among other things, failing to sufficiently evaluate the reasonableness of management's assumptions and by failing to test the reliability of the information used in the preparation of the reports used for valuing the properties. KPMG also departed from AU § 336 by, among other things, failing to appropriately test the data provided to the specialists.

### KPMG Failed to Obtain Sufficient Competent Evidence Regarding the Assumptions on Which Miller Energy's Valuation of the Alaska Assets Was Based

119. In assessing a company's fair value of assets, auditors are required, at a minimum to understand the client's assumptions and to determine whether the data on which the fair value

measurement is based is accurate, complete, and relevant. *See* AU § 328.40. As set forth below, KPMG's procedures failed to comply with professional standards.

120.    In addition, under AU § 315.12, a "successor auditor must obtain sufficient competent evidential matter to afford a reasonable basis for expressing an opinion on the financial statements he or she has been engaged to audit." Obtaining audit evidence to analyze the impact of the opening balances on the current-year financial statements may include applying appropriate auditing procedures to account balances at the beginning of the period under audit and to transactions in prior periods. *Id.* "Evidential matter" includes the underlying accounting data and all corroborating information available to the auditor. AU § 326.15. To be "competent," evidence must be both valid and relevant. AU § 326.21. For it to be "sufficient," the evidence must be "persuasive." AU § 326.22. In evaluating evidential matter, the auditor must consider whether the specific audit objectives have been achieved. AU § 326.25. In doing so, he or she makes an "unbiased" evaluation and considers "relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements." *Id.* If there is substantial doubt, the auditor must refrain from forming an opinion until additional evidential matter can be obtained to remove such doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. *Id.*

121.    As discussed below, KPMG and Riordan failed to obtain sufficient competent evidence supporting the assertions in Miller Energy's fiscal 2011 – 2014 financial statements concerning the fair value and fixed assets of the acquired Alaska Assets.

i.    *The Oil and Gas Reserves*

122.    In fiscal 2010, Miller Energy improperly recorded $368 million as the fair value of Miller Energy's oil and gas reserves. The $368 million value was taken directly from a reserve report that was prepared by a third-party petroleum engineer firm using the guidelines for

37

supplemental oil and gas disclosures. The reserve report expressly stated that it did not contain an opinion of fair value. Although this reserve report was created by a third-party engineer firm, it incorporated assumptions provided by the Company.

123. KPMG's internal valuation specialists, EVS, did not consider all of the significant assumptions Miller Energy used in the reserve report. In the memorandum memorializing its work, EVS admitted that an evaluation of oil and gas properties using the income approach consists of twelve inputs, including, among other things, the production forecast, future oil and gas prices, lease operating expenses, SG&A expenses, taxes, capital expenditures, the discount rate, and risk weightings. As part of its procedures, however, EVS considered only three of the Company's assumptions for these inputs (the discount rate, risk weightings, and future oil prices). Notably, EVS found that each of the three assumptions was erroneous and inappropriate for fair value purposes. Specifically, the reserve report: (1) used a 10% discount rate that KPMG concluded was inappropriate under the circumstances for fair value; (2) failed to apply any risk weighting to even the most speculative categories of reserves, which was also improper for fair value purposes; and (3) failed to appropriately estimate future oil prices and instead used a flat price in all years of approximately $61 per barrel. Given that the reserve report was prepared using a method that was not intended to estimate fair value and that all three of the assumptions under consideration were unreliable, KPMG should have requested additional support from management regarding the appropriateness of Miller Energy's valuation, particularly since their procedures left other significant assumptions unevaluated.

124. Instead, at the core engagement team's request, EVS created an estimated range of possible fair values, using its own assumptions for some of the inputs, to assess whether Miller Energy's overall fair value number was reasonable. As Boyd explained:

| | |
|---|---|
| Question: | But when KPMG came on a year later, they should have caught this [Miller Energy's misuse of the RE Davis report], shouldn't they? |
| Answer: | They did.  When they went through to take a look at all of our books, and especially the acquisition of Alaska, they told me point blank, you used the wrong report to value the asset.  They said, but we've got – we've – you need to order a new report, but we've got an idea from our experts in our oil and gas division that it's in the ballpark; but we want you to get the correct report, the NYMEX report. |
| Question: | Now, right there I want to stop right there.  [N]ow – the local guys told you that, the local KPMG guys told you that? |
| Answer: | Uh-huh. |
| Question: | And their – they didn't have a new report to go by? |
| Answer: | They had their internal report. |
| Question: | And their own internal report was based on what? |
| Answer: | I didn't – |
| Question: | You didn't ask that? |
| Answer: | I never saw a copy of that.  But they had their oil and gas division - |
| Question: | Bless it? |
| Answer: | Right.  And so they must have taken a look at the geology surveys and areas around our area.  And I don't know what all they did, but they somehow got comfortable giving that value. |
| Question: | And so the crux of the whole thing is, for going forward, that you relied on KPMG. If KPMG was wrong in the first report, they were wrong all the way through. |
| Answer: | That's correct. |

Boyd, p. 213-14.

125.    According to the SEC, EVS's analysis did not result in sufficient competent evidential matter for the fair value of the Alaska Assets. To test the reasonableness of the Company's fair value number, EVS used a spreadsheet software-based discounted cash flow template, which was populated mostly with the assumptions used in the non-fair value reserve report. EVS substituted its own assumptions for Miller Energy's discount rate and future oil prices assumptions in the reserve report. EVS also risk weighted the reserves – a step the Company's reserve report omitted.  Using substitute assumptions for these three inputs (which included more appropriate forecasted oil prices that were significantly higher than those used by Miller Energy), but keeping Miller Energy's other assumptions materially unchanged, EVS eventually estimated that a reasonable range of value for the oil and gas reserves was between $331 million  and $375 million.  Although the results of this analysis appeared to support Miller Energy's fair value measurement, EVS's substitute assumptions were themselves flawed and insufficiently substantiated.

126.    According to the SEC, KPMG improperly accepted EVS's substitute assumptions without adequately reviewing the reasonableness of those assumptions.  In some cases, the substitute assumptions were not appropriate.  For example, in lieu of the reserve report's 10% discount rate, EVS conducted multiple analyses using discount rates as low as 12% and as high as 17%. Ultimately, just prior to the issuance of the third quarter 2011 Form 10-Q, EVS changed its discount rate range to 12% to 15% from 14% to 17%. The basis for the range used was not adequately reviewed or documented by KPMG.  Had the discount rate not been lowered, keeping everything else constant, EVS's analysis would have indicated that the $368 million number was overstated by as much as 15%.

40

127. Additionally, according to the SEC, KPMG did not take appropriate steps to address specific indications that the Company's valuation might be overstated due to Miller Energy's use in the reserve report of underestimated future operating and capital costs. On March 9, 2011, EVS informed the core engagement team that portions of its own valuation estimate, which EVS was using to test the reliability of the client's valuation, appeared anomalously high on a per barrel basis. EVS indicated that the high values it observed could have been the result of the forecasted expenses Miller Energy used for the proved undeveloped ("PUD"), probable, and possible reserves. EVS asked the core engagement team to review the forecasted expenses, as well as the financial forecast used in the discounted cash flow to determine whether it was overly optimistic. EVS reiterated its concerns to the core engagement team again on March 10, stating that the value numbers for "[t]he PUDs, probable and possible" reserves "are so high, it does not make sense . . . ." On several occasions, EVS emphasized that it was relying on the core engagement team to assess the reasonableness of the forecasted expenses.

128. Despite these clear warnings, the SEC found that KPMG undertook insufficient procedures to assess the reliability of the forecast and estimated expenses used by Miller Energy to value the Alaska Assets. For example, KPMG was required to test the data used to develop the fair value measurement and evaluate whether the data on which the fair value measurement was based, including the data used in the work of a specialist, was accurate, complete, and relevant. *See* AU § 328.39. Had KPMG performed additional procedures on the cost estimates provided to the engineer firm, they could have identified contrary evidence indicating that the forecasted costs were unreasonably low. For instance, Miller Energy had in its possession historical expense data from the former owner. Had KPMG obtained and reviewed the available

historical expense data, KPMG could have discovered that the forecasted costs reflected in the reserve report were substantially lower than the historical expense data.

129.    Likewise, had KPMG compared the expense estimates used in the valuation to corresponding estimates created approximately one year later for use in the fiscal 2011 supplemental oil and gas disclosures, it would have been apparent that the capital expenditures for some of the same wells had increased by roughly $100 million.  According to the SEC, KPMG did not adequately identify or inquire about the reasons for this substantial increase.  Had the substantial increase in costs been identified, KPMG would have discovered that it resulted mainly from increased drill cost estimates for a number of wells (from $4.6 million to over $12 million each). Further inquiry likely would have led KPMG to discover that the higher estimated capital costs used in the 2011 supplemental oil and gas disclosures were consistent with historic data for the property and Miller Energy's internal expense estimates dating back to 2009.

130.    KPMG could have considered other publically identifiable indications that the forecasted costs in the Company's valuation were understated.  For example, Miller Energy's 2011 Form 10-K stated that in 2009 the Company informed the State of Alaska that it would cost $31 million to restart production in one of the Alaska Assets' two principal fields – an estimate that it internally increased in 2011 to $45 million.  However, the original $31 million cost estimate was nearly double the amount of restart costs ($16.8 million) in the reserve report used for the valuation.

131.    In connection with other audit procedures, KPMG obtained a 2011 budget containing management's forecast for the next several years. Had KPMG even just compared the forecasted costs in that budget to the forecasted costs in the February 2010 reserve report that was used to fair value the Alaska Assets, they could have also discovered that the budget

42

assumed significantly higher capital expenditures and significantly lower production numbers than those set forth in the reserve report.

ii.    *The Fixed Assets*

132.    According to the SEC, KPMG failed to take reasonable steps to assess Miller Energy's recorded value of $110 million for certain fixed assets included in the Alaska acquisition.  These fixed assets were the same operating assets that were expected to generate the future cash flows used to measure the value of the oil and gas reserves. In fact, the reserve report Miller Energy used for the valuation recognized the interconnectedness of the properties, as it listed the facilities and the offshore platform as assets used to generate the future cash flows. Because the fixed assets were integral to the operations of the acquired properties and the generation of cash flows, their values were already reflected in the reserve report's cash flows. Under these circumstances, including a separate value for the fixed assets, without any corresponding contributory asset charge to the forecasted cash flows, resulted in improperly counting all or substantially all of the value of the fixed assets twice.

133.    The SEC found that KPMG agreed with Miller Energy's accounting treatment for the fixed assets without performing sufficient procedures to obtain the necessary evidence to properly assess the reasonableness of that accounting treatment, and despite being aware of the potential double-counting.

134.    KPMG also had insufficient competent evidence to support the $110 million valuation of the fixed assets.  As discussed *supra*, KPMG knew that the insurance broker was not a valuation specialist and that the insurance report was not sufficient evidential matter to support the value of the fixed assets.

135.    To corroborate the $110 million number listed in the insurance report, Miller Energy, at KPMG's request, created a second estimate in 2011, without the assistance of any

43

valuation professionals. In preparing this analysis, Miller Energy adjusted its original estimates of the replacement costs for the various fixed assets – increasing the values for some assets and reducing the value of others – and made further adjustments to these replacement costs for depreciation and for functional obsolescence. KPMG accepted the new replacement cost values from this analysis as reasonable without obtaining adequate corroboration, and they did so even though the values were based on management's own internal cost estimates and included miles of additional pipelines (representing a 175% increase in pipeline mileage from the original report).

136. In addition, according to the SEC, KPMG's analysis of the fixed asset valuation was flawed because of the circumstances surrounding the assets themselves. Due to their remote and desolate location, a willing buyer and seller would not have agreed on replacement cost as the price for these assets. This was particularly true of the underground pipelines that connected various oil production facilities, which – in order to value them separately – KPMG deemed as surplus assets that were not needed to generate the cash flows in the reserve report. Using management's new numbers, KPMG estimated that replacing the pipelines on the properties would cost up to $46 million (or almost half the supposed value of the fixed assets). But it was highly unlikely that any market participant would pay $46 million for pipelines that were assumed to be extraneous to the production of oil and gas from the nearby fields.

### KPMG Failed to Exercise Due Professional Care and Professional Skepticism in Connection with the Miller Energy Audits

137. PCAOB standards require auditors to exercise due professional care in the planning and performance of the audit and the preparation of the report. AU § 230.01. Auditors are required to maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." AU § 230.07, *Due Professional Care in the*

*Performance of Work.* In addition, the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process." AU § 230.08. In exercising professional skepticism, an auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. AU §§ 230.09 and 316.13. Further, auditors should: (1) perform an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred; and (2) conduct the engagement with a mindset that recognizes that a material misstatement due to fraud could be present, regardless of past experience with the entity and the auditors' belief about management's honesty and integrity. AU § 316.13. Auditors should also exercise due professional care and professional skepticism in the course of reviews of interim financial information. AU § 722.01 (noting that the three general standards discussed in AU § 150 apply to interim reviews); *see also* AU § 150.02.

138. According to the SEC, KPMG failed to exercise due professional care and an attitude of professional skepticism in its Miller Energy audits.

139. With respect to the fair value of the Alaska Assets, KPMG failed to adequately evaluate the estimates in the reserve report given the high valuation in light of the nominal purchase price and the lack of oil and gas experience possessed by Miller Energy's CEO and CFO, as well as the material weakness identified by KPMG in connection with the inadequacy of the Company's accounting personnel. Miller Energy was run by a CEO with a background in commercial real estate and admittedly with little to no previous industry, corporate or executive experience. It also possessed a limited accounting staff led by a CFO with no prior industry experience. In regard to the CFO, who was the person responsible for recording the Alaska

Assets' valuation, KPMG's workpapers state: He "does not appear to have adequate knowledge and experience in the oil and gas industry to facilitate the completeness and accuracy of industry specific accounting and required financial statement presentation and disclosure . . . ."

140. According to the SEC, KPMG also failed to appropriately address the fact that the Company based its fair value estimate on two reports that they knew were inappropriate for that purpose. Under the circumstances, including EVS's stated concerns about the reserve report's forecast and expenses, it should have been apparent to the core engagement team that additional procedures were needed in order to obtain sufficient competent evidence for the valuation of the Alaska Assets.

141. KPMG further failed to exercise due care and professional skepticism following the discovery of the insurance report used to support the $110 million worth of fixed assets. At first, EVS was tasked with assessing only whether the reserve report supported the $480 million valuation. Using a pre-existing template, EVS created an estimate by using mostly the company's inputs from the reserve report and by substituting its own assumptions for the discount rate, future oil prices, and reserve adjustment factors. EVS's initial estimate, which assumed significantly higher oil prices than Miller Energy, was approximately $200 million. However, due to a flawed understanding of Miller Energy's valuation, EVS removed from its analysis the reserve adjustments – *i.e.*, risk weightings – it had applied in that initial calculation, which caused the high- end of its estimate to increase to over $500 million.

142. Approximately two weeks into EVS's procedures and one week prior to the third quarter filing deadline (and after Riordan had informed Miller Energy's audit committee that EVS's work was almost complete and KPMG did not anticipate restatement of the valuation of the Alaska Assets), KPMG discovered that management had used an insurance report to value

the fixed assets. At the time, again due in part to a flawed understanding of management's valuation, EVS's value range based on the reserve report alone appeared to suggest a value of $469 million to $531 million for the Alaska Assets, which roughly approximated Miller Energy's overall $480 million valuation. Thus, when the insurance report surfaced, KPMG and Riordan became concerned that Miller Energy's estimate may have been *understated* due to the additional $110 million value reflected in the insurance report.

143. As a result, Riordan sent EVS an email telling them that KPMG had already informed the Company's audit committee that KPMG did not anticipate restatement of the valuation, which meant that the valuation of the Alaska Assets did not need to be included among the financial restatement items that KPMG had identified and that the company had been working "feverishly" to complete. Two days after Riordan's email to EVS, KPMG discovered that the Company's valuation did not include any reserve adjustment factors. KPMG had received inconsistent representations from management regarding whether or not the values set forth in the reserve report incorporated reserve adjustment factors. KPMG failed to adequately inquire about the reasons for Miller Energy having provided them with inconsistent information. Instead, EVS reapplied risk weightings to its model. EVS then made several additional changes to its valuation model, the rationale for which was not properly documented.[13] Due to these changes, EVS's final estimated range appeared to support the Company's fair value measurement for the Alaska Assets.

144. According to the SEC, KPMG also failed to exercise due care and professional skepticism in connection with the valuation of the fixed assets. For example, after discovery of

---

[13] The SEC found that KPMG also failed to prepare and retain required audit documentation in sufficient detail to provide a clear understanding of its purpose, source, and conclusions reached in connection with its Miller Energy engagement, in violation of AS No. 3.12.

the insurance report, KPMG did not exercise appropriate due care and professional skepticism when it failed to perform sufficient additional inquiries and other procedures relating to the fair value of the fixed assets and to detect that Miller Energy double counted the value of the fixed assets. These departures from due care and professional skepticism also included failing to reasonably investigate the lack of an engagement letter for the insurance report. KPMG asked the Company for the engagement letter setting forth the terms of the insurance broker's supposed valuation work. In response, KPMG was told that no such letter could be located. KPMG did not pursue the engagement letter further. Had they done so, KPMG could have learned that the insurance broker undertook no valuation work for Miller Energy.

145.    The SEC found that KPMG also discounted, and did not sufficiently consider, information that came prior to KPMG issuance of its audit reports on Miller Energy's financial statements. For example, on July 28, 2011, *TheStreetSweeper*, a financial blog dedicated to "exposing corporate fraud," published a lengthy article that was extremely negative about Miller Energy and challenged the recorded valuation of the Alaska Assets. The article quoted "Digger" Smith, a veteran oil and gas geologist and businessman, who stated that the Alaska Assets were not worth $350 million. Smith valued the assets at between $35 to $40 million dollars, offset by $40 million in liabilities. Smith's company had made a bid on the Cook Inlet properties and had allocated $875,000 of their bid toward those assets. One of Smith's companies had been hired by the State of Alaska to maintain the properties while in bankruptcy. Smith knew the assets, the costs of operating in Alaska, and the liabilities assumed. Smith was also a board member and audit committee chairman for numerous publicly-traded companies. The article provided Web-based links to numerous bankruptcy court records and other public sources for its assertions questioning the valuation of the Alaska Assets. Riordan, the core engagement team, and a

48

member of KPMG management became aware of *TheStreetSweeper* article on the day it was published.

146.    Shortly, thereafter, in August 2011, Miller Energy received a subpoena from the Commission's Division of Enforcement (the "Division") seeking information relating in part to the purchase and valuation of the Alaska Assets. According to Boyd, KPMG was not only aware of the SEC inquiry, but drafted responses for the Company which defended the valuation of the Alaska Assets. Boyd, p. 134-35. Riordan discussed the formal investigation with regional KPMG management and with national office personnel in the Department of Professional Practice ("DPP") and in the general counsel's office. As part of this consultation, DPP became aware of the allegations in *TheStreetSweeper* article. KPMG, including senior personnel in its national office, did not view the Division's investigation into the valuation of the Alaska Assets as requiring additional audit consideration largely because Riordan represented that it had applied "certain audit procedures" to the Alaska valuation and because it believed the staff's investigation stemmed from *TheStreetSweeper* "hit job." While Riordan sought direction from KPMG's national office, the national office failed to make sufficient inquiries of the engagement team and to provide the engagement team with sufficient guidance in light of the Division's investigation and the information in *TheStreetSweeper* article. KPMG and Riordan only made inquiries of certain company insiders and affiliates, including outside counsel representing Miller Energy in the Division's investigation, and never revisited its valuation procedures.

147.    Miller Energy was also the subject of numerous other articles from, among other news sources, *TheStreetSweeper*, *SeekingAlpha*, and *Esquire* magazine, all of which questioned the Alaska purchase. Further, before KPMG issued its first audit opinion, a class action lawsuit

2275770.3

was filed against Miller Energy and its officers on an August 16, 2011, alleging that the Company had improperly valued the Alaska Assets on its books for 2009-11.

148. KPMG failed to take reasonable steps to assess the allegations set forth in news articles, SEC inquiry or class action lawsuit, or to consider them in light of their review and audit procedures on the Alaska Assets.

149. Finally, KPMG failed to respond appropriately to Miller Energy's material weaknesses in its internal controls and accounting staffing. For example, by the end of fiscal year 2014, the Company still had not completely remediated its material weaknesses relating to an insufficient complement of corporate accounting and finance personnel necessary to consistently implement management review controls. Since KPMG had knowledge of the material weaknesses through all of its audits beginning in 2011, it was required to effectively respond to the increased risk of material misstatement. KPMG failed to respond in the appropriate fashion throughout the Class Period. Some of its responses should have included the following:

    a. Changing the nature, timing and extent of its audit procedures;

    b. Evaluating Miller Energy's selection and application of significant accounting principles, such as focusing on those related to subjective measurements and complex transactions that are indicative of bias that could lead to a material misstatement in the financial statements; and

    c. Obtaining more persuasive audit evidence from substantive procedures. AS No. 13.

### KPMG Failed to Properly Supervise its Engagement Team

150. PCAOB standards state that audit "assistants," including firm personnel other than the auditor with final responsibility for the audit, are to be "properly supervised." AU § 311.01. Those standards further require that assistants be informed of their responsibilities and

the objectives of procedures assigned to them, and that the work of assistants be reviewed to determine whether that work was adequately performed. AU §§ 311.12 and 311.13.

151. According to the SEC, KPMG failed to properly supervise the engagement team in connection with its Miller Energy engagement. Once the valuation testwork had begun, KPMG failed to properly supervise EVS and its work. For example, the core engagement team did not sufficiently evaluate EVS's substitute assumptions as discussed in paragraph 125, *supra.* Similarly, despite knowing about the SEC's investigation into Miller Energy's valuation of the Alaska Assets and *TheStreetSweeper* article calling into question the valuation of the Alaska Assets, no one from KPMG's regional management office, national Department of Professional Practice ("DPP") office or general counsel's office required the audit team to conduct additional audit consideration. Nor, did the national office make sufficient inquiries of the engagement team or provide the engagement team with sufficient guidance in light of the SEC investigation and the information in *TheStreetSweeper* article. Furthermore, despite knowing that Riordan had insufficient oil and gas experience, KPMG assigned him as the lead engagement partner and did nothing to ensure that the audit team had sufficient qualifications and experience to handle the Miller Energy audit.

### KPMG Lacked Independence

152. By certifying the public reports that collectively depicted Miller Energy's financial status, KPMG assumed a public responsibility transcending any employment relationship with Miller Energy. KPMG's lack of independence, in both mind and appearance, resulted in KPMG repeatedly certifying four years' worth of fraudulent financials.

153. Auditors function as critical gatekeepers in the area of issuer reporting and disclosure. Comprehensive, accurate, and reliable financial reporting is the bedrock upon which our markets are based, and is essential to ensuring public confidence in them. Auditors play a

51

crucial role in the financial reporting process by serving a "public watchdog function" that demands "total independence from the client at all times and requires complete fidelity to the public trust." *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

154.    From virtually the moment KPMG was retained by Miller Energy, KPMG began knowingly or recklessly violating numerous of these standards, including the bedrock standard of independence, which requires that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor." AU § 220.

155.    The conceptual framework for the AICPA independence standards is provided within the AICPA's Code of Professional Conduct, and defines the two required components of independence as:

> a.    Independence of mind – The state of mind that permits the performance of an attest service without being affected by influences that compromise professional judgment, thereby allowing an individual to act with integrity and exercise objectivity and professional skepticism.

> b.    Independence in appearance – The avoidance of circumstances that would cause a reasonable and informed third party, having knowledge of all relevant information, including safeguards applied, to reasonably conclude that the integrity, objectivity, or professional skepticism of a firm or a member of the attest  engagement team had been compromised.[14]

156.    In addition to certain specific situations that would render an auditor's independence impaired, AICPA ET (Ethics) Section 101 recognizes that it is not practical to list every circumstance that might result in the appearance of a lack of independence and accordingly, advises that "…a member should evaluate whether that circumstance would lead a reasonable person aware of all the relevant facts to conclude that there is an unacceptable threat to the member's and the firm's independence." The evaluation of threats to independence, and

---

[14] *See* AICPA Code of Professional Conduct, *available at* http://www.aicpa.org/Research/Standards/CodeofConduct/DownloadableDocuments/2014December14CodeofProfessionalConduct.pdf.

52

safeguards applied to eliminate, or reduce to an acceptable level such threats, are required to be documented.  AICPA ET Section 101, Independence, ¶02 101-1.

157.    KPMG's failure to maintain its independence and objectivity, as required by PCAOB standards, is apparent from the numerous instances of reckless disregard of the PCAOB standards discussed herein.  Furthermore, as discussed more fully below, KPMG subordinated its judgment to that of Miller Energy's management, thereby failing to maintain its independence and objectivity as required by the PCAOB standards.

158.    From the outset of its engagement by Miller Energy, KPMG knowingly or recklessly failed "to maintain an independence in mental attitude in all matters relating to the engagement" and to the assignment at hand, including because KPMG performed independence-destroying bookkeeping, appraisal, and valuation services for the Company.

159.    Indeed, Boyd said that he "hired KPMG to do our books once we started getting some money in," after "convincing Scott [Boruff] that we had to have some more help and we needed to upgrade our accounting," because "I needed somebody with oil and gas experience, because I knew I didn't have it."  Boyd, p. 56.  According to Boyd, after Boruff "started talking to some of the large investors, they said, . . . a Big 4 firm would be nice."  *Id*. at p. 57.

160.    Further, even before KPMG completed its audit of Miller Energy's financial statements for fiscal year 2011, the Company began receiving letters from the SEC with questions and concerns regarding the Company's SEC filings, and KPMG was instrumental in preparing the Company's responses to these letters.  In his sworn statement, Boyd was asked about Miller Energy's process for responding to SEC inquiries:

> Question:    Did you go through KPMG?
>
> Answer:    Like, what I just said, I didn't do any of these in a vacuum or on my own.  I didn't even prepare some of the answers on my own.  I was just in charge of coordinating

> the response. So sometimes KPMG themselves would give me a draft of the answer to this particular -- you know, because they always sent, like, 10 or 20 questions. And so I would assign those questions to different people. I'd say, okay, who's got the most knowledge about this? Who can help me with this one, you know? And I said, I can do a couple of these myself, but I don't -- you know, I want everybody's help on this; this is a group effort. And so I would get KPMG's help on a lot of them to actually draft, and then they would sign off on the entire thing before it went.

161. KPMG's undisclosed conduct in the drafting of the responses to these SEC letters badly undermined KPMG's independence, as these letters included Miller Energy's justifications for the valuation of the Alaska Assets, which valuation KPMG was supposed to be auditing and scrutinizing, not defending.

162. Miler Energy's former Senior Vice President for Investor Relations, Bobby Gaylor, confirmed these events, explaining that Miller Energy's books and records were in such disarray that KPMG needed to "fix them . . . so they could audit them."

163. The foregoing acts by KPMG went well beyond providing auditing services, and instead constituted bookkeeping, appraisal, and valuation services, completely destroying KPMG's independence.

164. As the AICPA Plain English Guide to Independence explains:

> Because of self-audit concerns, performing any type of bookkeeping service for an SEC audit client is considered to impair independence under SEC rules unless it is reasonable to expect that the results of the auditor's services will not be subject to the firm's audit procedures.
>
> ***
>
> This presumption of self-audit also applies to financial information design and implementation; <u>appraisals, valuations, fairness</u>

2275770.3

opinions, or contribution-in-kind reports; actuarial-related advisory services; and internal audit outsourcing.[15]

165.   Indeed, as the SEC itself explained in SEC Release No. 33-7919, published in connection with its revisions to, among other things, 17 C.F.R. 210 (which includes rules governing public auditing firms):

> Our rule lists services that, regardless of the size of the fees they generate, place the auditor in a position inconsistent with the necessary objectivity. Bookkeeping services, for example, place the auditor in the position of later having to audit his or her own work and identify the auditor too closely with the enterprise under audit. It is asking too much of an auditor who keeps the financial books of an audit client to expect him or her to be able to audit those same records with an objective eye.
>
> In much the same way, performing certain valuation services for the audit client is inconsistent with independence. An auditor who has appraised an important client asset at mid-year is less likely to question his or her own work at year-end. Similarly, an auditor who provides services in a way that is tantamount to accepting an appointment as an officer or employee of the audit client cannot be expected to be independent in auditing the financial consequences of management's decisions.[16]

166.   17 C.F.R. 210.2-01(c)(4), in turn, provides that "[a]n accountant is not independent if, at any point during the audit and professional engagement period, the accountant provides [certain] non-audit services to an audit client," including bookkeeping services, as set forth in 17 C.F.R. 210.2-01(c)(4)(i):

> (i) *Bookkeeping or other services related to the accounting records or financial statements of the audit client.* Any service, unless it is reasonable to conclude that the results of these services will not be subject to audit procedures during an audit of the audit client's financial statements, including:

---

[15]American Institute of Certified Public Accountants, Inc., *AICPA Plain English Guide to Independence*, March 1, 2016, at 42, available at http://www.aicpa.org/interestareas/professionalethics/resources/tools/downloadabledocuments/plain%20english%20guide.pdf (emphasis added).

[16] https://www.sec.gov/rules/final/33-7919.htm#P127_53448

55

(A) Maintaining or preparing the audit client's accounting records;

(B) Preparing the audit client's financial statements that are filed with the Commission or that form the basis of financial statements filed with the Commission; or

(C) Preparing or originating source data underlying the audit client's financial statements.

167.    17 C.F.R. 210.2-01(c)(4)(iii) further provides that appraisal and valuation services also destroy independence:

> (iii) *Appraisal or valuation services, fairness opinions, or contribution-in-kind reports*. Any appraisal service, valuation service, or any service involving a fairness opinion or contribution-in-kind report for an audit client, unless it is reasonable to conclude that the results of these services will not be subject to audit procedures during an audit of the audit client's financial statements.

The wisdom of these rules is highlighted by the facts of this case. As the above allegations make clear, from the outset, KPMG performed in-house accounting, bookkeeping, appraisal, and valuation services for Miller Energy. It is no wonder that KPMG's "audits" of the figures generated through these services resulted in unqualified clean audit opinions. Indeed, as Gaylor explained, the reason KPMG "stuck around" as the Company's auditor – despite the unauthorized Form 10-K filing on July 29, 2011 without KPMG's consent – was that "they are culpable at that point forward," by virtue of having "fixed" the Company's accounting entries. Gaylor, p. 194-95.[17]

168.    Further, even before KPMG completed its audit of Miller Energy's financial statements for fiscal year 2011, the Company began receiving letters from the SEC with questions and concerns regarding the Company's SEC filings, and KPMG was instrumental in

---

[17] Citations to "Gaylor, p. __" are to pages of a transcript of sworn testimony given by Gaylor on April 19, 2016.

56

preparing the Company's responses to these letters.  In his sworn statement, Boyd was asked about Miller Energy's process for responding to SEC inquiries:

> Question:    Did you go through KPMG?
>
> Answer:     Like, what I just said, I didn't do any of these in a vacuum or on my own.  I didn't even prepare some of the answers on my own.  I was just in charge of coordinating the response. So sometimes KPMG themselves would give me a draft of the answer to this particular -- you know, because they always sent, like, 10 or 20 questions. And so I would assign those questions to different people.  I'd say, okay, who's got the most knowledge about this?  Who can help me with this one, you know? And I said, I can do a couple of these myself, but I don't -- you know, I want everybody's help on this; this is a group effort.  And so I would get KPMG's help on a lot of them to actually draft, and then they would sign off on the entire thing before it went.

169.     KPMG's undisclosed conduct in the drafting of the responses to these SEC letters badly undermined KPMG's independence, as these letters included Miller Energy's justifications for the valuation of the Alaska Assets, which valuation KPMG was supposed to be auditing and scrutinizing, not defending.

**KPMG's "No Audit At All" Concealed Miller Energy's Fraud from Investors**

170.     KPMG's conduct prevented Miller Energy's fraud from being revealed to the investing public.  Absent KPMG's conduct in furthering the Company's fraud, the Company would not have been able to obtain the critical financing it needed to meet its short-term obligations and avoid bankruptcy in 2011.

171.     Indeed, according Gaylor, KPMG's Riordan and Bennett flew to Alaska to meet with investors, in which their sole function was to demonstrate to investors that KPMG was involved, and that therefore, Miller Energy could be trusted.  Gaylor, p. 78-79.

57

172. Not only did KPMG's clean opinions provide credibility to Miller Energy's valuation of the Alaska Assets, but they provided the Company "cover" and were relied upon by investors.

173. KPMG knew full well the value of its imprimatur to Miller Energy and the Company's executives, creditors, and investors. It knew that were it to subject the Alaska Assets to the scrutiny required of an independent public auditor, or to resign as Miller Energy's independent auditor, or to issue anything other than a clean, unqualified report, the Miller Energy house of cards would crumble, resulting in massive and widespread losses.

174. Notably, the Miller Energy auditing debacle was not even the latest case involving improper conduct by KPMG. For instance, in April 2017, KPMG announced that it had fired five partners, including the national managing partner for audit quality and professional practice, after KPMG improperly obtained information about which audits its regulator, the PCAOB, planned to inspect.

175. The PCAOB oversees firms that audit U.S.-traded public companies. According to *The Wall Street Journal*, among the Big 4 accounting firms, KPMG had the highest number of deficiencies cited by the accounting board in each of the past two years. In the previous year, 20 of KPMG's inspected audits, or 38% of those inspected, were found to be deficient. In 2015, the number of deficient audits was 28, or 54% of those inspected.

## H. Additional Scienter Allegations

176. KPMG knew or were reckless in not knowing about the false and misleading nature of the valuation of the Alaska Assets.

177. The Alaska Assets were extremely material to the Company. Indeed, their fraudulent valuation was the only reason the Company was able to avoid bankruptcy in fiscal year 2010, and was responsible for generating the only "profit" ever experienced by the

58

Company. Because of the extreme, Company-defining significance of the Alaska Assets and KPMG's robust knowledge of all aspects of those Assets, KPMG knew or recklessly disregarded that they were fraudulently overvalued.

178. KPMG had unfettered access to data that conclusively revealed the fraudulent valuation of the Alaska Assets further, including to, among other things: (a) emails and records showing actual costs and expenses associated with recovering hydrocarbons from the Alaska Assets, which were significantly higher than the assumptions underlying their reported fair market value; and (b) emails and records using internal estimates of such costs and expenses that were significantly higher than the assumptions underlying the reported fair market value of the Alaska Assets.

179. KPMG was repeatedly warned and put on notice that the Alaska Assets were likely to have been overvalued, including in numerous reports published by *TheStreetSweeper*, reports which included analysis from oil and gas experts and investors, as well as on-the-record statements by reputable executives in the energy industry; in correspondence from the SEC relating to the valuation of the Alaska Assets; and in lawsuits alleging the fraudulent valuation of the Alaska Assets.

180. KPMG had motive to perpetuate the fraud. Its Knoxville office, which held the Miller Energy account, was motivated by the fact that during the Class Period, there were not many businesses in Knoxville that could generate the millions of dollars in fees that the Miller Energy account was capable of generating and did in fact generate for that office. Indeed, a sense of the size of the fees generated by the Miller Energy account was revealed in documents filed in Miller Energy's bankruptcy proceedings, which showed, among other things, that just in the 90 days preceding Miller Energy's October 1, 2015 bankruptcy filing, it had paid KPMG

59

$553,280, and still owed KPMG an additional $448,000 on top of that amount. KPMG's Knoxville office was also motivated by the connections to Knoxville's business elite that could be developed through the Miller Energy account, and indeed, as Gaylor explained, Riordan and Bennett asked Gaylor to introduce them to Knoxville-area business leaders. As for opportunity, KPMG had every opportunity to either perpetuate the fraud by participating in it, or to expose the fraud. At every turn, KPMG chose the former, further demonstrating scienter.

181. KPMG's ignorance of numerous additional red flags not discussed above also supports scienter. Among these are that: (a) the Company filed the July 29, 2011 Form 10-K without KPMG's consent; (b) the Company had a history of "going concern" qualified audit opinions prior to its acquisition of the Alaska Assets; (c) KPMG was brought in to become the Company's auditor on February 1, 2011, towards the end of the Company's fiscal year, which was April 30, 2011, despite the fact that the proxy dated January 28, 2011, stated that Sherb was being recommended for re-appointment; (d) Miller Energy revealed on March 18, 2011 that it had to file that Form 10-Q late, and that it had failed to property record depreciation, depletion and amortization ("DD&A") and other items relating to the Alaska Assets; (e) Boruff financed the purchase of a home and furnishings worth $9.5 million using the rising price of Company stock, despite being paid only a $500,000 salary; (f) the Company repeatedly borrowed money at effective interest rates of over 20%; (g) the Company always had cash flow problems and always paid its bills late; (h) the Company's founder, Deloy Miller, treated the Company like a family business, instead of a public company; and (i) KPMG personnel, including Riordan, personally witnessed enormous dysfunction within Miller Energy, including two members of the accounting staff getting intoxicated in the office, becoming angry and disorderly, and loudly complaining about their compensation. Gaylor, p. 120-124.

## I.    KPMG's False and Misleading Statements

182.    On August 29, 2011, in connection with Miller Energy's Form 10-K/A of the same date, KPMG stated:

> We have audited the accompanying consolidated balance sheet of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year ended April 30, 2011. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2011, and the results of their operations and their cash flows for the year ended April 30, 2011, in conformity with U.S. generally accepted accounting principles.

183.    On July 16, 2012, in connection with Miller Energy's Form 10-K of that same date, KPMG stated:

> We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

61

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 16, 2012 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting

184.    That same day, KPMG stated:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2012, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to

obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the

consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2012 consolidated financial statements, and this report does not affect our report dated July 16, 2012, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2012, based on the criteria established in Internal Control - Integrated Framework issued by the COSO.

185. On July 15, 2013, in connection with Miller Energy's Form 10-K of the same date, KPMG stated:

We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2013. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and the results of their operations and their cash

flows for each of the years in the three-year period ended April 30, 2013, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 15, 2013 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

186. That same day, KPMG stated:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial

65

reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2013. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2013 consolidated financial statements, and this report does not affect our report dated July 15, 2013, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2013, based on the

criteria established in Internal Control - Integrated Framework issued by the COSO.

187.    On July 14, 2014, in connection with Miller Energy's Form 10-K of that same date, KPMG stated:

> We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the three-year period ended April 30, 2014, in conformity with U.S. generally accepted accounting principles.
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in *Internal Control - Integrated Framework (1992)* issued by the Committee of Sponsoring Organization of the Treadway Commission, and our report dated July 14, 2014 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

67

188.   That same day, KPMG stated:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2014, based on criteria established in Internal Control Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

68

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2014. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2014 consolidated financial statements, and this report does not affect our report dated July 14, 2014, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2014, based on the criteria established in Internal Control - Integrated Framework (1992) issued by the COSO.

189.    The foregoing statements were also incorporated into Miller Energy's September

6, 2012 Registration Statement, which became effective on September 18, 2012, and into various

prospectus supplements, as follows:

69

| | Registration Statement dated September 6, 2012 | Prospectus supplement dated February 13, 2013 | Prospectus supplement dated May 7, 2013 | Prospectus supplement dated June 27, 2013 | Prospectus supplement dated September 25, 2013 | Prospectus supplement dated October 17, 2013 | Prospectus supplement dated August 20, 2014 |
|---|---|---|---|---|---|---|---|
| KPMG's August 29, 2011 Report | x | x | x | x | x | x | x |
| KPMG's July 16, 2012 Reports | x | x | x | x | x | x | x |
| KPMG's July 15, 2013 Reports | | | | | x | x | x |
| KPMG's July 15, 2014 Reports | | | | | | | x |

190.    The foregoing Registration Statement, and each of the foregoing Prospectus Supplements incorporating that Registration Statement, also contained the following statement under the heading "Experts":

> The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and for the years then ended, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing. Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended, and the effectiveness of internal control over financial reporting as of April 30, 2012, incorporated by reference herein and to the reference to our firm under the heading "Experts" in the prospectus.
>
> /s/ KPMG LLP
>
> Knoxville, Tennessee
>
> September 5, 2012

191. The June 27, 2013, September 25, 2013, and October 17, 2013 Prospectus

Supplements each also contained the following statement, under the heading "Experts":

> The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and for each of the years in the three-year period ended April 30, 2013, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing.

192. The August 20, 2014 Offering Documents also contained the following statement,

under the heading "Experts":

> The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013 and for each of the years in the three-year period ended April 30, 2014, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing.

193. The foregoing Registration Statement, and each of the foregoing Prospectus

Supplements, also incorporated by reference the following materially misleading SEC filings by

Miller Energy:

- Annual Report on Form 10-K for the year ended April 30, 2012 as filed on July 16, 2012 and amended on August 28, 2012, and further amended on September 6, 2012);

- Current Report on Form 8-K as filed on July 17, 2012;

- Current Report on Form 8-K as filed on July 26, 2012;

- Current Report on Form 8-K as filed on July 27, 2012 and amended on August 1, 2012;

- Current Report on Form 8-K as filed on July 31, 2012;

- Current Report on Form 8-K as filed on August 1, 2012;

- Current Report on Form 8-K as filed on August 17, 2012;

- Current Report on Form 8-K/A as filed on August 27, 2012; and

- Current Report on Form 8-K as filed on September 4, 2012.

194.    The foregoing statements and documents were false and misleading because, contrary to these statements and the representations in these documents:

a.    KPMG did not conduct any of its audits in accordance with GAAS or the standards of the PCAOB;

b.    The financial statements referred to in these statements all contained material errors;

c.    The financial statements referred to in these statements did not conform with GAAP;

d.    KPMG lacked any reasonable basis for its opinion that the financial statements referred to in these statements were accurate;

e.    KPMG's statements regarding Miller Energy's internal control weaknesses falsely stated that KPMG took those weaknesses into account when auditing Miller Energy's financial statements; and

f.    KPMG's statements regarding Miller Energy's internal control weaknesses omitted to disclose that those weaknesses resulted in material inaccuracies in Miller Energy's financial statements.

195.    In addition, the foregoing statements were false and misleading because, as the SEC subsequently determined, Miller Energy's financial reports for Forms 10-Q for the third quarter of fiscal year 2010 and for the first three quarters of fiscal years 2011 through 2015; Forms 10-K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 and August 20, 2014 pursuant to Rule 424, all "materially misstated the value of its assets."  KPMG Order at 5.

196.    Specifically, the SEC found, among other things, that: (1) KPMG's valuation of the Alaska Assets at an "inflated value of $480 million . . . violated generally accepted accounting principles ("GAAP") and overstated the fair value of the assets by hundreds of

millions of dollars"; (2) KPMG "failed to comply with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), chiefly with respect to the procedures relating to the oil and gas properties that contained the overstated asset values"; (3) KPMG "failed to obtain sufficient competent evidence regarding the impact of the opening balances of the Alaska Assets, despite knowing that no proper fair value assessment had been performed by management"; (4) KPMG "failed to appropriately consider the facts leading to Miller Energy's acquisition of the Alaska Assets, including the multiple offers received for those assets and the "abandonment" of the assets by the prior owner" in valuing the Alaska Assets; (5) KPMG "failed to sufficiently review certain forecasted costs associated with the estimation of the fair value of the Alaska Assets, which were understated, and to detect that certain fixed assets were double counted in the company's valuation"; (6) KPMG "failed to properly assess the risks associated with accepting Miller Energy as a client and to properly staff the audit"; (7) KPMG "overlooked evidence that indicated a possible overvaluation of the Alaska Assets"; (8) KPMG "failed to exercise the requisite degree of due professional care and skepticism" in auditing Miller Energy"; and (9) even after KPMG management and national office personnel became aware of the unusual and highly material valuation of the Alaska Assets, KPMG failed to "take sufficient action to determine that an appropriate response was taken by the engagement team regarding the risk of overvaluation of the Alaska Assets."

### J.    The Truth Begins to Emerge

197.    The truth was revealed to the market over the course of a series of events and disclosures, each of which revealed that, contrary to Miller Energy and KPMG's representations: (1) the Company did not have the ability to profitably produce meaningful amounts of oil from the Alaska Assets; (2) the Company's valuations depended on patently untenable assumptions; (3) the valuation of the Alaska Assets was not based on fair market value; (4) KPMG was not

independent; (5) KPMG's unqualified clean audit opinions were false; and (6) KPMG and Miller Energy had engaged in a years-long scheme to defraud investors.

198.    Beginning in December 2013, and through the time it filed for bankruptcy, the truth that Miller Energy was a fraud, and the risks concealed by that fraud, including by KPMG's participation in it, leaked out, were revealed, and materialized.

199.    On December 17, 2013, a group of shareholders calling themselves "Concerned Miller Shareholders" sent an open letter decrying, among other things, management's lack of expertise with respect to the Alaska Assets.  On that day, the price of Miller Energy's stock dropped from a closing price of $8.60 on December 16, 2013, to a closing price of $7.07 on December 19, 2013.  During the same period, Series C Preferred Stock declined from a closing price of $26.35 to a closing price of $25.96, and Series D Preferred Stock declined from a closing price of $24.19, to a closing price of $23.84.

200.    Then, on December 24, 2013, a report entitled "*Miller Energy: Digging Itself Into Another Deep Hole?*" was published by *TheStreetSweeper*.  That report pointed out that Miller Energy was "a bleeding energy firm buried underneath a mountain of expensive debt." It featured an interview with "Robert Chapman, the former boss of Miller President/Acting CFO David Voyticky," who said that "Miller barely even resembles a normal energy firm since it focuses so much of its attention on raising capital that it seems to market its stock as its primary product while selling a little bit of oil on the side."

201.    Chapman explained that Miller Energy's "gross production numbers are not big – they're tiny – and the company is still cash-flow negative (from operations combined with necessary capitalized investments), so it has to keep selling this story about its monstrous reserves."  Chapman described the Company as "a preferred-stock issuance machine that seems

to be more in the business of raising money than making money," and "it looks like a stock that's driven by a myth."

202.    As for the elevation of Voyticky – his former employee – to CFO, Chapman said that the Company had "placed its trust in an executive that (based on his own firsthand experience) lacks any substantial skills outside of his ability to raise capital by 'smooth-talking investors and lenders into parting with their funds.'"

203.    The report analyzed several events relating to the valuations attached to the Alaska Assets.  For instance, the report cited a October 31, 2013 press release titled "*Miller Energy Resources Provides Update on Alaska Operations*," released on the very last day of the second quarter of fiscal year 2014, in which the Company claimed to have achieved "record oil sales with over 200,000 barrels sold" for the quarter ending October 31, 2013.  However, the December 24 report noted that when the Company posted its actual results for that quarter on December 10, 2013, those results showed that the Company had not even produced that many barrels during that period.

204.    The report also cited a hedge fund manager who explained that one of the "levers that you can pull when you're estimating to value of reserves to arrive at a really big number" is "how much it will cost you to produce it."  Of course, that is precisely one of the levers pulled by Miller Energy, and one that KPMG was complicit in concealing.

205.    On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, Miller Energy's stock price fell from a closing price of $7.29 on December 23, 2013, to a closing price of $6.88 on December 26, 2013.  During the same period, Series C Preferred Stock declined

from a closing price of $25.75, to a closing price of $22.62 and Series D Preferred Stock declined from a closing price of $23.50, to a closing price of $21.25.

206.   On March 13, 2014, before trading began, the Company filed a Form 8-K, including its earnings release for the third quarter of fiscal year 2014.   In that release, the Company announced an operating loss during the quarter of $6.6 million, a net loss of $6.8 million, and earnings per share of $-0.15.   It also announced increased expenses, including $5.8 million in oil and gas operating expenses, and also increased DD&A expenses, both associated with the costs of extracting oil.   The release also announced that the Company was taking on more debt.

207.   After trading hours, an investor call was held to discuss those results.   On the call were Boruff, Voytickey, Brawley, and Hall.   The public transcript for this call was posted on March 14, 2014, at 6:40:09 PM.[18]  During that call, the Company was repeatedly pressed by multiple analysts about the costs and expenses associated with its operations and per barrel of oil, including with respect to two new Alaskan wells it had been touting, the RU-9 and the WMRU-2B wells. Hall revealed an estimate of $26 million for those two wells, while Boruff attempted to downplay operating costs more generally, including by downplaying the costs of extracting oil with the North Fork Unit, which the Company had recently acquired.   The Company also fielded questions about disappointing oil production volumes on a previous well it had been touting, the RU-7 well.   The Company also announced that it would be looking to acquire more assets in Alaska, including because it had "more capital availability," *i.e.*, more debt financing.

208.   On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a

---

[18] http://www.nasdaq.com/symbol/mill/call-transcripts.

result, and Miller Energy's stock price fell from a closing price of $6.67 on March 12, 2014, to a closing price of $5.69 on March 17, 2014. During the same period, Series C Preferred Stock declined from a closing price of $25.75, to a closing price of $24.90 and Series D Preferred Stock declined from a closing price of $23.73, to a closing price of $23.65.

209. On July 14, 2014, after trading hours, the Company filed its Form 10-K for the fiscal year 2014. Included with the filing was KPMG's unqualified audit report, confirming that the Company's financial statements "present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries," including a whopping $644.8 million value in 2014 for the "Oil and Gas Properties, Net" item on the Company's balance sheet, and the previous year's $491.3 million value for that same item. Because the Company used the income approach to generate these figures, the costs associated with generating the anticipated income were critical to achieving such eye-popping valuations. In arriving at these valuations, however, fraudulent cost figures were used, which the Company and KPMG knew or recklessly disregarded.

210. That same day, also after trading hours, the Company filed a Form 8-K attaching its earnings release for the fourth quarter and fiscal year ended April 30, 2014. In those filings, the Company reported increases in net loss and weaker than expected oil production.

211. The following day, July 15, 2014, after trading hours, an investor call was held to discuss those results. During that call, CFO Brawley acknowledged that costs and expenses were high, including DD&A expenses, and acknowledged that poor net income and earnings per share numbers were items that "a number of our shareholders focus on." Brawley also acknowledged that Miller Energy's internal controls were still deficient, but touted the hiring of "a junior accountant with big four accounting experience" as a reason for investors to be optimistic.

212.     During the question and answer period, the very first question asked related to the "complete cost for each well" that had been previously touted on the call, on a net basis, including tax rebates.  However, neither Boruff nor Hall was able to provide complete answers.

213.     On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result, Miller Energy's stock price fell from a closing price of $5.79 on July 14, 2014, to a closing price of $4.95 on July 16, 2014.  During the same period, Series C Preferred Stock declined from a closing price of $26.58, to a closing price of $26.50 and Series D Preferred Stock declined from a closing price of $25.79, to a closing price of $25.68

214.     On October 13, 2014, after trading hours, *Reuters* reported that Brean Capital, a firm's whose analyst had been following Miller Energy closely, cut its price target of Miller Energy from $9 to $7. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result, Miller Energy's stock price fell from a closing price of $3.58 on October 13, 2014, to a closing price of $3.12 on October 14, 2014.  During the same period, Series C Preferred Stock declined from a closing price of $20, to a closing price of $17.76 and Series D Preferred Stock declined from a closing price of $21.21, to a closing price of $18.75.

215.     On November 26, 2014, Miller Energy stock began to become the subject of margin calls.  Those margin calls were the foreseeable consequence of KPMG's fraud, in that it was foreseeable that when the artificial inflation engendered by KPMG's fraud would inevitably dissipate and would result in margin calls, as margin calls are standard and foreseeable features of securities markets.  On and around this day, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, in connection with

these margin calls, and the Company's stock fell from a closing price of $3.16 on November 25, 2014, to $1.59 on December 1, 2014. During the same period, Series C Preferred Stock declined from a closing price of $20.63, to a closing price of $18.06 and Series D Preferred Stock declined from a closing price of $20.22, to a closing price of $16.48.

216. On November 28, 2014, after trading hours, *Reuters* reported that Brean Capital cut its price target for Miller Energy again from $7 to $6. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result, Miller Energy's stock price fell from a closing price of $2.32 on November 28, 2014, to a closing price of $1.59 on December 1, 2014.

217. On December 4, 2014, after trading hours, Miller Energy filed a Form 8-K revealing those margin calls, and *Reuters* reported that Imperial Capital, another firm with an analyst who had been following Miller Energy closely, cut its price target for Miller Energy from $7.50 to $2.50. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result, the Company's stock price fell from a closing price of $1.67 on December 4, 2014, to $1.22 on December 8, 2014. During the same period, Series C Preferred Stock declined from a closing price of $18.18, to a closing price of $11.99 and Series D Preferred Stock declined from a closing price of $15.35, to a closing price of $10.00.

218. On December 10, 2014, as the trading day began, Miller Energy filed a Form 8-K, attaching its earnings release for the second quarter of fiscal year 2015, ending October 31, 2014. In that release, the Company announced that during that quarter, it "recognized a $265.3 million non-cash impairment charge related to its Redoubt field proved and unproved properties. The proved and unproved properties were written down to their estimated fair value." On an earnings

call that same day, CEO Giesler explained that "expense overruns," *i.e.*, costs, "factored into the impairment." The Company also announced a loss of $285.7 million.

219. The Company also announced $9 million in lease operating expenses ("LOE"), a 73% increase over the same quarter the previous year, as well as DD&A of $20.1 million, an increase of 123% compared to the same quarter the previous year.

220. Also on December 10, 2014, and as a result of the impairment charges taken to the Alaska Assets, the Company announced modifications to its agreements with various lenders that, among other things, amended the Company's leverage and interest covenants, increased the percentage of the value of the Company's oil and gas properties that could be the subject of mortgages in favor of its lenders from 80% to 90%, eliminated restrictions on the sale of equity interests by Deloy Miller, and increased the applicable interest rates.

221. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $1.35 on December 9, 2014, to close at $1.16 on December 10, 2014. Series C Preferred Stock declined from a closing price of $14.32 on December 9, 2014, to a closing price of $8.90 on December 16, 2014, and Series D Preferred Stock declined from a closing price of $12.75 on December 9, 2014, to a closing price of $8.10 on December 16, 2014.

222. Then, on March 12, 2015, the Company revealed it was taking another $149.1 million impairment charge on the Alaska Assets, increasing total impairment to $414.4 million. As a result of the impairment charges, Miller Energy again announced that it was being forced to modify its agreements with various lenders, added additional onerous requirements to the terms of various credit facilities, including, among other things, prioritizing certain cash flow for the

repayment of loan balances, interest rate increases, and the addition of various covenants relating to collateral, negatively impacting future cash flow. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $1.28 on March 12, 2015, to close at $1.16 on March 13, 2015.  Series C Preferred Stock declined from a closing price of $12.20 on March 12, 2015, to a closing price of $10.61 on March 16, 2015, and the Series D Preferred Stock declined from a closing price of $9.99 on March 12, 2015, to a closing price of $8.31 on March 16, 2015.

223.    On April 29, 2015, the Company filed a Form 8-K, attaching a press release in which it announced that it had received a "Wells Notice"[19] from the SEC indicating that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the Alaska Assets.  On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $0.92 on April 29, 2015, to close at $0.73 on April 30, 2015. Series C Preferred Stock declined from a closing price of $11.86 on April 29, 2015, to a closing price of $7.47 on May 1, 2015 and Series D Preferred Stock declined from a closing price of $9.50 on April 29, 2015 to a closing price of $6.52 on May 1, 2015.

---

[19]"A Wells notice is a communication from the staff to a person involved in an investigation that:

(1) informs the person the staff has made a preliminary determination to recommend that the [SEC] file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the [SEC] concerning the proposed recommendation."   SEC Division of Enforcement, *Enforcement Manual* (October 28, 2016), https://www.sec.gov/divisions/enforcementmanual.pdf.

2275770.3

224. On May 6, 2015, the Company announced it was deferring dividend payments on its Series C and D Preferred Stock. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result Miller Energy's stock price fell from a closing price of $0.65 on May 5, 2015, to close at $0.59 on May 6, 2015. Series C Preferred Stock declined from a closing price of $7.91 on May 5, 2015, to a closing price of $5.15 on May 6, 2015, and Series D Preferred Stock declined from a closing price of $6.48 on May 5, 2015 to a closing price of $4.64 on May 6, 2015.

225. On May 12, 2015, the Company disclosed that the NYSE had notified it that its shares were subject to de-listing due to its having failed to maintain listing requirements.

226. On July 14, 2015, Miller Energy filed a Form 8-K, attaching a press release in which it announced "substantial doubt about its ability to continue as a going concern." On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were revealed, leaked out, or materialized, and as a result the Company's stock price fell from a closing price of $0.35 on July 13, 2015, to close at $0.21 on July 14, 2015. During the same period, Series C Preferred Stock declined from a closing price of $3.30, to a closing price of $1.18 and Series D Preferred Stock declined from a closing price of $3.24, to a closing price of $1.21.

227. On July 30, 2015, after market close, Miller Energy disclosed that its common and preferred stock would be de-listed from the NYSE. On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were revealed, leaked out, or materialized, and as a result the Company's stock price fell from a closing price of $0.30 on July 29, 2015, to close at $0.11 on July 31, 2015. During the same period, Series C

2275770.3

Preferred Stock declined from a closing price of $1.60, to a closing price of $0.06 and Series D

Preferred Stock declined from a closing price of $1.70, to a closing price of $0.55.

228.    On August 6, 2015, Hall resigned his positions as COO of the Company and as

CEO of CIE.    That same day, the SEC commenced an administrative proceeding ("SEC

Enforcement Action") against Miller Energy, Boyd, Hall, and Vogt, alleging fraudulent

overvaluation of the Alaska Assets. Specifically, in its Order Instituting Public Administrative

and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that

after acquiring the Alaska Assets in late 2009, Miller Energy overstated their value by more than

$400 million, boosting the Company's net income and total assets.  According to the SEC, the

allegedly inflated valuation had a significant impact, turning a penny-stock company into one

that was eventually listed on the NYSE, where its common stock had reached a 2013 high of

nearly $9 per share.

229.    In a statement, William P. Hicks, Associate Regional Director of the SEC's

Atlanta office, stated, in pertinent part, as follows:

> We've charged that Miller Energy falsified financial statement
> information and grossly overstated the value of its Alaska assets
> and that the company's independent auditor failed to conduct an
> audit that complied with professional standards . . . . The SEC will
> aggressively prosecute such conduct.

230.    The SEC sought and obtained, among other things, cease-and-desist orders, civil

monetary penalties, and return of alleged ill-gotten gains from Miller Energy, Boyd, and Hall.

231.    Also on August 6, 2015, in response to the SEC Enforcement Action, creditors of

CIE filed an involuntary petition for bankruptcy in the United States Bankruptcy Court for the

District of Alaska.

232.    On October 1, 2015, Miller Energy itself filed for Chapter 11 bankruptcy, citing

in large part the filing of the SEC Enforcement Action, which the Company's senior executives

83

stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing

of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors

Baker Hughes Oilfield Operations, Inc. and Schlumberger Technology Corp., with total claims

of $2.79 million. On and around this day, and on this news, risks or truth concealed by, or effects

associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a

result, the Company's stock price fell from a closing price of $0.07 on September 30, 2015, to

close at $0.03 on October 5, 2015.  During the same period, Series C Preferred Stock declined

from a closing price of $0.30, to a closing price of $0.04 and Series D Preferred Stock declined

from a closing price of $0.21, to a closing price of $0.05.

233.    On January 12, 2016, the SEC entered an Order Making Findings and Imposing a

Cease-and-Desist Order and Penalties Pursuant to Section 8A of the Securities Act of 1933 and

Section 21C of the Securities Exchange Act of 1934 as to Miller Energy Resources, Inc.

("January Order").  The January Order found as follows:

- the Company violated Section 17(a)(2)and (3) of the Securities Act which prohibit fraudulent conduct in the offer or sale of securities;

- the Company violated Section 13(a) of the Exchange Act, and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the [SEC], among other things, annual, current, and quarterly reports as the [SEC] may require;

- the Company violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- the Company violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP; and

- the Company violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or

report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

234. The Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims under the "Joint Plan of Reorganization" ("Plan"), which was approved on January 28, 2016, by the United States Bankruptcy Court for the District of Alaska. On March 29, 2016, the "Effective Date" under the Plan, the Company filed a Form 8-K, announcing that "all equity interests in Miller will be cancelled, including outstanding shares of common stock, approximately 25,750 outstanding shares of Series B Redeemable Preferred Stock with a redemption value of $100 per share, approximately 3,250,000 outstanding shares of 10.75% Series C Cumulative Redeemable Preferred Stock with a redemption value of $25.00 per share, and approximately 3,499,723 outstanding shares of 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock with a redemption value of $25.00 per share."

235. Also on March 29, 2016, the Company finally admitted the truth that the Alaska Assets were essentially worthless, and that the Company's financials to the contrary were a sham that could not be relied upon:

> [T]he Company has conducted an asset impairment analysis on certain of its assets, . . . and after further review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 and other accounting matters, the Company has concluded that its financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon.

236. On and around March 29, 2016, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were revealed, leaked out, or materialized, and as a result, Miller Energy's stock was cancelled entirely, reducing their value to zero.

237. On June 7, 2016, the SEC made findings and imposed remedial sanctions as to Boyd, Hall, and Vogt.

238. On August 16, 2017, the SEC revealed that it had conducted an investigation into KPMG's role in the fraud as well, confirming that, as alleged herein, KPMG failed utterly in its professional duties, had engaged in "improper professional conduct," and was therefore liable for "securities law violations" relating to its "revise and audit of the financial statements of Miller Energy Resources, Inc." That same day, the SEC announced that the targets of that investigation—KPMG and Riordan—had settled with the SEC. The settlement required KPMG to pay a $1 million fine, disgorge $4,675,680 in fees and $558,319 in prejudgment interest. The KPMG Order also censured KPMG, and denied Riordan the privilege or appearing or practicing before the SEC Commission as an accountant. Unusually, the KPMG Order also required KPMG to, among other things:

   a. Perform a complete review and evaluation of its quality controls, including its policies and procedures for audits and interim reviews, including: (1) client acceptance and continuance practices, including client designation, retention, risk identification; (2) auditing fair value measurements and disclosures[20]; (3) use of specialists; (4) audit documentation; and (5) assessment of the expertise and technical proficiency of the audit team members and partners;

   b. Perform a complete review and evaluation of its training programs to provide reasonable assurance that its auditors have adequate technical training and proficiency in relation to: (1) valuations, auditing estimates, including fair value measurements; (2) use of engaged or employed and/or management specialists; and (3) fraud risks and fraud detection;

   c. Deliver a detailed written report to the SEC regarding the review set forth in subparts a and b above, which provides reasonable assurance and sufficient evidence of

---

[20] Including, but not limited to: (i) considering the relevance, reliability and sufficiency of the factors and data used in forming the assumptions underlying estimates, (ii) evaluating the results of procedures performed, including whether the evidence obtained supports or contradicts the estimates included in the financial statements; (iii) considering and documenting estimates giving rise to significant risk based on projected financial information.

86

compliance with all relevant SEC Commissions regulations and PCAOB standards and rules, as well as the adequacy of its training program;

d. Retain, at its own expense, an independent consultant to perform a review of and issue a report to both KPMG and the SEC on KPMG's policies and procedures to determine whether such policies and procedures are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules, and whether KPMG's training program is adequate. KPMG must then adopt all recommendations of the independent consultant in its review and certify to the SEC Commission that it has adopted and implemented or will implement all recommendations of the independent consultant, if any; and

e. Annually certify for calendar years 2018 and 2019, through its Vice Chair, that KPMG has assessed whether its policies and procedures are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules.

239. As the SEC's investigation into KPMG confirms, and as highlighted by the severity of the terms of KPMG's settlement with the SEC, KPMG played a critical role in perpetuating the Miller Energy fraud. Every step of the way, KPMG's conduct prevented Miller Energy's fraud from being revealed to the investing public. KPMG's conduct—which the SEC has now confirmed violated the federal securities laws—thus caused substantial losses to Plaintiffs and the Section 10(b) Class, and these losses were the foreseeable consequences of KPMG's conduct.

240. For instance, had KPMG been truly independent and properly audited Miller Energy's reports, the Company would not have been able to obtain the critical financing it needed to continue meeting its short-term obligations and to avoid bankruptcy.

241. KPMG's imprimatur also lent much needed credibility to the valuation of the Alaska Assets in a variety of contexts, and was heavily relied upon by all market participants, including investors such as Plaintiffs and the Section 10(b) Class.

242. According to Gaylor, Riordan and Bennett went to Alaska for a meeting with investors, in which their sole function was to demonstrate to investors that KPMG was involved,

and that therefore Miller could be trusted. As another example, in a September 2012 earnings call with investors, Boruff touted the fact that Miller Energy "received the clean opinion from KPMG regarding our audited financials for the past two years" in his opening remarks as evidence of Miller Energy's "having cured any remaining deficiencies in our other public filings," and of "the improvements that we achieved in our financial reporting." And, in a December 2012 earnings call with investors, Boruff again touted as evidence of Miller Energy's financial credibility the fact that Miller Energy "worked closely with auditors and KPMG to achieve these improved results," and the fact that Miller Energy "received a clean opinion from KPMG regarding our financials for the past two years."

243. KPMG's imprimatur was also critical to Miller Energy's ability to access the financing that fueled the Company, whose paltry revenues never even came close to exceeding expenses.

244. All of these facts were known and foreseeable to KPMG. KPMG knew the value of its imprimatur to Miller Energy and the Company's executives, creditors, and investors. It knew that, at any time during the Class Period, were it to subject the Alaska Assets to the high level scrutiny required of an independent public auditor, or to resign as independent auditor, or to issue anything other than a clean report, the house of cards that was Miller Energy would collapse, and cause massive and widespread losses. As a result, all the foregoing losses were a foreseeable consequence of KPMG's misconduct.

### K. Loss Causation

245. KPMG's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Section 10(b) Class.

2275770.3

246. Throughout the Class Period, the price of the Company's securities was artificially-inflated and/or maintained at an artificially high level as a result of KPMG's fraudulent statements, omissions, and conduct.

247. The price of the Company's securities declined significantly, and the Company's securities were eventually cancelled entirely, when the risks and truth concealed by KPMG's fraud materialized, leaked, or were disclosed. Importantly, the price of the Company's securities declined not just on the explicit revelation of new information, but also on the materialization of risks relating to the true costs associated with the Alaska Assets concealed by KPMG's misconduct, and on the partial disclosure of aspects of the truth regarding Miller Energy's inability to profitably produce oil from the Alaska Assets, as well as the true costs associated with the Alaska Assets. Accordingly, even if a particular event or disclosure set forth above did not fully or explicitly disclose the fraudulent overvaluation of the Alaska Assets itself, losses associated with it were still causally connected to KPMG's misconduct, as explained below.

248. Throughout the Class Period, Miller Energy, with KPMG's assistance, took on more debt and issued more equity, all on the promise of its balance sheet, *i.e.*, on the valuation of the Alaska Assets. Meanwhile, it repeatedly missed earnings forecasts, failed to profitably generate meaningful revenue, and generated no profits or net income. Nevertheless, Miller Energy and KPMG were able to keep the Company's stock price from falling to zero or very nearly zero, by fraudulently insisting to the market that the Alaska Assets had a fair market value several hundred million dollars higher than their actual fair market value, and even repeatedly doubled down on that fraud.

L. **Inapplicability of the Statutory Safe Harbor**

249. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this

Complaint. None of the misstatements and omissions complained of herein was a forward looking statement, nor were any of the statements identified as forward-looking when made. Rather, the false or misleading statements and omissions complained of in this Complaint concerned omissions of historical and/or current facts and conditions existing at the time the statements were made.

250. Alternatively, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

251. Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, KPMG is liable for those false or misleading forward-looking statements because at the time those statements were made, KPMG knew the statement was false or misleading, or the statement was authorized and/or approved by a KPMG partner who knew or recklessly disregarded that the statement was materially false or misleading when made.

## M. Presumption of Reliance

252. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against KPMG are predicated in part upon material omissions of fact that KPMG had a duty to disclose.

253. In the alternative, Plaintiffs are entitled to a presumption of reliance on KPMG's material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Miller Energy securities was open, efficient and well-developed for the following reasons, among others:

2275770.3

a. The market for Miller Energy securities was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all reliable, publicly-available sources and reflected such information in the price of Miller Energy securities;

b. Miller Energy securities met the requirements for listing and were listed and actively traded on the NYSE and NASDAQ during the Class Period, highly efficient and automated markets;

c. The Company was consistently followed, before and throughout the Class Period, by the media, which issued over 1,644 news stories regarding Miller Energy during the Class Period;

d. Miller Energy was followed by numerous securities analysts employed by firms including Wunderlich Securities, Brean Capital, Imperial Capital, Caris & Company, SunTrust Robinson Humphrey Capital Markets, and MLV & Co., among others, who wrote reports about the Company and the value of its securities that were publicly available and entered the public marketplace during the Class Period. Indeed, there was extensive securities analyst coverage of Miller Energy, with at least several dozen analyst reports published during the Class Period;

e. The price of Miller Energy securities reacted promptly to the dissemination of new information regarding the Company;

f. Miller Energy securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation. The average daily trading volume for Miller Energy common stock during the Class Period was approximately 2,140,764 shares per week and the average weekly turnover was 4.88%. The average daily trading volume for the Miller Energy Series C Preferred Stock during the Class Period was approximately 108,000 shares per week and the average weekly turnover was 4.62%, and the average daily trading volume for the Miller Energy Series D Preferred Stock during the Class Period was approximately 141,895 shares per week and the average weekly turnover was 10%;

g. Miller Energy regularly communicated with public investors through established market communication mechanisms, including through regular press releases, which were carried by national and international news wires, and through other wide ranging public disclosures, such as communications and conferences with investors, the financial press and other similar reporting services;

h. As a public company, Miller Energy filed period public reports with the SEC; and

i. Miller Energy met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Offerings, among other SEC filings.

91

254.     As a result of the foregoing, the market for Miller Energy securities promptly digested current information regarding Miller Energy from all reliable, publicly available sources and reflected such information in the price of Miller Energy's securities. Under these circumstances, purchasers of Miller Energy securities during the Class Period suffered injury through their purchases of Miller Energy securities at artificially-inflated prices and a presumption of reliance applies.

255.     Accordingly, Plaintiffs and other members of the Section 10(b) Class did rely and are entitled to have relied upon the integrity of the market price for Miller Energy securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period. Additionally, Plaintiffs are entitled to a presumption of reliance because the claims asserted herein against KPMG are also predicated upon omissions of material fact which there was a duty to disclose.

### N.     Claims for Relief Under the Exchange Act

### COUNT ONE
### Violation of § 10(b) of the Securities Exchange Act of 1934 and
### Rule 10b-5(b) Promulgated Thereunder

256.     Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

257.     This Count is brought solely and exclusively under the provisions of Rule 10b-5(b). KPMG alone, and acting in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Miller Energy which resulted in misstatements and omissions of material facts in the Company's financial reporting. KPMG employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that

92

included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company not misleading.

258.   KPMG knew, or was reckless in not knowing, that Miller Energy's reported annual financial results for fiscal years ended April 30, 2011 through April 30, 2014, which were disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP; and that the audits were not performed in accordance with GAAS and, therefore, each of KPMG's unqualified audit reports were materially false and misleading.

259.   KPMG knew, or should have known, that Miller Energy's financial statements for the relevant period were materially false and misleading.  As described above, KPMG failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

260.   As a result of KPMG's clean opinions of Miller Energy's misstated financial reports and KPMG's own false and misleading statements and omissions in its unqualified audit reports, the market price of the Company's securities were artificially-inflated throughout the Class Period.

261.   All quarterly and annual filings by Miller Energy with the SEC (on which the public relies) from the third quarter of 2011 through the third quarter of 2015, were based on fraudulent valuations and materially-misstated the assets of Miller Energy.

262.   KPMG, Miller Energy's outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or to take reasonable actions to correct them.

263. Had KPMG not violated principles and standards of GAAP and GAAS, it would have detected the fraudulent valuations and material misstatements in Miller Energy's 2011-2014 financial statements.

264. Instead, KPMG acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided, (b) the false and misleading nature of Miller Energy's financial statements, (c) its failure to conduct proper audit tests and examinations of the books, records and financial statements of Miller Energy, and (d) the false representations that the financial statements had been properly audited in accordance with GAAS.

265. In violation of GAAS, KPMG failed to expand the scope of its audits notwithstanding its knowledge or reckless ignorance of innumerable red flags that should have put it on notice of the massive over-valuation and misstatements by Miller Energy. KPMG had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." SAS No. 1 (AU § 230) and SAS No. 82 (effective Dec. 15, 1997). If there is a material misstatement, whether by fraud or mistake, the auditors' procedures need to be designed and performed to detect it. Further, the auditor is required to view the audit evidence with professional skepticism.

266. KPMG knowingly or recklessly closed its eyes to the massive fraud detailed throughout this Complaint, which was ultimately detected by the SEC.

267. In violation of GAAS, and contrary to the representations in its report on Miller Energy's financial statements, KPMG also failed to obtain sufficient, competent, evidential matter to support the Company's assertions regarding the valuation of the Alaska Assets. Moreover, KPMG, either deliberately or recklessly, ignored information indicating that the Company's financial statements did not "present fairly" the Company's true financial position.

268.     In carrying out its engagement to audit the financial statements of Miller Energy and in rendering its unqualified report on those financial statements, KPMG violated, among others, the following GAAS standards:

a.     The requirement that KPMG properly risk assess the Miller Energy engagement. QC 20.14-15; *see also* ¶¶ 82-99;

b.     The requirement that KPMG ensure adequate personnel, management, competency, and proficiency on the Miller Energy engagement. QC 20.13, QC 20.17, QC 40.02, QC 40.06, QC 40.08, AU § 161, AU § 210.01; *see also* ¶¶ 100-03;

c.     The requirement that KPMG properly plan the Miller Energy audits. AU § 311.03, AU § 311.05-06, AU § 312.12-13, AU § 312.17, AS No. 9.7 ; *see also* ¶¶ 104-06;

d.     The requirement that KPMG adequately assess whether the valuation of the Alaska Assets conformed with GAAP. AU § 328.03, AU § 328.09, AU § 328.39-40, AU § 328.47, AU § 336.08-09, AU § 336.12, AU § 342.07, AU § 342.10; *see also* ¶¶ 107-18;

e.     The requirement that KPMG obtain competent evidence regarding the assumptions on which Miller Energy's valuation of the Alaska Assets was based. AU § 315.12, AU § 326.15, AU § 326.21-22, AU § 326.25. AU § 328.40; *see also* ¶¶ 119-36;

f.     The requirement that KPMG exercise due professional care and professional skepticism in connection with the Miller Energy audits. AU § 230.01, AU § 230.07-09, AU § 316.13, AU § 722.01, AS No. 3.12. AS No. 13; *see also* ¶¶ 137-49;

g.     The requirement that KPMG properly supervise its engagement team. AU § 311.01, AU § 311.12-13; *see also* ¶¶ 150-51;

h.     The requirement that KPMG maintain its independence from Miller Energy. AU § 220; *see also* ¶¶ 152-69.

269.     KPMG's conduct represents an extreme departure from the professional standards that should have been applied.  Had KPMG exercised due professional care and professional skepticism, it would have determined that Miller Energy's valuation of the Alaska Assets were based on fiction and that the Company's books and records were consistently falsified to conceal the true value of the Alaska Assets.

95

270.    KPMG knew that its reports would be relied upon by present and potential investors in Miller Energy securities.

271.    Plaintiffs and other members of the Section 10(b) Class were ignorant of the fact that the market price of Miller Energy's securities was artificially-inflated during the Class Period.  As a result, Plaintiff and other members of the Section 10(b) Class acquired the Company's securities during the Class Period at artificially-high prices and were damaged thereby.

272.    By virtue of the foregoing, KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

273.    For the reasons set forth herein, KPMG is liable in whole or in part for the damages suffered by Plaintiffs and to Section 10(b) Class members.

## COUNT TWO
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder

274.    Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

275.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that KPMG made any misrepresentations or omissions of material fact for which it may also be liable under Rule 10b-5(b) and/or any other provisions of law.

276.    During the Class Period, KPMG pursued an unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Section 10(b) Class; (ii) artificially-inflate the market price of Miller Energy securities; and (iii) cause Plaintiffs to purchase the Company's securities at artificially-inflated prices.

277. In furtherance of this unlawful course of conduct, KPMG employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Section 10(b) Class in connection with their purchases of Miller Energy securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

278. KPMG's fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included: (i) acting not as Miller Energy's independent auditor, but as its bookkeeper and appraiser, and performing bookkeeping, appraisal, and valuations to justify the valuation assigned by Boruff and Miller Energy to the Alaska Assets; (ii) helping Miller Energy defend the valuation of the Alaska Assets to the SEC; and (iii) meeting with investors in order to enhance Miller Energy's credibility.

279. During the Class Period, Plaintiffs and the Section 10(b) Class were unaware of KPMG's conduct. Had Plaintiffs and the Section 10(b) Class known of the unlawful scheme and unlawful course of conduct, they would not have purchased Miller Energy securities, or if they had, would not have done so at the artificially-inflated prices paid for such securities.

280. As a direct and proximate result of KPMG's conduct, as described herein, Plaintiffs and the Section 10(b) Class suffered damages in connection with their purchases of Miller Energy securities during the Class Period.

281. By reason of the foregoing, KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and is liable to Plaintiffs and the Section 10(b) Class for damages suffered in connection with their purchases of Miller Energy securities during the Class Period.

## VI. SECURITIES ACT ALLEGATIONS

2275770.3

282.   In the allegations and claims set forth in this part of the Complaint, Plaintiffs asserts a series of strict liability and negligence claims against the KPMG pursuant to the Securities Act on behalf of themselves and the Section 11 Class (as defined in ¶ 33 above).

283.   Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of KPMG.  Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud, and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims and allegations.

### A.   The Offering Documents

284.   During the Class Period, the Company conducted six securities offerings through which it raised a total of approximately $77 million (the "Offerings").

285.   On or about September 6, 2012, Miller Energy filed a Form S-3 registration statement and prospectus using a "shelf" registration ("Shelf Registration Statement"). Under the Shelf Registration Statement, Miller Energy would offer for sale securities using future prospectus supplements, which would form part of the registration statement for those offerings. The Shelf Registration Statement became effective on September 18, 2012. The Shelf Registration Statement and prospectus supplements are referred to here as the "Offering Documents."

286.   During the Class Period, the Offerings were conducted pursuant to the September 6, 2012 Shelf Registration Statement, as follows:

| Date | Series | Price | Shares | Proceeds |
|---|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | 625,000 | $14,312,500 |
| May 7, 2013 | Series C | $22.25 | 500,000 | $11,125,000 |
| June 27, 2013 | Series C | $21.50 | 335,000 | $7,202,500 |
| Sep. 25, 2013 | Series D | $25.00 | 1,000,000 | $25,000,000 |
| Oct. 17, 2013 | Series D | $23.95-$24.38 | 70,448 | $1,701,000 |
| Aug. 20, 2014 | Series D | $24.50 | 750,000 | $18,375,000 |

2275770.3

Case 3:16-cv-00121-TAV-DCP   Document 59   Filed 09/15/17   Page 101 of 120   PageID #: 3292

287. The February 13, 2013 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement dated February 13, 2013, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

288. The May 7, 2013 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement dated May 7, 2013, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

289. The June 27, 2013 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement dated June 27, 2013, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

290. The September 25, 2013 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement dated September 25, 2013, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

291. The October 17, 2013 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement dated October 17, 2013, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

292. The August 20, 2014 Preferred Stock Offering was marketed and sold to the public through the materially misstated Shelf Registration Statement, and prospectus supplement

2275770.3

dated August 20, 2014, and filed with the SEC pursuant to Securities Act Rules 415 and 424(b)(5), respectively.

### B. False and Misleading Statements in the Offering Documents

293. The financial information incorporated by reference into the Offering Documents, including the internal control-related representations and unqualified audit reports, contained untrue statements of material fact, or omitted to disclose material facts required to be stated therein or necessary to make the statements therein not misleading.

294. As the SEC has found, the financial information contained in Miller Energy's financial statements was not prepared in conformity with GAAP and GAAS requirements, and did not accurately present the value of Miller Energy's Alaska Assets.

295. The Offering Documents for each Offering incorporated by reference therein the following materially misleading SEC filings by Miller Energy:

- Annual Report on Form 10-K for the year ended April 30, 2012 as filed on July 16, 2012 and amended on August 28, 2012, and further amended on September 6, 2012);

- Current Report on Form 8-K as filed on July 17, 2012;

- Current Report on Form 8-K as filed on July 26, 2012;

- Current Report on Form 8-K as filed on July 27, 2012 and amended on August 1, 2012;

- Current Report on Form 8-K as filed on July 31, 2012;

- Current Report on Form 8-K as filed on August 1, 2012;

- Current Report on Form 8-K as filed on August 17, 2012;

- Current Report on Form 8-K/A as filed on August 27, 2012; and

- Current Report on Form 8-K as filed on September 4, 2012.

296.     The Offering Documents for each Offering also contained the following statement under the heading "Experts":

> The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and for the years then ended, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing.

297.     They also each contain the following statement by KPMG:

> We consent to the use of our reports dated July 16, 2012, with respect to the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended, and the effectiveness of internal control over financial reporting as of April 30, 2012, incorporated by reference herein and to the reference to our firm under the heading "Experts" in the prospectus.
>
> /s/ KPMG LLP
>
> Knoxville, Tennessee
>
> September 5, 2012

298.     The reports incorporated by reference, in turn, stated as follows.

299.     For the fiscal year ended April 30, 2011:

> We have audited the accompanying consolidated balance sheet of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year ended April 30, 2011. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the

101

financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2011, and the results of their operations and their cash flows for the year ended April 30, 2011, in conformity with U.S. generally accepted accounting principles.

300.    For the fiscal year ended April 30, 2012:

We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2012, based on criteria established in

*Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 16, 2012 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting

301.   Also for the fiscal year ended April 30, 2012:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2012, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management

2275770.3

and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2012 consolidated financial statements, and this report does not affect our report dated July 16, 2012, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2012, based on the criteria established in Internal Control - Integrated Framework issued by the COSO.

302.   The June 27, 2013, September 25, 2013, and October 17, 2013 Offering

Documents each also contained the following statement, under the heading "Experts":

The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and for each of

the years in the three-year period ended April 30, 2013, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing.

303.    In addition to the reports described in ¶¶ 298-301, the reports incorporated by reference in these Offering Documents stated as follows.

304.    For the fiscal year ended April 30, 2013:

We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2013. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and the results of their operations and their cash flows for each of the years in the three-year period ended April 30, 2013, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee

105

of Sponsoring Organization of the Treadway Commission (COSO), and our report dated July 15, 2013 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

305. Also for the fiscal year ended April 30, 2013:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2013, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable

106

assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2013. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2013 consolidated financial statements, and this report does not affect our report dated July 15, 2013, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2013, based on the criteria established in Internal Control - Integrated Framework issued by the COSO.

306.    The August 20, 2014 Offering Documents also contained the following statement,

under the heading "Experts":

The consolidated financial statements of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013 and for each of

the years in the three-year period ended April 30, 2014, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered accounting firm, incorporated by reference herein, and upon the authority of such firm as experts in accounting and auditing.

307.    Thus, in addition to the reports incorporated into the prior Offering Documents, the reports incorporated by reference in this Offering Document stated as follows.

308.    For the fiscal year ended April 30, 2014:

We have audited the accompanying consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries (the Company) as of April 30, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the three-year period ended April 30, 2014, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Miller Energy Resources, Inc.'s internal control over financial reporting as of April 30, 2013, based on criteria established in *Internal Control - Integrated Framework (1992)* issued by the

108

Committee of Sponsoring Organization of the Treadway Commission, and our report dated July 14, 2014 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

309. Also for the fiscal year ended April 30, 2014:

We have audited Miller Energy Resources, Inc.'s and subsidiaries (the Company) internal control over financial reporting as of April 30, 2014, based on criteria established in Internal Control Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting (Item 9A(b)). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable

109

assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Miller Energy Resources, Inc. and subsidiaries as of April 30, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended April 30, 2014. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2014 consolidated financial statements, and this report does not affect our report dated July 14, 2014, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of April 30, 2014, based on the criteria established in Internal Control - Integrated Framework (1992) issued by the COSO.

310. The Offering Documents statements were materially misleading, contained untrue statements of fact, and omitted to state facts necessary to make the Offering Documents not misleading, and omitted required material facts, including as follows:

a.   KPMG did not conduct any of its audits in accordance with GAAS or the standards of the PCAOB;

b.   The financial statements referred to in these statements all contained material errors;

c.   The financial statements referred to in these statements did not conform with GAAP;

d.   KPMG lacked any reasonable basis for its opinion that the financial statements referred to in these statements were accurate;

e.   KPMG's statements regarding Miller Energy's internal control weaknesses falsely stated that KPMG took those weaknesses into account when auditing Miller Energy's financial statements; and

f.   KPMG's statements regarding Miller Energy's internal control weaknesses omitted to disclose that those weaknesses resulted in material inaccuracies in Miller Energy's financial statements.

311.   In addition, the foregoing statements were false and misleading because, as the SEC subsequently determined, Miller Energy's financial reports for Forms 10-Q for the third quarter of fiscal year 2010 and for the first three quarters of fiscal years 2011 through 2015; Forms 10-K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 and August 20, 2014 pursuant to Rule 424, all "materially misstated the value of its assets."  KPMG Order at 5.

312.   Specifically, the SEC found, among other things, that: (1) KPMG's valuation of the Alaska Assets at an "inflated value of $480 million . . . violated generally accepted accounting principles ("GAAP") and overstated the fair value of the assets by hundreds of millions of dollars"; (2) KPMG "failed to comply with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), chiefly with respect to the procedures relating to the oil and gas properties that contained the overstated asset values"; (3) KPMG "failed to obtain sufficient competent evidence regarding the impact of the opening balances of

111

the Alaska Assets, despite knowing that no proper fair value assessment had been performed by management"; (4) KPMG "failed to appropriately consider the facts leading to Miller Energy's acquisition of the Alaska Assets, including the multiple offers received for those assets and the "abandonment" of the assets by the prior owner" in valuing the Alaska Assets; (5) KPMG "failed to sufficiently review certain forecasted costs associated with the estimation of the fair value of the Alaska Assets, which were understated, and to detect that certain fixed assets were double counted in the company's valuation"; (6) KPMG "failed to properly assess the risks associated with accepting Miller Energy as a client and to properly staff the audit"; (7) KPMG "overlooked evidence that indicated a possible overvaluation of the Alaska Assets"; (8) KPMG "failed to exercise the requisite degree of due professional care and skepticism" in auditing Miller Energy"; and (9) even after KPMG management and national office personnel became aware of the unusual and highly material valuation of the Alaska Assets, KPMG failed to "take sufficient action to determine that an appropriate response was taken by the engagement team regarding the risk of overvaluation of the Alaska Assets."

313. Because KPMG consented to being named as having certified the false and misleading financial statements used in connection with the Offering Documents, KPMG is strictly liable under Section 11 for those false and misleading financial statements.

## C. Claim for Relief Under the Securities Act

314. In each of the six offerings alleged in Counts III below, plaintiffs and members of the Section 11 Class acquired securities in or traceable to the Shelf Registration Statement. As a direct and proximate result of misrepresentations and/or omissions therein, Plaintiffs and the Section 11 Class members suffered substantial damage in connection with their acquisition of the securities described herein. As a result of the conduct herein alleged, KPMG violated §11 of the 1933 Act.

112

315.    At the time of their acquisition of the securities issued in the Offerings, Plaintiffs and the other Section 11 Class members were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untruths or omissions before August 6, 2015.

## COUNT THREE
### Violation of Section 11 of the Securities Act

316.    Plaintiffs repeat and re-allege paragraphs 282 through 315 only as though fully set forth herein.

317.    This Count is brought in connection with each of the Offerings (except for the February 13, 2013 Offering) and the Offering Documents solely and exclusively under Section 11 of the Securities Act, 15 U.S.C. § 77k, for strict liability against KPMG.

318.    KPMG consented to the incorporation of its unqualified auditor's reports regarding Miller Energy's financial statements and internal controls into the Offering Documents. Specifically, KPMG consented to the incorporation into the Offering Documents of its unqualified auditor's report on Miller Energy's financial statements included in Miller Energy's Form 10-Ks for the fiscal years ending April 30, 2011, April 30, 2012, April 30, 2013, and April 30, 2014.

319.    The Offering Documents were materially misleading, contained untrue statements of fact, and omitted to state facts necessary to make the Offering Documents not misleading, and omitted required material facts, including because:

      a.    KPMG did not conduct any of its audits in accordance with GAAS or the standards of the PCAOB;

      b.    The financial statements referred to in these statements all contained material errors;

      c.    The financial statements referred to in these statements did not conform with GAAP;

d.  KPMG lacked any reasonable basis for its opinion that the financial statements referred to in these statements were accurate;

e.  KPMG's statements regarding Miller Energy's internal control weaknesses falsely stated that KPMG took those weaknesses into account when auditing Miller Energy's financial statements; and

f.  KPMG's statements regarding Miller Energy's internal control weaknesses omitted to disclose that those weaknesses resulted in material inaccuracies in Miller Energy's financial statements.

320.  KPMG owed to the purchasers of the securities offered in the Offerings the duty to make a reasonable and diligent investigation of the statements it consented to including in the Offering Documents to ensure that said statements were true and that there were no omissions of material facts which rendered the statements therein materially false and misleading. KPMG did not make a reasonable investigation or possess reasonable grounds to believe that said statements were true and without omissions of any material facts and were not misleading. Accordingly, KPMG acted negligently and is therefore liable to Plaintiffs and the other members of the Section 11 Class.

321.  KPMG did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents as set out above were accurate and complete in all material respects. Had KPMG exercised reasonable care, it would have known of the material misstatements and omissions alleged herein.

322.  Plaintiffs and the other members of the Section 11 Class sustained damages as the value of Miller Energy's Series C and Series D Preferred Stock declined substantially subsequent to and due to KPMG's violations of Section 11 of the Securities Act.

323.  This action was brought within one year after the discovery of the untrue statements and omissions, and within three years after the Offering Documents became effective.

2275770.3

324. KPMG utilized national securities exchanges, the mails, telephones and other instruments of interstate commerce in connection with the offering and sale of Miller Energy's Series C and Series D Preferred Stock.

325. By reason of the foregoing, KPMG is liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Section 11 Class, each of whom has been damaged by reason of such violations

326. At the time of the Offerings, Plaintiffs and other members of the Section 11 Class were ignorant of the falsity of the Offering Documents, and believed them to be accurate, and although certain information regarding their falsity had begun to leak out to the public before the August 2014 Offering, the full truth had yet to be disclosed at the time of that Offering.

## VII. JURY TRIAL DEMAND

327. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Section 10(b) and Section 11 Classes herein, adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiffs as the designated representatives of the Section 10(b) and Section 11 Classes and Plaintiffs' counsel designated as Co-Class Counsel for the Classes;

B. Plaintiffs and the members of the Section 10(b) and Section 11 Classes recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiffs and the Section 10(b) and Section 11 Classes be entered against KPMG in an amount permitted pursuant to such law;

C. KPMG, its subsidiaries, affiliates, successors, transferees, assignees, and the

115

respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on its behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.  Plaintiffs and members of the Section 10(b) and Section 11 Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.  Plaintiffs and members of the Section 10(b) and Section 11 Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.  Plaintiffs and members of the Section 10(b) and Section 11 Classes receive such other and further relief as may be just and proper.

Respectfully submitted, this 15th day of September, 2017.

*/s/ Gordon Ball*
Gordon Ball
TN BPR#001135
Lance K. Baker
Tenn. Bar #: 032945
**GORDON BALL PLLC**
Ste. 600, 550 Main Street
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
gball@gordonball.com
lkb@gordonball.com

Steven J. Toll
Times Wang
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
1100 New York Ave NW, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
stoll@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY  10005
Tel: (212) 838-7797
Fax:  (212 838-7745
lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

116

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I caused the foregoing to be filed using the

Court's CM/ECF system, which in turn sent notice to counsel of record.

Dated:     September 15, 2017                    */s/ Times Wang*
                                                                    Times Wang