# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

```
-------------------------------------------------------------X
                                                  :
LEWIS COSBY, KENNETH R. MARTIN, as                :   No. 3:16-cv-121
beneficiary of the Kenneth Ray Martin Roth IRA,   :
and MARTIN WEAKLEY on behalf of themselves        :
and all others similarly situated,                :
                                                  :
                        Plaintiffs,               :
                                                  :
            v.                                    :
                                                  :
KPMG LLP,                                         :
                                                  :
                        Defendant.                :
-------------------------------------------------------------X
```

## MEMORANDUM OF LAW IN SUPPORT OF KPMG LLP's
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Paul S. Davidson (TN BPR # 011789)
Tera Rica Murdock (TN BPR #028153)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: 615-244-6380
Email: paul.davidson@wallerlaw.com
Email: terarica.murdock@wallerlaw.com

Gary F. Bendinger (admitted pro hac vice)
Gregory G. Ballard (admitted pro hac vice)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: +1 212 839-5300
Facsimile: +1 212 839-5599
Email: gbendinger@sidley.com
Email: gballard@sidley.com

Attorneys for Defendant KPMG LLP

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ALLEGATIONS OF THE COMPLAINT....................................................................2

    A.    Miller Energy's acquisition of the Alaska Assets................................2

    B.    KPMG's audits..................................................................................3

    C.    Prior securities litigation and the SEC investigation .........................4

    D.    The claims against KPMG ..................................................................7

ARGUMENT .............................................................................................................8

I.    The Section 10(b) claims must be dismissed .....................................................8

    A.    Plaintiffs fail to plead scienter .........................................................8

    B.    Plaintiffs fail to plead loss causation .................................................16

    C.    The Section 10(b) claims are barred by the two-year statute of limitations ..........18

    D.    Count One fails to allege an actionable misstatement ..........................20

    E.    Court Two fails to allege an actionable scheme .................................21

II.    The Section 11 claim must be dismissed .........................................................23

    A.    Mr. Weakley was not appointed lead plaintiff for preferred stock purchasers ......23

    B.    The Section 11 claim is time-barred .................................................25

        1.    The claim does not relate back to the date of the Original Complaint ......25

        2.    The claim is barred by the three-year statute of repose ...........................27

        3.    The claim is barred by the one-year statute of limitations........................29

        4.    *American Pipe* tolling does not apply ......................................................35

    C.    Plaintiffs fail to plead an actionable misstatement or omission............................36

CONCLUSION...............................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re aaiPharma Inc. Sec. Litig.,*
  521 F. Supp. 2d 507 (E.D.N.C. 2007)..................................................................10

*American Pipe & Construction Co. v. Utah,*
  414 U. S. 538 (1974)..............................................................................35, 36

*Andrews v. Orr,*
  851 F.2d 146 (6th Cir. 1988) ..........................................................................35

*Asher v. Unarco Material Handling, Inc.,*
  596 F.3d 313 (6th Cir. 2010) ..........................................................................25

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig.,*
  2011 WL 4538428 ...................................................................................23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).....................................................................................9

*Buttonwood Tree Value Partners, LP v. Sweeney,*
  910 F. Supp. 2d 1199 (C.D. Cal. 2012) .................................................................16

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,*
  137 S. Ct. 2042 (June 26, 2017).......................................................................36

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994)...................................................................................21

*In re Comshare, Inc. Sec. Litig.,*
  183 F.3d 542 (6th Cir. 1999) .......................................................................9, 11

*Dura Pharmaceuticals, Inc. v. Brouda,*
  544 U.S. 336 (2005)...................................................................................16

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976).....................................................................................8

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
  2013 WL 4399215 (S.D.N.Y. Aug. 13, 2013)..........................................................23

*Fidel v. Farley,*
  392 F.3d 220 (6th Cir. 2004) ..................................................................9, 11, 12

*Gaynor v. Miller*,
  2017 U.S. Dist. LEXIS 130107 (E.D. Tenn. Aug. 11, 2017) ..........1, 18, 24, 27, 28, 29, 32, 34

*Gen. Partner Glenn Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................................36

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011).............................................................................................22

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
  910 F. Supp. 2d 561 (S.D.N.Y. 2012).......................................................11, 12, 20

*Mansbach v. Prescott, Ball & Turben et al.*,
  598 F.2d 1017 (6th Cir. 1979) ................................................................................8

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010).............................................................................................19

*In re Miller Energy Rec. Sec. Litig.*,
  No. 3:11–CV–386–TAV–CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014)....2, 4, 18, 20, 22

*Newby v. Enron Corp.*,
  2005 U.S. Dist. LEXIS 34021 (S.D. Tex. June 21, 2005) ......................................26

*Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*,
  135 S. Ct. 1318 (2015)................................................................................1, 36, 37

*Phipps v. Wal-Mart Stores, Inc.*,
  792 F.3d 637 (6th Cir. July 7, 2015)......................................................................35

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ..........................................................................8, 15

*Reiger v. PricewaterhouseCoopers LLP*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000)..................................................................11

*Ret. Sys. v. Ernst & Young, LLP*,
  622 F.3d 471 (6th Cir. 2010) .................................................................................8

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  2015 WL 3833849 (M.D. Pa. June 22, 2015)........................................................37

*SEC v. Pricewaterhouse*,
  797 F. Supp. 1217 (S.D.N.Y. 1992).......................................................................11

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014)................................................................11, 12

Case 3:16-cv-00121-TAV-DCP   Document 64   Filed 10/20/17   Page 4 of 45   PageID #: 3369

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
No. 15-1813, 2016 WL 1392280 (2d Cir. Apr. 8, 2016) ........................................................37

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008).........................................................................................................1, 21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................................8

*In re Velti PLC Sec. Litig.*,
No. 13-CV-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)................................37

*In re Worldcom Secs. Litig.*,
2004 U.S. Dist. LEXIS 32716 (S.D.N.Y Jan. 20, 2004) ......................................................26

*In re Xchange Inc.*,
2002 U.S. Dist. LEXIS 15909 (D. Mass. Aug. 26, 2002) .....................................................26

*Zucker v. Sasaki*,
963 F. Supp. 301 (S.D.N.Y. 1997)...........................................................................................11

## Statutes

15 U.S.C.A. § 77z-1 ...................................................................................................................23

15 U.S.C.A. § 78u-4...............................................................................................................8, 23

15 U.S.C. § 77m....................................................................................................................27, 28, 29

28 U.S.C. § 1658(b) ...........................................................................................................18, 19

17 C.F.R. § 201.102 (2017) ..........................................................................................................5

17 C.F.R. § 230.430B(f)(5)(i) ...................................................................................................28

Securities Act of 1933 Section 11................................................................................ *passim*

## Other Authorities

Fed. R. Civ. P. 9(b) ...............................................................................................................9, 23

Federal Rule of Civil Procedure 23 .......................................................................................35

Federal Rules of Civil Procedure Rule 15(c)................................................................25, 26, 27

KPMG LLP ("KPMG") respectfully submits this memorandum in support of its motion to dismiss the Second Amended Class Action Complaint dated September 15, 2017 ("SAC").[1]

## PRELIMINARY STATEMENT

The claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of purchasers of the common stock of Miller Energy Resources, Inc. ("Miller Energy" or the "Company")—Counts One and Two—fail because: (1) Plaintiffs have not alleged facts giving rise to the "strong" inference of scienter required by the Private Securities Litigation Reform Act (the "PSLRA"); (2) Plaintiffs have not pleaded loss causation; and (3) the claims, filed more than two years after discovery of the relevant facts, are time-barred. Also, Count One fails because Plaintiffs have not pleaded an actionable misstatement of opinion under *Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), and Count Two fails because Plaintiffs have not alleged an actionable "scheme" under *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2007).

The claim under Section 11 of the Securities Act of 1933 (the "Securities Act") by a new plaintiff (Martin Weakley) on behalf of a proposed class of preferred stock purchasers—Count Three—also must be dismissed. First, Mr. Weakley did not apply to serve as lead plaintiff and is not authorized to assert claims for preferred shareholders; the *Gaynor v. Miller* plaintiffs were appointed to represent these shareholders. Second, as the preferred shares were *bona fide* offered more than three years prior to the filing of the SAC, the claim is barred by the three-year statute of repose. Third, as Plaintiffs had notice more than one year prior to asserting the claim, it is barred by the one-year statute of limitations. Fourth, the claim is not viable under *Omnicare*.

---

[1] Plaintiffs filed the initial complaint in this case (the "Initial Complaint") on March 14, 2016 and a first amended complaint ("FAC") on May 8, 2017.

## ALLEGATIONS OF THE COMPLAINT

### A.    Miller Energy's acquisition of the Alaska Assets

On December 10, 2009, Miller Energy acquired certain assets in Alaska (the "Alaska Assets"), along with related liabilities, for approximately $4.5 million from a bankrupt company. (SAC ¶ 46.) The Alaska Assets included 602,000 acres of oil and gas leases; hundreds of miles of geologic seismic data; pipelines, roads, pads, and equipment; onshore and offshore production and processing facilities including an offshore energy platform; and millions of barrels of proved, probable, and possible oil and gas reserves. (Ex. 1 at 17, F-15, F-27.)[2]

Miller Energy accounted for the transaction in which it acquired the Alaska Assets and related liabilities as a "business combination" pursuant to generally accepted accounting principles ("GAAP"), which required it to estimate the fair values of the assets and liabilities and recognize any resulting "bargain purchase." (Ex. 1 at 39-40.) Miller Energy valued the acquired assets at $479 million and the liabilities at $203 million, and recorded a bargain purchase gain of $277 million. (SAC ¶ 52; Ex. 1 at 32.) Plaintiffs acknowledge that Miller Energy's estimate of the value of the Alaska Assets was informed by a reserve report of a petroleum engineering firm, which estimated the present value of expected net cash flows to be $368 million, although Plaintiffs allege that such reports do not alone constitute estimates of "fair value." (SAC ¶¶ 49-50.) The Company disclosed its accounting treatment and valuations in its annual report for the year ended April 30, 2010 ("Fiscal 2010"). (SAC ¶ 52 n.6; *see* Ex. 1.) Sherb & Co., LLP ("Sherb & Co.") audited those financial statements and issued an unqualified opinion. (Ex. 1 at F-2.)

---

[2] Citations in the form "Ex. __" are to exhibits to the Declaration of Tera Rica Murdock, which are documents integral to the complaint and/or public records that the Court may consider on this motion. *Gaynor v. Miller*, No. 3:15-CV-545-TAV-CCS, 2017 U.S. Dist. LEXIS 130107, at *9 n.4 (E.D. Tenn. Aug. 11, 2017); *In re Miller Energy Rec. Sec. Litig.*, No. 3:11–CV–386–TAV–CCS, 2014 WL 415730, at *13 (E.D. Tenn. Feb. 4, 2014)

In early 2011, in three letters, the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") inquired about the Company's valuation of the Alaska Assets and the bargain purchase gain reported in the Form 10-K for Fiscal 2010. (SAC ¶ 66; *see* Exs. 2-4.) Miller provided detailed responses. (Exs. 5-7.) On July 20, 2012, the SEC issued a letter stating that it had completed its review. (Ex. 8.) These letters were publicly filed with the SEC. The Company appeared to have addressed the SEC's concerns satisfactorily.

## B.    KPMG's audits

In February 2011, Miller Energy engaged KPMG to replace Sherb & Co. as its auditors. (SAC ¶ 63.) As Plaintiffs have acknowledged, once engaged, KPMG required Miller Energy to re-state its prior financial statements to correct certain errors: "[a]lthough Miller Energy's prior financial statements had been audited by the Sherb firm . . . , as part of its review of prior financial statements, KPMG required Miller Energy to re-state and correct previously-issued quarterly reports and filings with the SEC and its shareholders." (FAC ¶ 74.)

KPMG never issued an unqualified opinion on Miller Energy's internal controls; each year, KPMG either declined to issue an opinion or issued an *adverse* opinion. (SAC ¶¶ 91, 93, 96, 184, 186, 188.) In Fiscal 2011, as management had not completed its assessment of the effectiveness of its internal controls, KPMG was unable to render an opinion, and the Form 10-K was considered deficient. This was disclosed in the Form 10-K. (Ex. 9 at Explanatory Note & 43-44.) In its audit reports on internal controls for Fiscal 2012 through 2014, KPMG reported a "material weakness" in the Company's controls arising from "an insufficient complement of corporate accounting and finance personnel to consistently operate management review controls" and stated KPMG's opinion that "the Company has *not* maintained effective control over financial reporting." (Ex. 10 at 45 & F-1; Ex. 11 at 16, 49-50, F-1; Ex. 12 at 19, 59-60, F-2.)

KPMG issued unqualified opinions on the Company's financial statements for Fiscal Years 2011 through 2014. (SAC ¶ 73.) KPMG's audits were performed in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB")[3] which direct auditors to obtain "reasonable assurance" about whether financial statements are free of material misstatement. (Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.) Financial statements "are the responsibility of the Company's management," and KPMG's responsibility was "to express an opinion" on the financial statements based on its audit. (Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.) KPMG's audit reports stated that KPMG believed its audits provided "a reasonable basis for our opinion" that the Company's financial statements presented fairly, in all material respects, its financial position in accordance with GAAP. (Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.) KPMG's audit reports on the financial statements for Fiscal Years 2012 through 2014 reiterated that KPMG had issued "an adverse opinion" on the Company's internal controls in those years. (Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.)

**C.**     **Prior securities litigation and the SEC investigation**

In 2011, shareholders filed class action litigation alleging that Miller Energy overvalued the Alaska Assets. (SAC ¶ 147.) In February 2014, this Court ruled on motions to dismiss, holding that Section 10(b) fraud claims against the Company and some individuals were adequately pleaded. *In re Miller Energy Rec. Sec. Litig.*, No. 3:11–CV–386–TAV–CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014).

The SEC conducted an investigation and charged Miller Energy and certain individuals with securities law violations in connection with the Company's accounting for the Alaska

---

[3] Since 2002, the PCAOB has been responsible for adopting auditing standards for public companies. The PCAOB initially adopted existing generally accepted auditing standards ("GAAS") of the American Institute of Certified Public Accountants. (SAC ¶ 76.)

Assets. (SAC ¶¶ 4, 66, 228-230, 233-234, 237.) In January 2016, the SEC entered an order

making findings and imposing sanctions against Miller Energy for, among other things, federal

securities fraud. (SAC ¶¶ 233-234; *see* Ex. 13.) On June 7, 2016, the SEC entered orders making

findings and imposing sanctions against the Company's chief executive officer (David M. Hall),

its chief financial officer (Paul W. Boyd), and an outside auditor from Sherb & Co. (Carlton W.

Vogt, III). (SAC ¶ 237; *see* Exs. 14-16.) The SEC found that Mr. Hall and Mr. Boyd (but not Mr.

Vogt) committed federal securities fraud. (Ex. 14 at ¶ 43; Ex. 15 at ¶ 47; Ex. 16 at ¶ 62.)

On August 15, 2017, the SEC issued an order finding that, in its audits of Miller Energy's

financial statements, KPMG acted negligently, but not fraudulently. (SAC ¶¶ 6-9 & *passim*; Ex.

47.) The SEC found that KPMG engaged in improper professional conduct under Rule

102(e)(1)(ii) and Rule 102(e)(1)(iv)(B) of the SEC's Rules of Practice. (Ex. 47.) These

subsections of the rule cover "two types of *negligent* conduct: (1) [a] single instance of highly

unreasonable conduct . . . in circumstances in which an accountant knows, or should know, that

heightened scrutiny is warranted" and (2) [r]epeated instances of unreasonable conduct." SEC

Rules of Practice, 17 C.F.R. §201.102 (2017) (emphasis added).[4] A separate subsection, Rule

102(e)(1)(iv)(A), covers intentional, knowing, and reckless conduct; the SEC brought no charges

and made no findings against KPMG under this subsection. The SEC did not find that KPMG

committed securities fraud or fraud of any kind. (Ex. 47.) The SEC did not find that KPMG

committed any scienter-based or recklessness-based violation of any law or rule. (Ex. 47.)

---

[4] *See also* SEC Release No. 33-7593, *Amendment to Rule 102(e) of the Commission's Rules of Practice* (Oct. 19, 1998) ("highly unreasonable" covers only conduct "greater than ordinary negligence but less than recklessness").

The SEC did *not* find that KPMG performed "no audit at all;" rather, the SEC found that KPMG's audit work was deficient in some respects.[5] The SEC found that KPMG negligently failed to comply with auditing standards, but did not find that it engaged in intentional, fraudulent, manipulative, deceptive, or reckless conduct.

---

[5] (Ex. 47 at ¶ 2 ("Although KPMG . . . *did undertake some audit procedures relating to the opening balances*, these procedures failed to *appropriately* consider the facts leading to Miller Energy's acquisition of the Alaska Assets") (emphasis added); *id.* at ¶ (KPMG "failed to *sufficiently* review certain forecasted costs") (emphasis added); *id.* at ¶ 3 ("the firm did not take *sufficient* action to confirm an appropriate response") (emphasis added); *id.* at ¶ 22 ("engagement team performed an *inadequate* assessment of the risks") (emphasis added); *id.* at ¶ 22 (KPMG "assigned the Miller Energy engagement an overall risk grade of 'medium,' which was not reevaluated and changed to 'high' until after KPMG issued its unqualified opinion on the company's fiscal 2011 financial statements"); *id.* at ¶ 23 ("failed to *adequately* address the audit team's lack of industry experience") (emphasis added); *id.* at ¶ 24 ("the assignment of valuation specialists (whose scope and objectives were defined by the engagement partner) and a senior manager, all of whom had significant oil and gas experience, did not *adequately* mitigate KPMG's failure to assign a partner-in-charge with sufficient prior oil and gas experience") (emphasis added); *id.* at ¶ 26 ("KPMG . . . performed additional audit and review procedures in an attempt to obtain sufficient competent evidence regarding the impact of the opening balances on the current period's financial statements"); *id.* at ¶ 27 ("Riordan reviewed the reserve report and sought assistance from KPMG's internal valuation specialists, Economic and Valuation Services ('EVS'), in connection with the core engagement team's review and audit procedures over the fair value of the Alaska Assets"); *id.* at ¶ 37 ("In an effort to evaluate whether the valuation of the Alaska Assets was misstated . . ., the core engagement team . . . gave EVS the reserve report . . . and requested assistance in testing Miller Energy's recorded fair value for the Alaska Assets."); *id.* at ¶ 40 ("EVS created an estimated range of possible fair values, using its own assumptions for some of the inputs, to assess whether Miller Energy's overall fair value number was reasonable"); *id.* at ¶ 41 ("Although the results of this analysis appeared to support Miller Energy's fair value measurement, EVS's substitute assumptions were themselves flawed and insufficiently substantiated."); *id.* at ¶ 42 (KPMG accepted assumptions "without *adequately* reviewing the reasonableness of those assumptions") (emphasis added); *id.* at ¶ 44 ("Had the engagement team performed *additional* procedures on the costs estimates . . ., they could have identified contrary evidence") (emphasis added); *id.* at ¶ 45 ("KPMG . . . did not *adequately* identify or inquire . . . . *Further* inquiry likely would have likely led the core engagement team to discover . . .") (emphasis added); *id.* at ¶ 49 (KPMG "made an inquiry to the third-party petroleum engineer firm . . . about the forecasted costs . . . . In response to this inquiry, an employee of the engineer firm informed the core engagement team that his firm had sufficient cost data to prepare the 2011 reserve report . . . . In any event, inquiry alone was not a *sufficient* method to test the data") (emphasis added); *id.* at ¶ 57 ("Once the valuation test work had begun, KPMG and Riordan failed to properly supervise EVS and its work.").

**D.**     **The claims against KPMG**

Count One of the SAC is a Section 10(b) claim asserted on behalf of a proposed class of common stock purchasers based on the allegation that KPMG's audit reports on Miller Energy's financial statements for Fiscal 2011 through 2014, included in the Company's Form 10-Ks, were false. (SAC ¶¶ 182-188, 256-273; *see* Ex. 9 at F-2; Ex. 10 at F-2; Ex. 11 at F-2; Ex. 12 at F-1.)

Count Two, also asserted on behalf of common stock purchasers, is based on "devices, schemes and artifices" under subsections (a) and (c) of Rule 10b-5, promulgated by the SEC pursuant to Section 10(b). (SAC ¶¶ 275, 277.) For this claim, Plaintiffs assert that they "need not allege . . . that KPMG made any misrepresentations or omissions of material fact." (SAC ¶ 275.)

Count Three is a Section 11 claim asserted by a new plaintiff, Martin Weakley, on behalf of "[a]ll those who purchased Miller Energy *preferred* shares pursuant to or traceable to the Offering Documents," defined to including a September 6, 2012 Registration Statement and six prospectus supplements issued from February 13, 2013 through August 20, 2014. (SAC ¶¶ 33, 285-186 (emphasis added).)[6] The SAC alleges that there were six separate offerings of preferred shares pursuant to six separate prospectus supplements from February 2013 through August 2014—the "February 13, 2013 Preferred Stock Offering," the "May 7, 2013 Preferred Stock Offering," the June 27, 2013 Preferred Stock Offering," the September 25, 2013 Preferred Stock Offering," the "October 17, 2013 Preferred Stock Offering," and the "August 20, 2014 Preferred Stock Offering." (SAC ¶¶ 287-292.) Plaintiffs assert the Section 11 claim in connection with the latter five of those six offerings. (SAC ¶ 317 ("This Count is brought in connection with each of the Offerings (except for the February 13, 2013 Offering)").)

---

[6] The Initial Complaint and the FAC asserted claims only on behalf of common stock purchasers. They asserted no claim on behalf of preferred stock purchasers.

**ARGUMENT**

**I.      The Section 10(b) claims must be dismissed**

     **A.      Plaintiffs fail to plead scienter**

Plaintiffs' Section 10(b) claims must be dismissed because Plaintiffs have not pleaded

facts giving rise to a "strong inference" that KPMG acted with the required state of mind. 15

U.S.C. § 78u-4(b)(2). The required state of mind is an "intent to deceive, manipulate or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness may suffice, but only

if it is so severe that it amounts to "highly unreasonable conduct which is an extreme departure

from the standards of ordinary care," *Mansbach v. Prescott, Ball & Turben et al.*, 598 F.2d 1017,

25 (6th Cir. 1979). The Court is to view the complaint "holistically" and "in its entirety" and ask

"whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). The Court "must take into account

plausible opposing inferences," including "plausible, nonculpable explanations" for the KPMG's

conduct. *Id.* The inference of scienter "must be more than merely 'reasonable' or 'permissible'—

it must be cogent and compelling, thus strong in light of other explanations," and the complaint

may survive "only if a reasonable person would deem the inference of scienter cogent and at

least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The standard is "especially stringent when the claim is brought against an outside

auditor." *Louisiana Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 481 (6th Cir.

2010). "Specifically, '[r]ecklessness on the part of an independent auditor entails a mental state

so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the

audited company.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (citation

8

omitted). To satisfy the test, plaintiffs must show "that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* at 693-94 (citation omitted).

Under this standard, Plaintiffs' conclusory assertions that KPMG acted "knowingly or recklessly" (SAC ¶¶ 75, 176, 258-259, 264, 266) and that its audits "amounted to essentially no audits at all" (SAC ¶ 2) are insufficient as a matter of law. The PSLRA requires particularized factual allegations that give rise to a strong inference of scienter. Parroting the legal standard and alleging that KPMG violated it are not enough. *See, e.g., In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999).[7]

Plaintiffs' lengthy allegations that KPMG violated professional standards (SAC ¶¶ 76-157, 265, 267-268) are likewise inadequate as a matter of law. *Louisiana Sch. Emps.' Ret. Sys.* 622 F.3d at 481-82 ("failure to follow Generally Accepted Accounting Principles is, by itself, insufficient to establish scienter," and "[m]ere allegations that an accountant negligently failed to closely review files or follow Generally Accepted Auditing Standards cannot raise a strong inference of scienter."); *Fidel v. Farley*, 392 F.3d 220, 230 (6th Cir. 2004) ("failure to follow generally accepted accounting procedures does not in and of itself lead to an inference of scienter") (overruled on other grounds).

---

[7] Plaintiffs must also satisfy the particularity requirements of Fed. R. Civ. P. 9(b). Even under Rule 8, plaintiffs must plead facts that "raise a right to relief above the speculative level" with "more than labels and conclusions, and a formulaic recitation of the elements of a clause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs try to bolster their conclusory assertion that KPMG acted with scienter with a series of shop-worn allegations that courts regularly reject as inadequate. For example, Plaintiffs allege that the Alaska Assets were "extremely material to the Company" (SAC ¶ 177), but the Sixth Circuit has held that such allegations do not contribute to an inference of scienter. *Louisiana Sch. Emps.' Ret. Sys.*, 622 F.3d at 484 ("We have addressed similar allegations of scienter based on the magnitude of fraud with respect to an outside auditor. 'We decline to follow the cases that hold that the magnitude of the financial fraud contributes to an inference of scienter on the part of the defendant.'"). "Allowing such an inference would eviscerate the principle that accounting errors alone cannot support a finding of scienter." *Id.* (citing *Stambaugh v. Corrpro Cos.*, 116 Fed. Appx. 592, 597 (6th Cir. 2004), which "declin[ed] to find a strong inference of scienter where . . . plaintiff referenced the magnitude of the fraud and the fact that the fraud involved a material component of the defendant's business").

Plaintiffs allege that KPMG had "unfettered access to data" and Company records (SAC ¶ 178), but "[g]eneral allegations regarding an auditor's access to information do not raise an inference of fraud." *Louisiana Sch. Emps.' Ret. Sys.*, 622 F.3d at 481; *In re aaiPharma Inc. Sec. Litig.*, 521 F. Supp. 2d 507, 513–14 (E.D.N.C. 2007) ("[M]erely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library. Merely alleging that [the auditor] had broad access to [company] operations at best supports an inference that [the auditor] was negligent, and more likely supports nothing at all.").

Plaintiffs allege that an article posted online in *TheStreetSweeper* put KPMG on notice that the Alaska Assets might have been overvalued (SAC ¶ 179), but that article was published *in July 2011* and was available to Plaintiffs and any investors considering purchasing Miller

Energy's securities (Ex. 18 (published on July 28, 2011)). Indeed, Miller Energy's response was filed publicly with the SEC, bringing the article and the Company's views regarding its content to the attention of investors. (Ex. 21.) Such publicly available information cannot form the basis for an inference of scienter. *See, e.g., In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 576-77 (S.D.N.Y. 2012); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 431 (S.D.N.Y. 2014).

Plaintiffs allege that KPMG earned fees for its audit work (which fees were publicly disclosed) and had a motive to continue to earn fees. (SAC ¶¶ 180.) Allegations of motive and an opportunity to commit fraud, however, are not adequate. *See In re Comshare, Inc.*, 183 F.3d at 551 ("under a plain interpretation of the PSLRA as informed by well-settled law on the contours of the 'scienter' requirement, we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud"). As the Sixth Circuit has explained, "allegations that the auditor earned and wished to continue earning fees from a client do not raise an inference that the auditor acted with the requisite scienter." *Fidel*, 392 F.3d at 232. "Even a specific account that was one of the auditor's most lucrative would not imply scienter on the part of an auditor." *Louisiana Sch. Emps.' Ret. Sys.*, 622 F.3d at 484.[8]

---

[8] *See also Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997) (it is "economically irrational" for an auditor to condone a client's fraud "at the risk of jeopardizing its reputation and license as well as the possibility of damages in an amount much greater than its fee"); *SEC v. Pricewaterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees"); *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000) (because "a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud," scienter

Finally, Plaintiffs allege, incorrectly, that there were "red flags." (SAC ¶ 181.) The alleged "red flags" were not indicative of fraud and so were not red flags under the case law. *See Fidel*, 392 F.3d at 229. What Plaintiffs incorrectly call "red flags" were circumstances disclosed in public SEC filings or otherwise part of the public record at the time. *See In re Longtop Fin. Tech.*, 910 F. Supp. 2d at 576-77 (matters that are publicly disclosed are not red flags and do not give rise to an inference of scienter; "neither the SEC nor the investing public recognized Longtop's alleged fraud," which "raises the inference that these purported red flags are in fact red herrings"); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 431 (S.D.N.Y. 2014) ("red flags embedded in publicly available documents do not support an inference of scienter"). Below is a list of Plaintiffs' purported "red flags," along with dates of the public SEC filings and other documents disclosing those matters long ago:

| | |
|---|---|
| "The Company filed the July 29, 2011 Form 10-K on July 29, 2011 without KPMG's consent." (SAC ¶ 181(a).) | Ex. 19 (Form 10-K/A- Amendment No. 1, filed Aug. 9, 2011) at Explanatory Note (disclosing that Miller Energy had filed its Form 10-K on July 29, 2011 before KPMG had completed its audit work and provided its consent). |
| "[T]he Company had a history of 'going concern' qualified audit opinions prior to its acquisition of the Alaska Assets. (SAC ¶ 181(b).) | All audit opinions issued prior to Miller Energy's acquisition of the Alaska Assets were publicly filed contemporaneously. (*See, e.g.*, Ex. 17.) |
| "KPMG was brought in to become the Company's auditor on February 1, 2011, toward the end of the Company's fiscal year, which was April 30, 2011, despite the fact that the proxy dated January 28, 2011, stated that Sherb was being recommended for re-appointment." (SAC ¶ 181(c).) | KPMG's appointment was publicly disclosed immediately (Ex. 58) and the proxy recommending Sherb's reappointment was also publicly filed. (Ex. 59.) |

---

allegations must "overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client").

| | |
|---|---|
| "Miller Energy revealed on March 18, 2011 that it had to file that Form 10-Q late, and that it had failed to property [sic] record depreciation, depletion and amortizations ('DD&A') and other items relating to the Alaska Assets." (SAC ¶ 181(d).) | The disclosure containing the alleged revelations was publicly filed on March 20, 2011 (Ex. 57), and the Form 10-Q was publicly filed on March 20, 2011 (Ex. 57). |
| Scott Boruff bought an expensive home, and his salary was only $500,000. (SAC ¶ 181(e).) | Mr. Boruff's purchase of the home was publicly reported at the time (Ex. 20 (press report published on June 9, 2011)), and his salary was publicly disclosed annually (*see, e.g.,* Ex. 9 at 51). |
| The Company had high borrowing costs. (SAC ¶ 181(f).) | *See, e.g.,* Ex. 1 (filed July 28, 2010) at 33-37 (describing loan and financing arrangements). |
| The Company had cash flow problems and paid bills late. (SAC ¶ 181(g).) | The Company's financial statements disclosed its cash position periodically as required. (*See, e.g.,* Ex. 11 (filed July 15, 2013) at 42.) While Plaintiffs allege that the Company overvalued the Alaska Assets, Plaintiffs have not alleged that the Company's publicly reported cash flow was misstated in any way. |
| The Company's founder, Deloy Miller, treated the Company like a family business, instead of a public company. (SAC ¶ 181(h).) | Mr. Miller's role in founding the Company was publicly disclosed. (*See, e.g.,* Ex. 1 (filed July 28, 2010) at 43.) The fact that Mr. Boruff was his son in law was publicly disclosed. (*Id.*)[9] |

Therefore, giving Plaintiffs credit for the allegations that they claim bear on KPMG's state of mind, and even without considering (as is required) opposing nonculpable explanations, there is no basis for drawing any inference of scienter, much less a "strong" one.

---

[9] The only other alleged "red flag" is that KPMG personnel "witnessed enormous dysfunction within Miller Energy, including two members of the accounting staff getting intoxicated in the office, becoming angry and disorderly, and loudly complaining about their compensation." (SAC ¶ 181(i).) Nothing in these allegations bears on the contention that the Company overvalued the Alaska Assets and committed a fraud. Aside from the description of two individuals as intoxicated and emotional, the only allegation as to the content of their remarks is that they complained about their compensation. Complaints about compensation are ubiquitous across all manner of companies and institutions and are in no way indicative of fraud.

When the competing inferences that naturally flow from the allegations of the SAC are added to the mix, the conclusion is all the more clear—there is no strong inference that KPMG acted with the required state of mind. For example, the acquisition of the Alaska Assets took place in December 2009, and the Company's independent auditor at the time was Sherb & Co., not KPMG. (SAC ¶¶ 27, 46.) KPMG was not retained until over a year later, in February 2011. (SAC ¶ 62-63.) By the time KPMG was retained, the Company had already decided how the Alaska Assets were to be treated on its financial statements, and the Company's independent auditor at the time, Sherb & Co., had already audited those financial statements and issued its audit report on those statements. (Ex. 1 at F-2.) Thus, when KPMG came onto the engagement in February 2011, the purchase of the Alaska Assets had already been accomplished and accounted for in the Company's reported financial results, and another year had passed. Nothing in these circumstances suggests that KPMG was on notice of any glaring deficiency in the Company's prior financial results or its accounting practices; these circumstances militate against any inference that KPMG knew of some on-going fraud at the Company and decided to join it.

As noted (*supra* at 11-12 & n.8), courts recognize that it would be "economically irrational" for auditors to participate in a client's fraud, which means plaintiffs must overcome the irrational inference that the auditor would risk its professional reputation to do so. Here the economic irrationality is even more pronounced, given that according to Plaintiffs' allegations, the Company embarked upon its fraud long before KPMG was retained; KPMG had even less of an incentive to join in a pre-existing alleged fraud. Yet, this implausible scenario—KPMG is retained as the new auditor and immediately joins an ongoing fraud—is exactly what Plaintiffs allege. (SAC ¶ 154 ("From virtually the moment KPMG was retained by Miller Energy, KPMG began knowingly or recklessly violating numerous of these standards").) Having had no prior

involvement with Miller Energy, and having not had any role in the acquisition of the Alaska

Assets or the prior accounting treatment of them, there would be no reason for KPMG to take on

a new engagement and join in an on-going fraud. The most natural inference to draw from these

circumstances is that KPMG did not learn of, or intend to join, the Company's alleged fraud.[10]

The fact that the SEC made several inquiries regarding the Company's treatment of the

Alaska Assets from April through June 2011 and, after receiving responses and supporting

materials from the Company, decided to close its inquiry on July 20, 2012—without making

additional comments, demanding revisions to the Company's financial reports, or taking any

further action (SAC ¶ 66; *see* Exs. 2-8)—supports an inference that there was no obvious fraud

and that KPMG did not intentionally or recklessly join it.

Another fact that counters an inference of scienter is that Sherb & Co. issued an

unqualified opinion on the financial statements for 2010. (Ex. 1 at F-2.) As Miller Energy had

acquired the Alaska Assets in December 2009, they were accounted for in the financial

statements for Fiscal 2010. As noted above, to support an inference of scienter, plaintiffs must

allege accounting practices so deficient that "no reasonable accountant" would have made the

same decisions in the same circumstances. *PR Diamonds, Inc.*, 364 F.3d at 693-94. The fact that

two separate independent audit firms (Sherb & Co. and KPMG) audited the Company's financial

statements after it acquired the Alaska Assets and found no material misstatement regarding the

valuation of those assets shows that Plaintiffs cannot meet their burden.

Another fact previously admitted by Plaintiffs that supports an inference that KPMG

acted without fraudulent intent is that in the first year of its engagement KPMG reviewed Miller

---

[10] That KPMG is a Big Four accounting firm that provides services to 76% of the top 50
oil and gas companies (SAC ¶ 17 & n.3) also supports an inference of an innocent state of mind,
as KPMG had no incentive to join a fraud to add a small oil and gas company to its client list.

Energy's prior financial statements, found errors, and "required Miller Energy to re-state and correct the previously-issued quarterly reports and filings with the SEC." (FAC ¶ 74.) Again, it would make no sense for KPMG, if it was intent on joining a pre-existing and ongoing fraud, to require the Company to restate prior financial results. Such actions are simply inconsistent with Plaintiffs' theory that KPMG eagerly joined in Miller Energy's fraud.

Another exculpatory fact admitted by Plaintiffs is that KPMG issued *adverse* opinions on the Company's internal controls, finding and reporting publicly that Miller Energy "has not maintained effective internal control over financial reporting." (SAC ¶¶ 91, 93, 96, 184, 186, 188; Ex. 10 at 45 & F-1; Ex. 11 at 16, 49-50, F-1; Ex. 12 at 19, 59-60, F-2.) Again, if KPMG was participating in the Company's fraud, it would make no sense to issue adverse opinions reporting that there were material weaknesses in the Company's internal controls. That KPMG did so supports an inference that KPMG was acting in good faith and not attempting to mislead investors. It severely undermines any inference of fraudulent intent. *See Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012) (auditor's identification of material weakness in audit client's internal controls is "inconsistent with Plaintiffs' allegation that [the auditor] pandered to [the audit client's] management").

In short, Plaintiffs have not pleaded facts giving rise to a strong inference of scienter, and so the Section 10(b) claims (Counts One and Two) must be dismissed.

## B.    Plaintiffs fail to plead loss causation

Loss causation—"a causal connection between the material misrepresentation and the loss"—is a necessary element of a Section 10(b) claim. *Dura Pharmaceuticals, Inc. v. Brouda*, 544 U.S. 336, 342 (2005). Allegations that Plaintiffs purchased at inflated prices are not enough. *Id.* at 347. "When the purchaser subsequently resells such shares, even at a lower price, that

lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 342-43. Rather, Plaintiffs must show "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* at 346. They must plead not only that they suffered an economic loss, but also a "causal connection" between the defendant's misrepresentation and that loss. *Id.* at 347.

Plaintiffs allege that they purchased at artificially inflated prices and that they suffered economic losses as the share price declined when certain information made its way into the market (SAC ¶¶ 197-237), but Plaintiffs plead no causal connection between KPMG's alleged misrepresentations (its audit reports) or KPMG's other conduct and those economic losses.

For example, in paragraph 199, Plaintiffs allege that on December 17, 2013, a group of concerned shareholders sent an open letter to the Company "decrying, among other things, management's lack of expertise with respect to the Alaska Assets," which caused the Company's stock price to decline from $8.60 to $7.07. (SAC ¶ 199.) But this was nothing new. By Plaintiffs' own admission, shareholders had been criticizing management's handling of the Alaska Assets for years; shareholder filed multiple lawsuit against the Company's management in 2011 based on management's handling of the Alaska Assets. (SAC ¶ 147.) Moreover, nothing in this allegation reveals any causal connection between the alleged misrepresentations or other conduct of *KPMG* and Plaintiffs' loss. By their own admission, the disclosure at issue in paragraph 199 relates to Miller Energy's management, not KPMG or its audit reports or other conduct.[11]

_____

[11] In the prior securities litigation, this Court held that the plaintiffs had adequately pleaded a causation connection between *Miller Energy's* and its *management's*

In multiple other instances through March 2016, Plaintiffs allege that information relating to the Alaska Assets was revealed to the markets, causing the stock price to decline, ultimately to $0 on or around March 29, 2016 (SAC ¶¶ 200-236), but in each instance Plaintiffs plead no causal connection between KPMG's audit reports or other conduct and the price decline or any resulting economic loss. Plaintiffs allege that the SEC announced its settlement with KPMG on August 16, 2017 (SAC ¶ 238), but as Plaintiffs admit, the Company's stock price had already declined to zero by March 2016 (SAC ¶ 236), and so Plaintiffs had already incurred their losses.

In *Gaynor*, this Court rejected an argument for dismissal based on loss causation, but that case was different. 2017 U.S. Dist. LEXIS 130107, at *42. The claim in *Gaynor* was a Section 11 claim, as to which loss causation is an affirmative defense. *Id.* at *36-38. Here, KPMG moves to dismiss a Section 10(b) fraud claim, as to which loss causation is an essential element that must be pleaded with particularity, and Plaintiffs have not pleaded facts supporting the claim that the price declined in response to the disclosure of any new information relating to *KPMG*.

C.     **The Section 10(b) claims are barred by the two-year statute of limitations**

The Section 10(b) claims against KPMG (Counts One and Two)[12] are time-barred under 28 U.S.C. § 1658(b), as Plaintiffs filed the Original Complaint on March 14, 2016, more than two years after a reasonably diligent investigation would have revealed the facts allegedly constituting a violation under Section 10(b).

---

misrepresentations and the economic losses that followed from stock price declines. *In re Miller Sec. Litig.*, 2014 WL 415730, at *23. Indeed, the allegations in that case, and in the present case, appear to be directed at establishing a causal connection between Miller Energy's alleged misrepresentations about the value of the Alaska Assets and the alleged economic losses, not a causal connection between KPMG's audit reports (or other conduct) and such losses.

[12] KPMG's audit reports for 2011, 2012, and 2013 were issued more than two years before the filing of this action. The only audit report filed within the two-year period leading up to the filing of this action was the report for 2014, dated July 14, 2014. (Ex. 12 at 69.)

Under Section 1658(b), a plaintiff may bring a Section 10(b) claim no later than the earlier of two years after discovery of the facts constituting the violation or five years after the violation itself. In *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010), the Supreme Court held that the word "discovery" in this context "encompasses not only those facts the plaintiffs actually knew, but also those facts a reasonably diligent plaintiff would have known." "In determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 653.

The facts constituting the violation in the present case, including alleged facts on which Plaintiffs base their contention that KPMG acted with scienter, were known, or would have been discovered by a reasonably diligent plaintiff, before March 14, 2014, two years prior to the filing of the present action. The underlying alleged facts and circumstances that form the basis for Plaintiffs' claims of securities fraud relating to Miller Energy's valuation of and accounting for the Alaska Assets were publicly known many years ago, and indeed formed the basis for prior securities fraud lawsuits against Miller Energy and its chief executives that survived motions to dismiss years ago. The plaintiffs in those cases discovered facts they needed to file complaints (in 2011), and their claims against Miller Energy and most of the individual defendants survived motions to dismiss. Indeed, this Court's decision denying most of the motions to dismiss is dated February 4, 2014, more than two years before Plaintiffs filed the present case.

The only conceivable argument Plaintiffs might advance is that the facts constituting scienter on the part of KPMG were not known or discoverable by a reasonably diligent plaintiff by February 14, 2014, but any such argument is contradicted by the very allegations advanced by Plaintiffs in the Complaint. Plaintiffs' scienter allegations against KPMG are based on facts and circumstances that were publicly disclosed and a matter of public record before February 14, 2014. The materiality of the Alaska Assets to Miller Energy (SAC ¶ 177) was disclosed, and obvious, from the outset (Ex. 1 at 20). That KPMG as the Company's outside auditors had access to the Company's data and records (SAC ¶¶ 178) was known at all times, as all auditors must have such access to perform audits. The article in *TheStreetSweeper* (SAC ¶ 179) was published in 2011 (Ex. 18), as was the Company's public response (Ex. 21). The fees that KPMG earned (SAC ¶ 180) were a matter of public record, as audit fees were disclosed annually (SAC ¶ 21; Ex. 9 at 60; Ex. 10 at 47; Ex. 11 at 51; Ex. 12 at 62.) And, as detailed above, the purported "red flags" that are the centerpiece of Plaintiffs contention that KPMG acted with scienter were publicly disclosed before February 14, 2014. *See supra* at 12-13.

### D. Count One fails to allege an actionable misstatement

Plaintiffs' "misstatement" claim under Section 10(b) (Count One) is also subject to dismissal because Plaintiffs have not alleged an actionable misstatement. An audit report is a statement of opinion[13] that is false only if the speaker does not believe it.[14] Yet, as discussed below (*infra* at II.C.), Plaintiffs have not pleaded that KPMG did not believe its audit opinions.

---

[13] *E.g.* Ex. 9 at F-3 ("Our responsibility is to express an opinion . . . . We believe that our audits provide a reasonable basis for our opinion. In our opinion . . .")

[14] *In re Longtop Fin. Tech.*, 910 F. Supp. 2d at 580 ("[T]o allege that an auditor opinion is a misrepresentation, a complaint must show that the statement in question is grounded on a specific factual premise that is false, and that the speaker did not 'genuinely or reasonably believe' it."); *see In re Miller Sec. Litig.*, 2014 WL 415730, at *15 (plaintiffs must plead

## E.    Count Two fails to allege an actionable scheme

Plaintiffs' "scheme" liability claim (Count Two) is precluded by *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), which addressed "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)." *Id.* at 156. In *Stoneridge*, the Court affirmed the dismissal of a "scheme" liability claim, premised upon conduct rather than misstatements or omissions, because "respondents' acts or statements were not relied upon by the investors and . . . as a result, liability cannot be imposed upon respondents." *Id.* at 159.[15] "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action." *Id.* The Court explained that "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," and ""[p]etitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.*

Plaintiffs purport to assert a "scheme" liability claim based on allegedly deceptive conduct, rather than on alleged misstatements or omissions (SAC ¶¶ 275-278), but Plaintiffs

---

"particular facts sufficient to demonstrate that the [defendants] did not believe those opinions at the time they were made").

[15] In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994), the Court "determined that §10(b) liability did not extend to aiders and abettors," as the scope of liability under the rule is "delimited by the text" of the statute. *Stoneridge*, 552 U.S. at 157. In *Stoneridge*, the Supreme Court reiterated that Rule 10b-5 cannot be construed to impose liability beyond what Section 10(b), the authorizing statute, prohibits: "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Id.* "In a typical § 10(b) private action," the Court observed, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.*

allege that they were *unaware* of this conduct: "During the Class Period, Plaintiffs and the Section 10(b) Class were unaware of KPMG's conduct" (SAC ¶ 279). As in *Stoneridge*, no plaintiffs "had knowledge, either actual or presumed, of [KPMG's allegedly] deceptive acts during the relevant times," and Plaintiffs, "as a result, cannot show reliance upon any of [KPMG's] actions except in an indirect chain" that is "too remote for liability." *Stoneridge*, 552 U.S. at 159.[16]

The "scheme" claim fails for another reason as well: it is not truly based on "conduct" unrelated to alleged misstatements or omissions, but is rather a classic example of attempting to impose liability on a defendant who had some role in contributing to or preparing a public statement, but was not the one who actually was the "maker" of the statement. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011). Plaintiffs allege that KPMG "performed bookkeeping, appraisal, and valuations to justify the valuation assigned by Boruff and Miller Energy to the Alaska Assets." (SAC ¶ 278.) But, as Plaintiffs allege, the valuation of the Alaska Assets was contained in the Company's public SEC filings. With their "scheme" allegations, Plaintiffs are essentially alleging that KPMG has some behind-the-scenes role in generating, preparing, or drafting valuations that made their way into the Company's allegedly misleading public filings. That is what the Supreme Court rejected in *Janus. Janus*, 564 U.S. at 142-43; *In re Miller Sec. Litig.*, 2014 WL 415730, at *9.[17]

_____

[16] Plaintiffs cannot take advantage of any presumption of reliance that might apply for omissions claims (SAC ¶ 252) given that the claim is based on an alleged "scheme" and disavows reliance on alleged misstatements or omissions (SAC ¶ 275). Such presumptions may be available only where "there is an omission of a material fact by one with a duty to disclose" or under the fraud-on-the-market doctrine "when the statements at issue become public." *Stoneridge*, 552 U.S. at 159.
[17] Plaintiffs also allege that KPMG helped defend the Company's valuation of the Alaska Assets to the SEC (SAC ¶ 278), conduct that similarly cannot be linked to public investors

## II.    The Section 11 claim must be dismissed

The Section 11 claim—Count Three—asserted by the new plaintiff, Martin Weakley, on behalf of all those who purchased "Miller Energy preferred shares pursuant to or traceable to the Offering Documents" is also subject to dismissal for several reasons. (SAC ¶ 33).

### A.    Mr. Weakley was not appointed lead plaintiff for preferred stock purchasers

Mr. Weakley and his counsel are not authorized to serve as lead plaintiff and lead plaintiff's counsel in bringing the Section 11 claim on behalf of a proposed class of purchasers of the preferred stock of Miller Energy.[18] The federal securities laws contain procedures governing the appointment of lead plaintiffs in class action securities cases. *See* 115 U.S.C.A. § 78u-4 (West); 15 U.S.C.A. § 77z-1 (West). Mr. Weakley and his counsel did not apply for appointment as lead plaintiff and lead plaintiffs' counsel, or comply with any of the statutory requirements for doing so. Other plaintiffs complied with the statutory requirements and have been appointed to serve in that capacity, and Plaintiffs here did not object to their appointment.

Mr. Cosby and Mr. Martin filed a motion for appointment as co-lead plaintiffs to represent purchasers of the *common* stock of Miller Energy under the Exchange Act. (Ex. 48.) They made a public announcement as required, indicating that they were seeking to represent

---

except through the affirmative statements made by Miller Energy in its SEC filings. The third type of conduct Plaintiffs allege is "meeting with investors in order to enhance Miller Energy's credibility." (SAC ¶ 278.) That conduct is on its face not deceptive; the mere attendance of a person at a meeting, devoid of any allegation about what any person said at the meeting, cannot be deemed deceptive. Allowing a claim to proceed under that theory would be at odds with Supreme Court precedent, including *Janus*, as well as the PSLRA and Rule 9(b).

[18] *See, e.g., In re Facebook, Inc., IPO Sec. & Derivative Litig.*, MDL No. 12–2389, 2013 WL 4399215, at *3 (S.D.N.Y. Aug. 13, 2013) (appointed lead plaintiff "has the sole authority to determine what claims to pursue on behalf of the class"); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 10 Civ. 275 (PKC), 2011 WL 4538428, at (S.D.N.Y. Sept. 29, 2011) (new plaintiff had no authority to bring class claims on behalf of option holders even where lead plaintiff lacked standing to bring such claims).

purchaser of the common stock. (Ex. 49.) They filed motion papers seeking to show that they are the most adequate plaintiffs to represent purchasers of the common stock. (Ex. 50.) They selected counsel for the proposed class. (Ex. 48-50.) This Court granted the motion of Mr. Cosby and Mr. Martin to be appointed lead plaintiffs for the common stock purchasers and ratified their selection of counsel. (Ex. 51.) Neither Mr. Cosby and Mr. Martin, nor the new plaintiff here, Mr. Weakley, sought appointment as lead plaintiffs for purchasers of the preferred stock of Miller Energy or appointment of lead counsel for such purchasers.

In a different case pending before this Court, another group of plaintiffs—Kenneth Gaynor, Marcia Goldberg, Gabriel R. Hull, and Christopher R. Vorrath (the "Gaynor Plaintiffs")—filed a motion for appointment as lead plaintiffs to represent purchasers of the preferred stock of Miller Energy. (Ex. 52.) They filed motion papers to show that they are the most adequate plaintiffs to represent purchasers of the preferred stock. (Ex. 52-53.) They also selected counsel for the proposed class. (Ex. 53.) This Court granted the Gaynor Plaintiffs' motion and appointed the Gaynor Plaintiffs lead plaintiffs for the preferred stock purchasers and appointed their chosen counsel as lead and local counsel for those purchasers. (Ex. 54.) Neither Mr. Cosby and Mr. Martin, nor Mr. Weakley, objected to the Gaynor Plaintiffs' motion for appointment as lead plaintiffs for preferred stock purchasers. This Court noted that those who did not object waived any right to do so. (Ex. 54, at 1 ("No party has responded in opposition to the Motion, and the time for doing so has expired. *See* L.R. 7.2 ('Failure to respond to a motion may be deemed a waiver of any opposition to the relief sought.').").). Accordingly, Mr. Weakley's claim is inappropriate here and should be dismissed.

## B.    The Section 11 claim is time-barred

Even if Mr. Weakley were permitted to assert it, the Section 11 claim is barred by both

the three-year statute of repose as well as the one-year statute of limitations.

### 1.    The claim does not relate back to the date of the Original Complaint

For limitations purposes, the Section 11 claim in the SAC was brought on September 15,

2017 (the date of the SAC), not March 14, 2016 (the date of the Original Complaint). The claim

does not "relate back" under Rule 15(c) of the Federal Rules of Civil Procedure.

Rule 15(c)(1)(B), which permits relation back when the amendment asserts "a claim or

defense" that "arose out of the conduct, transaction, or occurrence set out" in the original

pleading, is inapplicable for two reasons. First, this subsection of Rule 15(c) "allows relation

back of an amendment asserting a 'claim or defense,' but it does not authorize the relation back

of an amendment adding a new party." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313,

318 (6th Cir. 2010) ("an amendment which adds a new party creates a new cause of action and

there is no relation back to the original filing for purposes of limitations") (internal citations and

quotation marks omitted). Mr. Weakley asserts a new cause of action on behalf of a newly

proposed class of preferred stock purchasers. Neither the Original Complaint nor the FAC

asserted a claim on behalf of Mr. Weakley or any preferred stock purchaser.[19]

Second, relation back under Rule 15(c)(1)(B) is unavailable because the Section 11 claim

in the SAC does not arise out of the same "conduct, transaction, or occurrence" set out in the

Original Complaint. Section 11 creates liability for misstatements in securities offering materials.

The SAC asserts a Section 11 claim on behalf of purchasers of the preferred stock of Miller

---

[19] The Original Complaint asserted a Section 11 claim only on behalf of certain people who purchased common stock, a different security (Original Complaint ¶ 123), and the FAC asserted only Section 10(b) claims only on behalf of common stock purchasers.

Energy in five offerings—the May 7, 2013 Preferred Stock Offering, the June 27, 2013 Preferred Stock Offering, the September 25, 2013 Preferred Stock Offering, the October 17, 2013 Preferred Stock Offering, and the August 20, 2014 Preferred Stock Offering. (SAC ¶¶ 287-292, 317.) The Original Complaint did not assert a claim based on any of these preferred stock offerings. In fact, a Section 11 claim in an amended complaint based on one offering of a company's securities does not relate back even when the prior complaint asserted a Section 11 claim based on the same securities if they were sold in a different offering. *In re Worldcom Secs. Litig.*, 2004 U.S. Dist. LEXIS 32716, *36-*37 (S.D.N.Y Jan. 20, 2004) (Section 11 claims based on a 2000 bond offering do not relate back to claims in prior complaint based on a 2001 bond offering); *In re Xchange Inc.*, 2002 U.S. Dist. LEXIS 15909, at *12-13 (D. Mass. Aug. 26, 2002) (Section 11 claims based on a December 1998 initial public offering and a June 1999 second offering did not relate back to original complaint that "made no reference to" and had no allegations about those offerings); *compare with Newby v. Enron Corp.*, 2005 U.S. Dist. LEXIS 34021, at *13-14 (S.D. Tex. June 21, 2005) (claim in amended complaint related back to original complaint where both complaints asserted claims arising out of the same notes offering).

Rule 15(c)(1)(C), which permits relation back when the amendment changes "the name of the party or the party against whom a claim is asserted," is also inapplicable. As the Sixth Circuit has explained, this subsection of Rule 15(c) is limited "by its plain language, to change to *defendants*." *Asher*, 596 F.3d at 318 (emphasis in original). While some courts have extended this subsection to amendments changing the identities of plaintiffs, these types of changes have been "limited to corrections of misnomers or misdescriptions," and the Sixth Circuit has expressly declined to "legislatively craft a new rule of civil procedure" to allow for relation back of an amendment adding a new plaintiff. *Id.* at 319-20.

## 2.     The claim is barred by the three-year statute of repose

The Section 11 claim in the SAC is barred by the three-year statute of repose in Section 13 of the Securities Act, which provides that "[i]n no event shall any such action be brought to enforce a liability created under Section 11 . . . more than three years after the security was *bona fide* offered to the public." 15 U.S.C. § 77m (2006). As discussed above, the date the Section 11 claim in the SAC was first brought for limitations purposes was September 15, 2017, the date of the SAC. As explained below, the preferred stock sold pursuant to each of the prospectus supplements at issue was *bona fide* offered more than three years prior to September 15, 2017.

As this Court observed in the case brought by the Gaynor Plaintiffs in connection with the same offerings of preferred stock at issue here, when a company employs a shelf-registration process, securities are generally "*bona fide* offered" to the public "on the date the SEC declares the registration statement effective, rather than when the supplemental prospectus is filed." *Gaynor*, 2017 U.S. Dist. LEXIS 130107, at *25 (internal citation and quotation marks omitted). Under SEC rules, the "offering" date for statute of limitations purposes is now: "(i) the date of the prospectus supplement for issuers and underwriters, and (ii) the date of the registration statement for directors and signing officers." *Id.* at *26. As for signing officers and directors, an exception exists "by which a new bona fide offering date may apply . . . if the prospectus encompasses a 'fundamental change in the information set forth in the registration statement.'" *Id.* at *26-27 (citation omitted).

The same SEC rules that this Court addressed in *Gaynor* regarding the offering date for Section 11 claims against issuers and officers and directors also contain provisions regarding the offering date for purposes of Section 11 claims against accountants such as KPMG who have consented to the inclusion of their audit reports in company filings. Specifically, the SEC rules

provide that the date on which securities are *bona fide* offered to the public for purposes of a Section 11 claim against an accounting firm is the date that the original registration statement was declared effective, not the date of the prospectus supplement. 17 C.F.R. § 230.430B(f)(5)(i).

The date on which the registration statement was declared effective (and the date the preferred shares were *bona fide* offered for purposes of a claim against KPMG) was September 18, 2012 (SAC ¶ 189)—more than three years prior to the September 15, 2017 filing of the SAC. Under 15 U.S.C. § 77m, therefore, the Section 11 claim is barred by the statute of repose.

The rule contains an exception for a prospectus supplement that "contains new audited financial statements or other financial information as to which the accountant is an expert and for which a new consent is required pursuant to section 7 of the Securities Act," 17 C.F.R. § 230.430B(f)(5)(i), but the exception does not help Plaintiffs. Plaintiffs acknowledge that the May 7, 2013 and June 27, 2013 prospectus supplements did *not* incorporate new audited financial statements beyond those incorporated into the Registration Statement (SAC ¶ 189). Plaintiffs allege that the September 25, 2013 and October 17, 2013 prospectus supplements incorporated new audited financial statements (the financial statements for Fiscal 2013 and KPMG's audit report dated July 15, 2013), and that the August 20, 2014 prospectus supplement incorporated new audited financial statements (the financial statements for Fiscal 2014 and KPMG's audit report dated July 15, 2014). (SAC ¶ 189.) But the dates of those prospectus supplements are still more than three years prior to the date of the SAC (September 15, 2017).

Thus, the Section 11 claim is barred in its entirety because the preferred shares at issue were *bona fide* offered more than three years prior to the September 15, 2017 date of the SAC.

### 3.    The claim is barred by the one-year statute of limitations

The statute of limitations barring claims not brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" 15 U.S.C. § 77m (2006), also dooms the Section 11 claim here.

The statute commences when the plaintiff had "either actual notice or inquiry notice." *Gaynor*, 2017 U.S. Dist. LEXIS 130107, at *32. Inquiry notice means the plaintiff has knowledge of facts "that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." *Id.* (internal citation and quotation marks omitted). The plaintiff "need not have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss;" rather, inquiry notice "is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Id.* at *32-33 (internal citations and quotation marks omitted). Storm warnings or suspicious facts are not adequate to commence the statute, but they "trigger a duty to investigate, and the limitations period begins to run only when a reasonably diligent investigation would have discovered the fraud." *Id.* at *33 (internal citation and quotation marks omitted).

The allegations in the SAC demonstrate that Plaintiffs had actual notice, or at least inquiry notice, more than one year prior to September 15, 2017. All of the following events allegedly occurred more than one year prior to September 15, 2017:

| | |
|---|---|
| December 2013 | "The Miller Energy house of cards finally began to collapse in December 2013, when it started to become clear that the Alaska Assets were worth nowhere near what KPMG and Miller Energy said they were." (SAC ¶ 4.) |
| December 2013 | "Beginning in December 2013, and through the time it filed for bankruptcy [October 1, 2015], the truth that Miller Energy was a fraud, and the risks concealed by that fraud, including by KPMG's participation in it, leaked out, were revealed, and materialized." (SAC ¶ 198.) |

| | |
|---|---|
| December 17, 2013 | "On December 17, 2013, a group of shareholders calling themselves 'Concerned Miller Shareholders' sent an open letter decrying, among other things, management's lack of expertise with respect to the Alaska Assets," and on that date the price of the preferred stock declined. (SAC ¶ 199.) |
| December 24, 2013 | "[O]n December 24, 2013, a report entitled *Miller Energy: Digging Itself Into Another Deep Hole?*" was published by *TheStreetSweeper*," and it quoted Robert Chapman describing the Company as "a preferred-stock issuance machine that seems to be more in the business of raising money than making money" and that "it looks like a stock that's driven by a myth." (SAC ¶¶ 200-204.) "On or around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized," and the price of the preferred stock declined. (SAC ¶ 205.) |
| March 13, 2014 | The Company announced losses, increased expenses, and negative earnings per share and held an investor call during which "the Company was repeatedly pressed by multiple analysts about the costs and expenses associated with its operations." (SAC ¶¶ 206-207.) "On or around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 208.) |
| July 15, 2014 | The Company held an investor call to discuss results reported on the prior day. "On and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶¶ 210-213.) |
| October 13, 2014 | Brean Capital lowered its price target on the Company, and "[o]n or around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized," and the price of the preferred stock declined. (SAC ¶ 214.) |
| November 16, 2014 | Miller Energy stock became the subject of margin calls, and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 215.) |

| | |
|---|---|
| November 28, 2014 | Brean Capital cut its price target again, and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized." (SAC ¶ 216.) |
| December 2014 | "Then, in December 2014, the Company disclosed it was taking a $263.3 million impairment charge on the Alaska Assets, in part because of issues relating to cost." (SAC ¶ 4.) |
| December 4, 2014 | The Company "recognized a $265.3 million non-cash impairment charge" related to the Alaska Assets and "announced a loss of $285.7 million," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶¶ 218-221.) |
| March 2015 | "Three months later, the Company disclosed yet another impairment charge of $150 million on the Alaska Assets, ultimately writing down almost all of the goodwill from that acquisition." (SAC ¶ 4.) |
| March 12, 2015 | "Then, on March 12, 2015, the Company revealed it was taking another $149.1 million impairment charge on the Alaska Assets, increasing total impairment to $414.4 million," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 222.) |
| April 29, 2015 | The Company disclosed that the SEC "had made a preliminary determination to recommend a civil action against the Company related to its accounting for the Alaska Assets," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 223.) |
| May 6, 2015 | "On May 6, 2015, the Company announced it was deferring dividend payments on its Series C and D Preferred Stock," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 224.) |

| | |
|---|---|
| May 12, 2015 | "On May 12, 2015, the Company disclosed that the NYSE had notified it that its shares were subject to de-listing due to its having failed to maintain listing requirements." (SAC ¶ 225.) |
| July 14, 2015 | "On July 14, 2015, Miller Energy filed a Form 8-K, attaching a press release in which it announced 'substantial doubt about its ability to continue as a going concern," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 226.) |
| July 30, 2015 | "On July 30, 2015, after market close, Miller Energy disclosed that its common and preferred stock would be de-listed from the NYSE," and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 227.) |
| August 6, 2015 | "Also on August 6, 2015, in response to the SEC Enforcement Action, creditors of CIE filed an involuntary petition for bankruptcy in the United States Bankruptcy Court for the District of Alaska." (SAC ¶ 231.) |
| October 1, 2015 | "On October 1, 2015, Miller Energy itself filed for Chapter 11 bankruptcy, and "[o]n and around this day, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were partially revealed, leaked out, or materialized, and as a result" the price of the preferred shares declined. (SAC ¶ 232.) |
| November 9, 2015 | Kenneth Gaynor, through his attorneys, files a complaint dated November 9, 2015, asserting claims under Section 11 based on the same offerings of preferred shares at issue in this case. (Ex. 55.) |
| January 12, 2016 | The SEC entered an order finding that the Company committed federal securities fraud. (SAC ¶ 233.) |
| January 28, 2016 | The Bankruptcy Court approved a plan that would cancel all equity interests in Miller Energy. (SAC ¶ 234.) |
| March 29, 2016 | "The Company finally admitted its fraud on March 29, 2016 when it disclosed that *none* of its financial statements regarding the valuation of the Alaska Assets should be relied upon." (SAC ¶ 5.) |

| March 29, 2016 | "Also on March 29, 2016, the Company finally admitted the truth that the Alaska Assets were essentially worthless, and that the Company's financials to the contrary were a sham that could not be relied upon," and "[o]n and around March 29, 2016, and on this news, risks or truth concealed by, or effects associated with, KPMG's fraud were revealed, leaked out, or materialized, and as a result, Miller Energy's stock was cancelled entirely, reducing their value to zero." (SAC ¶¶ 235-236.) |

All of the above dates are more than a year prior to the September 17, 2017 filing of the SAC. Indeed, Plaintiffs allege that information regarding KPMG's alleged participation in the purported fraud leaked out and became public in December 2013—three years and nine months prior to the filing of the SAC. (SAC ¶ 4 (in December 2013 it started to become "clear" that the Alaska Assets were "worth nowhere near what KPMG and Miller Energy said they were"); SAC ¶ 198 (beginning in December 2013, the "truth that Miller Energy was a fraud" and the "risks concealed by that fraud" including "by KPMG's participation" in the alleged fraud "were revealed"); SAC ¶ 205 (on or around December 24, 2013, "risks or truth concealed by . . . KPMG's fraud were partially revealed"). Based on these allegations, Plaintiffs' were under at least a duty to investigate by no later than December 2013. Any reasonably diligent investigation would have uncovered the purported basis for the Section 11 claim (a non-scienter based claim not subject to the PSLRA's heightened pleading requirements) within the following two years and nine months leading up to September 17, 2016 (one year prior to the SAC).

As discussed above (*supra* at 10-13, 20), the alleged facts that Plaintiffs claim support an inference of scienter on the part of KPMG for purposes of the Section 10(b) fraud claim were all publicly known long ago as well. It is inconceivable that Plaintiffs could be on notice of facts that, in their view, support an inference that KPMG committed a federal securities fraud violation requiring a showing of scienter years ago, without being on inquiry notice of a potential claim under Section 11, which has much less stringent elements and pleading requirements.

This Court's decision in *Gaynor*, a case filed on behalf of Miller Energy's preferred shareholders in November 2015, does not help Plaintiffs here. This Court agreed with plaintiffs "that it cannot say with certainty, based on the facts before it, that the prior litigation provided more than a 'storm warning,' prompting plaintiffs to investigate, rather than inquiry notice." 2017 U.S. Dist. LEXIS 130107, at *36. But this Court was addressing only whether prior litigation was sufficient to prove inquiry notice. Here, as set forth above, the SAC itself details many circumstances beyond the existence of the prior litigation which show with certainty that Plaintiffs had inquiry notice. Also, Mr. Weakley waited almost two years after the November 2015 filing of the *Gaynor* action before attempting, in the September 2017 SAC, to file his claim on behalf of the same preferred shareholders. While this Court observed in *Gaynor* that a claim is barred by the statute of limitations based on inquiry notice "'only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered' the violation," 2017 U.S. Dist. LEXIS 130107, at *33-34, in the present case, *Plaintiffs' own allegations* about what was publicly known—which Plaintiffs cannot controvert—irrefutably demonstrate that Plaintiffs discovered or should have discovered the claim years ago.[20]

Indeed, that a reasonably diligent investigation would have uncovered the alleged basis for a Section 11 claim on behalf of preferred stock purchasers based on the offerings at issue here is evidenced by the fact that, in November 2015, the Gaynor Plaintiffs in fact brought Section 11 claims on behalf of those purchasers based on those same offerings. (Ex. 55 at ¶ 1.)

---

[20] Even if the Section 11 claim were to relate back to the date of the Original Complaint (it does not relate back, *see supra* at II.B.1.), the claim would be barred by the statute of limitations because as shown above Plaintiffs had actual notice, or at least inquiry notice, by March 14, 2015, one year prior to the date of the Original Complaint.

## 4.     *American Pipe* tolling does not apply

Plaintiffs cannot take advantage of equitable tolling. In some circumstances, the filing of a class action lawsuit tolls the statute of limitations for class members under *American Pipe & Construction Co. v. Utah*, 414 U. S. 538 (1974). Such tolling is inapplicable, and the filing of the Original Complaint in March 2016 did not toll the statute for the Section 11 claim in the SAC.

First, *American Pipe* tolling only applies to members of the class described in the original complaint, 414 U.S. at 550 (under Federal Rule of Civil Procedure 23, "the filing of a timely class action complaint commences the action for all members of the class"), and neither Mr. Weakley nor the proposed class of preferred stock purchasers were members of the class in the Original Complaint, which included only purchasers of "common shares." (Original Complaint ¶ 123.) In the SAC, Mr. Weakley asserts a claim on behalf of those who purchased "*preferred* shares pursuant to or traceable to the Offering Documents," defined to including a September 6, 2012 Registration Statement and six prospectus supplements issued from February 13, 2013 through August 20, 2014. (SAC ¶¶ 33, 285-186 (emphasis added).)

Second, *American Pipe* tolling is only available for plaintiffs who refrain from filing individual actions in reliance on the previous filing of a class action in which they are members of the proposed class; it does not toll the statute for subsequent *class* actions, *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988), except in certain circumstances not applicable here such as where a prior class action was dismissed prior to a ruling on class certification, *see Phipps v. Wal-Mart Stores, Inc.*, 792 F.3d 637 (6th Cir. July 7, 2015). Mr. Weakley purports to bring the Section 11 claim on behalf of a proposed class of preferred shareholders.

Third, in no event may *American Pipe* tolling be invoked to toll the three-year statute of repose that governs Section 11 claims. The Supreme Court confirmed in June 2017 that the

three-year time limitation applicable to Section 11 claims is a statute of repose that is not subject to equitable tolling under *American Pipe* or otherwise. *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050-51 (June 26, 2017).

### C.     Plaintiffs fail to plead an actionable misstatement or omission

Plaintiffs' Section 11 claim is based on the allegation that KPMG's audit reports which stated that KPMG had audited Miller Energy's financial statements in accordance with generally accepted auditing standards and that, *in its opinion*, the Company's financial statements presented the financial position of Miller Energy fairly and in conformity with GAAP. (SAC ¶ 268.) Under *Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), an opinion statement is actionable as a misrepresentation under Section 11 if "the speaker did not hold the belief she professed," 135 S. Ct. at 1327; and is actionable as an omission under Section 11 if "the speaker omits information whose omissions makes the statement misleading to a reasonable investor." *Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (affirming dismissal of Section 11 claims and finding that the opinion statements at issue were not actionable under *Omnicare*). Plaintiff has failed to sufficiently allege that KPMG's opinion statements constitute actionable misrepresentations or omissions under *Omnicare*.

The audit reports state that they are an expression of KPMG's "opinion." (Ex. 9 at F-2, F-3; Ex. 10 at F-1, F-2; Ex. 11 at F-1, F-2; Ex. 12 at F-1, F-2.) Under *Omnicare*, a statement of opinion can be a misrepresentation only if the speaker did not believe it. That the allegation that defendant's belief or opinion statement turned out to be wrong "alone will not give rise to liability under § 11's first clause because . . . a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief

wrong. That clause, limited as it is to factual statements, does not allow investors to second-guess inherently subjective and uncertain assessments." *Id*. at 1327. Plaintiff has not alleged that KPMG did not hold the opinion that Miller Energy's financial statements were in conformity with GAAP. Nor have Plaintiffs alleged that KPMG had formed the opinion at the time that its audits were inadequate in any way. Plaintiffs have only alleged that years later the SEC found (pursuant to a settlement in which KPMG did not admit or deny the SEC's findings) that KPMG's audits were deficient and that KPMG should not have formed that opinion at the time. Even if "plaintiff could later prove that opinion erroneous, the words 'I believe' themselves admitted that possibility, thus precluding liability for an untrue statement of fact." *Omnicare*, 135 S. Ct. at 1326.[21]

Nor have Plaintiffs adequately alleged that KPMG's audit opinions are actionable for omitting any particular information. Plaintiffs' primary theory is based on a misstatement theory: that KPMG made affirmatively false statements (that based on its audits in compliance with professional auditing standards it believed the financial statements complied with GAAP). While Plaintiffs also purport to assert that KPMG made material omissions, the alleged omissions are not true omissions, but rather merely the same alleged misstatements recharacterized as

---

[21] Other courts have recognized that audit opinions are just that, statements of opinion, under *Omnicare. See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, No. 15-1813, 2016 WL 1392280, at *3 (2d Cir. Apr. 8, 2016) (holding that defendant's audit opinion was a statement of opinion under *Omnicare* and plaintiff's bare assertion that auditor had conducted a deficient audit investigation and omitted facts that contradicted its audit opinion was insufficient to state a Section 18 claim); *In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *19 (N.D. Cal. Oct. 1, 2015) (finding audit opinion to an statement of opinion under Omnicare and dismissing Section 11 claims against auditor where plaintiff failed to identify adequately which facts auditor allegedly omitted from its audit opinion); *Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *7, 34 (M.D. Pa. June 22, 2015) (finding audit opinion to be an opinion statement and dismissing Section 11 claim against auditor where allegations amounted to "little more than the conclusory assertion" that defendant's audit opinion lacked reasonable basis).

omissions. For example, Plaintiffs allege that KPMG's statement—that based on its audits in compliance with professional standards it believed the financial statements complied with GAAP—omitted to disclosed that its audits did not comply with professional standards and that the financial statement did not comply with GAAP. (SAC ¶¶ 310, 319.) But, any misstatement can be made to look, superficially, like an omission in this manner. That does not change its true nature; it is still an alleged misstatement.[22]

---

[22] Also, Mr. Weakley lacks standing to assert the Section 11 claim. His filings make clear that he did not purchase directly in any of the relevant offerings (the dates and amounts of his purchases do not match with any of the offering dates or offering prices). (Ex. 56; SAC ¶ 286.) As an after-market purchaser, he cannot show that the particular shares he purchased are traceable to any of the particular securities offerings on which he sues. Given that he is not even attempting to bring a claim based on the February 13, 2013 Offering (SAC ¶ 317), he cannot deny that there were pre-existing preferred shares in the market at the time of his purchases. There is no way, therefore, for him to show that the particular shares he purchased came from one of the offerings at issue in the SAC rather than from a prior offering. Nonetheless, in light of this Court's decision in *Gaynor*, holding that the standard for pleading traceability for Section 11 is more lenient than the standard applicable to Section 12 and holding that an allegation that a plaintiff purchased shares "pursuant to and/or traceable to" the offerings is adequate at the pleading stage, KPMG is not seeking dismissal for Plaintiffs' lack of standing at this time.

## CONCLUSION

For the foregoing reasons, KPMG requests that the Court grant its motion to dismiss.

Because Plaintiffs have already amended their complaint twice, and because the grounds for

dismissal set forth above are insurmountable, KPMG requests that dismissal be with prejudice.

Dated: October 20, 2017

                                           Respectfully submitted,

                                           s/ Paul S. Davidson
                                           Paul S. Davidson (TN BPR # 011789)
                                           Tera Rica Murdock (TN BPR #028153)
                                           WALLER LANSDEN DORTCH & DAVIS, LLP
                                           511 Union Street, Suite 2700
                                           Nashville, TN 37219
                                           Phone: 615-244-6380
                                           Email: paul.davidson@wallerlaw.com
                                           Email: terarica.murdock@wallerlaw.com

                                           Gary F. Bendinger (admitted pro hac vice)
                                           Gregory G. Ballard (admitted pro hac vice)
                                           SIDLEY AUSTIN LLP
                                           787 Seventh Avenue
                                           New York, New York 10019
                                           Telephone: +1 212 839-5300
                                           Email: gbendinger@sidley.com
                                           Email: gballard@sidley.com

                                           Attorneys for Defendant KPMG LLP

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2017, a copy of the foregoing was filed electronically and served via the Court's CM/ECF system on the following:

Gordon Ball
Gordon Ball PLLC
550 West Main Street, Suite 600
Knoxville, TN 37902

Lance Kristopher Baker
The Baker Law Firm
550 West Main Street, Suite 600
Knoxville, TN 37902

Steven J Toll
Times Wang
Laura Posner
Cohen, Milstein, Sellers & Toll PLLC
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005-3934

*Attorneys for Plaintiffs*

s/ Paul S. Davidson