# Exhibit 47 - SEC Order In the Matter of KPMG LLP and John Riordan 81396, August 15, 2017

## UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 81396 / August 15, 2017

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 3888 / August 15, 2017

**ADMINISTRATIVE PROCEEDING**
File No. 3-18110

|  |  |
|---|---|
| In the Matter of<br><br>**KPMG LLP AND**<br>**JOHN RIORDAN, CPA**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against KPMG LLP ("KPMG") and John Riordan, CPA ("Riordan" and collectively with KPMG, "Respondents") pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.[2]

---

[1] Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others . . . (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations thereunder.

[2] Rule 102(e)(1)(ii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and over the subject matter of these proceedings, which are admitted, and, except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds that:

## SUMMARY

1.       This case involves improper professional conduct and securities law violations by KPMG and Riordan relating to a review and audit of the financial statements of Miller Energy Resources, Inc. ("Miller Energy"). During its fiscal 2010, Miller Energy acquired certain oil and gas interests located in Alaska (the "Alaska Assets") for an amount the company estimated at $4.5 million and then subsequently reported those assets at an inflated value of $480 million in its fiscal 2010 financial statements. This asset valuation violated generally accepted accounting principles ("GAAP") and overstated the fair value of the assets by hundreds of millions of dollars. KPMG was hired as the company's auditor during fiscal 2011, the year following the acquisition of the Alaska Assets, and issued an audit report containing an unqualified opinion on Miller Energy's fiscal 2011 financial statements. However, in conducting the audit and review of the financial statements for fiscal 2011 and the third quarter of fiscal 2011 ("3Q2011"), respectively, Respondents failed to comply with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), chiefly with respect to the procedures relating to the oil and gas properties that contained the overstated asset values.

2.       As the successor auditor, PCAOB standards required KPMG, as part of its 2011 audit, to analyze the impact of Miller Energy's opening account balances, including the value of its oil and gas properties, on the current-year financial statements. KPMG and Riordan failed to obtain sufficient competent evidence regarding the impact of the opening balances on the current-year financial statements, despite knowing that no proper fair value assessment had been performed by management in the prior year. Although KPMG and Riordan did undertake some audit procedures relating to the opening balances, these procedures failed to appropriately consider the facts leading to Miller Energy's acquisition of the Alaska Assets, including the multiple offers received for those assets and the "abandonment" of the assets by the prior owner. In applying these procedures, KPMG and Riordan also failed to sufficiently review certain forecasted costs associated with the estimation of the fair value of the Alaska Assets, which were understated, and to detect that certain fixed assets were double counted in the company's valuation.

3.       KPMG and Riordan failed to properly assess the risks associated with accepting Miller Energy as a client and to properly staff the audit. KPMG and Riordan also overlooked

2

evidence that indicated a possible overvaluation of the Alaska Assets and failed to exercise the requisite degree of due professional care and skepticism. And while KPMG management and national office personnel became aware of the unusual and highly material prior-year transaction, the firm did not take sufficient action to determine that an appropriate response was taken by the engagement team regarding the risk of overvaluation of the Alaska Assets.

## RESPONDENTS

4.     **KPMG LLP** is a Delaware limited liability partnership headquartered in New York City. KPMG is registered with the PCAOB and is the U.S. member firm of KPMG International, a Swiss cooperative, with over 90 offices in the U.S. KPMG was Miller Energy's auditor from February 2011 until approximately October 2015, when Miller Energy filed a voluntary bankruptcy petition.

5.     **John Riordan**, age 52, is a certified public accountant ("CPA") licensed to practice in Georgia and Tennessee. Riordan joined KPMG's New York City office in 1987, before relocating to the Atlanta, Georgia office in 1992. He was admitted to the partnership in 2000. He served as the KPMG engagement partner in charge of the 2011 audit of Miller Energy. Riordan is a member of KPMG's Technology, Media and Telecommunications practice, and, since 2013, he has been the managing partner of KPMG's Knoxville, Tennessee office, although he has remained primarily based out of KPMG's Atlanta office.

## OTHER RELEVANT ENTITIES

6.     **Miller Energy Resources, Inc.** is a Tennessee corporation that, in 2011, was headquartered in Knoxville, Tennessee. Miller Energy operated and developed oil and gas wells in north and south central Alaska. It was founded in 1967 as a Tennessee-based oil and gas drilling contractor. The company went public via a reverse merger in 1996. Between 2002 and 2009, Miller Energy's stock price regularly traded below one dollar per share, and the company reported net losses in all years. It changed its name from Miller Petroleum, Inc. to Miller Energy Resources, Inc. in April 2011. Until March 29, 2016, Miller Energy's common stock was registered pursuant to Exchange Act Section 12(b). On October 1, 2015, Miller Energy and its subsidiaries filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. As part of Miller Energy's bankruptcy plan, which became effective on March 29, 2016, all of the company's common and preferred shares were cancelled and extinguished. The company is now wholly owned by its former creditors and doing business under another name.

## FACTS

### *Miller Energy Acquires and Overvalues the Alaska Assets*

7.     In the fall of 2009, Miller Energy – at the time, a thinly traded penny-stock company with operations primarily in Tennessee – learned that certain oil and gas interests located in Alaska (the "Alaska Assets") were in the process of being legally "abandoned" as part of the bankruptcy proceedings of a California-based energy company. The Alaska Assets consisted of leases covering 602,000 acres of mostly unproven exploratory oil and gas prospects. In addition to these prospects, the leases included five operative oil and gas wells located mainly on two fields, two major facilities, and an offshore platform.

3

8.     In late 2008, the former owner of the Alaska Assets began extensive marketing efforts to sell those assets. These marketing efforts included hiring a leading financial advisory firm, which approached roughly 40 market participants and made available to them a data room containing materials about the value and operations of the assets. In mid-2009, after these marketing efforts failed, the Alaska Assets were the subject of a bankruptcy court sponsored auction, with the winning bidder agreeing to pay $8.1 million for the assets. A second entity, which bid $7 million, was designated as the backup bidder. However, neither bidder closed on the bids.

9.     Thereafter, the former owner sought, and obtained, an order as part of its bankruptcy administration allowing it to abandon title to the Alaska Assets. In approving the abandonment of the assets, the bankruptcy court concurred with the former owner's assessment that the Alaska Assets were of "no value or other benefit" to the former owner. A primary purpose of the abandonment order was to relieve the former owner of virtually all financial obligations relating to the Alaska Assets.

10.     Following Miller Energy's expression of interest in acquiring the Alaska Assets, the abandonment order was rescinded so that the assets could be sold. Miller Energy ultimately obtained the Alaska Assets via a competitive auction by outbidding a subsidiary of an NYSE-listed company, which at the time was the largest land drilling contractor in the world. Miller Energy's winning bid consisted of $2.25 million in cash plus the assumption of certain liabilities (reported at $2.22 million). The transaction closed on December 10, 2009.

11.     Under the circumstances, applicable accounting principles required Miller Energy to record the Alaska Assets at fair value, with any resulting gain flowing from a "bargain purchase" to be recorded on the income statement. *See* Accounting Standards Codification ("ASC") 805, *Business Combinations.* "Fair value" is described in ASC 820, *Fair Value Measurement,* as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction in the principal (or most advantageous) market at the measurement date under current market conditions (that is, an exit price) regardless of whether that price is directly observable or estimated using another valuation technique." ASC 820-10-35-9A. As discussed below, there were significant problems with Miller Energy's estimate of "fair value."

12.     In its first periodic filing with the Commission following the acquisition (*i.e.*, the 3Q2010 Form 10-Q), Miller Energy disclosed that it had assigned a value to the assets of $480 million, comprised principally of $368 million for oil and gas properties and $110 million for fixed assets. It also recognized a one-time, after-tax bargain purchase gain of $277 million. Following the acquisition, the Alaska Assets accounted for more than 95% of Miller Energy's total reported assets.

13.     Miller Energy, however, failed to conduct an appropriate analysis to calculate the fair value of the Alaska Assets and overstated the value of the acquired assets by hundreds of millions of dollars. For the recorded $368 million fair value of the oil and gas properties acquired, Miller Energy improperly relied on a reserve report that was prepared by a third-party petroleum engineer firm under the guidelines for supplemental oil and gas disclosures, but not for fair value

4

purposes.[3] The use of the reserve report was improper for the purpose of fair value, and the report itself expressly disclaimed that any of the estimates set forth in the report were estimates of fair value.

14.     Upon receiving the reserve report, Miller Energy merely recorded the sum of the estimates for the proved, probable, and possible reserves – $368 million – as the fair value for the acquired oil and gas properties without undertaking any additional analysis. The use of the estimates from the reserve report for the purpose of fair value was improper because the report failed to incorporate necessary assumptions, such as an appropriate discount rate and risk adjustments for certain speculative reserve categories. In addition, the report contained understated and unsubstantiated forecasted cost information, which was provided to the engineer firm by Miller Energy.

15.     Miller Energy also erroneously double counted all or substantially all of the value of the acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves, which it valued at $110 million. To support this fixed asset value, Miller Energy relied on an insurance report that purported to show replacement cost estimates from a third-party insurance broker. However, the report did not contain any estimates prepared by the broker. Rather, Miller Energy simply refashioned a pre-existing insurance report to make it appear that the broker had independently calculated the $110 million replacement cost value. The value numbers in the report were provided to the broker by Miller Energy and the former owners of the Alaska Assets. Aside from the fact that it contained no third-party analysis of value, use of the report was improper for other reasons. For example, by recording a separate value for the fixed assets in addition to the reserves, Miller Energy double counted those fixed assets because they were necessary to produce the oil and gas reserves and were thus included in the reserve report value. Recording incremental value based on replacement cost was inappropriate for these particular assets because they had little to no independent value absent the reserves to which they related.

16.     As a result of the flawed valuation, Miller Energy filed with the Commission financial reports that materially misstated the value of its assets, as follows: Forms 10-Q for the third quarter of fiscal year 2010 and for the first three quarters of fiscal years 2011 through 2015; Forms 10-K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 and August 21, 2014 pursuant to Rule 424.

17.     In August 2015, the Commission instituted administrative proceedings against Miller Energy, two of its former officers, and the engagement partner for the independent audit firm who audited the company's fiscal 2010 financial statements. Miller Energy filed for

---

[3] ASC 932 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies* and SFAS 69, *Disclosures About Oil and Gas Producing Activities*) establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%. The FASB has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows. It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." Paragraph 83 of the Basis for Conclusions of SFAS 69.

bankruptcy shortly thereafter. Miller Energy submitted an offer to settle the administrative proceedings that the Commission accepted on January 12, 2016. The remaining respondents in that proceeding submitted offers of settlement that the Commission accepted on June 7, 2016.

### *KPMG Named as Miller Energy's Auditor*

18.    On February 1, 2011, Miller Energy replaced its independent audit firm with KPMG, which staffed the engagement with personnel principally from its Atlanta, Georgia and Knoxville, Tennessee offices.

19.    The KPMG engagement team began with the interim review of the company's results for 3Q2011. The KPMG engagement team was led by Riordan and two senior managers, one of whom resided in Houston, Texas, and was added to the team specifically for her oil and gas experience, as Riordan and the other, Knoxville-based senior manager had no oil and gas industry experience.

20.    KPMG issued audit reports containing unqualified opinions on Miller Energy's annual financial statements for fiscal years 2011 through 2014. Those audit reports were included in Miller Energy's Form 10-K filings that contained materially inflated asset values for the company's oil and gas properties. KPMG also provided review services related to Miller Energy's quarterly financial statements beginning in 3Q2011. During the 3Q2011 review and fiscal 2011 audit, the value of the Alaska Assets recorded by Miller Energy was substantially the same as the $480 million value initially reported by Miller Energy following the acquisition of those assets in December 2009.

### *KPMG's Flawed Client Acceptance and Engagement Staffing*

21.    An accounting firm should establish policies and procedures for deciding whether to accept or continue a client relationship and whether to perform a specific engagement for that client. The PCAOB's quality control standards ("QC") also require, among other things, that audit firms establish policies and procedures to provide reasonable assurance that each firm appropriately considers the risks associated with providing professional services in the particular circumstances. *See* QC 20.14-.15. In 2011, KPMG had not established adequate policies and procedures for client acceptance and continuation. Having recently transitioned to a new system for assessing and documenting prospective clients and engagements, KPMG had not established adequate guidance and procedures relating to the use of the new system.

22.    Without adequate guidance and procedures in place, the KPMG engagement team performed an inadequate assessment of the risks associated with the Miller Energy engagement. Among other things, KPMG's initial evaluation, which was completed by Riordan and approved by KPMG management, failed to adequately consider Miller Energy's bargain purchase, its recent history as a penny-stock company, its lack of experienced executives and qualified accounting staff, its existing material weaknesses in internal control over financial reporting, its long history of reported financial losses, and its pressing need to obtain financing to operate the newly acquired Alaska Assets. As a result, KPMG accepted Miller Energy as a client and incorrectly designated it as a "low" risk client. Based on the information in the initial evaluation, KPMG and Riordan also assigned the Miller Energy engagement an overall risk grade of "medium," which was not

reevaluated and changed to "high" until after KPMG issued its unqualified opinion on the company's fiscal 2011 financial statements.

23.     KPMG's client acceptance procedures also failed to adequately address the audit team's lack of industry experience. Although a client acceptance evaluation form completed by Riordan noted that the assigned engagement partner and senior manager had no prior experience with oil and gas companies like Miller Energy, it stated that there were no concerns regarding the overall skills and experience of the engagement team. Consequently, KPMG assigned to the engagement team personnel who had insufficient expertise to appropriately address the risks presented by Miller Energy. Riordan lacked the necessary experience to serve as the partner-in-charge of the engagement, resulting in departures from professional standards.

24.     PCAOB quality control standards state that firms should establish policies and procedures providing reasonable assurance that a practitioner-in-charge of an engagement possesses the competencies necessary to fulfill his or her engagement responsibilities. *See* QC 40.06. Among other things, these policies and procedures should address whether practitioners-in-charge possess an understanding of the industry in which the client operates. *See* QC 40.08. KPMG did not have in place specific policies requiring an assessment of the engagement partner's competencies in the circumstances. In light of the high degree of risk associated with the Miller Energy engagement and the unusual bargain purchase transaction in the prior year, KPMG should not have assigned a partner-in-charge who had no experience auditing companies in the oil and gas industry. Under these circumstances, the assignment of valuation specialists (whose scope and objectives were defined by the engagement partner) and a senior manager, all of whom had significant oil and gas experience, did not adequately mitigate KPMG's failure to assign a partner-in-charge with sufficient knowledge of the oil and gas industry. Many of the departures from PCAOB auditing standards listed below occurred in part because Riordan lacked the industry-specific knowledge to spot potential problems and meaningfully review the work of his assistants.

### *KPMG and Riordan Failed to Obtain Sufficient Competent Evidence to Assess the Impact of the Opening Balance of the Alaska Assets on Miller Energy's Current Year Financial Statements*

25.     As part of their audit procedures relating to Miller Energy's fiscal 2011 financial statements, KPMG and Riordan were required under AU § 315, *Communications Between Predecessor and Successor Auditors*, to obtain sufficient competent evidential matter to afford a reasonable basis for expressing an opinion on the financial statements the auditor was engaged to audit, including evaluating the consistency of the application of accounting principles. This includes obtaining audit evidence to analyze the impact of the opening balances on the current-year financial statements and could include applying procedures to transactions in prior periods. AU § 315.12. An auditor's review of its predecessor's workpapers may affect the nature, timing, and extent of procedures with respect to the opening balances. AU § 315.13.

26.     In regard to the fiscal 2011 audit and 3Q2011 review, KPMG and Riordan determined that there had been no reportable disagreements between the prior auditors and Miller Energy, and that the prior auditors did not resign or decline to stand for re-election. Nonetheless, KPMG and Riordan concluded that the predecessor auditor did not document sufficient audit procedures or evidence obtained relating to the valuation of the Alaska Assets. But the

7

deficiencies in the predecessor auditor's work identified by KPMG and Riordan were not documented in KPMG's own workpapers. Due to the lack of documented procedures by the predecessor auditor, KPMG and Riordan performed additional audit and review procedures in an attempt to obtain sufficient competent evidence regarding the impact of the opening balances on the current period's financial statements. *See* AU § 315.12. As discussed below, however, these additional procedures were insufficient to properly assess the potential impact of the Alaska Assets' opening balances on the current-year financial statements.

27.     At the outset of the 3Q2011 review, Riordan reviewed the reserve report and sought assistance from KPMG's internal valuation specialists, Economic and Valuation Services ("EVS"), in connection with the core engagement team's review and audit procedures over the fair value of the Alaska Assets.[4] Specifically, KPMG and Riordan tasked EVS with performing certain limited procedures relating to the Alaska Assets. As detailed below, the procedures performed by EVS mainly consisted of (1) evaluating three assumptions in the reserve report and developing its own oil and gas property valuation estimate using substitute inputs for those three assumptions and (2) reviewing the replacement costs Miller Energy used to fair value certain fixed assets. Most of the audit procedures relating to the fair value of the Alaska Assets occurred during, and were performed concurrently with, the 3Q2011 review. Accordingly, the results of those procedures were relied on in connection with both the third quarter review and the 2011 audit.

28.     As explained below, however, the additional procedures performed by the KPMG engagement team, including the work done by EVS, failed to result in sufficient competent evidence to support the value of the Alaska Assets. These failures included (i) not appropriately assessing whether Miller Energy's fair value estimate conformed with GAAP and (ii) insufficiently examining the appropriateness of the assumptions on which Miller Energy's valuation was based.

### *KPMG and Riordan Failed Adequately to Assess Whether Miller Energy's Valuation of the Alaska Assets Conformed with GAAP*

29.     KPMG and Riordan failed to obtain sufficient competent audit evidence to provide reasonable assurance that Miller Energy's fair value measurements and disclosures relating to the Alaska Assets were in conformity with GAAP. *See* AU § 328.03, *Auditing Fair Value Measurements and Disclosures*. KPMG and Riordan also failed to obtain sufficient competent evidential matter to provide reasonable assurance that management's accounting estimates were reasonable in the circumstances. *See* AU § 342.07, *Auditing Accounting Estimates*.

30.     ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC 820 establishes a fair value hierarchy that distinguishes between observable inputs, *i.e.,* those inputs that reflect the assumptions market participants would use in pricing the asset or liability based on market data obtained from sources independent of the reporting entity, and unobservable inputs, *i.e.,* inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the

---

[4] Because KPMG's engagement team technically included the EVS staff, for clarity, the non-EVS members of the engagement team, including Riordan, who were responsible for conducting the overall audit are hereafter referred to as the "core engagement team."

best information available in the circumstances. Under ASC 820, the use of unobservable inputs should be minimized in favor of observable inputs whenever possible.

31.     As part of its procedures to obtain sufficient competent evidence to assess the impact of the opening balance of the Alaska Assets on the current period's financial statements, KPMG was required to review and understand how Miller Energy estimated the fair value that was ultimately recorded in its financial statements. AU § 342, provides that, "[i]n evaluating reasonableness, the auditor should obtain an understanding of how management developed the estimate." AU § 342.10; *see also* AU § 328.09 ("The auditor should obtain an understanding of the entity's process for determining fair value measurements . . . ."). Similarly, KPMG's policies required its engagement teams to "obtain an understanding" of "the requirements of the applicable financial reporting framework relevant to accounting estimates" and "how management makes the accounting estimates, and an understanding of the data on which they are based . . . ."

32.     KPMG and Riordan failed to obtain a sufficient understanding of the company's fair value measurement and to appropriately consider observable inputs relating to Miller Energy's acquisition of the Alaska Assets as part of their procedures relating to the impact of the opening balances. Although the prior owner sold the Alaska Assets while in bankruptcy, there were several facts suggesting that the sale price and history should have been considered in determining the fair value of those assets. These facts included the extensive but ultimately unsuccessful marketing efforts (which occurred during part of a roughly year-long period when the assets were made available for sale), the subsequent and ultimately unsuccessful purchase offers for the assets (each of which was for less than $10 million), the bankruptcy court-approved abandonment of the assets (which relieved the prior owner of substantially all financial obligations for the assets), and Miller Energy's acquisition of the Alaska Assets in a competitive auction for a fraction of Miller Energy's recorded value. All of these facts were readily ascertainable from the publicly available bankruptcy records of the prior owner of the Alaska Assets.

33.     If they had reviewed those records, KPMG and Riordan would have learned that their understanding of the facts leading to the acquisition was inaccurate. KPMG and Riordan wrongly believed that the low purchase price seemed reasonable because Miller Energy had succeeded in negotiating the segregation of more valuable assets from less desirable ones and that, during the auction, the bankruptcy court disqualified other bidders for colluding with each other, making Miller Energy the only party bidding on the assets. In addition, a review of the bankruptcy records also would have revealed evidence, such as the facts set forth in paragraph 32, contrary to the company's nearly half-billion-dollar asset valuation.

34.     KPMG and Riordan also failed to appropriately assess the unobservable inputs – specifically, the assumptions underlying the reserve report and the insurance report – which Miller Energy used in its estimation of the fair value of the Alaska Assets. KPMG and Riordan recognized that the two reports the company used to support its fair value determination for the Alaska Assets were not appropriate for ascertaining fair value. With respect to the reserve report, Riordan knew at the time that using the assumptions in the reserve report for fair value purposes was inappropriate. And, regarding the insurance report, Riordan further knew at the time that KPMG did not consider the insurance broker an expert. He believed that the insurance report was a starting point that EVS used when it came up with its own independent estimates of the value based on their experience and understanding of the specific equipment.

9

35. Despite Riordan's awareness that the insurance broker was not an expert, KPMG's workpapers refer to the insurance broker as "a third party valuation specialist" that "performed the appraisal of the fixed assets." Other workpapers also list the insurance broker among the "specialists" whose work KPMG used as audit evidence and note that "EVS concluded that the methodologies used and conclusions reached by [the insurance broker] were reasonable." KPMG and Riordan, however, had no information – other than the client's representations – about the insurance broker's methodology. The insurance report Miller Energy used for the fixed assets contained no description of any methodology, and KPMG never contacted the insurance broker to ascertain its supposed methodology.

36. Under these circumstances, where management used as fair value numbers from reports that were known by KPMG and Riordan to have been prepared for other purposes, KPMG and Riordan were unreasonable in applying certain limited procedures to Miller Energy's fair value estimate and then issuing an unqualified opinion on the company's financial statements based on those procedures.

## KPMG and Riordan Did Not Obtain Sufficient Competent Evidence Regarding the Assumptions on Which Miller Energy's Valuation of the Alaska Assets Was Based

37. In an effort to evaluate whether the valuation of the Alaska Assets was misstated such that it could materially impact the fiscal 2011 financial statements, the core engagement team, during their 3Q2011 review work, gave EVS the reserve report that was used in the company's prior-year valuation and requested assistance in testing Miller Energy's recorded fair value for the Alaska Assets. In doing so, the core engagement team asked EVS to formulate an estimated range of values. According to PCAOB standards, when developing its own estimate, the auditor at a minimum is required to understand the client's assumptions and to determine whether the data on which the fair value measurement is based is accurate, complete, and relevant. *See* AU § 328.40. As set forth below, KPMG's procedures failed to comply with professional standards.

### *The Oil and Gas Reserves*

38. As described in paragraph 13, *supra*, in fiscal 2010, Miller Energy improperly recorded $368 million as the fair value of the oil and gas reserves. The $368 million value was taken directly from a reserve report that was prepared by a third-party petroleum engineer firm using the guidelines for supplemental oil and gas disclosures. The reserve report expressly stated that it did not contain an opinion of fair value. Although this reserve report was created by a third-party engineer firm, it incorporated assumptions provided by the company.

39. EVS did not consider all of the significant assumptions Miller Energy used in the reserve report. In the memo memorializing its work, EVS stated that an evaluation of oil and gas properties using the income approach consists of twelve inputs, including, among other things, the production forecast, future oil and gas prices, lease operating expenses, SG&A expenses, taxes, capital expenditures, the discount rate, and risk weightings. As part of its procedures, EVS considered only three of the company's assumptions for these inputs (the discount rate, risk weightings, and future oil prices). In doing so, EVS found that each of the three assumptions was erroneous and inappropriate for fair value purposes. Specifically, the reserve report used a 10% discount rate that KPMG concluded was inappropriate under the circumstances for fair value. And

10

the reserve report failed to apply any risk weighting to even the most speculative categories of reserves, which was also improper for fair value purposes. Finally, the reserve report failed to appropriately estimate future oil prices and instead used a flat price in all years of approximately $61 per barrel.

40.     Under the circumstances, including that the reserve report was prepared using a method that was not intended to estimate fair value, the conclusion that all three of the assumptions under consideration were unreliable should have led KPMG and Riordan to request additional support from management regarding the appropriateness of Miller Energy's valuation, particularly since their procedures left other significant assumptions unevaluated. Instead, at the core engagement team's request, EVS created an estimated range of possible fair values, using its own assumptions for some of the inputs, to assess whether Miller Energy's overall fair value number was reasonable.

41.     EVS's analysis did not result in sufficient competent evidential matter for the fair value of the Alaska Assets. To test the reasonableness of the company's fair value number, EVS used a spreadsheet software-based discounted cash flow template, which was populated mostly with the assumptions used in the non-fair value reserve report. EVS substituted its own assumptions for Miller Energy's discount rate and future oil prices assumptions in the reserve report. EVS also risk weighted the reserves – a step the company's reserve report omitted. Using substitute assumptions for these three inputs (which included more appropriate forecasted oil prices that were significantly higher than those used by Miller Energy), but keeping Miller Energy's other assumptions materially unchanged, EVS eventually estimated that a reasonable range of value for the oil and gas reserves was between $331 million and $375 million. Although the results of this analysis appeared to support Miller Energy's fair value measurement, EVS's substitute assumptions were themselves flawed and insufficiently substantiated.

42.     KPMG and Riordan improperly accepted EVS's substitute assumptions without adequately reviewing the reasonableness of those assumptions. In some cases, the substitute assumptions were not appropriate. For example, in lieu of the reserve report's 10% discount rate, EVS conducted multiple analyses using discount rates as low as 12% and as high as 17%. Ultimately, just prior to the issuance of the 3Q2011 Form 10-Q, EVS changed its discount rate range to 12% to 15% from 14% to 17%. The basis for the range used was not adequately reviewed or documented by KPMG and Riordan. Had the discount rate not been lowered, keeping everything else constant, EVS's analysis would have indicated that the $368 million number was overstated by as much as 15%.

43.     Additionally, KPMG and Riordan did not take appropriate steps to address specific indications that the company's valuation might be overstated due to Miller Energy's use in the reserve report of underestimated future operating and capital costs. On March 9, 2011, EVS informed the core engagement team that portions of its own valuation estimate, which EVS was using to test the reliability of the client's valuation, appeared anomalously high on a per barrel basis. EVS indicated that the high values it observed could have been the result of the forecasted expenses Miller Energy used for the proved undeveloped ("PUD"), probable, and possible reserves. EVS asked the core engagement team to review the forecasted expenses, as well as the financial forecast used in the discounted cash flow to determine whether it was overly optimistic. EVS reiterated its concerns to the core engagement team again on March 10, stating that the value

11

numbers for "[t]he PUDs, probable and possible" reserves "are so high, it does not make sense . . . ." On several occasions, EVS emphasized that it was relying on the core engagement team to assess the reasonableness of the forecasted expenses. Nevertheless, insufficient procedures were undertaken to assess the reliability of the forecast and estimated expenses used by Miller Energy to value the Alaska Assets.

44.     There were, however, audit procedures that should have been done to assess the reasonableness of the forecasted expenses. For example, KPMG and Riordan were required to test the data used to develop the fair value measurement and evaluate whether the data on which the fair value measurement was based, including the data used in the work of a specialist, was accurate, complete, and relevant. *See* AU § 328.39. Had the engagement team performed additional procedures on the cost estimates provided to the engineer firm, they could have identified contrary evidence indicating that the forecasted costs were unreasonably low. For instance, Miller Energy had in its possession historical expense data from the former owner. Had the core engagement team obtained and reviewed the available historical expense data, KPMG and Riordan could have discovered that the forecasted costs reflected in the reserve report were substantially lower than the historical expense data.

45.     Likewise, had KPMG and Riordan compared the expense estimates used in the valuation to corresponding estimates created approximately one year later for use in the fiscal 2011 supplemental oil and gas disclosures, it would have been apparent that the capital expenditures for some of the same wells had increased by roughly $100 million. KPMG and Riordan did not adequately identify or inquire about the reasons for this substantial increase. Had the substantial increase in costs been identified, KPMG and Riordan would have discovered that it resulted mainly from increased drill cost estimates for a number of wells (from $4.6 million to over $12 million each). Further inquiry likely would have led the core engagement team to discover that the higher estimated capital costs used in the 2011 supplemental oil and gas disclosures were consistent with historic data for the property and Miller Energy's internal expense estimates dating back to 2009.

46.     KPMG and Riordan could have considered other identifiable indications that the forecasted costs in the company's valuation were understated. For example, Miller Energy's 2011 Form 10-K stated that in 2009 the company informed the State of Alaska that it would cost $31 million to restart production in one of the Alaska Assets' two principal fields – an estimate that it internally increased in 2011 to $45 million. However, the original $31 million cost estimate was nearly double the amount of restart costs ($16.8 million) in the reserve report used for the valuation.

47.     In connection with other audit procedures, the engagement team had obtained a 2011 budget containing management's forecast for the next several years. Had KPMG and Riordan compared the forecasted costs in that budget to the forecasted costs in the February 2010 reserve report that was used to fair value the Alaska Assets, they could have discovered that the budget assumed significantly higher capital expenditures and significantly lower production numbers than those set forth in the reserve report.

48.     The documentation of KPMG's procedures on the valuation of the Alaska Assets failed to accurately describe aspects of the company's valuation and to clearly state EVS's findings. While KPMG personnel have acknowledged the unreasonableness of Miller Energy's

12

pricing, risk weighting, and discount rate assumptions, these conclusions are not clearly documented in the only memo memorializing EVS's procedures (the "EVS Memo"). Quite the contrary, the EVS Memo implies that Miller Energy's assumptions were reasonable and, on several occasions, does not accurately reflect the facts KPMG uncovered. For example, the EVS Memo contains a table purporting to compare the reserve adjustment factors used by EVS against the reserve adjustment factors used by company management to fair value the oil and gas reserves. Miller Energy, however, applied no reserve adjustment factors when calculating its $368 million fair value estimate. During the 3Q2011 review, Miller Energy's management informed KPMG that, in other contexts, it used certain reserve adjustment factors, and the engagement team incorporated these numbers into a draft of the EVS Memo. Although the engagement team eventually discovered during the 3Q2011 review that management never risk weighted the reserves, none of the engagement team members who reviewed the EVS Memo, including Riordan, identified that the final EVS Memo continued to incorrectly state that management had applied certain reserve adjustment factors in its fair value estimate.

49.     The only procedure documented in the workpapers, other than the work of EVS, was performed in connection with Miller Energy's 2011 supplemental oil and gas disclosures (*see* note 3, *supra*). Near the end of the 2011 audit, the core engagement team made an inquiry to the third-party petroleum engineer firm, which authored Miller Energy's reserve reports at that time, about the forecasted costs used by the company in its 2011 supplemental oil and gas disclosures. In response to this inquiry, an employee of the engineer firm informed the core engagement team that his firm had sufficient cost data to prepare the 2011 reserve report that was used as support for the company's supplemental disclosures that year. But the cost data used in the 2011 reserve report was provided by Miller Energy to the engineer firm after the completion of the reserve report used to value the assets. In February 2010, when it prepared the reserve report used for the valuation of the Alaska Assets, the engineer firm was provided with virtually no data to support the cost numbers. Furthermore, the cost estimates used in the later 2011 reserve report differed in material respects from the cost estimates used in the earlier, February 2010 reserve report. In any event, inquiry alone was not a sufficient method to test the data on which the fair value measurement was based, especially since the core engagement team did not take any additional steps to evaluate whether the data included in the February 2010 reserve report, which was used to value the Alaska Assets' oil and gas reserves, was accurate, complete, and relevant.

*The Fixed Assets*

50.     KPMG and Riordan failed to take reasonable steps to assess Miller Energy's recorded value of $110 million for certain fixed assets included in the Alaska acquisition. These fixed assets were the same operating assets that were expected to generate the future cash flows used to measure the value of the oil and gas reserves. In fact, the reserve report Miller Energy used for the valuation recognized the interconnectedness of the properties, as it listed the facilities and the offshore platform as assets used to generate the future cash flows. Because the fixed assets were integral to the operations of the acquired properties and the generation of cash flows, their values were already reflected in the reserve report's cash flows. Under these circumstances, including a separate value for the fixed assets, without any corresponding contributory asset charge to the forecasted cash flows, resulted in improperly counting all or substantially all of the value of the fixed assets twice.

13

51.     KPMG and Riordan agreed with Miller Energy's accounting treatment for the fixed assets without performing sufficient procedures to obtain the necessary evidence to properly assess the reasonableness of that accounting treatment. Although EVS was aware of potential double-counting and made inquiries of the core engagement team about the relationship between the fixed assets and the reserve report's cash flows, the discussion and the resolution of this issue were not documented in KPMG's workpapers.

52.     There was also insufficient competent evidence to support the $110 million valuation of the fixed assets. Despite workpapers that state the opposite, KPMG and Riordan knew that the insurance broker was not a valuation specialist and that the insurance report was not sufficient evidential matter to support the value of the fixed assets (*see, supra*, paragraph 34).

53.     To corroborate the $110 million number listed in the insurance report, Miller Energy, at KPMG's request, created a second estimate in 2011, without the assistance of any valuation professionals. In preparing this analysis, Miller Energy adjusted its original estimates of the replacement costs for the various fixed assets – increasing the values for some assets and reducing the value of others – and made further adjustments to these replacement costs for depreciation and for functional obsolescence. KPMG and Riordan accepted the new replacement cost values from this analysis as reasonable without obtaining adequate corroboration, and they did so even though the values were based on management's own internal cost estimates and included miles of additional pipelines (representing a 175% increase in pipeline mileage from the original report). Based mostly on this additional analysis, EVS determined that the overall replacement cost estimate in the insurance report was a "reasonable proxy" for fair value.

54.     In addition, KPMG's analysis of the fixed asset valuation was flawed because of the circumstances surrounding the assets themselves. Due to their remote and desolate location, a willing buyer and seller would not have agreed on replacement cost as the price for these assets. This was particularly true of the underground pipelines that connected various oil production facilities, which – in order to value them separately – KPMG deemed as surplus assets that were not needed to generate the cash flows in the reserve report. Using management's new numbers, EVS estimated that replacing the pipelines on the properties would cost up to $46 million (or almost half the supposed value of the fixed assets). But it was highly unlikely that any market participant would pay $46 million for pipelines that were assumed to be extraneous to the production of oil and gas from the nearby fields.

### *Lack of Planning, Supervision, Due Care, and Professional Skepticism*

55.     In connection with the procedures on the Alaska Assets, KPMG and Riordan failed to exercise due care and to plan and reasonably supervise the work of the core engagement team and EVS.

56.     Specifically, KPMG and Riordan failed to adequately plan the work relating to the Alaska Assets, including the work to be performed by EVS and the core engagement team's review of EVS's conclusions. By way of example, prior to EVS beginning its testwork, KPMG and Riordan gave insufficient consideration to the nature and scope of the specialists' work, as well as the extent of the specialists' involvement. This was contrary to KPMG policies requiring the effective delineation of the responsibilities between the core engagement team and the KPMG specialists. There was no agreement at the onset of the valuation testwork concerning who was

specifically responsible for the significant assumptions in Miller Energy's valuation. In addition, on several important issues, such as the consideration of observable inputs and the accounting treatment for the fixed assets, there was no agreement regarding the respective roles and responsibilities of EVS and the core engagement team.

57.     Once the valuation testwork had begun, KPMG and Riordan failed to properly supervise EVS and its work. For example, the core engagement team did not sufficiently evaluate EVS's substitute assumptions (*see, supra*, paragraph 42).

58.     KPMG and Riordan also failed to exercise due professional care in connection with the procedures performed on the Alaska Assets. Due professional care requires an auditor to exercise professional skepticism − *i.e.*, an attitude that includes a questioning mind and critical assessment of audit evidence. *See* AU § 230.07, *Due Professional Care in the Performance of Work*. Due professional care also requires the auditor to consider the competency and sufficiency of the evidence. *See* AU § 230.08.

59.     With respect to the fair value of the Alaska Assets, KPMG and Riordan failed adequately to evaluate the estimates in the reserve report given the high valuation in light of the nominal purchase price and the lack of oil and gas experience possessed by Miller Energy's CEO and CFO, as well as the material weakness identified by KPMG and Riordan in connection with the inadequacy of the company's accounting personnel. Miller Energy was run by a CEO with a background in commercial real estate and with little to no previous industry, corporate or executive experience. It also possessed a limited accounting staff led by a CFO with no prior industry experience. In regard to the CFO, who was the person responsible for recording the Alaska Assets' valuation, KPMG's workpapers state: He "does not appear to have adequate knowledge and experience in the oil and gas industry to facilitate the completeness and accuracy of industry specific accounting and required financial statement presentation and disclosure . . . ." Based on Riordan's recommendation, the CFO was replaced shortly after the issuance of KPMG's audit report on Miller Energy's fiscal 2011 financial statements.

60.     KPMG and Riordan also failed to appropriately address the fact that management based its fair value estimate on two reports that they knew were inappropriate for that purpose. Under the circumstances, including EVS's stated concerns about the reserve report's forecast and expenses, it should have been apparent to the core engagement team that additional procedures were needed in order to obtain sufficient competent evidence for the valuation of the Alaska Assets.

61.     KPMG and Riordan further failed to exercise due care and professional skepticism following the discovery of the insurance report used to support the $110 million worth of fixed assets. At first, EVS was tasked with assessing only whether the reserve report supported the $480 million valuation. Using a pre-existing template, EVS created an estimate by using mostly the company's inputs from the reserve report and by substituting its own assumptions for the discount rate, future oil prices, and reserve adjustment factors. EVS's initial estimate, which assumed significantly higher oil prices than Miller Energy, was approximately $200 million. However, due to a flawed understanding of Miller Energy's valuation, EVS removed from its analysis the reserve adjustments − *i.e.*, risk weightings − it had applied in that initial calculation, which caused the high-end of its estimate to increase to over $500 million.

15

62.     Approximately two weeks into EVS's procedures and one week prior to the third quarter filing deadline (and after Riordan had informed Miller Energy's audit committee that EVS's work was almost complete and KPMG did not anticipate restatement of the valuation of the Alaska Assets), KPMG, Riordan, and the rest of the engagement team discovered that management had used an insurance report to value the fixed assets. At the time, again due in part to a flawed understanding of management's valuation, EVS's value range based on the reserve report alone appeared to suggest a value of $469 million to $531 million for the Alaska Assets, which roughly approximated Miller Energy's overall $480 million valuation. Thus, when the insurance report surfaced, KPMG and Riordan became concerned that Miller Energy's estimate may have been *understated* due to the additional $110 million value reflected in the insurance report.

63.     As a result, Riordan sent EVS an email telling them that KPMG had already informed the company's audit committee that the firm did not anticipate restatement of the valuation, which meant that the valuation of the Alaska Assets did not need to be included among the financial restatement items that KPMG had identified and that the company had been working "feverishly" to complete. Two days after Riordan's email to EVS, KPMG and Riordan discovered that the company's valuation did not include any reserve adjustment factors. KPMG and Riordan had received inconsistent representations from management regarding whether or not the values set forth in the reserve report incorporated reserve adjustment factors. KPMG and Riordan failed to adequately inquire about the reasons for Miller Energy having provided them with inconsistent information. Instead, EVS reapplied risk weightings to its model. EVS then made several additional changes to its valuation model, the rationale for which was not properly documented. Due to these changes, EVS's final estimated range appeared to support the company's fair value measurement for the Alaska Assets.

64.     KPMG and Riordan also failed to exercise due care and professional skepticism in connection with the valuation of the fixed assets. During the week-long period between the discovery of the insurance report and the 3Q2011 filing deadline, KPMG and Riordan did not exercise appropriate due care and professional skepticism when they failed to perform sufficient additional inquiries and other procedures relating to the fair value of the fixed assets and to detect that Miller Energy double counted the value of the fixed assets (*see*, *supra*, paragraphs 50 to 54). These departures from due care and professional skepticism also included failing to reasonably investigate the lack of an engagement letter for the insurance report. The core engagement team asked management for the engagement letter setting forth the terms of the insurance broker's supposed valuation work. In response, the core engagement team was told that no such letter could be located. The core engagement team did not pursue the engagement letter further. Had they done so, KPMG and the core engagement team could have learned that the insurance broker undertook no valuation work for Miller Energy.

65.     KPMG and Riordan discounted, and did not sufficiently consider, information that came to light shortly before KPMG issued its audit report on Miller Energy's fiscal 2011 financial statements.

66.     On July 28, 2011, *TheStreetSweeper*, a financial blog dedicated to "exposing corporate fraud," published a lengthy article that was extremely negative about Miller Energy and challenged the recorded valuation of the Alaska Assets. The article provided Web-based links to

16

numerous bankruptcy court records and other public sources for its assertions questioning the valuation of the Alaska Assets. Riordan, the core engagement team, and a member of KPMG management became aware of *TheStreetSweeper* article on the day it was published.

67.     KPMG and Riordan failed to take reasonable steps to assess the allegations set forth in *TheStreetSweeper* article and to consider them in light of their review and audit procedures on the Alaska Assets.

68.     In late July 2011, on the day after *TheStreetSweeper* article was published, Miller Energy's then-CEO caused the company to file with the Commission a Form 10-K that included KPMG's audit report containing an unqualified opinion on the company's financial statements. The filing, however, occurred prior to Miller Energy having obtained KPMG's consent to file and before KPMG had finished its audit. After an internal investigation by outside counsel representing the audit committee, KPMG concurred with the audit committee's assessment that the premature and illegal filing had resulted from a miscommunication among company personnel.

69.     In August 2011, before KPMG issued its audit report, Miller Energy received a subpoena from the Commission's Division of Enforcement (the "Division") seeking information relating in part to the purchase and valuation of the Alaska Assets. Per KPMG policy, Riordan discussed the formal investigation with regional KPMG management and with national office personnel in the Department of Professional Practice ("DPP") and in the general counsel's office. As part of this consultation, DPP became aware of the allegations in *TheStreetSweeper* article. KPMG, including senior personnel in its national office, did not view the Division's investigation into the valuation of the Alaska Assets as requiring additional audit consideration largely because Riordan represented that it had applied "certain audit procedures" to the Alaska valuation and because it believed the staff's investigation stemmed from *TheStreetSweeper* "hit job." While Riordan sought direction from KPMG's national office, the national office failed to make sufficient inquiries of the engagement team and to provide the engagement team with sufficient guidance in light of the Division's investigation and the information in *TheStreetSweeper* article. KPMG and Riordan only made inquiries of certain company insiders and affiliates, including outside counsel representing Miller Energy in the Division's investigation, and never revisited its valuation procedures.

### KPMG's National Office Involvement in the Audit

70.     KPMG management and national office personnel in DPP had considerable involvement in certain aspects of the Miller Energy engagement, both at the start of the engagement (with firm management's appointment of Riordan and acceptance of the company as a client) as well as during the summer of 2011 when multiple consultations substantially overlapped. One of these consultations involved restatements of prior-year financial statements unrelated to the Alaska Assets valuation. KPMG policies required DPP to expand its review beyond the possible restatement items and to consider "all significant issues."

71.     KPMG policies also provided that, "[o]nce an inquiry is initiated, DPP involvement is not necessarily limited to the narrow, specific question and fact set. Depending on the circumstances, area of consultation, and other factors, additional questions may be asked to fully understand the inquiry and to ensure that the issue is appropriately framed and scoped." According to this policy, the DPP "deliberation process is designed to assist the engagement team and to

17

improve the consultation process and our adherence to professional standards." Contrary to these policies, DPP's inquiries were insufficient to elicit the information known to the engagement team, including EVS's concerns about the expenses and the fact that the company relied on two reports that were not prepared in accordance with ASC 820.

72. The memo memorializing the consultation with DPP on the restatement states that the consultation "centered on" a materiality assessment regarding the identified errors, and it does not mention any other significant matters. DPP's decision not to inquire further about the valuation of the Alaska Assets was unreasonable in light of the circumstances. In addition to the restatement issue, DPP was simultaneously consulted about comment letters from the Commission's Division of Corporation Finance (portions of which involved the Alaska Assets valuation), the prematurely filed Form 10-K and the resulting internal investigation, and the formal investigation by the Division inquiring primarily about the valuation of the Alaska Assets. Through these consultations, DPP became familiar with the company and the "transformational" nature of the Alaska acquisition. It also became aware of the allegations made in the highly negative online article by *TheStreetSweeper*. Its knowledge of the unusual "bargain purchase" for the Alaska acquisition, as well as the Division's formal investigation and the allegations in *TheStreetSweeper* article, should have resulted in DPP making further inquiries about the company's fair value assessment of the Alaska Assets and KPMG's procedures for that valuation.

73. Had DPP made such inquiries, it could have discovered certain information that cast significant doubt about the reliability of Miller Energy's previously filed financial statements. This information included that the KPMG auditors were aware of the deficiencies in the predecessor auditor's work concerning the portion of the audit relating to the Alaska Assets valuation and that neither of the reports provided to KPMG satisfied the requirements for fair value under ASC 820. Through further inquiry, DPP could also have identified that the use of a separate insurance report to value the fixed assets raised the possibility that the value of the fixed assets had been double-counted and that the forecasted expenses in the reserve report used for the valuation were low. This information should have prompted KPMG to consider whether its procedures were sufficient in the circumstances.

## VIOLATIONS

### *Rule 102(e) and Section 4C of the Exchange Act*

74. KPMG's 2011 audit and 2011 third quarter review were deficient and not performed in accordance with PCAOB standards.[5] Section 4C(b) of the Exchange Act and Rule 102(e)(1)(iv) define improper professional conduct with respect to persons licensed to practice as accountants as (1) a single instance of highly unreasonable conduct in circumstances for which heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct that indicate a lack of competence to practice before the Commission.

75. As a result of the conduct described above, KPMG and Riordan engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice. Section 4C(a)(2) of the Exchange Act

---

[5] References to auditing standards in this Order are to PCAOB standards in effect at the time the audit and review work was performed.

Case 3:16-cv-00121-TAV-DCP   Document 67-1   Filed 10/20/17   Page 19 of 32   PageID #: 5934

and Rule 102(e)(1)(ii) provide, in pertinent part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in improper professional conduct.

76.     As set forth above, KPMG and Riordan should have known that Miller Energy's financial statements were not in accordance with GAAP. They knew that the two reports the company relied on to substantiate the fair value of the Alaska Assets were not fair value estimates that were appropriate for financial reporting purposes. They should have known that the inclusion of the numbers in the insurance report double counted as much as $110 million worth of the fixed assets. Moreover, throughout the 3Q2011 review and fiscal 2011 audit, KPMG and Riordan were aware of the company's inadequate accounting staff, ineffectual internal controls, and management's possible incentive to overstate the value of the Alaska Assets. During the review and audit, they should have been aware of the understated forecasted costs in the reserve report. Yet KPMG and Riordan failed to take reasonable steps to determine that the company's valuation for its Alaska acquisition was properly recorded pursuant to applicable GAAP.

### Failure to Properly Plan the Audit (AU §§ 311 and 312)

77.     In planning the audit, PCAOB standards state that an auditor should consider the nature, extent and timing of work to be performed in planning the audit and should prepare a written audit program which sets forth in reasonable detail the audit procedures necessary to accomplish the audit objectives. AU § 311.05. Auditors must also consider audit risk and materiality in planning the audit and designing audit procedures. AU § 312.12. In doing so, they should plan the audit so that audit risk will be limited to a low level appropriate for expressing an opinion on the financial statements. AU § 312.13. Auditors are also required to consider identified significant risks of material misstatement of the financial statements in: (1) determining the nature, timing or extent of procedures; (2) assigning staff; or (3) requiring appropriate levels of supervision. AU § 312.17.

78.     As a result of the conduct described above, KPMG and Riordan failed to adequately plan the audit of Miller Energy's fiscal 2011 financial statements in accordance with professional standards.

### Failure to Exercise Due Professional Care
### and Professional Skepticism (AU §§ 230, 316 and 722)

79.     PCAOB standards require auditors to exercise due professional care in the planning and performance of the audit and the preparation of the report. AU § 230.01. Auditors are required to maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." AU § 230.07. In addition, the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process." AU § 230.08. In exercising professional skepticism, an auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. AU §§ 230.09 and 316.13. Further, auditors should: (1) perform an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred; and (2) conduct the engagement with a mindset that recognizes that a material misstatement due to fraud could be present, regardless of past experience with the entity and the auditors' belief about

19

management's honesty and integrity. AU § 316.13. Auditors should also exercise due professional care and professional skepticism in the course of reviews of interim financial information. AU § 722.01 (noting that the three general standards discussed in AU § 150 apply to interim reviews); *see also* AU § 150.02.

80.    As a result of the conduct described above, KPMG and Riordan failed to exercise due professional care and an attitude of professional skepticism in its 3Q2011 review and 2011 audit of Miller Energy.

### *Failure to Properly Test Fair Value Measurements and Disclosures and Using the Work of a Specialist (AU §§ 328, 342 and 336)*

81.    AU § 328 requires auditors to obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. AU § 328.03. The standard provides that "[t]he auditor should test the data used to develop the fair value measurements and disclosures and evaluate whether the fair value measurements have been properly determined from such data and management's assumptions." This includes "whether the data on which the fair value measurements are based, including the data used in the work of a specialist, is accurate, complete and relevant . . . ." AU § 328.39. In addition, "[t]he auditor should evaluate the sufficiency and competence of the audit evidence obtained from auditing fair value measurements and disclosures as well as the consistency of that evidence with other audit evidence obtained and evaluated during the audit." AU § 328.47; *see also* AU § 342.07 (the auditor's objective is, *inter alia,* to obtain sufficient competent evidential matter to provide reasonable assurance the accounting estimates are presented in conformity with applicable accounting principles). If a valuation model is used, the auditor reviews the model and evaluates whether the assumptions used are reasonable. AU § 328.40.

82.    In addition, AU § 336 provides guidance to auditors when they seek to use the work of a specialist as evidential matter to support financial statement assertions. Among other items, the standard requires the auditor to evaluate the professional qualifications of the specialist to determine that he or she possesses the necessary skill and knowledge in the type of work under consideration. *See* AU § 336.08. It also provides that the auditor should obtain an understanding of the nature, scope, and objectives of the work performed by the specialist, including the appropriateness of using the specialist's work for the intended purpose. *See* AU § 336.09. In addition, AU § 336.12 states that an auditor should evaluate the appropriateness and reasonableness of the specialist's methods and assumptions by: (a) obtaining an understanding of those methods and assumptions; (b) making appropriate tests of data provided to the specialist; and (c) evaluating whether the specialist's findings support the related assertions in the financial statements.

83.    As a result of the conduct described above, KPMG and Riordan failed to comply with these professional standards in connection with testing Miller Energy's fair value assertions for the Alaska Assets. KPMG and Riordan departed from AU § 328 by, among other things, failing to sufficiently evaluate the reasonableness of management's assumptions and by failing to test the reliability of the information used in the preparation of the reports used for valuing the properties. KPMG and Riordan also departed from AU § 336 by, among other things, failing to appropriately test the data provided to the specialists.

*Failure to Obtain Sufficient Competent Evidential Matter (AU §§ 315 and 326)*

84.     Under AU § 315.12, "[t]he successor auditor must obtain sufficient competent evidential matter to afford a reasonable basis for expressing an opinion on the financial statements he or she has been engaged to audit." Obtaining audit evidence to analyze the impact of the opening balances on the current-year financial statements may include applying appropriate auditing procedures to account balances at the beginning of the period under audit and to transactions in prior periods. *Id.* "Evidential matter" includes the underlying accounting data and all corroborating information available to the auditor. AU § 326.15. To be "competent," evidence must be both valid and relevant. AU § 326.21. For it to be "sufficient," the evidence must be "persuasive." AU § 326.22. In evaluating evidential matter, the auditor must consider whether the specific audit objectives have been achieved. AU § 326.25. In doing so, he or she makes an "unbiased" evaluation and considers "relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements." *Id.* If there is substantial doubt, the auditor must refrain from forming an opinion until additional evidential matter can be obtained to remove such doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. *Id.*

85.     As a result of the conduct described above, KPMG and Riordan failed to obtain sufficient competent evidence supporting the assertions in Miller Energy's fiscal 2011 financial statements concerning the fair value of the acquired Alaska Assets.

*Failure to Supervise the Engagement Team Properly (AU § 311)*

86.     PCAOB standards note that audit "assistants," including firm personnel other than the auditor with final responsibility for the audit, are to be "properly supervised." AU §§ 311.01. Those standards further require that assistants be informed of their responsibilities and the objectives of procedures assigned to them, and that the work of assistants be reviewed to determine whether that work was adequately performed. AU §§ 311.12 and 311.13.

87.     As a result of the conduct described above, KPMG and Riordan failed to properly supervise the engagement team in connection with its 2011 Miller Energy engagement.

*Failure to Prepare Required Documentation (AS 3)*

88.     PCAOB standards mandate that an auditor's documentation contain sufficient information to enable an experienced auditor, having no previous connection to the engagement to: (1) understand the nature, timing, extent and results of the procedures performed, evidence obtained and conclusions reached; and (2) determine who performed the work and the date such work was completed as well as the person who reviewed the work and the date of such review. AS 3.1, 3.6. Auditors are also required to document significant findings and issues, including the actions taken to address them and the basis for the conclusions reached. AS 3.12.

89.     As a result of the conduct described above, KPMG and Riordan failed to prepare and retain required audit documentation in sufficient detail to provide a clear understanding of its purpose, source, and conclusions reached in connection with its 2011 Miller Energy engagement.

*Failure to Issue an Accurate Audit Report (AU § 508)*

90.    Under AU § 508, an auditor may only express an unqualified opinion on historical financial statements when the auditor has formed such an opinion on the basis of an audit performed in accordance with PCAOB standards. AU § 508.07. Based upon the departures from PCAOB auditing standards discussed above, KPMG should not have issued an audit report containing an unqualified opinion on Miller Energy's fiscal year 2011 financial statements.

*Failure to Perform Adequate Personnel Management (QC 20 and 40)*

91.    PCAOB Quality Control Standards require an auditing firm to establish policies and procedures which provide the firm with reasonable assurance that work is assigned to personnel having the degree of technical training and proficiency required in the circumstances. *See* QC 20.13 and QC 40.02.

92.    These standards also require the firm to establish policies specifically designed to address the competencies of audit partners, including a requirement that practitioners-in-charge of an engagement possess an understanding of the industries in which their clients operate. *See* QC 40.08. When the client's business involves unique and complex accounting, as in the case of the oil and gas industry, the need for the engagement partner to understand the client's industry is even more important.[6]

93.    As a result of the conduct described above, KPMG failed to meet the standard that required the partner-in-charge to be competent and have the degree of technical training and proficiency required in the circumstances.

*Failure Related to Adequate Competency and Proficiency*
*(AU §§ 210 and 161, QC 20)*

94.    PCAOB standards require that the audit be performed by "a person or persons having adequate technical training and proficiency as an auditor." AU § 210.01. Likewise, PCAOB Quality Control standards require that "[p]olicies and procedures should be established to provide the firm with reasonable assurance that the work performed by engagement personnel meets applicable professional standards, regulatory requirements, and the firm's standards of quality." QC 20.17. Firm policies and procedures should also provide reasonable assurance that the policies and procedures established for the elements of quality controls described in the standard are "suitably designed and are being effectively applied." QC 20.20; *see also* AU § 161.

95.    As a result of the conduct described above, KPMG failed to meet the standard that required competency and proficiency in staffing the fiscal 2011 Miller Energy audit.

---

[6] The American Institute of Certified Public Accountants ("AICPA"), for example, has observed that the "[f]inancial accounting by entities with oil and gas producing activities is unique in many areas and consequently presents challenges for the auditor when determining whether the financial statements are presented in accordance with an applicable financial reporting framework." AICPA Auditing & Accounting Guide, *Entities with Oil and Gas Producing Activities*, at 8.03.

22

## FINDINGS

96.    As a result of the conduct described above, the Commission finds that Respondents engaged in improper professional conduct within the meaning of Sections 4C(a)(2) and 4C(b)(2) of the Exchange Act and Rules 102(e)(1)(ii) and 102(e)(1)(iv)(B) of the Commission's Rules of Practice. Respondents' conduct during the 2011 audit and 3Q2011 review of Miller Energy involved repeated instances of unreasonable conduct, each resulting in violations of PCAOB standards and indicating a lack of competence, and also satisfies the standard of highly unreasonable conduct resulting in violations of PCAOB standards in circumstances in which heightened scrutiny was warranted.

## RESPONDENTS CAUSED VIOLATIONS OF SECTION 13(a) OF THE EXCHANGE ACT AND RULES 13a-1 AND 13a-13 THEREUNDER

97.    Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require that every issuer of a security registered pursuant to Section 12 of the Exchange Act file with the Commission annual and quarterly reports (*i.e.*, Forms 10-K and 10-Q) as the Commission may require. The obligation to file such reports embodies the requirement that they be true and correct.

98.    As a result of the conduct described above, KPMG and Riordan caused Miller Energy's violations of Section 13(a) of the Exchange Act, and Rules 13a-1and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the Commission, among other things, annual and quarterly reports as the Commission may require.

## REMEDIAL EFFORTS

99.    In determining to accept its Offer, the Commission considered the remedial acts undertaken by KPMG.

## UNDERTAKINGS

KPMG has undertaken to complete the following actions:

100.    ***KPMG's Review***. Within 120 days after the entry of this Order, KPMG shall perform and complete a review and evaluation ("KPMG's Review") of the sufficiency and adequacy of KPMG's quality controls, including its policies and procedures for audits and interim reviews regarding the following (hereinafter referred to as "KPMG's Policies and Procedures"):

a) client acceptance and continuance practices, including client designation, retention, risk identification, and assessment of identified risk areas of such clients;

b) auditing fair value measurements and disclosures (as set forth in AS 2502) of non-financial assets, including, but not limited to:

   (i) considering the relevance, reliability, and sufficiency of the factors and data used in forming the assumptions underlying estimates;

23

<blockquote>
<blockquote>
(ii) evaluating the results of procedures performed, including whether the evidence obtained supports or contradicts the estimates included in the financial statements; and

(iii) considering and documenting estimates giving rise to significant risk and based on projected financial information;
</blockquote>

c) appropriate use of specialists employed or engaged by KPMG to perform risk assessments, plan or perform audit procedures, or evaluate audit results (as set forth in AS 2101 and AS 1201 or AS 1210, as applicable), including, but not limited to:

<blockquote>
(i) the coordination of relative responsibilities between auditors and specialists; and

(ii) effective supervision by engagement partners and managers of the employed specialists' work, including the evaluation of whether: (1) the work was performed and documented; (2) the objectives of the procedures were achieved; and (3) the results of the work support the conclusions reached (as set forth in AS 1201);
</blockquote>

d) appropriate use of specialists engaged or employed by management (as set forth in AS 1210);

e) consultations with local, regional or national office technical oversight professionals;

f) audit documentation of risk assessment procedures and responses, significant findings and resulting actions, work paper sign-off, and the work of specialists; and

g) obtaining reasonable assurance (as set forth in QC 20 and QC 40) that

<blockquote>
(i) the engagement partner and other individuals assisting the engagement partner in supervising the engagement possess the competencies that are necessary and appropriate in the individual circumstances; and

(ii) work is assigned to personnel having the degree of technical training and proficiency required in the circumstances.
</blockquote>
</blockquote>

KPMG's Review shall assess the forgoing areas to determine whether KPMG's Policies and Procedures relating to the subparts of this paragraph are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules.

101. ***KPMG Report***. Within 60 days of completing KPMG's Review, KPMG shall deliver to the Commission staff a detailed written report ("KPMG Report") summarizing its review and changes to KPMG's Policies and Procedures relating to the subparts of paragraph 100, if any, to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules. With respect to KPMG's Policies and Procedures, the KPMG Report shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The KPMG Report shall also contain a section consistent with paragraph 106, which requires KPMG to conduct an assessment

regarding the adequacy of certain aspects of its training program. The Commission staff may make reasonable requests for further evidence of compliance, and KPMG agrees to provide such evidence.

102. ***Independent Consultant's Review.*** KPMG has undertaken to retain, within 180 days after the entry of this Order, an independent consultant ("Independent Consultant"), not unacceptable to the Commission staff. KPMG shall provide to the Commission staff a copy of the engagement letter detailing the scope of the Independent Consultant's responsibilities. The Independent Consultant's compensation and expenses shall be borne exclusively by KPMG. KPMG shall deliver to the Independent Consultant the KPMG Report at the same time as KPMG provides such report to the Commission staff as specified in paragraph 101 above. KPMG shall require that the Independent Consultant perform a review (the "IC Review") of KPMG's Policies and Procedures to determine whether such policies and procedures are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules. KPMG shall cooperate fully with the Independent Consultant and shall provide reasonable access to firm personnel, information, and records as the Independent Consultant may reasonably request for the IC Review (including training materials pertaining to the undertaking in paragraph 106), subject to KPMG's right to withhold from disclosure any information or records protected by any applicable protection or privilege such as the attorney-client privilege or the attorney work product doctrine.

103. ***Independent Consultant's Report.*** After the IC Review is completed, but no later than 90 days after receiving the KPMG Report, the Independent Consultant shall issue a detailed written report (the "IC Report") to KPMG: (a) summarizing the IC Review; (b) making recommendations, where appropriate, reasonably designed to ensure that KPMG's Policies relating to the topics enumerated in paragraph 100 are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules; and (c) describing its review of KPMG's training as required under paragraph 106. KPMG shall require the Independent Consultant to provide a copy of the IC Report to the Commission staff and the PCAOB staff when the IC Report is issued.

104. KPMG shall adopt, as soon as practicable, all recommendations of the Independent Consultant in the IC Report. Provided, however, that within thirty days of issuance of the IC Report, KPMG may advise the Independent Consultant in writing of any recommendation that it considers to be unnecessary, outside the scope of this Order, unduly burdensome, or impractical. KPMG need not adopt any such recommendation at that time, but instead may propose in writing to the Independent Consultant and the Commission staff an alternative policy or procedure designed to achieve the same objective or purpose. KPMG and the Independent Consultant shall engage in good-faith negotiations in an effort to reach agreement on any recommendations objected to by KPMG. In the event that the Independent Consultant and KPMG are unable to agree on an alternative proposal within 60 days, KPMG shall abide by the determinations of the Independent Consultant.

105. ***Certification by Vice Chair.*** Within 60 days of issuance of the IC Report, but not sooner than 30 days after a copy of the IC Report is provided to the Commission staff, KPMG's Vice Chair must certify to the Commission staff in writing that (i) KPMG has adopted and has implemented or will implement all recommendations of the Independent Consultant, if any; and

(ii) the Independent Consultant agrees with KPMG's adoption and implementation of the recommendations. To the extent that KPMG has not implemented all recommendations of the Independent Consultant within 60 days of issuance of the IC Report, KPMG's Vice Chair must certify to the Commission staff in writing, 30 days after their implementation, that (i) KPMG has adopted and has implemented all recommendations of the Independent Consultant; and (ii) the Independent Consultant agrees that the recommendations have been adequately adopted and implemented by KPMG. The certifications by KPMG's Vice Chair shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and KPMG agrees to provide such evidence.

106. ***Training***. As part of KPMG's Review, KPMG shall examine and assess whether it has adequate and sufficient training programs in place to provide reasonable assurance that KPMG auditors have adequate technical training and proficiency (as set forth in AS 1010) in relation to (i) valuations, auditing estimates, including fair value measurements (collectively, "Valuation Training"); (ii) use of engaged or employed specialists and using the work of management's specialists (collectively, "Specialist Training"); and (iii) fraud risks and fraud detection training (collectively, "Fraud Training"). In a separate section of the KPMG Report, KPMG shall set forth the results of the examination and assessment required under this paragraph, including a description of the specific training. As to each training course, the KPMG Report shall, at a minimum, include a description of the course (including training content, intended audience, delivery method (*e.g.*, in-person, webinars, remote-place viewing)), the qualifications of the preparers and providers of the training, the length of training as well as the recipients of such training, the training objective, a discussion of how the training techniques and methods used achieve the stated training objective, and a brief discussion of why the chosen attributes (*e.g.*, content, delivery method, level of interaction on the part of participants) of the course are sufficient in the circumstances. The KPMG Report should also include a description of any training courses added or modified as a result of the assessment conducted under this paragraph. The Independent Consultant shall review the KPMG Report and state in the IC Report whether it concurs with the results of KPMG's assessment under this paragraph. The Independent Consultant, as and if necessary, shall make additional recommendations regarding the training relating to the topics enumerated in paragraph 100. Notwithstanding anything else in this paragraph, KPMG will ensure that, during the period beginning May 1, 2017 and ending 15 months after the entry of this Order, all audit personnel are provided with (i) a minimum of 4 hours of Valuation Training, (ii) a minimum of 4 hours of Specialist Training, and (iii) a minimum of 4 hours of Fraud Training.

107. To ensure the independence of the Independent Consultant, KPMG: (1) shall not have the authority to terminate the Independent Consultant or substitute another independent compliance consultant for the initial Independent Consultant, without the prior written approval of the Commission staff; and (2) shall compensate the Independent Consultant and persons engaged to assist the Independent Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

108. KPMG shall require the Independent Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with KPMG, or any of its present or former

26

affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement shall also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division, enter into any employment, consultant, attorney-client, auditing or other professional relationship with KPMG, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

109.    KPMG shall not be in, and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client privilege or any other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports, or documents to Commission staff.

110.    KPMG shall inform its audit professionals of the terms of the Order within ten business days after entry of the Order.

111.    By no later than 15 months after the entry of this Order, KPMG's Vice Chair shall certify, in writing, compliance with the undertakings set forth in paragraph 106 and 110. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and KPMG agrees to provide such evidence.

112.    ***Annual Certification***. With respect to the calendar years 2018 and 2019, KPMG's Vice Chair shall certify that KPMG has assessed whether KPMG's Policies and Procedures relating to topics set forth in the subparts of paragraph 100 are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules by, among other things, testing the firm's implementation of KPMG's Policies and Procedures during the twelve (12) months preceding the certification ("Annual Certification"). The Annual Certification shall describe the nature and scope of KPMG's testing. The Annual Certification shall represent that the Vice Chair has reviewed and evaluated the firm's assessment and testing process and that, based on belief and after reasonable inquiry, the Vice Chair believes that KPMG's Policies and Procedures relating to topics set forth in the subparts of paragraph 100 are adequate and sufficient to provide reasonable assurance of compliance with all relevant Commission regulations and PCAOB standards and rules. If the Vice Chair cannot represent that KPMG's Policies and Procedures are adequate and sufficient, then the Vice Chair shall describe in reasonable detail the reasons for the inability to so certify. The Vice Chair shall provide the Annual Certifications to the Commission's staff within 60 days of the end of the annual period. KPMG shall preserve and retain all documentation regarding the Vice Chair's Annual Certification for seven (7) years and will make it available to the staffs of the Commission or the PCAOB upon request.

113.    All reports and certifications mentioned in these undertakings shall be submitted to Aaron Lipson, Associate Regional Director, and William M. Uptegrove, Senior Counsel, Division of Enforcement, Securities and Exchange Commission, 950 East Paces Ferry Rd., N.E., Suite 900,

Atlanta, GA 30326, or such other person as the Commission staff may request, with a copy to the Office of Chief Counsel of the Enforcement Division.

114. For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A. Pursuant to Section 21C of the Exchange Act, KPMG shall cease and desist from committing or causing any violations and any future violations of Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 promulgated thereunder.

B. KPMG is censured.

C. Riordan shall cease and desist from committing or causing any violations and any future violations of Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 promulgated thereunder.

D. Riordan is denied the privilege of appearing or practicing before the Commission as an accountant.

E. After two years from the date of this Order, Riordan may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

    1. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Riordan's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

    2. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for

28

reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.     an independent accountant. Such an application must satisfy the Commission that:

a.  Riordan, or the public accounting firm with which he is associated, is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

b.  Riordan, or the registered public accounting firm with which he is associated, has been inspected by the PCAOB and that inspection did not identify any criticisms of or potential defects in the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

c.  Riordan has resolved all disciplinary issues with the PCAOB, and has complied with all terms and conditions of any sanctions imposed by the PCAOB (other than reinstatement by the Commission); and

d.  Riordan acknowledges his responsibility, as long as Riordan appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the PCAOB, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

F.     The Commission will consider an application by Riordan to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Riordan's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

G.     KPMG shall comply with the undertakings enumerated in paragraphs 100 through 114 above.

H.     KPMG shall, within 14 days of the entry of this Order, pay disgorgement of $4,675,680, which represents audit and audit related fees paid to KPMG by Miller Energy over the course of their auditor-client relationship, and prejudgment interest of $558,319, to the Commission. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, transfer them to the general fund of the United States Treasury, subject to Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to Commission Rule of Practice 600.

29

I.   Respondents each shall, within 14 days of the entry of this Order, pay civil money penalties indicated below:

     1.   $1,000,000 for KPMG; and

     2.   $25,000 for Riordan

to the Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payments are not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

J.   Payments ordered in paragraphs H and I must be made in one of the following ways:

     1.   Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

     2.   Respondents may make direct payment from a bank account via Pay.gov through the Commission website at http://www.sec.gov/about/offices/ofm.htm; or

     3.   Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

     Enterprise Services Center
     Accounts Receivable Branch
     HQ Bldg., Room 181, AMZ-341
     6500 South MacArthur Boulevard
     Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying KPMG or Riordan as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Aaron Lipson, Associate Regional Director, Securities and Exchange Commission, Atlanta Regional Office, 950 East Paces Ferry Road, N.E., Suite 900, Atlanta, GA 30326.

K.   Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any

Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Riordan, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Riordan under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Riordan of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary