# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

LEWIS COSBY and KENNETH R. MARTIN,
as beneficiary of the Kenneth Ray Martin Roth
IRA, and MARTIN WEAKLEY on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

KPMG, LLP,

        Defendant.

Case No. 3:16-cv-00121-TAV-CCS

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO KPMG'S MOTION TO DISMISS

Gordon Ball
**GORDON BALL PLLC**
550 W. Main Street
Suite 600
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
gball@gordonball.com

*Lead Counsel for Plaintiffs*

Steven J. Toll
Times Wang
**COHEN MILSTEIN SELLERS & TOLL
  PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
**COHEN MILSTEIN SELLERS & TOLL
  PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 220-2925
Fax: (212) 838-7745
lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Factual and Procedural Background ..................................................................................... 2

    A.    Miller rose to prominence on the purported strength of the Alaska Assets. ........... 2

    B.    KPMG is retained to lend credibility and to attract institutional investors, but immediately engages in misconduct that deepens the fraud, and breaches a litany of professional standards by turning a blind eye to clear evidence of the overvaluation of the Alaska Assets—*including warnings issued by its own internal valuation specialists.* ............................................................................... 5

    C.    KPMG failed to require that Miller resolve the double-counting and made it more difficult to detect. ............................................................................................... 10

    D.    KPMG ignored other glaring red flags of fraud. ..................................................... 13

    E.    KPMG failed to supervise Riordan and EVS in violation of GAAS. .................. 14

    F.    KPMG propped up Miller in the eyes of investors. .............................................. 15

    G.    The truth emerges, and the Miller house of cards finally collapses. ..................... 15

    H.    The SEC finds that KPMG and Riordan violated the securities laws. ................... 16

Argument ............................................................................................................................... 17

    I.    Plaintiffs plead a strong inference of scienter. ....................................................... 18

    II.    Plaintiffs adequately plead loss causation. ............................................................. 27

    III.    Plaintiffs adequately state a scheme liability claim. .............................................. 30

    IV.    Plaintiffs plead the falsity of KPMG's audit reports. ............................................ 32

    V.    Plaintiffs adequately allege Section 11 claims against KPMG. ............................. 35

Conclusion ............................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*In re AFC Enterprises, Inc. Sec. Litig.*,
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...............................................................40

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ...................................................................28, 30

*Alpern v. UtilCorpUtiliCorp United, Inc.*,
    84 F.3d 1525 (8th Cir. 1996) ...........................................................................37

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................18

*Asher v. Unarco Material Handling, Inc.*,
    596 F.3d 313 (6th Cir. 2010) ......................................................................37, 38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................18

*Buttonwood Tree Value Partners, LP v. Sweeney*,
    910 F. Supp. 2d 1199 (C.D. Cal. 2012) .............................................................26

*In re Carter's, Inc. Sec. Litig.*,
    No. 1:08-CV-02940-AT, 2012 WL 3715241 (N.D. Ga. Aug. 28, 2012) ...............23

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994).........................................................................................32

*Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*,
    No. 8:04CV2561T-24EAJ, 2006 WL 547989 (M.D. Fl. Mar. 6, 2006) .................39

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)...............................................................36

*In re Enron Corp.*,
    No. H-01-3624, 2005 WL 1638039 (S.D. Tex. June 21, 2005)............................37

*In re Envoy Corp. Sec. Litig.*,
    133 F. Supp. 2d 647 (M.D. Tenn. 2001).............................................................23

*In re EveryWare Glob., Inc. Sec. Litig.*,
    175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58*
    *Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017)............39, 40

Case 3:16-cv-00121-TAV-DCP   Document 68   Filed 11/22/17   Page 3 of 48   PageID #: 6398

*Fidel v. Farley*,
　　392 F.3d 220 (6th Cir. 2004) ...................................................................22

*In re Fleming Companies Inc. Sec. & Derivative Litig.*,
　　No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004).........................24

*Frank v. Dana Corp.*,
　　547 F.3d 564 (6th Cir. 2008) ...................................................................18

*Frank v. Dana Corp.*,
　　646 F.3d 954 (6th Cir. 2011) .......................................................18, 19, 22

*Freidus v. Barclays Bank PLC*,
　　734 F.3d 132 (2d Cir. 2013).....................................................................40

*Gaynor, et al. v. Miller, et al.*,
　　No. 3:16-cv-232-TAV-CCS (E.D. Tenn.) .................................................. *passim*

*Helwig v. Vencor, Inc.*,
　　251 F.3d 540 (6th Cir. 2001) ...................................................................18

*Janus Capital Group, Inc. v. First Derivative Traders*,
　　564 U.S. 135 (2011)..............................................................................32

*In re Lehman Bros. Sec. and ERISA Litig.*,
　　131 F. Supp. 3d 241 (S.D.N.Y. 2015)........................................................35

*Lind v. Vanguard Offset Printers, Inc.*,
　　857 F. Supp. 1060 (S.D.N.Y. 1994)..........................................................37

*In re Longtop Financial Technologies Ltd. Securities Litigation*,
　　910 F. Supp. 2d 561 (S.D.N.Y. 2012)...........................................25, 33, 35

*Louisiana Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*,
　　622 F.3d 471 (6th Cir. 2010) ..............................................................22, 26

*Matrixx Initiatives, Inc. v. Siracusano*,
　　563 U.S. 27 (2011)............................................................................18, 22

*In re MicroStrategy, Inc. Sec. Litig.*,
　　115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................23, 24, 27

*In re Miller Energy Res. Sec. Litig.*,
　　No. 3:11-CV-386-TAV-CCS (E.D. Tenn.)...........................................14, 15, 31

*In re National Media Sec. Litig.*,
　　No. Civ. A. 93-2977, 1994 WL 649261 (E.D. Pa. Nov. 18, 1994)........................37

Case 3:16-cv-00121-TAV-DCP　Document 68　Filed 11/22/17　Page 4 of 48　PageID #: 6399

*NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)................................................................36

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ..........................................................27

*Newman v. Warnaco Grp., Inc.*,
   335 F.3d 187 (2d Cir. 2003)................................................................39

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016) ............................................................28

*Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*,
   135 S. Ct. 1318 (2015)........................................................33, 34, 35

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)................................................29

*In re Petrobras Sec. Litig.*,
   14-cv-9662 (JSR), 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) ....................34, 35

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ............................................19, 20, 21, 22

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ........................................................28, 29

*In re Rent-Way Sec. Litig.*,
   209 F. Supp. 2d 493 (W.D. Pa. 2002)................................................23

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................32

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)..............................................2, 25

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
   243 F. Supp. 3d 1109 (E.D. Cal. 2017)........................................33, 35

*Stambaugh v. Corrpro Cos.*,
   116 Fed. Appx. 592 (6th Cir. 2004)..................................................26

*Sun v. Han*,
   No.: 15-703 (JLL), 2015 WL 9304542 (D.N.J. Dec. 21, 2015) ..............25

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)........................................................22, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................18, 22, 23

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
    501 F.3d 493 (6th Cir. 2007) ....................................................................................37

*U.S. v. Arthur Young & Co.*,
    465 U.S. 805 (1984)...............................................................................................7, 8, 9

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    845 F.3d 384 (8th Cir. 2016) ................................................................................30, 32

*Winslow v. BancorpSouth, Inc.*,
    No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. April 26, 2011) .........................30

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................................36

*In re Worldcom, Inc. Sec. Litig.*,
    308 F. Supp. 2d 214 (S.D.N.Y. 2004), *vacated and remanded sub nom. In re
    WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007)...............................................38

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 CIV. 3288(DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003).............24

*In re Xchange Inc. Sec. Litig.*,
    No. CIV.A.00-10322-RWZ, 2002 WL 1969661 (D. Mass. Aug. 26, 2002) .........38

Plaintiffs[1] respectfully submit this memorandum opposing KPMG LLP's ("KPMG") Rule 12(b)(6) motion to dismiss Plaintiffs' Second Amended Class Action Complaint ("SAC").

## PRELIMINARY STATEMENT

KPMG perpetuated a massive fraud on Miller Energy Resources, Inc.'s ("Miller" or the "Company") investors. During the Class Period, KPMG knowingly and repeatedly ignored glaring signs of fraud, utterly failed to meet its obligations as an independent auditor, and, for nearly four years, conducted essentially "no audit at all" of Miller's financial statements, resulting in a *more than $400 million overvaluation* of Miller's oil and gas properties in Alaska ("Alaska Assets" or "Assets"), and causing hundreds of millions of dollars in investor losses. In August 2017, the SEC confirmed what Plaintiffs allege: that KPMG's audits of Miller were so deficient that they violated the federal securities laws and numerous professional and ethical standards. Notably, the SEC's investigation revealed that KPMG ignored *repeated warnings by its own valuation experts* that its valuation figures for the Alaska Assets were "so high, they make no sense," and that the assumptions supplied by Miller were unreliable.

The severity of KPMG's misconduct is reflected in the harshness of the penalties imposed by the SEC, which include not only the disgorgement of everything KPMG earned from working for Miller, totaling more than $5 million including interest, but also $1 million in additional penalties against KPMG, $25,000 against the KPMG partner who led the audits, the banning of that partner from appearing before the SEC, and a significant reform program that requires KPMG's senior most executives to regularly report to the SEC on its efforts to prevent a similar debacle from occurring again. *See In the Matter of KPMG LLP and John Riordan, CPA*,

---

[1] Plaintiffs are Lewis Cosby, Kenneth R. Martin (as beneficiary of the Kenneth Ray Martin Roth IRA), and Martin Weakley.

SEC Admin. Proceeding No. 3-18110 (August 15, 2017) ("KPMG Order") (Dkt. 67-1).

KPMG now moves to dismiss, hoping this Court will ignore the SEC's factual findings, which KPMG barely mentions, and which demonstrate that KPMG deliberately turned a blind eye to glaring evidence of fraud, and thus engaged in knowing misconduct or at a minimum extreme recklessness. But, KPMG cannot wish these facts away by ignoring them. Instead, they are fatal to its motion. KPMG's other arguments for dismissal of the Section 10(b) claims similarly rely on ignoring well-settled securities law, much of which KPMG does not cite. They should be rejected.

KPMG also seeks dismissal of the Section 11 claims by, for example, challenging Mr. Weakley's ability to assert them. However, Messrs. Cosby and Martin *also* assert those claims, and KPMG does not challenge, and thus concedes, their ability to do so. Similarly, KPMG argues that Section 11 claims cannot be asserted on behalf of preferred shareholders because of *Gaynor, et al. v. Miller, et al.*, No. 3:16-cv-232-TAV-CCS (E.D. Tenn.) ("*Gaynor*"). But, it does not argue, and thus concedes, that Section 10(b) claims can. Thus, KPMG cannot prevent the Section 11 claims, or claims on behalf of preferred shareholders, from moving forward.

KPMG's motion should be denied, and this case should proceed to discovery.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Miller rose to prominence on the purported strength of the Alaska Assets.

On the purported strength of a 2009 acquisition of the Alaska Assets for less than $3 million in cash, Miller rose from a small Knoxville-based oil and gas company at the fringes of the industry, to a New York Stock Exchange ("NYSE") company with a market capitalization that approached $400 million. Unfortunately for investors, and as numerous SEC investigations have now revealed, that vertiginous rise was fueled by fraud, and particularly fraud relating to the Alaska Assets' "fair market value" or "fair value."

The Alaska Assets consisted of mostly unproven exploratory below-ground oil and gas reserves and related above-ground infrastructure, and had been the subject of an extensive marketing effort by their previous owners. ¶ 44.[2] By mid-2009, those efforts had failed, and the Alaska Assets were auctioned in a public bankruptcy proceeding. *Id.* The winning bid was $8.1 million, with a backup bid of $7 million. *Id.* However, both bidders failed to close, *id.*, so the owner obtained permission from the bankruptcy court to abandon the Alaska Assets, which the court described as being of "no value or other benefit." ¶ 45. Shortly thereafter, Miller and Scott Boruff ("Boruff"), recently appointed as Miller's CEO, expressed interest in the Alaska Assets. ¶ 46. The abandonment order was rescinded, and another auction was held in which Miller acquired the Alaska Assets with a bid of $2.25 million and the assumption of certain liabilities. *Id.* The transaction closed on December 10, 2009. *Id.*

The following week, on December 16, 2009, Miller announced the acquisition to the investing public. ¶ 48. Incredibly, it asserted the Alaska Assets had a value of *$325 million—* more than *100 times* what it had paid a mere week before. *Id.* Then, just three months later in its 10-Q for 3Q2010,[3] Miller claimed that the fair market value under Generally Accepted Accounting Principles ("GAAP") for the Alaska Assets was *$480 million*, including an astounding *$368 million* worth of "Oil and Gas Properties," *$110 million* worth of "Fixed Assets," and $1.9 million in cash and inventory. ¶ 52.

Unbeknownst to investors, however, these figures were massively inflated, and the Alaska Assets' actual fair value was hundreds of millions of dollars lower. *E.g.*, Miller Order, Dkt. 65-14, ¶ 56 (finding that "Miller Energy overvalued the Alaska assets by more than $400

[2] Citations to "¶ __" are to paragraphs in the SAC.

[3] 10-Q refers to SEC Forms 10-Q. 3Q2010 refers to the third quarter of fiscal year 2010. Miller's fiscal year ran from May 1 to April 30, and 3Q2010 was the quarter ending January 31, 2010.

million"). One reason was that the Company massively understated how much it would cost to actually extract oil from the Alaska Assets—a critical input in the standard "income approach"[4] to valuation it claimed to be using. ¶¶ 4, 7, 8, 51, 130, 209. Another reason was that the $368 million and the $110 million figures reported as the fair value for the Alaska Assets in its 3Q2010 10-Q—and the basis for all the reported valuations going forward—*had nothing to do with fair market value*. The $368 million figure was directly lifted from a "reserve report" issued by petroleum engineering firm Ralph E. Davis ("RE Davis") which warned on its very first page *that it was not an estimate of fair market value*. ¶ 50.[5]

The $110 million was overstated in at least two ways. First, although Miller claimed to have relied on a replacement-cost valuation report issued by a third-party insurance broker, the truth was that the broker's figures were supplied by Miller and the Alaska Assets' previous owners themselves, and were not the product of an independent analysis. Miller Order, Dkt. 65-14, ¶¶ 41-54. Second, the $110 million was *already accounted for* in the value reported for the

---

[4] Under GAAP, and specifically under Accounting Standards Codification ("ASC") 820, the three permissible approaches to measuring fair market value at the time were: (1) the market approach, which uses prices and other information generated by comparable market transactions; (2) the income approach, which converts future cash flows to a single discounted present value; and (3) the cost approach, which estimates what it would currently cost to replace the asset in question. Miller Order, Dkt. 65-14, ¶ 16.

[5] The reserve reports were flawed for several other reasons as well, all unknown to investors. For instance, another engineering firm initially approached by Miller told the Company that, based on its experience with the Alaska Assets and the Redoubt Shoal, costs and expenses would exceed income, such that the present value would be *less than zero*. As a result, that firm refused to assign *any* value to the Redoubt Shoal, telling Miller it would not put its "name on a report that implies value exists where it likely does not." Miller Order, Dkt. 65-14, ¶ 36. Only after Miller was refused by this firm did it obtain the RE Davis reserve report. *Id.*, ¶ 37. KPMG could have discovered this, but simply failed to investigate. The reserve reports also improperly: relied on fraudulently understated costs and expenses, *id.*, ¶ 25-26; failed to consider costs associated with legal obligations for retiring oil and gas assets, *id.*, ¶ 27; failed to consider the effect of income taxes on cash flow, *id.*, ¶ 28; used a 10% discount rate that badly underestimated the true risks associated with Assets, *id.*, ¶ 29; and failed to apply proper risk weights to probable and possible reserves, which are inherently riskier that proved reserves. *Id.*, ¶ 30.

oil reserves. Thus, to separately report the value of the fixed infrastructure was to double count and inflate their value—by $110 million. ¶¶ 8, 52, 132, 133.

Following its announcement of the Alaska Assets' valuation, Miller's stock price more than doubled from a pre-acquisition price of a mere $0.61 per share, ¶ 57, to $1.35 per share. ¶ 71 n.10. By the end of the following March, after the Company filed its 3Q2010 10-Q, its stock price had skyrocketed to $6.60 per share, a *982%* increase from the pre-acquisition price. ¶ 57.

> **B. KPMG is retained to lend credibility and to attract institutional investors, but immediately engages in misconduct that deepens the fraud, and breaches a litany of professional standards by turning a blind eye to clear evidence of the overvaluation of the Alaska Assets—including *warnings issued by its own internal valuation specialists.***

As Miller rose in prominence, it realized that it needed more accounting credibility. At the time of the Alaska acquisition, its accounting department, which consisted of its then-CFO Paul Boyd ("Boyd") and two part-time clerical staff, was, as Boyd has since admitted, "the blind leading the blind." ¶ 47. Indeed, Boyd was previously the CFO of a failed local company, lacked auditing experience, and had never worked in the energy industry before. ¶ 84. CEO Boruff too lacked both oil and gas and public-company reporting experience. *Id.* Miller's then-auditor, Sherb & Co. LLP ("Sherb"), was a small firm lacking credibility and significant oil and gas experience, would eventually be suspended by the SEC in 2013, and is now defunct. ¶ 27. Thus, as Boyd explained, after "some of the [Company's] large investors … said … a Big 4 firm would be nice," ¶ 159, Boyd interviewed three of the Big Four firms, and eventually recommended KPMG to the Company's Audit Committee. ¶¶ 62, 159. According to Boyd, KPMG told him "they were experts in the field of valuing oil and gas assets." *Id.* On February 1, 2011, KPMG replaced Sherb as Miller's independent auditor.

From the beginning, however, instead of improving Miller's financial reporting, KPMG's involvement made things worse. Indeed, as the SEC would later conclude, KPMG's failures

began even *before* it retained Miller as a client. Specifically, the SEC found that in deciding to accept the engagement, KPMG "failed to properly assess the risks associated with accepting Miller as a client and to properly staff the audit," in violation of Generally Accepted Auditing Standards ("GAAS"), as set out by the Public Company Accounting Oversight Board ("PCAOB"). ¶ 7. These risks included the highly unusual nature of the Alaska acquisition, the Company's recent history as a penny-stock company, its lack of experienced executives and qualified accounting staff, material internal control weakness, a long history of financial losses, and the Company's pressing need to obtain financing to operate the newly acquired Alaska Assets, all of which KPMG knew about. ¶¶ 83-84.

KPMG's early failures also included appointing John Riordan ("Riordan"), the head of KPMG's Knoxville office, as lead engagement partner, even though he "lacked the necessary experience to serve as the partner-in-charge of the engagement," ¶ 103, and selecting an audit team that "had insufficient expertise to appropriately address the risks presented by Miller Energy." *Id.*

KPMG also completely failed to properly plan its Miller audits. For example, in violation of GAAS, as well its own internal policies, KPMG and the core engagement team—the audit personnel who worked directly with Miller—failed to define the scope and extent of its "Economic and Valuation Services" ("EVS") unit's work, resulting in no meaningful process for verifying the valuation-determinative assumptions underlying the Alaska Assets' reported value, or for assessing the accounting treatment of the fixed infrastructure. ¶¶ 105, 123. KPMG's audit strategy further violated GAAS because it failed to properly take into consideration or tailor its audit strategy to account for a litany of significant risks KPMG knew about both before and after being retained, including Miller's admittedly ineffective internal controls over financial reporting

throughout the Class Period, need to restate its 1Q and 2Q2011 10-Qs due to errors (as discussed below), need to late-file its 3Q2011 10-Q, and failure to ever form an Internal Audit Group, in violation of NYSE rules with which it was required to comply. ¶ 87.

KPMG also breached its duties to be both skeptical of and independent from Miller's management—fundamental auditing principles. ¶¶ 78, 153. As a public auditor, KPMG served a "public watchdog function" that demanded "total independence from [Miller] at all times and require[d] complete fidelity to the public trust." *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984). KPMG, however, was both overly credulous and totally lacking in independence. Indeed, before KPMG even completed its first Miller audit, instead of applying scrutiny to the valuation, KPMG helped Miller *defend* it—and to the SEC no less. ¶¶ 67, 146, 161. Given that KPMG had not yet even completed its first Miller audit, its *defense* of that valuation in the face of SEC inquiries badly compromised its independence and its ability to objectively scrutinize the Alaska Assets, in violation of GAAS.[6]

As for KPMG's actual review of the Alaska Assets' valuation, as the SEC would later confirm, it was characterized by "repeated instances of unreasonable conduct," and amounted to "highly unreasonable conduct resulting in violations of PCAOB standards in circumstances in which heightened scrutiny was warranted." KPMG Order, Dkt. 67-1, ¶ 96. For example, KPMG relied on the RE Davis report in valuing the Alaska Assets despite knowing that it did not include reserve adjustment factors for the riskier categories of oil reserves. ¶ 143. Thus, as the SEC later confirmed, KPMG "knew that using the assumptions in the reserve report for fair

---

[6] Notably, the SEC had specifically highlighted the risks and expenses associated with the Redoubt Shoal [Alaska Assets], noting that its "prior experience with the Redoubt Shoal indicates that it is a high operating cost area," and requested that Miller provide the "figures for and sources of the components of your projected production costs here." Dkt. 65-4 (SEC letter dated June 7, 2011).

value purposes was inappropriate." ¶ 114. *See also id.*, ¶ 124. Similarly, KPMG also improperly relied on the insurance broker report for fair value purposes, despite knowing that the insurance broker was not a valuation expert. ¶¶ 114, 116, 134.

At this juncture, it should have been clear to KPMG that, contrary to Miller's representations to the investing public, it had never performed a proper fair market value analysis of the Alaska Assets. Yet, instead of requiring the Company to conduct a proper analysis in the first instance—as KPMG should have—KPMG instead conducted its own analysis of the Alaska Assets' worth, producing "their [own] internal report," ¶ 124, conveniently yielding a number "in the ballpark" as what Miller had reported. *Id.* This was confirmed by the SEC, which revealed that EVS had generated a range of possible valuations that "appeared to support" Miller's $480 million figure. ¶ 143. The problem with EVS's work, however, was that—as with KPMG's defense of the Alaska Assets' valuation to the SEC—it badly undermined KPMG's independence. Indeed, as the SEC explained: "[P]erforming certain valuation services for the audit client is inconsistent with independence. An auditor who has appraised an important client asset at mid-year is less likely to question his or her own work at year-end." ¶ 165.

Moreover, EVS's valuation of the Alaska Assets was itself deeply flawed. According to an internal KPMG memorandum, KPMG admitted that a true fair value analysis required consideration of twelve inputs, including, among other things, the production forecast, future oil and gas prices, lease operating expenses ("LOE"), selling, general and administrative ("SG&A") expenses, taxes, capital expenditures, the discount rate, and risk weightings. ¶ 123. Yet, in calculating its valuation, KPMG, through EVS, simply took at face value nine of Miller's inputs, choosing to independently analyze only three inputs: (1) the discount rate; (2) future oil prices; and (3) risk weightings. *Id.* Remarkably, it found that Miller's assumptions for all three were

8

inappropriate. *Id.*[7] Yet, despite this clear red flag, KPMG did nothing to ensure that the other critical assumptions supplied by Miller, including critical cost assumptions, were accurate. *Id.*

KPMG's failure to scrutinize the cost assumptions was particularly inexcusable given that *EVS itself warned Riordan and KPMG that those assumptions were dubious.* ¶¶ 127-28. Indeed, as the SEC revealed, EVS explicitly told Riordan and the core engagement team on March 9, 2011 that portions of its own estimate were anomalously high, likely because of erroneous cost assumptions supplied by Miller. ¶ 127. Thus, EVS asked the core engagement team to review those assumptions. *Id.* EVS reiterated its concerns the next day, saying that the Company's assumptions were resulting in valuations for "[t]he PUDs [proved undeveloped], probable and possible" reserves that were "so high, it does not make sense." *Id.* And, on several occasions, EVS warned that it was relying on Riordan and others on the core engagement team to assess the reasonableness of Miller's cost assumptions, on which EVS's range was based. *Id.*

Despite these warnings—from its own internal valuation specialists no less—KPMG failed to take even the most basic steps to evaluate these critical cost assumptions. For example, the SEC found that Miller had in its possession historical expense data from the Alaska Assets' former owner that showed the cost assumptions Miller supplied to RE Davis, and on which EVS's valuation was based, was substantially lower than the historical data. ¶ 128. Yet, in violation of GAAS, KPMG never asked for, much less, analyzed that data. Instead, it simply accepted Miller's understated assumptions, no questions asked.

---

[7] EVS's treatment of certain of these assumptions was itself indefensible. Just before the issuance of the 3Q2011 10-Q, EVS lowered the discount rate range to 12% to 15% from 14% to 17%, without explanation or documentation. ¶ 126. Had it not been lowered, EVS's analysis would have indicated that the $368 million number was overstated by as much as 15%. *Id.* Instead, EVS's lowering of the discount rate conveniently resulted in a range that appeared to support the existing valuation. *Id.*

Similarly, the cost figures used by the Company for the fiscal 2011 supplemental oil and gas disclosures showed that capital expenditures for some of the exact same oil wells had increased by roughly *$100 million* compared to the previous year's estimates—which estimates EVS relied on, and which underpinned the $480 million figure. ¶ 129. As the SEC explained, that increase mainly resulted from increased drill cost estimates for several wells (from $4.6 million to over $12 million each). *Id.* Moreover, these higher figures were far more consistent both with historical data and Miller's own internal cost estimates, than they were with the Company's operative assumptions. *Id.* Yet, KPMG failed utterly to investigate the $100 million increase in capital expenditure assumptions, in direct violation of GAAS. *Id.*

Other data available to KPMG also made clear that forecasted costs were significantly understated. For example, Miller's 2011 10-K stated that in 2009 the Company informed the State of Alaska that it would cost $31 million to restart production in one of the Alaska Assets' two principal fields (an estimate it internally increased in 2011 to $45 million). ¶ 130. However, that $31 million cost estimate was nearly *double* the amount of restart costs ($16.8 million) supplied by the Company for valuation purposes. *Id.*

Further, as the SEC revealed, KPMG had *actual possession* of a document contradicting the Company's cost assumptions, namely a 2011 budget that contained management's forecast for the next several years. ¶ 131. The figures in that budget were significantly higher than those used to value the Alaska Assets, and the production numbers significantly lower—as KPMG either knew and ignored or would have discovered had it simply compared the figures. *Id.* Yet, KPMG turned a blind eye to this fact as well.

### C. KPMG failed to require that Miller resolve the double counting of the above-ground infrastructure and made it more difficult to detect.

KPMG's complicity in the fraud went even deeper with respect to the purported $110

million worth of above-ground infrastructure. As the SEC found, KPMG knew the insurance broker who prepared the report from which this figure was lifted was not a valuation specialist. ¶¶ 114, 116. Yet, KPMG's workpapers inexplicably refer to the broker as a "third party valuation specialist" who "performed the appraisal of the fixed assets." ¶ 116. Worse, KPMG listed the insurance broker as a "specialist" whose work KPMG relied on as audit evidence, and wrote that "EVS concluded that the methodologies used and conclusions reached by [the insurance broker] were reasonable"—despite having no information other than Miller's representations. *Id.* The report itself did not describe a methodology, and KPMG never contacted the broker as it should have under GAAS. *Id.* Had they done so, they would have learned there was no methodology—the broker simply used numbers given to it.

In all events, upon discovering the report, KPMG told Miller to create a second estimate. ¶ 135. But Miller's revised estimate was no more reliable, as Miller simply did another "replacement cost" analysis internally, without using any experts. *Id.* KPMG accepted this new analysis as reasonable despite that, and despite other dubious claims, like the inclusion of *175% more miles* of pipelines than had been included in the original report. *Id.*

Miller's figures were also unreasonable because, as the SEC found, the infrastructure was in a remote location, such that a willing buyer and seller would not have agreed on replacement cost as the price for these assets. ¶ 136. This was particularly true of the underground pipelines that connected various oil production facilities, which KPMG—after deeming them unnecessary for generating income, to avoid the appearance of double counting—purported to assign a replacement cost of up to $46 million. *Id.* This was almost half the supposed value of the infrastructure previously reported in the "Fixed Assets" category. *Id.* However, as the SEC found, it was highly unlikely that any market participant would pay $46 million for pipelines that

were assumed to be extraneous to the production of oil and gas from nearby fields. *Id.*

A deeper problem with these tactics was that they did not resolve the double-counting problem, despite KPMG being aware of that problem. The proper solution was to require Miller to restate its valuation by writing off the incorrectly reported $110 million from its balance sheet. However, because Riordan had already assured Miller's Audit Committee that no such restatement would be necessary—before KPMG had learned of the insurance broker report—KPMG instead improperly worked with Miller to "reclassify" the value of the above-ground infrastructure into the "Oil and Gas Properties" category, including by engaging in the accounting procedures described above. Dkt. 35, Amended Class Action Complaint ("FAC"), ¶¶ 66, 75.[8] The net effect of these maneuvers was to enable Miller to falsely claim that the $110 million error that had been on its books and reported in numerous SEC filings was "immaterial," given the purported lack of a net impact on its balance sheet. *See* 2011 10-K, Dkt. 65-10 at F-27 (describing errors as "immaterial").[9] The reality, of course, was that even if the below-ground oil

---

[8] Specifically, in its annual report for the fiscal year ending April 30, 2011, Miller, at KPMG's direction, reduced the $110 million value reported in the "Fixed Assets" category in previous filings by $107 million, FAC, ¶ 75, and increased the value reported in the "Oil and Gas Properties" category for the same period by virtually the same amount. *Id.* There was, however, no economic justification for that increase. In prior filings, the purported fair value of the oil reserves was approximately $368 million, using the "income approach," which incorporated cash flows generated by the double-counted above-ground infrastructure. Under the income approach, a nearly $110 million increase in the fair value of oil reserves implied a change in the underlying economics, such that those same assets were now expected to generate an *additional* $110 million in cash flow. But no such change occurred—Miller had not discovered more oil or gas on its properties, had not dramatically reduced its costs, or done anything else to justify claiming that it would be able to generate an additional $110 million in cash flow. Instead, the only reason for the increase was to hide the enormous $110 million error recorded in prior financial statements, and to avoid having $110 million vanish from the Company's balance sheet.

The addition of nearly $110 million to the oil and gas reserves represented an approximately ***29% increase** in the purported value of those reserves*—one of, if not the most important metric for oil and gas investors—with that increase being a complete fiction.

[9] Worse, according to Boyd, instead of requiring that Miller's management or accounting

12

reserves had been properly valued—and they had not been for numerous reasons described above—any value that had previously been assigned to the above-ground infrastructure was a fiction, and should have been written off.

### D. KPMG ignored other glaring red flags of fraud.

KPMG was warned in other ways that the Alaska Assets were overvalued. For example, on July 28, 2011, a lengthy article was published in *The Street Sweeper*, a financial blog dedicated to "exposing corporate fraud," that challenged the Alaska Assets' valuation, citing numerous pieces of evidence, claiming they were likely only worth between $35 to $40 million dollars, offset by $40 million in liabilities. ¶ 145. Riordan, the core engagement team, and a member of KPMG's upper management became aware of the article the same day. *Id.*

Then, in August 2011, Miller received a subpoena from the SEC seeking information about the Alaska Assets' valuation. ¶ 146. Riordan discussed the formal investigation, as well as the allegations in *The Street Sweeper* article, with upper KPMG management, including KPMG's Department of Professional Practice ("DPP") and its general counsel. *Id.* Nevertheless, despite the clarion warnings of fraud set out in the article, and despite the SEC subpoena, KPMG concluded that no additionally scrutiny was warranted. *Id.*

On August 16, 2011, *In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS

---

department make the necessary adjustment, KPMG crafted and gave Miller the journal entry, leaving Miller and Boyd with only the clerical task of booking the adjustment. FAC, ¶¶ 58, 138. Indeed, Boyd himself admitted that he had "hired KPMG to do our books." ¶ 159. Similarly, as Miller's former Senior Vice President of Investor Relations Bobby Gaylor ("Gaylor") explained, Miller's books were in such disarray that KPMG had to "fix them … so they could audit them" in the first place. ¶ 162. This further violated GAAS and undermined KPMG's independence, which was now acting as Miller's bookkeeper. Indeed, as the SEC has explained, "[b]ookkeeping services … place the auditor in the position of later having to audit his or her own work and identify the auditor too closely with the enterprise under audit. It is asking too much of an auditor who keeps the financial books of an audit client to expect him or her to be able to audit those same records with an objective eye." ¶ 165.

(E.D. Tenn.) ("*In re Miller*") was filed, alleging that the Alaska Assets were fraudulently overvalued. ¶ 147. Yet, KPMG still did not subject the Alaska Assets to any additional scrutiny. Instead, on August 29, 2011, it issued a clean audit report, asserting that Miller's "financial statements … present fairly, in all material respects, the financial position of Miller Energy." 2011 10-K, Dkt. 65-10 at F-2.

On December 24, 2013, *The Street Sweeper* again criticized the valuation of the Alaska Assets, saying that "Miller [Energy] barely even resembles a normal energy firm since it focuses so much of its attention on raising capital that it seems to market its stock as its primary product while selling a little bit of oil on the side." ¶ 200. The article noted that Miller's production numbers were "tiny," and that Miller was still "cash-flow negative," and "has to keep selling this story about its monstrous reserves." ¶ 201. The article also cited a hedge fund manager who pointed out that one way Miller might have been manipulating that value of those reserves was by manipulating "how much it will cost you to produce it." ¶ 204. Nonetheless, KPMG again failed to reevaluate the Alaska Assets or further scrutinize the information provided by Miller.

### E. KPMG failed to supervise Riordan and EVS in violation of GAAS.

The foregoing conduct also violated the GAAS requirement that auditors properly supervise all personnel other than the auditor with final responsibility for the audit. ¶¶ 150-51. According to the SEC, KPMG failed to properly supervise EVS, such as by failing to properly evaluate EVS's substitute assumptions for the discount rate. *See supra* at 9 n. 7. Further, according to the SEC, KPMG's regional management office, DPP office, and general counsel all knew about the SEC's investigation into Miller's valuation of the Alaska Assets, as well as the article published by *The Street Sweeper* questioning that valuation, yet none of them asked the core engagement team to subject that valuation to additional scrutiny. ¶¶ 145-46, 151. And, according to the SEC, this failure to supervise extended to their decision to allow Riordan to lead

that team, despite knowing he lacked the necessary experience. ¶¶ 64, 151.

## F.    KPMG propped up Miller in the eyes of investors.

Meanwhile, certain investors *had* challenged the Alaska Assets' valuation, most notably in the *In re Miller* action. Indeed, in February 2014, this Court rejected Miller's motion to dismiss that action, which proceeded to discovery. Not long after, however, the action settled in July 2014, for $2.95 million. Notably, one of the main reasons cited by counsel for investors for that settlement "was the fact [that] KPMG continued to support the accounting treatment" challenged by that action. *In re Miller*, Dkt. 82 at 12.

Investors more generally also continued to be reassured by KPMG's imprimatur. Indeed, as Gaylor explained, Miller even brought KPMG's Riordan and Bennett to Alaska for an investors' conference, where their only role was to show investors that KPMG was involved, and that Miller could be trusted. ¶ 242. Similarly, Miller repeatedly touted KPMG's involvement on investor calls as evidence of the soundness of its financial statements. *Id.*

## G.    The truth emerges, and the Miller house of cards finally collapses.

From the end of 2013 to the middle of 2015, the reality that Miller was a house of cards began to set in. Following a series of events and disclosures indicating that Miller would not be able to deliver on the promised oil production, on December 10, 2014, Miller (under a new CEO following Boruff's departure) announced a whopping $265.3 million impairment charge to the Alaska Assets, citing, among other things, "expense overruns." ¶ 218. Another $149.1 million write off followed on March 12, 2015. ¶ 222. Then, on April 29, 2015, the Company announced it had received a "Wells Notice" that the SEC intended to bring charges relating to the Alaska Assets. ¶ 223. This was followed in the next few months by the suspension of dividend payments, an announcement that Miller doubted its ability to operate as a going concern, the formal filing of SEC charges against Miller and several executives, de-listing from the NYSE, an

involuntary petition for bankruptcy filed by creditors against one of Miller's subsidiaries, and eventually Miller's own bankruptcy petition on October 1, 2015. ¶¶ 224, 227, 231.

Finally, on March 29, 2016, the Company admitted that "after further review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 … the Company has concluded that its financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon." ¶ 235.

### H.    The SEC finds that KPMG and Riordan violated the securities laws.

On August 15, 2017, the SEC publicly announced charges for "improper professional conduct and securities law violations by KPMG and Riordan relating to a review and audit of the financial statements of Miller Energy Resources, Inc." ¶ 238. Over nearly a hundred paragraphs of detailed findings, the SEC found that KPMG was repeatedly confronted with evidence that the Alaska Assets were overvalued, and yet turned a blind eye to that evidence, in violation of GAAS and numerous laws and regulations.[10]

---

[10] The SEC specifically found that KPMG violated GAAS in the following ways: (1) failure to properly plan the audit (AU §§ 311 and 312); (2) failure to exercise due professional care and professional skepticism (AU §§ 230, 316, and 722); (3) failure to properly test fair value measurements and disclosures and using the work of the specialist (AU §§ 328, 342, and 336); (4) failure to obtain sufficient competent evidential matter (AU §§ 315 and 326); (5) failure to supervise the engagement team properly (AU § 311); (6) failure to prepare required documentation (AS 3); (7) failure to issue an accurate audit report (AU § 508); (8) failure to perform adequate personnel management (QC 20 and 40); and (9) failures relating to adequate competency and proficiency (AU §§ 210 and 161, QC 20).

The SEC also found that KPMG violated Sections 4C(a)(2) and 4C(b)(2) of the Exchange Act and Rules 102(e)(1)(ii) and 102(e)(1)(iv)(B) of the Commission's Rules of Practice because its conduct "involved *repeated instances of unreasonable conduct*, each resulting in violations of PCAOB standards and indicating a lack of competence," and also constituted "*highly unreasonable conduct* resulting in violations of PCAOB standards in circumstances in which heightened scrutiny was warranted." KPMG Order, Dkt. 67-1, ¶ 96.

Finally, the SEC found that "KPMG and Riordan caused Miller Energy's violations of Section 13(a) of the Exchange Act, and Rules 13a-1 and 13a-13 thereunder," which required Miller to file true and correct annual and quarterly reports with the SEC. *Id.*, ¶¶ 97-98.

In anticipation of those charges, KPMG and Riordan offered to settle. *Id*. Yet, underscoring the graveness of the misconduct, the SEC still imposed extremely severe penalties, including the disgorgement of *everything* KPMG earned from working from Miller, totaling more than $5 million including interest, a $1 million penalty against KPMG, a $25,000 fine against Riordan, the banning of Riordan from appearing before the SEC, and an onerous reform program, to be monitored by the SEC.[11]

## ARGUMENT

KPMG's Rule 12(b)(6) motion seeks dismissal of the Section 10(b) claims for failure to plead scienter, loss causation, falsity, or an actionable scheme, as well as untimeliness. KPMG further seeks dismissal of the Section 11 claims for failure to comply with the PSLRA's lead plaintiff procedures, untimeliness, and lack of falsity. These arguments fail.[12]

To survive KPMG's motion, Plaintiffs need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "When an allegation is capable of more than one inference, it must be

---

[11] The specific penalties were: (1) a "complete review and evaluation … of the sufficiency and adequacy of KPMG's quality controls"; (2) a "detailed written report … summarizing its review" to be delivered to the SEC; (3) the retention of "an independent consultant … not unacceptable to the [SEC]" to whom KPMG's report would also be delivered; (4) "a review … of KPMG's Policies and Procedures" by the independent consultant; (5) a "detailed written report" summarizing that review to be provided to KPMG, the SEC, and to the PCAOB; (6) the adoption of the independent consultant's recommendations; (7) a certification by KPMG's Vice Chair, in writing relating to those recommendations; (8) an examination of the adequacy of KPMG's training programs; (9) several measures to ensure the independence of the independent consultant; (10) annual certifications by KPMG's Vice Chair in connection with the foregoing measures; (11) KPMG's formal censure; (12) denying Riordan the privilege of practicing before the SEC (with an opportunity for possible reinstatement after two years); (13) the disgorgement of $4,675,680 in audit and audit-related fees paid to KPMG by Miller, and prejudgment interest of $558,319; (14) a $1,000,000 fine for KPMG; and (15) a $25,000 fine for Riordan.

[12] If the Section 11 claims are timely, the Section 10(b) claims are necessarily timely also, because they have a longer statute of limitations and more elements. Thus, Plaintiffs will discuss both together, focusing primarily on the Section 11 claims.

construed in the plaintiff's favor." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001). Rule 12(b)(6) "does not require 'detailed factual allegations,'" *Iqbal*, 556 U.S. at 677, and the facts alleged need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

## I. PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER.

Scienter allegations must be viewed holistically. In contrast to previous Sixth Circuit law, the Supreme Court requires courts to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). As a result, "[t]he *only* appropriate approach" is to begin and end the scienter analysis with a "collective view of [all] the facts, not the facts individually." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("*Frank II*") (emphasis added) (citing *Tellabs* and *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)).[13]

"[K]nowing and deliberate intent to manipulate, deceive, or defraud, and recklessness," all constitute scienter. *Frank II*, 646 F.3d at 959 (citation omitted). In auditor liability cases, actionable recklessness exists where "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *PR*

---

[13] *Cf. Frank II*, 563 U.S. at 961 (rejecting the prior approach whereby courts in the Sixth Circuit "conducted [the] scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach."). Notably, again in contrast to prior Sixth Circuit law, the inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most 'plausible of competing inferences,'" *Tellabs*, 551 U.S. at 324, and if equally strong inferences exist for and against scienter the "draw [goes] to the plaintiff." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("*Frank I*"); *cf. Helwig v. Vencor*, 251 F.3d at 553 (requiring the culpable inference be "the most plausible of competing inferences").

*Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693-94 (6th Cir. 2004). Facts showing that the auditor knowingly or recklessly disregarded red flags, particularly multiple and obvious red flags that "should have led the auditor to question its audit opinion," "or at least would have given [the auditor] reasons to question the veracity of" the client's representations, are sufficient. *Id.* at 687.

Plaintiffs' allegations easily meet these standards. As alleged, from the moment KPMG was retained, it was confronted with—and ignored—a staggering number of warning signs that the fair value of the Alaska Assets was not remotely close to what Miller claimed. For instance, KPMG knew that the RE Davis and the insurance broker reports were not suitable for valuing the Alaska Assets. ¶ 124. Yet, instead of requiring the Company to conduct a legitimate fair market value analysis in the first instance, KPMG bent over backwards to justify the Company's baseless figure. Worse, KPMG did so in the face of warnings from its own experts that the Company's assumptions were generating numbers that were "so high, it does not make sense." ¶ 127. More, EVS repeatedly warned that its work depended on those assumptions, and asked the core engagement team to investigate. *Id.* These concerns were red flags that "should have led [KPMG] to question its audit opinion," and to "question the veracity of" Miller's representations, including about costs. *PR Diamonds*, 364 F.3d at 687. KPMG failed to do so. In fact, without ever meaningfully scrutinizing the provided assumptions, KPMG told Miller its internal analysis supported the Company's valuation, and no restatement of the Alaska Assets was needed. ¶ 124. However, as the SEC revealed, KPMG achieved its confirmatory analysis only after a series of last-minute, unexplained, and undocumented changes to various inputs in EVS's model. ¶ 125.

These facts alone are sufficient for scienter because they show "an egregious refusal to see the obvious, or to investigate the doubtful." *PR Diamonds*, 364 F.3d at 693. And yet, they are just the tip of the iceberg.

Well before issuing its first audit report, KPMG was presented with numerous other warning signs that the Company's assumptions could not be trusted, and that the Alaska Assets were overvalued. These include Miller's double counting of the above-ground infrastructure. ¶ 144. They also include the fact that Miller's books were in such disarray that, in Gaylor's words, KPMG had to "fix" them. ¶ 162. Equally troubling was that Miller had filed the 2011 10-K without KPMG's authorization. ¶ 167. Moreover, this filing came the day after *The Street Sweeper* published a detailed public critique of the Alaska Assets' valuation, ¶ 145, and was followed by both a shareholder class action and SEC subpoenas challenging that valuation. ¶¶ 146, 147. KPMG was aware of all these facts, and they all constituted red flags that "should have led [KPMG] to question its audit opinion" and "the veracity of" Miller's representations about the Alaska Assets. *PR Diamonds*, 364 F.3d at 687. But instead, KPMG again turned a blind eye, and just a few weeks later, issued its first clean audit report asserting that Miller's financial statements were accurate. ¶ 182.

In the years to come, more red flags would follow. For example, at one point, Riordan and other KPMG employees witnessed two members of Miller's accounting department getting drunk, angry, and disorderly, and complaining about their compensation, which should have alerted KPMG as to the quality of the financial information being generated by that department. ¶ 181. More generally, KPMG knew that Miller's accounting department was perpetually devoid of qualified staff or executives, including a series of CFOs with little or no accounting experience, much less the oil and gas experience necessary for robust financial reporting. ¶ 139. KPMG was also aware of unorthodox personal financial arrangements, including Boruff's financing the purchase of a $9.5 million estate backed by little more than the rising price of Miller's stock, which should have led it to suspect that Boruff had a unique motive to inflate that

stock. ¶ 181. It also knew that Miller was perpetually unable to follow basic rules and requirements, such as forming an internal audit group, or ensuring its SEC filings were made on time, which should have raised further questions about the reliability of the Company's financial information. ¶¶ 98, 181. In the face of ever more indisputable evidence that the Alaska Assets were overvalued, KPMG did nothing to investigate.[14]

In the face of all these facts, KPMG's clean audit reports and other misconduct cannot be interpreted as the result of anything less than extreme recklessness. As the warning signs flashed and the red flags piled on, KPMG stood idly by, unwilling to discharge its duty as a "public watchdog." And, as the facts plausibly show, KPMG's failures arose out of "an egregious refusal to see the obvious, or to investigate the doubtful," *PR Diamonds*, 364 F.3d at 693, if not a deliberate effort to conceal its own wrongdoing. KPMG's audits were thus "no audit at all," and scienter is adequately alleged.

Against these overwhelming allegations of scienter, KPMG resorts to legally and factually dubious arguments, all of which fail. Indeed, KPMG tellingly does not even mention critical facts revealed by the SEC's investigation about its awareness of numerous red flags. For instance, KPMG's scienter argument ignores EVS's warnings to Riordan and the core engagement team that the valuations it was arriving at, based on assumptions supplied by the Company, "make no sense." *See* MTD at 16. It also ignores its knowledge that the RE Davis and

_____

[14] Nor can KPMG claim that Miller kept facts hidden from it. As Plaintiffs allege, and as the SEC's findings make clear, just the opposite was true: KPMG had ready access to all the necessary information, and the slightest inquiry would have revealed that the assumptions underpinning the Alaska Assets' valuation, including about extraction costs, were a fiction. ¶ 178. Indeed, one of the documents that would have made this clear—Miller's 2011 budget— was in KPMG's *actual possession*. ¶ 131. KPMG also cannot argue that the Alaska Assets were just a small part of a sprawling and complex business empire. Just the opposite was true—the Alaska Assets *defined* Miller, and for all intents and purposes, constituted its *entire* business.

insurance broker reports on which Miller based the Alaska Assets' valuations were wholly inappropriate for that purpose. *Id.* It similarly ignores its knowledge of the double counting problem. *Id.* Indeed, it mentions essentially *none* of the facts and findings detailed in the KPMG Order showing that KPMG had ample notice, if not actual knowledge, that the Alaska Assets were overvalued. *Id.* For this reason alone, KPMG's scienter argument must be rejected.

Further, KPMG's scienter analysis should be rejected because, rather than being holistic, it employs a quintessential divide-and-conquer approach that runs afoul of *Tellabs*, *Matrixx*, and *Frank II* (which KPMG does not even cite).[15] And courts that properly conduct a holistic analysis have sensibly concluded that the types of allegations KPMG rejects out of hand should inform the scienter inquiry. *E.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) ("At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss.") (collecting cases).[16]

---

[15] KPMG's improperly atomized arguments also fail on their own terms, because with few exceptions, the cited cases merely say that various types of allegations cannot *by themselves* satisfy the PSLRA's pleading standard for scienter, *e.g.*, *Louisiana Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 481 (6th Cir. 2010) (failure to follow GAAP "is, *by itself*, insufficient") (emphasis added); *Fidel v. Farley*, 392 F.3d 220, 230 (6th Cir. 2004) (failure to follow GAAP "does not *in and of itself* lead to an inference of scienter") (emphasis added), or that "general" or "vague" allegations do not support scienter. *E.g.*, *Louisiana*, 622 F.3d at 481 ("General allegations regarding an auditor's access to information do not raise an inference of fraud."). Such authorities have little application here, because Plaintiffs do not rely on any single fact or general allegations. KPMG's authorities are also undermined by the fact that they all predate *Frank II*, which rejected a categorical approach to scienter as inconsistent with Supreme Court precedent. Finally, in none of the cases cited by were the GAAP and GAAS violations nearly as egregious as those at issue here.

[16] *See also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) ("[W]here plaintiffs have pled facts explaining how the [professional accounting and auditing] standards were recklessly or consciously violated … courts have found them probative."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000) ("By violating the GAAS requirement of independence, PwC has weakened its ability to rely on its reputation in

KPMG also argues that it would be implausible and "economically irrational" for KPMG to risk its reputation by being aware "of some on-going fraud at the Company and decid[ing] to join it." *E.g.*, MTD at 14. However, this misstates the standard—KPMG is equally liable for egregiously refusing to investigate facts and circumstances suggesting fraud *after* being retained, and scienter does not require it to knowingly join an ongoing fraud. More to the point, however—and even though "the absence of a motive allegation is not fatal," *Tellabs* at 325—Plaintiffs plausibly allege numerous motives for KPMG's misconduct.

As an initial matter, KPMG personnel have recently risked the firm's reputation in other audit matters. In April 2017, for instance, KPMG was forced to fire five senior partners, including its national managing partner for audit quality and professional practice, after improperly obtaining confidential information from the PCAOB regarding which audits PCAOB planned to inspect. ¶ 174. As another example, in recent inspections of the Big Four accounting firms, KPMG's audits had the most deficiencies, with deficiency rates of 54% and 38% in 2015 and 2016 respectively. ¶ 175. Thus, whatever the precise reasons for KPMG's misconduct here, it was neither unprecedented nor wholly out of character.

As to motive, Gaylor's sworn statement provides insight. Specifically, Gaylor stated that Riordan and Bennett were unabashed about asking Gaylor for introductions to the Knoxville-area business elite since KPMG lacked lucrative accounts in the area. ¶ 180. Of course, the Miller account was itself highly lucrative, as evidenced by the $4.6 million Miller paid KPMG over the

---

countering as 'irrational' allegations that it participated in a client's fraud[.]"); *In re Carter's, Inc. Sec. Litig.*, No. 1:08-CV-02940-AT, 2012 WL 3715241, at *6 n.14 (N.D. Ga. Aug. 28, 2012) (lack of independence, "considered in combination" with other allegations, "provide further support for the inference of recklessness on the part of PwC"); *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 660 (M.D. Tenn. 2001) ("GAAP violations along with other circumstances, can create a strong inference of scienter.") (modifications and citation omitted).

course of the engagement. ¶ 238. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288(DLC), 2003 WL 21488087, at *4 (S.D.N.Y. June 25, 2003) (noting that "WorldCom was the most valuable client for Andersen's branch office in Jackson, Mississippi").[17]

Another fact indicating motive is that Riordan preemptively assured the Company's Audit Committee that KPMG did not anticipate needing to restate the Alaska Assets' valuation. ¶ 142. Indeed, after facts undermining the valuation came to light, Riordan emailed EVS to inform them of the assurance he had provided the Audit Committee. ¶ 143. A plausible inference is that because Riordan and KPMG had already given that assurance, it was too difficult to renege on that assurance and require a restatement.

A final motivating factor was that because KPMG had become complicit in the overvaluation from the outset, it was left with little choice but to accept that overvaluation as the years went on, or risk revealing its own role in perpetuating it. Indeed, as Gaylor testified, the reason KPMG "stuck around" was that "they [were] culpable at that point forward." ¶ 167. Thus, KPMG's argument that it would be "irrational" for it to act with scienter must be rejected.

KPMG's next argument is, somewhat incredibly, that there were *no* red flags of fraud, in part because anything that had been publicly disclosed cannot constitute a red flag as a matter of law. But there is no principle in law, logic, or accounting that says that only non-public facts can trigger an auditor's duty to investigate more closely. *E.g.*, *Sun v. Han*, No.: 15-703 (JLL), 2015

---

[17] *See also MicroStrategy*, 115 F. Supp. 2d at 655-56 ("Moreover, that PwC clearly would have received concrete benefits, through its partnership with MicroStrategy, from certifying and maintaining the Company's allegedly false and misleading financial reports lends more weight to a stronger inference of scienter."); *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at *40 (E.D. Tex. June 16, 2004) ("[A]llegations that D[eloitte] & T[ouche] had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that of its auditing fees are sufficient to support an inference of scienter as well.").

WL 9304542, at *16 (D.N.J. Dec. 21, 2015) ("The Court is unwilling to disregard these 'red flags' merely because they were publicly disclosed…. Defendant has not directed this Court to any case law in the Third Circuit or elsewhere, nor is the Court aware of any cases, holding that 'red flags' that are disclosed to the public cannot, as a matter of law, result in an inference of scienter.")[18] Further, this argument ignores the non-public nature of some of the most important red flags, such as the repeated warnings of KPMG's own internal valuation specialists, the fact that Miller's valuation was based on the wholly unsuitable RE Davis and insurance broker reports, and the fact that Miller had double counted the above-ground infrastructure. Thus, this argument also fails.

KPMG next argues that issuing negative opinions about Miller's internal controls, and requiring the restatement of the fiscal 2010 10-K, support a nonculpable inference. MTD at 15-16. But an equally plausible, and thus controlling, inference is that Miller's internal controls were so obviously deficient that a clean opinion would have raised suspicions about KPMG's other work, including its clean audit reports.[19] The restatement likewise cannot overcome the inference of culpability because, as explained, it *exacerbated* the fraud, by making the double counting problem harder to detect. *Supra* at 10-13. These facts cannot defeat scienter.

---

[18] KPMG's cases to the contrary, *In re Longtop Financial Technologies Ltd. Securities Litigation*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012) and *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 431 (S.D.N.Y. 2014), are outliers and should not be followed, to the extent they can even be read to stand for the proposition that the public nature of a fact categorically bars consideration of it as a red flag. *Cf. Sun*, 2015 WL 9304542, at *16 n.12 (suggesting that *Longtop* cannot be so read). Indeed, such a rule would create the absurd result where an auditor would never have a duty to investigate a public fact, or the similarly bizarre situation where an auditor, previously under a duty to investigate after learning of a bad fact, would be absolved of that duty when that fact becomes public.

[19] Such an inference does not appear to have been considered or advanced in *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012), cited by KPMG, making that case of little relevance here.

KPMG next relies on the fact that it was retained in 2011, after Miller and Sherb had decided on a value for the Alaska Assets, and after Sherb had issued a clean audit report. MTD at 15. But these facts could only support a nonculpable inference by closing one's eyes to KPMG's own decision to defend that value in the face of contrary evidence, and to Sherb's demonstrated record of accounting malfeasance. ¶ 27. These facts thus do not help KPMG.

Even more brazenly, KPMG asserts that its *own* clean audit reports support a nonculpable inference. *See* MTD at 15 ("The fact that two separate independent audit firms (Sherb & Co. and KPMG) audited the Company's financial statements … and found no material misstatement" supports KPMG). This is absurd. KPMG cannot defend against allegations that its audits were fraudulent by relying on the challenged—and now admittedly false—audits themselves.

KPMG also relies on the SEC's relative silence in 2012 following earlier inquiries as evidence that "there was no obvious fraud and that KPMG did not intentionally or recklessly join in." MTD at 15. However, given KPMG's role in lulling the SEC into temporary inaction, this argument should be rejected. ¶ 67. Moreover, the SEC specifically stated in its 2012 letter that its comments in those letters could not be used "as a defense in any proceeding initiated by … any person under the federal securities laws," *see* Dkt. 65-9, and it is well known that SEC investigations take years to complete.

Next, relying on *Louisiana Sch. Emps.* and *Stambaugh v. Corrpro Cos.*, 116 Fed. Appx. 592 (6th Cir. 2004), KPMG argues that the magnitude of the Miller fraud is irrelevant to its scienter. This is a red herring. Plaintiffs do not argue that the size of the fraud indicates scienter. Rather, Plaintiffs argue that because the Alaska Assets were essentially the only asset on Miller's balance sheet, KPMG's failure to subject them to any meaningful scrutiny was at least extremely reckless. *E.g.*, *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1099 (9th

26

Cir. 2011) ("[A]n auditor, in fulfilling duties of public trust, should take a long hard look at a transaction of $700 million, roughly a quarter of Broadcom's reported revenue in 2006 of $2.5 billion."). Plaintiffs also argue that the critical importance of the Alaska Assets to Miller's financials makes it highly doubtful that KPMG was unaware—particularly in light of numerous glaring red flags—that its valuation was inflated by more than $400 million. *E.g., MicroStrategy*, 115 F. Supp. 2d at 653 ("As to the NCR contract revenue-recognition issue … it is simply the case that the importance of this 'watershed' agreement to MicroStrategy and its enormous impact on the Company's financial status make it less likely that PwC's auditors were unaware that revenue from this agreement was recognized before any contract existed between the parties.").

Finally, although KPMG claims in the fact section of its brief that the SEC charges were for less-than-reckless wrongdoing, KPMG's scienter analysis does not actually argue this means the facts, taken together, support an inference of negligence, and certainly not that such an inference is *more* compelling than an inference of recklessness. Nor could it, given that those charges were the product of a negotiated settlement. Indeed, given the detailed SEC findings demonstrating, at a minimum, extreme recklessness, and the severity of the penalties levied, that KPMG acted with scienter is clearly the most plausible inference.

In sum, KPMG's arguments cannot defeat the inference that its conduct amounted to "no audit at all," because they do not create a more plausible opposing inference, as required.

## II.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION.

As the Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, the pleading standard for loss causation is "not meant to impose a great burden" and merely requires "provid[ing] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." 544 U.S. 336, 347 (2005). On the merits, loss causation can be shown through both a "corrective disclosure" theory, where the market reacts negatively to a disclosure

of facts and truth concealed by the alleged fraud, and through a "materialization of risk" theory, whereby the market reacts negatively to the materialization of foreseeable risks concealed by the alleged fraud. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016). Moreover, the concealed facts, truths, and risks need not be revealed in a single event, and may instead "leak out" through a series of events or partial disclosures. *E.g.*, *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("Nor does the corrective disclosure have to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures."). Furthermore, an event or disclosure need not reveal the precise nature of the fraud, and plaintiffs need not allege a "fact-for-fact disclosure," because otherwise "a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).[20] And, so long as the alleged loss causation theory is "plausible," a complaint survives dismissal. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 388 ("OPERS need only allege sufficient facts to support a plausible [loss causation] claim—not the most likely—at this stage.").

Plaintiffs more than meet these standards. Specifically, the crux of Plaintiffs' allegations is that KPMG's misconduct concealed the massive and foreseeable risk of Miller's inevitable collapse, causing equally massive and foreseeable losses as that risk, and the truth, materialized and leaked out in various ways. ¶¶ 197-248 (alleging a series of loss-causing events and disclosures in which the risks and truths concealed by, and the effects associated with, KPMG's fraud were revealed, leaked out, and materialized, all foreseeable to KPMG).

---

[20] *See also Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385 ("We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgement that it misled investors.").

KPMG does not meaningfully challenge the plausibility of the vast majority of these allegations, and thus concedes them. Instead, KPMG specifically challenges only a single disclosure, namely a December 17, 2013 shareholder letter "decrying … management's lack of expertise with respect to the Alaska Assets." ¶ 199. Yet, even then, KPMG does not actually dispute that this letter was a partial materialization of risk, or a partial disclosure of relevant truth. Nor could it—as Plaintiffs allege, KPMG's conduct concealed, among other things, management's inability "to profitably produce meaningful amounts of oil from the Alaska Assets." ¶ 197. Given that the December 17, 2013 letter accuses Miller's management of exactly that, the causal connection is adequately pleaded.

Still, KPMG argues that the letter "was nothing new," and that "shareholders had been criticizing management's handling of the Alaska Assets for years." MTD at 17. However, given that KPMG does not and cannot challenge that investors suffered a loss that day, that amounts to either a truth-on-the-market defense, or a competing loss causation defense, neither of which is appropriate for resolution at the pleadings stage.[21]

More generically, KPMG then also argues that "Plaintiffs have not pleaded facts supporting the claim that the price declined in response to the disclosure of any new information relating to *KPMG*." MTD at 18 (emphasis in MTD). KPMG's argument is thus that absent a "disclosure" of "new information relating to KPMG," KPMG's misconduct could not have

---

[21] *E.g.*, *Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 n.7 (W.D. Pa. 2006) ("Truth-on-the-market analysis is intensely fact specific and thus seldom appropriate at the pleading stage."); *Amedisys*, 769 F.3d at 325 ("Whether the connection between Amedisys's misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point."); *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820 at *11, (M.D. Tenn. April 26, 2011), report and recommendation approved, 2012 WL 214635 (holding that "it is not encumbent upon Plaintiff at this point to disprove other possible reasons for the drop").

caused losses. The problem is that, in addition to ignoring the Plaintiffs' materialization of risk allegations, KPMG cites no authority for this proposition—and none exists. Indeed, even under a corrective disclosure theory, a disclosure need not mention KPMG at all to be "corrective," and need only reflect part of the "relevant truth" concealed by KPMG's misconduct. *E.g.*, *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*12, *report and recommendation approved*, No. 3:10-CV-00463, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) ("'[T]o establish loss causation the disclosed information must reflect part of the "relevant truth"—the truth obscured by the fraudulent statement.'") (quoting *Alaska Elec.*, 572 F.3d at 230). Given that KPMG does not even cite this standard, this argument also fails.

Thus, Plaintiffs adequately plead loss causation, and KPMG's arguments fail.

## III. PLAINTIFFS ADEQUATELY STATE A SCHEME LIABILITY CLAIM.

To survive dismissal of the scheme liability claim, Plaintiffs need only allege "conduct beyond mere misrepresentations or omissions actionable under Rule 10b-5(b)," and a "causal connection between the defendants' alleged deceptive act and the information on which the market relied [that] is not too remote to support a finding of reliance." *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393, 394 (8th Cir. 2016).

Plaintiffs plausibly allege both. Plaintiffs allege that KPMG engaged in deceptive conduct beyond issuing the audit reports forming the basis for the Rule 10b-5(b) claims. For instance, KPMG defended the Alaska Assets' valuation to the SEC before it had even completed its first audit, despite knowing and having evidence that that valuation was unsupported. ¶¶ 124, 145, 147. KPMG also met with investors to bolster Miller's credibility, despite being aware of facts showing that that credibility was undeserved. ¶¶ 171-73. More generally, Plaintiffs allege that KPMG supplied its imprimatur to bolster Miller's credibility in a variety of contexts, including on investor calls, and in connection with the settlement of *In re Miller*, again despite

being aware of facts that such credibility was unwarranted, particularly in connection with the Alaska Assets' valuation. ¶¶ 173, 241, 243-44. Because this conduct extends "beyond mere misrepresentations or omissions," Plaintiffs plausibly allege deceptive acts.[22]

Plaintiffs also allege a direct "causal connection between the defendants' alleged deceptive act and the information on which the market relied." The information "on which the public relie[d]" was that the Alaska Assets were worth what Miller claimed they were— information that KPMG does not and cannot dispute was false. KPMG's deceptive conduct directly prevented that truth from reaching the market through, for example, SEC investigations, further litigation of *In re Miller*, or increased investor skepticism, all of which was stymied by KPMG's deceptive conduct. ¶¶ 170-73, 243-48. Thus, reliance is adequately alleged as well.

KPMG argues that because investors were unaware of its allegedly deceptive conduct, they could not have relied on it. MTD at 21-22. That argument fails, however, because scheme reliance does not require actual knowledge of the deceptive conduct, but merely a sufficiently close causal connection between the conduct and "the information on which the market relied." *Medtronic*, 845 F.3d at 394 (8th Cir. 2016). Indeed, one way that causal connection can be shown is through the fraud-on-the-market theory, which Plaintiffs have pleaded here, and which KPMG has not challenged as implausible or inadequately alleged. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (noting that fraud-on-the-market theory was a potential avenue by which investors' reliance could be pleaded).

---

[22] KPMG argues that the allegations regarding its meeting with investors are insufficient because such meetings are not inherently deceptive, and because they lack particularity. But Plaintiffs' theory is not that such meetings are inherently deceptive, but rather were deceptive here because KPMG knew that the Alaska Assets were likely overvalued. As for particularity, the allegation is based on the sworn testimony of Bobby Gaylor, who attended the meeting. ¶¶ 167, 171. In all events, the meeting is only one example of KPMG's deceptive conduct.

KPMG also argues that the scheme liability claim fails because "it is not truly based on 'conduct' unrelated to alleged misstatements or omissions." MTD at 22. But there is no authority that the deceptive conduct must be "unrelated" to any misrepresentations, and KPMG cites none. Instead, the SAC need only allege deceptive conduct "beyond" misrepresentations, and numerous courts have upheld scheme liability claims despite the presence of "related" misrepresentations. *E.g.*, *Smith Barney*, 884 F. Supp. 2d at 161 (deceptive acts taken "in addition to" statements or omissions suffice to plead deceptive scheme); *Medtronic, Inc.*, 845 F.3d at 393 (precedent "do[es] not hold that the alleged scheme can never involve any misrepresentation in order for the scheme liability claim to survive.")[23]

## IV. PLAINTIFFS PLEAD THE FALSITY OF KPMG'S AUDIT REPORTS.

KPMG also seeks dismissal of the Section 10(b) misstatement claim (Count One) and the Section 11 claims, for lack of falsity. As to Section 10(b), relying on *Longtop*, 910 F. Supp. 2d at 580, KPMG asserts that "[a]n audit report is a statement of opinion that is false only if the speaker does not believe it … and Plaintiffs have not pleaded that KPMG did not believe its audit opinions." MTD at 20. Similarly, as to Section 11, KPMG argues that, under *Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), KPMG's audit reports can only be false "if [KPMG] did not believe it." MTD at 36. These arguments fail for several reasons.

---

[23] For similar reasons, the Court should reject KPMG's argument that the scheme liability allegations are a mere repackaging of misrepresentation allegations, in violation of the bars on various forms of "secondary liability" set forth in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (aiding and abetting liability) and *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011) (non-speaker liability). MTD at 21 n.15. Put simply, KPMG is accused of primary misconduct, and the mere presence of other misrepresentations, such as KPMG's audit reports or Miller's financial statements, does not change that.

Case 3:16-cv-00121-TAV-DCP   Document 68   Filed 11/22/17   Page 38 of 48   PageID #: 6433

As an initial matter, the challenged reports each stated that KPMG "conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)." ¶¶ 182, 184, 186, 188, 299, 301, 305, 309. Those statements—which the SEC revealed to be patently false, *see* ¶¶ 310-312—are on their face statements of fact, not opinion. For that reason alone, KPMG's argument fails.

Further, as to the portions of the audit reports that purport to set forth KPMG's "opinion," they are not the type of opinion statements contemplated by *Omnicare*. *See Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1116 (E.D. Cal. 2017) ("[A]udit opinions are not of the same substance as those discussed in *Omnicare*. The Supreme Court in that case keeps a running hypothetical of a CEO who opines, 'I believe … the TVs we manufacture have the highest resolution available on the market.' These sorts of opinions are qualitatively different from an auditor's professional opinion about the soundness of a company's financial statements.") (citation omitted).

Moreover, even if *Omnicare* applied, and it does not, KPMG badly misstates the case, because KPMG's subjective disbelief is only one of three ways to satisfy *Omnicare*. A second is if KPMG's opinions "contain]ed] embedded statements of [untrue] fact" in support of those opinions. *Omnicare*, 135 S. Ct. at 1327. And a third is if KPMG "omit[ed] material facts about [its] inquiry into or knowledge concerning" its audit reports that "conflict with what a reasonable investor would take from" those opinions. *Id.* at 1329. KPMG's failure to meaningfully discuss these aspects of *Omnicare* is fatal. And all three *Omnicare* theories are met in any event.

First, as to subjective disbelief, KPMG was warned by its own valuation specialists that using assumptions provided by Miller resulted in valuations that were "so high, it does not make sense." ¶ 127. That KPMG ignored this and numerous other warnings creates the plausible

inference that KPMG did not actually believe its clean audit reports. And, as with scienter, that inference becomes stronger over time.

Second, KPMG's audit reports contained numerous embedded statements of fact. For instance, each falsely asserted that KPMG's audits were conducted in accordance with PCAOB standards. ¶¶ 137-38, 157-58. Further, each referenced Miller's "consolidated financial statements," "the financial position of the [C]ompany as of" a given date, and "the results of [the Company's] operations and cash flows" for a given fiscal year. ¶¶ 182-97. All these were factual in nature (and false), and by incorporating them KPMG is liable for them. *See In re Petrobras Sec. Litig.*, 14-cv-9662 (JSR), 2016 WL 1533553, at *3-4 (S.D.N.Y. Feb. 19, 2016) (denying motion to dismiss Section 11 claims against PwC because "[t]he facts of the financial statements were embedded in PwC's audit opinions").

Third, KPMG's audit reports omitted a slew of contradictory material facts, including the warnings issued by its own valuation specialists, its lack of independence from its client, its shoddy investigation into the Alaska Assets, its failure to comply with GAAS in conducting its audit, and the core engagement team's lack of expertise, all of which were "material facts about [KPMG's] inquiry" that "conflict[ed] with what a reasonable investor would take from the statement itself," *Omnicare*, 135 S. Ct. at 1329, namely that KPMG had performed a reasonable audit, in accordance with PCAOB standards and GAAS, and had not encountered any reasons to doubt the accuracy of Miller's financial statements.[24] Thus, KPMG's falsity argument fail.[25,26]

---

[24] To be clear, KPMG's failure to disclose these facts render its opinion statements false and misleading, *even if it subjectively believed them*. As the Supreme Court explained in *Omnicare*, "[i]n the context of the securities market, an investor" expects opinion statements "to rest on some meaningful inquiry—rather than, say, on mere intuition, however sincere." *Omnicare* at 1328-9. Thus, opinion statements about legal compliance made "in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view"

## V.    PLAINTIFFS ADEQUATELY ALLEGE SECTION 11 CLAIMS AGAINST KPMG.

*Standing to represent preferred shareholders.*[27] KPMG argues that the Section 11 claims on behalf of preferred shareholders must also be dismissed because "Mr. Weakley and his counsel are not authorized [under the PSLRA] to serve as lead plaintiff and lead plaintiff's counsel" on behalf of preferred shareholders, as opposed to common shareholders. MTD at 23. However, the Section 11 claims are brought not just by Mr. Weakley, but also by Messrs. Cosby and Martin. ¶¶ 14-16. Because KPMG does not challenge *their* authority to bring Section 11

---

are misleading, even if the company believed what it was saying. *Id.* at 1329. Given that the purported opinion statements here are the statutorily required "certifications" of a public independent auditor, it is doubly true that subjective belief cannot preclude liability. *Special Situations Fund III*, 243 F. Supp. 3d at 1117 ("[R]egistration statements are required by statute to include [certain financial statements] … that have been 'certified by an independent public or certified accountant.'") (quoting 15 U.S.C. § 77aa(25)-(26)).

[25] *See also In re Lehman Bros. Sec. and ERISA Litig.*, 131 F. Supp. 3d 241, 258 (S.D.N.Y. 2015) (denying Ernst & Young's motion for summary judgment under *Omnicare* when there was evidence that "would permit a jury to infer that EY had information in hand that strongly suggested that Lehman's quarter-[] and year-end balance sheets were misleading"); *Petrobras*, 2016 WL 1533553, at *4 ("A reasonable person reading PwC's audit opinions fairly and in context would conclude that the financial statements and evidence reviewed by PwC were the bases of its opinions. If these facts were missing from PwC's audit opinions, the opinions would be misleading. Thus, to the extent PwC argues that its audit opinions are pure opinion by severing them from their underlying factual basis, PwC opens itself to omissions liability under *Omnicare*."); *see also Suprema Specialties*, 438 F.3d at 279 ("A showing that an auditor *either* lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' has traditionally supported a finding of liability[.]"); *see also Longtop*, 910 F.Supp.2d at 580 (holding that an auditor's opinion is actionable if it is "grounded on a specific factual premise that is false," and if the auditor's belief in that premise is not "reasonabl[e].").

[26] KPMG half-heartedly, and without any legal support, tries to preempt this argument by claiming that "Plaintiffs' primary theory is based on a[n affirmative] misstatement theory" that somehow precludes an omissions theory of falsity. MTD at 37-38. The problem is that this argument flies in the face of *Omnicare*, and many other auditor liability cases besides—all of which involve what KPMG describes as "affirmatively false statements."

[27] KPMG concedes Plaintiffs can assert Section 10(b) claims on behalf of preferred stockholders.

claims on behalf of preferred shareholders, KPMG's argument fails.[28],[29]

**_Relation back._** KPMG also wrongly asserts that the Section 11 claims do not relate back to the original complaint. Under Rule 15(c)(1)(B), an amended pleading "relates back to the date of the original pleading when … the amendment asserts a claim … that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Courts in the Sixth Circuit do not parse the phrase "conduct, transaction, or occurrence," and instead focus on "whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading." _U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc._, 501 F.3d 493, 516 (6th Cir. 2007). Further, "[in] a securities fraud action, courts examine whether the allegations relate to the same statements and/or documents referenced in the original complaint." _In re Enron Corp._, No. H-01-3624, 2005 WL 1638039, at *4 (S.D. Tex. June 21, 2005) (internal quotation marks omitted).[30]

---

[28] Although KPMG does not argue otherwise, there is no question Messrs. Cosby and Martin may assert class claims on behalf of preferred shareholders. "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." _NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co._, 693 F.3d 145, 162 (2d Cir. 2012) (citation and quotation marks omitted). For instance, in _In re Eletrobras Sec. Litig._, 245 F. Supp. 3d 450, 461 (S.D.N.Y. 2017), the court held that the plaintiffs, who had only purchased American Depositary Shares ("ADS"), akin to common stock, could nevertheless bring claims on behalf of bondholders, despite not being bondholders themselves. _Id._ at 461 ("As purchasers of Eletrobras's ADSs during the class period, the named plaintiffs have plausibly pleaded that they suffered some actual injury as a result of the allegedly material misrepresentations in Eletrobras's annual reports, press releases, and public statements in a way that 'was broadcast at the same time to all members of the public, prospective shareholders and prospective bondholders alike.'") (quoting _In re Winstar Commc'ns Sec. Litig._, 290 F.R.D. 437, 452 (S.D.N.Y. 2013)).

[29] Moreover, since KPMG is not a defendant in _Gaynor_, there is no risk of overlap in claims.

[30] _See also In re National Media Sec. Litig._, No. Civ. A. 93-2977, 1994 WL 649261, *2 (E.D.Pa. Nov. 18, 1994) (amended complaint relates back where new allegations allege misrepresentations relating to the same product line in the same public statements); _Lind v._

Plaintiffs easily meet these standards. The original complaint asserted Section 11 claims against KPMG based on Miller's September 6, 2012 Registration Statement, and each of the relevant final Prospectuses issued pursuant to that Registration Statement, all of which were alleged to be misleading because of the overvalued Assets. *See* Dkt. 1, ¶¶ 52-56. The SAC likewise asserts Section 11 claims against KPMG based on the same Registration Statement and prospectuses, on the same theory of falsity. ¶¶ 56, 189-97. Thus, the SAC's Section 11 allegations indisputably "relate to the same statements and/or documents referenced in the original complaint," *Enron Corp.*, 2005 WL 1638039, at *4, and the original complaint unquestionably "placed [KPMG] on notice that [KPMG] could be called to answer for the [Section 11] allegations in the [SAC]." *U.S. ex rel. Bledsoe*, 501 F.3d at 516.

KPMG's contrary arguments, which cite none of the above authorities, are wrong. First, relying on *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010), KPMG argues that Rule 15(c)(1)(B) "'does not authorize the relation back of an amendment adding a new party.'" MTD at 25 (quoting *Asher*). But *Asher* was about the addition of claims that had *not* been originally been asserted, by plaintiffs who were *not* originally parties, which "create[d] a new cause of action" precluding relation back. *Asher*, 596 F.3d at 318. Here, the Section 11 claim is being asserted by, among others, Mr. Cosby, who was a party to the original complaint, and who asserted Section 11 claims in that complaint. *Asher* thus does not apply.

KPMG also argues that because the original complaint did not mention preferred stock,

---

*Vanguard Offset Printers, Inc.*, 857 F. Supp. 1060, 1068-69 (S.D.N.Y. 1994) (second amended complaint relates back because both original and new allegations all involve misrepresentations regarding a stock purchase agreement); *Alpern v. UtilCorpUtiliCorp United, Inc.*, 84 F.3d 1525, 1543-44 (8th Cir. 1996) (amendment to add Section 11 claims based on same misleading financial statements related back to original complaint asserting only Section 10(b) claims).

which is the subject of the Section 11 claims in the SAC, relation back fails. But KPMG cites no authority that the addition of a new type of security bars relation back, which is unsurprising given that the same false statements and documents can affect different types of securities.

Nor does the authority KPMG does cite help its cause. In both *In re Worldcom, Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 232 (S.D.N.Y. 2004), *vacated and remanded sub nom. In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007), and *In re Xchange Inc. Sec. Litig.*, No. CIV.A.00-10322-RWZ, 2002 WL 1969661, at *4 (D. Mass. Aug. 26, 2002), relation back failed because the amendment challenged *different statements and documents*, not because of new securities. *See Worldcom*, 496 F.3d at 232 ("Each bond offering was governed by its own registration statement and it is the existence of misrepresentations in a particular registration statement that give rise to a Section 11 claim."); *Xchange*, 2002 WL 1969661, at *4 (relation back failed because original complaint's "allegations [did not] concern the registration statements for [the newly challenged] offerings"). Here, by contrast, the original complaint is replete with allegations about the September 6, 2012 Registration Statement's falsity, and indeed asserted a Section 11 claim against KPMG on that basis. Thus, KPMG cannot argue it was not put on notice of the Section 11 claim here—particularly since Miller only issued preferred stock under that Registration Statement, not common stock. The Section 11 claims thus relate back.[31,32]

**Statute of limitations.** KPMG next argues that the Section 11 claims are barred by the one-year statute of limitations because a reasonably diligent investor "would have discovered" the claims before March 14, 2015. MTD at 29. This argument should be rejected.

---

[31] Notably, KPMG does not argue that the Section 10(b) claims on behalf of preferred stockholders are untimely for lack of relation back.

[32] KPMG also argues that the Section 11 claims are barred by the Securities Act's three-year statute of repose. However, that argument hinges entirely on the success of KPMG's relation back argument. Because that argument fails, so too does KPMG's statute of repose argument.

As an initial matter, "[d]istrict courts in this circuit have found that a dispute over whether plaintiffs' claims are barred by the [Securities Act's] one-year statute of limitations is factual in nature and cannot be decided on a motion to dismiss." *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 863 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) (collecting cases).[33]

Here, although some investors may have had suspicions before March 14, 2015 that Miller overvalued the Alaska Assets, KPMG's potential complicity remained significantly obscured. To state a non-frivolous claim that KPMG's audit reports were false, Plaintiffs would have had to uncover facts suggesting that KPMG was somehow culpable for failing to detect the overvaluation—which, at that time, was still only *suspected*.[34] However, most of the facts relied on to make that showing came *after* March 14, 2015, particularly with the SEC's August 6, 2015 charges against Miller, Boyd, Hall, and Vogt, which detailed such clear evidence that the Alaska Assets were overvalued that doubt was cast on KPMG's audits as well. Yet, even then, KPMG's potential Section 11 liability was far from clear, as evidenced by the *Gaynor* plaintiffs' decision not to name KPMG as a defendant in their November 6, 2015 complaint initiating that action. *See Gaynor*, Dkt. 1-1 (asserting Section 11 claims but not naming KPMG as defendant).

As for Plaintiffs' Section 10(b) allegations that events before March 14, 2015 caused

---

[33] Indeed, as this Court noted in *Gaynor*, dismissal based on the contention that a plaintiff should have discovered facts earlier can succeed "'only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered' the violation," *Gaynor* at 26 (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194–95 (2d Cir. 2003)), and even then, only if that is "apparent from the face of the complaint." *Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*, No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *24 (M.D. Fl. Mar. 6, 2006). Neither is present here.

[34] Indeed, under KPMG's theory that its audit reports were pure opinion statements, Plaintiffs would have had to uncover even more facts, as Plaintiffs would have had to show that KPMG subjectively disbelieved those opinions or knew of but failed to disclose contradictory facts.

some of Plaintiffs' losses, those were expressly not incorporated into the Section 11 claims and should not be considered in analyzing the timeliness of those claims. *E.g.*, *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1378 (N.D. Ga. 2004) (unincorporated allegations should not be considered in determining Section 11 pleading standard). But even if they were, they do not show obvious untimeliness, because none of those events revealed "precisely" the falsity of KPMG's audit reports. *EveryWare Glob.*, 175 F. Supp. 3d at 863 (finding Section 11 claims asserted on May 15, 2015 to be timely despite allegation that the fraud began to cause losses on an October 30, 2013 disclosure, because the October 30, 2013 events did not concern "'precisely' the information the defendants had allegedly misrepresented or concealed") (quoting *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013)). The Section 11 claims are thus timely.[35]

## CONCLUSION

KPMG's motion to dismiss should be denied.

---

[35] That the Section 10(b) claims, subject to a two-year statute of limitations, are timely is even less in dispute, because KPMG cannot explain how Plaintiffs could reasonably have discovered before March 14, 2014 essential facts underpinning KPMG's Section 10(b) liability, including that the Alaska Assets were inflated in large part because of fraudulently understated costs; that KPMG had helped Miller defend the valuations to the SEC before it had completed its audit; that KPMG had to "fix" Miller's books before it could even audit them; that KPMG had performed a flawed internal valuation which it used to justify Miller's valuation; that KPMG had been warned by its own valuation specialists that the Alaska Assets appeared to have been overvalued; that Riordan had given reassurance to Miller's Audit Committee that the Alaska Assets' valuation would stand before KPMG had done the necessary work and before contrary evidence came to light; that KPMG did not require Miller's management to perform a fair market value analysis in the first instance after realizing that the RE Davis and insurance broker reports relied on by Miller were inappropriate for fair value purposes; and that KPMG helped Miller conceal the double counting of the value of the above-ground infrastructure. Put simply, there is nothing in the SAC that remotely suggests that these facts—necessary for both falsity and scienter—could have been discovered before March 14, 2014. Thus, the Section 10(b) claims are timely.

Dated: November 22, 2017                     Respectfully submitted,

/s/ Gordon Ball

**GORDON BALL PLLC**
Gordon Ball
TN BPR#001135
Ste. 600, 550 Main Street
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
gball@gordonball.com

*Lead Counsel for Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Times Wang
1100 New York Ave NW, Suite 500
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
88 Pine Street, 14th Floor
New York, NY  10005
Tel: (212) 220-2925
Fax: (212 838-7745
lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2017, I caused the foregoing to be filed using the

Court's CM/ECF system, which in turn sent notice to counsel of record.

Dated:     November 22, 2017                    */s/ Times Wang*
                                                Times Wang