UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| LEWIS COSBY, KENNETH R. MARTIN, as beneficiary of the Kenneth Ray Martin Roth IRA, and MARTIN WEAKLEY on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>KPMG, LLP,<br><br>Defendant. | No. 3:16-cv-00121 |

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs Lewis Cosby, Kenneth R. Martin, as beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakley ("Plaintiffs") request that Defendant KPMG, LLP ("KPMG" or "Defendant") produce and permit Plaintiffs to inspect and copy the documents described below. The production should be made in accordance with the Federal Rules of Civil Procedure at the offices of Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave. NW, Suite 500, Washington, DC 20005 no later than thirty (30) days from the date of these requests.

## DEFINITIONS

1. "Alaska Assets" means all assets and liabilities owned and acquired by Miller Energy located in Alaska.

2. "All," "any," and "each" should each be construed as encompassing any and all.

2397085 v1

3. "And" and "or" should be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4. "Class Period" means the period from August 29, 2011 to October 1, 2015, inclusive.

5. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6. "Concerning" means relating to, referring to, describing, evidencing or constituting.

7. "Defendant" means KPMG LLP and all of its parents, U.S. and non-U.S. subsidiaries, divisions, affiliates, predecessors, successors, officers, directors, employees, agents, partners, limited partners, and independent contractors, as well as aliases, code names, trade names, or business names used by, or formerly used by, any of the foregoing.

8. "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

9. "DPP" means a unit, group, or division within KPMG sometimes referred to as Department of Professional Practice.

10. "Employee" means, without limitation, current and former officers, directors, executives, managers, analysts, supervisors, department heads, sales personnel, secretaries, clerical staff, messengers, agents, attorneys, representatives, or any person acting or authorized to act on behalf of Defendant.

11. "EVS" means a unit, group, or division within KPMG sometimes referred to as Economic and Valuation Services.

12. "KPMG" means KPMG, LLP.

13. "Miller Energy" means Miller Energy Resources Inc., and all of its parents, U.S. and non-U.S. subsidiaries, divisions, affiliates, predecessors, successors, officers, directors, employees, agents, partners, limited partners, and independent contractors, as well as aliases, code names, trade names, or business names used by, or formerly used by, any of the foregoing.

14. "Offerings" means Miller Energy's securities offerings dated on or around February 13, 2013, May 7, 2013, June 27, 2013, September 25, 2013, October 17, 2013, and August 20, 2014, pursuant to a September 6, 2012 registration statement.

15. "Offering Documents" means the prospectus supplements for the Offerings.

16. "PCAOB" means the Public Company Accounting Oversight Board.

17. "SEC" means the U.S. Securities Exchange Commission.

18. "SEC KPMG Order" means the Order Instituting Public Administrative and Cease-and-Desist Proceedings pursuant to Sections 4c and 21c of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions, and a Cease-and-Desist Order in the matter of KPMG LLP and John Riordan, CPA, dated August 15, 2017.

19. "Underwriter" means any and all of the Offerings' underwriters, including MLV & Co. LLC, Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC (n/k/a Dominick & Dickerman LLC), Ladenburg Thalmann & Co. Inc. (n/k/a Ladenburg Thalmann Financial Services Inc.), I-Bankers Securities, Inc., and Williams Financial Group.

20. "You" or "your" means Defendant.

**INSTRUCTIONS**

1. Please refer to Federal Rule of Civil Procedure 34 and consider it part of these instructions. All documents produced for inspection shall be produced as they are kept in the usual course of business, or shall be organized and labeled to correspond to the categories in the particular document requests, as required by Federal Rule of Civil Procedure 34(b). Documents attached to one another shall not be separated for production, the sequence of the documents shall not be disturbed from the condition in which they are normally kept, and all folders and containers for the documents shall be produced as well as the documents in the folders and containers.

2. You are requested to produce all documents within your possession, custody, or control, including without limitation documents in storage or in the possession of your professional or business advisors, such as your attorneys, investigators, brokers, investment advisors, and accountants, or in the possession of your or their agents, employees, or representatives.

3. Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

4. Any alteration of a requested document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a final document, is a separate and distinct document and it should be produced.

5. If you object to any of the definitions or instructions, state your objection(s) in your response and indicate whether you are complying with the direction or instruction in spite of your

2397085 v1

objection. If your objection goes to only part of a request, produce all documents which do not fall within the scope of your objection.

6. If a document responsive to these requests was at any time in Defendants' possession, custody or control but now is no longer available for production, as to each such document state the following information:

    a. Whether the document is missing or lost;

    b. Whether it has been destroyed;

    c. Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

    d. Whether the document has been otherwise disposed of; and

    e. A precise statement of the circumstances surrounding the disposition of the document and the date of the document's disposition.

7. The documents produced in response to these requests should be segregated and clearly marked or labeled as to the specific request to which such documents are responsive and are being produced. Otherwise, such documents shall be produced as they are kept in the usual course of business.

8. Without in any way limiting the definition of "document" contained in the Federal Rules of Civil Procedure or herein, you are specifically instructed to search all document management systems, computer archives, and/or backup tapes or disks for documents responsive to the following requests, and production of such documents should be made regardless of whether such documents exist in tangible or "hard" copy form. Production is also sought regardless of whether the user purported to "delete" the document, if such document is capable of being retrieved from archives and/or backup tapes or disks.

2397085 v1

9. With respect to any documents called for by these requests but withheld due to a claim of privilege or for any other reason, each such document should be preserved and identified by stating the following:

   a. generic description (*e.g.*, "letter," "memo," "note," *etc.*);

   b. general subject matter;

   c. date;

   d. author;

   e. person or persons for whom it was prepared and to whom it was sent; and

   f. the nature and basis of the privilege or other reason given for withholding such document.

10. For documents that originated in paper format, the following specifications should be used for their production:

    a. images should be produced as single page TIFF group IV format imaged at 300dpi;

    b. each filename must be unique and match the Bates number of the page. The filename should not contain any blank spaces and should be zero padded (for example ABC00000001);

    c. media may be delivered on CDs, DVDs or external USB hard drives. Each media volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001);

    d. each delivery should be accompanied by an image cross reference file that contains document breaks;

e. a delimited text file that contains available fielded data should also be included and at a minimum include Beginning Bates Number, Ending Bates Number, Custodian and Number of Pages. The delimiters for that file should be:

   i. Field Separator: "|"
   ii. Quote Character: "~"
   iii. Multi-Entry Delimiter: ";"

f. to the extent that documents have been run through Optical Character Recognition (OCR) Software in the course of reviewing the documents for production, full text should also be delivered for each document. Text should be delivered on a document level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document; and

g. a text cross-reference load file should also be included with the production delivery that lists the beginning Bates number of the document and the relative path to the text file for that document on the production media.

11. Electronic documents should be produced in such fashion as to identify the location (*i.e.*, the network file folder, hard drive, back-up tape or other location) where the documents are stored and, where applicable, the natural person in whose possession they were found (or on whose hardware device they reside or are stored). If the storage location was a file share or work group folder, that should be specified as well.

12. Attachments, enclosures, and/or exhibits to any parent documents should also be produced and proximately linked to the respective parent documents containing the attachments, enclosures, and/or exhibits.

13. For standard documents, emails, and presentations originating in electronic form, documents should be produced as TIFF images using the same specifications above with the following exceptions:

    a. Provide a delimited text file (using the delimiters detailed above) containing the following extracted metadata fields:

1. Beginning Production Number
2. Ending Production Number
3. Beginning Attachment Range
4. Ending Attachment Range
5. Custodian
6. Original Location Path
7. Email Folder Path
8. Document Type
9. Author
10. File Name
11. File Size
12. MD5 Hash
13. Date Last Modified
14. Date Created
15. Date Last Accessed

16. Date Sent

17. Date Received

18. Recipients

19. Copyees

20. Blind Copyees

21. Email Subject

22. Path to Native File

b. Extracted full text (not OCR text) should also be delivered for each electronic document. The extracted full text should be delivered on a document level according to the specifications above for paper documents.

c. foreign language text files and metadata should be delivered with the correct encoding to enable the preservation of the documents' original language;

d. all spreadsheets should be produced in their native format and in the order that they were stored in the ordinary course of business, *i.e.*, emails that attach spreadsheets should not be separated from each other and should be linked using the Attachment Range fields above. The original file name should be prepended with the document Bates number. The extractable metadata and text should be produced in the same manner as other documents that originated in electronic form; and

14. Generally, databases should be produced in a mutually-agreeable data exchange format. To determine the databases that are relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

1. Database Name

2. Type of Database

3. Software Platform

4. Software Version

5. Business Purpose

6. Users

7. Size in Gigabytes

8. A List of Standard Reports

9. Database Owner or Administrator's Name

10. Field List

11. Field Definitions (including field type, size and use)

Upon review of the list, Plaintiffs will meet and confer with Defendants on the data to be produced from each source, if any, and the form(s) of the production thereof.

15. Each page of a produced document shall have a legible, unique page identifier ("Production Number") and confidentiality legend (where applicable) electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document. No other legend or stamp should be placed on the document image other than the Production Number, confidentiality legend (where applicable), and redactions addressed above.

16. This First Request for Production of Documents is continuing in nature and any documents that should come into your possession, custody or control after your initial production are hereby requested and should be produced without the need to supplement this request.

## TIME PERIOD

Unless otherwise specified, all requests herein refer to the period August 1, 2010 to December 31, 2017, and includes items concerning such period or events occurring or projected

2397085 v1

to occur in such period, even if the items were prepared, published, or dated before or after that period.

## DOCUMENTS REQUESTED

1. All documents and communication concerning Miller Energy.

2. All documents and communications concerning the Alaska Assets.

3. All audit workpapers for the Miller Energy engagement.

21. All documents and communications concerning Sherb & Co., LLP or Carlton W. Voyt, III.

4. All documents and communications concerning Miller Energy's selection and retention of KPMG for any audit, accounting, or valuation services, including, but not limited to, any requests for proposal by Miller Energy, any KPMG responses thereto, any presentations by KPMG to Miller Energy, and KPMG's proposed and actual staffing of the Miller Energy engagement.

5. All presentations made by KPMG to Miller Energy.

6. All documents and communications concerning an Internal Audit Group described in Miller Energy's March 30, 2011 Form 8-K.

7. All communications between KPMG and Miller Energy's Audit Committee.

8. All documents and communications concerning KPMG's designation of Miller Energy as a "low risk" client.

9. All documents and communications concerning articles or securities analyst reports about Miller Energy's stock, including articles published by *The Street Sweeper*.

10. All deposition or interview transcripts concerning the Miller Energy engagement.

11. Documents and communications concerning John Riordan, Sam Bennet, and other KPMG personnel assigned to the Miller Energy engagement, including:

   (a) Documents sufficient to identify the previous audit experience of John Riordan, Sam Bennett, and other KPMG personnel assigned to Miller Energy engagement, regardless of time period;

   (b) All documents concerning any oil and gas audit experience of John Riordan, Sam Bennett, and other KPMG personnel assigned to Miller Energy engagement, regardless of time period;

2397085 v1

(c) The personnel files of John Riordan, Sam Bennett, and other KPMG personnel assigned to Miller Energy engagement, regardless of time period;

(d) All documents regarding the evaluation and selection of John Riordan as Managing Partner of the Knoxville office by KPMG, regardless of time period;

(e) All documents regarding John Riordan's goals or objectives as Managing Partner of the Knoxville office of KPMG, regardless of time period;

(f) Documents sufficient to identify all KPMG personnel who worked, in any capacity, on any aspect of the preparation of any of Miller Energy's SEC filings;

(g) All documents and communications concerning John Riordan and Sam Bennett's compensation, including bonuses and other income relating to the Miller Energy engagement, as well as factors used in calculation of such bonuses; and

(h) All documents and communication concerning John Riordan and Sam Bennett's employment status at KPMG and compensation since the censure of KPMG by the SEC over the Miller Energy engagement in August 2017.

12. All documents concerning any evaluation by KPMG of the risks associated with acceptance of Miller Energy as a client, and any periodic reviews by KPMG of the risks associated with the continued retention of Miller Energy as a client.

13. All documents and communications concerning the financial performance of KPMG's Knoxville, Tennessee office.

14. All documents and communications concerning revenues generated for KPMG by the Miller Energy engagement.

15. All time reports, work in progress, invoices, billing work papers supporting invoices, and accounts receivable aging, concerning Miller Energy.

16. Documents sufficient to identify Miller Energy personnel who were invited to or attended KPMG's Annual Oil and Gas Conference.

17. Document sufficient to identify the top ten clients of KPMG's Knoxville office for each year between 2009 and 2016, inclusive, as well as, for each client:

(a) Client's gross revenues;

(b) Client's total number of employees;

(c) Estimated number of employees in client's accounting function;

(d) KPMG's total hours and fees billed; and

(e) KPMG's average billable rate per hour.

2397085 v1

18. All documents and communications concerning the SEC's investigation of Miller Energy and KPMG, including but not limited to KPMG's document production to the SEC.

19. All KPMG policies, procedures, and training materials or applicable to the Miller Energy engagement from 2010 to the present, including:

(a) All policies, procedures, and training materials concerning the evaluation of potential clients prior to formal engagement as an audit client;

(b) All policies, procedures, and training materials providing non-audit services to audit clients;

(c) All policies, procedures, and training materials concerning auditor independence;

(d) All policies, procedures, and training materials concerning the auditing of public companies;

(e) All policies, procedures, and training materials concerning conflicts of interest;

(f) All policies, procedures, and training materials concerning fair market value accounting, fraud risk and fraud detection;

(g) All ethics policies;

(h) All policies and procedures concerning DPP; and

(i) All policies and procedures concerning EVS.

20. Documents sufficient to identify all persons within the DPP for each year between 2010 and 2017, inclusive.

21. Documents sufficient to identify all persons within EVS for each year between 2010 and 2017, inclusive.

22. All documents and communications concerning Ralph E. Davis & Associates.

23. All documents and communications concerning the $110 million valuation assigned to the above-ground infrastructure of the Alaska Assets.

24. All audit engagement letters for the Miller Energy engagement.

25. All documents and communications concerning the possibility of any individual or entity purchasing stock or investing in Miller Energy.

26. All documents and communications concerning the restatement of the April 30, 2010 Miller Energy financial statements.

27. All documents and communications concerning the $265.3 million impairment charge taken by Miller Energy on December 10, 2014.

2397085 v1

28. All documents and communications concerning the $150 million impairment charge taken by Miller Energy on March 12, 2015.

29. All documents and communications concerning Miller Energy's filing of Form 10-K for the year ended April 30, 2011 in July 2011 without KPMG's consent.

30. All proposed audit journal entries and supporting documentation for entries proposed by KPMG that were recorded by Miller Energy.

31. All waived audit journal entries and supporting documentation waived by KPMG and documents sufficient to identify reasons for not recording them relating to Miller Energy.

32. All documents and communications concerning KPMG's review of any "going concern" opinion for the Miller Energy engagement.

33. All KPMG internal quality control review reports for audits on which John Riordan served as a Partner or Audit Manager.

34. All communications between KPMG and the SEC concerning the Miller Energy engagement.

35. All communications between KPMG and the SEC concerning Freedom of Information Act ("FOIA") requests relating to the Miller Energy engagement or the Alaska Assets, including but not limited to communications purporting to justify the application of FOIA Exemption 4 to such requests, regardless of time period.

36. All documents KPMG produced to the SEC in connection with the investigation that culminated in the SEC KPMG Order.

37. All documents and communications between KPMG and the SEC concerning KPMG's compliance with the SEC KPMG Order.

38. Documents sufficient to identify KPMG's notification to all audit professionals of the terms of the SEC KPMG Order.

39. All documents, training materials, reviews, and report required of KPMG by the terms of the SEC KPMG Order;

40. All documents and communications concerning work performed by DPP in connection with the Miller Energy engagement.

41. All documents and communications concerning work performed by EVS in connection with the Miller Energy engagement.

42. Documents sufficient to identify the audit workpapers revised by KPMG personnel in anticipation of PCAOB's planned inspections of KPMG.

43. All documents and communications concerning the Offerings, including:

2397085 v1

(a) Documents and communications concerning any investigation conducted by KPMG in connection with the Offerings;

(b) Documents and communications concerning the inclusion of KPMG's statements and consents in the Offering Documents;

(c) Documents concerning, including drafts, of KPMG's audit opinions and "expert statements" in the Offering Documents;

(d) All communications between KPMG and the Offerings' Underwriters.

44. All insurance policies that provide or may provide coverage to KPMG or its employees, officers and/or directors with respect to the claims in this lawsuit.

45. All documents and communication You contend support Your defenses to any of Plaintiffs' claims in this case.

46. Documents sufficient to identify Your policies, procedures, and practices relating to the preservation, retention, or destruction of documents or electronically-stored information.

Dated: September 12, 2018

**GORDON BALL PLLC**

/s/ Gordon Ball
Gordon Ball
TN BPR#001135
Lance K. Baker
Tenn. Bar #: 032945
Ste. 600, 550 Main Street
Knoxville, TN 37902
Tel: (865) 525-7028
Fax: (865) 525-4679
gball@gordonball.com
lkb@gordonball.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Times Wang
1100 New York Ave NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
88 Pine Street, 14th Floor
New York, NY 10005

Tel: (212) 838-7797
Fax: (212 838-7745
lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

2397085 v1

## CERTIFICATE OF SERVICE

      I hereby certify that on September 12, 2018, I served the foregoing to counsel of record via email.

Dated:   September 12, 2018                          */s/ Times Wang*
                                                         Times Wang

2397085 v1

Case 3:16-cv-00121-TAV-DCP   Document 81-3   Filed 10/26/18   Page 17 of 17   PageID #: 6723