# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

LEWIS COSBY, KENNETH MARTIN, as
beneficiary of the Kenneth Ray Martin Roth IRA,
and MARTIN WEAKLEY on behalf of
themselves and all others similarly situated,

       Plaintiffs,

     v.

KPMG, LLP

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.: 3:16-cv-00121-TAV-DCP

## PLAINTIFFS' CORRECTED MOTION TO CERTIFY THE CLASSES, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ......................................................................................... 1

II.  BACKGROUND ........................................................................................................... 3

   A.  Statement of Facts ................................................................................................... 3

   B.  Proposed Class Representatives............................................................................... 7

III. CLASS CERTIFICATION IS APPROPRIATE ...................................................... 8

   A.  Securities Cases Are Particularly Well Suited for Class Action Treatment ....... 8

   B.  Legal Standard ......................................................................................................... 9

   C.  The Proposed Class Satisfies the Requirements of Federal Rule of Civil Procedure
      23(a) ......................................................................................................................... 10

      1.  The Classes Are Numerous ........................................................................... 11

      2.  Common Questions of Law and Fact Exist.................................................. 12

      3.  The Proposed Class Representatives' Claims Are Typical of Those of the Classes...... 14

      4.  The Proposed Class Representatives Will Fairly And Adequately Protect the
         Interests of the Classes .................................................................................. 17

   D.  The Proposed Classes Meet the Requirements of Rule 23(b)(3)........................ 18

      1.  Common Questions of Law and Fact Predominate .................................... 18

         a.  The Claims of All Class Members Will Be Proved by the Same Evidence ............... 20

         b.  The Section 10(b) Class is Entitled to a Presumption of Reliance Under Both *Basic*
            and *Affliated Ute* ........................................................................................... 20

         c.  The Section 10(b) Class is Entitled to the Fraud-on-the-Market Presumption of
            Reliance Pursuant to *Basic*........................................................................... 21

            (1)  Average Trading Volume ...................................................................... 23

            (2)  Analyst Coverage................................................................................... 24

(3)   Presence of Market Makers ...................................................................... 25

(4)   Eligibility to File an S-3 Registration Statement .................................... 25

(5)   Price Reaction of Stock to New Information .......................................... 26

(6)   Market Capitalization ............................................................................. 27

(7)   Bid-Ask Spread ...................................................................................... 28

(8)   Institutional Ownership .......................................................................... 28

(9)   Autocorrelation ...................................................................................... 29

d.   The Section 10(b) Class is Entitled to a Presumption of Reliance Pursuant to *Affliated Ute* ................................................................................................................. 30

2.   A Class Action is Superior to Alternative Methods of Resolving This Dispute ............ 31

IV.   THE PROPOSED CLASS REPRESENTATIVES' CHOSEN CO-LEAD COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL ....................................................... 33

V.  CONCLUSION ............................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀsᴇs

*In re Accredo Health, Inc. Sec. Litig.*,
No. 03-2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ............................11, 22, 23, 26

*Affiliated Ute Citizens v. US.*,
406 U.S. 128 (1972).............................................................................................................20, 30

*In re Am. Int'l Grp., Inc.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010).......................................................................................16

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ..............................................................................................14, 17

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................................................................................18

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................................................................................................................30

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................................... *passim*

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .........................................................................................27, 28

*Bobbitt v. Acad. Of Court Reporting, Inc.*,
252 F.R.D. 327 (E.D. Mich. 2008) ......................................................................................12, 14

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ................................................................................2, 9, 21, 22

*In re BP P.L.C. Sec. Litig.*,
No. 10-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)......................................................33

*Burges v. Bancorpsouth*,
No. 14-15645, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) .........................................11, 22

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................................ *passim*

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ...........................................................................................12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................22

*Castillo v. Envoy Corp.*,
    206 F.R.D. 464 (M.D. Tenn. 2002) .......................................................... *passim*

*Cates v. Cooper Tire & Rubber Co.*,
    253 F.R.D. 422 (N.D. Ohio 2008) ..............................................................10, 14

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003) .................................................................26, 28

*In re Constar Int'l Sec. Litig.*,
    585 F.3d 774 at 784 (3rd Cir. 2009) .................................................................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2009) ..........................................................16

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006) ..........................................................................11

*In re Direct Gen. Corp.*,
    No. 05-0077, 2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006)..............................11

*In re Dynex Capital Sec. Litig.*,
    No. 05-1897, 2011 WL 781215 (S.D.N.Y. Mar. 11, 2011)..............................15, 33

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) .............................................................29

*In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013).............................................................30

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) .....................................................................21, 22

*In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...........................................................16

*In re Gaming Lottery Sec. Litig.*,
    No. 96-5567, 2001 WL 204219 (S.D.N.Y. 2001)..............................................29

*Garden City Employees' Ret. Sys. V. Cent. States, Se. & Sw. Areas Pension Fund*,
    No. 09-00882, 2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ......................13, 31

*Goodman v. Genworth Fin. Wealth Mgmt.*,
    300 F.R.D. 90 (E.D.N.Y. 2014)......................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ..........................................................................................20, 21

*In re HealthSouth Corp. Sec. Litig.*,
    261 F.R.D. 616 (N.D. Ala. 2009) ..........................................................................14

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983) ..............................................................................................20

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ................................................................15

*Kasper v. AAC Holdings, Inc.*
    No. 15-923, 2017 WL 3008510 ......................................................................19, 23

*Kennedy v. Tallant*,
    710 F.2d 711 (11th Cir. 1983) ................................................................................9

*Krogman v. Sterrit*,
    202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................27, 28

*Levine v. Skymall, Inc.*,
    No. 99-166, 2001 WL 37118873 (D. Ariz. May 24, 2001) ....................................26

*Little Caesar Enterprises, Inc. v. Smith*,
    172 F.R.D. 236 (E.D. Mich. 1997) ..........................................................................2

*Manners v. Am. Gen. Life Ins. Co.*,
    No. 98-0266, 1999 WL 33581944 (M.D. Tenn. Aug. 11, 1999) ............................17

*In re Marsh & McLennan Co., Inc. Sec. Litig.*,
    No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................................14

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ......................................................................27

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ..................................................................................20

*In re NetBank Inc. Sec. Litig.*,
    259 F.R.D. 656 (N.D. Ga. 2009) ............................................................................27

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011) ............................................................................33

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    No. 08-0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ................................28

*In re Parmalat Sec. Litig.*,
No. 04-1653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)....................................9

*In re Petrobas Sec. Litig.*,
No. 14-9662, 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016).................................9

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) ........................................................29

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)..............................................................31

*Picard Chem. Profit Sharing Plan v. Perrigo Co.*,
No. 95-141, 1996 WL 739170 (W.D. Mich. Sept. 27, 1996) ............................9, 32

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
967 F. Supp. 2d 1143 (N.D. Ohio 2013).........................................24, 26

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,
501 F.3d 592 (6th Cir. 2007) ......................................................19

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)................................................16

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ......................................................9

*In re Revco Sec. Litig.*,
142 F.R.D. 659 (N.D. Ohio 1992) ...................................................9

*Rikos v. P&G*,
799 F.3d 497 (6th Cir. 2015) ...................................................10, 18

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) ............................................. *passim*

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) .......................................................19

*Schwartz v. Opus Bank*,
No. 16-07991, 2017 WL 5468820 (C.D. Cal. Feb. 23, 2017) ..............................33

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007)................................................28

*In re Se. Milk Antitrust Litig.*,
No. 08-1000, 2011 WL 3793777 (E.D. Tenn. Aug. 25, 2011) .............................10

*Shaw v. Toshiba America Information Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ...................................................................2

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ......................................................................12, 15

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ..................................................................24

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3rd Cir. 2006) .........................................................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*,
    546 F.3d 196 (2nd Cir. 2008) .......................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ......................................................................................8

*Vinh Nguyen v. Radient Pharm. Corp.*,
    287 F.R.D. 563 (C.D. Cal. 2012) ..................................................................25

*Weinberg v. Insituform Techs., Inc.*,
    No. 93-2742, 1995 WL 368002 (W.D. Tenn. Apr. 7, 1995) ...................................9

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ......................................................................19, 23

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
    280 F.R.D. 332 (E.D. Mich. 2012) ...............................................................22, 23

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 ...............................................................................9, 16, 18, 24

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................15

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ......................................................................24, 25

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.2d 532 (6th Cir. 2012) .......................................................................13

**STATUTES, RULES & REGULATIONS**

15 U.S.C. § 77

    § 77k......................................................................................................3

    § 77k(e) ...............................................................................................19

15 U.S.C. § 78j ................................................................................................................3

Securities Act of 1933 ................................................................................... *passim*

Securities Exchange Act of 1934 ................................................................... *passim*

Federal Rules of Civil Procedure Rule 23 ..................................................... *passim*

17 C.F.R. § 240.10b-5 ...................................................................................19

Lewis Cosby, Eric Montague and Martin Ziesman, as Co-Trustee for the Carolyn K. Ziesman Trust ("Plaintiffs" or "Class Representatives"), respectfully submit this memorandum of law in support of their Motion to Certify the Classes, Appoint Class Representatives and Appoint Class Counsel (the "Motion").

## I. PRELIMINARY STATEMENT

The sole catalyst for Miller Energy's ("Miller" or the "Company") dizzying transformation from an East Tennessee-based oil and gas penny stock company on the brink of insolvency to a powerhouse company traded on the New York Stock Exchange ("NYSE") was its 2009 acquisition of certain oil and gas reserves in Alaska ("the Alaska Assets"). Despite only paying $2.25 million for the Alaska Assets in a bankruptcy fire sale, Miller and its ostensibly independent auditor, KPMG, LLP ("KPMG" or "Defendant"), spent the next five years deceiving investors into believing that the Alaska Assets were worth a whopping $480 million. As the Securities and Exchange Commission ("SEC") later confirmed, this was an outright fraud and the Alaska Assets were essentially worthless.

KPMG was instrumental in perpetrating the fraud: it refused to apply any scrutiny to the suspect valuation; issued year after year of unqualified clean audit opinions vouching for the valuation; and systematically altered Miller's financials to portray the Alaska Assets as a growth engine that would allow Miller to deliver consistent and predictable earnings, all in flagrant disregard of professional audit standards ("GAAS") and auditing principles ("GAAP"). The fraud was of such magnitude that the revelation of the truth caused Miller's stock price to decline precipitously, eventually forcing Miller into bankruptcy, and causing investors to lose hundreds of millions of dollars.

As courts in the Sixth Circuit and throughout the country repeatedly note, "class actions

are a particularly appropriate means for resolving securities fraud actions."[1] This case, too, is ideally suited for class treatment. Indeed, in a related action pending against the underwriters of Miller's securities offerings (which are also at issue in this action), *Gaynor v. Miller*, No. 15-545 (E.D. Tenn.) ("Gaynor Action"), Magistrate Judge Poplin issued a detailed report and recommendation that a similar class of Miller investors be certified. *See* Report and Recommendation, Gaynor Action, ECF No. 167 ("Gaynor R&R").

As in the Gaynor Action, class certification is appropriate here because of the numerous factual and legal questions regarding KPMG's materially false and misleading statements and omissions that are common to all members of the proposed Classes. These common questions predominate over any individualized questions that may exist. This action is also similar to the Gaynor Action because the Classes are so numerous that it is impracticable to adjudicate Class members' claims individually and a class action is the superior way to fairly and efficiently adjudicate the issues. Finally, the proposed Class Representatives' claims are typical of those of the Classes, and, through Court-appointed Lead Counsel, the proposed Class Representatives have and will continue to successfully and diligently prosecute this action.

Accordingly, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Plaintiffs seek to: (1) certify a class of all persons or entities who purchased or otherwise acquired Miller Energy common stock, Miller Energy 10.75% Series C Cumulative Redeemable Preferred Stock (the "Series C Preferred Stock") or Miller Energy 10.5% Series D Fixed Rate/Floating Rate

---

[1] *See Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 455 (S.D. Ohio 2009); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 607 (S.D. Ohio 2003); *see also Shaw v. Toshiba America Information Sys, Inc.*, 91 F. Supp. 2d 942, 958 (E.D. Tex. 2000) ("Class certification in securities cases is practically routine."); *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 241-42 (E.D. Mich. 1997) ("when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class.").

Cumulative Redeemable Preferred Stock (the "Series D Preferred Stock") between August 29, 2011 and July 30, 2015 (the "Class Period"), inclusive, and who were damaged thereby (the Section 10(b) Class"); and (2) certify a class of all persons and entities who purchased or otherwise acquired Miller Energy Series C Preferred Stock or Series D Preferred Stock pursuant to or traceable to the Offering Documents and were damaged thereby (the "Section 11 Class") (together with the Section 10(b) Class, the "Classes").[2]  Plaintiffs also seek an Order: (1) appointing Lewis Cosby, Eric Montague and Martin Ziesman, as Co-Trustee for the Carolyn K. Ziesman Trust, as Class Representatives; and (2) appointing the law firms of Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC as Class Counsel.  For all the reasons set forth below, the Motion should be granted.

## II.    BACKGROUND

### A.    Statement of Facts

On December 10, 2009, Miller purchased the Alaska Assets at a bankruptcy auction. ¶¶ 43, 46.[3]  The bankruptcy court previously declared the Alaska Assets to be of "no value or other benefit" in an order permitting the prior owner to legally abandon them. ¶ 45. Miller nevertheless secured the rights to the Alaska Assets with a bid of $2.25 million and the assumption of liabilities that the Company valued at $2 million. ¶ 46. Following the acquisition, the Alaska Assets comprised 95% of the Company's reported assets. ¶ 57.

---

[2] Excluded from the Classes are KPMG, the Officers, Directors, Partners and affiliates of KPMG at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which KPMG has or had a controlling interest.  The Classes are named for the causes of action under which their claims arise: Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Section 11 of the Securities Act of 1933, 15 U.S.C. §77k.

[3] Citations to " ¶__" are to paragraphs of the Second Amended Complaint, ECF No. 59. Unless otherwise indicated, quotation marks and citations are omitted, and alterations are adopted.

On December 16, 2009, Miller announced the acquisition of the Alaska Assets in a press release, claiming that they were worth $325 million—more than one hundred times the price Miller had paid just days before. ¶ 48. In the Company's Form 10-Q for the quarter ending January 30, 2010, Miller then represented that the fair market value of the Alaska Assets was $480 million—a yet-further-inflated figure achieved by double-counting certain above-ground fixed assets associated with the reserves. *Id.* On the date of the acquisition of the Alaska Assets, Miller stock closed at $0.61 per share. *Id.* Less than four months later, the price had skyrocketed to $6.60 per share, an increase of 982%. *Id.* Once relegated to the penny-stock sheets, Miller rapidly moved its listing to the NASDAQ and was trading on the NYSE by 2012. *Id.* The fraudulent valuation of the Alaska Assets was the principal driver and accelerant that fueled Miller's meteoric rise.

On February 1, 2011, in response to mounting pressure from shareholders to professionalize its accounting practices, Miller replaced its audit firm with KPMG. ¶ 63. On April 14, 2011, unbeknownst to investors, the SEC sent a letter seeking "a detailed analysis of how the value of each component of [the Alaska Assets] was determined." ¶ 66. On June 7, 2011, the SEC sent another letter, again unbeknownst to investors, seeking information on the valuation of certain oilfields that were part of the Alaska Assets, noting the fact that many of the wells were dormant and unusable in what was known to be a "high operating cost area." ¶ 66. KPMG drafted responses to the SEC's letters and defended the integrity of Miller's fraudulent valuation of the Alaska Assets without applying scrutiny to the valuation and before completing its audit. ¶ 67. KPMG then issued a clean audit report on August 29, 2011, certifying to investors that Miller's "financial statements … present fairly, in all material respects, the financial position of Miller Energy." ¶ 98. It repeated these and other material misstatements over the following four years. ¶¶ 148-49.

As the SEC later found in a detailed Order, from the inception of its relationship with Miller, KPMG engaged in a litany of egregious misconduct in blatant violation of GAAS and GAAP, including, for example: flouting its bedrock duties to remain independent from, and skeptical of, Miller's management (¶¶ 78, 153); engaging in "repeated instances of [highly] unreasonable conduct," (¶ 96); appointing a lead partner who "lacked the necessary experience to serve as the partner-in-charge of the engagement[;]"[4] turning a blind eye to internal cost projections that contradicted the rosy assumptions underlying Miller's valuation of the Alaska Assets (¶ 84); and working to disguise the double-counting of above-ground infrastructure in Miller's financial disclosure statements. ¶¶ 103, 13.[5]

Further compounding these GAAP and GAAS failures, KPMG failed to heed warning signs that something was badly wrong with the Alaska Assets valuation. For example, on July 28, 2011, a financial blog dedicated to exposing corporate fraud ran an article that marshaled evidence to argue that Miller's valuation of the Alaska Assets was an outright sham. ¶ 122. Then, in August 2011, the SEC issued a subpoena to Miller seeking additional information about the Alaska Assets' valuation. ¶ 146. On August 16, 2011, *In re Miller Energy Res. Sec. Litig.*, No. 11-386 (E.D. Tenn.) was filed, alleging that Miller had overvalued the Alaska Assets. ¶ 147. KPMG was aware of each of these red flags (¶ 148), yet continued to issue clean audit reports for Miller, misleadingly telling

---

[4] The SEC found that KPMG selected an audit team that "had insufficient expertise to appropriately address the risks presented by Miller Energy." ¶ 103.

[5] KPMG's misconduct began even *before* it agreed to accept Miller as a client. The SEC would later conclude that KPMG "failed to properly assess the risks associated with accepting Miller as a client[.]" ¶ 7. Such risks included the extraordinary nature of the Alaska acquisition, Miller's recent history as a penny-stock company, its lack of experienced executives and qualified accounting staff, material internal controls weaknesses, and the Company's pressing need to obtain financing to operate the newly acquired Alaska Assets. ¶¶ 83-84.

investors that nothing was wrong, and that they could continue to rely on Miller's valuation of the Alaska Assets. ¶ 150-55.

KPMG's choice to lend its imprimatur to Miller's valuation of the Alaska Assets played a critical role in obtaining and reassuring investors. ¶ 173. Indeed, Miller brought KPMG accountants to Alaska for an investor conference to show investors that KPMG was involved and that Miller could be trusted. ¶ 242. Miller also repeatedly touted KPMG's involvement on investor calls as proof of the soundness of its financial statements. *Id.*

At the end of 2014, the house of cards began to collapse. On December 10, 2014, Miller announced a staggering $265.3 million impairment charge to the Alaska Assets. ¶ 218. On March 12, 2015, Miller wrote down another $149.1 million, increasing total impairment charges related to the Alaska Assets to $414.4 million. ¶ 222. On April 29, 2015, the Company announced that the SEC intended to bring charges against Miller relating to the Alaska Assets. ¶ 223. In the following months, Miller announced that it would suspend dividend payments; the SEC formally filed charges against Miller; and the NYSE de-listed Miller stock. ¶ 224-30. By September 30, 2015, Miller common stock was trading at $0.07 per share. ¶ 232. On October 1, 2015, Miller filed for Chapter 11 bankruptcy. *Id.* Finally, on March 29, 2016, Miller admitted that the Alaska Assets were worthless and that its years of financial statements to the contrary were a sham. ¶ 235.

 On August 15, 2017, the SEC publicly announced charges for "improper professional conduct and securities law violations by KPMG . . . relating to a review and audit of the financial statements of Miller Energy Resources, Inc." ¶ 238. In nearly one hundred paragraphs of detailed findings, the SEC concluded that KPMG was continually confronted with evidence that the Alaska Assets were overvalued, but turned a blind eye to that evidence in violation of numerous

laws and regulations. ¶¶ 240-42. The SEC's Order confirms that KPMG, together with Miller, violated the federal securities laws by working for years to deceive investors, enriching themselves with the fruits of their fraud, and leaving unsuspecting shareholders to suffer the consequences of their duplicity. As a result of its misconduct, the SEC ordered KPMG to conduct a comprehensive review of its quality controls for audits and training materials with the oversight of an independent monitor, pay a civil money penalty of $1 million,[6] and disgorge all of its Miller audit fees plus interest, a total of more than $5 million. ¶¶ 23, 28-30.

## B. Proposed Class Representatives

Lewis Cosby purchased Miller common stock at artificially inflated prices and suffered losses as a result of KPMG's misconduct. ECF. No. 3-1. On May 31, 2016, Plaintiffs moved for the appointment of Lewis Cosby as a Lead Plaintiff in this matter. *See* Motion to Appoint Counsel and Co-Lead Plaintiffs, ECF No. 11. On February 17, 2017, the Court granted the motion and appointed Lewis Cosby as a Lead Plaintiff. *See* Order, ECF No. 31.[7] Pursuant to the Private Securities Litigation Reform Act, the Court made a preliminary finding of Mr. Cosby's adequacy and typicality as part of the appointment. *Id.* As a Lead Plaintiff, Mr. Cosby has expended significant time and effort in informing himself about this case, and through qualified counsel, has vigorously prosecuted this action on behalf of the proposed Classes. He will continue to take an active role in and monitor the litigation for the best interest of the Classes.

---

[6] The Lead Audit Partner, John Riordan, also was ordered to pay a $25,000 penalty and was suspended from appearing or practicing in the financial reporting or audits of public companies. ¶ 9.

[7] Kenneth R. Martin (as beneficiary of the Kenneth Ray Martin Roth IRA) also moved for and was appointed as a Lead Plaintiff. Martin Weakley was added as an additional named plaintiff in Plaintiffs' SAC. Mr. Martin and Mr. Weakley moved to withdraw from this action on March 1, 2019. *See* Pls.' Mot. to Substitute, ECF No. 101.

*See generally*, Joint Declaration of Lewis Cosby, Eric Montague and Martin Ziesman in Support of Plaintiffs' Motion for Class Certification ("Joint Decl."), attached as Exhibit A.

Eric Montague purchased Miller Energy common stock at artificially inflated prices and suffered losses as a result of KPMG's misconduct. ECF No. 101-1. Martin Ziesman, as Co-Trustee for the Carolyn K. Ziesman Trust, purchased Miller Energy Series C Preferred Stock pursuant to and/or traceable to the Offerings at artificially inflated prices and suffered losses as a result of KPMG's misconduct. ECF No. 101-2. On March 1, 2019, Plaintiffs moved to substitute Messrs. Montague and Ziesman into the case. *See* Pls.' Mot. To Substitute, ECF No. 101. Messrs. Montague and Ziesman have taken time to inform themselves about the nature of the case, and will take an active role in and monitor the litigation for the best interest of the Classes. *See generally*, Joint Decl.

## III. CLASS CERTIFICATION IS APPROPRIATE

### A. Securities Cases Are Particularly Well Suited for Class Action Treatment

The Supreme Court repeatedly emphasizes the importance of class actions in redressing wrongs committed under the federal securities laws. *See*, *e.g*., *Basic Inc. v. Levinson*, 485 U.S. 224, 229-30, 249-50 (1988); *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313-14, 320 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions ....").

Rule 23 provides for the effective enforcement of the securities laws for large numbers of investors who have suffered injuries, but who do not have the economic resources or the individual interest to incur the expense and inconvenience of an individual lawsuit. Courts in the Sixth Circuit overwhelmingly find securities fraud actions similarly appropriate for class treatment. *See*, *e.g.*,

*Castillo v. Envoy Corp.*, 206 F.R.D. 464, 474 (M.D. Tenn. 2002) ("Courts have generally considered that class actions are the most favorable means of adjudicating federal securities fraud claims."); *Weinberg v. Insituform Techs., Inc.*, No. 93-2742, 1995 WL 368002, at *7 (W.D. Tenn. Apr. 7, 1995) ("securities fraud cases are uniquely suited to class action treatment[.]").[8] By providing a single forum to litigate the same or similar claims, a class action affords an indispensable mechanism for the conservation of judicial resources. *See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts.").[9] This case is no different: Plaintiffs have satisfied each of the requirements under Rule 23(a) and Rule 23(b)(3) and the proposed Classes should be certified.

### B. Legal Standard

Class certification under Rule 23 is a two-step process. "First, Rule 23(a) requires plaintiff to establish that the proposed class meets four prerequisites – namely, numerosity, commonality,

---

[8] *See also Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 659 ("It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions."); *Ross*, 257 F.R.D. at 455 (same); *Bovee*, 216 F.R.D. at 607 (same). Moreover, courts routinely certify classes in securities fraud cases against auditors. *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256 (3rd Cir. 2006); *In re Petrobas Sec. Litig.,* No. 14-9662, 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016); *In re Parmalat Sec. Litig.*, No. 04-1653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).

[9] Furthermore, Courts throughout the country and within the Sixth Circuit have found cases alleging violations of the Securities Act particularly suited for class certification, as those cases do not require than any investor specifically relied on the defendants' false and misleading statements. *See In re Constar Int'l Sec. Litig.*, 585 F.3d 774 at 784 (3rd Cir. 2009) ("reliance is irrelevant in a § 11 cases, a § 11 case will never demand individualized proof as to an investor's reliance or knowledge."); *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc*., 277 F.R.D. 97, 101 (S.D.N.Y. 2011) ("[a]s courts have repeatedly found, suits alleging violations of the securities laws, particularly those brought pursuant to Section 11 [] are especially amenable to class action resolution."); *Picard Chem. Profit Sharing Plan v. Perrigo Co*., No. 95-141, 1996 WL 739170 (W.D. Mich. Sept. 27, 1996); *In re Revco Sec. Litig*., 142 F.R.D. 659 (N.D. Ohio 1992).

typicality and adequacy." *Cates v. Cooper Tire & Rubber Co.*, 253 F.R.D. 422, 428 (N.D. Ohio 2008). Second, the plaintiff must demonstrate that the action falls within one of the subcategories of Rule 23(b). *Id*. Here, Plaintiffs seek certification under Rule 23(b)(3), which requires a showing that (1) common questions of fact and law predominate over any individual questions; and (2) a class action is superior to other available methods for adjudicating the controversy. *Ross*, 257 F.R.D. at 451.

While a "district court maintains substantial discretion in determining whether to certify a class", the "Supreme Court has made clear that Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Rikos v. P&G*, 799 F.3d 497, 504-05 (6th Cir. 2015). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 505. Thus, plaintiffs need not show at the class certification stage that they are likely to prevail on the merits of their claims. *See id*.; *In re Se. Milk Antitrust Litig.*, No. 08-1000, 2011 WL 3793777, at *2 (E.D. Tenn. Aug. 25, 2011).

### C.     The Proposed Class Satisfies the Requirements of Federal Rule of Civil Procedure 23(a)

To certify a class action, Plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 23(a), which requires that: (1) the class be so numerous that joinder of all parties is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of those of the class; and (4) the representatives will fairly and adequately represent the interests of the class. As demonstrated herein, Plaintiffs have satisfied each of the Rule 23(a) requirements for class certification.

### 1.    The Classes Are Numerous

As the Gaynor R&R held in a similar context, the Classes satisfy the numerosity requirement. Gaynor R&R at 9. Rule 23(a)(1) requires that a proposed class be so numerous that joinder of all its members is impracticable. Impracticality "does not require impossibility, but only difficulty or inconvenience in joining all members of the class." *In re Direct Gen. Corp.*, No. 05-0077, 2006 WL 2265472, at *2 (M.D. Tenn. Aug. 8, 2006). "[T]here is no strict numerical test" (*Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)), and "[n]umerosity is generally assumed to have been met in class action suits involving nationally traded securities." Gaynor R&R at 16 (quoting *Burges v. Bancorpsouth,* No. 14-15645, 2017 WL 2772122, at *2 (M.D. Tenn. June 26, 2017).[10]

While the exact number of Class members in the Classes is currently unknown, Plaintiffs estimate that there are thousands of members of both the proposed Section 10(b) and Section 11 Classes. Miller Energy Securities were actively traded on the NYSE during the Class Period, ¶ 22, when the Common Stock's average trading volume was approximately 2,140,764 shares per week, and average weekly turnover was 4.88%—demonstrating that at least thousands of investors are part of the Section 10(b) Class. ¶ 253. *See* Expert Report of Chad Coffman, CFA ("Coffman Report") (attached as Exhibit B) ¶¶ 29-30. Similarly, according to Miller's documents filed with the SEC, more than 6.21 million Series C and Series D Preferred Shares were sold in the Offerings during the Class Period.[11] Further, the average weekly turnover as a percentage of shares

---

[10] *See also In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216, 2006 WL 1716910, at *5 (W.D. Tenn. Apr. 19, 2006) (same).

[11] 625,000 Miller Energy preferred shares were issued pursuant to the February 13, 2013 Series C Offering's Prospectus Supplement; 500,000 Miller Energy Preferred shares were issued pursuant to the June 28, 2013 Series C Offering's Prospectus Supplement; 335,000 Miller Energy Preferred shares were issued pursuant to the June 28, 2013 Series C Offering's Prospectus Supplement; one

outstanding for the Miller Energy Series C and Series D shares during the Class Period was 5.16%

and 7.93% shares per week respectively, demonstrating that at least thousands of investors are part

of the Section 11 Class. Coffman Rpt. ¶ 30. *Id.* Classes of such size are too numerous to make

individual joinder practical or logistically possible. This is especially so given that the members

of the Classes are located throughout the country. *See In re Cardizem CD Antitrust Litig.*, 200

F.R.D. 297, 303 (E.D. Mich. 2001). Accordingly, the Classes satisfy the numerosity requirement

of Rule 23(a)(1).

### 2. Common Questions of Law and Fact Exist

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." To

show commonality, "[t]he claims of the potential class members need not be factually identical."

*Ross*, 257 F.R.D. at 442. "The mere fact that questions peculiar to individual class members could

remain does not necessarily defeat a finding of commonality." *Id.* Further, "[a]lthough Rule

23(a)(2) speaks of "questions" in the plural . . . there need only be one question common to the

class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). "The standard is not

demanding. Rule 23(a) simply requires a common question of law or fact." *Bobbitt v. Acad. Of

Court Reporting, Inc.*, 252 F.R.D. 327, 338 (E.D. Mich. 2008). The mere fact that questions

"peculiar to each individual member of the class" could remain does not necessarily defeat a

finding of commonality; especially when liability is premised on a single course of conduct. *See

Young v. Nationwide Mut. Ins. Co*., 693 F.2d 532, 543 (6th Cir. 2012).

---

million Miller Energy Preferred shares were issued pursuant to the September 26, 2013 Series D
Offering's Prospectus Supplement; 70,448 Miller Energy Preferred shares were issued pursuant to
the October 17, 2013 Series D Offering's Prospectus Supplement; and 750,000 Miller Energy
preferred shares were issued pursuant to the August 21, 2014 Series D Offering's Prospectus
Supplement. ¶ 286.

Here, KPMG made uniform misrepresentations to the investing public. These misrepresentations and omissions artificially inflated the price of Miller Energy Securities and injured each member of the Classes in the same way. Even though just one would suffice, Plaintiffs raise many common questions of law and fact arising from KPMG's conduct, including but not limited to:

- whether KPMG violated the federal securities laws, ¶¶ 70-72, 312;

- whether and to what extent Miller's financial statements during the proposed Class Period, and incorporated in the Offering Documents, failed to comply with GAAP, ¶¶ 8, 107-18, 310;

- whether the value of the Alaska Assets was fraudulently overstated during the proposed Class Period and in the Offering Documents, ¶¶ 70-72, 312;

- whether statements (or omissions) made by KPMG to the investing public misrepresented (or omitted to state) material facts about the business, operations and management of Miller, ¶¶ 293-313;

- whether KPMG's audits of Miller's financial statements, and incorporated into the Offering Documents, were conducted in accordance with GAAS and the standards of the PCAOB, ¶¶ 100-03, 268;

- whether KPMG abandoned its duty of independence as Miller's auditor, ¶¶ 152-69;

- whether KPMG acted with scienter, ¶¶ 176-81; and

- to what extent the members of the Section 10(b) and Section 11 Classes have sustained damages and the proper measure of damages, ¶¶ 246-48.

The answers to these common questions will drive the resolution of the lawsuit; this is the essence of commonality. *See Garden City Employees' Ret. Sys. V. Cent. States, Se. & Sw. Areas Pension Fund,* No. 09-00882, 2012 WL 1071281, at *36 (M.D. Tenn. Mar. 29, 2012) (finding that defendants' allegedly false and misleading statements and omissions of material fact "create[d] common issues of fact and law for the investor class"). Indeed, "[q]uestions of misrepresentation, materiality, and scienter are the paradigmatic common question[s] of law in a securities fraud class

action." *Ross*, 257 F.R.D. at 443. Class members would have to prove the same facts and address the same legal issues if they choose to pursue their claims on an individual basis. Thus, evidentiary proof of these issues will necessarily be common to all members of the Classes. *See* Gaynor R&R (finding commonality because "Defendants disseminated substantially the same omissions and misrepresentations concerning Miller Energy's over valuation of the Alaska Assets[]" and because "whether such actions violate the [securities laws] is a common question[.]") Accordingly, Plaintiffs satisfy the commonality requirement of Rule 23(a)(2).

### 3. The Proposed Class Representatives' Claims Are Typical of Those of the Classes

Rule 23(a)(3) requires that the claims and defenses of the representative parties are typical of those of the class. The claims and defenses of the proposed class representatives are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). "The requirement of typicality is not onerous." *Cates*, 253 F.R.D. at 429.[12] As this Court noted in the Gaynor Action, "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." Gaynor R&R at 21 (citing *In re Marsh & McLennan Co., Inc. Sec. Litig.*, No. 04-8144, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009)).

---

[12] *See also In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 627 (N.D. Ala. 2009) ("Typicality generally presents a low burden that is easily satisfied."); *Bobbitt v. Acad. of Court Reporting, Inc.*, 252 F.R.D. 327, 339 (E.D. Mich. 2008) ("The test for typicality, like commonality, is not demanding.").

Here, the proposed Class Representatives' claims are typical of, if not virtually identical to, the claims of the members of the proposed Classes. As the foregoing discussion explains, *see supra* at § III.C.2, the proposed Class Representatives' claims arise from the same events, invoke the same legal theories, are subject to the same defenses, and will be proved with the same evidence as those of the Classes. Simply put, "as goes the claim of the named plaintiff, so go the claims of the Class." *Sprague*, 133 F.3d at 399. Accordingly, the typicality requirement of Rule 23(a)(3) is satisfied.

For purposes of typicality at the class certification stage, it is irrelevant which Miller security each of the proposed Class Representative purchased since all of the claims arise from the very same false and misleading statements and omissions made by KPMG and incorporated in Miller's Forms 10-K and 10-Q, Registration Statement and Prospectus Supplements. *See*, *e.g.*, ¶¶ 182-193; 295-311. Courts have repeatedly held that a class representative has standing to represent class members who purchased a different security where all of the securities issued involve the same registration statement or misleading statements or omissions. *See, e.g., In re Dynex Capital Sec. Litig.*, No. 05-1897, 2011 WL 781215, at *9-10 (S.D.N.Y. Mar. 11, 2011) (holding that "it would be premature to defeat class certification on the basis that some Plaintiff did not purchase every single security forming the basis of the claims" and finding typicality even though the lead plaintiff only purchased one of the two series of bonds at issue, where the allegedly false and misleading statements for both offerings were identical); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008) (holding that "[p]laintiffs with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 281 (S.D.N.Y. 2003) (finding lead plaintiff typical

and certifying a class despite lead plaintiff not purchasing a security from two of the offerings at issue where the claims were "based on misrepresentations in the Registration Statements and on the same core course of conduct"); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1372 (N.D. Ga. 2005) (holding that plaintiffs had standing to pursue Section 11 claims arising from two different offerings despite only purchasing shares from one of the offerings at issue).[13] Indeed, this Court so held in the Gaynor Action. *See* Gaynor R&R at 20-21 (rejecting arguments that typicality was not met because a proposed class representative could not trace his shares back to the relevant offerings). This is because "putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." *Willis*, 242 F. Supp. 3d at 649 (collecting cases).

Here, the proposed Class Representatives include purchasers of Miller Energy Common Stock and Preferred Stock; holders of Common and Preferred Stock alike suffered losses after purchasing Miller Energy Securities at artificially inflated prices; and all share identical interests in holding KPMG accountable and maximizing their recovery. *See* Joint Decl. Nothing more is

---

[13] *See also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2009) ("[I]t is not necessarily the case that someone who purchased securities that were first registered on the same form and prospectus, but that were issued with different prospectus or pricing supplements, lacks standing to represent prior purchasers. So long as (1) the securities are traceable to the same initial shelf registrations and (2) the registration statements share common parts that (3) were false and misleading at each effective date, there is § 11 standing."); *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 537-38 (S.D.N.Y. 2010) (concluding that plaintiffs had standing to assert claims premised on 101 different offerings made pursuant to the same shelf registration statements from which plaintiff had purchased securities, despite not having participated in all 101 offerings at issue); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690-91 (M.D. Tenn. 2000) ("[A] § 11 cause of action can be brought by anyone who purchased stock under a registration statement, regardless of when the purchase was made.").

required under Rule 23: "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *Manners v. Am. Gen. Life Ins. Co.*, No. 98-0266, 1999 WL 33581944, at *15 (M.D. Tenn. Aug. 11, 1999).

### 4. The Proposed Class Representatives Will Fairly And Adequately Protect the Interests of the Classes

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The Sixth Circuit has established two criteria to determine adequacy of representation. First, the proposed class "representative must have common interests with unnamed members of the Class." *Amer. Med. Sys.*, 75 F.3d at 1083. This requirement overlaps with the commonality and typicality prerequisites and seeks to ensure that representatives have no conflicts of interest with the class. *Id.* Second, it must "appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.* This requirement seeks to ensure that class representatives have sufficient personal involvement in the matter and that class counsel are competent to prosecute the action vigorously. *Id.* Here, both prongs of the adequacy requirement are satisfied.

First, as set forth above, like the rest of the members of the Classes, the proposed Class Representatives sustained their losses as a result of the same alleged material misrepresentations and omissions contained and repeated in Miller's financial statements, KPMG's audit opinions, the Registration Statement and the Prospectus Supplements. Thus, the proposed Class Representatives interests are in common with the rest of the members of the Classes.

Second, the proposed Class Representatives have a meaningful financial stake in this litigation and have demonstrated their willingness and ability to play an active role in the litigation. *See* Joint Decl. The proposed Class Representatives also intend to supervise and monitor the

progress of this litigation, work with counsel to maximize recovery for the Classes, and provide testimony at deposition as necessary. *See* Joint Decl.; *Willis*, 242 F. Supp. 3d at 649 (finding proposed class representatives with similar financial and personal involvement in the case adequate). In the Gaynor Action, this Court found similar personal and financial involvement on the part of the named plaintiffs to militate for a finding of adequacy. Gaynor R&R at 22-25.

Moreover, the proposed Class Representatives retained counsel with extensive experience in securities class actions and complex litigation.[14] Plaintiffs' counsel have already demonstrated their commitment to vigorously prosecute this case by investigating and drafting pleadings; responding to and defeating KPMG's motion to dismiss; propounding discovery; consulting with experts on market efficiency, accounting and valuation; and moving for class certification. Plaintiffs' counsel will continue to provide competent and zealous representation to protect the interests of the Classes. Thus, the adequacy requirement is satisfied.

### D. The Proposed Classes Meet the Requirements of Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), this action also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate the dispute. *See Rikos,* 799 F.3d at 509-10 & n.5.

### 1. Common Questions of Law and Fact Predominate

The Supreme Court has held that the predominance standard is "readily met in certain cases alleging . . . securities fraud." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Going further, the Sixth Circuit has held that when "[t]he dispositive facts and law are the same as to each class member[, t]his is sufficient to satisfy both the commonality and predominance requirements."

---

[14] *See supra* § IV.

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). As the foregoing discussion of Plaintiffs' allegations under Rule 23(a)(2)'s commonality standard makes plain, *see supra* at § III.C.2, common questions of law and fact will drive the resolution of this litigation. These common questions predominate over any potential individual issues; nothing more is required to satisfy the predominance standard of Rule 23(b)(3). *See Powers*, 501 F.3d at 619; *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) ("When a company's stock trades in a large and efficient market, the contestable elements of the Rule 10b-5 claim reduce to false-hood, scienter, materiality, and loss. Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable representative steps forward."); Gaynor R&R at 31 ("[a]t the heart of [the Miller investors'] claim[s] is that the Registration Statement contained misstatements and/or omissions of material fact—the over valuation of the Alaska Assets. This issue will predominate over any secondary issues . . . .").[15]

---

[15] At the class certification stage, plaintiffs are not required to show that damages are capable of measurement on a classwide basis to demonstrate predominance. As the Sixth Circuit has held, "[w]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013). Though no such showing is necessary at this time, the Expert Report of Chad Coffman ("Coffman Report," attached as Exhibit A), demonstrates that damages can be calculated for both the Section 10(b) Class and the Section 11 Class on a classwide basis based on a common methodology. *See* Coffman Rpt. ¶¶ 97-103. Indeed, the methodologies set forth in the Coffman Report have been employed in nearly every securities class action, and are widely endorsed by courts, including courts in the Sixth Circuit. *See Kasper v. AAC Holdings, Inc.* No. 15-923, 2017 WL 3008510, at *9; Gaynor R&R at 40 ("Plaintiffs' reliance on the statutory formula provided in 15 U.S.C. § 77k(e) is sufficient.").

### a. The Claims of All Class Members Will Be Proved by the Same Evidence

Plaintiffs seek certification of the Classes to pursue claims of securities fraud under Section 10(b) of the Exchange Act and Section 11 of the Securities Act. Plaintiffs' Section 10(b) claim for securities fraud requires proof of: (1) a misleading statement or omission; (2) made by a defendant; (3) while acting with scienter; (4) that is material; (5) that was relied upon; (6) causing damage to the plaintiff. *See Ross*, 257 F.R.D. 439-40. Each of these elements will be proven by common evidence. *See supra* at § III.C.2. To prevail under Section 11 of the Securities Act, Plaintiffs "need only show a material misstatement or omission to establish [their] prima facie case." *Herman & Maclean v. Huddleston,* 459 U.S. 375, 382 (1983). Each of these elements will also be proven by common evidence. *See supra* at § III.C.2. Since reliance is not an element of a Section 11 claim, Plaintiffs need only show a presumption of reliance for their Section 10(b) claims. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012).

### b. The Section 10(b) Class is Entitled to a Presumption of Reliance Under Both *Basic* and *Affliated Ute*

Common questions of law and fact also predominate in this action because the Section 10(b) Class is entitled to a presumption of reliance. Therefore, individual reliance issues will not predominate over issues common to the Section 10(b) Class. *See generally Castillo*, 206 F.R.D. at 473-74. In an action involving false and misleading statements, courts look to the fraud-on-the-market presumption of reliance first articulated by the Supreme Court in *Basic* and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014). In an action involving material omissions, plaintiffs can also rely on the *Affiliated Ute* presumption of reliance. *Affiliated Ute Citizens v. US.*, 406 U.S. 128, 153-54 (1972). The application of one or the other depends on "the

crux of plaintiffs' claims." *Goodman v. Genworth Fin. Wealth Mgmt.*, 300 F.R.D. 90, 104 (E.D.N.Y. 2014).

Under both *Basic* and *Affiliated Ute*, reliance can be presumed and is, therefore, common to the Section 10(b) Class.

### c. The Section 10(b) Class is Entitled to the Fraud-on-the-Market Presumption of Reliance Pursuant to *Basic*

In an efficient market, reliance is presumed. *Halliburton*, 573 U.S. 258, 266 (2014); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990). An efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. By purchasing a security at the price set by an efficient market, an investor is constructively relying upon all of the public information about the company. *See Bovee*, 216 F.R.D. at 607; *Ross*, 257 F.R.D. at 453-54. When reliance is presumed, individual issues of proof do not predominate, and a class may be certified. *See Basic*, 485 U.S. at 247; *Ross*, 257 F.R.D. at 453 ("The fraud on the market theory is key to satisfying the predominance requirement in class certification of securities fraud cases."). Thus, proof sufficient to support a finding of an efficient market is all that is required to certify a class of investors to pursue claims under the federal securities laws. *See Castillo*, 206 F.R.D. at 471 ("preliminary determination as to the availability or applicability of the presumption" suffices at class certification stage).

In the Sixth Circuit, courts generally use five factors to determine whether stocks trade in an efficient market: (1) whether there was large average weekly trading volume during the class period; (2) whether a significant number of securities analysts followed the company's stock during the class period; (3) whether the company's stock had market markers; (4) whether the company was entitled to file an S-3 Registration Statement; and (5) whether empirical facts

showed a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 343 (E.D. Mich. 2012) (the so-called "*Cammer* factors").[16] "In order for the court to conclude that a market is efficient, it is *not* necessary that a stock satisfy all five factors." *In re Accredo Health, Inc., Sec. Litig.*, 2006 WL 1716910, at *10 (emphasis added). Courts also consider four additional factors from the economic literature on market efficiency, including: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; (3) institutional ownership; and (4) autocorrelation. Courts have used these factors as "an analytical tool rather than as a checklist." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015).

Here, there is no question that there was an efficient market for Miller Energy Securities, which were widely traded on the NYSE prior to, during and after the Class Period. ¶ 187. "Courts and commentators have noted that certain markets, such as the NYSE, are particularly efficient" and thus "well suited for application of the fraud on the market theory." *Bovee*, 216 F.R.D. at 606.[17] Moreover, as demonstrated herein and in the Coffman Report, each of the *Cammer* and

---

[16] *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[17] *See also Ross*, 257 F.R.D. at 442 (noting NYSE is a "recognized efficient market"); *Burges v. Bancorpsouth, Inc.*, No. 14-1564, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017) (finding the NYSE to be a "well-developed and impersonal market" that "will instantaneously incorporate all publicly available information about a given security into the market price of that security"); *Wilkof*, 280 F.R.D. at 343 ("[C]ertain markets [such as the NYSE] are developed and efficient for virtually all the securities trade there."); *Barclays*, 310 F.R.D. at 83 ("In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the Basic presumption on class certification."); *Freeman*, 915 F.2d at 199 ("[S]ecurities traded in national secondary markets such as the New York Stock Exchange, as was the case in *Levinson*, are well suited for application of the fraud on the market theory.").

"plus" factors supports a finding that the market for Miller Energy Securities was efficient.[18] In light of this showing, the Section 10(b) Class is entitled to the fraud-on-the-market presumption of reliance, and thus the claims of the Section 10(b) Class "will prevail or fail in unison." *In re Whirlpool Corp. Front-Loading Washer Prod. Lib. Litig.*, 722 F.3d 838, 858 (6th Cir. 2013).

### (1) Average Trading Volume

"Courts have found that there is a substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%." *Accredo*, 2006 WL 1716910, at *7 n.3.[19] Here, the average weekly trading volume for Common Stock during the Class Period was 5.04 % as a percentage of shares outstanding, which is higher than the average common stock traded on the New York Stock Exchange (2.36%). Coffman Rpt. ¶ 29. With respect to the Preferred Stock, the average weekly trading volume as a percentage of shares outstanding was 5.16% for Series C Preferred Stock and 7.93% for Series D Preferred Stock. *Id.* at ¶ 30; s*ee Wilkof*, 280 F.R.D. at 343 (finding that an average weekly trading volume between 1 and 2% during the class period created a substantial presumption of an efficient market and certifying the proposed class); *Kasper*, 2017 WL 3008510 at *8 (finding an efficient market with 4.19% average weekly

---

[18] Plaintiffs bring claims under Section 10(b) of the Exchange Act for all purchasers of Miller Energy Common Stock, Series C Preferred Stock and Series D Preferred Stock. Plaintiffs submit the Coffman Report in support of its market-efficiency arguments. Mr. Coffman is the President of Global Economics Group, a firm that specializes in the application of economics, finance, statistic, and valuation principles in a variety of contexts. Mr. Coffman has rendered an opinion on market efficiency for all of the Miller Energy Securities in this case. *See* Coffman Rpt., ¶¶ 24-26. Mr. Coffman analyzed Miller Energy Common Stock, Series C Preferred Stock and Series D Preferred Stock using the relevant factors described herein and concluded that the market for each was efficient. *See id.*

[19] *See also Cammer*, 711 F. Supp. at 1286. ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one ....")

trading volume). Thus, the high trading volume weighs strongly in favor of finding that the market for each of the Miller Energy Securities was efficient.

### (2) Analyst Coverage

"A stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016); *see also Cammer*, 711 F. Supp. At 1286. Even a single analyst can support a finding of an efficient market. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005). Here, during the Class Period, equity analysts from at least 15 separate firms issued more than 158 analyst reports. Coffman Rpt. ¶ 35.[20] In addition, Miller was discussed in at least 1,681 unique press articles during the Class Period. *Id.* ¶ 37. The number of analyst reports and volume of public dissemination of news and other information regarding Miller strongly indicates that the market for Miller Energy Securities was efficient. *Id.* ¶ 38; *see Willis*, 242 F. Supp. 3d at 654 (finding that analyst reports from 16 brokerage firms indicates market efficiency "in this Circuit"); *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1162 (N.D. Ohio 2013) (finding that "at least fifteen analysts" who "issued numerous reports" indicates market efficiency).[21]

---

[20] Miller earnings call transcripts indicate that additional equity analyst reports likely exist, but they were unavailable through third party providers. Thus, the number of analyst reports is "almost certainly understated." Coffman Rep. 17 n.31.

[21] *See also Castillo*, 206 F.R.D. at 470 (M.D. Tenn. 2002) (finding market efficiency when the company "was actively followed by securities analysts at major brokerage firms"); *Ross*, 257 F.R.D. at 454 (noting that the company was "followed by securities analysts" and presuming market efficiency).

### (3)     Presence of Market Makers

"A market-maker is one who helps establish a market for securities by reporting bid and ask quotations (the price a buyer will pay for a security and the price a seller will sell a security, respectively) and standing ready to buy or sell the security at these publicly quoted prices." *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572 (C.D. Cal. 2012). Market makers "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. At 1286-87. There were 73 market makers for Common Stock during the Class Period. Coffman Rpt. ¶ 43.[22] Though Bloomberg does not provide market-maker information for the Preferred Stock, both Series C and Series D preferred shares also traded on the NYSE throughout the relevant period. *Id.* The presence of such a large number of sophisticated professional investors is yet another indicator of market efficiency. *See*, *e.g.*, *Cammer*, 711 F.Supp. at 1283 n.30 (11 market makers supported a presumption of market efficiency).[23] Thus, this factor further supports a finding of an efficient market for Miller Energy Securities during the Class Period.

### (4)     Eligibility to File an S-3 Registration Statement

The SEC only permits the use of an S-3 short form Registration Statement by issuers whose securities are actively traded and widely followed, as demonstrated by a history of making required

---

[22] In *Cammer,* the court found the number of market makers relevant in an over-the-counter market *without* volume reporting. 711 F. Supp. at 1286-87. Here, by contrast, Miller Energy Securities traded on the NYSE, which, as the largest and most liquid exchange in the world, enjoys continuous public price and volume reporting. Thus, the number-of-market-makers factor is not as germane to Miller Energy Securities as it was to the security at issue in *Cammer*. *See id.* at 1292 ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

SEC filings and a market capitalization in excess of $75 million. *See Accredo*, 2006 WL 1716910, at *7 n.4 ("[E]ligibility to file the S-3 form is predicated upon the SEC's belief that the market for the company's stock already operates efficiently."); *accord Castillo*, 206 F.R.D. at 470. Here, Miller filed two Form S-3s on September 6, 2012 and October 5, 2012 and was eligible to do so throughout the majority of the proposed Class Period. Coffman Rpt. ¶¶ 44-46. Thus, this factor supports the conclusion that Miller Energy Securities traded in an efficient market. *See Burns*, 967 F. Supp. 2d at 1163 (finding that filing a Form S-3 and eligibility to file a Form S-3 during the class period "weighs in favor of market efficiency.").

### (5) Price Reaction of Stock to New Information

Evidence that the price of a security regularly reacts to news about the issuer is strong evidence of an efficient market. *See Burns*, 967 F. Supp. 2d at 1155. "[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. Here, using an event study,[24] Coffman found a statistically significant cause-and-effect relationship between news about Miller and changes in the market price for both the

---

[23] *See also Xcelera.com*, 430 F.3d at 516 (22 market makers supported a presumption of market efficiency); *Accredo*, 2006 WL 1716910, at *7 (37 market makers supported a presumption of market efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) (between 15 and 19 market makers supported a presumption of market efficiency); *Levine v. Skymall, Inc.*, No. 99-166, 2001 WL 37118873, at *6 (D. Ariz. May 24, 2001) (22 market makers supported a presumption of market efficiency).

[24] Courts have found that where the results of an event study show price changes that are statistically significant, a cause-and-effect relationship exists between the release of information pertaining to the company and the company's stock price. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*, 546 F.3d 196 at 207-08 (2nd Cir. 2008) ("An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.").

Common Stock and Preferred Stock. Coffman Rpt. ¶¶ 53-80. This demonstrates that Miller's share prices reacted rapidly to new and unexpected information. *See id.* Therefore, this factor also decisively indicates that Miller Energy Securities traded in an efficient market. *Id.*

### (6) Market Capitalization

Market capitalization is another quantitative measure that correlates with market efficiency. *See Krogman v. Sterrit*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). The considerable demand for investment in highly capitalized companies tends to result in an active market for the securities they issue, leading courts to conclude that the market for such securities is efficient. *See id.* The market capitalization for Miller Energy Common Stock was $0.2 billion on April 30, 2013 and 0.4 billion on January 31, 2014, a period in which at least 26% of the firms traded on the NYSE and NASDAQ had lower market capitalization. Coffman Rpt. ¶ 83. Coffman further found that it was most logical to consider the market capitalization of Miller as a whole for Series C and Series D Preferred Stock, since the size of the firm affects factors like analyst coverage and the amount of news. *Id.* ¶ 84. When factoring in Series C and Series D Preferred Stock, Miller's combined market capitalization was between that 16th and 41st percentile of the combined NYSE and NASDAQ markets over the relevant time period. *Id.*

Courts presume that this level of market capitalization indicates that the security trades in an efficient market. *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (market capitalization "rang[ing] from $292 million to $585 million" indicated an efficient market); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154, 160 (S.D.N.Y. 2012) (market capitalization "rang[ing] from $288 million to $717 million" indicated an efficient market); *In re NetBank Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (market capitalization

of $246 to $432 million indicated an efficient market). Thus, this factor supports a finding of market efficiency for Miller Energy Securities.

### (7) Bid-Ask Spread

The bid-ask spread reflects the difference between the price at which investors are willing to buy and the price at which they are willing to sell a security. *Krogman*, 202 F.R.D. at 478. Smaller bid-ask spreads are associated with more efficient markets.[25] Here, during the proposed Class Period, Miller Energy Preferred Stock had bid-ask spreads that were generally low and had an average value that closely approximated the average bid-ask spread of a random sample of 100 common stocks trading on the NYSE and NASDAQ. Coffman Rpt. ¶ 89. Such low values support a finding of efficiency. *Id.* Likewise, the average monthly percentage bid-ask spread for Common Stock ranged from 0.15% to 1.75%. *Id.* ¶ 87. Accordingly, Miller Energy Securities' bid-ask spreads were low during the Class Period, and this factor further supports market efficiency. *Id.*; *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (bid-ask spread of 1.9%, "weighs heavily in favor of a finding of market efficiency[.]"); *Cheney*, 213 F.R.D. at 501 (bid-ask spread of 2.44% suggests efficiency).

### (8) Institutional Ownership

Institutional investors are sophisticated, well-informed, and known to engage in detailed analysis of the securities in their portfolios. Coffman Rpt. ¶ 90. Such investors include mutual funds, pension funds, investment banks and other types of large financial institutions that have substantial resources to devote to such analysis. *Id.* During the proposed Class Period, 181

---

[25] *See Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 08-0160, 2018 WL 3861840, at *16 (N.D. Ohio Aug. 14, 2018) ("[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade[.]").

institutions held, on average, 30% of the public float.[26] This high level of institutional ownership coupled with high trading volumes further supports a conclusion of market efficiency. *Id.; see In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016) (efficiency supported where more than 214 mutual funds held Petrobras bonds); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006) (a "substantial number of institutional investors" is consistent with an efficient market).

### (9) Autocorrelation

Autocorrelation is the degree to which previous price movements have the ability to predict future price movements. Coffman Rpt. ¶ 91. Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency. *Id.* Here, the Coffman Report found that there is no evidence of autocorrelation for either the Common Stock or the Preferred Stock. *Id.* ¶ 94-96. Therefore, this factor also supports the conclusion that Miller Energy Securities traded in an efficient market throughout the Class Period. *See In re Gaming Lottery Sec. Litig.,* No. 96-5567, 2001 WL 204219, at *17 (S.D.N.Y. 2001) (finding an efficient market where the stock was traded on the NASDAQ and plaintiff's expert testified that a statistical analysis did not reveal autocorrelation).

\*\*\*

In sum, there can be no dispute that the market for Miller Energy Securities was efficient throughout the Class Period. Accordingly, the members of the Section 10(b) Class are entitled to

---

[26] A company's float is "the degree to which shares of the security are held by the public, rather than insiders." *Billhofer*, 281 F.R.D. at 160.

a presumption that they relied upon each of the false and misleading statements and omissions on which this action is based. *See Basic*, 485 U.S. at 247. As a result, there is no requirement for individual proof of reliance. Common issues will predominate and the Section 10(b) Class properly can and should proceed as a class action. *Id.*

> **d.** **The Section 10(b) Class is Entitled to a Presumption of Reliance Pursuant to *Affliated Ute***

The Section 10(b) Class is also entitled to a presumption of reliance pursuant to *Affiliated Ute*. The *Affiliated Ute* presumption applies to claims involving a failure to disclose. 406 U.S. at 153. In such circumstances, "positive proof of reliance is ***not*** a prerequisite to recovery." *Id.* at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* The *Affiliated Ute* presumption reflects the reality that where information is omitted, "reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).

Moreover, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) ("[B]ecause [t]he question of materiality … is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class."). Here, the Complaint alleges Defendant made material omissions. *See*, *e.g.*, ¶¶ 7, 22, 134, 156. Because the Complaint alleges actionable omissions, the Section 10(b) Class is also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### 2. A Class Action is Superior to Alternative Methods of Resolving This Dispute

Rule 23(b)(3) requires that a class action be superior to other available methods of adjudicating the controversy. Courts consider four factors when evaluating whether a class action is the superior means of adjudication:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability . . . of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Courts have also found the superiority requirement met where: (a) many in the class of investors likely suffered only small losses, making it impracticable to proceed with their claims as individuals; (b) use of the class vehicle will achieve judicial economy, as well as prevent inconsistent judgments; and (c) there are no other actions against the company involving the same claims, and the court foresees no particular difficulties with adjudicating the class action. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class action mechanism allows plaintiffs to pool claims that would otherwise be uneconomical to litigate individually); *Garden City Employees' Ret. Sys.,* 2012 WL 1071281, at *39 ("certification of [a securities] class action is a vastly superior method of adjudication because the common issues will only have to be heard and decided once, thereby promoting judicial efficiency.").

Each of the Rule 23(b)(3) factors is satisfied in this case. First, Plaintiffs are unaware of any Class member who would prefer to control the prosecution of her claims individually, likely

because doing so would be prohibitively expensive.[27] Class litigation is the only viable means by which the vast majority of persons injured by KPMG may seek a remedy. Second, for the reasons described above, no individual claims have been asserted against KPMG for its violations of the securities laws in connection with Miller. Third, the geographical dispersion of the members of the Classes means that it is desirable that their claims be litigated in a single forum. Concentration of the litigation in a single forum is also the best way to avoid inconsistent adjudications and promote fairness and efficiency. Finally, this case presents no unusual difficulties in maintaining the class action or providing notice to the Classes. Plaintiffs foresee no management difficulties or other issues which would preclude this action from proceeding as a class action and are confident that any such can be resolved by the parties or by this Court.

Moreover, judicial economy and the best interests of the Classes favor class certification, since the alternative would burden the judiciary and deprive the Classes of any practical means of seeking recourse. *See Perrigo*, 1996 WL 739170, at *9 ("If this Court does not certify this class, hundreds of small shareholders . . . will be effectively barred from seeking legal redress of their claims. Further, because the potential class members seek a determination on essentially the same issues, ... a class action would enhance judicial economy and efficiency."). This is precisely the evil that Rule 23 was designed to prevent. Thus, the class action is the only realistic method of fairly and efficiently disposing of the claims at issue here, and is superior to any other method of adjudicating this action. *See* Gaynor R&R at 41 ("The vast amount of shares, coupled with the predominant issue in this case, warrant a finding that a class action is the superior method of adjudication.").

---

[27] In any case, if a Class member wishes to pursue an individual claim, she will have the opportunity to opt out of the Classes and do so.

## IV. The Proposed Class Representatives' Chosen Co-Lead Counsel Should Be Appointed as Class Counsel

Plaintiffs respectfully move that the Court appoint their chosen Co-Lead Counsel, Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC, as Class Counsel. Federal Rule of Civil Procedure 23(g)(1) provides that "a court that certifies a class must appoint class counsel." In appointing class counsel, courts must consider counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(l)(A)(i)-(iv). All of these factors favor the appointment of Co-Lead Counsel as Class Counsel.[28]

Gordon Ball has served as lead or co-counsel for plaintiffs in dozens of antitrust, consumer, and product liability class actions across the United States. *See* Gordon Ball Legal Resume, attached hereto as Exhibit C. Cohen Milstein Sellers & Toll PLLC has extensive securities litigation experience and successfully prosecuted numerous securities fraud class actions on behalf of injured investors recovering billions for investors. *See* Cohen Milstein Sellers & Toll PLLC Firm Resume, ECF No. 40-3.[29] Together, Co-Lead Counsel have vigorously prosecuted this action,

---

[28] In appointing Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC as Co-Lead Counsel in this matter, this Court has already made a preliminary determination that Co-Lead Counsel will fairly and adequately protect the interests of the putative Classes. *See* Order of February 27, 2017 at 4, ECF No. 31; Order of July 24, 2017 at 2; ECF No. 54.

[29] *See, e.g.*, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 164 (S.D.N.Y. 2011) (finding Cohen Milstein "well-qualified to continue as class counsel based on its forty-plus years experience with securities and other class action representation."); *Schwartz v. Opus Bank*, No. 16-07991, 2017 WL 5468820, at *3 (C.D. Cal. Feb. 23, 2017) (appointing Cohen Milstein class counsel and finding that Cohen Milstein "has extensive experience litigating large and complex securities class actions, and is very familiar with the applicable law."); *Dynex*, 2011 WL 781215, at *9 (holding that "Cohen, Milstein, Sellers & Toll, PLLC has the experience, knowledge, commitment and record of work on this case to merit appointment as Class Counsel."); *In re BP P.L.C. Sec. Litig.*, No. 10-2185, 2013 WL 6388408, at *13 (S.D. Tex. Dec. 6, 2013)

including conducting an extensive investigation of the Classes' claims, developing a detailed plan for the prosecution of the case, defeating KPMG's motion to dismiss, engaging in substantial discovery, and pursuing class certification. Co-Lead Counsel will continue to draw on their expertise in securities and class litigation and will devote the resources necessary to promote the interests of the Classes, just as they have in numerous other matters. Accordingly, Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC fulfill the requirements of Rule 23(g) and should be appointed Class Counsel.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the court: (a) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (b) appoint Lewis Cosby, Eric Montague, and Martin Zeisman, as Co-Trustee for the Carolyn K. Ziesman Trust, as Class Representatives; and (c) appoint Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC as Class Counsel.

Dated: March 15, 2019

Respectfully submitted,

*/s/ Laura H. Posner*

Gordon Ball
GORDON BALL PLLC
550 W. Main Street
Suite 600
Knoxville, TN 37902
Tel: (865) 525-7029
Fax: (865) 525-4678

gball@gordonball.com

*Lead Counsel for Plaintiffs*

Laura H. Posner
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212)838-7745
lposner@cohenmisltein.com

Steven J. Toll
Allen Dreschel
COHEN MILSTEIN SELLERS & TOLL PLLC

(noting that Cohen Milstein has "considerable experience prosecuting class action securities fraud cases" and finding Cohen Milstein "more than adequate[]" to serve as class counsel).

1100 New York Ave NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
adreschel@cohenmisltein.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2019, I caused the foregoing to be filed using the Court's

CM/ECF System, which in turn sent notice to counsel of record.

Dated: March 15, 2019

*/s/ Laura H. Posner*

Laura H. Posner