UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

----------------------------------------x

LEWIS COSBY, KENNETH R. MARTIN,

as beneficiary of the Kenneth Ray Martin

Roth IRA, and MARTIN WEAKLEY on

behalf of themselves and all others

similarly situated,

                        Plaintiffs,

               vs.             No. 3:16-cv-00121

KPMG, LLP,

                        Defendant.

----------------------------------------x

                       April 12, 2019

                       9:01 a.m.


       VIDEOTAPED DEPOSITION of CHAD COFFMAN, held

at the law offices of MCDERMOTT WILL & EMERY LLP,

340 Madison Avenue, New York, New York, before

Eleanor Greenhouse, a Shorthand Reporter and Notary

Public within and for the State of New York.

Case 3:16-cv-00121-TAV-DCP   Document 120-1   Filed 04/16/19   Page 1 of 71   PageID #: 7375

```
 1
 2  A P P E A R A N C E S:
 3  Attorneys for Plaintiffs:
 4  COHEN MILSTEIN SELLERS & TOLL PLLC
 5        88 Pine Street, 14th Floor
 6        New York, New York  10005
 7  BY:   LAURA H. POSNER, ESQ.
 8        lposner@cohenmilstein.com
 9
10  Attorneys for Defendant:
11  MCDERMOTT WILL & EMERY LLP
12        340 Madison Avenue
13        New York, New York  10173-1922
14  BY:   GREGORY BALLARD, ESQ.
15        gballard@mwe.com
16           - AND -
17  WALLER LANSDEN DORTCH & DAVIS, LLP
18        Nashville City Center
19        511 Union Street - Suite 2700
20        Nashville, Tennessee 37219
21  BY:   PAUL S. DAVIDSON
22        paul.davidson@wallerlaw.com
23  ALSO PRESENT:
24        Mukarram Attari, Charles River Associates
25        Allison Hart, Paralegal, McDermott Will & Emery
```

1           C. Coffman

2              THE VIDEO TECHNICIAN:  This is the

3       video deposition of Chad Coffman in the

4       matter of Lewis Cosby et al. versus KPMG,

5       LLP.  This deposition is being held at

6       McDermott Will & Emery LLP on April 12, 2019

7       at 9:01:00 a.m.

8              My name is Darrak Lighty from Reporters

9       Central and I'm the video specialist.  The

10      court reporter today is Eleanor Greenhouse,

11      also associated with Reporters Central.

12             Counsel will now state their

13      appearances for the record.

14             MS. POSNER:  Laura Posner, Cohen

15      Milstein, Sellers & Toll PLLC, for the

16      Plaintiff.

17             MR. BALLARD:  I'm Greg Ballard, from

18      McDermott Will & Emery, for KPMG, LLP.  I

19      have Allison Hart, a paralegal here, also

20      from McDermott, with me.

21             MR. ATTARI:  Mukarram Attari, Charles

22      River Associates.

23             MR. DAVIDSON:  Paul Davidson, Waller

24      Lansden, on behalf of KPMG.

25             THE VIDEO TECHNICIAN:  Will the court

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 3 of 71  PageID #: 7377

```
1                         C. Coffman
2           reporter please swear in the witness.
3    C H A D   C O F F M A N, called as a witness,
4           having been duly sworn by a Notary Public,
5           was examined and testified as follows:
6                   (Exhibit 25, March 15, 2019 expert
7           report of Chad Coffman, marked for
8           identification, as of this date.)
9    EXAMINATION BY
10   MR. BALLARD:
11          Q.     I'm handing you Exhibit 25.  What is
12   Exhibit 25?
13          A.     This appears to be a copy of the report
14   I prepared and submitted in this matter.
15          Q.     Did you sign this report on March 15,
16   2019?
17          A.     Yes.
18          Q.     Does Exhibit 25 contain a complete and
19   accurate statement of your opinions as you hold
20   them today in this matter?
21          A.     Yes.  It summarizes the opinions, the
22   overarching opinions I've reached.  Within the
23   report there are a lot of sub-opinions as well, and
24   obviously my background and experience contributed
25   in a lot of ways to some of the analyses, but the
```

Case 3:16-cv-00121-TAV-DCP   Document 120-1   Filed 04/16/19   Page 4 of 71   PageID #: 7378

                            C. Coffman

 1
 2  everything, but I would have looked at that issue.
 3      Q.    This was important to you because those
 4  are the four of 19 instances that you referred to
 5  repeatedly through your report and you use it in
 6  your bar charts and you use it everywhere; right?
 7          MS. POSNER:  Objection.  Misstates the
 8      report.
 9      A.    I don't know that I use it everywhere.
10  There's a table that I find four of the 17
11  significant and I state that in the text as well.
12      Q.    Did you look at the question carefully?
13  Let me rephrase that.  For the 17 events that you
14  address in your event study for the common stock,
15  did you look carefully to make sure you were
16  getting the right dates?
17      A.    Yes.
18      Q.    Because that's important to your
19  analysis?
20      A.    Yes.
21      Q.    I want to ask some questions about the
22  Cammer factors so why don't you turn to page 14 of
23  your report.  The first factor you have listed here
24  is trading volume.  How significant is trading
25  volume as one of the factors?

C. Coffman

1

2  securities analysts.  It's not suggesting there's a

3  big difference between are there 15 analysts or 16

4  analysts or three analysts or four analysts.

5          It's less of a strict correlation than

6  is there just qualitatively evidence that there are

7  analysts covering the stock.

8      Q.    Would you say this factor weighs in

9  favor of a finding of efficiency if an

10 insignificant number of analysts are covering a

11 stock?

12     A.    I don't know how you would define

13 insignificant.  I certainly think it would not

14 weigh towards efficiency if there weren't any

15 analysts covering a stock or there was just one.

16 What significant means, I'm just not sure.

17     Q.    You've quoted this language here that

18 says that it would be persuasive to allege a

19 significant number of securities analysts.  What is

20 your view of what a significant number of

21 securities analysts would be?

22     A.    I guess I don't have a specific

23 threshold in mind.  I mean, in this particular

24 case, as I've identified on Exhibit 4, there were

25 15 separate analysts that issued reports on the

                          C. Coffman

1
2    stock.  At least a half dozen issued more than ten
3    reports on the stock, and as I also note, my source
4    for analysts' reports certainly doesn't cover all
5    of the analyst reports that may have been out
6    there, so the evidence in this case was sufficient
7    that there was, in my view, a significant number of
8    analysts covering the stock and I didn't need to
9    think exactly what that threshold was.
10        Q.   So you don't have a preset idea in your
11   mind about what would be a significant number in a
12   particular context, but you think that 15 certainly
13   meets the threshold?  Is that what you said?
14        A.   I think 15 certainly meets that
15   threshold.  I think as long as there's evidence of
16   significant analyst coverage of a company, that
17   this factor supports market efficiency, and I
18   demonstrate that there was significant analyst
19   coverage during the analysis period.
20        Q.   You said if there was only one analyst,
21   that wouldn't be significant, and 15 is
22   significant.  Can you give us any closer idea of
23   where the threshold would be for significance in
24   your mind?  5, 12, 10, 14, 2?
25        A.   Again, as I describe within this

```
1                        C. Coffman
2    section, you know, focusing on the specific number
3    is not really even what the Cammer factor was
4    really getting at.
5              The question is -- as an economic
6    matter, if you look at the language in the Cammer
7    factor, it says, "The existence of such analysts
8    would imply, for example, the auditor reports were
9    closely reviewed by investment professionals, who
10   would in turn make buy/sell recommendations to
11   client investors."
12             Now there are many different outlets
13   for people to get information about companies and
14   analysis of companies, not just analyst reports.
15   So again, I think the -- there could be an
16   over-focus on just the number of analyst reports,
17   so I don't have in my mind a very specific
18   threshold.
19             And the relevant question is, is there
20   evidence that there was significant analyst
21   coverage of Miller Energy securities during the
22   class period, and I concluded there was.
23        Q.    Do you remember my question?
24        A.    I think the question was, is there a
25   specific number that I have in mind when thinking
```

```
 1                      C. Coffman
 2  about what significant means.
 3       Q.    So is it yes or is it no?
 4             MS. POSNER:  Objection.  Asked and
 5       answered.
 6       Q.    I think it's no.
 7       A.    I don't have a specific number in mind.
 8  Again, I believe I've answered the question in my
 9  report whether there was evidence of significant
10  analyst coverage during the analysis period.
11       Q.    You've said one is not significant, 15
12  is significant, and you can't be any more specific
13  than that?
14             MS. POSNER:  Objection.
15             MR. BALLARD:  This is your chance.
16             MS. POSNER:  Objection.
17       A.    I'm not offering a bright line
18  threshold for what is significant and what is not
19  significant.
20       Q.    Does quality of the analyst coverage
21  matter?
22       A.    Theoretically it could.
23       Q.    Not all analysts are equal; right?
24       A.    That's correct.
25       Q.    So one analyst might work for a massive
```

REPORTERS CENTRAL, LLC * 212-594-3582

                          C. Coffman

1

2      Q.    Some of them you've never heard of

3  before; right?

4      A.    I don't know that I've never heard of

5  them before, but they're not that familiar to me.

6      Q.    What is SADIF Analytics?

7      A.    I don't know.

8      Q.    Do you know the name of the analyst, if

9  there actually was one there?

10     A.    Not as I sit here, no.  I would have to

11  go back and look at it.

12     Q.    Are you confident that there was an

13  actual analyst with a human being behind each of

14  these entities here?

15           MS. POSNER:  Objection.

16     A.    If you're asking me if there's an

17  individual analyst that is putting their name on

18  the report, I just don't recall.

19     Q.    Do you ever make any effort to

20  distinguish between analyst reports that are

21  created by actual human beings who create analyst

22  reports versus machine generated things that are

23  just spit out by computers?

24           MS. POSNER:  Objection.

25     A.    Within the context of this analysis,

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                        C. Coffman
 2  given the number of reports that were here from
 3  entities I am familiar with, I didn't make an
 4  attempt to do that.  In the past, I would say there
 5  is a qualitative difference between those things.
 6       Q.    Would you typically exclude machine
 7  generated analyst reports from this kind of
 8  analysis?
 9       A.    I don't know if I would typically
10  exclude them.
11       Q.    Should they be excluded?
12       A.    I don't know that they should be
13  excluded.  I think, you know, at an extreme, if
14  that was the only -- if the only evidence of
15  analyst reports were those types of reports, that
16  would -- that would be something I would certainly
17  consider and I would view that as less
18  qualitatively good evidence of analyst coverage.
19  But that wasn't -- I never really got to that
20  question in this case because it's clear there were
21  dozens of high-quality analyst reports issued
22  during this period on Miller Energy.
23       Q.    You've never looked at how many of
24  these analysts, these entities you list as
25  analysts, were actually machine generated things?
```

```
 1                         C. Coffman
 2                MS. POSNER:  Objection.
 3           A.    Well, I don't know that I ever -- I
 4    don't know that I performed a quantification of
 5    that, but in looking through the analyst reports in
 6    this case, I mean, there were certainly I believe
 7    examples of that, but I think there were lots of
 8    examples of analyst reports with -- from firms I
 9    recognize as well.
10           Q.    Do you know what Wall Street Transcript
11    is?
12           A.    I believe that specific report in this
13    case is the transcript of an interview somebody had
14    with an executive from Miller Energy.  That's my
15    recollection of that.
16           Q.    So how is that an analyst report?
17           A.    Well, a lot of analysts, important
18    information in a lot of analyst reports is when
19    they have discussions with management.  So an
20    interview by management to me is clearly providing
21    new relevant information to the market, and so I
22    didn't see a problem in treating that as an analyst
23    report.
24           Q.    You would treat a word-for-word
25    transcript of an interview with the CEO of Miller
```

```
 1                     C. Coffman
 2  Energy as an analyst report?
 3            MS. POSNER:  Objection.
 4       A.    It's certainly evidence of interest in
 5  following the company and what the company is
 6  saying about its business.  It's not what I would
 7  consider a traditional analyst report in the case
 8  of, you know, an analyst providing a buy or sell
 9  recommendation, but it's certainly a report that is
10  providing important information to the market.
11       Q.    The Wall Street Transcript shouldn't be
12  on your list here; should it?
13       A.    I disagree.
14       Q.    It's your expert opinion that the Wall
15  Street Transcript listed on your Exhibit 4 is an
16  analyst report, that's your testimony as an expert
17  sitting here under oath?
18       A.    I'm saying -- I think I've said in my
19  prior answer it's not what would be considered a
20  traditional analyst report, but it's certainly a
21  source of information and much of what analysts do
22  is provide information, including results of
23  meetings with management of public companies.  So
24  the transcript of an interview somebody had is
25  providing useful information to the market.
```

```
 1                     C. Coffman

 2              I would agree that it's not what is

 3   traditionally considered an analyst report but I

 4   think it's relevant to list it on this exhibit.

 5        Q.    Don't companies, when they make

 6   statements like that, file them in Form 8-Ks

 7   typically?

 8              MS. POSNER:  Objection.

 9        A.    Sometimes they do.

10        Q.    So why don't you --

11        A.    Let me finish my answer.

12        Q.    Go ahead.

13        A.    There are certainly times they do.

14   There are times that statements and interviews or

15   presentations by companies are not in 8-Ks.

16        Q.    When a company makes a public statement

17   and discloses it in an 8-K, why don't you include

18   that as an analyst report?

19        A.    Because that's not a third party

20   showing interest in the company.

21        Q.    So you would say there's something

22   substantially different between this Wall Street

23   Transcript publication and a company filing a

24   public statement, the same public statement, with

25   the SEC?
```

```
1                    C. Coffman
2        A.    Again, it's a third party spending
3   economic resources to go out and perform an
4   interview and report it to the market.  So that is
5   demonstrating interest by a third party in the
6   securities of the company and the company, itself.
7        Q.    Do you know if you have any entities on
8   your list here that are double counted?
9        A.    What do you mean by double counted?
10       Q.    When a company changes its name.
11       A.    I don't think any of the reports are
12  double counted.
13       Q.    You said there are 15 analysts covering
14  this stock.  If one of them is an entity that
15  simply changed its name, it should be 14; right?
16       A.    That's possible.  I don't know that I
17  can exclude that possibility, but again, I think
18  the point of this analysis was not to create a
19  perfect list of the analysts and the reports.  It
20  was to evaluate whether there is evidence of
21  significant analyst coverage and I believe I've
22  done that, and I've attempted to quantify, you
23  know, the number of reports and list who the
24  companies were that purportedly issued those
25  reports, and so I think I've done a fair job at
```

```
 1                    C. Coffman
 2  showing what data I relied upon to reach the
 3  conclusion that there was significant analyst
 4  coverage.
 5       Q.    What was the first date of your
 6  analysis period?
 7       A.    I believe it's August 29, 2011, but let
 8  me double-check that.  Yes, August 29, 2011.
 9       Q.    How many analysts were covering the
10  stock on that date?
11       A.    I don't know that I specifically know
12  the answer to that.  I know on that date, I
13  believe, or right around that date, there was a
14  conference call where there were -- there was at
15  least one analyst who announced and at least a
16  second one who was asking questions on the call,
17  but I don't know that I have a -- there may have
18  been others.  I just don't know.
19       Q.    On August 29, 2011, the beginning of
20  the analysis period, excluding machine generated
21  junk --
22            MS. POSNER:  Objection.
23       Q.    -- how many analysts were covering the
24  stock; do you snow?
25       A.    I don't know specifically how many were
```

                          C. Coffman

1
2  covering the company because again, as I said, to
3  conclude that there was significant analyst
4  coverage during the analysis period, I pulled down
5  the complete list of what is listed in Investec I
6  know that is an under-representation of all analyst
7  reports so I don't have a specific number.

8        Q.    If there was only one analyst covering
9  the stock for the first, say, full year of the
10 analysis period, that would be an indication that
11 this factor should count against efficiency;
12 correct?

13       A.    Can I have that read back, please.

14             (Record read.)

15       A.    I think if there were a single analyst
16 covering the stock for some period of the analysis
17 period, it would be fair to say that factor alone
18 doesn't provide supporting evidence.  You would
19 still want to look at all the other factors, so I
20 don't think that counts towards inefficiency.  It's
21 not some indicator of inefficiency, but I think
22 that would be fairly weak evidence in terms of that
23 factor, in isolation, providing economic evidence
24 of efficiency.

25       Q.    Did you see any analyst reports

                          C. Coffman

1   either on the NYSE or other exchanges throughout

2   the country where the security can trade.

3            So to me it refers to third parties who

4   are essentially making a market by offering quotes

5   in the market.

6        Q.    Do you know who the market makers were

7   for Miller Energy's securities?

8        A.    Not as I sit here, I don't know the

9   particular firms or names of who the market makers

10  were, no.

11       Q.    Do you know how many there were?

12       A.    I think there's a function within

13  Bloomberg that you can ask how many market makers

14  there were for common stocks, so for the common

15  stock, I believe there were 73 different market

16  makers listed for the class period, for the

17  analysis period.  I cite that in Footnote 41.  And

18  I'm sorry, let me take a step back.

19           The data for that, that's why I had 41

20  is -- the data for that was only available starting

21  January 1st, 2014.  But by -- as I describe

22  throughout this factor, by virtue of trading on the

23  NYSE, there's essentially a guarantee by the

24  exchange that there's a specialist who is serving

C. Coffman

as a market maker at all times.

    Q.    Aside from the designated market maker
that every New York Stock Exchange stock has, do
you know at this point the identity of any other
market makers for Miller Energy's preferred stock?

    A.    No.

    Q.    Do you know if there were any market
makers for Miller Energy's preferred stock?

    A.    I don't know that for certain.  Again,
I think it's critical to understand that the Cammer
factor, itself, talks about counting market makers
as a relevant thing to do in over-the-counter
markets without volume reporting.

        That's certainly not the case for
Miller Energy securities.  They did trade on the
exchange and I showed, in fact, for one, there was
substantial volume so there was a lot of market
making activity going on in all three securities.
But I don't specifically know the identity or
number of market makers for the preferred
securities.

        MR. BALLARD:  Let take a short break.

        THE VIDEO TECHNICIAN:  We're going off
    the record.  The time is 11:07 a.m.

```
 1                        C. Coffman
 2              (Recess taken.)
 3              THE VIDEO TECHNICIAN:  This begins
 4       Media Unit No. 2.  The time is 11:20 a.m.
 5       We're back on the record.
 6       Q.    Mr. Coffman, do you still have Exhibit
 7  25 in your hands?
 8       A.    I do.
 9       Q.    Turning to page 21, you have a section
10  here on Cammer factor 4, SEC Form S-3 eligibility;
11  right?
12       A.    Yes.
13       Q.    And toward the end of paragraph 45, you
14  indicate that "Eligibility to file a Form S-3 is
15  confirmatory evidence of efficiency, not a
16  requirement.  Interpreted in this way, the standard
17  makes sense as an indicator of efficiency."
18              What did you mean by that?
19       A.    I guess I mean that looking at whether
20  a firm is Form S-3 eligible is a fairly indirect
21  measure and is essentially, based on the logic in
22  the Cammer factor and as I describe here, it's a
23  proxy for the quantity of publicly available
24  information about a company that is outstanding.
25              So again, if a company is not S-3
```

C. Coffman

1

2  eligible, that certainly doesn't scream

3  inefficiency simply because it's a fairly indirect

4  measure, but when they are eligible, again, it's I

5  think a confirmatory factor, but certainly not a

6  bright line test for efficiency.

7        Q.    So in your opinion as an economist,

8  it's a factor that is at least indirectly relevant

9  and so you do look at it to determine whether it

10 supports or doesn't support efficiency?

11       A.    I think that's fair, yes.

12       Q.    At the beginning of the analysis

13 period, Miller Energy was not eligible to use Form

14 S-3; correct?

15       A.    That's my understanding, correct.

16       Q.    For how long, at the beginning of the

17 analysis period, was Miller Energy ineligible to

18 use Form S-3?  Do you need some help?

19       A.    Give me just a second.  I mean, I don't

20 know for certain off the top of my head what the

21 date was.  I believe it was after they filed their

22 2011 10-K, but I just don't recall specifically.  I

23 don't know what the date of that was or if that was

24 the precise date that they became S-3 eligible.

25             I know for certain they did issue S-3s

                              C. Coffman

1
2    during the class period so certainly by the time
3    they did that, they were S-3 eligible.
4         Q.    Maybe I can help you.  You do say in
5    paragraph 45 that among the requirements to be
6    eligible is the requirement that the company had
7    filed all documents in a timely manner for the past
8    12 months.
9         A.    I see that.
10        Q.    So does that help you determine how
11   long they were ineligible at the beginning of the
12   proposed class period or the analysis period?
13        A.    I haven't determined precisely when
14   they met that requirement.  It was certainly by
15   September 6, 2012, because they filed an S-3 at
16   that time, but precisely which date they became S-3
17   eligible, I don't recall.
18        Q.    Was it not important to you for how
19   long they were ineligible?
20        A.    Again, given that the essence of this
21   factor is, is there sufficient information
22   available about the company, I mean, I acknowledge
23   in my description that they weren't eligible for
24   certain portions.  So obviously during those
25   portions, I wouldn't point at this factor for those

```
 1                    C. Coffman
 2  particular periods as providing independent support
 3  for efficiency, but certainly during the analysis
 4  period, for most of it, they were S-3 eligible.
 5       Q.    So would you say that this factor
 6  supports your finding of efficiency for the
 7  portions of the analysis period when the company
 8  was S-3 eligible only?
 9            It's not a trick question.
10       A.    I understand.  I think it would be hard
11  to say, during the periods that it was ineligible,
12  that you would look at this factor independently as
13  providing evidence of efficiency.
14            Over most of the analysis period, it's
15  clear they were eligible and it does provide that
16  support, but when they were ineligible, technically
17  this factor doesn't support that.
18       Q.    You can confirm that Miller Energy was
19  ineligible for the first full year of the class
20  period; correct?
21       A.    I don't know that I could conclude
22  that, no.
23       Q.    In paragraph 45, you indicate that one
24  requirement is that the company had filed all
25  documents in a timely manner for the past 12
```

```
 1                      C. Coffman
 2  months; right?
 3       A.    Yes.
 4       Q.    Do you know what started the class
 5  period in this case, the proposed class period?
 6  Are you aware that the class period began with the
 7  filing of the Form 10-K, the second amended version
 8  of the Form 10-K?
 9       A.    That does ring a bell now.  I recall
10  there being an earnings announcement.  I wasn't --
11  yes, I believe -- now that I'm thinking about it,
12  yes, that does make sense.
13       Q.    So now you can confirm that, in fact,
14  the company was ineligible to use Form S-3 for the
15  first full year of the class period, correct,
16  proposed class period?
17       A.    I believe that's probably correct, yes.
18            (Exhibit 26, Second Amended Form 10-K
19        for Miller Energy for the period ending April
20        30, 2011, marked for identification, as of
21        this date.)
22            MR. BALLARD:  Let's mark this also as
23        27.
24            (Exhibit 27, detail printed from the
25        EDGAR website for Second Amended Form 10-K
```

1                      C. Coffman

2   and the percent would be 11.76 percent?  That's the

3   idea?

4              MS. POSNER:  Objection.

5       A.    That's the idea, yes.

6       Q.    Of how you calculated it anyway?

7       A.    That's the idea of how you calculate

8   the proportion, itself.  There's more that goes

9   into how you statistically compare the difference,

10  but that's how you calculate the proportion, yes.

11      Q.    You can't just eyeball it to see if

12  it's statistically significant, you have to

13  actually test it?

14      A.    Yes.

15      Q.    If I want to go find the days that you

16  have identified as the 318 no news days, where do I

17  go to find that?

18      A.    It's in our backup material, in my

19  backup material.

20      Q.    I'm going to hand you what we

21  previously marked as Defendant's Exhibit 3 which is

22  a copy of the Second Amended Complaint in this

23  case.  Have you read this?

24      A.    Yes.

25      Q.    You're aware that this is the current

                          C. Coffman

1  complaint in this case; right?

2       A.    That's my understanding, yes.

3       Q.    Would you turn to page 74.  Do you see

4  paragraph 200 on that page?

5       A.    Yes.

6       Q.    In paragraph 200, plaintiffs allege

7  that "On December 24, 2013, a report entitled

8  'Miller Energy:  Digging Itself Into Another Deep

9  Hole' was published by TheStreetSweeper."

10            Do you see that?

11      A.    I see that.

12      Q.    Was December 24, 2013, a news day or a

13 no news day in your analysis?

14      A.    I would have to look at my backup

15 material to determine that.

16      Q.    Sitting here today, you don't know?

17      A.    I don't know.

18      Q.    Do you have anything with you today

19 that would allow you to check that?

20      A.    No.

21      Q.    You didn't bring a laptop or anything

22 with the date on it?

23      A.    No.

24      Q.    Should December 24, 2013 have been

                          C. Coffman

treated as a no news day?

    A.    I don't know.  It may depend on when

this particular report was issued to the market.  I

know December 24th is Christmas Eve.  Some years

Christmas Eve, I believe, is a non-trading day.

Sometimes it closes the -- the market closes early

on that day, so to know for sure, I would have to

do a more detailed analysis of when this report

came out.

    Q.    Look at paragraph 205, please.  There

are allegations here about the price of the common

stock falling from the period December 23 to the

date December 26.  Do you see that?

    A.    I see that.

    Q.    Does that help you determine whether

December 24 should be a news or a no news day?

    A.    I don't know because I can't read from

this whether December 24 is a trading day or not.

    Q.    If December 24 was a trading day,

should it have been treated in your analysis as a

news day or a no news day?

    A.    I would have to investigate further if

there was a way to tell what the timing of the

issuance of that report was.

```
 1                         C. Coffman

 2         Q.    Do you know if -- let me back up.  You

 3   said that you relied on certain sources to

 4   determine what days were news days and what days

 5   were no news days.  I think you said Factiva, SEC

 6   filings, and something else.

 7         A.    Analysts reports.

 8         Q.    Anything else?

 9         A.    As I sit here, not that I can recall.

10   To be absolutely sure, I would want to look at my

11   backup, but I don't believe so.

12         Q.    So if the December 24, 2013 report

13   published by TheStreetSweeper didn't turn up in the

14   Factiva database and didn't turn up in the list of

15   analyst reports and didn't turn up in the SEC

16   filing, your methodology would not have captured it

17   and included that as a news day; correct?

18         A.    That's possible.  Whether we took into

19   account this particular report is something that I

20   would have to go back and look at my backup to

21   determine.

22         Q.    If you go back and look at your backup

23   and you determine that December 24 was treated as a

24   no news day, would you say that's a mistake?

25         A.    Not necessarily.  It would depend on
```

```
 1                        C. Coffman
 2    the timing of when that report was issued.
 3         Q.    If the report came out during the
 4    business day, would you say it's a mistake?
 5         A.    By business day, do you mean during
 6    market hours when the market was open?
 7         Q.    Trading day.  Yes.
 8         A.    I mean, it's possible.  Again, given
 9    that the denominator in my calculations is 318,
10    changing one day wouldn't be expected to change
11    anything material, but, you know, based on
12    additional information, it may be that one day
13    would be better treated as a news day rather than a
14    non-news day.  Without investigating it
15    specifically I just don't know.
16         Q.    Well, I'm not really asking about
17    whether changing one day would affect the results.
18    I'm asking about your methodology, and it seems
19    like your methodology took into account certain
20    things like Factiva, but it didn't necessarily take
21    into account things like what the complaint in this
22    case was alleging.
23              MS. POSNER:  Objection.
24         Q.    So I'm wondering whether your
25    methodology night need a little bit of refinement.
```

C. Coffman

1

2      A.      Again, determining whether this

3 particular report should have been treated as news

4 on that particular day is something I would have to

5 investigate.

6      Q.      With a securities fraud case based on

7 allegations about stuff being said to the market or

8 not being said to the market, I mean, wouldn't the

9 complaint be a pretty important thing to consult on

10 what would be a news day versus a no news day?

11      A.      I don't normally rely on the complaint

12 as a fact about when certain things were disclosed.

13 I usually verify that myself, so -- but like I

14 said, whether this report was part of what was

15 considered or wasn't considered, I just don't know

16 as I sit here.

17      Q.      If you, in your analysis, missed a news

18 day that was identified in the complaint in this

19 case as a news day, what does that say about your

20 methodology?

21      A.      I think that suggests possibly that

22 it's not absolutely perfect.  Again, I wouldn't

23 expect something like that to -- an individual day

24 to impact the overall conclusion, and I believe the

25 methodology I've used to identify news days is

                              C. Coffman

1

2    filed publicly with the SEC?

3         A.    It appears to say approximately 8:13

4    a.m., on July 16, 2013.

5         Q.    From looking at this, can you now

6    confirm that the Q4 and year-end results that you

7    examined in event number 9 were disclosed prior to

8    the market opening on July 16, 2013?

9         A.    That's what this seems to suggest.

10        Q.    So now can you confirm that you should

11   have looked at a market date of July 16, 2013,

12   instead of July 17, 2013?

13        A.    It's possible.  One thing I would like

14   to do is review my backup to see if -- just to

15   confirm that these dates, as listed, weren't a typo

16   of some kind, but this seems to indicate the

17   information was out at the beginning of market on

18   July 16th, 2013.

19             (Exhibit 33, printout of some the

20        backup material used in Chad Coffman's expert

21        report, marked for identification, as of this

22        date.)

23        Q.    I'm going to hand you what we've marked

24   as Exhibit 33.  It's a printout of some of the

25   backup material that you provided to us, and the

                          C. Coffman

1
2  backup material was voluminous, but there's a
3  regression tab related to the common stock.  Do you
4  know what I'm talking about?
5        A.    Yes.
6        Q.    Do you recognize this as the data from
7  that tab?
8              MS. POSNER:  Just to be clear, I
9        believe we produced all of the Excel
10       spreadsheets, both Bates stamped and in
11       native format so you can manipulate them.
12       I'm going to assume you're representing that
13       this is as originally produced as opposed to
14       with any changes by you.
15             MR. BALLARD:  I don't think I've seen
16       one with Bates numbers on it.  We got Excel
17       files.
18             MS. POSNER:  You should have gotten
19       both.  We Bates stamped one and kept it so it
20       was a static version and then one in native
21       so you can manipulate it.  It's irrelevant.
22             My only purpose for asking is, this is
23       as produced, there have been no changes to
24       this.
25             MR. BALLARD:  This has been formatted

```
 1                    C. Coffman
 2          for printing so it can be printed on a large
 3          piece of paper.  No one went and changed any
 4          numbers in here.  I have my laptop here and I
 5          have the actual data files on here if anyone
 6          needs to look at those.
 7               MS. POSNER:  I just wanted the record
 8          to be clear.
 9               MR. BALLARD:  We did not change any of
10          the numbers.
11               THE WITNESS:  I'm sorry, what was your
12          question?
13          Q.    I think we were talking about whether
14   you can confirm that you should have used July
15   16th, 2013, instead of July 17th, 2013 as the
16   market date for event number 9, and you indicated
17   that you might need to check some of your data.
18   Now this is some of your data.
19               Looking at this now, can you now
20   confirm that, in fact, you should have used July
21   16, 2013 as the market date?
22          A.    That is certainly possible.  Given that
23   you're pointing out what looks to be a mistake,
24   before I say on the record definitively, this is
25   something I would want to consult.  I would want to
```

```
 1                    C. Coffman
 2   study carefully before giving a final view on this
 3   on the record, but based on what you've shown me,
 4   unless there's something that contradicts it, it
 5   appears July 16, 2013 would be the appropriate
 6   market date.
 7        Q.    And did you find a statistically
 8   significant price movement on July 16th, 2013?
 9        A.    No.
10        Q.    Looking at your Exhibit 7, at event
11   number --
12        A.    What is giving me pause, just to be
13   clear, is the specific time that is listed on
14   Exhibit 7 is raising a question in my mind of why
15   I'm citing 10:22 specifically, so I understand
16   necessarily the reason for that.  So you've pointed
17   out something that concerns me.  I just want to --
18   until I fully analyze this, I don't know what the
19   changes may be.
20            MR. BALLARD:  Maybe I can help you with
21        that too.
22            THE WITNESS:  Okay.
23            MR. BALLARD:  I'll ask the court
24        reporter to mark this with our next exhibit
25        number.
```

REPORTERS CENTRAL, LLC * 212-594-3582

C. Coffman

1

2          (Exhibit 34, printout from Marketwired,

3      marked for identification, as of this date.)

4      Q.    Do you have Exhibit 34 in your hands?

5      A.    I do.

6      Q.    This is a printout from Marketwired.

7  Do you know what Marketwired is?

8      A.    Generally.  I don't have detailed

9  knowledge of exactly -- it looks like a wire

10  report.  I don't know that I've studied

11  Marketwired.  It looks like a wire service.  I

12  don't know that I know that one specifically.

13      Q.    It contains the information from the

14  earnings release that you included in the event 9

15  of your Exhibit 7.

16      A.    Okay.

17      Q.    Do you see the date at the top of this

18  and the timestamp?

19      A.    It appears to be 8:00 a.m. on July 16.

20      Q.    So again, now can you confirm that the

21  information certainly was in the market and picked

22  up by the market press before trading began on July

23  16?

24      A.    I see that.  It suggests the

25  information came out before the market on July 16,

                          C. Coffman

2013.

       Q.    Now is there any doubt in your mind
that you should have used July 16, 2013, as the
market date for event 9?

       A.    Based on what you're showing me, it
appears that's the case, but again, before I give a
final view on that, I would need to go back and
review how that occurred.

             MR. BALLARD:  Maybe I can help you with
       that too.  Mark this, please.

             (Exhibit 35, Dow Jones press release,
       marked for identification, as of this date.)

       Q.    I'm handing you Exhibit 35.  Does
reviewing Exhibit 35 help you clear up what
happened here?

       A.    Possibly.

       Q.    The Factiva database picked up the
correction on the newswire, but not the actual
original release, and so it showed a timestamp of
10:22 p.m. on July 16, 2016, even though the
information had come out the day before; right?

             MS. POSNER:  Objection.

       A.    I think it's -- I don't think your
question was quite right.

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 36 of 71  PageID #: 7410

```
1                      C. Coffman
2        Q.    Do you have any idea how you came up
3   with 10:22 p.m. as the time and July 16, 2013 as
4   the date for event number 9 on your Exhibit 7?
5        A.    It's possible that it was this Dow
6   Jones press release that was relied upon.
7        Q.    This Dow Jones press release is not
8   what you were intending to study in number 9; is
9   it?
10       A.    If the information was released prior
11  to the market on the 16th, then it would have been
12  appropriate to analyze July 16, 2013.
13       Q.    And Exhibit 35, this Dow Jones newswire
14  item, relates to a correction of three numbers in
15  the previously released data; correct?  Three
16  numbers that had been converted incorrectly; right?
17       A.    I guess I don't know where -- exactly
18  where you're seeing that.
19       Q.    The first paragraph.
20       A.    Oh, I'm sorry.  Okay, I see that.
21       Q.    In event number 9, you weren't trying
22  to test whether the release of the correction of
23  these three incorrectly converted numbers had an
24  effect on the market; were you?  You were trying to
25  test whether the earnings release, itself, had an
```

                            C. Coffman

1
2  effect; right?

3       A.    That's correct.

4       Q.    Now can you confirm with certainty that

5  you should have used July 16, 2013 as the market

6  date for event number 9 on your Exhibit 7?

7       A.    That seems to be the appropriate

8  conclusion.  Again, to give a final answer, I would

9  want to discuss with my staff and see if there's

10  anything else that I'm missing here, but based on

11  what you've shown me, that appears to be correct.

12       Q.    So sitting here right now, based on

13  everything you've seen, if you had to do this

14  analysis right now, what market date would you use,

15  July 16 or July 17?

16       A.    Based on what I'm seeing here, July 16.

17       Q.    So if that's your best understanding

18  right now, I want to ask you some questions about

19  what the items in that row should have in them.

20  Should item 9, in the first column, under date,

21  have July 15, 2013 instead of July 16, 2013?

22       A.    Based on what you've shown me, I

23  believe that's correct, yes.

24       Q.    And the time in column 2 should change

25  to something else too as well; right?

```
1                      C. Coffman
2          A.    Yes.
3          Q.    The closing price should be $4.09, not
4  $4.34; correct?
5          A.    That's correct.
6          Q.    The raw return should be 1.49 percent,
7  not 6.11 percent; correct?
8          A.    That's correct.
9          Q.    The volume should be .3, not .5;
10 correct?
11         A.    Correct.
12         Q.    The abnormal return should be 1.67
13 percent, not 5.56 percent; correct?
14         A.    I'm sorry.  Can you repeat that?
15         Q.    The abnormal return should be 1.67
16 percent, not 5.56 percent; correct?
17         A.    That's correct.
18         Q.    The abnormal dollar change should be 7
19 cents, not 23 cents; correct?
20         A.    That's correct.
21         Q.    The t-stat should be .7, not 2.32;
22 correct?
23         A.    .70, that's correct.
24         Q.    The sig level should not have any
25 asterisk; correct?
```

```
 1                        C. Coffman
 2         A.    That's correct.
 3         Q.    There shouldn't be two, there shouldn't
 4  be even one, there should be no asterisk at all for
 5  event 9, it was not statistically significant;
 6  correct?
 7         A.    That's correct.
 8         Q.    Now would you say that it was only 3,
 9  not 4, of the 17 events on Exhibit 7 of your report
10  that had statistically significant price movements
11  at the 95 confidence level?
12         A.    If what you've shown me is correct,
13  then that's the case, yes.
14         Q.    Can we turn to Exhibit 8 of your
15  report, please.  On Exhibit 8 of your report, under
16  the earnings announcement column, where it says 4,
17  that should be a 3; right?
18         A.    If what you're showing me is correct,
19  yes.
20         Q.    For the number or the percentage of
21  significant days at 95 confidence level, where you
22  have 23.53 percent, that should be what?
23         A.    I would need a calculator to give you
24  the precise number.
25         Q.    If I tell you that 3 divided by 17
```

```
                          C. Coffman
```

1    would give you 17.65 percent, does that help?

2        A.    That would be the appropriate number

3    then, that's correct.

4        Q.    And then you have an average absolute

5    abnormal return of 4.37 percent on this chart.  On

6    Exhibit 8 of your report, under the earnings

7    announcements column, for the average absolute

8    abnormal return, you have 4.37 percent.  That

9    should change to something else; right?

10        A.    Yes.

11        Q.    And the volume figure of .7 should

12    change as well; right?

13        A.    Yes.  Both those numbers would go down,

14    I believe by a relatively small amount, but they

15    would be different, yes.

16        Q.    So let's look at your report at page

17    30.  There's a bar chart on page 30 of your report.

18    Do you see that?

19        A.    Yes.

20        Q.    So that should change as well; right?

21        A.    If what you're showing me is correct,

22    then yes.

23        Q.    So the first bar that is somewhere

24    above 20 percent is going to drop down to something

```
 1                        C. Coffman
 2  lower; right?
 3       A.    Roughly 17 percent plus.
 4       Q.    And on page 31, you have a bar chart on
 5  the average absolute return.  Do you have that?
 6       A.    Yes.
 7       Q.    That would change a little bit too;
 8  right?
 9       A.    Yeah.  I don't think that would change
10  substantially, but it would come down a little bit,
11  yes.
12       Q.    On page 32, there's another chart on
13  average daily trading volume.  Certainly the data
14  underlying, that would change a bit as well; right?
15       A.    A bit, yes.  I don't think it would
16  change substantially, but yes, it would be lower.
17       Q.    Let's turn to page 29 of your report.
18  Paragraph 62, there's the reference to the 23.53
19  percent.  Do you see that?
20       A.    Yes.
21       Q.    That's wrong; right?
22       A.    If what you're showing me is correct,
23  yes.
24       Q.    And Footnote 61 is wrong; right?
25       A.    It would be 17 percent instead of
```

```
 1                        C. Coffman
 2   23.53.
 3        Q.    And you told us already you haven't
 4   done an analysis to see if that is statistically
 5   significant; right?
 6        A.    I would have to do that test to know.
 7        Q.    So sitting here today, you don't know
 8   if it would be statistically significant based on
 9   what you know now?
10        A.    I would have to test that.
11        Q.    And then paragraph 63, there's a 4.37
12   percent figure.  Do you see that?
13        A.    Yes.
14        Q.    That might change as well; right?
15        A.    Well, we already covered that, yes.
16        Q.    And then so Footnote 63 would change.
17   That's now wrong; right?
18        A.    The percentage would change.  Whether
19   the conclusion about statistical significance needs
20   to change is not clear.
21        Q.    And then paragraph 63, again, there's a
22   reference to the average magnitude of stock price
23   movement on earnings announcement days was 1.7
24   times higher.  You would have to take another look
25   at that one as well; right?
```

C. Coffman

1
2      A.     It would be slightly lower.  It might
3  still round to 1.7.  I just don't know.  I would
4  have to check.
5      Q.     And then on page 31, paragraph 65,
6  there's a reference to average daily trading volume
7  on the 17 days of 0.72 million.  Do you see that?
8      A.     Yes.
9      Q.     You would have to look at that again as
10  well; right?
11      A.     That would go down slightly, yes.
12      Q.     So going back to what we talked about
13  earlier, we looked at four of the events on your
14  Exhibit 7 for the year-end results for 2011, 2012,
15  2013 and 2014; right?
16      A.     That's correct.
17      Q.     And you had found a statistically
18  significant increase in the price of Miller
19  Energy's common stock in only one instance, and
20  that was for the year 2013; right?
21      A.     Originally, that's correct.
22      Q.     Based on what you have in Exhibit 7 of
23  your report and what you now know, can you now say
24  that there was no statistically significant
25  increase in the price of Miller Energy's common

1                    C. Coffman

2   allegations are, but I, as a matter of fact, have

3   not evaluated whether it's the case or not.

4              MR. BALLARD:  Let's take a short break.

5              THE VIDEO TECHNICIAN:  We're going off

6        the record.  The time is 2:28 p.m.

7              (Recess taken.)

8              THE VIDEO TECHNICIAN:  This begins

9        Media Unit No. 4.  The time is 2:59 p.m.

10       We're back on the record.

11       Q.    Turning to your report, at page 29,

12  Footnote 61 --

13             MS. POSNER:  What page did you say?

14             MR. BALLARD:  Page 29, Footnote 61.

15       Q.    I believe you indicated earlier that

16  you have not done the analysis as to whether you

17  would still find statistical significance at the 95

18  confidence level if it was 3 out of 17 instead of 4

19  out of 17; right?

20       A.    That's what I said before.

21       Q.    You haven't done the analysis now; have

22  you?

23       A.    I did a back of the envelope

24  calculation that I would want to check several

25  times before I, you know, was highly confident in

C. Coffman

it, but it suggested that just changing it to 3 out
of 17, it would still be significant at the 95
percent level.

Q.    Are you ready to express that opinion
or do you need to do more work on that first?

A.    No.  Given what you've pointed out,
there are likely to be corrections to my report and
before I express any final opinion on that, I would
want to review a number of different things.

Q.    I think earlier you also said that if
you had removed the Cammer 5 factor entirely from
your report, you hadn't evaluated whether you would
still have an opinion on market efficiency without
that; right?

A.    I think I said that there would be lots
of -- that there would be considerable economic
evidence towards efficiency from the other factors,
but I had not considered the possibility of
explicitly removing Cammer 5 from my report.

Q.    And I believe you said you hadn't given
it thought and don't have an opinion sitting here
today as whether removing that, you would still
have an opinion.

A.    Well, again, I said I wasn't sure why

C. Coffman

1    one would ever do that given the circumstances of

2    this case, but I have not considered whether just

3    totally removing Cammer 5, what the conclusion

4    would be.

5         Q.    Sitting here right now, you're not able

6    to express an opinion on the question of whether

7    there was a cause and effect relationship until you

8    do further analysis.

9              Given what you have just said, do you

10   have an opinion, sitting here right now, on whether

11   the market for the common stock was efficient

12   during the analysis period?

13             MS. POSNER:   Objection.

14        A.    Based on the analysis I've performed,

15   it's clear that there is a much greater -- that

16   there's a greater incidence of statistically

17   significant days on the earnings announcements,

18   that's there's greater absolute stock price

19   movements, greater volume.

20             Also just, you know, setting aside

21   or -- not setting aside.  In addition to the

22   analysis that's in my report, it's clear from just

23   a cursory review of certain other dates during the

24   class period that the stock price was moving in

```
 1                    C. Coffman
 2  reaction to news.  It wasn't part of what is
 3  included in my report, but I still believe that
 4  even with the material you showed me today, that
 5  there's a -- that this security traded in an
 6  efficient market.
 7        Q.   I understand you believe that.  But my
 8  question is, do you have, as a professional
 9  economist, an opinion sitting here today as to
10  whether the market for the common stock of Miller
11  Energy was efficient during the analysis period?
12        A.   I believe it was efficient during the
13  analysis period, yes, and I -- like I said, I want
14  to -- given what you've shown me, I want to go back
15  and review certain items and evaluate certain
16  items, but I do believe that it traded in an
17  efficient market, yes.
18        Q.   You keep saying you believe.
19        A.   That's my opinion.
20        Q.   That is your opinion sitting here
21  today?
22        A.   Yes.
23        Q.   Have you provided us with all the
24  backup and basis for that opinion or do you still
25  need to do more?
```

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 48 of 71  PageID #: 7422

C. Coffman

         A.    Yes.  I think given what you've shown
me, I will likely prepare a corrected version of
the report and so at that point I believe I will
have given you the full basis that I'm using to
conclude that the market is efficient.  But this
alone does not change my opinion of the market
efficiency.

         Q.    Do you expect that you will be revising
your exhibits as well?

         A.    Based on what you've shown me, there
will likely be revisions to my exhibits, yes.

         Q.    We got a large dump of data, Excel
spreadsheets and the like.  That will change as
well; right?

         A.    I don't think anything in the event
study, itself, will change, but the summaries from
that event study will change.  So it's -- there
will be materials in the backup that would change,
yes.

         Q.    Do you know how long it will take to do
that work?

         A.    I don't know with any precision.

         Q.    I'd like you to take a look at Exhibit
3 which is the Second Amended Complaint, and I'll

C. Coffman

1 the nature of the misstatements, whether or not
2 they would be expected to move the stock price.
3 For example, if plaintiffs were using the price
4 maintenance theory, then they might not be expected
5 to move the stock price on the misstatement or
6 omission dates, especially if there were omissions,
7 but on the corrective disclosures, my understanding
8 is they're alleging the price declined on certain
9 corrective dates that reflects the dissipation of
10 artificial inflation.

11 Q.   So, so far, we've gone through six
12 dates, the four alleged misstatement dates and the
13 first of the two corrective disclosure dates, and
14 we don't have a statistically significant movement
15 in response to any of them on the first day; right?

16 MS. POSNER:   Objection.

17 A.   Well, in reviewing plaintiffs'
18 complaint, there's an allegation that the allegedly
19 false and misleading audit opinion was first issued
20 on August 29th, which according to my event study,
21 was statistically significant.  So it's not clear
22 to me that that's correct.

23 Q.   So are you now saying the year-end
24 results for 2011 came out on August 29?

C. Coffman

    A.    That's a possibility I need to
investigate.

    Q.    So you may have another error on your
Exhibit 7?

    A.    Well, given that you pointed out that I
apparently inadvertently relied on a Dow Jones
correction, I guess I would like to go back and
review the details of each of these dates to make
sure I'm selecting the right date, and I'm saying
as of right now, there does appear to be a
suggestion that August 29th may have been the right
date to analyze.

    Q.    So we went through event 9 and talked
about how your report and exhibits might change if
you use the right data.  You're now saying that
event 1 might also be incorrect?

    A.    It's possible.

    Q.    Are you sure you still have an opinion
sitting here today about whether the market was
efficient?

    A.    Yes.

    Q.    Even without the data?

    A.    No.  As I said, I believe there's
sufficient evidence, based on the higher proportion

                            C. Coffman

1
2   of significant dates, that if what I'm saying about
3   event 1 is right, that would actually improve the
4   numbers, and my review of all the other Cammer
5   factors and my review of other dates that I noted
6   during the class period which showed statistically
7   significant movements in response to clear new
8   news, it's my professional opinion that the market
9   for the common stock was efficient.
10          I believe based on what you've shown me
11  today, there's some important details in my report
12  that I want to revisit, but nothing has changed my
13  view as to whether the market is efficient or not.
14      Q.   So for Exhibit 7, you're saying you
15  looked at 19 events, 19 events; right?
16      A.   17.
17      Q.   Sorry, 17.  Not a big number, 17
18  events.  We know you got one of them wrong and
19  you're saying you might have gotten two of them
20  wrong, but one mistake was one direction and the
21  other mistake might have been the other direction
22  so it offsets?
23      A.   I'm not saying that at all yet.  I'm
24  saying that there's details I want to go back and
25  review.

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 52 of 71  PageID #: 7426

C. Coffman

on the nine news or event days with the results you

found on the no news days; right?

     A.    That's correct.

     Q.    So for this analysis here, you included

earnings releases as well as certain other events;

right?

     A.    That's correct, yes.

     Q.    On the common stock, you looked at only

earnings releases; right?

     A.    That's correct.

     Q.    Why a different methodology?

     A.    Because the Series C and Series D were

offered -- a couple of different reasons.  Number

one, they're offered later in the class period.

           Number two, over the period in which

they're trading at par value, I wouldn't, for the

reasons described, wouldn't expect them to respond

to quarterly earnings announcements frequently.  So

that was going to leave me with a small sample size

of dates to test.

           Three would not be -- I think there's

three earnings announcements over the relevant

period for performing this test so I attempted to

identify an additional category or categories of

C. Coffman

1
2  dates that would be relevant to test.

3      Q.    Wait a minute.  This analysis here on
4  Exhibit 9 is for the period when you said after
5  October 15, 2014, you would expect the market
6  prices of the preferred C series shares to react to
7  earnings announcements; right?

8      A.    Or at least could potentially, but I
9  describe in the report how I'm not surprised that
10 they don't, given that the market price of the
11 common stock didn't react to these particular
12 earnings announcements either.

13     Q.    If you look at Exhibit 9 for this C
14 series and you look at the earnings releases, that
15 would be events 2, 4 and 8; right?

16     A.    That's correct.

17     Q.    And the price of the preferred stock,
18 the C series, never reacted in a statistically
19 significant way to an earnings release; correct?

20          MS. POSNER:  Objection.

21     A.    That's correct, and what I'm saying is
22 that that's not in any way inconsistent with market
23 efficiency given that the common stock didn't react
24 significantly to those either.

25     Q.    If you used the same methodology for

C. Coffman

the C series that you did for the common stock, you
would have found no cause and effect relationship
between the release of new information and
movements in the price of the preferred stock; is
that correct?

A.    Well, if you're saying if I had used
the exact same precise methodology, I suppose
that's true, but there's reasons not to do that
that are described in the report, and I do follow
the same general methodology, which is to analyze
dates with clear firm-specific news and compare it
to dates where there's no firm-specific news.

So the overall methodology is the same.
It's just I have a criteria for identifying
additional dates for the Series C preferred stock
and Series D preferred stock that I believe speak
to -- that are potentially material events for the
company that provide relevant evidence about market
efficiency by testing those dates.

Q.    To be clear, on Exhibit 11, you can
confirm that the price of the Series D preferred
also never reacted in a statistically significant
way to an earnings release; correct?

MS. POSNER:  Objection.

                            C. Coffman

1

2          A.    Correct, and for the same reasons I

3    responded to the Series C question, that did not

4    surprise me.

5          Q.    Can you look at Exhibit 2-C, please.

6          A.    Okay.

7          Q.    What is this intended to show?

8          A.    It's just a graphical display of this

9    particular information, what the closing price of

10   the Series C preferred stock was, when the end of

11   the analysis period was in the event that -- is the

12   end of the analysis period, and then identifies the

13   specific offerings that at least I was aware of

14   that occurred during the analysis period.

15         Q.    And this shows stock price as well as

16   volume data?

17         A.    I'm sorry, I left out the volume, yes.

18   It shows the closing price of the Series C and the

19   volume of the Series C on each day.

20         Q.    So you're saying, looking at this

21   chronology here, prior to the middle of October

22   2014, you would expect the price not to be reacting

23   to company specific news, only interest rate

24   movements?

25              MS. POSNER:  Objection.

C. Coffman

Q.    Mr. Coffman, could you turn to page 49
of your report, please.

A.    Okay.

Q.    This is where you talk about damages,
and in the carryover paragraph you indicate that
plaintiffs' complaint alleges -- I'm sorry.  Hold
on.  I've got the wrong page.  On pages 48 through
49 --

A.    It starts on 47.

Q.    I'm sorry, you're right.  So let's go
back.  From page 47 onward, you have a discussion
of 10(b)5 damages as well as Section 11 damages;
right?

A.    Yes.

Q.    And let's talk about Section 11 damages
first.  In Section 11, there's a statutory formula
that you mention in your report.  Right?

A.    Yes.

Q.    And you quote it here.  It states in
part that you calculate damages for a Section 11
claim in part based on the difference between the
amount paid for the security not exceeding the
price at which the security was offered to the
public, and then the sale price, and there's

C. Coffman

several ways that can be calculated; right?

A.    Yes, not just the sales price but
there's a number of different potential prices or
values that you compare against based on when the
shares sold.

Q.    Depending on whether you held it
forever or whether you sold it during the class
period or the like; right?

A.    Or I think it's technically not the
class period, but the date of suit, or there's -- I
mean, it says what it says.

Q.    Got it.  But the point is, for any of
these damages calculations, you need to know the
price at which the security was initially offered
to the public; correct?

A.    That's one element of the calculation,
yes.

Q.    Well, let's take a look at Mr. Ziesman.
Do you have his certification?  It was Exhibit 37.

A.    Yes.

Q.    So Mr. Ziesman, as we've noted earlier,
purchased in June of 2014 at a price of $25.43 per
share basically.  Right?

A.    Slightly below that, but yes, it rounds

```
 1                      C. Coffman
 2   to that.
 3        Q.    He purchased at a price that was higher
 4   than any of the initial offering prices for the C
 5   series securities; is that correct?
 6        A.    That's my understanding, yes.
 7        Q.    So his damages will be limited by the
 8   statutory formula; is that correct?
 9        A.    Yes.
10        Q.    To know what his damages are, you need
11   to know which offering his shares came from; is
12   that correct?
13        A.    Well, you could make a statement about
14   that his -- the offering price wasn't below a
15   certain number so you could use the lowest offering
16   price and say that his damages would be at least
17   that much, but --
18        Q.    To accurately calculate his damages,
19   you need to know which offering his shares came
20   from, correct, according to the statutory formula?
21        A.    Like I said, I think there's a way to
22   calculate it conservatively, but to precisely base
23   it on the offering that that individual security
24   was bought in, I don't know if that's necessary,
25   but if it is, then what I'm describing would be a
```

                         C. Coffman

1    conservative estimate, but not necessarily the

2    precise amount of damages that he might be entitled

3    to.

4         Q.    If his shares came from the initial

5    offering in October 2012 at $23 per share, his

6    damages would be capped based on the $23 amount

7    under the statutory formula; correct?

8         A.    Could I have that read back.

9         Q.    I'll restate it.  If Mr. Ziesman's

10   shares came from the October 12 offering in which

11   shares were sold at $23 per share, the statutory

12   formula would limit his damages based on the $23

13   initial share price; correct?

14        A.    That's my understanding, yes.

15        Q.    If his shares came from the offering in

16   February 2013, when shares were offered at $22.90

17   per share, his damages would be limited based on

18   that number; correct?

19        A.    I'm assuming you're quoting those

20   numbers right without looking at them, but yes, it

21   would be limited based on the offering price as of

22   that date.

23        Q.    If his shares came from the

24   at-the-market offering, his damages would be

```
 1                    C. Coffman
 2   limited under the statutory formula to whatever the
 3   original at-the-market offering price was for those
 4   particular shares; correct?
 5        A.    That's my understanding, yes.
 6        Q.    Do you know if his shares,
 7   Mr. Ziesman's shares, came from the October 2012
 8   offering?
 9        A.    I don't.
10        Q.    Do you know if they came from the
11   at-the-market offering?
12        A.    I don't.
13        Q.    Do you know if they came from the 2013
14   best efforts offering?
15        A.    You're referring to the at-the-market
16   offering?
17        Q.    No.  There was an at-the-market
18   offering in October 2012 and then a best efforts
19   underwriting in February of 2013.
20        A.    I don't know.
21        Q.    Do you know if his shares came from the
22   May 2013 offering?
23        A.    I don't know.
24        Q.    Do you know if his shares came from the
25   June 27 offering?
```

                        C. Coffman

1

2       A.      I don't know.

3       Q.      So you can't say what Mr. Ziesman's

4  damages would be under the statutory formula; isn't

5  that fair?

6              MS. POSNER:  Objection.

7       A.      If it's unclear which offering it came

8  from, I haven't determined whether that's

9  determinable or not, but if it can't be determined,

10 the best one could do is the most conservative

11 estimate of his damages.

12      Q.      Well, the statutory formula says

13 damages are calculated based on the difference

14 between the amount paid for the security not

15 exceeding the price at which the security was

16 offered.  Right?

17      A.      Yeah, and all I'm suggesting is that

18 one could make a statement saying that his damages

19 would be at least a certain amount if the -- if you

20 could base it off of the lowest offering price.

21      Q.      So if we go back to that statutory

22 formula and the parenthetical "not exceeding the

23 price," you would be calculating damages by a

24 formula where you would insert the word "lower"

25 before the word "price," so the formula in the

C. Coffman

statute would be calculated based on the difference
between the amount paid for the security not
exceeding the lowest price at which the security
was offered to the public?

  A. No.

    MS. POSNER: Objection.

  A. I'm not rewriting the statute.  You're
asking me -- again, I'm not -- it's not clear to me
what offering he purchased in.  It's not clear to
me whether or not that information would ultimately
be available.

    I'm just saying that even if one
couldn't determine his damages precisely based on
the formula, if there was ambiguity about which
offering he bought in, you could still make a
statement potentially about the lowest amount of
damages if it could be traced back to at least an
offering that was at issue in the case.  I'm not --

    That's all I'm saying.  As a matter of
math, you could identify that damages were at least
some certain amount if you were able to trace it
back to an offering that is at issue in the case.

  Q. You couldn't determine what his precise
damages are under the statutory formula without

                            C. Coffman

1

2    being able to trace his shares back to a particular

3    offering.  Isn't that a fact?

4         A.    I don't think you could identify the

5    precise damages.  I think I already testified to

6    that, yes.

7         Q.    And yet you have given an opinion in

8    this case that you believe it would be possible to

9    calculate Section 11 damages on a class-wide basis;

10   is that not right?  That was the opinion you stated

11   in your report?

12        A.    Well, I say -- again, embedded in

13   paragraph 101 of my report is the idea that the

14   purchase was made pursuant or traceable to the

15   offering documents.  So if there's a determination

16   that based on what you're showing me, it can't be

17   traced, then that's not part of what would be

18   calculated.

19             If it can be traced, I'm saying I could

20   make a statement about if it could be traced back

21   to multiple offerings, one of multiple offerings

22   that are part of the case, I could make a statement

23   about that the damages were at least a certain

24   amount, but I could not calculate the precise

25   damages, so I could come up with a conservative

```
 1                    C. Coffman

 2    estimate.

 3        Q.    So for now, we're only talking about

 4    Mr. Ziesman; right?

 5        A.    That's my understanding of what your

 6    question is.

 7        Q.    Yes.

 8        A.    Yeah.

 9        Q.    So now let's talk about the entirety of

10    the proposed Section 11 class.  Is it your

11    testimony that you can calculate damages under the

12    Section 11 formula for the proposed Section 11

13    class in this case?

14        A.    My understanding of the definition of

15    the class is people who purchased pursuant to or

16    traceable to the offering documents, so that

17    some -- that the definition of the class would only

18    include people for which you could at least trace

19    back to an offering, and I'm saying that while one

20    might not be able to calculate precise damages for

21    each investor, one would be able to calculate a

22    minimum amount.

23        Q.    I'm not asking if you can calculate a

24    minimum amount.  I'm asking if you can calculate

25    the damages according to what you said is a
```

                     C. Coffman

1

2    statutory formula that can be applied on a

3    class-wide basis.  You can't; can you?

4         A.    I don't think you can apply precisely

5    the wording in here if you don't know which

6    offering to trace it back to.

7         Q.    And you looked at volume data for the

8    Series C shares; didn't you?

9         A.    I did.

10        Q.    They traded, in your opinion, quite

11   frequently?

12        A.    They did trade quite frequently.

13        Q.    They turned over more than, on average,

14   two times a year; right?

15        A.    That's true, yes.

16        Q.    Mr. Ziesman goes into his Scottrade

17   account in June of 2014 and buys 1,000 shares of C

18   series stock.  By that time, the C series has been

19   trading and trading and trading in high volume for

20   a long period of time; correct?

21        A.    On average, they were trading more than

22   the average security on the exchange, so there was

23   a lot of volume, yes.

24        Q.    So his shares are likely to have traded

25   multiple times between the initial offering date,

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 66 of 71  PageID #: 7440

```
1                        C. Coffman
2    whenever that was, and we don't know when it was,
3    and when he purchased them; right?
4              MS. POSNER:  Objection.
5         A.    I don't know that you can conclude that
6    those particular shares traded multiple times.  I
7    just don't know.
8         Q.    There's just no way to know; right?
9              MS. POSNER:  Objection.
10        A.    It's not clear whether there may or may
11   not be records that would allow one to trace it
12   back to a particular offering.  I'm just saying I
13   don't have any information that would allow me to
14   do that as I sit here.
15        Q.    Is the same true for the Series D
16   shares, you don't know how or whether a particular
17   plaintiff would be able to trace their shares back
18   to a particular offering?
19              MS. POSNER:  Objection.
20        A.    If they bought it in the offering
21   itself, they presumably could.  If they bought in
22   the secondary market, only after the first offering
23   and not additional offerings, they might be able
24   to.
25              And again, whether they could after a
```

C. Coffman

1

2  secondary offering, I think would depend on what

3  evidence there might be, but I don't know of any as

4  I sit here.

5      Q.    So a plaintiff who actually bought in

6  one of the offerings at the offering price, for

7  that plaintiff, you could calculate their damages

8  accurately under the statutory formula?

9      A.    Absolutely, yes.

10      Q.    It's just the people who bought in the

11  aftermarket where you don't know?

12          MS. POSNER:  Objection.

13      A.    Again, I think with the exception of

14  people who bought after the first offering before

15  there were any secondary offerings, one could

16  logically trace back to the initial offering.

17      Q.    You're talking about the D series now?

18      A.    Theoretically, that would be true for

19  both series.

20      Q.    Well, the first few offerings of C

21  series are outside of the period and aren't at

22  issue in this case so you could never trace back to

23  those.

24          MS. POSNER:  Objection.

25      Q.    I guess let me ask you this:  You've

                          C. Coffman
1
2   testified you could calculate damages for the
3   Section 11 claim for the C series shares.  How
4   would you do that?
5        A.    Well, for somebody that bought in one
6   of the offerings, you would follow the statutory
7   formula.  For somebody that bought in the
8   aftermarket, you would have to evaluate if there
9   was a way to trace it back to one or a series of
10  the offerings that are relevant in the case, and
11  like I said, you could -- you might not be able to
12  calculate the damages precisely, but you could get
13  a lower bound estimate of what those damages would
14  be.
15       Q.    In your report, at paragraph 102, you
16  wrote, "Given that there is a statutorily defined
17  formula for Section 11 damages, it is clear that
18  damages under Section 11 can be calculated using a
19  common methodology for members of the Section 11
20  class."
21            Do you see that in paragraph 102?
22       A.    Yes, and I'm stating that with respect
23  to what I say in paragraph 101 is my understanding
24  that it has to be pursuant or traceable to the
25  offering documents at issue in the case.

Case 3:16-cv-00121-TAV-DCP  Document 120-1  Filed 04/16/19  Page 69 of 71  PageID #: 7443

C. Coffman

1

2      Q.    So if a plaintiff didn't purchase any

3   offering, like Mr. Ziesman, and can't trace to a

4   particular offering, you can't calculate that

5   plaintiff's damages under the statutory formula; is

6   that fair?

7      A.    I think it would be difficult to do

8   that with precision.  One might be able to say what

9   the minimum amount of damages are, but it would be

10  hard to know which precise offering price to use in

11  the formula.

12     Q.    Let's turn back to the complaint in

13  this case, the Second Amended Complaint, Exhibit 3,

14  and I want to direct your attention again to

15  paragraph 197.  That's the beginning of the section

16  on the allegation that "the truth begins to

17  emerge."  Do you have that in front of you?

18     A.    Yes.

19     Q.    Before we dig into that, I want to

20  direct your attention to one other paragraph

21  earlier in the complaint, paragraph 4.

22            In paragraph 4, plaintiffs allege "The

23  Miller Energy house of cards finally began to

24  collapse in December 2013, when it started to

25  become clear that the Alaska Assets were worth

1

2                    C E R T I F I C A T E

3   STATE OF NEW YORK )

4                          :

5   COUNTY OF NEW YORK)

6

7        I, ELEANOR GREENHOUSE, a Shorthand Reporter

8   and Notary Public within and for the State of New

9   York, do hereby certify:

10       That, CHAD COFFMAN, the witness whose

11  deposition is hereinbefore set forth, was duly

12  sworn by me and that such deposition is a true

13  record of the testimony given by such witness.

14       I further certify that I am not related to

15  any of the parties to this action by blood or

16  marriage, and that I am in no way interested in the

17  outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto set my

19  hand this 14th day of April, 2019.

20

21

22       _____

23                ELEANOR GREENHOUSE

24

25