**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| LEWIS COSBY, KENNETH R. MARTIN, as beneficiary of the Kenneth Ray Martin Roth IRA, and MARTIN WEAKLEY on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No.: 3:16-CV-121-TAV-DCP ) |
| KPMG, LLP, | ) ) |
| Defendant. | ) |

<u>**CORRECTED EXPERT REPORT OF CHAD COFFMAN, CFA**</u>

April 19, 2019

# Table of Contents

**Page**

**Explanation of Need for Correction and Summary of Changes:** ......................................................3

**I.      INTRODUCTION** .............................................................................................................12

**II.     QUALIFICATIONS** ..........................................................................................................13

**III.    SUMMARY OF OPINIONS** ............................................................................................14

**IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS** ............................................15

**V.      DISCUSSION OF RELIANCE ELEMENT** ....................................................................16

**VI.     CAMMER FACTORS** ......................................................................................................19

**VII.    APPLICATION OF EFFICIENCY FACTORS TO MILLER ENERGY SECURITIES** .................................................................................................................................**20**

    A.    OVERVIEW ........................................................................................... 20

    B.    CAMMER FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ................... 23

    C.    CAMMER FACTOR 2: ANALYST COVERAGE ........................................ 25

    D.    CAMMER FACTOR 3: MARKET MAKERS ............................................ 28

    E.    CAMMER FACTOR 4: SEC FORM S-3 ELIGIBILITY .......................... 30

    F.    CAMMER FACTOR 5: PRICE REACTION TO NEW INFORMATION .............. 31

    G.    ADDITIONAL FACTOR 1: MARKET CAPITALIZATION ................................... 49

    H.    ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ............................ 51

    I.    ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP .............................. 54

    J.    ADDITIONAL FACTOR 4: AUTOCORRELATION ............................................. 54

    K.    ADDITIONAL FACTOR 5: OPTIONS .................................................... 57

**VIII.   SECTION 10b-5 DAMAGES** ..........................................................................................**57**

**IX.     SECTION 11 DAMAGES** .................................................................................................**59**

**X.      CONCLUSION** .................................................................................................................**60**

**Explanation of Need for Correction and Summary of Changes:**

i.     I initially filed my Expert Report on March 15, 2019 (the "Initial Report"). At my deposition on April 12, 2019, I was asked a number of questions and was shown a number of exhibits that suggested there were inadvertent errors in my Initial Report. Upon further review and as described below and demonstrated in this Corrected Expert Report, correction of these inadvertent errors did not impact the conclusions to be drawn from my report or change any of my opinions.

ii.     First, in my initial report, I made an inadvertent error in identifying the date upon which the market would have first reacted to Miller Energy's release of Q4 2013 earnings. I erroneously relied upon the timing of a Dow Jones Newswires publication of a "Correction" to the earnings report instead of the timing of the original earnings report. This inadvertent error caused me to analyze July 17, 2013 as the market date for the Q4 2013 earnings announcement, instead of July 16, 2013. I have confirmed that the market date for the other 16 earnings announcements I analyzed was correct.[1] I have made this correction in my analysis of all Miller Energy Securities.

iii.     Second, there are two days upon which Plaintiffs assert that news impacted the market price of Miller Energy that were inaccurately classified as "no news" days in my analysis (the *StreetSweeper* report issued after market hours on December 23, 2013 that would have impacted the market on December 24, 2013, and a *Reuters* article issued after market hours on

---

[1] In my review, I also discovered evidence that the specific time of day I referenced was not always the earliest available reporting of certain earnings releases. I have revised the time of day where appropriate, and the identification of the earliest source, but none of these changes impacted the relevant identification of the market date or any of the analysis.

October 13, 2014, that would have impacted the market on October 14, 2014).[2] I have made this correction in my analysis of all Miller Energy Securities.

iv.     As demonstrated within this Corrected Expert Report, while correction of these inadvertent errors changes certain numbers and calculations contained within the report, it does not impact in any way the ultimate conclusions to be drawn from the analysis or the opinions I have offered in this case. In addition, the errors do not indicate that the methodology used in my report, which is standard and regularly accepted by Courts throughout the country, is inadequate in any way.

v.     As part of my detailed review, I also re-evaluated whether it was appropriate to include Miller Energy's press release announcing Q4 2011 earnings after market hours on August 30, 2011 as new news to be analyzed given that information about Q4 2011 earnings had been previously released (as described further below).  After my review, I can confirm that it was appropriate to include this earnings release in my analysis.[3]

vi.     As part of this review, however, I performed additional analysis of the movements of Miller Energy's Common Stock to information concerning the original reporting of Miller Energy's FY 2011 financial performance which would have subsumed and provided information about earnings in Q4 2011 prior to August 30, 2011.  In addition, this analysis sheds light on the

---

[2] *StreetSweeper* reports are not contained in either Factiva or Investext, the third-party news and analyst report providers I relied upon, respectively. The Reuters article on October 13, 2014 was included in the original Factiva search, but was incorrectly treated as having occurred during market hours instead of after market hours. Generally speaking, I am confident that the methodology I employed here and have used in many other reports to identify "no news" dates will reliably identify days on which major news related to a company is released.  However, because the coverage of Factiva and Investext is not universal (indeed I acknowledged in my Initial Report that Investext does not have universal coverage of analyst reports and that there are likely reports that I do not have) and there can be some ambiguity in the timing of news releases (e.g. if there is no time stamp, or the time stamp is not reported as expected) without intensive investigation, the methodology I employed to identify "no news" dates is necessarily not perfect.  As I testified in my deposition, however, the inadvertent treatment of a potential news day as a "no news" day would, if anything, bias against finding a cause and effect relationship.

[3] My conclusions are ultimately not sensitive to whether this event is included or not.

subject of whether there is any evidence that the release of any of KPMG's audit reports impacted the market price of Miller Energy Securities (an issue that was not the subject of my Initial Report and is irrelevant to the question of whether the market for Miller Energy Securities is efficient, but was raised multiple times during my deposition). I can confirm that the unique and complicated release of earnings information for Q4 2011 provides both additional strong evidence that the market for Miller Energy Securities was efficient during the Analysis Period, and that the prices of Miller Energy Securities were impacted by KPMG's audit reports.

vii.    Specifically, during market hours on July 28, 2011, *TheStreetSweeper* published a report that, among other things, raised serious questions about the legitimacy of Miller Energy's accounting and noted that the Company was late in providing audited financial statements.[4]  The intraday price chart below shows an immediate market reaction to that news, and demonstrates that the Company lost over 20% of its value. Furthermore, on this date, my event study indicates that the market price of Miller Energy Common Stock fell by 23.40%, after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% level with a t-statistic of -8.83.[5]

---

[4] "TheStreetSweeper Posts Negative Report on Miller Energy," *Benzinga*, July 28, 2011 2:46 PM; "Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 1)," *The Street Sweeper*, July 28, 2011 https://seekingalpha.com/article/282825-miller-energy-this-hot-alaska-stock-may-be-about-to-melt-part-1; "Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 2)," *The Street Sweeper*, July 28, 2011, https://seekingalpha.com/article/282825-miller-energy-this-hot-alaska-stock-may-be-about-to-melt-part-2.

[5] I expanded the time period of my event study methodology to analyze the price movements and statistics for these pre-Analysis Period dates discussed in this section.



Miller Energy Resources, Inc. Common Stock Intraday Price and Volume
7/28/2011

Source: TICK Data and S&P Capital IQ.

viii.  On the next trading day, July 29, 2011, the market price of Miller Energy declined even further, although in the middle of trading hours, Miller Energy's CEO told the market that the allegations of fraud in *TheStreetSweeper* report were false, and that it would be releasing its audited Form 10-K that evening.[6]  On this date, my event study indicates that the market price of Miller Energy Common Stock fell by 17.66%, after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -6.64.

---

[6] "Miller Energy (MILL) CEO Fights Back, Says 'Nothing to Hide'; Stock Moving Higher," *StreetInsider.com*, July 29, 2011.



Miller Energy Resources, Inc. Common Stock Intraday Price and Volume
7/29/2011

Source: TICK Data and S&P Capital IQ.

ix.    After market hours on Friday July 29, 2011, Miller Energy released its purportedly audited Form 10-K[7] (and thus first provided the market with information on its Q4 2011 earnings).  However, prior to the market opening on the next trading day of Monday, August 1, 2011, the Company retracted the issuance of the Form 10-K because KPMG had not authorized the release of an audit opinion.[8] In reaction to this news, my event study indicates that the market price of Miller Energy Common Stock fell by 9.97% on August 1, 2011, after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence interval with a t-statistic of -3.20.

---

[7] Miller Energy Resources, Inc. SEC Form 10-K filed July 29, 2011 5:36 PM ET.

[8] Miller Energy Resources, Inc. SEC Form 8-K filed August 1, 2011 9:20 AM ET.



Miller Energy Resources, Inc. Common Stock Intraday Price and Volume
8/1/2011

Source: TICK Data and S&P Capital IQ

       x.     By the evening of August 1, 2011, law firms began to announce investigations into the events that led to the unauthorized release of KPMG's audit opinion, and the market price of Miller Energy Common Stock declined significantly on August 2, 2011. My event study indicates that the market price of Miller Energy Common Stock fell by 12.42%, after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence interval with a t-statistic of -3.98.



Miller Energy Resources, Inc. Common Stock Intraday Price and Volume
8/2/2011

Source: TICK Data.

xi.    On August 8, 2011, Miller Energy published an amended Form 10-K/A after-market hours that removed reference to KPMG's audit opinion and made clear the results remained unaudited.[9] This 10-K/A once again provided the market with earnings results for Q4 2011.  On August 9, 2011, my event study indicates that the market price of Miller Energy Common Stock fell by 18.01%, after controlling for market and industry effects. This abnormal price decrease is statistically significant at the 99% confidence level with a t-statistic of -5.13.

---

[9] Miller Energy Resources, Inc. SEC Form 10-K/A filed August 8, 2011 9:32 PM ET



**Miller Energy Resources, Inc. Common Stock Intraday Price and Volume**
**8/9/2011**

Source: TICK Data and S&P Capital IQ

xii. On August 29, 2011, Miller Energy released its final audited version of the Form 10-K/A with KPMG's audit opinion.[10] This release once again provided the market with earnings information for Q4 2011, but now with the blessing of KPMG's official audit opinion. With the questions surrounding whether Miller Energy would be able to publish a Form 10-K consistent with its prior accounting with the blessing of an auditor now resolved, the market price of Miller Energy climbed by over 50% on a single day. Indeed, my event study indicates that the market price of Miller Energy Common Stock increased by 57.85%, after controlling for market and industry effects. This abnormal price increase is statistically significant at the 99% confidence level with a t-statistic of 13.96.

---

[10] Miller Energy Resources, Inc. SEC Form 10-K/A filed August 29, 2011 7:46 AM ET.



Miller Energy Resources, Inc. Common Stock Intraday Price and Volume
8/29/2011

Source: TICK Data and S&P Capital IQ

xiii.   The ultimate conclusion from this detailed history of the release of Q4 2011 earnings is that (1) Miller Energy had several times already represented to the market what earnings it had achieved in Q4 2011 before the August 30, 2011 earnings announcement[11] (which provides additional evidence as to why it is not surprising that the formal "earnings release" on August 30, 2011 did not cause a statistically significant price change); and (2) the history of the release of Q4 2011 earnings provides its own unique evidence of how the market price of Miller Energy responded quickly to new publicly available information.  This additional analysis further provides evidence of a clear cause and effect relationship between Company specific information and changes in the market price of Miller Energy Common Stock.

---

[11] The new information contained in the Form 8-K and press release released on August 30, 2011 is presented in "Reconciliation of EBITDA to GAAP" and "Consolidated Statement of Income for Three Months ended April 30, 2011." Total Revenue, Operating Loss, and Net Income were previously reported in Miller Energy's amended 10-K released on August 29, 2011.

## I. INTRODUCTION

1.     I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Plaintiffs in this matter to examine and opine on whether the markets for Miller Energy Resources, Inc. ("Miller Energy" or the "Company") publicly traded securities were efficient during the period from August 29, 2011 through July 30, 2015, inclusive ("Analysis Period").[12] The Miller Energy publicly traded securities (collectively, "Miller Energy Securities") I have been asked to consider include Miller Energy common stock ("Miller Energy Common Stock" or  "Common Stock") and Miller Energy's two preferred securities ("Miller Energy Preferred Securities" or "Preferred Securities"): Miller Energy 10.75% Series C Cumulative Redeemable Preferred Stock ("Miller Energy Series C Preferred Stock" or "Series C Preferred Stock"), and Miller Energy 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Miller Energy Series D Preferred Stock" or "Series D Preferred Stock").

2.     In addition, I have been asked to opine on whether calculating damages in this matter is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)"). Plaintiffs also have separate claims under Section 11 of the Securities Act of 1933 (the "Securities Act") for the offerings of Series C Preferred Stock and Series D Preferred Stock.  I

---

[12] The stated Class Period in the Second Amended Class Action Complaint is August 29, 2011 – October 1, 2015, however, Counsel for Plaintiffs has asked me to opine on market efficiency from the beginning of the Class Period through July 30, 2015 (*i.e.* the market date before Miller Energy Securities were delisted from the New York Stock Exchange).

was also asked to explain and demonstrate the method for computing statutory damages under Section 11 of the Securities Act related to these offerings.

3.     The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $800 per hour for my work on this matter, and at rates between $170 and $450 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.     QUALIFICATIONS

4.     I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

5.     I, along with several others, founded Global Economics Group on March 25, 2008.[13] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas, including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions, as well as other matters. As a result of

---

[13] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

6.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

7.     After analyzing Miller Energy's Securities during the Analysis Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the markets for Miller Energy Securities were efficient during the Analysis Period. I have also formed the opinion that damages can be calculated for the two proposed Classes on a class-wide basis. These opinions are based upon my analysis described in the remaining sections of this report.

8.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Miller Energy's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the *Cammer* factors and other factors that financial economists and courts apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for the Miller Energy Securities during the Analysis Period. **Section VIII** addresses how damages under Rule 10(b)-5 in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** describes the computation of statutory damages under Section 11 of the Securities Act.

9.     I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.     During the Analysis Period, Miller Energy was incorporated in the state of Tennessee with its headquarters in Knoxville, Tennessee. Miller Energy described its business, in part, as follows:

> We are an independent exploration and production company that utilizes seismic data and other technologies for geophysical exploration, development and operation of oil and gas wells in southcentral Alaska, including the Cook Inlet and Kenai Peninsula, and the Appalachian region of east Tennessee. During fiscal 2015, we expect to expand our operations into Alaska's North Slope (the "North Slope") through our acquisition of Savant Alaska, LLC ("Savant). Occasionally we offer these services to third-party customers on a contract basis. During fiscal 2014, we continued to develop our oil and gas operations acquired from Pacific Energy Resources ("Pacific Energy") in December 2009 through a bankruptcy proceeding, including onshore and offshore production and processing facilities, the offshore Osprey platform, and approximately 700,000 lease or exploration license acres of land, along with hundreds of miles of 2-D and 3-D geologic seismic data, miscellaneous rods, pads, pipelines and facilities.[14]

11.     For the fiscal year-end 2014, Miller Energy reported the following financial figures: revenues of $70.5 million, operating loss of -$10.6 million, and net income loss of -$28.5 million.[15] As of April 2014, Miller Energy employed 84 employees[16], and the Company's Common Stock shares traded on the New York Stock Exchange under the ticker "MILL."[17]

---

[14] Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2011, p. 4., Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2012 p. 1., Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2013 p. 1., Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2014, p. 1.

[15] Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2014, p. F-4.

[16] Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2014, p. 17.

[17] Miller Energy Resources, Inc. SEC Form 10-K for the Fiscal Year-End April 30, 2014, p. 36.

Miller Energy's Series C Preferred Stock and Series D Preferred Stock also traded on the New York Stock Exchange under the tickers "MillprC" and "MillprD," respectively.[18]

12.    Plaintiffs' Complaint alleges that KPMG[19] issued false and misleading statements and omitted material information during the Analysis Period, ultimately causing damages to purchasers of Miller Energy Securities who unknowingly bought Miller Energy Securities at artificially inflated prices and were damaged when the market prices ultimately reflected the concealed information.[20]

13.    More specifically, the Complaint claims, among other things, that KPMG issued audit reports containing unqualified opinions on Miller Energy's annual financial statements for fiscal years 2011 through 2014, even though Miller Energy's financial statements were not prepared according to Generally Accepted Accounting Principles and vastly overstated the value of Miller Energy's assets in Alaska.[21]    The Complaint alleges that the relevant truth was revealed to the markets over a series of partial corrective disclosures.[22]

## V.    DISCUSSION OF RELIANCE ELEMENT

14.    Class members' reliance on the alleged misstatements and material omissions is a required element for Plaintiffs' Section 10(b) claims. Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations

---

[18] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012 and Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

[19] Complaint ¶¶ 18-20.

[20] Complaint ¶¶ 257 and 314.

[21] Complaint ¶ 2.

[22] Complaint ¶¶ 197-244.

or omissions since the value of those misrepresentations or omissions is incorporated into each

class member's purchase price. The "fraud on the market" theory was first addressed by the U.S.

Supreme Court in *Basic Inc. v. Levinson*:

> …[I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[23]

15.   The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[24]

16.   As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and

efficient market, market prices reflect what is known about a company. If a company, or an

auditor, provides the market with misleading information regarding its financial strength or

business practices, the market price will be inflated (or deflated) compared to what the price

would have been if the truth were known (but-for misleading information). Thus, in an efficient

market, where the plaintiff asserts there were material misrepresentations or omissions, all

purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the

inflated (or deflated) price.

---

[23] *Basic Inc., v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), 241-42.

[24] *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2418 (2014) ("*Halliburton II*").

17.     Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[25] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[26] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[27]

18.     The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[28] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not

---

[25] To recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[26] Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).

[27] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[28] *Basic,* 241.

necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

19.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the markets for these particular securities were efficient.

## VI.  *CAMMER* FACTORS

20.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[29]

21.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

---

[29] *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[30]

22.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

23.    In the subsequent sections, I evaluate the markets for Miller Energy Securities during the Analysis Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

## VII.  APPLICATION OF EFFICIENCY FACTORS TO MILLER ENERGY SECURITIES

### A.  *OVERVIEW*

24.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the markets for Miller Energy Securities were efficient throughout the Analysis Period. In addition to the discussion below,

---

[30] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

**Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that each of the Miller Energy Securities traded in an efficient market. **Exhibit 1** reflects that for certain factors there are separate empirical analyses for each of the Miller Energy Securities, while for other factors there is a single analysis that applies to Miller Energy Securities as a whole. For instance, *Cammer* Factor 2 deals with analyst coverage. Analyst reports disseminate value-relevant information about the financial prospects of the Company overall and their relevance is not limited to Miller Energy Common Stock.

25.    As further background to my analyses, **Exhibit 2, Exhibit 2-C, and Exhibit 2-D** display the closing price and trading volume for each day throughout the Analysis Period for Miller Energy Common Stock, Miller Energy Series C Preferred Stock and Miller Energy Series D Preferred Stock, respectively.[31] **Appendix C** provides background information and details on the terms of Miller Energy Series C Preferred Stock and Miller Energy Series D Preferred Stock.

26.    In summary, and as discussed more fully below, Miller Energy Securities traded in efficient markets during the Analysis Period. First, the average weekly trading volume of all Miller Energy Securities during the Analysis Period far exceeded benchmarks that courts have established, and each of the Miller Energy Securities had an average weekly trading volume that exceeded the average security traded on the New York Stock Exchange ("NYSE") and the NASDAQ Exchange ("NASDAQ").[32] Second, there were a substantial number of securities analysts following and reporting on Miller Energy. Third, Miller Energy Securities were actively traded on the New York Stock Exchange, fulfilling the *Cammer* factor regarding market makers.

---

[31] When referring to exhibits, exhibits labeled "C" and "D" refer to Miller Energy 10.75% Series C Preferred Stock and Miller Energy 10.5% Series D Preferred Stock, respectively. Exhibits labelled without a letter (with the exception of **Exhibit 9** through **Exhibit 12**) reference Miller Energy Common Stock.

[32] The average weekly trading volume was 5.04%, 5.16%, and 7.93% of shares outstanding for the Common Stock, Series C Preferred Stock, and Series D Preferred Stock, respectively, during the Analysis Period. The average weekly trading volume for stocks trading on the NYSE and NASDAQ during the Analysis Period was 2.36%.

Fourth, Miller Energy filed multiple SEC Forms S-3 during the Analysis Period, met the important eligibility criteria, and was apparently eligible to file a Form S-3 throughout the majority of the Analysis Period. Fifth, over most of the Analysis Period, prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the market capitalization of the Miller Energy Common Stock (or the Miller Energy Securities collectively) was in the mid-quartile range[33] of all common stocks trading on the NYSE and NASDAQ combined. Sixth, over most of the Analysis Period, prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Securities had low bid-ask spreads relative to other exchange-traded common stocks. Seventh, institutions, which are considered generally to be well-informed investors, held, on average, over 30% of the public float of Miller Energy Common Stock.[34] Eighth, there is no evidence of consistent autocorrelation during the Analysis Period. Ninth, there was active trading in Miller Energy options throughout the Analysis Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market prices of Miller Energy Securities during the Analysis Period. My analyses of all of these factors support the conclusion that Miller Energy Securities traded in open, developed, and efficient markets throughout the Analysis Period.

---

[33] The "mid-quartile range" refers to between the 25th percentile and 75th percentile of a distribution, or in the middle half.

[34] Institutions also held the Preferred Securities, although the data available is limited. According to the SEC, institutional investment managers must use Form 13F for reports to the commission with respect to accounts holding Section 13(f) Securities (See https://www.sec.gov/pdf/form13f.pdf). The SEC publishes a list of Section 13F Securities quarterly, which lists all securities that institutions must report (quarterly lists can be found at https://www.sec.gov/divisions/investment/13flists.htm). For all quarterly lists starting in the third calendar quarter of 2012 (when Series C Preferred Stock began trading) and ending at the end of the Analysis Period, the Preferred Securities were not labelled as Section 13F Securities, meaning institutions were not required to report their holdings of the Preferred Securities. This is not uncommon for preferred securities in general: only 85 of the 17,395 securities identified as 13-F Securities were preferred securities in the list for the second quarter of 2015 ("List of Section 13F Securities, Second Quarter FY 2015," SEC, June 15, 2015).

## B. *CAMMER FACTOR 1: AVERAGE WEEKLY TRADING VOLUME*

27.    The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[35]

28.    Volume as a fraction of shares outstanding is an important indicator of market efficiency. <u>First</u>, volume is objectively quantifiable and comparable across securities. <u>Second</u>, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[36] <u>Third,</u> substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[37]

29.    Miller Energy Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for Miller Energy Common Stock during the Analysis Period was 5.04% of shares outstanding,

---

[35] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[36] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45.

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005), 317.

[37] Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105 (2000), 108. Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

compared to 2.36% for the NYSE and NASDAQ. **Exhibit 3** plots Miller Energy Common Stock's trading volume as a fraction of shares outstanding for each week during the Analysis Period.[38] Indeed, the average weekly trading volume during the Analysis Period was 2.24 million shares. The volume of trading for Miller Energy Common Stock supports the conclusion that the market for this security was efficient throughout the Analysis Period.

30.    Miller Energy Series C Preferred Stock and Series D Preferred Stock also easily surpass the *Cammer* threshold. The average weekly turnover as a percentage of shares outstanding was 5.16% for Series C Preferred Stock and 7.93% for Series D Preferred Stock. **Exhibit 3-C** and **Exhibit 3-D** plot Series C Preferred Stock and Series D Preferred Stock's weekly trading volume as a fraction of shares outstanding and public float for each week during the Analysis Period. The volume of trading for these two securities supports the conclusion that they were both efficient during the Analysis Period.

31.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[39] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.*, shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, Miller Energy Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported

---

[38] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[39] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

Turnover Velocity Ratio = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

statistics. For example, over the Analysis Period, the annualized turnover velocity ratio for Miller Energy Common Stock was 251.99%, compared with the NYSE and NASDAQ average of 122.98% for the Analysis Period. The annualized turnover velocity ratio for Miller Energy Series C was 258.02%, compared with the NYSE and NASDAQ average of 122.98% for the Analysis Period. Finally, the annualized turnover velocity ratio for Miller Energy Series D was 396.41%, compared with the NYSE and NASDAQ average of 122.98% for the Analysis Period.[40] Thus, Miller Energy Securities have annualized turnover velocity ratios that were substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that all traded in efficient markets.

32.    In short, the relatively high trading volume in Miller Energy Securities throughout the Analysis Period supports the conclusion that the markets for Miller Energy Securities were efficient.

### C. *CAMMER FACTOR 2: ANALYST COVERAGE*

33.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[41]

34.    Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

---

[40] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[41] *Cammer*, 711 F. Supp. at 1286.

35. During the Analysis Period, there was continuous analyst coverage for Miller Energy. **Exhibit 4** shows that there were at least 158 equity analyst reports issued during the Analysis Period and lists 15 separate firms that had equity analysts issue reports on Miller Energy, including major firms such as Brean Capital, SunTrust Robinson Humphrey, and Imperial Capital.[42] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Miller Energy by securities analysts supports the conclusion that all Miller Energy Securities traded in efficient markets throughout the Analysis Period.[43]

36. Since 1989, when the *Cammer* decision was rendered, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[44] and other media, the ability of

---

[42] I obtained Miller Energy analyst reports from Investext. The number of analyst reports I identify is almost certainly understated since many reports are not available through third party data providers such as Investext. For example, it is clear that analysts from Rockwood and Kendall Square Capital, LLC. participated in earnings conference calls during the Analysis Period, but research reports from these analysts are not available via Investext. See, for example, Miller Energy, Inc. Q1 2013 Earnings Call, September 20, 2012.

[43] Analyst reports covering Miller Energy Common Stock also provide relevant information for investors in the Preferred Shares. For example, several analysts address the Preferred Shares directly. For example, see "TURNING THE CORNER: Kitchen Sink of a Quarter Could Mark a Bottom, New Strategy in Place," MLV & Co. LLC, December 10, 2014. Even those reports that do not specifically mention the Preferred Shares directly provide relevant information to investors of the Preferred Shares since the value of Preferred Shares are related to the value of the Common Shares. See section "Event Study for Preferred Securities" for a more detailed description of the Preferred Shares and how their value relates to the value of the Common Stock.

[44] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/, and http://www.rss-specifications.com/what-is-rss.htm).

individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

37.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of Miller Energy, there were many other sources of public information dissemination. For example, there was substantial public press regarding Miller Energy. A search for articles classified as related to Miller Energy by Factiva over the Analysis Period results in 1,681 unique articles.[45] In addition, there were numerous SEC filings available online in the SEC EDGAR database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Miller Energy in the public arena throughout the Analysis Period.

38.     In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Miller Energy provide evidence of robust and active markets for public information about Miller Energy and evidence that its securities traded in efficient markets during the Analysis Period.

---

[45] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources and provides organizations with search, alerting, dissemination, and other information management capabilities. The 1,681 unique articles were identified in a search within "All Sources" available on Factiva with the company field for "Miller Energy Resources, Inc." and the keyword field for "Miller Energy" for the period August 29, 2011 through July 30, 2015, and excluding the phrase "New 52-Week Highs And Lows." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

#### D. *CAMMER FACTOR 3: MARKET MAKERS*

39.     A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[46] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[47]

40.     The basic premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (*i.e.*, the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[48]

41.     Miller Energy Securities traded on the NYSE with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[49] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern

---

[46] *See* http://www.sec.gov/answers/mktmaker.htm.

[47] *Cammer*, 711 F. Supp. at 1293.

[48] Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285 (1994), 291.

[49] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[50]

42.     The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[51] The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

43.     Nevertheless, according to Bloomberg, throughout the Analysis Period, there were 73 market makers for Miller Energy Common Stock.[52] Therefore, Miller Energy Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Analysis Period. Additionally, both Series C Preferred Stock and Series D Preferred Stock traded on the NYSE throughout the Analysis Period. As discussed previously, the market structure of the NYSE is supportive of the conclusion that the Preferred Securities traded in efficient markets. Based on the analysis above, this factor supports the efficiency of the markets for Miller Energy Securities during the Analysis Period.

---

[50] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; *see* Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[51] For NYSE, *see* https://www.nyse.com/market-model; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf. For NASDAQ, *see* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities.

[52] Bloomberg RANK function. Bloomberg only has RANK data for Miller Energy starting January 1, 2014.

### E. *CAMMER FACTOR 4: SEC FORM S-3 ELIGIBILITY*

44.     The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[53]

45.     Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[54] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.  Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

46.     Other than at the start and towards the end of the Analysis Period,[55] I have no reason to believe that Miller Energy was not S-3 eligible throughout the vast majority of the Analysis Period. In fact, Miller Energy filed Form S-3's during the Analysis Period (*i.e.*

---

[53] *Cammer*, 711 F. Supp. at 1287.

[54] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

[55] Miller Energy was not timely in filing their 10-K for the FYE April 30, 2010 per a letter from the SEC (*See*, Letter from SEC to Paul W. Boyd dated July 26, 2011). As required by the SEC, one has to be timely with their SEC filings for 12 months in order to be S-3 eligible. Once Miller Energy became eligible, I have found no further evidence they were not S-3 eligible up until nearly the end of the Analysis Period on July 14, 2015 when Miller Energy filed another NT 10-K. (*See*, https://www.sec.gov/cgi-bin/browse-edgar?company=Miller+Energy+Resources&owner=exclude&action=getcompany)

September 6, 2012 and October 5, 2012).[56] Miller Energy meets this *Cammer* efficiency factor, which supports the conclusion that Miller Energy Securities traded in efficient markets.

## F. *CAMMER FACTOR 5: PRICE REACTION TO NEW INFORMATION*

47.    The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

> …[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[57]

48.    Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[58] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[59]

49.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements

---

[56] https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0000785968&type=s-3&dateb=&owner=exclude&count=40.

[57] *Cammer,* 711 F. Supp. 1291.

[58] MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

[59] Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

50. To analyze cause and effect, I performed event studies to determine whether there is scientific evidence that the market prices of Miller Energy Securities react to new information. For Miller Energy Common Stock, consistent with what I have done for other market efficiency analyses, I have evaluated whether Miller Energy Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Miller Energy-related news. I also analyzed the extent to which large price movements in Miller Energy Common Stock on dates other than earnings announcements could be explained by newly released information. Based on the analyses I performed, which explicitly controls for the broader market as well as the price of oil, I find that there is a clear cause-and-effect relationship between new public information about Miller Energy and the market price of Miller Energy Common Stock.

51. To analyze Miller Energy Preferred Securities, I also undertook an event study approach, however, the nature of the Preferred Securities (which are senior to the Common Stock in the capital structure) suggests that the Preferred Securities would not regularly react to quarterly earnings announcements unless the solvency of the firm was called into question.[60] There were only three earnings announcements after the Preferred Securities were consistently trading well below their par value, and the Common Stock did not react significantly to these events, therefore it is unsurprising that the Preferred Securities did not either.

---

[60] Miller Energy Series C Preferred Stock may have also become sensitive to earnings announcements had the Common Stock approached or exceeded $10 per share because of the conversion features outlined in its prospectus. However, Miller Energy Common Stock did not reach that value during the Analysis Period. Series D Preferred Stock, meanwhile, was non-convertible and was therefore not sensitive to any conversion feature. For further information on the terms and conditions of Miller Energy Series C and Series D Preferred Stock, please see **Appendix C**.

52.     Therefore, to analyze cause and effect for the Preferred Securities, from the time that the Preferred Securities first traded substantially below par value, I analyzed whether the Preferred Securities reacted to firm-specific events that clearly updated the market regarding the ability of the Company to continue paying dividends or for the securities to continue trading on the exchange.  I now describe in further detail the event study methodology, the events I tested, and the results.

### COMMON STOCK CAUSE AND EFFECT ANALYSIS

53.     A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[61] I have performed such an analysis in this matter where I evaluate the relationship between Miller Energy Common Stock daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and NYMEX WTI Light Sweet Crude Oil Futures, hereafter referred to as the "Oil Price Index."[62] I chose an Oil Price Index instead of an index of peer companies because the

---

[61] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in Miller Energy Common Stock (the Miller Energy daily return) is the dependent variable and the contemporaneous daily returns for the broad market and oil index are the independent variables. For a general discussion of regression analysis, *see* Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995, Chapters 1-3.

[62] The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from the estimation (*i.e.*, 7/28/2011 with regard to market reaction to a TheStreetSweeper article alleging potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges after-market hours on October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

Company's communications to the market clearly identified the price of oil as a critical factor in its ability to generate cash flows. Given that, as the Company described, the fair value of its assets was directly impacted by market price of oil, that the Company's value was highly concentrated in a single geographic area, and that the Company was primarily in exploration and production rather than being vertically integrated into other areas of oil processing, the use of an oil price index is preferred to a broader oil company index.[63]

54. For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[64] By using a "rolling" estimation window, it allows for the relationship between Miller Energy Common Stock, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[65]

55. The model indicates that there is a positive correlation between Miller Energy Common Stock and the control variables. In other words, the movement of the Market Index and Oil Price Index helps explain the price movements of Miller Energy Common Stock. For instance, choosing a day in the Analysis Period purely as an example, April 1, 2014, and looking

---

[63] Nevertheless, I performed robustness checks to make sure that my ultimate conclusions are not sensitive to the choice of an oil price index instead of an index of industry peers. In particular, I considered whether my conclusions were sensitive to (1) use of an industry index instead of an oil price index or (2) inclusion of an industry index in addition to the oil price index. The industry index I considered was the Dow Jones US Exploration and Production Index, which Miller Energy compares itself against in its 10-Ks in 2012, 2013, and 2014. However, several companies included in the Dow Jones US Exploration and Production Index follow a different business model than Miller Energy. For instance, several firms operated refineries, fueling centers, and processing plants while Miller Energy was solely focused on oil and natural gas exploration and production. I, nonetheless, found that performing these robustness checks did not materially alter the results or conclusions I make throughout this report.

[64] MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997), 15: "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[65] Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995), 1597.

at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.15, which means that a 1% rise in the S&P 500 predicts a 1.15% increase in returns for Miller Energy Common Stock. The estimated coefficient for the Oil Price Index is 0.40, meaning that the expected return for Miller Energy Common Stock is about a 0.40% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Analysis Period, and it demonstrates there was a consistently positive relationship between the general market, the Oil Price Index, and the price of Miller Energy Common Stock. Furthermore, the results showed that as the market price of the Common Stock declined, the Company became much more sensitive to changes in the control indices.

56. Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in the price movement of Miller Energy Common Stock after controlling for the Market Index and Oil Price Index. For instance, on the example date, April 1, 2014, the model predicted that absent any new firm-specific information, the price of Miller Energy Common Stock would decrease by 0.18% because the S&P 500 was up 0.71% and the Oil Price Index was down 1.76%.[66] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of -0.85%. Thus, the "abnormal return" for this day is -0.67% (the actual return of -0.85% minus the predicted return of -0.18%). I then rely

---

[66] The expected return of -0.18% is found as follows: 1.15 * 0.71% (Coefficient on Market Index *times* Market Index return) + 0.40 * -1.76% (Coefficient on Oil Price Index Return *times* Oil Price Index Return) + -0.29% (constant term from the regression results).

on the standard deviation of the errors from the regression model to tell if this abnormal return of -0.67% is sufficiently large that I reject random movement as the explanation.

57. The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -0.67% represents -0.18 standard deviations or a t-statistic of -0.18 (abnormal return of -0.67% divided by the standard deviation of the errors of 0.0375). Using the standard assumption that, in the absence of new Company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[67] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of -0.18, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

---

[67] Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

58.     **Exhibit 6** shows that the standard deviation of the errors for Miller Energy Common Stock varied over the Analysis Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

59.     To analyze cause-and-effect, I examined the price response of Miller Energy Common Stock to the seventeen earnings announcements that occurred during the Analysis Period, an objective set of dates (see **Exhibit 7**).

60.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[68] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the fifth earnings release listed in **Exhibit 7** as an example, the Company announced negative fourth quarter results for the fiscal year 2012 due to high operating loss.[69] In response, the market price of Miller Energy Common Stock decreased 7.13%, compared to the predicted return of 1.35%, and had an abnormal return on July 17, 2012 of -8.48%. With a t-statistic of -2.54, this abnormal price movement is statistically significant, and I therefore have scientific evidence that Miller Energy Common Stock reacted rapidly to this new information.[70]

---

[68] Beaver, W., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971, pp. 119-163; Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[69] *See*, "Miller Energy Resources Reports Fourth Quarter and Year End Results," *Business Newswire*, July 16, 2012 6:31 PM EST; Miller Energy Resources Inc. Form 10-K filed July 16, 2012 5:17 PM ET; "More Production Growth and Litigation Certainty Needed," *SunTrust Robinson Humphrey*, August 6, 2012.

[70] It is not unusual to have occasional earnings announcements that are not statistically significant. This would happen, for instance, in quarters where there was not much surprise and the firm roughly met expectations, if the

61.     Similar to this example, I analyzed the market reaction to Miller Energy's other earnings announcements I identified above. In total, of the seventeen regular quarterly earnings Miller Energy issued during the Analysis Period, three resulted in statistically significant price movements above the 95% confidence level.[71] **Exhibit 7** presents a summary of the earnings releases during the Analysis Period.

62.     I then compared these results against the 316 days during the Analysis Period where there was no Miller Energy-related news, analyst reports published, or SEC filings issued. Of these 316 days, there were fourteen statistically significant price movements. Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level on 17.65% of the earnings announcements, but when compared to days with no Miller Energy-related news, I observed statistically significant reactions 4.43% of the time.[72] For days with no news, the fact that I observed only fourteen days with significant movements is consistent with what I would expect to observe by randomness alone.[73] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Miller Energy Common Stock.

63.     Furthermore, on the 316 days with no news, the average change in price of Miller Energy Common Stock was 2.52% after controlling for the broad market and the price of oil, while the average change in Miller Energy Common Stock on earnings dates was 4.16%. In

---

firm offered little change in guidance, and/or if there was a mix of both positive and negative information that netted out.

[71] Additionally, three earnings announcements during the Analysis Period resulted in price movements that were statistically significant at the 90% confidence interval.

[72] This difference between 17.65% and 4.43% is itself statistically significant at the 95% confidence level.

[73] There is no statistically significant difference between 4.43% and 5.00%. This is within the proportion of dates that would be significant by chance alone when using a 95% confidence interval.

other words, the average magnitude of stock price movement on earnings announcement days was about 1.7 times higher than on dates with no news.[74] Again, this demonstrates that on days when important Company-specific information is released to the market, the stock price moves much more than on days where there is no Company-specific news. This provides further evidence of a cause-and-effect relationship between Company-specific news and changes in the price of Miller Energy Common Stock, and thus an efficient market.

64.    The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



**Percentage of Days Significant at the 95% Confidence Level**

---

[74] This difference between 2.52% and 4.16% is itself statistically significant.



**Average Absolute Abnormal Return**

65.   Finally, when important Company-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher than on days where there is a low amount of news. For instance, the average daily trading volume of the seventeen days with earnings announcements was 0.71 million. Compare this to the average daily trading volume of 0.34 million for days in the Analysis Period with no news.[75] The bar chart below summarizes this analysis.

---

[75] This difference between 0.71 million and 0.34 million is itself statistically significant.



**Average Daily Trading Volume**

66. The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Miller Energy Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.

67. In conclusion, the event study analysis presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of Miller Energy Common Stock.

**EVENT STUDY FOR PREFERRED SECURITIES**

68.     Preferred securities are a hybrid between equity and debt, and the terms for preferred securities can vary substantially for each issue.[76] They often receive a coupon payment like a bond, but may have a very long or perpetual maturity. They typically rank junior to debt (e.g. debt-holders would be repaid in a liquidation before preferred shareholders), but senior to common equity. Companies may also issue multiple classes (or series) of preferred stock, which are ranked by seniority in relation to one another.[77] Preferred securities also often receive preferential treatment when it comes to dividends (e.g. preferred share coupon payments often must be made before any dividends can be paid to common shareholders).[78] In many cases, preferred stock issuances are callable, meaning the issuing company has the option to purchase back preferred shares at a predetermined price at their discretion.[79] In addition, preferred stock can often be converted to common stock. Sometimes this option is held by the investor and other times by the issuer. In addition, preferred stock represents ownership in the company, but owners of preferred stock do not usually have voting rights.[80]

69.     Certain investors might find preferred stock more attractive relative to common stock for a variety of reasons. For example, it may offer regular cash flows that are not as

---

[76] For example, see the discussion in William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, p. 420.

[77] William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, p. 420.

[78] William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, p. 420.

[79] William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, p. 420.

[80] Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, McGraw-Hill, 1988, Third Edition, pp. 308-309.

sensitive to company performance as dividends on common stock, and institutions may find preferred stock particularly attractive because of favorable rules governing dividends. Also, it is typically a safer investment vehicle because in the event of a company's liquidation, preferred stockholders enjoy priority distribution of the company's assets over the common shareholders.[81]

70.   On or about October 5, 2012, Miller Energy offered 685,000 shares of 10.75% Series C Cumulative Redeemable Preferred Stock at $23.00 a share ("Miller Energy Series C Preferred Stock" or "Series C Preferred Stock").[82, 83] The Series C Preferred Stock had a $25.00 per share liquidation preference, meaning that in the event of liquidation (e.g., the company selling all of its assets), the holders of Series C Preferred Stock would have the right to receive $25.00 per share if sufficient assets were available. Holders of the Series C Preferred Stock were entitled to receive quarterly dividends at an annual rate of 10.75% of the $25.00 per share liquidation preference (equivalent to $2.6875 per year per share).[84] The Series C Preferred Stock had no stated maturity.[85] Miller Energy had the option to redeem the Series C Preferred Stock on or after November 1, 2017 at a redemption price of $25.00 per share.[86] Each share was convertible at any time at the option of the shareholder into the number of whole shares of Miller

[81] Frank K. Reilly and Keith C. Brown, *Investment Analysis and Portfolio Management*, The Dryden Press, Sixth Edition, 2000, p. 82; Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, McGraw-Hill, 1988, Third Edition, pp. 308-309.

[82] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012 and Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2012.

[83] Miller's SEC filings state that the offering date was on October 5, 2012 but the first price available for this series occurs on October 8, 2012.

[84] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012.

[85] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012.

[86] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012.

Energy Common Stock as is equal to $25.00 per share, plus accrued and unpaid dividends, divided by an initial conversion price of $10.00.[87]

71.    Additional shares of Series C Preferred Stock were also offered and issued to the public throughout the Analysis Period through two types of agreements with MLV & Co. LLC ("MLV"), an investment bank. Miller Energy entered into an agreement with MLV on October 12, 2012, which was an At Market Issuance Sales Agreement.[88] This agreement allowed Miller Energy the option to periodically issue additional shares of Series C Preferred Stock at the prevailing market price through MLV. In exchange, MLV received a commission equal to 3.5% of the gross proceeds of any additional sale of Miller Energy's Series C Preferred Stock.[89] Miller Energy entered into another agreement with MLV on February 12, 2013, which was an Underwriting Agreement for a follow-on "best efforts" offering of the Series C Preferred Stock.[90] Miller Energy issued an additional 625,000 shares of the Series C Preferred Stock at $22.90 per share pursuant to this Underwriting Agreement.[91] Throughout the Analysis Period, Miller Energy entered into two other Underwriting Agreements with MLV: on May 7, 2013 for an issuance of an additional 500,000 shares of Series C Preferred Stock,[92] and June 27, 2013 for an issuance of additional 335,000 shares of Series C Preferred Stock.[93]

---

[87] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed September 28, 2012.

[88] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2012.

[89] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2012.

[90] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended January 31, 2013.

[91] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended January 31, 2013. These shares were subsequently issued on February 13, 2013.

[92] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended July 31, 2013. These shares were subsequently issued on May 10, 2013.

[93] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended July 31, 2013. These shares were subsequently issued on July 2, 2013.

72. On or about September 30, 2013, Miller Energy offered 1,000,000 shares of 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock at $25 a share ("Miller Energy Series D Preferred Stock" or "Series D Preferred Stock").[94, 95] The Series D Preferred Stock had a $25.00 per share liquidation preference, meaning that in the event of liquidation (e.g., the company selling all of its assets), the holders of Series D Preferred Stock would have the right to receive $25.00 per share.[96] Holders of the Series D Preferred Stock were entitled to receive quarterly dividends at an annual rate of 10.5% of the $25.00 per share liquidation preference (equivalent to $2.625 per year per share) until December 1, 2018. After December 1, 2018, holders of the Series D Preferred Stock would be entitled to receive quarterly dividends at an annual floating rate.[97] The Series D Preferred Stock had no stated maturity.[98] Miller Energy had the option to redeem the Series D Preferred Stock on or after September 30, 2018 at a redemption price of $25.00 per share.[99] The Series D Preferred Stock was not convertible or exchangeable for any other property or securities of Miller Energy.[100] The Series C Preferred Stock and the Series D Preferred Stock ranked equally in seniority.[101]

---

[94] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013 and Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2013.

[95] Miller's SEC filings state that the offering date was September 30, 2013 but the first price available for this series occurs on October 1, 2013.

[96] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

[97] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013 ("…at an annual rate equal to the sum of (a) Three- Month LIBOR…as calculated on each applicable date of determination and (b) 9.073%, based on the $25.00 per share liquidation preference per annum.")

[98] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

[99] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

[100] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

[101] Miller Energy Resources, Inc. SEC Form 424(b)(5) filed October 17, 2013.

73.     Additional shares of Series D Preferred Stock were also offered and issued to the public throughout the Analysis Period through two types of agreements with MLV. Miller Energy entered into an agreement with MLV on October 17, 2013, which was an At Market Issuance Sales Agreement.[102] This agreement allowed Miller Energy the option to periodically issue additional shares of Series D Preferred Stock at the prevailing market price through MLV. In exchange, MLV received a commission equal to 3.0% of the gross proceeds of any additional sale of Miller Energy's Series D Preferred Stock.[103] Miller Energy entered into another agreement with MLV on August 20, 2014, which was an Underwriting Agreement for a follow-on "best efforts" offering of the Series D Preferred Stock.[104] Miller Energy issued an additional 750,000 shares of the Series D Preferred Stock at $24.50 per share pursuant to this Underwriting Agreement.[105]

74.     Based upon the terms described above, the market prices of the Preferred Securities would, to the extent there was not a substantial increase in the perceived chance of default, trade based upon the present value of the expected dividend payments.  This has specific implications for what to expect from an event study.  In particular, from the time of the issuance of each of the Preferred Securities to the time where the market prices substantially fall below the par value (and therefore indicating an increased risk of default), market price would be driven primarily by changes in the time value of money (*i.e.* the applicable discount rate), market prices would not be expected to be sensitive to all the factors that impact the common stock.  As a result, the volatility of the Preferred Securities would be expected to be low relative to common stock and

---

[102] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2013.

[103] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2013.

[104] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended January 31, 2015.

[105] Miller Energy Resources, Inc. SEC Form 10-Q for the quarter ended October 31, 2014. The shares were subsequently issued on August 25, 2014.

the market price would not be expected to respond to events like earnings announcements or other news that does not fundamentally impact the perceived chance of default.

75. As of October 15, 2014, the market prices of the Preferred Securities fell to a new low that was substantially below par value. The decline in the Preferred Securities at that time (as well as the Common Stock) signals that the markets saw a greater probability that the company might default and that the value of the Preferred Securities would depend to a greater extent on the perceived value of Miller Energy's assets, rather than just the promise to pay. From that point forward, the market prices of the Preferred Securities would be expected to be much more correlated with the factors that impact the Common Stock.

76. For the reasons described above, I constructed two different fixed estimation windows for the Preferred Securities: one prior to October 15, 2014 and another for October 15, 2014 to the end of the Analysis Period.[106] **Exhibits 5-C** and **Exhibit 5-D** show the coefficients on the Market Index and Oil Price Index for the Preferred Securities over these windows. As can be seen, the coefficients are much lower during the pre-October 15, 2014 period and more commensurate with the coefficients from the Common Stock after October 15, 2014.

77. Likewise, **Exhibit 6-C** and **Exhibit 6-D** show the standard deviation of the errors for the regression models, which shows that the volatility of the Preferred Securities are very low during the pre-October 15, 2014 period and more commensurate with the Common Stock after October 15, 2014. The fact that the Preferred Securities exhibit these patterns is itself consistent with market efficiency.

---

[106] For the Preferred Securities, I extended my analysis to include July 31, 2015 in order to measure the effect of the announcement released after market hours on July 30, 2015.

78.     To test for cause and effect, I evaluated the price movements of the Preferred Securities in the post-October 15, 2014 period where there was news that was clearly related to the ability of the Company to continue paying preferred stock dividends or remain listed on the NYSE.  These events included announcements of the intent to continue to pay or suspend the dividend, disclosure of a "Wells Notice" associated with the Company's valuation of the Alaska Assets, the warning that there was substantial doubt about the Company's ability to continue as a going concern and the delisting of the Preferred Securities from the NYSE.  Considering May 6, 2015, the sixth material release listed in **Exhibit 9** and **Exhibit 11,** as an example, the Company announced that its Board of Directors voted to defer quarterly payments of dividends for the Series C and Series D Preferred Stocks.[107] In response, the market price of Miller Energy Series C Preferred Stock decreased 34.89%, compared to the predicted return of 0.17%. Miller Energy Series D Preferred Stock also decreased 28.40%, compared to the predicted return of 0.27%. Thus, the abnormal return on May 6, 2015 was -35.06% and -28.67% for Series C Preferred Stock and Series D Preferred Stock, respectively. With a t-statistic of –5.70 and -4.53, respectively, these abnormal price movements are statistically significant, and I therefore have scientific evidence that Miller Energy Preferred Securities reacted rapidly to this new information.[108]

79.     Like with the Common Stock, I then compared the event study results on these days with the results for days with no news, SEC filings, or analyst reports.

---

[107] *See*, "Press Release: Miller Energy Defers Cash Dividends on Its Series C and Series D Preferred Stock," *Dow Jones Newswires*, May 6, 2015 8:00 AM EST.

[108] It is not unusual to have occasional announcements that are not statistically significant. This would happen, for instance, in quarters where there was not much surprise and the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information that netted out.

80.   **Exhibit 10** and **Exhibit 12** summarize this analysis and demonstrate that the news events are associated with far greater incidence of statistical significance, stock price movements, and trading volume.  This provides scientific evidence of a cause and effect relationship between new news events and changes in the market price of the Preferred Securities.

### G. *ADDITIONAL FACTOR 1: MARKET CAPITALIZATION*

81.   In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[109] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[110] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[111] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

82.   Prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Common Stock had a market capitalization in the mid-quartile range of all common stocks trading on the NYSE and NASDAQ, thus

---

[109] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[110] *Krogman*, 202 F.R.D. at 478.

[111] Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000), 117.

suggesting this factor is supportive of efficiency. There were between 40.6 million and 46.7 million shares of Miller Energy Common Stock outstanding during the Analysis Period.[112]

83.     Based on the market price, the market capitalization for Miller Energy Common Stock averaged $117.3 million during the Analysis Period. **Exhibit 13** shows Miller Energy's market capitalization over the Analysis Period. **Exhibit 14** shows that during the Analysis Period, Miller Energy Common Stock market capitalization fell between the 6th and 36th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Analysis Period.[113] In other words, on average, over the Analysis Period, Miller Energy Common Stock had a higher market capitalization than 21% of the firms on the combined NYSE and NASDAQ exchanges.

84.     In many respects, it makes sense to consider the market capitalization of Miller Energy as a whole for Series C Preferred Stock and Series D Preferred Stock because the overall size of Miller Energy affects things such as the amount of news and analyst coverage. In that case, the opinion I reached is also applicable to Miller Energy Series C Preferred Stock and Miller Energy Series D Preferred. **Exhibit 13-C** and **Exhibit 13-D** shows the market capitalization of the Series C Preferred Stock and Series D Preferred Stock, respectively, over the Analysis Period, while **Exhibit 14** shows that when factoring in the Preferred Stocks, Miller Energy combined market capitalization fell between the 16th and 41st percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Analysis Period.[114]

---

[112] S&P Capital IQ.

[113] Bloomberg.

[114] Market capitalization for Series C Preferred Stock and Series D Preferred Stock is calculated as the daily closing price multiplied by shares outstanding according to quarterly SEC filings. Throughout the Analysis Period, Miller Energy periodically issued additional stock pursuant to its sales agreement with MLV. These issuances are accounted for in quarterly SEC filings of shares issued and outstanding.

85.     Given that the market capitalization Miller Energy Common Stock and Miller Energy as a whole was in the mid-quartile range relative to other publicly traded companies, this factor is supportive of market efficiency for the Miller Energy Securities.

## H. *ADDITIONAL FACTOR 2: THE BID-ASK SPREAD*

86.     The *Krogman* court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[115] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

87.     I analyzed bid-ask spreads for Miller Energy Common Stock during the Analysis Period. **Exhibit 15** shows that during this period, the time-weighted average percentage bid-ask spread for Miller Energy Common Stock in each month was between 0.1535% and 1.7477%. Prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the bid-ask spread was below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in December

---

[115] *Krogman*, 202 F.R.D. at 478.

2014.[116,117] **Exhibit 15** demonstrates that Miller Energy Common Stock had a monthly average bid-ask spread of 0.8115% in December 2014, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.76%.[118] Although this spread is larger than the average of the 100 other common stocks, it is a relatively small difference, and is due particularly to the price of the Common Stock substantially falling ahead of the Company's bankruptcy. The academic literature is clear that as a stock's price falls to low levels, the percentage of its bid-ask spread tends to increase.[119] Accordingly, Miller Energy Common Stock bid-ask spread was low during the Analysis Period prior to the market price fall, and this factor further supports market efficiency for Miller Energy Common Stock.

88. As with the Common Stock, I analyzed bid-ask spreads for Series C Preferred Stock and compared them to a random sample of other publicly traded stocks in December 2014.[120] As **Exhibit 15-C** shows, during this period, the time-weighted average percentage bid-ask spread for Miller Energy Series C Preferred Stock in each month was between 0.2452% and 8.5394%. Prior

---

[116] Quote data for Miller Energy and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[117] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ throughout the Analysis Period and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for December 2014.

[118] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Huang, R., and Stall, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[119] Kadapakkam, P., S. Krishnamurthy, and Y. Tse (2005), "Stock Splits, Broker Promotion, and Decimalization," *The Journal of Financial and Quantitative Analysis*, v. 40 (4), December, pp. 873 – 895.

[120] Quote data for Miller Energy Series C Preferred Stock and other publicly traded stocks was obtained from the Tick Data. See www.tickdata.com.

to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Series C Preferred Stock had a bid-ask spread at or around 0.76%, the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ. While the bid-ask spread jumped past that average for the last eight months, that large spread was due to the falling market price of the Series C Preferred Stock prior to delisting and the Company's bankruptcy. Otherwise, Series C Preferred Stock was low during the Analysis Period, and therefore this factor supports efficiency**.**

89.    As with the Common Stock and Series C Preferred Stock, I analyzed bid-ask spreads for Series D Preferred Stock and compared them to a random sample of other publicly traded stocks in December 2014.[121]  As **Exhibit 15-D** shows, during this period, the time-weighted average percentage bid-ask spread for Miller Energy Series D Preferred Stock in each month was between 0.3192% and 8.0119%. Prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Series D Preferred Stocks had a bid-ask spread at or around 0.76%, the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ. While the bid-ask spread jumped past that average near the end of the Analysis Period, that large spread was due to the falling market price of the Series D Preferred Stock prior to delisting and the Company's bankruptcy. Otherwise, Series D Preferred Stock was low during the Analysis Period, and therefore this factor supports efficiency.

---

[121] Quote data for Miller Energy Series D Preferred Stock and other publicly traded stocks was obtained from the Tick Data. See www.tickdata.com

## I. ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

90.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 16** shows, 181 institutions reported owning Miller Energy Common Stock during the Analysis Period, holding, on average, over 30% of the public float. This substantial level of institutional ownership of Miller Energy Common Stock during the Analysis Period coupled with the high trading volume further supports a conclusion of market efficiency.[122]

## J. ADDITIONAL FACTOR 4: AUTOCORRELATION

91.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

92.    Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation

---

[122] Institutions also held the Preferred Securities although the data available was limited. According to the SEC, institutional investment managers must use Form 13F for reports to the commission with respect to accounts holding Section 13(f) Securities (*See* https://www.sec.gov/pdf/form13f.pdf). The SEC publishes a list of Section 13F Securities quarterly, which lists all securities that institutions must report (quarterly lists can be found at https://www.sec.gov/divisions/investment/13flists.htm). For all quarterly lists starting in the third calendar quarter of 2012 (when Series C Preferred Stock began trading) and ending at the end of the Analysis Period, the Preferred Securities were not labelled as Section 13F Securities, meaning institutions were not required to report their holdings of the Preferred Securities. This is not uncommon for preferred securities in general: only 85 of the 17,395 securities identified as 13-F Securities were preferred securities in the List for the second quarter of 2015 ("List of Section 13F Securities, Second Quarter FY 2015," SEC, June 15, 2015).

were large enough and persistent enough that a trader could consistently earn riskless profits over time.[123]

93.     A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[124] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

94.     **Exhibit 17** shows the coefficients and the associated t-statistics for the regression of Miller Energy Common Stock abnormal return against the abnormal return from the previous day for each quarter during the Analysis Period. The coefficient for the Analysis Period is not statistically significant at the 95% confidence level. Therefore, this factor also supports the conclusion that Miller Energy Common Stock traded in an efficient market throughout the Analysis Period.

95.     As with the Common Stock, I performed regression analysis for Series C Preferred Stock during the Analysis Period that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today for this series of preferred stock.[125] As with the Common Stock, Miller Energy Series C Preferred Stock did not exhibit consistent autocorrelation during the Analysis Period. **Exhibit 17-C** shows the coefficients and the associated t-statistics for the regression of Miller Energy Series C Preferred Stock abnormal return against the abnormal return from the previous day for each quarter during

---

[123] Doron Avramov, et al., Liquidity and Autocorrelations in Individual Stock Returns, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, Some Anomalous Evidence Regarding Market Efficiency, 6 J. FIN. ECON. 95 (1978).

[124] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[125] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

the Analysis Period. As the exhibit shows, there was not a consistent relationship that would allow one to predict Miller Energy Series C Preferred Stock returns based on their prior movements. The coefficients for the Analysis Period are not statistically significant at the 95% confidence level. Therefore, this factor also supports the conclusion that the Series C Preferred Stock traded in efficient markets throughout the Analysis Period.

96.    As with the Common Stock and Series C Preferred Stock, I performed regression analysis for Series D Preferred Stock during the Analysis Period that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today for this series of preferred stock.[126] **Exhibit 17-D** shows the coefficients and the associated t-statistics for the regression of Miller Energy Series D Preferred Stock abnormal return against the abnormal return from the previous day for each quarter during the Analysis Period. While I did find statistically significant autocorrelation for Series D Preferred Stock across the Analysis Period, the quarterly autocorrelation analysis demonstrates that there is no consistent pattern that would suggest an arbitrage opportunity because the sign of the autocorrelation coefficient is not even consistently the same sign.  In other words, in order to profit from autocorrelation, the direction of the autocorrelation needs to be consistent.  In this case, the sign changes from quarter to quarter.  Therefore, the statistical evidence is inconsistent with the presence of systematic autocorrelation that would allow a trader to consistently profit. Therefore, analysis of this factor for Miller Energy Series D Preferred Stock is consistent with market efficiency.

---

[126] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

### K. *ADDITIONAL FACTOR 5: OPTIONS*

97.    In addition to the factors analyzed above, there was also option trading in Miller Energy Common Stock during the Analysis Period.[127] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[128] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[129] The existence of active option trading in Miller Energy Common Stock provides evidence supporting efficiency.

## VIII. SECTION 10b-5 DAMAGES

98.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using methodologies common to the Classes. Plaintiffs' Complaint alleges damages under Section 10(b) for all securities and Section 11 damages specific to the preferred offerings.

99.    In this matter,  Section 10(b) damages can be calculated for all those who purchased Miller Energy Common Stock, Miller Energy Series C Preferred Stock, and Miller Energy Series D Preferred Stock during the Class Period and were damaged thereby.[130] Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the

---

[127] For instance, according to Bloomberg data, there were 98,418 Miller Energy Common Stock put contracts and 301,129 Miller Energy Common Stock call contracts that traded during the Analysis Period.

[128] Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[129] Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

[130] Complaint ¶¶ 32.

"out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[131]

100.   The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the Section 10(b) Class can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the Section 10(b) Class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to members of the Section 10(b) Class.

---

[131] Specifically, the Private Securities Litigation Reform Act of 1995 states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

## IX.    SECTION 11 DAMAGES

101.  Section 11 damages can be calculated for the members of the Section 11 Class, all those who purchased Miller Energy Series C Preferred Stock and Miller Energy Series D Preferred Stock "pursuant to or traceable to the Offering Documents" issued during the Class Period.[132] Section 11 damages calculations are based on Section 11(e) of the Securities Act which establishes the statutory formula by which damages for Section 11 claims are calculated. Specifically, Section 11(e) states the following:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

102.  Given that there is a statutorily defined formula for Section 11 damages, it is clear that damages under Section 11 can be calculated using a common methodology for members of the Section 11 Class.

103.  Section 11 allows Defendants to offset some or all of these damages if they can prove that financial losses under the statutory formula were not caused by the false statements or omissions.  Section 11 provides:

> if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion or all such damages shall not be recoverable.

---

[132] Complaint ¶¶ 33.

104. Any negative causation evidence would be applicable to each class member as opposed to relevant for any specific investor. Therefore, even to the extent there is negative causation, damages can still be calculated for members of the Section 11 Class.

## X.   CONCLUSION

105. In sum, every factor analyzed supports my opinion that Miller Energy Securities traded in efficient markets during the Analysis Period. Furthermore, class-wide damages in this matter can be calculated using common methodologies for both the Section 10(b) Class and the Section 11 Class.

106. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on April 19, 2019.


Chad Coffman

# Exhibit 1
## Summary of Efficiency Factors for Miller Energy Resources, Inc. Securities

| Factor | Summary of Factor | Miller Energy Common Stock | Miller Energy 10.75% Series C Preferred Stock | Miller Energy 10.5% Series D Preferred Stock |
|---|---|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 5.04%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 2.2 million shares traded weekly on average during the Analysis Period, on a split adjusted basis). | • The average weekly trading volume of 5.16%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 0.1 million shares traded weekly on average during the Analysis Period, on a split adjusted basis). | • The average weekly trading volume of 7.93%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 0.2 million shares traded weekly on average during the Analysis Period, on a split adjusted basis). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Analysis Period at least 15 securities analysts issued 158 analyst reports which implies that important information relevant to trading Miller Energy Common Stock, Miller Energy Series C Preferred Stock, and Miller Energy Series D Preferred Stock was widely communicated to the market. | | |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Miller Energy's Common Stock shares, Series C Preferred Stock shares, and Series D Preferred Stock shares were exchange-traded on the NYSE during the Analysis Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Analysis Period, there were at least 73 market makers for Miller Energy Common Stock. | | |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • During the Analysis Period, Miller Energy filed two Form S-3s (i.e. September 6, 2012 and October 5, 2012). I have found no evidence to believe that Miller Energy was not S-3 eligible for the majority of the Analysis Period, thus satisfying this factor. | | |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Miller Energy Common Stock.. | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Miller Energy Series C Preferred Stock. | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Miller Energy Series D Preferred Stock. |

# Exhibit 1
## Summary of Efficiency Factors for Miller Energy Resources, Inc. Securities

| Factor | Summary of Factor | Miller Energy Common Stock | Miller Energy 10.75% Series C Preferred Stock | Miller Energy 10.5% Series D Preferred Stock |
|---|---|---|---|---|
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | •Over most of the Analysis Period, prior to the market price of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the market capitalization of the Miller Energy Common Stock (and the Miller Securities collectively) was in the mid-quartile range of all common stocks trading on the NYSE and NASDAQ combined. | | |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Analysis Period, the average percentage bid-ask spread for Miller Energy Common Stock in each month ranged from 0.15% to 1.75%. Prior to the market price of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, this is below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in December 2014. This supports a finding of efficiency | • During the Analysis Period, the average percentage bid-ask spread for Miller Energy Series C Preferred Stock in each month ranged from 0.24% to 8.54%. Prior to the market price of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Series C Preferred Stock had a bid-ask spread at or around the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ in December 2014. This supports a finding of efficiency. | • During the Analysis Period, the average percentage bid-ask spread for Miller Energy Series D Preferred Stock in each month ranged from 0.32% to 8.01%. Prior to the market price of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Series D Preferred Stocks had a bid-ask spread at or around the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ in December 2014. This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 181 institutions held, on average, 30.3% of the public float throughout the Analysis Period which further supports the finding that Miller Energy Common Stock traded in an efficient market. While there is some limited institutional data for the Series C Preferred Stock and Series D Preferred Stock, it was not a required filing by institutions like it was for the Common Stock. | | |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Miller Energy Common Stock based solely on its past price movements. This supports a finding of efficiency. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Miller Energy Series C Preferred Stock based solely on its past price movements. This supports a finding of efficiency. | • There was no evidence of consistent statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Miller Energy Series D Preferred Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 301,129 Miller Energy Common Stock call contracts and 98,418 Miller Energy Common Stock put contracts that traded during the Analysis Period. Miller Energy Common Stock therefore meets this criterion. There is no Bloomberg data for Options Data for Series C Preferred Stock and Series D Preferred Stock. | | |



**Exhibit 2**
**Miller Energy Common Stock Price & Volume**
**8/29/2011 - 8/31/2015**

Analysis Period: 8/29/2011 - 7/30/2015

7/31/2015:
Miller Energy securities begin trading OTC after they are delisted from the NYSE.

Volume — Closing Price

Sources: Complaint, Order, S&P Capital IQ, and "Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange," *Dow Jones*, July 30, 2015.



**Exhibit 2-C**
**Miller Energy 10.75% Series C Preferred Stock Price & Volume**
**10/8/2012 - 8/31/2015**

Analysis Period: 10/8/2012 - 7/30/2015

10/8/2012: Miller Energy issues 685,000 shares of Series C Preferred Stock.

5/7/2013: Miller Energy issues an additional 500,000 shares of Series C Preferred Stock.

7/31/2015: Miller Energy securities begin trading OTC after they are delisted from the NYSE.

2/13/2013: Miller Energy issues an additional 625,000 shares of Series C Preferred Stock.

6/27/2013: Miller Energy issues an additional 335,000 shares of Series C Preferred Stock.

10/12/2012: Miller Energy enters into an At Market Issuance Sales Agreement allowing it to periodically issue additional shares of Series C Preferred Stock.

Pursuant to the Sales Agreement entered into on 10/12/2012, Miller Energy issued an additional 1,105,000 shares of Series C Preferred Stock periodically throughout the Analysis Period.

Closing Price

Volume

10/08/12 12/08/12 02/08/13 04/08/13 06/08/13 08/08/13 10/08/13 12/08/13 02/08/14 04/08/14 06/08/14 08/08/14 10/08/14 12/08/14 02/08/15 04/08/15 06/08/15 08/08/15

Volume — Closing Price ■ Events

Sources: Complaint, S&P Capital IQ, "Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange," *Dow Jones*, July 30, 2015 and Miller Energy quarterly SEC filings throughout the Analysis Period.



# Exhibit 2-D
## Miller Energy 10.5% Series D Preferred Stock Price & Volume
### 10/1/2013 - 8/31/2015

Analysis Period: 10/1/2013 - 7/30/2015

**10/1/2013:**
Miller Energy issues 1,000,000 shares of Series D Preferred Stock.

**10/17/2013:**
Miller Energy enters into an At Market Issuance Sales Agreement allowing it to periodically issue additional shares of Series D Preferred Stock

Pursuant to the Sales Agreement entered into on 10/17/2013, Miller Energy issued an additional 1,580,608 shares of Series D Preferred Stock periodically throughout the Analysis Period.

**8/25/2014:**
Miller Energy issues an additional 750,000 shares of Series D Preferred Stock.

**7/31/2015:**
Miller Energy securities begin trading OTC after they are delisted from the NYSE.

Closing Price

Volume

Volume — Closing Price — Events

Sources: Complaint, S&P Capital IQ, "Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange," *Dow Jones,* July 30, 2015 and Miller Energy quarterly SEC filings throughout the Analysis Period.

# Exhibit 3
## Miller Energy Common Stock Average Weekly Trading Volume
## as a Percentage of Shares Outstanding
### 8/29/2011 - 7/30/2015



"1% average weekly trading volume of the outstanding shares justify a substantial presumption" (*Cammer*)

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

**Average Weekly Volume as Percentage of Shares Outstanding:**
Average: 5.04%
Median: 3.88%

■ Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Analysis Period on August 29, 2011 through July 30, 2015. The last week consists of just one trading day (i.e., 7/30/2015), and therefore is excluded from the average and median calculations.

# Exhibit 3-C
# Miller Energy 10.75% Series C Preferred Stock Average Weekly Trading Volume
## as a Percentage of Shares Outstanding
## 10/8/2012 - 7/30/2015



■ Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Analysis Period on October 8, 2012 (when Series C began trading) through July 30, 2015. The last week consists of just one trading day (i.e., 7/30/2015), and therefore is excluded from the average and median calculations.



**Exhibit 3-D**
**Miller Energy 10.5% Series D Preferred Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**10/1/13 - 7/30/2015**

"1% average weekly trading volume of the outstanding shares justify a substantial presumption" (*Cammer*)

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

**Average Weekly Volume as Percentage of Shares Outstanding:**
Average: 7.93%
Median: 5.32%

■ Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Analysis Period on October 1, 2013 (when Series D began trading) through July 30, 2015.

# Exhibit 4
## Summary of Securities Analyst Reports Issued for Miller Energy

| | Analyst Name | Reports Issued During the Analysis Period: 8/29/2011 - 7/30/2015 |
|---|---|---|
| [1] | BREAN CAPITAL, LLC. | 40 |
| [2] | WRIGHT INVESTORS SERVICE | 22 |
| [3] | SUNTRUST ROBINSON HUMPHREY CAPITAL MAR | 19 |
| [4] | MARKETLINE | 17 |
| [5] | MLV & CO. | 12 |
| [6] | IMPERIAL CAPITAL, LLC | 10 |
| [7] | SADIF ANALYTICS | 10 |
| [8] | GLOBALDATA | 7 |
| [9] | VALUENGINE, INC. | 6 |
| [10] | BUYSELLSIGNALS RESEARCH | 6 |
| [11] | NOBLE FINANCIAL CAPITAL MARKETS | 3 |
| [12] | SADIF-INVESTMENT ANALYTICS SA | 3 |
| [13] | STEPHENS INC. | 1 |
| [14] | VALIDEA | 1 |
| [15] | WALL STREET TRANSCRIPT | 1 |
| | **Total** | **158** |

Sources: Investext, Bloomberg, and Counsel.
Note: Many analyst reports are not available through third party data providers (e.g. Investext and Bloomberg); therefore, this almost certainly understates the total amount of analyst coverage.



**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Miller Energy Common Stock**
**8/29/2011 - 7/30/2015**

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

**Exhibit 5-C**
**Coefficients from Fixed Regressions for Miller Energy Series C Preferred Stock**
**10/8/2012 - 7/31/2015**



S&P 500 Total Return Index Coefficient ——— NYMEX WTI Light Sweet Crude Oil Futures Coefficient

Note: The results are based on two fixed regressions that span over two consecutive time periods (10/8/2012 to 10/14/2014 and 10/15/2014 to 7/31/2015). The regression model controls for a broad market index (S&P Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.



**Exhibit 5-D**
**Coefficients from Fixed Regressions for Miller Energy Series D Preferred Stock**
**10/1/2013 - 7/31/2015**

Note: The results are based on two fixed regressions that span over two consecutive time periods (10/1/2013 to 10/14/2014 and 10/15/2014 to 7/31/2015). The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K , 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

# Exhibit 6
## Standard Deviation of the Errors from Rolling Event Study Regression for Miller Energy Common Stock
## 8/29/2011 - 7/30/2015



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a TheStreetSweeper article alleging potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.



**Exhibit 6-C**
**Standard Deviation of the Errors from Fixed**
**Regressions for Miller Energy Series C Preferred Stock**
**10/8/2012 - 7/31/2015**

Note: The results are based on two fixed regressions that span over two consecutive time periods (10/8/2012 to 10/14/2014 and 10/15/2014 to 7/31/2015) The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a TheStreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K., 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.



**Exhibit 6-D**
**Standard Deviation of the Errors from Fixed**
**Regressions for Miller Energy Series D Preferred Stock**
**10/1/2013 - 7/31/2015**

Note: The results are based on two fixed regressions that span over two consecutive time periods (10/1/2013 to 10/14/2014, and 10/15/2014 to 7/31/2015). The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

**Exhibit 7**
**Event Study Analysis of Miller Energy Earnings Announcements for Common Stock**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Volume (millions) | Rolling Event Study Regression (120-day rolling window) | | | |
|---|------|------|-------------|-------|----------|---------------|-----------|-------------------|---------------------|--------------------------|--------|-----------|
| | | | | | | | | | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
| 1 | 8/30/11 | 4:22 PM | 8/31/11 | Q4 2011 Earnings | Miller Energy Resource Reports Fourth Quarter and Year End Results *Source - Business Wire* | $3.58 | -0.56% | 1.1 | -0.71% | -$0.03 | -0.17 | |
| 2 | 9/9/11 | 5:10 PM | 9/12/11 | Q1 2012 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $3.34 | 4.38% | 0.3 | 3.52% | $0.11 | 0.83 | |
| 3 | 12/12/11 | 4:01 PM | 12/13/11 | Q2 2012 Earnings | Miller Energy Resources Reports Second Quarter Results *Source - Dow Jones Newswires* | $2.89 | -11.08% | 0.5 | -10.50% | -$0.34 | -1.79 | * |
| 4 | 3/12/12 | 4:21 PM | 3/13/12 | Q3 2012 Earnings | Miller Energy Resources Reports Third Quarter Results *Source - Business Wire* | $4.34 | 4.83% | 0.3 | 0.71% | $0.03 | 0.15 | |
| 5 | 7/16/12 | 5:17 PM | 7/17/12 | Q4 2012 Earnings | Miller Energy Resources Inc. Form 10-K *Source - SEC Edgar* | $4.04 | -7.13% | 0.5 | -8.48% | -$0.37 | -2.54 | ** |
| 6 | 9/10/12 | 7:56 AM | 9/10/12 | Q1 2013 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $4.76 | 0.00% | 0.7 | 0.44% | $0.02 | 0.15 | |
| 7 | 12/10/12 | 7:51 AM | 12/10/12 | Q2 2013 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $4.03 | -6.06% | 0.6 | -5.98% | -$0.26 | -2.36 | ** |
| 8 | 3/12/13 | 6:51 AM | 3/12/13 | Q3 2013 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $3.75 | -5.06% | 0.4 | -5.00% | -$0.20 | -2.04 | ** |
| 9 | 7/15/13 | 5:18 PM | 7/16/13 | Q4 2013 Earnings | Miller Energy Resources Inc. Form 10-K *Source - SEC Edgar* | $4.09 | 1.49% | 0.3 | 1.67% | $0.07 | 0.70 | |
| 10 | 9/9/13 | 8:04 AM | 9/9/13 | Q1 2014 Earnings | DJ Miller Energy 1Q Loss/Shr 22c >MILL *Source - Dow Jones Newswires* | $6.90 | -2.40% | 0.7 | -3.81% | -$0.27 | -1.39 | |

# Exhibit 7
## Event Study Analysis of Miller Energy Earnings Announcements for Common Stock

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Volume (millions) | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-------------------|-----------------|------------------------|--------|-----------|
| | | | | | | | | | Rolling Event Study Regression (120-day rolling window) | | | |
| 11 | 12/10/13 | 4:51 PM | 12/11/13 | Q2 2014 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $8.06 | 5.91% | 1.0 | 6.02% | $0.46 | 1.68 | * |
| 12 | 3/12/14 | 4:57 PM | 3/13/14 | Q3 2014 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $6.50 | -2.55% | 0.6 | -1.34% | -$0.09 | -0.38 | |
| 13 | 7/14/14 | 5:33 PM | 7/15/14 | Q4 2014 Earnings | Miller Energy Resources Reports Record Fourth Quarter and Full Year 2014 Results *Source - Dow Jones Newswires* | $5.40 | -6.74% | 0.8 | -5.90% | -$0.34 | -1.71 | * |
| 14 | 9/9/14 | 4:51 PM | 9/10/14 | Q1 2015 Earnings | Miller Energy Resources Inc. Form 10-Q *Source - SEC Edgar* | $4.36 | -3.11% | 0.5 | -3.44% | -$0.15 | -1.01 | |
| 15 | 12/10/14 | 8:47 AM | 12/10/14 | Q2 2015 Earnings | Miller Energy 2Q Loss/Shr $3.71 >MILL *Source - Dow Jones Newswires* | $1.16 | -14.07% | 2.5 | -3.49% | -$0.05 | -0.79 | |
| 16 | 3/12/15 | 7:00 AM | 3/12/15 | Q3 2015 Earnings | Miller Energy 3Q Loss/Shr $3.39 >MILL *Source - Dow Jones Newswires* | $1.28 | 4.92% | 0.2 | 4.51% | $0.05 | 0.79 | |
| 17 | 7/29/15 | 1:48 AM | 7/29/15 | Q4 2015 Earnings | Miller Energy Reports Fiscal Fourth Quarter and Full Year 2015 Results *Source - Dow Jones Newswires* | $0.30 | 7.50% | 1.1 | 5.21% | $0.01 | 0.74 | |

Sources: S&P Capital IQ and Factiva.

Notes:

(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a TheStreetSweeper article alleging potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

(2) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Comparison of Statistical Significance and Abnormal Returns
for Miller Energy Common Stock Earnings Announcements
vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 17 | 316 |
| Significant Days at 95% Confidence Level | 3 | 14 |
| % Significant Days at 95% Confidence Level [2] | 17.65% | 4.43% |
| Average Absolute Abnormal Return [3] | 4.16% | 2.52% |
| Average Volume (Millions) [4] | 0.7 | 0.3 |

Notes:
(1) Results are based on the Analysis Period of 8/29/2011 through 7/30/2015. For the purposes of this analysis, I selected the 316 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued. Two other dates with corrective information that were not recorded in the initial report (12/24/2013 and 10/14/2014), have been added as news dates.
(2) 17.65% rate of statistical significance is statistically significantly different than 4.43% at the 95% confidence level.
(3) 4.16% absolute return is statistically significantly different than 2.52% based on a t-test for difference of means at the 95% confidence level.
(4) The difference between 0.7 million and 0.3 million is statistically significant at the 99% confidence level.

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Volume (millions) | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-------------------|-----------------|------------------------|--------|-----------|
| | | | | | | | | | **Two Fixed Event Study Regressions** | | | |
| 1 | 10/30/14 | 7:35 PM | 10/31/14 | Decision to Pay Cash Dividend | Miller Energy Declares Cash Dividends On Its Series C and Series D Preferred Stock and Holds Annual Shareholder Meeting *Source - SEC Edgar* | $23.35 | 1.04% | 0.01 | 0.79% | $0.18 | 0.13 | |
| 2 | 12/10/14 | 8:47 AM | 12/10/14 | Q2 2015 Earnings | Miller Energy 2Q Loss/Shr $3.71 >MILL *Source - Dow Jones Newswires* | $14.45 | 0.91% | 0.08 | 6.23% | $0.89 | 1.01 | |
| 3 | 1/30/15 | 8:00 AM | 1/30/15 | Decision to Pay Cash Dividend | Press Release: Miller Energy Declares Cash Dividends on Its Series B, Series C and Series D Preferred Stock *Source - Dow Jones Newswire* | $12.73 | 20.09% | 0.08 | 14.59% | $1.55 | 2.37 | ** |
| 4 | 3/12/15 | 7:00 AM | 3/12/15 | Q3 2015 Earnings | Miller Energy 3Q Loss/Shr $3.39 >MILL *Source - Dow Jones Newswires* | $12.20 | -2.79% | 0.05 | -2.57% | -$0.32 | -0.42 | |
| 5 | 4/29/15 | 5:28 PM | 4/30/15 | Receipt of Wells Notice | Press Release: Miller Energy Provides Details Concerning Recent Events Including Receipt of NYSE Continued Listing Notice *Source - SEC Edgar* | $9.18 | -22.60% | 0.11 | -22.99% | -$2.73 | -3.74 | *** |
| 6 | 5/6/15 | 8:00 AM | 5/6/15 | Decision to Suspend Cash Dividend | Press Release: Miller Energy Defers Cash Dividends on Its Series C and Series D Preferred Stock *Source - Dow Jones Newswires* | $5.15 | -34.89% | 0.12 | -35.06% | -$2.77 | -5.70 | *** |
| 7 | 7/14/15 | 8:07 AM | 7/14/15 | Going Concern Warning | Miller Energy Announces Timing For Reporting Its Fiscal Fourth Quarter And Full Year 2015 Financial Results *Source - SEC Edgar* | $1.18 | -64.24% | 0.23 | -65.63% | -$2.17 | -10.68 | *** |
| 8 | 7/29/15 | 1:48 AM | 7/29/15 | Q4 2015 Earnings | Miller Energy Reports Fiscal Fourth Quarter and Full Year 2015 Results *Source - Dow Jones Newswires* | $1.60 | -3.03% | 0.02 | -4.87% | -$0.08 | -0.79 | |
| 9 | 7/30/15 | 5:34 PM | 7/31/15 | Delisting of Securities | Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange *Source - Dow Jones Newswires* | $0.06 | -96.10% | 0.00 | -93.35% | -$1.44 | -15.18 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:

(1) The results are based on two fixed regressions that span over two consecutive time periods (10/8/2012 to 10/14/2014 and 10/15/2014 to 7/31/2015) The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its delivery prices in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

(2) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater.* Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 10**

**Comparison of Statistical Significance and Abnormal Returns
for Miller Energy Series C Preferred Stock Material Announcements
vs. Days with No News during the Analysis Period**

| Statistic | Material Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 9 | 192 |
| Significant Days at 95% Confidence Level | 5 | 9 |
| % Significant Days at 95% Confidence Level [2] | 55.56% | 4.69% |
| Average Absolute Abnormal Return [3] | 27.34% | 1.28% |
| Average Volume (Millions) [4] | 0.08 | 0.02 |

Notes:
(1) Results are based on the Analysis Period of 10/8/2012 through 7/30/2015 along with results for 7/31/2015 due to the news released after market hours on 7/30/2015. For the purposes of this analysis, I selected the 192 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued. Two other dates with corrective information that were not recorded in the initial report (12/24/2013 and 10/14/2014), have been added as news dates.
(2) 55.56% rate of statistical significance is statistically significantly different than 4.69% at the 99% confidence level.
(3) 27.34% absolute return is statistically significantly different than 1.28% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 0.08 million and 0.02 million is statistically significant at the 99% confidence level.

Exhibit 11
**Event Study Analysis of Miller Energy Material Announcements for Series D Preferred Stock**

| | | | | | | | | | Two Fixed Event Study Regressions | | | |
| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Volume (millions) | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10/30/14 | 7:35 PM | 10/31/14 | Decision to Pay Cash Dividend | Miller Energy Declares Cash Dividends On Its Series C and Series D Preferred Stock and Holds Annual Shareholder Meeting<br>*Source - SEC Edgar* | $22.33 | 0.68% | 0.01 | 0.56% | $0.13 | 0.09 | |
| 2 | 12/10/14 | 8:47 AM | 12/10/14 | Q2 2015 Earnings | Miller Energy 2Q Loss/Shr $3.71 >MILL<br>*Source - Dow Jones Newswires* | $12.02 | -5.73% | 0.08 | -0.11% | -$0.01 | -0.02 | |
| 3 | 1/30/15 | 8:00 AM | 1/30/15 | Decision to Pay Cash Dividend | Press Release: Miller Energy Declares Cash Dividends on Its Series B, Series C and Series D Preferred Stock<br>*Source - Dow Jones Newswire* | $11.01 | 20.59% | 0.17 | 14.26% | $1.30 | 2.25 | ** |
| 4 | 3/12/15 | 7:00 AM | 3/12/15 | Q3 2015 Earnings | Miller Energy 3Q Loss/Shr $3.39 >MILL<br>*Source - Dow Jones Newswires* | $9.99 | -7.50% | 0.16 | -7.08% | -$0.77 | -1.12 | |
| 5 | 4/29/15 | 5:28 PM | 4/30/15 | Receipt of Wells Notice | Press Release: Miller Energy Provides Details Concerning Recent Events Including Receipt of NYSE Continued Listing Notice<br>*Source - SEC Edgar* | $6.94 | -26.95% | 0.22 | -27.56% | -$2.62 | -4.35 | *** |
| 6 | 5/6/15 | 8:00 AM | 5/6/15 | Decision to Suspend Cash Dividend | Press Release: Miller Energy Defers Cash Dividends on Its Series C and Series D Preferred Stock<br>*Source - Dow Jones Newswires* | $4.64 | -28.40% | 0.22 | -28.67% | -$1.86 | -4.53 | *** |
| 7 | 7/14/15 | 8:07 AM | 7/14/15 | Going Concern Warning | Miller Energy Announces Timing For Reporting Its Fiscal Fourth Quarter And Full Year 2015 Financial Results<br>*Source - SEC Edgar* | $1.21 | -62.66% | 0.24 | -64.16% | -$2.08 | -10.13 | *** |
| 8 | 7/29/15 | 1:48 AM | 7/29/15 | Q4 2015 Earnings | Miller Energy Reports Fiscal Fourth Quarter and Full Year 2015 Results<br>*Source - Dow Jones Newswires* | $1.70 | 4.29% | 0.05 | 2.35% | $0.04 | 0.37 | |
| 9 | 7/30/15 | 5:34 PM | 7/31/15 | Delisting of Securities | Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange<br>*Source - Dow Jones Newswires* | $0.55 | -64.52% | 0.00 | -61.52% | -$0.95 | -9.72 | *** |

Sources: S&P Capital IQ and Factiva.

Notes:

(1) The results are based on two fixed regressions that span over two consecutive time periods (10/1/2013 to 10/14/2014, and 10/15/2014 to 7/31/2015). The regression model controls for a broad market index (S&P 500 Total Return Index) and the NYMEX WTI Light Sweet Crude Oil futures (NYMEX:CL). Miller Energy describes using the NYMEX WTI prices to determine its dividend rates in its 10-Ks in 2012, 2013, and 2014. Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

(2) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 12**

**Comparison of Statistical Significance and Abnormal Returns
for Miller Energy Series D Preferred Stock Material Announcements
vs. Days with No News during the Analysis Period**

| Statistic | Material Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 9 | 118 |
| Significant Days at 95% Confidence Level | 5 | 4 |
| % Significant Days at 95% Confidence Level [2] | 55.56% | 3.39% |
| Average Absolute Abnormal Return [3] | 22.92% | 2.09% |
| Average Volume (Millions) [4] | 0.13 | 0.02 |

Notes:
(1) Results are based on the Analysis Period of 10/1/2013 through 7/30/2015 along with results for 7/31/2015 due to the news released after market hours on 7/30/2015. For the purposes of this analysis, I selected the 118 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued. Two other dates with corrective information that were not recorded in the initial report (12/24/2013 and 10/14/2014), have been added as news dates.
(2) 55.56% rate of statistical significance is statistically significantly different than 3.39% at the 99% confidence level.
(3) 22.92% absolute return is statistically significantly different than 2.09% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 0.13 million and 0.02 million is statistically significant at the 99% confidence level.



**Exhibit 13**
**Miller Energy Common Stock Market Capitalization**
**8/29/2011 - 8/31/2015**

Analysis Period: 8/29/2011 - 7/30/2015

7/31/2015:
Miller Energy Common Stock
begins trading OTC after it is
delisted from the NYSE.

Market Capitalization (millions)

$500
$400
$300
$200
$100
$0

08/29/11 10/29/11 12/29/11 02/29/12 04/30/12 06/30/12 08/31/12 10/31/12 12/31/12 02/28/13 04/30/13 06/30/13 08/31/13 10/31/13 12/31/13 02/28/14 04/30/14 06/30/14 08/31/14 10/31/14 12/31/14 02/28/15 04/30/15 06/30/15 08/31/15

■ Market Capitalization

Sources: Complaint, S&P Capital IQ, "Press Release: Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange," *Dow Jones,* July 30, 2015.

# Exhibit 13-C
## Miller Energy 10.75% Series C Preferred Stock Market Capitalization
### 10/8/2012 - 8/31/2015



Sources: Complaint, S&P Capital IQ, and Miller Energy quarterly SEC filings throughout the Analysis Period.
Note: Market capitalization is calculated as the daily Series C Preferred Stock closing price multiplied by shares outstanding according to SEC filings. Throughout the Analysis Period, Miller Energy periodically issued additional stock pursuant to its sales agreement with MLV. These issuances are accounted for in quarterly SEC filings of shares issued and outstanding. Dates referenced in boxes are dates of issuance, not the dates when the shares were registered through a prospectus.



**Exhibit 13-D**
**Miller Energy 10.5% Series D Preferred Stock Market Capitalization**
**10/1/2013 - 8/31/2015**

Analysis Period: 10/1/2013 - 7/30/2015

8/25/2014:
Miller Energy issues an additional 750,000 shares of Series D Preferred Stock.

Pursuant to the Sales Agreement entered into on 10/17/2013, Miller Energy issued an additional 1,367,022 shares of Series D Preferred Stock periodically throughout the Analysis Period.

7/31/2015:
Miller Energy securities begin trading OTC after they are delisted from the NYSE.

10/1/2013:
Miller Energy issues 1,000,000 shares of Series D Preferred Stock.

10/17/2013:
Miller Energy enters into an At Market Issuance Sales Agreement allowing it to periodically issue additional shares of Series D Preferred Stock

8/8/2014:
Purchase of Anchor Point Pipeline completed. 213,586 shares released from escrow.

■ Market Capitalization

Sources: Complaint, S&P Capital IQ, and Miller Energy quarterly SEC filings throughout the Analysis Period.
Note: Market capitalization is calculated as the daily Series D Preferred Stock closing price multiplied by shares outstanding according to SEC filings. Throughout the Analysis Period, Miller Energy periodically issued additional stock pursuant to its sales agreement with MLV. These issuances are accounted for in quarterly SEC filings of shares issued and outstanding. Dates referenced in boxes are dates of issuance, not the dates when the shares were registered through a prospectus.

**Exhibit 14**
**Miller Energy Common Stock**
**Market Capitalization Rankings**

| Last trading day of quarter ending in: | Miller Energy Common Stock | | Sum of Market Capitalization of Miller Energy Securities | |
|---|---|---|---|---|
| | Market Capitalization (millions) | Percentile Rank on NYSE & NASDAQ | Market Capitalization (millions) | Percentile Rank on NYSE & NASDAQ |
| 10/31/2011 | $117.4 | 27% | $117.4 | 27% |
| 1/31/2012 | $165.3 | 31% | $165.3 | 31% |
| 4/30/2012 | $223.1 | 35% | $223.1 | 35% |
| 7/31/2012 | $163.2 | 30% | $163.2 | 30% |
| 10/31/2012 | $196.0 | 31% | $211.4 | 33% |
| 1/31/2013 | $174.8 | 28% | $190.4 | 30% |
| 4/30/2013 | $164.9 | 26% | $197.5 | 30% |
| 7/31/2013 | $216.8 | 29% | $265.9 | 32% |
| 10/31/2013 | $295.4 | 33% | $395.8 | 39% |
| 1/31/2014 | $351.3 | 36% | $456.8 | 41% |
| 4/30/2014 | $218.6 | 27% | $322.6 | 35% |
| 7/31/2014 | $225.3 | 29% | $335.1 | 37% |
| 10/31/2014 | $162.0 | 24% | $280.9 | 32% |
| 1/31/2015 | $54.6 | 10% | $116.9 | 20% |
| 4/30/2015 | $33.8 | 6% | $86.8 | 16% |

Sources: Bloomberg, S&P Capital IQ, and Miller Energy quarterly SEC filings throughout the Analysis Period.



**Exhibit 15**
**Miller Energy Common Stock Average Monthly Bid-Ask Percentage Spread**
**8/29/2011 - 7/30/2015**

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014: 0.26%

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014: 0.76%

Percentage Spread per Share

Sources: Thomson Reuters Eikon and TICK Data.
Note: August 2011 and July 2015 are limited to the Analysis Period.



**Exhibit 15-C**
**Miller Energy 10.75% Series C Preferred Stock Monthly Bid-Ask Percentage Spread**
**10/8/2012 - 7/30/2015**

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014: 0.26%

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014 0.76%

Percentage Spread per Share

Sources: Thomson Reuters Eikon and TICK Data.
Note: October 2012 and July 2015 data are limited to the Analysis Period.



**Exhibit 15-D**
**Miller Energy 10.5% Series D Preferred Stock Monthly Bid-Ask Percentage Spread**
**10/1/2013 - 7/30/2015**

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014: 0.76%

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in December 2014: 0.26%

Sources: Thomson Reuters Eikon and TICK Data.
Note: July 2015 data are limited to the Analysis Period.

**Exhibit 16**
**Miller Energy Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Total Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Total Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float[1] |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 9/30/2011 | 40,912 | 70 | 10,255 | 4,732 | 35,390 | 25.1% | 14,180 | 34.7% | 40.1% |
| 12/31/2011 | 40,912 | 65 | 10,255 | 4,745 | 35,402 | 25.1% | 11,964 | 29.2% | 33.8% |
| 3/31/2012 | 41,087 | 68 | 10,327 | 6,511 | 37,271 | 25.1% | 13,699 | 33.3% | 36.8% |
| 6/30/2012 | 41,087 | 72 | 10,327 | 7,391 | 38,150 | 25.1% | 12,805 | 31.2% | 33.6% |
| 9/30/2012 | 42,022 | 74 | 11,466 | 8,425 | 38,980 | 27.3% | 13,460 | 32.0% | 34.5% |
| 12/31/2012 | 43,362 | 77 | 5,670 | 9,480 | 47,172 | 13.1% | 14,229 | 32.8% | 30.2% |
| 3/31/2013 | 43,415 | 69 | 10,404 | 10,332 | 43,343 | 24.0% | 13,413 | 30.9% | 30.9% |
| 6/30/2013 | 43,400 | 70 | 10,405 | 10,399 | 43,394 | 24.0% | 13,455 | 31.0% | 31.0% |
| 9/30/2013 | 43,700 | 71 | 10,603 | 10,391 | 43,488 | 24.3% | 13,819 | 31.6% | 31.8% |
| 12/31/2013 | 44,525 | 87 | 10,571 | 10,302 | 44,256 | 23.7% | 15,610 | 35.1% | 35.3% |
| 3/31/2014 | 45,346 | 78 | 13,156 | 6,878 | 39,068 | 29.0% | 13,952 | 30.8% | 35.7% |
| 6/30/2014 | 45,240 | 79 | 10,590 | 6,445 | 41,096 | 23.4% | 13,326 | 29.5% | 32.4% |

**Exhibit 16**
**Miller Energy Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Total Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Total Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float[1] |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 9/30/2014 | 46,551 | 68 | 11,711 | 6,750 | 41,590 | 25.2% | 12,806 | 27.5% | 30.8% |
| 12/31/2014 | 46,634 | 75 | 4,688 | 6,230 | 48,176 | 10.1% | 10,880 | 23.3% | 22.6% |
| 3/31/2015 | 46,664 | 72 | 3,846 | 6,165 | 48,982 | 8.2% | 8,062 | 17.3% | 16.5% |
| 6/30/2015 | 46,634 | 54 | 4,146 | 4,819 | 47,306 | 8.9% | 4,157 | 8.9% | 8.8% |
| **Total Institutions over Analysis Period:** | | **181** | **Analysis Period Average:** | | | **21.3%** | | **28.7%** | **30.3%** |

Source: S&P Capital IQ.

# Exhibit 17
## Miller Energy Common Stock
### Test for Autocorrelation During the Analysis Period[1]

| Quarter Ending In | Coefficient on Previous Day's Abnormal Return[2] | t-Statistic |
|---|---|---|
| 10/31/2011 | -0.52 | -3.59 |
| 1/31/2012 | -0.08 | -0.60 |
| 4/30/2012 | -0.06 | -0.46 |
| 7/31/2012 | 0.01 | 0.07 |
| 10/31/2012 | 0.08 | 0.58 |
| 1/31/2013 | 0.02 | 0.18 |
| 4/30/2013 | 0.00 | -0.01 |
| 7/31/2013 | 0.00 | 0.03 |
| 10/31/2013 | -0.02 | -0.15 |
| 1/31/2014 | 0.11 | 0.90 |
| 4/30/2014 | -0.19 | -1.56 |
| 7/31/2014 | -0.05 | -0.41 |
| 10/31/2014 | -0.11 | -0.93 |
| 1/31/2015 | -0.10 | -0.85 |
| 4/30/2015 | 0.22 | 1.71 |
| 7/31/2015 | 0.07 | 0.47 |
| **Analysis Period** | **-0.02** | **-0.67** |

Source: S&P Capital IQ.

Notes:

(1) The autocorrelation period runs from August 29, 2011 to July 30, 2015.

(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(3) Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation ( i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

## Exhibit 17-C
## Miller Energy Series C Preferred Stock
## Test for Autocorrelation During the Analysis Period[1]

| Quarter Ending In | Coefficient on Previous Day's Abnormal Return[2] | t-Statistic |
|---|---|---|
| 10/31/2012 | 0.00 | -0.01 |
| 1/31/2013 | 0.04 | 0.29 |
| 4/30/2013 | 0.13 | 1.01 |
| 7/31/2013 | 0.20 | 1.57 |
| 10/31/2013 | -0.15 | -1.29 |
| 1/31/2014 | -0.33 | -3.79 |
| 4/30/2014 | -0.23 | -1.81 |
| 7/31/2014 | -0.15 | -1.15 |
| 10/31/2014 | 0.40 | 3.63 |
| 1/31/2015 | 0.15 | 1.03 |
| 4/30/2015 | 0.13 | 1.11 |
| 7/31/2015 | -0.30 | -2.46 |
| **Analysis Period** | **-0.04** | **-1.03** |

Source: S&P Capital IQ.

Notes:

(1) The autocorrelation period runs from October 8, 2012 to July 30, 2015.

(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(3) Earnings announcements, the alleged corrective disclosure dates, and three other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

**Exhibit 17-D**

**Miller Energy Series D Preferred Stock**

**Test for Autocorrelation During the Analysis Period[1]**

| Quarter Ending In | Coefficient on Previous Day's Abnormal Return[2] | t-Statistic |
|:---:|:---:|:---:|
| 10/31/2013 | -0.36 | -1.62 |
| 1/31/2014 | 0.00 | -0.03 |
| 4/30/2014 | -0.32 | -2.68 |
| 7/31/2014 | -0.15 | -1.19 |
| 10/31/2014 | 0.49 | 4.47 |
| 1/31/2015 | -0.01 | -0.06 |
| 4/30/2015 | 0.30 | 2.54 |
| 7/31/2015 | 0.09 | 0.66 |
| **Analysis Period** | **0.13** | **2.61** |

Source: S&P Capital IQ.

Notes:

(1) The autocorrelation period runs from October 1, 2013 to July 30, 2015.

(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(3) Earnings announcements, the alleged corrective disclosure dates, and two other outlier dates have been removed from estimation (i.e., 7/28/2011 with regard to market reaction to a The StreetSweeper article alleging a potential fraud in Miller Energy's subsequent 10-K, 8/29/2011 with regard to market reaction to Miller Energy correcting a mistake in its 10-K filing after a review performed by an Audit Committee, and 7/15/2015 with regard to continued volatility after the Going Concern Warning released on 7/14/2015). Counsel alleges October 13, 2014 as a corrective disclosure due to a Reuters article about Brean Capital cutting its price target for Miller Energy (Complaint ¶214). While the Reuters news was released after market hours on October 13, 2014, the Brean Capital report was released before market hours that same day. Therefore, both October 13, 2014 and October 14, 2014 were excluded from the estimation in order to be conservative.

# Appendix A
# Documents Considered

## Court Documents

- Second Amended Class Action Complaint filed September 15, 2017, in *LEWIS COSBY, KENNETH R. MARTIN, as Beneficiary of the Kenneth Ray Martin Roth IRA, and MARTIN WEAKLY On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP,* Case No. 3:16-cv-00121.
- Memorandum Opinion and Order filed August 2, 2018, *in LEWIS COSBY, KENNETH R. MARTIN, as Beneficiary of the Kenneth Ray Martin Roth IRA, and MARTIN WEAKLEY On Behalf of Themselves and All Others Similarly Situated, vs, KPMG, LLP,* Case No. 3:16-CV-121-TAV-DCP.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson,* 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud,* § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.,* 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- Miller Energy Resources, Inc. SEC Form 10-K filings submitted during the Analysis Period.
- Miller Energy Resources, Inc. SEC Form 10-Q filings submitted quarterly during the Analysis Period.
- Miller Energy Resources, Inc. SEC Form 8-K filings submitted during the Analysis Period.
- Miller Energy Resources, Inc. SEC Form 424(b)(5) filings submitted during the Analysis Period.
- SEC Generated Letter to Paul Boyd Re: Miller Energy Resources, Inc. Form 10-K for Fiscal Year Ended April 30, 2010, dated July 26, 2011.
- Miller Energy Resources, Inc. SEC Form S-3 filings submitted during the Analysis Period.
- SEC Form S-3 eligibility information from http://www.sec.gov/about/forms/forms-3.pdf.
- SEC Official List of Section 13(f) Securities submitted quarterly during the Analysis Period from https://www.sec.gov/divisions/investment/13flists.htm.
- SEC Form 13F information from https://www.sec.gov/pdf/form13f.pdf.

## Security Data

- Historical data for Miller Energy Resources, Inc. Common Stock, Series C Preferred Stock, Series D Preferred Stock, the NYMEX WTI Light Sweet Crude Oil Futures (NYMEX:CL) Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ. Historical data for the Market Capitalization and Shares Outstanding of the Preferred Securities were obtained directly from SEC filings.
- Trade and quote data for Miller Energy Resources, Inc. Common Stock, Series C Preferred Stock, and Series D Preferred Stock during the Analysis Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for December 2014 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for December 2014 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Miller Energy Resources, Inc. Common Stock options data was obtained from Bloomberg.
- Miller Energy Resources, Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- Miller Energy Resources, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.
- The Sum of Market Capitalization of Miller Energy Securities market capitalization percentile was obtained by summing the market capitalizations of Miller Energy Resources, Inc. Common Stock, Miller Energy Resources, Inc. 10.75% Series C Preferred Stock, and Miller Energy Resources, Inc. 10.5% Series D Preferred Stock. Market Capitalization Percentile for this sum was then estimated using market capitalization percentiles obtained from Bloomberg for all companies trading on the NYSE and NASDAQ during the Analysis Period.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## Miller Energy Resources, Inc. News

- Miller Energy Resources, Inc. news headlines and select articles downloaded from Factiva for the Analysis Period. The Factiva search for news over the Analysis Period resulted in 1,681 news articles were obtained by executing a search via Factiva for "All Sources" with the company field "Miller Energy Resources, Inc." or keyword field "Miller Energy" for the period "August 29, 2011 – July 30, 2015" and excluding the phrase "New 52-Week Highs And Lows." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

- Miller Energy Resources, Inc. earnings conference call and investor call transcripts during the Analysis Period.
- Miller Energy Resources, Inc. earnings, and guidance update press releases during the Analysis Period.

**Miller Energy Resources, Inc. Analyst Reports**

- Miller Energy Resources, Inc. analyst reports supplied by Investext via Thomson Reuters, Bloomberg, and counsel for the period of August 29, 2011 – July 30, 2015, including but not limited to:
  - "More Production Growth and Litigation Certainty Needed," *SunTrust Robinson Humphrey*, August 6, 2012.
  - "TURNING THE CORNER: Kitchen Sink of a Quarter Could Mark a Bottom, New Strategy in Place," MLV & Co. LLC, December 10, 2014.

**Academic Articles**

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).
- Beaver, W., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Brealey, R., and Myers, S., *Principles of Corporate Finance*, McGraw-Hill, Third Edition, 1988.
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. Fin. Econ. 95 (1978).
- Kadapakkam, P., S. Krishnamurthy, and Y. Tse, "Stock Splits, Broker Promotion, and Decimalization," *The Journal of Financial and Quantitative Analysis*, Vol. 40, No. 4, December 2005.
- Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. Fin. 717 (1998).
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. Econ. Literature (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Reilly, F., and Brown, K., *Investment Analysis and Portfolio Management*, The Dryden Press, Sixth Edition, 2000.
- Ross, S., *Options and Efficiency*, 90 Q. J. Econ. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 Law & Contemp. Probs. 105 (2000).

**Other**

- http://www.sec.gov/answers/mktmaker.htm.
- https://www.nyse.com/market-model
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf
- http://www.nasdaqomx.com/transactions/trading/equities.
- http://www.rss-specifications.com/.
- http://www.rss-specifications.com/what-is-rss.html

**Additional Sources Relied Upon for Corrected Report**

- "TheStreetSweeper Posts Negative Report on Miller Energy," *Benzinga*, July 28, 2011 2:46 PM.
- "Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 1)," *The Street Sweeper*, July 28, 2011 https://seekingalpha.com/article/282825-miller-energy-this-hot-alaska-stock-may-be-about-to-melt-part-1.

- "Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 2)," *The Street Sweeper*, July 28, 2011, https://seekingalpha.com/article/282825-miller-energy-this-hot-alaska-stock-may-be-about-to-melt-part-2.
- "Miller Energy (MILL) CEO Fights Back, Says 'Nothing to Hide'; Stock Moving Higher,**"** *StreetInsider.com*, July 29, 2011.
- Miller Energy Resources, Inc. SEC Form 10-K filed July 29, 2011 5:36 PM ET.
- Miller Energy Resources, Inc. SEC Form 8-K filed August 1, 2011 9:20 AM ET.
- "Miller Energy Resources' CEO Issues an Open Letter to Shareholder," *Business Wire,* August 1, 2011 3:04 PM.
- "Law Offices of Howard G. Smith Announces Investigation of Miller Energy Resources," *Business Wire*, August 1, 2011.
- Miller Energy Resources, Inc. SEC Form 10-K/A filed August 8, 2011 9:32 PM ET.
- Miller Energy Resources, Inc. SEC Form 10-K/A filed August 29, 2011 7:46 AM ET.
- "Miller Energy: Digging Itself into Another Deep Hole?" *The Street Sweeper*, December 24, 2013, https://seekingalpha.com/article/1914191-miller-energy-digging-itself-into-another-deep-hole. Originally published December 23, 2013 11:13 PM.

# CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:      (312) 470-6500
Mobile:     (815) 382-0092
Email:      ccoffman@globaleconomicsgroup.com


**EMPLOYMENT:**

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**      Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**     Knox College, 1995

Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

## Testimony:

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed expert rebuttal report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2011**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February

17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015. Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts.</u> Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade</u>

Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017.

- Testifying expert in Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019.

- Testifying expert in Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division. Filed expert report January 19, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018.

- Testifying expert in In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas. Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois. Filed expert report July 13, 2018. Deposition September 21, 2018.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM, United States District Court for the Southern District of New York</u>. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

Knox College, Teaching Assistant - Statistics, (1995)
Knox College, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994   Ford Fellowship Recipient for Summer Research.
1993   Arnold Prize for Best Research Proposal.
1995   Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

# Appendix C

# Description of Preferred Securities

**THE OFFERING**

*The following is a brief summary of certain terms of this offering. For a more complete description of the terms of the Series C Preferred Stock, please see the sections entitled "Description of the Series C Preferred Stock" in this prospectus supplement and "Description of Capital Stock—Preferred Stock" in the accompanying prospectus. For a description of our common stock, please see the section entitled "Description of Capital Stock" in the accompanying prospectus.*

| | |
|---|---|
| Issuer | Miller Energy Resources, Inc. |
| Securities Offered | Up to 2,565,000 shares of 10.75% Series C Cumulative Redeemable Preferred Stock and up to $100 million of shares of our common stock. We are also registering 24,393,150 shares of our common stock underlying the Series C Preferred Stock and issuable upon conversion. |
| Commercially Reasonable Efforts | MLV is not required to sell any specific number or dollar amount of our Series C Preferred Stock or common stock, but has agreed to make all sales using commercially reasonable efforts consistent with its normal trading and sales practices on mutually agreed terms between MLV and us. See "Plan of Distribution" on page S- 41. |
| Dividends | Holders of the Series C Preferred Stock will be entitled to receive cumulative cash dividends at a rate of 10.75% per annum of the $25.00 per share liquidation preference (equivalent to $2.6875 per annum per share) when, as and if declared by our board of directors. |
| | Dividends will be payable quarterly on the 1st day of each December, March, June and September, provided that if any dividend payment date is not a business day, then the dividend which would have been payable on that dividend payment date will be paid on the next succeeding business day. Dividends will accrue and be cumulative from, and including, the date of original issuance, which was on October 5, 2012. The first dividend payable on December 1, 2012 in the amount of $0.41 per share will be paid to the persons who are the holders of record of the Series C Preferred Stock at the close of business on the corresponding record date, which will be November 15, 2012. For the definition of "dividend payment date" please see the section entitled "Description of Series C Preferred Stock—Dividends." |
| | A portion of the proceeds from the sale of Series C Preferred Stock in an amount equal to anticipated dividend payments through September 28, 2013, the anniversary of the initial sale date of the Series C Preferred Stock, will be placed in a separate account of the company. Our lender will have a lien on and control over this account. |
| No Maturity | The Series C Preferred Stock has no stated maturity and will not be subject to any sinking fund or mandatory redemption. Shares of the Series C Preferred Stock will remain outstanding indefinitely unless we decide to redeem or otherwise repurchase them as described below under "—Redemption—Optional Redemption or —Special Optional Redemption" or "—Conversion Rights; Market Trigger; Conversion and Redemption" or they become convertible and are converted as described below under "—Conversion Rights." We are not required to set aside funds to redeem the Series C Preferred Stock. |
| Optional Redemption | The Series C Preferred Stock is not redeemable until November 1, 2017, except as described below under "—Special Optional Redemption" and under "—Conversion Rights; Market Trigger; Conversion and Redemption." On and after November 1, 2017 we may, at our option, redeem the Series C Preferred Stock, in whole or in part, at any time or from time to time, for cash at a redemption price equal to $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date fixed for redemption. See "Description of Series C Preferred Stock—Redemption—Optional Redemption." |

| Special Optional Redemption | Upon the occurrence of a Change of Control, provided no Limiting Document (as defined herein) may prohibit it, we may, at our option, redeem the Series C Preferred Stock, in whole or in part, within 120 days after the first date on which such Change of Control occurred, for cash at a redemption price of $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date fixed for redemption. If, prior to the Change of Control Conversion Date (as defined herein), we have provided notice of our election to redeem some or all of the shares of Series C Preferred Stock (whether pursuant to our optional redemption right described above or this special optional redemption right), the holders of Series C Preferred Stock will not have the Change of Control Conversion Right described below under "—Conversion Rights" with respect to the shares of Series C Preferred Stock called for redemption. Please see the section entitled "Description of the Series C Preferred Stock—Redemption—Special Optional Redemption" in this prospectus supplement. Notwithstanding the foregoing, holders shall always have the right, up to any applicable redemption date, to convert the Series C Preferred Stock into our common stock at a conversion price of $10.00 per share, as such conversion price may be adjusted. |
|---|---|

A "Change of Control" is deemed to occur when, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing:

- the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of our stock entitling that person to exercise more than 50% of the total voting power of all our stock entitled to vote generally in the election of our directors (except that such person will be deemed to have beneficial ownership of all securities that such person has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition); and

- following the closing of any transaction referred to in the bullet point above, neither we nor the acquiring or surviving entity has a class of common securities (or American depositary receipts representing such securities) listed on a National Exchange. For the definition of "National Exchange" please see the section entitled "Description of Series C Preferred Stock—Dividends."

| | |
|---|---|
| Market Trigger Conversion and Redemption | At any time, we, at our option, may cause the Series C Preferred Stock to be converted in whole or in part, on a *pro rata* basis, into fully paid and nonassessable shares of common stock at the Conversion Price (defined below) if the Closing Bid Price (as defined hereafter) of the Common Stock shall have equaled or exceeded 150% of the Conversion Price for at least 20 trading days in any 30 consecutive trading day period ending three days prior to the date of notice of conversion (such event, the "Market Trigger"). Any shares of Series C Preferred Stock so converted shall be treated as having been surrendered by the holder thereof for conversion on the date of such mandatory conversion (unless previously converted at the option of the holder). |

We may, at our option, redeem the Series C Preferred Stock for cash equal to $25.00 per share plus accrued and unpaid dividends, if the Market Trigger has occurred in the period ending three days prior to the date of notice of redemption (unless previously converted at the option of the holder).  See "Description of Series C Preferred Stock —Conversion Rights; Market Trigger Conversion and Redemption."

| | |
|---|---|
| Conversion Rights | Each outstanding share of Series C Preferred Stock shall be convertible at any time at the option of the holder into that number of whole shares of our common stock as is equal to $25.00 per share, plus accrued and unpaid dividends, divided by an initial conversion price of $10.00. The initial conversion price and the conversion price as adjusted are referred to as the "Conversion Price." A share of Series C Preferred Stock called for redemption shall be convertible into shares of our common stock up to and including, but not after, the close of business on the date fixed for redemption unless we default in the payment of the amount payable upon redemption. |

Upon the occurrence of a Change of Control, in addition to the conversion right noted in the above paragraph, each holder of Series C Preferred Stock will have the right subject to our election to redeem the Series C Preferred Stock in whole or part, as described above under "—Optional Redemption" or "—Special Optional Redemption," prior to the Change of Control Conversion Date to convert some or all of the Series C Preferred Stock held by such holder on the Change of Control Conversion Date into a number of shares of our common stock per share of Series C Preferred Stock equal to the lesser of:

- the quotient obtained by dividing (i) the sum of the $25.00 liquidation preference per share of Series C Preferred Stock plus the amount of any accumulated and unpaid dividends thereon to, but not including, the Change of Control Conversion Date (unless the Change of Control Conversion Date is after a dividend record date (as defined herein) and prior to the corresponding dividend payment date (as defined herein) for the Series C Preferred Stock, in which case no additional amount for such accrued and unpaid dividends will be included in this sum) by (ii) the Common Stock Price (as defined herein); and

- 9.51 (the "Share Cap"), subject to adjustments to the Share Cap for any splits, subdivisions or combinations of our common stock;

in each case, on the terms and subject to the conditions described in this prospectus supplement, including provisions for the receipt, under specified circumstances, of alternative consideration as described in this prospectus supplement.

For definitions of "Change of Control Conversion Right," "Change of Control Conversion Date" and "Common Stock Price" and a description of certain adjustments and provisions for the receipt of alternative consideration that may be applicable to the conversion of Series C Preferred Stock in the event of a Change of Control, and for other important information, please see the section entitled "Description of the Series C Preferred Stock—Conversion Rights." For definitions of "dividend payment date" and "dividend record date," please see the section entitled "Description of the Series C Preferred Stock—Dividends."

| | |
|---|---|
| Liquidation Preference | If we liquidate, dissolve or wind up, holders of the Series C Preferred Stock will have the right to receive $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date of payment, before any payment is made to the holders of our common stock. Please see the section entitled "Description of the Series C Preferred Stock—Liquidation Preference." |
| Ranking | The Series C Preferred Stock will rank, with respect to rights to the payment of dividends and the distribution of assets upon our liquidation, dissolution or winding up, (A) senior to all classes or series of our common stock and to all other equity securities issued by us other than equity securities referred to in clauses (B) and (C); (B) junior to our Series B Redeemable Preferred Stock, or Series B Preferred Stock, and junior to all equity securities issued by us which do not have dividend rights and with terms specifically providing that those equity securities rank senior to the Series C Preferred Stock with respect to rights to the distribution of assets upon our liquidation, dissolution or winding up; (C) on parity with all other equity securities issued by us with terms specifically providing that those equity securities rank on parity with the Series C Preferred Stock with respect to rights to the distribution of our assets upon liquidation, dissolution or winding up and (D) effectively junior to all of our existing and future indebtedness (including indebtedness convertible to our common stock or preferred stock) and to the indebtedness of our existing subsidiary and any future subsidiaries. Please see the section entitled "Description of the Series C Preferred Stock—Ranking." |
| Voting Rights | Holders of Series C Preferred Stock will generally have no voting rights. However, if we do not pay dividends on the Series C Preferred Stock for four or more quarterly dividend periods (whether or not consecutive), the holders of the Series C Preferred Stock (voting separately as a class with the holders of all other classes or series of our equity securities we may issue upon which similar voting rights have been conferred and are exercisable and which are entitled to vote as a class with the Series C Preferred Stock in the election referred to below) will be entitled to vote for the election of two additional directors to serve on our board of directors until we pay, or declare and set aside funds for the payment of, all dividends that we owe on the Series C Preferred Stock, subject to certain limitations described in the section entitled "Description of the Series C Preferred Stock—Voting Rights." In addition, the affirmative vote of the holders of at least two- thirds of the outstanding shares of Series C Preferred Stock is required for us to authorize or issue any class or series of stock ranking senior to the Series C Preferred Stock with respect to the payment of dividends or the distribution of assets on liquidation, dissolution or winding up, to amend any provision of our second amended and restated charter, as amended, so as to materially and adversely affect any rights of the Series C Preferred Stock or to take certain other actions. Please see the section entitled "Description of the Series C Preferred Stock—Voting Rights." |

| | |
|---|---|
| Information Rights | During any period in which we are not subject to Section 13 or 15(d) of the Exchange Act and any shares of Series C Preferred Stock are outstanding, we will use our best efforts to (i) transmit by mail (or other permissible means under the Exchange Act) to all holders of Series C Preferred Stock, as their names and addresses appear on our record books and without cost to such holders, copies of the annual reports on Form 10- K and quarterly reports on Form 10- Q that we would have been required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act if we were subject thereto (other than any exhibits that would have been required) and (ii) promptly, upon request, supply copies of such reports to any holders or prospective holder of Series C Preferred Stock, subject to certain exceptions described in this prospectus supplement. We will use our best efforts to mail (or otherwise provide) the information to the holders of the Series C Preferred Stock within 15 days after the respective dates by which a periodic report on Form 10- K or Form 10- Q, as the case may be, in respect of such information would have been required to be filed with the SEC, if we were subject to Section 13 or 15(d) of the Exchange Act, in each case, based on the dates on which we would be required to file such periodic reports if we were a "non- accelerated filer" within the meaning of the Exchange Act. |
| Listing | Our common stock and our Series C Preferred Stock each trade on the NYSE under the symbol "MILL" and "MILLprC," respectively. |
| Use of proceeds | We plan to use the net proceeds from this offering for general corporate purposes. Please see the section entitled "Use of Proceeds" in this prospectus supplement. |

S- 6

| Risk Factors | Investing in our preferred stock involves risks. You should carefully consider the risks described under "Risk Factors" in this prospectus supplement, in our most recent Annual Report on Form 10- K and our subsequent Quarterly Reports on Form 10- Q as well as the other information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus before making a decision to invest in our common stock. |
|---|---|
| Material U.S. Federal Income Tax Considerations | For a discussion of the material federal income tax consequences of purchasing, owning and disposing of the Series C Preferred Stock and any common stock purchased in this offering or received upon conversion of the Series C Preferred Stock, please see the section entitled "Material Federal Income Tax Considerations." You should consult your tax advisor with respect to the U.S. federal income tax consequences of owning the Series C Preferred Stock in light of your own particular situation and with respect to any tax consequences arising under the laws of any state, local, foreign or other taxing jurisdiction. |
| Book- Entry and Form | The Series C Preferred Stock will be represented by one or more global certificates in definitive, fully registered form deposited with a custodian for, and registered in the name of, Cede & Co., the nominee of The Depository Trust Company, or "DTC". Purchases of our common stock will be recorded in electronic form through DTC. |

**THE OFFERING**

*The following is a brief summary of certain terms of this offering. For a more complete description of the terms of the Series D Preferred Stock, please see the sections entitled "Description of the Series D Preferred Stock" in this prospectus supplement and "Description of Capital Stock — Preferred Stock" in the accompanying prospectus.*

Issuer

Miller Energy Resources, Inc.

Securities Offered

Up to 3,000,000 shares of 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock.

Commercially Reasonable Efforts

MLV is not required to sell any specific number or dollar amount of our Series D Preferred Stock, but has agreed to make all sales using commercially reasonable efforts consistent with its normal trading and sales practices on mutually agreed terms between MLV and us. See "Plan of Distribution" on page S−39.

Dividends

Holders of the Series D Preferred Stock will be entitled to receive cumulative cash dividends accruing: (i) from, and including, the date of original issuance to, but not including, December 1, 2018, at an initial annual rate of 10.5% per annum, based on the $25.00 per share liquidation preference (equivalent to $2.625 per annum per share during that period); and (ii) from, and including, December 1, 2018 and thereafter, at an annual rate equal to the sum of (a) Three- Month LIBOR (as defined herein) as calculated on each applicable date of determination and (b) 9.073%, based on the $25.00 per share liquidation preference per annum.

The term "Three- Month LIBOR" means, on any date of determination, the rate (expressed as a percentage per year) for deposits in U.S. dollars for a three- month period as appears on Bloomberg, L.P. page US0003M, as set by the British Bankers Association at 11:00 a.m. (London time) on such date of determination.

Dividends will be payable quarterly on the first day of each December, March, June and September, provided that if any dividend payment date is not a business day, then the dividend which would have been payable on that dividend payment date will be paid on the next succeeding business day. Holders of Series D Preferred Stock will only be entitled to dividend payments for each quarterly dividend period during which they are the holder of record as of the applicable dividend record date. Dividends will accrue and be cumulative from, and including, the later of September 30, 2013 and the first day of the quarterly dividend period in which that issuance occurs; provided that if such shares of the Series D Preferred Stock are issued after a dividend record date, dividends will accrue and be cumulative from the first day of the next quarterly dividend period to begin. Accordingly, any shares of Series D Preferred Stock initially issued after the dividend record date for a quarterly dividend period (which is expected to be on or about the fifteenth of each month prior to the dividend payment date) will not be entitled to dividends for such quarterly dividend period.

All dividends shall accrue daily during the relevant dividend period. For dividend periods beginning on and after December 1, 2018, Three- Month LIBOR shall each be determined on each dividend payment date, which determination will apply to each day during the dividend period. For the definition of "dividend payment date" and "dividend period" please see the section entitled "Description of Series D Preferred Stock — Dividends."

The first dividend, payable on December 1, 2013 in the amount of $0.4448 per share, will be paid to the persons who are the holders of record of the Series D Preferred Stock at the close of business on the corresponding record date, which will be

November 15, 2013.

No Maturity

The Series D Preferred Stock has no stated maturity and will not be subject to any sinking fund or mandatory redemption. Shares of the Series D Preferred Stock will remain outstanding indefinitely unless we decide to redeem or otherwise repurchase them as described below under "— Redemption — Optional Redemption" or "— Special Optional Redemption." We are not required to set aside funds to redeem the Series D Preferred Stock.

| | |
|---|---|
| Optional Redemption | The Series D Preferred Stock is not redeemable until September 30, 2018, except as described below under "— Special Optional Redemption." On and after September 30, 2018 we may, at our option, redeem the Series D Preferred Stock, in whole or in part, at any time or from time to time, for cash at a redemption price equal to $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date fixed for redemption. See "Description of Series D Preferred Stock — Redemption — Optional Redemption." |
| Special Optional Redemption | Upon the occurrence of a Change of Control, provided no Limiting Document (as defined herein) may prohibit it, we may, at our option, upon not less than 30 nor more than 60 days' written notice, redeem the Series D Preferred Stock, in whole or in part, within 120 days after the first date on which such Change of Control occurred, for cash at a redemption price of $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date fixed for redemption. If, prior to the Change of Control Conversion Date (as defined herein), we have provided notice of our election to redeem some or all of the shares of Series D Preferred Stock (whether pursuant to our optional redemption right described above or this special optional redemption right), the holders of Series D Preferred Stock will not have the Change of Control Conversion Right described below under "— Change of Control Conversion Rights" with respect to the shares of Series D Preferred Stock called for redemption. Please see the section entitled "Description of the Series D Preferred Stock — Redemption — Special Optional Redemption" in this prospectus supplement. |

A "Change of Control" is deemed to occur when, after the original issuance of the Series D Preferred Stock, the following have occurred and are continuing:

• the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of our stock entitling that person to exercise more than 50% of the total voting power of all our stock entitled to vote generally in the election of our directors (except that such person will be deemed to have beneficial ownership of all securities that such person has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition); and

- following the closing of any transaction referred to in the bullet point above, neither we nor the acquiring or surviving entity has a class of common securities (or American depositary receipts representing such securities) listed on a National Exchange. For the definition of "National Exchange" please see the section entitled "Description of Series D Preferred Stock — Dividends."

**Conversion Rights**

Upon the occurrence of a Change of Control, each holder of Series D Preferred Stock will have the right, subject to our election to redeem the Series D Preferred Stock in whole or part, as described above under "— Optional Redemption" or "— Special Optional Redemption," prior to the Change of Control Conversion Date, to convert some or all of the Series D Preferred Stock held by such holder on the Change of Control Conversion Date into a number of shares of our common stock per share of Series D Preferred Stock equal to the lesser of:

- the quotient obtained by dividing (i) the sum of the $25.00 liquidation preference per share of Series D Preferred Stock plus the amount of any accumulated and unpaid dividends thereon to, but not including, the Change of Control Conversion Date (unless the Change of Control Conversion Date is after a dividend record date (as defined herein) and prior to the corresponding dividend payment date (as defined herein) for the Series D Preferred Stock, in which case no additional amount for such accrued and unpaid dividends will be included in this sum) by (ii) the Common Stock Price (as defined herein); and

- 7.1225 (the "Share Cap"), subject to adjustments to the Share Cap for any splits, subdivisions or combinations of our common stock;

in each case, on the terms and subject to the conditions described in this prospectus supplement, including provisions for the receipt, under specified circumstances, of alternative consideration as described in this prospectus supplement.

For definitions of "Change of Control Conversion Right," "Change of Control Conversion Date" and "Common Stock Price" and a description of certain adjustments and provisions for the receipt of alternative consideration that may be applicable to the conversion of Series D Preferred Stock in the event of a Change of Control, and for other important information, please see the section entitled "Description of the Series D Preferred Stock — Conversion Rights." For definitions of "dividend payment date" and "dividend record date," please see the section entitled "Description of the Series D Preferred Stock — Dividends."

**Liquidation Preference**

If we liquidate, dissolve or wind up, holders of the Series D Preferred Stock will have the right to receive $25.00 per share, plus any accumulated and unpaid dividends to, but not including, the date of payment, before any payment is made to the holders of our common stock. Please see the section entitled "Description of the Series D Preferred Stock — Liquidation Preference."

| | |
|---|---|
| Ranking | The Series D Preferred Stock will rank, with respect to rights to the payment of dividends and the distribution of assets upon our liquidation, dissolution or winding up, (A) senior to all classes or series of our common stock and to all other equity securities issued by us other than equity securities referred to in clauses (B) and (C); (B) junior to our Series B Redeemable Preferred Stock, or Series B Preferred Stock, and junior to all equity securities issued by us which do not have dividend rights and with terms specifically providing that those equity securities rank senior to the Series D Preferred Stock with respect to rights to the distribution of assets upon our liquidation, dissolution or winding up; (C) on parity with our 10.75% Series C Cumulative Redeemable Preferred Stock and all other equity securities issued by us with terms specifically providing that those equity securities rank on parity with the Series D Preferred Stock with respect to rights to the distribution of our assets upon liquidation, dissolution or winding up and (D) effectively junior to all of our existing and future indebtedness and to the indebtedness of our existing subsidiary and any future subsidiaries. Please see the section entitled "Description of the Series D Preferred Stock — Ranking." |
| Voting Rights | Holders of Series D Preferred Stock will generally have no voting rights. However, if we do not pay dividends on the Series D Preferred Stock for four or more quarterly dividend periods (whether or not consecutive), the holders of the Series D Preferred Stock (voting separately as a class with the holders of all other classes or series of our equity securities we may issue upon which similar voting rights have been conferred and are exercisable and which are entitled to vote as a class with the Series D Preferred Stock in the election referred to below) will be entitled to vote for the election of two additional directors to serve on our board of directors until we pay, or declare and set aside funds for the payment of, all dividends that we owe on the Series D Preferred Stock, subject to certain limitations described in the section entitled "Description of the Series D Preferred Stock — Voting Rights." In addition, the affirmative vote of the holders of at least two-thirds of the outstanding shares of Series D Preferred Stock is required for us to authorize or issue any class or series of stock ranking senior to the Series D Preferred Stock with respect to the payment of dividends or the distribution of assets on liquidation, dissolution or winding up, to amend any provision of our amended and restated charter, as amended, so as to materially and adversely affect any rights of the Series D Preferred Stock or to take certain other actions. Please see the section entitled "Description of the Series D Preferred Stock — Voting Rights. |

| | |
|---|---|
| Information Rights | During any period in which we are not subject to Section 13 or 15(d) of the Exchange Act and any shares of Series D Preferred Stock are outstanding, we will use our best efforts to (i) transmit by mail (or other permissible means under the Exchange Act) to all holders of Series D Preferred Stock, as their names and addresses appear on our record books and without cost to such holders, copies of the annual reports on Form 10- K and quarterly reports on Form 10- Q that we would have been required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act if we were subject thereto (other than any exhibits that would have been required) and (ii) promptly, upon request, supply copies of such reports to any holders or prospective holder of Series D Preferred Stock, subject to certain exceptions described in this prospectus supplement. We will use our best efforts to mail (or otherwise provide) the information to the holders of the Series D Preferred Stock within 15 days after the respective dates by which a periodic report on Form 10- K or Form 10- Q, as the case may be, in respect of such information would have been required to be filed with the SEC, if we were subject to Section 13 or 15(d) of the Exchange Act, in each case, based on the dates on which we would be required to file such periodic reports if we were a "non-accelerated filer" within the meaning of the Exchange Act. |
| Listing | Our Series D Preferred Stock trades on the NYSE under the symbol "MILLprD". |
| Use of Proceeds | We plan to use the net proceeds from this offering for general corporate purposes. To the extent we are prohibited under the Apollo Loan Agreement from paying dividends due in connection with the December 1, 2013 dividend payment date on our Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock from any other source, we may use certain equity proceeds for that purpose, which might include proceeds from this offering. We expect that the total amount of the dividends due on December 1, 2013, will be approximately $2.46 million plus the amount of all dividends that will become payable on or prior to that date on the Series D Preferred Stock issued pursuant to this offering. Please see the section entitled "Use of Proceeds" in this prospectus supplement. |

S- 9

| Risk Factors | Investing in our preferred stock involves risks. You should carefully consider the risks described under "Risk Factors" in this prospectus supplement, in our most recent Annual Report on Form 10- K and our subsequent Quarterly Reports on Form 10- Q as well as the other information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus before making a decision to invest in our common stock. |
|---|---|
| Material U.S. Federal Income Tax Considerations | For a discussion of the material federal income tax consequences of purchasing, owning and disposing of the Series D Preferred Stock and any common stock received upon conversion of the Series D Preferred Stock, please see the section entitled "Material Federal Income Tax Considerations." You should consult your tax advisor with respect to the U.S. federal income tax consequences of owning the Series D Preferred Stock in light of your own particular situation and with respect to any tax consequences arising under the laws of any state, local, foreign or other taxing jurisdiction. |
| Book- Entry and Form | The Series D Preferred Stock will be represented by one or more global certificates in definitive, fully registered form deposited with a custodian for, and registered in the name of, Cede & Co., the nominee of The Depository Trust Company, or "DTC". |