**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

-------------------------------------------------------------X
                                                             :
LEWIS COSBY, KENNETH R. MARTIN, as          :    No. 3:16-cv-00121-TAV-DCP
beneficiary of the Kenneth Ray Martin Roth IRA,  :
and MARTIN WEAKLEY on behalf of themselves   :
and all others similarly situated,                        :
                                                             :
                                   Plaintiffs,             :
                                                             :
                        v.                                   :
                                                             :
KPMG LLP,                                              :
                                                             :
                                   Defendant.            :
-------------------------------------------------------------X

**KPMG LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO**
**EXCLUDE THE REPORTS AND TESTIMONY OF CHAD COFFMAN**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT .....................................................................................................................4

    I.      EXPERT TESTIMONY THAT IS UNRELIABLE MUST BE
          EXCLUDED. ...........................................................................................4

    II.     MR. COFFMAN'S DATA AND ANALYSIS DO NOT
          SUPPORT HIS CONCLUSIONS.................................................................6

         A.     The Data and Results Do Not Support Mr. Coffman's
              Conclusion on the Efficiency of the Market for the
              Common Stock...................................................................................6

         B.     The Data and Results Do Not Support Mr. Coffman's
               Conclusion on the Efficiency of the Markets for the
              Preferred Stock..................................................................................8

         C.     Mr. Coffman's Results Fail to Establish that KPMG's
              Alleged Misrepresentations Impacted the Price of Miller
              Energy's Securities. .........................................................................10

    III.    MR. COFFMAN'S METHODOLOGIES ARE UNRELIABLE. ........................12

         A.     Mr. Coffman's Methodology For Analyzing Market
              Efficiency Is Unreliable. .................................................................12

             1.     Mr. Coffman's Methodology For Identifying News
                    Days, No News Days, and Market Dates Has a High
                    Known Rate of Error........................................................12

             2.     Mr. Coffman Failed to Control For Market
                    Reactions Caused By Other Miller Energy Events
                    or Disclosures..................................................................14

             3.     Mr. Coffman's Methodology For Controlling For
                    the Price of Oil Is Incorrect............................................16

             4.     Mr. Coffman's Report Was Prepared Solely For
                    This Litigation.................................................................17

          B.     Mr. Coffman's Methodology for the Series C and Series D
              Preferred Stock Event Study Is Unreliable. ................................18

               1.      Mr. Coffman Incorrectly Computed the Returns on the Series C and Series D Preferred Stock. .................................18

               2.      Mr. Coffman's Methodology for the Event Study of the Series C and Series D Preferred Stock Is Biased. ...................19

               3.      Mr. Coffman's AutoCorrelation Analysis Supports the Conclusion that the Markets for Series C and Series D Stock Were Inefficient. ...................................21

      C.     Mr. Coffman's Methodology For Calculating Damages Is Unreliable. ................................................................22

               1.      Mr. Coffman's Methodology Does Not Provide A Mechanism For Determining Which Investors in the Section 11 Class Suffered Damages. ..............................22

               2.      Mr. Coffman's Methodology Does Not Provide A Mechanism For Separating Low Risk and High Risk Investors in the Section 10(b) Class. ....................................22

IV.    AN EVIDENTIARY HEARING MAY BE HELPFUL TO THE COURT. ............................................................................24

CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Bell v. Ascendant Sols., Inc.*,
  2004 WL 1490009 (N.D. Tex. July 1, 2004) ...................................................................21

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .................................................................................9, 10

*Carpe v. Aquila, Inc.*,
  2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) ...................................................................19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................................................7

*Coffey v. Dowley Mfg., Inc.*,
  187 F. Supp. 2d 958 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir.
  2003) ..........................................................................................................................24

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................ *passim*

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ....................................................................5, 7

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................................4, 13

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ...........................................................................5, 6, 7, 12

*In re Northfield Labs, Inc. Sec. Litig.*,
  267 F.R.D. 536 (N.D. Ill. 2010) .........................................................................6, 15, 16, 21

*In re Whirlpool Corp. Front–Loading Washer Products Liab. Litig.*,
  45 F. Supp. 3d 724 (N.D. Ohio 2014) .............................................................................11

*In re Xcelera.com Sec. Litig.*,
  2008 WL 7084626 (D. Mass. Apr. 25, 2008) .......................................................5, 12, 19, 22

*Johnson v. Manitowoc Boom Trucks, Inc.*,
  484 F.3d 426 (6th Cir. 2007) .................................................................................5, 14, 18

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................................9, 10

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ..........................................................................................2, 24

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).......................................................................7

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
    472 F.3d 398 (6th Cir. 2006) .........................................................................5, 17

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ...........................................1, 5, 7, 21

*Turpin v. Merrell Dow Pharm., Inc.*,
    959 F.2d 1349 (6th Cir. 1992) ...........................................................................12

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000).........................................................................................4

*Willis v. Big Lots, Inc.*,
    2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) ...................................................10

**Other Authorities**

David Tabak, "What Should We Expect When Testing For Price Response to
    News in Securities Litigation," NERA Economic Consulting, Working Paper
    (Aug. 2016) ....................................................................................................7

Fed. R. Evid. 702 ...................................................................................................4

KPMG LLP ("KPMG") submits this Memorandum of Law in Support of Its Motion to Exclude the Reports and Testimony of Chad Coffman (ECF Nos. 107-2; 121).

## PRELIMINARY STATEMENT

Chad Coffman's reports and testimony are not reliable and must be excluded. His reports and opinions – regarding the purported efficiency of the markets for the securities of Miller Energy Resources, Inc. ("Miller Energy" or "the Company") and whether damages can be calculated on a class-wide basis – are unsupported by basic economics, statistics, and the underlying data. Mr. Coffman's initial expert report was so fundamentally flawed that he had to revise and issue a corrected report. His corrected report, however, is also riddled with errors.

The data underlying Mr. Coffman's analysis does not support his conclusion that the markets for Miller Energy's securities were efficient. According to Mr. Coffman, only three out of seventeen earnings announcements by Miller Energy were followed by statistically significant movements in the price of its common stock. None of the earnings announcements was followed by a statistically significant movement in the prices of Miller Energy's Series C and Series D Preferred Stock. Mr. Coffman's conclusion that the markets for Miller Energy's securities were efficient falls far below the rigorous standards of reliability under *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592 n.10 (1993), and in the Sixth Circuit, *see Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *5 (N.D. Ohio Aug. 14, 2018) (excluding expert's testimony where event study found only "a total of four dates with statistically significant price movements, out of a total of nine purported 'news' dates tested").

Furthermore, Mr. Coffman's data and methodologies are unreliable. The known rates of error in his methodologies and calculations are high and impact all of his results. Among other errors, Mr. Coffman mis-identified the critical dates and times of the news events that he was

attempting to study despite the fact that at least some of those events were alleged in the Second Amended Complaint (the "SAC"). He incorrectly computed the returns that underlie his entire event study by using the wrong oil price index, by failing to account for the payment of dividends, and by improperly skewing the time period and events studied to bias the results in favor of finding efficiency. The many errors in the data, methodology, and conclusions in his corrected report are cataloged in the Expert Report of Dr. Mukarram Attari (attached hereto as Appendix A hereto ("Attari Report"), which explains that Mr. Coffman's errors were "systematic" and infected his entire work, that his approach was "biased and non-scientific," and that his analysis and conclusions are incorrect and unreliable. (*See* Attari Report at ¶¶ 7-16.)

As for damages, Mr. Coffman's opinions that damages for the proposed Section 11 and Section 10(b) Classes can be calculated on a class-wide basis are meritless. For the proposed Section 11 Class, Mr. Coffman fails to address the fact that there were multiple offerings, not all of which are at issue in this case, which makes class-wide damages calculations impossible. For the proposed Section 10(b) Class, he fails to take into account Plaintiffs' "materialization of the risk" theory, which requires that any damages methodology include a mechanism for separating low risk from high risk investors. The Fifth Circuit recently rejected Mr. Coffman's testimony for this very reason. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690-691 (5th Cir. 2015).

## BACKGROUND

In support of their class certification motion, Plaintiffs submitted the expert report of Chad Coffman dated March 15, 2019 in an attempt to establish a fraud-on-the-market presumption based on the efficiency of the markets for Miller Energy's securities. In his original report, Mr. Coffman conducted an event study for the period from August 29, 2011 through July 30, 2015 (the "Analysis Period"). (Coffman Report, ECF No. 107-2, ¶ 1.) For Miller Energy's common stock, Mr. Coffman evaluated whether there was a statistically significant price

movement in response to the Company's earnings announcements as compared to price movements on days with no Miller Energy-related news ("no news days") during the Analysis Period. (*Id.* ¶¶ 50-54.) However, for the Series C and Series D Preferred Stock, Mr. Coffman only evaluated the period after October 15, 2014, and examined "firm-specific events that clearly updated the market regarding the ability of the company to continue paying dividends." (*Id.*) For both event studies, Mr. Coffman claimed that he controlled for price movements in response to the price of oil. (*Id.*) Mr. Coffman found that there was a statistically significant price movement in the price of Miller Energy's common stock in four out of seventeen events. (*Id.* at Ex. 7). With respect to the Series C and Series D Preferred Stock, Mr. Coffman found there was a statistically significant price movement in four out of the nine events. (*Id.* at Exs. 9, 11). Based on these results, Mr. Coffman concluded that the markets for Miller Energy's securities were efficient.

During the first day of his deposition, Mr. Coffman was confronted with evidence of fundamental errors in his work. (*See* Corrected Coffman Report, ECF No. 121, ¶¶ i-iii (pages 3-4); *see also* Coffman Dep. Tr. (Apr. 12, 2019) (attached hereto as Appendix B ("App. B")) at 157; 195; 244).) He discovered that he used incorrect dates and times for the key events he was attempting to study, and that he incorrectly identified certain days as no news days. (Corrected Coffman Report, ECF No. 121, ¶¶ i-iii (pages 3-4).) These errors are critical. Given that the objective of an event study is to examine whether there were rapid reactions to certain events, a valid study depends on the correct identification of the dates and times of the news events under examination. Mr. Coffman was forced to issue a corrected report.

Mr. Coffman issued a new, corrected report on April 19, 2019. In his new report, he made numerous corrections including 204 changes in the data and analysis contained in his event study for the common stock, and he found that there was a statistically significant movement in

the price of the common stock after only three out of seventeen earnings events (corrected downwards from four). (*Id.* at Ex. 7; *see also* (Coffman Dep. Tr. (Apr. 25, 2019) (attached hereto as Appendix C "App. C") at 388.) For the first time, Mr. Coffman opined that KPMG's audit opinions impacted the prices of Miller Energy's securities, despite his finding that there was no statistically significant price movement in response to three of the four audit opinions. (Corrected Coffman Report, ECF No. 121, ¶ vi (pages 4-5).)

Mr. Coffman's corrections to his expert report do not cure the flaws in his methodologies and data. As discussed below, his reports and testimony are unreliable and must be excluded.

## ARGUMENT

## I.   EXPERT TESTIMONY THAT IS UNRELIABLE MUST BE EXCLUDED.

Expert testimony is admissible only if: (1) it is based on sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts. *See* Fed. R. Evid. 702. The proponent of testimony must establish by a preponderance of the evidence that it satisfies these standards. *See id.*; *Daubert*, 509 U.S. at 592 n.10. To meet their burden, Plaintiffs' must show that Mr. Coffman's opinions, and the methodologies used to reach them, meet *Daubert*'s "exacting standards of reliability." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *15 (S.D.N.Y. Oct. 29, 2013) (quoting *Weisgram v. Marley Co*., 528 U.S. 440, 455 (2000)).

The Sixth Circuit applies the following factors to determine if an expert's testimony is reliable under *Daubert*:

(1) whether the theory or technique can be (and has been) tested;

(2) whether the theory has been subjected to peer review and publication;

(3) whether there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

4

(4) whether the theory or technique is generally accepted by the relevant scientific community.

*Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 429-430 (6th Cir. 2007). In addition, the Sixth Circuit considers a fifth factor, the "Prepared-Solely-For-Litigation Factor." *Id*. at 434. Under this factor, "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Id.*; *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation."). While the "Prepared-Solely-For-Litigation Factor" is not dispositive, it cuts against the admissibility of an expert's testimony. *Johnson*, 484 F.3d at 434-435.

In securities class actions, courts exclude expert testimony as unreliable where the expert's opinions and conclusions are not supported by the results of his expert report. *See In re Xcelera.com Sec. Litig*., 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) (excluding market efficiency expert where expert's "theory [did] not match the facts"). Where the expert is opining on market efficiency, courts have excluded the expert's testimony if fewer than half of the news days had a statistically significant price movement. *See Ohio Pub. Employees*, 2018 WL 3861840, at *5 (excluding expert testimony where expert found 4 of 9 news days had a statistically significant price movement, because "[c]ourts also require the testing of many more dates throughout a class period to establish market efficiency."); *George v. China Auto. Sys., Inc*., 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("Even assuming that the methodology was proper, showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency."); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig*., 281 F.R.D. 174, 180 (S.D.N.Y. 2012) (finding 16 of 57

news days insufficient to establish market efficiency because "plaintiff must show that the market price responds to most new, material news.").

Courts exclude expert testimony where the expert departs from accepted methodologies. *See id*. at 181 (discrediting market efficiency expert and denying class certification where expert performed "two inconsistent event studies" and his opinions were "poorly supported"). Courts also exclude expert testimony where the expert employs methodologies that skew their results in favor of their clients. *See, e.g., In re Northfield Labs, Inc. Sec. Litig*., 267 F.R.D. 536, 548 (N.D. Ill. 2010) (excluding testimony of market efficiency expert who "made decisions about that study that tend to skew it toward a conclusion that the market was efficient").

## II.    MR. COFFMAN'S DATA AND ANALYSIS DO NOT SUPPORT HIS CONCLUSIONS.

### A.    The Data and Results Do Not Support Mr. Coffman's Conclusion on the Efficiency of the Market for the Common Stock.

To analyze the cause-and-effect relationship between Miller Energy's disclosures and movements in the price of its common stock, Mr. Coffman conducted an event study[1] in which he examined price movements of the Company's common stock after earnings announcements. (Corrected Coffman Report, ECF No. 121, ¶¶ 59-63 & Ex. 7).) Mr. Coffman examined earnings announcements because "the release of [a] company's earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security." (*Id*. ¶ 60.) Out of the seventeen earnings announcements during the Analysis Period, only three resulted in statistically significant price movements. (*Id*.) Mr. Coffman concluded that

---

[1] Event studies are intended to provide evidence on whether there is a cause-and-effect relationship between the release of news about a company and the company's stock price ("*Cammer*" factor number five), which is the factor bearing most directly on market efficiency. (Attari Report ¶ 125; App. B at 44-46.) Without an event study showing a cause-and-effect relationship, Mr. Coffman does not have an opinion on whether the markets were efficient. App. C at 349-351.

"[t]his is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Miller Energy Common Stock." (*Id*. ¶ 62.) That conclusion is unsupported by Mr. Coffman's own data.

Mr. Coffman examined only seventeen earnings announcements, and he found that only three of these were followed by a statistically significant price movement. (*Id*. ¶ 60.) Mr. Coffman's finding that only three out of the seventeen earnings announcements were followed by statistically significant price movements discredits his conclusion that there is a cause-and-effect relationship. (*Id*.) Three out of seventeen is merely 17.65 percent, which, "to state the obvious, [] is less than [the] 50%" courts require to establish market efficiency. *George*, 2013 WL 3357170, at *12. This low rate of news events that were followed by statistically significant price changes is insufficient to support the conclusion that there was a cause-and-effect relationship between the release of news and changes in the price of Miller Energy's stock. *See In re Freddie Mac*, 281 F.R.D. at 182 (finding expert's results that stock price "responded to material news 28% of the time is insufficient to satisfy plaintiff's burden of proving *Cammer*'s cause-and-effect factor"). As courts have held, if fewer than half of the earnings announcements led to a statistically significant price reaction, then there is no cause-and-effect relationship.[2] "[A]n event study with too few 'events' is incapable of distinguishing whether stock price movements are the probable result of news events or simply random variation." *Ohio Pub. Employees*, 2018 WL 3861840, at *4.

---

[2] The cases cited by Plaintiffs do not support a finding of efficiency where, as here, only 17% of events were followed by statistically significant price changes. *See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 88 (S.D.N.Y. 2015) (5 of 15 (33%) of events were followed by statistically significant price changes); *McIntire v. China MediaExpress Holdings, Inc*., 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (42% of events).

Significantly, when given the opportunity to correct his initial report, Mr. Coffman had to _decrease_ the number of earnings announcements that caused statistically significant price movements down from four (23.53 percent) to three (17.65 percent) of the seventeen earnings announcements. (Corrected Coffman Report, ECF No. 121, ¶ 61.) Mr. Coffman has conceded that a finding of less than three statistically significant price movements would not support a cause-and-effect relationship:

> Q:   If it dropped to 2 of 17, would it still be statistically significant, the difference between earnings releases and no news days?
>
> A:    I don't believe it would still be – in terms of the percentage of days that are statistically significant, it likely would not be . . .

(App. C at 347-348). Mr. Coffman found far less than fifty percent of Miller Energy's earnings announcements caused a statistically significant price movement. This data does not support his conclusion that there is a cause-and-effect relationship between Miller Energy's earnings announcements and the price of its common stock.

### B.      The Data and Results Do Not Support Mr. Coffman's Conclusion on the Efficiency of the Markets for the Preferred Stock.

The data from Mr. Coffman's event study also do not support his conclusion that the markets for Miller Energy's Series C and Series D Preferred Stock were efficient. To examine the cause-and-effect relationship between the price of Miller Energy's Series C and Series D Preferred Stock, Mr. Coffman conducted an event study in which he examined the price movements of the Series C and Series D Preferred Stock following earnings announcements and certain other announcements of news that was purportedly "related to the ability of the Company to continue paying preferred stock dividends or remain listed on the NYSE." (Corrected Coffman Report, ECF No. 121, ¶ 78 & Exs. 9-11).) The event study was limited to the events after October 15, 2014. (_Id_. ¶ 78.) Even assuming _arguendo_ that there are no flaws in this

methodology (which as discussed below there are), Mr. Coffman found there were no statistically significant movements in the prices of the Series C and Series D Preferred Stock in response to the three earnings announcements in the time period of his event study. (*Id*.) Accordingly, as for the common stock, Mr. Coffman's own analysis and data do not support his conclusion that there is a cause-and-effect relationship between Miller Energy's earnings announcement and the price of Miller Energy's Series C and Series D Preferred Stock.

As Dr. Attari explains in his expert report, Mr. Coffman's backup data shows he also tested the statistical significance of the price movements of the Series C and Series D Preferred Stock in response to earnings announcements prior to October 15, 2014. (Attari Report ¶ 132.) Mr. Coffman chose to exclude this data from his event study (and fails to mention it in his report). (*Id*.) Upon reviewing Mr. Coffman's backup computations and results, Dr. Attari found that _none_ of the eleven earnings announcements during the proposed class period was followed by a statistically significant change in the prices of the Series C and Series D Preferred Stock. (*Id*. ¶¶ 133-34.) Given that price movements in three of seventeen events is not sufficient to establish efficiency under the case law discussed above, *a fortiori*, price movements in response to zero out of eleven earnings announcements is insufficient to establish efficiency.

In addition, Mr. Coffman's own analysis of the indirect indicators of market efficiency demonstrates that the markets for Miller Energy's Series C and Series D Preferred Stock were not efficient. With respect to the indirect indicators of market efficiency in *Cammer* and *Krogman*, Mr. Coffman's report:

- presents no evidence of any analysts covering Miller Energy's Series C and Series D Preferred Stock;

- presents no evidence of the existence of more than one market maker;

- presents no evidence of institutional investors holding Series C and Series D Preferred Stock;

- does not analyze the market capitalization of the Series C and Series D Preferred Stock on their own but, instead, lumps them together with the Miller Energy common stock;

- states that Miller Energy was ineligible to file a Form S-3 at the beginning and for several months at the end of the proposed class period; and

- does not analyze that the bid-ask spreads for the Series C and Series D Preferred Stock were above average at the end of the proposed class period.

*See Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) (listing factors sufficient to establish market efficiency); *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (same). "[T]he *Cammer* factors [] reflect the legal standard for market efficiency and have been considered by the Sixth Circuit in such determinations." *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *4 (S.D. Ohio Mar. 17, 2017). The data and results do not support Mr. Coffman's conclusion that the markets for the Series C and Series D Preferred Stock were efficient.

### C. Mr. Coffman's Results Fail to Establish that KPMG's Alleged Misrepresentations Impacted the Price of Miller Energy's Securities.

Plaintiffs allege that KPMG made misrepresentations in its audit opinions on Miller Energy's financial statements for fiscal years ending April 30 of 2011, 2012, 2013, and 2014. (SAC ¶¶ 182-188). In his original report, Mr. Coffman expressed no opinion on whether KPMG's alleged misrepresentations impacted the price of Miller Energy's securities, as he acknowledged in his deposition. (App. B at 213-214.) In his "corrected" report, Mr. Coffman included a novel opinion on this topic. Following his first day of deposition Mr. Coffman apparently performed further analysis, which resulted in his new conclusion that there was a statistically significant price movement in response to one of the four audit opinions issued by KPMG on Miller Energy's year-end financial results. (Corrected Coffman Report, ECF No. 121, Ex. 7 at event numbers 1, 5, 9, and 13).)

Mr. Coffman's new opinion on price impact should be excluded because it was not included in his original report, but was added in his "corrected" report in response to questions asked of him at the first day of his deposition. (*Id*. at ¶ vi (pages 4-5)); *see also In re Whirlpool Corp. Front–Loading Washer Products Liab. Litig.*, 45 F. Supp. 3d 724, 760 (N.D. Ohio 2014) ("[C]courts should not permit experts to 'testify as to a wholly new, previously unexpressed opinion.'") (internal citation omitted).

Mr. Coffman's new opinion on price impact also must be excluded because it is unscientific and unreliable. *First*, Mr. Coffman concedes that at least three of the four KPMG audit opinions did *not* cause any price increase of Miller Energy's common stock. (Coffman Corrected Report, ECF No. 121, ¶ xii (page 11).) *Second*, Mr. Coffman did not examine whether the one instance where there was an increase in the stock price following release of a KPMG audit opinion (on August 29, 2011) was potentially caused by other Miller Energy disclosures. *See* App. C at 398-399 ("On [August 29, 2011], the 10-K and the earnings announcement and the Business Wire all came out within a matter of hours with each other, all after market on the same day, so I was just identifying the earliest release of fourth quarter information. I'm not saying that's the only source of information on that day"). As Dr. Attari has explained, the information regarding the valuation of the Alaska Assets had been disclosed weeks prior to August 29, 2011, in both Miller Energy's Form 10-K filed on July 29, 2011, and in the Form 10-K/A filed on August 8, 2011. (Attari Report ¶ 217.) In addition, Miller Energy made two other disclosures on August 29, 2011 that may have caused the price increase: (1) Miller Energy filed an amendment to its loan agreement with Guggenheim Corporate Funding, and (2) the Company concluded an internal investigation and found there was no intentional wrongdoing in the premature filing of

the Form 10-K filed on July 29, 2011. (*Id.*) Mr. Coffman does not analyze, much less reach a conclusion on, whether either of these disclosures might have had an effect on the price increase.

Mr. Coffman's new conclusion that KPMG's audit opinions increased the price of Miller Energy's common stock (on one occasion) is unsupported by his data and must be excluded. *See In re Freddie Mac*, 281 F.R.D. at 181 (discrediting market efficiency expert and denying class certification where expert performed "two inconsistent event studies" and his opinions were "poorly supported"); *In re Xcelera.com*, 2008 WL 7084626, at *1 (excluding market efficiency expert where expert's "theory [did] not match the facts").

## III.   MR. COFFMAN'S METHODOLOGIES ARE UNRELIABLE.

The methodologies employed in Mr. Coffman's event studies do not meet the Sixth Circuit's rigorous standards for reliability. *See Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992) (close judicial analysis of expert testimony is necessary because expert witnesses are not necessarily unbiased scientists).

### A.   Mr. Coffman's Methodology For Analyzing Market Efficiency Is Unreliable.

As explained below, the methodology Mr. Coffman employed in conducting his event studies, for the common stock and for the preferred stock, was so fundamentally flawed that his conclusions are unreliable. The methodological flaws discussed in the subsections below infect all of Mr. Coffman's work on both the common and the preferred stock.

#### 1.   Mr. Coffman's Methodology For Identifying News Days, No News Days, and Market Dates Has a High Known Rate of Error.

Although the reliability of event studies depends on accurate identification of the dates and times of earnings announcements and the correct identification of news and "no news" days, Mr. Coffman's original report failed to do so, and the errors were of such significance that he

12

had to prepare a corrected report.[3] Mr. Coffman used the Factiva database, the Investext website, and the SEC's EDGAR website to identify news days, and the date and timing of Miller Energy's earnings announcements, news articles, analyst reports, and SEC filings. (Corrected Coffman Report, ECF No. 121, ¶ iii n. 2 (page 4).) That methodology proved to be unreliable.

*First*, Mr. Coffman's original report incorrectly identified the date of Miller Energy's earnings announcement for the fourth quarter of 2013. (*Id.* ¶ ii (page 3).) Rather than identifying the date of the original earnings announcements, his methodology identified the date of a revised announcement a day later. (*Id.*) This error caused Mr. Coffman to analyze July 17, 2013, instead of July 16, 2013 as the market date for analysis. (*Id.*) Correcting the date to July 16, 2013 changed the statistical significance. (*Id.* Ex. 7 at event 9). On July 16, 2013 there was no statistically significant price movement. (*Id.*) Failing to identify the correct market date changed the number of statistically significant events, the most critical results on which Mr. Coffman purports to base his ultimate conclusion about the presence of a cause-and-effect relationship.

*Second*, nine of the seventeen earnings announcements had the incorrect time for the release of the announcement in Mr. Coffman's original report. (*Id.* Ex. 7, at events 2, 5-9, 11-12, 14). That the corrected times for eight of the earnings announcements did not alter the market date was a matter of luck, and can in no way be attributed to the alleged reliability of his methodology. *See* App. C at 395 (conceding that for nine earnings announcements his methodology picked the wrong time). Luck falls far below the "exacting standards of reliability" of *Daubert*. *IBEW Local*, 2013 WL 5815472, at *15 (internal citation omitted).

---

[3] Mr. Coffman testified that he has had to revise his signed expert reports because errors were brought to his attention during his deposition "less than a handful" of times. App. C at 327.

In addition, Mr. Coffman missed two news days that were actually alleged in Plaintiffs' SAC. (Corrected Coffman Report, ECF No. 121, ¶ iii (pages 3-4).) Specifically, Mr. Coffman incorrectly identified December 23, 2013 as a no news days when the SAC alleges a *StreetSweeper* report regarding the valuation of Miller Energy's Alaska Assets was issued that day, and October 13, 2014, the day a *Reuters* article regarding Miller Energy was issued. (*Id.*) In correcting these errors, the number of no news days decreased from 318 to 316. (*Id.*) Mr. Coffman has admitted that incorrectly treating potential news days as no news days biases in favor of finding a cause-and-effect relationship:

> Q:    It would change the numbers in a way that would make you more likely to find a cause and effect relationship; correct? […]
>
> A:    Right. […]

App. C at 361-362. That Mr. Coffman missed two news days that were alleged in the SAC further demonstrates the unreliability of his methodology.

In determining whether an expert's testimony is reliable, the Sixth Circuit considers whether there is "a high known or potential rate of error" in the expert's methodology. *Johnson*, 484 F.3d at 429. Mr. Coffman's report had such a high rate of error that he had to go back to the drawing board and prepare a corrected report. (Corrected Coffman Report, ECF No. 121, ¶¶ i-iv (pages 3-4).) Moreover, these errors related to fundamental components of his event study, the identification of news days and market dates. As such, his testimony is unreliable under *Daubert*.

## 2.    Mr. Coffman Failed to Control For Market Reactions Caused By Other Miller Energy Events or Disclosures.

Mr. Coffman's event studies, even as reported in his "corrected" report, did not analyze whether the observed price changes were in fact reactions to other Miller Energy events or disclosures that occurred around the same dates as the earnings releases he purported to study. This impermissibly skewed his event study in favor of Plaintiffs, and is another reason why his

testimony should be excluded. *See In re Northfield*, 267 F.R.D. at 548 (excluding testimony of market efficiency expert who "made decisions about that study that tend to skew it toward a conclusion that the market was efficient").

Plaintiffs' allege that the price of Miller Energy's securities responded over a two-to-three day period. (*See* SAC ¶¶ 199, 200, 205).[4] For example, Plaintiffs allege that the market reacted from December 24 through 26, 2013, a two-day period, in response to the *StreetSweeper* article issued on December 24, 2013. (*Id.* ¶¶ 200, 205). At his deposition, Mr. Coffman asserted that it was "plausible" for an event or disclosure to cause a statistically significant price movement two or three days after the event. App. C at 417-418. He testified further that he could have, but chose not to, examine a two-day window in his event study:

> Q:     Could you have looked at a two-day window to see if an event had an effect on the price of the stock?
>
> A:     That's something you could do. You could look at two-day windows after each event.
>
> Q:     But you didn't in this case?
>
> A:     No.

App. B at 172.

Moreover, Mr. Coffman admits that he did not do any work to analyze whether the price changes he observed on market dates were reactions to other news or events in the two or three days leading up to the earnings releases, *i.e.* whether the price movements were caused by events other than the earnings releases. The choice not to control for confounding events is illogical

---

[4] Plaintiffs' allegations are not consistent with market efficiency. Claims that prices reacted over two or three days, rather than rapidly, are not consistent with the efficient market hypothesis. (*See* Corrected Coffman Report, ECF No. 121, ¶ 14 (defining an efficient market as one "in which widely-available public information is quickly incorporated into the market price of a security").)

given Plaintiffs' allegations and, more importantly, skews the event study towards a conclusion that there was a cause-and-effect relationship. This methodology disregards the possibility that the price movements were caused by other events or disclosures two or three days beforehand, or that the full price reaction in response to the news days did not occur on the market dates in the event study. *See* App. C at 414-415 (agreeing that there could be a market reaction over two days with an initial reaction on the first market date). Because these other possible causes of the price movements are not excluded, Mr. Coffman's methodology is unreliable. *See In re Northfield*, 267 F.R.D. at 548 (excluding testimony where event study was skewed in favor of plaintiffs).

### 3. Mr. Coffman's Methodology For Controlling For the Price of Oil Is Incorrect.

Mr. Coffman's methodology required him to control for the impact of changes in the price of oil, but he mistakenly downloaded and used data from the wrong oil price index, rendering all of his analyses unreliable. Mr. Coffman states that he used the NYMEX WTI Light Sweet Crude Oil Futures Index obtained from S&P Capital IQ. (Corrected Coffman Report, ECF No. 121, ¶ 53.) As Dr. Attari explains in his report, however, Mr. Coffman actually, apparently inadvertently, used a different index, the ICE WTI Light Sweet Crude Oil Futures Index. (Attari Report ¶¶ 36-38.) As shown in Table 3A to Dr. Attari's report, there is a price difference on twenty-nine percent of the days (325 days) in the Analysis Period between the oil prices used by Mr. Coffman and the NYMEX WTI Light Sweet Crude Oil Futures Index. (*Id*. ¶ 39.)

On top of this error, as Dr. Attari explains, Mr. Coffman incorrectly calculated the return on his oil price index for multiple dates in his event study. Oil price indexes are based on futures contracts where the price of oil varies by day depending not only on the variation of the price of oil but also upon the maturity date of the futures contract included in the index. (*Id*. ¶¶ 43-44.) To correctly calculate the return on the oil price index on any given day Mr. Coffman should

have identified the futures contract on that date and calculated the percentage change in price of that same futures contract on that particular date. (*Id.* ¶ 45.) However, this is not the methodology Mr. Coffman used:

> Q: In performing your calculations here for the oil futures returns column in your Exhibit 44 of your corrected report, we it just a mechanical calculation every time were you just went through that math that you walked through where you divide the price on one day by the prior day price and then subtract one?
>
> A: I believe so, yes.

App. C at 475. As Mr. Coffman testified, he simply divided the index level on each date by the prior date, even on dates when the futures contract used in the index changed. (*Id.*; *see also* Attari Report ¶ 45.) Dr. Attari explains that Mr. Coffman's returns on the oil price index differ from the correctly calculated returns on 334 days during the period from March 8, 2011 through July 31, 2015. (Attari Report ¶ 47.) Using April 1, 2014 as an example, Dr. Attari shows that Mr. Coffman's oil price index is incorrect on a total of 39 days out of the 115 days (33.9 percent) used in estimating the coefficients for his regression model. (*Id.* ¶ 49.) The pervasiveness of this error renders the methodology unreliable.[5]

### 4. Mr. Coffman's Report Was Prepared Solely For This Litigation.

The Sixth Circuit is "suspicious of methodologies created for the purpose of litigation" because they signal that the proposed expert is a quintessential expert for hire and such methodologies justify applying the *Daubert* factors with greater rigor. *Mike's Train House*, 472 F.3d at 408 (excluding expert's opinions because expert created methodology solely for purposes of litigation). As discussed above, the errors in Mr. Coffman's event study expose him as a

---

[5] Dr. Attari explains that this resulted in Mr. Coffman's identifying at least one no news day incorrectly, and his concluding that at least one price change was statistically significant when in fact it was not. (*Id.* ¶ 50.)

Case 3:16-cv-00121-TAV-DCP   Document 127   Filed 05/21/19   Page 22 of 30   PageID #: 7604

"quintessential expert for hire," justifying application of "the *Daubert* factors with greater rigor" and excluding his reports and testimony. *Johnson*, 484 F.3d at 435.

**B.     Mr. Coffman's Methodology for the Series C and Series D Preferred Stock Event Study Is Unreliable.**

In addition to the errors described above which affect all of Mr. Coffman's work, Mr. Coffman's event study for Miller Energy's Series C and Series D Preferred Stock suffers from three additional fundamental flaws that render his results unreliable.

**1.     Mr. Coffman Incorrectly Computed the Returns on the Series C and Series D Preferred Stock.**

As explained in Dr. Attari's report, Mr. Coffman incorrectly computed the returns on the Series C and Series D Preferred Stock by ignoring the dividend payments investors received. (Attari Report ¶¶ 30-31.) This resulted in lower returns for both the Series C and Series D Preferred Stock, which affected the coefficients for the regression model in Exhibits 5-C and 5-D. (*Id*. ¶ 32.) Mr. Coffman used these coefficients to calculate the abnormal returns and abnormal dollar changes on the event days in Exhibits 9 and 11, which affected the statistical significance of the event days in those exhibits in Exhibits 10 and 12. (*Id*.) For example, on August 13, 2013 Mr. Coffman incorrectly calculated the return on the Series C Preferred Stock as -0.14% when the correct return, all else equal, is 3.07%. (*Id*. ¶ 33.) Based on his incorrect return, Mr. Coffman calculated the abnormal return as -0.26%, which is not statistically significant. (*Id*.) The correct abnormal return is 2.95%, which is statistically significant at the ninety-five percent level. (*Id*.) Mr. Coffman likely incorrectly concluded that August 13, 2013 was not a statistically significant news day. (*Id*.; *see also* Corrected Coffman Report, ECF. No. 121, Ex. 10). In fact, August 13, 2013 was likely a statistically significant no news day and was thus incorrectly excluded from the count of statistically significant no news days in Exhibit 10 of Mr. Coffman's corrected report. (Attari Report ¶ 33.) As this example demonstrates, Mr.

Coffman's calculations to determine which days are statistically significant, the foundation of his event study, may be incorrect on any number of other days as well.

Because Mr. Coffman's calculation for the returns of the Series C and Series D Preferred Stock departed from accepted methodologies by failing to include dividend payments (*Id*. ¶¶ 30-33), it is unreliable, and his opinions must be excluded. *See In re Xcelera.com*, 2008 WL 7084626, at *1-2 (excluding market efficiency where expert used techniques not supported in peer-reviewed journals); *Carpe v. Aquila, Inc*., 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding testimony and report of plaintiff's expert where he failed to "perform a proper event study and failed to follow the accepted methodology of his field.")

### 2. Mr. Coffman's Methodology for the Event Study of the Series C and Series D Preferred Stock Is Biased.

Mr. Coffman's event studies for the Series C and Series D Preferred Stock were, without legitimate basis, limited to the time period after October 15, 2014. (Corrected Coffman Report, ECF No. 121, ¶ 78.) Also, rather than using earnings announcements, as he did with the event study of the common stock, Mr. Coffman deviated from his usual methodology and analyzed price movements in response to "news that was clearly related to the ability of the Company to continue paying preferred stock dividends or remain listed on the NYSE." (*Id*.) Mr. Coffman attempts to justify his shortened analysis period, his exclusion of earnings announcements, and his inclusion of other specially-selected news items based on his assertion that price movements in the preferred stock "would be driven primarily by changes in the time value of money (*i.e.* the applicable discount rate)." (*Id*. ¶ 74.) That explanation is unsupported by basic economics, accepted statistical methodology, and Mr. Coffman's own data.

As Dr. Attari explains in his report, the prices of both the Series C and Series D Preferred Stock would respond to changes in the risk-free rate (which does not depend on the financial

condition of Miller Energy) and the risk premium demanded by investors (which is driven by the financial condition of Miller Energy). (Attari Report ¶ 137.) Contrary to Mr. Coffman's assertions, the prices of Series C and Series D Preferred Stock did not respond to changes in the risk free rate and should be expected to be affected by changes in Miller Energy's financial condition over the entire Analysis Period, not just after October 15, 2014. (*Id*. ¶¶ 138-139.)

It is evident from Mr. Coffman's data why he shortened his analysis period, excluded earnings announcements, and added additional select news items in his event study for the Series C and Series D Preferred Stock – he was engineering his study to be biased in favor of a finding of efficiency. As Dr. Attari has explained, these methodological flaws biased the event study toward a particular result, rendering the work unscientific. (*Id*. ¶¶ 146-154.) Of the eleven earnings announcements from the time of issue of the Series C Preferred Stock through the Analysis Period, _none_ was followed by a statistically significant movement in the price of the Series C Preferred Stock. (*Id*. ¶¶ 134-135 (emphasis added).) Of the seven earnings announcements from the time of the first issuance of the Series D Preferred Stock through the Analysis Period, _none_ was followed by a statistically significant movement in the price of the Series D Preferred Stock. (*Id*.) (emphasis added). Importantly, Mr. Coffman tested the statistical significance of these earnings announcements and included the data in his backup materials. (*Id*. ¶ 132.) Mr. Coffman's decision to shorten his analysis period and exclude earnings announcements from his event study of the Series C and Series D Preferred Stock distorted the results in favor of Plaintiffs.

Finally, the entire methodology employed by Mr. Coffman – comparing earnings releases with "no news" days – is not supported by scientific literature. (*Id*. ¶¶ 157-160.)

Courts regularly exclude expert testimony where the expert employs unscientific or biased methodologies like Mr. Coffman has here. *See Ohio Pub. Employees*, 2018 WL 3861840, at *7 (excluding expert testimony where expert selected events knowing beforehand whether there was a significant price impact); *see also In re Northfield*, 267 F.R.D. at 548 (excluding testimony of expert who "made decisions about that study that tend to skew it toward a conclusion that the market was efficient"); *Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004) (excluding expert testimony where expert included dates that appeared "consciously chosen in order [to] artificially [...] support his hypothesis of efficiency").

### 3. Mr. Coffman's AutoCorrelation Analysis Supports the Conclusion that the Markets for Series C and Series D Stock Were Inefficient.

Mr. Coffman's autocorrelation analysis is unreliable and refutes his conclusion that the markets for the Series C and Series D Preferred Stock were efficient. An autocorrelation analysis measures the extent to which past returns on securities can be used to predict future returns. (Attari Report ¶ 161.) Mr. Coffman ran "the simplest possible" autocorrelation analysis, which only tests whether the abnormal returns for the Series C and Series D Preferred Stock can be predicted using the abnormal return from the day before – a test of the so-called weak-form efficiency which is not designed to establish semi-strong form efficiency as required. Mr. Coffman's test actually provides evidence against *weak form* efficiency. (*Id*. ¶¶ 164-166.) And, a market that is not *weak form* efficient by definition cannot be *semi-strong* form efficient. (*Id*.) Again, Mr. Coffman did no work to determine if abnormal returns from two or three days beforehand can predict the return on a market date. (*Id*.) Moreover, the results of his autocorrelation analysis show that the returns for the Series C and Series D Preferred Stock are correlated at a statistically significant level. (Corrected Coffman Report, ECF No. 121, Ex. 17-D). This is evidence that the markets for the Series C and Series D Preferred Stock were

*inefficient*. As discussed above, an expert's testimony is unreliable if his own data and results do not support his opinions and conclusions. *See In re Xcelera.com*, 2008 WL 7084626, at *1 (excluding market efficiency expert whose "theory [did] not match the facts").

      **C.**     **Mr. Coffman's Methodology For Calculating Damages Is Unreliable.**

Mr. Coffman's opinions that damages can be calculated on a class-wide basis are simply wrong. As Dr. Attari explains, in the circumstances of this case, damages cannot be calculated on a class-wide basis for either of the proposed classes.

      **1.**     **Mr. Coffman's Methodology Does Not Provide A Mechanism For Determining Which Investors in the Section 11 Class Suffered Damages.**

Mr. Coffman's opinion that damages for the proposed Section 11 Class can be calculated on a class-wide basis because the statutory damages formula renders the knowledge of the individual circumstances of each proposed class member irrelevant is simply wrong. (Corrected Coffman Report, ECF No. 121, ¶ 102.) In this case, where there were multiple offerings of the preferred stock at different initial offering prices, only some of which are at issue in the lawsuit, there is no way to calculate any investor's potential damages without knowing which offering that investor's shares came from, and there is in fact no way to determine which offering any individual investor's shares came from, as Dr. Attari has explained. (Attari Report ¶¶ 108-109.) Mr. Coffman's methodology provides no mechanism to calculate whether investors in the Section 11 class were actually damaged, and if so, by how much. His opinion that Section 11 damages are capable of being calculated on a class-wide basis, therefore, is unreliable.

      **2.**     **Mr. Coffman's Methodology Does Not Provide A Mechanism For Separating Low Risk and High Risk Investors in the Section 10(b) Class.**

Mr. Coffman's opinion that damages for the proposed Section 10(b) class can be calculated on a class-wide basis is also without scientific basis. His proposed methodology is not

capable of distinguishing between high- and low-risk investors, as it must, given that Plaintiffs are pursuing damages based on a "materialization of the risk" theory in this case.

There is no question that Plaintiffs are pursuing a "materialization of the risk" theory. As this Court previously found, "Plaintiffs primarily set forth a materialization of the risk theory, and assert that the risks concealed by that fraud, including by [defendant's] participation in it, leaked out, were revealed, and materialized." (ECF No. 76, Ct. Or., Aug. 2, 2018, at 6).

Where the plaintiffs invoke a "materialization of the risk" theory, any damages calculation must take into account the fact that potential class members have different risk tolerances. As Dr. Attari explains in his expert report, where liability is premised on a materialization of the risk theory, there are two types of investors for purposes of damages: (1) those with a lower risk tolerance who would not have invested in Miller Energy had the allegedly undisclosed risk been disclosed; and (2) those with a higher risk tolerance who may still have invested in Miller Energy had the risk been disclosed, but at a lower price. (Attari Report ¶ 207.) Although damages for the low risk investors theoretically could be calculated using an out-of-pocket approach, damages for the high risk investors could not. (*Id*.) Damages for high risk investors cannot be calculated based on Mr. Coffman's methodology. (*Id*.) Also, there is no way to distinguish between the two classes of investors without individual discovery of each class member, making class-wide damages calculations impossible. (*Id.*)

Mr. Coffman concedes that his methodology does not separate low risk and high risk investors in the Section 10(b) class. Mr. Coffman testified as follows:

> Q:     Does your damages methodology provide any mechanism for separating low risk investors from high risk investors?
>
> A:     No. I don't know why there would be a rationale to do that, but no.

App. C at 487.

In *Ludlow*, the Fifth Circuit excluded Mr. Coffman's testimony for exactly this reason. The plaintiffs in that case sought certification of two classes, one of which was a class of investors who purchased stock in BP before the Deepwater Horizon oil spill ("the Pre-Spill class"). *Ludlow*, 800 F.3d at 680. Plaintiffs alleged a materialization of the risk theory- that BP understated the risk of BP's safety procedures and ability to effectively respond to an oil spill, and when that risk materialized, BP's stock price dropped. *Id*. In support of their motion for class certification, the plaintiffs submitted a damages model by Mr. Coffman, which calculated damages using an out-of-pocket losses measurement. *Id*. at 683. As in this case, Mr. Coffman conducted an event study of BP's stock price during the Pre-Spill class period, and calculated the inflation caused by BP's misrepresentations. *Id*. at 683-684. The Fifth Circuit found "[t]he problem is that the Coffman model here does not provide any mechanism for separating these two classes of plaintiffs . . . it lumps together those who would have bought the stock at the heightened risk with those who would not have." *Id*. at 690-691.

Because Mr. Coffman's methodology cannot calculate damages attributable to Plaintiffs' materialization of the risk theory, his testimony is unreliable and must be excluded.

## IV. <u>AN EVIDENTIARY HEARING MAY BE HELPFUL TO THE COURT.</u>

KPMG respectfully requests that the Court hold an evidentiary hearing on the (lack of) reliability of Mr. Coffman's opinions. *See, e.g., Coffey v. Dowley Mfg., Inc*., 187 F. Supp. 2d 958 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (finding expert whose "pedigree is impressive," nonetheless not qualified as an expert following the court's testing of his methodologies at "helpful" and "necessary" *Daubert* hearing).

## CONCLUSION

For the foregoing reasons, the Court should grant KPMG LLP's Motion to Exclude the

Reports and Testimony of Chad Coffman.

Dated: May 21, 2019                    Respectfully submitted,

_/s/ Gregory Ballard_

**MCDERMOTT WILL & EMERY LLP**
Gregory G. Ballard (admitted pro hac vice)
Ludwig von Rigal (admitted pro hac vice)
340 Madison Avenue
New York, New York 10173
Telephone: +212-547-5330
Email: gballard@mwe.com
Email: lvonrigal@mwe.com

**WALLER LANSDEN DORTCH & DAVIS, LLP**
Paul S. Davidson (TN BPR # 011789)
Tera Rica Murdock (TN BPR #028153)
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: 615-244-6380
Email: paul.davidson@wallerlaw.com
Email: terarica.murdock@wallerlaw.com

**SIDLEY AUSTIN LLP**
Gary F. Bendinger (admitted pro hac vice)
787 Seventh Avenue
New York, New York 10019
Telephone: +1 212 839-5300
Email: gbendinger@sidley.com
Email: gballard@sidley.com

_Counsel for Defendant KPMG LLP_