# Appendix B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

---------------------------------------x

LEWIS COSBY, KENNETH R. MARTIN,

as beneficiary of the Kenneth Ray Martin

Roth IRA, and MARTIN WEAKLEY on

behalf of themselves and all others

similarly situated,

                  Plaintiffs,

          vs.              No. 3:16-cv-00121

KPMG, LLP,

                  Defendant.

---------------------------------------x

                  April 12, 2019

                  9:01 a.m.


      VIDEOTAPED DEPOSITION of CHAD COFFMAN, held

at the law offices of MCDERMOTT WILL & EMERY LLP,

340 Madison Avenue, New York, New York, before

Eleanor Greenhouse, a Shorthand Reporter and Notary

Public within and for the State of New York.

```
 1
 2  A P P E A R A N C E S:
 3  Attorneys for Plaintiffs:
 4  COHEN MILSTEIN SELLERS & TOLL PLLC
 5        88 Pine Street, 14th Floor
 6        New York, New York  10005
 7  BY:   LAURA H. POSNER, ESQ.
 8        lposner@cohenmilstein.com
 9
10  Attorneys for Defendant:
11  MCDERMOTT WILL & EMERY LLP
12        340 Madison Avenue
13        New York, New York  10173-1922
14  BY:   GREGORY BALLARD, ESQ.
15        gballard@mwe.com
16           - AND -
17  WALLER LANSDEN DORTCH & DAVIS, LLP
18        Nashville City Center
19        511 Union Street - Suite 2700
20        Nashville, Tennessee 37219
21  BY:   PAUL S. DAVIDSON
22        paul.davidson@wallerlaw.com
23  ALSO PRESENT:
24        Mukarram Attari, Charles River Associates
25        Allison Hart, Paralegal, McDermott Will & Emery
```

```
1                    C. Coffman
2            THE VIDEO TECHNICIAN:  This is the
3    video deposition of Chad Coffman in the
4    matter of Lewis Cosby et al. versus KPMG,
5    LLP.  This deposition is being held at
6    McDermott Will & Emery LLP on April 12, 2019
7    at 9:01:00 a.m.
8            My name is Darrak Lighty from Reporters
9    Central and I'm the video specialist.  The
10   court reporter today is Eleanor Greenhouse,
11   also associated with Reporters Central.
12           Counsel will now state their
13   appearances for the record.
14           MS. POSNER:  Laura Posner, Cohen
15   Milstein, Sellers & Toll PLLC, for the
16   Plaintiff.
17           MR. BALLARD:  I'm Greg Ballard, from
18   McDermott Will & Emery, for KPMG, LLP.  I
19   have Allison Hart, a paralegal here, also
20   from McDermott, with me.
21           MR. ATTARI:  Mukarram Attari, Charles
22   River Associates.
23           MR. DAVIDSON:  Paul Davidson, Waller
24   Lansden, on behalf of KPMG.
25           THE VIDEO TECHNICIAN:  Will the court
```

1                    C. Coffman

2          reporter please swear in the witness.

3    C H A D   C O F F M A N, called as a witness,

4          having been duly sworn by a Notary Public,

5          was examined and testified as follows:

6                    (Exhibit 25, March 15, 2019 expert

7          report of Chad Coffman, marked for

8          identification, as of this date.)

9    EXAMINATION BY

10   MR. BALLARD:

11        Q.    I'm handing you Exhibit 25.  What is

12   Exhibit 25?

13        A.    This appears to be a copy of the report

14   I prepared and submitted in this matter.

15        Q.    Did you sign this report on March 15,

16   2019?

17        A.    Yes.

18        Q.    Does Exhibit 25 contain a complete and

19   accurate statement of your opinions as you hold

20   them today in this matter?

21        A.    Yes.  It summarizes the opinions, the

22   overarching opinions I've reached.  Within the

23   report there are a lot of sub-opinions as well, and

24   obviously my background and experience contributed

25   in a lot of ways to some of the analyses, but the

C. Coffman

summary of the opinions is certainly contained in
the report.

    Q.   Did you prepare this report?

    A.   I did.  I had -- I directed the
preparation of the report.  I had assistance from
staff members of my firm.

    Q.   You had assistance but ultimately it's
your opinion and your report?

    A.   Absolutely, yes.

    Q.   Did you attempt to include in this
report a complete statement of all opinions you
will express in this matter and the basis and
reasons for them?

    MS. POSNER:  Objection.  As to class
certification?

    MR. BALLARD:  As to class certification,
yes.

    A.   I expressed opinions on the questions I
was asked, and I haven't been asked any additional
questions outside the scope of this in terms of
opinions I'm being asked to form.

    Q.   As to the opinions you've been asked to
form, did you --

    A.   Or asked to answer, sorry.  Questions

C. Coffman

1 
2 I've been asked to answer.
3      Q.    As to the questions you were asked to
4 answer, does Exhibit 25 contain a complete
5 statement of the opinions that you developed?
6      A.    I believe it does, yes.
7      Q.    Does it contain the bases and the
8 reasons for those opinions?
9      A.    Yes, it does.  Again, there may be some
10 elements of my experience and knowledge that I have
11 not committed to the four corners of this report,
12 but I believe it summarizes all of the analyses I
13 performed and the logic I'm using to reach the
14 opinions.
15      Q.    You did your best to comply with the
16 Federal Rules requirement that this report contains
17 a complete statement of all opinions you will
18 express and the bases and reasons for them as to
19 class cert; correct?
20      A.    Yes, absolutely.
21      Q.    Did you include in this report the
22 facts and data you considered in formulating these
23 opinions?
24      A.    I believe the results of any analyses I
25 performed are summarized in the report.  I believe

C. Coffman

1
2 there was a host of backup material that was
3 created that's not in the report per se, but that
4 supports the report, I believe.  I actually don't
5 recall if that material was asked for or produced,
6 but there is backup material that is not explicitly
7 in the report.
8          Q.    Does this report contain the exhibits
9 or any exhibits that you would use to support your
10 opinions?
11          A.    Based on what I know right now, yes.
12          Q.    It contains your qualifications as
13 well?
14          A.    It does, yes.
15          Q.    Did you list all of the publications
16 that you have made in the last ten years in your
17 report?
18          A.    Yes.
19          Q.    I'd like you to turn to page 3 of
20 Exhibit 25 and I'll direct your attention to the
21 first paragraph of your report.  Do you have that?
22          A.    Yes.
23          Q.    In this paragraph, you indicate that
24 you were asked by counsel for the plaintiffs to
25 examine and opine on whether the markets for Miller

C. Coffman

1
2     Energy Resources, Inc.'s publicly traded securities
3     were efficient during the period from August 29,
4     2011, through July 30, 2015, inclusive, and you
5     defined that as the analysis period; right?
6          A.    Yes.
7          Q.    Why was the analysis period different
8     from the originally proposed time period in this
9     case, do you know?
10               MS. POSNER:  Objection.  I think it
11          calls for attorney-client privileged
12          communications.
13          A.    I don't know all the reasons that
14     counsel asked me to analyze that particular period.
15          Q.    So this was a period that was given to
16     you and you were just asked to opine on that, you
17     didn't determine what the period would be; is that
18     fair?
19          A.    I ultimately did not determine the
20     period that was used.  I believe there was some
21     discussion ahead of my starting work about using
22     this period versus the full class period, but
23     again, I wasn't the one that ultimately made the
24     decision, so I don't know all the different reasons
25     that were used.

C. Coffman

1

2      Q.      Is it your understanding that the

3 analysis period that you examined is now the class

4 period that is being proposed in the case?

5      A.      I don't know that for sure.

6      Q.      You were asked to examine whether the

7 market was efficient for three separate securities;

8 is that right?

9      A.      That's right.

10      Q.      The common stock was one, the 10.75

11 percent C series preferred stock was another, and

12 the 10.5 percent D series preferred stock was the

13 third; is that right?

14      A.      That's correct, yes.

15      Q.      Did you examine each of those three

16 securities as to whether the market for the trading

17 was efficient?

18      A.      Yes.

19      Q.      Each of those three securities was, in

20 fact, a separate security with a separate CUSIP

21 number; is that right?

22      A.      Yes, that's my understanding.

23      Q.      Each traded separately; is that right?

24      A.      In the way I think about it, yes.

25      Q.      And each of the three securities at

C. Coffman

1

2    issue, the common stock, the Series C and the

3    Series D, traded at different prices through the

4    analysis period; is that right?

5         A.    That's fair, yes.

6         Q.    Because they're different securities?

7         A.    Yes.

8         Q.    And each of the three securities had

9    its own unique characteristics; is that fair?

10              MS. POSNER:  Objection.

11        A.    Yes.

12        Q.    You, in fact, described some of those

13   in the appendices to your report where you listed

14   some of the characteristics of the C series and the

15   D series; is that right?

16        A.    Yes.

17        Q.    Would it be possible for a company's

18   common stock to trade in an efficient market while

19   its preferred stock does not?

20              MS. POSNER:  Objection.

21        A.    Yes.

22        Q.    So you have to evaluate each of the

23   securities to determine whether the market for that

24   security was efficient?

25        A.    Yes.  I mean, you can learn

C. Coffman

something -- I don't think that it's absolutely
independent.  In other words, if a number of
factors point towards efficiency for all the
securities and one security is -- you know, has
even additional evidence that it trades efficiently
and the prices are moving how you would expect them
to in terms of consistency across markets, that
might provide some additional evidence of
efficiency, but ultimately, the way I approach a
problem is to analyze each of them separately.

    Q.    So if you're examining whether the
market for a particular security of a company is
efficient and you determine that it is, and then
you were asked to determine whether the market for
another of that company's security was efficient,
you might consider the work you had already done,
but what you had concluded with respect to the
first security would not, standing alone, be enough
for you to conclude that the second security is
trading in an efficient market; is that fair?

    MS. POSNER:  Objection.

    A.    I think that's fair in most
circumstances.  I can think of securities like
tracking stocks or things like that where they move

                        C. Coffman

1
2   almost in tandem where you might not need to do a
3   whole lot, but yes, that's generally true.
4        Q.    So at least for the three securities
5   you looked at here, it's true you would have to
6   look at each one separately?
7        A.    Yes, and that's what I did.
8        Q.    In paragraph 2 of your report, you
9   indicate that you have been asked to opine on
10  whether calculating damages in this matter is
11  subject to a common methodology under Section 11
12  and under Section 12; right?
13       A.    No.
14             MS. POSNER:  Objection.
15       Q.    I'm sorry -- let me restate that.  I
16  was wrong.
17             In paragraph 2, you indicate that you
18  were asked to opine on whether it is possible to
19  subject damages calculations to a common
20  methodology under Section 10(b) of the Securities
21  and Exchange Act and Section 11 of the Securities
22  Act; is that correct?
23       A.    Yes.
24       Q.    So basically you were asked for
25  opinions on two questions, one on market

1              C. Coffman

2   efficiency, and two on whether damages are capable

3   of class-wide determination?

4            MS. POSNER:  Objection.

5        A.    Yes, I believe that's a fair summary.

6        Q.    Have you been asked for opinions on any

7   other topics beyond those two?

8        A.    No.

9        Q.    Have you formulated any opinions on any

10  topics other than those two?

11       A.    No.

12       Q.    As for the opinion on damages -- well,

13  let me rephrase that.  You're not giving an opinion

14  on damages, right, you're giving an opinion on

15  whether it would be possible to determine damages

16  on a class-wide basis; right?

17       A.    That's correct, yes.  If by the first

18  question, you mean have I quantified damages, the

19  answer is no.

20       Q.    When you were asked this question

21  whether calculating damages is subject to common

22  methodology, did you treat that question as a

23  matter of economics or a question of law or

24  something else?

25       A.    Economics and experience in these types

1                           C. Coffman

2  of matters, but it's ultimately an economic

3  question.

4       Q.    Were you asked to calculate damages in

5  this case?

6       A.    In terms of forming an opinion to

7  calculate damages?

8       Q.    Yes.

9       A.    No.

10      Q.    Did you attempt to calculate damages in

11 this case?

12      A.    No, I have not attempted to do

13 calculate damages in this case.

14      Q.    So you have not, as of today, actually

15 calculated the damages for any of the claims in

16 this case?

17      A.    That's correct.

18      Q.    So you were asked to opine only on

19 whether it might be possible to calculate damages

20 in this case; is that fair?

21      A.    I don't know about the word "might."

22      Q.    Let me rephrase it.

23      A.    Yes.

24      Q.    You were asked only whether it is

25 possible to calculate damages in this case?

```
1                      C. Coffman
2             MS. POSNER:  Objection.
3       Q.    Is that fair?
4       A.    I guess I prefer the wording that is
5  here, whether there is a common methodology that
6  allows calculation of damages for the entire class.
7       Q.    I see.  So you were asked only whether
8  there's a common methodology for calculating
9  damages.  You were not asked whether it's possible
10 and you were not asked to actually do it; is that
11 fair?
12      A.    Well, I think --
13            MS. POSNER:  Objection.
14      A.    -- in ascertaining whether there's a
15 common methodology, I was entertaining the
16 question, is this case, like the dozens or even
17 hundreds of others I've come across in my career in
18 which I've been asked to perform damages
19 calculations, is there anything specific in this
20 case that implies that the methodology that is used
21 in virtually every case, the out-of-pocket
22 methodology, that for some reason it's -- it
23 wouldn't make sense in this case.
24            So in my mind, I was being asked is it
25 possible to calculate damages in this case and so I
```

1                         C. Coffman

2   believe the answer to that is yes and I believe I'm

3   giving that opinion.

4        Q.    So you are in a sense giving an opinion

5   as to whether it's possible to calculate damages,

6   you just haven't done it yet?

7        A.    Correct.

8        Q.    Do you know if you are going to be

9   asked to calculate damages in this case?

10       A.    I don't know.

11       Q.    So at this point you're basically

12  saying, "I haven't done it yet, I haven't tried to

13  do it yet, but trust me, I could do it if you asked

14  me to"?

15            MS. POSNER:  Objection.

16       A.    I don't know that I'm saying trust me.

17  I'm saying based on my reading of the complaint and

18  understanding of plaintiffs' allegations and the

19  nature of plaintiffs' allegations and the nature of

20  what is laid out there and my discussions with

21  plaintiffs' counsel, that this case looks like, in

22  its core features, dozens of other cases in which

23  I've been engaged to evaluate and compute damages.

24            And in all those cases, virtually all

25  those cases, the damages were being calculated on

C. Coffman

the out-of-pocket methodology that I described in
this report and I see no reason, as a matter of
economics, that that methodology wouldn't apply in
this case.

Q.    So in your view, there's nothing unique
about this case that would make that common
methodology referred to inapplicable?

A.    That's correct.

Q.    You mentioned dozens of cases where
you've been engaged to compute damages.  Did I hear
that right?

A.    Yes.  I think I said dozens or even
more than 100 or something to that effect.

Q.    It's a bunch?

A.    It's a lot, yes.

Q.    Over a long period of time?

A.    Yes.

Q.    When was the first time, just roughly,
when you were engaged to calculate damages in a
securities class action?

A.    It probably would have been -- I don't
know an exact time, but it probably would have been
around 1997 or 1998.  I was not a testifying expert
then, but I was a consulting expert that was

                        C. Coffman

1   working with a party in a class action securities

2   case and I was attempting to compute damages under

3   a number of different scenarios.

4       Q.    Do you recall when you were first

5   engaged as a testifying expert on damages in a

6   class action securities case roughly?

7       A.    Probably around 2008 or 2009.

8       Q.    So you've had a lot of experience both

9   as a consulting and as a testifying expert on the

10  topic of damages?

11      A.    In class action securities cases, yes.

12      Q.    And have you used the same methodology

13  in all of those matters?

14      A.    No.

15      Q.    What is the most common methodology

16  you've used in these matters?

17      A.    The out-of-pocket methodology that I

18  described.  There were a couple of cases with

19  unique circumstances or unique legal theories that

20  were being put forth and I calculated damages under

21  a couple of different scenarios where it was not

22  the out-of-pocket methodology, but the vast, vast

23  majority, almost exclusively, it's on the

24  out-of-pocket methodology.

C. Coffman

Q.    So really there's only been a couple of
cases where you used a different methodology?

A.    Again, I can -- I think that's fair,
yes.

Q.    Do you remember the names of any of
those cases?

A.    In the DVI matter, I put forth two
different methodologies, the traditional
out-of-pocket methodology based on an event study,
and then a model I referred to as the insolvency
model which I guess still falls under the idea of
an out-of-pocket methodology, but it was -- did not
employ the usual event study approach to
ascertaining what the inflation was.

       And then in the BP matter, there was a
legal theory being put forward that deviated from
the out-of-pocket methodology.

Q.    What was that method that deviated from
the out-of-pocket?

A.    Well in that particular case, there
were two separate classes.  There was a post-oil
spill class that used the standard out-of-pocket
methodology, and then there was a pre-spill class
where the allegation or the legal theory being put

C. Coffman

forward was that investors could recover for losses
suffered as a result of the oil spill even though
had the full truth of what was alleged to have been
misleading was not -- if that had been disclosed
prior to the oil spill, it was clear that the stock
price wouldn't have reacted as it did after the oil
spill, but that plaintiffs' legal theory in that
case was that they were entitled to the full drop
even after the oil spill.

    Q.    The class was certified for the
post-spill class and was not certified for the
pre-spill class; is that right?

    A.    That's right.

    Q.    And your opinion was rejected in
connection with the pre-spill class; correct?

    A.    Well, my opinion was -- again, I think
it's a little more complex than that.  My -- I was
engaged to opine on the appropriate method of
damages under their legal theory and that legal
theory was rejected, so I -- you know, the method I
was proposing for calculating damages was not
accepted, yes.  The class was not certified.

    Q.    And in the DVI case, your opinions were
challenged in that case as well.  Do you recall the

1                           C. Coffman

2    outcome of that?

3          A.    I believe the more traditional

4    out-of-pocket methodology, the class was certified,

5    and with the exception of certain corrective

6    disclosures which were ruled that both I and the

7    defense expert could not opine with regard to

8    damages on certain corrective -- some small

9    minority of the corrective disclosures, the

10   insolvency theory was ruled to not sufficiently fit

11   with the law, and so I was prevented from

12   testifying about that particular theory.

13         Q.    So have you -- I know you've expressed

14   an opinion in this case on your conclusion that a

15   common methodology is available.  Have you

16   evaluated whether it would, in fact, be necessary

17   to turn to an alternative method of computing

18   damages if you were asked to actually compute

19   damages in this case?

20              MS. POSNER:  Objection.

21         A.    I have not entertained or been involved

22   in any discussions that would suggest that anything

23   other than the standard out-of-pocket methodology

24   is what is being sought in this case.

25              In other words, the complaint alleges

C. Coffman

1
2    an artificially inflated price of the securities.
3    It alleges that there were corrective disclosures.
4    It's not alleging any theory of damages outside of
5    what I can see is the out-of-pocket method, and in
6    my discussions with counsel leading to my opinions,
7    in which we discuss damages broadly, my
8    understanding is they're not pursuing anything
9    other than the standard out-of-pocket methodology.
10        Q.    What is your understanding of the
11    damages theory in this case?
12            MS. POSNER:  Objection.
13        A.    That investors paid artificially
14    inflated prices as the result of KPMG's alleged
15    misstatements, and that ultimately that artificial
16    inflation came out of the stock through a series of
17    partial corrective disclosures.
18        Q.    Do you understand that the plaintiffs
19    have alleged a materialization of risk theory?
20        A.    I know that language is in the
21    complaint.  I don't pretend to know all the legal
22    in's and out's of what that might mean, but I don't
23    read it to mean anything other than the application
24    of the out-of-pocket methodology.
25        Q.    What is your understanding of the

```
 1                    C. Coffman
 2  materialization of risk theory?
 3           MS. POSNER:  Objection.
 4      A.    I've seen it used in multiple ways so
 5  that's why I don't put a lot of stock in -- when I
 6  actually see those words, what, you know, is
 7  intended from a legal perspective.
 8           What I, from an economic perspective,
 9  what I understand is that there is a theory that
10  what materialized later was within the realization
11  of a risk that had either not been disclosed or
12  insufficiently disclosed in the past.  I've also
13  seen it referred to as something different than the
14  out-of-pocket methodology, and I've seen that
15  language used in a sort of -- used in a lot of
16  loose ways as well, so I don't -- when I see that
17  language, I don't ascribe any particular economic
18  meaning to it.
19      Q.    You recall that the plaintiffs in the
20  BP case had a materialization of risk theory for
21  their pre-spill class claim; correct?
22      A.    Correct, and that's what I was talking
23  about in terms of in that particular case, when
24  they referred to the materialization of the risk
25  theory, they were talking about one that clearly
```

C. Coffman

1   deviated from the out-of-pocket methodology.

2

3        Q.     Why do you say that?

4        A.     Because as I made clear in my opinions

5   in that case, I was not attempting to quantify what

6   the "but for" stock price would have been but for

7   the misstatements in the pre-spill period.

8              In that particular case, there were

9   claims that BP had insufficiently disclosed its

10  safety profile and I clearly opined in that case

11  that had BP disclosed some of the issues with its

12  safety profile that plaintiffs were alleging were

13  unknown to the market before the spill, clearly the

14  stock price would have declined to some degree, but

15  there was no way it was going to decline to the

16  degree that you actually saw after the spill had

17  already occurred.

18             But yet plaintiffs were alleging that

19  they were entitled to the financial losses even for

20  those purchasers that occurred as a result of the

21  spill and further disclosures after that.  So they

22  were attempting to collect damages over and above

23  the difference between the observed price in the

24  market and what would have been the alternative

25  price had full disclosure been made prior to the

1                        C. Coffman

2  spill.

3       Q.    Did you read what the 5th Circuit had

4  to say about the pre-spill class in its opinion in

5  that case?

6       A.    I may have at some point.  I don't have

7  in mind right now what was said.

8       Q.    Do you remember agreeing or disagreeing

9  with anything you read from what the 5th Circuit

10  said about that, the pre-spill class?

11      A.    I don't recall specifically what the

12  5th Circuit said.

13      Q.    And you don't remember why the 5th

14  Circuit said that your methodology wouldn't work?

15           MS. POSNER:  Objection.

16      A.    Well, I recall reading the opinion of

17  the District Court judge.  I don't know if you're

18  talking about --

19      Q.    The 5th Circuit on appeal.  Let me

20  rephrase the question.  You don't remember anything

21  that the 5th Circuit had to say about why your

22  methodology for the pre-spill class was not

23  appropriate?

24      A.    As I sit here right now, I don't recall

25  reading that.  I may have at some point.

                        C. Coffman

1

2       Q.      In your report, at paragraph 3, you

3  indicate you're getting paid at an hourly rate of

4  $800 per hour.  Is that your current standard rate?

5       A.      For new matters, yes.

6       Q.      And you give rates for the other folks

7  who work on your team.  How many people are working

8  on this matter on your team?

9       A.      There are three primary people I recall

10 working directly on this.  They may have delegated

11 certain work to other folks, but there were three

12 people I interacted with in preparing this report.

13      Q.      Do you have a sense of how many hours

14 in total have been put in on the project so far?

15      A.      I don't.

16      Q.      Do you have a sense of how many dollars

17 have been billed or accrued to date on the project?

18      A.      I don't know that number specifically,

19 no.

20      Q.      How much time have you spent on it?

21      A.      Again, I don't know a specific number

22 of hours, but I can try to a rough estimate, but I

23 don't have a specific amount.

24      Q.      Do you have a rough estimate of the

25 number of hours that you put in on the matter so

                         C. Coffman

1  far?

2      A.    More than 20, probably more than 30,

3  less than 100, would be my best guess.

4      Q.    And do you have any rough estimate of

5  how much time the other folks on your team have put

6  in?

7      A.    Just based on the amount of work

8  involved, certainly more than 100 but beyond that,

9  I don't know.  We obviously have records that

10  reflect that, but I don't know.

11     Q.    You indicate that your compensation is

12  in no way contingent on the outcome of this case.

13  How do you bill your time?

14     A.    By the hour.

15     Q.    And then how do you bill or invoice

16  your client in this case?

17     A.    Like all our other clients, we prepare

18  monthly invoices sometime after the close of each

19  month and send it to the client.

20     Q.    So you're paid as you go, you don't

21  wait until the end?

22     A.    That's correct.

23     Q.    Do you know how much you billed to

24  date?

```
 1                         C. Coffman
 2        A.     I don't.
 3        Q.     Do you have an expectation of how much
 4   you will bill in this case?
 5        A.     No.
 6        Q.     I want to go back to something you said
 7   earlier about the dozens of cases that you were
 8   involved on damages issues.  Have you been employed
 9   by plaintiffs and defendants in those cases?
10        A.     Yes.  I've been actually engaged by a
11   number of different types of parties, so I've been
12   engaged by plaintiffs, I've been engaged by
13   defendants, I've been engaged by D&O insurers for
14   defendants, and I've been engaged by neutrals that
15   are trying to resolve these cases to evaluate the
16   work, the damages work, on both sides of the case.
17        Q.     Are you working on any matters for a
18   defendant in a class action securities case at the
19   moment?
20        A.     Not at the moment, no.
21        Q.     If you go back, say, the last five
22   years, have you worked for a defendant in a class
23   action securities litigation in that time period?
24        A.     Yes.
25        Q.     Roughly what is the next -- how often
```

                         C. Coffman

1
2   do you represent plaintiffs versus defendants?

3          A.    I don't represent anyone.

4          Q.    That's a good point.  Let me rephrase

5   that question.  What is the rough mix in terms of

6   who engages you, how often it's plaintiffs and how

7   often it's defendants?

8          A.    In class action securities cases, it's

9   varied substantially over time.  Currently it's

10  primarily plaintiffs, the vast majority is

11  plaintiffs.  Over the whole scope of my career,

12  it's more of a mix.

13         Q.    At present the vast majority of your --

14  can I call them clients?

15         A.    Clients, yes.

16         Q.    At present the vast majority of your

17  clients are plaintiffs' counsel; is that fair?

18               MS. POSNER:  Objection.

19         A.    In class action securities cases that's

20  fair, yes.  There are other types of work in cases

21  I perform where I work for defendants more often.

22         Q.    I'd like you to turn to paragraph 7 of

23  your report.  There's a heading, "Summary of

24  Opinions."  Do you have that?

25         A.    Yes.

C. Coffman

1

2      Q.      In paragraph 7, you indicate that you

3   have formed the opinion that the markets for Miller

4   Energy securities were efficient during the

5   analysis period.  Do you see that?

6      A.      Yes.

7      Q.      And you are referring to each of the

8   three securities you looked at here; right?

9      A.      Yeah.  When I use the capitalized term

10  "Miller Energy Securities," I think I defined that

11  earlier as the three securities we were talking

12  about.

13     Q.      And for ease of reference today, can we

14  call them the common stock, the Series C preferred,

15  and the Series D preferred?

16     A.      That's fine, yes.

17     Q.      And we will all know what we're talking

18  about?

19     A.      Yes.

20     Q.      Is it your opinion that the market for

21  Miller Energy's common stock was efficient through

22  the entirety of the analysis period?

23     A.      Yes.

24     Q.      Is it your opinion that the market for

25  the Series C preferred stock was efficient for the

1                           C. Coffman
2    entirety of the analysis period?
3        A.    Yes.
4        Q.    Is it your opinion --
5        A.    Well, let me take a step back.  The
6    Series C wasn't issued until sometime in the middle
7    of the analysis period, so from the time it was
8    issued to the end of the analysis period, yes.
9        Q.    As to the Series D securities, is it
10   your opinion that the market for those securities
11   was efficient from the time they were issued
12   through the end of the analysis period?
13       A.    Yes.
14       Q.    Each of those three securities had its
15   own ticker symbol; right?
16       A.    Yes.
17       Q.    And they were traded on the New York
18   Stock Exchange?
19       A.    That was their primary listing, yes.
20       Q.    Is it your opinion that --
21       A.    I think -- yes is the answer.
22       Q.    Is it your opinion that any security
23   that trades on the New York Stock Exchange trades
24   in an efficient market?
25       A.    I think that makes it highly likely,

1                    C. Coffman
2   but that, in and of itself, doesn't convince me,
3   no.
4          Q.    So the fact that a security trades on
5   the New York Stock Exchange, standing alone,
6   wouldn't be enough for you to conclude that the
7   market was efficient?
8          A.    I think that's fair, yes.  I would want
9   to look at more data beyond just that.
10         Q.    Let me direct your attention to
11  paragraph 12 of your report.  You write,
12  "Plaintiffs' complaint alleges that KPMG issued
13  false and misleading statements and omitted
14  material information during the analysis period."
15               Do you see that?
16         A.    Yes.
17         Q.    In this sentence, you're describing an
18  allegation of the complaint; right?
19         A.    Yes.
20         Q.    You have no knowledge as to whether it
21  is true or false as a matter of fact; is that
22  right?
23         A.    That's correct.
24         Q.    And you have no expert opinion on that
25  as well; right?

```
 1                         C. Coffman
 2              MS. POSNER:  As to whether KPMG issued
 3        false and --
 4        Q.    I'll rephrase it.  Do you have an
 5   expert opinion as to whether KPMG issued false and
 6   misleading statements and omitted material
 7   information during the analysis period?
 8        A.    No.
 9        Q.    For bonds that are traded on the New
10   York Stock Exchange, first of all, there are bonds
11   traded on the New York Stock Exchange; right?
12        A.    I believe there are some at least, yes.
13        Q.    Are they likely to trade in an
14   efficient market by virtue of the fact that they
15   are traded on the New York Stock Exchange?
16              MS. POSNER:  Objection.
17        A.    Can I have that read back, please.
18              (Record read.)
19        A.    I don't know.  That's not something
20   that I have explicitly evaluated.
21        Q.    In paragraph 12 of your opinion, you
22   refer to the allegation that the prices of Miller
23   Energy securities were artificially inflated and
24   the plaintiffs were damaged.  Do you see that?
25        A.    Yes.
```

C. Coffman

1

2      Q.     Do you have an opinion on whether the

3   prices of Miller Energy securities were inflated?

4      A.     No.  I understand that's what is being

5   alleged, but I do not -- have not formed an opinion

6   on that.

7      Q.     Do you have an opinion on whether

8   plaintiffs were damaged?

9      A.     No.  I'm not offering that opinion at

10  this time, no.

11     Q.     You said you're not offering that

12  opinion at this time.  Have you formulated an

13  opinion at this time?

14     A.     No.

15     Q.     In paragraph 13, there's a reference

16  again, I think it's to an allegation, that Miller

17  Energy vastly overstated the value of Miller

18  Energy's assets in Alaska; do you see that?

19     A.     That's part of what that sentence says,

20  yeah.  There's more in the middle there but it --

21  part of that sentence is that Miller Energy's

22  annual financial statements for fiscal years 2011

23  through 2014 vastly overstated the value of Miller

24  Energy's assets in Alaska.

25     Q.     And that sentence is referring to an

```
1                      C. Coffman
2   allegation of the complaint; right?
3        A.    Yes.
4        Q.    You have no opinion on whether it's
5   true or false; correct?
6        A.    That's correct.
7        Q.    And you have no expert opinion on that
8   question as well; right?
9        A.    That's correct.
10        Q.    Have you formulated any opinion on the
11   value of the Alaska Assets?
12        A.    No.
13        Q.    Have you done any analysis of the value
14   of the Alaska Assets?
15        A.    No.
16        Q.    Have you formulated any opinion on the
17   fair value of any assets or liabilities at issue in
18   this case?
19        A.    Let me take a step back.  Obviously
20   embedded within the prices of what I've analyzed
21   are at least the market's assessment, based on the
22   information available, of what the assets are.  So
23   I don't want to say that my opinions are completely
24   divorced of at least what the market's beliefs were
25   about the value of the Alaska Assets, but if you're
```

1                         C. Coffman

2 asking me have I performed my own fair value

3 valuation of the assets, themselves, the answer is

4 no.

5       Q.    You're not an expert on generally

6 accepted accounting principles, are you?

7       A.    I think I'm more generally familiar

8 with those principles than a lay person off the

9 street in terms of my experience and education, but

10 I don't hold myself out as somebody who testifies

11 as an expert about the application of GAAP, no.

12      Q.    Are you a CPA?

13      A.    I am not, no.

14      Q.    Are you an expert on generally accepted

15 auditing standards?

16      A.    Again, I probably have more than a lay

17 person's understanding of it than somebody walking

18 on the street, as a result of my background and

19 education and experience, but I do not hold myself

20 out as a testifying expert in that area or somebody

21 who gives expert opinions in that area.

22      Q.    Are you an expert on PCAOB standards?

23      A.    No.

24      Q.    So you're not giving or you're not

25 proposing to give any opinions in this matter on

```
 1                    C. Coffman
 2  GAAS or GAAP or PCAOB standards; is that fair?
 3       A.    No.
 4       Q.    You're not --
 5       A.    I mean, that's not what I've been asked
 6  to form an opinion on, but no, that's not my
 7  understanding of what my role in this case would
 8  ever be.
 9       Q.    And you haven't been asked to evaluate
10  whether KPMG's audits were in compliance with
11  professional standards?
12       A.    That's correct.
13       Q.    In your report on page 6, in Footnote
14  3, there's a reference to several Form 10-K's
15  issued by Miller Energy; do you see that?
16       A.    I do.
17       Q.    And it looks like there is a Form 10-K
18  listed here for 2011, 2012, 2013 and 2014.  Do you
19  see those?
20       A.    Yes.
21       Q.    And when I refer to the year, you
22  understand that Miller Energy's fiscal year ended
23  on April 30; right?
24       A.    Yes.
25       Q.    So if I refer to the fiscal year 2011,
```

C. Coffman

1
2   you'll understand that to refer to the year that
3   ended April 30, 2011?
4        A.    That's my understanding, yes.
5        Q.    Was that the way you would refer to it?
6   I just want to make sure we're talking about the
7   same years when we talk about these things.
8        A.    It is.  The only reason I hesitated is
9   there are some companies that have very strange
10  naming of their fiscal years and whether the one
11  ending April 30, 2011 is what they call 2011 or
12  2010, that's the detail I'm completely remembering,
13  but I'm fine in this deposition referring to it the
14  way you referred to it.
15       Q.    We can all try to make sure we're clear
16  on what we're talking about.  I think that will be
17  fine.
18            So there are four annual reports on
19  Form 10-K that are referenced in Footnote 3 of your
20  report; right?
21       A.    Yes.
22       Q.    Have you formulated any opinion on
23  whether those financial statements contained
24  material misstatements or omissions?
25       A.    No.

1                        C. Coffman

2        Q.    Have you formed any opinion as to

3  whether those financial statements were misstated

4  in any way?

5        A.    No.

6        Q.    Have you formulated any opinion as to

7  whether KPMG's audit opinions included in Miller

8  Energy's filings were misstated in any way?

9        A.    No.

10       Q.    Let's turn to paragraph 15 of your

11 report on page 8.

12       A.    Okay.

13       Q.    In this paragraph you refer to the

14 Supreme Court decision Halliburton II?

15       A.    Yes.

16       Q.    Have you read that opinion?

17       A.    Yes.

18       Q.    You're aware of the comments the

19 Supreme Court made about the efficient market

20 theory; correct?

21            MS. POSNER:  Objection.

22       A.    Yes.  That's part of what -- I believe

23 there may be additional statements made, but that's

24 what I'm quoting.  Part of it is what I'm quoting

25 here, yes.

1                    C. Coffman

2        Q.    And it's your understanding that in

3   certain circumstances, plaintiffs may be allowed to

4   invoke a presumption of reliance; is that right?

5             MS. POSNER:  Objection.

6        A.    That's my understanding, yes.

7        Q.    And is it your understanding that that

8   presumption is rebuttable?

9             MS. POSNER:  Objection.

10       A.    I mean, that's my general

11  understanding, yes.  I mean, I'm not a lawyer but

12  that's what I generally understand, yes.

13       Q.    The Supreme Court said so in

14  Halliburton II; right?

15            MS. POSNER:  Objection.  He's not an

16       attorney.

17            MR. BALLARD:  That's okay.  You can

18       answer.

19       Q.    You're quoting a Supreme Court decision

20  in your opinion; right?

21       A.    I am.  As I sit here, I just don't

22  recall all that I said about the ability to rebut

23  it, but yes, my general understanding is that the

24  defendants -- based on my experience in these types

25  of cases, that defendants have the ability to try

                              C. Coffman

to rebut the presumption of reliance.

        Q.    Have you been asked to evaluate whether
the presumption of reliance or any presumptions of
reliance that might be applicable in this case is
rebuttable?

        A.    That's not the nature of the work I
performed in this case, no.

        Q.    Have you formulated any opinion as to
whether the presumption of reliance, if it applies
in this case, is rebuttable?

        A.    I don't know what -- all you might mean
by rebuttable.  I've formed the opinion that the
market was efficient which I understand is related
to that topic, but whether there's -- what the
contours of how or for what reasons defendants
might be able to rebut that presumption is not
something I've looked at.

        Q.    So as of today, you have no opinion on
that topic?

              MS. POSNER:  Objection.

        A.    Again, to the extent it turns on the
efficiency of the market, I believe I do, but to
the extent it turns on something outside of that,
I'm not opining on that one way or the other.

C. Coffman

1

2      Q.      Let's turn to page 9 of your report.
3  So we're in Exhibit 25 at paragraph 18.  Do you
4  have that in front of you?

5      A.      Yes.

6      Q.      In the middle of that paragraph, you
7  refer to the semi-strong form of efficiency.  Do
8  you see that?

9      A.      Yes.

10     Q.      You write, "Semi-strong form efficiency
11 implies that all publicly available information is
12 reflected in a security's current market price.
13 This implies that security prices adjust to new
14 publicly available information rapidly and in an
15 unbiased fashion so that it is impossible to earn
16 excess returns by trading on that information."

17             Do you see that?

18     A.      I see that, yes.

19     Q.      Can you explain what you meant by that?

20     A.      Well, again, this is describing a
21 theoretical construct of what it means for a market
22 to be semi-strong form efficient, that the market
23 prices reflect all widely available information
24 that is available to investors.  And so I'm
25 describing here how the basic decision and the

C. Coffman

1
2  Halliburton II decision are talking about what I
3  understand to be that particular economic
4  theoretical construct of semi-strong form market
5  efficiency.
6       Q.    So then when you do your analysis in
7  this case, is that the type of efficiency you're
8  essentially looking at or looking for?
9            MS. POSNER:  Objection.
10      A.    That's correct, and again, I think it's
11 important to keep in mind that while Dr. Fama, who
12 I describe, his theories in here laid out what
13 theoretical market efficiency is, I also describe
14 in here how efficiency exists on a continuum, and
15 so I'm not evaluating whether it's perfectly
16 semi-strong form efficiency, but whether or not
17 that's a reasonable assumption to make that it
18 trades in a semi-strong form efficient market.
19      Q.    And in your view it's an empirical
20 exercise?
21      A.    To evaluate that, yes.
22      Q.    So you do an analysis and you evaluate
23 empirical data and formulate an opinion as to
24 whether a particular market for a particular
25 security was efficient for a particular period of

C. Coffman

1
2  time?

3       A.    I think that's fair.  I mean, as I
4  describe in the report, there have been a number of
5  factors that have been consistently used in this
6  context to evaluate market efficiency and I
7  performed those types of analyses to evaluate
8  whether there is economic evidence supportive of
9  market efficiency.  I also describe in the report
10 how there's no bright line test that tells you,
11 yes, this market is efficient, or no, it's not, so
12 that's why it's important to analyze a number of
13 different factors to reach that view.

14      Q.    Would it be fair to say that some
15 factors bear more directly on the question of
16 whether security prices adjust to new available
17 information rapidly than other factors?

18      A.    I think that's probably fair, that some
19 are more direct than others.

20      Q.    So the fact that there are analysts
21 covering a stock may bear indirectly on the
22 question, whereas an event study might provide more
23 direct evidence?

24            MS. POSNER:  Objection.

25      Q.    Is that the way you would look at it?

```
 1                      C. Coffman
 2         A.    I think it's fair to say that an event
 3   study looking at the -- how the prices react to new
 4   information is a more direct test than just looking
 5   at whether there are analysts covering.  As I
 6   describe in the section of my report that deals
 7   with analyst coverage, you know, the logic behind
 8   the analyst coverage factor really is whether or
 9   not there's sufficient information and analysis out
10   in the market, and I describe how currently, now
11   with the Internet, there's a vast array of
12   different ways you can get information on a
13   security so that it's not really looking just at
14   analysts.
15              But I would generally agree with you
16   that doing the event study type test is a more
17   direct test than just looking at analysts, but I do
18   think they're both important.
19         Q.    It just seems that if the question is,
20   do securities prices react rapidly to new
21   information, it seems that some of your analysis
22   appears to be more directly addressed to that
23   question, and so the event study and that
24   particular Cammer factor seems to be one of them.
25              Is that the way you would think of
```

C. Coffman

1
2  that?

3          MS. POSNER:  Objection.

4      A.    I think it's fair to say that the event

5  study tests are more direct than some of other

6  factors.  But again, I think they're all important.

7      Q.    And how rapidly in an efficient market

8  would you expect security prices to adjust to new

9  public information?

10     A.    I think it can depend greatly on the

11  facts and circumstances of what is being released.

12  I think generally speaking, the tests I perform

13  within this test are to look within a day.

14          There are certainly circumstances of

15  particular disclosures where it may take a series

16  of days.  I don't think looking beyond a small

17  number of days is the usual approach to what is

18  thought of as rapidly.

19          Sometimes it's clear the market reacts

20  on an intraday basis very quickly, but assessing

21  when it fully impounds certain information often

22  can be a case-specific analysis or an

23  event-specific analysis.

24     Q.    Did you determine that in this case,

25  the appropriate window to look at was one day?

```
1                     C. Coffman
2              MS. POSNER:  Objection.  Are you asking
3         with regard to market efficiency?
4              MR. BALLARD:  The event study.
5         A.    I think if the question was looking at
6    one specific event or -- looking at a possibly --
7    if you were trying to evaluate the effect of a
8    single piece of news and how that impacted the
9    price, I think you would want to look more closely
10   than I have in terms of whether there's evidence to
11   suggest you should look at a shorter window than a
12   full day or a longer window than a full day,
13   depending on the facts and circumstances.
14              For the purposes of evaluating
15   marketing efficiency, I've used a full day, which
16   is a standard approach, but I don't -- I wouldn't
17   read into what I've done that in all circumstances,
18   for every piece of news, the right event window
19   would be one day.
20        Q.    For what type of events might a longer
21   period be appropriate?
22              MS. POSNER:  Objection.
23        A.    I don't know that I can characterize it
24   fully or all the circumstances, but for example, if
25   there's an unexpected complex announcement of some
```

1                    C. Coffman

2 kind where there's an initial market reaction, and

3 then analysts weigh in and there's additional news

4 stories and coverage about that event over a series

5 of days, and you observed high volume on multiple

6 days and you see the stock price reacting over

7 multiple days, you know, in those circumstances,

8 the evidence may suggest looking at a longer event

9 window.

10     Q.   So at least for this case, you looked

11 at hundreds of events and for each of them, in

12 every instance, you looked at a window of one day

13 of trading; right?

14     A.   Yes.  To evaluate market efficiency, I

15 set a standard of looking at daily stock price

16 returns.

17     Q.   And did you say that was standard, to

18 look at one day in this context?

19     A.   Well, I'm saying it's -- in the context

20 of analyzing market efficiency, I believe looking

21 at daily returns is a standard thing that is done

22 both in the context of this -- of this type of

23 analysis, which I've done in many, many cases, and

24 I've seen other experts do those types of studies

25 in many cases.  And also historically, in the

C. Coffman

academic literature, there are literally dozens, if
not hundreds, of daily event studies out there
analyzing the market's reaction to different types
of information.

Q.    So just to get the concept down, if an
event occurs and it's material and it's new
information, in an efficient market, you would
expect the price of the security to react rapidly,
and so you look at the next day.

And if it reacts, you may be able to
draw some conclusions based on that.  If it doesn't
react, you may be able to draw conclusions based on
that.  Is that the essence of the concept?

MS. POSNER:  Objection.

A.    Again, I think in that question you're
saying is one day the only thing you would
necessarily look at, and I wouldn't necessarily
agree with that.  Looking at what the -- how the
stock price responds in some reasonably short time
period after the event is, I think, an appropriate
way to think about it.

Whether that -- for a variety of
reasons, it may be that the best way to look at
that is to look even shorter than a day if there's

C. Coffman

confounding information during a day that you want
to eliminate the possibility of that influence, or
if -- like I said, there are certainly examples
where follow-on coverage of an event from analysts
and media and others may suggest that looking at
more than just a single day is appropriate.

Q.    So, as a general matter, if material
new information comes out and the market reacts
quickly, as a general matter, you would say that
tends to support a finding of efficiency where if
material new information comes out and it takes
several days for the market price to react, that
would tend to support a conclusion of inefficiency;
is that fair?

MS. POSNER:  Objection.

A.    I don't know that I would necessarily
agree with that.  I mean, if what -- I think there
are different gradations of what you're talking
about.

So if, in an efficient market or in a
market, information is revealed and the stock price
reacts on the first day, but then there seems to be
some residual continued reaction as people process
the information and as analysts comment on the

1                          C. Coffman

2     information, and as new stories comment on the

3     information, in that case, the full impact may take

4     several days.

5               I think in your question you're sort of

6     asking if the impact takes several days, so if you

7     see a news announcement on a particular day or a

8     new event, and there's no reaction for a day or two

9     days, and it doesn't react, or it appears not to

10    react until a third day at all, I think that would

11    be a little bit less consistent with market

12    efficiency.  But there's the idea of an initial

13    impact and then it sort of being fully reflected,

14    and that fully reflected I believe takes -- the

15    market takes time to fully react to information and

16    that could be within a day, it could take two days,

17    three days.

18              I think when I refer to rapidly, I'm

19    incorporating all those possibilities in terms of

20    how long it takes it to be fully reflective of the

21    stock price.

22         Q.    But here you looked at a period of

23    what, like a thousand days, right, trading days?

24         A.    It may even be more than that.

25         Q.    It may be more?

1                    C. Coffman

2        A.    I don't recall exactly how many trading

3   days.

4        Q.    A lot of days, I mean, several years;

5   right?  And in each instance, you looked at each

6   day and each day was either deemed to be a date

7   where there was no news or a date where there's an

8   SEC filing, or a date where there was an earnings

9   race, and then you looked at just the next day to

10  see if there was a price reaction.  Right?

11       A.    Yeah.  Again, the task I've been asked

12  to perform is to evaluate the market efficiency of

13  these securities during the analysis period, so in

14  order to do that, one of the things I had to choose

15  was an event window to look at for, as you said,

16  the thousands of days we're looking at and multiple

17  earnings announcements and multiple types of other

18  announcements, and so to have a standard event

19  window for the purposes of calculating market

20  efficiency, I restricted the price movement to be

21  within a day, yes.

22       Q.    How do you reconcile that with your

23  testimony earlier that it's possible for an event

24  to lead to a price reaction that occurs over more

25  than one day?

C. Coffman

1

2      A.     Because it's a different question when

3 you're asking how did this specific one

4 announcement, what is the best opinion you can give

5 about how this one particular event changed the

6 value of the stock when it was fully imputed into

7 the stock price.

8             So looking over many events for the

9 purposes of analyzing market efficiency, I'm

10 restricting it to a day, but I'm not being asked to

11 give an opinion about the detailed full price

12 impact of a particular piece of information.

13      Q.     So if you have a number of days you

14 looked at in your period, and on day three, you

15 found a statistically significant price movement --

16 are you with me so far?

17      A.     I believe so.

18      Q.     -- in your methodology, you would

19 attribute that to news on day two if there was news

20 on day two; right?

21             MS. POSNER:   Objection.

22      A.     I think I want to be careful about a

23 hypothetical.  So if you're saying after market

24 hours on day two, there's an announcement and then

25 there's a stock price reaction, I would attribute

C. Coffman

1
2  that to the post-market release of information on
3  day two or to an announcement early on day three.
4       Q.    And how would your methodology assess
5  whether that reaction might actually have been a
6  reaction to an announcement post-close on day one?
7       A.    Well, again, I'm not suggesting in any
8  way that the first time the market would react to
9  new information is three days out from when the
10 stock price or when the event occurred.
11            I'm saying that in some circumstances,
12 it's apparent that news affects a security on the
13 first day, but then that there could be some
14 residual reaction beyond one day.
15      Q.    So in my hypothetical, we have news
16 comes out after the close on day one.  News comes
17 out after the close on day two.  There's a
18 statistically significant price movement on day
19 three.
20            Does your methodology allow you to
21 determine whether that reaction is in response to
22 the news that came out after the close on day two
23 versus day one?
24            MS. POSNER:  Objection.
25      A.    When you say "your methodology," in the

C. Coffman

1 particular methodology I'm using to evaluate market

2 efficiency, I'm not ever trying to suggest that the

3 movement on day three is due to the news on day

4 one.

5 Q.    But didn't you say that it's possible

6 for news to have an effect on not only the

7 following day, but the second day following?

8 A.    I'm saying in some circumstances, based

9 on the facts and circumstances of that particular

10 disclosure, that's possible.  And I've seen cases

11 where the evidence supports that, but that's a

12 highly fact-specific case-specific date-specific

13 analysis.

14 So for example, if I see a news event

15 and there's a reaction on day one, and there's no

16 movement on day two but there's significant

17 movement on day three, I wouldn't just say that day

18 three movement is tied to the news on day one.

19 There would have to be a whole set of

20 analyses that would go into whether it's

21 plausible -- whether it's even plausible that that

22 day three reaction is still potentially related

23 back to the news on day one.

24 So I think the initial assumption and a

1                     C. Coffman

2  standard assumption to begin with is consistent

3  with what you're saying if you look a day out, but

4  then if you're analyzing a specific announcement

5  for full impact, it also makes sense to at least

6  evaluate whether there's evidence that the market

7  could have still been reacting beyond day one.

8          Q.     In the methodology you employed in this

9  case for the particular securities here, you were

10 assuming that material new information would be

11 incorporated within one trading day; is that fair?

12             MS. POSNER:  Objection.

13         A.     I don't believe I'm making that -- I

14 don't believe I'm making the assumption that the

15 market would fully impound all information in one

16 trading day.  What I'm doing is using this

17 methodology as a test for market efficiency.

18             So what I'm testing is whether there's

19 rapid price reactions in general on news days

20 relative to non-news days, and for that purpose,

21 I'm selecting one day as the testing window.  I'm

22 not suggesting a one-day testing window is the only

23 plausible event window one could choose.

24         Q.     Do you believe that one day is the best

25 window to use in this case?

```
 1                      C. Coffman

 2              MS. POSNER:  Objection.

 3      A.    I think it's a -- I think it is the

 4  best window available for testing market

 5  efficiency.  Again, if I were analyzing a specific

 6  event and the question was what is your best

 7  estimate of the full price impact of that event, I

 8  would want to at least analyze more carefully

 9  rather than just assume that one day is the right

10  event window.

11              But for evaluating market efficiency, I

12  do think looking at a daily event study is an

13  appropriate thing to do, and in my view, the most

14  standard thing that is done.  That's not to say you

15  couldn't do it other ways, but I think it's the

16  most reasonable thing to do.

17      Q.    Let me ask it this way:  If it

18  routinely took two days for the market to absorb

19  new information about Miller Energy, then your

20  event study really wouldn't tell you much; right?

21              MS. POSNER:  Objection.

22      A.    I don't know that that's the case.

23  Again, there's a difference between initial price

24  reaction and fully reflected price reaction, so in

25  a purely hypothetical situation, I'm not at all
```

C. Coffman

suggesting this is the case here, but let's
hypothetically assume that full price reactions
take place over two days, but that initial price
reactions can occur very quickly.

In my view, that market would still be
efficient, it's rapidly reflecting the new
information, and the tests I'm conducting would
reflect that because there's rapid reaction on day
one.  There may just be some residual price
reaction on day two that is not being measured.

Q.    I'm asking, I think, a different
question.  I'm asking whether you're actually
testing the right thing.  If it takes two days
routinely for the market to incorporate and react
to new information, and you look at, say, 19
earnings releases and your methodology only looks
at the one day after they come out, how do you know
those instances where you found a statistically
significant reaction are in fact, a reaction to the
press release the day before as opposed to
something that happened the day before that?

MS. POSNER:  Objection.

A.    I guess under your hypothetical
scenario, which is not anything close to what I've

```
1                      C. Coffman
2   concluded in this case, that somehow there's
3   routinely two-day price reactions, I think the
4   criticism would be that the method isn't
5   necessarily reflecting the full price impacts, but
6   it's still testing for whether there's a rapid
7   reaction within one day.
8        Q.    Your position is it's testing whether
9   there's a rapid reaction within one day even though
10  you haven't controlled for whether there was a
11  statement two days before that also might have had
12  an effect?
13            MS. POSNER:  Objection.
14       A.    Here's where I think we're sort of
15  tacking past each other a little bit, is that in
16  the circumstances where I've seen evidence of
17  multiple-day reactions, and I'm not in any way
18  suggesting that happens routinely as your question
19  put it, but in the cases where I have seen that,
20  typically what is occurring is an event occurs,
21  there is a rapid reaction on day one, but then
22  there's some residual continued reaction beyond one
23  day.
24            When analyzing whether that specific
25  information caused a price reaction, one might want
```

1                          C. Coffman

2    to take that into account or would want to take

3    that into account.  That's a different question

4    than, is there economic evidence of rapid price

5    reaction, because even in that particular

6    circumstance, if I measure the day one reaction, I

7    will see that the event caused a reaction.

8         Q.    Have you seen any reason -- do you have

9    any reason to believe that in connection with

10   Miller Energy's securities, it should take more

11   than a day for the price to react to new news?

12        A.    I haven't seen anything that suggests

13   it would take more than a day to initially react,

14   but I did note that plaintiffs have alleged certain

15   disclosures where they're suggesting the price

16   reacted over several days.  But that's not

17   something I've evaluated whether that's the case or

18   not.

19        Q.    You talked about complex types of

20   announcements where it might take the market more

21   than a day to figure out what it's about.  Do you

22   remember that?

23        A.    Yeah, to fully reflect all the full

24   value of the information.  I'm not suggesting it

25   would take more than a day for an initial reaction

C. Coffman

1
2   to occur, but it might, as I would describe it, for
3   the price to sort of settle out or fully reflect
4   the information.
5       Q.    Do you have any reason to believe that
6   any of the news in connection with Miller Energy is
7   that type of complex news that might take longer to
8   absorb?
9           MS. POSNER:  Objection.
10      A.    I haven't evaluated that specific
11  question.
12      Q.    So going back to the question of
13  whether it might take more than a day for a market
14  price to react, it sounds like you would consider
15  that to be a rare instance if it's an efficient
16  market?
17          MS. POSNER:  Objection.
18      A.    I just want to be careful the record is
19  clear.  When you say takes more than a day to
20  react, I'm not suggesting an initial reaction would
21  take more than a day.  I'm saying the full price
22  reaction might take over a day.
23          I don't know that I would characterize
24  it as rare.  I've certainly seen examples of it,
25  but I haven't computed how often it occurs or

                         C. Coffman

1
2    anything like that.  I know there is one study out
3    there by NERA that suggests that on average, for
4    events at the end of -- I believe their study was
5    looking at the end of class periods in class action
6    securities cases, but they had evidence that, on
7    average, it took somewhat more than a day for the
8    full price reaction to take place.  I think -- I
9    forget exactly what the average was, but I think it
10   was between one and two days.
11        Q.    So would it be fair to say that in the
12   instances where a material announcement -- let me
13   start over.
14             Would it be fair to say that in the
15   instances where in an efficient market a -- I'm
16   going to strike that and start over again.
17             Would it be fair to say that in the
18   instances where an announcement of new news takes
19   more than a day to be absorbed by the market, you
20   would expect at least an initial reaction on the
21   first day of trading after the announcement?
22             MS. POSNER:  Objection.
23        A.    In the vast majority of instances where
24   I've seen this, the answer to that is yes.  I can
25   think of a couple of examples I've seen where that

C. Coffman

is called into question a little bit, but generally

speaking, when I've seen multiple-day windows

applied, there is at least evidence of some

reaction on the first day, yes.

Q.    So it would be really weird in an

efficient market if material news comes out and

there's no reaction on the first trading day after

that, and then there's a statistically significant

reaction on the next day?

MS. POSNER:  Objection.

Q.    Is that fair?

A.    Again, I've seen some weird examples

where information comes out in a form that is not

widely available and it doesn't come out in a

widely available way until a day later.  So that's

something that could influence it.

I've seen examples where news is

reported in a foreign language and it's not

republished in English in a widely available source

until the next day, and so I've seen examples where

sometimes stock prices don't necessarily react to

that first foreign disclosure of information.

So putting aside those, you know, sort

of very unique examples, generally in an efficient

                    C. Coffman

market, you expect to see a reaction the first day.

    Q.    So the answer is yes?

        MS. POSNER:  Objection.

    Q.    It would be really weird?

    A.    It would be unusual, in an efficient market, for the market not to react at all the first day in a multiple-day window.  Not impossible but unusual.

    Q.    Looking at your paragraph 17 and 18 in your report, where you're describing some of the general concepts about efficiency, we talked about the sentence where you talk about the securities prices expected to rapidly incorporate new information, and we've also talked about where you describe it as an empirical exercise.

        So my question now is, was your event study an attempt to obtain empirical evidence about whether the markets for Miller Energy's securities were efficient or not?

        MS. POSNER:  Objection to form.

    A.    Again, I don't think that is a bright line test that definitively tells you yes or no without looking at other information, but the event study methodology was an attempt to develop

                              C. Coffman

1
2   economic evidence supportive of market efficiency,
3   yes.
4        Q.    Would you agree that empirical data
5   that shows that information is incorporated rapidly
6   into the price would tend to show that the market
7   is efficient?
8        A.    Can I have that read back, please.
9              (Record read.)
10       A.    I think as a general matter, that's
11  true, yes.
12       Q.    Would you agree that if empirical data
13  shows that the information is incorporated slowly
14  into the price, that would tend to show the market
15  is inefficient?
16       A.    I think I would have to understand what
17  you mean by slowly.  If you're using it as an
18  antonym to rapidly where I'm saying there's
19  evidence that it reacts within a day or a series of
20  days, then I think the answer would probably be
21  yes, but you're going to have to be a little more
22  specific about what you mean by slowly.
23       Q.    I'm more interested in what you think
24  than what I think.  You said rapidly and I'm just
25  wondering in what circumstance -- how slow would

C. Coffman

1
2   the markets have to react for you to say this
3   market is inefficient?
4           MS. POSNER:  Objection.
5       A.    Again, I think there's a difference
6   between, and it's an important difference,
7   concluding and reaching a conclusion that the
8   evidence is sufficient that the markets can be
9   described as efficient in the way in which I'm
10  defining them and in a way that Dr. Fama defined
11  them.
12          There are certainly circumstances where
13  the evidence is insufficient or there's not enough
14  supportive evidence to conclude efficiency where I
15  wouldn't necessarily call the market inefficient,
16  but I would say I don't have sufficient evidence to
17  conclude it is efficient.
18          And then there's, I guess
19  hypothetically, a situation where the market price
20  reactions are sufficiently deviant from what you
21  would expect in an efficient market that you would
22  call it inefficient, but I'm not sure I've ever
23  come across that in a New York Stock Exchange
24  traded security.
25      Q.    When is the last time you have found

C. Coffman

that the market for a particular security was
inefficient?

     A.     I don't know that I've ever come to the
opinion that it's inefficient.  I've come to the
opinion on number of different occasions that there
was insufficient evidence of efficiency for me to
opine that it was efficient.  That's occurred on a
number of different occasions.

     Q.     How slowly would the market price have
to react to news for you to conclude that there's
no evidence -- no sufficient evidence for a finding
of efficiency?

     A.     Again, I think you're isolating the
analysis to sort of the event study analysis.  So
there's a lot of different factors to look at.  I
don't know that I have in mind a threshold of
how -- I mean, it would sort of depend on how
you're developing the evidence that it was reacting
slowly.

          So I'm -- I'm a little confused by your
question because if -- let's just take a purely --
pure hypothetical where on a consistent basis, the
company is releasing obviously new value-relevant
news that would change the value of -- that would

C. Coffman

clearly, in any reasonable investor's mind, change
the value of a security in a substantial way and
you consistently saw the price not react to that
within a couple of days and saw the price reacting
to it in some consistent way three, four, five
days, a week later.  That would give me certainly
pause or would certainly lead me to a conclusion
that it is not efficient in the way one normally
thinks about efficient.

It certainly would not be efficient to
the degree where I would be comfortable opining
that it's efficient.  Whether that means it's
inefficient in that it -- I guess by this
definition, it would be, so by the definition I'm
using, it would be, because it doesn't rapidly
reflect the prices, but I have not seen a
circumstance where that sort of evidence is
available.

Q.    This methodology that you're proposing
here and opining on is intended to be a scientific,
reliable methodology; right?

A.    Absolutely.

Q.    And you're saying you're examining,
testing the question of whether markets are

                              C. Coffman

1

2   reacting -- market prices are reacting rapidly to

3   new information.  Is there some predetermined,

4   knowable threshold where an objective observer can

5   look and say, okay, here's how I know if this

6   expert would find that there's efficiency and

7   here's how I know they would not find that, in

8   advance, are there some criteria?

9                MS. POSNER:  Objection.

10       A.    I think the criteria that I'm using to

11  provide scientific evidence is laid out in my

12  report.  It's taking a series of days on which

13  there's news and a series of days on which there's

14  no news and performing a comparison of what I'll

15  call the treatment group, which is days with news,

16  and the placebo group, which is days of no news,

17  and showing that there's a statistically

18  significant difference between those two samples

19  and, therefore, showing scientifically beyond --

20  with confidence beyond the standards that are

21  typically used in my scientific field, that there

22  are -- there is evidence of price reactions within

23  a day.

24                So I don't think I've ever -- I don't

25  think in this case, I ever got to the question of

C. Coffman

how -- what would happen if that weren't true.

I mean, that's what the evidence shows, so I mean, if the evidence didn't show that, and if there was no evidence of stock price reactions within a day, then I would have to move to looking at the other factors.  I would have to determine why was I observing that, you know, is there evidence that it's occurring over multiple days or not for several -- you know, initial reaction is not for several days, but I never got to that question because the scientific evidence here is clear that there's a demonstrable cause and effect relationship between new news and the price of the securities I've been asked to look at.

Q.    You found that in the 17 instances where there were earnings releases, in four instances, there was a statistically significant price movement the next day; right?

A.    I believe that's right, but let me just double-check.  Yes, I believe there's two more that are significant at the 90 percent level, but there were four that were significant at the 95 percent level.

Q.    And in each of those instances, you

C. Coffman

were assuming that those price movements were a
reaction to the earnings announcement the day
before as opposed to anything that might have been
said the day before the earnings announcement;
correct?

A.     That's the assumption used in the
analysis, yes.

Q.     But you testified earlier that there
could be instances where new news might have an
effect on day one and a residual effect on day two
as well; right?

A.     It's plausible in certain
circumstances.

Q.     Is it possible that any or all of those
four or six instances where you found a reaction to
the earnings announcement might have actually been
a reaction to something that happened the day
before the earnings announcement?

A.     I looked carefully enough at these
dates that I don't believe, for any of these dates,
that's a plausible explanation.  For each earnings
announcement, I studied the analysts' reports and
the other news surrounding those days, so I'm not
aware of a circumstance where in this particular

C. Coffman

1

2  case, for any of these particular dates, where that

3  was a real concern.

4      Q.    Your methodology treated each price

5  reaction as a reaction to the news on the day

6  before and did not evaluate in any way whether that

7  price reaction might be the residual effect of an

8  announcement the day before that; correct?

9          MS. POSNER:  Objection.

10     A.    Well, I want to be a little bit

11 careful.  You're using the term "day before."  Some

12 of these announcements are in the evening of the

13 day before and then I'm testing the next day.  Some

14 of these announcements are the in the morning.

15     Q.    I'm pretty sure you know what I mean;

16 right?

17     A.    Yes, I know what you mean.  I just want

18 the record to be clear that I'm testing the first

19 trading day where that information could have

20 impacted the market.  And like I said, I don't

21 think I'm just assuming it.  I looked at each of

22 these dates and the news surrounding it, and I

23 don't believe on any of these dates there was clear

24 material news the day before the earnings

25 announcement, but I don't have perfect recall of

1                            C. Coffman

2     everything, but I would have looked at that issue.

3          Q.    This was important to you because those

4     are the four of 19 instances that you referred to

5     repeatedly through your report and you use it in

6     your bar charts and you use it everywhere; right?

7               MS. POSNER:  Objection.  Misstates the

8          report.

9          A.    I don't know that I use it everywhere.

10    There's a table that I find four of the 17

11    significant and I state that in the text as well.

12         Q.    Did you look at the question carefully?

13    Let me rephrase that.  For the 17 events that you

14    address in your event study for the common stock,

15    did you look carefully to make sure you were

16    getting the right dates?

17         A.    Yes.

18         Q.    Because that's important to your

19    analysis?

20         A.    Yes.

21         Q.    I want to ask some questions about the

22    Cammer factors so why don't you turn to page 14 of

23    your report.  The first factor you have listed here

24    is trading volume.  How significant is trading

25    volume as one of the factors?

```
 1                    C. Coffman
 2        A.    I'm not sure exactly what you mean by
 3   how significant, but I generally think actual
 4   trading volume is an important and one of the more
 5   direct tests of market efficiency.  Without actual
 6   activity on a market, it's hard to conclude it's
 7   efficient.  So I think it's important.
 8        Q.    And would trading volume, standing
 9   alone, be enough to be defining efficiency?
10        A.    I don't think there's any of the tests
11   that standing alone are bright line tests of
12   efficiency.  I think the combination of stock
13   trading on the NYSE, with high -- reasonably high
14   trading volume, goes a long way towards a stock
15   being efficient because that implicitly means it's
16   meeting a number of the other categories, so -- but
17   standing alone, can you scientifically say that's
18   evidence, determinative evidence of efficiency?
19   No.
20        Q.    Let's talk about analyst coverage,
21   Cammer factor number 2.  You have this beginning on
22   page 16.
23        A.    Okay.
24        Q.    Can you explain why analyst coverage is
25   relevant to your analysis?
```

C. Coffman

A.    Sure.  I mean, in paragraph 33, I quote
a Cammer decision which I understand is a
well-recognized decision that laid out a number of
these factors initially.  And then in paragraph 34,
I describe why, as an economist, that factor makes
sense to me as something to look at.

In paragraph 36, I describe why sort of
a narrow focus on just analysts is not necessarily
the right thing to look at because there are so
many different ways that people can get
information.  But that looking at analysts' reports
is a -- does provide some evidence supportive of
efficiency.

Q.    Does the number of analysts covering a
particular security matter?

A.    Again, the notion of the factor is, is
there evidence that there's interest in the company
and its securities and that there's an active
market for information.  So I don't think the
numbers is as important as the --

I mean, the essence of the factor is
that is there evidence of sufficient interest in
the stock, and so the Cammer decision said it would
be persuasive to allege a significant number of

                    C. Coffman

1
2   securities analysts.  It's not suggesting there's a
3   big difference between are there 15 analysts or 16
4   analysts or three analysts or four analysts.
5            It's less of a strict correlation than
6   is there just qualitatively evidence that there are
7   analysts covering the stock.
8        Q.   Would you say this factor weighs in
9   favor of a finding of efficiency if an
10  insignificant number of analysts are covering a
11  stock?
12       A.   I don't know how you would define
13  insignificant.  I certainly think it would not
14  weigh towards efficiency if there weren't any
15  analysts covering a stock or there was just one.
16  What significant means, I'm just not sure.
17       Q.   You've quoted this language here that
18  says that it would be persuasive to allege a
19  significant number of securities analysts.  What is
20  your view of what a significant number of
21  securities analysts would be?
22       A.   I guess I don't have a specific
23  threshold in mind.  I mean, in this particular
24  case, as I've identified on Exhibit 4, there were
25  15 separate analysts that issued reports on the

                              C. Coffman

1

2  stock.  At least a half dozen issued more than ten

3  reports on the stock, and as I also note, my source

4  for analysts' reports certainly doesn't cover all

5  of the analyst reports that may have been out

6  there, so the evidence in this case was sufficient

7  that there was, in my view, a significant number of

8  analysts covering the stock and I didn't need to

9  think exactly what that threshold was.

10      Q.    So you don't have a preset idea in your

11  mind about what would be a significant number in a

12  particular context, but you think that 15 certainly

13  meets the threshold?  Is that what you said?

14      A.    I think 15 certainly meets that

15  threshold.  I think as long as there's evidence of

16  significant analyst coverage of a company, that

17  this factor supports market efficiency, and I

18  demonstrate that there was significant analyst

19  coverage during the analysis period.

20      Q.    You said if there was only one analyst,

21  that wouldn't be significant, and 15 is

22  significant.  Can you give us any closer idea of

23  where the threshold would be for significance in

24  your mind?  5, 12, 10, 14, 2?

25      A.    Again, as I describe within this

1                           C. Coffman

2    section, you know, focusing on the specific number

3    is not really even what the Cammer factor was

4    really getting at.

5                The question is -- as an economic

6    matter, if you look at the language in the Cammer

7    factor, it says, "The existence of such analysts

8    would imply, for example, the auditor reports were

9    closely reviewed by investment professionals, who

10   would in turn make buy/sell recommendations to

11   client investors."

12               Now there are many different outlets

13   for people to get information about companies and

14   analysis of companies, not just analyst reports.

15   So again, I think the -- there could be an

16   over-focus on just the number of analyst reports,

17   so I don't have in my mind a very specific

18   threshold.

19               And the relevant question is, is there

20   evidence that there was significant analyst

21   coverage of Miller Energy securities during the

22   class period, and I concluded there was.

23        Q.    Do you remember my question?

24        A.    I think the question was, is there a

25   specific number that I have in mind when thinking

1                          C. Coffman

2   about what significant means.

3         Q.    So is it yes or is it no?

4               MS. POSNER:  Objection.  Asked and

5         answered.

6         Q.    I think it's no.

7         A.    I don't have a specific number in mind.

8   Again, I believe I've answered the question in my

9   report whether there was evidence of significant

10  analyst coverage during the analysis period.

11        Q.    You've said one is not significant, 15

12  is significant, and you can't be any more specific

13  than that?

14              MS. POSNER:  Objection.

15              MR. BALLARD:  This is your chance.

16              MS. POSNER:  Objection.

17        A.    I'm not offering a bright line

18  threshold for what is significant and what is not

19  significant.

20        Q.    Does quality of the analyst coverage

21  matter?

22        A.    Theoretically it could.

23        Q.    Not all analysts are equal; right?

24        A.    That's correct.

25        Q.    So one analyst might work for a massive

C. Coffman

1
2  brokerage and that analyst report might be

3  distributed to thousands of people, whereas another

4  analyst might work for a tiny shop that has three

5  clients and that analyst report might be

6  distributed to three people who don't really trade

7  much; right?

8          MS. POSNER:  Objection.

9      Q.    So it matters?

10         MS. POSNER:  Objection.

11     A.    What you're saying is plausible.

12  There's other analysts who release their reports

13  publicly, and I don't know -- I'll leave my answer

14  there.

15     Q.    What is your definition of an analyst

16  for this purpose?

17     A.    Well, for this purpose, my methodology

18  was to download reports from Investec, which is a

19  service that provides downloadable analyst reports,

20  so I would have pulled down the reports that are on

21  that service.

22     Q.    Do you know all these entities?  I'm

23  looking at Exhibit 4 of your report.

24     A.    Some of them I'm familiar with.  Some

25  of them I'm not.

1                    C. Coffman

2        Q.    Some of them you've never heard of

3   before; right?

4        A.    I don't know that I've never heard of

5   them before, but they're not that familiar to me.

6        Q.    What is SADIF Analytics?

7        A.    I don't know.

8        Q.    Do you know the name of the analyst, if

9   there actually was one there?

10       A.    Not as I sit here, no.  I would have to

11  go back and look at it.

12       Q.    Are you confident that there was an

13  actual analyst with a human being behind each of

14  these entities here?

15            MS. POSNER:  Objection.

16       A.    If you're asking me if there's an

17  individual analyst that is putting their name on

18  the report, I just don't recall.

19       Q.    Do you ever make any effort to

20  distinguish between analyst reports that are

21  created by actual human beings who create analyst

22  reports versus machine generated things that are

23  just spit out by computers?

24            MS. POSNER:  Objection.

25       A.    Within the context of this analysis,

C. Coffman

given the number of reports that were here from
entities I am familiar with, I didn't make an
attempt to do that.  In the past, I would say there
is a qualitative difference between those things.

Q.    Would you typically exclude machine
generated analyst reports from this kind of
analysis?

A.    I don't know if I would typically
exclude them.

Q.    Should they be excluded?

A.    I don't know that they should be
excluded.  I think, you know, at an extreme, if
that was the only -- if the only evidence of
analyst reports were those types of reports, that
would -- that would be something I would certainly
consider and I would view that as less
qualitatively good evidence of analyst coverage.
But that wasn't -- I never really got to that
question in this case because it's clear there were
dozens of high-quality analyst reports issued
during this period on Miller Energy.

Q.    You've never looked at how many of
these analysts, these entities you list as
analysts, were actually machine generated things?

C. Coffman

MS. POSNER:   Objection.

A.    Well, I don't know that I ever -- I don't know that I performed a quantification of that, but in looking through the analyst reports in this case, I mean, there were certainly I believe examples of that, but I think there were lots of examples of analyst reports with -- from firms I recognize as well.

Q.    Do you know what Wall Street Transcript is?

A.    I believe that specific report in this case is the transcript of an interview somebody had with an executive from Miller Energy.  That's my recollection of that.

Q.    So how is that an analyst report?

A.    Well, a lot of analysts, important information in a lot of analyst reports is when they have discussions with management.  So an interview by management to me is clearly providing new relevant information to the market, and so I didn't see a problem in treating that as an analyst report.

Q.    You would treat a word-for-word transcript of an interview with the CEO of Miller

C. Coffman

1 
2  Energy as an analyst report?

3          MS. POSNER:  Objection.

4      A.    It's certainly evidence of interest in

5  following the company and what the company is

6  saying about its business.  It's not what I would

7  consider a traditional analyst report in the case

8  of, you know, an analyst providing a buy or sell

9  recommendation, but it's certainly a report that is

10  providing important information to the market.

11     Q.    The Wall Street Transcript shouldn't be

12  on your list here; should it?

13     A.    I disagree.

14     Q.    It's your expert opinion that the Wall

15  Street Transcript listed on your Exhibit 4 is an

16  analyst report, that's your testimony as an expert

17  sitting here under oath?

18     A.    I'm saying -- I think I've said in my

19  prior answer it's not what would be considered a

20  traditional analyst report, but it's certainly a

21  source of information and much of what analysts do

22  is provide information, including results of

23  meetings with management of public companies.  So

24  the transcript of an interview somebody had is

25  providing useful information to the market.

1                          C. Coffman

2                I would agree that it's not what is

3    traditionally considered an analyst report but I

4    think it's relevant to list it on this exhibit.

5         Q.    Don't companies, when they make

6    statements like that, file them in Form 8-Ks

7    typically?

8                MS. POSNER:  Objection.

9         A.    Sometimes they do.

10        Q.    So why don't you --

11        A.    Let me finish my answer.

12        Q.    Go ahead.

13        A.    There are certainly times they do.

14   There are times that statements and interviews or

15   presentations by companies are not in 8-Ks.

16        Q.    When a company makes a public statement

17   and discloses it in an 8-K, why don't you include

18   that as an analyst report?

19        A.    Because that's not a third party

20   showing interest in the company.

21        Q.    So you would say there's something

22   substantially different between this Wall Street

23   Transcript publication and a company filing a

24   public statement, the same public statement, with

25   the SEC?

C. Coffman

A.    Again, it's a third party spending
economic resources to go out and perform an
interview and report it to the market.  So that is
demonstrating interest by a third party in the
securities of the company and the company, itself.

Q.    Do you know if you have any entities on
your list here that are double counted?

A.    What do you mean by double counted?

Q.    When a company changes its name.

A.    I don't think any of the reports are
double counted.

Q.    You said there are 15 analysts covering
this stock.  If one of them is an entity that
simply changed its name, it should be 14; right?

A.    That's possible.  I don't know that I
can exclude that possibility, but again, I think
the point of this analysis was not to create a
perfect list of the analysts and the reports.  It
was to evaluate whether there is evidence of
significant analyst coverage and I believe I've
done that, and I've attempted to quantify, you
know, the number of reports and list who the
companies were that purportedly issued those
reports, and so I think I've done a fair job at

                        C. Coffman

1

2   showing what data I relied upon to reach the

3   conclusion that there was significant analyst

4   coverage.

5        Q.    What was the first date of your

6   analysis period?

7        A.    I believe it's August 29, 2011, but let

8   me double-check that.  Yes, August 29, 2011.

9        Q.    How many analysts were covering the

10  stock on that date?

11       A.    I don't know that I specifically know

12  the answer to that.  I know on that date, I

13  believe, or right around that date, there was a

14  conference call where there were -- there was at

15  least one analyst who announced and at least a

16  second one who was asking questions on the call,

17  but I don't know that I have a -- there may have

18  been others.  I just don't know.

19       Q.    On August 29, 2011, the beginning of

20  the analysis period, excluding machine generated

21  junk --

22            MS. POSNER:  Objection.

23       Q.    -- how many analysts were covering the

24  stock; do you snow?

25       A.    I don't know specifically how many were

C. Coffman

covering the company because again, as I said, to
conclude that there was significant analyst
coverage during the analysis period, I pulled down
the complete list of what is listed in Investec I
know that is an under-representation of all analyst
reports so I don't have a specific number.

Q.    If there was only one analyst covering
the stock for the first, say, full year of the
analysis period, that would be an indication that
this factor should count against efficiency;
correct?

A.    Can I have that read back, please.

(Record read.)

A.    I think if there were a single analyst
covering the stock for some period of the analysis
period, it would be fair to say that factor alone
doesn't provide supporting evidence.  You would
still want to look at all the other factors, so I
don't think that counts towards inefficiency.  It's
not some indicator of inefficiency, but I think
that would be fairly weak evidence in terms of that
factor, in isolation, providing economic evidence
of efficiency.

Q.    Did you see any analyst reports

```
 1                    C. Coffman

 2   dedicating to covering the preferred stocks?

 3        A.    I don't recall seeing any reports

 4   directly covering the preferred stocks independent

 5   of the common stock.  I think there were analysts

 6   that talked about the preferred securities in their

 7   reports and certainly the information would be

 8   relevant to investors in those securities, but I

 9   don't recall any analyst reports focused directly

10   on the preferred stocks as what they were offering

11   recommendations about.

12        Q.    You've said the preferred securities

13   are a hybrid between equity and debt; right?

14        A.    I think generally I described preferred

15   securities that way and I think -- I think that's a

16   fair characterization, is there are equity-like

17   features of the preferred securities and debt-like

18   features of the preferred securities.

19        Q.    So would it be the case that as to the

20   preferred securities of Miller Energy, concepts

21   like credit rating and probability of default, loss

22   rates, recovery rates, those would be relevant

23   factors for investors in those types of securities?

24        A.    I think those -- could I have that read

25   back, please.
```

1          C. Coffman

2                (Record read.)

3     A.    I think that's true.  I think those

4  factors would be important to common stockholders

5  as well because to even get value to the common

6  stock, you would want to consider those sorts of

7  things.

8     Q.    Did you see any analyst reports

9  covering Miller Energy that analyzed those concepts

10  during the analysis period with regard to Miller

11  Energy's preferred stock?

12     A.    I don't know that they analyzed issues

13  like that specifically just with regard to the

14  preferred stock, but I think analysts certainly

15  were focused on the company's liquidity issues and

16  what the liquidity issues meant for the company's

17  ability to generate value and go on as a continuing

18  going concern.

19                So I think the issues discussed by the

20  analysts were exactly the issues that would matter

21  to preferred security holders as well.  I don't

22  recall them specifically talking about some of the

23  areas you mentioned.

24     Q.    Would it be fair to say that the

25  analysts reports you identified in your report do

C. Coffman

1
2 not cover the debt component, the debt component of
3 the preferred securities?

4      A.    I don't have perfect recall of all the
5 analyst reports as I sit here.  I do believe at
6 times they discussed the company's ability to
7 continue paying the preferred dividends, which is a
8 debt-like feature, like a coupon on a bond,
9 although it obviously had different features in
10 that it's not mandatory to pay at a particular
11 time, but I do believe the analysts were certainly
12 discussing the company's liquidity and ability to
13 continue paying those dividends.  That's my
14 recollection.

15      Q.    I know you said earlier you evaluated
16 the common stock and Series C and Series D
17 independently.  As to the analyst coverage element,
18 however, you lumped them together; right?

19      A.    Well, I didn't -- well, I mean, the
20 same analysis applies to all three so in that
21 sense, I lumped them together, but I thought about
22 it independently for each.

23      Q.    Well, I meant you literally lumped them
24 together in Exhibit 1, because you combined the
25 columns for the three securities and you put one

                              C. Coffman

1

2   entry there.

3        A.    Well, yeah.  As I just said, I used the

4   same evidence as supporting evidence, but I did,

5   and I believe it's reflected in my report, but I

6   believe I had some footnotes that talked about how

7   those analyst reports also pertained to what

8   investors in the preferred securities would care

9   about.

10       Q.    If I pull out one of these analyst

11  reports, would you expect it to have like a price

12  target for the common stock?

13       A.    Many of them do, not all of them.

14       Q.    Do any of them have price targets for

15  the preferred?

16       A.    I don't believe so, no.  I don't recall

17  seeing that.

18       Q.    In your report at paragraph 36, you

19  indicate that there has been a significant increase

20  in alternative methods by which publicly available

21  information about publicly-traded securities is

22  disseminated to investors.  And then you refer to

23  several things, the Internet, 24-hour cable news

24  networks, e-mail, RSS feeds, and other media.

25            Do you see that?

C. Coffman

1

2      A.      Yes.

3      Q.      Were those important to consider and if

4   so, why?

5      A.      Well, I think it's important to

6   consider that since the Cammer decision, there's

7   less reliance on analysts to get information.  So

8   again, when you read the text of the Cammer

9   decision that I quoted there, it's talking about

10  how people could review the auditor reports and the

11  financials.

12          I mean, now, you can go on the SEC's

13  website and download all the SEC filings yourself

14  at no cost, almost instantaneously, so back when I

15  started doing this work and even in 1995, you would

16  have to contact a third-party service and get

17  information faxed to you.

18          So, I mean, there's just been an

19  explosion in the ways people can get information

20  about companies and do their own evaluation and

21  work without relying on analyst reports to get that

22  information.

23     Q.      On the SEC website, how long has that

24  system been in place where you can go on and get

25  access to SEC filings?

```
 1                        C. Coffman
 2        A.    I don't recall.  I know it has been
 3   improved over time too, but I don't know exactly
 4   how long that has been in place.
 5        Q.    Was it available through the analysis
 6   period?
 7        A.    Yes.
 8        Q.    So in your event study, you had this
 9   process where you looked at days where there was an
10   earnings announcement.  You compared those with no
11   news days; right?
12        A.    That's part of what I did.  I think for
13   preferred securities, I looked at dates other than
14   earnings announcements, but yes, I was looking at
15   news days versus non-news days as a general matter.
16        Q.    So part of what you did is you figured
17   out, okay, what are the days when there was no news
18   related to Miller Energy; right?
19        A.    Yes.
20        Q.    So for the common stock, for example,
21   there was 300 and something of those no news days;
22   right?
23        A.    I believe it's 194, is the specific
24   number that I'm looking at.
25        Q.    I think you're looking at the
```

1                        C. Coffman

2   preferred.

3        A.    I'm looking at the preferred, you're

4   right.  Yes, 318 days, and again, it's not to

5   suggest there wasn't some news article out there

6   that just used the word Miller Energy or something

7   like that.  We looked at primary sources and

8   whether there were SEC filings or evidence of

9   analyst reports, so that's how we defined what a no

10  news date is, but yes.

11       Q.    So if there was an SEC filing, then it

12  was not a no news day; right?

13       A.    I believe we -- again, there are lots

14  of different types of SEC filings, I think we

15  looked at 10-Ks, 10-Qs, 8-Ks, I forget the exact

16  list, but correct, there was not what would

17  normally be considered an SEC filing with

18  information investors would focus on.

19       Q.    If there was an analyst report, that

20  was not a no news day?

21       A.    Correct.

22       Q.    If there was a news article about

23  Miller Energy, that was not a no news day?

24       A.    Based on the news search criteria we

25  performed, that's correct.

1                    C. Coffman

2        Q.    Did you use the Factiva database to

3  identify what days were news days versus no news

4  days?

5        A.    That was part of it, yes.

6        Q.    What else did you use?

7        A.    The EDGAR website and the Investec

8  search that I described.

9        Q.    Going back to your report at paragraph

10  36, where you talk about all these other new forms

11  of media like the Internet, and 24-hour cable news,

12  and RSS feeds, and e-mail and other media, did you

13  do anything to figure out whether there was new

14  news on any of these sources on any days to

15  determine whether they were news or no news days?

16        A.    I didn't specifically look beyond what

17  I just described.  I mean, to the extent that there

18  was a news day that we missed a story for some

19  reason or something that investors were interested

20  in, that would tend to bias against the finding of

21  market efficiency because it would be biasing

22  upward the chance of observing a stock price

23  movement in the no news sample or the placebo

24  sample.

25              So while it's plausible that the

                          C. Coffman

construction of that sample isn't perfect, to the

extent what you're describing occurred, it would

bias against my finding.

     Q.    Well, I'm not asking about bias.  I'm

asking about methodology.  In paragraph 36, you

seem to be saying that there are new means of

communicating that are important; right?  And

you've listed them.

          And if they're important, why aren't

they all considered in your analysis when you go

about trying to figure out what days are days with

no news?

     A.    I think we're talking about -- a little

bit, talking about two different things, which is,

I'm saying in paragraph 36 there's a multitude of

ways by which people could get information about

companies, not necessarily that there would be new

news.

          So when I'm referring to the Internet,

for example, I'm referring to the fact that you can

go to the SEC website or other websites, finance

websites, and get information about a company

without having to wait or rely on an analyst

report.

```
 1                        C. Coffman

 2              Certainly, when I'm referring to

 3    24-hour cable news networks, that reflects there

 4    can sometimes be interviews or news about a company

 5    that way.  You're right, my methodology doesn't

 6    search that out unless there was -- unless whatever

 7    that was was newsworthy enough to generate news

 8    articles or analyst reports following on that news.

 9              You know, RSS feeds are generally used

10    to download news, so to the extent there was a

11    meaningful news story published, my method would

12    probably pick that up.  To the extent people are

13    getting information via e-mail from investment

14    advisors, et cetera, that may not relate to new

15    news.

16              So I'm really talking about two

17    different concepts here.  In paragraph 36, I'm

18    talking about how investors access information, not

19    necessarily new news.

20         Q.    Well, in fairness, in paragraph 36, you

21    write, "There has been a significant increase in

22    alternative methods by which publicly available

23    information about publicly-traded securities is

24    disseminated to investors," and then you give those

25    examples; correct?
```

```
 1                          C. Coffman
 2          A.    Yes.  So I'm including in that somebody
 3    going to the SEC website and downloading
 4    information about a company.  So information -- in
 5    that case, information is being disseminated in a
 6    way that doesn't rely on an analyst report and
 7    that's a way that is new since 1989, so that's all
 8    I'm saying, is that people can get information from
 9    a lot of different sources.
10          Q.    In paragraph 37, you write that "The
11    ability to trade online is available almost
12    instantaneously via the Internet for anyone with an
13    online brokerage account."
14                I'm familiar with the fact that you can
15    securities at issue in this case?
16          A.    I didn't perform any tests of that in
17    this particular case, but I see no reason why it
18    wasn't true for the securities in this particular
19    case that are NYSE-traded securities.
20                I'm familiar with the fact that you can
21    go online and purchase NYSE-traded securities
22    through a brokerage account online and get current
23    bid-ask market prices, et cetera, instantaneously,
24    so I have no reason to think it wasn't.
25          Q.    So it's your expectation that if
```

1                    C. Coffman

2  someone wanted, during the analysis period, to buy

3  Miller Energy common stock, they could go into

4  their Charles Schwab brokerage account and buy it;

5  right?

6       A.    Yes.

7       Q.    And the same would be true for the

8  Series C and Series D preferred?

9       A.    I believe that's true.

10       Q.    Do you know how the online brokerages

11  fill orders?

12       A.    I'm not familiar with all the ways they

13  do it.  In my experience, if you place, at least

14  with the securities I've dealt with, if you place a

15  market order on an online brokerage, it tends to

16  get filled very quickly.

17            I have some understanding that they

18  have some electronic exchanges where things get

19  filled, but whether they also rely on specialists

20  to a certain degree, I just don't know.  I don't

21  know the mechanics of all the things they do.

22       Q.    So they could get the shares with some

23  online platform with the New York Stock Exchange or

24  some specialist or from their own inventory or

25  through a third party, you just don't know?

C. Coffman

1

2     A.     Yeah, and there's multiple exchanges

3 too that you can transact on, so there's a whole

4 host of ways that type of order can get filled.

5 And I don't know the -- all the underlying

6 mechanics for different types of brokerage houses.

7     Q.     In the middle of paragraph 37 of your

8 report, you indicate that there are numerous SEC

9 filings available online in the SEC EDGAR database

10 at no cost.  Do you see that?

11     A.     Yes.

12     Q.     That's the database you were referring

13 to earlier where folks can go on and have access to

14 SEC filings from public companies; right?

15     A.     Yes.

16     Q.     That was available through the entire

17 analysis period?

18     A.     As far as I know, yes, I believe it

19 was.

20     Q.     And if the market was efficient, would

21 you expect information filed publicly on the SEC

22 EDGAR database to be rapidly incorporated into the

23 price of the security?

24     A.     Generally speaking, yes.  I think you

25 can posit examples where it might not be immediate

C. Coffman

or within one day.  For example, if there's some
key piece of information buried deep in a filing
that no one really points out until a day or two
later, there can be some time that evolves, but I
think generally speaking, things on EDGAR are
considered publicly available and widely available
and you would expect the market to react to it
relatively quickly or rapidly.

Q.    Can you turn to page 19 of your report,
please.  We're going to turn to the Cammer factor
number 3 for market makers.  Do you have that?

A.    Yes.

Q.    Can you just explain generally how do
market makers work?

A.    Are you asking that specific to on the
NYSE or an over-the-counter market or just more
generally?

Q.    We can say NYSE.

A.    Okay.  I mean, my understanding is that
on an NYSE-traded security, there are designated
specialists who make markets, meaning that they
stand ready to buy or sell the security at a given
bid-ask price.  There can also be other market
makers that are participating by posting quotes

                        C. Coffman

1

2  either on the NYSE or other exchanges throughout

3  the country where the security can trade.

4           So to me it refers to third parties who

5  are essentially making a market by offering quotes

6  in the market.

7       Q.    Do you know who the market makers were

8  for Miller Energy's securities?

9       A.    Not as I sit here, I don't know the

10  particular firms or names of who the market makers

11  were, no.

12      Q.    Do you know how many there were?

13      A.    I think there's a function within

14  Bloomberg that you can ask how many market makers

15  there were for common stocks, so for the common

16  stock, I believe there were 73 different market

17  makers listed for the class period, for the

18  analysis period.  I cite that in Footnote 41.  And

19  I'm sorry, let me take a step back.

20           The data for that, that's why I had 41

21  is -- the data for that was only available starting

22  January 1st, 2014.  But by -- as I describe

23  throughout this factor, by virtue of trading on the

24  NYSE, there's essentially a guarantee by the

25  exchange that there's a specialist who is serving

1           C. Coffman

2 as a market maker at all times.

3      Q.    Aside from the designated market maker

4 that every New York Stock Exchange stock has, do

5 you know at this point the identity of any other

6 market makers for Miller Energy's preferred stock?

7      A.    No.

8      Q.    Do you know if there were any market

9 makers for Miller Energy's preferred stock?

10     A.    I don't know that for certain.  Again,

11 I think it's critical to understand that the Cammer

12 factor, itself, talks about counting market makers

13 as a relevant thing to do in over-the-counter

14 markets without volume reporting.

15          That's certainly not the case for

16 Miller Energy securities.  They did trade on the

17 exchange and I showed, in fact, for one, there was

18 substantial volume so there was a lot of market

19 making activity going on in all three securities.

20 But I don't specifically know the identity or

21 number of market makers for the preferred

22 securities.

23          MR. BALLARD:  Let take a short break.

24          THE VIDEO TECHNICIAN:  We're going off

25     the record.  The time is 11:07 a.m.

```
1                    C. Coffman
2              (Recess taken.)
3              THE VIDEO TECHNICIAN:  This begins
4         Media Unit No. 2.  The time is 11:20 a.m.
5         We're back on the record.
6         Q.    Mr. Coffman, do you still have Exhibit
7    25 in your hands?
8         A.    I do.
9         Q.    Turning to page 21, you have a section
10   here on Cammer factor 4, SEC Form S-3 eligibility;
11   right?
12        A.    Yes.
13        Q.    And toward the end of paragraph 45, you
14   indicate that "Eligibility to file a Form S-3 is
15   confirmatory evidence of efficiency, not a
16   requirement.  Interpreted in this way, the standard
17   makes sense as an indicator of efficiency."
18              What did you mean by that?
19        A.    I guess I mean that looking at whether
20   a firm is Form S-3 eligible is a fairly indirect
21   measure and is essentially, based on the logic in
22   the Cammer factor and as I describe here, it's a
23   proxy for the quantity of publicly available
24   information about a company that is outstanding.
25              So again, if a company is not S-3
```

                          C. Coffman

eligible, that certainly doesn't scream

inefficiency simply because it's a fairly indirect

measure, but when they are eligible, again, it's I

think a confirmatory factor, but certainly not a

bright line test for efficiency.

        Q.    So in your opinion as an economist,

it's a factor that is at least indirectly relevant

and so you do look at it to determine whether it

supports or doesn't support efficiency?

        A.    I think that's fair, yes.

        Q.    At the beginning of the analysis

period, Miller Energy was not eligible to use Form

S-3; correct?

        A.    That's my understanding, correct.

        Q.    For how long, at the beginning of the

analysis period, was Miller Energy ineligible to

use Form S-3?  Do you need some help?

        A.    Give me just a second.  I mean, I don't

know for certain off the top of my head what the

date was.  I believe it was after they filed their

2011 10-K, but I just don't recall specifically.  I

don't know what the date of that was or if that was

the precise date that they became S-3 eligible.

                  I know for certain they did issue S-3s

C. Coffman

1
2  during the class period so certainly by the time

3  they did that, they were S-3 eligible.

4      Q.    Maybe I can help you.  You do say in

5  paragraph 45 that among the requirements to be

6  eligible is the requirement that the company had

7  filed all documents in a timely manner for the past

8  12 months.

9      A.    I see that.

10     Q.    So does that help you determine how

11 long they were ineligible at the beginning of the

12 proposed class period or the analysis period?

13     A.    I haven't determined precisely when

14 they met that requirement.  It was certainly by

15 September 6, 2012, because they filed an S-3 at

16 that time, but precisely which date they became S-3

17 eligible, I don't recall.

18     Q.    Was it not important to you for how

19 long they were ineligible?

20     A.    Again, given that the essence of this

21 factor is, is there sufficient information

22 available about the company, I mean, I acknowledge

23 in my description that they weren't eligible for

24 certain portions.  So obviously during those

25 portions, I wouldn't point at this factor for those

C. Coffman

1

2 particular periods as providing independent support

3 for efficiency, but certainly during the analysis

4 period, for most of it, they were S-3 eligible.

5      Q.    So would you say that this factor

6 supports your finding of efficiency for the

7 portions of the analysis period when the company

8 was S-3 eligible only?

9           It's not a trick question.

10     A.    I understand.  I think it would be hard

11 to say, during the periods that it was ineligible,

12 that you would look at this factor independently as

13 providing evidence of efficiency.

14          Over most of the analysis period, it's

15 clear they were eligible and it does provide that

16 support, but when they were ineligible, technically

17 this factor doesn't support that.

18     Q.    You can confirm that Miller Energy was

19 ineligible for the first full year of the class

20 period; correct?

21     A.    I don't know that I could conclude

22 that, no.

23     Q.    In paragraph 45, you indicate that one

24 requirement is that the company had filed all

25 documents in a timely manner for the past 12

1                          C. Coffman

2   months; right?

3        A.    Yes.

4        Q.    Do you know what started the class

5   period in this case, the proposed class period?

6   Are you aware that the class period began with the

7   filing of the Form 10-K, the second amended version

8   of the Form 10-K?

9        A.    That does ring a bell now.  I recall

10  there being an earnings announcement.  I wasn't --

11  yes, I believe -- now that I'm thinking about it,

12  yes, that does make sense.

13       Q.    So now you can confirm that, in fact,

14  the company was ineligible to use Form S-3 for the

15  first full year of the class period, correct,

16  proposed class period?

17       A.    I believe that's probably correct, yes.

18            (Exhibit 26, Second Amended Form 10-K

19       for Miller Energy for the period ending April

20       30, 2011, marked for identification, as of

21       this date.)

22            MR. BALLARD:  Let's mark this also as

23       27.

24            (Exhibit 27, detail printed from the

25       EDGAR website for Second Amended Form 10-K

                          C. Coffman

1
2          for Miller Energy for the period ending April

3          30, 2011, with filing date of August 29,

4          2011, marked for identification, as of this

5          date.)

6          Q.    We've handed you Exhibit 26 and 27.  Do

7      you recognize Exhibit 26 as the second amended Form

8      10-K for Miller Energy for the period ending April

9      30, 2011?

10         A.    I certainly recognize it as the 10-K

11     covering the fiscal period April 30, 2011.  Maybe

12     you could help me find the date that this was filed

13     on here.  It looks familiar, but I'd like to

14     confirm.

15         Q.    I anticipated you might have that

16     question so we've handed you Exhibit 27, which is

17     the detail printed from the EDGAR website for this

18     filing and if you look at the top left, do you see

19     a filing date of August 29, 2011, accepted in the

20     morning at 7:46 a.m.?

21         A.    Yes, that appears to indicate that's

22     when it was filed.

23         Q.    So turn, if you will, in Exhibit 26, to

24     the page number 22.

25         A.    Okay.

C. Coffman

1

2      Q.    At the top of the page, there's a

3  heading, "The staff of the SEC has determined that

4  certain of our Forms 8-K related to acquisitions

5  were made in fiscal year 2010 and our Form 10-K for

6  fiscal year 2011 are materially deficient which

7  will adversely impact our ability to raise

8  additional capital."

9            Do you see that?

10     A.    I do.

11     Q.    If you look three lines down, there's a

12  sentence, "Until such time as we file audited

13  financial statements, the staff has advised us it

14  considers these Forms 8-K to be materially

15  deficient and that it will not waive the financial

16  statement requirements.  As a result, we are unable

17  to utilize Short Form Registration Statement on SEC

18  Form S-3."

19            Do you see that?

20     A.    Yes.

21     Q.    So this would confirm that at the

22  beginning of the analysis period, the company was

23  not eligible to use Form S-3; correct?

24     A.    Yes.

25            MR. BALLARD:  You can set that aside.

```
1                      C. Coffman

2         Mark this, please.

3              (Exhibit 28, Form 10-K for Miller

4         Energy for the period ended April 30, 2012,

5         marked for identification, as of this date.)

6              (Exhibit 29, detail printed from the

7         EDGAR website for Form 10-K for Miller Energy

8         for the period ended April 30, 2012, showing

9         filing date of July 16, 2012 at 5:17 p.m.,

10        marked for identification, as of this date.)

11        Q.    I'm going to hand you what we have now

12   marked as Exhibit 28.  Does this look to be the

13   Form 10-K for Miller Energy for the period ended

14   April 30, 2012?

15        A.    Yes.

16        Q.    And for the filing date, let me hand

17   you Exhibit 29.  From Exhibit 29 can you determine

18   when Exhibit 28 was filed and accepted by the SEC?

19        A.    It appears it was filed on July 16,

20   2012.  It appears to be after market hours on that

21   date.

22        Q.    At 5:17 p.m.; right?

23        A.    Yes.

24        Q.    And is it your understanding that

25   that's when this was filed and available on the
```

                            C. Coffman

1

2  EDGAR system?

3       A.     That's my general understanding.  I

4  don't know all the precise mechanics of when it

5  becomes available, but my understanding is that

6  that reflects essentially the time it was filed

7  with the SEC.

8       Q.     Can you turn to page 19, please.  The

9  page numbers are a little hard to find but 19 is at

10 the top of the page on the left-hand side.  Yours

11 is single-sided and mine is double-sided so it

12 won't --

13            MS. POSNER:  Is it the page that starts

14       in bold "CIE Operations"?

15            MR. BALLARD:  I have a page before that

16       that looks like that.

17            MS. POSNER:  So you want that little --

18            MR. BALLARD:  That's the carryover

19       page.

20       A.     I think I've found the beginning of

21 page 19.  There's a bullet point starting "Merge or

22 Consolidate"?

23       Q.     I think we are probably in the same

24 place.

25       A.     I'm on what I believe is 19.

C. Coffman

1

2      Q.    That's it.  Okay.  So page 19, do you

3  see a heading, "Our business and stock price could

4  be adversely affected"?

5      A.    Yes.

6      Q.    It goes on, "if we're not successful in

7  enhancing our management systems, accounting,

8  controls and reporting performance."  Right?

9      A.    I see that.

10      Q.    Two paragraphs down, there's a

11  statement, "The staff of the SEC has determined

12  that certain of our Forms 8-K related to

13  acquisitions we made in fiscal year 2010 are

14  materially deficient which will adversely impact

15  our ability to raise additional capital."

16            Do you see that?

17      A.    I do.

18      Q.    And then in the next paragraph, four

19  lines down, there's a statement, "As a result, we

20  are unable to utilize the Short Form Registration

21  Statement on SEC Form S-3."  Do you see that?

22      A.    I see that, yes.

23      Q.    So does this confirm that as of July

24  16, 2012, Miller Energy was still unable to utilize

25  Form S-3?

1                          C. Coffman

2          A.    It seems to indicate that, yes.

3          Q.    You can set that aside.  Now at some

4   point in time Miller Energy regained its ability to

5   file on Form S-3; right?

6          A.    Yes.

7          Q.    But then at some point, the company

8   lost the ability again; right?

9          A.    I believe that's the case, yes.

10         Q.    Do you know when Miller Energy once

11  again lost the ability to use Form S-3?

12         A.    I believe at some point late in the

13  analysis period, they disclosed to the market that

14  they couldn't file one of their filings on a timely

15  basis, so my understanding is that probably

16  triggers the ineligibility to file S-3, but I don't

17  recall the specific date as I sit here.  I mean, I

18  can try to look for it in my report.  I don't know

19  if it's there.

20         Q.    You're aware that eligibility to file

21  on Form S-3 requires that a company maintain a

22  certain float, right, excluding stockholders who

23  are affiliated?

24         A.    That's my general understanding, is

25  there are some requirements for public float or

C. Coffman

1

2  market cap, yes.

3      Q.    If the affiliated float drops below $75

4  million, the company loses its eligibility;

5  correct?

6      A.    As I sit here, I don't recall the exact

7  numbers, but I believe there are those types of

8  conditions.

9      Q.    Do you know when Miller Energy's

10  non-affiliated float dropped below $75 million?

11      A.    I mean, I could try to figure that out,

12  but I don't know precisely as I sit here.

13      Q.    Do you have a rough estimate of when

14  that occurred, even if you just narrow it down to a

15  year?

16      A.    As I sit here right now, I can't

17  because I don't remember if the criteria is

18  specific to just the common stock or includes the

19  non-affiliated float of all their publicly-traded

20  securities.

21      Q.    Okay, but as you think about it now,

22  has it become clear to you that at some point

23  Miller Energy became ineligible again to file on

24  Form S-3 because its market cap dropped below the

25  threshold?

C. Coffman

1

2      A.      That is certainly plausible, yes.

3      Q.      And from that point forward, through

4  the end of the analysis period, the company

5  remained ineligible to use Form S-3; correct?

6      A.      I don't know if the prices went back up

7  for some period of time where they would have

8  become eligible, but certainly at some point that's

9  true.

10     Q.      Do you know for how much of the

11  analysis period Miller Energy was ineligible?

12     A.      I think for the first year, and then

13  for some period towards the end of the analysis

14  period, it was not.  Based on looking at my Exhibit

15  13, I believe they would have been eligible at

16  least, based on the market cap limit, up through

17  sometime during the fourth quarter of 2014.

18     Q.      Let me stop --

19     A.      But beyond that, I don't know

20  precisely.

21     Q.      Now we may have used this 2014 -- when

22  you said fourth quarter 2014, are you talking about

23  through April 30, 2014?

24     A.      No.  I'm talking about the calendar

25  quarter of fourth quarter 2014.

C. Coffman

1

2      Q.      I just want to be clear because earlier

3  we talked about the years and how we're defining

4  them.  So in this instance, you're talking about

5  fourth quarter of calendar year 2014?

6      A.      Correct.

7      Q.      You're looking around October, is that

8  correct, when the market cap dropped significantly?

9      A.      Yeah.  What I'm saying is the market

10 cap is clearly over $100 million, really over $150

11 million, prior to sometime in it appears to be

12 around November 2014.

13     Q.      So we've got a chunk at the beginning

14 and a chunk at the end where the company is

15 ineligible.

16     A.      That's my understanding, yes.  That's

17 consistent with what I said in my report.

18     Q.      Well, in your report, if you look at

19 paragraph 46, the last sentence, you wrote, "Miller

20 Energy meets this Cammer efficiency factor, which

21 supports the conclusion that Miller Energy

22 securities traded in efficient markets"; right?

23 That's what you wrote?

24     A.      I think I acknowledged in Footnote 44

25 there were portions of the class period that they

                              C. Coffman

1

2   were not eligible to file S-3.

3       Q.   My quibble is in this sentence you're

4   treating it as a binary question, yes or no, it

5   either supports or doesn't support efficiency.

6   That's what that sentence reads to me.  Is that not

7   what you intended?

8       A.   I think it's fair to say that over a

9   substantial portion of the analysis period, they

10  met this Cammer factor and it supports the

11  conclusion that they traded in efficient markets.

12           I agree with you at a technical level

13  over periods where they weren't S-3 eligible, if

14  you were sort of tallying up the factors that

15  support efficiency, I wouldn't necessarily put this

16  factor in that column.

17      Q.   So, for example, for the first year of

18  the proposed class period or the analysis period,

19  this factor does not support a finding of

20  efficiency; correct?

21      A.   I don't think it provides any evidence

22  of inefficiency, but I would not say that it

23  provides affirmative support of efficiency.

24      Q.   So maybe in paragraph 46, we should

25  read this to have a qualifier at the end, during

1                    C. Coffman
2  certain portions of the analysis period; correct?
3       A.    I think read together with Footnote 44,
4  it's clear that I'm saying that this was true over
5  a large portion of the class period, analysis
6  period, but it's not true during some portions,
7  that's correct.
8       Q.    Let's move on and talk a little bit
9  about the preferred stock again.  Do you know if
10  Miller Energy offered any preferred stock using
11  Form S-3?
12       A.    As I sit here right now, I don't recall
13  if they used S-3 as support for that offering.
14       Q.    Are you aware that there are
15  eligibility requirements for Form S-3 that relate
16  both to the company, the registrant, as well as the
17  security, itself?
18            MS. POSNER:  Objection.
19       Q.    So there are market cap requirements
20  for the company and there are market cap
21  requirements for the actual security for purposes
22  of S-3; right?
23       A.    As I sit here right now, I don't recall
24  that level of detail.
25       Q.    Let's talk about Cammer factor number

C. Coffman

1

2 5, and you call this price reaction to new

3 information; right?

4          A.    Yes.  I think I also refer to it as

5 cause and effect in other places.

6          Q.    All right.  And in paragraph 47 of your

7 report you write "The fifth Cammer Factor relates

8 to how the price of the security reacts to new

9 company-specific information and states," and then

10 you have a quote here.  That quote is from economic

11 literature; right?

12          A.    No.  That's from the Cammer decisions.

13          Q.    That's from Cammer.  Okay.  So in 47,

14 you quote Cammer for the proposition that "One of

15 the most convincing ways to demonstrate market

16 efficiency would be to illustrate, over time, a

17 cause and effect relationship between company

18 disclosures and resulting movement in stock price."

19          Did I read that right?

20          A.    Yes.

21          Q.    Do you agree that this is one of the

22 most convincing ways to demonstrate market

23 efficiency?

24          A.    I think it's one of the most direct

25 methods of showing it, so yes.

C. Coffman

1

2      Q.    So among all the Cammer factors, this

3  is one that is more, as opposed to less, direct?

4            MS. POSNER:  Objection.

5      A.    Yeah.  I would never say it's the only

6  factor or that it's determinative by itself, but I

7  would say it is one of the most -- it is the most

8  direct test, yes.

9      Q.    In paragraph 48, you refer to something

10 called an event study and then in 49, you talk a

11 little bit about what an event study is; right?

12     A.    Yes.

13     Q.    And in paragraph 49 you write "An event

14 study is a technique used to measure the effect of

15 new information on the market prices of a company's

16 publicly traded securities."

17           Why new information?

18     A.    Because to the extent information that

19 is being reported is not new or unexpected in some

20 way, you wouldn't expect it to change investors'

21 valuation of the company.

22     Q.    If it's old information that came out a

23 month ago, it should already be incorporated into

24 the price; right?

25     A.    Yes.  You have to be careful sometimes

C. Coffman

1
2  about context, so just as a hypothetical, a company
3  announces that it has a billion dollars in cash,
4  and then the next period, based on what had
5  transpired, the market would have expected it to
6  grow in some substantial way and they come out and
7  say again that our cash is a billion dollars.

8            Technically, those are the same pieces
9  of information but it really does provide new
10 information in terms of context.  You have to be a
11 little careful about how you talk about old
12 information, but generally, if the information
13 isn't really introducing anything new and value
14 relevant to investors you wouldn't expect it to
15 move the stock price.

16      Q.    You refer to specifying a model with
17 expected price movements, conditioned on outside
18 market factors, and then you explain in the
19 subsequent paragraphs of your report.  Right?

20      A.    I explain that in the section, yes.

21      Q.    Can you just explain generally how you
22 go about testing whether there's a deviation from
23 expected price movements and whether it's
24 sufficiently large to exclude randomness.

25      A.    Are you talking about an individual day

C. Coffman

1 coming from an event study?

2

3     Q.    As a general matter.

4     A.    Sure.  Well, because there's multiple

5 different tests that are relevant in what I'm

6 doing, so if you're testing the statistical

7 significance of a given day, you estimate what you

8 expect the stock price movement to be based on the

9 movement of the independent factors you're

10 controlling for.

11          You then observe what you -- what the

12 actual stock price movement was, and then you

13 compare those two to create what is called an

14 abnormal return, which is the unexpected portion of

15 the price movement given the control factors, and

16 then based on the empirical data of how volatile

17 the stock is, those abnormal returns are over the

18 estimation window, you can evaluate whether what

19 you're observing on a given day is sufficiently far

20 from zero that you would not expect to observe that

21 by random forces alone.

22          And then if you observe that it falls

23 outside the 95 percent confidence interval of what

24 you would expect by randomness alone, you draw an

25 inference that the new information that was

1                           C. Coffman

2   revealed caused the price movement.

3        Q.    The independent factors you controlled

4   for here were movements in the S&P 500 and oil

5   prices; right?

6        A.    A measure of oil futures, yes.

7        Q.    In paragraph 50, you talk about your

8   cause and effect analysis and you mention you

9   performed an event study, and then you say you

10  evaluated whether Miller Energy's common stock

11  reacted to earnings announcements in a manner

12  significantly different from how the stock moved on

13  days when no Miller Energy-related news came out.

14  Right?

15       A.    Right.  So now, just to complete my

16  previous answer, the other statistical test I

17  performed, beyond just looking at statistical

18  significance on individual dates, is whether the

19  results on earnings dates are statistically

20  significantly different than the results on no news

21  dates.  So that's a separate statistical test

22  that's part of the event study methodology I

23  performed.

24       Q.    I'm sorry.  What was the first

25  statistical test?

C. Coffman

1

2      A.      Testing whether an individual day

3  was -- how you determine whether an individual day

4  is statistically significant, and then there's a

5  separate statistical test of are the news days that

6  I'm identifying different than the no news days I'm

7  identifying.

8      Q.      But the first statistical test you

9  referred to, testing whether an individual day was

10  statistically significant, that alone doesn't tell

11  you anything about market efficiency, right, in the

12  absence of the second test?

13      A.      I don't know that it tells you nothing.

14  I think in the -- certainly in the past, that's how

15  many experts looked at market efficiency, was to

16  identify days where there was news and evaluate

17  whether there was a statistically significant stock

18  price movement and use that as evidence for market

19  efficiency.

20          Certainly when you observe that, it's

21  consistent with market efficiency, so I don't know

22  whether I would say it's no evidence.  I'm saying

23  my methodology is to go beyond that and say let's

24  look at a sample of days with news and days with no

25  news.

C. Coffman

Q.    In this case, as you say, you looked at earnings days versus no news days and that was an important part of your analysis; right?

A.    Yes, that's an important part of my analysis.  I'm just saying the first part isn't devoid of information.

Q.    Let me ask you this.  If you hadn't done the earnings days versus no news days analysis, and you had none of that available to you, would you have been able to reach a conclusion on cause and effect?

A.    Possibly.  I mean, I haven't really considered how precisely I would have done that without that type of test, but one could have looked at other days to see if there was market price reaction.  I mean, I'm not saying there aren't alternative ways to look at it, but what you're describing is an important part of what I'm doing.

Q.    So the way you did it here was to compare earnings days with no news days?

A.    Yes.

Q.    There might be another way to do it, but that's how you did it here and that's how you

1                          C. Coffman

2  got to a conclusion; right?

3        A.     That's the evidence that I'm using to

4  support my conclusion, yes.

5        Q.     So Exhibit 7, for example, on the

6  common stock, that contains the essence of your

7  analysis on the cause and effect relationship in

8  this case for the common stock?

9        A.     I think it's really Exhibit 7 and --

10        Q.     And 8?

11        A.     -- and 8, but that's not to say there

12  isn't other relevant evidence you could draw from

13  the event study I performed, but that's the test

14  I'm performing that I'm relying on that supports my

15  conclusion at this time, yes.

16        Q.     Exhibit 7 and 8 contain the actual test

17  and analysis you used to draw your conclusion.

18  You're not excluding the possibility that if you

19  looked at something else, you might have found

20  something else to look at, but that's what you used

21  in this case?

22        A.     In terms of analyzing cause and effect,

23  yes.

24        Q.     On that comparison between earnings

25  announcement days versus no news days, how did you

1    C. Coffman

2   select or why did you select earnings announcement

3   days for that comparison?

4        A.    Because that's something that there's

5   an abundance of academic literature that studies

6   how earnings announcements can and often provide

7   important firm-specific information relevant to

8   investors in valuing stocks, so there's a -- and

9   it's an objective set of dates to test.

10            Every company has to issue earnings

11  announcements on a quarterly basis, so it provides

12  a regular objective set of dates to test.

13       Q.    Have you ever used any other set of

14  dates, like 10-Ks, or all news dates, or some other

15  measure?

16       A.    Well, yeah.  I mean, in this case, for

17  the preferred securities, I look at other types of

18  dates, and there have been other cases where I've

19  looked at certain other types of dates.

20            For example, in certain cases involving

21  biotech companies where the company is really

22  pre-revenue or pre at least significant revenue,

23  and the company is valued much more on how it's

24  proceeding through the clinical trials and the

25  regulatory process, then, you know, the public

C. Coffman

1  statements about their progression through that

2  process actually provide a lot more information

3  about value than earnings event dates.

4

5          So there are certain times and certain

6  cases where I've looked beyond earnings

7  announcements.  It's not to suggest earnings

8  announcements are the only thing you can look at.

9  It just provides an objective set of data that

10  makes sense to look at.

11      Q.    Don't companies sometimes give guidance

12  such that analysts can have a pretty good idea of

13  where earnings are going to be before the earnings

14  are announced?

15      A.    Well, I think sometimes they provide

16  guidance well ahead of earnings announcements.  So

17  there are a lot of times that companies will have

18  earnings that are consistent with prior

19  expectations and, therefore, the stock price

20  wouldn't necessarily be expected to react

21  significantly, but it's still providing important

22  firm-specific information.

23          And, you know, sometimes they offer

24  pre-announcement, pre-announce earnings, you know,

25  before the official earnings announcements, and

C. Coffman

2  those would be important dates to look at too or

3  could be important dates to look at.

4        So I'm not saying earnings

5  announcements are the only dates you could look at,

6  but it provides an objective set of dates where

7  there's often firm-specific information being

8  provided.

9       Q.    If you have a stock with a bunch of

10  analysts covering the stock and they have got

11  analyst reports out in the market all the time and

12  they have their models and they're predicting what

13  earnings will be, can't you have a situation where

14  the markets are very well aware of what the

15  expected earnings release will be before it comes

16  out?

17       A.    Well, yeah, but just because there are

18  expectations, and you're right, there often are

19  expectations out in the market as to what the

20  earnings will be, that doesn't mean the earnings

21  will necessarily be what those expectations are,

22  nor does it mean that there can't -- even if the

23  earnings are around what was expected for the

24  current quarter, that the company can't provide

25  either updated guidance on other qualitative

C. Coffman

information or other information about the company
that affects the market's perception of the value
of the company.

So it's not even just about the
earnings.  There's lots of information that is
potentially revealed on earnings announcement
dates.  And you actually see it fairly often that
the market isn't surprised by anything in the
earnings announcements and, therefore, it doesn't
react in a statistically significant way.  That
happens all the time.

Q.    Are you saying that you would expect
the markets to be more likely to react on earnings
release days than on no news days, even though in
many instances there should be no reaction because
there's no real new news?

MS. POSNER:  Objection.

A.    Again, I think it would be odd for
there to be no real new news.  I mean, even when a
company meets expectations, they're providing
clearly relevant information on how the company is
performing, and they could be providing other
information beyond the earnings numbers that is
relevant to investors.

1    C. Coffman

2         Again, it doesn't necessarily mean that

3    all that information would necessarily cause an

4    expected statistically significant stock price

5    movement, but certainly much more often than a no

6    news day, yes, because it's a day on which the

7    company is regularly providing material new

8    firm-specific information.

9         Q.    In paragraph 54, you talk about your

10   regression model for the company stock and you

11   indicate that you used a window of 120 trading

12   days.  Do you see that?

13        A.    I do.

14        Q.    Can you explain that?

15        A.    Sure.  So this is a methodology I often

16   use in this context.  When you're doing a event

17   study, there is some subjectivity in choosing what

18   period over which you're estimating the expected

19   price movements.

20             I cite to some particular literature

21   that suggests for an event, a daily event study,

22   the market model parameters could be estimated over

23   the 120 days prior to the event.  That is

24   essentially a six-month time period, which means

25   you're using data that is fairly close to the event

                         C. Coffman

1  of interest and not going so far back that the

2  circumstances would be expected to change in a --

3  as if you were using a five-year period, but at the

4  same time gives you enough data to be -- provide a

5  powerful sample of data from which to draw a

6  conclusion.

7          So it's a -- I generally adopted this

8  approach consistently across cases where it makes

9  sense.

10     Q.    And you came to the conclusion it made

11 sense here?

12     A.    For the common stock, it did.  For

13 reasons described later in the preferred section, I

14 don't believe it made sense for the preferred

15 securities, but for the common stock, yes, it did.

16     Q.    I want to back up for a second to

17 paragraph 43 where you talk about the oil price

18 index.

19     A.    Yes.

20     Q.    And then you indicate that you chose

21 that rather than using a group of peer firms, but

22 then there's a footnote where you say you did a

23 sensitivity analysis of some sort to see if it made

24 a difference; right?

C. Coffman

1

2          A.     Yes.

3          Q.     And I think you concluded that it did

4    not materially alter the results when you did the

5    test to see if you used the peer firms?

6          A.     Right.  Certainly over -- in terms of

7    the overall conclusions, it did not affect

8    anything.  Obviously, on any given day, it may have

9    affected something to a certain extent, but the

10   overall conclusions of the report were no

11   different.

12         Q.     Do you remember any of the details of

13   that analysis?

14         A.     I remember looking at it, but I don't

15   remember specific numbers from it.

16         Q.     Did you perform like a similar kind of

17   an event study with respect to peers -- what did

18   you perform in that analysis?

19         A.     Yeah.  I performed essentially the same

20   analysis that is described here, as I say in

21   Footnote 52, once using the industry index as a

22   replacement for the oil price index and once using

23   the industry index in addition to the oil price

24   index.

25         Q.     Did you include any of those analyses

```
                          C. Coffman
 1
 2    or data or findings in your report or exhibits?
 3         A.    I don't believe I reported the
 4    specifics of those results in the report, no.
 5         Q.    Do you still have them?
 6         A.    I believe so.
 7    REQ        MR. BALLARD:  Can I have them?
 8              MS. POSNER:  We're happy to take your
 9         request under advisement, to the extent it
10         wasn't included in the materials we provided.
11    REQ        MR. BALLARD:  It would be good to have
12         it.  It's cited in the report so I would like
13         to have the backup for that.
14              MS. POSNER:  Why don't you make a
15         request and we will take it under advisement.
16              MR. BALLARD:  I just did.
17         Q.    In paragraph 55, you indicate that
18    "There is a positive correlation between Miller
19    Energy common stock and the control variables.  In
20    other words, the movement of the market index and
21    oil price index helps explain the price movements
22    in Miller Energy common stock."
23         A.    Yes.
24         Q.    So the common stock at least was
25    sensitive to changes in the price of oil; is that
```

1                        C. Coffman

2    right?

3         A.    That's correct, yes, overall.  I think

4    it varied in importance over time, but my

5    understanding is the common stock was influenced by

6    the price of oil, yes.

7         Q.    And the preferred stocks were also

8    sensitive to the price of oil as well, right,

9    particularly toward the end of the period?

10        A.    Certainly toward the end of the period.

11   I think early in the period, for reasons described

12   in my report, it was likely not sensitive to oil

13   prices in a -- on a day-by-day basis because when

14   the preferred's were trading as if -- where there

15   weren't huge liquidity concerns about the company,

16   and the value of the preferred's is based primarily

17   on the payment of the dividend, you wouldn't expect

18   that to necessarily be sensitive to the price of

19   oil.

20        Q.    Whereas on the common stock, you

21   concluded that there was a consistently positive

22   relationship between the general market of the oil

23   price index and the price of Miller Energy common

24   stock; right?

25        A.    Yes.  I think if you look at Exhibit 5,

1                          C. Coffman
2    there was one very tiny portion early in the
3    analysis period where the coefficient was negative,
4    but generally speaking, over the class period, it
5    was positive and it was more sensitive toward the
6    end.
7         Q.    You're talking about Exhibit 5 to your
8    report; right?
9         A.    Correct, yes.
10        Q.    And you're just seeing this anomaly
11   where it drops below zero for a short period of
12   time at the beginning?
13        A.    Yes.
14        Q.    But otherwise, the price of Miller
15   Energy's common stock was very much dependent on
16   the price of oil?
17             MS. POSNER:  Objection.
18        A.    I don't know what you mean by "very
19   much," but it makes sense, as a matter of economics
20   and the results I see, that the common stock price
21   would be sensitive to the price of oil.
22        Q.    Tell me just generally, what is Exhibit
23   5 intended to show?
24        A.    It shows over time the results of the
25   rolling regression model I describe in my report,

```
 1                      C. Coffman
```
what the sensitivity is of the common stock price

to the independent control that is being used.

            So it shows -- the blue line reflects

the coefficient for the S&P 500 Total Return index

and the purple line reflects that for what I'm

using as the oil price index.

      Q.    So why don't you give us an example.

So if -- what does it mean to say that the

coefficient for one of those variables is, say,

1.6?

      A.    Sure.  So at that point in time, that

is suggesting that over the previous 120 days, the

model is telling you that for every 1 percent

change in the price of the S&P 500, you would

expect a 1.6 percent change in the price of the

common stock.

      Q.    And the same applies for the oil index,

you're just looking at the other line on here?

      A.    Yes.

      Q.    Thank you.  Earlier you mentioned the

95 percent confidence level.  Can you explain what

that is?

      A.    Sure.  I mean, generally in the field

of statistics, it's if you're performing a

1                    C. Coffman
2    statistical test and have an assumption about the
3    distribution of what you're measuring, it's asking
4    whether your observed data falls outside the range
5    of what you would expect by range of chance with 95
6    percent confidence.
7        Q.    Is the 95 percent confidence level
8    routinely used in this type of case?
9        A.    Yes.  There are other levels that I've
10   seen used both in securities litigation and also in
11   the relevant economic literature, but 95 percent is
12   often used, yes.
13       Q.    Is that what you used typically?
14       A.    I think it, as a matter of financial
15   economics, makes sense to point out and it's
16   reliable to draw inferences even at the 90 percent
17   level, but I use 95 percent as the threshold that
18   I'm describing in this report.
19              I mean, I show where results are
20   significant at the 90 and 95 percent level, but my
21   opinion is that, you know, my -- the results
22   suggest that there's a cause and effect
23   relationship well above the 95 percent confidence
24   level.
25       Q.    So your opinion in this case is based

                         C. Coffman

1  

2  on the results you show at the 95 percent

3  confidence level?

4       A.    Again, I'm concluding market efficiency

5  in part based on cause and effect analyses that

6  have statistical significance over 95 percent.  I'm

7  not suggesting that if it were over 90 percent,

8  that that doesn't provide important scientific

9  evidence, but in this particular case, I'm saying

10  that the results are significant at well over the

11  95 percent level.

12       Q.    Is the 95 percent confidence level what

13  you typically see in the academic literature?

14       A.    I think you see both.  I think when

15  somebody -- I think it's clear when somebody is

16  talking about statistical significance and not

17  specifying a particular level, they're usually

18  referring to a 95 percent level, but if you look at

19  the academic literature in the area of financial

20  economics, there are inferences drawn at the 90

21  percent level all the time.

22       Q.    So in paragraph 59, you say you

23  analyzed cause and effect and you examined the

24  price response of Miller Energy common stock to the

25  17 earnings announcements that occurred during the

```
1                       C. Coffman
2    analysis period, which you describe as an objective
3    set of dates.
4              Do you see that?
5         A.   Yes.
6         Q.   And again, I think you said that this
7    was the heart of your analysis at least on the
8    cause and effect factor?
9         A.   For the common stock.
10        Q.   For the common stock, yes, and then for
11   the preferred, we would have to look at different
12   exhibits where you did a different analysis?
13        A.   Yes.  The selection of the dates was
14   different on the preferred for reasons described in
15   my report as to why the preferred wouldn't
16   necessarily be sensitive to earnings -- the
17   earnings announcements.
18             MS. POSNER:  Just for clarity, you said
19        Exhibit 7 and 8 when you were testifying
20        earlier about this.
21             MR. BALLARD:  Good point, 7 and 8.
22        A.   Yeah, and there's also obviously detail
23   in the text and charts in the text related to that.
24        Q.   And I understand there's extensive, you
25   know, backup data you've produced with the
```

C. Coffman

underlying data, but I'm just talking about if you
want to direct someone to the essence of your
analysis and conclusions with respect to whether
there's a cause and effect relationship for the
common stock, Exhibits 7 and 8 are the best places
to look; right?

A.     I think that provides a fair
representation or summary of what I -- of the
results I obtained and what I'm basing my opinion
on, but again, it's discussed in more detail in the
text and I provide other graphical ways of
depicting that data in the text.

Q.     In paragraph 60 of your report, you
give an example here.  You write, "Considering the
fifth earnings release listed in Exhibit 7 as an
example, the company announced negative fourth
quarter results for the fiscal year 2012 due to
high operating loss.  In response, the market price
of Miller Energy common stock decreased 7.13
percent compared to the predicted return of 1.35
percent and had an abnormal return on July 17,
2012, of -8.48 percent.  With a t-statistic of
-2.54, this abnormal price movement is
statistically significant and I therefore have

1                    C. Coffman

2  scientific evidence that Miller Energy common stock

3  reacted rapidly to this new information."

4            Did I read that correctly?

5      A.    Yes.

6      Q.    So in your opinion, is this strong

7  evidence that the price of Miller Energy's common

8  stock declined in a statistically significant way

9  in response to the disclosure of the company's Q4

10 and year-end results for the fiscal year 2012?

11     A.    I think that's certainly part of what

12 it was reacting to.  The test would incorporate any

13 firm-specific information that was available

14 included in the filing or any other firm-specific

15 information that was released on that day.

16            So, for example, there could have been

17 qualitative disclosures as well, so I wouldn't read

18 this to be saying that it's specific necessarily to

19 the fourth quarter results as much as the mix of

20 information that was released as part of that

21 earnings announcement.

22            In other words, I'm not disaggregating

23 whether it was the fourth quarter results or some

24 other information as part of that earnings release

25 as part of this analysis.

1          C. Coffman

2          Q.    It could have been the year-end

3    results, it could have been the fourth quarter

4    results, it could have been some commentary

5    included in the release, it could have been

6    anything, but you are saying it was a statistically

7    significant reaction to whatever came out that day;

8    right?

9          A.    Yes.  I don't know that I would

10   distinguish between the full year and the fourth

11   quarter because the full year is just incorporating

12   things that already had been released, but aside

13   from that, yes.

14         Q.    So when you're talking about the fourth

15   quarter earnings release, you're really talking

16   about a release that included both the fourth

17   quarter as well as the full year results?

18         A.    It included that.  I'm just saying that

19   the results for the first three quarters wouldn't

20   be new news at that point.

21         Q.    In Footnote 59 on this page, you

22   indicate "It is not unusual to have occasional

23   earnings announcements that are not statistically

24   significant."

25               What did you mean by that?

C. Coffman

1

2      A.      I think that reflects what I was

3 describing in one of my prior answers, which is

4 that to the extent the earnings announcement is

5 consistent with market expectations or that there's

6 a mix of positive and negative information, it's

7 not unusual at all to see earnings announcements

8 where there is not a statistically significant

9 stock price movement because there is not a

10 sufficient change in the mix of value-relevant

11 information in order to generate a significant

12 change in the price.

13      Q.      Just to be clear, are you saying it is

14 not unusual to have occasional earnings

15 announcements that are not statistically

16 significant even for a security that trades in an

17 efficient market?

18      A.      Yes.

19      Q.      What do you mean by occasional in that

20 context?

21      A.      I don't -- I wasn't trying to convey

22 any particular quantification there.  In fact, it's

23 probably not a great word to use because it's

24 actually more than occasional.  It happens quite

25 often.

```
 1                    C. Coffman
 2       Q.    The overwhelming majority of Miller
 3  Energy's earnings releases didn't result in a
 4  statistically significant reaction; correct?
 5            MS. POSNER:  Objection.
 6       A.    That's true, yes.  And I see that in a
 7  number of different cases and I think there are
 8  specific reasons why that -- in the context of this
 9  case, why that's not surprising.
10       Q.    In this case, 13 of 17 earnings
11  announcements did not result, by your analysis, in
12  a statistically significant change in the price of
13  Miller Energy's common stock; is that right?
14       A.    That's correct, and as I just said, I
15  think there's a lot of important reasons why that
16  is not a surprising result even in an efficient
17  market.
18       Q.    What are those reasons?
19       A.    Number one, as I've explained in prior
20  answers, just theoretically, there's nothing
21  suggesting that all earnings announcements should
22  be statistically significant, especially if the
23  earnings are within the bounds of what was expected
24  or there's a mix of positive and negative
25  information.
```

C. Coffman

1

2          Second, in this -- for this particular

3   company, early in the class period or analysis

4   period, the nature of this company is that its

5   value, at least perceived market value, is based on

6   the amount of oil in the ground that it expects to

7   extract, and very early in the analysis period, the

8   company is just preparing to extract it and putting

9   capital expenditures in place to be able to do

10  that.

11          And so the specific earnings numbers

12  that are given early in the analysis period may not

13  move the needle very much in terms of how people

14  would value an oil company whose primary assets are

15  the oil still in the ground.  And then towards the

16  end of the analysis period, when the stock price is

17  trading at a very low value, even analysts are

18  talking about the stock price is really an

19  indicator of the option value that the company is

20  going to survive.

21          And so immediate short-term earnings

22  are less important than the general liquidity

23  issues that the company was facing and so you

24  wouldn't necessarily expect the stock price to be

25  overly sensitive or highly sensitive to earnings.

                            C. Coffman

1              So there are specific case-specific

2    reasons why that result is not all that surprising,

3    as well as the initial reason I gave, which is just

4    as a theoretical matter, every earnings

5    announcement wouldn't be expected to be

6    statistically significant.

7              The relevant point is, and that is the

8    purpose of the analysis, is to say even given those

9    things, is it clear that there's evidence of cause

10   and effect for the earnings announcements relative

11   to the no news dates, and there clearly is.

12        Q.    Going back to the broad approach that

13   you're using, you're comparing earnings

14   announcement days with no news days.  And I thought

15   you said the rationale for that is, well, you would

16   typically expect earnings announcements that

17   contain material information might move the price,

18   whereas you would expect the price not to typically

19   move where there's no news.

20        A.    Right.  I think "might" is the

21   important word in that sentence.  It's that on

22   earnings announcement days, it's much more likely

23   that firm-specific information is reaching the

24   market that might cause a statistically significant

                    C. Coffman

1

2   stock price movement, but it doesn't mean that it

3   is always receiving information that would move the

4   stock price movement.

5           I think generally speaking, there is

6   material information released on earnings

7   announcement dates, but that information, as some

8   of your questions have suggested, might be

9   reaffirming for the market what is expected and

10  therefore might not move the stock price.

11          And again, even though in this case we

12  see a substantial proportion of the earnings dates

13  not being significant, we see a much greater than

14  you would expect by randomness alone are

15  statistically significant.

16      Q.    14 out of 17 were not statistically

17  significant here, by your analysis.

18          MS. POSNER:  Objection.

19      Q.    Right?

20      A.    14 of the -- I'm sorry.  13 of the --

21      Q.    13 of the 17 were not statistically

22  significant according to your analysis.  It just

23  doesn't sound occasional to me.

24      A.    Again, I agree with you that 13 out of

25  17 is a substantial proportion, but that that's not

C. Coffman

the relevant -- that's not the relevant statistic
to focus on when evaluating whether this is
providing scientific evidence of market efficiency,
because there are all sorts of reasons you wouldn't
expect every single earnings announcement to yield
a statistically significant stock price movement.

        And as I previously testified, my use
of the word "occasional" doesn't really have a
quantitative number attached to it, and I provided
a number of case-specific reasons why I'm not
surprised at all that a substantial number of the
earnings announcements in this case weren't
statistically significant.

        Q.    I'd like to direct your attention to
paragraph 62 of your report.

        A.    Okay.

        Q.    In paragraph 62 of your report you
refer to the 318 days during the analysis period
where there was no Miller Energy-related news,
analyst reports published or SEC filings issued.

        So in your analysis, there were 318
days where there was no news during the analysis
period; right?

        A.    Based on the searches we conducted,

C. Coffman

that's correct, yes.

Q.    And that was over how many total days
in the analysis period?

A.    I can't give you a precise number, but
eyeballing, if that's just under five years, on
average, there's about 240 to 250 trading days a
year, so somewhere over 1,000, maybe 1,100,
something like that.  I don't know.  It's obviously
ascertainable from my backup material but roughly
speaking, it's probably in that range.

Q.    So to find the number, all I have to do
is look at the analysis period and figure out how
many trading days there were in there?

A.    Yes.

Q.    You're not counting Saturdays or
Sundays or days when the market is closed?

A.    Correct.

Q.    For each of those days when you were
determining whether there was a reaction in the
price of the common stock, you looked at the next
trading day; right?

A.    Well, or whatever the next trading
period would be.  So if the news was issued in the
evening after market hours, I would look at the

C. Coffman

1
2  next day.  If it was during market hours, I would
3  look at the same day.
4       Q.    And if it was before market hours, you
5  would look at the same day?
6       A.    Same day, yes.
7       Q.    And that's the same methodology you
8  used for the earnings announcements when you looked
9  at whether they led to a reaction on the stock
10 price?
11      A.    Yes.  Well, in this case, there's no
12 news so we're essentially saying there was no news
13 over the period where that day would have been the
14 relevant day to consider.
15      Q.    I see.  So if I take, I don't know,
16 take January 5 as a date, for that to be a no news
17 day, there would have to have been no news coming
18 out on January 4th or before the market opened on
19 January 5?
20      A.    Well, after the market on January 4th,
21 or January 5 before market or during market hours.
22      Q.    Got it.  So in your report, at
23 paragraph 62, you indicate that during the analysis
24 period, you found a statistically significant price
25 reaction at the 95 percent confidence level on

C. Coffman

1
2  23.53 percent of the earnings announcements

3  compared to 4.4 percent of the no news days; right?

4       A.    That's correct, yes.

5       Q.    So that's the key comparison for your

6  analysis of the common stock; right?

7            MS. POSNER:  Objection.

8       A.    That is one of the key comparisons.  I

9  also compare not just the proportion of days that

10 are significant, but also the size of the stock

11 price movements and the volume on those days as

12 well, but for comparing the proportion of

13 statistically significant days, that's the key

14 comparison, yes.

15      Q.    And in Footnote 61, you indicate the

16 difference between 23.53 percent and 4.4 percent --

17 let me start over.

18            You indicate in Footnote 61 that the

19 difference between 23.53 percent and 4.4 percent is

20 itself statistically significant at the 95 percent

21 confidence level; right?

22      A.    Yes.

23      Q.    Can you explain that?

24      A.    Sure.  So that's -- so I performed a

25 statistical test asking the question of, if these

C. Coffman

two samples really were identical, and then you

expect -- and that there was no impact of news on

the stock price, you would expect that proportion

to be the same.

And so I'm asking are these proportions

sufficiently different that you can reject random

just noise in the data as the cause?  And the

answer to that is yes, you can reject that random

noise as the cause, and so there is scientific

evidence that the earnings announcements have a

greater propensity than the no news days to have

statistically significant stock price reactions.

Q.    The 23.53 percent is basically 4

divided by 17?

A.    Yes.

Q.    So if there had been three earnings

announcements that led to a statistically

significant price movement, that would have been 3

divided by 17 or 17.65 percent; right?

MS. POSNER:  Objection.

A.    I would have to use a calculator to get

your answer, but it would be 3 divided by 17.

Q.    And if it was 2 out of 17, you would

use the same procedure, it would be 2 divided by 17

C. Coffman

1
2  and the percent would be 11.76 percent?  That's the
3  idea?

4          MS. POSNER:  Objection.

5      A.    That's the idea, yes.

6      Q.    Of how you calculated it anyway?

7      A.    That's the idea of how you calculate

8  the proportion, itself.  There's more that goes

9  into how you statistically compare the difference,

10  but that's how you calculate the proportion, yes.

11     Q.    You can't just eyeball it to see if

12  it's statistically significant, you have to

13  actually test it?

14     A.    Yes.

15     Q.    If I want to go find the days that you

16  have identified as the 318 no news days, where do I

17  go to find that?

18     A.    It's in our backup material, in my

19  backup material.

20     Q.    I'm going to hand you what we

21  previously marked as Defendant's Exhibit 3 which is

22  a copy of the Second Amended Complaint in this

23  case.  Have you read this?

24     A.    Yes.

25     Q.    You're aware that this is the current

                              C. Coffman

1    complaint in this case; right?

2         A.    That's my understanding, yes.

3         Q.    Would you turn to page 74.  Do you see

4    paragraph 200 on that page?

5         A.    Yes.

6         Q.    In paragraph 200, plaintiffs allege

7    that "On December 24, 2013, a report entitled

8    'Miller Energy:  Digging Itself Into Another Deep

9    Hole' was published by TheStreetSweeper."

10             Do you see that?

11        A.    I see that.

12        Q.    Was December 24, 2013, a news day or a

13   no news day in your analysis?

14        A.    I would have to look at my backup

15   material to determine that.

16        Q.    Sitting here today, you don't know?

17        A.    I don't know.

18        Q.    Do you have anything with you today

19   that would allow you to check that?

20        A.    No.

21        Q.    You didn't bring a laptop or anything

22   with the date on it?

23        A.    No.

24        Q.    Should December 24, 2013 have been

1                     C. Coffman

2 treated as a no news day?

3          A.    I don't know.  It may depend on when

4 this particular report was issued to the market.  I

5 know December 24th is Christmas Eve.  Some years

6 Christmas Eve, I believe, is a non-trading day.

7 Sometimes it closes the -- the market closes early

8 on that day, so to know for sure, I would have to

9 do a more detailed analysis of when this report

10 came out.

11          Q.    Look at paragraph 205, please.  There

12 are allegations here about the price of the common

13 stock falling from the period December 23 to the

14 date December 26.  Do you see that?

15          A.    I see that.

16          Q.    Does that help you determine whether

17 December 24 should be a news or a no news day?

18          A.    I don't know because I can't read from

19 this whether December 24 is a trading day or not.

20          Q.    If December 24 was a trading day,

21 should it have been treated in your analysis as a

22 news day or a no news day?

23          A.    I would have to investigate further if

24 there was a way to tell what the timing of the

25 issuance of that report was.

C. Coffman

1

2      Q.    Do you know if -- let me back up.  You
3  said that you relied on certain sources to
4  determine what days were news days and what days
5  were no news days.  I think you said Factiva, SEC
6  filings, and something else.

7      A.    Analysts reports.

8      Q.    Anything else?

9      A.    As I sit here, not that I can recall.
10  To be absolutely sure, I would want to look at my
11  backup, but I don't believe so.

12      Q.    So if the December 24, 2013 report
13  published by TheStreetSweeper didn't turn up in the
14  Factiva database and didn't turn up in the list of
15  analyst reports and didn't turn up in the SEC
16  filing, your methodology would not have captured it
17  and included that as a news day; correct?

18      A.    That's possible.  Whether we took into
19  account this particular report is something that I
20  would have to go back and look at my backup to
21  determine.

22      Q.    If you go back and look at your backup
23  and you determine that December 24 was treated as a
24  no news day, would you say that's a mistake?

25      A.    Not necessarily.  It would depend on

```
 1                      C. Coffman
 2   the timing of when that report was issued.
 3        Q.    If the report came out during the
 4   business day, would you say it's a mistake?
 5        A.    By business day, do you mean during
 6   market hours when the market was open?
 7        Q.    Trading day.  Yes.
 8        A.    I mean, it's possible.  Again, given
 9   that the denominator in my calculations is 318,
10   changing one day wouldn't be expected to change
11   anything material, but, you know, based on
12   additional information, it may be that one day
13   would be better treated as a news day rather than a
14   non-news day.  Without investigating it
15   specifically I just don't know.
16        Q.    Well, I'm not really asking about
17   whether changing one day would affect the results.
18   I'm asking about your methodology, and it seems
19   like your methodology took into account certain
20   things like Factiva, but it didn't necessarily take
21   into account things like what the complaint in this
22   case was alleging.
23             MS. POSNER:  Objection.
24        Q.    So I'm wondering whether your
25   methodology night need a little bit of refinement.
```

C. Coffman

2     A.    Again, determining whether this
3 particular report should have been treated as news
4 on that particular day is something I would have to
5 investigate.

6     Q.    With a securities fraud case based on
7 allegations about stuff being said to the market or
8 not being said to the market, I mean, wouldn't the
9 complaint be a pretty important thing to consult on
10 what would be a news day versus a no news day?

11     A.    I don't normally rely on the complaint
12 as a fact about when certain things were disclosed.
13 I usually verify that myself, so -- but like I
14 said, whether this report was part of what was
15 considered or wasn't considered, I just don't know
16 as I sit here.

17     Q.    If you, in your analysis, missed a news
18 day that was identified in the complaint in this
19 case as a news day, what does that say about your
20 methodology?

21     A.    I think that suggests possibly that
22 it's not absolutely perfect.  Again, I wouldn't
23 expect something like that to -- an individual day
24 to impact the overall conclusion, and I believe the
25 methodology I've used to identify news days is

C. Coffman

1
2 generally reliable.

3        Also, to the extent a news day was

4 treated as a no news day, again, that would tend to

5 bias towards -- against finding the conclusion of

6 efficiency, because it would include dates in the

7 no news that were more likely to have price

8 movements.

9        Q.    You do want the data to be right;

10 right?

11        A.    That's absolutely the intent, and I've

12 designed a methodology that I think is generally

13 reliable for classifying news days and no news

14 days.  That methodology, which relies on certain

15 sets of information, may not in every single

16 circumstance be perfect.

17        When you get to a natural breaking

18 point, I wouldn't mind taking a break, but if you

19 have a couple of more questions in this section,

20 I'm happy to continue on.

21        MR. BALLARD:  That's fine.  Take a

22        break now.

23        THE VIDEO TECHNICIAN:  We're going off

24        the record.  The time is 12:40 p.m.

25        (Luncheon recess:  12:40 p.m.)

C. Coffman

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C. Coffman

1                    A F T E R N O O N   S E S S I O N

2                           1:15 p.m.

3  C H A D   C O F F M A N, resumed the stand and

4         testified further as follows:

5                THE VIDEO TECHNICIAN:  This begins

6         Media Unit No. 3.  The time is 1:15 p.m.

7         We're back on the record.

8  BY MR. BALLARD:

9         Q.    So Mr. Coffman, we talked a little bit

10  about Cammer factor number 5, the price reaction to

11  new information.  I believe it spans pages 32 to 39

12  of your report.  Is that right?

13        A.    Yes, that's correct, and the exhibits

14  that are mentioned.

15        Q.    And the exhibits, of course.  So is

16  this a significant portion of your report?  And I

17  think you already testified that it was one of the

18  more direct factors from among the Cammer factors;

19  right?

20        A.    Both of those things are true.

21        Q.    And now I have a question:  If you were

22  to remove that factor and its analysis entirely

23  from your report, so you had been able to do none

24  of the analysis on that particular factor one way

C. Coffman

or the other, if you just removed it and had none
of that, would you still have an opinion on market
efficiency in this case?

A.    I don't know.  That's not something I
really considered.  I mean, there is certainly a
lot of evidence in support of market efficiency but
that's not something I specifically considered, and
frankly, I don't quite understand it, because given
that the prices and news were available, I would
see no reason to do that.  But that's just not
something I considered.

Q.    Well, let me ask a different question.
This is hypothetical.  You're okay with that,
right?

A.    Sure.

Q.    So here's the hypothetical.  You're
able to do an analysis of Cammer factor number 5 on
price reaction to new information, but you are
unable to find any evidence of a cause and effect
relationship.  That's the hypothetical.

Would you still have an opinion on
market efficiency in this case?

A.    Possibly.  I just don't know.  That's
not something that I had to consider and haven't

                              C. Coffman

1  considered.  As I said, there are a number of other

2  factors that are highly supportive of market

3  efficiency.

4

5           It would depend on why I had reached

6  that finding, if it were true that there just

7  weren't any specific news events that would have

8  been expected to move the stock price, you just

9  didn't see any stock price movements during the

10 analysis period, not because there was some

11 suggestion of inefficiency but actually because of

12 the facts of the case, so you know, it's hard to

13 deal with that in hypothetical terms.

14         Q.    Please turn to Exhibit 7 of your

15 report.

16         A.    Okay.

17         Q.    What is Exhibit 7 intended to show?

18         A.    It summarizes the result of the event

19 study for the 17 earnings announcement dates I

20 tested.

21         Q.    For the common stock?

22         A.    For the common stock, yes, thank you.

23         Q.    You have a number of column headings on

24 this chart.  The first one is number, the second

25 one is date.  That's the date of the event; right?

                          C. Coffman

1

2       A.      That's correct.

3       Q.      And then the time of the event is the

4  time during the day obviously; right?

5       A.      Yes.

6       Q.      Market date is the date -- the trading

7  date you looked at; right?

8       A.      Correct.

9       Q.      So just by way of example, in the first

10 item, you have a time of 4:22 p.m. after the

11 markets closed, so you looked at the next day as

12 the market date; right?

13      A.      That's correct.

14      Q.      Whereas, I don't know, look at number

15 6.  The event date is September 10, but it was 8:15

16 in the morning during the trading day, or before

17 the trading day started, and so you looked at that

18 day, September 10, as the market date; right?

19      A.      That's correct.

20      Q.      So we have your methodology down here.

21 Then you have the event and the headline.  That

22 describes the event you're looking at; right?

23      A.      It doesn't really describe the

24 information, the totality of the information

25 provided.  It is just meant as a reference as to

1                    C. Coffman
2  what the main period was and what the name of the
3  headline of the press release was.
4         Q.    I didn't phrase that well.  It
5  identifies what the event is.  It doesn't describe
6  the content otherwise; right?
7         A.    Not in any level of detail.
8         Q.    The closing price would be the closing
9  price of the common stock on the market date;
10 right?
11        A.    That's correct, yes.
12        Q.    What does the raw return column
13 indicate?
14        A.    The percentage change in the stock
15 price from the prior trading day.
16        Q.    Without controlling for the independent
17 variables?
18        A.    Correct.
19        Q.    So then the volume is just the volume
20 of trading on that day?
21        A.    Yes.
22        Q.    What is abnormal return?
23        A.    The abnormal return is the return after
24 factoring out the market indices described in my
25 report.

C. Coffman

1

2      Q.     The market indices in this case being

3  the S&P 500 index and the oil and gas futures

4  index?

5      A.     I don't think it's oil and gas.  It's

6  the WTI light sweet crude oil futures.

7      Q.     Just the oil index?

8      A.     Yes.

9      Q.     The next column you have on Exhibit 7

10  of your report is abnormal dollar change.  What is

11  that?

12      A.     That's just the percentage return in

13  the prior column converted to a dollar per share

14  figure.

15      Q.     What is the t-stat column?

16      A.     That reflects the results of the

17  statistical test.  What it measures is the number

18  of standard deviations away from zero the abnormal

19  return is.

20      Q.     What is sig level?

21      A.     That's just an indicator as to whether

22  the abnormal return that is observed on that date

23  is statistically significant at the 90, 95 or 99

24  percent level.  So if there's one star, it's

25  significant at the 90 percent level.  Two stars is

```
1                      C. Coffman
2   significant at the 95 percent level, and three
3   stars is significant at the 99 percent level.
4              I note that Footnote 2 inadvertently
5   left off the description of one star as denoting
6   the 90 percent level, but that's what it means.
7        Q.   If there is nothing in the sig level
8   column, what does that indicate?
9        A.   That indicates that it's not
10  significant at the 90 percent or higher level.
11       Q.   So going back to the market date again,
12  we've talked a little bit about this, but I want to
13  make sure we have a full understanding of this.
14  You looked at the next trading day after the event
15  in question because you were seeking to determine
16  whether the market reacted rapidly to potentially
17  new information.  Is that right?
18       A.   That's correct.  The first -- I think
19  the way I would phrase it is the first trading
20  session after or during which the release of
21  information occurred.
22       Q.   So if you find that the market reacted
23  in the first trading day, then you might have
24  evidence of efficiency and that's what you're
25  looking for?
```

1                    C. Coffman

2            MS. POSNER:  Objection.

3        A.    Well, when you say might have evidence

4    of efficiency, I don't think you can -- I'm not

5    doing anything to conclude efficiency or not with

6    respect to any one individual day.  I'm looking at

7    them as a set.

8        Q.    Let me ask it this way:  If you find

9    that the market reacted in a statistically

10   significant way within one day, that might support

11   a conclusion that the market was efficient, whereas

12   if you were to find that the market reacted slowly,

13   say in three days, that might undermine such a

14   conclusion.  Is that fair?

15       A.    But that's -- that test isn't being

16   performed here of whether it's one day or three

17   days.

18       Q.    Understood.  I'm just trying to get an

19   explanation as to why you chose the one-day window.

20       A.    To evaluate whether there was evidence

21   of the stock price reacting rapidly.

22       Q.    And you didn't look at whether it took

23   two days for any event to result in a statistically

24   significant price change?

25       A.    Not for the purposes of evaluating

1                     C. Coffman

2   cause and effect.  Again, if I were to be asked a

3   question about analyzing the price impact of a

4   particular event, I might look at different

5   particular event window, but for the purposes of

6   analyzing cause and effect and rapid price

7   movements generally during the analysis period, I

8   looked only at one-day windows.  That's correct.

9        Q.    Could you have looked at a two-day

10  window to see if an event had an effect on the

11  price of the stock?

12       A.    That's something you could do.  You

13  could look at two-day windows after each event.

14       Q.    But you didn't in this case?

15       A.    No.

16       Q.    Why not?

17       A.    Because for the -- for testing the

18  general proposition of market efficiency, I think a

19  one-day period is more appropriate.

20       Q.    So this Exhibit No. 7 to your report

21  indicates that you found a statistically

22  significant price movement in the common stock in

23  reaction to 4 of the 17 earnings releases at the 95

24  percent confidence level?

25       A.    At the 95 percent confidential level, I

C. Coffman

found 4.  At the 90 percent confidential level, I

found 6, yes.

        Q.    And you're relying on the findings at

the 95 percent level for your opinion in this case?

        A.    That's what I used in Exhibit 8 to

perform the statistical task.  You could look at

the 90 percent level as well, but then you would

want to look at the 90 percent level for the no

news days as well, so you just have to be

consistent.

                But in preparing Exhibit 8, I looked at

the 95 percent confidence level.

        Q.    So if the Court wants to know what your

opinion is based on here, it's based on the 95

percent confidential level; right?

        A.    Right.

        Q.    I would like you to look at Footnote 1

of Exhibit 7, and here you refer to the rolling

regression of the previous 120 trading days.

                Do you see that?

        A.    Yes.

        Q.    That's what you explained earlier,

right?

        A.    I mean, I explained that concept

                              C. Coffman

1

2    earlier, yes.

3         Q.    And here you say the regression model

4    controls for a broad market index, the S&P 500, and

5    then you refer to the NYMEX WTI light sweet crude

6    oil futures index.

7         A.    Yes.

8         Q.    And then you have a sentence that says

9    "Earnings announcements on the alleged corrective

10   disclosure dates and two other outlier dates have

11   been removed from estimation."

12              Do you see that?

13        A.    Yes.

14        Q.    Start with the alleged corrective

15   disclosure dates.  What were the corrected

16   disclosure dates and how did you identify them

17   here?

18        A.    I identified them using the complaint

19   and what dates were described in the complaint.

20        Q.    Do you remember how many there were?

21        A.    Not off the top of my head, no.

22        Q.    We can find them in your backup?

23        A.    Yes.

24        Q.    Why did you remove those days?

25        A.    Because the purpose of the estimation

C. Coffman

procedure is to evaluate the relationship between

the -- the relationship between the stock and the

independent variables, and to come up with a

measure of volatility that is generally in the

absence of news, and so those days clearly, whether

they're corrective or not, had firm-specific news

associated with them or at least allegedly did, so

those dates were removed from the estimation

window.  And just to be clear, they're removed from

the estimation window; they're not removed from the

dates that are necessarily being considered.

    Q.    Have you evaluated whether there was a

statistically significant price movement on any of

the corrective disclosure dates?

    A.    Well, I think from our backup you could

determine that.  I don't think I make specific

reference to it in the reports except to the extent

any of the earnings announcements are corrective

disclosure dates, or for the Series C and D

preferred, I think some of the dates I analyzed are

coincident with alleged corrective disclosures.

        But I didn't make an effort to

enumerate in the report, because it's not relevant

to my opinions, whether the corrective disclosures

1                          C. Coffman

2    were statistically significant or not.

3        Q.    Have you expressed an opinion in your

4    report about whether there was a statistically

5    significant price movement on any of the corrective

6    disclosure dates?

7        A.    Again, I think based on the model I've

8    run, one can look up in our -- in my backup

9    material whether or not the event study I've

10   performed suggests whether a one-day price movement

11   is statistically significant on those days.

12             MR. BALLARD:  You didn't answer my

13        question.  I'll have it read back.

14             THE WITNESS:  Okay.

15             (Record read.)

16       A.    I think I answered that.  I said

17   that -- I mean, to be I guess more direct, I

18   haven't, in the text of my report, offered an

19   opinion about the statistical significance of the

20   corrective disclosure dates, but by virtue of

21   having run a daily event study from my materials,

22   one can see whether a one-day price return around

23   the times of the corrective disclosures is or is

24   not significant.

25             So one can see that from my backup

```
                          C. Coffman
```

1   material, but I'm not expressing any opinion about

2   whether the corrective information is either, A,

3   corrective or, B, whether that's the particular

4   information that was moving the price on that day.

5

6                But I do provide information in my

7   materials that answers the question of whether

8   there are statistically significant movements on

9   individual days that plaintiffs are alleging are

10  corrective.

11        Q.    So my question was a pretty

12  straightforward yes or no question, and with all

13  due respect, that was a lot of words you just

14  spoke.  To be clear, the Federal Rules, I'm sure

15  you are aware, require that your report contain a

16  complete statement of all opinions you will express

17  in this case.

18                You're aware of that; right?

19        A.    Yes.

20        Q.    Does your report contain an opinion on

21  whether there was a statistically significant price

22  movement on any of the corrective disclosure dates

23  in this case?

24                MS. POSNER:  Objection.

25        Q.    Yes or no?

C. Coffman

2    MS. POSNER:  Objection.  You can

3    answer.

4    A.    I was not asked to form an opinion

5    about that question in the preparation of my

6    report, but as part of doing -- you know, my report

7    lays out my opinions on the questions I was asked,

8    and as part of that, it also provides all the data

9    and bases, and I provided backup material that

10   supports those opinions, and I'm saying if you --

11   if you were to look at my backup material, there is

12   information there that would allow one to answer

13   that question.

14        So I have not expressed in the text of

15   the report an opinion about the statistical

16   significance of the price reaction to any

17   individual corrective disclosure, but one could

18   read from my material whether there was or was not

19   in the model I've run.

20   Q.    Well, do you have opinions that you

21   formulated in this case that you've chosen to keep

22   out of your report that are in your backup that you

23   expect to express at some later date?

24        MS. POSNER:  Objection.

25        MR. BALLARD:  I just want to know if

1                    C. Coffman

2          we're being sandbagged with opinions that are

3          out there that are buried in the backup but

4          haven't been put in the report.

5                MS. POSNER:  I don't think he's saying

6          that.  I think all he's saying is that there

7          is information in his backup that can lead

8          one to answer the question you asked.  He

9          said very clearly he's not giving an opinion

10         as to damages or the statistical significance

11         of the corrective disclosures in his report.

12         Is that accurate?

13               THE WITNESS:  The purpose of my report

14         is to offer the opinions that are summarized

15         in paragraph 7 of my report.

16               MR. BALLARD:  At least you can't get a

17         yes or no answer either.

18         A.    I mean, hypothetically, if you said

19    there's an alleged corrective disclosure on X date,

20    and then you asked me do I have the opinion that

21    there was a statistically significant stock price

22    movement on that date or on the date after,

23    depending on the timing of the announcement, I've

24    done sufficient work and there's material in my

25    backup that I could answer that question yes or no.

C. Coffman

I'm not being asked to offer an expert opinion about what relevance that may or may not have for the case or what it says about damages or loss causation or anything of that sort, but if you're asking could I give an opinion about whether a certain date is statistically significant under my current model of the stock price movements on any given day, I could answer that question.

And I'm relying on that information to draw scientific conclusions so I think the material is there and speaks for itself. So I think I would be misleading to just say no.

Q. In Footnote 1 of your Exhibit 7, in the sentence we looked at a while ago, you refer to two outlier dates.

A. Yes.

Q. What was the first outlier date? Isn't it listed there?

A. It is, yes. I'm sorry, I was just looking at something else. It's the August 29th, 2011 filing of the 10-K.

Q. And you indicated that you excluded that date as an outlier. Why did you exclude that date?

C. Coffman

1

2      A.      Because there was obvious firm-specific

3   information and associated large stock price

4   movement on that date.

5      Q.      You indicated that on that date or it

6   appears to indicate that on or around that date,

7   there was a market reaction to Miller Energy

8   correcting a misstatement in a 10-K filing after a

9   review performed by an audit committee.

10              What do you know about that?

11      A.      I just recall there being a revised

12   10-K being issued and that as part of it, it was

13   correcting a mistake after a review by the audit

14   committee.

15      Q.      So which day -- was it August 29 that

16   was excluded or August 30 or what?

17      A.      I believe it was August 29.

18      Q.      And the other outlier date you list is

19   July 14, 2015; is that right?

20      A.      It's July 15th, 2015, because there

21   appeared to be large continued volatility after the

22   going concern warning that was released on the

23   14th.

24      Q.      I see, and that warning came out on the

25   14th after trading hours?

C. Coffman

1

2      A.      Yes, I believe that's right, but

3   that's -- oh, I'm sorry.  Actually, I'm not certain

4   about that.  It may be that I excluded the -- what

5   is causing me confusion is the use of the words

6   "continued volatility," so I don't know if

7   that's -- I would have to review the details of

8   that, but there was a -- July 15th was the day

9   excluded.

10      Q.      I think you've already explained

11  Footnote 2 and that we're to read that to include

12  also that one asterisk would denote significance at

13  a 90 percent level; right?

14      A.      Yes.  That was a typo of some kind to

15  exclude that.

16      Q.      In this instance on this chart anyway,

17  Exhibit 7, there were no instances where you found

18  statistical significance at the 99 percent

19  confidence level; correct?

20      A.      That's correct.

21      Q.      So I want to focus for a minute on the

22  first event on your Exhibit 7.

23      A.      Okay.

24      Q.      So this relates to the Q4 2011 and

25  year-end results for the fiscal year ended April

C. Coffman

30, 2011; right?

A.    That's my understanding, yes.

Q.    And you were evaluating whether the
market reacted quickly to this new information; is
that right?

A.    I was evaluating whether there was an
abnormal return -- what the abnormal return was on
that date and whether it was statistically
significant, and I also analyzed what the volume
was on that date and the magnitude of the abnormal
stock price movement.  All those things entered my
analysis.

Q.    The new information that you were
evaluating was the Q4 and year-end results for the
fiscal year ended April --

A.    That's the reason the date was chosen.
That's not to say there couldn't have been other
information as well that day, but that's the reason
the date was chosen.

Q.    The earnings release came out at 4:22
p.m. on August 30, 2011; is that right?

A.    Yes.

Q.    So the concept is new information came
out, as you said earlier, after the market closed

C. Coffman

1

2     on August 30, and so you looked to see if there was

3     a statistically significant price movement on the

4     next trading day, August 31; is that right?

5          A.     Yes.  And like I said, I analyzed other

6     things as well, but that's one of the things I

7     analyzed.

8          Q.     Did you find that there was a

9     statistically significant price movement in

10     response to the Q4 and year-end results for the

11     year ended April 30, 2011?

12          A.     No.

13          Q.     There was, in fact, no statistically

14     significant price movement; correct?

15          A.     That's correct.

16          Q.     Let's look at event number 5.

17          A.     Okay.

18          Q.     In this instance, you were looking at

19     an event that was the Q4 and year-end results for

20     the period ending April 30, 2012.  Is that right?

21          A.     Yes.

22          Q.     And again, you were looking to see if

23     there was a reaction in terms of price or volume or

24     whatever to the new information; correct?

25          A.     That's correct.

C. Coffman

1

2     Q.     That earnings release came out at 6:30

3  p.m. on July 16, 2012, and so you looked at the

4  market date of July 17, 2012; right?

5     A.     Yes.

6     Q.     Did you find that there was a

7  statistically significant price reaction at the 95

8  percent confidence level in response to the Q4 and

9  year-end results for the year-ended April 30, 2012?

10     A.     Yes.

11     Q.     And that was a statistically

12  significant decline in value, not an increase;

13  correct?

14     A.     Correct.

15     Q.     Would you explain the abnormal return

16  figure you have here of -8.48 percent?

17     A.     Sure.  That's the percentage change in

18  the stock price after factoring out market and --

19  the effects of the market index and the oil index.

20     Q.     So the price of the common stock went

21  down by some amount and you're trying to isolate

22  the amount that was abnormal; is that right?

23     A.     Abnormal in the sense that it is

24  attributable to firm-specific information because

25  the idea of the controls is to remove the effects

C. Coffman

of market-wide or industry effects, so the idea is
to get a measure of what -- the best estimate of
what the firm-specific price movement was.

Q.    What does the abnormal dollar change of
-37 cents mean?

A.    That means that after taking account of
the control factors, the stock price fell 37 cents
per share.

Q.    So the negative numbers here signify
that the price of the common stock moved down, not
up, in a statistically significant way in response
to the disclosure of the year-end and fourth
quarter results for the period ended April 30,
2012; is that right?

A.    Or other information released on that
same day, yes.

Q.    Okay.  Let's turn to event 13, please.
Event 13 relates to the Q4 and year-end results for
the period ended April 30, 2014; correct?

A.    That's my understanding, yes.

Q.    And the new information -- I'm sorry.
Strike that.  The earnings release that you're
examining here came out on July 14, 2014, at 5:33
p.m.; right?

C. Coffman

1

2      A.      That's correct.

3      Q.      So again, after the market is closed,

4  so your market date is the next day, July 15, 2014;

5  right?

6      A.      That's correct, yes.

7      Q.      And again, the concept is new

8  information came out after the market closed on the

9  14th, so you looked to see if there were

10  significant changes in price or volume on the next

11  trading day, July 15; right?

12      A.      Well, looked at significant changes in

13  the price and the price level and the volume, not

14  necessarily a significant change in the volume is

15  the way you phrased it.  That's really not what

16  we're looking for.

17      Q.      So you're looking at the volume, but

18  you're not looking for whether it's statistically

19  significant, the change from the prior day?

20      A.      Correct.

21      Q.      For event number 13, you found that

22  there was a price movement that was significant

23  only at the 90 percent confidence level, though;

24  right?

25      A.      Yes.

```
 1                    C. Coffman
 2        Q.    That's for the Q4 and year-end results
 3   the year ended April 30, 2014; right?
 4        A.    Or other information released on that
 5   day, yes.
 6        Q.    That was a decline in value, not an
 7   increase, right?
 8        A.    Yes.
 9        Q.    Could you explain the abnormal return
10   of -5.9 percent for event number 13?
11        A.    Sure.  The -5.9 percent reflects that
12   the stock price declined 5.9 percent after
13   factoring out market and oil-related price
14   movements.
15        Q.    Can you explain the abnormal dollar
16   change of -34 cents for event number 13?
17        A.    Yes.  That indicates that after
18   factoring out market and industry effects, that the
19   stock price fell by 34 cents a share.
20        Q.    So again, the negative numbers here
21   signify that the price of the common stock moved
22   down, not up, in a statistically significant way in
23   response to a the disclosure of the year-end
24   results for the year ended April 30, 2014; correct?
25        A.    Significant at the 90 percent level,
```

C. Coffman

1  yes.

2

3      Q.    Let's go back to event number 9.  For

4  event number 9, the new information you were

5  evaluating was -- for event number 9, the new

6  information you were evaluating was the Q4 and

7  year-end results for the period ended April 30,

8  2013; is that correct?

9      A.    Yes, or that's why I chose -- the

10 release of that news is why I chose that day, but

11 there could have been other information in addition

12 to that as well.

13     Q.    And you were attempting to evaluate

14 whether the market reacted quickly to whatever

15 information came out that day; is that right?

16     A.    Well, I'm attempting to evaluate the

17 degree to which the market moved within one day.

18 That test alone doesn't tell you whether it

19 reacted -- you can't draw a conclusion about

20 whether the market reacted -- well, the purpose of

21 testing that date isn't just to look at whether it

22 reacted quickly on just that date.

23          It's to evaluate what the event tells

24 us about how the stock price moved within one

25 trading day, and to use that then to help evaluate

C. Coffman

1
2 whether the stock price reacted quickly to earnings
3 announcements more than it reacted to no news days.

4     Q.    Well, the point of looking at a one-day
5 window is to determine whether the prices are
6 reacting quickly to news; right?

7     A.    Generally, yes.  Yes.

8     Q.    It wouldn't work if you picked a
9 five-day window; right?

10     A.    You would be looking at something
11 different if you were looking at a five-day window.
12 I guess what I'm saying is that I'm not using any
13 individual date to draw a conclusion about whether
14 the market reacts quickly in a general sense.

15     I'm looking at it to measure the
16 abnormal return and whether or not that date was
17 statistically significant and the level of volume
18 that occurred.

19     Q.    So for this event, event number 9, you
20 had a date of July 16, 2013, at 10:22 p.m., so you
21 looked at a market date of July 17, 2013; right?

22     A.    That's correct.

23     Q.    Because the 10:22 p.m. was after
24 trading hours on the 16th; right?

25     A.    Correct.

C. Coffman

1

2     Q.    And did you find that there was a

3 statistically significant price movement at the 95

4 percent confidence level on July 17, 2013 in

5 response to the Q4 and year-end results for the

6 year ended April 30, 2014?

7     A.    I found a statistically significant

8 result that day, yes.  I haven't isolated whether

9 it was due to that particular news or there could

10 have been other news on that date, but I chose that

11 date because of the earnings announcement, yes.

12     Q.    We have now looked at four events on

13 Exhibit 7.  Each of them was a fourth quarter and

14 year-end announcement, right, 1, 5, 9 and 13?

15     A.    Yes.

16     Q.    Those were earnings releases for the

17 four years ended April 30, 2011, 2012, 2013 and

18 2014; right?

19     A.    Yes.

20     Q.    And the earnings release for 2013 is

21 the only one where you found a statistically

22 significant increase in the price of the common

23 stock; is that correct?

24     A.    Yes.

25     Q.    I'm going to hand you what we

```
 1                      C. Coffman
 2    previously marked as Exhibit 14 in this case.  Do
 3    you know what Exhibit 14 is?
 4         A.     It appears to be the 10-K for the
 5    period ended April 30, 2013.
 6         Q.     This would be the annual results
 7    contained -- the annual report on Form 10-K
 8    containing the results for the year ended April 30,
 9    2013; right?
10         A.     Yes.
11         Q.     When was this filed?
12         A.     I don't know that I can tell from this
13    document precisely when it was filed.
14              MR. BALLARD:  Mark this, please.
15              (Exhibit 30, document indicating filing
16         date of July 15, 2013, 5:18 p.m., for April
17         30, 2013 Form 10-K, marked for
18         identification, as of this date.)
19         Q.     I'm going to hand you what we just
20    marked as Exhibit 30 in this case.  From Exhibit
21    30, can you determine when the Form 10-K for the
22    period ended April 30, 2013, was filed?
23         A.     It appears to be July 15, 2013.
24         Q.     At what time?
25         A.     This suggests 5:18 p.m.
```

C. Coffman

1

2      Q.     The Form 10-K for the year ended April

3  30, 2013, which was filed on July 15, 2013, at 5:17

4  p.m., contained the year-end results and quarter

5  results for the period ended April 30, 2013;

6  correct?

7      A.     I believe that's accurate, yes.

8      Q.     The earnings release you cite in your

9  Exhibit 7, at event number 9, was dated July 16,

10  2013, after hours, but the information had already

11  been publicly disclosed on July 15th after hours;

12  correct?

13      A.     That's what this would seem to suggest,

14  yes.

15      Q.     So for event number 9 on your Exhibit

16  7, you should have looked at July 16, 2013 as the

17  market date; correct?

18      A.     I guess that's possible.  I would need

19  to know whether 7/16 was a trading date.

20      Q.     That would be in your backup; right?

21      A.     Yes.

22      Q.     So if July 16 was a trading date, then

23  July 16 should have been the market date you

24  examined for event 9; correct?

25      A.     I would have to think about that and

1                           C. Coffman

2  understand what was disclosed and what wasn't

3  disclosed on each date, and whether there was new

4  information on both dates, but that's something I

5  would want to investigate.

6              MR. BALLARD:  Mark this, please.

7              (Exhibit 31, July 16, 2013 8-K, marked

8        for identification, as of this date.)

9              (Exhibit 32, document indicating filing

10       date of 8:13 a.m., on July 16, 2013, for July

11       16, 2013, 8-K, marked for identification, as

12       of this date.)

13       Q.    I'm handing you Exhibit 31 and Exhibit

14  32.  First of all, take a look at Exhibit 31.  Do

15  you see the date is July 16, 2013?

16       A.    I see that.

17       Q.    And it's an 8-K; right?

18       A.    That's what it appears to be, yes.

19       Q.    If you look at the attachments, there

20  is a press release dated July 16, 2013; do you see

21  that?

22       A.    Okay, I see that.

23       Q.    You will see that it's -- I'll tell you

24  what.  Why don't you look at Exhibit 32.  From

25  Exhibit 32, can you determine when Exhibit 31 was

                              C. Coffman

1    filed publicly with the SEC?

2         A.    It appears to say approximately 8:13

3    a.m., on July 16, 2013.

4         Q.    From looking at this, can you now

5    confirm that the Q4 and year-end results that you

6    examined in event number 9 were disclosed prior to

7    the market opening on July 16, 2013?

8         A.    That's what this seems to suggest.

9         Q.    So now can you confirm that you should

10   have looked at a market date of July 16, 2013,

11   instead of July 17, 2013?

12        A.    It's possible.  One thing I would like

13   to do is review my backup to see if -- just to

14   confirm that these dates, as listed, weren't a typo

15   of some kind, but this seems to indicate the

16   information was out at the beginning of market on

17   July 16th, 2013.

18             (Exhibit 33, printout of some the

19        backup material used in Chad Coffman's expert

20        report, marked for identification, as of this

21        date.)

22        Q.    I'm going to hand you what we've marked

23   as Exhibit 33.  It's a printout of some of the

24   backup material that you provided to us, and the

C. Coffman

backup material was voluminous, but there's a
regression tab related to the common stock.  Do you
know what I'm talking about?

1   

2  backup material was voluminous, but there's a

3  regression tab related to the common stock.  Do you

4  know what I'm talking about?

5      A.   Yes.

6      Q.   Do you recognize this as the data from

7  that tab?

8         MS. POSNER:  Just to be clear, I

9        believe we produced all of the Excel

10        spreadsheets, both Bates stamped and in

11        native format so you can manipulate them.

12        I'm going to assume you're representing that

13        this is as originally produced as opposed to

14        with any changes by you.

15         MR. BALLARD:  I don't think I've seen

16        one with Bates numbers on it.  We got Excel

17        files.

18         MS. POSNER:  You should have gotten

19        both.  We Bates stamped one and kept it so it

20        was a static version and then one in native

21        so you can manipulate it.  It's irrelevant.

22        My only purpose for asking is, this is

23        as produced, there have been no changes to

24        this.

25         MR. BALLARD:  This has been formatted

1          C. Coffman

2          for printing so it can be printed on a large

3          piece of paper.  No one went and changed any

4          numbers in here.  I have my laptop here and I

5          have the actual data files on here if anyone

6          needs to look at those.

7                    MS. POSNER:  I just wanted the record

8          to be clear.

9                    MR. BALLARD:  We did not change any of

10         the numbers.

11                    THE WITNESS:  I'm sorry, what was your

12         question?

13         Q.    I think we were talking about whether

14   you can confirm that you should have used July

15   16th, 2013, instead of July 17th, 2013 as the

16   market date for event number 9, and you indicated

17   that you might need to check some of your data.

18   Now this is some of your data.

19              Looking at this now, can you now

20   confirm that, in fact, you should have used July

21   16, 2013 as the market date?

22         A.    That is certainly possible.  Given that

23   you're pointing out what looks to be a mistake,

24   before I say on the record definitively, this is

25   something I would want to consult.  I would want to

                    C. Coffman

1
2   study carefully before giving a final view on this
3   on the record, but based on what you've shown me,
4   unless there's something that contradicts it, it
5   appears July 16, 2013 would be the appropriate
6   market date.
7        Q.   And did you find a statistically
8   significant price movement on July 16th, 2013?
9        A.   No.
10       Q.   Looking at your Exhibit 7, at event
11  number --
12       A.   What is giving me pause, just to be
13  clear, is the specific time that is listed on
14  Exhibit 7 is raising a question in my mind of why
15  I'm citing 10:22 specifically, so I understand
16  necessarily the reason for that.  So you've pointed
17  out something that concerns me.  I just want to --
18  until I fully analyze this, I don't know what the
19  changes may be.
20            MR. BALLARD:  Maybe I can help you with
21       that too.
22            THE WITNESS:  Okay.
23            MR. BALLARD:  I'll ask the court
24       reporter to mark this with our next exhibit
25       number.

```
 1                      C. Coffman
 2               (Exhibit 34, printout from Marketwired,
 3        marked for identification, as of this date.)
 4        Q.    Do you have Exhibit 34 in your hands?
 5        A.    I do.
 6        Q.    This is a printout from Marketwired.
 7   Do you know what Marketwired is?
 8        A.    Generally.  I don't have detailed
 9   knowledge of exactly -- it looks like a wire
10   report.  I don't know that I've studied
11   Marketwired.  It looks like a wire service.  I
12   don't know that I know that one specifically.
13        Q.    It contains the information from the
14   earnings release that you included in the event 9
15   of your Exhibit 7.
16        A.    Okay.
17        Q.    Do you see the date at the top of this
18   and the timestamp?
19        A.    It appears to be 8:00 a.m. on July 16.
20        Q.    So again, now can you confirm that the
21   information certainly was in the market and picked
22   up by the market press before trading began on July
23   16?
24        A.    I see that.  It suggests the
25   information came out before the market on July 16,
```

```
 1                      C. Coffman
 2  2013.
 3       Q.    Now is there any doubt in your mind
 4  that you should have used July 16, 2013, as the
 5  market date for event 9?
 6       A.    Based on what you're showing me, it
 7  appears that's the case, but again, before I give a
 8  final view on that, I would need to go back and
 9  review how that occurred.
10            MR. BALLARD:  Maybe I can help you with
11       that too.  Mark this, please.
12            (Exhibit 35, Dow Jones press release,
13       marked for identification, as of this date.)
14       Q.    I'm handing you Exhibit 35.  Does
15  reviewing Exhibit 35 help you clear up what
16  happened here?
17       A.    Possibly.
18       Q.    The Factiva database picked up the
19  correction on the newswire, but not the actual
20  original release, and so it showed a timestamp of
21  10:22 p.m. on July 16, 2016, even though the
22  information had come out the day before; right?
23            MS. POSNER:  Objection.
24       A.    I think it's -- I don't think your
25  question was quite right.
```

                      C. Coffman

1

2        Q.    Do you have any idea how you came up

3  with 10:22 p.m. as the time and July 16, 2013 as

4  the date for event number 9 on your Exhibit 7?

5        A.    It's possible that it was this Dow

6  Jones press release that was relied upon.

7        Q.    This Dow Jones press release is not

8  what you were intending to study in number 9; is

9  it?

10       A.    If the information was released prior

11  to the market on the 16th, then it would have been

12  appropriate to analyze July 16, 2013.

13       Q.    And Exhibit 35, this Dow Jones newswire

14  item, relates to a correction of three numbers in

15  the previously released data; correct?  Three

16  numbers that had been converted incorrectly; right?

17       A.    I guess I don't know where -- exactly

18  where you're seeing that.

19       Q.    The first paragraph.

20       A.    Oh, I'm sorry.  Okay, I see that.

21       Q.    In event number 9, you weren't trying

22  to test whether the release of the correction of

23  these three incorrectly converted numbers had an

24  effect on the market; were you?  You were trying to

25  test whether the earnings release, itself, had an

1                       C. Coffman

2  effect; right?

3        A.      That's correct.

4        Q.      Now can you confirm with certainty that

5  you should have used July 16, 2013 as the market

6  date for event number 9 on your Exhibit 7?

7        A.      That seems to be the appropriate

8  conclusion.  Again, to give a final answer, I would

9  want to discuss with my staff and see if there's

10  anything else that I'm missing here, but based on

11  what you've shown me, that appears to be correct.

12        Q.      So sitting here right now, based on

13  everything you've seen, if you had to do this

14  analysis right now, what market date would you use,

15  July 16 or July 17?

16        A.      Based on what I'm seeing here, July 16.

17        Q.      So if that's your best understanding

18  right now, I want to ask you some questions about

19  what the items in that row should have in them.

20  Should item 9, in the first column, under date,

21  have July 15, 2013 instead of July 16, 2013?

22        A.      Based on what you've shown me, I

23  believe that's correct, yes.

24        Q.      And the time in column 2 should change

25  to something else too as well; right?

C. Coffman

1

2      A.    Yes.

3      Q.    The closing price should be $4.09, not

4  $4.34; correct?

5      A.    That's correct.

6      Q.    The raw return should be 1.49 percent,

7  not 6.11 percent; correct?

8      A.    That's correct.

9      Q.    The volume should be .3, not .5;

10 correct?

11     A.    Correct.

12     Q.    The abnormal return should be 1.67

13 percent, not 5.56 percent; correct?

14     A.    I'm sorry.  Can you repeat that?

15     Q.    The abnormal return should be 1.67

16 percent, not 5.56 percent; correct?

17     A.    That's correct.

18     Q.    The abnormal dollar change should be 7

19 cents, not 23 cents; correct?

20     A.    That's correct.

21     Q.    The t-stat should be .7, not 2.32;

22 correct?

23     A.    .70, that's correct.

24     Q.    The sig level should not have any

25 asterisk; correct?

C. Coffman

1

2      A.      That's correct.

3      Q.      There shouldn't be two, there shouldn't

4   be even one, there should be no asterisk at all for

5   event 9, it was not statistically significant;

6   correct?

7      A.      That's correct.

8      Q.      Now would you say that it was only 3,

9   not 4, of the 17 events on Exhibit 7 of your report

10  that had statistically significant price movements

11  at the 95 confidence level?

12     A.      If what you've shown me is correct,

13  then that's the case, yes.

14     Q.      Can we turn to Exhibit 8 of your

15  report, please.  On Exhibit 8 of your report, under

16  the earnings announcement column, where it says 4,

17  that should be a 3; right?

18     A.      If what you're showing me is correct,

19  yes.

20     Q.      For the number or the percentage of

21  significant days at 95 confidence level, where you

22  have 23.53 percent, that should be what?

23     A.      I would need a calculator to give you

24  the precise number.

25     Q.      If I tell you that 3 divided by 17

```
1                        C. Coffman
2    would give you 17.65 percent, does that help?
3         A.    That would be the appropriate number
4    then, that's correct.
5         Q.    And then you have an average absolute
6    abnormal return of 4.37 percent on this chart.  On
7    Exhibit 8 of your report, under the earnings
8    announcements column, for the average absolute
9    abnormal return, you have 4.37 percent.  That
10   should change to something else; right?
11        A.    Yes.
12        Q.    And the volume figure of .7 should
13   change as well; right?
14        A.    Yes.  Both those numbers would go down,
15   I believe by a relatively small amount, but they
16   would be different, yes.
17        Q.    So let's look at your report at page
18   30.  There's a bar chart on page 30 of your report.
19   Do you see that?
20        A.    Yes.
21        Q.    So that should change as well; right?
22        A.    If what you're showing me is correct,
23   then yes.
24        Q.    So the first bar that is somewhere
25   above 20 percent is going to drop down to something
```

                         C. Coffman

1
2  lower; right?

3      A.    Roughly 17 percent plus.

4      Q.    And on page 31, you have a bar chart on

5  the average absolute return.  Do you have that?

6      A.    Yes.

7      Q.    That would change a little bit too;

8  right?

9      A.    Yeah.  I don't think that would change

10  substantially, but it would come down a little bit,

11  yes.

12      Q.    On page 32, there's another chart on

13  average daily trading volume.  Certainly the data

14  underlying, that would change a bit as well; right?

15      A.    A bit, yes.  I don't think it would

16  change substantially, but yes, it would be lower.

17      Q.    Let's turn to page 29 of your report.

18  Paragraph 62, there's the reference to the 23.53

19  percent.  Do you see that?

20      A.    Yes.

21      Q.    That's wrong; right?

22      A.    If what you're showing me is correct,

23  yes.

24      Q.    And Footnote 61 is wrong; right?

25      A.    It would be 17 percent instead of

C. Coffman

23.53.

Q.    And you told us already you haven't
done an analysis to see if that is statistically
significant; right?

A.    I would have to do that test to know.

Q.    So sitting here today, you don't know
if it would be statistically significant based on
what you know now?

A.    I would have to test that.

Q.    And then paragraph 63, there's a 4.37
percent figure.  Do you see that?

A.    Yes.

Q.    That might change as well; right?

A.    Well, we already covered that, yes.

Q.    And then so Footnote 63 would change.
That's now wrong; right?

A.    The percentage would change.  Whether
the conclusion about statistical significance needs
to change is not clear.

Q.    And then paragraph 63, again, there's a
reference to the average magnitude of stock price
movement on earnings announcement days was 1.7
times higher.  You would have to take another look
at that one as well; right?

1                          C. Coffman

2          A.     It would be slightly lower.  It might

3     still round to 1.7.  I just don't know.  I would

4     have to check.

5          Q.     And then on page 31, paragraph 65,

6     there's a reference to average daily trading volume

7     on the 17 days of 0.72 million.  Do you see that?

8          A.     Yes.

9          Q.     You would have to look at that again as

10    well; right?

11         A.     That would go down slightly, yes.

12         Q.     So going back to what we talked about

13    earlier, we looked at four of the events on your

14    Exhibit 7 for the year-end results for 2011, 2012,

15    2013 and 2014; right?

16         A.     That's correct.

17         Q.     And you had found a statistically

18    significant increase in the price of Miller

19    Energy's common stock in only one instance, and

20    that was for the year 2013; right?

21         A.     Originally, that's correct.

22         Q.     Based on what you have in Exhibit 7 of

23    your report and what you now know, can you now say

24    that there was no statistically significant

25    increase in the price of Miller Energy's common

C. Coffman

1
2   stock on the market date after Miller Energy
3   disclosed its year-end results for 2011?
4           A.      Could I have that read back, please.
5                   (Record read.)
6           A.      That's correct.
7           Q.      There was a statistically significant
8   decrease in the price of Miller Energy's common
9   stock on the market date after Miller Energy
10  disclosed its year-end results for 2012; correct?
11          A.      That's correct.
12          Q.      There was no statistically significant
13  increase in the price of Miller Energy's common
14  stock on the market date after Miller Energy
15  disclosed its year-end results for 2013; is that
16  correct?
17          A.      Based on what you've shown me, I
18  believe that's correct.
19          Q.      There was a decrease, but only at the
20  90 percent confidence level, in the price of Miller
21  Energy's common stock on the market date after
22  Miller Energy disclosed its year-end results of
23  2014; correct?
24          A.      That's correct.
25          Q.      So for the four years at issue in this

```
 1                       C. Coffman
 2    case, 2011 to 2014, in two instances, the
 3    disclosure of Miller Energy's year-end results did
 4    not lead to a statistically significant movement
 5    one way or another in the price of Miller Energy's
 6    common stock; is that right?
 7              MS. POSNER:  Objection.
 8         A.    Can I have that read back.
 9              (Record read.)
10              MS. POSNER:  Objection.
11         A.    That's correct.
12         Q.    In the other two instances, the
13    disclosure of Miller Energy's year-end results led
14    to a statistically significant decrease in the
15    price of the stock at the 95 confidence level in
16    one instance, and a statistically significant
17    decrease in the price of the common stock at 90
18    percent in the other instance; is that correct?
19              MS. POSNER:  Objection.
20         A.    I think that's correct, yes.
21         Q.    So in no instance did the disclosure of
22    Miller Energy's year-end results lead to a
23    statistically significant increase in the stock
24    price; correct?
25              MS. POSNER:  Objection.
```

C. Coffman

1

2          A.     Based on what you've shown me, I

3    believe that's the case.

4          Q.     You're aware that KPMG issued audit

5    opinions on Miller Energy's financial statements in

6    certain years; right?

7          A.     That's my understanding, yes.

8          Q.     It was the financial statements for the

9    years ended April 30, 2011, 2012, 2013 and 2014;

10   correct?

11         A.     My understanding is they issued audit

12   opinions for those years.  Whether there were -- I

13   don't believe there were any earlier years, but I

14   think by the time 2015 came around, I'm not sure a

15   10-K was filed so I believe that's correct.

16         Q.     You understand that the plaintiffs in

17   this case have alleged that there are four

18   instances in which KPMG issued audit opinions that

19   the plaintiffs have alleged were misstated; is that

20   correct?

21         MS. POSNER:  Objection.

22         A.     My understanding is there are four

23   audit opinions.  I believe they're alleging other

24   dates on which that material was incorporated by

25   reference, but I believe that that's the four audit

1                            C. Coffman

2     opinions that are being referenced.

3          Q.    And you understand the audit opinions

4     were included in the Form 10-K's with the SEC;

5     right?

6          A.    That's my understanding.  I would have

7     to go back to check to give that opinion, but

8     typically that's the case, yes.

9          Q.    You understand that plaintiffs' theory

10    in this case is that KPMG's audit opinions helped

11    artificially inflate the price of Miller Energy

12    securities?

13         A.    That's my understanding of their claim,

14    yes.

15         Q.    And in Exhibit 7, and in our discussion

16    today on Miller Energy's common stock, you

17    evaluated whether there was a statistically

18    significant price movement in response to the

19    disclosure of Miller Energy's year-end results for

20    each of those years ending April 30, 2011, '12, '13

21    and '14; correct?

22         A.    Yes.

23         Q.    And in each instance, you found no

24    statistically significant increase in the price of

25    the common stock; right?

C. Coffman

2    MS. POSNER:  Objection.

3    A.    Based on what you've shown me, I

4  believe that's correct.

5    Q.    Well, in two instances there was a

6  movement but it was down, not up; right?

7    A.    Correct.

8    Q.    Would you agree that it appears that

9  KPMG's audit opinions on Miller Energy's financial

10  statements for the years ended April 30, 2011, '12,

11  '13 and '14 did not result in the artificial

12  inflation of Miller Energy's stock price?

13    MS. POSNER:  Objection.

14    A.    I'm sorry, can I have that read back.

15    (Record read.)

16    MS. POSNER:  Objection.

17    A.    No.

18    Q.    Do you have any evidence that KPMG's

19  audit opinions caused artificial inflation in the

20  stock price?

21    A.    I wasn't asked to evaluate that.

22    Q.    You have no opinion on that topic?

23    A.    That's correct, I have not evaluated

24  that.  I mean, I've seen plaintiffs' complaint.  I

25  understand the economic logic of what their

```
1                    C. Coffman
2  allegations are, but I, as a matter of fact, have
3  not evaluated whether it's the case or not.
4               MR. BALLARD:  Let's take a short break.
5               THE VIDEO TECHNICIAN:  We're going off
6        the record.  The time is 2:28 p.m.
7               (Recess taken.)
8               THE VIDEO TECHNICIAN:  This begins
9        Media Unit No. 4.  The time is 2:59 p.m.
10       We're back on the record.
11          Q.    Turning to your report, at page 29,
12 Footnote 61 --
13              MS. POSNER:  What page did you say?
14              MR. BALLARD:  Page 29, Footnote 61.
15          Q.    I believe you indicated earlier that
16 you have not done the analysis as to whether you
17 would still find statistical significance at the 95
18 confidence level if it was 3 out of 17 instead of 4
19 out of 17; right?
20          A.    That's what I said before.
21          Q.    You haven't done the analysis now; have
22 you?
23          A.    I did a back of the envelope
24 calculation that I would want to check several
25 times before I, you know, was highly confident in
```

C. Coffman

it, but it suggested that just changing it to 3 out of 17, it would still be significant at the 95 percent level.

Q.    Are you ready to express that opinion or do you need to do more work on that first?

A.    No.  Given what you've pointed out, there are likely to be corrections to my report and before I express any final opinion on that, I would want to review a number of different things.

Q.    I think earlier you also said that if you had removed the Cammer 5 factor entirely from your report, you hadn't evaluated whether you would still have an opinion on market efficiency without that; right?

A.    I think I said that there would be lots of -- that there would be considerable economic evidence towards efficiency from the other factors, but I had not considered the possibility of explicitly removing Cammer 5 from my report.

Q.    And I believe you said you hadn't given it thought and don't have an opinion sitting here today as whether removing that, you would still have an opinion.

A.    Well, again, I said I wasn't sure why

C. Coffman

one would ever do that given the circumstances of
this case, but I have not considered whether just
totally removing Cammer 5, what the conclusion
would be.

Q.    Sitting here right now, you're not able
to express an opinion on the question of whether
there was a cause and effect relationship until you
do further analysis.

Given what you have just said, do you
have an opinion, sitting here right now, on whether
the market for the common stock was efficient
during the analysis period?

MS. POSNER:  Objection.

A.    Based on the analysis I've performed,
it's clear that there is a much greater -- that
there's a greater incidence of statistically
significant days on the earnings announcements,
that's there's greater absolute stock price
movements, greater volume.

Also just, you know, setting aside
or -- not setting aside.  In addition to the
analysis that's in my report, it's clear from just
a cursory review of certain other dates during the
class period that the stock price was moving in

C. Coffman

1

2  reaction to news.  It wasn't part of what is

3  included in my report, but I still believe that

4  even with the material you showed me today, that

5  there's a -- that this security traded in an

6  efficient market.

7      Q.    I understand you believe that.  But my

8  question is, do you have, as a professional

9  economist, an opinion sitting here today as to

10 whether the market for the common stock of Miller

11 Energy was efficient during the analysis period?

12     A.    I believe it was efficient during the

13 analysis period, yes, and I -- like I said, I want

14 to -- given what you've shown me, I want to go back

15 and review certain items and evaluate certain

16 items, but I do believe that it traded in an

17 efficient market, yes.

18     Q.    You keep saying you believe.

19     A.    That's my opinion.

20     Q.    That is your opinion sitting here

21 today?

22     A.    Yes.

23     Q.    Have you provided us with all the

24 backup and basis for that opinion or do you still

25 need to do more?

C. Coffman

1

2    A.    Yes.  I think given what you've shown

3  me, I will likely prepare a corrected version of

4  the report and so at that point I believe I will

5  have given you the full basis that I'm using to

6  conclude that the market is efficient.  But this

7  alone does not change my opinion of the market

8  efficiency.

9    Q.    Do you expect that you will be revising

10  your exhibits as well?

11    A.    Based on what you've shown me, there

12  will likely be revisions to my exhibits, yes.

13    Q.    We got a large dump of data, Excel

14  spreadsheets and the like.  That will change as

15  well; right?

16    A.    I don't think anything in the event

17  study, itself, will change, but the summaries from

18  that event study will change.  So it's -- there

19  will be materials in the backup that would change,

20  yes.

21    Q.    Do you know how long it will take to do

22  that work?

23    A.    I don't know with any precision.

24    Q.    I'd like you to take a look at Exhibit

25  3 which is the Second Amended Complaint, and I'll

                              C. Coffman

1

2    direct your attention to paragraph 197 of the

3    Second Amended Complaint.

4            Do you have the complaint in front of

5    you and are you looking at the section that begins

6    with paragraph 197?  There's a heading, "The Truth

7    Begins to Emerge"?

8        A.    Yes.

9        Q.    You understand that plaintiffs have

10   alleged that the truth leaked out over a period of

11   time beginning in December 2013?

12       A.    That's my the understanding, yes.

13       Q.    In paragraph 199, plaintiffs refer to

14   an event on December 17, 2013.  Do you see that?

15       A.    I see that.

16       Q.    That was a concerned shareholder's

17   letter; right?

18       A.    That's what they're pointing to, yes.

19       Q.    I'm going to hand you what we

20   previously marked as Exhibit 17.  Exhibit 17 is a

21   Schedule 14A.  Do you see that?

22       A.    I see that.

23       Q.    Proxy materials filed by some folks in

24   connection with Miller Energy, and it contains a

25   press release as well as the concerned shareholder

```
 1                      C. Coffman
 2   letter dated December 17, 2013; correct?
 3        A.    I see that, yes.
 4              (Exhibit 36, document indicating that
 5        the concerned shareholder letter and the
 6        accompanying materials were filed with the
 7        SEC on December 17, at 11:41 a.m., marked for
 8        identification, as of this date.)
 9        Q.    Let me hand you what we've marked as
10   Exhibit 36 in this case.  From Exhibit 36, can you
11   see that the concerned shareholder letter and the
12   accompanying materials were filed with the SEC on
13   December 17, at 11:41 a.m.?
14        A.    That's what this seems to suggest.
15        Q.    So if this event had been included on
16   your Exhibit 7, for example, it would have had a
17   date of December 17 and a market date of December
18   17th, 2013; right?
19        A.    That would have been the first day the
20   market could have reacted to it, yes.
21        Q.    Because that was the day the
22   information was made public during trading hours;
23   right?
24        A.    Yes.
25        Q.    So under your methodology, you would
```

C. Coffman

1
2  have looked at December 17th to see if the price
3  reacted; right?
4        A.    Well, when you say "your methodology,"
5  under my methodology for evaluating market
6  efficiency, if this was what I had included as a
7  quote-unquote news date, that's true.
8              Whether that's what I would ultimately
9  do if asked to determine the market price impact of
10 this particular announcement, that might be
11 something different, but certainly under the
12 methodology employed to analyze market efficiency,
13 that's the case.
14       Q.    If truth leaked into the market on that
15 day by virtue of this concerned shareholder letter
16 as plaintiffs allege, wouldn't you expect the
17 market to react on December 17th?
18       A.    That's plausible.  It's also plausible
19 that the market wouldn't fully incorporate the
20 information until possibly the 18th, especially if
21 news reports or analyst reports or other things
22 first started widely reporting on this later in the
23 day.
24             So there's a lot of specific details I
25 would want to analyze before giving an opinion

C. Coffman

about what the full price impact of what this event
might have been.  But the first day it could have
reacted, based on what you're showing me, is
December 17, 2013.

Q.    I thought earlier you said, when we
were talking about whether you would look at a
two-day window, you would in an efficient market
expect at least a statistically significant
reaction on day one.  You might also get one on day
two.  I thought your testimony on that was pretty
clear earlier.

A.    That you would expect to see a
reaction.  I don't know that I used the words
"statistically significant reaction."  But, you
know, if one were to look at a full-day event
window for this particular event, you know, one
would want to look into the middle of the day on
the next trading day as well.

So I'm just saying it's not quite as
simple as ending the analysis by just looking at
the abnormal return on the 17th.  It could also be
confounded by information prior to 11:00 a.m. on
the 17th.  So answering the question of how this
disclosure impacted the market price would require

```
1                          C. Coffman
2    a detailed analysis potentially beyond what is
3    already reported in my event study details.
4          Q.    Didn't you have items on your event
5    study that came out during the trading day?
6                MS. POSNER:  Objection.  I'm not
7          following your question.
8          A.    I believe they all came out either
9    before or after the trading day on Exhibit 7.
10         Q.    So are you saying you would use a
11   different methodology for events that come out
12   during the trading day?
13         A.    I'm saying it's just something I would
14   look at to determine whether the -- what the
15   appropriate event window to draw conclusions from
16   would be given the specific facts and circumstances
17   of that particular event.  So it may or may not be.
18         Q.    Was there a statistically significant
19   market reaction on December 17, 2013?
20         A.    No.
21         Q.    Was there a statistically significant
22   decline on December 18th?
23         A.    Oh, I'm sorry.  I think I looked at the
24   wrong date.  I apologize.  Let me double-check.
25   There was not on the 17th.  There was on the 18th.
```

```
 1                      C. Coffman
 2        Q.    And what about the 19th?
 3        A.    Yes, there was a significant reaction
 4   on the 19th as well.
 5        Q.    So returning to the allegations of the
 6   Second Amended Complaint, in paragraph 199, where
 7   plaintiffs refer to the concerned shareholder's
 8   letter, plaintiffs allege that the price of Miller
 9   Energy stock dropped from a closing price of $8.60
10   on December 16 to a closing price of $7.07 on
11   December 19th.  Do you see that?
12        A.    I see that.
13        Q.    So plaintiffs are alleging that over
14   that three-day period, the 17th, 18th and 19th, the
15   price of Miller Energy's common stock dropped in
16   response to the shareholder letter; correct?
17        A.    I think technically it's about a
18   two-and-a-half day period, but that's what I
19   understand, yes.
20        Q.    Is it your opinion that the declines on
21   the 18th and the 19th were a reaction to the
22   concerned shareholder letter and the filing on the
23   morning of December 17th?
24             MS. POSNER:  Objection.
25        A.    I have not reached an opinion on that.
```

1           C. Coffman

2       Q.    Would it be consistent with a

3   conclusion of market efficiency if it took three

4   days for the price to react to a disclosure like

5   this?

6       A.    I don't think you can rule that out.

7   Again, I would want to study the specifics of how

8   this information was disseminated to the market and

9   whether there's evidence of broader dissemination

10  on the 18th and 19th, and what other information

11  might be available to evaluate that question.

12      Q.    You've given an opinion in this case

13  that the market was efficient at that time; right?

14      A.    Yes.

15      Q.    Do you think you might need to look a

16  little more closely back to examine the data around

17  those dates?

18           MS. POSNER:  Objection.

19      A.    No.  As I testified earlier, there's

20  nothing inconsistent with market efficiency to say

21  that the full impact on certain types of event days

22  might extend beyond one day.  I don't think there's

23  anything inconsistent with that.

24      Q.    Have you read the concerned shareholder

25  letter?

C. Coffman

1

2      A.    I believe at one point I did.  It's

3  been a while.  I don't recall.

4      Q.    Do you think it's the kind of

5  information the market would ignore for a couple of

6  days?

7           MS. POSNER:  Objection.

8      Q.    It's pretty incendiary, don't you

9  recall?

10           MS. POSNER:  Objection.

11      A.    It's certainly the type of information

12  that the stock price might react to.  Again, in

13  this particular case, it clearly reacted not within

14  a couple of days, but on the -- this was issued

15  apparently during market hours on one day and by

16  the end of the next trading day, the stock price

17  had reacted in a statistically significant manner.

18  Whether that was due to this letter or something

19  else or what all the issues surrounding that might

20  be, is not something I formed an opinion on.

21      Q.    So it's possible the market was

22  reacting on the 18th and 19th to the December 17th

23  morning disclosure; is that what you're saying?

24      A.    I think it's plausible that the market

25  was continuing to digest this information on the

                        C. Coffman

1

2  18th and possibly even the 19th, but that's

3  something I would have to analyze, whether there

4  was supporting evidence for that.

5        Q.    It's also possible the market wasn't

6  efficient; right?

7        A.    That's one hypothetical possibility but

8  inconsistent with all the evidence in my report.

9        Q.    All of the evidence in your report, are

10 you sure about that?

11       A.    Or the primary conclusion of my report,

12 and all of the supporting factors that are

13 described in my report.

14       Q.    Let's turn to paragraph 200 of the

15 complaint.  There's a reference to a December 24,

16 2013 report, "Miller Energy:  Digging Itself Into

17 Another Deep Hole?" published on TheStreetSweeper.

18 Do you see that?

19       A.    Yes.

20       Q.    Was there a statistically significant

21 price movement following this posting?

22       A.    Again, it's not clear from the

23 description whether it came out during market hours

24 or before market hours on the 24th or after -- or

25 post market hours on the 24th, so on the 24th

C. Coffman

there's not a statistically significant movement.

On the 26th, which would be the next
trading date, there's not a statistically
significant movement.

Q.    In paragraph 205 of the complaint,
plaintiffs allege that the market reacted over that
period, including those two trading days, December
24 and December 26; right?

A.    That's what plaintiffs' complaint is
pointing out or attempting to -- alleging to point
out.

Q.    So if plaintiffs are right about this,
this could be another of those instances where
there's no reaction on day one, but there is on day
two?

A.    Again, I don't know what the exact
timing was so I'm not going to speculate what it
might or might not mean, and at least based on the
daily event study here, neither day was
statistically significant.

Q.    Okay.  You said neither day, so you're
saying there's nothing statistically significant on
December 24 or 26?

A.    Well, again, until I -- you know, if I

C. Coffman

were evaluating a specific question of whether that
news caused any price response, I would want to
look at a host of additional things, including
trying to assess precisely when it came out,
looking at the intraday pricing to see if there's
additional information, looking to see if there's
confounding positive information that might explain
that.  I haven't done that analysis, so I don't
know.

      Q.    So in this case, you know that
plaintiffs are alleging that there were statements
at the beginning that supposedly inflated the
price, and then truth comes out on certain dates at
the end where the truth leaked out and the price
declined again; right?  You know that's the theory?

      A.    When you say the price declined again,
I understand they're alleging there are corrective
dates on which the price declined, yes.

      Q.    So the critical dates where the
plaintiffs are saying information moved the price
were the dates of the alleged misstatements and the
dates when the truth came out; right?

            MS. POSNER:  Objection.

      A.    Well, it's not clear that, depending on

C. Coffman

the nature of the misstatements, whether or not
they would be expected to move the stock price.
For example, if plaintiffs were using the price
maintenance theory, then they might not be expected
to move the stock price on the misstatement or
omission dates, especially if there were omissions,
but on the corrective disclosures, my understanding
is they're alleging the price declined on certain
corrective dates that reflects the dissipation of
artificial inflation.

Q.    So, so far, we've gone through six
dates, the four alleged misstatement dates and the
first of the two corrective disclosure dates, and
we don't have a statistically significant movement
in response to any of them on the first day; right?

MS. POSNER:  Objection.

A.    Well, in reviewing plaintiffs'
complaint, there's an allegation that the allegedly
false and misleading audit opinion was first issued
on August 29th, which according to my event study,
was statistically significant.  So it's not clear
to me that that's correct.

Q.    So are you now saying the year-end
results for 2011 came out on August 29?

C. Coffman

1

2     A.    That's a possibility I need to

3 investigate.

4     Q.    So you may have another error on your

5 Exhibit 7?

6     A.    Well, given that you pointed out that I

7 apparently inadvertently relied on a Dow Jones

8 correction, I guess I would like to go back and

9 review the details of each of these dates to make

10 sure I'm selecting the right date, and I'm saying

11 as of right now, there does appear to be a

12 suggestion that August 29th may have been the right

13 date to analyze.

14     Q.    So we went through event 9 and talked

15 about how your report and exhibits might change if

16 you use the right data.  You're now saying that

17 event 1 might also be incorrect?

18     A.    It's possible.

19     Q.    Are you sure you still have an opinion

20 sitting here today about whether the market was

21 efficient?

22     A.    Yes.

23     Q.    Even without the data?

24     A.    No.  As I said, I believe there's

25 sufficient evidence, based on the higher proportion

C. Coffman

of significant dates, that if what I'm saying about
event 1 is right, that would actually improve the
numbers, and my review of all the other Cammer
factors and my review of other dates that I noted
during the class period which showed statistically
significant movements in response to clear new
news, it's my professional opinion that the market
for the common stock was efficient.

I believe based on what you've shown me
today, there's some important details in my report
that I want to revisit, but nothing has changed my
view as to whether the market is efficient or not.

Q.    So for Exhibit 7, you're saying you
looked at 19 events, 19 events; right?

A.    17.

Q.    Sorry, 17.  Not a big number, 17
events.  We know you got one of them wrong and
you're saying you might have gotten two of them
wrong, but one mistake was one direction and the
other mistake might have been the other direction
so it offsets?

A.    I'm not saying that at all yet.  I'm
saying that there's details I want to go back and
review.

                         C. Coffman

1

2       Q.     But you're confident you've still got

3   that opinion on market efficiency; right?

4       A.     Yes.

5       Q.     In paragraph 206 of the Second Amended

6   Complaint, plaintiffs refer to a disclosure in the

7   form of an 8-K.  Do you see that?

8       A.     I see that, yes.

9       Q.     And this one is alleged to have come

10  out before trading began; right?

11      A.     The complaint alleges that on March 13,

12  2014, before trading began, the company filed a

13  Form 8-K.

14      Q.     And do you see that on your Exhibit 7?

15      A.     Yes, I see that.

16      Q.     Did you evaluate whether there was a

17  statistically significant price movement on March

18  13, 2014?

19      A.     I did.

20      Q.     Was there?

21      A.     No.

22      Q.     So here's another example of one of

23  these news events not having a statistically

24  significant price impact?

25              MS. POSNER:  Objection.

```
                       C. Coffman
```

1

2          A.    At least on the date of March 13, 2014,

3  that's correct, yes.

4          Q.    That's the proper market date to look

5  at under your methodology; isn't it?

6                MS. POSNER:  Objection.

7          A.    Yes.

8          Q.    Unless --

9          A.    Based on what I know, yes.

10          Q.    Paragraph 207 refers to an investor

11  call.  Do you see that?

12          A.    Yes.

13          Q.    That would be the investor call that

14  took place on March 13 and a transcript was filed

15  on March 14 after hours; is that right?

16          A.    This says the public -- yeah, this

17  seems to indicate that there was an investor call

18  after the market on the 13th, and a public version

19  available after market on the 14th.

20          Q.    So if you wanted to see if there was a

21  reaction on the price, you would look at March 14?

22          A.    If the call actually took place after

23  market on the 13th, the 14th is certainly a

24  relevant date to look at.

25          Q.    Was there a statistically significant

```
 1                    C. Coffman
 2  price movement on March 14, 2014?
 3       A.    On March 14th, 2014?  No, there was
 4  not.
 5       Q.    Can you turn to paragraph 209 of the
 6  complaint, please.
 7       A.    Okay.
 8       Q.    Looking at this allegation, I can't
 9  tell if plaintiffs are alleging that this was a
10  misstatement date or a truth in the market date or
11  what.  Do you know?
12       A.    I think they're alleging both in the
13  sense that there's a reiteration of the alleged
14  misstatements, but also a partial corrective
15  disclosure based on the financial results.
16       Q.    So in this instance, we know that on
17  July 15th, you found a price movement that was at
18  least marginally significant at the 90 percent
19  level; right?
20            MS. POSNER:  Objection.
21       Q.    You can look at your Exhibit 7 for
22  this.
23       A.    I find that July 15th was significant
24  at the 90 percent level, and after the earnings
25  call, was significant at the 95 percent level.
```

C. Coffman

Q.     But it was a decline; right?

A.     Both were declines, yes.

Q.     So we finally found a statistically
significant, at least at the 90 percent level,
movement in the price of the common stock, but it's
a decline in response to one of the four alleged
misstatements made by KPMG and Miller Energy;
right?

MS. POSNER:  Objection.

A.     That's true, but there is also --
plaintiffs are alleging at least that there was
also partially corrective information at least over
those two days as well.

Q.     What was the partially corrective
information that came out over those two days?

A.     My understanding is the plaintiffs are
alleging as part of the earnings release and the
call, there was an acknowledgement that "costs and
expenses were high, including DD&A expenses, and
acknowledged that poor net income and earnings per
share numbers were items that 'a number of our
shareholders focused on.'"

Plaintiffs talk about how "Brawley also
acknowledged that Miller Energy's internal controls

C. Coffman

1
2   were still deficient, but touted the hiring of 'a

3   junior accountant with big four accounting

4   experience'  as a reason for investors to be

5   optimistic."

6                   And then that there was discussion on

7   the call about the cost for each well that

8   defendants weren't able to provide complete

9   answers.  And then they say in paragraph 213, "On

10  and around this day, and on this news, risks or

11  truth concealed by, or effects associated with,

12  KPMG's fraud were partially revealed."

13                  So what is talked about in paragraph

14  211 or 212, I understand to be the information that

15  they're pointing to.

16      Q.    So the year-end disclosures for 2014

17  were both the alleged misstatement that the

18  plaintiffs are suing on and they're also what

19  disclosed the truth partially to the market.  Have

20  you ever seen that in a securities case before?

21      A.    Yes.

22      Q.    Where?

23      A.    I believe there have been a number of

24  cases where defendant was making alleged false

25  statements that continued to essentially give the

C. Coffman

1

2 market the same information over time.  And here

3 it's alleging that the audit opinions, you know,

4 that they were -- the financial statements were

5 prepared consistent with GAAP, and I understand

6 misleading or omitted other information and I don't

7 believe the market would have seen an accountant's

8 reiterating their accounting opinion as necessarily

9 something that would increase the stock price on

10 that given day because the market was probably

11 expecting to hear that, but at the same time,

12 announcing negative information that at least

13 partially reveals what plaintiffs are alleging was

14 misstated or concealed by the false and misleading

15 statements.

16      Q.    Please turn to paragraph 215 of the

17 Second Amended Complaint.  Plaintiffs in this

18 paragraph refer to margin calls on November 26,

19 2014.  Do you see that?

20      A.    I do.

21      Q.    Did you evaluate or give an opinion on

22 whether there was a statistically significant price

23 movement following this event?

24      A.    Can I have that read back, please.

25           (Record read.)

                        C. Coffman

1

2          A.    I mean, I haven't studied the specific

3    timing of when those events occurred.  On the 26th,

4    itself, I found there's not a statistically

5    significant stock price movement.  On the following

6    trading day of the 28th, there was.

7          Q.    And on December 1st as well; right?

8          A.    That's right.

9          Q.    If you look at plaintiffs' allegation

10   in 215, they allege that the price of the common

11   stock fell from a closing price of $3.16 on

12   November 25, 2014, to $1.59 on December 1, 2014.

13   Do you see that?

14         A.    I see that.

15         Q.    So plaintiffs are alleging that this

16   disclosure or this event led to a decline in stock

17   price over that three-day period from November 26

18   through December 1; right?

19         A.    That seems to be what the allegation

20   is.

21              MS. POSNER:  Just a point of

22         clarification.  November 25th.

23              MR. BALLARD:  No, the 25th was the

24         event day so the decline happened on November

25         26, 28 and December 1.  Right?

```
1                        C. Coffman
2              MS. POSNER:  Your question was we
3         allege, and I'm pointing out that what we
4         allege is that there was a drop from November
5         25th, from $3.16 to $1.59 on December 1,
6         2014.
7         Q.    Mr. Coffman, if you're evaluating
8    plaintiffs' allegation as written here about the
9    decline in the price from the closing price on
10   November 25 through December 1, 2014, what market
11   days would you look at to evaluate that?
12        A.    That would seem to encompass the market
13   days of November 26th, November 28th and December
14   1st.
15        Q.    Three days, not four; right?
16        A.    At least based on my reading of this,
17   that's correct.
18        Q.    You would treat the November 25 day as
19   the event day.  That's why you used that as the
20   starting price, and then you looked to see if
21   there's a change in the price on the 26th, 28th or
22   December 1st; right?
23        A.    By citing a closing price on the 25th,
24   I'm comparing the movement after that to that
25   closing price.  My understanding is the implication
```

C. Coffman

1

2    is that the information wasn't out as of the close

3    of November 25th.

4              MR. BALLARD:  I knew I was right.

5              MS. POSNER:  You're actually not, but

6         that's fine.  You were quoting what we

7         allege, so I just wanted to be clear about

8         what we actually specifically state.

9              MR. BALLARD:  I understand but I also

10        read and understand English.

11             MS. POSNER:  Apparently not.

12        Q.    I think you said there was no

13   statistically significant price movement on

14   November 26, right, and there was on November 28th

15   and on December 1; right?

16        A.    Based on my event study, that's

17   correct.

18        Q.    And so this would be one of those

19   instances where there's no reaction on day one, but

20   there is on day two and day three, and yet you

21   would conclude that's still consistent with market

22   efficiency?

23             MS. POSNER:  Objection.

24        Q.    Is that your testimony?

25        A.    I haven't concluded anything about the

                        C. Coffman

1    timing of these -- this particular announcement or

2    analyzed whether it makes sense to look at a one,

3    two or three-day window so I haven't reached any

4    conclusion about that.

5        Q.    Not to beat a dead horse or anything,

6    but on November 25, 2014, looking at the closing

7    price of 3.16, the price doesn't change after

8    closing; right?

9        A.    Not during regular market hours.  It

10   could during aftermarket trading, but I guess I

11   don't see why that's relevant.  I'm saying I'm not

12   sure the timing of when these margin calls

13   occurred.  It's alleged that it was on November

14   26th.  I'm saying it could have been after market

15   on the 26th so I don't even know what day one

16   actually is here.

17            MR. BALLARD:  I'm just getting back to

18         my dispute with Laura about what the relevant

19         time period is.

20            MS. POSNER:  I have no dispute with you

21         about what the relevant time period is.  I

22         was just correcting your reading of our

23         complaint.

24            MR. BALLARD:  We will agree to disagree

```
 1                      C. Coffman

 2       on that.

 3       Q.    If the allegations in paragraph 215 are

 4  correct and it took three trading days for the

 5  market to react to this event, that would be a sign

 6  that the market was not efficient; correct?

 7       A.    I think I need to give a multi-part

 8  answer to that question.  Number one, I'm not --

 9  it's not clear to me that's what actually occurred.

10  Number two, to have an opinion about that, I would

11  have to analyze precisely what happened and why I

12  was seeing what I was seeing.

13            If in some hypothetical world, if I saw

14  an event and the first reaction to it seemed to

15  occur three days later and it was clearly a widely

16  available piece of information, that might cause a

17  question, but if it was continuing to react because

18  of some new piece of information or new analysis

19  that was provided by some analyst or some other

20  outlet, it might make perfect sense.  So until I

21  analyze the specifics of the event and what

22  occurred and why one might be observing what

23  they're observing, I don't think I could draw any

24  specific conclusion.

25       Q.    Let's look at paragraph 217 of the
```

```
1                        C. Coffman
2    complaint.  Here there's an allegation about a Form
3    8-K.  Do you see that?
4         A.    Yes.
5         Q.    As well as a Reuters report; do you see
6    that?
7         A.    Yes.
8         Q.    And then there's an allegation that the
9    market reacted over the period from December 4
10   through December 8.  Do you see that?
11        A.    Well, I see -- I mean, in reading this
12   now, one of the reasons the -- if these margin
13   calls were occurring over time, that might be
14   another explanation for why the price reaction is
15   occurring over some period of time and then I think
16   in paragraph 217 they're saying the information
17   came out after market on the 14th, so it would
18   effect subsequent trading days, and if I look, that
19   would be the 5th and the 8th, so that would be two
20   trading days.
21        Q.    Was there a statistically significant
22   price movement on December 5, 2014?
23        A.    No.
24        Q.    Was there on December 8, 2014?
25        A.    Yes.
```

                    C. Coffman

    Q.    So again, another event where no

reaction on day one, but there is on day two.  Is

that consistent with market efficiency?

    A.    It's not clear to me that how the

market is reacting on day 8 relates back to what

plaintiffs are alleging here.  That's an issue I

would have to study.

    Q.    So plaintiffs could be wrong about

that, but if they're right about it, it's not

consistent with market efficiency; right?

            MS. POSNER:  Objection.

    A.    I would have to study it to give an

opinion on that.

    Q.    How many instances do I have to find

where the market doesn't react on day one and does

on day two for you to question whether the market

was efficient?

    A.    Well, you're not proving the predicate

to your question, which is that there was -- that

the news that the market is reacting to is from

some multiple prior days.  That's just not

something I've studied here.

    Q.    Oh, I agree with you that plaintiffs

haven't proven this allegation.  There we can agree

                         C. Coffman

1

2  on that.  But if they are to prove it and if it

3  were true, as they alleged it, that it took a

4  couple of days for these things to make their way

5  into the market price, that would be inconsistent

6  with market efficiency; correct?

7              MS. POSNER:  Objection.

8        A.    Again, it would really depend on the

9  facts and circumstances of each event.  I mean,

10 when you're talking about the margin calls, for

11 example, those could have been -- the trades

12 necessary for those margin calls could have been

13 happening over time or concentrated on a particular

14 day after they started.

15             I would have to study, you know, how

16 exactly the information got into the market and how

17 it was covered and when analysts were covering it,

18 et cetera.  So I'm just not going to speculate

19 about that because it would require a detailed --

20 essentially drawing any conclusions about whether

21 the news plaintiffs are pointing to is what

22 actually caused the price movements and over what

23 time, it would take a detailed analysis that I have

24 not done.

25        Q.    Certainly, if you accepted plaintiffs'

                    C. Coffman

1
2   allegations as true, given what we've seen today,
3   you've seen a number of things that would give
4   cause for questioning whether there was market
5   efficiency for the common stock; right?
6           MS. POSNER:  Objection.
7       A.    No, because I mean, I don't take what
8   plaintiffs allege in their complaint as the truth
9   about what news was causing which price movements.
10      Q.    So perhaps if plaintiffs prove that
11  their own allegations are wrong, then it would be
12  consistent with your conclusion of efficiency, but
13  you're not willing to accept their allegations as
14  true?
15          MS. POSNER:  Is that a question?
16          MR. BALLARD:  Yes, it is.
17      A.    There is nothing in the formation of my
18  opinions that require accepting plaintiffs'
19  allegations as true in any way.
20      Q.    But accepting your opinion would
21  require rejecting certain allegations of the
22  complaint; correct?
23      A.    I haven't drawn that conclusion.  There
24  may be other reasons for observing why what we're
25  observing.  So, for example, on day one of these

                    C. Coffman

1
2  windows, maybe there was confounding positive
3  information and so that's drowning out the effect
4  on day one.
5           I just haven't studied it, and you're
6  asking me to speculate what the right conclusions
7  are to draw from that and I just haven't done that
8  analysis.
9       Q.    Well, with all due respect, you've
10 given an opinion on market efficiency in this case
11 and today is your deposition.  Today is the day for
12 you to tell us if you have a basis for your
13 opinion, and what it is, and the full extent of it.
14 So now is your chance.
15          Is there any way you can explain these
16 anomalies we've looked at where it appears that the
17 markets are not acting in an efficient way?
18          MS. POSNER:  Objection.
19      A.    I think the predicate to your question
20 is incorrect, which is that somehow what you're
21 pointing out implies the market is reacting in an
22 inefficient way.
23      Q.    Is that a yes or no?
24          MS. POSNER:  Objection.
25      A.    I've laid out in my report the basis

                              C. Coffman

1   for my opinions on why the market is efficient, and

2   I stand by them.

3        Q.    Do you want to tell the judge why you

4   can't answer my question yes or no?

5              MS. POSNER:  Objection.

6        A.    Can I have that question read back,

7   please.

8              (Record read.)

9        A.    And as I said, I don't believe you've

10  shown me something that suggests there's an anomaly

11  in which the market is behaving in an inefficient

12  way.

13       Q.    We've looked at instances where the

14  market didn't react on the first day, the market

15  date as you defined it, in response to events that

16  the plaintiffs have said are material.  That's not

17  an anomaly for you?

18       A.    No, because sometimes material

19  information isn't enough to change the market

20  price.  Something can be material and be an

21  important thing for a shareholder to consider, but

22  not be sufficient to move the stock market price in

23  a significant way.

24             I think you're imputing into your

                         C. Coffman

1

2  questions that the plaintiffs are absolutely right

3  about how to interpret what events moved the price

4  on which days, and I'm saying I'm not taking that

5  as a predicate to my opinion.  I've analyzed market

6  efficiency on the basis of the analyses that are in

7  my report.

8       Q.    Please turn to paragraph 218 of the

9  Second Amended Complaint.

10      A.    Okay.

11      Q.    In paragraph 218, the plaintiffs allege

12 that "On December 10, 2014, as the trading day

13 began, Miller Energy filed a Form 8-K, attaching

14 its earnings release for the second quarter of

15 fiscal year 2015, ending October 31, 2014.  In that

16 release, the Company announced during that quarter

17 it, 'recognized a $265.3 million non-cash

18 impairment charge related to its Redoubt field of

19 proved and unproved properties.  The proved and

20 unproved properties were written down to their

21 estimated fair value."

22           Do you see that?

23      A.    I see that.

24      Q.    Then plaintiffs allege that there were

25 some comments on an earnings call that day about

C. Coffman

1

2 expense overruns and costs factored into the

3 impairment.  Do you see that?

4          A.    I see that.

5          Q.    And then it says the company also

6 announced a loss of $285.7 million.  Do you see

7 that?

8          A.    I see that.

9          Q.    Was there a statistically significant

10 movement in the price of Miller Energy's common

11 stock in response to the disclosures on March 12,

12 2015, that came out at 7:00 a.m. in the morning?

13 So that's 16 on your report.

14          A.    I'm confused because you were reading

15 me stuff about December 10 and then switched to

16 March 12.

17          Q.    You're right.  I read the wrong date.

18 Let me rephrase that.  You're looking at Exhibit 7?

19          A.    Yes.  And Exhibit 33 of -- Deposition

20 Exhibit 33 as well.

21          Q.    Let me rephrase that.  So in paragraph

22 218, there's an allegation about the Form 8-K on

23 December 10, 2014.  Right?  That's what you're

24 looking at?

25          A.    That's what you're referring to, yes.

C. Coffman

Q.     And that's the one where there was a
disclosure of a $265.3 million non-cash impairment
charge related to the Alaska Assets; right?

A.     That's my understanding of what they're
alleging, yes.

Q.     Returning to your Exhibit 7, does that
appear on your list of events?

A.     December 10th, 2014 does, yes.

Q.     And that's event number 15; right?

A.     Yes.

Q.     Was there a statistically significant
reaction in the price of the common stock?

A.     Not according to the event study, no.

Q.     Please turn to paragraph 222 of the
complaint.

A.     Okay.

Q.     There's an allegation here about a
disclosure on March 12, 2015.  Do you see that?

A.     I see that.

Q.     And this allegation states that "The
Company revealed it was taking another $149.1
million of impairment charges on the Alaska Assets,
increasing total impairment to $414.4 million."

        Do you see that?

C. Coffman

2          A.     Yes.

3          Q.     Did the price of the common stock react

4   to this announcement?

5          A.     It does not appear there was a

6   statistically significant result on March -- the

7   complaint is referencing March 13.  It does not

8   appear there's a statistically significant

9   announcement there.

10         Q.     So there were two dates on which the

11  company disclosed large impairment charges related

12  to the Alaska Assets and on neither did the stock

13  price react in a statistically significant way; is

14  that correct?

15                MS. POSNER:  Objection.

16         A.     At least on these two events, that's

17  true.

18         Q.     And you are aware that this whole case

19  is about the value of the Alaska Assets; right?

20         A.     My understanding is that the complaint

21  is based on an allegation that the Alaska Assets

22  were overvalued by Miller Energy in violation of

23  GAAP, and that KPMG, nevertheless, provided a clean

24  audit opinion.

25         Q.     And it's your understanding, based on

```
 1                      C. Coffman
 2   your work, that in the four instances when KPMG
 3   made a public statement in the form of an audit
 4   opinion on the financial statements, the price
 5   never went up in a statistically significant way in
 6   reaction to those statements, and it also didn't go
 7   down when the company disclosed large impairment
 8   charges related to the Alaska Assets; correct?
 9            MS. POSNER:  Objection.
10       A.    Well, I believe it might have gone up
11   on the first announcement of the audit opinion,
12   based on my review of plaintiffs' complaint and the
13   review of my event study.  On the two dates you
14   pointed me to where they allege impairment charges,
15   my event study does not suggest there's a
16   statistically significant decline.
17       Q.    What you just testified to about the
18   price possibly going up on one day, that's nowhere
19   in your report; right?
20       A.    Well, it's in my backup materials that
21   shows that there's a positive statistically
22   significant stock price movement on August 29th.
23       Q.    It's nowhere in your report; right?
24       A.    It's not reflected in the text of my
25   report.  It's reflected in my backup materials.
```

1                           C. Coffman

2          Q.     None of the backup materials attached

3    to your report reflect that; correct?

4          A.     That there's a statistically

5    significant stock price movement on August 29th,

6    2011, there is.

7          Q.     Where?

8          A.     On Exhibit 33.

9          Q.     That's not attached to your report.

10         A.     I'm sorry.  I didn't catch the

11   "attached to my report" part of the question.

12         Q.     Let me rephrase the question.  You

13   produced a report and exhibits in this case that

14   are intended to contain a complete statement of

15   your opinions as required by the Federal Rules;

16   correct?

17         A.     Yes.

18         Q.     The testimony you just gave about the

19   stock price possibly going up in response to KPMG's

20   statements is nowhere to be found in that report or

21   the exhibits to it; correct?

22         A.     It's not.  Again, the purpose of my

23   report was not to evaluate that question.  It was

24   to evaluate whether there was evidence of market

25   efficiency.  So the fact that that particular

C. Coffman

conclusion or data isn't in my report is not

particularly relevant to this question.

Q.    You actually excluded that date from

your report and you did so quite intentionally

because you deemed it an outlier; right?

MS. POSNER:  Objection.

A.    Well, no.  I excluded it from the

estimation window for future dates because there

was clearly important firm-specific information and

a huge stock price movement on that day.  That's

why it was excluded.

I didn't exclude it because it was

KPMG's statement or for any other reason.  It would

have biased my event study results on future days

to continue including that date in the estimation

period.  It's a different issue.

Q.    Do you have any explanation for why the

price of the common stock didn't go down in

response to the disclosures about the impairment

charges on December 10, 2014 and March 12, 2015?

MS. POSNER:  Objection.

THE WITNESS:  Can I have that read back

please.

(Record read.)

C. Coffman

A.    That's not something I formed a conclusion on, no.

Q.    I'd like to talk a little bit about the event studies you conducted with respect to the Series C and Series D preferred shares, so please turn to page 37 of your report.

A.    Okay.

Q.    So your discussion of the event studies for the preferred securities, it looks like it starts on page 33; is that right?

A.    Yes.

Q.    And if you look at paragraph 70, you refer to an October 5, 2012 offering of 685,000 shares of the C series; right?

A.    Correct.

Q.    Do you know how many of those shares were sold in that offering?

A.    I thought it was those 685,000 shares, but I believe that's -- I'm using their SEC filing to state that's what they were offering.  I guess I don't know precisely how many were sold on that day.

Q.    You referred to the Form 10-Q, right, in the footnote?  And the 10-Q states "On September

C. Coffman

28, 2012, we sold 685,000 shares of the company's
newly designated 10.75 percent Series C cumulative
redeemable preferred stock, the Series C preferred
stock, pursuant to the company's shelf registration
statement."

So did you take that to mean that they
sold the entirety of the 685,000 shares?

A.     Yes.  That helps remind me of why I was
able to make that statement, yes, or that they were
sold, not just offered.

Q.     And they entered the market at $23 per
share; right?

A.     That's what they were sold for.

Q.     On the next page, in paragraph 71, you
refer to an additional offering of C series shares
in October of 2012 which was an at-the-market
issuance.  Do you see that?

A.     Yes.

Q.     So those shares were sold into the
market at varying prices over time; correct?

A.     That's my understanding, yes.

Q.     And then at the end of that paragraph,
you indicate that Miller Energy issued an
additional 625,000 shares of the C series at $22.9

C. Coffman

1
2    per share.  Do you see that?

3        A.    Yes.

4        Q.    So those shares entered the market at

5    $22.9 a share; right?

6        A.    Yes.  When you say entered the market,

7    that's what they were sold for, yes.

8        Q.    There were different initial prices for

9    the C series shares as they were sold originally

10   into the market; correct?

11       A.    When you say initial prices, that was

12   just the price, because it's one transaction when

13   they bought the stock.

14       Q.    Some people bought the stock as an

15   initial matter at $23 a share.  Some people bought

16   it initially at $22.90 a share and some people

17   bought it in the aftermarket offerings at a variety

18   of other prices; correct?

19       A.    That's consistent with my

20   understanding, yes, that there were different

21   transaction prices for the sales of these shares.

22       Q.    If you look at the complaint, and

23   paragraph 317, you will see an allegation that

24   "This Count," the Section 11 count, "is brought in

25   connection with each of the Offerings (except for

                         C. Coffman

1

2    the February 13, 2013 Offering)."

3              Do you see that?

4        A.    I see that.

5        Q.    If you turn to paragraph 286, you will

6    see a list of offerings.  Do you see that?

7        A.    Yes.

8        Q.    There are three Series C offerings

9    listed here.  Do you see those?

10       A.    Yes.

11       Q.    There's a May 7, 2013 offering where

12   shares were sold at $22.25 and that was 500,000

13   shares; right?

14       A.    I'm sorry.  I was looking at something

15   and lost the context of your question.  Can you

16   re-ask it please.

17       Q.    Looking at the Second Amended

18   Complaint, paragraph 286, you can see that on May

19   7, 2013, according to plaintiffs, there were

20   500,000 additional C series shares that were sold

21   at $22.25.  Right?

22       A.    I see that.

23       Q.    And then the plaintiffs allege that on

24   June 27, 2013, there was another offering in which

25   335,000 Series C shares were offered at $21.50;

```
 1                        C. Coffman

 2   right?

 3        A.    Yes.

 4        Q.    And comparing that list with the

 5   allegation in paragraph 13, you can see that the

 6   plaintiffs are alleging that the Section 11 claim

 7   is asserted on behalf of those who purchased in or

 8   can trace their shares to the May 7, 2013 and the

 9   June 27, 2013 offerings; is that correct?

10              MS. POSNER:  For Series C.

11              MR. BALLARD:  For Series C.

12        A.    So just so I make sure I understand the

13   question, paragraph 286 lists the -- not the

14   initial offering of Series C, but the additional

15   offerings after the initial offering in February,

16   May and June of 2013.

17        Q.    Those are the offerings that are at

18   issue in the case with the exception that February

19   13, 2013 is excluded as stated in paragraph 317 of

20   the complaint.  Do you see that?

21        A.    I mean, I see that.  I mean, this

22   strikes me as a legal issue over which they're

23   bringing claims on versus which they're not, which

24   I haven't really studied, but I see what you're

25   pointing me to.
```

                              C. Coffman

1

2          Q.     So the Section 11 claim is not asserted

3    in connection with the February 2013 offering of

4    625,000 C series shares.  You can see that; right?

5    It says so right in 317.

6          A.     That seems to be what it's indicating.

7          Q.     And the Section 11 claim is also not

8    asserted in connection with the October 2012

9    at-the-market offering or the October 2012 offering

10   of 685,000 C series shares.  You see that; right?

11         A.     You're suggesting it doesn't include

12   the October 5th initial offering of 685,000 shares?

13         Q.     That's right.

14                MS. POSNER:  Can you read back the

15                question.  I just want to make sure he said

16                the Section 11 claim.

17                (Record read.)

18         Q.     So let me ask this:  Would you agree

19   there were at least 680,000 plus 625,000 for a

20   total of over 1.3 million C series shares in the

21   market that are not at issue in the Section 11

22   claim in this case?

23         A.     Again, this is an issue I haven't

24   focused on.  I think if what you're representing,

25   which is that the initial offering of 685,000

                        C. Coffman

1
2   shares is not part of this case, and the 625,000

3   shares offered in February are not part of this

4   case, that would imply that there is over a million

5   shares of Series C that are not subject to Section

6   11 damages or Section 11 claims.

7          Whether that's an appropriate legal

8   reading of this or not, I don't know, but from a

9   mathematical perspective, if those offerings don't

10  have Section 11 claims, what you're saying is

11  right.

12          MR. BALLARD:  Mark this as the next

13      exhibit.

14          (Exhibit 37, Certification of Martin

15      Ziesman, marked for identification, as of

16      this date.)

17          THE WITNESS:  I was going to say that's

18      true at some point in time.  Obviously,

19      before October 5th, 2012 -- before the

20      February 2013 date, it's only 685,000, but

21      collectively after the fact, what you said is

22      right.

23      Q.   Please look at Defendant's Exhibit 37

24  and you can turn to the certification and it's the

25  certification of Mr. Martin Ziesman, and attached

                              C. Coffman

1
2   is a Schedule A which lists his purchase of C
3   series shares.  Do you see that?
4        A.    Okay, I see that.
5        Q.    Mr. Ziesman says he bought 1,000 shares
6   of the C series stock on June 4, 2014, at a price
7   of $25.4292 per share.  Right?
8        A.    That's what it appears to assert, yes.
9        Q.    And that's the only purchase he says he
10  made; right?
11       A.    In this declaration, that's true, or
12  certification, that's true.
13       Q.    So from this you can tell he didn't buy
14  those shares in the October 2014 initial offering;
15  right?
16       A.    I don't think your question was right.
17       Q.    He did not buy his shares in the
18  original offering in October 2012; right?
19       A.    That seems unlikely, yes.
20       Q.    It was years later.
21       A.    And at a different price.  Yes, that
22  doesn't seem right.
23       Q.    He didn't buy them in the at-the-market
24  offering that began in October 2012 either;
25  correct?

                              C. Coffman

1

2        A.     It doesn't appear so, but I haven't

3  studied how long that at-the-market offering took

4  place, but given that it's almost two years later,

5  I would agree with that.

6        Q.     Mr. Ziesman didn't buy in the February

7  2013 offering; correct?

8        A.     No.

9        Q.     And he didn't buy in the May 7, 2013

10 offering; right?

11       A.     No.

12       Q.     He didn't buy in the June 27, 2013

13 offering; right?

14       A.     No.

15       Q.     Mr. Ziesman obviously bought in the

16 aftermarket; correct?

17       A.     Well, when you say aftermarket, do you

18 mean in the secondary market?

19       Q.     Yes.

20       A.     I don't know that for -- well, give me

21 just a second.

22              That appears to be the case, yes, or

23 that would be an inference I would likely draw from

24 this.

25       Q.     Do you know if the 1,000 Series C

C. Coffman

1
2   shares that Mr. Ziesman acquired in June of 2014
3   came from the batch that was offered originally in
4   October of 2012?
5       A.    I don't know that.
6       Q.    Do you know if they came from the
7   February 2013 offering?
8       A.    I don't know that.
9       Q.    Do you know if they came from the May
10  7, 2013 offering?
11      A.    It had to come from one of the
12  offerings, but I don't know which offering it came
13  from.
14      Q.    It could have come from the
15  at-the-market or any of the other offerings, right,
16  you just don't know which one?
17      A.    I don't know.
18      Q.    Do you know of any way you could trace
19  those particular shares to any particular offering?
20      A.    I don't know the answer to that,
21  whether there's a way or not.
22      Q.    So they may have come from one of the
23  offerings that is at issue in the case or they
24  might have come from one of the offerings that is
25  not at issue in this case as far as you know;

                          C. Coffman

1

2   right?

3              MS. POSNER:  Objection.

4        A.    As far as I know, that's not an issue

5   I've investigated.

6        Q.    So returning to your discussion of the

7   preferred shares, you included some exhibits where

8   you included your event studies related to the

9   preferred shares; right?

10       A.    I have exhibits that summarize that.  I

11  also provided backup material with the details but

12  yeah, there are a number of exhibits that summarize

13  my findings from those event studies and other

14  data.

15       Q.    And those are Exhibits 9 and 10 relate

16  to the C series, and 11 and 12 relate to the D

17  series; right?

18       A.    Again, it goes beyond the event study,

19  but Exhibit 9 and 10 are addressing cause and

20  effect for the C series, and 11 and 12 are

21  addressing it for the D series, and then there's

22  also text -- it's also discussed in the text and

23  there are charts in the text as well.

24       Q.    Let's look at the text on page 37,

25  paragraph 74 and 75.  This is one of the places you

1                   C. Coffman

2   discuss the preferred securities; correct?

3       A.    Yes.

4       Q.    And in paragraph 74 in the middle you

5   write, "From the time of the issuance of each of

6   the preferred securities to the time where the

7   market prices substantially fall below the par

8   value (and therefore indicating an increased risk

9   of default) market price would be driven primarily

10  by changes in the time value of money (i.e., the

11  applicable discount rate)."

12            Do you see that?

13      A.    Yes.

14      Q.    And then you say market prices would

15  not be expected to be sensitive to all the factors

16  that impact the common stock; right?

17      A.    Correct.

18      Q.    So you did an event study for the

19  period after October 15, 2014, when you expected

20  the market prices would be more sensitive to

21  information about the financial condition of the

22  company; is that fair?

23      A.    Yeah, where I would expect it to be

24  more sensitive to company-specific information.

25      Q.    Did you conduct an event study or any

C. Coffman

study to assess whether there was a cause and
effect relationship between events affecting the
time value of money and movements in the price of
the preferred stock?

    A.    No.

    Q.    So you have no event study examining
the period from the beginning of the analysis
period up to October 15, 2014; correct?

    A.    I have an event study.  I performed the
regression analysis.  I don't rely on a testing any
of dates during that period to evaluate market
efficiency.

    Q.    You could have done an event study to
assess whether there was a cause and effect
relationship between events affecting the time
value of money and movements in the price of the
stock prior to October 15, 2014; right?

    A.    Well, that paragraph 47 of my report,
when I'm citing Cammer, it's saying "One of the
most convincing ways to demonstrate market
efficiency would be to demonstrate, over time, a
cause and effect relationship between company
disclosures and resulting movements in stock
price."

1                       C. Coffman

2               So I interpret that to mean

3    company-specific information or company specific --

4    so the time value of money component would be more

5    of an independent market effect, not a

6    company-specific event.

7         Q.    You could still test it; couldn't you?

8         A.    One could test whether the prices were

9    sensitive to things like interest rates, et cetera.

10        Q.    And that would bear on the question of

11   whether the market is efficient; correct?

12        A.    It may.

13        Q.    But you chose not to do that kind of

14   analysis?

15        A.    I did not do that analysis, that's

16   correct.

17        Q.    So you do not have evidence or an

18   opinion on whether there was a cause and effect

19   relationship between events affecting the time

20   value of money and movements in the price of the

21   preferred stock in the period from the beginning of

22   the analysis period up through October 15, 2014;

23   correct?

24        A.    That was not the focus of my analysis,

25   to analyze the changes in the time value of money.

```
 1                    C. Coffman
 2   My focus was to analyze whether during the period
 3   where it would be expected to respond to
 4   company-specific information, whether there was
 5   evidence that it did have a cause and effect
 6   relationship during that period.
 7           Q.    The preferred securities had a debt
 8   component and an equity component; right?
 9           A.    I think -- a debt-like component and an
10   equity-like components, yes.  It's not like it's a
11   strict combination of the two in a strict way, but
12   yes, it had those sorts of components.
13           Q.    Just focus on the Series C for a
14   moment.  They were paying an interest rate of 10.75
15   percent; right?
16           A.    If there were going to be dividends
17   paid, that's the rate at which the dividends were
18   going to be paid.
19           Q.    Do you remember what interest rates
20   were back then?
21           A.    Could you be more specific about what
22   interest rate?
23           Q.    Well, we can cut right to the chase on
24   this.  10.75 percent was pretty high, indicating
25   that this was a risky security; right?
```

1                         C. Coffman

2                 MS. POSNER:   Objection.

3        A.     This security certainly had risk and

4    the 10.7 percent being above the risk-free rate,

5    certainly indicates that, yes.

6        Q.     Investors were demanding a significant

7    premium over the risk-free rate for this security;

8    right?

9        A.     Yes.

10                MS. POSNER:   Objection.

11       Q.     Given that, why wouldn't you expect the

12   security price to react to information about the

13   financial condition about the company?

14       A.     I'm not saying it couldn't.  I'm saying

15   during a period where the prices are substantially

16   below par value is when you would expect it to be

17   more sensitive to company-specific information

18   where there's -- the data would be more powerful

19   for testing the cause and effect question.

20       Q.     So you could have done an event study

21   for company announcements for the period from the

22   beginning of the analysis period up to October 14,

23   2015 as well, but you just didn't do it?

24                MS. POSNER:   Objection.

25       A.     I could have.  It just would not have

```
1                        C. Coffman
2    surprised me to find that the securities weren't
3    reacting to that information, so I didn't view that
4    as a powerful test of cause and effect.  Because
5    for a bond, a bond-like instrument, as I described
6    in the report, the focus of the market would be on
7    the ability to pay the dividend, not the excess
8    equity value over the -- in other words, the
9    equity-like components would not be as significant.
10        Q.    So if you did an event study of some
11   type for the period up to October 15, 2014, you
12   thought it wouldn't provide evidence of efficiency?
13             MS. POSNER:  Objection.  That's not
14        what he testified to.
15        A.    No.  I said that during that period, it
16   would not likely be a powerful test because the
17   types of events like earnings announcements that I
18   test for the common stock wouldn't be expected to
19   alter the price of the security unless there was a
20   fundamental change in the liquidity of the company
21   or perceived liquidity of the company.
22        Q.    For purposes of the preferred
23   securities, you divided the analysis period into
24   two parts, divided by the date October 15, 2014;
25   right?
```

1                    C. Coffman

2        A.    I ran a different model before and

3  after that date, that's correct, yes.

4        Q.    You ran a model after that date, and

5  you didn't before that date; right?

6        A.    Well, I ran a model.  I just didn't

7  select any dates to test where there was obvious

8  firm-specific information that I thought would

9  likely change or had a high degree of possibility

10 of changing the value of the security in a

11 significant way.

12       Q.    This methodology that you have

13 described in your report where you constructed two

14 different fixed estimation windows for the

15 preferred securities, is that something you've seen

16 in other cases?

17       A.    It's certainly something where there is

18 an obvious change in what the market would be

19 considering as factors affecting the value to use a

20 different estimation period for that portion of the

21 relevant period.

22       Q.    Have you done this in any other cases?

23       A.    I believe there are other cases where I

24 have used fixed regression windows for certain

25 portions of analysis or class periods, yes.

C. Coffman

Q.    Is this a common technique?

A.    I think it's very common when there's a reason to believe that there's been a fundamental change in the factors that affect the return-generating process of the security, yes.

Q.    Is there any academic literature supporting this methodology?

A.    I think there's general academic literature that supports that if you observe a security over a period of time and have economic reasons to believe the security will behave differently in two different periods, to run two different regressions to study those periods.  I believe that is, yes.

Q.    Where can I find that?

A.    I think the general concepts of how a regression model would be biased if you didn't do it in the face of different -- of a return-generating process having changed or an underlying model having changed, and you didn't adjust for it, how that would be biased is in basic econometrics textbooks, but the specific use of different regressions for an event study over different periods, I don't recall the specific

C. Coffman

literature, but it's certainly something that I
recall having read about.

Q.    Let's look at Exhibit No. 11 to your
report.  Exhibit 11 summarizes the event study you
conducted with respect to the D series.  Is that
right?

A.    This summarizes the event study results
for the D series, yes, or at least the dates of
material announcements, yes.

Q.    Let's back up.  I want to look at the C
series first.  Let's go to Exhibit 9.

A.    Okay.

Q.    Exhibit 9 shows a summary of your event
study for the C series; right?

A.    Yes.  And again, there's more beyond
this, but this summarizes the results for the
specific days that I'm testing.

Q.    And in this, you look at nine events;
right?

A.    Just to be clear, I also look at the
194 no news events, so that's not summarized here
but this is the nine events that I'm calling the
news days or events that I'm testing.

Q.    And you compared the results you found

C. Coffman

1

2   on the nine news or event days with the results you

3   found on the no news days; right?

4        A.    That's correct.

5        Q.    So for this analysis here, you included

6   earnings releases as well as certain other events;

7   right?

8        A.    That's correct, yes.

9        Q.    On the common stock, you looked at only

10  earnings releases; right?

11       A.    That's correct.

12       Q.    Why a different methodology?

13       A.    Because the Series C and Series D were

14  offered -- a couple of different reasons.  Number

15  one, they're offered later in the class period.

16            Number two, over the period in which

17  they're trading at par value, I wouldn't, for the

18  reasons described, wouldn't expect them to respond

19  to quarterly earnings announcements frequently.  So

20  that was going to leave me with a small sample size

21  of dates to test.

22            Three would not be -- I think there's

23  three earnings announcements over the relevant

24  period for performing this test so I attempted to

25  identify an additional category or categories of

C. Coffman

2  dates that would be relevant to test.

3      Q.    Wait a minute.  This analysis here on

4  Exhibit 9 is for the period when you said after

5  October 15, 2014, you would expect the market

6  prices of the preferred C series shares to react to

7  earnings announcements; right?

8      A.    Or at least could potentially, but I

9  describe in the report how I'm not surprised that

10  they don't, given that the market price of the

11  common stock didn't react to these particular

12  earnings announcements either.

13      Q.    If you look at Exhibit 9 for this C

14  series and you look at the earnings releases, that

15  would be events 2, 4 and 8; right?

16      A.    That's correct.

17      Q.    And the price of the preferred stock,

18  the C series, never reacted in a statistically

19  significant way to an earnings release; correct?

20          MS. POSNER:  Objection.

21      A.    That's correct, and what I'm saying is

22  that that's not in any way inconsistent with market

23  efficiency given that the common stock didn't react

24  significantly to those either.

25      Q.    If you used the same methodology for

1               C. Coffman

2  the C series that you did for the common stock, you

3  would have found no cause and effect relationship

4  between the release of new information and

5  movements in the price of the preferred stock; is

6  that correct?

7       A.    Well, if you're saying if I had used

8  the exact same precise methodology, I suppose

9  that's true, but there's reasons not to do that

10 that are described in the report, and I do follow

11 the same general methodology, which is to analyze

12 dates with clear firm-specific news and compare it

13 to dates where there's no firm-specific news.

14            So the overall methodology is the same.

15 It's just I have a criteria for identifying

16 additional dates for the Series C preferred stock

17 and Series D preferred stock that I believe speak

18 to -- that are potentially material events for the

19 company that provide relevant evidence about market

20 efficiency by testing those dates.

21       Q.    To be clear, on Exhibit 11, you can

22 confirm that the price of the Series D preferred

23 also never reacted in a statistically significant

24 way to an earnings release; correct?

25            MS. POSNER:  Objection.

1                        C. Coffman

2         A.     Correct, and for the same reasons I

3    responded to the Series C question, that did not

4    surprise me.

5         Q.     Can you look at Exhibit 2-C, please.

6         A.     Okay.

7         Q.     What is this intended to show?

8         A.     It's just a graphical display of this

9    particular information, what the closing price of

10   the Series C preferred stock was, when the end of

11   the analysis period was in the event that -- is the

12   end of the analysis period, and then identifies the

13   specific offerings that at least I was aware of

14   that occurred during the analysis period.

15        Q.     And this shows stock price as well as

16   volume data?

17        A.     I'm sorry, I left out the volume, yes.

18   It shows the closing price of the Series C and the

19   volume of the Series C on each day.

20        Q.     So you're saying, looking at this

21   chronology here, prior to the middle of October

22   2014, you would expect the price not to be reacting

23   to company specific news, only interest rate

24   movements?

25               MS. POSNER:  Objection.

C. Coffman

1

2      A.    No.  I mean, it could react.  I was

3  just devising a period where -- so it's plausible

4  that it's reacting to company-specific news.  I was

5  trying to define a more powerful test of the cause

6  and effect relationship which would be the power of

7  any test would be greater during the period where

8  it was trading in a more equity-like fashion.

9      Q.    Let's go back to Exhibit 9 for a

10  minute.  You drew these nine events from that

11  period mid-October 2014 through the end of the

12  analysis period and then I guess a little bit

13  beyond that; right?

14      A.    Well, it includes the day after the

15  analysis period, the day of the delisting, yes.

16      Q.    And when I look at Footnote 1, it looks

17  like you referred to a time period of October 8,

18  2012 through October 14, 2014.  Is that the period

19  you used to evaluate no news days?

20      A.    I believe that's the case, yes.

21      Q.    So you drew the nine events on one side

22  of your comparison from one period of time and you

23  drew the 100 and whatever no news days from a

24  different period of time?

25      A.    Again, there's no reason not to look at

1          C. Coffman

2   the no news days from the earlier point in time

3   because you can still evaluate whether there were

4   more than the expected statistically significant

5   stock price movements based on chance alone during

6   that period.  So that's still a relevant period to

7   consider for the no news dates.

8          Q.    Why wouldn't you just use the same

9   period of time?  Wouldn't it be better to use the

10  same period of time for the event days and the no

11  news days?

12         A.    The news event dates I'm picking come

13  from post-2014, but for the no news days, there's

14  no reason not to look at the entire period.  I

15  mean, one could make that comparison too, but --

16         Q.    As a matter of methodology, wouldn't it

17  be better, as a general matter, if you're drawing a

18  comparison, to look at the event days from a period

19  of time and compare them with the no news days from

20  the same period of time?

21         A.    Well, I'm looking at both from the

22  entire period of time.  I'm just identifying the

23  nine event dates come from post 10/14 -- I'm sorry,

24  post 10/15/2014, because that's when I believe

25  there are events that are more likely to influence

```
 1                    C. Coffman
 2  the price of the stock in a significant way.
 3       Q.    Well, you didn't include the earnings
 4  events from the earlier period of time.
 5       A.    Right, for reasons I described in my
 6  report.
 7       Q.    I know.  So I'm asking if you're going
 8  to limit the period of time when you're looking at
 9  events, shouldn't you look at the same period of
10  time when you're looking at no news days?  Wouldn't
11  that be a better methodology?
12       A.    I don't think there's anything wrong
13  with looking at no news dates over the entire
14  period.  You could make that as an additional
15  comparison, but I don't think that's necessarily a
16  better way of doing it.
17            When you get to a natural stopping
18  point --
19            MR. BALLARD:  This is perfect.  We can
20       take a break now.
21            THE VIDEO TECHNICIAN:  We're going off
22       the record.  The time is 4:44 p.m.
23            (Recess taken.)
24            THE VIDEO TECHNICIAN:  The time is 4:54
25       p.m.  We're back on the record.
```

C. Coffman

1

2      Q.     Mr. Coffman, could you turn to page 49

3 of your report, please.

4      A.     Okay.

5      Q.     This is where you talk about damages,

6 and in the carryover paragraph you indicate that

7 plaintiffs' complaint alleges -- I'm sorry.  Hold

8 on.  I've got the wrong page.  On pages 48 through

9 49 --

10      A.     It starts on 47.

11      Q.     I'm sorry, you're right.  So let's go

12 back.  From page 47 onward, you have a discussion

13 of 10(b)5 damages as well as Section 11 damages;

14 right?

15      A.     Yes.

16      Q.     And let's talk about Section 11 damages

17 first.  In Section 11, there's a statutory formula

18 that you mention in your report.  Right?

19      A.     Yes.

20      Q.     And you quote it here.  It states in

21 part that you calculate damages for a Section 11

22 claim in part based on the difference between the

23 amount paid for the security not exceeding the

24 price at which the security was offered to the

25 public, and then the sale price, and there's

C. Coffman

several ways that can be calculated; right?

     A.    Yes, not just the sales price but
there's a number of different potential prices or
values that you compare against based on when the
shares sold.

     Q.    Depending on whether you held it
forever or whether you sold it during the class
period or the like; right?

     A.    Or I think it's technically not the
class period, but the date of suit, or there's -- I
mean, it says what it says.

     Q.    Got it.  But the point is, for any of
these damages calculations, you need to know the
price at which the security was initially offered
to the public; correct?

     A.    That's one element of the calculation,
yes.

     Q.    Well, let's take a look at Mr. Ziesman.
Do you have his certification?  It was Exhibit 37.

     A.    Yes.

     Q.    So Mr. Ziesman, as we've noted earlier,
purchased in June of 2014 at a price of $25.43 per
share basically.  Right?

     A.    Slightly below that, but yes, it rounds

                            C. Coffman

1   
2   to that.

3       Q.    He purchased at a price that was higher

4   than any of the initial offering prices for the C

5   series securities; is that correct?

6       A.    That's my understanding, yes.

7       Q.    So his damages will be limited by the

8   statutory formula; is that correct?

9       A.    Yes.

10      Q.    To know what his damages are, you need

11  to know which offering his shares came from; is

12  that correct?

13      A.    Well, you could make a statement about

14  that his -- the offering price wasn't below a

15  certain number so you could use the lowest offering

16  price and say that his damages would be at least

17  that much, but --

18      Q.    To accurately calculate his damages,

19  you need to know which offering his shares came

20  from, correct, according to the statutory formula?

21      A.    Like I said, I think there's a way to

22  calculate it conservatively, but to precisely base

23  it on the offering that that individual security

24  was bought in, I don't know if that's necessary,

25  but if it is, then what I'm describing would be a

C. Coffman

1
2 conservative estimate, but not necessarily the

3 precise amount of damages that he might be entitled

4 to.

5     Q.    If his shares came from the initial

6 offering in October 2012 at $23 per share, his

7 damages would be capped based on the $23 amount

8 under the statutory formula; correct?

9     A.    Could I have that read back.

10     Q.    I'll restate it.  If Mr. Ziesman's

11 shares came from the October 12 offering in which

12 shares were sold at $23 per share, the statutory

13 formula would limit his damages based on the $23

14 initial share price; correct?

15     A.    That's my understanding, yes.

16     Q.    If his shares came from the offering in

17 February 2013, when shares were offered at $22.90

18 per share, his damages would be limited based on

19 that number; correct?

20     A.    I'm assuming you're quoting those

21 numbers right without looking at them, but yes, it

22 would be limited based on the offering price as of

23 that date.

24     Q.    If his shares came from the

25 at-the-market offering, his damages would be

                          C. Coffman

1

2  limited under the statutory formula to whatever the

3  original at-the-market offering price was for those

4  particular shares; correct?

5       A.   That's my understanding, yes.

6       Q.   Do you know if his shares,

7  Mr. Ziesman's shares, came from the October 2012

8  offering?

9       A.   I don't.

10      Q.   Do you know if they came from the

11 at-the-market offering?

12      A.   I don't.

13      Q.   Do you know if they came from the 2013

14 best efforts offering?

15      A.   You're referring to the at-the-market

16 offering?

17      Q.   No.  There was an at-the-market

18 offering in October 2012 and then a best efforts

19 underwriting in February of 2013.

20      A.   I don't know.

21      Q.   Do you know if his shares came from the

22 May 2013 offering?

23      A.   I don't know.

24      Q.   Do you know if his shares came from the

25 June 27 offering?

C. Coffman

2     A.     I don't know.

3     Q.     So you can't say what Mr. Ziesman's

4 damages would be under the statutory formula; isn't

5 that fair?

6          MS. POSNER:  Objection.

7     A.     If it's unclear which offering it came

8 from, I haven't determined whether that's

9 determinable or not, but if it can't be determined,

10 the best one could do is the most conservative

11 estimate of his damages.

12    Q.     Well, the statutory formula says

13 damages are calculated based on the difference

14 between the amount paid for the security not

15 exceeding the price at which the security was

16 offered.  Right?

17    A.     Yeah, and all I'm suggesting is that

18 one could make a statement saying that his damages

19 would be at least a certain amount if the -- if you

20 could base it off of the lowest offering price.

21    Q.     So if we go back to that statutory

22 formula and the parenthetical "not exceeding the

23 price," you would be calculating damages by a

24 formula where you would insert the word "lower"

25 before the word "price," so the formula in the

C. Coffman

statute would be calculated based on the difference

between the amount paid for the security not

exceeding the lowest price at which the security

was offered to the public?

    A.    No.

          MS. POSNER:  Objection.

    A.    I'm not rewriting the statute.  You're

asking me -- again, I'm not -- it's not clear to me

what offering he purchased in.  It's not clear to

me whether or not that information would ultimately

be available.

          I'm just saying that even if one

couldn't determine his damages precisely based on

the formula, if there was ambiguity about which

offering he bought in, you could still make a

statement potentially about the lowest amount of

damages if it could be traced back to at least an

offering that was at issue in the case.  I'm not --

          That's all I'm saying.  As a matter of

math, you could identify that damages were at least

some certain amount if you were able to trace it

back to an offering that is at issue in the case.

    Q.    You couldn't determine what his precise

damages are under the statutory formula without

1                        C. Coffman

2  being able to trace his shares back to a particular

3  offering.  Isn't that a fact?

4        A.    I don't think you could identify the

5  precise damages.  I think I already testified to

6  that, yes.

7        Q.    And yet you have given an opinion in

8  this case that you believe it would be possible to

9  calculate Section 11 damages on a class-wide basis;

10 is that not right?  That was the opinion you stated

11 in your report?

12       A.    Well, I say -- again, embedded in

13 paragraph 101 of my report is the idea that the

14 purchase was made pursuant or traceable to the

15 offering documents.  So if there's a determination

16 that based on what you're showing me, it can't be

17 traced, then that's not part of what would be

18 calculated.

19             If it can be traced, I'm saying I could

20 make a statement about if it could be traced back

21 to multiple offerings, one of multiple offerings

22 that are part of the case, I could make a statement

23 about that the damages were at least a certain

24 amount, but I could not calculate the precise

25 damages, so I could come up with a conservative

1                    C. Coffman

2    estimate.

3        Q.    So for now, we're only talking about

4    Mr. Ziesman; right?

5        A.    That's my understanding of what your

6    question is.

7        Q.    Yes.

8        A.    Yeah.

9        Q.    So now let's talk about the entirety of

10   the proposed Section 11 class.  Is it your

11   testimony that you can calculate damages under the

12   Section 11 formula for the proposed Section 11

13   class in this case?

14       A.    My understanding of the definition of

15   the class is people who purchased pursuant to or

16   traceable to the offering documents, so that

17   some -- that the definition of the class would only

18   include people for which you could at least trace

19   back to an offering, and I'm saying that while one

20   might not be able to calculate precise damages for

21   each investor, one would be able to calculate a

22   minimum amount.

23       Q.    I'm not asking if you can calculate a

24   minimum amount.  I'm asking if you can calculate

25   the damages according to what you said is a

                              C. Coffman
1
2   statutory formula that can be applied on a
3   class-wide basis.  You can't; can you?
4        A.    I don't think you can apply precisely
5   the wording in here if you don't know which
6   offering to trace it back to.
7        Q.    And you looked at volume data for the
8   Series C shares; didn't you?
9        A.    I did.
10       Q.    They traded, in your opinion, quite
11  frequently?
12       A.    They did trade quite frequently.
13       Q.    They turned over more than, on average,
14  two times a year; right?
15       A.    That's true, yes.
16       Q.    Mr. Ziesman goes into his Scottrade
17  account in June of 2014 and buys 1,000 shares of C
18  series stock.  By that time, the C series has been
19  trading and trading and trading in high volume for
20  a long period of time; correct?
21       A.    On average, they were trading more than
22  the average security on the exchange, so there was
23  a lot of volume, yes.
24       Q.    So his shares are likely to have traded
25  multiple times between the initial offering date,

```
 1                    C. Coffman
 2   whenever that was, and we don't know when it was,
 3   and when he purchased them; right?
 4            MS. POSNER:  Objection.
 5        A.   I don't know that you can conclude that
 6   those particular shares traded multiple times.  I
 7   just don't know.
 8        Q.   There's just no way to know; right?
 9            MS. POSNER:  Objection.
10        A.   It's not clear whether there may or may
11   not be records that would allow one to trace it
12   back to a particular offering.  I'm just saying I
13   don't have any information that would allow me to
14   do that as I sit here.
15        Q.   Is the same true for the Series D
16   shares, you don't know how or whether a particular
17   plaintiff would be able to trace their shares back
18   to a particular offering?
19            MS. POSNER:  Objection.
20        A.   If they bought it in the offering
21   itself, they presumably could.  If they bought in
22   the secondary market, only after the first offering
23   and not additional offerings, they might be able
24   to.
25            And again, whether they could after a
```

                        C. Coffman

1

2   secondary offering, I think would depend on what

3   evidence there might be, but I don't know of any as

4   I sit here.

5       Q.    So a plaintiff who actually bought in

6   one of the offerings at the offering price, for

7   that plaintiff, you could calculate their damages

8   accurately under the statutory formula?

9       A.    Absolutely, yes.

10      Q.    It's just the people who bought in the

11  aftermarket where you don't know?

12          MS. POSNER:  Objection.

13      A.    Again, I think with the exception of

14  people who bought after the first offering before

15  there were any secondary offerings, one could

16  logically trace back to the initial offering.

17      Q.    You're talking about the D series now?

18      A.    Theoretically, that would be true for

19  both series.

20      Q.    Well, the first few offerings of C

21  series are outside of the period and aren't at

22  issue in this case so you could never trace back to

23  those.

24          MS. POSNER:  Objection.

25      Q.    I guess let me ask you this:  You've

C. Coffman

testified you could calculate damages for the

Section 11 claim for the C series shares.  How

would you do that?

A.    Well, for somebody that bought in one

of the offerings, you would follow the statutory

formula.  For somebody that bought in the

aftermarket, you would have to evaluate if there

was a way to trace it back to one or a series of

the offerings that are relevant in the case, and

like I said, you could -- you might not be able to

calculate the damages precisely, but you could get

a lower bound estimate of what those damages would

be.

Q.    In your report, at paragraph 102, you

wrote, "Given that there is a statutorily defined

formula for Section 11 damages, it is clear that

damages under Section 11 can be calculated using a

common methodology for members of the Section 11

class."

Do you see that in paragraph 102?

A.    Yes, and I'm stating that with respect

to what I say in paragraph 101 is my understanding

that it has to be pursuant or traceable to the

offering documents at issue in the case.

                         C. Coffman

1

2       Q.    So if a plaintiff didn't purchase any

3  offering, like Mr. Ziesman, and can't trace to a

4  particular offering, you can't calculate that

5  plaintiff's damages under the statutory formula; is

6  that fair?

7       A.    I think it would be difficult to do

8  that with precision.  One might be able to say what

9  the minimum amount of damages are, but it would be

10 hard to know which precise offering price to use in

11 the formula.

12      Q.    Let's turn back to the complaint in

13 this case, the Second Amended Complaint, Exhibit 3,

14 and I want to direct your attention again to

15 paragraph 197.  That's the beginning of the section

16 on the allegation that "the truth begins to

17 emerge."  Do you have that in front of you?

18      A.    Yes.

19      Q.    Before we dig into that, I want to

20 direct your attention to one other paragraph

21 earlier in the complaint, paragraph 4.

22            In paragraph 4, plaintiffs allege "The

23 Miller Energy house of cards finally began to

24 collapse in December 2013, when it started to

25 become clear that the Alaska Assets were worth

C. Coffman

nowhere near what KPMG and Miller Energy said they
were, in large part because the assumptions about
how much it would cost Miller Energy to actually
extract hydrocarbons from those Alaska Assets were
massively and fraudulently understated."

          Do you see that?

     A.     Yes.

     Q.     And then plaintiffs allege in paragraph
4, "As this reality materialized, Miller Energy's
securities prices began to crumble."

          Do you see that?

     A.     Yes.

     Q.     Do you understand the plaintiffs are
asserting a materialization of risk theory in this
case?

     A.     I understand those words appear and
might be a legal way of describing loss causation
in this case, but my understanding is that they're
alleging that the fact that these assets were worth
far less than what was being reported was known or
should have been known from the very beginning so
that it didn't require additional events for the
risk to materialize.

     Q.     You understand that the plaintiffs

                          C. Coffman

1   allege that there were quantities of oil and gas

2   reserves in the Alaska Assets that had not been

3   extracted yet, they were underground or underwater;

4   right?

5        A.    That's my understanding, yes.

6        Q.    And plaintiffs allege that the costs

7   associated with extracting the oil from under the

8   ground or under the water, plaintiffs allege they

9   were understated, those costs; right?

10       A.    That's part of what they're alleging, I

11  understand.

12       Q.    And they allege that by understating

13  the cost of extraction, the value of the assets was

14  effectively overstated?

15            MS. POSNER:  Objection.

16       A.    That's at least one part of what

17  they're alleging.  I don't know if there's other

18  things, but that's a general understanding of part

19  of what they're alleging, yes, is that the value is

20  overstated for at least that reason.

21       Q.    So hypothetically, if the cost of

22  extracting a barrel of oil is $10 a barrel and the

23  price of oil is $100 a barrel, there could be great

24  value there, but if the cost of extraction is $10

C. Coffman

and the price of oil is $5, there could be no value

there if that's the price of oil; right?

                MS. POSNER:  Objection.

        A.    Possibly under your hypothetical.  You

have to think about option values and things like

that too, but your general point is understood,

yes.

        Q.    The value of the Alaska Assets could

depend on both the price of oil and the cost of

extraction?

                MS. POSNER:  Objection.

        A.    That's fair, yes.

        Q.    And the plaintiffs are alleging that

Miller Energy made assumptions about the cost of

extracting the oil and that those were understated

or effectively understated the cost of extraction.

That's what they're alleging, you understand that;

right?

                MS. POSNER:  Objection.

        A.    That's at least my understanding of

what they're alleging.  Again, I don't have

committed to memory all the bases of what they're

alleging, but that's a good -- I think obviously

paragraph 4 is a summary of what they're alleging,

```
 1                    C. Coffman
 2   which is that the costs that were embedded in how
 3   the valuation was done were unrealistic.  That's my
 4   understanding of their complaint.
 5        Q.    Have you done any analysis of the
 6   allegations of the complaint regarding the risk
 7   materializing and the truth leaking out?
 8        A.    I think you're asking if I analyzed
 9   loss causation and the answer is no.
10        Q.    So you haven't taken a look at the
11   events alleged beginning in paragraph 197, going
12   forward, to see if they were leaking out new
13   information or correcting prior misstatements?  You
14   haven't taken a look at that?
15        A.    That's not an analysis I performed, no.
16        Q.    If you were asked to calculate damages
17   in this case for the 10(b) plaintiffs, how would
18   you go about doing that?
19        A.    Well, it's described in my report.  I
20   would calculate the difference between the
21   artificial inflation at the time of purchase minus
22   the artificial inflation at the time of sale.
23   That's how damages are calculated.  That would rely
24   on a detailed loss causation analysis to actually
25   quantify the artificial inflation at different
```

C. Coffman

1  points in time and that's something I have not

2  determined precisely how I would do it.

3      Q.   Well, let's look at paragraph 100 of

4  your report.  In this paragraph, you're talking

5  about the methodology that you would use if you

6  were asked to calculate damages for the 10(b)

7  class?

8      A.   Well, I think in paragraph 99, I define

9  how damages would be calculated.  I then talk in

10 paragraph 100 about some of the procedures that

11 would be used to potentially analyze artificial

12 inflation per share, but I don't determine

13 precisely how artificial inflation per share would

14 be quantified based on the facts and circumstances

15 of this case.

16     Q.   And I think you said you haven't looked

17 at artificial inflation in this case and you

18 haven't been asked to; is that right?

19     A.   In terms of quantifying it, correct.

20     Q.   In paragraph 100 you write, "In

21 particular, as is standard procedure in Section

22 10(b) cases, the most common methodology to

23 quantify artificial inflation is to perform an

24 event study that measures price reaction to

1                       C. Coffman
2      disclosures that reveal the relevant truth
3      concealed by the alleged material omissions and/or
4      misrepresentations."
5                You wrote that?
6      A.    I did, yes.
7      Q.    Have you done anything to evaluate what
8      the relevant truth concealed by the alleged
9      material omissions and/or misstatements was in this
10     case?
11     A.    Well, I generally understand it to be
12     the overvaluation of the assets, and the -- that
13     were signed off by the company KPMG in their
14     financial statements.
15     Q.    So if you were conducting a damages or
16     loss causation analysis in this case, you would be
17     looking at the events that supposedly corrected the
18     prior misstatements to see if they revealed a
19     relevant truth?
20     A.    That would be part of the analysis,
21     yes.
22     Q.    And what exactly would you be looking
23     for in looking at the disclosures that revealed the
24     relevant truth?
25     A.    Can you be a little more specific in

C. Coffman

1

2  your question?  I'm a little confused by what you

3  mean.

4        Q.    In doing this analysis where you would

5  have to look at disclosures that revealed the

6  relevant truth, that's your phrase, would you be

7  looking for a disclosure of a specific misstatement

8  or omission on the part of KPMG?

9        A.    I don't think the announcement, itself,

10  would necessarily have to mention KPMG, but it

11  would have to be either a direct or indirect

12  revelation that the value of the underlying assets

13  were less than what the market had believed they

14  were based on those statements.

15       Q.    Would you be looking for disclosures

16  that relate to the cost of extraction and whether

17  they were higher than previously stated or assumed?

18       A.    That's one thing that might be relevant

19  to look at, yes.

20       Q.    What else might you be looking for to

21  determine what disclosures revealed the relevant

22  truth?

23       A.    Given that I haven't been asked to

24  analyze loss causation, I haven't concluded

25  precisely what all the different categories or

C. Coffman

types of information that might potentially be

partially corrective would be, so I don't think I

could answer your question.

Q.   So if we went through the paragraphs in

this section in the complaint beginning on page 197

regarding the truth beginning to emerge, I could

ask you about each of them, but you haven't

evaluated whether they are, in fact, corrective

disclosures or whether the truth was coming out for

any of those; right?

A.   That's correct.

Q.   So sitting here today, you don't know

how you would -- if you were to conduct that kind

of study, how you would treat any of these

particular events or disclosures; is that fair?

A.   That's fair.  I haven't drawn any

conclusions about precisely how I would treat any

of those particular events or even whether there's

other events that might qualify.

(Exhibit 38, Brean Capital report from

October 13, 2014, marked for identification,

as of this date.)

Q.   I'm going to hand you Exhibit No. 38.

In paragraph 214 of the complaint, plaintiffs

                              C. Coffman

1

2    allege that "On October 13, 2014, after trading

3    hours" --

4         A.    What paragraph number?

5         Q.    214.  In paragraph 214, plaintiffs

6    allege that "On October 13, 2014, after trading

7    hours, Reuters reported that Brean Capital, a firm

8    whose analyst had been following Miller Energy

9    closely, cut its price target from $9 to $7."

10              And then plaintiffs allege that "On and

11   around this day, and on this news, risks or truth

12   concealed by, or effects associated with, KPMG's

13   fraud were partially revealed, leaked out, or

14   materialized, and as a result, Miller Energy's

15   stock price fell."

16              Do you see that?

17        A.    Yes.

18        Q.    If you look at Exhibit number 38, you

19   can see this is the Brean Capital report from

20   October 13, 2014?

21        A.    It's a Brean Capital report from that

22   date, yes.

23        Q.    At the beginning, it starts in the

24   investment summary by saying "We reduced our 2014

25   crude oil and natural gas price forecasts."

```
 1                        C. Coffman

 2            Do you see that?

 3       A.    I see that.

 4       Q.    And then in the next sentence, "We also

 5   reduced our long-term forecasts for crude oil."

 6            Do you see that?

 7       A.    I see that.

 8       Q.    And then in the next sentence, "These

 9   changes in our commodity price forecasts led to

10   significant price target changes in our coverage

11   universe, most notably for Bonanza Creek, Emerald

12   Oil, Laredo Petroleum, Miller Petroleum and Warren

13   Resources."

14            Do you see that?

15       A.    I see that.

16       Q.    Do you see any indication here that

17   this report had anything to do with anything other

18   than the price of oil falling?

19       A.    I don't see any specific reference here

20   beyond oil prices.

21       Q.    It sure doesn't look like any relevant

22   truth came out of this report; right?

23            MS. POSNER:  Objection.

24       A.    I would have to understand if there was

25   some theory being asserted by which the oil price
```

                        C. Coffman
 1
 2   declines are somehow representative of risks
 3   materializing that's related to the fraud, but in
 4   terms of company-specific information that is
 5   contained in here, I don't see anything.
 6           MR. BALLARD:  It's 5:30 and I promised
 7       to wrap up by 5:30 so I think we will call it
 8       a day.
 9           MS. POSNER:  Before we go off the
10       record, since I, in our seven hours, haven't
11       had a chance to redirect, and since we're
12       going to have to bring Mr. Coffman back
13       anyway, I'm happy, if you need a few more
14       minutes to finish up to be able to do that on
15       the portions you didn't get to today, and I
16       will do my redirect then.
17           MR. BALLARD:  We might as well do it
18       when we come back.
19           THE VIDEO TECHNICIAN:  This completes
20       the deposition of Chad Coffman on April 12,
21       2019, at 5:30 p.m.  We are off the record.
22           (Time noted:  5:30 p.m.)
23
24
25

```
 1
 2              A C K N O W L E D G E M E N T.
 3
 4          I, CHAD COFFMAN, hereby certify that I
 5    have read the transcript of my testimony taken
 6    under oath in my deposition of April 12, 2019; that
 7    the transcript is a true, complete and correct
 8    record of my testimony, and that the answers on the
 9    record as given by me are true and correct.
10
11
12    _____
13                Chad Coffman
14
15    Subscribed and sworn to before me
16    on this the 10th day of  May           2019.
17
18    _____      October 19, 2022
19    Notary Public               My Commission Expires:
20
21              B URBAN
              Official Seal
          Notary Public - State of Illinois
22      My Commission Expires Oct 19, 2022
23
24
25
```

1

2                  C E R T I F I C A T E

3  STATE OF NEW YORK )

4                          :

5  COUNTY OF NEW YORK)

6

7       I, ELEANOR GREENHOUSE, a Shorthand Reporter

8  and Notary Public within and for the State of New

9  York, do hereby certify:

10       That, CHAD COFFMAN, the witness whose

11 deposition is hereinbefore set forth, was duly

12 sworn by me and that such deposition is a true

13 record of the testimony given by such witness.

14       I further certify that I am not related to

15 any of the parties to this action by blood or

16 marriage, and that I am in no way interested in the

17 outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto set my

19 hand this 14th day of April, 2019.

20

21

22  _____

23                 ELEANOR GREENHOUSE

24

25

```
 1
 2   April 12, 2019
 3                        I N D E X
 4   WITNESS              EXAMINATION BY          PAGE
 5   CHAD COFFMAN         MR. BALLARD                4
 6
 7   REQUESTS (RQ):  137-7, 136-11
 8
 9                    E X H I B I T S
10    EXHIBIT      DESCRIPTION          PAGE   LINE
11   Exhibit 25, March 15, 2019          4      6
     expert report of Chad Coffman
12
     Exhibit 26, Second Amended        109     18
13   Form 10-K for Miller Energy
     for the period ending April
14   30, 2011
15   Exhibit 27, detail printed        109     24
     from the EDGAR website for
16   Second Amended Form 10-K for
     Miller Energy for the period
17   ending April 30, 2011, with
     filing date of August 29, 2011
18
     Exhibit 28, Form 10-K for         112      3
19   Miller Energy for the period
     ended April 30, 2012
20
     Exhibit 29, detail printed        112      6
21   from the EDGAR website for
     Form 10-K for Miller Energy
22   for the period ended April 30,
     2012, showing filing date of
23   July 16, 2012 at 5:17 p.m.
24
25
```

1
2                    I N D E X (Continued.)
3                     E X H I B I T S
4   EXHIBIT       DESCRIPTION            PAGE   LINE
5   Exhibit 30, document                 192    15
    indicating filing date of July
6   15, 2013, 5:18 p.m., for April
    30, 2013 Form 10-K
7
    Exhibit 31, July 16, 2013 8-K        194     7
8
    Exhibit 32, document                 194     9
9   indicating filing date of 8:13
    a.m., on July 16, 2013, for
10  July 16, 2013, 8-K
11  Exhibit 33, printout of              195    19
    some the backup material used
12  in Chad Coffman's expert report
13  Exhibit 34, printout from            199     2
    Marketwired
14
    Exhibit 35, Dow Jones press          200    12
15  release
16  Exhibit 36, document indicating      220     4
    that the concerned shareholder
17  letter and the accompanying
    materials were filed with the
18  SEC on December 17, at 11:41 a.m.
19  Exhibit 37, Certification of         263    14
    Martin Ziesman
20
    Exhibit 38, Brean Capital            305    21
21  report from October 13, 2014
22
23
24
25

1. 46: 4-6 – Missing "the," should state "I think it's fair to say that the event study tests are more direct than some of [the] other factors."
2. 47: 15 – "marketing," should be "market".
3. 52: 9 – "race," should be "release."
4. 80: 18 – "Investec," should be "Investext."
5. 87: 24 – "snow," should be "know."
6. 88: 5 – "Investec," should be "Investext."
7. 89: 2 – "dedicating," should be "dedicated."
8. 96: 7 – "Investec," should be "Investext."
9. 159: 7 - "analysts reports," should be "analyst reports."
10. 244: 17 – "14th," should be "4th."
11. 245: 6 – "day 8" should state "December 8."
12. 272: 4 – "10.7 percent," should be "10.75 percent".
13. 281: 20 – When I gave the answer "I believe that's the case, yes,", I had interpreted the question to be asking whether that was "a" period from which I evaluated no news dates, not "the" period (i.e. to the exclusion of other periods). As is evident from my report and backup data, the period I used to evaluate "no news" dates spans October 8, 2012 to July 31, 2015"