# Appendix C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

---------------------------------------x

LEWIS COSBY, KENNETH R. MARTIN,

as beneficiary of the Kenneth Ray Martin

Roth IRA, and MARTIN WEAKLEY on

behalf of themselves and all others

similarly situated,

                 Plaintiffs,

         vs.            No. 3:16-cv-00121

KPMG, LLP,

                 Defendant.

---------------------------------------x

                 April 25, 2019

                 8:57 a.m.


             CONTINUED VIDEOTAPED DEPOSITION of

CHAD COFFMAN, held at the law offices of MCDERMOTT

WILL & EMERY LLP, 340 Madison Avenue, New York, New

York, before Eleanor Greenhouse, a Shorthand

Reporter and Notary Public within and for the State

of New York.

1

2 A P P E A R A N C E S:

3 Attorneys for Plaintiffs:

4

5 COHEN MILSTEIN SELLERS & TOLL PLLC

6      88 Pine Street, 14th Floor

7      New York, New York  10005

8 BY:   LAURA H. POSNER, ESQ.

9      lposner@cohenmilstein.com

10

11 Attorneys for Defendant:

12 MCDERMOTT WILL & EMERY LLP

13      340 Madison Avenue

14      New York, New York  10173-1922

15 BY:   GREGORY BALLARD, ESQ.

16      gballard@mwe.com

17         - AND -

18 WALLER LANSDEN DORTCH & DAVIS, LLP

19      Nashville City Center

20      511 Union Street - Suite 2700

21      Nashville, Tennessee 37219

22 BY:   PAUL S. DAVIDSON

23      paul.davidson@wallerlaw.com

24

25

1
2  A P P E A R A N C E S: (Continued.)
3
4  ALSO PRESENT:
5        Assen Koev, Charles River Associates
6        Allison Hart, Paralegal, McDermott Will & Emery
7        Darrak Lighty, Video Specialist, Reporters
8          Central
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1               C. Coffman

2          THE VIDEO TECHNICIAN:  This is the

3     continued video deposition of Chad Coffman in

4     the matter of Lewis Cosby, et al., versus

5     KPMG, LLP.  This deposition is being held at

6     McDermott Will & Emery LLP on April 25th,

7     2019 at 8:57 a.m.

8          My name is Darrak Lighty from Reporters

9     Central and I am the video specialist.  The

10    court reporter today is Eleanor Greenhouse,

11    also associated with Reporters Central.

12    Counsel will now state their appearances for

13    the record.

14         MS. POSNER:  Laura Posner, Cohen

15    Milstein, for the Plaintiffs.

16         MR. BALLARD:  I'm Greg Ballard from

17    McDermott Will & Emery.  I have Allison Hart,

18    a paralegal, also from McDermott, with me.

19    We're representing KPMG, and Assen Koev from

20    Charles River Associates is here with us as

21    well.

22         MR. DAVIDSON:  Paul Davidson from

23    Waller Lansden Dortch & Davis, representing

24    KPMG.

25         THE VIDEO TECHNICIAN:  The witness has

```
 1                    C. Coffman
 2          been previously duly sworn.
 3   C H A D   C O F F M A N,    resumed as a witness,
 4          having been previously sworn by the Notary
 5          Public, was examined and testified further as
 6          follows:
 7   EXAMINATION BY
 8   MR. BALLARD:
 9          Q.    Good morning.
10          A.    Good morning.
11                (Exhibit 42, corrected expert report of
12          Chad Coffman, signed April 19, 2019, marked
13          for identification.)
14          Q.    Mr. Coffman, I've placed before you
15   several newly marked exhibits.  Do you have in your
16   hands Exhibit No. 42?
17          A.    Yes.
18          Q.    What is Exhibit 42?
19          A.    Exhibit 42 appears to be a copy of the
20   corrected expert report I've now submitted in this
21   matter.
22          Q.    Did you sign this on April 18, 2019?
23          A.    April 19, 2019, I believe.
24          Q.    Does Exhibit 42 contain a complete
25   statement of all opinions you will express, and the
```

1                         C. Coffman
2    basis and reasons for them, on class certification
3    in this case?
4         A.    It provides a summary of all the
5    opinions I've been asked to -- all the questions
6    I've been asked to answer in this phase of this
7    case, yes.
8         Q.    And I used the phrase "a complete
9    statement" because that's what the Federal Rules
10   require.  You intended to include a complete
11   statement of your opinions; right?
12        A.    Yes.
13        Q.    Did you do your best to make sure that
14   Exhibit 42, your corrected report, contains the
15   facts and the data that you considered in forming
16   your opinions?
17        A.    It provides a summary of the facts and
18   analyses that I'm relying upon.  There's also
19   backup material that is not in the report that I
20   view as part of what I produced.
21        Q.    Does Exhibit 42 contain the exhibits
22   that you would use to support your opinions?
23        A.    As far as I know at this point, yes.
24        Q.    When you produced the corrected report
25   to us in this case, did you also produce some

```
 1                    C. Coffman
 2   additional backup material?
 3        A.    That's my understanding, yes.
 4        Q.    Before we get to that, I want to show
 5   you what we previously marked as Exhibit 25.  This
 6   was your old report.  So you've got Exhibit 25 and
 7   42 in your hands.  We should look to Exhibit 42,
 8   not Exhibit 25, to find your current opinions; is
 9   that right?
10        A.    Well, I don't think the overall
11   opinions have changed at all, but in terms of
12   corrected numbers based on the updated analysis,
13   yes.
14        Q.    For that we should be using Exhibit 42?
15        A.    Yes.
16             MR. BALLARD:  So let's set aside 25.
17        We don't need to look at that anymore.
18             (Exhibit 43, redline of original report
19        against corrected report, marked for
20        identification.)
21             MR. BALLARD:  In your pile over there,
22        there is Exhibit 43.  We ran a redline of
23        your original report against your corrected
24        report.  That's what this is, to show the
25        changes, and so you can just keep that handy
```

1                    C. Coffman

2       today in case it's useful to refer to.

3              THE WITNESS:  Okay.

4              MR. BALLARD:  I don't have any

5       questions on it at this point.  I just

6       thought it would be helpful in case you

7       needed to refer to it.

8              The next document in your pile there is

9       Exhibit 44.

10             (Exhibit 44, printout of regression CS

11       tab in the backup provided with corrected

12       report, marked for identification.)

13      Q.    Do you see the big printout?

14      A.    Yes.

15      Q.    This is a printout of the regression CS

16  tab in the backup you provided with your corrected

17  report.

18      A.    Okay.

19             MS. POSNER:  Just for clarity, the only

20       changes you made to this is formatting?

21             MR. BALLARD:  Yes.  What we did is we

22       took the regression CS tab of the larger

23       spreadsheet, formatted it to print on a page

24       like this, and printed it.  None of the

25       numbers or data has been changed and all of

```
 1                    C. Coffman
 2       the columns are printed the way they appear
 3       in the spreadsheet.
 4              MS. POSNER:  Thank you.
 5       Q.    Do you recognize this?
 6       A.    Yes.  This appears to be a -- what
 7  appears to be a copy of a spreadsheet that would be
 8  produced as a result of the event study.
 9       Q.    And you recall that we looked at a
10  similar large spreadsheet on the first day of your
11  deposition?
12       A.    Yes.
13       Q.    The numbers have changed a little bit
14  in this spreadsheet; right?
15       A.    Yes.
16       Q.    So we should consult Exhibit 44 if we
17  want to see what your regression analysis for the
18  common stock showed?
19       A.    Yes.
20              (Exhibit 45, trade dates tab from
21       backup to corrected report, marked for
22       identification.)
23              (Exhibit 46, news dates tab from backup
24       to corrected report, marked for
25       identification.)
```

1                    C. Coffman

2              (Exhibit 47, earnings release dates tab

3         from backup to corrected report, marked for

4         identification.)

5              (Exhibit 48, SEC filing dates tab from

6         backup to corrected report, marked for

7         identification.)

8              (Exhibit 49, analyst report dates tab

9         from backup to corrected report, marked for

10        identification.)

11        Q.    There's a series of several additional

12   exhibits in your pile there also printed from your

13   backup.  Do you have that Exhibit 45, 46, 47, 48

14   and 49?

15        A.    Yes.

16        Q.    And these, again, were printed from

17   your backup.  We added to the top of each page a

18   reference to the Bates number or the file number

19   from your backup and also next to that, the title

20   of the tab that was printed.  So the Exhibit 45

21   says "Trade Dates."  Do you see that?

22        A.    Yes.

23        Q.    Exhibit 46 says "News Dates."  Exhibit

24   47 says "Earnings Release Dates" and Exhibit 48

25   says "SEC," for SEC filing dates, and Exhibit 49

```
 1                      C. Coffman
 2   says "AR" for analyst report dates.  Do you see
 3   that?
 4        A.    I see that, yes.
 5        Q.    Do you recognize these materials?
 6        A.    I mean, I've seen these in electronic
 7   form at some point, but I mean, yes, these appear
 8   to be the standard sort of interim data files that
 9   are created from our process of doing the event
10   study.
11        Q.    One of the things that you had to do in
12   conducting your analysis was to determine what days
13   were going to be categorized as no news days;
14   right?
15        A.    Yes.
16        Q.    And you categorized a day as a no news
17   day if there was no news article, no SEC filing, no
18   earnings release and no analysis report on that
19   date; is that right?
20        A.    That's correct.
21        Q.    And does this backup material here in
22   Exhibits 44 through 49 tell us which dates you
23   categorized as a date when there was a news
24   article, an SEC filing, an earnings release or an
25   analyst report?
```

C. Coffman

2        A.    As long as this is the backup material

3  that was produced along with the corrected report,

4  yes, because there would have been similar tables I

5  believe produced for the original report.

6        Q.    These are the materials we printed from

7  the backup that you produced for your corrected

8  report.

9        A.    Okay.

10        Q.    So for purposes of determining if you

11  treated a day, a particular day, as a no news day,

12  we could consult these exhibits and if the day does

13  not appear on the news day, the earnings release

14  day, the SEC filing day or the analyst report day,

15  and is a trade date, that would be a no news day;

16  right?

17        A.    That's my understanding, yes.

18        Q.    You can set those aside for now.  We

19  will come back to those later.  I'd like to return

20  now to your original report for a minute, number

21  25.  Please turn to page 50.

22               On page 50, you had the conclusion in

23  your original report, and you wrote that you

24  declared, under penalty of perjury under the laws

25  of the United States of America, that the foregoing

```
1                       C. Coffman
2   is true and correct and you signed that on March
3   15, 2019; right?
4        A.    Yes.
5        Q.    Before you signed, what did you do to
6   make sure the report and exhibits were true and
7   correct?
8        A.    Well, I would say that there's a whole
9   process in place as the work is being done to make
10  sure that's true.  I mean, everything -- you know,
11  I reviewed the report myself.  I guided and
12  provided direction to my staff as to what analyses
13  I wanted performed.  They would present me with
14  results.  I would review those.  There's a process
15  in place for a second independent person to produce
16  those results.
17            So, I mean, that's at a very general
18  level the processes that are in place, and then the
19  conclusions are based off of the analysis that has
20  been performed.
21       Q.    Are those what you would call quality
22  control procedures that you follow as a general
23  matter in all your matters?
24       A.    Yes.
25       Q.    And who was the second independent
```

```
 1                    C. Coffman
 2  reviewer who worked with you on this?
 3       A.    Well, there was a team of people that
 4  were helping me.  I had a manager whose name is
 5  Mark Hedstrom and then there were two research
 6  analysts, Thomas Keene and Christian Geoppo.
 7       Q.    I thought you said that there was
 8  someone who was designated to be a second
 9  independent reviewer.  Was there someone who had
10  that role on this matter?
11       A.    Well, Mr. Hedstrom helped serve as a
12  manager of the process, and then the two
13  individuals beyond him that I mentioned would have
14  been the ones performing the work, each one working
15  independently to audit results.
16       Q.    So in producing your original report in
17  this matter, did you follow the quality control
18  procedures that you would typically follow in any
19  matter?
20       A.    Yes.
21       Q.    Have you had occasions like this before
22  where you had to revise your report?
23       A.    Not often, but there have been a couple
24  of occasions where I've had to make corrections to
25  a report.
```

```
 1                    C. Coffman
 2       Q.    On how many occasions have you signed
 3  reports that you later had to revise because of
 4  errors brought to your attention during a
 5  deposition?
 6       A.    I don't recall a specific number but I
 7  believe it's less than a handful.
 8       Q.    At the time of the day of your first
 9  deposition, you had not discovered any of the
10  errors; is that right?
11       A.    That's correct.
12       Q.    Do you think you ever would have
13  discovered them on your own?
14       A.    In the context -- not without
15  performing an additional review which at some point
16  may have occurred somewhere along the line in this
17  case.
18       Q.    Have you adopted or are you considering
19  adopting any new policies or procedures or
20  practices to prevent this kind of thing from
21  happening again?
22       A.    Well, I think it's really more
23  reiterating the process that was in place and some
24  of the procedures that should be performed.
25  Clearly there was a -- I would say a -- in
```

1                           C. Coffman

2  investigating how the error occurred, there was an

3  over-reliance on one particular source instead of

4  consulting multiple sources on certain things.

5            So yeah, there are updates to the --

6  not really updates to the procedures as much as

7  just a reiteration of all the things that need to

8  be checked to make sure things are accurate.

9       Q.    Describe how you investigated how the

10 errors occurred.

11      A.    I convened a conference call with the

12 people I mentioned before, you know, asked how this

13 happened, and we had a discussion about that.  And

14 it became clear that there were certain procedures

15 that -- you know, my staff works on a lot of these

16 types of matters, and so we discussed how some of

17 the procedures that were being done were not being

18 done as thoroughly and carefully as they need to

19 be.

20      Q.    Whose fault was it that your report

21 contained errors?

22      A.    Well, I think ultimately it's my fault.

23 I'm the one who is responsible.  I would say there

24 was fault along the way at every level.

25 Mr. Hedstrom didn't do a sufficient review, and

```
 1                      C. Coffman
 2  there was an over-reliance on just looking at Dow
 3  Jones newswires, newswire stories, as the way to
 4  identify the dates on which earnings announcements
 5  occurred, which in most cases wouldn't lead to this
 6  sort of error, but in this particular case, did
 7  because of the correction we discussed.
 8                 And I had an understanding that the
 9  review was going beyond just cataloging those and
10  reviewing those press releases much more carefully
11  than had been done in this case.  So I would say
12  there were errors made at all levels, but I'm
13  ultimately responsible.
14        Q.    Have you provided feedback or criticism
15  to anyone on your staff as a result?
16              MS. POSNER:  Objection.
17        A.    Yes.
18        Q.    Can you describe that?
19        A.    It would have been part of that
20  conference call and follow-up conversations
21  enumerating some of the things that should be done
22  each time we're looking at the timing of an
23  earnings announcement, and going forward, there's
24  going to be a -- we're putting in process a
25  checklist procedure to make sure those are
```

```
 1                      C. Coffman
 2   followed.
 3       Q.    So I believe I asked you what you did
 4   to investigate or to describe your investigation.
 5   You talked about a conference call.  Was there
 6   anything else you did as part of this
 7   investigation?
 8       A.    Well, there were a number of follow-up
 9   conversations, so after the initial conference call
10   where I asked my staff -- you know, we talked about
11   how the error occurred, but I also said we need to
12   go back and recheck every single -- the timing of
13   every single earnings announcement and event date
14   that we're studying and verify that we're looking
15   at the right event date.
16            And then they provided me the detailed
17   information that supported that.  I looked at it.
18   Mr. Hedstrom looked at it.  So there was certainly
19   followup to make sure we were getting that right.
20       Q.    So as your work in connection with the
21   corrected report, your team went back and took a
22   very close look at each of the events to make sure
23   you had the right date and the right time?
24       A.    Yes.
25       Q.    And are you confident that this time
```

```
 1                    C. Coffman
 2  you have the right date and the right time for each
 3  event?
 4        A.    Yes.
 5        Q.    How many people worked on the corrected
 6  report?
 7        A.    I think it was the same group of
 8  people.
 9        Q.    Four people?
10        A.    Yes.  I mean, there may have been
11  another person that somebody asked to check
12  something, but those were the main people working
13  on it.
14        Q.    Do you know how many hours were spent
15  working on the corrections?
16        A.    I don't know that, no.
17        Q.    Are you planning to bill your time and
18  your team's time for the corrections?
19        A.    I don't think a final decision has been
20  made about that, but I'm certainly considering not
21  doing that.
22        Q.    Can you describe whatever quality
23  checks you have performed on the corrected report,
24  to the extent you haven't already described them?
25        A.    Yeah.  I think the general process that
```

```
 1                        C. Coffman
 2    I described before was used for the corrected
 3    report as well.  Any corrections were checked by
 4    multiple people.  The updated analysis was
 5    independently confirmed by multiple people.
 6               That's the general quality control
 7    check, and then Mr. Hedstrom reviews everything and
 8    then I reviewed everything.
 9         Q.    I want to walk through and just make
10    sure I have a complete inventory of the changes
11    that were made, so feel free to look at either the
12    redline or the new report or the old report,
13    whatever is more useful to you.  I'm looking at
14    Exhibit 43, which is the redline.
15               So obviously the date on the front has
16    changed and it says, "Corrected," and you have a
17    new date and signature at the end, and it looks to
18    me that in your corrected report, Exhibit 42, the
19    section titled, "Explanation of Need For Correction
20    and Summary of Changes," which starts on page 3 and
21    goes through page number 11, is new.  Is that
22    right?
23         A.    Yes.
24         Q.    So that text and the charts on those
25    pages are all new?
```

1                    C. Coffman

2        A.    Yes.

3        Q.    And then I notice there are changes in

4   the section that discusses your regression analyses

5   in the text, in the footnotes and in the charts; is

6   that right?

7        A.    Yes.

8        Q.    Then there are changes in your Exhibit

9   7 on the regression analysis for the common stock;

10  right?

11       A.    Yes.

12       Q.    There are changes in Exhibit 8?

13       A.    Yes.

14       Q.    I saw some changes in Exhibit 9 as

15  well; is that right?

16       A.    Yes.

17       Q.    9 is the regression analysis for the C

18  series.

19       A.    Yes.

20       Q.    And then 10 changed as well, Exhibit

21  10?  I think because the days with no news number

22  changed, the numbers in the right-hand column

23  changed in Exhibit 10; is that right?

24       A.    Yes.

25       Q.    And then Exhibit 11 is your regression

```
 1                      C. Coffman
 2   analysis, or a summary of it, for the Series D.
 3   There were some changes in that as well; right?
 4        A.    Give me just a second.
 5        Q.    I believe you updated some of the
 6   headlines and the times.
 7        A.    Yeah, but I don't think any of the
 8   numbers should have changed.  Let me just
 9   double-check that.
10             MS. POSNER:  You're in 11 or 12?
11             MR. BALLARD:  11.
12        Q.    It doesn't look like the numbers
13   changed in any of the columns other than -- I take
14   that back.  In the time, it looks like in the
15   second column, there's a change, for example, in
16   the first row.
17        A.    Yes.  Yeah, but none of the
18   regression -- none of the output of the regression
19   changed.  Some of the details of the headlines and
20   timing changed, yes.
21        Q.    And there are some changes in the
22   footnotes which we will talk about later.  Right?
23        A.    Yes.
24        Q.    I think you added another outlier day.
25        A.    Yes.
```

```
 1                        C. Coffman
 2         Q.    And then on Exhibit 12, there are
 3  changes here as well; right?
 4         A.    To the right-hand column, yes.
 5         Q.    And in the footnotes; right?
 6         A.    Yes.
 7         Q.    And I think the next exhibit where we
 8  notice changes is Exhibit 17.  Can you turn to
 9  that.
10         A.    Yes.
11         Q.    So there were changes there?  This is
12  the autocorrelation analysis.
13         A.    Yes.  There are changes there because
14  of the changes in certain exclusion dates.  That
15  caused changes in the autocorrelation as well.
16         Q.    The outlier dates?
17         A.    Yes.
18         Q.    So that would have resulted in changes
19  to 17-C and 17-D as well?
20         A.    Slight changes, yes.  17-C, yes.
21         Q.    Actually 17-D --
22         A.    17-D, I don't believe it changed any of
23  the numbers.  Just the footnote.
24         Q.    Okay.  And then I think nearly last,
25  but not least, you've obviously updated Appendix A
```

```
 1                        C. Coffman
 2  to add the documents that you considered; right?
 3       A.    Correct.
 4       Q.    And then I think I noticed throughout
 5  there were some miscellaneous changes in the text
 6  of your report.  So, for example, on page 30 --
 7       A.    The redline doesn't have page numbers.
 8       Q.    Yes.  It's probably better to look at
 9  Exhibit 42, the corrected report.
10       A.    Sure.  Yes.
11       Q.    So in paragraph 46, you had said,
12  "Other than at the start and very end of the
13  analysis period," and you've changed that to say,
14  "Other than at the start and towards the end of the
15  analysis period."  That was a change; right?
16       A.    Yes.
17       Q.    And then there are some other changes
18  throughout.  On page 46, in paragraph 73, the
19  second line, it looks like you added the words,
20  "types of" to the phrase "two types of agreements."
21  Do you see that?
22       A.    Yes.
23       Q.    Why did you make that change?
24       A.    I just thought that was a better way of
25  describing -- I wasn't -- upon further reflection,
```

1                          C. Coffman

2    I wasn't sure that there were -- exactly how many

3    agreements there were, so I noted that there were

4    at least two types of agreements.

5              Again, that's not particularly relevant

6    to any of the opinions I'm giving.  I just thought

7    it was a better way to describe it.

8         Q.   On the same page, I noticed in the

9    footnotes, you previously had a bunch of footnotes

10   that described 10-Qs and stated that they were

11   dated as of a certain date, and it has been

12   corrected to say that they were for the quarter

13   ended that date in a number of instances, and that

14   was just to make it more accurate; right?

15        A.   Yes.  It didn't change any analysis.

16   It was just to make clear that's what I was

17   referring to, yes.

18        Q.   So when you went through and revised

19   your report, if you noticed things like that that,

20   whatever you want to call them, minor changes or

21   typos or whatever, you fixed them; right?

22        A.   Yes.

23        Q.   So anything you saw that was wrong, you

24   fixed; right?

25        A.   Yes.

```
 1                    C. Coffman
 2        Q.    Even if it was minor?
 3        A.    Yes.
 4        Q.    I think we've touched on all the
 5   categories of changes that we've identified.  Have
 6   I missed anything that you can think of?
 7        A.    I don't believe so, no.
 8        Q.    And looking at the redline Exhibit 43,
 9   the redline at least says 1,545 insertions, 1,364
10   deletions for a total of 2,913 changes.
11        A.    I think -- I don't know if that's
12   counting the number of characters.  I mean, I
13   inserted eight or nine pages of text and charts so
14   I assume that accounts for a lot of it.  But the --
15   I mean, there were only a couple of errors
16   identified, but those errors obviously propagate
17   through a lot of the numbers that were calculated
18   and so the changes reflect that.
19        Q.    We can set aside the redline and let's
20   focus on your corrected report which is Exhibit 42.
21        A.    Okay.
22        Q.    Let's turn to page 3, please --
23        A.    Okay.
24        Q.    -- in the section where you explain the
25   need for correction and you summarize the changes.
```

```
1                      C. Coffman
2  So you do acknowledge that there were errors in
3  your original report that needed to be corrected;
4  right?
5       A.   Yes.
6       Q.   And you've listed two types of errors
7  here on page 3, the first relating to identifying
8  the date upon which the market would have first
9  reacted to Miller Energy's release of earnings;
10 right?
11      A.   Correct.  Of Q4 2013 earnings
12 specifically.
13      Q.   So that was for one of the 17 events
14 you looked at in the regression study for the
15 common stock, there was an error in the date for
16 one of the 17?
17      A.   Correct, yes.
18      Q.   And you note that you have confirmed
19 that "The market date for the other 16
20 announcements I analyzed was correct."
21      A.   Yes.
22      Q.   And that you've double-checked and
23 you're confident that the other 16 were and
24 continue to be correct; right?
25      A.   Yes.
```

                              C. Coffman

1

2       Q.    And then the second type of error you

3  listed here relates to two days upon which

4  plaintiffs assert that news impacted the market

5  price for Miller Energy that were inaccurately

6  reclassified as no news dates; right?

7       A.    Correct.

8       Q.    So you're saying these two errors led

9  to the many changes in the data and analysis and

10 conclusions throughout the report?

11            THE WITNESS:  I'm sorry.  Could I have

12       that read back, please.

13            (Record read.)

14       A.    Well, again, I don't think there's a

15 change to any of the conclusions, but it certainly

16 changed specific numbers within the report and so

17 those numbers have been updated.

18       Q.    Well, did you draw a conclusion about

19 whether each of the events you studied resulted or

20 led to a statistically significant change in the

21 market price?

22       A.    Yes.  I was referring to my overall

23 conclusions about whether there was evidence of

24 cause and effect.

25       Q.    So these errors didn't cause you or

C. Coffman

1

2  correcting these errors did not lead you to change

3  your conclusion about market efficiency; right?

4       A.    It did not, that's correct.

5       Q.    But correcting these errors did lead

6  you to change your conclusion about whether

7  individual events led to a statistically

8  significant price movement?

9       A.    Well, one of the 17 events, yes.  But

10 again, the overall conclusion from the analysis,

11 which is whether or not there's a significant

12 difference between what you observe on earnings

13 dates versus no news dates, that didn't change, but

14 the significance of one of the dates did change

15 based on the misidentification of which day should

16 be analyzed.

17      Q.    In your original report, you concluded

18 that 4 out of 17 events led to statistically

19 significant movements in the price of the common

20 stock; right?

21      A.    Correct.

22      Q.    And in your corrected report, you've

23 concluded that only 3 of 17 led to such price

24 movements; right?

25      A.    That's correct, yes.

C. Coffman

Q.    So that conclusion changed?

A.    Yes, the results of those calculations changed and that's reflected in my corrected report, but it didn't change any conclusion about whether there was evidence for cause and effect.

Q.    On page 4 of your corrected report, there's a paragraph, little iv.  Do you see that?

A.    Yes.

Q.    In that paragraph, you state that "The errors do not indicate that the methodology used in my report is inadequate in any way."  Why do you say that?

A.    That the methodology -- I'm not doing anything to change the overall methodology by which I'm conducting the test.  In other words, the error was not in methodology, it was in just in execution, and I stand by that the methodology I'm using hasn't changed in any way and is what is standard and regularly accepted.

Q.    At some point, if you found additional errors, or at some point would the number of errors or repetition of errors or something cause you to question the methodology?

A.    Not the overall methodology that I'm

C. Coffman

employing to test for market efficiency, no.  I
mean, it matters that the execution is accurate,
but the methodology, itself, that I'm employing is
something that I've used in many different reports
and has been accepted many times.

Q.   So it was the same methodology that you
used in your corrected report that led you to
conclude 3 of 17 events had statistically
significant price movements as the methodology you
used that previously led you to conclude that 4 of
17 had such movements?

A.   Yes.  I guess what I'm trying to say is
the methodology didn't change.  The execution of it
did slightly because of an inadvertent error, but
the methodology, itself, the approach to the
problem or the question, has not changed in any
way.

Q.   In the next paragraph of your report on
page 4, little v, you write that as part of your
detailed review, you reevaluated whether it was
appropriate to include Miller Energy's press
release announcing the Q4 2011 earnings after
market hours on August 30, 2011 as new news to be
analyzed, given that information about Q4 2011

```
 1                        C. Coffman
 2   earnings had been previously released.
 3              Do you see that?
 4        A.    Yes.  It says, "as further described
 5   below."
 6        Q.    And then you also say "I can confirm
 7   that it was appropriate to include this earnings
 8   release in my analysis."  Right?
 9        A.    Yes.
10        Q.    That was the first of the 17 events in
11   your list; right?
12        A.    That's correct, yes.
13        Q.    You took a very close look at that to
14   make sure that it was correct to include it?
15        A.    Yes.  I mean, I evaluated whether there
16   was any information in that announcement that could
17   still be considered new.  Even if it was unlikely
18   to cause a stock price movement, there was still
19   some new information in that, so to be consistent
20   with the methodology I employ, it was correct to
21   include that.
22        Q.    To be clear, that would be on Exhibit
23   7, event number 1; right?
24        A.    Correct, yes.
25        Q.    So in your corrected report, your event
```

1                         C. Coffman

2    number 1 is the "Miller Energy Resources reports

3    fourth quarter and year-end results," and your

4    source is Business Wire; right?

5         A.    That's the source that is listed, yes.

6         Q.    And you used a date of August 30, 2011,

7    and a market date of August 31, 2011; right?

8         A.    Yes.

9         Q.    So that's the one you took a really

10   hard look at to make sure that was right?

11        A.    Well, I took a look at all of them to

12   make sure that they were right, but that's one of

13   them I took a look at.  And the reason I took an

14   even closer look at that one is because as

15   described in my report, some information had been

16   previously already revealed about Miller Energy's

17   fourth quarter 2011 earnings.

18        Q.    So based on your additional work and

19   your taking an even closer look at that, you're

20   confident that event 1 is correctly listed here

21   with a market date of August 31, 2011?

22        A.    Yes.

23        Q.    Turning to page 4 of your report, in

24   paragraph little vi, you say that as part of your

25   review, you performed additional analysis of the

```
 1                          C. Coffman
 2    movements of Miller Energy's common stock to
 3    information concerning the original reporting of
 4    Miller Energy's fiscal year 2011 financial
 5    performance, and then it continues.  Right?
 6         A.   Yes.
 7         Q.   And that section spans a few pages
 8    where you have detailed some analyses you did of
 9    that period of time; right?
10         A.   Yes.
11         Q.   So what you're describing here at the
12    bottom of 4 through page 10 -- I'm sorry, through
13    page 11 -- that's all new; right?
14         A.   Yes.
15         Q.   Those are new analyses that you
16    performed after the first day of your deposition;
17    right?
18         A.   Yes.
19         Q.   And so these are new opinions that were
20    not expressed in your original report?
21              MS. POSNER:  Objection.
22         A.   Well, they're new analyses that I would
23    say further support the opinion that was given in
24    my opening report, but the analyses are new, yes.
25         Q.   Your team conducted these analyses
```

```
 1                     C. Coffman
 2  after completing your original report and after the
 3  first day of your deposition; right?
 4        A.    That's correct, yes.
 5        Q.    And these analyses relate to a study
 6  you did of a period outside of the proposed class
 7  period; right?
 8        A.    With the exception of the last date
 9  that I analyzed, that's correct.  I think the last
10  date is the beginning of the class period.
11        Q.    I know you said that the corrections
12  didn't change your ultimate opinion about whether
13  there was cause and effect.  Right?
14        A.    Correct.
15        Q.    And one of the changes that was made
16  was you concluded that 3 of 17 instead of 4 of 17
17  earnings releases led to statistically significant
18  movements in the price of Miller Energy's common
19  stock; right?
20        A.    Correct.
21        Q.    If it dropped to 2 of 17, would it
22  still be statistically significant, the difference
23  between earnings releases and no news days?
24        A.    I don't know for certain the answer to
25  that, but I don't believe it would still be -- in
```

C. Coffman

terms of the percentage of days that are
statistically significant, it likely would not be,
but that doesn't mean that the other tests I
performed wouldn't still be statistically
significant.

        Q.    If one more event dropped out, though,
and it dropped from 3 of 17 to 2 of 17, your
conclusion about whether there was cause and effect
would change; right?

        A.    Not necessarily.  Again, I performed
three different tests on the common stock to check
for cause and effect.  I studied the percentage of
dates that are significant, the average absolute
price movement after controlling for market
factors, and also the volume on earnings dates
versus no news dates, so it's not related just to
the 3 out of 17 or 2 out of 17.  There's more
beyond that.

              And also, the -- as I discussed in my
prior deposition, and now I've outlined in this
section, there are certainly, at least at an
anecdotal level, other dates that make clear
there's strong examples of cause and effect.

        Q.    You don't normally rely on anecdotal

1                    C. Coffman
2    evidence; do you?
3         A.    I don't normally completely rely on
4    anecdotal evidence.  I think if there's anecdotal
5    evidence that reinforces or supports an opinion I'm
6    giving, that it's also relevant to look into and
7    I've pointed it out in a number of different
8    reports.
9         Q.    You wouldn't describe relying on
10   anecdotal evidence as a scientific method; would
11   you?
12        A.    I think it would depend on the context
13   of the question.
14        Q.    If you had found only 1 of 17 events
15   led to statistically significant price movements in
16   the common stock, would your conclusion about cause
17   and effect have changed?
18             MS. POSNER:  Objection.
19        A.    It may have.
20        Q.    If you had observed no statistically
21   significant price movements in response to any of
22   the 17 events for the common stock, what would you
23   have concluded about cause and effect?
24        A.    I don't know the ultimate answer to
25   that because if I had observed that, I would have

```
1                      C. Coffman
2   carefully considered why I was observing that,
3   whether there was a reason I was observing that,
4   and whether or not the reason I was observing that
5   is because for some reason the power of that test
6   was low because of the nature of what was being
7   disclosed, and thought about whether there was a
8   more appropriate test that might have -- could be
9   performed, or I may have concluded that there was
10  insufficient evidence to support market efficiency,
11  so I just don't know.  That's not something I
12  confronted.
13       Q.   If you had found zero of 17 earnings
14  releases led to statistically significant price
15  movements in the common stock, would you have
16  concluded that there was no cause and effect
17  relationship and, therefore, there was no market
18  efficiency?
19            MS. POSNER:  Objection.
20       A.   I think I just answered that, which is
21  to say I would have -- certainly that analysis, in
22  and of itself, would not provide evidence of market
23  efficiency.  What I would ask at that point is why
24  am I observing what I'm observing.  Is it because
25  the market really wasn't focused on earnings and,
```

                          C. Coffman
therefore, a better test for cause and effect would
be to look at other types of dates, or was it
because there's really no evidence of cause and
effect, and then I would conclude there's not
sufficient evidence to support market efficiency.

          So again, the reason I didn't get to
that particular question is that's not what I
observed.

    Q.    So if you had observed zero of 17
events leading to statistically significant price
changes in the common stock, you would have done
additional analyses and you might have nonetheless
concluded that the market was efficient?

    A.    Again, it would depend on if there was
other reliable evidence of a cause and effect
relationship.  I think if hypothetically I observed
what you're suggesting, obviously, like I said,
that test, in and of itself, would not provide
evidence of a cause and effect relationship.

          So I would want to understand why, if
there were rationales why I was observing that, and
if there was a test -- if there were more relevant
dates to test that relationship, much as I did with
the preferred stock in this case.

```
 1                      C. Coffman

 2            It was clear that over large portions

 3    of the class or the analysis period, earnings date

 4    would not be something powerful to test and so I

 5    looked for other events that have strong economic

 6    rationale of why you would expect there to be

 7    material information that might move the stock

 8    price or the securities price, and then test that.

 9            I mean, the reason I select earnings

10    announcements in the first place is because there's

11    literature that talks about why those are

12    generally, not always, but generally important

13    dates on which there can be value-relevant

14    information that moves the stock price in a

15    significant way.

16            But it's not the only types of dates.

17    So it's not -- if you don't observe cause and

18    effect from the earnings dates, I would say that's

19    not completely dispositive of the question, but it

20    certainly doesn't provide affirmative evidence if

21    you find zero dates that are significant.

22       Q.   Let me see if I understand this.  I'm

23    going to make several statements and see if you

24    agree with them.  Your methodology, as performed

25    here, the regression analysis on the common stock,
```

```
 1                    C. Coffman
 2   depending on the results, could allow you to
 3   conclude that there is evidence of a cause and
 4   effect relationship and, therefore, evidence of
 5   efficiency; right?
 6        A.    Yes.
 7        Q.    And it did in this case?
 8        A.    Yes.
 9        Q.    Your methodology, depending on the
10   results, could lead you to conclude that there is
11   no evidence from the test to support a finding of
12   cause and effect and efficiency; right?
13        A.    That's correct.
14        Q.    Your methodology would never lead you
15   to conclude that the market was inefficient?
16        A.    I don't think it's designed to --
17        Q.    Be falsifiable?
18        A.    I'm sorry.  I want to make sure I'm
19   answering the original question.  So let's just
20   have a clear record, so if you want to ask me a
21   different question.
22             MR. BALLARD:  I interrupted you.  I
23        apologize.  Let me have the question read
24        back, please.
25             (Record read.)
```

1              C. Coffman

2       Q.    Let me just state it again.  Your

3  methodology would never lead you to conclude that

4  the market was inefficient; correct?

5       A.    I think that would depend on the

6  specific facts and circumstances and context.  So

7  if there were days where the news unambiguously in

8  some way should have caused a very large change in

9  how a company was being valued -- and I'm just

10  going to throw out an example.  Let's say a

11  company's stock is trading at $10 a share and then

12  they declare bankruptcy and the stock price doesn't

13  move.

14              To me, that would be a sure sign of

15  inefficiency, if the common stockholders are really

16  getting wiped out in bankruptcy and the stock price

17  doesn't move and reflect that.  So I don't think

18  it's incapable of that.  It would really depends on

19  the facts and circumstances.

20              By itself, finding zero out of 17, I

21  think does not indicate inefficiency.  It would

22  really depend on analyzing the nature of the

23  events, but I would not want to say that it's never

24  possible.

25       Q.    Would it be fair to say that you are

1                          C. Coffman

2    testing for efficiency, not for inefficiency?

3         A.    I think that's a fair -- I mean, in the

4    way this is being tested, it's asking is there

5    affirmative scientific evidence of efficiency.  I

6    think to get to a conclusion of inefficiency would

7    take more detailed analysis beyond the test,

8    itself.

9         Q.    Let me ask you some questions about the

10   footnote on page 4 of your report.  Actually there

11   are two footnotes.  I want to focus on Footnote No.

12   2.  Footnote 2 notes there were StreetSweeper

13   reports that were not contained in either the

14   Factiva or Investext databases that you used and

15   relied on, and then you note that there was a

16   Reuters article of October 13, 2014 that was

17   included in the original Factiva search, but was

18   incorrectly treated as having occurred during

19   market hours instead of after market hours.  Right?

20        A.    Yes.

21        Q.    So this is referring to the corrections

22   you made as to which days were no news days?

23        A.    Yes.

24        Q.    And then you note that you're now

25   confident that the methodology you employed and

                            C. Coffman
have used in other reports to identify no news

dates will reliably identify days on which major

news related to the company is released; right?

        A.    Yes.

        Q.    And you note later that it's

necessarily not perfect; right?

        A.    Correct.

        Q.    And then I guess my question on this

is, so you use Factiva and Investext as your data

source to identify certain days that were news

days; right?

        A.    Yes.

        Q.    And it turned out that those data

sources had some either incorrect or missing -- or

they were missing information on the date or time

of news items; right?

        A.    Well, I think I acknowledged in my

initial report that Investext, which is a source

for analyst reports, doesn't have universal

coverage and that's a well-known fact.  So I

acknowledged, even in my opening report, that I'm

likely missing some analyst reports or at least

there's the potential to be missing some analyst

reports.  And as I say here, StreetSweeper wasn't

1                         C. Coffman
2    covered so I wouldn't characterize that as an error
3    of any kind.  It's just the reality that that
4    source does not have universal coverage.
5              And to the extent it's missing reports
6    that might be considered new news, it could be
7    classified -- it could result in there being a date
8    classified as no news when there really was an
9    analyst report, but again, that would bias against
10   the findings to the extent that those reports had a
11   tendency to move the market.
12             What I found is that that issue tends
13   not to be a -- in most cases, tends not to be a big
14   issue, because the process by which I identify news
15   dates typically picks up any time there was major
16   news.
17   Q.    What did you do, if anything, to check
18   to see if there were any other errors or omissions
19   in the databases you used?
20             MS. POSNER:  With regard to Factiva and
21        Investext?
22             MR. BALLARD:  Yes.
23   A.    I didn't perform any other checks.  I
24   continued to rely on those.
25   Q.    You mentioned this question of which

1                     C. Coffman

2    way errors would bias the results, and you do note

3    in Footnote 2 that the inadvertent treatment of a

4    potential news day as a no news day would, if

5    anything, bias against finding a cause and effect

6    relationship.

7              You just referred to that; right?

8         A.    Yes.

9         Q.    But when you just mentioned earlier,

10   you said that the inadvertent treatment of a

11   potential news day as a news day would, if

12   anything, bias against finding a cause and effect

13   relationship if that news day impacted the market

14   price.  Right?

15        A.    Well, yes.

16        Q.    And only if?

17        A.    Well, no, no, no.  Again, what I'm

18   saying is there's two possibilities.  One is the

19   news that is missing was not an important

20   value-relevant piece of news and didn't move the

21   price, and, therefore, doesn't bias the test in any

22   way in either direction, or to the extent there's a

23   report or news item that somehow was missed in this

24   process, and it did impact the price, that would

25   tend to bias against a finding of cause and effect

```
 1                      C. Coffman
 2  because it may have impacted the market price.
 3       Q.    Let's take an example.  You originally
 4  had 318 no news days; right?
 5       A.    Yes.
 6       Q.    You changed it to 316 no news days;
 7  right?
 8       A.    Yes.
 9       Q.    So you identified two days you
10  originally treated as no news days inadvertently
11  and you're now treating them as news days, so
12  you've taken them out of the denominator; correct?
13       A.    Yes.
14       Q.    So in your original report, you said 14
15  of 318 no news days led to changes in the market
16  price.
17       A.    Yes.
18       Q.    In your revised report, you found that
19  14 of 316 no news days led to changes in the market
20  price; correct?
21       A.    Correct.
22       Q.    The denominator changed; right?
23       A.    Yes.
24       Q.    The percentage went up if the
25  denominator went down; correct?
```

page 360

```
1                          C. Coffman

2        A.    Yes.

3        Q.    Which narrowed the gap between no news

4   days and earnings releases; right?

5        A.    Correct.

6        Q.    The correction of errors confirms that,

7   in fact, the inadvertent treatment of potential

8   news days as no news days biases for, not against,

9   a finding of cause and effect relationship;

10  correct?

11       A.    Well, I think that would certainly -- I

12  mean, the change here is miniscule.  The point I'm

13  making is in a large sample, that would certainly

14  be true, because there's only two dates being

15  changed here and it didn't change the significance

16  level -- hold on just one second.

17       Q.    My question wasn't about the size of

18  the change and whether it was miniscule.  My

19  question was about bias, which direction it points,

20  and it was a yes or no question.

21             MS. POSNER:  Objection.

22       A.    Yeah.  Overall, the bias would be the

23  way I describe in my report.  Here, in this

24  particular situation, we're not looking at a large

25  sample, we're looking at having changed two dates,
```

1                          C. Coffman

2    and it had a miniscule effect on the results.  So

3    that's not necessarily reflecting any overall bias

4    because it's such a small sample size.

5         Q.    If you treated ten extra news days as

6    no news days and each of those news days were days

7    when there was news that did not actually result in

8    a price change, what would that effect be on your

9    analysis, which way would it bias the analysis?

10                THE WITNESS:  Can I have that read

11        back, please.

12                (Record read.)

13                MS. POSNER:  Objection.

14        A.    Again, I think mathematically in what

15    you're describing isn't -- when I'm talking about

16    bias, I'm talking about overall, adopting the

17    methodology, how would you expect it to influence

18    what you're looking at.  I mean, the example you're

19    giving, it would mathematically change the numbers,

20    but I don't think that's changing the direction of

21    the bias.

22         Q.    It would change the numbers in a way

23    that would make you more likely to find a cause and

24    effect relationship; correct?  It would narrow the

25    percentage between news days and earnings days that

```
 1                    C. Coffman

 2   lead to market changes in the price?

 3        A.    Right.  I mean, what I'm saying is,

 4   from an economic point of view, what you would

 5   expect is that you would, in a large sample size,

 6   expect the bias to be the other way, but in a small

 7   sample size, what you're describing could occur.

 8             And again, I wouldn't consider that

 9   bias as much as I would say that that's just, you

10   know, given -- you couldn't predict over small

11   changes in classification of news dates or no news

12   dates, it could go either direction, but in a large

13   sample, the bias would be against finding cause and

14   effect.

15        Q.    You are aware that no news item in this

16   case, no category of news item, was likely to lead

17   to a price change in a statistically significant

18   way; right?

19             MS. POSNER:  Objection.

20        A.    I don't know what you mean by category

21   of news item.

22        Q.    We have earnings releases.  You found 3

23   of 17 of those led to statistically significant

24   price changes; right?  11 percent or something?

25        A.    I think it's 17 percent.
```

1                    C. Coffman

2        Q.    17 percent?

3        A.    Yes.

4        Q.    Okay.  You have SEC filings, you have

5   news articles and you have analyst reports.  Those

6   are the categories that you identified of news;

7   right?

8        A.    I think for the preferred's, I identify

9   other categories of news.

10       Q.    Focusing on the common stock, those are

11  the four categories of news you identify; right?

12       A.    Yes.

13       Q.    None of them was anywhere close to 50

14  percent likely to result in a statistically

15  significant movement of the price; right?

16            MS. POSNER:  Objection.

17       A.    Nor would you expect it to be

18  necessarily.

19       Q.    So if you take days where there was

20  news as you have defined it, a small or large

21  sample of them, and you take them and you treat

22  them as no news days incorrectly, that would bias

23  for, not against, finding a cause and effect

24  relationship, correct, as a matter of math?

25            MS. POSNER:  Objection.

                        C. Coffman

1

2       A.    Again, I think you're subsuming into

3   the question a particular result.  So I'm

4   approaching it from the broad methodological point

5   of view that if you believe there is -- could I

6   have the question read back again, please.

7              (Record read.)

8              MS. POSNER:  Objection.

9       A.    Again, I think for certain samples,

10  that may be true.  I mean, taken to its extreme,

11  that is certainly not true, because if you just

12  took the earnings dates and added it to the no news

13  dates, obviously that would eliminate any

14  difference between -- and treated those as no news

15  dates, it would narrow the gap.

16             I guess I acknowledge it's possible

17  that if there are categories of news dates that

18  tend not to move the stock price, and you add more,

19  that could add bias in the other way.

20      Q.    You said it could be true for certain

21  samples.  If we take the data in Exhibits 45

22  through 49, your data from this case, it's true for

23  that sample; correct?

24      A.    I don't know that for certain without

25  doing some calculations, but it's likely true.

```
1                          C. Coffman
2               MR. BALLARD:  We've been going about an
3       hour.  Let's take a break.
4               THE VIDEO TECHNICIAN:  We're going off
5       the record.  The time is 10:01 a.m.
6               (Recess taken.)
7               THE VIDEO TECHNICIAN:  This begins
8       Media Unit No. 2.  The time is 10:15 a.m.
9       We're back on the record.
10      Q.    Mr. Coffman, I'd like to direct your
11 attention to page 15 of your corrected report.
12      A.    Okay.
13      Q.    In the carryover paragraph from the
14 prior page, you refer to unique and complicated
15 release of earnings information for Q4 2011; do you
16 see that?
17      A.    Yes.
18      Q.    And you state that it provides both
19 additional strong evidence that the market for
20 Miller Energy securities was efficient during the
21 analysis period, and also on whether the prices
22 were impacted by KPMG's audit reports; right?
23      A.    Yes.
24      Q.    On the first part of that, are you
25 saying that your analysis of events prior to the
```

1                         C. Coffman

2   proposed class period provides evidence of whether

3   the market was efficient during the proposed class

4   period?

5       A.    Yes.

6       Q.    Is that a typical methodology, to

7   examine one period for the purpose of finding

8   evidence of efficiency in another period?

9       A.    Well, there have been a whole host of

10  reports I've filed where given the length of a

11  particular class period, I've used an expanded

12  analysis period that goes beyond the class period

13  to get more data and evidence to evaluate cause and

14  effect, and that makes sense as long as there's no

15  structural change in the mechanics of how the

16  market is operating.

17          If you see evidence of cause and effect

18  just prior to the beginning of the class period,

19  there's nothing magical about the beginning of the

20  class period that would suggest that suddenly cause

21  and effect has gone away.  So I do think it

22  provides relevant economic evidence.

23      Q.    Would you say that the study of events

24  outside of a proposed class period is not a

25  standard scientific method for attempting to prove

```
1                    C. Coffman
2   efficiency during the proposed class period?
3        A.    I would disagree with that.  I look
4   outside class periods all the time to gain evidence
5   about the operation of the market and whether it
6   was efficient.  There's nothing -- like I said,
7   there's nothing magic about the beginning of a
8   class period that suggests somehow that whether the
9   market is efficient or not would change.
10        Q.    In paragraph vii on page 5, little vii
11  on page 5, you refer to the StreetSweeper
12  publication.  Do you see that?
13        A.    Yes.
14        Q.    That was on July 18, 2011; right?
15        A.    Yes.
16        Q.    And that was during market hours?
17        A.    Yes.
18        Q.    And then you say, "The intraday price
19  chart below shows an immediate market reaction to
20  that news and demonstrates that the company lost
21  over 20 percent of its value."
22              Do you see that?
23        A.    I do.
24        Q.    And you're in that referring to the
25  chart that appears on page 6?
```

1                          C. Coffman

2          A.      Yes.

3          Q.      You also state that on this date, your

4    event study indicates that "the market price of

5    Miller Energy common stock fell by 23.4 percent

6    after controlling for market and industry effects.

7    This abnormal price decrease is statistically

8    significant at the 99 percent level with a

9    t-statistic of -8.83"; right?

10         A.      Yes.

11         Q.      So this price decrease that you've

12   described here took place prior to the beginning of

13   the proposed class period on July 28, 2011; is that

14   right?

15         A.      That is correct, yes.

16         Q.      This was before the first alleged

17   misstatement by KPMG; correct?

18         A.      Yes.

19         Q.      You interpret this to be a reaction to

20   the StreetSweeper report about the alleged

21   overvaluation of the Alaska Assets?

22         A.      I do attribute it as a stock price

23   decline related to the StreetSweeper article.  I

24   believe that article discussed the Alaska Assets.

25   It may have discussed other things as well, but the

```
 1                    C. Coffman
 2   market did clearly respond to the StreetSweeper
 3   article.
 4        Q.    So in your expert opinion, the risk of
 5   overvaluation of the Alaska Assets was made public
 6   in the StreetSweeper article and immediately
 7   affected the price of Miller Energy's securities;
 8   is that right?
 9             MS. POSNER:  Objection.
10             THE WITNESS:  Could I have that read
11        back, please.
12             (Record read.)
13             MS. POSNER:  Objection.
14        A.    I think the market price clearly
15   reflected whatever was in the StreetSweeper report.
16   Part of their opinion was that the Alaska Assets
17   may be overvalued or were overvalued, so certainly
18   their opinion or views were priced in the market
19   price at that point in time.  I don't know that I
20   would go beyond saying it that way.
21        Q.    On page 6 of your report, you refer to
22   some events on July 29, 2011.
23        A.    Yes.
24        Q.    You note that on this date your event
25   study indicates that the market price of the common
```

```
 1                       C. Coffman
 2  stock fell by 17.66 percent after controlling for
 3  market and industry effects, and that the abnormal
 4  price decrease is statistically significant at the
 5  99 percent confidence level; right?
 6       A.    Yes.
 7       Q.    So again, this was another decline in
 8  the price that took place prior to the beginning of
 9  the proposed class period before the first alleged
10  misstatement by KPMG; right?
11       A.    That's correct, yes.
12       Q.    And again, you are interpreting this
13  additional decline in the price to be a reaction to
14  the disclosures in the StreetSweeper report?
15            MS. POSNER:  Objection.
16       A.    I think that's a logical conclusion.  I
17  don't know that I've studied every last possible
18  thing that could have been going on on July 29th,
19  but given that this is -- there had not even been a
20  full trading day for the stock price to react to
21  the StreetSweeper article, I think there's strong
22  evidence that the StreetSweeper article is likely a
23  primary cause of that, yes.
24       Q.    As a general matter, in an efficient
25  market, if a risk is disclosed and incorporated
```

C. Coffman

1

2  into the price of a security, and then later the

3  same risk is disclosed again, would another price

4  reaction at that point be a sign of inefficiency?

5      A.    Not necessarily, because there could be

6  intervening information that affected the market's

7  assessment, or the severity of the risk or

8  likelihood of the risk could be changing in the

9  market's mind.

10          So I mean, I wouldn't jump to that

11  conclusion without much further study.

12      Q.    Let's turn to page 8 of your report.

13  On this page, you refer to law firms announcing

14  investigations by the evening of August 1, 2011.

15  Do you see that?

16      A.    I see that.

17      Q.    Where did you get that information?

18      A.    As I sit here right now, I don't recall

19  where that specific information comes from.

20      Q.    You indicate that you evaluated the

21  decline in Miller Energy's common stock on August

22  2.  Were you attributing that decline to the law

23  firm announcements that you referenced in this

24  paragraph?

25      A.    I mean, it could have been continued

                              C. Coffman

reaction to the 8-K filing the prior day.  It could

have been in reaction to the law firms announcing

investigations.  Those I think are the primary

sources of new news on these days, including Miller

Energy also released an open letter to

shareholders.

              But I haven't done a full study of all

the possible things that could have been moving the

price, but those were the things that I reviewed

that struck me as the most likely sources of the

price movements.

       Q.    Would it be fair to say that as a

general matter, in a period when there are a lot of

things going on, lots of public statements and

filings happening, it's more difficult to isolate

cause and effect?

       A.    I think it can be more difficult to

isolate exactly what is causing which price -- that

can make it more difficult to analyze exactly which

statements are causing which price movements, but

it really depends on the facts and circumstances,

because if most of the information is not new or

repeated and you can isolate which filing actually

has new information that the market would care

```
 1                     C. Coffman
 2  about, then it might not be.  So I think it really
 3  depends on the facts and circumstances.
 4        Q.    Please turn to page 30 of your report.
 5        A.    Okay.
 6        Q.    Earlier we identified this change in
 7  paragraph 47 where you took the words "very end"
 8  out and added the phrase "towards the end of the
 9  analysis period."  Do you see that?
10        A.    I think you said paragraph 47 so I want
11  you to clarify your question.
12        Q.    Looking at paragraph 46 you made a
13  change to the wording there; right?
14        A.    Yes.
15        Q.    Why did you make that change?
16        A.    Because I thought "very end" could be
17  misinterpreted and I thought "towards the end" is a
18  better description.
19        Q.    I want to talk about your study of
20  cause and effect in your regression analysis, so
21  let's turn to that section of that report beginning
22  on page 31.
23              Do you have that?
24        A.    Yes.
25        Q.    I believe if you turn to page 33, you
```

1                          C. Coffman
2  will see Footnote 62.  Do you have that?
3       A.    Yes.
4       Q.    In Footnote 62, you have changed the
5  number of outliers from 2 to 3; right?
6       A.    Yes.
7       Q.    And it looks like you added July 28,
8  2011 with regard to market reaction to the
9  StreetSweeper article alleging potential fraud in
10 Miller Energy's subsequent 10-K as a new outlier;
11 right?
12      A.    Yes.
13      Q.    Did you analyze the market reaction to
14 that StreetSweeper article?
15      A.    Yes.
16      Q.    Is that what you described in your
17 report at page -- what page?
18      A.    5 and the chart on page 6.
19      Q.    Got it.  Was the reaction to the
20 StreetSweeper article from July 28, 2011,
21 statistically significant?
22      A.    Yes.
23      Q.    That's the reaction we talked about
24 earlier?
25      A.    We talked about others, but yes.

```
 1                       C. Coffman
 2              MS. POSNER:  Objection.
 3        Q.    Got it.  We can move on to the next
 4   item here.  Let's turn to page 38.  In paragraph
 5   61, on page 38 of your report, you indicate that
 6   three events resulted in statistically significant
 7   price movements at the 95 percent confidence level
 8   in your event study of the common stock; right?
 9        A.    Yes.
10        Q.    That was what you had changed from 4 in
11   your original report?
12        A.    Yes.
13        Q.    Then in paragraph 62, you say you
14   compared these results against the 316 days during
15   the analysis period that were no news days.  That's
16   what you changed from 318 in your original report;
17   right?
18        A.    Yes.
19        Q.    And then you say there were 14 no news
20   days that had statistically significant price
21   movements.  That didn't change?
22        A.    Correct.
23        Q.    And then in paragraph 62, you say,
24   "Thus, during the analysis period, there was a
25   statistically significant price reaction at the 95
```

```
 1                        C. Coffman
 2   percent confidence level on 17.65 percent of the
 3   earnings announcements."
 4              That figure changed from 23.53 percent
 5   in your original report; right?
 6        A.    Yes.
 7        Q.    And then in paragraph 62, you continue
 8   to say, "But when compared to days with no Miller
 9   Energy-related news, I observed statistically
10   significant reactions 4.43 percent of the time."
11              That percentage changed from 4.4
12   percent in your original report; right?
13        A.    Yes.
14        Q.    So both the numerator and the
15   denominator in that calculation changed?
16        A.    No.  Just the denominator.
17        Q.    You're right.  So the numerator in the
18   first comparison of the earnings release has
19   changed and the denominator in the no news days
20   changed?
21        A.    Correct.
22        Q.    Then looking at Footnote 71, I guess
23   the only change there is the three earnings
24   announcements; right?
25        A.    Yes.
```

C. Coffman

1

2      Q.    And then in Footnote 72, you do the

3  calculation of statistical significance and you say

4  the difference between 17.65 percent and 4.43

5  percent is statistically significant at the 95

6  percent confidential level.  So this is just you've

7  rerun the calculation with the new numbers?

8      A.    Correct.

9      Q.    And concluded that 3 of 17 is still

10 statistically significant compared to the no news

11 result; correct?

12     A.    Correct.

13     Q.    Going back to what we said earlier, if

14 it dropped to 2 of 17, you believe that would not

15 be statistically significant; right?

16     A.    That I believe is likely the case, yes.

17 Again, that's not the only relevant test, but for

18 that particular test, that's correct.

19     Q.    In Footnote 73 you write, "There is no

20 statistically significant difference between 4.43

21 percent and 5 percent.  This is within the

22 proportion of dates that would be significant by

23 chance alone when using a 95 percent confidence

24 interval."

25           Can you explain that?

                        C. Coffman

1

2          A.     Sure.  So if you have a model where

3   you're testing for significance at the 95 percent

4   confidence level, by chance alone, you would expect

5   1 out of every 20 dates or 5 percent of the no news

6   dates to be statistically significant.  So this is

7   just saying that the 4.43 percent isn't

8   statistically different than the 5 percent you

9   would expect by chance alone.

10          Q.     Does that mean you could have run your

11   analysis without even looking at no news days, you

12   could have just compared the result you got for

13   earnings releases against 5 percent?

14          A.     I think that would have been a less

15   powerful test but in -- you could -- I guess it's

16   possible to devise that sort of test.  I don't

17   think that would be as reliable or accurate a test

18   because then you're not actually using sample data

19   points.  You're just assuming what the no news

20   results would be.

21          Q.     But the 5 percent at least doesn't

22   require you to rely on data sources, whereas your

23   test does, and we know there are errors in your

24   data source; right?

25               MS. POSNER:  Objection.

C. Coffman

1

2          A.    Well, it's also an implicit test of

3   whether the model is working well.  In other words,

4   the 5 percent is a hypothetical number, it's not an

5   actual what-you-observed number.  So if you're

6   comparing -- let's say you're doing a test of a new

7   drug and you give it to -- you give it to -- you

8   give the real drug to some patients and they do

9   better than would be expected by just giving a

10  placebo.  You can't just make an assumption about

11  what the placebo effect is, you actually test it.

12  So that's the importance of actually testing the no

13  news dates for the given security.

14         Q.    In paragraph 63 of your corrected

15  report, in the first line, there's a reference to

16  the 316 days with no news.  We already talked about

17  that.  That was changed from 318.  Right?

18         A.    Yes.

19         Q.    And then in the next line, you refer to

20  the average change in price of the common stock as

21  2.52 percent.  That changed from 2.53 percent in

22  your original report?

23         A.    Yes.

24         Q.    Then in the last line, there's a

25  reference to the average change on earnings dates

```
 1                    C. Coffman
 2  of 4.16 percent.  That changed from 4.37 percent?
 3       A.    That's correct.
 4       Q.    On page 39 of your report, you have
 5  included a chart regarding the percentage of days
 6  significant at the 95 percent confidence level.  Do
 7  you see that?
 8       A.    Yes.
 9       Q.    This is just a graphic representation
10  of the data we just discussed; right?
11       A.    Yes.
12       Q.    So the blue column is now representing
13  the 17.65 percent instead of what you previously
14  had as 23.53 percent?
15       A.    Yes.
16       Q.    And the reddish orange column is now
17  the 4.43 percent instead of what was originally 4.4
18  percent; right?
19       A.    Yes.
20       Q.    So looking back at your original
21  report, the charts from a distance look almost
22  identical, but that's because you changed the
23  scale; right?
24       A.    Yes.  The scale has changed.
25       Q.    That's to emphasize the difference
```

```
 1                    C. Coffman
 2  between the two columns; right?
 3       A.    There's still a statistically
 4  significant difference between the two columns.
 5       Q.    Looking at Footnote 74 on this page,
 6  there's another calculation of statistical
 7  significance and this one is the 2.52 percent
 8  average change in the price of the common stock
 9  versus the 4.16 percent average change in the
10  common stock on earnings dates; right?
11       A.    Yes.
12       Q.    Those numbers changed from whatever you
13  had before, but you found that there are still
14  statistically significant differences?
15       A.    Yes.  It was a very small change from
16  2.53 to 2.52 and then a change from 4.37 to 4.16.
17       Q.    Those data points are shown on the
18  chart on page 40?
19       A.    Yes.
20       Q.    So again, this chart would have changed
21  at least slightly from what you had in your
22  original report; right?
23       A.    Yes.
24       Q.    And then in paragraph 65, it looks like
25  you have some data on trading volume where you have
```

                        C. Coffman

 1

 2  a reference to 71 million.  Do you see that?

 3      A.    I think it's .71 million.

 4      Q.    Good point.  .71 million, that's the

 5  average daily trading volume on the 17 days with

 6  earnings announcements; right?

 7      A.    Yes.

 8      Q.    That came down from .72 in your

 9  original report; right?

10      A.    Yes.

11      Q.    And then you compared this to the

12  average daily trading volume with.34 million for no

13  news days.  That's a change from .35 million in

14  your original report; right?

15      A.    Yes.

16      Q.    And it looks like you have a chart

17  showing that on page 41; right?

18      A.    Yes.

19      Q.    That one also changed slightly from

20  what you had in your original report?

21      A.    Yes.

22      Q.    Let's turn to page 60.  In paragraph

23  104 of your corrected report, you write, "Any

24  negative causation evidence would be applicable to

25  each class member as opposed to relevant for any

```
 1                    C. Coffman
 2    specific investor."
 3              What did you mean by that?
 4         A.    Meaning --
 5              MS. POSNER:  I'm sorry, where are you?
 6              MR. BALLARD:  Page 60, paragraph 104.
 7         A.    I mean that any evidence regarding what
 8    was causing the stock price to be moving -- so let
 9    me take a step back.  I understand negative
10    causation is something that defendants have the
11    burden of proving for a Section 11 case, meaning
12    that the stock price declines or security price
13    declines were caused by something other than the
14    fraud.
15              And what I'm saying here is that
16    whatever negative causation analysis would be done
17    would be done -- could be done on a class-wide
18    basis, not on an individual investor basis, because
19    the reasons the stock price was moving would not be
20    specific to any individual investor.
21         Q.    I think I got it.  So when you said
22    applicable to each class member, you didn't mean it
23    would have to be proven individually for each class
24    member.  You meant it could be proven on a
25    class-wide basis?
```

C. Coffman

A.   Yes.

Q.   So if the decline was caused by changes in oil prices, that could be proven on a class-wide basis for example?

A.   If that were considered negative causation information, yes.

Q.   Going back to what we talked about earlier about the 4.43 percent of no news days that had a statistically significant price movement, do you recall that discussion?

A.   Yes.

Q.   If you want to look at your report in the regression analysis, it's on page 38.

A.   I know which number you're referring to, yes.

Q.   We talked about that and the 5 percent a little while ago.  So the 4.43 percent is basically the measure you're comparing against, right, when you're testing the earnings releases to see if they have a market effect, a price effect?

MS. POSNER:  Objection.

A.   That's one of the things I'm testing against.

Q.   What other things are you testing

```
1                    C. Coffman
2   against?
3        A.   The average stock price movement on
4   those dates, the average volume on those dates.
5        Q.   If you found that the number of days
6   was not significant, then the other factors
7   wouldn't matter much; would they?
8             MS. POSNER:  Objection.
9        A.   I don't follow that.
10       Q.   If you found zero out of 17 days of
11  earnings releases had statistically significant
12  price movements, it really wouldn't matter much how
13  much volume there was on those days; right?
14       A.   The volume test, itself, might not
15  matter as much, but the average stock price
16  movement still would be relevant.
17       Q.   So in this comparison where you compare
18  the 17.65 percent of earnings announcements, 3 out
19  of 17, that had statistically significant price
20  movements with the 4.43 percent of no news days
21  that had such movements, you drew conclusions about
22  cause and effect; right?
23       A.   Yes.
24       Q.   Can you explain what your conclusions
25  about cause and effect were?
```

C. Coffman

A.    My conclusion is that consistent with
what you would expect to see in an efficient
market, their earnings announcements, which provide
at least sometimes, not all the time, but at least
sometimes, the academic literature has shown,
provide new value-relevant information to
investors, had a greater tendency to move the stock
price than when there was no news, and that
directly goes to the idea of Cammer factor 5, which
is that there's a cause and effect relationship
between news and information that is being released
about the company.

Q.    In your analysis, did you attempt to
exclude other possible causes?

MS. POSNER:  Objection.

A.    When you say other possible causes, I
want to make sure I understand.  When I'm looking
at the earnings announcements, I'm looking at all
the information in the earnings announcements, not
any specific number or -- I guess the test is
looking at the mix of information that is released
on those days.

Q.    Well, did you do anything, to control
for the price of oil?

```
 1                      C. Coffman
 2        A.    Yes.
 3        Q.    Did you do anything to control for
 4   movements in the S&P 500?
 5        A.    Yes.
 6        Q.    Did you do anything to control for
 7   anything other than those two things?
 8        A.    Not explicitly, no.
 9        Q.    So you didn't attempt to exclude any
10   other possible causes of the price movements beyond
11   changes in the price of oil or the S&P 500 index;
12   right?
13              MS. POSNER:  Objection.
14        A.    That's correct.
15        Q.    Let's turn to Exhibit 7 of your
16   corrected report.  I'm going to ask you some
17   questions about the changes that were made to
18   Exhibit 7 so you might want to have the redline
19   handy.
20        A.    Okay.
21        Q.    So in Exhibit 7, you have obviously 17
22   events.  We talked about that.  And for each event,
23   you have data across 12 columns; right?
24        A.    Other than the numbering column, yes.
25        Q.    And each column was intended to give a
```

```
 1                      C. Coffman
 2   separate piece of relevant information?
 3        A.    It's providing summary information.  I
 4   mean, what matters is the results of the event
 5   study ultimately, but it provides information about
 6   the timing of the events, yes.
 7        Q.    I mean, you had included each column
 8   for a reason; right?
 9        A.    Yes.
10        Q.    To show something?
11        A.    Yes.
12        Q.    So 17 columns -- I'm sorry.  17 rows
13   and 12 columns of data.  204 pieces of data on this
14   chart; right?
15        A.    I'm trying to do the math in my head
16   but I'll believe you that 17 times 12 is 204.
17        Q.    It's beyond the usual multiplication
18   tables I recognize.  I count of the 204 pieces of
19   data displayed on this chart in your original
20   report, 41 of them were incorrect.
21             MS. POSNER:  Objection.
22        Q.    Is that right?
23        A.    Again, I don't think that incorrect is
24   the right way to characterize it.  I would say for
25   what ultimately mattered, there was one correction,
```

1                          C. Coffman

2  which is the timing of -- because all that really

3  matters ultimately for getting the analysis right

4  is identifying the correct earnings date, and I did

5  that for all but one of the dates.

6              Updating all of the results for that

7  change created some changes to some of the numbers,

8  and then as described in my report, I made an

9  effort, in going back and checking a variety of

10  sources and the timing of the news information,

11  updated the exhibit to show what I could determine

12  was the earliest version of the earnings release

13  that I could identify.  So that changed the

14  specific source I was citing, the time of day that

15  it was occurring, but it also really didn't change

16  any of the analysis.

17      Q.    You changed these 41 data items because

18  they were wrong in your original report; correct?

19      A.    I changed them because it updates my --

20  it reflects an update to the analysis.  The only

21  thing that resulted in a -- that was incorrect in

22  terms of how it affected the analysis was the

23  timing of event 9.

24      Q.    Well, let's take an example.  In event

25  1, you originally said the abnormal return

                         C. Coffman
1
2   percentage was .46 percent.  Was that correct or
3   incorrect?
4        A.    That did not reflect treating one of
5   the outlier dates as an outlier date.  So it wasn't
6   incorrect from a -- it was the wrong calculation.
7   It reflected the analysis at that point in time.
8            I now believe it's more appropriate to
9   leave out one additional outlier date, as I
10  described, but I don't think the original number
11  was wrong.  I think this is an updated number.
12           In other words, that wasn't the result
13  of an error.  That was the result of a slight
14  change in identifying outlier dates that I think
15  was appropriate.  The one thing that was just flat
16  out wrong and was an error was the timing on event
17  9.
18       Q.    For event 3, in your original report,
19  you found nothing for significance level, and then
20  you have an asterisk for that event in your
21  corrected exhibit.  Which is correct?
22       A.    I'm relying on my updated, corrected
23  analysis which shows that date is significant at
24  the 90 percent level.  It was a relatively small
25  change in the abnormal return, but it pushed it

```
 1                    C. Coffman
 2  over the threshold of 90 percent.
 3       Q.    So would you say that the original
 4  report, in having no asterisk there, was incorrect
 5  and your corrected report is correct?
 6       A.    I think this is more reliable.  Again,
 7  that wasn't due to what I would consider an error.
 8  It's really an update.
 9       Q.    So whether we call them corrections or
10  updates, you have 41 of 204 corrections or updates
11  in this chart.  Correct?
12       A.    Yes.
13       Q.    Over 20 percent of the items here have
14  been corrected or updated; right?
15       A.    If you count it that way.  I don't
16  think that's a particularly relevant way to count
17  it given the substance, but if you count it that
18  way, that's fair.
19       Q.    Let's take a look at an example.  Take
20  time of day.  You've got 9 out of 17 of those
21  wrong, right, in the original report?
22       A.    Again, I don't -- the time of day of
23  the -- what I was citing was not wrong.  What has
24  been reflected here is an updated analysis to make
25  sure I was grabbing the earliest time, which
```

```
 1                    C. Coffman
 2   required relying on some of these for a different
 3   source which slightly changed the time of day.
 4             Again, by -- it doesn't change which
 5   market date is relevant.  It just changes the
 6   earliest time that the news was identified, and I
 7   changed the source that reflects that.
 8             So, in other words, let's take event
 9   number 2.  There was a "Miller Energy Resources
10   reports first quarter result," reported by Business
11   Wire at 5:22 p.m. on September 9th.  That was not
12   wrong.  It was correct.
13             I'm just saying in my updated analysis,
14   I've reflected that there was actually a -- I
15   identified that the 10-Q was published on the SEC
16   website 12 minutes earlier, and while that doesn't
17   change anything in the analysis, I wanted to
18   reflect that.
19        Q.   Are you saying it was not important for
20   you to get the right time for these items?
21        A.   I think getting the right time --
22   getting the earliest time, as long as it was on the
23   correct market date, was not material to the
24   analysis at all.  That's what I'm saying.
25        Q.   Given the nature of the analysis you
```

1                          C. Coffman

2  were doing, trying to test for whether there was a

3  market reaction, a rapid reaction in the price to

4  new information, wasn't it really, really, really

5  important to figure out when the new information

6  first came out?

7             MS. POSNER:  Objection.

8        A.    It was really important to figure out

9  which was the appropriate market date to analyze.

10 It was -- the difference between 5:10 p.m. and 5:22

11 p.m., given the nature of my analysis, was not

12 important.

13       Q.    So you're saying you're lucky that when

14 you identified the wrong release of information,

15 you're lucky that it so happens the correct release

16 of information wasn't the day before or during

17 business hours; right?

18       A.    I don't know that I would use the word

19 "lucky."  It's that it didn't change it.

20       Q.    Well, in one instance, it did.

21       A.    Again, in a prior -- in many prior

22 cases, I've relied on the timing of the Business

23 Wire reporting of earnings as reflecting the

24 appropriate data to analyze for earnings

25 announcements.

1                        C. Coffman

2              In this particular case, there was one

3    time, and this is an unusual occurrence, but there

4    was one time that what came up out of that process

5    was a correction rather than the original report,

6    and for the other 16 dates, it resulted in looking

7    at the right earnings date.

8              I mean, in my experience, the Business

9    Wire story comes out very quickly after earnings

10   announcements, and in all of the other matters in

11   which I've relied upon that, it didn't result in

12   any error.

13        Q.    And you're sure that's true for event

14   number 1 as well?

15        A.    I believe we looked carefully to see if

16   there was anything earlier than 4:22 p.m. on event

17   1.

18        Q.    So in this test, you were at least

19   attempting to identify when Miller Energy first

20   released its earnings for each event; right?

21        A.    Well, I was looking for when the market

22   date upon which Miller Energy securities, common

23   stock, would have been reacting to an earnings

24   announcement, yes.

25        Q.    And you were looking for the time as

```
1                       C. Coffman
2    well?
3         A.    Yes.
4         Q.    And in nine of those instances, your
5    process or methodology or work resulted in you
6    getting the wrong time; correct?
7         A.    Again, in all but one, it didn't matter
8    for the analysis, for any substance of the
9    analysis.  It was giving me the right earnings
10   announcement date to analyze.  In one case, it was
11   incorrect.
12        Q.    Well, in nine instances, the time you
13   put in your original report was incorrect; correct?
14        A.    I think you're just pointing out that
15   there could be some time difference between
16   Business Wire and certain other sources hitting the
17   public market, and I wasn't always picking up the
18   very earliest one.
19        Q.    And my question is, did that happen in
20   nine of 17 instances?
21        A.    Yes.
22        Q.    Turning to the column for abnormal
23   return, there were six instances where you changed
24   the abnormal return that was reported in your
25   original Exhibit 7; is that right?
```

```
 1                    C. Coffman
 2       A.    That's correct.
 3       Q.    And then for abnormal dollar change, it
 4  looks like four of these changed; right?
 5       A.    Well, they all would have changed to
 6  some -- I mean, all six would have changed to some
 7  slight degree.  It's just that two of them, the
 8  change is so small that due to rounding, it doesn't
 9  result in any change.
10       Q.    And then for the significant level
11  column, it looks like 2 of the 17 items have
12  changed; right?
13       A.    That's correct.
14       Q.    On the event number 1, where you refer
15  to the Q4 2011 earnings and you cite Business Wire,
16  you have a market date of August 31, 2011.  Do you
17  see that?
18       A.    Yes.
19       Q.    You are aware that the Form 10-K was
20  filed on August 29, 2011; right?
21       A.    Yes.
22       Q.    And you're still confident that you
23  have the right market date for that one?
24       A.    Yes.
25       Q.    And why is that?
```

```
 1                      C. Coffman
 2        A.    Because there was an earnings
 3   announcement released by Miller Energy in the
 4   afternoon on August 30th, 2011.
 5        Q.    In your report, you indicate that the
 6   Form 10-K -- I'm on page 7 -- came out after market
 7   hours on July 29, 2011.  Do you see that?
 8        A.    I thought you were asking me about
 9   August.
10        Q.    Good point.  I'm looking in the wrong
11   place.  Okay.  So August.
12              When was the Form 10-K for 2011 filed?
13        A.    Are you talking about the original one
14   or the amended one?
15        Q.    Amended.
16        A.    The final amended one -- my
17   understanding is there are two amended ones, but
18   the final amended one, my understanding is was
19   filed August 29th, at 7:46 a.m.
20        Q.    So before the markets opened on the
21   29th; right?
22        A.    Correct.
23        Q.    And notwithstanding that, you believe
24   you have the right market date for event 1?
25        A.    Yes, because as I described in the
```

C. Coffman

report, there's still a, quote-unquote, earnings

announcement released on that day that at least

contains some additional information, and so to be

consistent with my general methodology, I included

that date.

And I acknowledged -- just to be clear,

I mean, I acknowledge in the first section of the

report that there were some earlier disclosures

that contained earnings information for Q4 2011.

Q.    For event 5, you originally had a

Business Wire source for your headline and you've

changed that to the Form 10-K; right?

A.    Yes.

Q.    So why did you change 5 and not 1?

A.    Because as I've described in the

report, I'm attempting to identify dates on which

new earnings information came out.  So like I

described in the report, the release of fourth

quarter 2011 earnings is much more complex than the

other date.

On date 5, the 10-K and the earnings

announcement and the Business Wire all came out

within a matter of hours with each other, all after

market on the same day, so I was just identifying

C. Coffman

1

2  the earliest release of fourth quarter information.

3  I'm not saying that's the only source of

4  information on that day.

5           In other words, the Business Wire

6  article also contains information, but I'm just

7  identifying the first one on that day that contains

8  fourth quarter information.

9       Q.    For events 5 and 9, you identify the

10  10-K as the first release of earnings for the

11  fiscal year 2012 and 2013; right?

12      A.    Because those came out before the

13  Business Wire articles on those days.

14      Q.    But the same is true for event 1.  The

15  10-K came out before the Business Wire article;

16  right?

17      A.    Right, but it's actually on separate

18  days and providing different information.  So that

19  was a relevant difference.

20      Q.    Okay, I think I've got it.  You're

21  confident you've got the right date for event 1?

22      A.    Yes.  Again, to be clear, I'm

23  acknowledging in my report that there is some

24  fourth quarter 2011 earnings information out, in

25  fact, most of it out before that date, but I still

C. Coffman

think it's a relevant date to consider because
there is some -- at least arguably some new
information included in that particular earnings
announcement.

    Q.    In the footnotes to your Exhibit 7, I
just want to make sure we've identified all the
changes, but I think we've talked about this in
another context.  But in Footnote 1, it looks to me
like there's a change.  You changed two outliers to
three outliers; right?

    A.    Yes.

    Q.    And then you added a reference to the
StreetSweeper.  I think this is the same as what
you included in the text of your report.

    A.    Yes.

    Q.    And in Footnote 2, you added the
sentence we talked about last time we met about
statistical significance at the 90 percent
confidence level being indicated by one asterisk;
right?

    A.    Yes.

    Q.    That was just inadvertently left off
your prior exhibit; right?

    A.    Yes.

```
 1                    C. Coffman
 2        Q.    Let's turn to Exhibit 8.  So Exhibit 8
 3   is your comparison of statistical significance and
 4   abnormal returns for common stock earnings
 5   announcements against no news dates; right?
 6        A.    That's part of what is on there.
 7   There's also a comparison of average absolute
 8   returns and volume as well.
 9        Q.    I was just trying to read the heading.
10   Your heading of Exhibit 8 states, "Comparison of
11   Statistical Significance and Abnormal Returns for
12   Miller Energy Common Stock Earnings Announcements
13   Versus Days With No News During the Analysis
14   Period."
15        A.    That's the title, yes.
16        Q.    And there a few items of data here.  It
17   looks like there's a number, significant days at 95
18   percent, percentage of significant days at 95
19   percent, and average absolute abnormal return
20   followed by average volume; right?
21        A.    Yes.
22        Q.    And it looks like ten items of data are
23   reflected on this chart; correct?
24        A.    Yes.
25        Q.    In your original Exhibit 8, seven of
```

1                       C. Coffman

2    the ten items were incorrect; is that right?  I

3    take that back.  Let me rephrase that.

4              In your original Exhibit 8, six of the

5    ten items of data were wrong; is that right?

6         A.    Six of the ten have been updated to

7    reflect the correction of an error, yes, or

8    correction of errors, yes.

9         Q.    And those changes are also made in the

10   footnotes; right?

11        A.    Yes.

12        Q.    So in terms of significant days, the

13   number went from four to three; right?

14        A.    Yes.

15        Q.    The percentage went from 23.53 percent

16   to 17.65 percent.  Right?

17        A.    Yes.

18        Q.    And the average absolute abnormal

19   return went from 4.37 percent to 4.16 percent;

20   right?

21        A.    Yes.

22        Q.    And in the right-hand column, 318

23   became 316?

24        A.    Yes.

25        Q.    14 stayed the same for the number of

```
 1                        C. Coffman
 2  significant days at 95 percent confidence; right?
 3       A.    Yes.
 4       Q.    And the percentage of significant days
 5  went up to 4.43 percent from 4.0 percent; right?
 6       A.    4.40.
 7       Q.    4.40.  And then the average absolute
 8  abnormal return went from 2.53 to 2.52 percent;
 9  right?
10       A.    Correct.
11       Q.    Let's look at Exhibit 9.  Exhibit 9
12  summarizes the event study you conducted with
13  respect to the C series; right?
14       A.    Yes.  This is part of it.  It's the
15  dates -- the news dates that I considered for the
16  Series C.  There's obviously other dates I
17  considered in terms of the no news dates,
18  et cetera, but this reflects part of the event
19  study analysis, yes.
20       Q.    And on this page you made the same
21  changes on the footnotes regarding outlier dates
22  and on statistical significance at the 90 percent
23  level we already talked about?
24       A.    Yes.
25       Q.    And then it looks like you've changed
```

```
1                        C. Coffman
2  the market or the date for one of these items; is
3  that right?
4              MS. POSNER:  Can you direct us --
5       Q.    It looks like event 1, the date
6  changed.
7       A.    The market date didn't change, but
8  the -- I show the first announcement as being
9  reflected on the evening of the 30th instead of the
10 morning of the 31st, that is correct.
11      Q.    And you added a time where you had none
12 before; right?
13      A.    Correct.
14      Q.    So again, you were lucky that in
15 looking at the wrong source, changing it to the
16 correct source was at least after hours so it
17 didn't change the market date; right?
18             MS. POSNER:  Objection.
19      A.    Again, I wouldn't say it was lucky.
20 It's that that source generally allows getting the
21 market date correct.
22      Q.    You changed for this event also the
23 headline source that you referred to.
24      A.    That probably just reflects that I
25 was -- I'm citing a -- the source that came out at
```

1              C. Coffman

2   7:35 p.m. the prior night rather than the one that

3   came out in the morning.

4        Q.   It looks like you changed the sources

5   you used under headline for events 5 and 7 as well;

6   right?

7              MS. POSNER:  Objection.  7 is just a

8         change in capitalization.

9              MR. BALLARD:  Okay, hold on.  Okay.

10        Let me rephrase that.

11        Q.   You changed the source that you used

12   for event 5 as well; right?

13        A.   Yes.

14        Q.   And it looks like you made a change to

15   the heading at the top.  Where in your original

16   Exhibit 9, you had the heading, "Rolling Event

17   Study Regression 120-Day Window," it looks like you

18   changed that to "Two Fixed Event Study

19   Regressions."

20        A.   Yeah.  That was -- I mean, in my prior

21   report, in the text, I described how for the

22   preferred securities, I used two fixed event

23   windows rather than the 120-day rolling.  The

24   120-day rolling window heading was inadvertently

25   carried over onto these exhibits.

C. Coffman

1

2      Q.     So in Exhibit 9 of your original

3   report, that was just a typo on the heading?

4      A.     Yes.

5      Q.     So you fixed that?

6      A.     Yes.

7      Q.     Let's turn to Exhibit 10, please.

8   Exhibit 10 is your comparison of statistical

9   significance in abnormal returns for Miller Energy

10  Series C preferred stock material announcements

11  versus days with no news during the analysis

12  period; right?

13     A.     Correct.

14     Q.     And this, again, has ten items of data

15  on it; right?

16     A.     Yes.

17     Q.     Four of these items were incorrect in

18  your original Exhibit 10; right?

19     A.     As a result of errors described --

20  correcting the errors described, it changed four

21  data items, yes.

22     Q.     So the number in the right-hand column

23  changed from 194 to 192?

24     A.     Correct.

25     Q.     The significant days at 95 changed from

                        C. Coffman

1
2    11 to 9?

3         A.    Yes.

4         Q.    And the percentage of significant days

5    changed from 5.67 percent to 4.69 percent?

6         A.    Correct.

7         Q.    And the average absolute abnormal

8    return changed from 1.35 percent to 1.28 percent?

9         A.    Correct.

10        Q.    And again, there were changes in the

11   footnotes regarding the number of days on which

12   there was no news; is that right?

13        A.    Correct.

14        Q.    In this instance, because the period of

15   time was different, from the common stock, you had

16   192 no news days in your revised Exhibit 10,

17   whereas you had 194 in your original exhibit;

18   right?

19        A.    Correct.

20        Q.    And then you note, at the end of

21   Footnote 1 of Exhibit 10, two other dates with

22   corrective information that were not reported in

23   the initial report.  12/24/13 and 10/14/2014 have

24   been added as news dates.  Did I read that

25   correctly?

```
 1                      C. Coffman
 2        A.     Yes.
 3        Q.     That's new, you added that; right?
 4        A.     Yes.   That's consistent with what has
 5   been described in previous exhibits, but yes,
 6   that's new to this exhibit.
 7        Q.     And then I think the Footnotes 2 and 3
 8   just contain the same corrected numbers that are
 9   reflected in the chart and reflect your test of
10   statistical significance on them, right?
11        A.     Correct.
12        Q.     Let's look at Exhibit 11 on your event
13   study for the Series D.  Do you have that?
14        A.     Yes.
15        Q.     So again, you made the correction to
16   the heading on the two fixed event studies; right?
17        A.     Yes.
18        Q.     You changed the date and added the time
19   for event 1; right?
20        A.     The same changes that were on Exhibit
21   9, yes.
22        Q.     The same exact changes, so again, for
23   events 1 and 5, you have a new source and it's the
24   same source as what we talked about for Exhibit 9?
25        A.     Right, and for both Exhibit 9 and
```

C. Coffman

 1    Exhibit 11, none of the changes change any of the
 2    numbers from the event study in those exhibits, but
 3    those updates were made, yes.
 4         Q.    Turn to Exhibit 12, please.
 5         A.    Okay.
 6         Q.    Exhibit 12 is your comparison of
 7    statistical significance and abnormal returns for
 8    Miller Energy Series D preferred stock material
 9    announcements versus days with no news during the
10    analysis period; right?
11         A.    Yes.
12         Q.    And this contains ten items of data?
13         A.    Yes.
14         Q.    Your original Exhibit 12 had -- in your
15    original Exhibit 12, four of the ten items of data
16    were incorrect?
17         A.    Yeah, and just to be clear, I mean,
18    there's the ten items of data on the table.
19    There's also the conclusions in the footnotes about
20    the difference between, or the significance levels
21    of the findings, which hasn't changed at all, but
22    within the table itself, there are ten data items,
23    yes, and four of them, as a result of correcting
24    the errors I've identified, did change.

```
 1                        C. Coffman
 2        Q.    The number went from 120 to 118?
 3        A.    The number of no news dates, yes.
 4        Q.    And then the significant days at 95
 5   confidence went from 6 to 4 for no news days;
 6   right?
 7        A.    Yes.
 8        Q.    And the percentage went from 5 to 3.39
 9   percent?
10        A.    Yes.
11        Q.    The average absolute abnormal return
12   went from 2.2 to 2.09 percent; right?
13        A.    Correct.
14        Q.    Please turn to Exhibit 17.
15        A.    Okay.
16        Q.    So it looks like this is summarizing
17   some of your tests for autocorrelation during the
18   analysis period; is that right?
19        A.    Yes.
20        Q.    And it looks like there are data items
21   for 16 quarters here; right?
22        A.    Correct, and the analysis period as a
23   whole.
24        Q.    You've changed at least some of the
25   data for at least five of these items; right?  I
```

1                          C. Coffman

2    mean five of the 16 quarters.

3        A.    I believe the numbers have changed

4    slightly for five of the quarters, yes.

5        Q.    Just explain why did these numbers

6    change?

7        A.    So you will notice that the first two

8    quarters changed.  That's as a result of changing

9    the regression to remove the outlier date from --

10   that's identified in the other exhibits that we've

11   already talked about.  So that, just because of the

12   120-day rolling regression, that only affects the

13   first two quarters of the analysis period, and then

14   there are changes to a number in the middle of the

15   table because the earnings date changed associated

16   with event number 9, so that changed again.

17   Because of that change, it changed which dates were

18   being excluded from the regression.

19       Q.    Just generally, what is this chart

20   intended to show?

21       A.    Well, Exhibit 17 is intended to

22   reflect -- to summarize the test I performed to

23   analyze whether stock price movements on a given

24   day are predictive of stock price movements on the

25   next day.  And you would not expect to find a

```
 1                    C. Coffman
 2  significant relationship there, or at least a
 3  consistent significant relationship there if the
 4  market were efficient.
 5       Q.   So can you explain just what these
 6  numbers -- you have a coefficient on previous days
 7  abnormal return for the analysis period of -.02 and
 8  a t-statistic of -.67.  What does that mean?
 9       A.   So what that means is on average, if
10  there's a 1 percent stock price movement today,
11  that on average, we observed the next day, there's
12  a negative 0.02 percentage stock price movement the
13  following day, and the t-statistic of -.67 suggests
14  that's not statistically significant, meaning
15  that's close enough to zero that it can be
16  explained by randomness alone.
17       Q.   What would the cutoff be for the
18  t-statistic?
19       A.   In a large enough sample, it's 1.96 for
20  95 percent significance.  Because of the size of
21  the sample, it may be slightly higher than that.
22       Q.   So then Exhibit 17-C looks like there
23  are a couple of changes there.  They would be for
24  the same reasons?
25       A.   Yes.  The removal of the outlier
```

```
 1                      C. Coffman
 2  pre-analysis period doesn't affect this one because
 3  the Series C begins trading on the NYSE later, but
 4  it is still affected by the one earnings date being
 5  changed.
 6            MR. BALLARD:  We're about to start a
 7       new topic so I want to take a short break.
 8            THE VIDEO TECHNICIAN:  We're going off
 9       the record.  The time is 11:24 a.m.
10            (Recess taken.)
11            THE VIDEO TECHNICIAN:  This begins
12       Media Unit No. 3.  The time is 11:37 a.m.
13       We're back on the record.
14       Q.    I'm going to hand you what we've marked
15  as Exhibit No. 3.  It's the Second Amended
16  Complaint.  Turn to page 73, paragraph 197.
17  There's a heading that states, "The Truth Begins to
18  Emerge."  Do you see that?
19       A.    Yes.
20       Q.    I'm sure you recall at the first day of
21  your deposition, I asked you some questions about
22  plaintiffs' allegations about disclosures and
23  events when, according to plaintiffs, the truth
24  leaked out over time.  Right?
25       A.    Yes.
```

```
 1                      C. Coffman
 2       Q.    You remember that?
 3       A.    Yes.
 4       Q.    And you recall we looked at some
 5  instances where the plaintiffs allege a disclosure
 6  or an event impacted the price of Miller Energy
 7  securities over a two or three-day period?
 8       A.    Yes.
 9       Q.    So we looked at paragraph 199,
10  paragraph 215.  A couple of these paragraphs we
11  looked at.  Do you remember that?
12       A.    I generally remember that, yes.
13       Q.    And you testified that there could be
14  instances in which an announcement of new news
15  might be absorbed by the market over two days, with
16  at least an initial reaction on the first trading
17  day after the announcement, followed by another
18  reaction on the second trading day after the
19  announcement.  Do you recall that?
20            MS. POSNER:  Objection.
21       A.    I don't know whether I used the word
22  "another decline" or "another change" but that the
23  full impact of the announcement wouldn't be
24  reflected until the end of the second day or
25  something to that effect.
```

1           C. Coffman
2       Q.    And I think you said that you would
3   expect at least an initial reaction on the first
4   day of trading.  Do you recall that?
5       A.    Yes.
6       Q.    We looked at some instances where
7   plaintiffs alleged that there was a disclosure that
8   leaked out the truth where your data showed there
9   was no statistically significant movement on the
10  following day, but there was a statistically
11  significant price movement on the second day after
12  the disclosure.  Do you remember that?
13          MS. POSNER:  Objection.
14      A.    I don't remember which specific events
15  that related to.  I generally remember -- and when
16  you say the following day, you mean the first
17  trading day after which the news -- which the
18  market would reflect the news; correct?
19      Q.    So yeah --
20      A.    I just don't want to get -- when you
21  say the following day, I want to make sure we're
22  not talking about starting from day two.
23      Q.    Let's be clear.  I believe we looked at
24  instances where there was an alleged disclosure
25  where the truth leaked out, and then the first

C. Coffman

market date after that, where there was trading,
there was no statistically significant price
movement, but on the market date plus 1 there was a
movement.

      MS. POSNER:  Objection.

    Q.   Do you remember that?

    A.   Vaguely, yes.  I don't remember which
days we were talking about, but again, there can
also be a difference between any movement and a
significant movement, but yes, I generally recall
that discussion.

    Q.   And you said "That's just not something
I've studied here."  Do you remember?

    A.   In terms of drawing any specific
conclusions about any specific disclosures, that's
correct.

    Q.   Since the first day of your deposition,
have you studied that question?

    A.   No.  I mean, the only additional things
I've studied are reflected in the report.

    Q.   You haven't done any additional work to
evaluate instances where plaintiffs allege that a
disclosure impacted the market over two or three
days?

```
 1                   C. Coffman
 2        A.    I have not done that, no.
 3        Q.    In your opinion, is it possible for an
 4   event to cause a significant price movement on the
 5   day after the event, the first market date, and
 6   then another movement on the next day, market date
 7   plus 1, in an efficient market?
 8             MS. POSNER:  Objection.
 9        A.    As I described in my previous
10   deposition, that's plausible.  And in certain cases
11   I've seen where there's, you know, additional
12   evidence to support that, not just that it always
13   makes sense to look at two-day windows, but where
14   there's evidence of continued reporting or
15   additional analyst reporting or additional
16   analysis, or additional volume, there could be
17   supporting evidence to suggest that looking at more
18   than a one-day window would be appropriate.
19        Q.    So you could have an announcement of
20   news in some form, and then you might see in an
21   efficient market a price movement on the market
22   date followed by another price movement on market
23   date plus 1?
24        A.    Yes.
25        Q.    When I say market date plus 1, you know
```

```
1                    C. Coffman
2   what I mean; right?
3        A.    Yes.
4        Q.    So market date, we're using the
5   definition you used for your Exhibit 7.  Right?
6        A.    Yes.
7        Q.    And market date plus 1 would just be
8   the next day?
9        A.    The next trading day, yes.
10        Q.    I just want to make sure we're using
11   the same terminology.
12        A.    Yes.
13        Q.    So in an efficient market, would it be
14   possible for there to be an announcement of new
15   news followed by a statistically significant price
16   movement at the 90 percent confidence level on the
17   market date, followed by a statistically
18   significant price movement at the 95 percent
19   confidence level on market date plus 1?
20        A.    It's plausible.  I'm not saying it
21   happens frequently, but it's plausible.
22        Q.    In your event study for the common
23   stock as reflected on Exhibit 7, you found that
24   there was a statistically significant price
25   movement at the 95 percent confidence level for
```

```
1                    C. Coffman
2    three of the 17 events you studied; right?
3         A.    Yes.
4         Q.    For the three events for which you
5    found an earnings release was followed by a
6    statistically significant price movement at the 95
7    percent confidence level, what, if anything, did
8    you do to make sure that the price movement you
9    observed was the market date response to the
10   earnings release you were studying rather than a
11   market date plus 1 carryover effect from a news
12   event the day before?
13        A.    Well, I reviewed the news around these
14   earnings announcements, and I don't remember all
15   the details, but I don't recall, on the day prior
16   to any of those dates, there being what I would
17   consider clearly new material news that would be
18   expected to move the market, but without looking
19   back at my backup, I don't know for sure, but I
20   certainly would have looked at that.
21        Q.    It is conceivable in your opinion, in
22   an efficient market, for the three price reactions
23   you observed at the 95 percent confidence level,
24   it's conceivable that those were a reaction to
25   something other than the earnings release; correct?
```

C. Coffman

A.    When you define the earnings release,
are you including everything in the earnings
release and not just the earnings numbers,
themselves?  I just want to make sure I'm --

Q.    Let me be clear.

A.    Yeah.

Q.    I'm saying, take an example, event 5.
You used the date of July 16 and it was after
hours, the earnings release, and so you looked at
the market date of 7/17; right?

A.    Yes.

Q.    And you found a statistically
significant price movement at the 95 percent
confidence level on July 17th; right?

A.    Yes.

Q.    And you've drawn an inference that that
was a cause and effect response to the earnings
release; right?

A.    Yes, that -- well, it is an earnings
date.  There is an earnings release.  It doesn't
exclude the possibility there could be other news
on that day that is also contributing.  But that's
not --

Q.    Well, it's possible that news came out

```
 1                    C. Coffman
 2   the day before July 16th as well; right?
 3        A.    It's plausible.  Like I said, I believe
 4   I looked at that as to whether there was any news
 5   that could plausibly explain that, but it's
 6   theoretically plausible.
 7        Q.    Was July 13, 2012, a news day?
 8        A.    Are you asking me about July 13th?
 9        Q.    Yes.
10        A.    2013?
11        Q.    Correct.  I believe that's a Friday,
12   right?
13        A.    I don't believe that's a trading day at
14   all.
15        Q.    Are you looking at your trade dates
16   chart?
17        A.    I am.
18        Q.    I'm looking at item 768 on Exhibit 45.
19        A.    Isn't that 2012?  You were asking me
20   about 2013, I believe, or maybe I misunderstood.
21        Q.    Event 5 is 2012.
22        A.    Oh, it is 2012.  Okay, that's the
23   mistake I was making.
24        Q.    Let me ask a clean question.  Was
25   Friday, July 13, 2012, a news day?  You know what?
```

C. Coffman

1
2    Let me back up.
3              First was Friday, July 13, 2012 a
4    trading day?
5         A.    Yes.  Sorry.  I was getting confused.
6    I was looking at 2013.  Yes, it is.
7         Q.    July 13, 2012 was a trading day.  Was
8    it a news day?
9         A.    According to my table, yes, it was.
10        Q.    Do you know what news came out that
11   day?
12        A.    Sitting here right now, I don't recall.
13        Q.    You're saying it's a news day because
14   it appears on your Exhibit 47 which lists the days
15   when news articles came out according to the
16   databases you consulted; right?
17        A.    I think you said Exhibit 47.  That's
18   not right.
19        Q.    Exhibit 46, sorry.
20        A.    Correct.
21        Q.    And it would also be a news day if an
22   SEC filing was made on that day; right?
23        A.    Correct.
24        Q.    We will look at that in a minute, but I
25   believe your SEC list in Exhibit 48 does not list

                              C. Coffman

1
2   that date.

3        A.    Correct.

4        Q.    If there, in fact, was an SEC filing on

5   that date, then it would also be a news day for

6   that reason?

7        A.    Yeah.  I don't know that we look at all

8   types of SEC filings.  I think we certainly looked

9   at 10-Ks, 10-Qs, 8-Ks, but there might be some

10  other types of filings related to specific

11  individuals that might not be counted in there, but

12  it's -- if there would have been a 10-K or a 10-Q

13  or an 8-K, yes, we would have treated that as a

14  news day.

15       Q.    Let's pause on that for a moment.  I

16  was under the impression that you included all SEC

17  filings.  Do I now understand you to say that you

18  looked at all the SEC filings, and then you

19  categorized them into as some that might be counted

20  as news days and some that would not?

21       A.    I'm just trying to recall.  I believe

22  there's a filter for types of SEC filings where

23  we're attempting to pick up primary news

24  disclosures by the company, so 10-Ks, 10-Qs, 8-Ks.

25  There may be other types that are included.

```
 1                         C. Coffman

 2              I'm not sure that every single type of

 3    SEC filing is picked up.  That's something I just

 4    have to go back and review.

 5         Q.    And there's nothing in your materials

 6    or backup that I can look to to get the answer to

 7    that question?

 8         A.    I'm not certain about that.  I would

 9    have to look.  Certainly we've shown which dates

10    have SEC filings according to our -- what data

11    analysis we performed.

12         Q.    What was the purpose of counting some

13    SEC filings but not others?

14         A.    Again, I'm just -- I'm not absolutely

15    certain about that.  I just -- I would have to go

16    back and look at exactly what the search criteria

17    was.

18         Q.    Well, I'm certain you missed SEC

19    filings, but I'm wondering why.  So you can't shed

20    any light on that today?

21         A.    I would have to go back and review

22    which filings are being excluded to answer why.

23              (Exhibit 50, printout from SEC Edgar

24         system indicating Exhibit 51 was filed on

25         July 13, 2012, marked for identification.)
```

                        C. Coffman

1
2                   (Exhibit 51, letter dated July 13, 2012
3          from Miller Energy, marked for
4          identification.)
5          Q.    I'm going to hand you what we've marked
6   as Exhibit 50 and Exhibit 51.  So Exhibit 51 is a
7   letter dated July 13, 2012 from Miller Energy; do
8   you see that?
9          A.    I see that.
10         Q.    And it contains, among other things,
11  supplemental oil and gas disclosure information; do
12  you see that?
13         A.    Could you point me to where you see
14  that particular language?
15         Q.    I'm just flipping through the document,
16  looking at lots of words and numbers, and a heading
17  "Supplemental Oil and Gas Disclosures Unaudited."
18                MS. POSNER:  Page 3.
19         Q.    Maybe it will help if I directed your
20  attention --
21         A.    I just want to review the document to
22  make sure I understand what it is.
23         Q.    Take your time.  Just let me know when
24  you're ready.
25         A.    Okay.

```
 1                    C. Coffman
 2        Q.    So you've had a chance to review
 3   Exhibit 51?
 4        A.    Yeah.  I haven't read every word of it
 5   but I generally have a sense of what it is now.
 6        Q.    It's a response from Miller to comments
 7   it received from the SEC; right?
 8        A.    Yes.
 9        Q.    And this letter is dated July 13, 2012.
10   Right?
11        A.    Yes.
12        Q.    And if you look at Exhibit 50, you can
13   see that it was filed on the SEC's Edgar system on
14   July 13, 2012; right?
15        A.    Yes.
16        Q.    So this would make this a news day in
17   your analysis; right?  I recognize you picked it up
18   as a news day because you had a news article on the
19   same date, but I just mean would this SEC filing
20   also make it a news day?
21        A.    I would have to understand -- I mean,
22   on the face of it, it's not clear to me why it
23   wouldn't, but whether this could plausibly impact
24   the stock price is another question because I would
25   have to review whether and how much of this had
```

```
 1                     C. Coffman
 2  been previously disclosed, but arguably you could
 3  treat a day as a news day as a result of this, yes.
 4       Q.    You're aware that plaintiffs have
 5  alleged that there were comment letters from the
 6  SEC that are very significant in this case; right?
 7       A.    That's my recollection, yes.
 8       Q.    And they have alleged that some of
 9  those comment letters were unknown to investors.
10  Are you aware of that?
11       A.    I don't recall that detail.
12       Q.    Even though they were filed with the
13  SEC on their Edgar system?
14            MS. POSNER:  Objection.
15       A.    I don't recall that detail.
16       Q.    Those kinds of comment letters from the
17  SEC and the company's responses certainly would be
18  significant SEC filings that should be counted as
19  news days; right?
20       A.    Plausibly, yes.
21       Q.    So, in any event, going back to Friday,
22  July 13, 2012, that was a news day and you treated
23  it as such in your analysis; right?
24       A.    Yes.
25       Q.    So July 16, 2012, was a Monday.
```

```
 1                      C. Coffman
 2         A.    I believe it was a Tuesday.  Oh, no,
 3  you're right.  The 16th would be a Monday, yes.
 4         Q.    And the 17th would be a Tuesday.
 5         A.    Correct, sorry.
 6         Q.    Was there a statistically significant
 7  movement in the price of Miller Energy's common
 8  stock on Monday, July 16?
 9         A.    Of 2012?  I'm sorry.
10         Q.    Yes, of 2012.
11         A.    Yes.
12         Q.    There was a statistically significant
13  price movement at the 90 percent confidence level
14  on July 16, 2012; right?
15         A.    No, at the 95 percent level.
16         Q.    Let me --
17         A.    Oh, I'm sorry.  Okay, I understand
18  where the confusion is now.  I thought you were
19  asking about the market date of the 17th which we
20  started this conversation with.  Now I understand.
21         Q.    Let's clear it up.
22         A.    I understand the confusion.
23         Q.    I'll ask a couple of questions and we
24  will clear it up.  So starting with July 17, the
25  market date you looked at, there was a
```

```
 1                    C. Coffman
 2   statistically significant price movement at the 95
 3   percent confidence level on July 17?
 4        A.   Yes.
 5        Q.   Was there a statistically significant
 6   movement in the price on July 16, 2012?
 7        A.   At the 90 percent level, yes.
 8        Q.   So you observed a statistically
 9   significant price movement at the 90 percent level
10   on July 16, 2012, followed by a statistically
11   significant price movement at the 95 percent level
12   on July 17, 2012; right?
13        A.   Yes.
14        Q.   Is it possible that the news item or
15   items on July 13, 2012, could have caused the
16   statistically significant price movements on July
17   16 and July 17, 2012?
18        A.   The 16th, yes, for sure.  The 17th, I
19   can't absolutely rule it out.  It's plausible that
20   it contributed.  It wouldn't -- it would be
21   unlikely it was the only thing, given that there
22   was other material news revealed, but it's
23   plausible that it contributed.
24        Q.   If that event drops out of your
25   analysis, you would be down to 2 of 17 earnings
```

                              C. Coffman
1
2    releases that resulted in statistically significant
3    price movements?
4         A.    I don't know why you would do that, but
5    if you just simply removed it, I guess that's true.
6         Q.    Well, if you removed it because
7    something else caused the price movement or because
8    you can't rule out the possibility that something
9    else caused the price movement, it would result in
10   you concluding that 2 of 17 price movements can be
11   attributed to earnings releases; correct?
12        A.    Well, again, I mean, at the end of the
13   day, it would still be showing that the stock price
14   was moving significantly to firm-specific news.  So
15   I don't know why one would focus -- why it has to
16   be just due to the earnings release, but
17   mathematically, if you removed it, it would be 2
18   out of 17.
19        Q.    And 2 out of 17 would not be
20   statistically significant versus no news days;
21   correct?
22        A.    Well, again, if you're removing it
23   entirely --
24        Q.    To be clear, I'm not saying remove the
25   event.  I'm saying if you were unable to include

                            C. Coffman
that as an event for which there was a
statistically significant price reaction that you
can attribute to the earnings release.

          A.    That's what I'm confused about because
I don't know that, number one, it matters, or
number two, that even if you thought that was the
right thing to do, it would be to just remove it
from the numerator and not the denominator, but I
don't think either one is the right thing to do.

          Q.    Is it possible that all three of the
statistically significant price movements you
observed on the market date after earnings releases
could have been market-date-plus-1 reactions to
something that happened the day before the event
date?

          A.    Not if there was no news on all three
of those days.

          Q.    You're assuming the market was
efficient, though, right, for that answer?

          A.    No, because the predicate of your
question is, is it possible that news from the day
earlier affected a day later, and I'm saying if
there was no news on the day earlier, it wouldn't
make sense to believe that.

C. Coffman

2    Q.    So earlier you said you had looked at

3  news around the event dates in question to see if

4  there's something else that might have caused the

5  price movements; right?

6    A.    Yes.

7    Q.    In doing that work, did you look at and

8  consider Exhibit 51?

9    A.    I don't recall specifically having seen

10  Exhibit 51.

11    Q.    So in concluding that there was no

12  other cause of the price movement that you

13  attributed to event number 5, you didn't consider

14  whether Exhibit 51 might have actually caused that

15  movement; is that right?

16    A.    I don't remember specifically

17  considering that.

18          MR. BALLARD:  We're going to take a

19      short break.  They're going to be bringing in

20      lunch shortly if they haven't already done

21      that.

22          THE VIDEO TECHNICIAN:  We're going off

23      the record.  The time is 12:08 p.m.

24          (Luncheon recess:  12:08 p.m.)

25

```
 1                    C. Coffman
 2          A F T E R N O O N   S E S S I O N
 3                    1:06 p.m.
 4   C H A D   C O F F M A N, resumed the stand and
 5          testified further as follows:
 6                  THE VIDEO TECHNICIAN:  The time is 1:06
 7          p.m.  We're back on the record.  BY MR.
 8          BALLARD:
 9          Q.    Can you turn to Exhibit 7 to your
10   corrected report.
11          A.    Before we do that, can I go back to
12   some of the questions you asked me before about SEC
13   filings and which ones we downloaded and the timing
14   of this particular SEC announcement?
15          Q.    Sure.
16          A.    After checking with my staff, I
17   confirmed we actually don't exclude any specific
18   types of SEC filings.  The particular filing that
19   you showed me is something that was considered and
20   is on the list of SEC filings.
21                  It's actually reflected, if you look at
22   Exhibit 48, as having become public on August 17th,
23   2012, so it's one of the items on the SEC list
24   that's one of the items 32 through 40 that I
25   understand were made public on August 17th.
```

1                          C. Coffman

2              In fact, if you go -- you had showed me

3    Exhibit 50, which is the exhibit that shows the

4    filing date and the accepted date.  The accepted

5    date, my understanding is, reflects when the SEC

6    accepted it, but that's not reflective of when it

7    was necessarily made public and given to the Edgar

8    system.

9              If you click on the complete submission

10   file which is the -- there's a sequence number 1

11   and 2, and then there's a complete submission file

12   which is a text file there.  At the top of that

13   text file, it reflects what I understand to be the

14   date it was received by Edgar, which is the site

15   that makes these filings public, and the date

16   reflected there is August 17th.

17             I also, when downloading the SEC site

18   list, I download that through Investext and that

19   also shows what is -- reflects a quote-unquote

20   receipt date, which the documentation suggests is

21   when Edgar received the file as August 17th, 2012

22   as well.  So I don't believe sort of the predicate

23   to all your questions before about this document as

24   being made public on July 13th, 2012, are correct.

25        Q.    So looking at Exhibit 50, your

C. Coffman

understanding is that that filing date is not the
date that it became public?

        A.    That's my understanding, correct.  That
was the date that the issuer filed it with the SEC
and it was accepted by the SEC, but that's not
necessarily the date it became public.

        Q.    How do you know for sure when it became
public?

        A.    My understanding is the best way -- I
mean, there's multiple ways that I've looked at
that, but if you click on the complete submission
text file, there's a date reflected at the top of
that document that my understanding is that's when
it was received by Edgar, which is the service that
makes these documents public.

        Q.    Where did you get that understanding?

        A.    By pulling up this document and
clicking through to this complete submission file
and then also talking with my staff to understand
how we had put this document on August 17th.

        Q.    So when your staff compiled the SEC
filing data, they didn't go and click through all
these complete submission text files; did they?

        A.    No.  Through the Investext service, you

```
 1                    C. Coffman
 2   can create a spreadsheet or a list that reflects
 3   not just the filing date and the accepted date, but
 4   also the receipt date by Edgar.  At least that's
 5   how we're interpreting it and that's what we
 6   believe it to be.  And that shows August 17, and as
 7   a check, while I was on a break, I went to this
 8   particular filing and clicked through to the
 9   complete submission text file and it also showed
10   that date.
11        Q.    Thank you.  Let's turn to your Exhibit
12   7 to your corrected report.  So in conducting your
13   event study for the common stock, you checked to
14   see if there was a statistically significant price
15   movement on the first trading day after each
16   earnings release, which you called the market date.
17   Right?
18        A.    Yes.
19        Q.    And you were attempting to study
20   whether the market reacted rapidly to earnings
21   releases; correct?
22        A.    That's the methodology, yes.
23        Q.    You didn't check to see if there was a
24   price movement on market date plus 1; right?
25        A.    No.
```

```
 1                    C. Coffman
 2        Q.    And you didn't check to see if there
 3   was a price movement on market date plus 2; right?
 4        A.    That was not part of the test, no.
 5        Q.    So you were basically checking to see
 6   if there was a rapid reaction to earnings releases,
 7   not whether there was a slow reaction to earnings
 8   releases?
 9             MS. POSNER:  Objection.
10        Q.    Is that fair?
11        A.    Yes.
12        Q.    To put it in scientific terms, if you
13   were going to say you had a hypothesis, you could
14   say your hypothesis was that the market for Miller
15   Energy's common stock is efficient and you're
16   testing for that; right?
17        A.    No.  The hypothesis is that there's no
18   difference -- so the null hypothesis that I'm
19   attempting to reject is that there's no difference
20   between earnings announcement dates and no news
21   dates.  And then I run a test which shows I can
22   reject that null hypothesis, and from that, I
23   conclude that there is evidence of a cause and
24   effect relationship between news on earnings
25   announcement dates and movements in the security.
```

1                    C. Coffman

2        Q.    You're saying if there is an efficient

3   market, you would expect a cause and effect

4   relationship between earnings releases and price

5   movements; correct?

6              MS. POSNER:  Objection.

7        A.    Can I have that read back, please.

8              (Record read.)

9        A.    Not necessarily in every single

10  circumstances.  Again, what Cammer 5 is calling for

11  is evidence of a cause and effect between

12  company-specific news and the movements in the

13  prices.

14             I've designed a test where the null

15  hypothesis is that there's actually no difference

16  between the no news dates and the particular dates

17  I'm identifying as having news or this type of

18  news.  One could imagine a scenario where even

19  though the market is perfectly efficient, that

20  there's not sufficient surprising information on

21  earnings dates that it would just be a circumstance

22  of the facts that you actually didn't observe any

23  statistically significant stock price movements on

24  the earnings dates.

25             So I don't think what you said is quite

                        C. Coffman

1    right.  You don't always expect there to be price

2    movements on earnings dates in an efficient market

3    every time, but if you do observe it, that

4    certainly allows you to reject the null hypothesis.

5         Q.    So you are essentially checking to see

6    if there's a rapid reaction to earnings releases?

7         A.    Relative to the no news days, correct.

8         Q.    And you found that 3 of the 17 earnings

9    releases had statistically significant reactions

10   upon the market date?

11             MS. POSNER:  Objection.

12        A.    At the 95 percent level.  There's more

13   at the 90 percent, but at the 95 percent level,

14   yes, 3 out of 17.

15        Q.    For event 9, was there a statistically

16   significant price movement at the 95 percent

17   confidence level on market date plus 1?

18        A.    I believe there was, yes.

19        Q.    For event 13, was there a statistically

20   significant price movement at the 95 percent

21   confidence level on market date plus 1?

22        A.    Yes.

23        Q.    For event number 17, was there a

24   statistically significant price movement at the 95

```
 1                    C. Coffman
 2  percent confidence level on market date plus 1?
 3            MS. POSNER:  Was that number 17?
 4            MR. BALLARD:  Yes.
 5       A.    Yes.
 6       Q.    There were at least three instances out
 7  of 17 in which the price of Miller Energy's common
 8  stock moved in a statistically significant way at
 9  the 95 percent confidence level on market date plus
10  1, with a second day after the earnings release;
11  correct?
12       A.    Yes.
13       Q.    Three out of 17 would be 17.65 percent?
14       A.    Yes, but I think you're assuming in
15  your question somehow that there's no additional
16  news that might explain that and, in fact, I think
17  the company had a practice from time to time of
18  holding earnings calls a day after their
19  announcements so their earnings calls may have also
20  been contributing to that, but what you state is
21  correct.
22       Q.    In fairness, in your analysis, you were
23  assuming for each of the market dates there was no
24  other confounding news item that came out on those
25  dates as well; correct?
```

1                    C. Coffman

2               MS. POSNER:  Objection.

3        A.    I wasn't assuming that.  I'm assuming

4   that whatever the -- that the stock price was

5   reacting to whatever the total mix of news was on

6   those dates.

7        Q.    In each instance, you looked at an

8   entire trading day and looked at the market price

9   at the end of that day; right?

10       A.    That's correct, yes.

11       Q.    So other news could have come out that

12  could have been the cause of the price movements

13  you observed rather than the earnings release;

14  right?

15       A.    Other news plausibly could have

16  contributed.  Again, to the extent that's

17  occurring, that's just adding further evidence that

18  that day was showing a cause and effect

19  relationship, but yes, it's possible things other

20  than the earnings news were contributing.

21       Q.    So your data shows that 3 out of 17

22  earnings releases were followed by statistically

23  significant price movements on the market date, but

24  also shows that 3 out of 17 earnings releases were

25  followed by statistically significant price

C. Coffman

1 
2 movements on the market date plus 1; right?

3     A.    At least.  I don't know that I've
4 looked at all of them.  You've shown me three.  I
5 don't know if there's more.

6     Q.    Earnings releases were just as likely
7 to be followed by a statistically significant price
8 movement on the second day of trading as they were
9 the first; right?

10          MS. POSNER:  Objection.

11     A.    Again, I think your question is
12 ignoring the possibility that there's additional
13 news being released around those times, but as a
14 factual matter, it's showing that, yes.

15     Q.    The price of Miller Energy's common
16 stock was as likely to take an extra day to react
17 as it was to react on the first market date;
18 correct?

19          MS. POSNER:  Objection.

20     A.    No.

21     Q.    What is your basis for saying that, if
22 any?

23     A.    That there's -- I'm not aware of
24 evidence suggesting that on those days, it was
25 taking an extra day for it to react.  It may have

```
1                      C. Coffman
2   been reacting to other information, so I just
3   haven't drawn that conclusion.
4        Q.   So it's possible that those three
5   occasions where there was a market reaction two
6   days after the announcement were, in fact,
7   reactions to those earnings releases; correct?
8             MS. POSNER:  Objection.
9        A.   I guess I haven't done anything to
10  completely rule that out, but I'm certainly not
11  drawing that conclusion.
12       Q.   If that's true, that would be strong
13  evidence of an inefficient market; correct?
14       A.   I don't necessarily believe so, no.
15       Q.   You were testing for whether the market
16  was efficient.  You were not testing for whether it
17  was inefficient; correct?
18       A.   Again, I think I've laid out exactly
19  what my test is.  I'm testing a null hypothesis
20  that the earnings announcements had no effect and
21  I'm able to reject that scientifically.
22       Q.   If you can test for whether the market
23  reacted rapidly, can't you test for whether it
24  reacted slowly?
25       A.   Well, if it was consistently reacting
```

1                    C. Coffman

2  slowly in some systematic way, I would have

3  expected to see some evidence of that in the

4  autocorrelation test, but I don't see that.  I mean

5  what you're saying is technically plausible, I

6  guess, but I don't believe there's actually any

7  evidence to support that, certainly not in my

8  report.

9         Q.    For event number 12, was there a

10 statistically significant price movement at the 95

11 percent confidence level on market date plus 2?

12        A.    So it would be March 17th, the Monday.

13 Yes, there was a significant return.  And just to

14 be clear, throughout this questioning, we're

15 talking about the common stock.

16        Q.    Yes, for the common stock.

17              For event number 17, was there a

18 statistically significant price movement in the

19 common stock at the 95 percent confidence level on

20 market date plus 2?

21        A.    So that would be July 31st.  The answer

22 is yes.  I happen to know that's the day they were

23 delisted from the exchange so there certainly was

24 other news that helps explain that.

25        Q.    Of the 17 events at issue, in at least

C. Coffman

1

2  five instances, the price of the common stock moved

3  in a statistically significant way at the 95

4  percent confidence level on the second or third day

5  after the event in question; correct?

6          A.    You're factually correct that it moves.

7  Attributing that to the earnings announcement or

8  somehow inferring from that that the price moved

9  slowly, I don't think would be the conclusion you

10 could draw from that.

11         Q.    You've devised a test that will allow

12 you to conclude that there was a cause and effect

13 relationship, but your test does not allow you to

14 ever conclude that there was a slow reaction to the

15 earnings releases; correct?

16         A.    Well, the test -- again, I think it's

17 important to look at a couple of different things.

18 I've devised a test that allows me to test the null

19 hypothesis that earnings announcement dates don't

20 look any different than the no news dates, and

21 rejected that null.

22              I've not performed a specific test of

23 whether there are delayed reactions beyond day 2 --

24 I'm sorry, beyond day 1, but I do have a test of

25 autocorrelation that suggests there's no consistent

```
1                        C. Coffman
2   ability to predict the stock price movement on day
3   T+1 from day T, so I think there is evidence in my
4   report that suggests that the market -- that it did
5   generally react rapidly.
6        Q.    Can you explain, if the market was
7   efficient, why the stock price was much more likely
8   to move on the second or third day after an
9   earnings release than it was on the day after an
10  earnings release?
11            MS. POSNER:  Objection.
12       A.    Yeah, because it may not have been the
13  earnings release that was moving the stock up on
14  those days.
15       Q.    You're saying there might have been
16  some other news out there that could have caused
17  the price movement on market date plus 1 and plus
18  2?
19       A.    Yes.  In fact, I just gave you an
20  answer to that.  On July 31st, I know for a fact
21  there was other news that caused the stock price to
22  decline with an abnormal return over 50 percent, so
23  I know there was other news on that day.
24       Q.    That criticism is applicable to your
25  entire approach, because you didn't check to see
```

```
 1                      C. Coffman
 2  whether there was conflicting or additional
 3  information on any of the market dates; correct?
 4            MS. POSNER:  Objection.
 5      A.    No, because now I'm looking within a
 6  day and that's my methodology.  You're now saying
 7  that you could somehow draw some conclusion about
 8  how slowly the market is reacting just by observing
 9  the rate at which there were significant results
10  over the two and three-day windows without
11  considering whether there was other news that was
12  interfering.
13      Q.    So you're assuming there must have been
14  new information on market date 1 or market date 2,
15  but you're assuming there wasn't any new
16  information on the market date beyond the earnings
17  release?
18            MS. POSNER:  Objection.
19      A.    No, I'm not assuming any of those
20  things.
21      Q.    Is it your opinion that the markets for
22  Miller Energy securities were efficient through the
23  entirety of the proposed class period?
24      A.    So I guess the reason I'm hesitating
25  there is I know originally there was a proposed
```

C. Coffman

class period that extended beyond July 31st of

2015, and so I just want to be clear about what

time period you're asking me about.

Q.   So just to be clear, when I refer to

the proposed class period, I'm referring to the

proposed class period contained in the motion to

certify classes, not what is in the complaint.

A.   Okay.  I don't know that I've actually

ever reviewed that document, so if you're asking

for the analysis period, which is what I was asked

to give an opinion on, the answer is yes.

Q.   If the market for Miller Energy

securities was efficient throughout the analysis

period, then publicly disclosed information

contained in SEC filings related to Miller Energy

should have been rapidly incorporated into the

price of Miller Energy's securities; right?

MS. POSNER:  Can you read that back.

(Record read.)

MS. POSNER:  Objection to form.

A.   Yes.

Q.   On your Exhibit 7, for example, looking

at event number 5 for the year-end results reported

in the company's Form 10-K, your opinion is that

```
 1                    C. Coffman
 2  the market for Miller Energy securities was
 3  efficient and that the information made public
 4  through that filing was rapidly incorporated into
 5  the price of the company's securities?
 6       A.    Yes.
 7             MS. POSNER:  Objection to form.
 8       A.    Yes.
 9       Q.    And is it your opinion that for each of
10  the 10-Ks and 10-Qs, the information that was
11  publicly disclosed would have been rapidly
12  incorporated into the price of the company's
13  securities because the market was efficient?
14       A.    Yes.
15       Q.    Does that apply to the exhibits to the
16  Form 10-K as well?
17       A.    Generally speaking, yes.  I guess there
18  could be a circumstance in which -- and I think I
19  may have testified about this at our first session,
20  that if there was some important value-relevant
21  detail buried deep in a filing and it wasn't
22  noticed until -- and then it was reported on
23  shortly after that by analysts and things like
24  that, you could imagine there being some short
25  delay, but generally speaking, I would think that
```

```
1                    C. Coffman
2  anything that's attached to the 10-K filing would
3  be reflected rapidly.
4        Q.    I'm going to hand you Exhibit 28.
5        A.    Just to be clear, as long as those
6  exhibits were public at the time, as part of the
7  public filing.
8        Q.    In Exhibit 28, can you turn to page F30
9  toward the end.  There's a heading, "Supplemental
10 Oil and Gas Disclosures Unaudited."  Do you see
11 that?
12       A.    I see that heading, yes.
13       Q.    Following that heading, there's some
14 texts and charts and data.
15       A.    Yes.
16       Q.    If the markets were efficient, this
17 information would have been incorporated in Miller
18 Energy's securities prices rapidly?
19       A.    Sitting here right now, I have no
20 reason to believe that to be untrue.  I agree, I
21 would expect that.
22       Q.    If you look at page F35 -- actually,
23 F34, sorry.
24       A.    Okay.
25       Q.    On F34, the last paragraph starts, "The
```

```
 1                      C. Coffman
 2   following schedule."  Do you see that?
 3        A.    Yes.
 4        Q.    And there's a sentence that says, "All
 5   estimates were prepared by third-party reserve and
 6   engineering firms."
 7              Do you see that?
 8        A.    I see that.
 9        Q.    And then if you look on the next page,
10   there's a paragraph, "Each of the engineering
11   reports also projected..."  Do you see that?
12        A.    I see the paragraph that starts that,
13   yes.
14        Q.    There's a reference to their
15   calculation of present value discounted at 10
16   percent per annum.  Do you see that?
17        A.    Let me review it.  I see that.
18        Q.    Are you familiar with the engineering
19   firms that are referred to here?
20        A.    Not specifically, no.
21              MR. BALLARD:  I need to go off the
22         record.
23              THE VIDEO TECHNICIAN:  We're going off
24         the record.  The time is 1:33 p.m.
25              (Recess taken.)
```

C. Coffman

1
2          THE VIDEO TECHNICIAN:  The time is 1:58
3      p.m.  We're back on the record.
4          MR. BALLARD:  Mr. Coffman, we've handed
5      you Exhibit 52.
6          (Exhibit 52, Edgar detail related to
7      the Form 10-K for the year 2012 for Miller
8      Energy, marked for identification.)
9          MR. BALLARD:  I'm going to hand you two
10     more exhibits.  Number 53.
11         (Exhibit 53, May 29, 2012 reserve
12     report, marked for identification.)
13         MR. BALLARD:  And 54.
14         (Exhibit 54, reserve report, marked for
15     identification.)
16     Q.    Do you recognize Exhibit 52 as the
17 Edgar detail related to the Form 10-K for the year
18 2012 for Miller Energy?
19     A.    Yes.
20     Q.    And you see that there were a number of
21 exhibits that were filed along with the annual
22 report on Form 10-K?
23     A.    That appears to be the case, yes.
24     Q.    Among those exhibits were a number of
25 reserve reports; do you see that?

C. Coffman

1

2     A.    It appears to be, yes.

3     Q.    And can you take a look at Exhibits 53

4  and 54.  Do you see that those are two of those

5  reserve reports?

6     A.    That's what it appears to be, yes.

7     Q.    So looking at Exhibit 53, what is the

8  date of the letter that you have in front of you

9  there?

10     A.    The date of the letter appears to be

11  May 29, 2012.

12     Q.    This is a letter signed by a Lloyd

13  Branum of Ralph E. Davis Associates, Inc.

14     A.    I'm sorry, you said Lloyd?  I see LB.

15  Do you see Lloyd somewhere?

16          MS. POSNER:  Page 7 of 17.

17     A.    Yes, I see that.

18     Q.    And he's identified as a licensed

19  professional engineer, do you see that, in

20  paragraph 2?

21     A.    I see that's the representation, yes.

22     Q.    Turning to the front of this document,

23  Exhibit 53, do you see that he has indicated that

24  Miller has asked his firm, Ralph E. Davis, to

25  prepare a statement of oil and gas reserves in

```
 1                        C. Coffman
 2  Alaska?
 3        A.    I see it says, "On specific leaseholds
 4  in which Cook Inlet Energy has interest for CIE and
 5  Miller."  I don't know if that's referenced to all
 6  the Alaska Assets, but I see he's prepared an
 7  estimate of the reserves for whatever he's looking
 8  at.
 9        Q.    And in this instance, he's prepared an
10  estimate of the proved, probable and possible
11  reserves; do you see that in the third line?
12        A.    I see the words "probable" and
13  "possible" there, yes.
14        Q.    And "proved" as well; right?
15        A.    Yes.
16        Q.    If the markets were efficient, the
17  markets would have absorbed this information and
18  incorporated it into the price of Miller Energy
19  securities; isn't that true?
20        A.    Generally speaking, yes, to the extent
21  there's -- someone could read between the lines
22  here and some analyst or other person could put
23  this in more context and provide additional
24  information.  That's theoretically possible, but
25  certainly given that it was public and filed with a
```

C. Coffman

10-K, it was available to the market and would be
priced in, yes.

Q.    If you look at page 2 of Exhibit 53, in
the second paragraph, do you see that Ralph E.
Davis has estimated the future net income and
discounted present value associated with the
reserves as of April 30, 2011?

A.    I see that, yes.

Q.    And do you see that at the end of that
paragraph, he's indicated that "The present value
is presented for your information and should not be
construed as an estimate of the fair market value"?
Do you see that?

A.    I see that, yes.

Q.    That was also made public as well and
should have been incorporated into the market price
of Miller Energy securities if the market was
efficient; right?

A.    Yes.

Q.    Do you see that in this instance, Ralph
E. Davis estimated that the company had, for the
proved reserves, estimated future net income in
excess of $452 million?

A.    Can you point me again to where you're

```
 1                          C. Coffman
 2   seeing that?
 3        Q.    If you look at the first chart on page
 4   2 there's a heading, "Proved."
 5        A.    I see that.  I didn't see the proved
 6   heading.  Yes, I see that.
 7        Q.    Under "Income Data" there's a capital M
 8   and a dollar sign.  Do you see that?
 9        A.    I see that.
10        Q.    So that would indicate these numbers
11   are in thousands?
12        A.    That's generally the notation for that,
13   yes.
14        Q.    And if you look down at future net
15   income, FNI, do you see that line?
16        A.    Yes.
17        Q.    So Ralph E. Davis was estimating over
18   $452 million of future net income for the proved
19   reserves as of April 30, 2011; right?
20        A.    That's what it seems to indicate.  I
21   mean, that's not a present value, but that's the
22   future net income according to them, yes.
23        Q.    And using a discount rate of 10
24   percent, this firm calculated the present value of
25   that as in excess of $301 million; right?
```

C. Coffman

2     A.    That's what it seems to indicate
3  they're calculating.

4     Q.    If you turn to the next page, do you
5  see there's a heading for, "Probable"?

6     A.    Yes.

7     Q.    And Ralph E. Davis was estimating at
8  this time that Miller Energy would have in excess
9  of $412 million of future net income on its
10  probable reserves?  Do you see that?

11     A.    That seems to be what this is
12  indicating, yes.

13     Q.    And their present value of that, at a
14  10 percent discount rate, was in excess of $232
15  million; is that right?

16     A.    That's what this seems to indicate
17  their view was, this particular engineer's view was
18  or this firm's view was.

19     Q.    Do you see the next heading for,
20  "Possible"?

21     A.    Yes.

22     Q.    It looks as though Ralph E. Davis' firm
23  was estimating that there would be future net
24  income in excess of $1.1 billion on the possible
25  reserves according to this; right?

```
 1                       C. Coffman
 2        A.     That's what it seems to indicate.
 3        Q.     Their present value for that was in
 4   excess of $663 million using a 10 percent discount
 5   rate?
 6        A.     That's what it seems to indicate.
 7        Q.     If you turn to page 5, at the top in
 8   the first line, do you see that this firm was using
 9   an average crude oil price of $85.55 per barrel?
10        A.     I see that statement.
11        Q.     So if the markets were efficient, the
12   price of Miller Energy's common stock would have
13   rapidly absorbed all this information; right?
14        A.     Yes.
15        Q.     If you turn to Exhibit 54 --
16             MS. POSNER:  Before you go on, are you
17        going to tie this to the corrections in his
18        report?  Because you don't just get another
19        seven hours.
20             MR. BALLARD:  I'm not going to comment.
21        You can give a direction if you want to.
22             MS. POSNER:  I'm going to tell him to
23        stop answering questions unless you can tell
24        me you're relating this in some way to his
25        corrected report and the corrections to it.
```

1                    C. Coffman

2          MR. BALLARD:  You can give whatever

3     instructions you want to give.

4          MS. POSNER:  You're not going to tell

5     me one way or the other?

6          MR. BALLARD:  I'm going to ask

7     questions today.  I'm not going to explain.

8          MS. POSNER:  If you have no further

9     questions on his corrections to his report,

10    we can stop the deposition.

11         MR. BALLARD:  No, I'm not stopping the

12    deposition.

13         MS. POSNER:  We can leave.  That's

14    fine.

15         MR. BALLARD:  If you leave, the

16    consequences will be on you.  I have

17    questions to ask and I'm going to continue

18    asking.

19         MS. POSNER:  We can call the Court.

20         MR. BALLARD:  Do you have a direction

21    to your witness?

22         MS. POSNER:  I'm going to stop the

23    deposition.  I don't need to instruct him.

24    We can leave.  I'm trying to get some clarity

25    from you if you're asking questions about the

1                      C. Coffman

2       corrected report.  You know that you're

3       limited to seven hours for the deposition.

4       We agreed to take him back to answer

5       questions with regard to his corrected

6       report.

7            You're now well beyond that with regard

8       to your questions, so I'm asking you if

9       you're going to get to questions pertaining

10      to his corrected report.  If so, I'm happy to

11      let you continue.

12           MR. BALLARD:  My position is all of my

13      questions relate to his corrected report.  If

14      you disagree, you can disagree.  If you want

15      to give him an instruction, give him an

16      instruction, but otherwise, I have a question

17      I'd like to ask this witness.

18           MS. POSNER:  That is not being

19      responsive.  You're taking the position that

20      anything about efficiency relates to the

21      corrections to his report?  Is that your

22      position?

23           MR. BALLARD:  I didn't say that.

24           MS. POSNER:  I'm asking you for clarity

25      so we have a record here.

1           C. Coffman

2           MR. BALLARD:  I think we've made a

3      record.  I have a question pending.  I'd like

4      an answer.

5           MS. POSNER:  No.  I'd like some clarity

6      from you about what you think the scope that

7      you can cover today is.  If you think it goes

8      beyond the corrections to his report, please

9      put that on the record so that I know your

10     position and we can decide how we want to

11     proceed here.

12          MR. BALLARD:  The deposition today is

13     on his corrected report and that's what I'm

14     asking questions about.

15          MS. POSNER:  You've just asked

16     questions that have nothing to do with his

17     corrected report.

18          MR. BALLARD:  We agree to disagree on

19     that.

20          MS. POSNER:  What do you think you just

21     asked questions about that went to the

22     corrections in his report?

23          MR. BALLARD:  I'm not going to argue

24     anymore with you.  You can answer the

25     question, or if your counsel wants to

```
 1              C. Coffman
 2   instruct you, she can instruct you.
 3        Can we have the question read back.
 4        MS. POSNER:  If you're not going to be
 5   able to provide any further information
 6   regarding whether you have any further
 7   questions about the corrections to his
 8   report, then we can just stop.  That's all
 9   I'm asking you.
10        MR. BALLARD:  I'm asking questions.  I
11   have one pending.  I want an answer.  Please
12   answer.
13        MS. POSNER:  You can answer the pending
14   question if you want and we can leave after
15   that.
16        THE WITNESS:  I don't recall the
17   pending question.
18        (Record read.)
19        MS. POSNER:  If you have no further
20   questions about the corrections to his
21   report, I'm going to do my redirect and we're
22   going to be done with the deposition.  If you
23   have further questions about the corrections
24   to his report, I'm happy to let you ask them.
25   Q.    Turning to Exhibit 54, would all of the
```

                        C. Coffman

 1  information in it have been rapidly incorporated

 2  into the price of Miller Energy's securities if the

 3  market was efficient?

 4       A.    To the extent it was attached to the

 5  10-K as it seems to be indicated here, I would say

 6  yes.

 7       Q.    You can set that aside.  I want to

 8  direct your attention to the Second Amended

 9  Complaint again.  It's Exhibit No. 3.

10       A.    Okay.

11       Q.    I'll direct your attention to paragraph

12  225.

13       A.    Okay.

14       Q.    In this paragraph, plaintiffs allege

15  "On May 12, 2015, the company disclosed that the

16  New York Stock Exchange had notified it that its

17  shares were subject to de-listing due to its having

18  failed to maintain listing requirements.

19            Do you see that?

20       A.    I do.

21       Q.    Are you aware of how this information

22  became public on May 12, 2015?

23       A.    I don't have a specific recollection as

24  I sit here.  Give me just a moment.

```
 1                    C. Coffman
 2            I don't.
 3       Q.    Would it surprise you if you heard that
 4  a Form 8-K witness disclosure was filed on the
 5  morning of May 12, 2015?
 6       A.    I don't know that it would surprise me.
 7  Like I said, as I sit here, I'm generally not aware
 8  of that, of the specifics of how that became
 9  public.
10            (Exhibit 55, Form 8-K dated May 12,
11       2015, marked for identification.)
12       Q.    I've handed you Exhibit No. 55.
13  Exhibit 55 is a Form 8-K dated May 12, 2015; right?
14            MS. POSNER:  What date did you say?
15       It's May 6, 2015, as of the cover of this
16       document.
17       Q.    If you look at the last page of the
18  document, do you see that there's a signature from
19  Carl Isler, Jr.?
20       A.    I see that.
21       Q.    And it's dated May 12, 2015, at least
22  on the signature page; right?
23       A.    I see that.
24       Q.    And then on the front, there's a date
25  of report, date of earliest event reported, of May
```

```
1                    C. Coffman
2   6, 2015; do you see that?
3        A.    Where specifically are you pointing me
4   to there?  Oh, at the top, on the cover sheet?
5   Okay, I see that.
6        Q.    Is it your understanding that this
7   document was filed on May 12, 2015?
8        A.    That's what it appears to suggest.
9        Q.    In this document, Miller Energy has
10  indicated that on May 6, 2015, the company received
11  a notice from the New York Stock Exchange that it
12  was not in compliance with listing standards; do
13  you see that?
14       A.    Yes.
15       Q.    And Miller Energy disclosed that such
16  non-compliance was based on the company's failure
17  to maintain an average market capitalization and
18  shareholder's equity greater than $50 million over
19  a 30 trading day period.  Do you see that?
20       A.    Yes.
21       Q.    It also indicated that the company had
22  45 days to submit a plan to regain compliance or be
23  delisted; right?
24       A.    Yeah.  I mean it had 18 months to
25  regain compliance, but it had to submit a plan
```

```
 1                      C. Coffman
 2   within 45 days.  That's my understanding of how to
 3   read this.
 4       Q.    So basically Miller Energy got the
 5   notice from the New York Stock Exchange on May 6th
 6   and they filed or publicly disclosed it by May 12,
 7   2015.  Is that how you understand it?
 8       A.    Yeah.  I would want to review to see if
 9   there's any other indication that it was disclosed
10   earlier, but that's what this document appears to
11   be suggesting, yes.
12       Q.    And it's what the complaint alleges in
13   paragraph 225?
14       A.    That's what it appears to allege, yes.
15       Q.    So looking at Exhibit 44, which is the
16   regression analysis for the common stock for your
17   corrected report, can you tell us if there was a
18   statistically significant price reaction on May 12
19   or May 13 or May 14 of 2015?
20       A.    There was not.
21       Q.    If you would look at the Second Amended
22   Complaint at paragraph 227, there's an allegation
23   that "On July 30, 2015, after market close, Miller
24   Energy disclosed that its common and preferred
25   stock would be de-listed from the New York Stock
```

```
 1                    C. Coffman
 2   Exchange," and then there's an allegation that this
 3   leaked out the truth, and the stock price fell.
 4            Do you see that?
 5       A.   Yes.
 6       Q.   And your regression analysis for the
 7   common stock showed that the price in fact declined
 8   in a statistically significant way on July 30,
 9   2015; is that right?
10       A.   It does, although paragraph 227 seems
11   to indicate that the news was after the market
12   close, which means the market date would have been
13   July 31st.
14       Q.   And your regression analysis shows a
15   statistically significant decline on that date as
16   well; right?
17       A.   Yes.
18       Q.   If the market was efficient, given that
19   the risk of delisting was disclosed on May 12,
20   shouldn't there have been a price reaction after
21   the May 12 disclosure?
22       A.   No, not necessarily.
23       Q.   If the market was efficient, given that
24   the risk of delisting was disclosed on May 12,
25   shouldn't the price not have reacted after the July
```

C. Coffman

1 30 disclosure?

3     A.    No, not at all.  There are two very
4 different sets of information being disclosed.  On
5 May 12, they're being notified -- they're telling
6 the market they have been notified that they don't
7 meet the market capitalization qualifications and
8 they need a plan to rectify that.

9         The market was well aware through
10 public information what their market cap was so it
11 probably wouldn't have been a shock to the market
12 that they were getting such a notice.

13         And on July 30th, the fact that they
14 didn't come up with a plan to rectify it and the
15 exchange actually went through with the delisting
16 is very different than just saying the company had
17 to submit a plan.  So I see those as two very
18 different events.

19     Q.    The market knew through that entire
20 period that the average market capitalization
21 didn't bounce back; right?

22     A.    Correct, but -- correct.

23     Q.    So the market knew that the listing
24 requirements continued to not be met through this
25 entire period; right?

                    C. Coffman

1

2       A.    That's probably true, yes.

3       Q.    I want to turn back to Exhibit 44, your

4   regression analysis for the common stock for your

5   corrected report.

6             If you look at the top, there are a

7   bunch of column headings.

8       A.    Yes.

9       Q.    And I don't know, a third of the way

10  across the page, there's one "REP" and then "CL."

11  Do you see that?

12      A.    Yes.

13      Q.    What is that?

14      A.    I believe that is the return of the oil

15  futures index that I'm controlling for or the oil

16  futures price that I'm controlling for on each day.

17      Q.    And how did you compute the return on

18  oil futures in this analysis?

19      A.    It's the percentage change in the price

20  of the index.  Hold on, let me just take a step

21  back.  So it's relying on -- I'm sorry, Footnote 62

22  of my corrected report makes reference to the NYMEX

23  WTI light sweet crude oil index futures index so

24  it's NYMEX CL so I'm looking at the percentage

25  change in value of that index.

```
 1                         C. Coffman
 2         Q.    So let's just take a specific day.  Can
 3  you look at November 15 of 2011.
 4         A.    Okay.
 5         Q.    And you have a figure in there, it
 6  looks like .0131445.  Do you see that?
 7         A.    Yes.
 8         Q.    How mathematically did you calculate
 9  that number by way of example?
10         A.    It's the percentage change in the price
11  of the index that is referenced in my report from
12  the prior day.  The closing -- the closing price.
13               So if -- I mean, formulaically, it's
14  the price at the close on that day, divided by the
15  price of the close on the prior day, minus 1.
16         Q.    Closing price on November 15, 2012,
17  divided by closing price on the prior day, which
18  would have been November 14 --
19         A.    Yes.
20         Q.    -- '12, minus 1?
21         A.    Yes.
22         Q.    And that would get you the --
23         A.    Percentage change or the return.
24               MS. POSNER:  We're on 2011 though,
25         right?
```

C. Coffman

2    MR. BALLARD:  You're right, 2011.  I
3    think I misspoke.  2011.
4    Q.    Is that the method you used to compute
5    all of the numbers in this column?
6    A.    Yes.
7    Q.    What happens when a futures contract
8    matures?
9    MS. POSNER:  Objection.
10    A.    My understanding is this is an index of
11    how generally futures prices are changing, so it's
12    not necessarily reflective of the maturity of a
13    specific contract.
14    Q.    So you pulled data from this source
15    that gave you the prices for oil futures for each
16    date?
17    A.    Well, my understanding is it's an index
18    of, or it's meant to be a reflection of how oil
19    futures prices are changing on a day-to-day basis.
20    And I know there's a methodology for how they
21    choose which futures they're looking at, but it's
22    meant to reflect a relative change in oil prices.
23    Q.    Did you use the price for the future
24    with the nearest maturity date?
25    A.    It's been sometime since I've looked at

C. Coffman

the details of how this index is computed, but I believe that's the general methodology, but I think it converts over to the next nearest to maturity at some point before maturity.  So I just don't recall all the specific details about that.

(Exhibit 56, printout of backup data to Chad Coffman's expert report production numbers MILLER ENERGY-KPMG-CC 015923, marked for identification.)

Q. I'm going to hand you Exhibit No. 56. Exhibit 56 is a printout of some of the backup data that you provided to us.  It had production numbers MILLER ENERGY-KPMG-CC 015923.

A. Can you give me just one second.

Q. Sure, take your time.

A. Okay.

Q. Are you ready?

A. Yes.

Q. So do you recognize the data in Exhibit 56?

A. Not specifically.  I mean, I would have to have some additional context to -- all that is shown is a date and a price, so I'm not certain.

Q. Maybe I can help you with that.  I

C. Coffman

mean, it looks to be the oil index prices that you
used for your analysis; right?

   A.   I don't know the answer to that without
looking at something else.

   Q.   Let's look at the date 11/15/2011 that
we looked at before and test that formula you gave
us.

   A.   Okay.

   Q.   So if we would take 11/15/11, there's a
price of $99.43; right?

   A.   Yes.

   Q.   99.43 and you would divide that by
98.14, which is the price for 11/14/2011; right?

   A.   Yes.

   Q.   Subtract 1, right, subtract 1?

   A.   Yes.

   Q.   My calculator says .01314449.

   A.   Right, which would correspond to what
is listed in the column on Exhibit 44.

   Q.   So can you now confirm that Exhibit 56
is the oil price data you used to calculate that
column on your Exhibit 44?

        MS. POSNER:  Objection.

   A.   Based on that calculation, that seems

```
 1                     C. Coffman
 2   likely, yes.
 3        Q.    And when you downloaded the data on oil
 4   prices on the index or futures, did you just
 5   download the data or did you compute something?
 6             MS. POSNER:  Objection.
 7        A.    I believe it was just downloaded as is,
 8   because I'm reporting that these data actually come
 9   from a specific ticker symbol.
10        Q.    Where is the ticker symbol?
11        A.    In Footnote 62, in parens there, I have
12   (NYMEX:CL) so that is probably why it was called
13   REP_CL.
14        Q.    I see.  In the second line?
15        A.    Yes.
16             (Exhibit 57, data downloaded from
17        Bloomberg, marked for identification.)
18        Q.    I've handed you Exhibit No. 57 which is
19   data downloaded from Bloomberg.  Do you see there's
20   a listing there for CL 1 and CL 2?
21        A.    There appears to be, yes.
22        Q.    Do you know what those refer to?
23        A.    Not specifically as I sit here, no.  I
24   would have to investigate that.
25        Q.    Did you understand that there were
```

```
 1                    C. Coffman
 2  futures contracts available with different maturity
 3  dates?
 4       A.    That's my general understanding of
 5  futures contracts, yes.
 6       Q.    So there might at any point in time be
 7  a contract with a maturity date of X and another
 8  contract available at the same time with a later
 9  maturity date?
10            MS. POSNER:  Objection.
11       A.    I understand that there can be
12  different futures contracts, yes.
13       Q.    In performing your calculations here
14  for the oil futures returns column in your Exhibit
15  44 of your corrected report, was it just a
16  mechanical calculation every time where you just
17  went through that math that you walked through
18  where you divide the price on one day by the prior
19  day price and then subtract one?
20       A.    I believe so, yes.
21       Q.    Were you always comparing the same
22  contracts with the same maturity date in that
23  calculation?
24       A.    I know that series is put together
25  somehow in terms of looking at the contracts on a
```

```
 1                    C. Coffman
 2  rolling basis.  Just without seeing the description
 3  of exactly how that's done, I just don't recall as
 4  I sit here.
 5       Q.    Let's look at that November 15, 2011
 6  date again, and we already looked at Exhibit 56
 7  where we determined how you got to that number.
 8       A.    Yes.
 9       Q.    So the $99.43 divided by the $98.14;
10  right?
11       A.    Yes.
12       Q.    So look at 11/15/2011 on Exhibit 57.
13       A.    Okay.
14       Q.    For purposes of calculating the return,
15  the oil futures return for November 15, 2011, you
16  used the $99.43 figure from the CL 2 futures
17  contract; right?
18       A.    I mean, those numbers are the same.  I
19  don't know that that's precisely how that was done.
20       Q.    You didn't divide that number into the
21  98.22 from the same contract from the day before;
22  did you?
23            MS. POSNER:  Objection.
24       A.    That's not the calculation that was
25  done.  Again, I'm not -- it's not clear to me
```

```
 1                      C. Coffman
 2   exactly if these are the contracts where those
 3   prices were coming from without investigating it
 4   more carefully, but --
 5       Q.    Do you see the 98.14 for the CL 1
 6   futures contract for November 14, 2011?
 7       A.    I see that number there, yes.
 8       Q.    So it looks like you took the -- for
 9   your calculation for November 15, 2011, you took
10   the price of 99.43 from one futures contract with a
11   certain maturity and you divided that by the price
12   from the prior day for a different futures contract
13   with a different maturity date and that's how you
14   performed the calculation.
15            MS. POSNER:  Objection.
16       Q.    Is that right?
17       A.    Again, this index may have been created
18   using a rolling method of looking at different
19   contracts.  That may be how it was done.  I would
20   have to investigate further.  I just don't know.
21       Q.    To do it properly, you should be using
22   the same contract in the formula; right?
23       A.    I don't know that that's the only way
24   you could do it.
25       Q.    Well, in some instances, did you use,
```

```
 1                    C. Coffman
 2  for your formula, the contract price for one
 3  contract divided by the contract price from the day
 4  before for that same contract?
 5       A.    Again, just sitting here right now, I
 6  don't recall all the details of how the price
 7  series that I rely on was put together.  I
 8  understand that it reflects the prices of near-term
 9  futures contracts, but precisely how it was put
10  together, I just don't recall, so I would be
11  speculating to answer that question.
12       Q.    So looking at the figure you gave in
13  your Exhibit 44 for your corrected report for the
14  oil futures returns for November 15, 2011, you had
15  this figure .0131445.  Is that correct?
16       A.    It reflect the differences in price you
17  showed me on Exhibit 56, yes.
18       Q.    Well, if you took the price of 99.43
19  and divided it by the prior day price of the same
20  futures contract, you would get a different number;
21  wouldn't you?
22       A.    I don't -- you know, you're
23  representing what these series represent.  I'm not
24  absolutely sure what they are, so I'm just not
25  certain and I'm not going to speculate about it.
```

```
 1                        C. Coffman

 2        Q.    If Exhibit 57 accurately reflects the

 3   data for two different sets of futures contracts

 4   with different maturities -- assume that -- if

 5   that's the case, looking at the date of November

 6   15, 2011, the figure you have in your oil futures

 7   returns of .0131445 is not correct; right?

 8             MS. POSNER:  Objection.

 9        A.    When you say not correct, I mean, if

10   what you're saying is correct, and these are the

11   sources for this price series, it's not necessarily

12   incorrect.  It's just rolling over from one

13   contract to the next and that's what this index is

14   intended to reflect.

15        Q.    So how did you go about deciding which

16   contract prices to use for this calculation?

17        A.    I believe -- I would have to

18   double-check the details, but I think this is just

19   a series that you can download on its own.  I don't

20   believe there were any specific decisions or

21   calculations made about which contract to pull

22   from.

23        Q.    I mean, you see from the data on 57, if

24   you're starting with a price of 99.43, you could

25   have divided that by 98.22 or you could divide it
```

```
 1                          C. Coffman
 2   by 98.14 to do your calculation; right?
 3               MS. POSNER:  Objection.
 4         A.    I mean, plausibly you could have done
 5   it either way, yes.
 6         Q.    In fact, you or your team chose to do
 7   it by dividing 99.43 for the one contract and by
 8   98.14 for the other contract; right?
 9         A.    If what you're representing to me is
10   that these are the underlying prices that lead into
11   this price series, that appears to be correct.
12         Q.    Do you have any explanation for why you
13   would use that methodology?
14               MS. POSNER:  Objection.
15         A.    Again, without reviewing, I don't -- I
16   would have to review to understand completely the
17   methodology used for this index.  I think it's
18   still reflecting an overall change in prices.  The
19   fact that you might be comparing across contracts,
20   I think you can do it either way.
21         Q.    That contract that has the 99.43 price
22   for 11/15/2011 also had a price for the prior day;
23   right?
24         A.    It did, yes.
25         Q.    So --
```

```
 1                    C. Coffman
 2       A.    If this is what you're representing to
 3  me it is, yes.
 4       Q.    Wouldn't that be the better
 5  calculation, to use the same security price?
 6       A.    That's another way one could do it.  I
 7  would have to think carefully about what all the
 8  implications of that are, but it's plausible.  I
 9  don't want to say it's the wrong way to do it, but
10  I think you could do it either way.
11       Q.    You could get different numbers and
12  different results depending on which way you do it;
13  right?
14       A.    Plausibly the numbers could be a little
15  bit different.  Again, because they're both
16  reflecting oil futures, you would expect them to
17  move roughly together, but the numbers would be
18  slightly different, yes.
19       Q.    If you had used the same prices in your
20  calculation for the same contracts throughout, do
21  you know how it would have affected all of your
22  data?
23            MS. POSNER:  Objection.
24       A.    Not without calculating it, no.
25       Q.    But it could affect all of your data;
```

```
 1                      C. Coffman
 2   right?
 3        A.    It would only affect the index on days
 4   in which it rolled from one contract to the next in
 5   terms of how the returns would change for the oil
 6   index.
 7        Q.    Who created the index?
 8        A.    I believe this is a NYMEX index.
 9        Q.    So you just consulted the data and used
10   it, no one on your team performed any analysis of
11   it; is that right?
12        A.    I recall, again, like I said, reading
13   the details of this at one point in time.  I just
14   don't recall the specifics as I sit here, but I
15   don't think that's a fair description.
16        Q.    Do you have any idea how your team
17   dealt with the situation where contracts had to be
18   rolled forward?
19        A.    As I sit here, I don't know the details
20   of that, no.
21             MR. BALLARD:  We're going to take a
22        short break.
23             THE VIDEO TECHNICIAN:  We're going off
24        the record.  The time is 2:47 p.m.
25             (Recess taken.)
```

1          C. Coffman

2          THE VIDEO TECHNICIAN:  The time is

3     3:03:00 p.m.  We're back on the record.

4          Q.    Mr. Coffman, have you had a chance to

5     talk with your staff about the rolling forward of

6     futures contracts?

7          A.    The only thing I was able to confirm is

8     that the series was created just by pulling down a

9     consistent series from a market website that

10    reflects the price of the nearest-term contract, so

11    that -- there weren't any changes or putting

12    together of the data from different contracts.

13          The price series you see in Exhibit 56

14    is precisely what was downloaded as the price index

15    for the current contract.

16          Q.    Okay.  And so if you're looking at

17    Exhibit 57, and Exhibit 56, do you have any way of

18    knowing how the data your team downloaded for

19    Exhibit 56, how it pulled prices from which

20    maturity?

21          A.    I was not able to get to that level of

22    detail over the break.  I don't know as I sit here.

23          Q.    But looking at Exhibit 57, for November

24    15, you can see that there are prices for November

25    15 and November 14 for both maturity dates; right?

1                       C. Coffman

2        A.    Yes.

3        Q.    And you just don't know why they chose

4   to use one price from one security and the other

5   price from the other security?

6        A.    When you say they chose, the data was

7   just downloaded as one series so there wasn't a

8   choice made.  We downloaded the data and used it as

9   is.

10       Q.    So it was in the index, you just pulled

11  it down?

12       A.    Yes.

13       Q.    So we would have to talk to whoever

14  created the index to figure out why they were

15  mixing prices up?

16       A.    I think it was designed that way.  I

17  think the idea is you're trying to create something

18  that reflects how an investment, a continued

19  rolling investment in the most current contract,

20  would have performed.  And so at some point you

21  have to roll over to the next contract, so I think

22  that's the logic behind it, but again, it's been a

23  while since I've thought about this specific

24  detail.

25       Q.    How would we go about finding out what

C. Coffman

their methodology is for rolling forward the

contracts?

    A.    Well, it's a price series that's listed

on S&P's Capital IQ website so I would want to go

and consult with how it's described there.

    Q.    Would you agree that it's important for

this data to be correct for your analysis?

    A.    Well, I don't think there's any

question our data is correct in that we pulled it

down as a price series of oil futures, so I don't

think there's a question of whether it's correct or

not.  You're asking a question about

methodologically how it moves from one contract to

the next, but I don't think any of the data is

incorrect.

    Q.    Would you agree that if your data is

incorrect, your analysis will be incorrect as well?

    A.    Well, I don't think any of the data is

incorrect.  I calculated -- I downloaded an oil

futures index and computed returns off of that.  I

don't think there's anything incorrect about that.

    Q.    If the data in the index is incorrect,

your analysis will be incorrect; right?

    A.    If there's something incorrect about an

```
 1                    C. Coffman
 2  input to an analysis, then conceivably the results
 3  coming out of that analysis are incorrect.
 4       Q.   I think I have one more question for
 5  you on a different topic.  Can you turn back to
 6  your corrected report, Exhibit No. 42.
 7       A.   Okay.
 8       Q.   I'm looking at page 57.
 9       A.   Okay.
10       Q.   There's the heading on Section 10(b)(5)
11  damages.  Do you have that?
12       A.   Yes.
13       Q.   I'd asked you some questions about the
14  damages analysis on the first day of your
15  deposition.  Have you done any additional work
16  since the first day of your deposition on damages?
17       A.   No.
18       Q.   Has your opinion on whether damages are
19  capable of being calculated on a class-wide basis
20  changed in any way?
21       A.   No.
22       Q.   Has your opinion about how damages
23  could be calculated changed in any way since the
24  first day of your deposition?
25       A.   No.
```

```
 1                    C. Coffman
 2        Q.    Does your damages methodology provide
 3   any mechanism for separating low risk investors
 4   from high risk investors?
 5        A.    No.  I don't know why there would be a
 6   rationale to do that, but no.
 7              MR. BALLARD:  Thank you.  I have no
 8         further questions at this time.
 9              MS. POSNER:  I'm going to attempt to do
10         some redirect without a voice.
11   EXAMINATION BY
12   MS. POSNER:
13        Q.    During your first deposition,
14   Mr. Ballard asked you some questions regarding the
15   identity of the analysts that were covering Miller
16   Energy during the analysis period.
17              Do you recall that?
18        A.    Yes.
19        Q.    Does the identity of the analyst, in
20   other words, their name specifically, that covered
21   Miller Energy matter?
22        A.    I don't see why it would, no.
23        Q.    Why not?
24        A.    Because analyst reports are generally
25   put out by -- the concept of looking at analysts
```

```
 1                        C. Coffman
 2   for market efficiency is whether or not there's
 3   interest and information being disseminated about a
 4   company and an analysis being performed.  It
 5   doesn't depend on the identity of any particular
 6   analyst.
 7          Q.    And Mr. Ballard was separating out what
 8   he deemed traditional analysts versus
 9   computer-generated analysts.  Do you remember that?
10          A.    Yes.
11          Q.    Do you know how many, in his definition
12   of traditional analysts, covered Miller Energy
13   during the analysis period?
14          A.    I believe it was on the order of
15   approximately 80 to 90, I think.
16          Q.    80 or 90 reports?
17          A.    Reports.
18          Q.    Do you know how many analysts,
19   traditional analysts, issued those reports?
20          A.    I believe it was six.
21          Q.    Do you know whether there have been
22   other cases that have been certified that you've
23   been involved in that have had similar numbers of
24   reports or analysts covering the company?
25                MR. BALLARD:  Objection to form.
```

1                        C. Coffman

2        A.    There are certainly cases where the

3    analyst coverage in, terms of number of analysts or

4    reports, was less that were certified, yes.

5        Q.    You testified at your first deposition

6    that there's not a set threshold for the number of

7    analysts that need to cover a security in order for

8    Cammer factor 2 to be satisfied.  Why is that?

9        A.    Because again, the idea of the factor

10   is whether or not there's sufficient interest and

11   resources being spent in analyzing a company and

12   information dissemination about a company, and so

13   the specific counting of analysts isn't really the

14   thrust of the idea.

15            And so there's -- you know, there's --

16   and there's no academic literature that says in

17   order to have efficiency, you have to have a

18   specific number of analysts.  So there's just not a

19   bright line test.

20       Q.    Does not having a threshold mean that

21   your analysis of Cammer factor 2 was not

22   scientific?

23            MR. BALLARD:  Objection.

24       A.    No.  I think I showed there was

25   substantial coverage by analysts and there was no

1                     C. Coffman

2   need to consider what some sort of threshold would

3   be since it was clear there was substantial analyst

4   coverage.

5       Q.    Did the analysts that were covering

6   Miller Energy during the analysis period provide

7   information that was relevant to preferred

8   securities holders?

9       A.    Yes.

10      Q.    What was that information?

11      A.    Any information that would be involved

12  in valuing the common stock would be relevant to

13  consider in valuing or considering the value of the

14  preferred stock.

15      Q.    Did any of the analysts give a price

16  target for the preferred securities?

17      A.    Not that I specifically remember, no.

18      Q.    Is it common for analysts to not

19  provide a price target for preferred securities?

20      A.    I don't -- that would be something that

21  I think is pretty rare.  I don't recall having seen

22  a lot of analysts provide price targets for

23  preferred securities.

24      Q.    I'm going to turn your attention to

25  another topic Mr. Ballard asked you about at your

```
 1                     C. Coffman
 2  first deposition.  He asked you some questions
 3  regarding whether you can identify by name any of
 4  the market makers in Miller Energy securities
 5  during the analysis period.
 6            Do you recall that?
 7       A.    Yes.
 8       Q.    In conducting an analysis for market
 9  efficiency purposes, does it matter if you can
10  identify by name the market makers?
11       A.    Certainly not in this case.  In a case
12  where the stock is traded on a national exchange
13  where the rules are designed to always make sure
14  there is market making present for a common stock
15  or a preferred stock, knowing the identity of who
16  the market makers are I don't think really provides
17  any additional or useful information.
18       Q.    If you could take out Exhibit 42, which
19  is your corrected report, I'm going to turn your
20  attention to page 30.
21       A.    Okay.
22       Q.    Can you read what you say quoting from
23  Cammer under paragraph 44 there.
24       A.    Sure.  "It would be helpful to allege
25  the company was entitled to file an S-3
```

                        C. Coffman

1

2   registration statement in connection with public

3   offerings, or if ineligible, such ineligibility was

4   only because of timing factors rather than because

5   the minimum stock requirements set forth in the

6   instructions to Form S-3 were not met.  Again, it

7   is the number of shares traded and value of shares

8   outstanding that involve the facts which imply

9   efficiency."

10       Q.   I think you discussed with Mr. Ballard

11  the fact that Miller Energy was ineligible to file

12  an S-3 for about the first year of the analysis

13  period.  Do you recall that?

14       A.   Yes.

15       Q.   Was the reason that they were

16  ineligible due to them failing to meet the, quote,

17  minimum stock requirements that are described in

18  Cammer factor 4 here?

19       A.    In terms of the shares traded or the

20  value of shares outstanding, no.  My understanding

21  that is not the reason they were ineligible.

22       Q.    And then there was a time period at the

23  end of the analysis period where they became

24  ineligible again.  Do you recall that?

25       A.    Yes.

```
 1                      C. Coffman
 2        Q.    And I believe that was July 14, 2015.
 3   Does sound like the right date to you?
 4        A.    I believe that's the date on which they
 5   missed a filing and therefore weren't current on
 6   their filings, yes.
 7        Q.    Did Miller Energy's shares trading and
 8   volume of shares outstanding otherwise meet the
 9   minimum stock requirement under Cammer factor 4
10   during that time period?
11        A.    The number of shares traded certainly
12   did.  The value of shares outstanding, my
13   understanding is, is not actually necessary to be
14   eligible for S-3.
15        Q.    Is there a reason why -- strike that.
16              During the early part of the analysis
17   period, Mr. Ballard asked you some questions
18   regarding whether Miller Energy securities were
19   efficient.  During that first year of the analysis
20   period, is it your opinion that Miller Energy
21   common stock was efficient?
22        A.    Yes.
23        Q.    Why is that?
24        A.    For all the reasons listed in my
25   report.  I mean, all of the different factors that
```

                            C. Coffman

1    I analyzed.  Clearly, some of the factors speak

2    directly to it.

3            Some of the factors speak over the

4    period more generally, but in terms of -- I mean,

5    there was certainly sufficient volume during that

6    period.  There was analyst coverage during that

7    period.

8            They were generally -- would have been

9    S-3 eligible, based on the shares traded and value

10   of shares outstanding, but for the late filing.

11   They were on the exchange, so it certainly met the

12   market maker, and the price reaction to new

13   information analysis supports it was efficient.

14           The -- just one second.  While it

15   had -- it had sufficient market capitalization at

16   the beginning of the class period.  The bid-asked

17   spread was low during the beginning of the class

18   period.  There were institutional holdings.  There

19   was no autocorrelation, and there was options

20   trading.  So really none of the factors point

21   towards it being inefficient during that period.

22       Q.    I realize the preferred stock didn't

23   start trading until a little bit later, at least

24   most of it.  During the initial few months when the

```
 1                      C. Coffman
 2  preferred stock was trading, is it your opinion
 3  that the market for preferred shares was also
 4  efficient at that time?
 5       A.    Yes.
 6       Q.    Why is that?
 7       A.    Again, because overall, looking at all
 8  of the factors, there was certainly sufficient
 9  volume in the preferred securities.  There was
10  analyst coverage of the company throughout that
11  period.  They traded on the exchange.  They were
12  S-3 eligible during that period.
13            I've shown that at least during a
14  period where the preferred's would have been
15  subject to price changes due to new news, that
16  there is a cause and effect relationship there.
17            The bid-asked spread during that period
18  for the preferred stocks was around -- just a
19  second.  The bid-asked spread was generally below
20  the mean for the exchange traded stocks.
21            Overall, the market cap of the company
22  was sufficiently high and there's no evidence of
23  autocorrelation, regular autocorrelation, for
24  preferred shares.
25       Q.    In your answer just now, when you
```

1                         C. Coffman

2   talked about the cause and effect, you were talking

3   about different kinds of value-relevant information

4   that you used to analyze the preferred securities

5   versus the common stock.

6               Why did you look at different types of

7   information or announcements in analyzing the cause

8   and effect relationship for the preferred's versus

9   the common stock?

10      A.    Well, I explained that in my report.

11  Because preferred securities have both equity-like

12  and bond-like components, there are periods in

13  which the preferred shares, while they were trading

14  in a primarily bond-like manner, would not be

15  sensitive to announcements like earnings

16  announcements.  And then once you get to a point

17  that the price is trading below par value and,

18  therefore, in a substantial way, and therefore

19  reflects that there is some liquidity concern about

20  the company, then it would trade more on an

21  equity-like basis and you would expect it to react

22  to new updated news about the company, including

23  potentially earnings announcements.  But in

24  particular, you would expect it to respond to

25  further information about the liquidity of the

```
 1                    C. Coffman
 2    company and the extent to which the preferred
 3    dividends were going to continue to be paid.  So I
 4    looked at those types of events.
 5         Q.    You talked today and at your last
 6    deposition a little bit about how you collected
 7    news to use in your analysis and I think you
 8    provided a couple of different services you used.
 9    What are those services?
10         A.    Factiva for news, Investext for analyst
11    reports, and then both the SEC directly and
12    Investext to identify SEC filings.
13         Q.    Are those standard sources for
14    gathering news about a company?
15         A.    Yes.
16         Q.    Have you used those same sources in
17    other cases?
18              MR. BALLARD:  Objection.
19         A.    Numerous other cases.
20         Q.    I turn your attention to your last
21    deposition.  Mr. Ballard was asking you some
22    questions about whether you could calculate Section
23    11 damages on a class-wide basis.
24              Do you remember that?
25         A.    Yes.
```

```
 1                    C. Coffman
 2        Q.    Assuming Series C and Series D
 3   purchases could be traced to a specific Miller
 4   Energy offering, could you calculate their damages
 5   under the statutory formula with precision?
 6             MR. BALLARD:  Objection to form.
 7        A.    Yes.
 8        Q.    Assuming Series C or D purchases could
 9   be traced to a specific Miller Energy offering and
10   you had investors' purchase and sale information,
11   would the damages for all purchasers of each
12   offering be calculated in the same manner?
13             MR. BALLARD:  Objection to form.
14        A.    They would be calculated using the same
15   formula, yes.  The numbers might be different
16   depending on their particular purchase prices and
17   which offering it traces back to and what their
18   sale prices were, et cetera, but the methodology
19   would be identical, yes.
20             MS. POSNER:  I don't think I have any
21        further questions, pending anything from Mr.
22        Ballard.
23   EXAMINATION BY
24   MR. BALLARD:
25        Q.    I have one more question.  With respect
```

                          C. Coffman

1

2   to the six traditional analysts that you referred

3   to earlier, how many of those were covering Miller

4   Energy at the beginning of the analysis period?

5       A.    One for sure.  There were other

6   individuals on the call, but I don't recall seeing

7   analyst reports from those particular individuals,

8   and as I said, Investext, in my opening report, and

9   in my deposition, Investext may not capture all

10  analyst reports, but I believe there was one at the

11  beginning of the class period that I could

12  identify.

13      Q.    For the first year of the proposed

14  class period, how many of the six traditional

15  analysts were covering the stock?

16      A.    I don't recall.

17          MR. BALLARD:  I have no further

18      questions.

19          MS. POSNER:  Just give me two minutes.

20          MR. BALLARD:  Let's go off.

21          THE VIDEO TECHNICIAN:  We're going off

22      the record.  The time is 3:25 p.m.

23          (Discussion off the record.)

24          THE VIDEO TECHNICIAN:  The time is 3:26

25      p.m.  We're back on the record.

1                    C. Coffman

2            MS. POSNER:  I have no further

3      questions.  Thank you, Mr. Coffman.

4            MR. BALLARD:  Thank you.

5            THE VIDEO TECHNICIAN:  This completes

6      the video deposition of Chad Coffman on April

7      25, 2019 at 3:26 p.m.  We are off the record.

8            (Time noted:  3:26 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                A C K N O W L E D G E M E N T
 3
 4         I, CHAD COFFMAN, hereby certify that I
 5   have read the transcript of my testimony taken
 6   under oath in my deposition of April 25, 2019; that
 7   the transcript is a true, complete and correct
 8   record of my testimony, and that the answers on the
 9   record as given by me are true and correct.
10
11
12                    _____
13                         Chad Coffman
14
15   Subscribed and sworn to before me
16   on this the 16th day of May            2019.
17
18   _____        October 19, 2022
19   Notary Public                My Commission Expires:
20           ┌─────────────────────────────┐
21           │          B URBAN            │
22           │        Official Seal        │
             │ Notary Public - State of Illinois │
             │ My Commission Expires Oct 19, 2022 │
             └─────────────────────────────┘
22
23
24
25
```

1

2                    C E R T I F I C A T E

3  STATE OF NEW YORK )

4                         :

5  COUNTY OF NEW YORK)

6

7         I, ELEANOR GREENHOUSE, a Shorthand Reporter

8  and Notary Public within and for the State of New

9  York, do hereby certify:

10        That, CHAD COFFMAN, the witness whose

11  deposition is hereinbefore set forth, was duly

12  sworn by me and that such deposition is a true

13  record of the testimony given by such witness.

14        I further certify that I am not related to

15  any of the parties to this action by blood or

16  marriage, and that I am in no way interested in the

17  outcome of this matter.

18        IN WITNESS WHEREOF, I have hereunto set my

19  hand this 29th day of April, 2019.

20

21

22      _____

23                ELEANOR GREENHOUSE

24

25

1

2 April 25, 2019

3                          I N D E X

4 WITNESS                  EXAMINATION BY           PAGE

5 CHAD COFFMAN        MR. BALLARD         317-487

6                     MS. POSNER          487-498

7                     MR. BALLARD         498-500

8

9                      E X H I B I T S

10                                              FOR IDENT.

11 Exhibit 42, corrected expert report of      317

12 Chad Coffman, signed April 19, 2019

13 Exhibit 43, redline of original report      319

14 against corrected report

15 Exhibit 44, printout of regression CS       320

16 tab in the backup provided with corrected

17 Report

18 Exhibit 45, trade dates tab from backup     321

19 to corrected report

20 Exhibit 46, news dates tab from backup      321

21 to corrected report

22 Exhibit 47, earnings release dates tab      322

23 from backup to corrected report

24 Exhibit 48, SEC filing dates tab from       322

25 backup to corrected report

1

2  April 25, 2019

3              I N D E X (Continued.)

4                E X H I B I T S

5                                    FOR IDENT.

6  Exhibit 49, analyst report dates tab from    322

7  Backup to corrected report

8  Exhibit 50, printout from SEC Edgar          424

9  system indicating Exhibit 51 was filed

10 on July 13, 2012

11 Exhibit 51, letter dated July 13, 2012       425

12 from Miller Energy

13 Exhibit 52, Edgar detail related to the      452

14 Form 10-K for the year 2012 for Miller

15 Energy

16 Exhibit 53, May 29, 2012 reserve report      452

17 Exhibit 54, reserve report                   452

18 Exhibit 55, Form 8-K dated May 12, 2015      464

19 Exhibit 56, printout of backup data to       472

20 Chad Coffman's expert report production

21 numbers MILLER ENERGY-KPMG-CC 015923

22 Exhibit 57, data downloaded from Bloomberg  474

23

24

25

Errata – Deposition of Chad Coffman – 04-12-2019

1. 352:3 - "date," should be "dates."
2. 352:16 - "types," should be "type."
3. 367: 14 - "July 18, 2011," should be "July 28, 2011."
4. 469: 10 – "'REP' and then "CL," should state "RET_CL."
5. 474:13 "REP_CL," should state "RET_CL."
6. 494: 17-18 – "bid-asked spread," should state "bid-ask spread."
7. 495: 17 – "bid-asked spread," should state "bid-ask spread."
8. 495: 19 – "bid-asked spread," should state "bid-ask spread."