# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

LEWIS COSBY, KENNETH MARTIN, as
beneficiary of the Kenneth Ray Martin Roth IRA,
and MARTIN WEAKLEY on behalf of
themselves and all others similarly situated,

     Plaintiffs,

    v.

KPMG, LLP

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.:  3:16-cv-00121-TAV-DCP

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CERTIFY THE CLASSES, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL

I. Introduction ........................................................................................................... 1

II. Argument ............................................................................................................... 4

    A. The Section 10(b) Class Should Be Certified ........................................... 4

        1. Common Issues Predominate ......................................................... 4

            a. The Market For Miller Energy Securities Was Efficient ............... 4

            b. The Section 10(b) Class is Entitled to the *Affiliated Ute* Presumption of Reliance ..................................................................... 9

            c. KPMG Fails to Demonstrate the Absence of Price Impact .......... 10

            d. KPMG's Fraud Was Not Known by Investors Prior to the End of the Class Period ..................................................................... 13

            e. Damages for the 10(b) Class Can Be Calculated on a Classwide Basis ................................................................................ 16

        2. The Proposed Representatives are Typical ............................... 19

    B. The Section 11 Class Should Be Certified ............................................. 21

        1. The Section 11 Class Is Numerous ........................................... 21

        2. Mr. Ziesman is Typical ............................................................ 22

        3. The Proposed Representatives Are Adequate ........................... 25

        4. Damages for the Section 11 Class Can Be Calculated on a Classwide Basis ............................................................................ 28

III. Conclusion ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Accredo Health, Inc. Sec. Litig.*,
No. 03-cv-2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) .........................................22

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) .............................................................................19

*In re Am. Int'l Grp., Inc.*,
741 F.Supp.2d 511 (S.D.N.Y. 2010)......................................................................28

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..............................................................................................3

*Aranaz v. Catalyst Pharm. Partners Inc.*,
302 F.R.D. 657 (S.D. Fla. 2014).............................................................................11

*Atari Corp. v. Ernst & Whinney*,
981 F.2d 1025 (9th Cir. 1992) ..............................................................................21

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) .......................................................................18, 19

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F.Supp.2d 746 (S.D.N.Y. 2012)......................................................................27

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................................19

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) .....................................................................20, 21

*In re BP P.L.C. Sec. Litig.*,
No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) .....................................17, 18

*In re Bridgestone Sec. Litig.*,
430 F. Supp. 2d 728 (M.D. Tenn. 2006)................................................................17

*Burges v. Bancorpsouth, Inc.*,
No. 14-cv-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) .......................10, 11, 13, 21

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ................................................................................16

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................................... *passim*

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 .............................................................................................................13

*In re Citigroup Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y.2010).............................................................................28

*In re Colbalt Int'l Energy, Inc., Sec. Litig.*,
    No. 14-cv-3428, 2017 WL 2608243 (S.D. Texas June 15, 2017) ..........................................24

*Comcast v. Behrend*,
    569 U.S. 27 (2013).................................................................................................16, 17, 30

*In re Countrywide Fin. Corp. Sec. Litig.*,
    273 F.R.D. 586 (C.D. Cal. 2009) .....................................................................................8

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ........................................................................................16

*In re Direct Gen. Corp.*,
    No. 05-cv-77, 2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006).........................................23, 24

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)............................................................................27

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ............................................................................8

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ...................................................................................30

*Fogarazzao v. Lehman Bros.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................................10

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................................19

*Freeland v. Iridium World Commc'ns, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006)........................................................................................24

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) .........................................................................................8

*Gaynor v. Miller*,
    No. 15-cv-545, 2018 WL 3751606 (E.D. Tenn. Aug. 6, 2018)...................................... *passim*

2

*Grae v. Corr. Corp. of Am.*,
    No. 16-cv-2267, 2019 WL 1399600 (M.D. Tenn. Mar. 26, 2019) .........................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ..............................................................................................10, 11, 21

*In re HCA Holdings, Inc.*,
    No. 14-cv-511, 2015 WL 10575861 (6th Cir. Feb. 26, 2015) .................................14

*In re HealthSouth Corp. Sec. Litig.*,
    261 F.R.D. 616 (N.D. Ala. 2009) ..................................................................................8

*In re Heckmann Corp. Sec. Litig.*,
    No. 10-cv-378, 2013 WL 2456104 (D. Del. June 6, 2013) ...................................16

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ................................................................................10

*Kasper v. AAC Holdings, Inc.*,
    No. 15-cv-923-JPM-JSF, 2017 WL 3008510 (M.D. Tenn. July 14, 2017) ...................1, 10, 11

*Kelly v. Montgomery Lynch & Assocs., Inc.*,
    No. 07–cv–919, 2007 WL 4562913 (N.D. Ohio Dec. 19, 2007)...........................22

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ................................................................... *passim*

*In re Lehman Bros. Sec. & ERISA Litig.*,
    584 F. Supp. 2d 485 (S.D.N.Y. 2010)........................................................................28

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) ....................................................................................8

*Mauss v. NuVasive, Inc.*,
    No. 13-cv-2005, 2017 WL 1080654 (S.D. Cal. Mar. 22, 2017) .............................19

*McGee v. East Ohio Gas Co.*,
    200 F.R.D. 382 (S.D. Ohio 2001) ..............................................................................22

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    No. 08-cv-5310, 2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016)...............................14

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d. Cir. 2015)........................................................................................16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).........................................................................................27

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
No. 08-cv-5093, 2013 WL 6839093 (S.D.N.Y. Dec. 27, 2013) ............................30

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013).....................................................................................27

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015).........................................................................................16

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
No. 08-cv-160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)...............................10

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
318 F.R.D. 435 (D. Colo. 2015) ...............................................................................30

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)........................................................................................8

*Phillips v. Ford Motor Co.*,
435 F.3d 785 (7th Cir. 2006) ....................................................................................28

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)..............................................................23, 24

*Ret. Fund v. Tile Shop Holdings, Inc.*,
No. 14-cv-786, 2016 WL 4098741 (D. Minn. July 28, 2016) .................................24

*Ret. Sys. v. Prudential Fin., Inc.*,
No. 12-cv-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) .................................10

*Ret. Sys. v. Psychiatric Sols., Inc.*,
No. 09-cv-882, 2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ...........................20

*Rikos v. P&G*,
No. 11-cv-226, 2014 WL 11370455 (S.D. Ohio June 19, 2014)............................20

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015).....................................................................................16

*Rocco v. Nam Tai Electronics, Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) .............................................................................20

*Rooney v. EZCORP, Inc.*,
No. 15-cv-00608-SS, 2019 WL 691205 (W.D. Tex. Feb. 19, 2019)......................19

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) ....................................................................3, 20, 22

4

*Rowe v. Marietta Corp.*,
172 F.3d 49 (6th Cir. 1999) ...........................................................17

*In re Sadia, S.A. Sec. Litig.*,
269 F.R.D. 298 (S.D.N.Y. 2010) ....................................................19

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
No. 08-cv-397, 2012 WL 4482032 (D.N.J. Sept 25, 2012)..............23, 24

*Schuh v. HCA Holdings, Inc.*,
No. 11-cv-1033, 2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014)........22

*In re Smart Tech., Inc. S'holder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) ......................................................24

*In re St. Jude Med. Inc. Sec. Litig.*,
No. 10-cv-0851, 2014 WL 6908434 (D. Minn. Dec. 8, 2014) .............17

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016) ................................................11, 19

*Taylor v. CSX Transp., Inc.*,
264 F.R.D. 281 (N.D. Ohio 2007) ..................................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..............................................................8

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) ....................................................14

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ............................................................8

*United Food and Commercial Workers Union v. Chesapeake Energy*,
281 F.R.D. 641 (W.D. Okla. 2012)..................................................24

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ......................................................16

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ......................................................19

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018)...........8

*Wagner v. Barrick Gold Corp.*,
251 F.R.D. 112 (S.D.N.Y. 2008) ....................................................19

5

*Wallace v. Intralinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .................................................................23, 24, 29

*In re Wells Fargo Mortg. Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ....................................................................28

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) .....................................................................................16

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) ......................................................... *passim*

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................................27

*In re WorldCom, Inc. Sec. Litigation*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ...............................................................................25

## STATUTES, RULES & REGULATIONS

Securities Act of 1933....................................................................................... *passim*

Securities Exchange Act of 1934 ...................................................................... *passim*

15 U.S.C. § 77k.....................................................................................................30

15 U.S.C. § 77k(a)(5)............................................................................................25

Federal Rule of Civil Procedure 23 .................................................................1, 16

# I.  INTRODUCTION

Plaintiffs have overwhelmingly satisfied the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, demonstrating that both the Section 10(b) Class and the Section 11 Class (together, the "Classes") are numerous, that the Proposed Representatives are adequate and typical of the members of the Classes, that the claims asserted are common to all members of the Classes, that common issues predominate, and that damages for both Classes can be calculated on a classwide basis.

KPMG's kitchen-sink opposition runs roughshod over the boundaries of clearly defined precedent to offer a number of well-worn and routinely rejected arguments, including arguments squarely rejected by this Court in *Gaynor v. Miller*, No. 15-cv-545, 2018 WL 3751606 (E.D. Tenn. Aug. 6, 2018) (the "Gaynor R&R"). Indeed, the bulk of KPMG's arguments are plainly irreconcilable with Magistrate Judge Poplin's detailed and well-reasoned report and recommendation that a class of Miller Energy investors be certified, *see id.*, as well as decades of precedent in the Sixth Circuit and throughout the Country.

That common questions of law and fact predominate stands unrefuted. More specifically, KPMG has not rebutted the finding of market efficiency established by Plaintiffs' expert, Mr. Chad Coffman, CFA, whose methodology has been found credible by dozens of courts, including by courts in this Circuit as recently as 2017. *See Kasper v. AAC Holdings, Inc.*, No. 15-cv-923-JPM-JSF, 2017 WL 3008510 (M.D. Tenn. July 14, 2017), *leave to appeal denied*, No. 17-0509, 2017 WL 4801185 (6th Cir. Oct. 24, 2017) (holding that plaintiffs were entitled to the presumption of reliance based on Coffman's market-efficiency report and certifying a class of investors). While KPMG argues – wrongly – in its separate Motion to Exclude that there are certain methodological issues with Coffman's expert report, their own purported expert, Dr. Mukarram Attari, concedes

that the market for Miller Energy Common Stock was efficient, meeting the factors elucidated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). And, although Attari claims that Miller Energy Preferred Stock does not meet certain of the *Cammer* and *Krogman* factors, he is wrong. As in the only other securities fraud class action where he submitted a purported expert report—which the Court rejected—Attari's opinion is based on incorrect assumptions, misapplies well-established standards, and is contrary to longstanding precedent.

Forced to concede that the Section 10(b) Class is entitled to the presumption of reliance, the thrust of KPMG's remaining argument is that individual investors should somehow have known of KPMG's fraud during the Class Period. This is strikingly incongruous with KPMG's argument at the motion-to-dismiss stage that there were no red flags that should have alerted it— an experienced public accounting firm tasked with confirming that Miller Energy's financial statements conformed with Generally Accepted Accounting Principles ("GAAP")—to Miller Energy's misconduct, and particularly absurd given that KPMG continued to lend its imprimatur to Miller Energy's financial statements for years, causing investors to lose millions. Indeed, this Court has twice explicitly rejected this same argument – at the motion to dismiss stage in this case and in the *Gaynor* Action.

KPMG is also notably silent about the SEC's August 2017 Order confirming precisely what Plaintiffs allege: that KPMG's audits of Miller Energy were so deficient that they violated the federal securities laws and numerous professional and ethical standards besides at every single step of their audits of Miller Energy. *See* Second Am. Class Action Compl. ("Complaint") at ¶¶ 233-34, ECF No. 59. In a detailed and virtually unprecedented order against a Big 4 accounting firm, the SEC ordered the disgorgement of everything KPMG earned from working for Miller,

2

totaling more than five million dollars, levied an additional million-dollar penalty against KPMG, and required KPMG's senior executives to regularly report to the SEC on its efforts to prevent such a debacle from happening again—a testament to the gravity of KPMG's misconduct. *Id.*

KPMG's remaining arguments—that its false and misleading audit opinions did not artificially inflate the price of Miller Energy securities, that damages for the Section 10(b) Class and the Section 11 Class cannot be calculated on a classwide basis, that the Section 11 Class is not sufficiently numerous, and that Plaintiffs must demonstrate traceability at the class certification stage —are based entirely on a misapplication of the facts and the law (including this Court's decision in the *Gaynor* Action), and thus can easily be rejected.

This case epitomizes the "well-recognized" rule that "class actions are a particularly appropriate means for resolving securities fraud actions." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 455 (S.D. Ohio 2009). The overwhelming predominance of issues, including falsity, materiality, causation, reliance and damages, are amenable to treatment on a classwide basis and will be proved or disproved through common evidence. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) ("[p]redominance is a test readily met in. . . securities fraud [cases]"). Accordingly, Plaintiffs respectfully submit that their Motion should be granted. *See* Pls.' Corrected Mot. to Certify the Classes, Appoint Class Representatives, and Appoint Class Counsel ("Motion"), ECF No. 108-1.[1]

---

[1] Unless otherwise indicated, quotation marks and citations are omitted, and alterations are adopted. Capitalized terms are the same as defined in the Motion.

3

## II. ARGUMENT

### A. The Section 10(b) Class Should Be Certified

KPMG concedes numerosity, commonality, adequacy and superiority.  Grasping at straws, KPMG challenges predominance and typicality; these arguments fail for the reasons set forth below.

#### 1. Common Issues Predominate

##### a. The Market For Miller Energy Securities Was Efficient

Plaintiffs have demonstrated that the market for Miller Energy Securities—both the Common Stock and the Series C and Series D Preferred Stock, all of which were listed on the NYSE—was efficient throughout the Class Period. As a result, the Section 10(b) Class is entitled to the *Basic* presumption of reliance. Plaintiffs' expert, Coffman, empirically demonstrates under the same methodology that courts have approved in countless cases, that the Miller Energy Securities meet the factors set forth in *Cammer* and *Krogman*.[2] While KPMG weakly—and wrongly—asserts that the methodology utilized by Coffman has certain deficiencies, KPMG and its purported expert, Attari, **concede** that Miller Energy Common Stock traded in an efficient market and that it met virtually all of the *Cammer* and *Krogman* factors. *See*, *e.g.*, Attari Dep. ("Attari Deposition")[3] 24:4-8 (average weekly trading volume); 25:19-26:7 (analyst coverage);

---

[2] Defendants do not cite, and Plaintiffs are unaware of, any case holding that the common stock of a NYSE-listed company is inefficient.

[3] This brief refers to a number of expert materials, including the Corrected Expert Report of Chad Coffman, CFA ("Coffman Opening Report"), ECF No. 121; the Expert Report of Dr. Mukarram Attari ("Attari Report"), ECF No. 130; the Expert Rebuttal Report of Chad Coffman, CFA ("Coffman Rebuttal Report"), attached to the accompanying Declaration of Gordon Ball as Exhibit A; and the Attari Deposition Transcript, attached to the accompanying Declaration of Gordon Ball as Exhibit B. The Attari Deposition Transcript (Exhibit B) itself includes exhibits, which are identified by number as "Attari Deposition Exhibits."

4

60:19-23 (market makers); 66:1-14 and 71:6-10 (Form S-3); 74:17-21 (market capitalization); 78:8-20 (bid-ask spread); 82:5-12 (institutional ownership); 96:6-10 (options trading).[4]

KPMG also does not dispute that Miller Energy Preferred Securities met the majority of the *Cammer* and *Krogman* factors during the Class Period. For example, Attari concedes that: (1) the Preferred Securities had an average weekly trading volume that exceeded the standard set forth in *Cammer* Factor 1 throughout the Class Period; (2) Miller Energy was eligible to file a Form S-3[5] and, in fact, issued securities pursuant to a Form S-3, for most of the Class Period except for the time periods after it filed its' Form 10-K late, as set forth in *Cammer* Factor 4; and (3) the Preferred Securities had bid-ask spreads that met the thresholds set forth in *Krogman* until the last 8 months of the Class Period. *See* Attari Dep. 24:9-14; 66:1-71:10; 78:21-79:5. Attari also concedes that the market for the Preferred Securities was "liquid" throughout the Class Period, and that purchases and sales of the Preferred Securities were "quickly" executed, further demonstrating that the market for the Preferred Securities was efficient. *See* Attari Dep. 64:24-65:19; Attari Report at ¶ 68. Critically, Attari has "no opinion", and thereby concedes, that the Preferred Securities were impounding relevant information quickly throughout the Class Period, the *sine qua non* of an

---

[4] As will be set forth in Plaintiffs' Opposition to KPMG's Motion to Exclude the Reports and Testimony of Chad Coffman, Defendant's purported expert, Attari, has virtually no experience serving as an expert in securities fraud class actions. He has only filed one report in such a case, and the report's findings were rejected by the court. *See* Attari Dep. 14:9-16:4; Attari Dep. Ex. 75. Attari's record stands in stark contrast to that of Coffman, whose market-efficiency reports have been credited in certifying 25 securities fraud class actions.

[5] There is no reason to believe that Miller Energy becoming ineligible to utilize Form S-3 due to late paperwork filing somehow induces market inefficiency, especially while all other factors indicate efficiency. Coffman Rebuttal Report ¶ 32. Attari's opinion that Miller Energy was ineligible to file a Form S-3 when its market capitalization fell below $75 million is wrong; there is no requirement that a company have market capitalization of $75 million to be eligible to file a Form S-3. *See* Attari Dep. 14:9-16:4; Attari Dep. Exs. 72 and 73; Coffman Rebuttal Report ¶ 7e.

5

efficient market. *See* Attari Dep. 80:17-81:7. These facts alone are more than enough evidence that the market for the Preferred Securities was efficient through the Class Period.

Even KPMG's carefully circumscribed objections to Coffman's findings as to Miller Energy Preferred Stock are contrary to longstanding precedent and otherwise not credible. For example, Attari claims that the market for the Preferred Securities does not meet the standard under *Cammer* Factor 2, which pertains to public coverage of the securities at issue. Notably, however, Attari concedes that numerous analysts discussed the Preferred Securities throughout the Class Period and analyzed information relevant to the Preferred Securities. *See* Attari Dep. 26:8-60:8; Attari Dep. Exs. 60-71.[6] Instead, Attari remarkably claims that it is not enough for analysts to cover information relevant to the security at issue or even to discuss the security at issue by name, but that the analysts must provide a price target and a buy, sell, or hold recommendation for the security to fulfill this factor. There is no such requirement. *See* Coffman Rebuttal Report ¶ 29. Indeed, no court has ever imposed such a requirement, nor could Attari point to any academic literature or case law supporting his position. *See* Attari Dep. 34:22-35:3. Accordingly, *Cammer* Factor 2 also demonstrates that the market for the Preferred Securities was efficient.

Similarly, Attari concedes that there is no need for market makers for securities, like the Preferred Securities, that trade on the NYSE instead of on the Over the Counter Bulletin Board, which was the exchange at issue in *Cammer* (*Cammer* Factor 3). *See* Attari Dep. 61:3-64:11; Coffman Opening Report ¶¶ 41-42. Attari also has "no beliefs" regarding the number of

---

[6] In addition, significant additional information was available about the Preferred Stock *via* press releases, earnings call transcripts, SEC filings on Edgar, news articles, the Internet, 24-hour cable news networks, email, RSS feeds, and other media, all of which are relevant to satisfaction of *Cammer* Factor 2. *See* Coffman Opening Report ¶¶ 36-38. Attari concedes that this information was also available to Preferred Stock investors throughout the Class Period. *See* Attari Dep. 59:10-60:10.

6

institutions that held the Preferred Securities since that data is unavailable, yet admits that numerous institutions held the Common Stock. *See* Attari Dep. 61:3-64:11. He similarly concedes that he "didn't know" of any structural reasons preventing options from being listed on the Preferred Securities. *See id.* 82:5-84:1. Thus, each of these factors also support that the market for the Preferred Securities was efficient.

With regard to the market capitalization factor in *Krogman*, Attari baldly asserts that one must individually analyze the market capitalization of each security at issue. *See* Attari Report. ¶ 180.  However, that makes no economic sense given that the purpose of this factor, as even Attari's report sets out, is whether the company itself, not the given security, is sufficiently well capitalized.  *See id.* ¶ 178 (noting that the factor goes to whether stock purchasers are incentivized to invest in "more highly capitalized corporations"); Attari Dep. 76:4-77:23; *see also* Coffman Rebuttal Report ¶ 33.[7]

Attari's opinion that the autocorrelation test conducted by Coffman is "invalid" is also belied not only by hundreds of courts that have accepted the same test, but by Attari's own opinion in a separate case, in which both he and the Plaintiffs' expert conducted the same autocorrelation test that Coffman conducted here, which demonstrates that there was no autocorrelation in the Preferred Securities. *See* Coffman Rebuttal Report ¶ 25; Attari Dep. 84:2-91:4; Attari Dep. Exs. 74-75.[8]

---

[7] Further, the low market capitalization of the Preferred Securities at the very end of the Class Period was due to the sharp decline in the Preferred Stock share price, not the result of a decrease in efficiency. Coffman Rebuttal Report ¶ 33.

[8] In that case, the plaintiffs' expert and Attari used the same autocorrelation test but different robustness tests. The court did not credit Attari's robustness test. *See* Attari Dep. 84:2-91:4; Attari Dep. Exs. 74-75. Notably, the robustness tests conducted by both the plaintiffs' expert and Attari in that case were weaker than the one conducted by Coffman here. The plaintiffs' expert and Attari's robustness tests used a one-year period; here, Coffman performed a robustness test with a

Finally, although a "plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies,"[9] Plaintiffs have done so here (*Cammer* Factor 5). Specifically, Coffman empirically demonstrates that, once the Preferred Securities first traded substantially below par value, they reacted in a statistically significant way to firm-specific events that updated the market regarding the ability of the Company to continue paying dividends or stay listed on the NYSE. *See* Coffman Opening Report ¶¶ 51-52; Coffman Rebuttal Report ¶¶ 65-66.[10] Attari does not dispute this; rather, he argues that Coffman should

---

quarterly analysis. *Compare* Attari Dep. Ex. 75 at pp. 27-28 *with* Attari Dep. Ex. 42 at 17c and 17d.

[9] *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018). *See also In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017) (explaining that "indirect evidence of market efficiency" under the other four *Cammer* factors would "add little to the Basic analysis if courts only ever considered them after finding a strong showing based on direct evidence alone", and that indirect evidence regarding the efficiency of a market for a company's stock under the first four *Cammer* factors "is particularly valuable in situations where direct evidence does not entirely resolve the question" of market efficiency); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2014) ("Neither are we persuaded by [the] argument that a finding of market efficiency always requires proof that the alleged misrepresentations had an immediate effect on the stock price. . . . [The defendant] does not point us to any court that has adopted the unwavering evidentiary requirement it urges upon us. Nor could it. Even the Cammer court itself did not establish such a strict evidentiary burden at the class certification stage."); *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005) (explaining that the district court improperly used three of the Cammer factors, including Cammer 5, "as a checklist rather than an analytical tool"); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004) (explaining that courts "should consider factors such as" the *Cammer* factors).

[10] The *Cammer* and *Krogman* factors are regularly modified by courts when analyzing market efficiency for non-equity securities, like the Preferred Securities here. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n. 11 (2d Cir. 2008) (applying the *Cammer* factors in modified form "to bond markets with a recognition of the differences between the manner in which debt bonds and equity securities trade."); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 747-49 (S.D. Tex. 2006) (applying the *Cammer* factors in modified form to debt securities); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 615 (C.D. Cal. 2009) (modifying the *Cammer* factors to account for the unique attributes of stocks and bonds); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635-36 (N.D. Ala. 2009) (same).

8

have analyzed how the Preferred Securities moved in response to earning releases instead. This is wrong.

There is no reason to expect preferred securities to move in response to earnings releases absent concern about the Company's liquidity, solvency, ability to pay dividends, or ability to continue trading on an exchange. *See id.*; Attari Dep. 132:10-137:1. Furthermore, there are a multitude of reasons why the Preferred Securities would not be expected to react to earnings releases generally, including that they did not provide any new or material information. *See* Coffman Rebuttal Report at 8 n.16; Attari Dep. 130:8-132:3. Indeed, contrary to KPMG's assertion, academic research demonstrates that there is no expectation in the first instance that equity securities react to earnings releases all or even half of the time. *See* Attari Dep. 127:18-130:7; Attar Dep. Ex. 77.

Since Plaintiffs have demonstrated overwhelming evidence of market efficiency for each of the Miller Energy Securities, the 10(b) Class is entitled to the *Basic* presumption of reliance.[11]

### b. The Section 10(b) Class is Entitled to the *Affiliated Ute* Presumption of Reliance

Plaintiffs also establish that the Class is entitled to a presumption of reliance under *Affiliated Ute*. *See* Mot. at 19-21. KPMG contends that the *Affliated Ute* presumption is unavailable because "Plaintiffs' claims are not based on omissions, but rather on alleged affirmative misstatements[.]" Opp'n of KPMG LLP to Pls.' Mot. to Certify the Classes, Appoint Class Representatives, and Appoint Class Counsel ("Opp'n"), at 15. The Court should not credit this opportunistic and highly conclusory attempt to recast Plaintiffs' allegations. The heart of this case

---

[11] As will be set forth in more detail in Plaintiffs' Opposition to KPMG's Motion to Exclude, Attari's attacks on Coffman's methodology are wrong. Coffman's methodology was rigorous, and Attari's criticisms of his study are unscientific, unsound, and regardless, have no impact on Coffman's conclusions. *See generally* Coffman Rebuttal Report.

is KPMG's failure to disclose the truth about the value of the Alaska Assets. Moreover, "the theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information." *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005). Having primarily alleged material omissions, reliance pursuant to *Affiliated Ute* may be presumed. *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373 (S.D.N.Y. 2015).

### c.    KPMG Fails to Demonstrate the Absence of Price Impact

As the Supreme Court has held, to rebut the presumption of reliance, "it is incumbent upon [KPMG] to show ***the absence of price impact***" – *i.e.* that the alleged misrepresentations and corrective disclosures did not affect the price of the relevant stock at all – by a preponderance of the evidence. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) (emphasis added). *See also Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 657 (S.D. Ohio 2017); *Kasper*, 2017 WL 3008510, at *12; *Burges v. Bancorpsouth, Inc.*, No. 14-cv-1564, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017). "Merely pointing to other potential causes for a stock price change following a corrective disclosure is . . . not enough to rebut the *Basic* presumption." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-cv-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015). "Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with [Defendants'] analysis is insufficient." *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 08-cv-160, 2018 WL 3861840, at *13 (N.D. Ohio Aug. 14, 2018) (emphasis in original). As such, "in practice, the so-called 'rebuttable presumption' is largely irrebuttable." *Halliburton,* 573 U.S. at 296. *See also Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 (S.D.N.Y. 2016) (a price-impact challenge "will not ordinarily present a serious obstacle to class certification" and "the vast majority of courts have found that defendants

10

have failed to meet their burden of proving lack of price impact."); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014) (describing the burden of proving the absence of price impact as "daunting[.]"). KPMG has not – and cannot – meet its burden.

KPMG's price-impact challenge fails in two key respects. First, KPMG focuses exclusively on price impact at the time of the misrepresentations and ignores price impact at the time of the corrective disclosures.[12] This distorts the relevant legal standard: "price impact is demonstrated *either* through evidence that a stock's price rose in a statistically significant manner after a misrepresentation *or* that it declined in a statistically significant manner after a corrective disclosure." *Willis*, 242 F. Supp. 3d at 657 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014)) (emphasis added); *Burges*, 2017 WL 2772122, at *9 ("[t]o successfully rebut the fraud-on-the-market presumption . . . a defendant cannot simply show that a price did not rise after a misrepresentation."); *Kasper v. AAC Holdings, Inc.*, No. 3:15-cv-00923-JPM-JSF, 2017 WL 3008510, at *12 (M.D. Tenn. July 14, 2017), *leave to appeal denied, In re AAC Holdings, Inc.*, No. 17-0509, 2017 WL 4801185 (6th Cir. Oct. 24, 2017) ("Price impact can be shown *either* by an increase in price following a fraudulent public statement *or* a decrease in price following a revelation of the fraud.") (emphasis added). Indeed, KPMG's expert implicitly acknowledges as much: "*One way* to show that there was a potential price impact is to show that the price of a company's securities increased in response to the alleged misrepresentations." Attari Report at ¶ 214 (emphasis added).

---

[12] KPMG asserts that "[w]here the evidence shows that the alleged misrepresentations did not result in an increase in the prices of the securities in question, the presumption of reliance has been rebutted." Opp'n at 9.

Second, KPMG offers **no** evidence whatsoever of a lack of price impact. Instead, while Plaintiffs allege that the stock price fell in response to numerous corrective disclosures (*see* Compl. ¶¶ 197-236),[13] Attari's report entirely fails to address the price impact of the corrective disclosures, much less establish that all of the corrective disclosures had no impact on the price of Miller Energy Securities.[14] Indeed, Attari concedes that he did not conduct a negative causation analysis and has no opinion regarding whether Miller Energy's share price fell in response to the alleged corrective disclosures. *See* Attari Dep. 114:7-10.[15] That alone is enough to reject KPMG's attempt to rebut the presumption of reliance.[16]

But there is more. KPMG acknowledges that its first false and misleading audit report preceded a statistically significant increase of nearly 60% in the share price. *See* Opp'n at 11-12; Attari Report. ¶¶ 217(d); Attari Dep. 159:22-161:7. And while KPMG questions whether that misstatement *alone* caused the share price to rise, it does not argue, much less meet its burden of establishing, that it did not cause **at least some** of the price increase. Indeed, Attari has no opinion about what caused the price increase on that day. *See* Attari Dep. 161:18-21; 169:11-16. Merely

---

[13] *See also* Memorandum Opinion and Order of August 2, 2018 ("MTD Order"), ECF No. 76 (finding that "[b]ased on the second amended complaint, plaintiffs have shown a causal link between the loss and the alleged misrepresentation. . . . Plaintiffs have provided detailed allegations of loss, and they have clearly asserted that this loss was a direct result of disclosures regarding Miller Energy's operating loss and questionable cost figures.").

[14] KPMG attempts to make much of the fact that the stock price did not drop following just two dates discussed in the Complaint – namely, the December 10, 2014 and March 12, 2015 announcements of impairment charges on the Alaska Assets. *See* Opp'n at 13-14. But this fails to meet KPMG's burden, since KPMG only purports to challenge price impact on two dates, not on the 14 disclosures in the Complaint alleged to have caused Miller Energy Securities to fall.

[15] Notably, although not the subject of his report, Attari has calculated the damages suffered by investors in this action, thereby conceding price impact. *See* Attari Dep. 11:19-12:7.

[16] KPMG's arguments about Martin and Weakley's trading patterns (Opp'n at 13-14) are irrelevant, as they are not moving to be appointed as class representatives. Furthermore, their trading does nothing to demonstrate the absence of price impact.

12

pointing to other potential causes of an increase in the share price is a far cry from demonstrating the ***absence*** of price impact.[17]

Further, though it is not Plaintiffs' burden, Coffman demonstrated that KPMG's first audit report did cause significant inflation in the prices of Miller Energy Securities. *See* Coffman Opening Report ¶¶ vi-xiii.; Coffman Rebuttal Report ¶¶ 58-60. Moreover, despite KPMG's claim that other news on that day may have also caused some of the price inflation, Attari concedes that the only other new information disclosed on that day either would have caused the stock price to decrease (the change regarding Miller Energy's credit agreement) or was related to KPMG's false and misleading audit report (the finding that there was nothing nefarious about Miller Energy's premature filing of its Form 10-K without KPMG's sign off a few weeks earlier). Attari Dep. 161:22-168:17.[18] Accordingly, KPMG has not rebutted the presumption of reliance.

### d. KPMG's Fraud Was Not Known by Investors Prior to the End of the Class Period

Even though KPMG continued to sign off on Miller Energy's financial statements throughout the Class Period, reassuring investors that the valuation of the Alaska Assets was accurate, and even though there was no public indication that KPMG acted improperly until after the Class Period, KPMG argues that because certain hypothetical investors may have known the

---

[17] While KPMG attempts to cast doubt on the viability of the price-maintenance theory in the Sixth Circuit (Opp'n 9 n.5), it neglects to mention that the case it relies on ***endorses the price-maintenance theory***. *See Willis*, 242 F. Supp. 3d at 658 ("This Court agrees with the reasoning of those courts that have recognized the price maintenance theory of price impact."); *see also Burges*, 2017 WL 2772122, at *9 ("the fact that there was no stock price increase when the statements were made does not suggest a lack of price impact."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 86-87 (S.D.N.Y. 2015) ("[A] material misstatement can impact a stock's value    . . .by improperly maintaining the existing stock price.").

[18] Indeed, the results of the internal investigation were so inconsequential many analysts did not even discuss it. *See*, *e.g.*, Attari Report, Ex. 80.

13

truth of the fraud and KPMG's role in it prior to the end of the Class Period, the statute of limitations has run and common issues do not predominate. Opp'n at 20-23. They are wrong.

First, as the Sixth Circuit has held, "an affirmative defense, standing alone, does not compel a finding that common liability issues do not predominate." *In re HCA Holdings, Inc.*, No. 14-cv-511, 2015 WL 10575861, at *2 (6th Cir. Feb. 26, 2015). Indeed, courts regularly hold that a statute-of-limitations defense based on public information does not defeat predominance because it is subject to generalized proof. *See, e.g., N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, No. 08-cv-5310, 2016 WL 7409840, at *8 (S.D.N.Y. Nov. 4, 2016) (defendants "rely on news reports and other publicly available information, none of which suggests that any putative class member had unique knowledge as to the alleged misstatements . . . .To the extent those news reports are relevant to a statute of limitations or knowledge, they are subject to generalized proof and thus do not militate against the certification of a class."); *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 214 (S.D.N.Y. 2012) (defendant "has not provided sufficient evidence that any class member had actual knowledge of the allegedly false or misleading statements . . . . or that they later were on notice of such statements sufficient to raise individualized statute of limitations issues.").

Second, even if such a defense were sufficient to defeat predominance – which it is not – there is no evidence that investors were put on notice of KPMG's fraud prior to the end of the Class Period. *See* Pls.' Opp'n to Def.'s Mot. to Dismiss, at 39; 40 n. 35, ECF No. 68. While KPMG notes that Mr. Cosby knew about the premature filing of Miller Energy's Form 10-K in 2011 (Opp'n at 23), such knowledge revealed nothing about KPMG's fraud to Mr. Cosby, or any other Miller Energy investor. More to the point, and as KPMG acknowledges, each of the Proposed Representatives testified that they were not aware of KPMG's wrongdoing (or even Miller

Energy's wrongdoing), prior to the end of the Class Period. Opp'n at 26, n. 27.[19] This makes sense given that until the SEC implicated the auditors in Miller Energy's fraud after the end of the Class Period, investors had no reason to believe that KPMG had engaged in any wrongdoing and could not have sufficiently pled a claim against KPMG. KPMG admits as much when arguing (wrongly) that Mr. Cosby is atypical because he sold after only some of the partial disclosures of the fraud: "But Plaintiffs allege only three events and disclosures during that period of time, ***none of which disclosed anything about KPMG***, and so none can be viewed as a corrective disclosure." Opp'n at 24-25 (emphasis added).

Notably, this argument was already raised by KPMG and rejected by this Court at the motion-to-dismiss stage. As the Court held, KPMG has "failed to show that the statute of limitation had clearly run prior to plaintiffs' filing their initial complaint. . . . Even if plaintiffs were aware of the previous lawsuits, these lawsuits are not enough to conclude at this point in the proceedings that the statute of limitation period was triggered. MTD Order, at 17-18. The same argument was also considered and rejected by this Court in the *Gaynor* Action at class certification: "The Court finds Defendants' affirmative defense of knowledge does not defeat class certification. With respect to the publicly available news articles, the Court finds this insufficient to show that certain class members had differing levels of knowledge regarding the alleged misleading statements or omissions." *See* Gaynor R&R at 34; *see also id.* at 33-37 (explaining that the same reasoning applies to the defendants' statute-of-limitations argument). Thus, common issues predominate.

---

[19] KPMG speculates that Mr. Martin may have had unique knowledge about certain of Miller Energy's officers. *See* Opp'n at 23. But this does not come close to demonstrating that Mr. Martin had actual or constructive knowledge of Miller Energy's fraud, or KPMG's role in it. Furthermore, Mr. Martin is not a proposed Class Representative, so his knowledge is irrelevant to class certification.

e.      **Damages for the 10(b) Class Can Be Calculated on a Classwide Basis**

Plaintiffs need not demonstrate that damages are capable of measurement on a classwide basis at class certification.[20] Indeed, as numerous courts have explained, "while *Comcast* addresses class action certification, it was not in regard to a securities fraud litigation, which have generally been certified for class status. Instead, *Comcast* addresses antitrust litigation." *In re Heckmann Corp. Sec. Litig.*, No. 10-cv-378, 2013 WL 2456104, at *14 (D. Del. June 6, 2013).[21] Nonetheless, Plaintiffs demonstrate that damages for the Section 10(b) Class can be calculated on a classwide basis by utilizing the well-settled, out-of-pocket methodology that is regularly utilized and approved in similar cases. *See* Coffman Opening Report at ¶¶ 73-74; Coffman Rebuttal Report at ¶¶ 47-50; *Rowe v. Marietta Corp.*, 172 F.3d 49 (6th Cir. 1999) ("The out-of-pocket measure is the favored method of computing damages in a securities fraud case."); *Willis*, 242 F. Supp. 3d at 652 (employing out-of-pocket damages calculation method in a § 10(b) case); *In re Bridgestone Sec.*

---

[20] *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d. Cir. 2015) (it is "a misreading of Comcast" to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement."); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) ("Comcast does not mandate that certification . . . requires a finding that damages are capable of measurement on a classwide basis."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257-58 (10th Cir. 2014) ("Comcast did not rest on the ability to measure damages on a class-wide basis."); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

[21] KPMG disputes Plaintiffs' reliance on *In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 860 (6th Cir. 2013), attempting to dismiss it as an irrelevant products-liability case. Yet *In re Whirlpool* squarely holds that plaintiffs are not required to show that damages are capable of measurement on a classwide basis to show predominance. *See id.* ("[w]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate.").

16

*Litig.*, 430 F. Supp. 2d 728, 738 (M.D. Tenn. 2006) (same).[22] Indeed, courts continue to consistently rely on the out-of-pocket methodology in certifying securities class actions following *Comcast v. Behrend*, 569 U.S. 27 (2013). *See In re St. Jude Med. Inc. Sec. Litig.*, No. 10-cv-0851, 2014 WL 6908434, at \*6-9 (D. Minn. Dec. 8, 2014) (collecting cases).

In response, KPMG asserts that "individual issues of damages will overwhelm common issues." Opp'n at 16. KPMG is wrong. Crucially, KPMG is unable to point to a single securities-fraud decision where a class invoking the "out-of-pocket" method was not certified, and Plaintiffs are unaware of any such case. In fact, in the lone, out-of-Circuit securities case KPMG cites, the court certified a class of investors who advanced the same out-of-pocket damages methodology, and used the same expert, as Plaintiffs here. *See In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at \*12-13 (S.D. Tex. May 20, 2014) ("*BP*"); *see also* Coffman Rebuttal Report ¶ 49. While KPMG argues that Plaintiffs' "out-of-pocket" approach is not consistent with their theory of liability, *BP* held ***precisely the opposite***, explaining that "the out-of-pocket measure of damages employed in most securities fraud cases is ***particularly consonant*** with the fraud-on-the-market theory." *Id.* at \*13 n.14 (emphasis added).

Undeterred, KPMG attempts a sleight of hand, premising its entire argument on the "pre-spill" subclass in *BP*. Opp'n at 19-20. But the pre-spill subclass sought to recover consequential damages related to the post-spill stock price decline. *BP* at \*8. In so doing, the pre-spill subclass "***expressly eschew[ed]***" the traditional out-of-pocket damages calculation method advanced by Plaintiffs here. *Id.* at \*11; *see also* Coffman Rebuttal Report ¶ 49. Thus, KPMG's sole authority

---

[22] Attari concedes that Coffman proposes an out-of-pocket damages theory. *See* Attari Dep. 100:17-24. Further, Attari admits that if his "understanding," based entirely on instruction from KPMG's counsel, that Plaintiffs need to separate high- and low-risk investors to demonstrate that damages can be calculated on a classwide basis is wrong, that he has no further criticism of Plaintiffs' damages theory. *See id.* at 99:23-100:16.

that the out-of-pocket damages method is improper in this case is the denial of certification to a subclass that did not use the out-of-pocket damages method and sought consequential damages. *See id.* For these reasons alone, KPMG's attempt to marshal *BP* as authority fails.

Seizing on the fact that the *BP* pre-spill subclass employed a materialization-of-the-risk theory, KPMG then attempts to stretch the denial of certification as to that subclass into a rule that every case that invokes materialization-of-the-risk must provide a damages model that distinguishes between high-risk and low-risk investors. Opp'n at 18-20. This is demonstrably wrong. Indeed, there are dozens, if not hundreds, of cases where the standard out-of-pocket methodology – without separating high risk and low risk investors – is used for cases alleging a materialization-of-the-risk theory. *See*, *e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91 (S.D.N.Y. 2016) (certifying a class of investors in a materialization-of-the-risk case where Coffman conducted a standard out-of-pocket damages analysis without separating high risk and low risk investors); *Grae v. Corr. Corp. of Am.*, No. 16-cv-2267, 2019 WL 1399600, at *2 (M.D. Tenn. Mar. 26, 2019) (certifying a class of investors in a materialization-of-the-risk case with a standard out-of-pocket damages analysis without separating high-risk and low-risk investors).[23]

*In re Barrick Gold Securities Litigation*, 314 F.R.D. 91 (S.D.N.Y. 2016)—a case with strikingly similar facts to those here in which Coffman also served as the plaintiffs' expert—

---

[23] *See also Strougo v. Barclays PLC*, 312 F.R.D. 307, 325 (S.D.N.Y. 2016) (certifying a class of investors in a materialization-of-the-risk case with a standard out-of-pocket damages analysis without separating high risk and low risk investors); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 164 (S.D.N.Y. 2012) (same); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 321 (S.D.N.Y. 2010) (same); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 110 (S.D.N.Y. 2009) (same); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008) (same); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (same); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 79 (S.D.N.Y. 2007) (same); *Rooney v. EZCORP, Inc.*, No. 15-cv-608-SS, 2019 WL 691205, at *9 (W.D. Tex. Feb. 19, 2019) (same, with Coffman as class certification expert); *Mauss v. NuVasive, Inc.*, No. 13-cv-2005, 2017 WL 1080654, at *4 (S.D. Cal. Mar. 22, 2017) (same).

18

illustrates the point. As here, the plaintiffs in *In re Barrick* brought a Section 10(b) claim on a materialization-of-the-risk theory. *See* 314 F.R.D. at 103-04. The defendants argued that the plaintiffs' use of an out-of-pocket damages calculation would cause individualized damages issues to predominate. *See id.* The Court noted that: "Defendants' reasoning depends on two incorrect assumptions about plaintiffs' theories of damages and loss causation: (1) that plaintiffs seek consequential damages and (2) that plaintiffs' claims are limited to materialization of the risk." *Id.* at 105. Rejecting the defendants' damages argument, the Court held that: "plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be measurable on a class-wide basis. . . . [as] evidenced by the fact that securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations." *Id.* at 105-06.

Classwide damages do not predominate over individual damage issues.

## 2. The Proposed Representatives are Typical

KPMG does not dispute that the Proposed Representatives allege that they purchased Miller Energy Securities at prices artificially inflated by fraud and that their claims are based on the same legal theories and facts. Typicality requires nothing more. *See, e.g., Rikos v. P&G*, No. 11-cv-226, 2014 WL 11370455, at *8 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 09-cv-882, 2012 WL 1071281, at *37 (M.D. Tenn. Mar. 29, 2012).

Nevertheless, KPMG asserts that Mr. Cosby is atypical because of the "the timing of his purchase[s]." Opp'n at 24. This argument is a nonstarter. "Differences in the timing of stock purchases by class representatives do not make their claims atypical if plaintiffs allege a common scheme of misrepresentation." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 445 (S.D. Ohio 2009); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 610 (S.D. Ohio 2003) ("When a named

19

plaintiff alleges a common course of conduct in a securities class action, the fact that he purchased stock late in the class period does not vitiate his suitability as a class representative."). Indeed,

> [d]efendants in securities class actions have often argued that a plaintiff's claim cannot be typical of the claims of class members who purchased at different times in reliance on different documents. It is now settled, however, that the claims of such a plaintiff are typical of the claims of the class if all the documents relied upon are part of a common course of conduct or common scheme to defraud.

*Ross*, 257 F.R.D. at 445 (quoting 7 Newberg on Class Actions § 22.26 (4th ed. 2002)).[24] Thus, Mr. Cosby is typical.[25]

KPMG also attempts to paint Messrs. Ziesman and Montague as atypical because they did not read KPMG's audit reports prior to investing. Curiously, KPMG does not contest that Messrs. Ziesman and Montague relied on KPMG's misstatements, but instead asserts that their reliance was somehow "*not* justifiable." Opp'n at 25-26 (emphasis in original). Crucially, in so arguing, KPMG concedes Messrs. Ziesman and Montague's reliance. This is consistent with the well-established principle that to "rely on a misstatement in the sense relevant for the *Basic* presumption, [an investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton*, 573 U.S. at 273. KPMG has not rebutted the presumption of reliance, and Plaintiffs need not show more at this stage of the

---

[24] KPMG's authority does not show otherwise. For example, *Rocco v. Nam Tai Electronics*, *Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) is readily distinguishable from this case, as it involved post-class period purchases designed to capitalize on uncorrected and ongoing fraud.

[25] Mr. Montague undisputedly held through the end of the Class Period. Mr. Cosby sold his shares after certain of the alleged corrective disclosures, which need not explicitly refer to KPMG to be sufficient for loss-causation purposes. Such disclosures must only reflect part of the "relevant truth" concealed by KPMG's misconduct. *See*, *e.g.*, *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *12, *report and recommendation approved*, No. 3:10-cv-00463, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) ("[T]o establish loss causation the disclosed information must reflect part of the "relevant truth"—the truth obscured by the fraudulent statement.").

20

litigation. *See id.* [26]

Moreover, whether Messrs. Ziesman and Montague's reliance was somehow not "justifiable" goes to the merits and is improper at class certification. *See Bovee*, 216 F.R.D. at 611 ("even if [defendants] can prove non-reliance as an affirmative defense, this goes to the merits of the case and cannot be considered by the court on a certification motion.").[27] Accordingly, each of the Proposed Representatives are typical of the Section 10(b) Class.

### B. The Section 11 Class Should Be Certified

#### 1. The Section 11 Class Is Numerous

As set forth in the Motion, "[n]umerosity is generally assumed to have been met in class action suits involving nationally traded securities." Gaynor R&R at 16 (quoting *Burges*, 2017 WL 2772122, at *2); *Ross*, 257 F.R.D. at 442 (collecting cases); *In re Accredo Health, Inc. Sec. Litig.*, No. 03-cv-2216, 2006 WL 1716910, at *5 (W.D. Tenn. Apr. 19, 2006). To meet this element, "the exact number of class members need not be pleaded or proved." *Willis*, 242 F. Supp. 3d at 644 (quoting *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)).[28]

KPMG asserts that Plaintiffs "offer no evidence of" numerosity. Opp'n at 28. To the contrary; Plaintiffs point both to the millions of shares sold in the Offerings and to the high average

---

[26] The Proposed Representatives testified that they relied on the price of the stock and had no reason to assume that the price was incorrect or that KPMG had engaged in fraud. *See* Cosby Dep. 96:4-13, 139:17-22, 251:21-25; Ziesman Dep. 43:6-13, 67:23-68:4, 82:16-20; Montague Dep. 108:20-23, 114:9-13. The Proposed Representatives' deposition transcripts are Exhibits C, D, and E, respectively, to the accompanying Declaration of Gordon Ball.

[27] *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992) is not a class action, and as such, KPMG's attempt to invoke it here is specious.

[28] Numerosity is presumed when the Class consists of just 40-50 individuals. *See, e.g., Taylor v. CSX Transp., Inc.,* 264 F.R.D. 281, 288 (N.D. Ohio 2007); *Kelly v. Montgomery Lynch & Assocs., Inc.,* No. 07–cv–919, 2007 WL 4562913, at *3 (N.D. Ohio Dec. 19, 2007).

21

weekly turnover as a percentage of preferred shares outstanding as strong evidence that there are at least thousands of people in the Section 11 Class. Mot. at 12; Coffman Opening Report ¶ 30. KPMG's rebuttal that more frequent turnover translates to a reduced likelihood that purchasers can trace their shares to the relevant offerings is merely a tracing argument masquerading as a numerosity argument.[29] As demonstrated *infra* at § II.B.2, tracing is not a bar to class certification.

Moreover, in the *Gaynor* Action, this Court found that the plaintiffs established numerosity "based on the number of Series C and Series D shares that were purchased (6.21 milion)[.]" Gaynor R&R at 16.[30] KPMG's failure to address the very argument that this Court found decisive in the *Gaynor* Action is conspicuous. And KPMG offers no valid reason for this Court to reverse itself in this case. The Section 11 Class is numerous.

### 2. Mr. Ziesman is Typical

KPMG argues that Mr. Ziesman is not typical because he cannot trace his Series C purchases to a specific offering at this time. *See* Opp'n at 27. This is incorrect. Courts nationwide hold that tracing arguments are not a bar to class certification in Section 11 cases. *See In re Direct Gen. Corp.*, No. 05-cv-77, 2006 WL 2265472, at *3 (M.D. Tenn. Aug. 8, 2006) (holding that traceability arguments are "more properly suited to a motion for summary judgment" and that "the common question of whether the registration statements were materially misleading predominates over any secondary tracing issues that might be encountered later in the litigation."); *In re Prison*

---

[29] KPMG contends that the high average weekly turnover makes it difficult to know how many people were injured (Opp'n at 28), but that is not the relevant standard. Plaintiffs need not show how many people were damaged to certify a class, only how many people *may* be part of the Section 11 Class.

[30] *See also Schuh v. HCA Holdings, Inc.*, No. 11-cv-1033, 2014 WL 4716231, at *13 (M.D. Tenn. Sept. 22, 2014) (holding that plaintiffs established numerosity because the "case involves the sale of millions of stock, and Plaintiff estimates that the number of purchasers is likely to be 'in the thousands' and that those purchasers reside in many states").

*Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690-91 (M.D. Tenn. 2000) ("[A] § 11 cause of action can be brought by anyone who purchased stock under a registration statement, regardless of when the purchase was made."); *Wallace v. Intralinks*, 302 F.R.D. 310, 319 (S.D.N.Y. 2014) ("[T]racing is a merits issue that the court need not consider at the class certification stage."); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, No. 8-cv-397, 2012 WL 4482032, at *11 (D.N.J. Sept 25, 2012) ("[Traceability] is a fact issue more appropriately addressed a later stage in the litigation."); Mot. at 15-16, n. 13 (collecting cases).[31]

Indeed, under KPMG's logic, tracing questions would preclude certification of **every** Section 11 claim involving a secondary offering or secondary market purchasers. This is not the law, as evinced by the fact that Section 11 classes, including secondary market purchasers, are routinely certified. *See In re Direct Gen. Corp.*, 2006 WL 2265472, at *3; *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d at 690-91; *Wallace*, 302 F.R.D. at 319; *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *36; *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 45-46 (D.D.C. 2006); *United Food and Commercial Workers Union v. Chesapeake Energy*, 281 F.R.D. 641, 647 (W.D. Okla. 2012); *In re Colbalt Int'l Energy, Inc., Sec. Litig.*, No. 14-cv-3428, 2017 WL 2608243, at *5 (S.D. Tex. June 15, 2017); *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-cv-786, 2016 WL 4098741, at *13 (D. Minn. July 28, 2016); *In re Smart Tech., Inc. S'holder Litig.*, 295 F.R.D. 50, 61-62 (S.D.N.Y. 2013).

Moreover, this Court so found in the *Gaynor* Action. *See* Gaynor R&R at 20-21 (rejecting argument that typicality was not met because a proposed class representative could not trace his shares back to the relevant offerings). As this Court explained:

> At the heart of Plaintiffs' claim is that the Registration Statement contained misstatements and/or omissions of material fact – the over valuation of the Alaska

---

[31] *See also* Gaynor R&R at 14 (collecting cases).

23

> Assets. This issue will predominate over any secondary issues with respect to tracing. . . . The Court has also considered Defendants' argument that aftermarket purchasers cannot establish that they purchased Series C shares that are not precluded by the statute of repose. . . . the Court does not find that they will predominate over the main issue involving the Registration Statement.

*Id.* at 31-32.

KPMG's argument reflects a fundamental misunderstanding of the class action mechanism. Under the proposed class definition, the Section 11 Class is limited to persons who can trace their shares to the offerings. The ultimate question of membership in the Class will be resolved upon settlement or a judgment holding KPMG liable. At that time, putative class members will be required to submit proof that they belong to the class as part of a claims-administration process. Accepting KPMG's tracing arguments would transform a routine element of class action practice into an outright bar to class certification.

Lastly, KPMG claims that Mr. Ziesman is subject to a statutory exception that requires him to prove reliance. *See* Opp'n at 28 (citing 15 U.S.C. § 77k(a)(5)). Specifically, KPMG asserts that "[b]ecause Mr. Ziesman purchased his Series C shares on June 4, 2014, after Miller Energy had issued earnings statements covering a period of twelve months after the effective date, he must prove reliance, and his claim is not typical." *Id.* This is incorrect. *In re WorldCom, Inc. Sec. Litigation*, 219 F.R.D. 267, 294-95 (S.D.N.Y. 2003) is directly on point. As the *WorldCom* court explained, "the 'earning statement' that triggers the requirement of proof of reliance . . . may not contain material omissions. . . . [and] must include the requisite material disclosures and be prepared in accordance with generally accepted accounting principles." *Id.* at 289. Here, there is no question that each of Miller Energy's earnings statements were false and misleading when made, and that they were not prepared in accordance with GAAP. *See* Compl. ¶¶ 194-96, 233.

24

Indeed, the SEC found, and KPMG admitted, as much. *See id.* ¶ 195. Accordingly, the statutory exception is not applicable here.[32]

The Proposed Representatives' claims are typical of the Section 11 Class.

### 3. The Proposed Representatives Are Adequate

KPMG does not dispute that Messrs. Cosby, Montague and Ziesman are more than adequately fulfilling their obligations to the Classes, including communicating with and overseeing counsel, acting in the best interests of the Classes, and vigorously prosecuting this case. It is beyond dispute that Messrs. Cosby, Montague, and Ziesman understand what the case is about, the stage of the litigation, their obligations to the Classes and the arguments that are at issue in the litigation. They each regularly speak to their counsel and each other about the case, review pleadings, and in the case of Mr. Cosby, have reviewed nearly all the documents produced by KPMG to date in this matter. Two of the proposed Class Representatives – Messrs. Cosby and Montague – are CPAs, and as such, have a well-developed understanding of the accounting rules and obligations at issue.[33] As a result, KPMG resorts to claiming that the Proposed Representatives

---

[32] KPMG also argues that this inapplicable statutory exception demonstrates that common issues do not predominate. Opp'n at 30. For the same reasons, this argument can be easily rejected. Even if the statutory exception were relevant – which it is not – as discussed *supra* at § II.B.2, since the market for the Preferred Securities was efficient, Plaintiffs have established reliance.

[33] *See* Ziesman Dep. 26:4-9; Montague Dep. 100:8-12; Cosby Dep. 71:12 (reflecting that the Proposed Representatives are appropriately communicating with and overseeing counsel); Ziesman Dep. 20:7-8; Montague Dep. 10:22-11:2; Cosby Dep. 237:12-14; 239:11-14 (reflecting that the Proposed Representatives understand what is at issue in this litigation); Ziesman Dep. 22:22-23:13; Montague Dep. 100:16-20; Cosby Dep. 177:20-24 (reflecting that the Proposed Representatives are dedicated to achieving the best possible result for the Classes); Cosby Dep. 40:22-41:9 (reflecting that Mr. Cosby has reviewed almost all of the documents produced by KPMG); Cosby Dep. 8:18-25; Montague Dep. 12:11-21 (reflecting that Messrs. Cosby and Montague are CPAs); *see also* Joint Decl. of Lewis Cosby, Eric Montague, and Martin Ziesman ("Joint Declaration of Proposed Representatives"), ECF No. 107-1.

are inadequate because they purportedly do not have standing to represent the Section 11 Class. KPMG's argument depends on a mischaracterization of the facts and the relevant legal standard.

First, Mr. Ziesman is not "the one and only proposed class representative for the [Section 11] claim." Opp'n at 32. Mr. Cosby also seeks to represent the Section 11 Class, and he applied for and was appointed a Lead Plaintiff in this action. *See* Compl. ¶¶ 14-16; Order of February 17, 2017, ECF No. 31.[34] There can be no question that Mr. Cosby can adequately represent the interests of the Section 11 Class. Class representatives need not have purchased a specific security to represent the interests of purchasers of that security. This is because, "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).

*In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 461 (S.D.N.Y. 2017), is instructive. There, the court held that the plaintiffs, who had only purchased American Depositary Shares ("ADS"), akin to common stock, could nevertheless bring claims on behalf of bondholders, despite not being bondholders themselves. *Id.* at 461 ("As purchasers of Eletrobras's ADSs during the class period, the named plaintiffs have plausibly pleaded that they suffered some actual injury as a result of the allegedly material misrepresentations in Eletrobras's annual reports, press releases, and public statements in a way that 'was broadcast at the same time to all members of the public,

---

[34] Mr. Montague similarly seeks to represent the Section 11 Class. Indeed, each of the Proposed Representatives seeks to represent both Classes. *See* Joint Decl. of Proposed Representatives.

prospective shareholders and prospective bondholders alike.'") (quoting *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 452 (S.D.N.Y. 2013)).[35]

The same is true here. All of the Proposed Representatives sustained losses because of the same alleged material misrepresentations and omissions contained and repeated in Miller Energy's financial statements, KPMG's audit opinions, the Registration Statement, and the Prospectus Supplements. Thus, the Proposed Representatives' interests are coextensive with purchasers of each Miller Energy Security at issue in the case, and the Proposed Representatives have standing to represent both Classes.[36]

Further, this Court has already held that whether Mr. Cosby has standing to represent the Section 11 Class is only appropriate for resolution "after . . . class certification has been raised by the parties or ruled on by this Court." MTD Order at 27. Given that discovery is stayed, it would

---

[35] *See also*, *e.g.*, *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 162-64 (2d Cir. 2013) (holding that where an issuer had issued multiple securities under the same shelf registration statement, a plaintiff who had invested in only some of those securities could bring claims based on securities in which it had not invested so long as all of the relevant claims implicated the same set of concerns.); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F.Supp.2d 746, 778 (S.D.N.Y.2012) (finding that a plaintiff need not further establish tranche standing to represent a class whose members invested in tranches in which the lead plaintiff did not invest); *In re Am. Int'l Grp., Inc.,* 741 F.Supp.2d 511, 538 (S.D.N.Y. 2010) (holding that a named plaintiff can represent purchasers from offerings the named plaintiff did not purchase in when the plaintiffs "do not rely on the information furnished in the prospectus and pricing supplements unique to each of the . . . offerings but rather on the alleged material misstatements and omissions located in the common elements of the . . . different registration statements"); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 584-85 (S.D.N.Y. 2010) (holding that "where a plaintiff alleges untrue statements in the shelf registration statement or the documents incorporated therein—as opposed to an alleged untrue statement in a supplemental prospectus unique to a specific offering—then that plaintiff has standing to raise claims on behalf of all purchasers from the shelf"). As such, KPMG's reliance on two outlying and out-of-date cases is misplaced. *See* Opp'n at 34 n.34 (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 584 F. Supp. 2d 485, 491 (S.D.N.Y. 2010); *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958, 964 (N.D. Cal. 2010)).

[36] KPMG's argument that the Proposed Representatives lack standing to represent Series D purchasers (Opp'n at 33-34) fails for the same reason.

be premature to resolve this issue before the parties have had the opportunity to develop the relevant factual record.

Second, adding, withdrawing, and substituting class representatives is a customary feature of class action practice. *See Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006) (holding that "[s]ubstitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptionable ('routine') feature of class action litigation . . . in the federal courts[,]" and collecting cases). There is no reason that a newly added class representative, like Mr. Ziesman, cannot represent the Section 11 Class, even though he was not initially an appointed Lead Plaintiff. Further, contrary to KPMG's assertion (Opp'n. at 27), Mr. Ziesman need not prove traceability at this stage to demonstrate that he is a member of the Section 11 Class, particularly when discovery has been stayed. *See* Coffman Rebuttal Report ¶¶ 51-55. It is enough that he purchased Series C Preferred Stock and held it through the end of the Class Period. *See* Certification of Martin Ziesman, ECF No. 101-2.

### 4. Damages for the Section 11 Class Can Be Calculated on a Classwide Basis

KPMG erroneously contends that "[b]ecause Miller Energy issued the Series C and Series D preferred shares in more than one issuance at different initial offering prices, damages cannot be calculated accurately under the statutory formula without knowing which offering each investor's shares came from." Opp'n at 31. In so doing, KPMG offers yet another traceability argument, this time in the guise of a damages argument. Notably, KPMG fails to support this argument with *a single case* holding that the statutorily mandated damages formula under Section 11 weighs against—much less precludes—certification. The question of whether a putative class member can prove traceability is susceptible to classwide determination. As the court explained in *Wallace*,

The Section 11 claims provide no reason to exclude aftermarket purchasers. To be sure, only those who can trace their shares to the allegedly misleading registration statement have standing in a Section 11 claim. But tracing is a merits issue that the court need not consider at the class certification stage.

302 F.R.D. at 319. This Court reached the very same conclusion in the *Gaynor* Action. *See* Gaynor R&R at 32-33. According to KPMG's contrary view, no Section 11 case could *ever* be certified, as the calculations under Section 77k cannot occur until the Class submits their proof of claims identifying the date of purchase(s) and sale and the price of each. This is not a credible position.

Consistent with standard practice in Securities Act cases, Plaintiffs proffer the generally applicable methodology for measuring per-share damages—specifically, the statutory formula prescribed by Section 11:

> The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k. The application of the statutory methodology—which amounts to simple arithmetic—does not create individualized issues that outweigh the common issues to be resolved on a unified basis on behalf of the Class. *See* Coffman Rebuttal Report ¶¶ 47-55.[37] As this Court

---

[37] *See also In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) (*Comcast* does not bar certification . . . where Section 11(e) of the Securities Act provides a statutory formula for damages. . . . Because the statutory formula applies, the individual damages questions are sufficiently reduced that predominance of the common questions, answers, and facts remains."); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 318 F.R.D. 435, 447 (D. Colo. 2015) ("[B]ecause Securities Act damages are calculated using a statutory formula, [t]he means of determining them therefore would be common to all class members"); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-5093, 2013 WL 6839093, at *5 (S.D.N.Y. Dec. 27, 2013) (holding that *Comcast* is "inapposite here, where damages reflect liability by

29

held in the Gaynor Action, the statutorily prescribed damages methodology is sufficient at class

certification to establish that common questions of law and fact predominate over individualized

issues. *See* Gaynor R&R at 32-33.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion.

Dated: June 14, 2019

Gordon Ball
GORDON BALL PLLC
550 W. Main Street
Suite 600
Knoxville, TN 37902
Tel: (865) 525-7029
gball@gordonball.com

*Lead Counsel for Plaintiffs*

Respectfully submitted,

*/s/ Laura H. Posner*

Laura H. Posner
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212)838-7745
lposner@cohenmisltein.com

Steven J. Toll
Allen Dreschel
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
adreschel@cohenmisltein.com

*Co-Lead Counsel for Plaintiffs*

---

statutory formula[]" and that "[S]ection 11(e) of the Securities Act sets out the proper method for
calculating damages in this case.").

30

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019, I caused the foregoing to be filed using the Court's

CM/ECF System, which in turn sent notice to counsel of record.

Dated: June 14, 2019
/s/ Laura H. Posner
Laura H. Posner