# EXHIBIT C

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF TENNESSEE
 2                      KNOXVILLE DIVISION

 3

 4

 5  LEWIS COSBY, KENNETH R. MARTIN,    )
    as beneficiary of the Kenneth Ray  )
 6  Martin Roth IRA, and MARTIN WEAKLEY)
    on behalf of themselves and all    )
 7  other similarly situated,          )
                                       )
 8                     PLAINTIFFS,     )
                                       )
 9  VS.                                )   NO. 3:16-CV-00121
                                       )
10  KPMG, LLP,                         )
                                       )
11                     DEFENDANT.      )

12

13

14

15       VIDEOTAPED DEPOSITION OF LEWIS F. COSBY III

16                      MARCH 26, 2019

17

18

19  _____

20              PEGGY F. MCCRORY, LCR #532
              Registered Professional Reporter
21               Knoxville, TN  37901

22

23

24

25
```

1   A   It is no plaintiff situation.  It's a
2 hearing in front of the Federal Communication Commission.  And
3 so applications are filed and it is -- the -- the FCC determines
4 who's the most qualified.  So there's hearings and then there's
5 administrative law judge.
6   Q   Did you obtain the license?
7   A   We did.
8   Q   Okay.  Did you testify at the hearing?
9   A   Yes.
10   Q   Were there any other proceedings in
11 connection with the application for that television license?
12   A   We had depositions.
13   Q   So there were depositions in a private
14 setting like this and then there was also a public hearing?
15   A   Yes.
16   Q   When was that?
17   A   It was 1981 through 1988.
18   Q   Aside from that matter, have you been
19 involved in any other litigation other than this lawsuit?
20   A   Yes.
21   Q   What -- what else were you involved in?
22   A   I was expert witness in a Southern
23 Industrial Banking Corporation bankruptcy proceeding and
24 testified.
25   Q   I'm sorry.  You did testify?

1      Q      Several hours?

2      A      Oh, yeah.

3      Q      More than five hours?

4      A      Yes.

5      Q      Did you spend more than a day --

6      A      Yes.

7      Q      -- reviewing work papers?

8      A      Not the work papers.

9      Q      Oh, you're talking about documents other
10 than work papers.

11     A      Well, you haven't produced many work
12 papers.  Mostly they're e-mail chains and sign-offs.

13     Q      So why -- why don't you tell me, what
14 kinds of documents have you reviewed from the KPMG production in
15 this case?

16     A      There were documents produced under the
17 four-year request.

18     Q      Okay.  So you're talking about documents
19 that were received from a government agency in response to a
20 Freedom of Information act request that your lawyers put in.

21     A      Uh-huh.

22     Q      Have you reviewed documents produced by
23 KPMG in this litigation?

24     A      Yes.

25     Q      Okay.  So what from those materials have

1 you reviewed?

2    A    The -- I think you produced documents in
3 mid February.

4    Q    They're -- they're probably even more than
5 one production --

6    A    Oh, yeah.  February, and then there was
7 one in March.

8    Q    Okay.  And have you reviewed all of them?

9    A    Almost all of them, I think so.

10    Q    So how -- how much time in total have you
11 spent reviewing KPMG's documents?

12    A    I'd say 80 to a hundred hours.

13    Q    Okay.

14    A    That was all in February and March of this
15 year.

16    Q    Tell me what you did to prepare for your
17 deposition today.

18    A    Met with Mr. Ball and Laura yesterday.

19    Q    How long did you meet?

20    A    Three or four hours.

21    Q    Did you review any documents?  Just yes or
22 no.

23    A    Let's see -- documents per se, I don't
24 think so.

25    Q    Okay.  And is that the only meeting you

1      A      By doing the things I'm doing now.  I've

2 reviewed pleadings.  I've participated in litigation decisions.

3 I've monitored counsel.  I will attend hearings.  And I'm here

4 for a deposition.  And will testify if necessary.

5      Q      How do you plan to actively monitor your

6 counsel in this litigation?

7      A      I bug them.

8            MR. BALL:  I promise you.

9            MS. POSNER:  So do I.

10 BY MR. BALLARD:

11      Q      You're in frequent contact.

12      A      I am.

13      Q      You read the pleadings in the case?

14      A      I do.

15      Q      Do you read all of the files in the case?

16      A      Yes.

17      Q      Okay.  Did you read the motion to

18 substitute parties?

19      A      Yes.

20      Q      Did you read the opposition to -- or the

21 response to the motion to substitute parties?

22      A      I think one of them was under seal, wasn't

23 it?

24      Q      Yes.  Did you read that?

25      A      I couldn't read it.

1  calculated the market cap.  And I compared that to the price
2  times the number of shares.  And that was, I thought, a good
3  investment.
4        Q      So you looked at the -- you said the
5  market cap and -- so the price mattered to you.
6        A      Yeah.
7        Q      Because if it had been priced at $40 a
8  share, based on the analysis you did, that would not have been a
9  good buy.
10      A      That's correct.
11      Q      So it -- it -- you were paying attention
12  to the price.
13      A      It all -- the price always matters, yeah.
14      Q      Okay.
15      A      Okay.  I didn't --
16      Q      Just checking.
17      A      Okay.  If I've given you that indication,
18  that's not right.
19      Q      No.  Earlier I was asking about the nature
20  of a market order --
21      A      Yeah.  But you were asking if it went to
22  $20, you know, I know that's hypothetical, but that's not
23  realistic.  And the -- that wasn't going to happen.  But it --
24  but if it traded at $4 and I put a market price in and it went
25  to $4, I've bought it at $4 a share.

1 securities.

2        A        Okay.

3        Q        I walk in and hand you this.  Would you
4 read it?

5        A        Oh, yeah.

6        Q        You would have read it because you would
7 want to know, right?

8        A        I would have liked to have read it, yeah.

9        Q        Okay.  Thank you.

10       A        Gosh.

11       Q        Now, if you had read it before you pushed
12 the button on your computer to purchase 500 shares, would you
13 have gone ahead and pushed that button?

14       A        Yes.

15               MS. POSNER:  Objection.

16 BY MR. BALLARD:

17       Q        Why do you say that?

18       A        KPMG.  They had audited this thing four
19 years later.  KPMG has looked at every one of these things.
20 They had to.  So they're the auditor.  They have all the inside
21 information.  They look at everything.  That's my experience.
22 And that's what I relied on.

23       Q        So then why read this if you're -- if --
24 if all you care about is KPMG, why would you read anything?  Why
25 would you read the 10-K?  Why would you read the 10-Q?  Why look

1        A        I'd like to see the work papers.

2        Q        Why do you say we haven't produced work
3 papers?

4        A        You haven't.

5        Q        Are you sure about that?

6        A        Uh-huh.

7        Q        Okay. Well --

8        A        You've -- you've produced sign-offs of
9 audit programs, but you know how big the work papers should be?
10 They should be very big.

11        Q        How many documents do you think we have
12 produced?

13        A        A hundred and forty thousand pages.

14        Q        Okay. And you think there are no work
15 papers in there.

16        A        Very few. Mostly e-mail chains and 20 and
17 30 copies of the same e-mail.

18        Q        Okay. So you're going to reserve judgment
19 until you see the work papers on whether it was a good audit --

20        A        This -- I'm not -- I'm not an accounting
21 expert. I'm doing this as a plaintiff. I want to make sure --
22 I wanted to make sure that I'm doing the right thing for the
23 class, okay? I do. And if I felt like we were wrong, I
24 wouldn't be here.

25        Q        So when you reviewed the work papers, if

1      Q     Are you being compensated in any way for
2 your participation in this case?

3      A     No.

4      Q     Have you been promised any compensation in
5 the event this lawsuit is successful?

6      A     No.  My share of the proceeds from the
7 loss.

8      Q     Like any other class member.

9      A     That's right.

10     Q     What are you seeking to achieve through
11 this lawsuit?

12     A     I'm seeking as such compensation that our
13 attorneys are successful in litigating, settling or negotiating
14 for all class members of common and preferred shareholders.

15     Q     Do you have an engagement agreement with
16 Mr. Ball's firm?

17     A     No.

18     Q     Do you have an engagement agreement with
19 Cohen Milstein?

20     A     I don't think so.

21     Q     Do any attorneys from either Mr. Ball's
22 firm or Cohen Milstein monitor your investments for securities
23 litigation purposes?

24     A     Say again.

25     Q     Does anyone from either of those firms

1        Q        It's on page two, yes.

2        A        Okay.

3        Q        In the last sentence of paragraph two
4 there's a statement, "Unbeknownst to the investing public, KPMG
5 clean audit opinions lacked any reasonable basis and were not
6 conducted in accordance with GAAS, such that they amounted to no
7 audits at all."

8        A        Yes.

9        Q        You see that.  What is your basis, if any,
10 for alleging that KPMG's audits amounted to no audits at all?

11       A        The oil and gas assets are so material to
12 Miller.  And the fact that they did not audit those numbers
13 properly, that it is so significant and the statements were so
14 overstated, that it amounted to no audit at all.

15       Q        Anything else?

16       A        That's it.  Talking about KPMG.

17       Q        In paragraph four of the second amended
18 complaint, in the first sentence there's a statement, "The
19 Miller Energy house of cards finally began to collapse in
20 December 2013 when it started to become clear that the Alaska
21 assets were worth nowhere near what KPMG and Miller Energy said
22 they were in large part because of the assumptions about how
23 much it would cost Miller Energy to actually extract
24 hydrocarbons from those Alaska assets were massively and
25 fraudulently understated."  Do you see that?

1 and gas accounting?

2  A  No.

3  Q  Earlier today Mr. Ballard asked you 4 whether your investment in Miller Energy was a large investment 5 and you said no. Do you recall that testimony?

6  A  Yes.

7  Q  Did you consider your investment in Miller 8 Energy to be an important investment?

9  A  It is.

10  Q  Why is that?

11  A  It was a significant loss proportionate to 12 the investment. And that bothered me.

13  Q  Why did it bother you?

14  A  Well, because that was significant loss in 15 percentage versus what the investment was.

16  Q  When you first invested in Miller Energy 17 you talked about the reasons for investing at that time with 18 Mr. Ballard. At the time did you think Miller Energy was a 19 risky investment?

20  A  Not extremely risky, no.

21  Q  Did you -- why didn't you think it was 22 extremely risky?

23  A  It was listed on the New York Stock 24 Exchange. It was a company that had substantial assets, equity. 25 And was audited by KPMG.