# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

---------------------------------------x

LEWIS COSBY, KENNETH R. MARTIN,

as beneficiary of the Kenneth Ray Martin

Roth IRA, and MARTIN WEAKLEY on

behalf of themselves and all others

similarly situated,

                  Plaintiffs,

        vs.               No. 3:16-cv-00121

KPMG, LLP,

                  Defendant.

---------------------------------------x

                  April 16, 2019

                  9:02 a.m.


     VIDEOTAPED DEPOSITION of MARTIN ZIESMAN,

held at the law offices of FOLEY & LARDNER LLP,

111 North Orange Avenue, Orlando, Florida, before

Donald R. DePew, Registered Professional Reporter,

Certified Realtime Reporter, Florida Professional

Reporter, and Notary Public in and for the State

of Florida at Large.

1          M. Ziesman

2          Do you know how many claims the

3  plaintiffs in this case are asserting against KPMG?

4     A.   No.

5     Q.   Do you know what type of claims they

6  are, the name of them or anything about them?

7     A.   Essentially going after them for

8  misrepresentation and fraud.

9     Q.   Did you provide comments on any draft

10 or version of the complaint to the lawyers in this

11 case?

12    A.   No, I haven't.

13    Q.   I'm handing you what we previously

14 marked as Exhibit 37.

15         Do you recognize this document?

16    A.   Sure.

17    Q.   What is it?

18    A.   It's where I purchased the security.

19    Q.   Is this a certification that you

20 signed on February 27th of 2019?

21    A.   Yes, sir.

22    Q.   Who drafted this?

23    A.   The attorneys.

24    Q.   Did you read it and then sign it?

25    A.   Yes.

```
 1                  M. Ziesman
 2       Q.    Okay.  Do you remember reading it?
 3       A.    In detail, no, but, yeah.
 4       Q.    Okay.  Did you see anything in it that
 5  you disagreed with in any way?
 6       A.    No.
 7       Q.    Do you remember anything that you read
 8  in this beyond what you've already said?
 9       A.    Not really.
10       Q.    In your certification in the second
11  paragraph you state that you are "willing to serve
12  as a representative party on behalf of the
13  Section 11 Class."
14             Do you know what that means?
15       A.    That I'm going to represent the --
16  actually all the shares, but particularly the C
17  and D Class.
18       Q.    What do you understand your duties to
19  be or what do you understand your duties will be
20  if you are accepted as a representative party on
21  behalf of the Section 11 Class?
22       A.    I need to be on top of the materials,
23  I need to work with the attorneys as well as the
24  other two fellows in the class.  The thrust of the
25  whole thing would be to recuperate as much of our
```

```
 1                    M. Ziesman
 2   investment as we can.  And then probably is that
 3   we go to trial to do that.
 4        Q.    You also indicate in your certification
 5   in paragraph 3 that you have -- you "purchased
 6   and/or sold the securities that are the subject of
 7   the Complaint as set forth" in "the attached
 8   Schedule A."
 9             Do you see that?
10        A.    Where is --
11             You're talking about 3 here?
12        Q.    Paragraph 3, yes.
13             Do you see paragraph 3 refers to a
14   Schedule A that lists purchases or sales you made
15   in securities at issue in this case?
16        A.    Okay.
17        Q.    All right.  And does Schedule A list
18   the one and only transaction you made in Miller
19   Energy securities?
20        A.    Correct.
21        Q.    Prior to June of 2014 had you ever
22   purchased a Miller Energy security before?
23        A.    No, sir.
24        Q.    And you never sold your shares --
25        A.    No.
```

```
 1              M. Ziesman
 2   and the litigation."
 3              How do you plan to do that?
 4       A.   I plan to stay on top of it and
 5   communicate -- basically I just answered this.
 6              Through Lewis, Eric, and myself we have
 7   to stay in contact with the two attorneys.  We have
 8   to know what's going on and if there's information
 9   we can provide from here on we need to do that.
10       Q.   You indicated you had some
11   communications with the other two individuals?
12       A.   Yeah.
13       Q.   How do you plan to regularly
14   communicate with them in the future?
15       A.   Anytime something comes up.
16              MR. BALLARD:  I'm going to ask our
17         court reporter to mark our next exhibit as
18         Exhibit 39.
19              (Exhibit 39, Copy of multipage
20         brokerage account, bearing Bates stamp Nos.
21         MillerEnergy-KPMG-MZ-000001 through
22         MillerEnergy-KPMG-MZ-000015, marked for
23         identification, as of this date.)
24              (Discussion off the record.)
25       Q.   Here, let me hand you Exhibit 39.
```

                    M. Ziesman

1

2          Q.     Okay.  So your belief today is you

3   probably put in a limit order rather than a market

4   order?

5          A.     Yes.

6          Q.     And that was based on your view of what

7   would be a good or a fair price for the security?

8          A.     I knew basic -- when you place an

9   order you know what the stock is trading at within

10  pennies or dollars, or whatever you want to say.

11  And within that window, I'm just saying that this

12  is the price target I want within that window of

13  where it's trading, if that's clear.

14         Q.     So when you placed the order do you

15  know how quickly it was filled?

16         A.     No.

17         Q.     Do you believe it was filled pretty

18  quickly after you placed the order?

19         A.     I would assume so.

20         Q.     If you look at Exhibit 39, on the

21  second page --

22         A.     Okay.

23         Q.     -- you'll see an entry related to your

24  purchase of the C Series Miller Energy stock.

25                Do you see that?

```
1              M. Ziesman
2              In other words, you're saying here that
3  you question how the back office is reporting, but
4  then you go ahead and say it's okay what they've
5  done.
6      Q.    Would you have taken this into account
7  if you had read it before investing?
8              MS. POSNER:  Objection.
9      A.    I don't...
10             From this standpoint looking back today
11 you would say, yeah, you probably should have.
12             But what I would have done at that
13 time, it's kind of theoretical.
14     Q.    You're saying it's theoretical, you
15 don't remember or you don't know or can't
16 speculate what you --
17     A.    It's a theoretical question is what
18 I'm saying.
19             Now after the security has crashed and
20 burned and you're looking back you're saying sure
21 wish I would have.
22     Q.    Did you think --
23             When you purchased the preferred stock
24 in June of 2014 did you think the company had
25 sufficient revenues to fund its operating expenses?
```

```
 1                    M. Ziesman
 2        A.    Definitely.
 3              You know, the price of the whole thing
 4   was very important.
 5        Q.    If someone had told you this company
 6   does not have revenues that are sufficient to fund
 7   its operating expenses would you still have
 8   invested?
 9              MS. POSNER:  Objection.
10        A.    I think any prudent person would have
11   to say they probably wouldn't.
12        Q.    So if you had known that Miller
13   Energy's revenues were not sufficient to fund its
14   operating expenses you would not have purchased
15   the C Series shares --
16              MS. POSNER:  Objection.
17        Q.    -- is that fair?
18        A.    I think it's fair.
19        Q.    Can you turn to page 40 of Exhibit 14.
20        A.    I'll get there.
21              Okay.
22        Q.    Do you see the heading "Risks Related
23   to Our Business"?
24        A.    Yes.
25        Q.    And do you see the first paragraph
```

```
 1                 M. Ziesman
 2   purchased Miller Energy's securities did you have
 3   any reason to believe that Miller Energy's financial
 4   statements were inaccurate in any way?
 5        A.   No.
 6        Q.   At any point in time prior to when you
 7   purchased Miller Energy securities did you have any
 8   reason to believe that the valuation of Miller
 9   Energy's Alaskan assets were inaccurate in any way?
10        A.   No.
11        Q.   Would you have purchased Miller Energy
12   securities if you had known that its financial
13   statements were false?
14             MR. BALLARD:  Objection to form.
15        A.   No.
16        Q.   Would you have purchased Miller Energy
17   securities if you knew that its financial
18   statements were fraudulent?
19             MR. BALLARD:  Objection to form.
20        A.   No.
21        Q.   Did you in purchasing the Miller Energy
22   Series C preferred stock rely on the price of the
23   Miller Energy preferred stock when making an
24   investment?
25             MR. BALLARD:  Objection to form.
```