# Exhibit B

1    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF TENNESSEE

2    KNOXVILLE DIVISION

     No. 3:16-cv-00121

3    -----------------------------------------X

     LEWIS COSBY and KENNETH R. MARTIN as

4    beneficiary of the Kenneth Ray Martin Roth

     IRA, on behalf of themselves and all

5    others similarly situated,

6                     Plaintiffs,

7    - against -

8    KPMG, LLP and SCOTT M. BORUFF,

9                     Defendants.

10   -----------------------------------------X

11

                      June 4, 2019

12                   8:06 a.m.

13

14

15      VIDEOTAPED DEPOSITION of DR. MUKARRAM

16   ATTARI, held at the offices of COHEN

17   MILSTEIN SELLERS & TOLL, PLLC, located at

18   88 Pine Street, 14th Floor, New York, New

19   York 10005, before Anthony Giarro, a

20   Registered Professional Reporter, a

21   Certified Realtime Reporter and a Notary

22   Public of the State of New York.

23

24

25

```
 1    A P P E A R A N C E S :
 2
 3    COHEN MILSTEIN SELLERS & TOLL, PLLC
        Attorneys for Plaintiffs
 4      88 Pine Street, 14th Floor
        New York, New York 10005
 5
        BY:  LAURA POSNER, ESQ.
 6           RICHARD BURNER, Paralegal
 7
 8
 9
10    McDERMOTT WILL & EMERGY
        Attorneys for Defendant KPMG, LLP
11      340 Madison Avenue
        New York, New York 10173
12
        BY:  GREGORY G. BALLARD, ESQ.
13
14
15    WALLER LANSDEN DORTCH & DAVIS, LLP
        Attorneys for Defendant KPMG, LLP
16      511 Union Street, Suite 2700
        Nashville, Tennessee 37219
17
        BY:  PAUL DAVIDSON, ESQ.
18
19
20
21
22    ALSO PRESENT:
23           Jonathan Popham, Videographer
24
25
```

1          THE VIDEOGRAPHER:  Good

2     morning.  We are going on the record

3     at 8:06 a.m. on June 4th, 2019.

4     Please note that the microphones are

5     sensitive and may pick up whispering,

6     private conversations and cellular

7     interference.  Please turn off all

8     cell phones or place them away from

9     the microphones as they can interfere

10    with the deposition audio.  Audio and

11    video recording will continue until

12    all parties agree to go off the

13    record.

14          This is Media No. 1 in the

15    video deposition of Mukarram Attari,

16    taken by counsel for plaintiffs, in

17    the matter of Lewis Cosby and Kenneth

18    R. Martin versus KPMG, LLC and Scott

19    B. Boruff, filed in the United States

20    District Court for the Eastern

21    District of Tennessee, Knoxville

22    Division, Case No. 3:16-cv-00121.

23    This deposition is being held at

24    Cohen Milstein, located at 88 Pine

25    Street, New York, New York.

1          My name is Jonathan Popham

2     from Veritext.  And I'm the

3     videographer.  The court reporter is

4     Anthony Giarro, also from Veritext.

5          I'm not authorized to

6     administer an oath.  I'm not related

7     to any party in this action, nor am I

8     financially interested in the

9     outcome.

10          Will counsel and all present

11     please now state their appearances

12     and affiliations for the record.

13          MS. POSNER:  Good morning.

14     Laura Posner from Cohen Milstein

15     Sellers & Toll.  And together with me

16     is Rich Burner, who's a paralegal in

17     my office.

18          MR. BALLARD:  I'm Greg

19     Ballard from McDermtt Will & Emery

20     for KPMG, LLP.

21          MR. DAVIDSON:  Paul Davidson

22     from Waller Lansden Dortch & Davis

23     for KPMG.

24          THE VIDEOGRAPHER:  Will the

25     court reporter please swear in the

```
 1        witness.
 2     D R.    M U K A R R A M    A T T A R I,
 3    after having first been duly sworn by a
 4    Notary Public of the State of New York, was
 5    examined and testified as follows:
 6     EXAMINATION BY
 7     MS. POSNER:
 8        Q        Good morning, Dr. Attari.
 9    How are you?
10        A        Good.
11              MS. POSNER:  Just a bit of
12        housekeeping, the caption read by the
13        videographer included Defendant
14        Boruff who was dismissed from the
15        action.  So I just want to make sure
16        that that's clear on the record.
17        Q        Thank you for being here
18    today.  I appreciate it.
19              You've been deposed before;
20    right?
21        A        Yes.
22        Q        So you understand how this
23    works.  I'm going to ask you questions,
24    you have to wait for me to finish my
25    question, and then you'll have to respond
```

1 orally, so that the court reporter can

2 get down your answers.

3      A     Yes.

4      Q     If you have any questions

5 about the questions I'm asking, you don't

6 understand what I'm asking, you'll be

7 sure to let me know?

8      A     I will.

9      Q     And if you don't ask me any

10 questions, I'm going to assume you

11 understand my question; is that okay?

12      A     That's fine.

13      Q     And if you ever need to take

14 any breaks, please let me know.  I just

15 ask that you respond to the pending

16 question before we take that break.  Is

17 that okay?

18      A     Yeah.  That sounds fine.

19      Q     We're going to mark as

20 Exhibit 58, your report in this matter.

21           (The above-referred-to

22    document was marked as Exhibit 58 for

23    identification, as of this date.)

24      Q     Do you recognize this

25 document?

Veritext Legal Solutions
www.veritext.com
212-279-9424    212-490-3430

1      A      I do.

2      Q      And did you sign this report

3 on May 13th, 2019?

4      A      Yes, I did.

5      Q      And did you prepare this

6 report?

7      A      I prepared it with

8 assistance from my team.

9      Q      And how many members are on

10 your team?

11      A      There were two or three

12 people who primarily worked on it.  But

13 there were a larger number over the

14 course of the report.

15      Q      Can you tell me the names of

16 the individuals from your team that

17 worked on the report?

18      A      The primary people were

19 Assen Koev and Ana Balcarcel.

20      Q      And did Mr. Koev or

21 Ms. Balcarcel ever submit an expert

22 report in public that you're aware of?

23      A      No.  I'm not aware of any

24 that they have submitted.

25      Q      Let's turn to page 2 of your

1    report and specifically paragraph 6.

2              Is this a complete list of

3    the questions that you were asked by

4    counsel for KPMG to address in your

5    report?

6         A    Yes.

7         Q    There are no questions

8    outside of what's provided in

9    paragraph 6; correct?

10        A    Correct.  I mean I was asked

11   the overarching question and to review

12   and opine on the reports submitted by

13   Chad Coffman.  And then I was asked

14   specific questions.

15        Q    And then if you continue

16   down on that page, starting on

17   paragraph 8 and continuing through 16 on

18   page 5, is that a complete summary of

19   your opinions as you hold them today in

20   this matter?

21        A    It's a summary of my

22   opinions.  The detailed opinions are in

23   the remainder of the report.  So, yes,

24   this is a summary of the opinions.

25        Q    And does this report in full

1    contain a complete and accurate statement

2    of your opinions as you hold them today

3    in this matter?

4         A       Yes, it does.

5         Q       And does it contain the

6    bases and reasons for those opinions?

7         A       Yes, it does.

8         Q       And did you include in this

9    report the facts and data you considered

10   in formulating these opinions?

11        A       Yes.  In addition, there was

12   some backup material that was provided to

13   you.

14        Q       And does this report contain

15   all the exhibits that you'll use to

16   support your opinion in this matter?

17        A       Yes, it does, again with the

18   backup.  So I'm assuming you're using the

19   term report to encompass this and the

20   backups, correct.

21        Q       And did you do your best to

22   comply with the federal rules requirement

23   that this report contain a complete

24   statement of all opinions you will

25   express and the bases or reasons for

1    them?

2         A        Yes, I did.

3         Q        Is there a reason you did

4    not declare under penalty of perjury

5    under the laws of the United States that

6    your report is true and correct when you

7    signed it?

8         A        Sorry.  I don't understand

9    that question.

10        Q        Do you know what it means to

11   declare something under penalty of

12   perjury?

13        A        I have seen that, yes.  But

14   I don't know that I've seen that very

15   often in expert reports.

16        Q        So you didn't understand

17   whether you had a requirement to do that?

18        A        Yes.  I didn't.

19        Q        Do you have any reason to

20   believe that anything contained in your

21   report is inaccurate?

22        A        No, I don't.

23        Q        What did you do before you

24   signed your report to ensure that the

25   report and the exhibits thereto were true

1  and correct?

2      A       I worked on the report.  I

3  reviewed it at various stages as, you

4  know -- I was making at it, other people

5  were making at it and, you know, I kind

6  of made sure I understood the analysis

7  that was being done.  And it was being

8  done under my supervision and to the --

9  to the specifications that I was

10 providing.

11     Q       Did you review all of the

12 documents cited as support for your

13 opinions in your report?

14     A       Yes.  I mean some of the

15 academic literature, I may not have

16 cited -- I may not have read completely.

17 Some of the other documents, I may not

18 have read completely.

19     Q       Have you or anyone on your

20 behalf been asked to calculate damages in

21 this matter?

22     A       At some point, we were asked

23 to do a preliminary damage calculation.

24     Q       Do you recall what the

25 damage calculation was?

1          MR. BALLARD:  We're going to

2     ask you not to answer that question.

3     That would be protected.

4          Q          You're not providing an

5     opinion here today with regard to the

6     damages at issue in this case; correct?

7          A          No.

8          Q          If you turn to, I believe

9     it's Appendix 1 of your report, which is

10    right after your signature, does Appendix

11    1 contain all of your relevant

12    qualifications in this matter?

13         A          Appendix 1 is my CV.  So it

14    contains, yes, all of my relevant -- all

15    of the relevant information about me.

16         Q          And there's a list of

17    publications provided on the bottom of

18    page 1, running over to page 2.

19              Is that a complete list of

20    all the publications you've published --

21    actually, this is longer than the past

22    ten years but in the past ten years?

23         A          Yes.

24         Q          And then --

25         A          Some of these are not

1    publications.  They're working papers.
2    But they're probably out there somewhere.
3    So the first four -- five are
4    publications.  They're SR working papers.
5        Q        Are they papers you're
6    currently working on or are there old
7    working papers?
8        A        No.  They're old working
9    papers.
10       Q        Were they published
11   anywhere?
12       A        They're available publicly.
13   But they weren't published in a journal.
14       Q        Now, if you turn to page 3
15   of this document, it talks about your
16   expert assignments.  Do you see that?
17       A        Yes.
18       Q        Is that a complete list of
19   all of the matters in which you've
20   submitted expert reports?
21       A        Yes.
22       Q        The first matter, the Ambac
23   v. EMC Mortgage Corporation matter, is
24   that related to the Syncora-EMC
25   Corporation matter?

1      A         I don't know what you mean
2   by related.
3      Q         Are the cases related?
4      A         Not that I know of.
5      Q         Do they involve the same set
6   of facts?
7      A         They involve similar facts
8   but not the same.
9      Q         And of these five matters,
10  only one of them is a securities fraud
11  class action; correct?
12     A         Correct.
13     Q         And that's the Dalton Petrie
14  case?
15     A         That's correct.
16     Q         That's actually two related
17  matters; is that correct?
18     A         Yeah.  They're two case
19  numbers.  I don't know how they were
20  related and such.
21     Q         And in that matter, I'm
22  going to refer to that as ECG; is that
23  okay?
24     A         That's fine.
25     Q         Sorry.  EGC.

1          In the EGC matter, who were

2   you hired by?

3      A      One of the defendants.  I

4   don't know which one.

5      Q      Was it the --

6      A      One or more of the

7   defendants.  I don't know.

8      Q      Were one or more of those

9   defendants a number of accountants?

10     A      No.  There were -- I believe

11  they were officers and directors.  But I

12  don't recall sitting here.

13     Q      Now, in that case, EGC

14  traded on the OTC bulletin board;

15  correct?

16     A      Correct.

17     Q      And you opined that the

18  market for EGC was not efficient;

19  correct?

20     A      Correct.

21     Q      And the court disagreed with

22  you; correct?

23     A      Correct.

24     Q      Are you, outside of these

25  five matters, currently working on any

1   securities fraud class actions?

2       A       As an expert?

3       Q       Yes.

4       A       No.

5       Q       And then if you could turn

6   back to page 1 of your report, in

7   paragraph 4, you talk about your clients

8   and various matters.  And you list

9   institutional and individual investors.

10  Do you see that?

11      A       Yes.

12      Q       In what context have you

13  represented institutional or individual

14  investors?

15      A       As a consultant in -- as a

16  consultant in various kinds of

17  damage-related matters.

18      Q       In any of those matters, did

19  you submit a report to a court?

20      A       No.

21      Q       And were any of those

22  matters securities fraud class actions?

23      A       No.

24      Q       If you turn to page 5 of

25  your report, paragraph 17, you indicate

1   that you're being compensated at an

2   hourly rate of $990 for your work in this

3   matter.  Is that still correct?

4        A      CRA is being compensated at

5   that rate.

6        Q      Fair enough.

7              Is that your current

8   standard rate?

9        A      Yes.

10       Q      And we mentioned that -- you

11  mentioned that you had at least two

12  members of your team working on this

13  matter.

14              Are they also charging

15  $990 per hour?

16       A      I don't think they are

17  charging anything.  CRA is charging their

18  standard rate.  And I don't know their

19  rate, sitting here.  It's not 990.

20       Q      Do you know, ballpark, what

21  it might be?

22       A      It would be between 5 and

23  800 or so.

24       Q      Do you know how many hours

25  your team has spent on this matter?

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

1    A        No.

2    Q        Do you know if it's more

3    than 100?

4    A        I've spent more than 100.

5    So, yes, the team would have spent more

6    than 100.

7    Q        Have you spent more than 200

8    hours?

9    A        No.  It's between 100 and

10   200.

11   Q        Is it fair to say that your

12   team, including you, has spent over 500

13   hours on this matter?

14   A        Very likely.

15   Q        Is it fair that you've spent

16   over 750 hours as a team on this matter?

17   A        Very -- I mean less likely

18   than 500 but quite likely.

19   Q        So it's likely between 500

20   and 750 hours?

21   A        It's probably more than --

22   if I had to estimate it, sitting here, it

23   would probably be something around 1,000.

24   But, you know, it could be over, it could

25   be under.

1      Q       Do you know how much CRA has

2  billed KPMG in this matter?

3      A       No, I don't.

4      Q       And do you bill your time --

5  I should say, does CRA bill your time or

6  your team's time by the hour?

7      A       Yes.

8      Q       CRA is a public company;

9  correct?

10     A       Correct.

11     Q       And it files Forms 10-K with

12 the SEC; correct?

13     A       Correct.

14     Q       And you read those form

15 10-Ks; correct?

16     A       Yes.  I have read some of

17 them.

18     Q       Is anyone from KPMG a

19 shareholder in Charles River?

20     A       I don't know how I would

21 know.

22     Q       Do you know if anyone from

23 Sidley Austin is a shareholder in CRA?

24     A       I don't know.

25     Q       Do you know if anyone from

1   McDermtt Will & Emery is a shareholder in

2   CRA?

3        A        I don't know.

4        Q        Do you know if anyone from

5   Waller Lansden Dortch & Davis is a

6   shareholder in CRA?

7        A        I don't know.

8        Q        Charles River uses an

9   outside auditor; correct?

10       A        Correct.

11       Q        Do you know who the current

12  outside auditor is?

13       A        I do not.

14       Q        And was KPMG ever Charles

15  River's outside auditor?

16       A        I do not know.

17                (The above-referred-to

18       document was marked as Exhibit 59 for

19       identification, as of this date.)

20       Q        We've handed you what's been

21  marked as Exhibit 59.

22                Do you recognize this

23  document?

24       A        I haven't seen this before.

25       Q        And this is a Form 10-K

1    filed with the SEC by CRA International;

2    correct?

3         A         That's what it says.

4         Q         And it was filed on

5    June 6th, 2014?

6         A         Yes.  That's what it says is

7    the date of the report.

8         Q         If you can turn to page 2 of

9    this document, if you review that, does

10   that refresh your recollection that KPMG

11   previously served as CRA's auditor?

12        A         Where are you reading?

13   Sorry.

14        Q         I guess it's a carryover

15   page.

16                  On the bottom of page 1, it

17   talks about, "On this date, we dismissed

18   KPMG, LLP as our registered public

19   accountants effective immediately."

20                  And it goes on page 2,

21   discussing the most recent audit opinions

22   from KPMG.

23        A         So, yeah, this document says

24   that KPMG had served as CRA's auditor at

25   some point.

1     Q       Until June 6th of 2014;

2  correct?

3     A       That's what it seems to say,

4  yes.

5     Q       Do you know why KPMG was

6  dismissed as Charles River's auditor?

7     A       I do not.

8     Q       And if you turn to page 2 of

9  this document in the first-full

10  paragraph -- sorry.  Excuse me.

11           The second-full paragraph,

12  it talks about KPMG's audit opinions.  Do

13  you see that?

14     A       Yes.

15     Q       And for Charles River's

16  fiscal year ending December 28, 2013 and

17  fiscal year ending March 29th, 2014, what

18  did KPMG find with regard to Charles

19  River's internal controls?

20           MR. BALLARD:  Objection to

21    form.

22     A       It doesn't have 2014.

23     Q       Sorry.

24           If you look up on the

25  first-full paragraph, it says, "Except

1   for the material weakness and our

2   internal control over financial reporting

3   as of our fiscal year ended December 28,

4   2013 and our fiscal quarter ended

5   March 29th, 2014."  Do you see that?

6        A     Yes.

7        Q     I just want to make sure I

8   get the dates right.

9            If you then go down to the

10  following paragraph, it talks about

11  "Except that KPMG's report indicates that

12  we did not obtain effective control over

13  financial reporting as of December 28,

14  2013 because of the effect of the

15  aforementioned material weakness."  You

16  see that?

17       A     Yes.

18       Q     So did KPMG find that

19  Charles River had inadequate internal

20  controls as of December 28, 2013?

21       A     I mean that's how this

22  sentence can be read.  But I have no

23  independent knowledge of that.

24       Q     You can turn that down.

25            I'm going to turn to the

1  Cammer and Krogman factors.  One of the
2  factors you don't address in your report,
3  if I understand correctly, in your
4  report, you don't dispute that the
5  average weekly trading volume for Miller
6  Energy's common stock exceeded the
7  standard under Cammer; correct?

8      A      Correct.

9      Q      And you also don't dispute
10 that the average weekly trading volume
11 for Miller Energy's Series C and Series D
12 also exceeded the standard under Cammer;
13 is that correct?

14     A      Correct.

15     Q      Turn to page 57 of your
16 report.  I'm going to direct your
17 attention to paragraphs 169 through 173
18 on page 59.

19     A      The okay.

20     Q      In your report, you don't
21 dispute that the analyst coverage of
22 Miller Energy's common stock meets the
23 standard under Cammer; correct?

24            MR. BALLARD:  Objection to
25     form.

Page 25

1      A       I don't know if there is a
2    specific number of analysts that Cammer
3    specifies, sitting here.  But Mr. Coffman
4    lists a number of different analysts.
5    And I don't dispute that there were a
6    number of analysts covering Cammer's
7    common stock.
8      Q       You also don't dispute that
9    it meets the Cammer's standard; correct?
10             MR. BALLARD:  Objection.
11     A       Like I said, I don't know
12   that Cammer has a bright line that says,
13   you know, if you're over ten, you're
14   good.  And if you're under ten, you're
15   not, at least I don't recall there being
16   something like that.
17     Q       I understand that there's no
18   specific number.
19             My question is whether you
20   are disputing whether there was
21   sufficient analyst coverage of the common
22   stock, such that it meets the standard
23   under Cammer.
24     A       And what I'm trying to say
25   is that I don't know that there is a

1      particular level.  So, you know,
2      Mr. Coffman has said there were --
3      whatever -- 10 or 15 analysts covering
4      it.  A number of those were actual
5      analysts.  The others were automated
6      reports.  And I'm not disputing it in
7      this report, yes.
8          Q        What is Cammer Factor 2?
9          A        I don't know the sequence.
10         Q        The Cammer factor dealing
11     with analyst reports, what, in your
12     opinion, is the purpose of that Cammer
13     factor?
14         A        That there were people who
15     were doing analysis of the firm's
16     financials, you know, valuing the
17     securities, providing investors with
18     recommendations on whether to buy or sell
19     the securities or to hold them, what they
20     thought the value of the securities would
21     be in the future, you know, and to
22     provide other information that investors
23     might be able to use, such as
24     projections, to form their own opinions
25     about investment in the securities.  So

1  analysts as in to analyze.

2      Q      So does analyst coverage

3  indicate that there's interest in the

4  company and its securities?

5      A      If there was no interest in

6  the company and its securities, it's

7  unlikely that analysts would be writing

8  reports.

9              On the other hand, it's more

10 than just interest.  It's providing

11 investors an ability to evaluate an

12 investment in the securities.

13     Q      Does analyst coverage

14 indicate that information about a company

15 is widely distributed?

16     A      Analyst coverage indicates

17 that analysis of, you know,

18 valuation-related information about the

19 company's securities is available to

20 investors.  Most of these analyst reports

21 are not public documents.  You can Google

22 and find analyst reports, typically.

23     Q      Depends on the analyst;

24 correct?

25     A      Yes.

1     Q       Do press reports also

2   indicate that there is interest in a

3   company and its securities?

4     A       Press reports indicate that

5   there was some event that the providers

6   of news found interesting enough to

7   report on.

8     Q       And generally, press reports

9   are pretty widely distributed; correct?

10     A       Again, I mean it depends on

11   the publication.  Some are

12   subscription-only; some are freely

13   available.

14     Q       Do SEC filings also provide

15   information about a company and its

16   securities?

17     A       The SEC filings also provide

18   information about a company and its

19   securities.

20     Q       And generally speaking, SEC

21   filings are available publicly through

22   the Edgar Web site?

23     A       Generally available, yes.

24     Q       Are earnings call

25   transcripts also a means for investors to

Veritext Legal Solutions
www.veritext.com
212-279-9424          212-490-3430

1  find out information about a company and

2  its securities?

3      A      Yes, they are.

4      Q      And generally, are earning

5  call transcripts widely distributed and

6  available?

7      A      Yes.  I believe so.

8      Q      Was the value of Miller

9  Energy's Series C and Series D preferred

10  stock related to the value of Miller

11  Energy's common stock?

12      A      Not directly, no.

13      Q      In no way, were they

14  related?

15      A      They were related but not --

16  you know, it wasn't that if the common

17  was X, then the preferred would be 2X or

18  half X.  It wasn't a direct and stable

19  relationship over time.

20      Q      But they were related?

21      A      Yes.  If the common went up,

22  you would expect the preferred to go up.

23      Q      How were they related?

24      A      I'm not sure I understand

25  that question.

1      Q       Were there specific

2    attributes of the preferred securities

3    that were related to the common stock?

4      A        Not directly.  There were --

5    there were securities issued by Miller.

6    But there was a sequencing in which

7    payments would be made.  The preferred

8    had a right to an ongoing dividend while

9    the common stockholders would only be

10   paid a dividend, you know, if there was

11   money available.

12     Q       And you agree with me that

13   the preferred stock was higher in the

14   capital structure than the Miller's

15   common stock?

16     A       It was more senior in the

17   capital structure than Miller's common

18   stock, yes.

19     Q       And would you agree with me

20   that the value of the preferred stock was

21   economically related to the value of the

22   common stock?

23     A        Yes and no.  If the common

24   stock went down to zero, it was likely

25   that the preferred would also have a low

1  or no value.

2          On the other hand, if the

3  common went up to a very high number, it

4  was not clear that the preferred would

5  kind of track it and go up to as a higher

6  number; you know, the Series C did have a

7  conversion feature that might cause it to

8  track a little bit better.  But the

9  Series D had no conversion feature.

10         Q       If you turn to page 59 of

11  your report, paragraph 173, the bottom of

12  that paragraph, you say, "Equity analyst

13  reports analyze revenue, projections,

14  earning projections, profitability and

15  share price targets.  These are relevant

16  to the equity component of the preferred

17  security but insufficient for the

18  analysis of the debt component."  You see

19  that?

20         A       Yes.

21         Q       So you agree that the

22  analyst reports, revenue projections,

23  earning projections, profitability and

24  share price targets were relevant to

25  preferred security holders?

1      A        The share price targets have

2   to do with the common.  So they would not

3   be relevant to the preferred stockholders

4   directly.  The rest of it would have some

5   relevance, yes.

6      Q        When you say "the share

7   price targets wouldn't be directly

8   relevant," would they be indirectly

9   relevant?

10     A        Yes.  If analysts explained

11  that they believed that the common stock

12  would be worth a lot more or they

13  expected that the common stock would be

14  worth a lot more in the future, that

15  would be a positive sign, signal to

16  preferred shareholders.

17     Q        And Miller Energy's equity

18  analysts did analyze Miller's revenue

19  projections, earnings projections,

20  profitability and gave share price

21  targets occasionally; correct?

22     A        Some of them did.  I think a

23  fraction of the total list that

24  Mr. Coffman has.

25     Q        Did Miller's -- did the

1  analysts following Miller Energy also

2  discuss Miller Energy's debt?

3      A       In valuing the common stock,

4  they discussed that, yes.

5      Q       Did the analysts covering

6  Miller Energy also discuss Miller

7  Energy's liquidity?

8      A       Again, in valuing the common

9  stock, yes.

10      Q       And did the analysts

11  following Miller Energy securities

12  specifically discuss the preferred

13  securities?

14      A       They discussed, I believe,

15  the issuance of the preferred securities,

16  you know, payments that were due on the

17  preferred securities.  They did not

18  discuss the preferred in terms of valuing

19  the preferred specifically.

20      Q       Did the analysts covering

21  Miller Energy also discuss the payment of

22  dividends to the preferred shareholders?

23      A       Yes.  The fact that

24  dividends had to be paid.  And so that

25  would affect what was left over for the

1   common stockholders.

2       Q       Did they also discuss

3   whether the dividends would be paid to

4   the preferred shareholders?

5       A       I believe they may have

6   discussed it, the fact that the dividends

7   had to be paid, yes.

8       Q       For this Cammer factor to be

9   satisfied, is it your position that only

10  formal analysts reports with a price

11  target for the security at issue were

12  relevant?

13      A       Absent that, investors do

14  not get information about the securities.

15  They get information about the company,

16  so yes.

17      Q       What's your basis for that

18  opinion?

19      A       The factor relates to

20  analyst report.  It doesn't relate to SEC

21  filings or news articles and so on.

22      Q       Do you have any academic

23  literature case law to support your

24  contention that analyst reports with

25  price targets are the only type of

1    analyst reports that are relevant for

2    purposes of this Cammer factor?

3         A       No.

4                 (The above-referred-to

5         document was marked as Exhibits 60

6         through 70 for identification, as of

7         this date.)

8         Q       So, Dr. Attari, I've marked

9    Exhibits 60 through 70 which are certain

10   analyst reports on Miller Energy.

11               Did you have a chance to

12   look through them briefly?

13        A       Just the headers, yes.

14        Q       Did you read the analyst

15   reports pertaining to Miller Energy?

16        A       I read a fair number of

17   them.

18        Q       If you turn to Exhibit 60 on

19   the first page, this is October 10, 2012

20   analyst report by SunTrust Robinson

21   Humphrey, there's a full paragraph that

22   starts, "Well on the way to sizable

23   production ramp." Do you see that?

24        A       Yes.

25        Q       And it talks about

1  eliminating much of the current

2  18 percent debt and 10.75 percent

3  preferred shares.  Do you see that?

4      A     Yes.

5      Q     Do you think that

6  information is relevant to preferred

7  shareholders?

8      A     In what way are you asking

9  it's relevant?

10     Q     In any way.

11     A     I mean it's financial

12 information about Miller, yes.  So to the

13 extent it's financial about Miller is

14 relevant, yes.

15     Q     It's discussing Miller

16 Energy's debt; correct?

17     A     It's discussing production

18 as I see it.

19     Q     Doesn't talk about trying to

20 eliminate much of the current 18 percent

21 debt?

22     A     Yes.

23     Q     And 10.75 percent preferred

24 shares?

25     A     Yes.

1      Q      Turn to the next exhibit,
2    61.  This is a report by Brean Capital
3    LLC on February 8, 2013.  And if you look
4    at the second-to-last sentence, it talks
5    about the requirement to raise an
6    additional 15 million in preferred equity
7    to tap the additional funds.
8      A      Yes.
9      Q      And then it talks about the
10   impact of that for the common
11   shareholders?
12     A      Yes.  It talks about the
13   impact for the common shareholders and
14   the reduced earnings per share.
15     Q      Is this information
16   something that you think would be
17   relevant to shareholders?
18     A      I'm not sure.  The sentence
19   says that it will reduce earnings per
20   share for the common shareholders.
21     Q      Correct.  That second
22   sentence does.
23            But do you think the fact
24   that they're required to raise additional
25   15 million in preferred equity to tap

1  additional funding is important to

2  preferred shareholders?

3      A       Yeah.  It's a piece of

4  information for preferred shareholders.

5      Q       You can turn that over.

6              And you can look at

7  Exhibit 62.  This is a July 17th, 2013

8  report by SunTrust Robinson Humphrey.

9  And if you go towards the bottom of the

10 first page under "Strong well could quell

11 liquidity concerns," you see that

12 paragraph?

13     A       Yes.

14     Q       Do you think that's

15 information that would be relevant to

16 preferred shareholders?

17     A       It's information about the

18 company, yes.

19     Q       It's also talking about

20 liquidity concerns with regard to the

21 company; correct?

22     A       Yes.

23     Q       And if you turn towards

24 page 3 of this document, the very last

25 line here, which is price target

1   analysis, they talk about cash flow

2   valuation; correct?

3       A       Correct.

4       Q       And that information would

5   be relevant to preferred shareholders; is

6   that correct?

7       A       I believe that's the

8   valuation of the common stock.  450 is

9   the price target that they come up with

10  for the common stock.

11      Q       Right.

12              And do you think cash flow

13  valuation would be relevant to a

14  preferred shareholder of the security?

15      A       This is after the preferreds

16  have been paid.  So this is what's left

17  over for the common.  So I'm not sure

18  that particular number would be terrible

19  relevant to the preferred shareholders.

20      Q       You don't think cash flow

21  would be potentially relevant to

22  preferred shareholders?

23      A       Preferred shareholders would

24  care about cash flow.  But they would

25  care about cash flow further up the

1    chain.

2        Q      Because they're concerned

3    about whether they'd be able to get their

4    dividend; correct?

5        A      Yes.

6        Q      You can turn that over.

7              Turn to Exhibit 63 which is

8    a September 27th, 2013 report by Imperial

9    Capital.

10            Just on that first chart on

11   the first page, talking about key data,

12   do you see that chart?

13       A      Yes.

14       Q      They list the total

15   preferred outstanding; correct?

16       A      Yes.

17       Q      63.2 million?

18       A      Yes.  And that's information

19   that will be in the 10-K or the 10-Q.

20       Q      If you turn to the next

21   page, they then have a chart about Miller

22   Energy's capitalization.  Do you see

23   that?

24       A      Yes.

25       Q      And they also talk about the

1   preferred equity there as well as the

2   total debt and preferred?

3       A       Yes.

4       Q       And then if you turn to

5   page 5 of this report, it's the first two

6   paragraphs under balance sheet.

7       A       Yes.

8       Q       In that first paragraph,

9   they're talking about Miller's

10  long-term -- among other things, Miller's

11  long-term debt; correct?

12      A       Correct.

13      Q       And they also talk about the

14  preferred Series C and the preferred

15  Series D; correct?

16      A       Correct.

17      Q       And then in the following

18  paragraph, they talk about specific

19  attributes of the preferred Series C and

20  the preferred Series D?

21      A       Yes.

22      Q       Do you think this

23  information would be relevant to

24  preferred shareholders?

25      A       Yes.  But this is all

1    duplicative of information that's in

2    Miller's filings.  So there's no analysis

3    of valuation or related information.

4         Q         If you turn to the following

5    page, page 6, under liquidity and capex,

6    in that second paragraph --

7         A         Yes.

8         Q         -- do you see they're

9    talking about a preferred equity raise

10   and the impact of that raise with the

11   Apollo withdrawal?

12        A         Yes.

13        Q         And they talk about the

14   ability of that money to bridge the gap

15   between capex and cash flow?

16        A         Yes.

17        Q         Do you think that's

18   information that would be relevant to

19   preferred shareholders?

20        A         Yes.

21        Q         If you turn to page 14 of

22   that same report, there's an income

23   statement chart.  Do you see that?

24        A         Yes.

25        Q         And they list there under

1   net income, the preferred stock dividends

2   and accretion.

3       A       Yes.

4       Q       And if you turn to page 16

5   under stockholders' equity, they also

6   discuss the numbers for the preferred

7   stock as well; correct?

8       A       Correct.

9       Q       You can turn that over and

10  turn to Exhibit 64.

11              This is a report by Brean

12  Capital on August 20th, 2014.  Do you see

13  that?

14      A       Yes.

15      Q       And in that first paragraph,

16  the last sentence, it talks about the

17  fact that Miller has informed the market

18  that it's going to do another public

19  offering of the Series D.  You see that?

20      A       Sorry.  Where are you?

21      Q       First paragraph under

22  investment summary.

23      A       Oh, yes.

24      Q       And it's the last

25  sentence -- sorry -- the second-to-last

1    sentence.

2        A        Yes.

3        Q        And then if you go down

4    under key points, the second bullet

5    point, they give more information there

6    about the announced public offering;

7    correct?

8        A        Correct.

9        Q        Go to the next one,

10   Exhibit 65.

11               This is Brean Capital report

12   of August 21st, 2014.  And throughout

13   this whole first page, they talk about

14   the Series D preferred offering; correct?

15       A        Can you point me to the

16   place?

17       Q        That first full paragraph,

18   they start talking about the confirmed,

19   they price an offering at 750,000 shares

20   of Series D preferred stock for a price

21   of 2450 per share, successfully raising

22   18.4 million in gross proceeds.

23       A        But that's something that

24   Miller did.  So this is just a report

25   that Miller issued these securities.

1      Q      And then it talks about the

2  proceeds from this offering, together

3  with drilling rebates and some money from

4  the company's revolver, that it gives

5  them 70 million in year-term liquidity.

6      A      Yeah.  But this doesn't

7  really have to do with the preferreds.

8  Where the cash came from is not terribly

9  relevant to the investments that they're

10  going to be able to fund.

11      Q      You don't believe that the

12  company's liquidity would be relevant to

13  preferred shareholders?

14      A      It would.  But this year,

15  they're talking about liquidity for

16  investment purposes.

17      Q      You don't believe that would

18  be relevant to preferred shareholders?

19      A      No, not directly in terms

20  of -- it's only relevant to the extent

21  that they need to know that the dividends

22  will be paid.  At least the way you read

23  it, they're talking about investments

24  that they'll be able to fund.

25      Q      Drilling that they'll be

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

1    able to embark on; correct?

2        A        Yes.  Investments.

3        Q        And in order to meet revenue

4    projections and have liquidity to provide

5    dividends, they actually have to be

6    successful in their drilling efforts;

7    correct?

8        A        Yes.  But this is money

9    that's already being raised.  So the

10   first bit you read was about money that

11   had been raised from preferred

12   shareholders.

13               So it was like a piece of

14   information about the past.  And now the

15   money's in the firm.  And this is telling

16   you what they're planning to do with the

17   money.  That's relevant to the firm as a

18   whole, not -- not -- it's not information

19   specific to preferred shareholders or --

20   I mean none of this gives you a way to

21   value the C and D.  It's general

22   information about the firm which is

23   relevant.

24               MS. POSNER:  Off the record.

25               THE VIDEOGRAPHER:  We're

1      going off the record at 9:01.  This

2      marks the end of Media 1.

3           (A short recess was taken.)

4           THE VIDEOGRAPHER:  We're

5      back on the record at 9:10.  This

6      marks the beginning of Media 2.

7      Q      Apologies for the mixup with

8  the exhibit numbers.

9           I'm going to turn your

10 attention to Exhibit 66 which would be

11 the September 8th, 2014 MLV report.  Do

12 you see that?

13     A      Yes.

14     Q      And then in the paragraph on

15 the first page under Liquidity Enhanced

16 by Preferred Stock Issuance and Tax

17 Credits --

18     A      Yes.

19     Q      -- if you review that

20 paragraph, do you think that's

21 information that would be relevant to

22 preferred shareholders?

23     A      Yes.  Again, it's

24 information about securities that were

25 issued and moneys that were raised from

1  those securities and how they're going to

2  be used.

3         Q       And also tax credits;

4  correct?

5         A       Yes.

6         Q       And then if you turn to

7  page 3, they provide a summary financial

8  model.  Do you see that?

9         A       Yes.

10        Q       And do you see under the

11 income statement, they list the preferred

12 dividends there?

13        A       Yes.  But this is just the

14 promised amounts, are they not?

15        Q       I'm not going to answer your

16 question.

17        A       I'm asking you --

18        Q       I understand you're asking

19 me.  I'm not going to answer your

20 questions.

21        A       This is just a pro forma

22 promise amount.  So it doesn't really say

23 anything to the preferred shareholders

24 about whether or not they'll get paid.

25 This is only relevant to the equity

1  holders in terms of here's money that's

2  promised to the preferred shareholders.

3      Q       Correct.

4              And under the balance sheet,

5  it also lists the preferred stock;

6  correct?

7      A       Yes.  It's the balances of

8  the preferred stock outstanding.

9      Q       You can turn to Exhibit 67

10  which is a December 10th, 2014 MLV

11  analyst report.

12              If you go to the bottom of

13  this first page, they discuss the payment

14  of the preferred dividends.  Do you see

15  that?  It says, "We also expect to -- we

16  expect it to honor its preferred

17  dividends which it considers

18  'sacrosanct.'"  Do you see that?  It's

19  the very last sentence.

20      A       Yes.

21      Q       You think that's information

22  that the preferred shareholders would be

23  interested in?

24      A       Yes.

25      Q       And then on the next page,

1  the earnings variance analysis under the
2  income statement, it provides information
3  about the preferred dividends, including
4  estimated for 2015?
5      A       Yes.
6      Q       And then under cash flow, it
7  does the same; correct?
8      A       It says actual 2015 on here.
9  And I'm just trying to figure out --
10     Q       The second -- the column
11 says "2015 estimated."
12     A       Yeah.  But it also has an
13 actual 2015.  And I'm just trying to
14 figure out how you have actuals between
15 2015 since you're in the middle of the
16 year.  Sorry.  Anyway, you were asking?
17     Q       They provide -- at least
18 they purport to provide the 2015 actual
19 and the 2015 estimated; correct?
20     A       Yes.
21     Q       And then if you turn the
22 page, page 3, again, they provide
23 information under income statement about
24 the preferred dividends?
25     A       Yes.  And this is the

1   promised dividend.

2       Q       And then if you go under

3   cash flow statement, it also talks about

4   the dividends paid, although appears to

5   be zero thus far on this sheet.

6       A       I think that is the common

7   dividend.

8       Q       You might be right.

9             Under balance sheet, it

10   talks about the preferred stock.  Same

11   page.

12       A       Yes.  And I thought we saw

13   this information on -- maybe it was a

14   previous report.

15       Q       You can turn that to the

16   side.

17             Turn to Exhibit 68.  This is

18   a Brean Capital report, dated

19   December 10th, 2014.

20             In the first-full paragraph

21   under Discussion --

22       A       Yes.

23       Q       -- it talks about noting

24   that preferred dividend payments were

25   sacrosanct in quotes several times.

1    "Giesler noted that the company's focus
2    on efficient low-risk operations now is
3    of paramount importance and that more
4    than a few means of financing debt
5    service and ongoing operations were on
6    the negotiating table, including asset
7    sales, joint venture, additional debt
8    and/or equity."  Do you see that?
9         A     Yes.
10        Q       Do you think that
11   information would be relevant to
12   preferred shareholders?
13        A       Yes.  But this is just an
14   analysis reporting something that the
15   company set, the CEO set.  It's not
16   analysis or an opinion.
17        Q       So is it your opinion that
18   only opinions provided by analysts are
19   relevant to Cammer Factor 2?
20        A       Well, it's the analysts
21   reports add value, add information
22   because analysts analyze information
23   about the firm.  They put it together.
24   They opine on what that means for the
25   firm.  And none of this has anything to

1   do with opinions about the valuation of

2   the preferred.

3       Q     If you could answer my

4   question, it's your opinion that only

5   analyst opinions are relevant to Cammer

6   Factor 2?

7       A     I think analyst opinions are

8   important to Cammer Factor 2.

9          MS. POSNER:  Read back the

10     question.

11          (The requested portion was

12     read back by the court reporter.)

13       A     No.  But analyst opinions

14   are an important part of what's important

15   to Cammer Factor 2.

16       Q     Do you have any academic

17   literature or case law that supports that

18   position?

19       A     Not sitting here.

20       Q     Sitting in your office,

21   perhaps?

22       A     I mean I could search.

23       Q     You don't cite any in your

24   report; correct?

25       A     No.

1      Q       You can turn that exhibit

2  down and turn to Exhibit 69.

3              This is a May 1st, 2015

4  report by MLV.  And if you look at the

5  last-full paragraph on the first page

6  under "Preferred Dividends are the

7  Elephant in the Room."

8      A       Yes.

9      Q       Do you think that

10 information in that paragraph would be

11 relevant to preferred shareholders?

12     A       Again, they're reporting on

13 a decision that the firm made.

14     Q       Do you think that

15 information would be relevant to

16 preferred shareholders?

17     A       Yes, that they would have

18 received it in press reports or, you

19 know, the firm's SEC filings and so on

20 which are public.  I don't know if this

21 was public.

22     Q       If you turn to the next

23 page, page 3, again, in their summary

24 financial model, they model out the

25 preferred dividends.  Do you see that

1    under income statement?

2         A        Yes.

3         Q        And then under balance

4    sheet, again, it lists the preferred

5    stock.

6         A        Yes.

7         Q        You can turn that over.

8                  Exhibit 70, this is a report

9    by Nobel Financial on July 30th, 2015.

10   If you turn to the second page of this

11   report on the third bullet point that

12   starts, "Mill continues to face liquidity

13   concerns and has preferred dividends,"

14   you see that paragraph?

15        A        Yes.

16        Q        Do you think that

17   information would be relevant to

18   preferred shareholders?

19        A        I mean it would be stale

20   information by this point.  They have

21   deferred several months before July 30th,

22   2015.  So I mean this would be

23   information that was already out there.

24        Q        Would the information be

25   important to preferred shareholders?

1    A        Not in this report.  By the
2  time this report came out, this
3  information would be stale.
4    Q        That wasn't my question.
5            Would the information itself
6  be important to preferred shareholders?
7    A        The information would have
8  been important to preferred shareholders
9  when Miller announced that it was
10 deferring dividend payments.
11            (The above-referred-to
12    document was marked as Exhibit 71 for
13    identification, as of this date.)
14    Q        And then Exhibit 71 is a
15 report from Brean Capital, dated
16 September 8th, 2014.
17            In the first-full paragraph
18 under investment summary, the sentence
19 starting "Outside of operating
20 activities," do you see that sentence?
21    A        Sorry.  Is this the report
22 that created all the trouble?
23    Q        Yes.
24    A        You said "under operating
25 summary."

1      Q        No.   "Under investment

2  summary."

3      A        Yes.

4      Q        The sentence starting

5  "Outside of Operating Activities."

6      A        Yes.   That's the third

7  sentence.

8      Q        Correct.

9               You think that information

10  in that sentence would be relevant to

11  preferred shareholders?

12      A        I mean again, the

13  information about the preferred stock

14  offering would presumably be known to

15  preferred shareholders since they bought

16  the offering.

17               And I don't know when the

18  tax credits -- the receipt of the tax

19  credits was first reported.  So this is

20  summarizing information that may or may

21  not be out there previously.

22               MS. POSNER:  Can you repeat

23      back my question?

24               (The requested portion was

25      read back by the court reporter.)

1     A      The information in that

2 sentence on this document may or may not

3 be relevant to preferred shareholders.

4 They would already have known it since

5 much of it seems to be stale.

6     Q      I'm going to ask it for a

7 third time.

8             Do you think the actual

9 information would be relevant to

10 preferred shareholders?

11           MR. BALLARD:  Objection to

12    form.

13     A      When it came out, yes.

14     Q      If you continue down this

15 first page under balance sheet received

16 several capital injections, they talk

17 about one of the preferred Series C

18 offerings, and then they talk about their

19 credit facility and tax credits and

20 Miller's available liquidity.  Do you see

21 that?

22     A      Yes.

23     Q      Do you think that

24 information would be relevant to

25 preferred shareholders?

1      A      Yes.  Again, when it came

2  out.

3      Q      Analyst reports typically

4  come out after SEC filings and earnings

5  calls; correct?

6      A      Correct.  And that's because

7  analysts, you know, integrate the

8  information, analyze it and provide

9  opinions on that information.

10      Q      Are you aware that Miller

11  Energy also discussed its preferred

12  securities in its SEC filings?

13      A      Yes.

14      Q      And are you aware that

15  Miller Energy also discussed its

16  preferred offerings in its earnings

17  conference calls?

18      A      Yes.

19      Q      Are you aware that Miller

20  Energy discussed its liquidity on its

21  earnings conference calls?

22      A      Yes.  These are the type of

23  information that are in, you know,

24  earnings conference calls, SEC filings

25  and such.  So, yes, I'm aware.

1  Q  Are you also aware that

2 Miller Energy discussed the payment of

3 dividends to its preferred shareholders

4 on its earnings conference calls?

5  A  On all of them or on some of

6 them?

7  Q  Some of them.

8  A  Yes.

9    THE VIDEOGRAPHER: We're

10 going off the record at 9:23 a.m.

11    (A short recess was taken.)

12    THE VIDEOGRAPHER: We're

13 back on the record at 9:35 a.m.

14  Q  Dr. Attari, I'm going to

15 direct your attention to pages 59 and 60

16 of your report, paragraphs 174 through

17 177. Do you have that in front of you?

18  A  Yes.

19  Q  In your report, you don't

20 dispute that the number of market makers

21 of Miller Energy's common stock meets the

22 standard under Cammer; correct?

23  A  I don't dispute that, yes.

24  Q  And what is Cammer Factor 3?

25 This is the market maker's factor.

Veritext Legal Solutions
www.veritext.com
212-279-9424    212-490-3430

```
 1        A          Sitting here, I can't recite
 2   it for you.
 3        Q          What is the purpose of this
 4   Cammer factor?
 5        A          To test whether there were a
 6   number of market makers, so that you
 7   would have a market that was orderly and
 8   liquid.
 9        Q          And in Cammer, the company
10   at issue was trading in the
11   over-the-counter market; right?
12        A          Yes.
13        Q          And why for a security
14   that's traded on the over-the-counter
15   market would market makers be important?
16        A          Because if you didn't have
17   market makers, it would be more difficult
18   for investors to trade the security.
19        Q          And in the over-the-counter
20   market, those market makers provide
21   liquidity to investors; correct?
22        A          Correct.
23        Q          And Miller Energy's
24   securities, both the common stock, the
25   Series C and the Series D did not trade
```

1    over-the-counter; correct?

2         A         Correct.  But the structure

3    of equity markets has changed over the 30

4    years since Cammer.

5         Q         They all traded on the New

6    York Stock Exchange; correct?

7         A         They were listed on the New

8    York Stock Exchange.  They traded in a

9    number of different venues.

10        Q         Fair enough.

11                  The New York Stock Exchange

12   has a computerized system to match orders

13   and provide quotes that does not rely on

14   market makers; correct?

15        A         Yes.  I believe the

16   over-the-counter markets may also have

17   had that back in the day.

18        Q         At the time at Cammer, you

19   think that's correct?

20        A         I don't know.

21        Q         You criticized Mr. Coffman

22   for not providing information on the

23   number of market makers for the Series C

24   and Series D; correct?

25        A         I just note that he does

1    not.

2        Q        Did you determine that there

3    was an insufficient number of market

4    makers for the Series C and Series D to

5    meet this Cammer factor?

6        A        I just say that there is no

7    evidence.  So this is not something where

8    we can say that the security meets this

9    factor.

10       Q        If you turn to page 22 of

11   your report, in paragraph 67, you're

12   talking here about how the Series C

13   trade; correct?

14       A        Yes.

15       Q        And in this paragraph, you

16   talk about the fact that there were

17   market makers for the Series C; correct?

18       A        I don't see where you see

19   that.

20       Q        You're discussing the

21   brokerage houses.

22                And you say, "Brokerage

23   houses sent orders placed by investors to

24   the securities exchanges such as the New

25   York Stock Exchange or other market

1   venues where the orders trade against

2   orders placed by other investors or

3   against a bid or an offer placed by a

4   market maker."  Do you see that?

5        A       Yes.

6        Q       I assume you're --

7        A       Or a market maker.

8        Q       You're talking here about

9   there being a market maker for the Series

10  C; correct?

11       A       Yes.  Or market maker, yes.

12       Q       If you go to the paragraph

13  right below it, paragraph 68, in the

14  third sentence, you talk about the fact

15  that Mr. Zeisman's purchases of the

16  Series C were quickly executed.  Do you

17  see that?

18       A       Quickly executed, I'm trying

19  to look for those words.  And I'm not

20  seeing them.

21       Q       It's the further line down.

22       A       Yes.  The order was quickly

23  executed, yes.

24       Q       And the fact that the order

25  was quickly executed indicates that the

1    market for the preferred securities was

2    liquid; correct?

3         A        Yeah.  We know that there

4    was a certain amount of trading volume

5    for these securities, yes.

6         Q        And the fact that the order

7    was quickly executed is consistent with

8    an efficient market, isn't it?

9         A        The fact that the order was

10   quickly executed is consistent with there

11   being volume.

12        Q        And does the fact that there

13   was volume indicate that the market was

14   efficient?

15        A        I think we spoke about the

16   volume related to Cammer factor earlier.

17   And I said that the turnover for the

18   Series C and Series D met the Cammer

19   thresholds.  So, yes.

20        Q        Let's turn to pages 63 to 65

21   of your report.  And this is paragraphs

22   189 through 193.

23            And you're talking about the

24   Cammer factor dealing with the Form S-3?

25        A        Yes.

1     Q        And you agree with

2  Mr. Coffman that there were times during

3  the proposed class period when Miller

4  Energy was eligible to file an S-3;

5  correct?

6     A        I agree that there were

7  times when Miller Energy was eligible to

8  file an S-3, yes.

9     Q        And, in fact, Miller Energy

10  sold securities pursuant to S-3 during

11  the class period; correct?

12     A        Miller Energy sold

13  securities pursuant to an S-3 during the

14  class period.

15     Q        And if you turn to page 64

16  of your report, paragraph 191 --

17     A        Yes.

18     Q        -- you state, "Mr. Coffman

19  ignores that the use of Form S-3 requires

20  that 'the aggregate market value of the

21  voting and non-voting common equity held

22  by non-affiliates of the registrant is

23  75 million or more.'" Do you see that?

24     A        Yes.

25     Q        And then you cite there to

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

1    SEC Form S-3.  Do you see that?

2         A       Yes.

3         Q       Did you actually review that

4    document?

5         A       Yes.

6                 (The above-referred-to

7         document was marked as Exhibit 72 for

8         identification, as of this date.)

9         Q       So I've placed in front of

10   you what's been marked as Exhibit 72.

11   This is the Form S-3 rule by the SEC that

12   you cite in your report.  Do you

13   recognize this document?

14        A       Yes.

15        Q       Do you know when the

16   requirements for this rule were put in

17   place?

18        A       No.

19        Q       I'll represent to you that

20   they were put in place in 2007 prior to

21   the start of your proposed class period.

22                MS. POSNER:  I'm going to

23        mark one more document.

24                (The above-referred-to

25        document was marked as Exhibit 73 for

1    identification, as of this date.)

2    Q        And I've handed you what's

3    been marked as Exhibit 73 which is a

4    discussion of the Form S-3 rule change in

5    2007.

6             Have you ever reviewed this

7    document before?

8    A        No.

9    Q        I'm going to direct your

10   attention to page 14 of this document.

11   And if you could review what it states

12   under Subheading B, Amendments to Form

13   S-3 through those first four bullet

14   points on page 15.  Let me know when

15   you're done.

16   A        Do you want me to read the

17   whole section?

18   Q        You can read as much as you

19   want.  But I just want to address your

20   attention to the first four bullet points

21   and the few sentences before it.

22   A        Okay.

23   Q        Doesn't this state that

24   they're actually changing the rule to get

25   away from the requirement that there be a

1  75 million public vote requirement for

2  Form S-3?

3         A         It seems to.  But I wouldn't

4  be able to tell you without reading more

5  of the document.

6         Q         You can turn back to

7  Exhibit 72, the actual rule.

8                   And if you go to page 2 of

9  this document under eligibility

10 requirements for use of Form S-3, that's

11 Subheading 1, and then there is

12 Subheading A, which has the registrant

13 requirements.  Do you see that?

14        A         Yes.

15        Q         Nowhere in here does it talk

16 about a requirement that there be a

17 $75 million public float; correct?

18        A         It's under transaction

19 requirements.

20        Q         And it's actually only under

21 one of the transaction requirements;

22 correctly?

23        A         Correct.

24        Q         It's under B-1 primary

25 offerings by certain registrants; right?

1    A        Yes.

2    Q        And it lists a whole host of

3  other types of transactions that don't

4  have a $75 million public float

5  requirement; correct?

6    A        I think some of the others

7  have other requirements in terms of the

8  size of the offering and such.

9    Q        But no requirement that

10  there be a $75 million public float?

11    A        Correct.

12    Q        Did Miller Energy conduct

13  any of the public offerings discussed

14  under B-1 where the $75 million float

15  requirement is after December 1, 2014

16  when its float fell below 75 million?

17    A        Sorry.  I did not understand

18  that question.

19    Q        Sure.  That was a mouthful.

20         Miller Energy had already

21  issued its initial primary offerings

22  prior to December 1st, 2014 when its

23  float fell below 75 million; correct?

24    A        Correct.

25    Q        So according to Exhibit 72

1    and 73, they actually were eligible to

2    file pursuant to S-3 during the proposed

3    class period, except for the time periods

4    when they did not file their Form 10-K on

5    time; correct?

6         A        Again, I mean -- you know, I

7    would need to read these documents,

8    Exhibit 73, more carefully to make sure I

9    understand that the 75 million cap or

10   float was no longer irrelevant.

11        Q        If a company trades

12   efficiently and is S-3 eligible and then

13   becomes ineligible due to a late filing,

14   how would that impact the ability of the

15   market to reflect publicly-available

16   information?

17        A        I don't know that -- sorry.

18   Can you repeat that question?

19               MS. POSNER:  Can you read

20      that back?

21               (The requested portion was

22      read back by the court reporter.)

23        A        I mean the S-3 eligibility

24   in the Cammer factors, the judge seems to

25   be focused on the public float being

1   sufficient to attract enough investors.

2   That's in paragraph 189.

3          So as the float -- as the

4   value falls, presumably, the number of

5   investors will be interested is reduced.

6   And the market is likely to be less

7   efficient than before.

8          MS. POSNER:  Can you repeat

9      back my question again?

10         (The requested portion was

11     read back by the court reporter.)

12     A      So if it becomes ineligible

13  because of a late filing, investors are

14  not getting information in a timely

15  fashion.  So the securities would become

16  less efficient because now there's kind

17  of a lack of information and more

18  uncertainty.

19     Q      How late was Miller Energy

20  in filing its Form 10-Ks?

21         MR. BALLARD:  Objection to

22     form.  Do you have a time period

23     you're focusing on?

24         MS. POSNER:  Why don't we

25     start with the first one.

1      A          Sitting here, I can't tell

2  you precisely.

3      Q          It was no more than a few

4  weeks; correct?

5      A          If that's what you are

6  stating, I'll accept that.

7      Q          How about the 10-K towards

8  the end of the class period when they

9  were late filing?  Do you know how late

10  they were with filing that 10-K?

11      A          Did they file the 10-K

12  within the class period?  My

13  understanding was that they didn't get

14  around to it.  But I may be mistaken,

15  sitting here.

16      Q          Are you aware of any

17  empirical support that a market becomes

18  less efficient when it moves from S-3

19  eligible to S-3 ineligible?

20      A          No.  But it seems to be

21  something that the Cammer judge decided

22  was important.

23      Q          Let's turn to page 60 of

24  your report.  And I'm going to direct

25  your attention to pages 60 to 62,

1    paragraphs 178 through 182.

2                And you're talking here

3    about the Krogman factor dealing with

4    market capitalization.  Do you see that?

5        A      Yes.

6        Q      And in your report, you

7    don't dispute that Miller Energy's common

8    stock market capitalization meets the

9    standard under Krogman; correct?

10       A      I don't believe that there

11   is a standard as in a threshold under

12   Krogman.  I'm just making the point here

13   that Mr. Coffman has provided the

14   information for the common but has not

15   provided it separately for the C and the

16   D.

17       Q      Do you dispute Mr. Coffman's

18   opinion that the market cap for the

19   common stock did meet the Krogman factor?

20       A      I don't have an opinion on

21   that.

22       Q      What do you think the

23   purpose of this Krogman factor is?

24       A      I believe it's another

25   window on this idea that a larger -- a

1    security with a large amount outstanding

2    is likely to attract more investor

3    interest.

4        Q        And on page 60,

5    paragraph 178 of your report, you quote

6    the Krogman court.  And you say, "The

7    court and Krogman v. Sterritt, 2001,

8    noted that 'the market capitalization

9    calculated as the number of shares,

10   multiplied by the prevailing share price,

11   may be an indicator of market efficiency

12   because there is a greater incentive for

13   stock purchasers to invest in more highly

14   capitalized corporations.'"  Do you see

15   that?

16       A        Correct.  And that's what I

17   just said in response to your previous

18   question.

19       Q        And you opine in your report

20   that the Series C and Series D should be

21   independently analyzed for purposes of

22   this Krogman factor; correct?

23       A        Correct.

24       Q        And why is that?

25       A        Because we are trying to

1   determine whether the market for the
2   Series C and the Series D on a
3   stand-alone basis were efficient.
4        Q        If the point is, is that
5   stock purchasers might be incentivized to
6   purchase "in more highly capitalized
7   corporations," why does analyzing the
8   market capitalization of each type of
9   security make sense?
10       A        Because you can have -- so
11  typically,, the way the capitalization of
12  a corporation is computed is the number
13  of shares times the value of the shares.
14  And it's typically a concept that is
15  applicable only to the common stock of
16  the company.
17            Here, what we're trying to
18  do is evaluate a preferred security.  And
19  so if you take the same concept, which is
20  relevant at a security level and apply it
21  to the security that we're trying to
22  analyze, then what we need to do is look
23  at each of the securities separately.
24            MS. POSNER:  Can you read
25      back my question?

1              (The requested portion was
2      read back by the court reporter.)
3      A        I think I answered it.  Is
4  there something specific that I'm
5  missing?
6      Q        The factor goes to whether
7  the corporation itself is highly
8  capitalized; correct?
9      A        If that's what the factor
10  goes to, then I think one only needs to
11  do the common.  And that's the relevant
12  thing.  But I disagree that that's what
13  the factor goes to.
14      Q        You disagree that the words
15  say "stock purchasers to invest in more
16  highly capitalized corporation" as you
17  quote in paragraph 178 of your report?
18      A        Yes.  It talks about stock
19  purchasers.  It doesn't talk about
20  preferred stock purchasers or bond
21  purchasers, you know, buying because
22  of -- the market capitalization of the
23  corporation is high.
24      Q        Why don't we turn to page 65
25  of your report and 66 which is paragraphs

1    194 through 196.

2              And again, you don't in your

3    report dispute that the bid ask spread of

4    Miller Energy's common stock meets the

5    standard under Krogman; correct?

6         A        Could you repeat the

7    question?

8         Q        In your report, you don't

9    dispute that the bid ask spread of Miller

10   Energy's common stock meets the standard

11   under Krogman; correct?

12        A        Again, I don't think this is

13   a factor where there is a threshold level

14   that's specified in the Krogman opinion.

15   But sitting here, I may be mistaken.  So

16   I don't have an opinion about the common

17   stock.

18        Q        You don't dispute

19   Mr. Coffman's findings; correct?

20        A        I don't have an opinion.

21        Q        And then with regard to the

22   Series C and Series D, you don't dispute

23   that the bid ask spread for both the

24   Series C and the Series D meets the

25   standard under Krogman until the last

1    eight months of the class period;

2    correct?

3         A         Again, I don't have an

4    opinion until the last eight months of

5    the period.

6         Q         And during the last eight

7    months of the class period, why do you

8    believe that the bid ask spreads of

9    Miller Energy's Series C and Series D

10   securities increased?

11        A         I have not looked into why

12   they increased.

13        Q         Are you familiar with the

14   academic literature that demonstrates

15   that bid ask spreads tend to increase as

16   price per share falls?

17        A         I'm aware of the academic

18   literature that says that lower-priced

19   securities have wider bid ask spreads

20   proportionately.  I don't know of

21   available literature that has looked at a

22   single security through time.

23        Q         In your opinion, if a market

24   for a given stock is generally efficient

25   and then the market price falls to a

1   level causing the bid ask spread to

2   increase, does that suggest that the

3   market is less able to price in new

4   information?

5         A        Yes, because it becomes more

6   expensive for investors to trade, for new

7   information to be impounded into prices.

8         Q        Becomes more expensive, but

9   it doesn't become difficult for that

10  information to be impounded; correct?

11        A        Because it's more expensive,

12  less of the information gets impounded.

13  The information gets impounded less

14  quickly.  So you can have various factors

15  that cause the price to be less

16  efficient.

17        Q        Is it your opinion that for

18  the Series C and Series D for the last

19  eight months of the class period that

20  they were impounding new information

21  slowly?

22        A        In this section, I'm looking

23  at this particular factor which the

24  courts have specified.  And I'm noting

25  that the bid ask spreads increased which

1  would go against a finding of efficiency.

2         MS. POSNER:  Can you read

3    back my question, please?

4         (The requested portion was

5    read back by the court reporter.)

6     A      I don't have an opinion on

7  that.

8     Q      Wouldn't an increase in bid

9  ask spreads in response to greater

10  uncertainty and lower prices be an

11  indication that the market prices are

12  responding to information as you would

13  expect in an efficient market?

14     A      I don't see how.

15     Q      Are you aware of any

16  companies that had a threat of delisting

17  or bankruptcy that did not lead to

18  increased bid ask spreads?

19     A      Could you read that back?

20         (The requested portion was

21    read back by the court reporter.)

22     A      Sitting here, no.

23     Q      Let's turn to page 62 of

24  your report.

25         I'm going to direct your

1    attention to pages 62 to 63, paragraphs

2    183 to 186.  You're talking about the

3    institutional ownership for the Season Ds

4    here.

5              In your report, you don't

6    dispute that there was substantial

7    institutional ownership of Miller

8    Energy's common stock throughout the

9    class period; correct?

10       A         There were a number of

11   institutional owners in the common stock

12   over the class period.

13       Q         In your opinion, is there a

14   number, a percentage of institutions that

15   must own a preferred security in order to

16   support that it is efficient?

17       A         A threshold number, no.

18       Q         You criticized Mr. Coffman

19   for not providing information on the

20   number of institutions that held the

21   Series C and Series D; right?

22       A         I do not criticize him.  I

23   just note that he has not provided

24   information.

25       Q         What method should

1   Mr. Coffman have used to determine the

2   number of institutions that held the

3   Series C and Series D?

4        A        I believe he says that the

5   information is not available.  So I think

6   the point here is that the information is

7   not available.  So we do not know that

8   there were institutional holders.

9        Q        Did you do anything to

10  determine how many institutions held the

11  preferred Ds throughout the class period?

12       A        I believe we may have tried

13  to pull the information and found it was

14  not available.

15       Q        Do you have any reason to

16  believe that institutions did not hold

17  Miller Energy Series C and Series D?

18       A        I have no reason to believe

19  that they did hold the Series C and

20  Series D.

21            MS. POSNER:  You want to

22     repeat my question?

23            (The requested portion was

24     read back by the court reporter.)

25       A        I have no beliefs on the

1    issue.

2         Q         Why don't we turn to page 55

3    of your report.  I'm going to direct your

4    attention to pages 55 to 56, paragraphs

5    161 to 166.  You're talking about auto

6    correlation with regard to the C and Ds

7    in this section.

8                   In your report, you discuss

9    that there are a number of ways to test

10   for auto correlation; correct?

11        A         Correct.

12        Q         And Mr. Coffman's auto

13   correlation test analyzed whether a

14   return on a given day is predictable by

15   the prior's day return?

16        A         Corrected.

17        Q         And then he conducted a

18   robustness check for every quarter of the

19   proposed class period; correct?

20        A         I don't know that I would

21   call it a robustness check.  He computed

22   it separately for every quarter of the

23   class period, correct.

24        Q         Is it your opinion that the

25   methodology that Mr. Coffman used to test

1    for auto correlation is invalid?

2        A        It's my opinion that it's

3    limited.

4        Q        So your opinion is not that

5    it's invalid; just that it's limited; is

6    that correct?

7        A        If the test is for auto

8    correlations, then it's invalid because

9    it only tests for a very limited form of

10   auto correlation.

11       Q        Are you aware that dozens,

12   if not hundreds of courts, have accepted

13   the same auto correlation test that

14   Mr. Coffman conducted in securities fraud

15   class actions?

16              MR. BALLARD:  Objection to

17       form.

18       A        Could you repeat that,

19   please?

20              (The requested portion was

21       read back by the court reporter.)

22       A        I'm not aware.

23              (The above-referred-to

24       document was marked as Exhibit 74 for

25       identification, as of this date.)

1      Q        Dr. Attari, I've marked as

2 Exhibit 74, an expert report you

3 submitted in connection with that case we

4 were discussing earlier today, EGC;

5 correct?

6      A        Correct.

7      Q        Do you recognize this

8 report?

9      A        Yes.

10      Q        In this expert report, you

11 admit that "The most common tests for

12 auto correlation is the one that tests if

13 a return on a given day is predictable by

14 the prior day's return"; correct?

15      A        Yes. sorry.  What page?

16      Q        If you go to page 8,

17 paragraph 28, the first sentence there --

18      A        Yup.

19      Q        -- in that case, you opined

20 that the stock at issue, EGC, was not

21 efficient; correct?

22      A        Correct.

23      Q        And the auto correlation

24 test you conducted there tested if a

25 return on a given day is predictable by

1    the prior day's return; correct?

2         A        Correct.

3         Q        And the plaintiffs' expert

4    conducted the same test; right?

5         A        I have no recollection.  I

6    don't think that he had conducted the

7    test prior to this.

8         Q        As opposed to in his

9    rebuttal report?

10        A        Correct.

11        Q        You both conducted

12   robustness tests, but you used different

13   one-year time periods to conduct that

14   robustness check.  Do you remember that?

15        A        I recall what I did, yeah.

16   There were different periods, yes.

17        Q        The results of your

18   robustness tests was one of the primary

19   basis for your opinions that EGC was

20   inefficient; correct?

21        A        Yes.  So in this case, what

22   I was testing was whether EGC's stock

23   price traded in an efficient market.

24   And, you know, as I note in my report in

25   Miller, there are an array of auto

1  correlation tests that can be used to

2  identify violations of market efficiency

3  and violations of weak form market

4  efficiency.

5          Mr. Coffman has done one of

6  those tests and claims that it somehow is

7  evidence of efficiency which is where --

8  kind of the flaw that I'm pointing out in

9  his work.

10      Q       You conducted that same test

11  to determine that there was inefficiency

12  in the EGC case; correct?

13      A       Correct.

14      Q       And the plaintiffs' expert

15  there conducted the same test and came to

16  the opinion that the market for EGC was

17  efficient based in part on that auto

18  correlation test; correct?

19      A       I don't believe that the

20  plaintiff expert did that.  I think the

21  plaintiff expert -- and sitting here, I'm

22  kind of going from recollection.

23      Q       Sure.

24      A       The plaintiffs' expert

25  pointed out that my auto correlation

1   results -- that he had different results

2   on the tests I conducted.  And since I

3   hadn't conducted a broader array of

4   tests, he was rebutting whatever I had

5   done.

6        Q     The court in EGC determined

7   that plaintiffs' auto correlation test

8   was a factor supporting efficiency in

9   that case; correct?

10       A     I have no recollection.  I

11   thought it was more that my -- my

12   evidence had been rebutted by them

13   successfully, not that this was a factor

14   in supporting efficiency.

15          (The above-referred-to

16     document was marked as Exhibit 75 for

17     identification, as of this date.)

18       Q     I've marked as Exhibit 75,

19   the court's order in the EGC case, which

20   is Docket 10CV00252, in the Central

21   District of California.  And I'll turn

22   your attention to pages 27 and 28 of this

23   order.

24       A     I was just looking up the

25   EGC report for something that you had

Veritext Legal Solutions
www.veritext.com
212-279-9424        212-490-3430

1   asked earlier.  What pages?

2        Q        27 and 28.

3        A        Yes.

4        Q        And in this section, the

5   court finds that the plaintiffs' experts

6   auto correlation study found no

7   significant auto correlation for EGC's

8   returns over the class period.

9             That's the second-full

10  paragraph under the heading.

11            And then it discusses your

12  position with regard to auto correlation.

13  And ultimately, the court holds that the

14  factor weighs in plaintiffs' favor on

15  page 28; correct?

16       A        Right, as in it doesn't

17  weigh in defendant's favor.  I don't

18  think this is evidence of efficiency.

19  The evidence that I had provided against

20  efficiency did not hold.

21       Q        So when the court says "the

22  factor weighs in plaintiffs' favor," you

23  don't understand that to mean that the

24  court is finding that plaintiffs' expert

25  has demonstrated a factor that supports

1  market efficiency?

2      A        No.  I believe that it's

3  that the defendant's expert had -- did

4  not support market inefficiency.

5      Q        I'm going to show you what

6  was previously marked as Exhibit 42.  And

7  it's just portions of Exhibit 42.  It's

8  the coversheet and then pages 57, 58, 59,

9  60 and Exhibit 17C and 17D from the

10  corrected report of Chad Coffman.  Do you

11  see that?

12      A        Yes.

13      Q        Just trying to save a few

14  trees here.

15                  If you turn to Exhibit 17C

16  and Exhibit 17D, charts or tables in

17  Mr. Coffman's report --

18      A        Yes.

19      Q        -- do you agree that the

20  auto correlation coefficient switches

21  inconsistently from positive to negative

22  and back throughout the class period for

23  both the Series C and Series D?

24      A        It switches from positive to

25  negative and back.  Actually, sorry.  It

Veritext Legal Solutions
www.veritext.com
212-279-9424        212-490-3430

1   switches from negative to positive and

2   back.

3        Q         And if the auto correlation

4   coefficient reverses regularly, is that

5   consistent with the ability of an

6   arbitrage opportunity?

7        A         It could be consistent with

8   the ability for an arbitrage opportunity.

9   It's just not consistent, you know, with

10  an arbitrage that says I will use, yes,

11  it is, a return to predict today's return

12  or today's return to predict tomorrow's

13  return.  It could be more complex

14  opportunities.

15       Q         Can you explain what kind of

16  complex arbitrage opportunity would be

17  able to take place where the auto

18  correlation coefficient reverses

19  regularly like this?

20       A         Sitting here, I haven't done

21  the work for it.  But there are a number

22  of different trading strategies that

23  people have published over the years.

24                 And this just says that you

25  need to look at something more complex

1  than using, yes, it is, a return to

2  predict today's return.

3      Q       In a market with no auto

4  correlation, would you expect to observe

5  the sign on the coefficient change

6  regularly or would you expect to observe

7  the same sign?

8      A       In a market with no auto

9  correlation, I would expect the sign to

10  change.  But I won't expect any of the

11  auto correlations to be statistically

12  significant.

13      Q       So it's your opinion that in

14  a market with no auto correlation, there

15  could not be any statistically

16  significant auto correlations?

17      A       Well, if you looked at a

18  large enough -- if you looked at a large

19  enough number of auto correlations, so,

20  you know, you'd find 5 percent of them to

21  be statistically significant.  But the

22  percentages that are statistically

23  significantly exceeds that 5 percent

24  threshold.

25      Q       So your opinion is that it

1    would have to be less than 5 percent in

2    order for there to be no auto

3    correlation?

4        A        Well, if it is randomly

5    generated auto correlation, so let's say

6    that I have an un-auto correlated series,

7    I have generated a set of random numbers

8    to not be auto correlated and then I

9    compute auto correlations on them and I

10   do this experiment over and over

11   thousands of times, then just basic

12   statistics tells me that 5 percent of the

13   time, I will find an auto correlation

14   that is different than 0 at the

15   95 percent significance level.

16       Q       That's a little bit

17   different, though, than what I just asked

18   you.

19       MS. POSNER:  Why don't you

20     read that back.

21       (The requested portion was

22     read back by the court reporter.)

23     A       I didn't understand the

24   question.  And I was trying to explain.

25     Q       So let me try to ask it a

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

1   different way then.

2              Can a statistically

3   significant auto correlation coefficient

4   appear based upon the timing of news?

5      A         You'll have to provide more

6   of an example, more information than

7   that.

8      Q         What are the bases that

9   could cause auto correlation to be

10  statistically significant?

11     A         Over what window of time?

12     Q         Any window of time.

13     A         I really don't know.   I

14  don't understand the question, is the

15  problem.  What causes auto correlation to

16  be statistically significant is if you

17  have systematic reversals or systematic

18  continuations and returns.

19     Q         Are those the only reasons

20  that you could see statistically auto

21  correlation coefficients?

22     A         I think mathematically,

23  that's what would give you a positive or

24  negative auto correlation.  And if it

25  were not systematic, it's unlikely to be

Page 96

1    statistically significant.

2         Q       Let's turn to page 63 of

3    your report.  This is paragraphs 187 and

4    188.  You're talking about the options

5    factor here.

6              In your report, you don't

7    dispute that there was options trading on

8    Miller Energy's common stock throughout

9    the proposed class period; correct?

10        A       No, I don't.

11        Q       Mr. Coffman did not opine

12   that there was option trading on the

13   Series C or Series D; correct?

14        A       I don't recall.

15        Q       Were there any barriers to

16   options trading on the preferred

17   securities?

18        A       I'm not sure I understand

19   the question.

20        Q       Is there any reason why

21   there couldn't be options trading on the

22   Series C or Series D?

23        A       I mean I don't think I'm

24   talking about traded.  I'm talking about

25   listed.  So there were no listed options.

1     Q     Correct.

2     My question is, is there any

3 reason why there could not be any listed

4 options on the preferred Series C or

5 Series D?

6     A     Sitting here, I don't know.

7     Q     What are the reasons why

8 there might not be options traded on a

9 given security?

10     A     Often, if the underlying

11 market is not sufficiently deep and

12 liquid, people will not list options.  So

13 that could be one of the barriers.

14     Q     Any other barriers that you

15 can think of or any other reasons why

16 there might not be options trading on a

17 given security?

18     A     Sitting here, no.

19     Q     Do you know how common it is

20 for there to be options traded on

21 preferred securities?

22     A     No.

23     Q     Let's turn to page 66 of

24 your report.  And I'm going to turn your

25 attention to pages 66 through 71.  And

Veritext Legal Solutions
www.veritext.com
212-279-9424     212-490-3430

1     it's paragraphs 197 to 208.

2              And this is your discussion

3     of the 10(b) damages and whether they can

4     be calculated on a class-wide basis.  Are

5     you there?

6          A     Yes.

7          Q     You provide one reason for

8     your opinion that Section 10(b) damages

9     cannot be calculated on a class-wide

10    basis; correct?

11         A     I provide an explanation of

12    why Section 10(b) damages cannot be

13    computed on a class-wide basis.

14         Q     And the reason that you

15    provide is that according to you, the

16    methodology proposed by Mr. Coffman does

17    not properly distinguish between

18    high-risk and low-risk investors;

19    correct?

20         A     That's the explanation, yes.

21         Q     I'm going to turn your

22    attention to page 70, paragraph 207.

23              And you say here, "Where

24    plaintiffs pursue a materialization of

25    the risk theory, I understand the damages

1    depend on the risk tolerance of the

2    investors in the proposed class."  Do you

3    see that?

4        A        Yes.

5        Q        Where did you get that

6    understanding?

7        A        From discussions with

8    counsel and from a review of an opinion

9    in, I think, the BP case.

10       Q        Are you an attorney?

11       A        No.  That's why I discussed

12   with counsel.

13       Q        Fair enough.

14                If your understanding is

15   incorrect, how does that impact your

16   opinion regarding the ability to

17   calculate Section 10(b) damages on a

18   class-wide basis?

19                MR. BALLARD:  Objection to

20       form.

21       A        It depends on how it is

22   incorrect.

23       Q        If there is no requirement

24   when plaintiffs pursue a materialization

25   of the risk theory that damages depend on

1    the risk tolerance of the investors in

2    the proposed class, how would that impact

3    your opinion with regard to the ability

4    to calculate 10(b) damages on a

5    class-wide basis?

6         A       So all investors are treated

7    the same.  This reason would not be

8    relevant.

9         Q       If plaintiffs and

10   Mr. Coffman are proposing to use an

11   out-of-pocket methodology that seeks to

12   measure the mispricing in the security at

13   each point in time as the basis for

14   competing damages, do your opinions still

15   apply?

16        A       No.

17        Q       In his report or during his

18   testimony, did Mr. Coffman ever suggest

19   he was proposing that damages be

20   calculated in any way other than the

21   standard out-of-pocket methodology?

22             MR. BALLARD:  Objection to

23        form.

24        A       Mr. Coffman did not.  But

25   the complaint and the motion to dismiss

1  indicate that it is a materialization of

2  risk-base damage that plaintiffs are

3  asking for.

4          Q       But that understanding is --

5  strike that.

6                  The relevance of what you

7  just mentioned, that the plaintiffs

8  allege a materialization of the risk

9  theory, is your understanding that

10  somehow that the risk tolerance of the

11  investors is relevant in those

12  circumstances; correct?

13      A       Can you read that back,

14  please?

15                  (The requested portion was

16      read back by the court reporter.)

17                  MR. BALLARD:  Objection to

18      form.

19      A       I don't understand the

20  question.

21      Q       Let me rephrase it.  It was

22  a poorly-phrased question.

23                  Plaintiffs don't allege a

24  theory of damages outside of

25  out-of-pocket damages in their complaint;

1  correct?

2      A      I thought every disclosure

3  says that risk materialized.  So I don't

4  know how to read that other than it being

5  a materialization of risk theory.

6      Q      And your assumption is that

7  if there's a materialization of the risk

8  theory, then somehow you have to

9  differentiate between high-risk and

10  low-risk investors?

11            MR. BALLARD:  Objection to

12      form.

13      A      Well, if it's a

14  materialization of risk theory, then you

15  may have to distinguish between high-risk

16  and low-risk investors.

17      Q      And that's based on your

18  understanding from counsel; correct?

19            MR. BALLARD:  Objection to

20      form.

21      A      And from reading the Ludlow

22  opinion.

23      Q      Did Mr. Coffman suggest

24  anywhere in his report or during his

25  testimony that the proper measure of

1  damages for purchasers of Miller

2  securities would consist of 'compensation

3  based on the full price decline' on the

4  corrective disclosures?

5      A      I don't recall, sitting

6  here, what he wrote in his report and his

7  deposition.  A number of the disclosures

8  in the complaint seem to have nothing to

9  do with the alleged misstatements.

10     Q      Are you aware that the

11 out-of-pocket methodology has been used

12 in numerous cases alleging a

13 materialization in the risk theory?

14     A      I'm not aware of that.

15     Q      Let's turn to your

16 discussion in Section 11 damages.  And

17 this is pages 19 through 34 of your

18 report.  And it's paragraphs 54 through

19 111.  Are you there?

20     A      Yes.

21     Q      I'm going to try to combine

22 the C and Ds so we don't have to do this

23 twice.

24         On page 19 of your report,

25 paragraph 56 and then on page 28 of your

1  report, paragraph 89, the first

2  paragraph, you're discussing the Series

3  C, and then the second paragraph, you're

4  discussing the Series D.

5      A      Yes.

6      Q      You say that "The existence

7  of a statutory damages formula 'renders

8  knowledge of the individual circumstances

9  of each proposed class member

10 irrelevant.'"  Do you see that?

11     A      Yes.

12     Q      And you cite to

13 paragraph 102 of Mr. Coffman's report;

14 correct?

15     A      Correct.

16     Q      So let's look back at

17 Exhibit -- what was Exhibit 42,

18 Mr. Coffman's report and the portions of

19 it.

20             And if you look at

21 paragraph 102 of his report, all it says

22 there is "That given there's a

23 statutorily defined formula for

24 Section 11 damages, it is clear that

25 damages under Section 11 can be

1  calculated using a common methodology for

2  members of the Section 11 class";

3  correct?

4      A       Correct.

5      Q       He doesn't say anything

6  about the irrelevance of knowledge and

7  the individual circumstances of each

8  proposed class member; right?

9      A       Well, a common methodology

10  implies that the individual circumstances

11  are not relevant.

12      Q       The individual circumstances

13  that you're talking about here are which

14  offering they purchased in or traceable

15  to, the price they paid and either the

16  price they sold their shares at or

17  evidence that they held through the

18  filing of the complaint; correct?

19      A       Yes.

20      Q       Are you aware of how the

21  claims process works in securities fraud

22  class actions?

23      A       Yes.

24      Q       And are you aware that

25  members of the class submit trading

1  information and that there's a

2  court-appointed claims administrator that

3  confirms the completeness and accuracy of

4  the claims submitted?

5     A     Yes.

6     Q     And that's with regard to

7  both Section 11 claims and Section 10(b)

8  claims; correct?

9     A     Correct.  As far as I know,

10  the information they submit is when they

11  purchase, what price they purchase, when

12  they sold, what price they sold.  It does

13  not provide information that would allow

14  you to determine which offering the

15  securities came from.

16     Q     The information submitted in

17  that claims process would include the

18  date of purchase; correct?

19     A     It would include the date of

20  purchase.

21     Q     And it would include the

22  price of purchase; correct?

23     A     It would include the price

24  of purchase.

25     Q     And it would also include

1 whether the purchase was made from an

2 underwriter directly; correct?

3     A       If that information was

4 requested, yes.

5     Q       Are you aware that there's

6 also a court-approved plan of allocation

7 which details how each claim is

8 calculated in securities fraud class

9 actions?

10     A       Yes.

11     Q       And you're aware that that

12 is true with regard to both Section 11

13 and Section 10(b) claims?

14     A       Yes.

15     Q       And with regard to a 10(b)

16 claim, you would need to know when an

17 investor purchased their shares and the

18 price they purchased at and when they

19 sold their shares and the price they sold

20 that in order to calculate their

21 Section 10(b) damages; correct?

22     A       Yes.

23     Q       Is it your position that in

24 a typical securities fraud class action,

25 you couldn't conduct class-wide damages

1   without that specific information?

2        A        In a 10(b)?

3        Q        In a 10(b) case.

4        A        You can estimate damages.

5   You can compute damages.

6        Q        You can come up with a

7   standard formula for calculating the

8   damages; correct?

9        A        With the information or

10  without?

11       Q        With the information.

12       A        With the information, you

13  can come up with a formula for

14  calculating damages.

15       Q        Is it your opinion that

16  Section 11 damages for investors who can

17  demonstrate that they purchased directly

18  in one of the offerings at issue in this

19  case cannot be calculated on a class-wide

20  basis?

21       A        Prior to getting information

22  or after getting information?

23       Q        After getting information

24  that they directly purchased in an

25  offering.

1     A          So after you have

2  information on investors who purchase in

3  an offering, you can calculate damages

4  for the investors who purchase in the

5  offering.

6          If the class -- if there are

7  investors who haven't submitted the

8  information, you cannot compute damages

9  for all investors who may have purchased

10  in the offering.

11     Q          If you had information, you

12  would use the statutory formula for

13  calculating Section 11 damages for that

14  individual; correct?

15          MR. BALLARD:  Objection to

16     form.

17     Q          Do you want me to repeat it?

18     A          Yes.

19     Q          Sure.

20          If you had an investor's

21  trading information, demonstrating that

22  they purchase directly in an offering,

23  you would use the Section 11 statutory

24  formula to calculate their damages;

25  correct?

1     A     If you had their purchase

2   and sale information, you could compute

3   the damages to that investor for people

4   who purchase in the offering.

5         My understanding is here,

6   the class is defined only as people who

7   were damaged.  So there would be some

8   people who were not damaged who wouldn't

9   be part of the class.

10     Q     Let's turn to page 21 of

11   your report.  And the similar information

12   is repeated on page 30 of your report

13   with regard to the Series D investors.

14     A     What paragraph?

15     Q     Paragraph 64 through 66 and

16   then paragraphs 95 on page 30.

17         Essentially, you're

18   discussing the DTC in both of these

19   sections?

20     A    Yes.

21     Q     You opine with certain

22   exceptions, purchasers of the Series C

23   and Series D cannot trace their shares

24   because they did not receive share

25   certificates.

Veritext Legal Solutions
www.veritext.com
212-279-9424       212-490-3430

 1                And it said their stock was

 2    held in book entry form at the DTC?

 3         A        Correct.

 4         Q        Are you aware that the

 5    overwhelming majority of investors in

 6    U.S.-based markets do not have share

 7    certificates but instead hold their

 8    shares in book entry form in the DTC?

 9         A        Yes.

10         Q        And that's been the case

11    since at least 2011; correct?

12         A        At least, yes.

13         Q        Do you know when companies

14    essentially stopped issuing share

15    certificates?

16         A        Sometime in the '70s.  But I

17    may be getting the date wrong.

18         Q        And on page 22 of your

19    report, paragraph 67, you note that

20    investors who trade through brokerage

21    houses have no way of knowing who sold

22    the securities they purchased or who

23    purchased the securities they sold.  Do

24    you see that?

25         A        Yes.

1       Q       You're talking again here

2  about secondary market purchases, not

3  individuals who purchase directly in an

4  offering; correct?

5       A      Correct.

6       Q      That fact is true for

7  secondary market purchasers in any

8  security, not just investors in Miller

9  Energy's Series C and Series D; correct?

10      A      Correct.

11      Q     On page 25 of your report,

12  this is paragraph 79, you

13  state, "After-market purchasers, those

14  who purchase their shares in open-market

15  trading, not directly in one of the

16  public offerings, cannot trace their

17  shares to these offerings.  Investors who

18  place orders in the open market will have

19  their brokerage settle that order through

20  the DTC by adjustment of the brokerage's

21  pro rata share of the security's fungible

22  bulk held at the DTC."  Do you see that?

23      A      Yes.

24      Q     Again, that is true for

25  virtually any after-market purchaser

1  bringing a Section 11 claim, not just
2  investors in Miller Energy's Series C and
3  Series D; correct?
4           MR. BALLARD:  Objection to
5      form.
6      A        That is true for any
7  investor trading in the secondary market.
8      Q        If you could trace an
9  investor's purchase to a specific Series
10  C or Series D offering and you knew the
11  price they purchased at and you knew the
12  price they paid at or whether they held
13  through the filing of the complaint, you
14  could calculate their damages according
15  to the statutory formula for Section 11
16  claims; correct?
17           Why don't I repeat it.
18           If you could trace an
19  investor's purchase to a specific Series
20  C or Series D offering, you knew the
21  price they purchased at and you knew the
22  price they sold at or whether they held
23  through the filing of the complaint, you
24  could calculate their damages according
25  to the statutory formula for Section 11;

1   correct?

2       A       You would have the starting

3   point for their damages according to the

4   statutory formula.  There's an offset for

5   unrelated declines that you'll still have

6   to incorporate, correct.

7       Q       You're not offering an

8   opinion in this case with regard to

9   negative causation; correct?

10      A       Not at this stage.

11         THE VIDEOGRAPHER:  We're

12     going off the record at 10:40 a.m.

13     This marks the end of Media 2.

14         (A short recess was taken.)

15         THE VIDEOGRAPHER:  We're

16     back on the record at 10:49 a.m.

17     This marks the beginning of Media 3.

18       Q       I believe we discussed this

19   earlier.

20         But all of Miller Energy's

21   securities -- the common stock, the

22   Series C, the Series D -- all traded on

23   the New York Stock Exchange throughout

24   the proposed class period; correct?

25      A       They were all listed on the

1    New York Stock Exchange and traded on a

2    bunch of venues.

3        Q       If you turn to page 60 of

4    your report, I'm going to direct your

5    attention to your Footnote 208.

6            And there, you state your

7    opinion that there is strong disagreement

8    in the finance research literature on

9    whether U.S. equity markets are efficient

10   or prone to various anomalies and

11   behavioral biases.

12           And then you discuss the

13   fact that it's notable that the vast

14   majority of the finance literature

15   analyzes the stocks listed on the New

16   York Stock Exchange and NASDAQ, the same

17   major exchanges on which according to

18   Mr. Coffman, a listing virtually

19   guarantees market efficiency.  Do you see

20   that?

21       A       Yes.

22       Q       In the EGC case we were

23   discussing earlier, you claimed that the

24   courts recognize that securities that

25   trade or listed on the New York Stock

1    Exchange are likely to be efficient,

2    didn't you?

3         A          Likely to be, yes.  And

4    sorry, courts.  This is about the

5    academic research literature which has a

6    different perspective.

7         Q          Sure.

8               But you also did admit in

9    that case as well that academic research

10   with regard to markets on which a

11   security trades is indicative of the

12   efficiency of the stock, didn't you?

13        A          Sorry.  Can you repeat that,

14   please?

15               (The requested portion was

16        read back by the court reporter.)

17               MR. BALLARD:  Objection to

18        form.

19        A          If you can show me that,

20   that will be helpful.

21        Q          Look on what we previously

22   marked as Exhibit 74 which is your

23   report.

24        A          Yes.

25        Q          If you look on page 3 of

1  this report, paragraph 11, the end there

2  of that paragraph, you say, "First, while

3  it is not dispositive when a stock is

4  listed on a market that is not efficient

5  such as the OTCBB, it's far less likely

6  that it trades efficiently than a stock

7  listed on a national exchange." Do you

8  see that?

9      A      Yes.

10     Q      And the corollary to that

11  sentence is that a security that does

12  trade on a national exchange is more

13  likely to be efficient than not; correct?

14     A      I missed the last bit.  I

15  may have started speaking.

16              (The requested portion was

17     read back by the court reporter.)

18     A      I don't see how that is the

19  corollary.  All that you can get to is

20  that it's more likely to be efficient

21  than a security that trades on the OTCBB.

22     Q      That's fair enough.

23             MS. POSNER:  Let's mark

24     Exhibit 76.

25              (The above-referred-to

1    document was marked as Exhibit 76 for

2    identification, as of this date.)

3        Q        This is a deposition

4    transcript of a deposition you gave in

5    the EGC case; correct?

6        A        Correct.

7        Q        Do you recognize this

8    transcript?

9        A        I have not seen this.  But,

10   yes, I remember being deposed.

11       Q        You don't recall having to

12   sign the transcript?

13       A        Probably.  I must have seen

14   it.

15       Q        If you turn to page 16 of

16   the transcript, and I'm going to direct

17   your attention to pages 16 through 19.

18   So if you want to review those quickly,

19   that might be easier.

20       A        16 to what?

21       Q        19.

22       A        Okay.

23       Q        So in the EGC case, you

24   testified under oath that it's an

25   "economically valid statement" to say

1 that the type of market a stock trades on

2 is indicative of efficiency; correct?

3            MR. BALLARD: Objection to

4   form.

5     A       Yes.

6     Q       And you also testified under

7 oath that the "academic literature in

8 general is supportive of that statement";

9 correct?

10            MR. BALLARD: Objection to

11   form.

12     A       Generally, yes.

13     Q       Generally, you actually

14 provided that statement under oath;

15 correct?

16     A       In general, it says -- I

17 mean the whole point of the academic

18 literature is they're testing the

19 efficiency of NASDAQ and NYSE stocks. I

20 think 30, 40 years of hundreds of years

21 of research in finance has been wasted.

22     Q       Did you perform an event

23 study of Miller Energy's common stock

24 during the proposed class period?

25     A       No.

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

1     Q       You're not offering the

2  opinion that Miller Energy's common stock

3  was inefficient during the proposed class

4  period; correct?

5     A       I'm not offering an opinion,

6  one way or the other.

7     Q       Let's turn back to your

8  report, pages 53 to 54, and primarily,

9  paragraphs 157 and 158.

10           Is it your opinion that

11  comparing earnings releases to non-news

12  days is not an appropriate methodology

13  for an event study?

14     A       It depends on the purpose of

15  the event study.

16     Q       So how about in this

17  specific case?  Do you think it's an

18  inappropriate methodology in this case?

19     A       In this case, in the context

20  of Mr. Coffman has used it or just

21  generally?

22     Q       Generally for this case, is

23  that methodology an appropriate

24  methodology to use to determine whether a

25  market is efficient?

Veritext Legal Solutions
www.veritext.com
212-279-9424          212-490-3430

1          A          I don't think it's an

2     approach that allows you to get to

3     that -- to be able to make a

4     determination of efficiency.

5          Q          Are you aware that that

6     methodology is often called the FDT

7     methodology?

8          A          I think Mr. Coffman may have

9     referred to it as that.

10         Q          I actually don't think Mr.

11    Coffman did.  But I'm asking you whether

12    you're familiar with that phrase, the FDT

13    methodology.

14         A          I mean looking at the

15    footnote on the page, I'm guessing FDT is

16    Ferrillo Dunbar Tabak, no, I was not.

17         Q          Are you aware that this

18    methodology of comparing earnings,

19    releases to non-news days is regularly

20    accepted by courts throughout the country

21    in certifying securities fraud class

22    actions?

23              MR. BALLARD:  Objection to

24         form.

25         A          With the threshold of

1   5 percent or with a different threshold?

2       Q       I'm just talking about the

3   methodology itself.

4       A       I'm aware that courts have

5   looked at -- that says one of the pieces

6   of information they evaluated.

7       Q       In your footnote there,

8   Footnote 178, you claim that one of the

9   authors, Dr. Tabak, purportedly has

10  strong misgivings about the

11  appropriateness of this test.  Do you see

12  that?

13      A       Yes.

14      Q       Are you aware that Dr. Tabak

15  has submitted expert reports to courts

16  using this methodology?

17      A       I don't know.  I mean if you

18  tell me that he has, maybe he has.

19      Q       In conducting an event study

20  of a company's earnings releases, is it

21  your opinion that 50 percent of the

22  earnings release dates would need to be

23  statistically significant at the

24  95 percent level in order for an event

25  study to demonstrate market efficiency?

1      A          I don't know that it's

2  50 percent precisely.  But there is a

3  literature that has found that the

4  returns on earnings announcement days are

5  more volatile than on other dates.

6              And so based on the time

7  period that are at issue and the industry

8  at issue, one would be able to come up

9  with a threshold.  And that threshold is

10  going to be much higher than 5 percent.

11      Q          What do you think that

12  threshold should be?

13      A          Well, it's not just a number

14  that I can make up; right?  It's going to

15  be based on the level of volatility on

16  earnings announcements, relative to, you

17  know, no news or non-event days and the

18  time period that one is studying.

19              And based on those two

20  factors, if it turns out that earnings

21  announcements in general are twice as

22  volatile as no news days for the period

23  and, you know, for the comparable set of

24  companies, then you can take that

25  information and come up with an

1  appropriate threshold.

2              And if it's twice as

3  volatile, it'll be much higher than

4  5 percent of threshold.  It could be --

5  you know, depending on that multiple,

6  50 percent could be the right number.

7      Q        So what you're saying is in

8  your opinion, that threshold would be

9  different for every single company?

10     A        The threshold could be

11  different for every company and time

12  period, yes.

13     Q        And in this case, is it your

14  opinion that that threshold should be

15  50 percent?

16     A        I don't have an opinion on

17  that.

18     Q        So you don't have an opinion

19  on what the threshold should be at all?

20     A        I have an opinion that it is

21  higher than 5 percent.  I haven't done

22  the work to determine what the right

23  threshold is.

24     Q        And you're saying higher

25  than 5 percent because that's the T-Stat

1  that you would expect to see outside

2  of -- explaining random movements?

3      A       Correct, on non-news days.

4             (The above-referred-to

5     document was marked as Exhibit 77 for

6     identification, as of this date.)

7      Q       This is a NERA report, dated

8  August 2016, by Dr. David Tabak, titled

9  "What Should we Expect when Testing for

10 Price Response to News in Securities

11 Litigation?"

12            Have you ever seen this

13 before?

14     A      I probably have.

15     Q      Do you know what NERA is?

16     A      Yes.

17     Q      What is NERA?

18     A      NERA is a firm that operates

19 in the same industry as we do.

20     Q      They're, like you, like CRA,

21 typically a defense expert in securities

22 fraud class actions; correct?

23           MR. BALLARD:  Objection.

24     A      I don't know -- I know that

25 they are typically experts in various

Veritext Legal Solutions
www.veritext.com
212-279-9424          212-490-3430

1  kinds of litigation.  I don't know

2  anything beyond that.  And I wouldn't

3  classify us as being on the defendant's

4  side either.

5      Q      Let's turn to page 2 and 3,

6  actually, 3 to 4 of this paper on pages 3

7  and 4.

8              Dr. Tabak goes through the

9  fact that what is referred to as the FDT

10 test has been regularly accepted by

11 courts.  Do you see that?

12     A      Sorry.  Can you point me

13 to --

14     Q      Yeah.  The FDT Test and Its

15 Successes is the header.

16     A      Okay.

17     Q      And then it talks through

18 some of the court opinions on this

19 matter.  And, in fact, on page 3 in the

20 middle of the page, it says, "More

21 recently, courts have accepted a number

22 of tests of market efficiency that

23 directly follow the FDT test procedures,

24 if not citing the FDT paper directly."

25 You see that?

1    A        I see that.

2    Q        If you turn to page 6 of

3   this report or this paper, in the

4   second-full paragraph right above the

5   heading Academic Literature --

6    A        Sorry.   There is a section

7   that follows the FDT test and its

8   successors that challenges to the FDT

9   test.   And it talks about opinions on

10  both sides.

11   Q        Correct.

12            It discusses the opinions on

13  the other side?

14   A        Well, it discusses two

15  opinions on the other side.   I don't know

16  if there are only two opinions on the

17  other side.

18   Q        If you go to page 6 of this

19  paper right above academic literature, do

20  you see, it says, "There is no

21  theoretical or mathematical/statistical

22  reason to believe that the fraction of

23  news days associated with statistically

24  significant returns should exceed

25  50 percent as a general matter in an

1   efficient market"?  Do you see that right
2   above the heading Academic Literature?
3   It's the last sentence.  Do you see that?
4        A        Yes.
5        Q        Do you disagree with that
6   statement?
7        A        No.  This is just the same,
8   as I told you earlier, that, you know,
9   each -- for each company and time period,
10  you have to -- you could calculate the
11  threshold.  And it may be higher than 50,
12  it may be below 50.
13       Q        And if you turn to page 9,
14  in the second-full paragraph, he's
15  discussing the results of his analysis
16  which looked at all of the companies in
17  the S&P 500.  And he looked at both the
18  day of an earnings release and the
19  following day of an earnings release.
20                And he finds that "Thus, the
21  argument that even a majority of news
22  announcements should be associated with
23  statistically significant returns would
24  not hold for approximately half of the
25  members of the S&P 500 under this set of

1    parameters." Do you see that?

2        A        I see that. I just want to

3    make sure what the set of parameters are.

4        Q        Sure.

5        A        If he's looking at a two-day

6    window, then I would expect that he

7    probably finds a lower set that are

8    statistically significant.

9        Q        If it's on page 7, it's the

10   runover sentence. And he's -- not both.

11   He's saying either the day of the

12   earnings announcement or the following

13   trading day or both.

14       A        Okay.

15       Q        Do you disagree with that

16   statement?

17            MR. BALLARD:  Which

18       statement?

19            MS. POSNER:  That the

20       argument that even a majority of news

21       announcements should be associated

22       with statistically significant

23       returns would not hold for

24       approximately half of the members of

25       the S&P 500 under this set of

1        parameters.

2        A        Well, under the set of

3    parameters, he's making a statement about

4    a study he has conducted.  And I'm

5    assuming that the numbers there line up

6    with what he's reporting in Table 1.  So

7    I have no reason to disagree.

8        Q        If an earnings release was

9    generally within market and analyst

10    expectations, would you expect to see a

11    statistically significant price reaction

12    to an earnings release?

13        A        No.

14        Q        And if an earnings release

15    provided few surprises, would you expect

16    to see a statistically significant price

17    reaction to the earnings release?

18        A        So earnings releases contain

19    information about past performance and

20    often speak about the future.  Analysts

21    and market participants have expectations

22    about both.

23                And I think your question

24    was limited to past performance.  But I

25    may have misheard it.  So it would be

1  both past performance and future.  So the

2  totality of the information was

3  completely in line with what investors

4  expected.  There wouldn't be a reaction.

5       Q       And if an earnings release

6  contained both positive and negative

7  information for the company, would you

8  expect to see a statistically significant

9  price reaction to the earnings release?

10      A       So, again, I think -- just

11 to be careful, statically significant

12 relative to what threshold, but, no.  If

13 there were precisely offsetting, no.  If

14 it contained a lot of positive

15 information and a little negative or vice

16 versa, you would end up with a large

17 return.

18      Q       If material new information

19 was provided in an earnings release,

20 would you expect to see analyst reports

21 or press reports discussing the

22 information shortly thereafter?

23      A       Typically, yes.

24      Q       If analysts don't change

25 their buy, sell or hold recommendation

1 based on an earnings release, would you

2 expect to see a statistically significant

3 price reaction to the earnings release?

4     A     I have no beliefs on that.

5 I mean I think that's a question that

6 could be researched generally

7 market-wide. And one would have to base

8 opinions on that. I'd be making a guess.

9 Your guess would be as good as mine.

10     Q     Generally speaking, can you

11 explain what preferred stock is?

12     A     Preferred stock is a

13 security that's a part of the capital

14 structure of firms. It's junior to the

15 debt, typically, and senior to the

16 common.

17          So preferred stockholders

18 get paid after debt holders have been

19 paid but before common stockholders are

20 paid. They typically have a stated

21 dividend. But the dividend can be -- the

22 company can miss a dividend payment

23 without triggering default.

24     Q     Preferred stock is typically

25 a hybrid between equity and debt;

1  correct?

2      A      Yes.

3      Q      And would you agree with me

4  that preferred securities are generally

5  considered safer investments than common

6  stock?

7      A      Generally, yes.

8      Q      If a company has both common

9  stock and preferred stock, do you expect

10  the common stock and the preferred stock

11  to react in the same way to the same

12  information?

13      A      In the same way as in the

14  same magnitude and direction, no.

15      Q      Do you expect common stock

16  and preferred stock -- strike that.

17          Do you expect preferred

18  stock always to move in a statistically

19  significant way if the common stock moves

20  in a statistically significant way?

21      A      The threshold for

22  statistically significance would be quite

23  different for the common and the

24  preferred because the common stock is

25  going to be much more volatile on a

Veritext Legal Solutions
www.veritext.com
212-279-9424    212-490-3430

1    day-to-day basis than the preferred.

2              So I don't know that I would

3    be able to make a statement about whether

4    they -- whether each time you saw a

5    statistically significant return for the

6    common, you'd see one for the preferred

7    and vice versa.

8         Q        Meaning that sometimes, they

9    might both move statistically

10   significantly and sometimes they might

11   not; is that correct?

12        A        And sometimes they might

13   move in the same direction.  And

14   sometimes they might not.

15        Q        Correct.

16             Would you expect a preferred

17   security to be sensitive to the same

18   information as a company's common stock?

19        A        The same information would

20   be relevant, or similar information would

21   be relevant to both.  But the common

22   stockholders might care about some

23   information more than the preferreds.

24   Some information that's positive for the

25   common could be negative for the

1  preferred and vice versa.  So information

2  about the company would generally be

3  relevant to both common stockholders and

4  preferred stockholders.

5      Q        Information pertaining to

6  revenue, earnings, profitability and

7  share price are very important to common

8  investors; correct?

9      A        Yes.  They are important to

10  common.

11      Q        And while they're important

12  to preferred investors, they're not as

13  important; correct?

14      A        I don't know that that's

15  necessarily the case.  It is going to be

16  important to preferred shareholders also.

17      Q        To the same degree?

18      A        Not to the same degree.  And

19  like I said, I mean some information

20  about these items may be positive for

21  common stockholders and negative for

22  preferred stockholders.

23      Q        Would you agree with me that

24  information relevant to the debt

25  component of a preferred stock is the

1  most important information for preferred

2  stock investors?

3      A      It is important information

4  for preferred stockholders.  I don't know

5  if it's necessarily the most important.

6      Q      Can you think of any kind of

7  factor that would be more important for a

8  preferred shareholder than information

9  pertaining to the debt component?

10      A      One of the two preferreds

11  here was convertible.  So, for example,

12  that one would have, you know, some of

13  the information that was relevant to

14  the -- the common would be relevant to

15  those investors also would be quite

16  relevant; you know, trying to rank all

17  the information is the bit that I'm just

18  a little hesitant about.

19      Q      So you don't have an opinion

20  whether one is more important than the

21  other?

22      A      I think I don't have an

23  opinion that -- a blanket statement that

24  I can make that over the life of the

25  company, it's always going to be this,

1    that's the most important.

2         Q        On pages 42 and 43, I think

3    this is primarily paragraphs 133 and 134

4    and 135, you conduct what you call

5    "extended event study of Miller Energy's

6    Series C and Series D preferred stock,

7    using the returns that Mr. Coffman

8    provided"; correct?

9         A        Yes.  I summarized the

10   results of his event study.

11        Q        The results that you

12   conducted are in Table 6 and 7 of your

13   report; is that correct?

14        A        Yes, that is correct.

15        Q        And based on that analysis,

16   your conclusion is neither the Series C,

17   nor the Series D reacted in a

18   statistically significant way at the

19   95 percent level to earnings releases;

20   correct?

21        A        Correct.

22        Q        In your opinion, if the

23   market for the Series C and Series D were

24   efficient, would you have expected to see

25   the Series C and Series D react in a

1   statistically significant way to earnings

2   releases throughout the class period?

3      A     Can you read that back,

4   please?

5            (The requested portion was

6     read back by the court reporter.)

7      A     Yes.  I mean, the thresholds

8   prior to October 15th, 2014 are quite

9   low.  I think for the C, Mr. Coffman's

10  threshold is 1 percent.  And for the D,

11  it's even less than 1 percent in terms of

12  standard deviation.

13          So, you know, the thresholds

14  for statistically significance are very

15  low.  And I would have expected that

16  these investors would react to

17  information on the financial condition of

18  Miller.

19      Q     Why would that be the case

20  since you also offer the opinion that

21  that methodology that Mr. Coffman uses of

22  comparing earnings releases to non-news

23  days is not sound?

24      A     Sorry.  Maybe I'm not

25  understanding the question.  This is just

Veritext Legal Solutions
www.veritext.com
212-279-9424          212-490-3430

1   whether or not, there would be a

2   statistically significant reaction on

3   earnings days?

4       Q       Right.

5               And you previously and other

6   parts of your report offer that the

7   opinion that comparing earnings releases

8   to non-news days is not a sound

9   methodology for determining market

10  efficiency, don't you?

11      A       With a 5 percent threshold,

12  yes, it's not.  But with an appropriate

13  threshold as we spoke of earlier, it

14  could be an approach.  And it's an

15  approach that the courts seem to be

16  using.

17      Q       Can you explain what you

18  mean when you say "with a 5 percent

19  threshold, yes, it's not"?

20      A       So the courts have decided

21  to use the cause-and-effect analysis as

22  one of the inputs to a determination of

23  market efficiency.

24              And the point I made in a

25  different part of this report is that one

1  cannot get to a finding that --

2  economically, one cannot get to a finding

3  that the security reacted to information

4  by comparing the returns on earnings

5  announcement days to returns on no news

6  days without making an adjustment to the

7  threshold.

8         Now, if you did make an

9  adjustment to the threshold, you would

10 have a way of determining whether or not

11 the security was reacting or not reacting

12 to information.  And that seems to be one

13 of the factors that the courts look at in

14 determining efficiency.

15    Q         In conducting the analysis

16 in Table 6 and 7 of your report, did you

17 make that adjustment to the threshold?

18    A         The threshold adjustment is

19 an adjustment that you'd make at the next

20 step.  So I think in Mr. Coffman's

21 report, he has Exhibit 7, 9 and 11 that

22 correspond to the information that's in

23 my Exhibit 6 and 7.  And then he has a

24 second set of exhibits, 8, 10 and 12,

25 which is where the threshold adjustment

1  would be needed.

2          And I don't even need to get

3  to that point of making an adjustment to

4  the threshold because I find that his

5  analysis suggests that Miller's

6  securities never reacted to the earnings

7  announcements.

8      Q      Did you make a threshold

9  adjustment to Mr. Coffman's analysis with

10 regard to the common stock?

11     A      No.  I haven't done that

12 work.

13     Q      Do you know what the results

14 would be if you did make that threshold

15 adjustment?

16     A      I haven't done that work.

17 So I don't know the answer.

18     Q      If you expect the preferred

19 stock to move in response to earnings

20 releases like you just testified, why

21 would analyst reports discussing the

22 earnings releases not be relevant to the

23 preferred shares?

24     A      The earnings -- sorry.  The

25 analyst reports contain information

1  that's relevant to the preferred shares.

2  The analyst reports, however, do not

3  analyze the preferred shares.  They do

4  not provide a valuation opinion on the

5  preferred shares.  They do not provide,

6  you know, advice to investors on whether

7  they should buy, sell or hold the

8  preferred shares.

9          So to that extent, the

10  analyst reports do not -- you know, are

11  not relevant to the preferred shares.

12      Q       Yet, the information that

13  they're purportedly analyzing is expected

14  to move the preferred shares in a

15  statistically significant way?

16      A       The earnings -- the

17  information in the earnings is expected

18  to move the preferred in a statistically

19  significant way.

20      Q       Even though it's your

21  opinion that the analyst reports

22  discussing that information are not

23  relevant to market efficiency for the

24  preferreds?

25      A       The analyst reports

1    typically come out after the earnings

2    announcements.  So by then, the

3    information in the earnings would already

4    be impounded in the securities prices if

5    they were efficient.

6              And what the analysts

7    provide is, you know, the icing on the

8    cake, the additional information on their

9    take and their opinions about the

10   information that came out.  And there,

11   they don't do the analysis for the

12   preferreds.  So they add little value to

13   the preferred.

14        Q     The information in the

15   earnings would already be impounded in

16   the securities prices for the common

17   stock if it was efficient as well;

18   correct?

19        A     Yes.

20        Q     Are you aware that for debt

21   securities, courts analyze the Cammer

22   factors and event studies differently

23   than they do with regard to equity

24   securities?

25        A     I am not aware of

1  differences.

2      Q        Let's turn to page 50 of

3  your report.   And I'm going to direct

4  your attention to pages 50 to 52,

5  paragraphs 151 to 154.

6              And you're discussing here

7  the price reaction on July 31st, 2015.

8  Are you there?

9      A        Yes.

10      Q        In your report, you state

11  that Miller's delisting was expected

12  prior to July 30th, 2015; correct?

13      A        Correct.

14      Q        You opine that Miller Energy

15  investors did not invest any unexpected

16  news information when the New York Stock

17  Exchange actually delisted Miller Energy

18  on July 30th, 2015; correct?

19      A        Unexpected new information,

20  no news information, yes.

21      Q        Did you review the analyst

22  reports discussing Miller Energy's

23  potential delisting prior to July 30th,

24  2015?

25      A        I reviewed the analyst

1  reports.  Sitting here, I don't have a

2  recollection of each and every one of

3  them.

4      Q        I'm going to direct your

5  attention back to what we previously

6  marked as Exhibit 69.

7              And this is the May 1st,

8  2015 MLV equity research report.  And

9  this is prior to the actual delisting on

10 July 31st, 2015; correct?

11     A        Correct.

12     Q        And if you go down to the

13 third heading, Assessment of SEC Wells

14 and NYSE Continued Listing Notices, Point

15 2 there, it states, "We expect the

16 company to return to compliance with the

17 continuing listing notice within its

18 six-month window."  Do you see that?

19     A        Yes.  This is to a different

20 notice and the reason they were

21 ultimately delisted.

22     Q        When they say that they

23 expect to return to compliance here, you

24 think this is a different issue?

25     A        My recollection is that it's

1  a different issue.

2          (The above-referred-to

3      document was marked as Exhibit 78 for

4      identification, as of this date.)

5      Q      This is an analyst report

6  from Imperial Capital on July 21st, 2015.

7  Do you see that?

8      A      Yes.

9      Q      If you turn to the second

10 page of the document, it's the carryover

11 on rationale, you see the last sentence

12 there, it notes that Miller is within an

13 18-month cure program that commenced in

14 May 2015?  Do you see that?

15     A      Yes.

16     Q      Do you think they're talking

17 about a different delisting issue there

18 as well?

19     A      Yes.  I think if you look at

20 Footnote 170 -- actually, 168 or 169 --

21 169, there were a number of different

22 delisting notices that the company

23 received.

24     Q      Right.

25          In paragraph 152 where

1    you're referencing that, that's the basis

2    for your opinion that the market was

3    expecting the delisting; correct?

4         A         Well, yes.  Footnote 170 is

5    the one that's right on point where the

6    company on July 29th -- that, you know,

7    they were below 15 million.  And they

8    referred to it as being a bright line

9    which, you know, I'm assuming is a legal

10   term, a bright line threshold -- give me

11   a second -- and they said they were

12   expecting it as early as this week.

13                 (The above-referred-to

14        document was marked as Exhibit 79 for

15        identification, as of this date.)

16        Q         I'm marking as Exhibit 79 --

17   this is an earnings call transcript from

18   July 29th, 2015; correct?

19        A         Correct.

20        Q         If you turn to page 145 of

21   this report, that first-full paragraph --

22        A         Yes.

23        Q         -- it talks about "The fact

24   that they believe there are many factors

25   that should be discussed and considered

1  by the New York Stock Exchange before any

2  action is taken to delist our stock,

3  including the advanced status of our

4  capital repositioning and our plans to

5  maximize the value of and the growth in

6  our assets.  In the event in our PO we

7  are ultimately unsuccessful, we expect

8  our securities will begin trading

9  over-the-counter."  Do you see that?

10      A       Yes.

11      Q       So they were telling the

12  market that they were appealing this

13  potential delisting; correct?

14      A       I think they were saying

15  that they plan to appeal it.  Let me just

16  read this.  Yes.  They said we expect we

17  will avail ourself of the right to appeal

18  any delisting proceeding, yes, that's

19  about what they said.

20      Q       And they're saying that they

21  think they're going to be successful in

22  their appeal; correct?

23      A       That's what they said, yes.

24      Q       So you think investors were

25  aware of this earnings call on July 29th,

1  2015?

2      A          Investors were aware that

3  their market cap had fallen below

4  15 million, that they would have been

5  aware of, even absent this earnings call.

6  If they haven't been made aware, they had

7  now been made aware.  They described it

8  as a bright line rule, whatever that

9  means legally.

10              And if investors were aware

11  of the New York Stock Exchange's

12  procedures, when you hit 15 million, it

13  was that they would suspend trading as

14  they began delisting proceedings.  So it

15  was not that they began proceedings and

16  then kind of let them play out and

17  suspend trading or delist at the end.

18  It's they would suspend at the time they

19  gave notice.  So I mean that's something

20  investors would have been aware of

21  because they kind of are investors.

22      Q          In this same earnings call,

23  the company discusses all of the things

24  they're doing to shore up their balance

25  sheet; correct?

1      A       If you can point me to that.

2      Q       Sure.

3            It's throughout.  But I'll

4 point you to paragraph 4 on page 9.

5      A       Paragraph 4, page 9.

6      Q       Yes.  The little number.

7 It's kind of the faded number on the

8 right.

9      A       I don't see anything.

10     Q       So it's talking about

11 they're prioritizing, securing,

12 refinancing and restructuring their debt.

13           And then if you go down a

14 few more paragraphs to the second from

15 the bottom, they talk about being --

16     A       Hang on.  So securing,

17 refinancing while we restructure our

18 existing debt through bankruptcy?

19     Q       Yes.

20     A       So from an equity

21 perspective, it would get all wiped out.

22     Q       But they're talking about

23 trying to avoid that; correct?

24     A       Sorry.  Where are they

25 talking about avoiding that?

1      Q          They're saying that they're

2  prioritizing, securing, refinancing while

3  at the same time, they're restructuring

4  their existing debt; right?

5                  MR. BALLARD:   Objection.

6      A          Through bankruptcy.

7      Q          Correct.

8                  They're giving two things

9  that they're working on simultaneously;

10  correct?

11                  MR. BALLARD:   Objection.

12      A          I think they're talking --

13  and maybe I'm just reading this

14  differently.   I thought it's that they

15  are trying to secure refinancing to exit

16  bankruptcy.   So you have a bunch of debt.

17  You need to restructure it.   You also

18  need more money to be able to exit.   And

19  I'm not sure how any of this helps push

20  the equity value up over 15 million.

21      Q          So you read those to be

22  coextensive, not separate items?

23      A          Well, even if they are

24  separate -- I read them to be coextensive

25  as you said.   But even if they are

1    separate, I don't know how it helps push
2    the equity value up.
3        Q        If you go further down this
4    page, the second-to-last paragraph, they
5    talk about also being discussions with
6    private infrastructure fund to make a
7    minority investment in our substantial
8    midstream assets.
9        A        Yes.
10       Q        You see that?
11       A        Again, I'm not sure how that
12   increases equity value.
13       Q        So you don't think an
14   investment in their assets would increase
15   equity?
16       A        I don't see how -- typically
17   when a firm is at that point,
18   investment -- investors who come in take
19   away from equity value because they're
20   taking secured positions and assets.
21       Q        If you go back to page 8,
22   the seventh-full paragraph down, so where
23   "We as a company" paragraph.
24       A        Yes.
25       Q        You read that sentence.

1         And it talks about the fact

2  that "We believe our immediate financial

3  problem will be solved in time and again

4  without bankruptcy."  Do you see that?

5         A       Yes.

6         Q       Does that help clarify for

7  you that they weren't intending to file

8  for bankruptcy at this time and that they

9  thought they had sufficient financial

10  position to cover their obligations?

11         A       Yes.  But I don't see how

12  that would help push the value of the

13  common above 15 million which is what

14  you'd need to avoid getting delisted.

15         Q       Well, they're talking about

16  being able to obtain near-term cash state

17  tax credit receipts, as well as money in

18  litigation judgments and money in ARO.

19  You see that?

20         A       Right.  But the expected

21  value of all of this would already be

22  reflected in the common stock.  And with

23  all of these things, the common stock was

24  worth less than 15 million.

25         Q       No.

1              This is saying expected, not

2  what they have currently; correct?

3     A      Yes.  So that's what I'm

4  saying.  So if I expect to be able to get

5  100 million but with 5 percent

6  probability, then investors have already

7  impounded the expected value of

8  $5 million.  So the 100 million times the

9  5 percent into the value of the fund.

10     Q      If you turn to page 12, Neal

11  Dingmann from SunTrust asks about the

12  timing of some of the financing they're

13  expecting to get.

14            And Miller's CEO responds

15  "very quickly."

16            And then further down the

17  page in the statement right before the

18  end, he talks about the fact that he's

19  disappointed that they didn't have

20  another 24 million that they were hoping

21  to get with the 9.3 million that we've

22  got today and that he's surprise -- he

23  would be surprised if they didn't get it

24  actually just later today after the call;

25  correct?

1    A        Yes.  He's saying that.

2    Q        And he says, "At a minimum,

3  they think they'll have it by the end of

4  August"; correct?

5    A        Yes.  But if you recall,

6  they said they expected the delisting

7  notice this week which is way before the

8  end of August.

9    Q        But that would give

10  investors some assurance that if they got

11  it, for example, later that day, that the

12  delisting wouldn't be an issue; correct?

13    A        If they got it later that

14  day, yeah.  So then the cause of the

15  decline would not be the delisting but

16  would actually be the fact that the money

17  didn't come in.

18    Q        Are you asking me a

19  question?

20    A        No.  I'm just trying to

21  understand where you're going with these

22  questions.  Sorry.

23    Q        Let's turn to page 11 of

24  your report, pages 11 through 13.  And

25  you're talking here about the index that

1   Mr. Coffman used in his event study.  Are

2   you there?

3        A       Yes.

4        Q       You criticize Mr. Coffman

5   for either mislabeling the index he used

6   or using the wrong oil price index;

7   correct?

8        A       I note that he has

9   mislabeled the index or used one that is

10  different than the one he says he used.

11       Q       Did you check to see whether

12  the outcome of Mr. Coffman's test for

13  cause and effect would change if he were

14  to use one of the oil price indexes

15  versus the other?

16       A       No.  I did not do that.

17       Q       Do you agree that both the

18  NYMEX WTI Light Sweet Crude Oil Future

19  Index and the ICTEI Light Sweet Crude Oil

20  Futures Index tracked the same underlying

21  commodity?

22       A       They track -- yes.

23       Q       Let's turn to page 9 of your

24  report.  It's 9 through 11, paragraphs 30

25  through 33.  And you criticize

1  Mr. Coffman for not counting for the

2  payment of dividends and computing his

3  returns for the Series C and Series D

4  stock; correct?

5      A       I note that he did not.

6      Q       Did you check to see whether

7  the outcome of Mr. Coffman's test for

8  cause and effect for either of the Series

9  C or the Series D would change if one

10  were to account for the payment of

11  dividends in computing the returns?

12      A       I did not do the work.  I

13  have, though, pointed out that the

14  numbers in his various exhibits would be

15  affected and, you know, numbers that he

16  bases his statistical tests on would

17  be -- would change.

18              So both of these -- you

19  know, the preferred stock, dividend issue

20  and the use of an index different than

21  the stated one would affect all of the

22  numbers in his report and in those

23  various exhibits to the report.

24      Q       Let's turn to page 72 of

25  your report.  And this is pages 72

1  through 76, paragraphs 214 to 219.

2         Is it your opinion that two

3  days statistically significant price

4  movements following material new news is

5  inconsistent with market efficiency?

6     A      Sorry.  Can you restate that

7  question, please?

8         (The requested portion was

9    read back by the court reporter.)

10     A      Sorry.  Two --

11     Q      I'll read it back.

12         Is it your opinion that

13  two-day statistically significant price

14  movements following material new news is

15  inconsistent with market efficiency?

16     A      So just so I respond to the

17  right question, are you saying that

18  there's material new information on,

19  let's say, at 8 a.m. on a day and you see

20  a statistically significant return on Day

21  1 and then a statistically significant

22  return on Day 2 and would I say that's

23  indicative of market inefficiency?

24     Q      Correct.

25     A      No, because, you know, the

Veritext Legal Solutions
www.veritext.com
212-279-9424       212-490-3430

1  second day could just be by random

2  chance.

3       Q       It also could be in response

4  to the new information; correct?

5       A       It depends on the type of

6  information or if there are -- there is

7  some follow-on kind of information that

8  came out.  Possibly.

9       Q       So it's possible that you

10  could see multiple days of statistically

11  significant returns in response to new

12  material information in an efficient

13  market?

14       A       Well, it depends on the type

15  of information.  So, you know, sometimes,

16  information is complex.  And it takes

17  investors a while to -- to evaluate it

18  and to get their heads around it and

19  determine the value implications of it.

20  So that would not imply market

21  inefficiency in and of itself.

22       Q       Let's turn to this

23  August 29th, 2011 Form 10-K A filing.

24            I think you agree with me

25  that on August 29th, 2011, Miller Energy

1  filed the Form 10-K A; correct?

2      A       Miller Energy filed a Form

3  10-K A on August 29, 2011.

4      Q       And do you agree with me

5  that it's also the first time that KPMG

6  issued an audit report on Miller Energy's

7  financial statements?

8      A       It is the first time that

9  KPMG issued -- well, it's the first time

10  there was a 10-K filed with KPMG audit

11  opinion.  And it was not withdrawn.

12      Q       Fair enough.

13              And there was no other kind

14  of SEC filing in which KPMG issued an

15  audit opinion on Miller Energy's

16  financial statements prior to

17  August 29th, 2011; correct?

18      A       That's my understanding.

19      Q       And I think you also agree

20  with me that on August 29th, 2011, the

21  price of Miller Energy's common stock

22  increased from $2.27 to $3.65 or

23  60.8 percent; correct?

24      A       Miller Energy's stock price

25  increased, yes.

1    Q        And that increase was

2  statistically significant; correct?

3    A        Mr. Coffman finds that to be

4  statistically significant.

5    Q        Do you disagree that it was

6  statistically significant?

7    A        I have not done the work.

8    Q        But despite those facts,

9  it's your opinion that KPMG's audit

10  opinion on that date did not cause the

11  price of Miller Energy's common stock to

12  increase; correct?

13    A        It's my opinion that

14  Mr. Coffman hasn't shown that it was

15  KPMG's audit opinion as opposed to other

16  information that came out in the 10-K

17  that caused the price increase.

18    Q        Do you have an opinion about

19  what caused the price increase on

20  August 29th, 2011?

21    A        No, I do not.

22    Q        Turning to your

23  paragraph 218, you talk about other

24  information that was disclosed on that

25  date that might account for the price

1    increase; correct?

2        A        Correct.

3        Q        And the first thing you note

4    is that the valuation of the Alaskan

5    assets have been previously disclosed on

6    July 29th and August 8th, 2011; correct?

7        A        Yes.  That's the first thing

8    I note.

9        Q        So that information wouldn't

10   have been responsible for the price

11   increase on August 29th, 2011; correct?

12       A        That information wouldn't be

13   expected to be the reason for the price

14   increase.

15       Q        And then the second thing

16   you talk about here is the fact that the

17   disclosure was confounded by the

18   disclosure of the loan amendment and

19   waiver.  Do you see that?

20       A        Yes.

21               (The above-referred-to

22       document was marked as Exhibit 80 for

23       identification, as of this date.)

24       Q        I've handed you what's been

25   marked as Exhibit 80 which is an

1    August 30th, 2011 SunTrust Robinson

2    report.

3         A       Yes.

4         Q       If you look in that first

5    paragraph, it talks about these credit

6    amendments that you were just discussing

7    in your report.

8         A       Yes.

9         Q       And then it says, "We've

10   lowered our price target to $8 from $8.50

11   as we factor in a higher cost of new

12   funding.  We now assume both rigs started

13   drilling early November."  Do you see

14   that?

15        A       Yes.

16        Q       So, if anything, the

17   amendments to their credit agreements

18   would have caused Miller Energy's stock

19   price to go down, not to go up; correct?

20        A       Well, there are two things

21   they're talking about here.  The higher

22   cost of new funding and the rigs starting

23   in early November.  So it could be one or

24   the other.  But, yes, it's a higher cost

25   of new funding.

1       Q         That's a negative thing for

2   Miller Energy; correct?

3       A         A higher cost is typically a

4   negative thing, yes.

5       Q         So we wouldn't expect that

6   to cause Miller Energy's stock price to

7   go up; correct?

8       A         Well, this is one analyst's

9   opinion.  It would be helpful to look at

10  the full spectrum of analyst reports

11  around this event to determine what other

12  people were thinking.

13      Q         Do you think ever increasing

14  the cost of new funding would cause

15  someone's stock price to go up, a

16  company's stock price to go up?

17      A         Well, if the new -- if an

18  increased cost goes along with greater

19  flexibility or increased funding then,

20  yeah, the cost could be outweighed by the

21  benefits.

22      Q         Do you know what the

23  amendment here that they're discussing on

24  August 29th did?

25      A         I don't know precisely,

1  sitting here.

2       Q       Let's go back to your

3  report.

4       A       But again, it would be

5  important to look at, you know, the

6  opinions of multiple analysts.

7       Q       Let's stay on this analyst

8  report.

9               In the second bullet point,

10  they talk about the fact that the "Fully

11  audited 10-K provides few surprises and

12  reassures asset value."

13              And then, it says, "KPMG

14  states in the audited filing that the

15  results of Miller's operations and cash

16  flows for the fiscal year ended 2011 were

17  in conformity with U.S. GAAP."

18              And then it talks about some

19  minor amendments.  Do you see that?

20       A       Yes.

21       Q       In that paragraph or

22  anywhere in the report, it doesn't

23  mention the results of the investigation

24  that was into whether what happened --

25  strike that.

1          Nothing in this report
2     discusses the results of the
3     investigation as to how Miller Energy
4     came to file its earlier 10-K without
5     sign-off from KPMG; correct?
6          A      Yeah.  I mean one would have
7     to look at earlier reports from this
8     analyst to determine how much -- how
9     concerned they were about that issue.
10         Q      And the focus of that
11    investigation was really whether and how
12    the company came to file a 10-K without
13    auditor sign-off; correct?
14         A      That's my understanding,
15    correct.
16         Q      Let's go back to your
17    paragraph 218.  The third reason you
18    state, that this increase might not be in
19    response to KPMG's audit report, is the
20    fact that they reported that there was no
21    intentional wrongdoing in the disclosure
22    errors, limiting potential legal goal
23    liabilities.  Do you see that?
24         A      Yes.
25         Q      Do you think that

1   information would also be relevant to the
2   importance of KPMG's signing off on
3   Miller Energy's statements in the
4   August 29th, 2011 10-K A?
5        A        Sorry.  Which information?
6        Q        That there was no finding of
7   intentional wrongdoing.
8        A        The fact that there was no
9   finding of intentional wrongdoing would
10  be relevant to KPMG?
11       Q        Would be related to the fact
12  that KPMG signed off on Miller Energy's
13  financial results in the August 29th,
14  2011 10-K A.
15                MR. BALLARD:  Objection to
16       form.
17       A        I'm not sure I understand.
18       Q        Do you think there's a
19  relationship between the fact that there
20  was a finding of no wrongdoing and the
21  fact that KPMG signed off on Miller's
22  financial results in the August 29th,
23  2011 10-K A?
24                MR. BALLARD:  Objection.
25       A        I don't know that there

1   would be a relationship between the

2   finding.  My assumption is that there

3   would be a relationship between whether

4   it was an honest mistake or someone

5   trying to manipulate markets or put

6   information out.  That -- there, the

7   relationship would be there.

8            If it was an honest mistake,

9   more likely than not, there was some kind

10  of a timing issue, someone misunderstood

11  whether the audit opinion had been

12  provided or not, while if there was ill

13  intent, then it's more likely than not

14  that KPMG wouldn't have ultimately signed

15  off an audit opinion or would have taken

16  a lot longer to sign off on an audit

17  opinion.

18       Q       And I apologize if I already

19  asked that.

20            But have you analyzed

21  whether the audit opinion on August 29th,

22  2011 impacted Miller Energy's stock

23  price?

24       A       I did not.  I looked at what

25  Mr. Coffman said about the -- about the

1    price on August 29th.  And I looked at a

2    longer window to see how the price

3    reacted over that longer window.

4                    And I note in my report that

5    from July 29th, the day before the

6    erroneous filing to August 29th, the day

7    after the 10-K A filing, the stock price

8    was down, both in terms of the stock

9    price itself and if you use Mr. Coffman's

10   adjusted returns on that basis too.

11        Q        Do you think it's likely

12   that KPMG's audit opinion on August 29th,

13   2011 did not cause at least part of the

14   stock price increase that day?

15        A        I don't have an opinion on

16   that.

17        Q        Have you analyzed whether

18   the alleged corrective disclosures in

19   this case impacted Miller Energy's stock

20   price?

21        A        In what sense?  Just in

22   terms of the returns on those days, the

23   statistical significance?

24        Q        Either.

25        A        I know that Mr. Coffman's

1   backup material has the normal returns.

2   I haven't looked at them carefully.

3        Q        Do you have an opinion about

4   whether the corrective disclosures caused

5   a statistically significant price decline

6   in Miller Energy's stock?

7        A        Individually?  Each of the

8   whatever 17?

9        Q        I'm just asking whether you

10  have an opinion, period.

11       A        I know that some of them

12  didn't because I believe that some of the

13  earnings announcements are corrective

14  disclosures.  And Mr. Coffman finds they

15  did not.  But beyond that, I haven't

16  looked.

17                THE VIDEOGRAPHER:  We're

18       going off the record at 12:02 p.m.

19       This marks the end of Media 3.

20                (A short recess was taken.)

21                THE VIDEOGRAPHER:  We are

22       back on the record at 12:23 p.m.

23       This marks the beginning of Media 4.

24                MS. POSNER:  Dr. Attari,

25       thank you very much.  I have no

1         further questions, pending cross from
2         your counsel.
3    EXAMINATION BY
4    MR. BALLARD:
5         Q         Earlier today, you recall
6    you were asked some questions about some
7    analyst reports that you were shown?
8         A         Yes.
9         Q         And you were asked some
10   questions in particular about information
11   in there and whether it was relevant to
12   preferred shareholders.  Do you recall
13   that testimony?
14        A         Yes.
15        Q         Can you explain why it is
16   that you don't believe the discussions in
17   those analyst reports constitute analyst
18   reports for purposes of the Cammer factor
19   for purposes of the preferred stock?
20             MS. POSNER:  Objection.
21        A         So the purpose of analyst
22   reports is to collect information, to
23   analyze information and to inform
24   investors of the implications of the
25   information for the value of the

1   securities that they hold.

2         If you look at the analyst

3   reports that we were looking at earlier,

4   they contain that type of analysis and

5   opinions for the common stock.  But they

6   do not contain similar analyses or

7   opinions for the preferred stock.

8         So, for example, the analyst

9   reports do not say we think that the

10  Series C preferred stock, we have a price

11  target of, say, $27 for the Series C

12  preferred stock or we advise investors to

13  sell the Series C preferred stock that

14  they hold and so on.

15        So for this reason, those

16  reports cannot be considered analyst

17  reports for the preferred stock.  What

18  the analyst reports do contain is

19  information on how much of the preferred

20  securities is outstanding, what the

21  dividend payments on those will be and

22  such.  But that's largely in the context

23  of trying to value and analyze the common

24  stock.

25        So the cash that's left over

1  for common stockholders is -- depends on

2  the amount that's -- interest payments to

3  debt holders, preferred dividends to the

4  owners of preferred securities.  So after

5  all of those deductions.  So a lot of the

6  references to the preferred securities

7  was in relation to that.

8              There were also references

9  about -- to preferred securities in terms

10 of, you know, the company at issue had

11 preferred securities and had raised

12 moneys from those preferred securities.

13 But that's just reiterating information

14 that's already out in the market.

15     Q      I would like to also revisit

16 a topic that came up more recently in

17 your testimony today.

18             If you turn to pages 75 and

19 76 of your report, you refer to a loan

20 agreement and the waiver of certain

21 events of defaults on these pages.

22             Do you recall you were asked

23 some questions about that earlier today?

24     A      Yes.

25     Q      What was the significance of

1  the loan agreement revisions and the

2  waiver of events of defaults to investors

3  in Miller Energy securities?

4      A       So the waiver of events of

5  defaults basically means that the company

6  can continue in operation which from a

7  common stockholder's perspective is

8  positive information because otherwise,

9  the company is in default and, you know,

10 will be liquidated or go through a

11 bankruptcy proceeding, a reorganization

12 and a bankruptcy proceeding which

13 typically causes a loss in value for

14 common stockholders.  So it's positive

15 news for common stockholders.

16     Q       Does Exhibit 58, your expert

17 report, still contain a complete and

18 accurate statement of your opinions as

19 you hold them right now?

20     A       Yes.

21     Q       Have you changed your

22 opinions in any way over the course of

23 the questions and answers today?

24     A       No.

25             MR. BALLARD:  I have no

1    further questions.

2    FURTHER EXAMINATION BY

3    MS. POSNER:

4        Q        I believe you already

5    testified to this earlier today.

6            But you have no academic

7    research supporting your position that in

8    order for an analyst report to be

9    relevant for Cammer Factor 2, it must

10   have a price target and a buy, hold or

11   sell recommendation on it; correct?

12       A        Yes, correct.

13       Q        You'll also agree with me

14   that the analyst reports that we looked

15   at earlier today not only discuss the

16   things you just responded to with

17   Mr. Ballard but also discussed things

18   such as the company's liquidity; correct?

19       A        Yes.

20       Q        They also discuss the

21   company's debt; correct?

22       A        Yes.

23       Q        They also discuss the

24   ability of the company to pay its

25   dividends to preferred shareholders;

1    correct?

2        A       Yes.

3        Q       And then moving to the

4    second topic Mr. Ballard asked you about

5    with regard to the August 29th waiver, as

6    of August 29th, 2011, was there a threat

7    that the company could not continue in

8    operations at that time, absent this

9    waiver?

10       A       I assume that there must

11   have been an event of default because

12   otherwise, you would not need a waiver of

13   an event of default.

14               MS. POSNER:  Can you read

15       back the question?

16               (The requested portion was

17       read back by the court reporter.)

18       A       And if there was a default,

19   then that would threaten the continued

20   operations of the company.

21       Q       Was there a concern that

22   they would not get that waiver at that

23   time?

24       A       I have not studied the

25   issue.

1          MS. POSNER:  I have no
2    further questions.
3          THE VIDEOGRAPHER:  This
4    concludes today's testimony of
5    Mukarram Attari.  We're going off the
6    record at 12:30 p.m.  This also
7    concludes Media 4.
8
9          (Time noted:  12:30 p.m.)
10
11    _____
12    DR. MUKARRAM ATTARI
13
14    Subscribed and sworn to before me
15    this _____ day of _____, 20___.
16
17    _____
18          NOTARY PUBLIC
19
20
21
22
23
24
25

1

2                         I N D E X

3

4                   E X A M I N A T I O N

5

6               EXAMINATION      FURTHER EXAMINATION

7     Ms. Posner            5   175
      Mr. Ballard              171

8

9                     E X H I B I T S

10    Exhibit                  Description          Page

11    Exhibit 58               Report               6

12    Exhibit 59               Form 10-K            20

13    Exhibits 60 through 70   Analyst             35
                               reports

14

15    Exhibit 71               Report              56

16    Exhibit 72               Form S-3 Rule       67

17    Exhibit 73               Discussion of       68
                               the Form S-3

18

19    Exhibit 74               Report              86

19

20    Exhibit 75               Court's order       89

20

21    Exhibit 76               Deposition         118

21                             transcript

22    Exhibit 77               Report             125

23    Exhibit 78               Report             146

24    Exhibit 79               Transcript         147

25    Exhibit 80               Report             162

1          C E R T I F I C A T I O N

2

3

4       I, ANTHONY GIARRO, a Shorthand

5 Reporter and a Notary Public, do hereby

6 certify that the foregoing witness, DR.

7 MUKARRAM ATTARI, was duly sworn on the date

8 indicated, and that the foregoing, to the

9 best of my ability, is a true and accurate

10 transcription of my stenographic notes.

11       I further certify that I am not

12 employed by nor related to any party to

13 this action.

14

15

16

       _____

17         ANTHONY GIARRO

18

19

20

21

22

23

24

25

Veritext Legal Solutions
www.veritext.com
212-279-9424       212-490-3430

**ERRATA SHEET**

**VERITEXT LEGAL SOLUTIONS**

**330 OLD COUNTRY ROAD**

**MINEOLA, NY 11501**

**800.727.6396**

CASE: COSBY, et al. vs. KPMG, LLP

DEPOSITION DATE: 6/4/2019

DEPONENT: DR. MUKARRAM ATTARI

PAGE LINE(S)     CHANGE                    REASON

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

____|____|_____|_____

_____

DR. MUKARRAM ATTARI

SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 20____.

_____        _____

(NOTARY PUBLIC)              MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   1:17 2:3,10,15 4:15,19,22 20:1,5 |

| 0 |
| --- |
| **0**   94:14 |
| **00121**   1:2 3:22 |

| 1 |
| --- |
| **1**   3:14 12:9,11,13 12:18 16:6 21:16 47:2 69:11,24 70:14,15 130:6 138:10,11 158:21 |
| **1,000**   18:23 |
| **10**   19:11,15 20:25 26:3 35:19 40:19 40:19 71:4 72:20 73:7,10,11 98:3,8 98:12 99:17 100:4 106:7 107:13,15 107:21 108:2,3 140:24 159:23 160:1,3,10 161:16 165:11 166:4,12 167:4,14,23 169:7 178:12 |
| **10.75**   36:2,23 |
| **100**   18:3,4,6,9 154:5,8 |
| **10005**   1:19 2:4 |
| **10173**   2:11 |
| **102**   104:13,21 |
| **10:40**   114:12 |
| **10:49**   114:16 |
| **10cv00252**   89:20 |
| **10th**   49:10 51:19 |
| **11**   103:16 104:24 104:25 105:2 106:7 107:12 108:16 109:13,23 113:1,15,25 117:1 |

140:21 155:23,24 156:24
**111**   103:19
**11501**   180:2
**118**   178:20
**12**   140:24 154:10
**125**   178:22
**12:02**   170:18
**12:23**   170:22
**12:30**   177:6,9
**13**   155:24
**133**   137:3
**134**   137:3
**135**   137:4
**13th**   7:3
**14**   42:21 68:10
**145**   147:20
**146**   178:23
**147**   178:24
**14th**   1:18 2:4
**15**   26:3 37:6,25 68:14 147:7 149:4 149:12 151:20 153:13,24
**151**   144:5
**152**   146:25
**154**   144:5
**157**   120:9
**158**   120:9
**15th**   138:8
**16**   8:17 43:4 118:15,17,20
**161**   84:5
**162**   178:25
**166**   84:5
**168**   146:20
**169**   24:17 146:20 146:21
**17**   16:25 170:8
**170**   146:20 147:4

**171**   178:7
**173**   24:17 31:11
**174**   60:16
**175**   178:7
**177**   60:17
**178**   74:1 75:5 77:17 122:8
**17c**   91:9,15
**17d**   91:9,16
**17th**   38:7
**18**   36:2,20 146:13
**18.4**   44:22
**182**   74:1
**183**   82:2
**186**   82:2
**187**   96:3
**188**   96:4
**189**   65:22 72:2
**19**   103:17,24 118:17,21
**191**   66:16
**193**   65:22
**194**   78:1
**196**   78:1
**197**   98:1
**1st**   54:3 70:22 145:7

| 2 |
| --- |
| **2**   7:25 12:18 21:8 21:20 22:8 26:8 47:6 52:19 53:6,8 53:15 69:8 114:13 126:5 145:15 158:22 175:9 |
| **2.27**   160:22 |
| **20**   177:15 178:12 180:23 |
| **200**   18:7,10 |
| **2001**   75:7 |
| **2007**   67:20 68:5 |

**2011**   111:11 159:23,25 160:3 160:17,20 161:20 162:6,11 163:1 165:16 167:4,14 167:23 168:22 169:13 176:6
**2012**   35:19
**2013**   22:16 23:4,14 23:20 37:3 38:7 40:8
**2014**   21:5 22:1,17 22:22 23:5 43:12 44:12 47:11 49:10 51:19 56:16 70:15 70:22 138:8
**2015**   50:4,8,11,13 50:15,18,19 54:3 55:9,22 144:7,12 144:18,24 145:8 145:10 146:6,14 147:18 149:1
**2016**   125:8
**2019**   1:11 3:3 7:3
**207**   98:22
**208**   98:1 115:5
**20th**   43:12
**21**   110:10
**214**   158:1
**218**   161:23 166:17
**219**   158:1
**21st**   44:12 146:6
**22**   63:10 111:18
**24**   154:20
**2450**   44:21
**25**   112:11
**27**   89:22 90:2 172:11
**2700**   2:16
**27th**   40:8

**28** 22:16 23:3,13
23:20 86:17 89:22
90:2,15 103:25
**29** 160:3
**29th** 22:17 23:5
147:6,18 148:25
159:23,25 160:17
160:20 161:20
162:6,11 164:24
167:4,13,22
168:21 169:1,5,6
169:12 176:5,6
**2x** 29:17

**3**

**3** 13:14 38:24 48:7
50:22 54:23 60:24
65:24 66:4,8,10,13
66:19 67:1,11
68:4,13 69:2,10
71:2,12,23 73:18
73:19 114:17
116:25 126:5,6,6
126:19 170:19
178:16,17
**3.65** 160:22
**30** 62:3 110:12,16
119:20 156:24
**30th** 55:9,21
144:12,18,23
163:1
**31st** 144:7 145:10
**33** 156:25
**330** 180:2
**34** 103:17
**340** 2:11
**35** 178:13
**37219** 2:16
**3:16** 1:2 3:22

**4**

**4** 1:11 16:7 126:6
126:7 150:4,5
170:23 177:7
**40** 119:20
**42** 91:6,7 104:17
137:2
**43** 137:2
**450** 39:8
**4th** 3:3

**5**

**5** 8:18 16:24 17:22
41:5 93:20,23
94:1,12 122:1
123:10 124:4,21
124:25 139:11,18
154:5,8,9 178:7
**50** 122:21 123:2
124:6,15 127:25
128:11,12 144:2,4
**500** 18:12,18,19
128:17,25 129:25
**511** 2:16
**52** 144:4
**5259** 179:16
**53** 120:8
**54** 103:18 120:8
**55** 84:2,4
**56** 84:4 103:25
178:15
**57** 24:15 91:8
**58** 6:20,22 91:8
174:16 178:11
**59** 20:18,21 24:18
31:10 60:15 91:8
178:12

**6**

**6** 8:1,9 42:5 127:2
127:18 137:12
140:16,23 178:11

**6/4/2019** 180:4
**60** 35:5,9,18 60:15
73:23,25 75:4
91:9 115:3 178:13
**60.8** 160:23
**61** 37:2
**62** 38:7 73:25
81:23 82:1
**63** 40:7 65:20 82:1
96:2
**63.2** 40:17
**64** 43:10 66:15
110:15
**65** 44:10 65:20
77:24
**66** 47:10 77:25
97:23,25 110:15
**67** 49:9 63:11
111:19 178:16
**68** 51:17 64:13
178:17
**69** 54:2 145:6
**6th** 21:5 22:1

**7**

**7** 129:9 137:12
140:16,21,23
**70** 35:6,9 45:5
55:8 98:22 178:13
**70s** 111:16
**71** 56:12,14 97:25
178:15
**72** 67:7,10 69:7
70:25 157:24,25
178:16
**73** 67:25 68:3 71:1
71:8 178:17
**74** 85:24 86:2
116:22 178:18
**75** 66:23 69:1,17
70:4,10,14,16,23
71:9 89:16,18

173:18 178:19
**750** 18:16,20
**750,000** 44:19
**76** 117:24 118:1
158:1 173:19
178:20
**77** 125:5 178:22
**78** 146:3 178:23
**79** 112:12 147:14
147:16 178:24

**8**

**8** 8:17 37:3 86:16
140:24 152:21
158:19 163:10
**8.50** 163:10
**80** 162:22,25
178:25
**800** 17:23
**800.727.6396**
180:3
**86** 178:18
**88** 1:18 2:4 3:24
**89** 104:1 178:19
**8:06** 1:12 3:3
**8th** 47:11 56:16
162:6

**9**

**9** 128:13 140:21
150:4,5 156:23,24
**9.3** 154:21
**95** 94:15 110:16
122:24 137:19
**990** 17:2,15,19
**9:01** 47:1
**9:10** 47:5
**9:23** 60:10
**9:35** 60:13

| a |
|---|

**a.m.** 1:12 3:3
60:10,13 114:12
114:16 158:19

**ability** 27:11 42:14
71:14 92:5,8
99:16 100:3
175:24 179:9

**able** 26:23 40:3
45:10,24 46:1
69:4 80:3 92:17
121:3 123:8 134:3
151:18 153:16
154:4

**absent** 34:13
149:5 176:8

**academic** 11:15
34:22 53:16 79:14
79:17 116:5,9
119:7,17 127:5,19
128:2 175:6

**accept** 73:6

**accepted** 85:12
121:20 126:10,21

**account** 157:10
161:25

**accountants** 15:9
21:19

**accretion** 43:2

**accuracy** 106:3

**accurate** 9:1
174:18 179:9

**action** 4:7 5:15
14:11 107:24
148:2 179:13

**actions** 16:1,22
85:15 105:22
107:9 121:22
125:22

**activities** 56:20
57:5

**actual** 26:4 50:8
50:13,18 58:8
69:7 145:9

**actuals** 50:14

**add** 52:21,21
143:12

**addition** 9:11

**additional** 37:6,7
37:24 38:1 52:7
143:8

**address** 8:4 24:2
68:19

**adjusted** 169:10

**adjustment**
112:20 140:6,9,17
140:18,19,25
141:3,9,15

**administer** 4:6

**administrator**
106:2

**admit** 86:11 116:8

**advanced** 148:3

**advice** 142:6

**advise** 172:12

**affect** 33:25
157:21

**affiliates** 66:22

**affiliations** 4:12

**aforementioned**
23:15

**aggregate** 66:20

**agree** 3:12 30:12
30:19 31:21 66:1
66:6 91:19 133:3
135:23 156:17
159:24 160:4,19
175:13

**agreement** 173:20
174:1

**agreements**
163:17

**al** 180:4

**alaskan** 162:4

**allege** 101:8,23

**alleged** 103:9
169:18

**alleging** 103:12

**allocation** 107:6

**allow** 106:13

**allows** 121:2

**ambac** 13:22

**amendment**
162:18 164:23

**amendments**
68:12 163:6,17
165:19

**amount** 48:22
65:4 75:1 173:2

**amounts** 48:14

**ana** 7:19

**analyses** 172:6

**analysis** 11:6
26:15 27:17 31:18
39:1 42:2 50:1
52:14,16 128:15
137:15 139:21
140:15 141:5,9
143:11 172:4

**analyst** 24:21
25:21 26:11 27:2
27:13,16,20,22,23
31:12,22 34:20,24
35:1,10,14,20
49:11 53:5,7,13
59:3 130:9 131:20
141:21,25 142:2
142:10,21,25
144:21,25 146:5
164:10 165:7
166:8 171:7,17,17
171:21 172:2,8,16
172:18 175:8,14

**al** 180:4

**analyst's** 164:8

**analysts** 25:2,4,6
26:3,5 27:1,7
32:10,18 33:1,5,10
33:20 34:10 52:18
52:20,22 59:7
130:20 131:24
143:6 165:6

**analyze** 27:1 31:13
32:18 52:22 59:8
76:22 142:3
143:21 171:23
172:23

**analyzed** 75:21
84:13 168:20
169:17

**analyzes** 115:15

**analyzing** 76:7
142:13

**announced** 44:6
56:9

**announcement**
123:4 129:12
140:5

**announcements**
123:16,21 128:22
129:21 141:7
143:2 170:13

**anomalies** 115:10

**answer** 12:2 48:15
48:19 53:3 141:17

**answered** 77:3

**answers** 6:2
174:23

**anthony** 1:19 4:4
179:4,17

**anyway** 50:16

**apollo** 42:11

**apologies** 47:7

apologize 168:18
appeal 148:15,17
  148:22
appealing 148:12
appear 95:4
appearances 4:11
appears 51:4
appendix 12:9,10
  12:13
applicable 76:15
apply 76:20
  100:15
appointed 106:2
appreciate 5:18
approach 121:2
  139:14,15
appropriate
  120:12,23 124:1
  139:12
appropriateness
  122:11
approved 107:6
approximately
  128:24 129:24
arbitrage 92:6,8
  92:10,16
argument 128:21
  129:20
aro 153:18
array 87:25 89:3
articles 34:21
asked 8:3,10,13
  11:20,22 90:1
  94:17 168:19
  171:6,9 173:22
  176:4
asking 6:5,6 36:8
  48:17,18 50:16
  101:3 121:11
  155:18 170:9

asks 154:11
assen 7:19
assessment 145:13
asset 52:6 165:12
assets 148:6 152:8
  152:14,20 162:5
assignments 13:16
assistance 7:8
associated 127:23
  128:22 129:21
assume 6:10 64:6
  163:12 176:10
assuming 9:18
  130:5 147:9
assumption 102:6
  168:2
assurance 155:10
attari 1:16 3:15
  5:8 35:8 60:14
  86:1 170:24 177:5
  177:12 179:7
  180:5,21
attention 24:17
  47:10 60:15 68:10
  68:20 73:25 82:1
  84:4 89:22 97:25
  98:22 115:5
  118:17 144:4
  145:5
attorney 99:10
attorneys 2:3,10
  2:15
attract 72:1 75:2
attributes 30:2
  41:19
audio 3:10,10
audit 21:21 22:12
  160:6,10,15 161:9
  161:15 166:19
  168:11,15,16,21
  169:12

audited 165:11,14
auditor 20:9,12,15
  21:11,24 22:6
  166:13
august 43:12
  44:12 125:8 155:4
  155:8 159:23,25
  160:3,17,20
  161:20 162:6,11
  163:1 164:24
  167:4,13,22
  168:21 169:1,6,12
  176:5,6
austin 19:23
authorized 4:5
authors 122:9
auto 84:5,10,12
  85:1,7,10,13 86:12
  86:23 87:25 88:17
  88:25 89:7 90:6,7
  90:12 91:20 92:3
  92:17 93:3,8,11,14
  93:16,19 94:2,5,6
  94:8,9,13 95:3,9
  95:15,20,24
automated 26:5
avail 148:17
available 13:12
  27:19 28:13,21,23
  29:6 30:11 58:20
  71:15 79:21 83:5
  83:7,14
avenue 2:11
average 24:5,10
avoid 150:23
  153:14
avoiding 150:25
aware 7:22,23
  59:10,14,19,25
  60:1 73:16 79:17
  81:15 85:11,22

103:10,14 105:20
  105:24 107:5,11
  111:4 121:5,17
  122:4,14 143:20
  143:25 148:25
  149:2,5,6,7,10,20

**b**

b 3:19 68:12 69:24
  70:14 98:3,8,12
  99:17 100:4 106:7
  107:13,15,21
  108:2,3 178:9
back 16:6 47:5
  53:9,12 57:23,25
  60:13 62:17 69:6
  71:20,22 72:9,11
  76:25 77:2 81:3,5
  81:19,21 83:24
  85:21 91:22,25
  92:2 94:20,22
  101:13,16 104:16
  114:16 116:16
  117:17 120:7
  138:3,6 145:5
  152:21 158:9,11
  165:2 166:16
  170:22 176:15,17
backup 9:12,18
  170:1
backups 9:20
balance 41:6 49:4
  51:9 55:3 58:15
  149:24
balances 49:7
balcarcel 7:19,21
ballard 2:12 4:18
  4:19 12:1 22:20
  24:24 25:10 58:11
  72:21 85:16 99:19
  100:22 101:17
  102:11,19 109:15

113:4 116:17
119:3,10 121:23
125:23 129:17
151:5,11 167:15
167:24 171:4
174:25 175:17
176:4 178:7
**ballpark** 17:20
**bankruptcy** 81:17
150:18 151:6,16
153:4,8 174:11,12
**barriers** 96:15
97:13,14
**base** 101:2 132:7
**based** 88:17 95:4
102:17 103:3
111:6 123:6,15,19
132:1 137:15
**bases** 9:6,25 95:8
157:16
**basic** 94:11
**basically** 174:5
**basis** 34:17 76:3
87:19 98:4,10,13
99:18 100:5,13
108:20 134:1
147:1 169:10
**began** 149:14,15
**beginning** 47:6
114:17 170:23
**behalf** 1:4 11:20
**behavioral** 115:11
**beliefs** 83:25 132:4
**believe** 10:20 12:8
15:10 29:7 33:14
34:5 39:7 45:11
45:17 62:15 74:10
74:24 79:8 83:4
83:12,16,18 88:19
91:2 114:18
127:22 147:24

153:2 170:12
171:16 175:4
**believed** 32:11
**beneficiary** 1:4
**benefits** 164:21
**best** 9:21 179:9
**better** 31:8
**beyond** 126:2
170:15
**biases** 115:11
**bid** 64:3 78:3,9,23
79:8,15,19 80:1,25
81:8,18
**bill** 19:4,5
**billed** 19:2
**bit** 5:11 31:8 46:10
94:16 117:14
136:17
**blanket** 136:23
**board** 15:14
**bond** 77:20
**book** 111:2,8
**boruff** 1:8 3:19
5:14
**bottom** 12:17
21:16 31:11 38:9
49:12 150:15
**bought** 57:15
**bp** 99:9
**break** 6:16
**breaks** 6:14
**brean** 37:2 43:11
44:11 51:18 56:15
**bridge** 42:14
**briefly** 35:12
**bright** 25:12 147:8
147:10 149:8
**bringing** 113:1
**broader** 89:3
**brokerage** 63:21
63:22 111:20

112:19
**brokerage's**
112:20
**bulk** 112:22
**bullet** 44:4 55:11
68:13,20 165:9
**bulletin** 15:14
**bunch** 115:2
151:16
**burner** 2:6 4:16
**buy** 26:18 131:25
142:7 175:10
**buying** 77:21

**c**

**c** 2:1 24:11 29:9
31:6 41:14,19
46:21 58:17 61:25
62:23 63:4,12,17
64:10,16 65:18
74:15 75:20 76:2
78:22,24 79:9
80:18 82:21 83:3
83:17,19 84:6
91:23 96:13,22
97:4 103:22 104:3
110:22 112:9
113:2,10,20
114:22 137:6,16
137:23,25 138:9
157:3,9 172:10,11
172:13 179:1,1
**cake** 143:8
**calculate** 11:20
99:17 100:4
107:20 109:3,24
113:14,24 128:10
**calculated** 75:9
98:4,9 100:20
105:1 107:8
108:19

**calculating** 108:7
108:14 109:13
**calculation** 11:23
11:25
**california** 89:21
**call** 28:24 29:5
84:21 137:4
147:17 148:25
149:5,22 154:24
**called** 121:6
**calls** 59:5,17,21,24
60:4
**cammer** 24:1,7,12
24:23 25:2,12,23
26:8,10,12 34:8
35:2 52:19 53:5,8
53:15 60:22,24
61:4,9 62:4,18
63:5 65:16,18,24
71:24 73:21
143:21 171:18
175:9
**cammer's** 25:6,9
**cap** 71:9 74:18
149:3
**capex** 42:5,15
**capital** 30:14,17
37:2 40:9 43:12
44:11 51:18 56:15
58:16 132:13
146:6 148:4
**capitalization**
40:22 74:4,8 75:8
76:8,11 77:22
**capitalized** 75:14
76:6 77:8,16
**caption** 5:12
**care** 39:24,25
134:22
**careful** 131:11

**carefully** 71:8
170:2
**carryover** 21:14
146:10
**case** 3:22 12:6
14:14,18 15:13
34:23 53:17 86:3
86:19 87:21 88:12
89:9,19 99:9
108:3,19 111:10
114:8 115:22
116:9 118:5,23
120:17,18,19,22
124:13 135:15
138:19 169:19
180:4
**cases** 14:3 103:12
**cash** 39:1,12,20,24
39:25 42:15 45:8
50:6 51:3 153:16
165:15 172:25
**causation** 114:9
**cause** 31:7 80:15
95:9 139:21
155:14 156:13
157:8 161:10
164:6,14 169:13
**caused** 161:17,19
163:18 170:4
**causes** 95:15
174:13
**causing** 80:1
**cell** 3:8
**cellular** 3:6
**central** 89:20
**ceo** 52:15 154:14
**certain** 35:9 65:4
69:25 110:21
173:20
**certificates** 110:25
111:7,15

**certified** 1:21
**certify** 179:6,11
**certifying** 121:21
**chad** 8:13 91:10
**chain** 40:1
**challenges** 127:8
**chance** 35:11
159:2
**change** 68:4 93:5
93:10 131:24
156:13 157:9,17
180:6
**changed** 62:3
174:21
**changing** 68:24
**charging** 17:14,17
17:17
**charles** 19:19 20:8
20:14 22:6,15,18
23:19
**chart** 40:10,12,21
42:23
**charts** 91:16
**check** 84:18,21
87:14 156:11
157:6
**circumstances**
101:12 104:8
105:7,10,12
**cite** 53:23 66:25
67:12 104:12
**cited** 11:12,16
**citing** 126:24
**claim** 107:7,16
113:1 122:8
**claimed** 115:23
**claims** 88:6 105:21
106:2,4,7,8,17
107:13 113:16
**clarify** 153:6

**class** 14:11 16:1,22
66:3,11,14 67:21
71:3 73:8,12 79:1
79:7 80:19 82:9
82:12 83:11 84:19
84:23 85:15 90:8
91:22 96:9 98:4,9
98:13 99:2,18
100:2,5 104:9
105:2,8,22,25
107:8,24,25
108:19 109:6
110:6,9 114:24
119:24 120:3
121:21 125:22
138:2
**classify** 126:3
**clear** 5:16 31:4
104:24
**clients** 16:7
**coefficient** 91:20
92:4,18 93:5 95:3
**coefficients** 95:21
**coextensive**
151:22,24
**coffman** 8:13 25:3
26:2 32:24 62:21
66:2,18 74:13
82:18 83:1 84:25
85:14 88:5 91:10
96:11 98:16
100:10,18,24
102:23 115:18
120:20 121:8,11
137:7 138:21
156:1,4 157:1
161:3,14 168:25
170:14
**coffman's** 74:17
78:19 84:12 91:17
104:13,18 138:9

140:20 141:9
156:12 157:7
169:9,25
**cohen** 1:16 2:3
3:24 4:14
**collect** 171:22
**column** 50:10
**combine** 103:21
**come** 39:9 59:4
108:6,13 123:8,25
143:1 152:18
155:17
**commenced**
146:13
**commission**
180:25
**commodity** 156:21
**common** 24:6,22
25:7,21 29:11,16
29:21 30:3,9,15,17
30:22,23 31:3
32:2,11,13 33:3,8
34:1 37:10,13,20
39:8,10,17 51:6
60:21 61:24 66:21
74:7,14,19 76:15
77:11 78:4,10,16
82:8,11 86:11
96:8 97:19 105:1
105:9 114:21
119:23 120:2
132:16,19 133:5,8
133:10,15,19,23
133:24 134:6,18
134:21,25 135:3,7
135:10,21 136:14
141:10 143:16
153:13,22,23
160:21 161:11
172:5,23 173:1
174:7,14,15

**companies** 81:16
111:13 123:24
128:16
**company** 19:8
27:4,6,14 28:3,15
28:18 29:1 34:15
38:18,21 52:15
61:9 71:11 76:16
124:9,11 128:9
131:7 132:22
133:8 135:2
136:25 145:16
146:22 147:6
149:23 152:23
166:12 173:10
174:5,9 175:24
176:7,20
**company's** 27:19
45:4,12 52:1
122:20 134:18
164:16 175:18,21
**comparable**
123:23
**comparing** 120:11
121:18 138:22
139:7 140:4
**compensated** 17:1
17:4
**compensation**
103:2
**competing** 100:14
**complaint** 100:25
101:25 103:8
105:18 113:13,23
**complete** 8:2,18
9:1,23 12:19
13:18 174:17
**completely** 11:16
11:18 131:3
**completeness**
106:3

**complex** 92:13,16
92:25 159:16
**compliance**
145:16,23
**comply** 9:22
**component** 31:16
31:18 135:25
136:9
**compute** 94:9
108:5 109:8 110:2
**computed** 76:12
84:21 98:13
**computerized**
62:12
**computing** 157:2
157:11
**concept** 76:14,19
**concern** 176:21
**concerned** 40:2
166:9
**concerns** 38:11,20
55:13
**concludes** 177:4,7
**conclusion** 137:16
**condition** 138:17
**conduct** 70:12
87:13 107:25
137:4
**conducted** 84:17
85:14 86:24 87:4
87:6,11 88:10,15
89:2,3 130:4
137:12
**conducting** 122:19
140:15
**conference** 59:17
59:21,24 60:4
**confirmed** 44:18
**confirms** 106:3
**conformity** 165:17

**confounded**
162:17
**connection** 86:3
**considered** 9:9
133:5 147:25
172:16
**considers** 49:17
**consist** 103:2
**consistent** 65:7,10
92:5,7,9
**constitute** 171:17
**consultant** 16:15
16:16
**contain** 9:1,5,14
9:23 12:11 130:18
141:25 172:4,6,18
174:17
**contained** 10:20
131:6,14
**contains** 12:14
**contention** 34:24
**context** 16:12
120:19 172:22
**continuations**
95:18
**continue** 3:11 8:15
58:14 174:6 176:7
**continued** 145:14
176:19
**continues** 55:12
**continuing** 8:17
145:17
**control** 23:2,12
**controls** 22:19
23:20
**conversations** 3:6
**conversion** 31:7,9
**convertible** 136:11
**corollary** 117:10
117:19

**corporation** 13:23
13:25 76:12 77:7
77:16,23
**corporations**
75:14 76:7
**correct** 8:9,10
9:20 10:6 11:1
12:6 14:11,12,15
14:17 15:15,16,19
15:20,22,23 17:3
19:9,10,12,13,15
20:9,10 21:2 22:2
24:7,8,13,14,23
25:9 27:24 28:9
32:21 36:16 37:21
38:21 39:2,3,6
40:4,15 41:11,12
41:15,16 43:7,8
44:7,8,14 46:1,7
48:4 49:3,6 50:7
50:19 53:24 57:8
59:5,6 60:22
61:21,22 62:1,2,6
62:14,19,24 63:13
63:17 64:10 65:2
66:5,11 69:17,23
70:5,11,23,24 71:5
73:4 74:9 75:16
75:22,23 77:8
78:5,11,19 79:2
80:10 82:9 84:10
84:11,19,23 85:6
86:5,6,14,21,22
87:1,2,10,20 88:12
88:13,18 89:9
90:15 96:9,13
97:1 98:10,19
101:12 102:1,18
104:14,15 105:3,4
105:18 106:8,9,18
106:22 107:2,21

108:8 109:14,25
111:3,11 112:4,5,9
112:10 113:3,16
114:1,6,9,24
117:13 118:5,6
119:2,9,15 120:4
125:3,22 127:11
133:1 134:11,15
135:8,13 137:8,13
137:14,20,21
143:18 144:12,13
144:18 145:10,11
147:3,18,19
148:13,22 149:25
150:23 151:7,10
154:2,25 155:4,12
156:7 157:4
158:24 159:4
160:1,17,23 161:2
161:12 162:1,2,6
162:11 163:19
164:2,7 166:5,13
166:15 175:11,12
175:18,21 176:1
**corrected** 84:16
91:10
**corrective** 103:4
169:18 170:4,13
**correctly** 24:3
69:22
**correlated** 94:6,8
**correlation** 84:6
84:10,13 85:1,10
85:13 86:12,23
88:1,18,25 89:7
90:6,7,12 91:20
92:3,18 93:4,9,14
94:3,5,13 95:3,9
95:15,21,24
**correlations** 85:8
93:11,16,19 94:9

**correspond**
140:22
**cosby** 1:3 3:17
180:4
**cost** 163:11,22,24
164:3,14,18,20
**counsel** 3:16 4:10
8:4 99:8,12
102:18 171:2
**counter** 61:11,14
61:19 62:1,16
148:9
**counting** 157:1
**country** 121:20
180:2
**course** 7:14
174:22
**court** 1:1 3:20 4:3
4:25 6:1 15:21
16:19 53:12 57:25
71:22 72:11 75:6
75:7 77:2 81:5,21
83:24 85:21 89:6
90:5,13,21,24
94:22 101:16
106:2 107:6
116:16 117:17
126:18 138:6
158:9 176:17
**court's** 89:19
178:19
**courts** 80:24 85:12
115:24 116:4
121:20 122:4,15
126:11,21 139:15
139:20 140:13
143:21
**cover** 153:10
**coverage** 24:21
25:21 27:2,13,16

**covering** 25:6 26:3
33:5,20
**coversheet** 91:8
**cra** 17:4,17 19:1,5
19:8,23 20:2,6
21:1 125:20
**cra's** 21:11,24
**created** 56:22
**credit** 58:19
153:17 163:5,17
**credits** 47:17 48:3
57:18,19 58:19
**criticize** 82:22
156:4,25
**criticized** 62:21
82:18
**cross** 171:1
**crude** 156:18,19
**cure** 146:13
**current** 17:7 20:11
36:1,20
**currently** 13:6
15:25 154:2
**cv** 1:2 3:22 12:13

| d |
|---|

**d** 5:2 24:11 29:9
31:9 41:15,20
43:19 44:14,20
46:21 61:25 62:24
63:4 65:18 74:16
75:20 76:2 78:22
78:24 79:9 80:18
82:21 83:3,17,20
91:23 96:13,22
97:5 104:4 110:13
110:23 112:9
113:3,10,20
114:22 137:6,17
137:23,25 138:10
157:3,9 178:2

**dalton** 14:13
**damage** 11:23,25
16:17 101:2
**damaged** 110:7,8
**damages** 11:20
12:6 98:3,8,12,25
99:17,25 100:4,14
100:19 101:24,25
103:1,16 104:7,24
104:25 107:21,25
108:4,5,8,14,16
109:3,8,13,24
110:3 113:14,24
114:3
**data** 9:9 40:11
**date** 6:23 20:19
21:7,17 35:7
56:13 67:8 68:1
85:25 89:17
106:18,19 111:17
118:2 125:6 146:4
147:15 161:10,25
162:23 179:7
180:4
**dated** 51:18 56:15
125:7
**dates** 23:8 122:22
123:5
**david** 125:8
**davidson** 2:17
4:21,21
**davis** 2:15 4:22
20:5
**day** 62:17 84:14
84:15 86:13,25
128:18,19 129:5
129:11,13 134:1,1
155:11,14 158:13
158:19,20,22
159:1 169:5,6,14
177:15 180:23

**day's** 86:14 87:1
**days** 120:12
  121:19 123:4,17
  123:22 125:3
  127:23 138:23
  139:3,8 140:5,6
  158:3 159:10
  169:22
**dealing** 26:10
  65:24 74:3
**debt** 31:18 33:2
  36:2,16,21 41:2,11
  52:4,7 132:15,18
  132:25 135:24
  136:9 143:20
  150:12,18 151:4
  151:16 173:3
  175:21
**december** 22:16
  23:3,13,20 49:10
  51:19 70:15,22
**decided** 73:21
  139:20
**decision** 54:13
**declare** 10:4,11
**decline** 103:3
  155:15 170:5
**declines** 114:5
**deductions** 173:5
**deep** 97:11
**default** 132:23
  174:9 176:11,13
  176:18
**defaults** 173:21
  174:2,5
**defendant** 2:10,15
  5:13
**defendant's** 90:17
  91:3 126:3
**defendants** 1:9
  15:3,7,9

**defense** 125:21
**deferred** 55:21
**deferring** 56:10
**defined** 104:23
  110:6
**degree** 135:17,18
**delist** 148:2
  149:17
**delisted** 144:17
  145:21 153:14
**delisting** 81:16
  144:11,23 145:9
  146:17,22 147:3
  148:13,18 149:14
  155:6,12,15
**demonstrate**
  108:17 122:25
**demonstrated**
  90:25
**demonstrates**
  79:14
**demonstrating**
  109:21
**depend** 99:1,25
**depending** 124:5
**depends** 27:23
  28:10 99:21
  120:14 159:5,14
  173:1
**deponent** 180:5
**deposed** 5:19
  118:10
**deposition** 1:15
  3:10,15,23 103:7
  118:3,4 178:20
  180:4
**described** 149:7
**description** 178:10
**despite** 161:8
**detailed** 8:22

**details** 107:7
**determination**
  121:4 139:22
**determine** 63:2
  76:1 83:1,10
  88:11 106:14
  120:24 124:22
  159:19 164:11
  166:8
**determined** 89:6
**determining** 139:9
  140:10,14
**deviation** 138:12
**differences** 144:1
**different** 25:4 62:9
  87:12,16 89:1
  92:22 94:14,17
  95:1 116:6 122:1
  124:9,11 133:23
  139:25 145:19,24
  146:1,17,21
  156:10 157:20
**differentiate** 102:9
**differently** 143:22
  151:14
**difficult** 61:17
  80:9
**dingmann** 154:11
**direct** 24:16 29:18
  60:15 68:9 73:24
  81:25 84:3 115:4
  118:16 144:3
  145:4
**direction** 133:14
  134:13
**directly** 29:12
  30:4 32:4,7 45:19
  107:2 108:17,24
  109:22 112:3,15
  126:23,24

**directors** 15:11
**disagree** 77:12,14
  128:5 129:15
  130:7 161:5
**disagreed** 15:21
**disagreement**
  115:7
**disappointed**
  154:19
**disclosed** 161:24
  162:5
**disclosure** 102:2
  162:17,18 166:21
**disclosures** 103:4
  103:7 169:18
  170:4,14
**discuss** 33:2,6,12
  33:18,21 34:2
  43:6 49:13 84:8
  115:12 175:15,20
  175:23
**discussed** 33:4,14
  34:6 59:11,15,20
  60:2 70:13 99:11
  114:18 147:25
  175:17
**discusses** 90:11
  127:12,14 149:23
  166:2
**discussing** 21:21
  36:15,17 63:20
  86:4 104:2,4
  110:18 115:23
  128:15 131:21
  141:21 142:22
  144:6,22 163:6
  164:23
**discussion** 51:21
  68:4 98:2 103:16
  178:17

discussions 99:7
152:5 171:16
dismiss 100:25
dismissed 5:14
21:17 22:6
dispositive 117:3
dispute 24:4,9,21
25:5,8 60:20,23
74:7,17 78:3,9,18
78:22 82:6 96:7
disputing 25:20
26:6
distinguish 98:17
102:15
distributed 27:15
28:9 29:5
district 1:1,1 3:20
3:21 89:21
dividend 30:8,10
40:4 51:1,7,24
56:10 132:21,21
132:22 157:19
172:21
dividends 33:22
33:24 34:3,6 43:1
45:21 46:5 48:12
49:14,17 50:3,24
51:4 54:6,25
55:13 60:3 157:2
157:11 173:3
175:25
division 1:2 3:22
docket 89:20
document 6:22,25
13:15 20:18,23
21:9,23 22:9 35:5
38:24 56:12 58:2
67:4,7,13,23,25
68:7,10 69:5,9
85:24 89:16 118:1
125:5 146:3,10

147:14 162:22
documents 11:12
11:17 27:21 71:7
doing 26:15
149:24
dortch 2:15 4:22
20:5
dozens 85:11
dr 1:15 5:8 35:8
60:14 86:1 122:9
122:14 125:8
126:8 170:24
177:12 179:6
180:5,21
drilling 45:3,25
46:6 163:13
ds 82:3 83:11 84:6
103:22
dtc 110:18 111:2,8
112:20,22
due 33:16 71:13
duly 5:3 179:7
dunbar 121:16
duplicative 42:1

**e**

e 2:1,1 178:2,4,9
179:1
earlier 65:16 86:4
90:1 114:19
115:23 128:8
139:13 166:4,7
171:5 172:3
173:23 175:5,15
early 147:12
163:13,23
earning 29:4
31:14,23
earnings 28:24
32:19 37:14,19
50:1 59:4,16,21,24
60:4 120:11

121:18 122:20,22
123:4,16,20
128:18,19 129:12
130:8,12,14,17,18
131:5,9,19 132:1,3
135:6 137:19
138:1,22 139:3,7
140:4 141:6,19,22
141:24 142:16,17
143:1,3,15 147:17
148:25 149:5,22
170:13
easier 118:19
eastern 1:1 3:20
ecg 14:22
economically
30:21 118:25
140:2
edgar 28:22
effect 23:14
139:21 156:13
157:8
effective 21:19
23:12
efficiency 75:11
81:1 88:2,4,7 89:8
89:14 90:18,20
91:1 115:19
116:12 119:2,19
121:4 122:25
126:22 139:10,23
140:14 142:23
158:5,15
efficient 15:18
52:2 65:8,14 72:7
72:16 73:18 76:3
79:24 80:16 81:13
82:16 86:21 87:23
88:17 115:9 116:1
117:4,13,20
120:25 128:1

137:24 143:5,17
159:12
efficiently 71:12
117:6
efforts 46:6
egc 14:25 15:1,13
15:18 86:4,20
87:19 88:12,16
89:6,19,25 115:22
118:5,23
egc's 87:22 90:7
eight 79:1,4,6
80:19
either 105:15
126:4 129:11
156:5 157:8
169:24
elephant 54:7
eligibility 69:9
71:23
eligible 66:4,7
71:1,12 73:19
eliminate 36:20
eliminating 36:1
embark 46:1
emc 13:23,24
emergy 2:10
emery 4:19 20:1
empirical 73:17
employed 179:12
encompass 9:19
ended 23:3,4
165:16
energy 33:1,6,11
33:21 35:10,15
59:11,15,20 60:2
66:4,7,9,12 70:12
70:20 72:19 83:17
144:14,17 159:25
160:2 164:2 166:3
174:3

energy's  24:6,11
24:22 29:9,11
32:17 33:2,7
36:16 40:22 60:21
61:23 74:7 78:4
78:10 79:9 82:8
96:8 112:9 113:2
114:20 119:23
120:2 137:5
144:22 160:6,15
160:21,24 161:11
163:18 164:6
167:3,12 168:22
169:19 170:6
enhanced  47:15
ensure  10:24
entry  111:2,8
equity  31:12,16
32:17 37:6,25
41:1 42:9 43:5
48:25 52:8 62:3
66:21 115:9
132:25 143:23
145:8 150:20
151:20 152:2,12
152:15,19
errata  180:1
erroneous  169:6
errors  166:22
esq  2:5,12,17
essentially  110:17
111:14
estimate  18:22
108:4
estimated  50:4,11
50:19
et  180:4
evaluate  27:11
76:18 159:17
evaluated  122:6

event  28:5 119:22
120:13,15 122:19
122:24 123:17
137:5,10 143:22
148:6 156:1
164:11 176:11,13
events  173:21
174:2,4
evidence  63:7 88:7
89:12 90:18,19
105:17
examination  5:6
171:3 175:2 178:6
178:6
examined  5:5
example  95:6
136:11 155:11
172:8
exceed  127:24
exceeded  24:6,12
exceeds  93:23
exceptions  110:22
exchange  62:6,8
62:11 63:25
114:23 115:1,16
116:1 117:7,12
144:17 148:1
exchange's  149:11
exchanges  63:24
115:17
excuse  22:10
executed  64:16,18
64:23,25 65:7,10
exhibit  6:20,22
20:18,21 35:18
37:1 38:7 40:7
43:10 44:10 47:8
47:10 49:9 51:17
54:1,2 55:8 56:12
56:14 67:7,10,25
68:3 69:7 70:25

71:8 85:24 86:2
89:16,18 91:6,7,9
91:15,16 104:17
104:17 116:22
117:24 118:1
125:5 140:21,23
145:6 146:3
147:14,16 162:22
162:25 174:16
178:10,11,12,15
178:16,17,18,19
178:20,22,23,24
178:25
exhibits  9:15
10:25 35:5,9
140:24 157:14,23
178:13
existence  104:6
existing  150:18
151:4
exit  151:15,18
expect  29:22 49:15
49:16 81:13 93:4
93:6,9,10 125:1,9
129:6 130:10,15
131:8,20 132:2
133:9,15,17
134:16 141:18
145:15,23 148:7
148:16 154:4
164:5
expectations
130:10,21
expected  32:13
131:4 137:24
138:15 142:13,17
144:11 153:20
154:1,7 155:6
162:13
expecting  147:3
147:12 154:13

expensive  80:6,8
80:11
experiment  94:10
expert  7:21 10:15
13:16,20 16:2
86:2,10 87:3
88:14,20,21,24
90:24 91:3 122:15
125:21 174:16
experts  90:5
125:25
expires  180:25
explain  92:15
94:24 132:11
139:17 171:15
explained  32:10
explaining  125:2
explanation  98:11
98:20
express  9:25
extended  137:5
extent  36:13 45:20
142:9

**f**

f  179:1
face  55:12
facility  58:19
fact  33:23 34:6
37:23 43:17 63:16
64:14,24 65:6,9,12
66:9 112:6 115:13
126:9,19 147:23
153:1 154:18
155:16 162:16
165:10 166:20
167:8,11,19,21
factor  26:8,10,13
34:8,19 35:2
52:19 53:6,8,15
60:24,25 61:4
63:5,9 65:16,24

74:3,19,23 75:22
77:6,9,13 78:13
80:23 89:8,13
90:14,22,25 96:5
136:7 163:11
171:18 175:9
**factors** 24:1,2
71:24 80:14
123:20 140:13
143:22 147:24
**facts** 9:9 14:6,7
161:8
**faded** 150:7
**fair** 17:6 18:11,15
35:16 62:10 99:13
117:22 160:12
**fallen** 149:3
**falls** 72:4 79:16,25
**familiar** 79:13
121:12
**far** 51:5 106:9
117:5
**fashion** 72:15
**favor** 90:14,17,22
**fdt** 121:6,12,15
126:9,14,23,24
127:7,8
**feature** 31:7,9
**february** 37:3
**federal** 9:22
**fell** 70:16,23
**ferrillo** 121:16
**figure** 50:9,14
**file** 66:4,8 71:2,4
73:11 153:7 166:4
166:12
**filed** 3:19 21:1,4
160:1,2,10
**files** 19:11
**filing** 71:13 72:13
72:20 73:9,10

105:18 113:13,23
159:23 160:14
165:14 169:6,7
**filings** 28:14,17,21
34:21 42:2 54:19
59:4,12,24
**finance** 115:8,14
119:21
**financial** 23:2,13
36:11,13 48:7
54:24 55:9 138:17
153:2,9 160:7,16
167:13,22
**financially** 4:8
**financials** 26:16
**financing** 52:4
154:12
**find** 22:18 23:18
27:22 29:1 93:20
94:13 141:4
**finding** 81:1 90:24
140:1,2 167:6,9,20
168:2
**findings** 78:19
**finds** 90:5 128:20
129:7 161:3
170:14
**fine** 6:12,18 14:24
**finish** 5:24
**firm** 46:15,17,22
52:23,25 54:13
125:18 152:17
**firm's** 26:15 54:19
**firms** 132:14
**first** 5:3 13:3,22
22:9,25 35:19
38:10 40:10,15
41:5,8 43:15,21
44:13,17 46:10
47:15 49:13 51:20
54:5 56:17 57:19

58:15 68:13,20
72:25 86:17 104:1
117:2 147:21
160:5,8,9 162:3,7
163:4
**fiscal** 22:16,17
23:3,4 165:16
**five** 13:3 14:9
15:25
**flaw** 88:8
**flexibility** 164:19
**float** 69:17 70:4,10
70:14,16,23 71:10
71:25 72:3
**floor** 1:18 2:4
**flow** 39:1,12,20,24
39:25 42:15 50:6
51:3
**flows** 165:16
**focus** 52:1 166:10
**focused** 71:25
**focusing** 72:23
**follow** 126:23
159:7
**following** 23:10
33:1,11 41:17
42:4 128:19
129:12 158:4,14
**follows** 5:5 127:7
**footnote** 115:5
121:15 122:7,8
146:20 147:4
**foregoing** 179:6,8
**form** 19:14 20:25
22:21 24:25 26:24
58:12 65:24 66:19
67:1,11 68:4,12
69:2,10 71:4
72:20,22 85:9,17
88:3 99:20 100:23
101:18 102:12,20

109:16 111:2,8
113:5 116:18
119:4,11 121:24
159:23 160:1,2
167:16 178:12,16
178:17
**forma** 48:21
**formal** 34:10
**forms** 19:11
**formula** 104:7,23
108:7,13 109:12
109:24 113:15,25
114:4
**formulating** 9:10
**found** 28:6 83:13
90:6 123:3
**four** 13:3 68:13,20
**fraction** 32:23
127:22
**fraud** 14:10 16:1
16:22 85:14
105:21 107:8,24
121:21 125:22
**freely** 28:12
**front** 60:17 67:9
**full** 8:25 22:9,11
22:25 35:21 44:17
51:20 54:5 56:17
90:9 103:3 127:4
128:14 147:21
152:22 164:10
**fully** 165:10
**fund** 45:10,24
152:6 154:9
**funding** 38:1
163:12,22,25
164:14,19
**funds** 37:7
**fungible** 112:21
**further** 39:25
64:21 152:3

154:16 171:1
175:1,2 177:2
178:6 179:11
**future** 26:21 32:14
130:20 131:1
156:18
**futures** 156:20

**g**

**g** 2:12
**gaap** 165:17
**gap** 42:14
**general** 46:21
119:8,16 123:21
127:25
**generally** 28:8,20
28:23 29:4 79:24
119:12,13 120:21
120:22 130:9
132:6,10 133:4,7
135:2
**generated** 94:5,7
**getting** 72:14
108:21,22,23
111:17 153:14
**giarro** 1:19 4:4
179:4,17
**giesler** 52:1
**give** 44:5 95:23
147:10 155:9
**given** 79:24 84:14
86:13,25 97:9,17
104:22
**gives** 45:4 46:20
**giving** 151:8
**go** 3:12 23:9 29:22
31:5 38:9 44:3,9
49:12 51:2 64:12
69:8 81:1 86:16
127:18 145:12
150:13 152:3,21
163:19,19 164:7

164:15,16 165:2
166:16 174:10
**goal** 166:22
**goes** 21:20 77:6,10
77:13 126:8
164:18
**going** 3:2 5:23
6:10,19 12:1
14:22 23:25 24:16
43:18 45:10 47:1
47:9 48:1,15,19
58:6 60:10,14
67:22 68:9 73:24
81:25 84:3 88:22
91:5 97:24 98:21
103:21 114:12
115:4 118:16
123:10,14 133:25
135:15 136:25
144:3 145:4
148:21 155:21
170:18 177:5
**good** 3:1 4:13 5:8
5:10 25:14 132:9
**google** 27:21
**greater** 75:12 81:9
164:18
**greg** 4:18
**gregory** 2:12
**gross** 44:22
**growth** 148:5
**guarantees** 115:19
**guess** 21:14 132:8
132:9
**guessing** 121:15

**h**

**h** 178:9
**half** 29:18 128:24
129:24
**hand** 27:9 31:2

**handed** 20:20 68:2
162:24
**hang** 150:16
**happened** 165:24
**header** 126:15
**headers** 35:13
**heading** 90:10
127:5 128:2
145:13
**heads** 159:18
**held** 1:16 3:23
66:21 82:20 83:2
83:10 105:17
111:2 112:22
113:12,22
**help** 153:6,12
**helpful** 116:20
164:9
**helps** 151:19 152:1
**hesitant** 136:18
**high** 31:3 77:23
98:18 102:9,15
**higher** 30:13 31:5
123:10 124:3,21
124:24 128:11
163:11,21,24
164:3
**highly** 75:13 76:6
77:7,16
**hired** 15:2
**hit** 149:12
**hold** 8:19 9:2
26:19 83:16,19
90:20 111:7
128:24 129:23
131:25 142:7
172:1,14 174:19
175:10
**holders** 31:25 49:1
83:8 132:18 173:3

**holds** 90:13
**honest** 168:4,8
**honor** 49:16
**hoping** 154:20
**host** 70:2
**hour** 17:15 19:6
**hourly** 17:2
**hours** 17:24 18:8
18:13,16,20
**housekeeping** 5:12
**houses** 63:21,23
111:21
**humphrey** 35:21
38:8
**hundreds** 85:12
119:20
**hybrid** 132:25

**i**

**icing** 143:7
**ictei** 156:19
**idea** 74:25
**identification** 6:23
20:19 35:6 56:13
67:8 68:1 85:25
89:17 118:2 125:6
146:4 147:15
162:23
**identify** 88:2
**ignores** 66:19
**immediate** 153:2
**immediately** 21:19
**impact** 37:10,13
42:10 71:14 99:15
100:2
**impacted** 168:22
169:19
**imperial** 40:8
146:6
**implications**
159:19 171:24

**implies** 105:10
**imply** 159:20
**importance** 52:3
  167:2
**important** 38:1
  53:8,14,14 55:25
  56:6,8 61:15
  73:22 135:7,9,11
  135:13,16 136:1,3
  136:5,7,20 137:1
  165:5
**impounded** 80:7
  80:10,12,13 143:4
  143:15 154:7
**impounding** 80:20
**inaccurate** 10:21
**inadequate** 23:19
**inappropriate**
  120:18
**incentive** 75:12
**incentivized** 76:5
**include** 9:8 106:17
  106:19,21,23,25
**included** 5:13
**including** 18:12
  50:3 52:6 148:3
**income** 42:22 43:1
  48:11 50:2,23
  55:1
**inconsistent** 158:5
  158:15
**inconsistently**
  91:21
**incorporate** 114:6
**incorrect** 99:15,22
**increase** 79:15
  80:2 81:8 152:14
  161:1,12,17,19
  162:1,11,14
  166:18 169:14

**increased** 79:10
  79:12 80:25 81:18
  160:22,25 164:18
  164:19
**increases** 152:12
**increasing** 164:13
**independent** 23:23
**independently**
  75:21
**index** 155:25
  156:5,6,9,19,20
  157:20
**indexes** 156:14
**indicate** 16:25
  27:3,14 28:2,4
  65:13 101:1
**indicated** 179:8
**indicates** 23:11
  27:16 64:25
**indication** 81:11
**indicative** 116:11
  119:2 158:23
**indicator** 75:11
**indirectly** 32:8
**individual** 16:9,13
  104:8 105:7,10,12
  109:14
**individually** 170:7
**individuals** 7:16
  112:3
**industry** 123:7
  125:19
**inefficiency** 88:11
  91:4 158:23
  159:21
**inefficient** 87:20
  120:3
**ineligible** 71:13
  72:12 73:19
**inform** 171:23

**information** 12:15
  26:22 27:14,18
  28:15,18 29:1
  34:14,15 36:6,12
  37:15 38:4,15,17
  39:4 40:18 41:23
  42:1,3,18 44:5
  46:14,18,22 47:21
  47:24 49:21 50:2
  50:23 51:13 52:11
  52:21,22 54:10,15
  55:17,20,23,24
  56:3,5,7 57:9,13
  57:20 58:1,9,24
  59:8,9,23 62:22
  71:16 72:14,17
  74:14 80:4,7,10,12
  80:13,20 81:12
  82:19,24 83:5,6,13
  95:6 106:1,10,13
  106:16 107:3
  108:1,9,11,12,21
  108:22,23 109:2,8
  109:11,21 110:2
  110:11 122:6
  123:25 130:19
  131:2,7,15,18,22
  133:12 134:18,19
  134:20,23,24
  135:1,5,19,24
  136:1,3,8,13,17
  138:17 140:3,12
  140:22 141:25
  142:12,17,22
  143:3,8,10,14
  144:16,19,20
  158:18 159:4,6,7
  159:12,15,16
  161:16,24 162:9
  162:12 167:1,5
  168:6 171:10,22

  171:23,25 172:19
  173:13 174:8
**informed** 43:17
**infrastructure**
  152:6
**initial** 70:21
**injections** 58:16
**inputs** 139:22
**institutional** 16:9
  16:13 82:3,7,11
  83:8
**institutions** 82:14
  82:20 83:2,10,16
**insufficient** 31:17
  63:3
**integrate** 59:7
**intending** 153:7
**intent** 168:13
**intentional** 166:21
  167:7,9
**interest** 27:3,5,10
  28:2 75:3 173:2
**interested** 4:8
  49:23 72:5
**interesting** 28:6
**interfere** 3:9
**interference** 3:7
**internal** 22:19
  23:2,19
**international** 21:1
**invalid** 85:1,5,8
**invest** 75:13 77:15
  144:15
**investigation**
  165:23 166:3,11
**investment** 26:25
  27:12 43:22 45:16
  56:18 57:1 152:7
  152:14,18
**investments** 45:9
  45:23 46:2 133:5

**investor** 75:2
  107:17 110:3
  113:7
**investor's** 109:20
  113:9,19
**investors** 16:9,14
  26:17,22 27:11,20
  28:25 34:13 61:18
  61:21 63:23 64:2
  72:1,5,13 80:6
  98:18 99:2 100:1
  100:6 101:11
  102:10,16 108:16
  109:2,4,7,9 110:13
  111:5,20 112:8,17
  113:2 131:3 135:8
  135:12 136:2,15
  138:16 142:6
  144:15 148:24
  149:2,10,20,21
  152:18 154:6
  155:10 159:17
  171:24 172:12
  174:2
**involve** 14:5,7
**ira** 1:4
**irrelevance** 105:6
**irrelevant** 71:10
  104:10
**issuance** 33:15
  47:16
**issue** 12:6 34:11
  61:10 84:1 86:20
  108:18 123:7,8
  145:24 146:1,17
  155:12 157:19
  166:9 168:10
  173:10 176:25
**issued** 30:5 44:25
  47:25 70:21 160:6
  160:9,14

**issuing** 111:14
**it'll** 124:3
**items** 135:20
  151:22

## j

**joint** 52:7
**jonathan** 2:23 4:1
**journal** 13:13
**judge** 71:24 73:21
**judgments** 153:18
**july** 38:7 55:9,21
  144:7,12,18,23
  145:10 146:6
  147:6,18 148:25
  162:6 169:5
**june** 1:11 3:3 21:5
  22:1
**junior** 132:14

## k

**k** 5:2 19:11 20:25
  40:19 71:4 73:7
  73:10,11 159:23
  160:1,3,10 161:16
  165:11 166:4,12
  167:4,14,23 169:7
  178:12
**kenneth** 1:3,4 3:17
**key** 40:11 44:4
**kind** 11:5 31:5
  72:16 88:8,22
  92:15 136:6
  149:16,21 150:7
  159:7 160:13
  168:9
**kinds** 16:16 126:1
**knew** 113:10,11
  113:20,21
**know** 6:7,14 10:10
  10:14 11:4,5 14:1
  14:4,19 15:4,7

  17:18,20,24 18:2
  18:24 19:1,20,21
  19:22,24,25 20:3,4
  20:7,11,16 22:5
  25:1,11,13,25 26:1
  26:9,16,21 27:17
  29:16 30:10 31:6
  33:16 45:21 54:19
  54:20 57:17 59:7
  59:23 62:20 65:3
  67:15 68:14 71:6
  71:17 73:9 77:21
  79:20 83:7 84:20
  87:24 92:9 93:20
  95:13 97:6,19
  102:4 106:9
  107:16 111:13
  122:17 123:1,17
  123:23 124:5
  125:15,24,24
  126:1 127:15
  128:8 134:2
  135:14 136:4,12
  136:16 138:13
  141:13,17 142:6
  142:10 143:7
  147:6,9 152:1
  157:15,19 158:25
  159:15 164:22,25
  165:5 167:25
  169:25 170:11
  173:10 174:9
**knowing** 111:21
**knowledge** 23:23
  104:8 105:6
**known** 57:14 58:4
**knoxville** 1:2 3:21
**koev** 7:19,20
**kpmg** 1:8 2:10,15
  3:18 4:20,23 8:4
  19:2,18 20:14

  21:10,18,22,24
  22:5,18 23:18
  160:5,9,10,14
  165:13 166:5
  167:10,12,21
  168:14 180:4
**kpmg's** 22:12
  23:11 161:9,15
  166:19 167:2
  169:12
**krogman** 24:1
  74:3,9,12,19,23
  75:6,7,22 78:5,11
  78:14,25
**ks** 19:15 72:20

## l

**lack** 72:17
**lansden** 2:15 4:22
  20:5
**large** 75:1 93:18
  93:18 131:16
**largely** 172:22
**larger** 7:13 74:25
**late** 71:13 72:13
  72:19 73:9,9
**laura** 2:5 4:14
**law** 34:23 53:17
**laws** 10:5
**lead** 81:17
**left** 33:25 39:16
  172:25
**legal** 147:9 166:22
  180:1
**legally** 149:9
**level** 26:1 76:20
  78:13 80:1 94:15
  122:24 123:15
  137:19
**lewis** 1:3 3:17
**liabilities** 166:23

**life** 136:24
**light** 156:18,19
**limited** 85:3,5,9
  130:24
**limiting** 166:22
**line** 25:12 38:25
  64:21 130:5 131:3
  147:8,10 149:8
  180:6
**liquid** 61:8 65:2
  97:12
**liquidated** 174:10
**liquidity** 33:7
  38:11,20 42:5
  45:5,12,15 46:4
  47:15 55:12 58:20
  59:20 61:21
  175:18
**list** 8:2 12:16,19
  13:18 16:8 32:23
  40:14 42:25 48:11
  97:12
**listed** 62:7 96:25
  96:25 97:3 114:25
  115:15,25 117:4,7
**listing** 115:18
  145:14,17
**lists** 25:4 49:5 55:4
  70:2
**literature** 11:15
  34:23 53:17 79:14
  79:18,21 115:8,14
  116:5 119:7,18
  123:3 127:5,19
  128:2
**litigation** 125:11
  126:1 153:18
**little** 31:8 94:16
  131:15 136:18
  143:12 150:6

**llc** 3:18 37:3
**llp** 1:8 2:10,15,15
  4:20 21:18 180:4
**loan** 162:18
  173:19 174:1
**located** 1:17 3:24
**long** 41:10,11
**longer** 12:21 71:10
  168:16 169:2,3
**look** 22:24 35:12
  37:3 38:6 54:4
  64:19 76:22 92:25
  104:16,20 116:21
  116:25 140:13
  146:19 163:4
  164:9 165:5 166:7
  172:2
**looked** 79:11,21
  93:17,18 122:5
  128:16,17 168:24
  169:1 170:2,16
  175:14
**looking** 80:22
  89:24 121:14
  129:5 172:3
**loss** 174:13
**lot** 32:12,14
  131:14 168:16
  173:5
**low** 30:25 52:2
  98:18 102:10,16
  138:9,15
**lower** 79:18 81:10
  129:7
**lowered** 163:10
**ludlow** 102:21

**m**

**m** 1:8 5:2,2 178:4
**madison** 2:11
**magnitude** 133:14

**major** 115:17
**majority** 111:5
  115:14 128:21
  129:20
**maker** 64:4,7,9,11
**maker's** 60:25
**makers** 60:20 61:6
  61:15,17,20 62:14
  62:23 63:4,17
**making** 11:4,5
  74:12 130:3 132:8
  140:6 141:3
**manipulate** 168:5
**march** 22:17 23:5
**mark** 6:19 67:23
  117:23
**marked** 6:22
  20:18,21 35:5,8
  56:12 67:7,10,25
  68:3 85:24 86:1
  89:16,18 91:6
  116:22 118:1
  125:5 145:6 146:3
  147:14 162:22,25
**market** 15:18
  43:17 60:20,25
  61:6,7,11,15,15,17
  61:20,20 62:14,23
  63:3,17,25 64:4,7
  64:9,11 65:1,8,13
  66:20 71:15 72:6
  73:17 74:4,8,18
  75:8,11 76:1,8
  77:22 79:23,25
  80:3 81:11,13
  87:23 88:2,3,16
  91:1,4 93:3,8,14
  97:11 112:2,7,13
  112:14,18,25
  113:7 115:19
  117:4 119:1

  120:25 122:25
  126:22 128:1
  130:9,21 132:7
  137:23 139:9,23
  142:23 147:2
  148:12 149:3
  158:5,15,23
  159:13,20 173:14
**markets** 62:3,16
  111:6 115:9
  116:10 168:5
**marking** 147:16
**marks** 47:2,6
  114:13,17 170:19
  170:23
**martin** 1:3,4 3:18
**match** 62:12
**material** 9:12 23:1
  23:15 131:18
  158:4,14,18
  159:12 170:1
**materialization**
  98:24 99:24 101:1
  101:8 102:5,7,14
  103:13
**materialized**
  102:3
**mathematical**
  127:21
**mathematically**
  95:22
**matter** 3:17 6:20
  8:20 9:3,16 11:21
  12:12 13:22,23,25
  14:21 15:1 17:3
  17:13,25 18:13,16
  19:2 126:19
  127:25
**matters** 13:19
  14:9,17 15:25
  16:8,17,18,22

Veritext Legal Solutions
www.veritext.com
212-279-9424    212-490-3430

maximize 148:5
mcdermott 2:10
mcdermtt 4:19
20:1
mean 8:10 11:14
14:1 18:17 23:21
28:10 36:11 46:20
53:22 55:19,22
57:12 71:6,23
90:23 96:23
119:17 121:14
122:17 132:5
135:19 138:7
139:18 149:19
166:6
meaning 134:8
means 10:10 28:25
52:4,24 149:9
174:5
measure 100:12
102:25
media 3:14 47:2,6
114:13,17 170:19
170:23 177:7
meet 46:3 63:5
74:19
meets 24:22 25:9
25:22 60:21 63:8
74:8 78:4,10,24
member 104:9
105:8
members 7:9
17:12 105:2,25
128:25 129:24
mention 165:23
mentioned 17:10
17:11 101:7
met 65:18
method 82:25
methodology
84:25 98:16

100:11,21 103:11
105:1,9 120:12,18
120:23,24 121:6,7
121:13,18 122:3
122:16 138:21
139:9
microphones 3:4,9
middle 50:15
126:20
midstream 152:8
mill 55:12
miller 24:5,11,22
29:8,10 30:5
32:17 33:1,2,6,6
33:11,21 35:10,15
36:12,13,15 40:21
43:17 44:24,25
56:9 59:10,15,19
60:2,21 61:23
66:3,7,9,12 70:12
70:20 72:19 74:7
78:4,9 79:9 82:7
83:17 87:25 96:8
103:1 112:8 113:2
114:20 119:23
120:2 137:5
138:18 144:14,17
144:22 146:12
159:25 160:2,6,15
160:21,24 161:11
163:18 164:2,6
166:3 167:3,12
168:22 169:19
170:6 174:3
miller's 30:14,17
32:18,25 41:9,10
42:2 58:20 141:5
144:11 154:14
165:15 167:21
million 37:6,25
40:17 44:22 45:5

66:23 69:1,17
70:4,10,14,16,23
71:9 147:7 149:4
149:12 151:20
153:13,24 154:5,8
154:8,20,21
milstein 1:17 2:3
3:24 4:14
mine 132:9
mineola 180:2
minimum 155:2
minor 165:19
minority 152:7
misgivings 122:10
misheard 130:25
mislabeled 156:9
mislabeling 156:5
mispricing 100:12
missed 117:14
missing 77:5
misstatements
103:9
mistake 168:4,8
mistaken 73:14
78:15
misunderstood
168:10
mixup 47:7
mlv 47:11 49:10
54:4 145:8
model 48:8 54:24
54:24
money 30:11
42:14 45:3 46:8
46:10,17 49:1
151:18 153:17,18
155:16
money's 46:15
moneys 47:25
173:12

month 145:18
146:13
months 55:21 79:1
79:4,7 80:19
morning 3:2 4:13
5:8
mortgage 13:23
motion 100:25
mouthful 70:19
move 133:18
134:9,13 141:19
142:14,18
movements 125:2
158:4,14
moves 73:18
133:19
moving 176:3
mukarram 1:15
3:15 177:5,12
179:7 180:5,21
multiple 124:5
159:10 165:6
multiplied 75:10

## n

n 2:1 178:2,4,4
179:1
name 4:1
names 7:15
nasdaq 115:16
119:19
nashville 2:16
national 117:7,12
neal 154:10
near 153:16
necessarily 135:15
136:5
need 6:13 45:21
71:7 76:22 92:25
107:16 122:22
141:2 151:17,18
153:14 176:12

**needed** 141:1
**needs** 77:10
**negative** 91:21,25
  92:1 95:24 114:9
  131:6,15 134:25
  135:21 164:1,4
**negotiating** 52:6
**neither** 137:16
**nera** 125:7,15,17
  125:18
**net** 43:1
**never** 141:6
**new** 1:18,22 2:4
  2:4,11,11 3:25,25
  5:4 62:5,7,11
  63:24 80:3,6,20
  114:23 115:1,15
  115:25 131:18
  144:16,19 148:1
  149:11 158:4,14
  158:18 159:4,11
  163:11,22,25
  164:14,17
**news** 28:6 34:21
  95:4 120:11
  121:19 123:17,22
  125:3,10 127:23
  128:21 129:20
  138:22 139:8
  140:5 144:16,20
  158:4,14 174:15
**nobel** 55:9
**non** 66:21,22
  120:11 121:19
  123:17 125:3
  138:22 139:8
**normal** 170:1
**notable** 115:13
**notary** 1:21 5:4
  177:18 179:5
  180:25

**note** 3:4 62:25
  82:23 87:24
  111:19 156:8
  157:5 162:3,8
  169:4
**noted** 52:1 75:8
  177:9
**notes** 146:12
  179:10
**notice** 145:17,20
  149:19 155:7
**notices** 145:14
  146:22
**noting** 51:23 80:24
**november** 163:13
  163:23
**number** 7:13 15:9
  25:2,4,6,18 26:4
  31:3,6 35:16
  39:18 60:20 61:6
  62:9,23 63:3 72:4
  75:9 76:12 82:10
  82:14,17,20 83:2
  84:9 92:21 93:19
  103:7 123:13
  124:6 126:21
  146:21 150:6,7
**numbers** 14:19
  43:6 47:8 94:7
  130:5 157:14,15
  157:22
**numerous** 103:12
**ny** 180:2
**nymex** 156:18
**nyse** 119:19
  145:14

**o**

**o** 178:4 179:1
**oath** 4:6 118:24
  119:7,14

**objection** 22:20
  24:24 25:10 58:11
  72:21 85:16 99:19
  100:22 101:17
  102:11,19 109:15
  113:4 116:17
  119:3,10 121:23
  125:23 151:5,11
  167:15,24 171:20
**obligations** 153:10
**observe** 93:4,6
**obtain** 23:12
  153:16
**occasionally** 32:21
**october** 35:19
  138:8
**offer** 64:3 138:20
  139:6
**offering** 43:19
  44:6,14,19 45:2
  57:14,16 70:8
  105:14 106:14
  108:25 109:3,5,10
  109:22 110:4
  112:4 113:10,20
  114:7 120:1,5
**offerings** 58:18
  59:16 69:25 70:13
  70:21 108:18
  112:16,17
**office** 4:17 53:20
**officers** 15:11
**offices** 1:16
**offset** 114:4
**offsetting** 131:13
**oh** 43:23
**oil** 156:6,14,18,19
**okay** 6:11,17
  14:23 24:19 68:22
  118:22 126:16
  129:14

**old** 13:6,8 180:2
**ongoing** 30:8 52:5
**open** 112:14,18
**operates** 125:18
**operating** 56:19
  56:24 57:5
**operation** 174:6
**operations** 52:2,5
  165:15 176:8,20
**opine** 8:12 52:24
  75:19 96:11
  110:21 144:14
**opined** 15:17
  86:19
**opinion** 9:16 12:5
  26:12 34:18 52:16
  52:17 53:4 74:18
  74:20 78:14,16,20
  79:4,23 80:17
  81:6 82:13 84:24
  85:2,4 88:16
  93:13,25 98:8
  99:8,16 100:3
  102:22 108:15
  114:8 115:7 120:2
  120:5,10 122:21
  124:8,14,16,18,20
  136:19,23 137:22
  138:20 139:7
  142:4,21 147:2
  158:2,12 160:11
  160:15 161:9,10
  161:13,15,18
  164:9 168:11,15
  168:17,21 169:12
  169:15 170:3,10
**opinions** 8:19,22
  8:22,24 9:2,6,10
  9:24 11:13 21:21
  22:12 26:24 52:18
  53:1,5,7,13 59:9

87:19 100:14
126:18 127:9,12
127:15,16 132:8
143:9 165:6 172:5
172:7 174:18,22
**opportunities**
92:14
**opportunity** 92:6
92:8,16
**opposed** 87:8
161:15
**option** 96:12
**options** 96:4,7,16
96:21,25 97:4,8,12
97:16,20
**orally** 6:1
**order** 46:3 64:22
64:24 65:6,9
82:15 89:19,23
94:2 107:20
112:19 122:24
175:8 178:19
**orderly** 61:7
**orders** 62:12
63:23 64:1,2
112:18
**otc** 15:14
**otcbb** 117:5,21
**ourself** 148:17
**outcome** 4:9
156:12 157:7
**outside** 8:8 15:24
20:9,12,15 56:19
57:5 101:24 125:1
**outstanding** 40:15
49:8 75:1 172:20
**outweighed**
164:20
**overarching** 8:11
**overwhelming**
111:5

**owners** 82:11
173:4
**ownership** 82:3,7

**p**

**p** 2:1,1
**p.m.** 170:18,22
177:6,9
**page** 7:25 8:16,18
12:18,18 13:14
16:6,24 21:8,15,16
21:20 22:8 24:15
24:18 31:10 35:19
38:10,24 40:11,21
41:5 42:5,5,21
43:4 44:13 47:15
48:7 49:13,25
50:22,22 51:11
54:5,23,23 55:10
58:15 63:10 66:15
68:10,14 69:8
73:23 75:4 77:24
81:23 84:2 86:15
86:16 90:15 96:2
97:23 98:22
103:24,25 110:10
110:12,16 111:18
112:11 115:3
116:25 118:15
121:15 126:5,19
126:20 127:2,18
128:13 129:9
144:2 146:10
147:20 150:4,5
152:4,21 154:10
154:17 155:23
156:23 157:24
178:10 180:6
**pages** 60:15 65:20
73:25 82:1 84:4
89:22 90:1 91:8
97:25 103:17

118:17 120:8
126:6 137:2 144:4
155:24 157:25
173:18,21
**paid** 30:10 33:24
34:3,7 39:16
45:22 48:24 51:4
105:15 113:12
132:18,19,20
**paper** 126:6,24
127:3,19
**papers** 13:1,4,5,7
13:9
**paragraph** 8:1,9
8:17 16:7,25
22:10,11,25 23:10
31:11,12 35:21
38:12 41:8,18
42:6 43:15,21
44:17 47:14,20
51:20 54:5,10
55:14 56:17 63:11
63:15 64:12,13
66:16 72:2 75:5
77:17 86:17 90:10
98:22 103:25
104:1,2,3,13,21
110:14,15 111:19
112:12 117:1,2
127:4 128:14
146:25 147:21
150:4,5 152:4,22
152:23 161:23
163:5 165:21
166:17
**paragraphs** 24:17
41:6 60:16 65:21
74:1 77:25 82:1
84:4 96:3 98:1
103:18 110:16
120:9 137:3 144:5

150:14 156:24
158:1
**paralegal** 2:6 4:16
**parameters** 129:1
129:3 130:1,3
**paramount** 52:3
**part** 53:14 88:17
110:9 132:13
139:25 169:13
**participants**
130:21
**particular** 26:1
39:18 80:23
171:10
**parties** 3:12
**parts** 139:6
**party** 4:7 179:12
**paul** 2:17 4:21
**pay** 175:24
**payment** 33:21
49:13 60:2 132:22
157:2,10
**payments** 30:7
33:16 51:24 56:10
172:21 173:2
**penalty** 10:4,11
**pending** 6:15
171:1
**people** 7:12,18
11:4 26:14 92:23
97:12 110:3,6,8
164:12
**percent** 36:2,2,20
36:23 93:20,23
94:1,12,15 122:1
122:21,24 123:2
123:10 124:4,6,15
124:21,25 127:25
137:19 138:10,11
139:11,18 154:5,9
160:23

percentage 82:14
percentages 93:22
perform 119:22
performance
  130:19,24 131:1
period 66:3,11,14
  67:21 71:3 72:22
  73:8,12 79:1,5,7
  80:19 82:9,12
  83:11 84:19,23
  90:8 91:22 96:9
  114:24 119:24
  120:4 123:7,18,22
  124:12 128:9
  138:2 170:10
periods 71:3 87:13
  87:16
perjury 10:4,12
perspective 116:6
  150:21 174:7
pertaining 35:15
  135:5 136:9
petrie 14:13
phones 3:8
phrase 121:12
phrased 101:22
pick 3:5
piece 38:3 46:13
pieces 122:5
pine 1:18 2:4 3:24
place 3:8 44:16
  67:17,20 92:17
  112:18
placed 63:23 64:2
  64:3 67:9
plaintiff 88:20,21
plaintiffs 1:6 2:3
  3:16 87:3 88:14
  88:24 89:7 90:5
  90:14,22,24 98:24
  99:24 100:9 101:2

101:7,23
plan 107:6 148:15
planning 46:16
plans 148:4
play 149:16
please 3:4,7 4:11
  4:25 6:14 81:3
  85:19 101:14
  116:14 138:4
  158:7
pllc 1:17 2:3
po 148:6
pocket 100:11,21
  101:25 103:11
point 11:22 21:25
  44:5,15 55:11,20
  74:12 76:4 83:6
  100:13 114:3
  119:17 126:12
  139:24 141:3
  145:14 147:5
  150:1,4 152:17
  165:9
pointed 88:25
  157:13
pointing 88:8
points 44:4 68:14
  68:20
poorly 101:22
popham 2:23 4:1
portion 53:11
  57:24 71:21 72:10
  77:1 81:4,20
  83:23 85:20 94:21
  101:15 116:15
  117:16 138:5
  158:8 176:16
portions 91:7
  104:18
position 34:9
  53:18 90:12

107:23 153:10
  175:7
positions 152:20
positive 32:15
  91:21,24 92:1
  95:23 131:6,14
  134:24 135:20
  174:8,14
posner 2:5 4:13,14
  5:7,11 46:24 53:9
  57:22 67:22 71:19
  72:8,24 76:24
  81:2 83:21 94:19
  117:23 129:19
  170:24 171:20
  175:3 176:14
  177:1 178:7
possible 159:9
possibly 159:8
potential 144:23
  148:13 166:22
potentially 39:21
precisely 73:2
  123:2 131:13
  164:25
predict 92:11,12
  93:2
predictable 84:14
  86:13,25
preferred 29:9,17
  29:22 30:2,7,13,20
  30:25 31:4,16,25
  32:3,16 33:12,15
  33:17,18,19,22
  34:4 36:3,6,23
  37:6,25 38:2,4,16
  39:5,14,19,22,23
  40:15 41:1,2,14,14
  41:19,20,24 42:9
  42:19 43:1,6
  44:14,20 45:13,18

46:11,19 47:16,22
  48:11,23 49:2,5,8
  49:14,16,22 50:3
  50:24 51:10,24
  52:12 53:2 54:6
  54:11,16,25 55:4
  55:13,18,25 56:6,8
  57:11,13,15 58:3
  58:10,17,25 59:11
  59:16 60:3 65:1
  76:18 77:20 82:15
  83:11 96:16 97:4
  97:21 132:11,12
  132:17,24 133:4,9
  133:10,16,17,24
  134:1,6,16 135:1,4
  135:12,16,22,25
  136:1,4,8 137:6
  141:18,23 142:1,3
  142:5,8,11,14,18
  143:13 157:19
  171:12,19 172:7
  172:10,12,13,17
  172:19 173:3,4,6,9
  173:11,12 175:25
preferreds 39:15
  45:7 134:23
  136:10 142:24
  143:12
preliminary 11:23
prepare 7:5
prepared 7:7
present 2:22 4:10
press 28:1,4,8
  54:18 131:21
presumably 57:14
  72:4
pretty 28:9
prevailing 75:10
previous 51:14
  75:17

**previously** 21:11
57:21 91:6 116:21
139:5 145:5 162:5
**price** 31:15,24
32:1,7,20 34:10,25
38:25 39:9 44:19
44:20 75:10 79:16
79:25 80:3,15
87:23 103:3
105:15,16 106:11
106:12,22,23
107:18,19 113:11
113:12,21,22
125:10 130:11,16
131:9 132:3 135:7
144:7 156:6,14
158:3,13 160:21
160:24 161:11,17
161:19,25 162:10
162:13 163:10,19
164:6,15,16
168:23 169:1,2,7,9
169:14,20 170:5
172:10 175:10
**priced** 79:18
**prices** 80:7 81:10
81:11 143:4,16
**primarily** 7:12
120:8 137:3
**primary** 7:18
69:24 70:21 87:18
**prior** 67:20 70:22
86:14 87:1,7
108:21 138:8
144:12,23 145:9
160:16
**prior's** 84:15
**prioritizing**
150:11 151:2
**private** 3:6 152:6

**pro** 48:21 112:21
**probability** 154:6
**probably** 13:2
18:21,23 118:13
125:14 129:7
**problem** 95:15
153:3
**procedures** 126:23
149:12
**proceeding** 148:18
174:11,12
**proceedings**
149:14,15
**proceeds** 44:22
45:2
**process** 105:21
106:17
**production** 35:23
36:17
**professional** 1:20
**profitability** 31:14
31:23 32:20 135:6
**program** 146:13
**projections** 26:24
31:13,14,22,23
32:19,19 46:4
**promise** 48:22
**promised** 48:14
49:2 51:1
**prone** 115:10
**proper** 102:25
**properly** 98:17
**proportionately**
79:20
**proposed** 66:3
67:21 71:2 84:19
96:9 98:16 99:2
100:2 104:9 105:8
114:24 119:24
120:3

**proposing** 100:10
100:19
**protected** 12:3
**provide** 26:22
28:14,17 46:4
48:7 50:17,18,22
59:8 61:20 62:13
95:5 98:7,11,15
106:13 142:4,5
143:7
**provided** 8:8 9:12
12:17 52:18 74:13
74:15 82:23 90:19
119:14 130:15
131:19 137:8
168:12
**providers** 28:5
**provides** 50:2
165:11
**providing** 11:10
12:4 26:17 27:10
62:22 82:19
**public** 1:22 5:4
7:22 19:8 21:18
27:21 43:18 44:6
54:20,21 69:1,17
70:4,10,13 71:25
112:16 177:18
179:5 180:25
**publication** 28:11
**publications** 12:17
12:20 13:1,4
**publicly** 13:12
28:21 71:15
**published** 12:20
13:10,13 92:23
**pull** 83:13
**purchase** 76:6
106:11,11,18,20
106:22,24 107:1
109:2,4,22 110:1,4

112:3,14 113:9,19
**purchased** 105:14
107:17,18 108:17
108:24 109:9
111:22,23 113:11
113:21
**purchaser** 112:25
**purchasers** 75:13
76:5 77:15,19,20
77:21 103:1
110:22 112:7,13
**purchases** 64:15
112:2
**purport** 50:18
**purportedly** 122:9
142:13
**purpose** 26:12
61:3 74:23 120:14
171:21
**purposes** 35:2
45:16 75:21
171:18,19
**pursuant** 66:10,13
71:2
**pursue** 98:24
99:24
**push** 151:19 152:1
153:12
**put** 52:23 67:16,20
168:5

| q |
| --- |

**qualifications**
12:12
**quarter** 23:4
84:18,22
**quell** 38:10
**question** 5:25 6:11
6:16 8:11 10:9
12:2 25:19 29:25
48:16 53:4,10
56:4 57:23 70:18

71:18 72:9 75:18
76:25 78:7 81:3
83:22 94:24 95:14
96:19 97:2 101:20
101:22 130:23
132:5 138:25
155:19 158:7,17
176:15
**questions** 5:23 6:4
6:5,10 8:3,7,14
48:20 155:22
171:1,6,10 173:23
174:23 175:1
177:2
**quickly** 64:16,18
64:22,25 65:7,10
80:14 118:18
154:15
**quite** 18:18 133:22
136:15 138:8
**quote** 75:5 77:17
**quotes** 51:25
62:13

**r**

**r** 1:3 2:1 3:18 5:2,2
5:2,2 179:1
**raise** 37:5,24 42:9
42:10
**raised** 46:9,11
47:25 173:11
**raising** 44:21
**ramp** 35:23
**random** 94:7
125:2 159:1
**randomly** 94:4
**rank** 136:16
**rata** 112:21
**rate** 17:2,5,8,18,19
**rationale** 146:11
**ray** 1:4

**react** 133:11
137:25 138:16
**reacted** 137:17
140:3 141:6 169:3
**reacting** 140:11,11
**reaction** 130:11,17
131:4,9 132:3
139:2 144:7
**read** 5:12 11:16,18
19:14,16 23:22
35:14,16 45:22
46:10 53:9,12
57:25 68:16,18
71:7,19,22 72:11
76:24 77:2 81:2,5
81:19,21 83:24
85:21 94:20,22
101:13,16 102:4
116:16 117:17
138:3,6 148:16
151:21,24 152:25
158:9,11 176:14
176:17
**reading** 21:12
69:4 102:21
151:13
**really** 45:7 48:22
95:13 166:11
**realtime** 1:21
**reason** 10:3,19
83:15,18 96:20
97:3 98:7,14
100:7 127:22
130:7 145:20
162:13 166:17
172:15 180:6
**reasons** 9:6,25
95:19 97:7,15
**reassures** 165:12
**rebates** 45:3

**rebuttal** 87:9
**rebutted** 89:12
**rebutting** 89:4
**recall** 11:24 15:12
25:15 87:15 96:14
103:5 118:11
155:5 171:5,12
173:22
**receipt** 57:18
**receipts** 153:17
**receive** 110:24
**received** 54:18
58:15 146:23
**recess** 47:3 60:11
114:14 170:20
**recite** 61:1
**recognize** 6:24
20:22 67:13 86:7
115:24 118:7
**recollection** 21:10
87:5 88:22 89:10
145:2,25
**recommendation**
131:25 175:11
**recommendations**
26:18
**record** 3:2,13 4:12
5:16 46:24 47:1,5
60:10,13 114:12
114:16 170:18,22
177:6
**recording** 3:11
**reduce** 37:19
**reduced** 37:14
72:5
**refer** 14:22 173:19
**references** 173:6,8
**referencing** 147:1
**referred** 6:21
20:17 35:4 56:11
67:6,24 85:23

89:15 117:25
121:9 125:4 126:9
146:2 147:8,13
162:21
**refinancing**
150:12,17 151:2
151:15
**reflect** 71:15
**reflected** 153:22
**refresh** 21:10
**regard** 12:5 22:18
38:20 78:21 84:6
90:12 100:3 106:6
107:12,15 110:13
114:8 116:10
141:10 143:23
176:5
**regarding** 99:16
**registered** 1:20
21:18
**registrant** 66:22
69:12
**registrants** 69:25
**regularly** 92:4,19
93:6 121:19
126:10
**reiterating** 173:13
**relate** 34:20
**related** 4:6 13:24
14:2,3,16,20 16:17
27:18 29:10,14,15
29:20,23 30:3,21
42:3 65:16 167:11
179:12
**relates** 34:19
**relation** 173:7
**relationship** 29:19
167:19 168:1,3,7
**relative** 123:16
131:12

**release** 122:22
128:18,19 130:8
130:12,14,17
131:5,9,19 132:1,3
**releases** 120:11
121:19 122:20
130:18 137:19
138:2,22 139:7
141:20,22
**relevance** 32:5
101:6
**relevant** 12:11,14
12:15 31:15,24
32:3,8,9 34:12
35:1 36:6,9,14
37:17 38:15 39:5
39:13,19,21 41:23
42:18 45:9,12,18
45:20 46:17,23
47:21 48:25 52:11
52:19 53:5 54:11
54:15 55:17 57:10
58:3,9,24 76:20
77:11 100:8
101:11 105:11
134:20,21 135:3
135:24 136:13,14
136:16 141:22
142:1,11,23 167:1
167:10 171:11
175:9
**rely** 62:13
**remainder** 8:23
**remember** 87:14
118:10
**renders** 104:7
**reorganization**
174:11
**repeat** 57:22 71:18
72:8 78:6 83:22
85:18 109:17

113:17 116:13
**repeated** 110:12
**rephrase** 101:21
**report** 6:20 7:2,6
7:14,17,22 8:1,5
8:23,25 9:9,14,19
9:23 10:6,21,24,25
11:2,13 12:9 16:6
16:19,25 21:7
23:11 24:2,4,16,20
26:7 28:7 31:11
34:20 35:20 37:2
38:8 40:8 41:5
42:22 43:11 44:11
44:24 47:11 49:11
51:14,18 53:24
54:4 55:8,11 56:1
56:2,15,21 60:16
60:19 63:11 65:21
66:16 67:12 73:24
74:6 75:5,19
77:17,25 78:3,8
81:24 82:5 84:3,8
86:2,8,10 87:9,24
89:25 91:10,17
96:3,6 97:24
100:17 102:24
103:6,18,24 104:1
104:13,18,21
110:11,12 111:19
112:11 115:4
116:23 117:1
120:8 125:7 127:3
137:13 139:6,25
140:16,21 144:3
144:10 145:8
146:5 147:21
155:24 156:24
157:22,23,25
160:6 163:2,7
165:3,8,22 166:1

166:19 169:4
173:19 174:17
175:8 178:11,15
178:18,22,23,25
**reported** 57:19
166:20
**reporter** 1:20,21
4:3,25 6:1 53:12
57:25 71:22 72:11
77:2 81:5,21
83:24 85:21 94:22
101:16 116:16
117:17 138:6
158:9 176:17
179:5
**reporting** 23:2,13
52:14 54:12 130:6
**reports** 8:12 10:15
13:20 26:6,11
27:8,20,22 28:1,4
28:8 31:13,22
34:10,24 35:1,10
35:15 52:21 54:18
59:3 122:15
131:20,21 141:21
141:25 142:2,10
142:21,25 144:22
145:1 164:10
166:7 171:7,17,18
171:22 172:3,9,16
172:17,18 175:14
178:13
**repositioning**
148:4
**represent** 67:19
**represented** 16:13
**requested** 53:11
57:24 71:21 72:10
77:1 81:4,20
83:23 85:20 94:21
101:15 107:4

116:15 117:16
138:5 158:8
176:16
**required** 37:24
**requirement** 9:22
10:17 37:5 68:25
69:1,16 70:5,9,15
99:23
**requirements**
67:16 69:10,13,19
69:21 70:7
**requires** 66:19
**research** 115:8
116:5,9 119:21
145:8 175:7
**researched** 132:6
**respond** 5:25 6:15
158:16
**responded** 175:16
**responding** 81:12
**responds** 154:14
**response** 75:17
81:9 125:10
141:19 159:3,11
166:19
**responsible**
162:10
**rest** 32:4
**restate** 158:6
**restructure**
150:17 151:17
**restructuring**
150:12 151:3
**results** 87:17 89:1
89:1 128:15
137:10,11 141:13
165:15,23 166:2
167:13,22
**return** 84:14,15
86:13,14,25 87:1
92:11,11,12,13

93:1,2 131:17
134:5 145:16,23
158:20,22
**returns** 90:8 95:18
123:4 127:24
128:23 129:23
137:7 140:4,5
157:3,11 159:11
169:10,22 170:1
**revenue** 31:13,22
32:18 46:3 135:6
**reversals** 95:17
**reverses** 92:4,18
**review** 8:11 11:11
21:9 47:19 67:3
68:11 99:8 118:18
144:21
**reviewed** 11:3
68:6 144:25
**revisions** 174:1
**revisit** 173:15
**revolver** 45:4
**rich** 4:16
**richard** 2:6
**right** 5:20 12:10
23:8 30:8 39:11
51:8 61:11 64:13
69:25 82:21 87:4
90:16 105:8
123:14 124:6,22
127:4,19 128:1
139:4 146:24
147:5 148:17
150:8 151:4
153:20 154:17
158:17 174:19
**rigs** 163:12,22
**risk** 52:2 98:18,18
98:25 99:1,25
100:1 101:2,8,10
102:3,5,7,9,10,14

102:15,16 103:13
**river** 19:19 20:8
23:19
**river's** 20:15 22:6
22:15,19
**road** 180:2
**robinson** 35:20
38:8 163:1
**robustness** 84:18
84:21 87:12,14,18
**room** 54:7
**roth** 1:4
**rule** 67:11,16 68:4
68:24 69:7 149:8
178:16
**rules** 9:22
**running** 12:18
**runover** 129:10

**s**

**s** 2:1 65:24 66:4,8
66:10,13,19 67:1
67:11 68:4,13
69:2,10 71:2,12,23
73:18,19 178:9,16
178:17 180:6
**s&p** 128:17,25
129:25
**sacrosanct** 49:18
51:25
**safer** 133:5
**sale** 110:2
**sales** 52:7
**satisfied** 34:9
**save** 91:13
**saw** 51:12 134:4
**saying** 124:7,24
129:11 148:14,20
151:1 154:1,4
155:1 158:17
**says** 21:3,6,23
22:25 25:12 37:19

49:15 50:8,11
79:18 83:4 90:21
92:10,24 102:3
104:21 119:16
122:5 126:20
127:20 155:2
156:10 163:9
165:13
**scott** 1:8 3:18
**search** 53:22
**season** 82:3
**sec** 19:12 21:1
28:14,17,20 34:20
54:19 59:4,12,24
67:1,11 145:13
160:14
**second** 22:11 37:4
37:21 42:6 43:25
44:4 50:10 55:10
90:9 104:3 127:4
128:14 140:24
146:9 147:11
150:14 152:4
159:1 162:15
165:9 176:4
**secondary** 112:2,7
113:7
**section** 68:17
80:22 84:7 90:4
98:8,12 99:17
103:16 104:24,25
105:2 106:7,7
107:12,13,21
108:16 109:13,23
113:1,15,25 127:6
**sections** 110:19
**secure** 151:15
**secured** 152:20
**securing** 150:11
150:16 151:2

**securities** 14:10
16:1,22 26:17,19
26:20,25 27:4,6,12
27:19 28:3,16,19
29:2 30:2,5 33:11
33:13,15,17 34:14
44:25 47:24 48:1
59:12 61:24 63:24
65:1,5 66:10,13
72:15 76:23 79:10
79:19 85:14 96:17
97:21 103:2
105:21 106:15
107:8,24 111:22
111:23 114:21
115:24 121:21
125:10,21 133:4
141:6 143:4,16,21
143:24 148:8
172:1,20 173:4,6,9
173:11,12 174:3
**security** 31:17,25
34:11 39:14 61:13
61:18 63:8 75:1
76:9,18,20,21
79:22 82:15 97:9
97:17 100:12
112:8 116:11
117:11,21 132:13
134:17 140:3,11
**security's** 112:21
**see** 13:16 16:10
22:13 23:5,16
31:18 35:23 36:3
36:18 38:11 40:12
40:22 42:8,23
43:12,19 47:12
48:8,10 49:14,18
52:8 54:25 55:14
56:20 58:20 63:18
63:18 64:4,17

66:23 67:1 69:13
74:4 75:14 81:14
91:11 95:20 99:3
104:10 111:24
112:22 115:19
117:8,18 122:11
125:1 126:11,25
127:1,20 128:1,3
129:1,2 130:10,16
131:8,20 132:2
134:6 137:24
145:18 146:7,11
146:14 148:9
150:9 152:10,16
153:4,11,19
156:11 157:6
158:19 159:10
162:19 163:13
165:19 166:23
169:2
**seeing** 64:20
**seeks** 100:11
**seen** 10:13,14
20:24 118:9,13
125:12
**sell** 26:18 131:25
142:7 172:13
175:11
**sellers** 1:17 2:3
4:15
**senior** 30:16
132:15
**sense** 76:9 169:21
**sensitive** 3:5
134:17
**sent** 63:23
**sentence** 23:22
37:4,18,22 43:16
43:25 44:1 49:19
56:18,20 57:4,7,10
58:2 64:14 86:17

117:11 128:3
129:10 146:11
152:25
**sentences** 68:21
**separate** 151:22
151:24 152:1
**separately** 74:15
76:23 84:22
**september** 40:8
47:11 56:16
**sequence** 26:9
**sequencing** 30:6
**series** 24:11,11
29:9,9 31:6,9
41:14,15,19,20
43:19 44:14,20
58:17 61:25,25
62:23,24 63:4,4,12
63:17 64:9,16
65:18,18 75:20,20
76:2,2 78:22,22,24
78:24 79:9,9
80:18,18 82:21,21
83:3,3,17,17,19,20
91:23,23 94:6
96:13,13,22,22
97:4,5 104:2,4
110:13,22,23
112:9,9 113:2,3,9
113:10,19,20
114:22,22 137:6,6
137:16,17,23,23
137:25,25 157:3,3
157:8,9 172:10,11
172:13
**served** 21:11,24
**service** 52:5
**set** 14:5 52:15,15
94:7 123:23
128:25 129:3,7,25
130:2 140:24

**settle** 112:19
**seventh** 152:22
**share** 31:15,24
32:1,6,20 37:14,20
44:21 75:10 79:16
110:24 111:6,14
112:21 135:7
**shareholder** 19:19
19:23 20:1,6
39:14 136:8
**shareholders**
32:16 33:22 34:4
36:7 37:11,13,17
37:20 38:2,4,16
39:5,19,22,23
41:24 42:19 45:13
45:18 46:12,19
47:22 48:23 49:2
49:22 52:12 54:11
54:16 55:18,25
56:6,8 57:11,15
58:3,10,25 60:3
135:16 171:12
175:25
**shares** 36:3,24
44:19 75:9 76:13
76:13 105:16
107:17,19 110:23
111:8 112:14,17
141:23 142:1,3,5,8
142:11,14
**sheet** 41:6 49:4
51:5,9 55:4 58:15
149:25 180:1
**shore** 149:24
**short** 47:3 60:11
114:14 170:20
**shorthand** 179:4
**shortly** 131:22
**show** 91:5 116:19

**shown** 161:14
171:7
**side** 51:16 126:4
127:13,15,17
**sides** 127:10
**sidley** 19:23
**sign** 7:2 32:15 93:5
93:7,9 118:12
166:5,13 168:16
**signal** 32:15
**signature** 12:10
179:16
**signed** 10:7,24
167:12,21 168:14
**significance** 94:15
133:22 138:14
169:23 173:25
**significant** 90:7
93:12,16,21 95:3
95:10,16 96:1
122:23 127:24
128:23 129:8,22
130:11,16 131:8
131:11 132:2
133:19,20 134:5
137:18 138:1
139:2 142:15,19
158:3,13,20,21
159:11 161:2,4,6
170:5
**significantly** 93:23
134:10
**signing** 167:2
**similar** 14:7
110:11 134:20
172:6
**similarly** 1:5
**simultaneously**
151:9
**single** 79:22 124:9

site 28:22
sitting 15:12 17:19
  18:22 25:3 53:19
  53:20 61:1 73:1
  73:15 78:15 81:22
  88:21 92:20 97:6
  97:18 103:5 145:1
  165:1
situated 1:5
six 145:18
sizable 35:22
size 70:8
slowly 80:21
sold 66:10,12
  105:16 106:12,12
  107:19,19 111:21
  111:23 113:22
solutions 180:1
solved 153:3
someone's 164:15
sorry 10:8 14:25
  21:13 22:10,23
  43:20,25 50:16
  56:21 70:17 71:17
  86:15 91:25 116:4
  116:13 126:12
  127:6 138:24
  141:24 150:24
  155:22 158:6,10
  167:5
sound 138:23
  139:8
sounds 6:18
speak 130:20
speaking 28:20
  117:15 132:10
specific 8:14 25:2
  25:18 30:1 41:18
  46:19 77:4 108:1
  113:9,19 120:17

specifically 8:1
  33:12,19
specifications 11:9
specified 78:14
  80:24
specifies 25:3
spectrum 164:10
spent 17:25 18:4,5
  18:7,12,15
spoke 65:15
  139:13
spread 78:3,9,23
  80:1
spreads 79:8,15,19
  80:25 81:9,18
sr 13:4
stable 29:18
stage 114:10
stages 11:3
stale 55:19 56:3
  58:5
stand 76:3
standard 17:8,18
  24:7,12,23 25:9,22
  60:22 74:9,11
  78:5,10,25 100:21
  108:7 138:12
start 44:18 67:21
  72:25
started 117:15
  163:12
starting 8:16
  56:19 57:4 114:2
  163:22
starts 35:22 55:12
stat 124:25
state 1:22 4:11 5:4
  66:18 68:23
  112:13 115:6
  144:10 153:16
  166:18

stated 132:20
  157:21
statement 9:1,24
  42:23 48:11 50:2
  50:23 51:3 55:1
  118:25 119:8,14
  128:6 129:16,18
  130:3 134:3
  136:23 154:17
  174:18
statements 160:7
  160:16 167:3
states 1:1 3:19
  10:5 68:11 145:15
  165:14
statically 131:11
stating 73:6
statistical 127:21
  157:16 169:23
statistically 93:11
  93:15,21,22 95:2
  95:10,16,20 96:1
  122:23 127:23
  128:23 129:8,22
  130:11,16 131:8
  132:2 133:18,20
  133:22 134:5,9
  137:18 138:1,14
  139:2 142:15,18
  158:3,13,20,21
  159:10 161:2,4,6
  170:5
statistics 94:12
status 148:3
statutorily 104:23
statutory 104:7
  109:12,23 113:15
  113:25 114:4
stay 165:7
stenographic
  179:10

step 140:20
sterritt 75:7
stock 24:6,22 25:7
  25:22 29:10,11
  30:3,13,15,18,20
  30:22,24 32:11,13
  33:3,9 39:8,10
  43:1,7 44:20
  47:16 49:5,8
  51:10 55:5 57:13
  60:21 61:24 62:6
  62:8,11 63:25
  74:8,19 75:13
  76:5,15 77:15,18
  77:20 78:4,10,17
  79:24 82:8,11
  86:20 87:22 96:8
  111:1 114:21,23
  115:1,16,25
  116:12 117:3,6
  119:1,23 120:2
  132:11,12,24
  133:6,9,9,10,10,15
  133:16,18,19,24
  134:18 135:25
  136:2 137:6
  141:10,19 143:17
  144:16 148:1,2
  149:11 153:22,23
  157:4,19 160:21
  160:24 161:11
  163:18 164:6,15
  164:16 168:22
  169:7,8,14,19
  170:6 171:19
  172:5,7,10,12,13
  172:17,24
stockholder's
  174:7
stockholders 30:9
  32:3 34:1 43:5

132:17,19 134:22
135:3,4,21,22
136:4 173:1
174:14,15
**stocks** 115:15
119:19
**stopped** 111:14
**strategies** 92:22
**street** 1:18 2:4,16
3:25
**strike** 101:5
133:16 165:25
**strong** 38:10 115:7
122:10
**structure** 30:14,17
62:2 132:14
**studied** 176:24
**studies** 143:22
**study** 90:6 119:23
120:13,15 122:19
122:25 130:4
137:5,10 156:1
**studying** 123:18
**subheading** 68:12
69:11,12
**submit** 7:21 16:19
105:25 106:10
**submitted** 7:24
8:12 13:20 86:3
106:4,16 109:7
122:15
**subscribed** 177:14
180:22
**subscription** 28:12
**substantial** 82:6
152:7
**successes** 126:15
**successful** 46:6
148:21
**successfully** 44:21
89:13

**successors** 127:8
**sufficient** 25:21
72:1 153:9
**sufficiently** 97:11
**suggest** 80:2
100:18 102:23
**suggests** 141:5
**suite** 2:16
**summarized** 137:9
**summarizing**
57:20
**summary** 8:18,21
8:24 43:22 48:7
54:23 56:18,25
57:2
**suntrust** 35:20
38:8 154:11 163:1
**supervision** 11:8
**support** 9:16
11:12 34:23 73:17
82:16 91:4
**supporting** 89:8
89:14 175:7
**supportive** 119:8
**supports** 53:17
90:25
**sure** 5:15 6:7 11:6
23:7 29:24 37:18
39:17 70:19 71:8
88:23 96:18
109:19 116:7
129:3,4 150:2
151:19 152:11
167:17
**surprise** 154:22
**surprised** 154:23
**surprises** 130:15
165:11
**suspend** 149:13,17
149:18

**swear** 4:25
**sweet** 156:18,19
**switches** 91:20,24
92:1
**sworn** 5:3 177:14
179:7 180:22
**syncora** 13:24
**system** 62:12
**systematic** 95:17
95:17,25

**t**

**t** 5:2,2 124:25
178:4,9 179:1,1
**tabak** 121:16
122:9,14 125:8
126:8
**table** 52:6 130:6
137:12 140:16
**tables** 91:16
**take** 6:13,16 76:19
92:17 123:24
143:9 152:18
**taken** 3:16 47:3
60:11 114:14
148:2 168:15
170:20
**takes** 159:16
**talk** 16:7 36:19
39:1 40:25 41:13
41:18 42:13 44:13
58:16,18 63:16
64:14 69:15 77:19
150:15 152:5
161:23 162:16
165:10
**talking** 38:19
40:11 41:9 42:9
44:18 45:15,23
63:12 64:8 65:23
74:2 82:2 84:5
96:4,24,24 105:13

112:1 122:2
146:16 150:10,22
150:25 151:12
153:15 155:25
163:21
**talks** 13:15 21:17
22:12 23:10 35:25
37:4,9,12 43:16
45:1 51:3,10,23
77:18 126:17
127:9 147:23
153:1 154:18
163:5 165:18
**tap** 37:7,25
**target** 34:11 38:25
39:9 163:10
172:11 175:10
**targets** 31:15,24
32:1,7,21 34:25
**tax** 47:16 48:3
57:18,18 58:19
153:17
**team** 7:8,10,16
17:12,25 18:5,12
18:16
**team's** 19:6
**tell** 7:15 69:4 73:1
122:18
**telling** 46:15
148:11
**tells** 94:12
**ten** 12:22,22 25:13
25:14
**tend** 79:15
**tennessee** 1:1 2:16
3:21
**term** 9:19 41:10
41:11 45:5 147:10
153:16
**terms** 33:18 45:19
49:1 70:7 138:11

169:8,22 173:9
**terrible** 39:18
**terribly** 45:8
**test** 61:5 84:9,13
  84:25 85:7,13
  86:24 87:4,7
  88:10,15,18 89:7
  122:11 126:10,14
  126:23 127:7,9
  156:12 157:7
**tested** 86:24
**testified** 5:5
  118:24 119:6
  141:20 175:5
**testimony** 100:18
  102:25 171:13
  173:17 177:4
**testing** 87:22
  119:18 125:9
**tests** 85:9 86:11,12
  87:12,18 88:1,6
  89:2,4 126:22
  157:16
**thank** 5:17 170:25
**theoretical** 127:21
**theory** 98:25
  99:25 101:9,24
  102:5,8,14 103:13
**thereto** 10:25
**thing** 77:12 162:3
  162:7,15 164:1,4
**things** 41:10
  149:23 151:8
  153:23 163:20
  175:16,17
**think** 17:16 32:22
  36:5 37:16,23
  38:14 39:12,20
  41:22 42:17 47:20
  49:21 51:6 52:10
  53:7 54:9,14

55:16 57:9 58:8
  58:23 62:19 65:15
  70:6 74:22 77:3
  77:10 78:12 83:5
  87:6 88:20 90:18
  95:22 96:23 97:15
  99:9 119:20
  120:17 121:1,8,10
  123:11 130:23
  131:10 132:5
  136:6,22 137:2
  138:9 140:20
  145:24 146:16,19
  148:14,21,24
  151:12 152:13
  155:3 159:24
  160:19 164:13
  166:25 167:18
  169:11 172:9
**thinking** 164:12
**third** 55:11 57:6
  58:7 64:14 145:13
  166:17
**thought** 26:20
  51:12 89:11 102:2
  151:14 153:9
**thousands** 94:11
**threat** 81:16 176:6
**threaten** 176:19
**three** 7:11
**threshold** 74:11
  78:13 82:17 93:24
  121:25 122:1
  123:9,9,12 124:1,4
  124:8,10,14,19,23
  128:11 131:12
  133:21 138:10
  139:11,13,19
  140:7,9,17,18,25
  141:4,8,14 147:10

**thresholds** 65:19
  138:7,13
**time** 19:4,5,6
  29:19 56:2 58:7
  62:18 71:3,5
  72:22 79:22 87:13
  94:13 95:11,12
  100:13 123:6,18
  124:11 128:9
  134:4 149:18
  151:3 153:3,8
  160:5,8,9 176:8,23
  177:9
**timely** 72:14
**times** 51:25 66:2,7
  76:13 94:11 154:8
**timing** 95:4
  154:12 168:10
**titled** 125:8
**today** 5:18 8:19
  9:2 12:5 86:4
  154:22,24 171:5
  173:17,23 174:23
  175:5,15
**today's** 92:11,12
  93:2 177:4
**told** 128:8
**tolerance** 99:1
  100:1 101:10
**toll** 1:17 2:3 4:15
**tomorrow's** 92:12
**topic** 173:16 176:4
**total** 32:23 40:14
  41:2
**totality** 131:2
**trace** 110:23
  112:16 113:8,18
**traceable** 105:14
**track** 31:5,8
  156:22

**tracked** 156:20
**trade** 61:18,25
  63:13 64:1 80:6
  111:20 115:25
  117:12
**traded** 15:14
  61:14 62:5,8
  87:23 96:24 97:8
  97:20 114:22
  115:1
**trades** 71:11
  116:11 117:6,21
  119:1
**trading** 24:5,10
  61:10 65:4 92:22
  96:7,12,16,21
  97:16 105:25
  109:21 112:15
  113:7 129:13
  148:8 149:13,17
**transaction** 69:18
  69:21
**transactions** 70:3
**transcript** 118:4,8
  118:12,16 147:17
  178:21,24
**transcription**
  179:10
**transcripts** 28:25
  29:5
**treated** 100:6
**trees** 91:14
**tried** 83:12
**triggering** 132:23
**trouble** 56:22
**true** 10:6,25
  107:12 112:6,24
  113:6 179:9
**try** 94:25 103:21
**trying** 25:24 36:19
  50:9,13 64:18

75:25 76:17,21
91:13 94:24
136:16 150:23
151:15 155:20
168:5 172:23
**turn** 3:7 7:25 12:8
13:14 16:5,24
21:8 22:8 23:24
23:25 24:15 31:10
35:18 37:1 38:5
38:23 40:6,7,20
41:4 42:4,21 43:4
43:9,10 47:9 48:6
49:9 50:21 51:15
51:17 54:1,2,22
55:7,10 63:10
65:20 66:15 69:6
73:23 77:24 81:23
84:2 89:21 91:15
96:2 97:23,24
98:21 103:15
110:10 115:3
118:15 120:7
126:5 127:2
128:13 144:2
146:9 147:20
154:10 155:23
156:23 157:24
159:22 173:18
**turning** 161:22
**turnover** 65:17
**turns** 123:20
**twice** 103:23
123:21 124:2
**two** 7:11 14:16,18
17:11 41:5 123:19
127:14,16 129:5
136:10 151:8
158:2,10,13
163:20

**type** 34:25 59:22
76:8 119:1 159:5
159:14 172:4
**types** 70:3
**typical** 107:24
**typically** 27:22
59:3 76:11,14
125:21,25 131:23
132:15,20,24
143:1 152:16
164:3 174:13

---
**u**

**u** 5:2
**u.s.** 111:6 115:9
165:17
**ultimately** 90:13
145:21 148:7
168:14
**un** 94:6
**uncertainty** 72:18
81:10
**underlying** 97:10
156:20
**understand** 5:22
6:6,11 10:8,16
24:3 25:17 29:24
48:18 70:17 71:9
90:23 94:23 95:14
96:18 98:25
101:19 155:21
167:17
**understanding**
73:13 99:6,14
101:4,9 102:18
110:5 138:25
160:18 166:14
**understood** 11:6
**underwriter** 107:2
**unexpected**
144:15,19

**union** 2:16
**united** 1:1 3:19
10:5
**unrelated** 114:5
**unsuccessful**
148:7
**use** 9:15 26:23
66:19 69:10 92:10
100:10 109:12,23
120:24 139:21
156:14 157:20
169:9
**uses** 20:8 138:21

---
**v**

**v** 13:23 75:7
**valid** 118:25
**valuation** 27:18
39:2,8,13 42:3
53:1 142:4 162:4
**value** 26:20 29:8
29:10 30:20,21
31:1 46:21 52:21
66:20 72:4 76:13
143:12 148:5
151:20 152:2,12
152:19 153:12,21
154:7,9 159:19
165:12 171:25
172:23 174:13
**valuing** 26:16 33:3
33:8,18
**variance** 50:1
**various** 11:3 16:8
16:16 80:14
115:10 125:25
157:14,23
**vast** 115:13
**venture** 52:7
**venues** 62:9 64:1
115:2

**veritext** 4:2,4
180:1
**versa** 131:16
134:7 135:1
**versus** 3:18 156:15
**vice** 131:15 134:7
135:1
**video** 3:11,15
**videographer** 2:23
3:1 4:3,24 5:13
46:25 47:4 60:9
60:12 114:11,15
170:17,21 177:3
**videotaped** 1:15
**violations** 88:2,3
**virtually** 112:25
115:18
**volatile** 123:5,22
124:3 133:25
**volatility** 123:15
**volume** 24:5,10
65:4,11,13,16
**vote** 69:1
**voting** 66:21,21
**vs** 180:4

---
**w**

**wait** 5:24
**waiver** 162:19
173:20 174:2,4
176:5,9,12,22
**waller** 2:15 4:22
20:5
**want** 5:15 23:7
68:16,19,19 83:21
109:17 118:18
129:2
**wasted** 119:21
**way** 29:13 35:22
36:8,10 45:22
46:20 76:11 95:1
100:20 111:21

120:6 133:11,13
133:19,20 137:18
138:1 140:10
142:15,19 155:7
174:22
**ways** 84:9
**we've** 20:20
154:21 163:9
**weak** 88:3
**weakness** 23:1,15
**web** 28:22
**week** 147:12 155:7
**weekly** 24:5,10
**weeks** 73:4
**weigh** 90:17
**weighs** 90:14,22
**wells** 145:13
**went** 29:21 30:24
31:3
**whispering** 3:5
**wide** 98:4,9,13
99:18 100:5
107:25 108:19
132:7
**widely** 27:15 28:9
29:5
**wider** 79:19
**window** 74:25
95:11,12 129:6
145:18 169:2,3
**wiped** 150:21
**withdrawal** 42:11
**withdrawn** 160:11
**witness** 5:1 179:6
**words** 64:19 77:14
**work** 17:2 88:9
92:21 124:22
141:12,16 157:12
161:7
**worked** 7:12,17
11:2

**working** 13:1,4,6
13:7,8 15:25
17:12 151:9
**works** 5:23 105:21
**worth** 32:12,14
153:24
**writing** 27:7
**wrong** 111:17
156:6
**wrongdoing**
166:21 167:7,9,20
**wrote** 103:6
**wti** 156:18

| x |
| --- |

**x** 1:3,10 29:17,18
178:2,4,9

| y |
| --- |

**yeah** 6:18 14:18
21:23 38:3 45:6
50:12 65:3 87:15
126:14 155:14
164:20 166:6
**year** 22:16,17 23:3
45:5,14 50:16
87:13 165:16
**years** 12:22,22
62:4 92:23 119:20
119:20
**york** 1:18,19,22
2:4,4,11,11 3:25
3:25 5:4 62:6,8,11
63:25 114:23
115:1,16,25
144:16 148:1
149:11
**yup** 86:18

| z |
| --- |

**zeisman's** 64:15
**zero** 30:24 51:5

# Federal Rules of Civil Procedure
## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.