# Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 86118 / June 17, 2019**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4051 / June 17, 2019**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-19203**

| | |
|---|---|
| In the Matter of<br><br>    KPMG LLP,<br><br>Respondent. | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

     The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Respondent KPMG LLP ("KPMG") pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 102(e)(1)(ii) and 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

---

[1]     Section 4C provides, in relevant part, that:

>     The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]     Rule 102(e)(1)(ii) provides, in pertinent part, that:

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Respondent admits the facts set forth in Section III below, acknowledges that its conduct violated PCAOB Rule 3500T and provides a basis for the Commission to impose remedies pursuant to Exchange Act Sections 4C(a)(2) and (a)(3) and Rules 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice; admits the Commission's jurisdiction over it and the subject matter of these proceedings; and consents to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[3] that:

## <u>SUMMARY</u>

1.      This matter involves two separate courses of misconduct that resulted in violations of the fundamental requirement that auditors act with integrity.

2.      First, from 2015 to 2017, now-former senior members of KPMG's Audit Quality and Professional Practice group ("AQPP" or "National Office") – which is responsible for the firm's system of quality control – improperly obtained and used confidential information belonging to the Public Company Accounting Oversight Board ("PCAOB" or "Board") in an effort to improve the results of the PCAOB's annual inspections of KPMG audits. The information obtained included lists of the specific audit engagements the PCAOB planned to inspect, the criteria the PCAOB used to select engagements for inspection, and the focus areas of the inspections. The personnel sought the information because the firm had experienced a high rate of audit deficiency findings in prior PCAOB inspections and had made improving its inspection results a priority.

---

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found to be lacking in character or integrity or to have engaged in unethical or improper professional conduct.

Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

[3]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

3. After obtaining the confidential list of the PCAOB's planned inspections in 2016, the now-former KPMG personnel oversaw a program to review and revise certain audit workpapers after the audit reports had been issued to reduce the likelihood that the PCAOB would find deficiencies in those audits. This effort resulted in a substantial improvement to KPMG's 2016 inspection results. In 2017, the now-former KPMG personnel again obtained the list of audit engagements that the PCAOB planned to inspect, but the misconduct was discovered by others within the firm and reported to KPMG leadership before relevant workpapers could be changed. In addition, a now-former KPMG partner attempted to use improperly-obtained confidential information relating to the PCAOB's inspection of another audit firm to win new business for KPMG.

4. Second, before, during, and after the senior National Office professionals used confidential PCAOB information, KPMG audit professionals – at all levels of seniority – engaged in misconduct in connection with examinations on internally-administered training courses that were intended to test whether they understood a variety of accounting principles and other topics of importance.

5. This misconduct took a variety of forms. KPMG audit professionals shared exam answers with one another. A number of audit partners gave exam answers to other partners, and a number also sent answers to and solicited answers from their subordinates. In addition, for a period of time up to November 2015, certain audit professionals made unauthorized changes to KPMG's server instructions that allowed them to manually select the scores necessary to pass the tests, which they often lowered to the point of passing exams with less than 25 percent of the questions answered correctly. The exams related to a variety of subjects that were relevant to the test-takers' audit practices, and included additional training required by a 2017 Commission Order after the Commission found that KPMG engaged in improper professional conduct and had caused a client's reporting violations.[4]

6. After discovering the training-related misconduct, KPMG reported the matter to Commission staff and appointed a Special Committee of its Board of Directors to oversee an internal investigation. During that investigation, two now-former partners who had shared exam answers deleted relevant documents. One of those partners and certain other audit professionals made misrepresentations to the firm's investigators.

7. KPMG is required, both by PCAOB rules and by the Code of Conduct of the American Institute of Certified Public Accountants ("AICPA"), to act with integrity in connection

---

[4] In August 2017, KPMG agreed to settle charges it engaged in improper professional conduct with respect to the audit of the financial statements of an oil and gas client and caused the company's reporting violations. As part of the settlement, the Commission ordered KPMG to ensure its audit staff complete specific training programs in various areas related to the Commission's findings in that proceeding. *KPMG LLP and John Riordan, CPA*, Exchange Act Release No. 81396 (Aug. 15, 2017). KPMG has required all personnel subject to that training undertaking to re-test to ensure full compliance with the Commission's 2017 Order.

with the professional services it provides its clients.[5]  Certified public accountants are required to "be, among other things, honest and candid within the constraints of client confidentiality."[6]  By the misconduct described herein, these professionals caused KPMG's failure to act with the integrity required of a public company auditor.[7]

8.     As indicated above, KPMG's Board of Directors has formed a Special Committee led by an independent board member to oversee an investigation of the misconduct relating to training examinations.  The Special Committee has retained an outside law firm to investigate the extent of such conduct within the past three years, and will recommend employment actions to KPMG management as appropriate.  As set forth in the Undertakings below, KPMG will retain an independent consultant to review and assess the Special Committee's investigation and whether the firm has taken appropriate employment actions or other remedial steps, and to ensure the firm has designed and implemented quality controls that reasonably assure compliance with all professional standards relating to ethics and integrity.

## **RESPONDENT**

9.     KPMG LLP is a Delaware limited liability partnership and PCAOB-registered accounting firm.  Headquartered in New York, New York, KPMG is the U.S. member firm of KPMG International Cooperative, a Swiss entity.

## **OTHER RELEVANT PERSONS**

10.    David Middendorf, 54, of Marietta, Georgia, was KPMG's National Managing Partner for AQPP until March 2017, and was separated from the firm the following month.  Middendorf is licensed as a CPA in Georgia, New York, and Ohio and was previously licensed in Texas.  The Commission has charged Middendorf for his role in the misconduct described in this Order.

11.    Thomas Whittle, 55, of Gladstone, New Jersey, was KPMG's National Partner-In-Charge for Quality Measurement until March 2017, and was separated from the firm the following month.  Whittle is licensed as a CPA in New York and New Jersey and was previously licensed in

---

[5]      PCAOB Rule 3500T requires KPMG to maintain integrity when performing any professional service in connection with the preparation or issuance of any audit report.  As an AICPA member, KPMG was required to comply with the AICPA's Code of Professional Conduct, which requires the firm to maintain integrity in connection with all professional services.  The AICPA also prohibits members from committing acts "discreditable to the profession."  *See* AICPA Code of Conduct 1.400.001 ("Acts Discreditable Rule").

[6]      *See* "Principles of Professional Conduct," ET Section 54 (available at https://www.aicpa.org/Research/Standards/CodeofConduct/DownloadableDocuments/2011June1CodeOfProfessionalConduct.pdf).  Codified as AICPA Code 0.300.040.

[7]      KPMG's conduct also failed to conform to the requirements of PCAOB Quality Control Standards ("QC") requiring registered firms to "have a system of quality control for its accounting and auditing practice" that provides "reasonable assurance that (a) personnel . . . perform all professional responsibilities with integrity."  QC 20.01 and 20.09.

Pennsylvania and Connecticut. The Commission has charged Whittle for his role in the misconduct described in this Order.

12.  David Britt, 55, of New Canaan, Connecticut, was a Partner in KPMG's Department of Professional Practice within AQPP, in which he was the Banking and Capital Markets Group Co-Leader until March 2017, and was separated from the firm the following month. Britt is licensed as a CPA in New York and California and was previously licensed in the District of Columbia. The Commission has charged Britt for his role in the misconduct described in this Order.

13.  Brian Sweet, 41, of Fresno, California, was a Partner in KPMG's Department of Professional Practice-Inspections group until March 2017. He was separated from the firm at the end of March 2017. Prior to joining KPMG, Sweet was an Associate Director in the PCAOB's inspections group from March 2014 until April 2015. Sweet was previously licensed as a CPA in New York, Illinois, and California. The Commission has charged Sweet for his role in the misconduct described in this Order.

14.  Cynthia Holder, 52, of Houston, Texas was an Executive Director in KPMG's Department of Professional Practice-Inspections group from August 2015 until April 2017, and was separated from the firm the following month. Prior to joining KPMG, Holder was an Inspections Leader at the PCAOB from December 2011 until August 2015. Holder was previously licensed as a CPA in Texas and New Jersey. The Commission has charged Holder for her role in the misconduct described in this Order.

15.  Jeffrey Wada, 43, of Tustin, California was an Inspections Leader at the PCAOB from February 2012 until February 2017. Wada is no longer at the PCAOB. Wada is licensed as a CPA in California. The Commission has charged Wada for his role in the misconduct described in this Order.

## FACTS

## I. THE MISAPPROPRIATION OF CONFIDENTIAL PCAOB INFORMATION

### A. The PCAOB's Inspections Process and KPMG's Efforts to Improve Its Results

16.  The PCAOB was created as part of the Sarbanes-Oxley Act of 2002 to oversee the audits of public companies that are subject to the federal securities laws in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports.

17.  One of the essential ways in which the PCAOB fulfills this mission is by inspecting audits of public companies conducted by registered public accounting firms. Through these inspections, the PCAOB assesses the audit firms' compliance with the statutes, regulations, and professional standards governing the accounting profession. The PCAOB typically selects the audit engagements it will inspect based on confidential internal analyses and thereafter notifies firms of which audits it will inspect. The PCAOB typically issues inspection reports, only parts of

which are made public, after all the inspections for a firm in a given cycle are complete. To ensure the integrity of the inspection process, the PCAOB closely guards the confidentiality of both its inspection targets prior to firm notification and its methodology for selecting those targets.

18. In September 2014, the PCAOB issued a report regarding its 2013 inspections of KPMG audits. The report found that out of 50 audits the PCAOB inspected, 23 had deficiencies. This 46 percent deficiency rate reflected a significant decline from KPMG's 34 percent deficiency rate the previous year. David Middendorf, who then oversaw the National Office's audit quality and professional practice work understood then that the Commission's Office of the Chief Accountant had been highly critical of KPMG's worsening inspection results.

**B. The Use of Confidential PCAOB Information Misappropriated by Sweet**

19. As part of its efforts to improve its PCAOB inspection results, KPMG hired Brian Sweet, an Associate Director at the PCAOB who had worked on the team inspecting KPMG audits. Sweet joined KPMG as a partner in the group within the firm's National Office responsible for PCAOB inspections. Sweet reported to Thomas Whittle, who was then the KPMG partner responsible for overseeing the PCAOB's inspections of the firm. Whittle, in turn, reported to Middendorf.

20. In April 2015, shortly before leaving the PCAOB, Sweet copied from an internal database to his office computer various confidential inspection-related materials he believed might be of use to him when he joined KPMG. On his final day at the PCAOB, Sweet transferred these materials, along with the other files on his PCAOB computer, to a personal hard drive that he took with him. Sweet also took from the PCAOB hard copy documents and retained other confidential PCAOB documents he had previously brought home.

21. The documents Sweet improperly took included PCAOB inspection planning information, inspection guides and manuals, and drafts of confidential inspection comment forms. The planning materials included the confidential list of KPMG audit engagements the PCAOB intended to inspect in 2015, the focus areas for each inspection, and a list of all the quantitative and qualitative criteria the Board used in deciding which KPMG audit engagements to inspect.

22. Upon joining KPMG in May 2015, Sweet transferred the PCAOB documents from his personal hard drive to his computer at the firm.

*The Use of the PCAOB's Confidential List of 2015 Inspections*

23. On his first day at the firm in May 2015, Sweet had lunch with Middendorf and other partners in KPMG's National Office, including David Britt, who was then a Partner in the National Office's Department of Professional Practice and co-leader of KPMG's Banking and Capital Markets Group. Over lunch, Sweet's new colleagues asked him various questions about the PCAOB's inspections of KPMG. Sweet testified that one of the questions Middendorf asked Sweet was whether the PCAOB intended to inspect a specific KPMG banking client that year. Without answering directly, Sweet indicated the PCAOB planned to do so. Sweet testified that Middendorf told him the next day that Sweet needed "to share insight and add value and be fully

open when it came to that type of information," and to "remember where [your] paycheck came from" and that Sweet had to be "completely loyal to KPMG and KPMG only."

24.    Several days later, at Middendorf's direction, Whittle asked Sweet to provide him the list of the PCAOB's planned inspections for 2015.[8]  Sweet testified that he showed Whittle a hard copy of a PCAOB inspection planning document listing the KPMG banking and financial service audits the PCAOB intended to inspect that year.

25.    The next day, Whittle emailed Sweet, asking him to have an assistant "scan and send me the banking selection list," i.e. KPMG's bank holding company clients the PCAOB had selected for inspection.  Sweet complied by sending Whittle the complete list of planned inspections and asked Whittle to exercise discretion given the nature of the information.  Whittle forwarded this information to Middendorf the same day, writing, "The complete list.  Obviously, very sensitive.  We will not be broadcasting this."

26.    Though Whittle immediately assigned Sweet to review the workpapers of one of the inspection targets, it does not appear that any workpapers were changed in response to Sweet providing the 2015 inspection list.  At the time Sweet provided this information to Middendorf and Whittle, KPMG had, pursuant to its policy, already locked the audit workpapers for all but two of the engagements from editing absent special circumstances.

27.    Whittle also instructed Sweet to speak to certain engagement partners responsible for audits on the 2015 list to explain the reasons for their selection.  By learning why they were selected, engagement partners could better tailor their responses to questions from PCAOB inspectors to mitigate concerns.  Middendorf and Whittle also assigned Sweet to one of the firm's large audit engagements on the 2015 list to help prepare for the inspection.  Internal training materials KPMG created for audit staff undergoing PCAOB inspection stressed the importance of replying to inspectors' questions – especially during the critical first meeting with PCAOB staff – with the "best first answer."  KPMG's National Office believed the audit staff's ability to respond effectively to inspectors' questions had a significant impact on whether the PCAOB would find deficiencies in the audit.

28.    In June 2015, Sweet identified for Britt a number of KPMG banking clients the PCAOB planned to inspect in 2015.  The next day, Britt asked Sweet to review his notes so he could give Britt the "last 3 Bank names."  Sweet shared this information later that day, asking Britt to note its sensitivity and "use your discretion with this info."

*The Use of the PCAOB's Confidential Process for Selecting Audits to Inspect*

29.    In April 2015, KPMG engaged an outside consultant to help it predict which audit engagements the PCAOB would inspect in 2016.  Sweet recalls that in June 2015 Middendorf and Whittle directed Sweet to share with the outside consultant everything he knew about how the

---

[8]    By that time, the PCAOB had informed KPMG of less than half of the audit engagements it intended to inspect in 2015.

PCAOB selected audits to inspect, including the confidential information Sweet had taken. Sweet understood this to be an instruction to give the consultant all of the information he took from the PCAOB.

30. Sweet complied with Middendorf and Whittle's directive by providing information about the Board's selection criteria to a Director in KPMG's National Office, who then gave that information to the consultant. In September 2015, Sweet spoke directly with the consultant and gave the consultant additional confidential information regarding the inspections selection process, including how the PCAOB's Inspections group used confidential information received from others at the Board and the Commission. At the end of September, Sweet reported to Middendorf and Whittle that he had "spent quite a bit of time with [the outside consultant] trying to guide their modeling efforts."

*The Use of Confidential PCAOB Information Regarding Another Audit Firm*

31. Sweet also provided confidential PCAOB information to an audit partner (who is no longer at KPMG) who was preparing a client pitch for a Spanish bank's audit business. Securing this audit business was a high priority for KPMG.

32. In April 2016, Sweet sent the audit partner confidential PCAOB comment forms related to the Board's inspection of another Spanish bank's audit, writing that he had attached "some examples of the types of issues that have been raised in the past. I hope this helps!" The comment forms discuss specific ways in which that bank's auditor had failed to adequately test the valuation of its Allowance for Loan and Lease Losses.

## C. The Solicitation of Confidential PCAOB Information from Holder

33. Before he left the PCAOB, Sweet had discussed with Cynthia Holder, a friend who was then a PCAOB Inspections Leader, the prospect of her joining him at KPMG. On Sweet's first day at KPMG (May 4, 2015), he informed Holder that he would be meeting with Whittle to push the firm to hire her. On May 11, 2015, Sweet told Holder he was going to hand-deliver her resume to Whittle and "make a sell again" in person.

34. On May 12, 2015, Sweet asked Holder to send him a confidential PCAOB document reflecting comments he had written about KPMG's audits while he was at the Board. At that time, KPMG personnel were preparing for a meeting with the PCAOB to discuss the firm's performance on its audits, during which KPMG would make a presentation on the root causes of audit deficiencies. Sweet asked Holder for a document he had written while he was at the PCAOB so he could review it before helping his KPMG colleagues with that presentation. That day, Holder sent Sweet the confidential document he requested.

35. On June 17, 2015, Holder again shared confidential PCAOB information with Sweet, telling him that the Board had decided to cancel its planned inspection of a KPMG audit client for 2015, and that the Board did not intend to replace it with another selection. Sweet immediately relayed this information to Whittle.

36.     KPMG sent Holder an employment offer in July 2015.  She joined the firm the following month as an Executive Director in KPMG's National Office, performing internal inspections and advising banking engagement teams on their audits.

## D.  The Use of Confidential PCAOB Information Obtained from Wada in 2016

37.     In early March 2016, Jeffrey Wada, an Inspections Leader at the PCAOB who had previously performed work on KPMG inspections but was then assigned to inspect another audit firm, learned that he had not been selected for a promotion.  Wada reacted angrily, telling a colleague the PCAOB had "screwed" him by passing him over.

38.     On March 28, 2016, Wada, who remained friends with Holder after she left the PCAOB, called her and read to her the names of thirteen KPMG clients the Board planned to inspect.[9]  Holder provided this information to Sweet, who then immediately relayed the list to Middendorf, Whittle, and Britt, informing them that it had come from a former colleague at the PCAOB.

39.     Wada sent the list of the PCAOB's planned inspections at a critical time.  In early February 2016, Middendorf and other members of KPMG's leadership team had met with staff from the Commission's Office of the Chief Accountant.  During that meeting, Commission personnel expressed significant concerns about the firm's audit quality and questioned whether KPMG was adequately addressing these issues.  Middendorf told Whittle, Sweet, and Britt they should use the list of inspection targets Wada had sent to protect KPMG from further criticism by its regulators.

40.     Middendorf, Whittle, Britt, and Sweet believed they could use Wada's list in this way because they had learned of the audits that would be inspected at a time when firm personnel were still able to access and revise audit workpapers.  Though KPMG had already issued audit reports for each of these engagements, it was within the 45-day period in which professional audit standards and firm policy allowed audit teams to complete the administrative process of assembling final audit files.[10]  At the end of this 45-day period, KPMG locked audit workpapers from editing absent special circumstances.[11]

---

[9]     Of the 13 clients, 11 were bank holding or other financial services companies and 2 were other issuers that Wada appears to have thought were also bank holding or other financial services companies.  It appears that Wada identified these engagements for Holder because her responsibilities at KPMG included advising banking engagement teams.

[10]     *See* Auditing Standard No. 3, *Audit Documentation*, paragraph 15.  "Prior to the report release date, the auditor must have completed all necessary auditing procedures and obtained sufficient evidence to support the representations in the auditor's report.  A complete and final set of audit documentation should be assembled for retention as of a date not more than 45 days after the report release date (documentation completion date)."  References to PCAOB standards are to those that were in effect at the time of the relevant conduct.

[11]     KPMG has since revised its audit documentation policies, requiring electronic workpapers to be assembled and locked within two business days of issuance of the report.

41.     Recognizing that the workpapers had not yet been locked per KPMG's policy, Middendorf, Whittle, and Britt agreed to have Sweet and others conduct an additional review of the audit workpapers for the seven banks on the list Wada had provided that were part of a key monitoring program run by the National Office to determine whether anything could be done to minimize the risk of receiving inspection comments from the PCAOB.[12] Middendorf and Whittle instructed that no one in the briefing should disclose that they had obtained confidential PCAOB information.

42.     To conceal the true purpose of their efforts, Britt falsely told others at KPMG that they were performing work in the ordinary course of business on all 35 banking engagements in the ALLL monitoring program. On March 28, 2016, Britt sent the engagement partners for these audits an email stating that, "[a]s part of our wrap up and reporting of the results of the ALLL monitoring program we need to gather some additional information" from the audit workpapers.[13]

43.     Over the next few weeks, Sweet, Holder, and various partners and managing directors in the National Office engaged in a review of the audit workpapers of the seven banks in the monitoring program that were on the list Wada provided. The National Office professionals suggested edits and proposed revisions to the engagement teams, which then decided what revisions to incorporate into the final audit workpapers.[14]

44.     In contrast to prior years, KPMG's 2016 inspection results did not include any comments related to the general Allowance for Loan and Lease Losses – an area where KPMG had historically received criticism related to financial services audits. The PCAOB did not publish the results because KPMG reported the misconduct to the PCAOB before the PCAOB issued the 2016 report. However, the PCAOB had designated two of the bank audits in the ALLL monitoring program whose workpapers Sweet had reviewed as "positive quality events," which meant they were so successful the PCAOB wanted to understand the factors driving the audit's quality. Indeed, the level of improvement in the inspection results led Whittle to be concerned that if

---

[12]     As the PCAOB found an increasing number of audit deficiencies by KPMG beginning in 2013, KPMG's National Office implemented "monitoring programs" that worked with audit engagement teams and reviewed workpapers to improve compliance with professional standards. One of these programs focused on the audits of certain banking clients' Allowance for Loan and Lease Losses. KPMG further developed this monitoring program in 2015 in response to numerous deficiencies the PCAOB had identified in this area. The success of this program was especially important to KPMG because the firm had promoted it as proof of the seriousness with which the firm was working to improve its audit quality.

[13]     Britt also asked a subordinate who previously had been in the Department of Professional Practice and was then assigned to an audit engagement on the list to conduct his own "stealth" review of workpapers for one KPMG audit client.

[14]     Middendorf, Whittle, Sweet, and Britt had agreed that Sweet would lead a team of National Office professionals to review the workpapers of the banks in the monitoring program, and that Middendorf, Whittle, and Britt would handle the other issuers on the list they received from Wada.

KPMG could not obtain confidential PCAOB information for the next inspection cycle, there could be a return of audit deficiencies that would be difficult to explain.

45. After the misconduct was discovered, the PCAOB conducted inspections of ten additional banks for the 2016 inspection cycle to replace the ones for which improper advance notice had been obtained. The PCAOB found that six of these audits had deficiencies with respect to auditing the ALLL.

**E. The Use of Confidential PCAOB Information Obtained from Wada in 2017**

46. In early January 2017, Wada provided Holder a "preliminary" list of PCAOB inspection targets for 2017. On January 9, Holder relayed the names of the clients on the list to Sweet, and together, they briefed Whittle. That night, Sweet, Whittle, and Britt discussed this information. After that meeting, Sweet contacted the engagement partners for two of the audits on the January 2017 list to warn them about the potential inspections. Whittle also discussed the January 2017 list with Middendorf. As a result of that discussion, Middendorf and Whittle assigned additional National Office resources to assist with two of the active audits on that list.[15]

47. In early February 2017, Wada conveyed to Holder a list of 47 ticker symbols that Holder understood to be the final list of KPMG audits the PCAOB would inspect that year. Wada also provided Holder the inspection focus areas for the banks on the list (as well as for another KPMG engagement), and the PCAOB's list of KPMG engagement partners with "poor performance evaluations."

48. Holder relayed the information to Sweet, who then shared it with Middendorf, Whittle, and Britt. Though Sweet questioned what to do with that information, Middendorf replied, "this is information that's too good not to use." Unlike the prior lists of PCAOB inspection targets, the audits on the February 2017 list were ongoing, thus providing substantially greater ability to improve the audit workpapers.

49. Whittle instructed Sweet to warn certain engagement partners about the impending inspections. Though Whittle had warned Sweet to be circumspect in how he communicated this to KPMG colleagues, Sweet's notice to one KPMG engagement partner caused her to suspect that the firm may have received confidential PCAOB information. These concerns were subsequently reported to the firm's management, which then reported the matter to the PCAOB, and KPMG began an investigation.

II. UNDERLINE AUDIT PROFESSIONALS IMPROPERLY SHARED TRAINING EXAM ANSWERS

**A. Professional Education Requirements for KPMG Auditor Personnel**

---

[15] Middendorf was the Engagement Quality Review partner on one of those audits. In this role, he was responsible for evaluating the significant judgments and related conclusions the audit team made in reaching the overall conclusion reflected in the audit report.

50.     As accountants licensed by state accountancy boards, many KPMG audit professionals are required to complete a minimum number of continuing professional education ("CPE") courses periodically – typically 120 hours every three years. KPMG requires its audit professionals to complete additional training in excess of state requirements. These training requirements vary by position, role, and industry, and are designed by the firm to be relevant to the audit work its professionals are performing.

51.     In addition to state accountancy boards' and KPMG's own continuing education requirements, the Commission ordered KPMG audit professionals to complete a minimum of 12 hours of training in specific audit areas as part of an August 2017 settlement of charges that KPMG failed to properly audit the financial statements of an oil and gas client.[16]

52.     To help its audit professionals satisfy these requirements, KPMG administers its own set of online training programs that also qualify for CPE credit. KPMG requires its auditors to pass an examination at the conclusion of each online training program. Audit professionals are given three opportunities to pass each examination. If one of KPMG's audit professionals is unable to pass after two attempts, their Performance Management Leader is notified. If they are unable to pass after three attempts, the consequences are more significant: they are required to re-take the training; they are prohibited from conducting audit work until they pass the exam; and others at the firm may be notified. Audit professionals also understood that failing to pass an exam could lead to their compensation being reduced.

## B. KPMG Audit Professionals Shared Answers to Training Exams

53.     On numerous occasions, KPMG audit professionals who had passed training exams sent their answers to colleagues to help them pass those exams. They sent colleagues images of their answers primarily by email or printed their answers and gave them to their colleagues. This conduct was committed by audit professionals at all levels of seniority, including lead audit engagement partners who were responsible for compliance with PCAOB standards in auditing their clients' financial statements. A number of lead audit engagement partners not only sent exam answers to other partners, but also solicited answers from and sent answers to their subordinates.[17]

54.     Upon learning of the potential cheating, KPMG leadership alerted the Commission staff and began an internal investigation. Soon after, the firm's Board of Directors formed a Special Committee led by an independent board member to oversee an independent investigation of this conduct. The Special Committee hired an outside law firm to conduct this review. The investigation has revealed extensive sharing of exam answers, with the bulk of this misconduct occurring among junior personnel. While many of those who shared and/or received exam answers engaged in misconduct only once, others sent or received answers to multiple exams.

---

[16]     *KPMG LLP and John Riordan, CPA*, Exchange Act Release No. 81396 (Aug. 15, 2017).

[17]     As KPMG itself has recognized, "[t]hose who manage others act as role models." KPMG Transparency Report (January 2019), available at https://audit.kpmg.us/content/dam/audit/pdfs/2018/2018-transparency-report1.pdf.

Prior to the firm's investigation, no one reported the improper sharing of exam answers to the firm's Ethics and Compliance Hotline. The firm has been taking disciplinary action against certain partners and other audit professionals in connection with its investigation.

55. After KPMG began to investigate the misconduct, certain now-former audit professionals, including a few lead audit engagement partners, attempted to conceal what they had done. For example, in September 2018, one engagement partner who is no longer with KPMG ("Former Partner 1") solicited from a junior partner answers to the exam for a training program relating to leases. The now-former junior partner sent Former Partner 1 the answers from his exam by text message. After receiving a document preservation notice from the firm, Former Partner 1 deleted the text messages the junior partner sent him, and encouraged his colleague to do the same. Former Partner 1 also encouraged the junior partner to say, falsely, that the texts were deleted by accident. When Former Partner 1 was asked in a written questionnaire in December 2018 whether he had received any answers to KPMG training exams, he answered "no."

56. In another example, a lead audit engagement partner who is no longer with the firm ("Former Partner 2") also answered "no" to the December 2018 questionnaire that asked whether he had sent or received answers to training programs. In fact, Former Partner 2 had received answers to training exams on seven occasions and sent answers to training exams on three occasions – all within eight months of completing the survey, and all with junior members of his engagement team.

### C. KPMG Audit Professionals Manipulated the Scoring of Training Exams

57. In addition to sharing answers to training examinations, certain audit professionals also manually changed the scores required to pass certain exams. Prior to November 2015, KPMG hosted exams to training programs on an internal server with software provided by a third party. KPMG sent participants in training programs a hyperlink that directed them to the applicable exams. Embedded in the hyperlink was an instruction to the server that specified the score necessary to pass the exam. Thus, the characters "MasteryScore=70" meant participants were required to answer at least 70 percent of the answers accurately to pass the exam.[18] By changing the number in the hyperlink, audit professionals could change the score required to pass.

58. For a period of time up to November 2015, certain audit professionals, including one partner, altered the URLs for their exams to lower the scores required to pass. Twenty-eight of these auditors did so on four or more occasions. Certain audit professionals lowered the required score to the point of passing exams while answering less than 25 percent of the questions correctly.

### VIOLATIONS

59. As a result of the conduct of personnel described above, KPMG willfully violated PCAOB Rule 3500T, which requires KPMG and associated persons to comply with ethics standards, including to maintain integrity, as described in the AICPA's Code of Professional

---

[18] Some exams required a higher score to pass, while others allowed a lower score.

Conduct when performing any professional service in connection with the preparation or issuance of any audit report,[19] within the meaning of Section 4C(a)(3) of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

60.     The AICPA Code of Conduct requires that a member not commit any act discreditable to the profession. AICPA Code of Conduct 1.400.001. As a result of the conduct of personnel described above, KPMG failed to comply with AICPA Code of Conduct 1.400.001 within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

61.     PCAOB Quality Control Standards require that a registered firm "shall have a system of quality control for its accounting and auditing practice." QC 20.01. Those quality control standards require further that firms should establish policies and procedures to provide "reasonable assurance that (a) personnel ... perform all professional responsibilities with integrity." QC 20.09. As a result of the conduct described above, KPMG failed to comply with QC 20 within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

## FINDINGS

62.     Based on the foregoing, the Commission finds that KPMG willfully violated PCAOB Rule 3500T within the meaning of Section 4C(a)(3) of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

63.     Based on the foregoing, the Commission finds that KPMG engaged in conduct that provides a basis to impose remedies against the firm pursuant to Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

## COOPERATION AND REMEDIAL EFFORTS

64.     In determining to accept KPMG's Offer, the Commission considered that KPMG reported these matters to the Commission and/or to the PCAOB, initiated an investigation of the testing matter under the oversight of a Special Committee of the Board of Directors, has cooperated with the Commission staff, and has undertaken various remedial measures, including: revising its audit documentation policies to require that electronic workpapers be assembled and locked within two business days of issuance of the report notwithstanding the 45-day period allowed under professional auditing standards; retaining an advisory firm to conduct an

---

[19]     The rule requires auditors to comply with the AICPA's Code of Professional Conduct Rule 102, and interpretations and rulings thereunder, as in existence on April 16, 2003. Although PCAOB Rule 3500T references the AICPA Code as in existence on April 16, 2003, the definition of integrity remains identical to the current definitions in the Code of Professional Conduct promulgated by the AICPA and applicable to current members of the AICPA.

independent cultural assessment; and retaining a learning and development consultant to conduct a current state assessment.

## UNDERTAKINGS

KPMG has undertaken to complete the following actions:

65.     KPMG's Review.  Within 120 days after the entry of this Order, KPMG shall evaluate ("KPMG's Review") the sufficiency and adequacy of its quality controls relevant to ethics and integrity (hereinafter referred to as KPMG's "Policies and Procedures") to determine whether they are designed and implemented in a manner that provides reasonable assurance of compliance with all professional standards relating to ethics and integrity.  KPMG's evaluation shall include assessing:

            a.      the adequacy and sufficiency of ethics and integrity training and guidance, including regarding anti-retaliation and whistleblowing;

            b.      whether KPMG's culture is supportive of ethical and compliant conduct, including strong, explicit, and visible support and commitment by the firm's management and Board of Directors; and

            c.      whether KPMG deploys proper resources and oversight for compliance with ethics and integrity requirements, including seniority of executives and managers responsible for implementation and oversight of these responsibilities, reporting lines, autonomy and independence, compensation and rewards, consistent discipline, access to information and personnel.

66.     KPMG Report to the Commission.  Within 60 days of completing KPMG's Review, KPMG shall deliver to the Commission staff a detailed written report ("KPMG Report to the Commission") summarizing its review and any changes it has made to KPMG's Policies and Procedures relating to the subjects described in paragraph 65.  The KPMG Report to the Commission shall provide written evidence of how the Policies and Procedures, including any changes, are designed and implemented in a manner that provides reasonable assurance of compliance with all professional standards relating to ethics and integrity in the form of a narrative and be supported by exhibits.  The Commission staff may request further evidence of how the Policies and Procedures provide such assurance, and KPMG agrees to provide such evidence.

The KPMG Report to the Commission shall set forth the results of its assessment of the adequacy and sufficiency of its ethics and integrity training, including a description of the training.  The KPMG Report to the Commission should also include a description of any training courses added or modified as a result of the assessment conducted under this paragraph.

67.     KPMG's Special Committee Review.  Within 360 days after the entry of this Order, a committee composed of independent members of KPMG's Board of Directors and non-Audit Partners (the "Special Committee") shall complete the steps reasonably necessary to identify, and to determine the extent to which, audit professionals violated ethics and integrity requirements in

connection with training examinations within the past three years ("Special Committee Investigation"), and to recommend any employment actions or other remedial steps to KPMG management that the Special Committee deems appropriate.

68.     Special Committee Report of Investigation.  Within 60 days of completing the Special Committee Investigation, the Special Committee shall deliver to KPMG's Board of Directors and Chief Executive Officer a detailed report ("Special Committee Report of Investigation") summarizing the investigative steps it has taken and any employment actions or other remedial steps it recommends be taken.

69.     Independent Consultant Review.  KPMG shall retain, within 60 days after the entry of this Order, an independent consultant ("Independent Consultant"), not unacceptable to the Commission staff.  The Independent Consultant shall have, at a minimum, the following qualifications:  (i) demonstrated expertise conducting ethics and integrity investigations; and (ii) experience designing or reviewing compliance policies, procedures, and controls relating to ethics and integrity.  KPMG shall provide to the Commission staff a copy of the engagement letter detailing the scope of the Independent Consultant's responsibilities.  KPMG shall deliver to the Independent Consultant the KPMG Report to the Commission at the same time as KPMG provides such report to the Commission staff as specified in paragraph 66.  The Special Committee shall deliver to the Independent Consultant the Special Committee Report of Investigation at the same time as it provides such report to KPMG's Board of Directors and Chief Executive Officer as specified in paragraph 68.  KPMG shall require that the Independent Consultant:

a.     perform a review (the "IC Review of Quality Controls") of KPMG's Policies and Procedures to determine whether they are designed and being implemented in a manner that provides reasonable assurance of compliance with all professional standards relating to ethics and integrity, including whether the firm's ethics and integrity training and guidance is adequate and sufficient; the culture is supportive of ethical and compliant conduct, and KPMG is deploying proper resources and oversight for compliance with ethics and integrity requirements; and

b.     review and assess (the "IC Review of Investigation") the Special Committee Investigation and whether KPMG (i) has taken reasonable steps to identify, and to determine the extent to which, those audit professionals who engaged in improper exam sharing within the past three years, and (ii) has followed the Special Committee's recommended employment actions or other remedial steps.

KPMG shall cooperate fully with the Independent Consultant and shall provide reasonable access to information and records as the Independent Consultant may reasonably request, subject to KPMG's right to withhold from disclosure any information or records protected by any applicable protection or privilege such as the attorney-client privilege or the attorney work product doctrine. The Independent Consultant shall have the right to interview any partner, employee, agent, or consultant of KPMG concerning any matter within or relating to the IC Review of Quality Controls or the IC Review of Investigation.

70.     Reports of IC Reviews.  After the IC Review of Quality Controls and the IC Review of Investigation are completed, but no later than 90 days after receiving the KPMG Report to the Commission and the Special Committee Report of Investigation, the Independent Consultant shall issue a detailed written report (the "IC Report") to KPMG: (i) summarizing its work; (ii) making recommendations, as the Independent Consultant deems appropriate, reasonably designed to ensure that KPMG's Policies and Procedures relating to the topics discussed in paragraph 65 are adequate and sufficient to provide reasonable assurance of compliance with all relevant professional standards relating to ethics and integrity; (iii) describing its review of KPMG's training and making additional recommendations, as the Independent Consultant deems appropriate, regarding ethics and integrity training; (iv) making recommendations, as the Independent Consultant deems appropriate, reasonably designed to ensure that the Special Committee Investigation has taken reasonable steps to identify, and to determine the extent to which, audit professionals who engaged in improper exam sharing within the past three years, including recommending additional investigative steps for the Special Committee to take; and (v) making recommendations, where appropriate, reasonably designed to ensure that KPMG has taken appropriate employment actions or other remedial steps in light of the findings of the Special Committee Investigation.  KPMG shall require the Independent Consultant to provide a copy of the IC Report to the Commission staff and the PCAOB staff when the IC Report is issued.

71.     KPMG shall adopt, as soon as practicable, all recommendations of the Independent Consultant in the IC Report.  Provided, however, that within 30 days of issuance of the IC Report, KPMG may advise the Independent Consultant in writing of any recommendation that it considers to be unnecessary, unjust, outside the scope of this Order, unduly burdensome, or impractical. KPMG need not adopt any such recommendation at that time, but instead may propose in writing to the Independent Consultant an alternative approach designed to achieve the same objective or purpose.  If KPMG's written proposal relates to an alternative policy, procedure, or investigative step, it will submit its proposal to the Commission staff at the same time.  KPMG and the Independent Consultant shall engage in good-faith negotiations in an effort to reach agreement on any recommendations objected to by KPMG.  In the event that the Independent Consultant and KPMG are unable to agree on an alternative proposal within 60 days of the issuance of the IC Report, KPMG shall abide by the determinations of the Independent Consultant.

72.     Ethics and Integrity Training.  For the period immediately following the completion of KPMG's assessment of the adequacy and sufficiency of its ethics training and guidance as specified in paragraph 65, and ending no earlier than 36 months after submission of the final CEO certification required by paragraph 73, all audit professionals are required to complete a minimum of 12 hours of ethics and integrity training each year, with a minimum 3 hours of such training occurring every 3 months.

73.     Certification by Chief Executive Officer.  Within 60 days of issuance of the IC Report, but not sooner than 30 days after a copy of the IC Report is provided to the Commission staff, KPMG's Chief Executive Officer must certify to the Commission staff in writing that (i) KPMG has adopted and has implemented or will implement all recommendations of the Independent Consultant, if any; and (ii) the Independent Consultant agrees with KPMG's adoption and implementation of the recommendations.  To the extent that KPMG has not implemented all recommendations of the Independent Consultant within 60 days of issuance of the IC Report,

17

KPMG's Chief Executive Officer must certify to the Commission staff in writing, 30 days after their implementation, that (i) KPMG has adopted and has implemented all recommendations of the Independent Consultant; and (ii) the Independent Consultant agrees that the recommendations have been adequately adopted and implemented by KPMG. The certifications by KPMG's Chief Executive Officer shall provide written evidence of the implementation of the Independent Consultant's recommendations in the form of a narrative, and be supported by exhibits. The Commission staff may request further evidence of the implementation of the Independent Consultant's recommendations, and KPMG agrees to provide such evidence.

74.     Hiring Authority. The Independent Consultant shall have the authority to employ legal counsel, consultants, investigators, experts, and other personnel necessary to assist in the proper discharge of the Independent Consultant's duties.

75.     The Independent Consultant's compensation and expenses shall be borne exclusively by KPMG. To ensure the independence of the Independent Consultant, KPMG: (i) shall not have the authority to terminate the Independent Consultant or substitute another independent compliance consultant for the initial Independent Consultant, without the prior written approval of the Commission staff; and (ii) shall compensate the Independent Consultant and persons engaged to assist the Independent Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

76.     KPMG shall require the Independent Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with KPMG, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement shall also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with KPMG, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

77.     KPMG shall not be in, and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client privilege or any other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports, or documents to Commission staff.

78.     KPMG shall inform its audit professionals of the terms of the Order within ten business days after entry of the Order.

79.     By no later than 15 months after the entry of this Order, unless otherwise extended by the Commission staff, KPMG's Chief Executive Officer shall certify, in writing, compliance with the undertakings set forth above. The certification shall provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate

compliance. The Commission staff may request further evidence of compliance, and KPMG agrees to provide such evidence.

80. <u>Annual Certification</u>. With respect to calendar years 2020 and 2021, KPMG's Chief Executive Officer shall certify that KPMG has assessed whether KPMG's Policies and Procedures relating to the topics discussed in paragraph 65 are adequate and sufficient to provide reasonable assurance of compliance with all professional standards relating to ethics and integrity by, among other things, testing the firm's implementation of KPMG's Policies and Procedures during the twelve (12) months preceding the certification ("Annual Certification"). The Annual Certification shall describe the nature and scope of KPMG's testing. The Annual Certification shall represent that the Chief Executive Officer has reviewed and evaluated the firm's assessment and testing process and that, based on belief and after reasonable inquiry, the Chief Executive Officer believes that KPMG's Policies and Procedures relating to the topics discussed in paragraph 65 are adequate and sufficient to provide reasonable assurance of compliance with all professional standards relating to ethics and integrity. If the Chief Executive Officer cannot represent that KPMG's Policies and Procedures are adequate and sufficient, then the Chief Executive Officer shall describe in reasonable detail the reasons for the inability to so certify. The Chief Executive Officer shall provide the Annual Certifications to the Commission's staff within 60 days of the end of the annual period. KPMG shall preserve and retain all documentation regarding the Chief Executive Officer's Annual Certification for seven (7) years and will make it available to the staffs of the Commission or the PCAOB upon request.

81. All reports and certifications mentioned in these undertakings shall be submitted to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, or such other person as the Commission staff may request, with a copy to the Office of Chief Counsel of the Enforcement Division.

82. For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent KPMG's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that:

A. KPMG shall cease and desist from committing or causing any violations and any future violations of PCAOB Rule 3500T.

B. KPMG be, and hereby is, censured.

C. KPMG shall comply with the undertakings enumerated in paragraphs 65 through 82 above.

D.      KPMG shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $50 million to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

E.      Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying KPMG as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Melissa Hodgman, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

F.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a

private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Acting Secretary