# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ERIC WEINER, Individually and on          )
Behalf of All Others Similarly Situated,   )
                                            )
          Plaintiff,                        )
                                            )
     v.                                     )          No. 3:17-cv-01469
                                            )
TIVITY HEALTH, INC., DONATO                 )
TRAMUTO,  GLENN HARGREAVES                   )
and ADAM HOLLAND,                           )
                                            )
          Defendants.                       )

## MEMORANDUM OPINION

Having survived a motion to dismiss, designated Lead Plaintiff, Oklahoma Firefighters

Pension and Retirement System, seeks certification of a class consisting of all those who purchased

or otherwise acquired Tivity Health, Inc. ("Tivity") common stock between March 6, 2017, and

November 6, 2017.  Tivity opposes the motion, which has been fully briefed by the parties (Doc.

Nos. 82, 93 & 96).

## I.  Background

The alleged facts underlying this litigation, and more specifically United Healthcare Inc.'s

("UHC") entry into the fitness and health improvement market in direct competition with Tivity are

set forth in detail in this Court's Memorandum Opinion denying the motions to dismiss,  see Weiner

v. Tivity Health, Inc., 365 F. Supp. 3d 900, 904-07 (M.D. Tenn. 2019).  They are also summarized

in this Court Memorandum Opinion in In re Tivity Health, Inc., No. 3:18-CV-00087, 2019 WL

5386506, at *1 (M.D. Tenn. Oct. 21, 2019), a derivative action brought against Tivity's Board of

Directors.  Because the factual allegations are well-known to the parties or otherwise readily

accessible, the Court assumes familiarity with them and turns directly to the standards governing

requests for class certification. The Court will then discuss the why the parties believe that Lead Plaintiff has either met or not met those standards.

## II. <u>Standards Governing Class Certification</u>

Class actions are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 33 (2013) (quoting <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700–701 (1979)). Consequently, a class action can be certified only if, "after rigorous analysis," a court is satisfied that the prerequisites of Rule 23(a) have been met and that the action falls within one of the categories under Rule 23(b). <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011); <u>Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.</u>, 935 F.3d 496, 503 (6th Cir. 2019).

Rule 23(a) establishes four requirements for class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "These four requirements – numerosity, commonality, typicality, and adequate representation – serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." <u>In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.</u>, 722 F.3d 838, 850 (6th Cir. 2013). Rule 23(b), in turn, provides in pertinent part that when the requirements of Rule 23(a) are met a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

2

controversy." Fed. R. Civ. P. 23(b).

The decision whether to certify a class is committed to the sound discretion of the district judge, and turns on the particular facts and circumstances of each individual case. In re Whirlpool, 722 F.3d at 850. This may require "the court to probe behind the pleadings before coming to rest on the certification question," and this "analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" Comcast, 569 U.S. at 33 (quoting Dukes, 564 U.S. at 350). Nevertheless, at the class certification stage, the court can only consider "those matters relevant to deciding if the prerequisites of Rule 23 are satisfied," and "may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" In re Whirlpool, 722 F.3d at 851-52 (quoting Messner v. Northshore Univ. Health Sys., 669 F.3d 802, 811 (7th Cir. 2012)).

### III. Application of the Governing Standards

Tivity argues that Lead Plaintiff has not met the requirements of either Rule 23(a) or 23(b). As to the former, it submits that the typicality and adequacy requirements cannot be met because (1) Lead Plaintiff purchased stock (at an even higher rate) after it was disclosed UHC through its Optum Fitness Advantage program was becoming a competitor to Tivity's flagship SilverSneakers program, and (2) the drop in Tivity's stock price was not merely the result of this diclosure, but also other, non-fraud factors. As to the latter, Tivity asserts Lead Plaintiff has not shown that common issues will predominate over individualized issues. Further, Tivity argues that Lead Plaintiff has not shown how damages can be determined on a classwide basis. The Court considers those arguments in turn.

### A. Rule 23(a)(3) Typicality and (a)(4) Adequacy

"Rule 23(a)(3) requires proof that plaintiffs' claims are typical of the class members' claims." Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 542 (6th Cir. 2012). "Typicality is met if the class

3

member's claims are 'fairly encompassed by the named plaintiffs' claims.'" In re Whirlpool Corp., 722 F.3d at 852 (quoting Sprague v. Gen. Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998)). "This requirement insures that the representative's interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." Id. at 852–53. In short, "as go the claim of the named plaintiff, so go the claims of the class." Sprague, 133 F.3d at 399.

Adequacy under Rule 23(a)(4) contemplates that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. "It must [also] appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." In re Am. Med. Sys., 75 F.3d 1069, 1083 (6th Cir. 1996) (citation omitted).

"The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." Id. Because "these two requirements 'tend to merge,'" Gooch v. Life Inv'rs Ins. Co. of Am., 672 F.3d 402, 429 (6th Cir. 2012), they are often considered in tandem, although, as noted, the adequacy "requirement also raises concerns about the competency of class counsel and conflicts of interest," Gen'l Tele. Co. of the Southwest v. Falcon, 457 U.S. 147, 157–158, n. 13 (1982).

Here, Lead Plaintiff insists that typicality is met because its claims arise from the same events

4

as those of the members of the proposed class, invoke the same legal theories, are subject to the same defenses, and will be established by the same evidence. That is, "[l]ike the other members of the class, Lead Plaintiff purchased common stock at artificially inflated prices and suffered losses as a result of Defendants' conduct; accordingly, Lead Plaintiff and class members share an identical interest in holding Defendants accountable and maximizing recovery." (Doc. No. 82 at 11-12).

Lead Plaintiff also insists that the adequacy prong is met because "like the rest of the members of the Class," it "sustained . . . losses as a result of the same alleged material misrepresentations and omissions contained and repeated in Tivity's SEC filings and statements to investors." (Id. at 12). Lead Plaintiff also claims to have (1) "a meaningful financial stake in this litigation," (2) "demonstrated its willingness and ability to play an active role in the litigation," and (3) "retained counsel with extensive experience in securities class actions." (Id.).

In response, Tivity does not claim that Lead Plaintiff's claims differ from those in the proposed class, or even that Lead Plaintiff would not have the ability to adequately prosecute the action. Rather, Tivity argues that Lead Plaintiff's claims are subject to "unique defenses" that either show some atypicality or suggest a conflict of interest if Lead Plaintiff were allowed to pursue this case on behalf of others.

Tivity first contends that Lead Plaintiff is atypical because the class claims are premised on the allegation that shareholders were damaged because they purchased Tivity stock at prices that were inflated due to alleged misstatements. However, Lead Plaintiff purchased Tivity stock on several occasions both before and after the alleged "truth" of Tivity's "fraud" was revealed. Specifically, Lead Plaintiffs purchased Tivity stock on June 20, 2017, at prices ranging between $37.26 and $40.02 per share. This was long before the corrective disclosure on November 6, 2017

that served as the catalyst of this suit. Lead Plaintiff also purchased stock at a higher price after that disclosure, at a time when Lord Abbett & Co. LLC ("Lord Abbett") – Lead Plaintiff's investment manager – knew that UHC was operating Optum Advantage in eleven states. This included the purchase of 4,084 shares at a per-share price of $41.32 on February 23, 2018. As a consequence, the argument goes, Lead Plaintiff is subject to the "unique defense" that the alleged misrepresentations were not really a factor in it purchasing decision.

Whether this is truly a "unique defense," the Court does not know because other putative class members may have purchased Tivity stock both before and after the November 6, 2017 corrective disclosure. Regardless, when the facts before the Court are analyzed in the context of the law that has developed in this area, Tivity's argument must be rejected for both factual and legal reasons.

Factually, Tivity ignores that on November 7, 2017, immediately following the operative disclosure, Lord Abbett recommended lessening Lead Plaintiff's position in Tivity because of the "new risk" presented by UHC's entry into the market. (Doc. No. 97-6, Matthew Decicco Depo. at 93-96). Tivity also ignores that the post-disclosure purchases of stock by Lead Plaintiff were made months after the disclosure, presumably at a time when the market had corrected itself.

Legally, purchasing a stock after a corrective disclosure that deflates the stock price may not even be relevant to the typicality inquiry because "a party may believe a stock to be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it." Ross v. Abercrombie & Fitch Co., 257 F.R.D. 435, 446 (S.D. Ohio 2009) (citation omitted) (collecting cases). At a minimum, a proposed class representative "is [not] as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a

6

post-disclosure purchase of the defendant company's stock," and this is "particularly so after the stock price has been 'corrected' by the market's assimilation of the new information." Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 138 (5th Cir. 2005). As one court has explained:

> The fraud on the market theory presumes that in efficient markets all material information, including disclosures of past frauds, will be reflected in the security's price. An investor who purchases a security after the disclosure of adverse information still relies on the fact that the newly released information will be absorbed by the market and therefore reflected in the post-disclosure price. This later purchase does not undercut or diminish the argument that the same investor may have purchased the security pre-disclosure relying on the fact that all information available at the time was reflected in the then current price.

In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 204 (E.D. Pa. 2008); see also Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 314 (5th Cir. 2007) ("Such trading becomes harmless where, after the company has made adverse disclosures, the stock price reverts to valuation based on an efficient market.").

In concluding that Lead Plaintiff's purchase of stock after the corrective disclosure does not render it unable to serve as the class representative, the Court has considered the string of cases cited by Tivity that it characterizes as the "well recognized" contrary view. That view, expressed in cases such as Rocco v. Nam Tai Electronics, Inc., 245 F.R.D. 131 (S.D.N.Y.2007), and Rolex Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 664 (D. Or.1991), however, is against "the weight of authority," In re Connetics Corp. Sec. Litig., 257 F.R.D. 572, 577 (N.D. Cal. 2009), a "deviat[ion] from th[e] general rule," Local 703, I.B. of T. Grocery & Food Emp. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1260 (11th Cir. 2014), and "not generally accepted." Feder, 429 F.3d at 137. Indeed, "courts routinely certify a class with representatives who purchased stock during and after a class period." In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607 (D. Minn. 2001).

7

Nor is Lead Plaintiff not adequate as a class representative or subject to some sort of conflict simply because its investment advisor admitted that the drop in Tivity stock may have been due to factors other than alleged fraud, such as concerns regarding the healthcare market in general that Tivity had previously gone through a restructuring and changed its names. If, in fact, these additional concerns were a factor in the precipitous 34% drop in stock price on November 6, 2017, this would not be an individualized issue or a matter or perspective. Those additional factors either did nor did not play a part in the drop in price, and this is true for no matter who held the stock.

Furthermore, Tivity's argument actually raises a question about loss causation, which "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Ohio Pub. Emp. Ret. Sys. v. Fed. Home Loan Mortg. Corp., 830 F.3d 376, 384 (6th Cir. 2016). The Supreme Court has made clear, however, that establishing loss causation is not a condition to obtaining certification. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 813 (2011). Rather, loss causation must simply be pled and this "is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016). In other words, "Plaintiffs must prove that portion of the price fall that they seek in damages is directly attributable to the misrepresentation, so that they do not recover a windfall, [but] they do not need to prove it at the certification stage." Ludlow v. BP, P.L.C., 800 F.3d 674, 687–88 (5th Cir. 2015). Loss causation based upon the drop in stock after the corrective disclosure has been adequately pled.

Based on the foregoing, the Court finds that Lead Plaintiff's claims are typical and that it can adequately represent the proposed class for purposes of Rules 23(a)(3) and (4). The Court also finds

(and without any arguments to the contrary by Tivity) that (1) the proposed class is so numerous as to make joinder impractical within the meaning of Rule 23(a)(1), considering that Tivity's common stock was traded on the NASDAQ and owned by 331 institutions during the class period; and (2) there are common question of law and fact for purposes of Rule 23(a)(2), including whether Tivity misrepresented or omitted to state material facts about its business, whether those alleged misstatement or omissions artificially inflated Tivity's stock, and whether Tivity acted with scienter. Thus, Lead Plaintiffs have satisfied the requirements of Rule 23(a).

## B. Rule 23(b) and Predominance

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." Halliburton, 573 U.S. at 276. That is the case here.

"Rule 23(b) requires a showing that *questions* common to the class predominate . . . in favor of the class." Amgen, 133 S.Ct. at 1191 (emphasis in original). "Common questions are those 'that can be proved through evidence common to the class.'" Bridging Communities Inc. v. Top Flite Fin. Inc., 843 F.3d 1119, 1124 (6th Cir. 2016) (quoting In re Whirlpool Corp., 722 F.3d at 858). "That said, plaintiffs seeking class certification 'need not prove that each element of a claim can be established by classwide proof: What the rule does require is that common questions predominate over any questions affecting only individual [class] members.'" Id. "In other words, '[t]o satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Id. at 1124-2 (quoting Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007).

9

Here, Lead Plaintiff asserts that common questions of law and fact predominate because the same evidence will be used to establish each of the elements of its fraud claims under Sections 10(b) and 20(a) of the Securities and Exchange of 1934. Those elements are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." In re Omnicare, Inc. Sec. Litig. 769 F.3d 455, 469 (6th Cir. 2014). Tivity insists that common questions will not prevail because an essential element of a securities claim is reliance, and the question of reliance will necessitate individualized proof in this case. Tivity also asserts that damages will also require individualized proof.

### 1. Reliance

Reliance is "essential" because "proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Halliburton, 563 U.S. 810 (citation omitted). Although the "traditional (and most direct) way" for a plaintiff to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation," this is often unfeasible and "places an unnecessarily unrealistic evidentiary burden on the [securities] plaintiff who has traded on an impersonal market." Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988). Furthermore, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively" would prevent such plaintiffs "from proceeding with a class action, since individual issues" would "overwhelm[ ] the common ones." Id. at 242, 108 S.Ct. 978. To address those problems, the Supreme Court in Basic established a rebuttable presumption for securities plaintiffs under a "fraud on the market theory," which is based

10

on the hypothesis that

> "in an open and developed securities market, the price of a company's stock is
> determined by the available material information regarding the company and its
> business . . . . Misleading statements will therefore defraud purchasers of stock even
> if the purchasers do not directly rely on the misstatements. . . . The causal connection
> between the defendants' fraud and the plaintiffs' purchase of stock in such a case is
> no less significant than in a case of direct reliance on misrepresentations."

Id. at 241-242 (quoting Peil v. Speiser, 806 F.2d 1154, 1160–1161 (3rd Cir. 1986)); see also, In re

BancorpSouth, Inc., No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("The Basic

fraud-on-the-market presumption is based on the premise that market professionals generally

consider most publicly announced material statements about companies, thereby affecting stock

market prices.).[1]

Application of the presumption announced in Basic is not automatic, however. Instead, "a

plaintiff must make the following showings to demonstrate that the presumption of reliance applies

in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were

material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock

between the time the misrepresentations were made and when the truth was revealed." Halliburton,

573 U.S. at 258. Nor is the presumption conclusive: "Any showing that severs the link between the

alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to

trade at a fair market price, will be sufficient to rebut the presumption of reliance." Basic, 485 U.S.

at 248. "So for example, if a defendant could show that the alleged misrepresentation did not, for

whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the

stock even had he been aware that the stock's price was tainted by fraud, then the presumption of

---

[1] Because the Court ultimately concludes that the Basic presumption applies, it need not reach Lead
Plaintiff alternative argument that it is entitled to a presumption for material omissions under Affiliated Ute
Citizens of Utah v. United States, 406 U.S. 128 (1972).

reliance would not apply."  Halliburton, 573 U.S. at 269.

Here Tivity argues that the Basic presumption is unwarranted because it has not been established that Tivity stock traded in an efficient market.  Tivity also argues that members of the putative class may have bought its stock knowing full-well that UHC was entering the market.  Neither argument is persuasive at this stage.

In analyzing whether an efficient market exists, many courts employ the so-called "Cammer factors" first set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).  Those factors are: (1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC Form S-3; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. Id. at 1286–8.

In an effort to establish market efficiency in this case, Lead Plaintiff has submitted an expert report from Chad Coffman, a Chartered Financial Analyst and the President of Global Economics Group.  In his report, Coffman concludes that the market for Tivity common stock was efficient during the class period based upon the Cammer factors, as well as five additional factors: (1) market capitalization; (2) bid ask spread; (3) fraction of shares held by institutional investors; (4) autocorrelation; and (5) options trading. (Doc. No. 83-6, Coffman Report at 11).[2]  In response, Tivity relies on an expert report from Dr. Paul A. Gompers, the Eugene Holman Professor of Business Administration at the Harvard Business School.  He opines that "nine of the ten 'efficiency' factors"

_____

[2]  The first three of these factors are sometime called "Krogman  factors" because they were articulated in Krogman v. Sterritt, 202 F.R.D. 467, 473 (N.D. Tex. 2001).  The factors taken collectively are sometimes referred to as the Cammer-plus factors.

12

[Coffman] considers do not provide direct evidence of market efficiency, while . . . the remaining factor (Cammer Factor 5) is flawed and does not demonstrate that Tivity's stock price consistently reacted to new information quickly and completely during the relevant Class Period." (Doc. No.93-2 Gompers Report at 2-3).[3]

Although both experts were paid handsomely for analyzing the Cammer-plus factors (Coffman received $800 per hour and Gompers $1,200 per hour), those factors are not a catechism for determining market efficiency. Indeed, the Sixth Circuit has not mandated use of those factors, and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist. Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 83 (S.D.N.Y. 2015); Första AP-Fonden v. St. Jude Med., Inc., 312 F.R.D. 511, 520 (D. Minn. 2015); Angley v. UTi Worldwide Inc., 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018). Accordingly, the Court finds it unnecessary to discuss each of the ten factors identified by Coffman, but will instead focus on a number of factors that lead the Court to discount Dr. Gomper's opinion in favor of Coffman's opinion.

First, Tivity is traded in volume on the NASDAQ. "[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency." Basic, 485 U.S. at 241–42. This is because those securities markets are "open and developed" and "[t]he high level of trading activity ensures that information from many sources is disseminated into the marketplace and consequently is reflected in the market price." Freeman v. Laventhol & Horwath, 915 F.2d 193, 199 (6th Cir. 1990). "This is the premise upon which the fraud on the

---

[3] This is not the first time that Coffman and Gompers have crossed swords in the context of class certification in a securities case. See e.g., Hatamian v. Advanced Micro Devices, Inc., No. 14-CV-00226 YGR, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016); In re NII Holdings, Inc. Sec. Litig., 311 F.R.D. 401, 412 (E.D. Va. 2015)

13

market theory rests." Id.  Thus, even though it is not a *per se* rule, "securities trading on national exchanges like the NYSE [and the  NASDAQ] 'are often presumed to be traded on an efficient market,' . . . precisely because the exchanges are generally populated by stocks that are closely watched by analysts and that trade at a high volume."  Local 703, I.B. of T. Grocery & Food Emp. Fund v. Regions Fin. Corp., 762 F.3d 1248, 1257 (11th Cir. 2014).

The presumption is even more warranted here.  Tivity had an average weekly trading volume of 6.24% during the proposed class period, which is higher than the average weekly common stock traded on the NASDAQ of 1.81%.  (Coffman Report at ¶ 28).  It is also significantly higher than the weekly 1% trading volume that establishes a "substantial presumption of an efficient market."  In re Accredo Health, Inc. Sec. Litig., No. 03-2216 DP, 2006 WL 1716910, at *7 (W.D. Tenn. Apr. 19, 2006) (collecting cases).

Second, while Dr. Gompers opined that nine of the ten factors provided no *direct* evidence of market efficiency, this is a far cry from saying that they offered *no* evidence of efficiency.  In fact, he agreed with Coffman's calculations on the vast majority of the ten factors indicative of market efficiency, including  (1) the stock's average trading volume; (2) analyst coverage: (3) the presence of market makers: (4) eligibility to file an S-3 registration statement; (5) market capitalization; (6) bid-ask spread; (7) float and institutional ownership; and (8) option trading.  (Doc. No. 96-2, Gompers Depo. at 48-61).

Third, Dr. Gompers criticizes Coffman's "event study" that was used to establish price reaction for purposes of Cammer factor five, but "[n]ot even the Cammer court said that an event study was required to satisfy the fifth factor." Carpenters Pension, 310 F.R.D. at 86.  In fact, there generally "is no reason to burden the court with review of an event study and the opposing expert's

14

attack of it," unless "defendants present evidence of lack of price impact or that the market was inefficient. Angley v. UTi Worldwide Inc., 311 F. Supp. 3d 1117, 1126 (C.D. Cal. 2018), which Tivity has not done here. Besides, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are . . . largely beside the point." Halliburton, 573 U.S. at 72 (emphasis in original)  "That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss," which is "all that Basic requires." Schleicher v. Wendt, 618 F.3d 679, 685 (7th Cir. 2010).  Thus, while "[t]here is no doubt that empirical evidence of a cause-and-effect relationship is helpful for a finding of market efficiency, . . . 'helpful' does not mean 'determinative.'"  Första AP-Fonden, 312 F.R.D. at 520.

Fourth, Dr. Gompers actual criticism of the Coffman's "event study" is unpersuasive.  The "event study," as the name suggests, studied the impact of certain events on Tivity stock in order to gauge whether there was a cause-and-effect between information provided to the market and a change in stock prices. More specifically, Coffman analyzed the cause-and-effect relationship between Tivity-specific information and the market price of its common stock from March 7, 2015 to November 6, 2018 because, in his view, the proposed class period of 172 days was not sufficiently long enough to provide enough data.  (Coffman Report ¶ 25).  From that study, Coffman concluded that there was "a clear cause-and-effect relationship between new material news and changes in the market price of Tivity Common Stock during the Analysis Period, and the Class Period."  (Id. ¶ 64).[4] He also concluded that there "was no evidence of statistically significant autocorrelation during the

---

[4] Just by way of example, eleven earnings announcement were made during the analysis period, ten of which resulted in "statistically significant price movements above the 99% confidence [level]." (Id. ¶ 57). Similarly, "on the 175 days with no news, the average change in the price of Tivity Common Stock was only 0.88% after controlling for market and industry factors, while the average change in Tivity Common Stock on earning announcement dates was 9.42%.  In other words, the average magnitude of stock price movement on earnings announcement days was over ten time higher than on no news days."  (Id. ¶ 60).

Class Period," (id. ¶ 25), meaning there was no pattern in Tivity's returns such that future returns could be predicted based upon past returns.

Dr. Gompers asserts the event study is "flawed" and Coffman's conclusions are incorrect because (a) Coffman ignored that the November 6, 2017 press release about UHC entering the fitness market was "stale" information, and a stock that reacts to such news is inconsistent with trading on in an efficient market; (b) there was statistically significant autocorrelation in Tivity's stock returns during the putative Class Period; and (c) Coffman ignored evidence that Tivity's stock price decline was an overraction, which is another factor that is inconsistent with an efficient market. The Court briefly considers these points in turn.

(a) Dr. Gompers contends Coffman ignored other information that indicated UHC was entering the fitness market, an argument that parallels Tivity's overriding argument that UHC's November 6, 2017 press release could not have possibly "revealed the truth" of the alleged fraud in this case because UHC and other entities publicly released information regarding Optum Fitnes Advantage on numerous occasions, even as far back as a year earlier. In other words, "these pre-November 6, 2017 disclosures demonstrate that putative class members were likely exposed to the very information that [Lead] Plaintiff alleges was misrepresented to, or withheld from, investors, prior to the alleged corrective disclosure." (Doc. No. 93 at 14). As a consequence there was no actionable fraud or, at a minimum, individual inquiries will be necessary as to actual knowledge.

Key to Tivity's argument is the notion that "the case law in this District is clear that a Defendant is *not* required to demonstrate affirmatively that class members has actual knowledge – it must only show that 'individual knowledge inquiries might be necessary.'" (Doc. No. 93 at 11). As support, Tivity cites Schuh v. HCA Holdings, Inc., No. 3:11-01033, 2014 WL 4716231 (M.D.

16

Tenn. Sept. 22, 2014). However, reading <u>Schuh</u> as standing for the proposition that the possibility of individualized knowledge precludes class certification is to entirely misconstrue that case.

In <u>Schuh</u>, then-Judge Sharp granted a request for class certification in a consolidated action against HCA Holding, even though HCA argued, as Tivity essentially does here, that it was "entitled to individualized demonstrations of proof and jury determinations as to each class member's knowledge." <u>Id.</u> at *7 Judge Sharp cabined his statement about "individualized knowledge inquiries" with the following:

> HCA's argues that investors "might have," "could have" or "would have" known certain things, and continues in its sur-reply by stating "that the information Plaintiff claims was omitted from the Registration Statement was publicly available and thus knowable by prospective class members." . . . "If courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on § 11's affirmative defense, presuming that the plaintiff should have known the relevant information rather than requiring the defendant to prove actual knowledge." This is not to say that Defendant must establish the merits of its affirmative defense at this stage; it is to say, however, that "the certification question [is] whether common liability issues predominate over individual knowledge defenses." Speculation "does not raise the concern of issues of individual knowledge predominating."

<u>Id.</u> at *9 (internal citations omitted). On appeal, the Sixth Circuit determined that it was not an abuse of discretion to certify a class and, in doing so, observed:

> the district court applied our precedent that an affirmative defense, standing alone, does not compel a finding that common liability issues do not predominate. It then considered the evidence presented by the parties regarding investor knowledge and concluded that the Defendants failed to present sufficient evidence that its affirmative defense of investor knowledge defeated predominance on the common liability issues. The district court acknowledged that the Defendants established that there was some information publicly available that, if known by investors, would preclude relief on the Plaintiffs' claims. But the district court found that the Defendants failed to show that any investor actually had knowledge of this information. The district court noted the Plaintiffs' evidence that certain sophisticated investors did not have knowledge of the information and found that the Defendants' speculation that other investors could have known this information could not, standing alone, defeat

predominance. Thus, viewed in its totality, the Plaintiffs met their burden of showing that investor knowledge did not defeat predominance of the common liability issues.

In re HCA Holdings, Inc., No. 14-0511, 2015 WL 10575861, at *2 (6th Cir. Feb. 26, 2015)

The same is true here. Tivity has presented no proof that any investor knew, or likely would have known, about UHC's entry into the market prior to the corrective disclosure. Instead, it points to what Lead Plaintiff properly characterizes as a "hodgepodge" of information from which it is to be inferred that the information was out there and publicly available. The sources of that information, however, are not the types one would commonly expect investors to consult, such as SEC filings, Barron's, the Economist, Kiplinger's, or Investor's Business Daily. Instead, the supposed disclosures about UHC's movement could be found (if one looked) in such diverse places as "a packet of information" released by UHC for insurance agents, a tweet from the Deer Park Fitness Center in Washington, an online flyer from the West Monmouth County New Jersey YMCA, websites of other New Jersey YMCAs, a Harrison, Ohio fitness blog, another blog maintained by the Mercury Pharmacy in Washington, a user post on the "Insurance Forum" website, and the www.fitnessadvantage.optum.com website. (Doc. No. 93 at 11-13). It is little wonder that even Dr. Gompers could only go so far as to say it is "likely" that "some of Tivity's institutional investors" were aware of Optum Fitness Advantage offerings in some states. ((Doc. No. 34).

(b) Coffman concluded that there was no consistent autocorrelation over the analysis period, which suggests an efficient market. Dr. Gompers does not dispute this, but claims that Coffman arbitrarily expanded the class period to reach that result. What Dr. Gompers does not adequately explain is why a longer period (that encompasses the class period) would not be more accurate statistically than a shorter one. Cf. Beaver Cty. Emp. Ret. Fund v. Tile Shop Holdings, Inc., No. 14-786 ADM/TNL, 2016 WL 4098741, at *10 (D. Minn. July 28, 2016) ("[A]s noted by Coffman

18

and supported by caselaw, averaging across the class period is superior to isolating small portions of the class period when assessing autocorrelation."). Further, during his deposition, Dr. Gompers could not "point to a specific characteristic of the market of Tivity" that would suggest the market would be less efficient during the class period than it was during the broader analysis period. (Gompers Depo. at 87). Nevertheless, he suggests that even for a short class period of say one week, analyzing information beyond that week is unhelpful because it would not automatically show the market reaction during the week at issue. Gompers has not identified any academic study that supports this position, nor has Tivity cited any legal authority for that proposition. And, Dr. Gompers did not conduct his own event study. See, Första AP-Fonden, 312 F.R.D. at 522 (noting that "a study's failure to conclusively prove efficiency . . . is different from proving inefficiency," and that "Defendants could have submitted rebuttal evidence in the form of an affirmative event study by Dr. Gompers," but did not). Regardless, "autocorrelation does not, standing alone, prove market inefficiency." Plumbers & Pipefitters Nat. Pension Fund v. Burns, 967 F. Supp. 2d 1143, 1160 (N.D. Ohio 2013) (collecting cases).

(c) Dr. Gompers states that the "evidence suggests the market potentially overreacted following the UHC press release." (Gompers Report at 26). The word choices – *suggesting* a *potential* overreaction – is likely intentional because Dr. Gompers provides no concrete evidence that there was, in fact, an overreaction, or any indication of how much the market overreacted, if it did. Instead, he points to seven analysts that published reports on either November 6 or 7, 2017, and notes that "no analyst suggested that the stock price underreacted to UHC's announcements and several suggested that it overreacted, *i.e.* the reaction was not commensurate with the value-implication of the news and the stock was undervalued as a result." (Id. ¶ 72). He then concludes: "if the market

19

overreacted, an investor could have purchased Tivity's stock and expected to make excess profits, which would be inconsistent with market efficiency." (Id. ¶ 73). Again, Dr. Gompers's word choices are telling because the converse is also likely true and just as speculative: if the market did not overreact, this would be consistent with an efficient market. Problem is, analysts opinion are inherently subjective, and there is nothing before the Court establishing that the 34% drop in Tivity common stock on November 7, 2017 was due to the market overreacting to the news that UHC had entered the health and fitness market in competition with the SilverSneakers program.

Finally on the issue of market efficiency, the Court notes (1) Lead Plaintiff's assertion that "Dr. Gompers's views on efficiency are routinely rejected by federal courts around the country as misguided, 'absolutist,' and inconsistent with decades of legal precedent" (Doc. No. 96 at 3); (2) Lead Plaintiff attachment of a table listing opinions rejecting Gompers' views on market efficiency (Doc. No. 96-3); and (3) Lead Plaintiffs' assertion that, even though Dr. Gompers has offered an expert opinion in securities cases several dozen times since 2001, he has never (a) offered an opinion in favor of an investor in a securities case, (b) found that the market in any security was efficient, or (c) offered an opinion that an opposing expert provided sufficient evidence to show that a stock was treated in an efficient market. (Doc. No. 96-3 at 96 n.1). To this, the Court simply "recognizes, as other courts throughout the country have recognized, that different experts may approach the determination of whether a market is efficient using different methods, focusing on different elements," Monroe Cty. Employees' Ret. Sys. v. S. Co., No. 1:17-CV-00241-WMR, 2019 WL 2482399, at *5 (N.D. Ga. June 12, 2019), and that there is no magical elixir that establishes market efficiency. That said, analysis of the factors that are generally employed lead unerringly to the conclusion that Tivity common stock traded in an efficient market, and did so during the proposed

class period.

### 2. Damages

Tivity argues that Lead Plaintiff cannot meet the predominance requirement of Rule 23(b) because Lead Plaintiff has not demonstrated that its proposed damages model will calculate damages on a classwide basis as required by <u>Comcast Corp. v. Behrend</u>. Again, Tivity relies extensively on Dr. Gompers' report, which serves more as a criticism of Coffman's conclusions, rather than an independent analysis. In this vein, Dr. Gompers contends that Coffman's damages methodology does not account for different investors' knowledge about UHC's Optum Fitness Advantage Program; does not specify a class-wide damages model that is consistent with the theory of liability; does not account for time-varying inflation; and does not account for potential overreaction. Even considering the Supreme Court's decision in <u>Comcast</u>, Tivity and Dr. Gompers place too great a burden on Lead Plaintiff at this juncture.

<u>Comcast</u> involved certification of an antitrust class action under Rule 23(b)(3) where plaintiffs proposed four theories of antitrust impact, but only one of those theories was accepted by the district court. Plaintiffs' sole basis for calculating damages, however, utilized a model that assumed the validity of all four theories. Utilizing "straightforward application of class certification principles," the Supreme Court held that class certification is improper where a "model fail[s] to measure damages resulting from the particular antitrust injury on which petitioners' liability . . . is premised.'" <u>Id.</u> at 36. "In other words, at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" <u>Zehentbauer Family Land</u>, 935 F.3d at 510 (6th Cir. 2019) (quoting <u>Comcast</u>, 569 U.S. at 35). Since the theory of liability did not square with the damages measure, certification in <u>Comcast</u> was improper.

21

In contrast, "[t]his is not a case where a plaintiffs' damages model does not track his theory of liability. Instead, this is a case in which the Plaintiff's 'proposed measure for damages is . . . directly linked with their underlying theory of classwide liability . . . and is therefore in accord with the Supreme Court's . . . decision in Comcast.'" Waggoner v. Barclays PLC, 875 F.3d 79, 106 (2d Cir. 2017) (quoting In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 123 n.8 (2d Cir. 2013)). Specifically, Lead Plaintiffs' allegations are that shareholders were harmed when Tivity led them to believe that its relationship with UHC would continue on as before, and no mention was made about UHC's implementation of a program that would directly compete with SilverSneakers, even though Tivity was fully aware of that fact. The "out-of-pocket" damages model proposed by Coffman seeks to "measure damages as the artificial inflation per share at the time of purchase less the artificially inflation at the time of the sale[.]" (Coffman Report ¶ 78).

Use of the out-of-pocket damages model in securities case is hardly new or novel – it "is the standard measurement of damages in Section 10(b) securities cases." City of Miami Gen. Emp. & Sanitation Emp. Ret. Tr. v. RH, Inc., No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases). Comcast did not change this, or render the model improper. See, Rougier v. Applied Optoelectronics, Inc., No. 4:17-CV-02399, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019) ("The Comcast requirement is easily satisfied in securities fraud cases invoking the Basic presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock."); In re Barrick Gold Sec. Litig., 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) ("[A]s required by Comcast, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be measurable on a class-wide basis. This is evidenced by the fact that securities

22

class actions routinely seek out-of-pocket damages for fraudulent misrepresentations.").

Dr. Gompers' criticisms of utilizing an "out-of-pocket" model in this case do not alter this Court's conclusion that predominance exits and certification is appropriate. For example, he asserts that the proposed model does not account for time-varying inflation and potential overractions. These arguments are premature. See, Waggoner, 875 F.3d at 106 ("[W]e are not persuaded by the Defendants' argument that class certification was improper under Comcast because the Plaintiffs' damages model failed to account for variations in inflation over time. Comcast does not suggest that damage calculations must be so precise at this juncture."). In any event, Coffman has submitted a Supplemental Report that indicates such concerns can be "mechanically incorporated into the standard damages model," depending upon what discovery reveals. (Doc. No. 97-1, Coffman Supp. Report ¶ 65).

Based upon the record and for the reasons set forth above, the Court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Therefore, certification of a class is appropriate.

## IV. Conclusion

Lead Plaintiff's Motion to Certify Class (Doc. No. 81) will be granted, and the Court will certify a class consisting of all those who purchased or otherwise acquired Tivity common stock between March 6, 2017 and November 6, 2017, inclusive. Further, and without objection from Tivity, the Court ill appoint Oklahoma Firefighters Pension and Retirement System as class representative, and Cohen Milstein Sellers & Toll PLLC as class counsel.

23

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE