Exhibit 11

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

----------------------------------------x

LEWIS COSBY, KENNETH R. MARTIN,

as beneficiary of the Kenneth Ray Martin

Roth IRA, and MARTIN WEAKLEY on

behalf of themselves and all others

similarly situated,

                  Plaintiffs,

        vs.              No. 3:16-cv-00121

KPMG, LLP,

                  Defendant.

----------------------------------------x

                  April 16, 2019

                  9:02 a.m.


      VIDEOTAPED DEPOSITION of MARTIN ZIESMAN,

held at the law offices of FOLEY & LARDNER LLP,

111 North Orange Avenue, Orlando, Florida, before

Donald R. DePew, Registered Professional Reporter,

Certified Realtime Reporter, Florida Professional

Reporter, and Notary Public in and for the State

of Florida at Large.

```
 1
 2  A P P E A R A N C E S:
 3
 4  Attorneys for Plaintiffs and The Witness:
 5  COHEN MILSTEIN SELLERS & TOLL PLLC
 6       88 Pine Street, 14th Floor
 7       New York, New York 10005
 8  BY:  LAURA H. POSNER, ESQ.
 9       lposner@cohenmilstein.com
10
11  Attorneys for Defendant:
12  McDERMOTT WILL & EMERY LLP
13       340 Madison Avenue
14       New York, New York 10173-1922
15  BY: GREGORY G. BALLARD, ESQ.
16       gballard@mwe.com
17            - AND -
18  WALLER LANSDEN DORTCH & DAVIS, LLP
19       Nashville City Center
20       511 Union Street, Suite 2700
21       Nashville, Tennessee 37219
22       paul.davidson@wallerlaw.com
23  BY: PAUL S. DAVIDSON, ESQ.
24
25
```

1

2   A P P E A R A N C E S (Continued):

3

4   ALSO PRESENT:

5   ALLISON HART, Paralegal, McDermott Will & Emery LLP

6   JEFFREY MENTON, Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 4 of 87   PageID #: 15008

1

2          THE VIDEOGRAPHER:  We are now on the

3     video record, the time is 9:02 a.m.  Today

4     is April the 16th, 2019.  This is the video

5     deposition of Martin Ziesman.

6          Please note, as the microphones are

7     very sensitive be aware that they can pick up

8     whispering and conversations not intended

9     for the record.

10          Additionally, please turn off your cell

11     phones or place them away from the

12     microphones as they can interfere.

13          This video deposition has been noticed

14     by the law firm of McDermott Will & Emery

15     and being taken by Attorney Gregory G. Ballard

16     representing the defendant In the matter of

17     Lewis Cosby, Kenneth R. Martin, as

18     beneficiary of the Kenneth Ray Martin Roth

19     IRA, and Martin Weakley on behalf of

20     themselves and all others similarly situated

21     versus KPMG, LLP, Case No. 3:16-cv-00121 in

22     the United States District Court of

23     Tennessee in the Knoxville Division.  This

24     deposition is being taken at the offices

25     of Foley & Lardner LLP at 111 North Orange

```
 1              M. Ziesman
 2         Avenue, Orlando, Florida.
 3              The court reporter is Donald DePew
 4         from Reporters Central.  My name is Jeff
 5         Menton, I am the certified legal video
 6         specialist from Valuable Video.
 7              Would counsel please state their
 8         appearances for the record and state whom
 9         you represent starting with the noticing
10         attorney, and then will the court reporter
11         please swear the witness in.
12              MR. BALLARD:  I am Greg Ballard from
13         McDermott Will & Emery.
14              Allison Hart is a paralegal from my
15         firm and she is here with me as well
16         representing KPMG.
17              MR. DAVIDSON:  And I'm Paul Davidson
18         from Waller Lansden in Knoxville
19         representing KPMG.
20              MS. POSNER:  Laura Posner, Cohen
21         Milstein Sellers & Toll, for the plaintiffs.
22              THE WITNESS:  Martin Ziesman, client's
23         rep.
24              (Continued on following page.)
25
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 6 of 87   PageID #: 15010

```
 1              M. Ziesman
 2  M A R T I N   Z I E S M A N,
 3         called as a  witness, having been duly
 4         sworn by the Notary Public, was examined and
 5         testified as follows:
 6  EXAMINATION BY
 7  MR. BALLARD:
 8         Q.    Mr. Ziesman, are you represented by
 9  counsel today?
10         A.    Yes, I am.
11         Q.    That's Laura Posner?
12         A.    Yes.
13         Q.    Are you taking any drugs or medications
14  that might impair your ability to testify
15  truthfully and accurately today?
16         A.    No, sir.
17         Q.    Is there any reason why you can't
18  testify truthfully and accurately today?
19         A.    No.
20         Q.    If I ask you a question and you don't
21  understand, can you let me know so I can rephrase
22  it.
23         A.    I will.
24         Q.    Thank you.
25               What's your current home address?
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2        A.    507 Viterra Court, Poinciana, Florida.
 3        Q.    Do you have a business address as well?
 4        A.    No.
 5              Been there, done that.
 6        Q.    Okay.  Have you been a party to a
 7   litigation prior to this one?
 8        A.    No.
 9        Q.    Have you ever been involved in an
10   arbitration or any kind of dispute of that nature?
11        A.    No.
12        Q.    Have you ever been in any dispute
13   regarding any investments prior to this?
14        A.    No.
15        Q.    Have you testified under oath in any
16   other setting, whether in court or in a deposition
17   or any other setting?
18        A.    I'm trying to think when.
19              Probably 19 -- somewhere in the 1960s
20   I had witnessed a boating accident, I testified
21   briefly in that.
22        Q.    Is that the only other time that you've
23   been --
24        A.    Yes.
25        Q.    -- recall testifying?
```

```
 1              M. Ziesman
 2              Can you just walk us through your
 3   educational background, please.
 4        A.    University of Iowa with a BBA, and
 5   that's the education part.
 6        Q.    When did you receive the BBA?
 7        A.    1961.
 8        Q.    Did you pursue any graduate degree?
 9        A.    No, sir.
10        Q.    What was your major?
11        A.    Business.
12        Q.    Do you hold any professional licenses?
13        A.    Not now, no.
14        Q.    Have you ever held a professional
15   license?
16        A.    I was a licensed broker in the '60s
17   and early '70s.
18        Q.    You're not a CPA, are you?
19        A.    No, sir.
20        Q.    Can you just walk us through briefly
21   your work history.
22        A.    Upon graduation I went to work
23   initially for Macy's.  Berlin came along, so I
24   found myself in the Coast Guard.
25              Following that I went to work for the
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 9 of 87   PageID #: 15013

```
 1                    M. Ziesman
 2  credit division of Montgomery Ward, I don't know,
 3  roughly four or five years.
 4              Then I went to work for Shearson,
 5  Hammill, a broker, for about the same period, four
 6  or five years.
 7              And then bought into an electric motor
 8  business which involved the repair, sales of
 9  electric motors in Saint Pete, Florida.
10              I retired in 1998.
11      Q.    Okay.  So it's been a while since you
12  were a broker?
13      A.    Yes.
14      Q.    That goes back to the '60s and '70s,
15  did you say?
16      A.    I started in '67 and left in '72.
17      Q.    All right.  And after you left the
18  brokerage in 1972 did you ever do any further work
19  in the investment field?
20      A.    No, except for my own personal
21  investment.
22      Q.    Do you have any particular experience
23  with oil and gas?
24      A.    I don't know what you mean by
25  experience.  But as far as investing, I have
```

```
 1                  M. Ziesman
 2  looked -- invested in it since -- oh, I don't
 3  know, probably 2011, 2012 is when I got seriously
 4  interested in those issues.
 5       Q.   What was it that got you interested in
 6  oil and gas in 2011 and 2012?
 7       A.   Basically I came to the idea that oil
 8  was something we had to have.  It was always going
 9  to be there.  In those days you were looking at
10  discussion about peak oil, so if anything there
11  was going to be less and less.
12            As opposed to trying to figure out if
13  you're going to buy into XYZ company, is the
14  product they have today going to be as viable
15  tomorrow, and so on and so forth.  You're not
16  looking for say the next widget to come out.
17            So it was much more stable inasmuch as
18  we actually have to have oil.
19       Q.   Did you follow oil prices once you
20  became interested in the oil --
21       A.   Oh, yes.
22       Q.   -- and gas sector?
23       A.   Oh, yeah.
24       Q.   Do you have any particular experience
25  or expertise with respect to accounting for oil
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 11 of 87   PageID #: 15015

```
 1              M. Ziesman
 2  and gas assets?
 3      A.   No.
 4      Q.   And I would presume you don't have any
 5  experience or expertise with auditing, is that --
 6      A.   No.
 7      Q.   What did you do to prepare for your
 8  deposition today?
 9      A.   I just tried to I suppose get ahead of
10  the curve a little bit --
11          MS. POSNER:  Just don't disclose any
12      attorney-client privileged communications.
13      He just wants --
14          Do you want to clarify?
15      Q.   So if you met with your attorney, for
16  example, it's okay to say that you met, but I'm
17  not going to ask about the conversations you had,
18  so...
19      A.   Yes.
20      Q.   So you met with your attorney?
21      A.   Yes, we did.
22      Q.   Did you -- well, how long did you meet
23  for?
24      A.   An hour and a half.
25      Q.   And when was this?
```

```
 1                    M. Ziesman
 2        A.    Yesterday.
 3        Q.    Did you review any documents?
 4        A.    Not in any depth, no.
 5        Q.    Did you review anything that refreshed
 6   your recollection about anything?
 7        A.    Yes.
 8        Q.    What did you review that refreshed
 9   your recollection?
10        A.    Just going back through what had gone
11   on basically.
12        Q.    What document was it that you were
13   looking at?
14        A.    I didn't look at any, quote/unquote,
15   documents.
16        Q.    Did you look through e-mails or
17   anything?
18        A.    I looked briefly at e-mails.
19        Q.    Were these e-mails documents that you
20   produced in this litigation?
21        A.    Yes.
22        Q.    Have you spoken with anyone else about
23   your deposition besides Ms. Posner?
24        A.    Not about the deposition, no.
25        Q.    Have you spoken with anyone else about
```

```
 1                  M. Ziesman
 2  the lawsuit?
 3       A.    Yes.  The other attorney on here,
 4  Gordon Ball.
 5             There are two other fellows in the
 6  class action, we all discussed, yeah.
 7       Q.    How many calls have you had with the
 8  other proposed plaintiffs in the case?
 9       A.    Two or three.
10       Q.    Was that Mr. Eric Montague?
11       A.    Yes.
12       Q.    And Mr. Lewis Cosby?
13       A.    Lewis Cosby, yeah.
14       Q.    Have you spoken with Martin Weakley?
15       A.    No, sir.
16       Q.    Have you spoken with Kenneth Martin?
17       A.    No.
18       Q.    When did you first become aware of
19  this lawsuit?
20       A.    This particular lawsuit in February.
21  We had contact with Gordon's office going back
22  probably the better part of two years.
23       Q.    You referred to this particular
24  lawsuit, were you aware of another lawsuit related
25  to Miller Energy?
```

```
 1                    M. Ziesman
 2        A.    Well, you had the lawsuit with Miller,
 3   but then you had the one that went against the
 4   underwriters.
 5        Q.    Okay.  So the one against the
 6   underwriters, do you know the name of that one,
 7   was it Gaynor?
 8        A.    Yeah.
 9        Q.    Okay.  And the lawsuit with Miller, do
10   you know what that was called?
11        A.    No, sir.
12        Q.    Do you remember when that lawsuit with
13   Miller was filed?
14        A.    Very early on.  I want to say that was
15   '14, '15, somewhere in there.
16        Q.    That was some years ago, right?
17        A.    Yes.  Yeah.
18        Q.    And were you aware that that lawsuit
19   was resolved?
20        A.    Yes.
21        Q.    And did you know at the time, when the
22   lawsuit against Miller was resolved, were you
23   aware of it at the time?
24        A.    No.
25        Q.    When did you become aware of that
```

```
 1                  M. Ziesman
 2   lawsuit?
 3        A.    Only recently.
 4        Q.    How did you first become aware of the
 5   present lawsuit?
 6        A.    How did?
 7        Q.    How did you learn about it?
 8        A.    Gordon Ball's office had contacted me.
 9   Obviously he knows who the owners of those
10   securities were and he followed it up and
11   contacted the owners.
12        Q.    And when did you first become -- first
13   consider becoming involved personally in the
14   lawsuit?
15        A.    I had gone back and forth with Gordon
16   a couple of times as these other suits were going
17   on.  And then it was only in February here that
18   we -- I became a member of the class.
19        Q.    And why did you decide to try to
20   become a member or try to become a plaintiff in
21   this  lawsuit?
22        A.    Probably you're hitting on a nerve.
23              As a broker way back when I felt like
24   I had become a whipping boy oftentimes when
25   corporations took advantage of their stockholders.
```

```
 1                    M. Ziesman
 2  Maybe an example of that would be on a buyout or a
 3  company was bought out for a fraction of what it
 4  was worth.
 5              Today you've got -- that would
 6  instantly get a lawsuit going, but in the '60s it
 7  didn't seem to happen.
 8              But when the cust -- when this happened
 9  to my customers they looked at me for I'm the one
10  that recommended that to them.  So it's something
11  you don't forget.
12              And when this case comes up I'm
13  involved, I lost a bunch of money in it.  Yes, I'm
14  going to step forward is the way I felt.
15      Q.    So why do you want to sue KPMG?
16      A.    I lost a bunch of money because they
17  didn't do what they were supposed to do.
18      Q.    Why do you say KPMG didn't do what it
19  was supposed to do?
20      A.    I think the SEC has kind of made that
21  perfectly clear.
22      Q.    Do you have any knowledge about KPMG's
23  audits?
24      A.    Specific details, no.
25      Q.    Do you have any knowledge about KPMG's
```

```
 1              M. Ziesman
 2   audits of Miller Energy's financial statements?
 3              MS. POSNER:  Outside of your
 4        conversations with counsel.
 5        A.    Just -- you say outside conversations,
 6   also what I've read, you know, that it was fraud.
 7        Q.    What did you read that suggested there
 8   was a fraud?
 9        A.    The SEC findings -- searching for the
10   right word there -- the findings of the SEC I
11   thought were quite clear on the matter and the
12   penalties that they came forward with seemed
13   rather severe.
14        Q.    So you're under the impression that
15   the SEC found that KPMG committed a fraud?
16        A.    Yes.
17        Q.    Would it surprise you to learn that
18   that's a mistaken impression?
19              MS. POSNER:  Objection.
20        Q.    Would that surprise you?
21              MS. POSNER:  Objection.
22              That's not clear.
23              MR. BALLARD:  Oh, it's quite clear.
24              MS. POSNER:  I disagree.
25              If you can answer.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 18 of 87   PageID #:
15022

```
 1                M. Ziesman
 2       Q.    As a matter of fact the SEC did not
 3  find any -- that KPMG committed fraud.
 4             Does that surprise you?
 5             MS. POSNER:  Objection.
 6       A.    I -- yeah, it would.
 7       Q.    So when you said you read some
 8  materials about KPMG you were referring to the SEC
 9  orders that were issued?
10       A.    I was reading the materials from the
11  counsel.
12       Q.    Okay.  Did you do any independent
13  research on your own regarding Miller Energy or
14  KPMG's involvement with Miller Energy?
15       A.    Only up front to know that they were
16  the auditor for them.
17       Q.    I'm going to hand you what we
18  previously marked as Exhibit 3.
19             This is a copy of the second amended
20  complaint in this lawsuit.
21             Have you read this complaint?
22             (Witness looks at document.)
23       A.    Not in all this detail.
24       Q.    Do you recognize this document?
25       A.    Give me a second here.
```

```
 1                M. Ziesman
 2             (Witness looks at document.)
 3     A.    No, I don't think I do.
 4     Q.    So is it your belief that you have not
 5  seen Exhibit 3 prior to today?
 6     A.    Not that I recall.
 7             And at my age I don't really know what
 8  I had for breakfast yesterday.  But outside of
 9  that...
10     Q.    Do you recall reviewing any version of
11  the complaint in this lawsuit?
12     A.    I looked at some of the -- any of
13  materials that have gone through counsel, yes,
14  I've seen.
15             (Discussion off the record.)
16     Q.    Do you know what you're proposing to
17  sue KPMG for in this complaint, in this lawsuit?
18     A.    My impression is that we're suing them
19  because they did not in simple terms do their job.
20  But they essentially just rubber stamped, my
21  understanding, the -- Miller's accounting, if you
22  will, and they didn't verify it.  And that, of
23  course, is what they get paid to do.
24     Q.    Do you know what -- let me rephrase
25  that.
```

```
 1              M. Ziesman
 2              Do you know how many claims the
 3  plaintiffs in this case are asserting against KPMG?
 4       A.    No.
 5       Q.    Do you know what type of claims they
 6  are, the name of them or anything about them?
 7       A.    Essentially going after them for
 8  misrepresentation and fraud.
 9       Q.    Did you provide comments on any draft
10  or version of the complaint to the lawyers in this
11  case?
12       A.    No, I haven't.
13       Q.    I'm handing you what we previously
14  marked as Exhibit 37.
15              Do you recognize this document?
16       A.    Sure.
17       Q.    What is it?
18       A.    It's where I purchased the security.
19       Q.    Is this a certification that you
20  signed on February 27th of 2019?
21       A.    Yes, sir.
22       Q.    Who drafted this?
23       A.    The attorneys.
24       Q.    Did you read it and then sign it?
25       A.    Yes.
```

```
 1                    M. Ziesman
 2        Q.    Is it accurate?
 3        A.    Yes.
 4        Q.    The first numbered paragraph of your
 5   certification states, "I have reviewed the Second
 6   Amended Class Action Complaint in this matter and
 7   authorize the filing of this Certification."
 8              Do you see that?
 9        A.    Uh-huh.
10        Q.    I think earlier you didn't recall
11   seeing the second amended complaint, is this the --
12        A.    I can see that coming.
13        Q.    So do you believe that you did review
14   the second amended complaint or was this a mistake
15   in your certification?
16        A.    I did review it.
17              You're throwing legal stuff at me here
18   that -- all I can tell you is basically, yes, I
19   did.
20              That was supplied to me at the time,
21   okay?
22        Q.    Okay.  So let's go back to Exhibit 3.
23              Is it now your testimony that you did,
24   in fact, read this document prior to today?
25        A.    If they -- I did, yes.
```

```
 1                  M. Ziesman
 2        Q.    Okay.  Do you remember reading it?
 3        A.    In detail, no, but, yeah.
 4        Q.    Okay.  Did you see anything in it that
 5   you disagreed with in any way?
 6        A.    No.
 7        Q.    Do you remember anything that you read
 8   in this beyond what you've already said?
 9        A.    Not really.
10        Q.    In your certification in the second
11   paragraph you state that you are "willing to serve
12   as a representative party on behalf of the
13   Section 11 Class."
14              Do you know what that means?
15        A.    That I'm going to represent the --
16   actually all the shares, but particularly the C
17   and D Class.
18        Q.    What do you understand your duties to
19   be or what do you understand your duties will be
20   if you are accepted as a representative party on
21   behalf of the Section 11 Class?
22        A.    I need to be on top of the materials,
23   I need to work with the attorneys as well as the
24   other two fellows in the class.  The thrust of the
25   whole thing would be to recuperate as much of our
```

```
 1              M. Ziesman
 2  investment as we can.  And then probably is that
 3  we go to trial to do that.
 4       Q.    You also indicate in your certification
 5  in paragraph 3 that you have -- you "purchased
 6  and/or sold the securities that are the subject of
 7  the Complaint as set forth" in "the attached
 8  Schedule A."
 9              Do you see that?
10       A.    Where is --
11              You're talking about 3 here?
12       Q.    Paragraph 3, yes.
13              Do you see paragraph 3 refers to a
14  Schedule A that lists purchases or sales you made
15  in securities at issue in this case?
16       A.    Okay.
17       Q.    All right.  And does Schedule A list
18  the one and only transaction you made in Miller
19  Energy securities?
20       A.    Correct.
21       Q.    Prior to June of 2014 had you ever
22  purchased a Miller Energy security before?
23       A.    No, sir.
24       Q.    And you never sold your shares --
25       A.    No.
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1              M. Ziesman
 2      Q.     -- of the preferred stock?
 3             Did you collect and produce all of the
 4  documents you have in your possession that relate
 5  to Miller Energy?
 6      A.     I did.
 7             The documents and -- today everything
 8  is online, so I just had to go back and -- and
 9  collect whatever was still up on the Web.
10      Q.     You didn't keep any paper files
11  related to Miller Energy?
12      A.     No.
13      Q.     I believe you produced some e-mails in
14  this case; is that --
15      A.     Yes, sir.
16      Q.     Where did you have your e-mail
17  account?
18      A.     I don't think I fully understand
19  what...
20      Q.     Well, do you have an e-mail account?
21      A.     Yes.
22      Q.     Who is that e-mail account with,
23  Google, Yahoo --
24      A.     Gmail.
25      Q.     Okay.  Gmail.  All right.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 25 of 87   PageID #: 15029

```
 1                  M. Ziesman
 2               And did you search your Gmail account
 3  for --
 4       A.    Yes.
 5       Q.    -- documents?
 6       A.    Yes.
 7       Q.    And you produced everything that you
 8  found that mentioned Miller Energy?
 9       A.    Yes.
10       Q.    I've handed you what we marked
11  previously as Exhibit 5.
12               Do you recognize this joint
13  declaration?
14               (Witness looks at document.)
15       A.    Yes.
16       Q.    And did you sign this in March of this
17  year?
18       A.    The 14th.
19       Q.    In your joint declaration you indicate
20  that you're "committed to actively overseeing the
21  effective and efficient prosecution of this
22  action."
23               And you also state, "We take the
24  obligations owed by class representatives
25  seriously," and "will actively monitor our counsel
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 26 of 87   PageID #: 15030

```
 1              M. Ziesman
 2  and the litigation."
 3              How do you plan to do that?
 4       A.    I plan to stay on top of it and
 5  communicate -- basically I just answered this.
 6              Through Lewis, Eric, and myself we have
 7  to stay in contact with the two attorneys.  We have
 8  to know what's going on and if there's information
 9  we can provide from here on we need to do that.
10       Q.    You indicated you had some
11  communications with the other two individuals?
12       A.    Yeah.
13       Q.    How do you plan to regularly
14  communicate with them in the future?
15       A.    Anytime something comes up.
16              MR. BALLARD:  I'm going to ask our
17       court reporter to mark our next exhibit as
18       Exhibit 39.
19              (Exhibit 39, Copy of multipage
20       brokerage account, bearing Bates stamp Nos.
21       MillerEnergy-KPMG-MZ-000001 through
22       MillerEnergy-KPMG-MZ-000015, marked for
23       identification, as of this date.)
24              (Discussion off the record.)
25       Q.    Here, let me hand you Exhibit 39.
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2        A.     Okay.
 3        Q.     Can you tell us what Exhibit 39 is.
 4        A.     It's a copy of my brokerage account.
 5        Q.     I see three names or I guess your name
 6   at the top and also Carolyn K. Ziesman?
 7        A.     Yeah, my wife.
 8        Q.     That's your wife?
 9        A.     Yeah.
10        Q.     And there's also the -- an indication
11   that this was the Carolyn K. Ziesman Trust?
12        A.     Correct.
13        Q.     Is the account held in the trust name?
14        A.     Yes.
15        Q.     Who has trading authority over this --
16        A.     Both.
17        Q.     -- account?
18        A.     Both she and I do.
19        Q.     Is she willing to be a plaintiff in
20   this case?
21        A.     I am...
22               I do all the trading, okay?
23               She really does not take any interest
24   whatsoever in any of it, so...
25               For all purposes she doesn't have any
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 28 of 87   PageID #: 15032

```
 1                    M. Ziesman
 2  testimony to give.  She is not familiar with it.
 3        Q.    She has never purchased or sold --
 4        A.    No.
 5        Q.    -- a security in the account?
 6        A.    No.
 7        Q.    But if she wanted to she could, she
 8  has trading authority?
 9        A.    Yeah.
10        Q.    There's a bunch of stuff redacted from
11  this, do you know what that is?
12        A.    I didn't redact it.  I would imagine
13  it's probably other securities in the account.
14        Q.    Do you know why that would have been
15  redacted?
16        A.    I don't know that it necessarily has
17  anything to do with what we're addressing here.
18        Q.    What other securities did you have in
19  this account?
20        A.    Off of the top of my head back in 2014,
21  I can't honestly say.
22              But more than likely there was other
23  oil securities.  It would be for the most part
24  common stock.
25        Q.    Did you focus your investing in oil
```

```
 1                    M. Ziesman
 2  and gas securities?
 3        A.    In this period of time I did.
 4        Q.    Do you recall how many oil and gas
 5  securities you held at this period of time?
 6        A.    No more than a dozen.
 7        Q.    Do you remember the names of any of
 8  the other oil and gas stocks that you owned?
 9        A.    At that point in time probably
10  SM Energy, Devon.  Somewhere along the line -- I
11  don't think at that point in time I had Petrobras,
12  but at one point in time I did.  I may have had
13  Occidental.
14              Off the top of my head those are the
15  ones that come to mind.
16              (Exhibit 40, Multipage document
17        entitled Carolyn K. Ziesman Revocable Trust,
18        bearing Bates stamp Nos.
19        MillerEnergy-KPMG-MZ-000016 through
20        MillerEnergy-KPMG-MZ-000041, marked for
21        identification, as of this date.)
22        Q.    I've handed you Exhibit 40.
23              Could you identify this.
24        A.    It's my wife's trust.
25        Q.    And is this the trust that owns the
```

```
 1                    M. Ziesman
 2  Scottrading account?
 3        A.    Yes, it is.
 4              (Exhibit 41, Seven-page Energy
 5        Prospectus Group document, bearing Bates
 6        stamp Nos. MillerEnergy-KPMG-MZ-000042
 7        through MillerEnergy-KPMG-MZ-000048, marked
 8        for identification, as of this date.)
 9        Q.    I've handed you Exhibit 41.
10              Can you tell us what this is.
11        A.    It looks like what I've taken down from
12  the Internet, primarily from the Energy Prospectus
13  site.
14        Q.    You're referring to the Energy
15  Prospectus Group?
16        A.    Yes.
17        Q.    What is the Energy Prospectus Group?
18        A.    I would basically describe it as a
19  news letter put out by Dan Steffens.
20              Dan is -- prior was a accountant for --
21  I'm drawing a blank right now, but one of the major
22  oil companies.  And after he left them, sometime
23  around 2000 he and another fellow set up this as a
24  newsletter for oil stocks.  And this is the Web
25  site and on there he will post those stocks that
```

```
 1                    M. Ziesman
 2   he is -- has selected, you know.
 3              And then he has a forum on there where
 4   the people that are a member of this -- it's a
 5   paid subscription -- can discuss them.  And there
 6   isn't much discussion.  It's usually just asking a
 7   question.  I'd say 80 percent of what's on there
 8   is Dan's follow-up to whatever -- if there was a
 9   news event that would impact a stock he would put
10   that on there.
11              In certain rare cases we can go on
12   there, if we so desire, and challenge.
13        Q.    Did you have a paid subscription to
14   this Web site?
15        A.    Yes.
16        Q.    When did you first subscribe?
17        A.    A while ago.  Don't hold me to it.  If
18   I had to pick a year I'd say probably 2011.
19        Q.    You certainly subscribed to it before
20   you purchased the --
21        A.    Oh, yeah.
22        Q.    -- Miller Energy --
23        A.    Oh, yeah.
24        Q.    And did you maintain your
25   subscription --
```

```
1                    M. Ziesman
2        A.    Yes.
3        Q.    Do you still have that subscription?
4        A.    I just paid him again on Monday.
5        Q.    Have you gone on the forum and posted
6   things there yourself?
7        A.    Sure.
8        Q.    What name do you use when you do that?
9        A.    Petrohawk, P-e-t-r-o hawk.
10        Q.    How did you come up with that name?
11        A.    I went to the University of Iowa, so
12   that would be hawk.  And petro is the name of the
13   game and at that time there was a stock by that
14   name which worked out quite well.
15        Q.    I thought you were going to say you
16   were hawkish on petroleum stocks.
17              So the postings by Dan S. Are probably
18   postings from Dan Steffens himself?
19        A.    Yes, sir.  Yeah.
20        Q.    Okay.  Did you ever post anything on
21   this Web site related to Miller Energy?
22        A.    Off the top of my head I'd have to say
23   that I don't recall.  I'm dubious.
24        Q.    Is there a way that the prior forum
25   postings are preserved on the site, such that
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 33 of 87   PageID #: 15037

```
 1                    M. Ziesman
 2  you're able to go on and pull them down again?
 3       A.    I tried to go back on there and find
 4  -- anything I found is here.  And, again,
 5  yesterday -- I think it was yesterday, if not the
 6  day before -- when I was paying the account to the
 7  secretary I asked her if she had the ability to go
 8  back and resurrect anything that I didn't see.
 9  And she said she'd try and come back to me on that
10  one.
11       Q.    So at least as of today this is
12  everything you found?
13       A.    Yeah.
14       Q.    All right.  I want to go back and talk
15  for a bit about your purchase of Miller Energy
16  securities in June of 2014 as reflected on your
17  certification.
18       A.    Yes.
19       Q.    So your certification indicates that on
20  June 4, 2014 you bought 1,000 shares of the
21  C Series of preferred stock --
22       A.    Right.
23       Q.    -- of Miller Energy?
24             And your share price was 25.4292 per
25  share; is that right?
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 34 of 87   PageID #: 15038

```
 1                    M. Ziesman
 2        A.     Uh-huh.
 3        Q.     How did you first hear about Miller
 4   Energy?
 5        A.     Through this Energy Prospectus site.
 6        Q.     What do you remember about what you
 7   first learned about Miller Energy?
 8        A.     Again, you're asking me to go back
 9   into '14, if not '13 here.
10             It would just -- as in the case of any
11   of these it would be a presentation on who the
12   company is, what they do, where they're located.
13   Give a breakdown of the estimated earnings from --
14   just as any accountant would do, from revenue, to
15   expenses, to cash flow, and that would be the
16   genesis of it.
17        Q.     Would it be fair to say that
18   Dan Steffens was recommending Miller Energy as a
19   potential investment in June of 2014?
20        A.     I would concur with that.  Dan has
21   made it crystal clear that he is presenting
22   information for our review.
23        Q.     Okay.  Well, you heard about the
24   Miller Energy through him, even --
25        A.     Yes.
```

```
 1                    M. Ziesman
 2       Q.    Okay.  So --
 3             And do you remember what his
 4  perspective on the preferred securities of Miller
 5  Energy was?
 6       A.    He was -- again, I'd have to agree
 7  with you, he was for the most part recommending
 8  that.  At some point, as it went on later, he had
 9  said  that the common -- he wasn't -- he wasn't
10  definitely the one recommending the common, but
11  the preferred, yes.
12       Q.    Okay.  Going back to June of 2014, why
13  did you decide to purchase the C Series of Miller
14  Energy stock?
15       A.    Well, first of all because it is a
16  preferred as opposed to the common, so for the
17  safety factor there.  Basically it had a 10 percent
18  dividend.
19             I looked into it.  We summer in the
20  Knoxville vicinity, so that perked my interest a
21  little bit more at the time.
22             And then as I've looked into it more
23  and more to see where they were located, it seemed
24  odd to me -- although Knoxville perked my interest,
25  I know that Knoxville was not oil territory, that
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 36 of 87   PageID #: 15040

```
1              M. Ziesman
2  we're talking Texas.  Oklahoma is  where 99 percent
3  of these oil companies are  located out of, so
4  that seemed a little odd.  And  they were -- the
5  property they were talking about  was sitting up
6  in Alaska.  So we've got three  different areas
7  here and...
8              You know, they claimed that that was
9  worth a fortune, what they had up there.  And
10 looking back and seeing that all the reports were
11 up to date -- talking about accounting -- from my
12 past experience in brokerage trade that's one of
13 the things I make sure of, is it's a red flag if
14 those haven't been filed.
15      Q.    Did you go and read any of the SEC
16 filings that Miller Energy had made before you
17 purchased it?
18      A.    No.
19      Q.    Did you know that you could go on the
20 SEC's Web site and review their filings?
21      A.    Yeah.
22      Q.    But you chose not to do that?
23      A.    Yeah.
24      Q.    Why didn't you read the filings?
25      A.    I spend a lot of time daily on the
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2  computer just looking at securities as well as the
 3  economy in general, which direction we're going,
 4  this, that, and the other thing, if you will.  And
 5  I suppose I've got more than enough time spent
 6  doing that as opposed to getting into the SEC.
 7           SEC is getting pretty deep into the
 8  subject when you start going to that level.
 9      Q.    Well, you're aware that companies,
10  public companies like Miller Energy, file annual
11  reports on Form 10-K, right?
12      A.    Yeah.
13      Q.    Did you read the Form 10-Ks for the
14  company or any of them?
15      A.    No.
16           But that's what I had referred to
17  earlier, their filings were up to date.
18      Q.    So you were aware that they had made
19  the filings, but you just didn't go and read them?
20      A.    Sure.
21      Q.    Did you know anything about the audit
22  opinions that KPMG had issued on Miller Energy?
23      A.    I only knew that they were involved in
24  it.  And frankly, when a firm of that size is
25  involved as opposed to a local, small firm, that's
```

```
 1                    M. Ziesman
 2  good enough for me.
 3       Q.    And you knew that in June of 2014 when
 4  you purchased?
 5       A.    Yeah.
 6       Q.    In June of 2014 did you know whether
 7  KPMG had issued a qualified or unqualified opinion
 8  on the financial statements of Miller Energy?
 9       A.    The difference between, you're saying?
10             No.
11       Q.    Did you know which they issued?
12       A.    No.
13       Q.    So you didn't know if it was qualified
14  or if it was unqualified?
15       A.    No, sir.
16       Q.    All right.  And did you know at the
17  time you purchased Miller Energy preferred
18  securities whether KPMG had issued an opinion on
19  the internal controls of their financial reporting
20  of Miller Energy?
21       A.    No.
22             All I knew is that was their accounting
23  firm and everything was up to date.
24       Q.    So you knew that KPMG was the
25  accounting firm that Miller Energy was using, but
```

```
 1              M. Ziesman
 2  you didn't know what form of opinion KPMG had
 3  issued on the financial statements or the internal
 4  controls --
 5       A.    True.
 6       Q.    -- would that be fair?
 7       A.    True.
 8       Q.    Did it matter to you whether KPMG had
 9  issued a qualified or unqualified opinion on the
10  financial statements?
11       A.    No.
12       Q.    Do you know the difference between a
13  qualified and an unqualified opinion on financial
14  statements?
15       A.    No.
16       Q.    Do you know what an adverse opinion is?
17       A.    I think the title would speak for
18  itself.
19       Q.    Were you aware that KPMG had issued an
20  adverse opinion on the internal controls of Miller
21  Energy?
22       A.    No.
23       Q.    Would that have affected your
24  investment decision if you had known it?
25            MS. POSNER:  Objection.
```

M. Ziesman

     A.    I would have taken it into
consideration.

     Q.    How did you determine the quantity of
shares to purchase in June of 2014?

     A.    Normally I probably shoot for a
$20,000 position.

          This, of course, is more than that.
And normally I would -- if it's a smaller priced
stock I would build up to that.  I wouldn't buy it
all at one time, but 20 in round figures is kind
of what I shoot at.

     Q.    Around this time what percentage of
your investment portfolio was the Miller Energy
position?

     A.    Hmm...

          Probably less than 10 percent.

     Q.    What was your view of the price you
paid at the time for the preferred shares?

     A.    Looking at the whole picture, taking
into account as to -- again going back to how it
was broken out for me, that they were earning the
money, they had the dividend covered.

          At the time oil was high and oil
companies were doing as well as they'd ever done,

```
 1              M. Ziesman
 2  so that's why I entered into it.
 3       Q.    Okay.  Did you have an expectation
 4  about the direction oil prices were headed at that
 5  time?
 6       A.    Yeah, up.
 7              I didn't get that right either.
 8       Q.    So did you think of this investment as
 9  essentially a bet on the price of oil?
10              MS. POSNER:  Objection.
11       A.    To some degree if you're going to
12  invest in an oil stock the basic commodity is a
13  determining factor, sure.
14       Q.    As it turned out oil prices declined
15  precipitously after you purchased the stock; is
16  that right?
17       A.    You've got it dead on.
18       Q.    So you've mentioned Dan Steffens, did
19  you consult with anyone else about your purchase
20  or did you consult with anyone about your purchase
21  of Miller Energy --
22       A.    No.
23       Q.    You didn't use an investment adviser
24  or broker?
25       A.    No.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 42 of 87   PageID #: 15046

```
 1              M. Ziesman
 2        Q.    You made the decision on your own?
 3        A.    Yes.
 4        Q.    And I think you said that your wife
 5   didn't participate in the --
 6        A.    No.
 7        Q.    -- decision, anyone else in your
 8   family?
 9        A.    No.
10        Q.    How did you place the order, was it
11   online?
12        A.    Yes.
13        Q.    And what type of order did you place?
14        A.    Well, you either place a limit or a
15   market, is that what you're asking?
16        Q.    Yes.
17        A.    In all honesty I can't tell you, but
18   99.9 percent of the orders I put in are limit.
19        Q.    So you would have determined the
20   highest price you were willing to pay and you
21   would have put a limit on the order you placed so
22   that it would not be --
23        A.    So I didn't get a --
24        Q.    -- filled at a higher price?
25        A.    -- surprise, yes.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 43 of 87   PageID #: 15047

```
 1                    M. Ziesman
 2        Q.    Okay.  So your belief today is you
 3  probably put in a limit order rather than a market
 4  order?
 5        A.    Yes.
 6        Q.    And that was based on your view of what
 7  would be a good or a fair price for the security?
 8        A.    I knew basic -- when you place an
 9  order you know what the stock is trading at within
10  pennies or dollars, or whatever you want to say.
11  And within that window, I'm just saying that this
12  is the price target I want within that window of
13  where it's trading, if that's clear.
14        Q.    So when you placed the order do you
15  know how quickly it was filled?
16        A.    No.
17        Q.    Do you believe it was filled pretty
18  quickly after you placed the order?
19        A.    I would assume so.
20        Q.    If you look at Exhibit 39, on the
21  second page --
22        A.    Okay.
23        Q.    -- you'll see an entry related to your
24  purchase of the C Series Miller Energy stock.
25              Do you see that?
```

```
 1                  M. Ziesman
 2              It's a little bit hard to read because
 3  it's small, but it's on the second page of the
 4  document.
 5              Oh, you know what, that's double-sided
 6  so you can see it there.
 7       A.    Okay.  Got it.
 8       Q.    This indicates that you bought 1,000
 9  shares, as you mentioned before, on June 4th, 2014
10  and it indicates that the average price was used.
11              Do you see that?
12              (Witness looks at document.)
13       A.    No.
14              What's -- towards the bottom?
15       Q.    Right there.
16       A.    Okay.
17              (Witness looks at document.)
18       A.    Yes, I do see it.
19       Q.    Do you know what that means?
20       A.    Not really.
21       Q.    Would you take that to mean that you
22  got 1,000 shares?
23       A.    Uh-huh.
24       Q.    And they might have been at --
25       A.    Some more, some less.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 45 of 87   PageID #: 15049

```
 1                    M. Ziesman
 2       Q.    Some more, some less, but the average
 3  price was the price reflected here?
 4       A.    Yeah.
 5             MS. POSNER:  Objection.
 6       Q.    Do you know how this order was filled,
 7  like where the shares came from?
 8       A.    No.
 9       Q.    They could have come from anywhere,
10  right?
11       A.    Sure.
12       Q.    And they could have come from more than
13  one source?
14       A.    Uh-huh.
15       Q.    In fact, the use of the average price
16  would indicate that they very well could have come
17  from more than one source, right?
18             MS. POSNER:  Objection.
19       Q.    Would you agree with that?
20       A.    Sure.
21       Q.    Going back to this time period in June
22  of 2014, I know you indicated that you focused on
23  the oil and gas sector.
24             Did you have in your investment
25  portfolio an investment strategy that you followed?
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2        A.    Growth and income.
 3        Q.    How would you describe your risk
 4   tolerance at that time?
 5        A.    Well, I'm retired so it's
 6   conservative.
 7        Q.    You referred to the fact that you're
 8   retired, so you're talking about the fact that
 9   you're more conservative because you're in
10   retirement already and you have a shorter time
11   window to invest?
12        A.    Well, I don't have the ability to
13   regenerate funds.
14        Q.    Has your risk tolerance changed over
15   time?
16        A.    Yeah.  Initially I would -- you know,
17   I've taken more of a flier occasionally.
18        Q.    And as the years have gone by you've
19   become more conservative, is that fair?
20        A.    A little bit.
21        Q.    Where on the spectrum were you back in
22   June of 2014?
23        A.    I'd been retired for 16 years at the
24   time so definitely conservative.
25        Q.    And were all of your investments in
```

```
 1                    M. Ziesman
 2   June of 2014 in oil and gas stocks?
 3        A.    Oh, God, no.
 4        Q.    What percentage of your portfolio was
 5   oil and gas at that time?
 6        A.    I'd say slightly over half, just
 7   shooting from the ballpark.
 8        Q.    Approximately how many securities did
 9   you own at the time?
10        A.    I'm going to pick a number out of the
11   hat, twenty.
12        Q.    What did you do to monitor your
13   investments?
14        A.    It would have been on the computer.
15        Q.    You watched the --
16              Did you monitor them on your Scottrade
17   account?
18        A.    I reviewed the statements at the end
19   of the month.  But as far as how do I track stocks,
20   I'm tracking them on the Internet.
21        Q.    How do you track them on the Internet?
22        A.    Bring up the -- basically bring up the
23   account, if you will, and everything is listed in
24   a row and you can just go bing, bing, bing down
25   the row.  And the ones that jump off the page that
```

```
 1                    M. Ziesman
 2   you need to give some attention to for whatever
 3   reason, you do.
 4        Q.    All right.  So beyond what you've
 5   already testified to, did you do anything else to
 6   research Miller Energy before you purchased?
 7        A.    I looked at what -- to be clear about
 8   it, I guess I looked at what Steffens had put up
 9   there.  Then I went to other sites to see if there
10   were comments on that and -- for example, sites
11   like Yahoo will put on the financials again, which
12   is repetitive from what Steffens had done.
13              And pretty much it.
14        Q.    Okay.  Aside from the Energy Prospectus
15   Group of Dan Steffens and Yahoo, do you remember
16   any other sites you consulted prior to purchase?
17        A.    I'm sure I would have looked at
18   Investor Village for one and -- you know,
19   basically -- I looked at other sites, but to say
20   I looked at whatever exactly for this, you know,
21   to be honest about it...
22        Q.    It's hard to remember?
23        A.    Yeah.
24        Q.    Okay.  What's Investor Village?
25        A.    It's just a place where you can -- once
```

```
 1              M. Ziesman
 2  again, they -- it's a subscription or a
 3  non-subscription.  I'm not a subscriber to it, but
 4  you can go on there and they have groups.  For
 5  example, they'll have an oil group, they'll have a
 6  biotech group, and, you know, go on down the line.
 7              And then they also have specific
 8  stocks and people post on there whatever.  And at
 9  the  time there was another group going, which was
10  strictly a dividend investor group, and at the
11  time I was a member of that and I'm sure I would
12  have looked at that one.
13      Q.    In Exhibit 41, the printout from the
14  Dan Steffens group, there's some references to
15  investor presentations, conference calls.
16              Did you ever participate in any
17  investor presentation or conference call related
18  to Miller Energy?
19      A.    No.
20              Where do you see conference calls?
21      Q.    Well, if you look on the first page
22  there's an entry Tuesday, April 21, 2015 and
23  there's a reference to "Sheraton Towers Times
24  Square."  And under that there's a Webcast address
25  and then there's a -- under that it says
```

```
 1              M. Ziesman
 2 "Conference participation is by invitation only."
 3          It's really hard to read, but it's --
 4      A.   What page?
 5      Q.   On the first page.  It's very small
 6 print.
 7      A.   Second paragraph?
 8           MS. POSNER:  Right here.
 9           MR. BALLARD:  Yeah, it's there.
10           (Witness looks at document.)
11      A.   Okay.  That's a luncheon that's held
12 in Houston and I would say that it's by invitation
13 only.
14           I don't know what he's trying to get,
15 but invitation only -- anybody that's a member can
16 go to those luncheons.  The luncheons are
17 absolutely free.
18           I attended one very early on.  The only
19 problem with them is that...
20      Q.   They're in Houston?
21      A.   They're in Houston, yeah.
22      Q.   Yeah.  Okay.
23           So the one you attended I'm guessing
24 did not cover Miller Energy?
25      A.   No.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 51 of 87   PageID #: 15055

```
 1              M. Ziesman
 2      Q.   So you never attended a luncheon on
 3  Miller Energy?
 4      A.   I think they only had one and I did
 5  not.
 6      Q.   When you purchased your Miller Energy
 7  preferred securities what did you know about the
 8  Alaska assets?
 9      A.   Only that they had them and I think
10  they valued them, round figures, 500 mill
11  basically.
12      Q.   Did you know anything about how they
13  acquired those assets?
14      A.   Through a bankruptcy.
15      Q.   Do you know what they paid for the
16  assets?
17           MS. POSNER:  Are you asking him now
18      what he knows or at the time?
19           MR. BALLARD:  At the time.
20      Q.   Did you know at the time how much
21  Miller Energy had paid for the Alaska assets?
22      A.   I don't think so, no.
23           I wish I had this conversation four
24  years ago.
25      Q.   Let me direct your attention to --
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1              M. Ziesman
 2  there's a page that has the No. 45, the Bates No.
 3  MZ 45 at the bottom.
 4       A.    Okay.
 5       Q.    At the top of that page there's an
 6  entry from Dan S., so Dan Steffens.
 7       A.    Uh-huh.
 8       Q.    It looks like it's dated May 20 --
 9       A.    9th?
10       Q.    Okay.  It's hard to read.  It's either
11  May 28th or May 29th, 2014.
12            So that would have been before you
13  purchased.
14       A.    Uh-huh.
15       Q.    Do you believe you read that -- this
16  entry or these entries before you purchased?
17       A.    Yeah, I read everything.
18       Q.    So you followed this site and you read
19  what --
20       A.    Oh, yeah.
21       Q.    -- Mr. Steffens had to stay about
22  Miller Energy?
23       A.    Yeah.
24       Q.    Okay.  There's a reference to "Brean
25  Capital" in this page as well --
```

```
 1                    M. Ziesman
 2        A.    Uh-huh.
 3        Q.    -- do you see that?
 4              Do you know what Brean Capital is?
 5        A.    Only that, you know, they're another
 6   investment house.
 7        Q.    Did you read any reports from Brean
 8   Capital?
 9        A.    No.
10        Q.    Do you know who any of the other
11   people who post on here are?
12        A.    No.
13        Q.    There's a Ken M. Or "kenm," do you
14   know who that is?
15        A.    I tried to go back since coming onboard
16   in February to sort of do some diligence on this
17   thing and see if I could find out who he was or
18   make contact and he is no longer -- you know, in
19   most of these sites there's a posting as -- to a
20   brief degree at any rate as to who these people
21   are and his was no longer up.
22        Q.    All right.  Do you see his entry here
23   for May 29th at 7:22 p.m.?
24        A.    "Thanks much for having them"?
25        Q.    Yes, that entry.
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2        A.    Okay.
 3        Q.    And he indicates in here, "I believe
 4   if some of their projections are hit the common
 5   will  react strong and take the preferred C with
 6   it."
 7              Do you see that?
 8        A.    Yeah.
 9        Q.    Did these kind of comments on here
10   influence you in your investment decision-making
11   process?
12        A.    I read them, took them into account,
13   but I -- not to the point that it, you know, kept
14   me from doing it.
15        Q.    Okay.  And it looks like the next entry
16   below that one is from Dan Steffens from May 29,
17   2014 at 8:36 p.m.
18              Do you see that?
19        A.    Yeah.
20        Q.    And in the first paragraph toward the
21   end he says, "I would rate the common stock as
22   high risk/high reward."
23              Do you see that?
24        A.    Uh-huh.  Uh-huh.
25              That's why I said earlier that he was
```

```
 1                  M. Ziesman
 2  not promoting the common.
 3       Q.    And so this was -- well, this was May
 4  of 2014 before you purchased.
 5            Did you have a view on the risk level
 6  for either the common stock or the preferred?
 7       A.    Obviously I did not think the
 8  preferred had that risk level.
 9       Q.    You thought it was a lower risk
10  investment?
11       A.    Well, it's -- yeah.  It's preferred
12  because they've got a higher claim on the assets
13  of the company.
14       Q.    What did you think about the interest
15  rate that they were paying on the preferred?
16       A.    It was attractive.  It -- they had
17  the -- and they had it covered.
18       Q.    Did the interest rate that they were
19  paying indicate anything about risk to you?
20       A.    Well, of course.  The higher the
21  interest rate the more risk you're going to have.
22  But 10 percent was at the high end, but it wasn't
23  in territory that necessarily would flag it.
24            MR. BALLARD:  All right.  We've been
25       going a little over an hour, let's take a
```

```
 1                M. Ziesman
 2        short break.
 3                THE WITNESS:  Okay.
 4                THE VIDEOGRAPHER:  This will be the end
 5        of video media disk No. 1.  The time is
 6        10:10 a.m.  We're going off the video record.
 7                (Recess taken.)
 8                THE VIDEOGRAPHER:  We're back on the
 9        video record.  This is video media disk
10        No. 2.  The time is 10:25 a.m.
11   BY MR. BALLARD:
12        Q.    Mr. Ziesman, I'm going to hand you
13   Exhibit 15.
14        A.    Okay.
15        Q.    Exhibit 15 is a copy of the Form 10-K
16   for the fiscal year-ended April 30, 2014.
17        A.    Okay.
18        Q.    Have you ever seen this before?
19        A.    No, sir.
20        Q.    Let me direct your attention to
21   page 169.
22                I'm looking at the page number in the
23   top right-hand corner.
24        A.    Yeah.  Got it.
25        Q.    Do you see the heading for
```

Case 3:16-cv-00121-TAV-DCP  Document 169-11  Filed 06/29/20  Page 57 of 87  PageID #: 15061

```
 1                    M. Ziesman
 2   "Stockholders' Equity"?
 3        A.    Uh-huh.
 4        Q.    Under that heading there's a heading
 5   for "C Series Preferred" --
 6        A.    Uh-huh.
 7        Q.    -- "Stock."
 8              Do you see that?
 9        A.    Uh-huh.
10        Q.    That's the series you bought, right?
11        A.    Sure.
12        Q.    The first paragraph refers to an
13   offering of 685,000 shares of the C Series
14   preferred stock on September 28, 2012.
15              Do you see that?
16        A.    Yes.
17        Q.    In the next paragraph there's a
18   reference to another offering of C Series shares
19   on October 12th, 2012.
20              Do you see that?
21        A.    Yes.
22        Q.    And then in the middle of that second
23   paragraph there's a reference to again
24   October 12th, 2012 and the sale of 924,968
25   Series C Preferred Stock shares.
```

```
 1                   M. Ziesman

 2              Do you see that?

 3      A.    Uh-huh.

 4      Q.    And then in the next paragraph there's

 5  a reference to another offering on February 12th

 6  of 2013 of C Series shares that's a "'best efforts'

 7  offering."

 8              Do you see that?

 9      A.    Yes.

10      Q.    And then there's a reference in the

11  following paragraph to an offering of C Series

12  shares, another "'best efforts' offering" on

13  May 7th of 2013.

14              Do you see that?

15      A.    Yes.

16      Q.    And then if you turn to the next page

17  there is one more reference to an offering of

18  C Series shares on June 27, 2013.

19              Do you see that?

20      A.    Yes.

21      Q.    And you see that there are different

22  prices for each of these offerings.

23      A.    Yes.

24      Q.    Do you know which of these offerings

25  your shares came from?
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 59 of 87   PageID #: 15063

```
 1                M. Ziesman
 2        A.    No, I don't.
 3        Q.    There's no way to know, right?
 4        A.    No.
 5        Q.    In fact, your shares could have come
 6   from more than one of these offerings; isn't that
 7   right?
 8              MS. POSNER:  Objection.
 9        A.    If I don't know I would have to think
10   anything is possible.
11        Q.    Do you know whose shares were sold to
12   you, who the seller was?
13        A.    I have no way of knowing.
14        Q.    Do you have any way of knowing how many
15   times those 1,000 shares changed hands before they
16   made their way to you?
17        A.    No.
18              MR. BALLARD:  You can set that aside.
19              I'll hand you the next exhibit, which
20        will be exhibit --
21        A.    It's kind of like going to a
22   convention.
23        Q.    A convention?
24        A.    All the paperwork you go home with.
25              MR. BALLARD:  We ship it back and
```

```
 1              M. Ziesman
 2         forth.
 3              THE WITNESS:  Oh, you will?
 4              Okay.
 5         Q.    Have you seen Exhibit 11 before?
 6         A.    Not that I can readily say, no.
 7         Q.    This is a press release dated
 8    December 16, 2009.  It was filed with the SEC
 9    related to the purchase of the Alaska assets by
10    Miller Energy.
11              Do you see that?
12         A.    Yeah.  Yeah.
13         Q.    There's a heading for "Acquisition
14    Details," do you see that heading?
15         A.    Yes.
16         Q.    Under that there's a statement that
17    "Miller Energy paid a total of $2.25 million" --
18         A.    I see.
19         Q.    -- "for the Alaskan oil and gas assets,
20    and an additional $2.22 million for contract cure
21    payments, bonds and other local, federal and State
22    of Alaska requirements to operate the facilities."
23              Do you see that?
24         A.    Yes.
25         Q.    So this indicates that there was
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 61 of 87   PageID #:
15065

```
 1                M. Ziesman
 2  approximately $4.5 million paid for the Alaska
 3  assets, right?
 4       A.    Right.
 5       Q.    Did you know that when you purchased?
 6       A.    No.
 7       Q.    If you had known that might you have
 8  thought differently of your purchase?
 9            MS. POSNER:  Objection.
10       A.    I certainly would have taken it into
11  account.
12       Q.    Do you know if you would have
13  purchased Miller Energy C Series shares if you had
14  known the purchase price for the Alaska assets?
15            MS. POSNER:  Objection.
16       A.    I can't say for certain.
17       Q.    Can you look at Exhibit 3 again.  It's
18  the second amended complaint.
19            And I'll direct your attention to
20  paragraph 68.
21       A.    Okay.
22       Q.    In paragraph 68 of the second amended
23  complaint plaintiffs allege that "On July 28th,
24  2011, analysts from TheStreetSweeper, a financial
25  Web site, published an investigative report on
```

```
 1              M. Ziesman
 2  Miller Energy, claiming that the Company had
 3  grossly exaggerated the value of the Alaska Assets.
 4  The report stated that the assets were actually
 5  worth between $25 million and $30 million, offset
 6  by $40 million of  liabilities."
 7              Do you see that?
 8      A.    Uh-huh.
 9      Q.    Have you ever seen that StreetSweeper
10  posting?
11              MS. POSNER:  Outside of...
12      A.    I was familiar that there was a Web
13  site called the StreetSweeper, yeah.  I did not
14  see this.
15      Q.    Did you know of this Web site in June
16  of 2014 when you purchased the security?
17      A.    I can't say yes or no.
18              I know of that Web site.  As to when I
19  first started being aware of it, I honestly can't
20  put a date on that.
21      Q.    Do you remember --
22      A.    It's no longer around.
23      Q.    Okay.  Do you remember ever consulting
24  any StreetSweeper posting in connection with your
25  Miller Energy securities?
```

```
 1                  M. Ziesman
 2        A.    No.
 3        Q.    If you had been aware of this posting
 4   as referenced here in paragraph 68 would you have
 5   read it before purchasing?
 6        A.    If I was aware of it it means I did
 7   read it, right?
 8              I suppose I can be aware of it if you
 9   said that it's there and I hadn't read it, okay.
10        Q.    Let me rephrase the question.
11              MS. POSNER:  I think you meant a
12        different question.
13        Q.    If you had been aware of the
14   StreetSweeper posting about Miller Energy in June
15   of 2014 would you have read the posting before
16   investing?
17        A.    I would think I probably -- yeah.
18        Q.    Do you know if it would have affected
19   your investment decision?
20              MS. POSNER:  Objection.
21        A.    I can't...
22              What it would have done, it would have
23   prompted me to do some more due diligence. Because
24   you've got a lot of people who have an  interest
25   in shorting stocks, putting up misinformation.
```

```
 1                M. Ziesman

 2                So I'd have taken that into account in

 3  saying who is right here?

 4      Q.    Are you saying that you might have

 5  discounted what they said on the StreetSweeper

 6  because it's a Web site for short sellers who may

 7  be trying to push the price down?

 8      A.    Correct.

 9      Q.    I will hand you Exhibit 14.

10                There you go.

11      A.    Okay.

12      Q.    Exhibit 14 is a Form 10-K for the

13  fiscal year-ended April 30, 2013.

14                I believe you said you had not reviewed

15  any of these before --

16      A.    Correct.

17      Q.    -- so you've never seen this one

18  before?

19      A.    No.  That's right.

20      Q.    Please turn to page 109.

21      A.    Okay.

22      Q.    Do you know what appears on page 109,

23  do you know what this is?

24                (Witness looks at document.)

25      A.    Well, it says it's -- the title of it
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 65 of 87   PageID #: 15069

```
 1                    M. Ziesman
 2  says that would be the report from the accountant.
 3      Q.    I believe you said earlier you had not
 4  read this report at the time you invested; is that
 5  right?
 6      A.    Correct.
 7      Q.    And if you turn to page 111, do you
 8  see another report there?
 9      A.    Yes.
10      Q.    You did not read that report prior
11  to --
12      A.    No.
13      Q.    -- investing?
14      A.    No.
15      Q.    When you say no you mean --
16      A.    I have not read it.
17      Q.    Okay.  Thank you.
18            Okay.  Go back to page 109 for a
19  second, please.
20      A.    Okay.
21      Q.    There's a paragraph that begins "A
22  material weakness," do you see that?
23      A.    Yes.
24      Q.    And it states, "A material weakness is
25  a deficiency, or a combination of deficiencies in
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1                    M. Ziesman
 2  internal controls over financial reporting, such
 3  that there is a reasonable possibility that a
 4  material misstatement of the company's annual or
 5  interim financial statements will not be prevented
 6  or detected on a timely basis."
 7                  Do you see that?
 8       A.    Uh-huh.
 9       Q.    And do you see the last paragraph
10  there's a statement, "In our opinion, because of
11  the effect of the aforementioned material weakness
12  on the achievement of the objectives of the control
13  criteria, the Company has not maintained effective
14  internal control over financial reporting as of
15  April 30, 2013"?
16                  Do you see that?
17       A.    Uh-huh.
18       Q.    If you had been aware of this adverse
19  opinion on the internal controls of Miller Energy
20  would you have still invested in the company's
21  preferred stock?
22                  MS. POSNER:  Objection.
23       A.    Well, it seemed to me if there was a
24  question on the back office accountability how can
25  you certify the -- how can you certify?
```

```
 1              M. Ziesman
 2              In other words, you're saying here that
 3   you question how the back office is reporting, but
 4   then you go ahead and say it's okay what they've
 5   done.
 6        Q.   Would you have taken this into account
 7   if you had read it before investing?
 8              MS. POSNER:  Objection.
 9        A.   I don't...
10              From this standpoint looking back today
11   you would say, yeah, you probably should have.
12              But what I would have done at that
13   time, it's kind of theoretical.
14        Q.   You're saying it's theoretical, you
15   don't remember or you don't know or can't
16   speculate what you --
17        A.   It's a theoretical question is what
18   I'm saying.
19              Now after the security has crashed and
20   burned and you're looking back you're saying sure
21   wish I would have.
22        Q.   Did you think --
23              When you purchased the preferred stock
24   in June of 2014 did you think the company had
25   sufficient revenues to fund its operating expenses?
```

```
 1                    M. Ziesman
 2        A.     Definitely.
 3               You know, the price of the whole thing
 4   was very important.
 5        Q.    If someone had told you this company
 6   does not have revenues that are sufficient to fund
 7   its operating expenses would you still have
 8   invested?
 9               MS. POSNER:  Objection.
10        A.     I think any prudent person would have
11   to say they probably wouldn't.
12        Q.     So if you had known that Miller
13   Energy's revenues were not sufficient to fund its
14   operating expenses you would not have purchased
15   the C Series shares --
16               MS. POSNER:  Objection.
17        Q.     -- is that fair?
18        A.     I think it's fair.
19        Q.     Can you turn to page 40 of Exhibit 14.
20        A.     I'll get there.
21               Okay.
22        Q.     Do you see the heading "Risks Related
23   to Our Business"?
24        A.     Yes.
25        Q.     And do you see the first paragraph
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 69 of 87   PageID #: 15073

```
 1              M. Ziesman
 2  that's in bold under that?
 3       A.    "In preparing"?
 4       Q.    It starts "We have a history."
 5       A.    Yes.
 6       Q.    Can you read the second sentence of
 7  that paragraph.
 8       A.    "Our revenues are not currently
 9  sufficient to fund our operating expenses and there
10  are no assurances we will develop profitable
11  operations."
12       Q.    Did you ever hear about a group of
13  concerned shareholders who sent a letter to the
14  company that was filed publicly with the SEC?
15       A.    No.
16             Well, let me -- at that time I hadn't.
17  I have since read that there was one, that might
18  be more accurate.
19       Q.    Okay.  So when you purchased your
20  Series C securities you were at that time not
21  aware of the concerned shareholders?
22       A.    No.
23             MR. BALLARD:  We're going to take a
24       minute to find the right document.
25             Why don't we just take a short break.
```

```
 1              M. Ziesman
 2              THE WITNESS:  Okay.
 3              THE VIDEOGRAPHER:  We're going off the
 4         video record at 10:44 a.m.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  We're back on the
 7         video record at 10:45 a.m.
 8   BY MR. BALLARD:
 9         Q.    I have handed you Exhibit 17 which is
10   a Form 14A filed with the SEC along with some
11   attachments, including a press release and also a
12   letter from certain people identified as
13   "Concerned Miller Shareholders."
14         A.    Okay.
15         Q.    You've never seen this before, right?
16         A.    No, sir.
17         Q.    Can you turn to the sixth page of the
18   document which is the beginning of the Concerned
19   Miller Shareholders letter.
20         A.    Okay.
21         Q.    Do you see it's dated December 17,
22   2013?
23         A.    Yes.
24         Q.    In the third paragraph in the third
25   line do you see there's a reference to --
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 71 of 87   PageID #: 15075

```
 1                M. Ziesman
 2      A.    Discredited?
 3      Q.    Yeah.
 4            -- "discredited absentee management
 5  team"?
 6            Do you see that?
 7      A.    Yes.
 8            MS. POSNER:  So just for the record,
 9      there's handwriting on the exhibit that I
10      don't think is part of the original.
11            MR. BALLARD:  Hold on.  Hold on.
12            MS. POSNER:  It's just a minor...
13            MR. BALLARD:  Yeah, that is...
14            It looks like there's one little
15      underline on that page.  We're recycling
16      exhibits from prior deposition days.
17            MS. POSNER:  It's okay.
18            MR. BALLARD:  Someone probably just
19      threw it in there.
20            MS. POSNER:  I just wanted you to be
21      aware, have it on the record.
22      Q.    I think you can just ignore the
23  underlining on that exhibit.
24      A.    It helped me find it.
25      Q.    And you see there's a reference also
```

```
 1                    M. Ziesman
 2  to an allegation that the "Board has failed to
 3  provide effective oversight."
 4          A.    In that paragraph?
 5          Q.    In the third paragraph.
 6                (Witness looks at document.)
 7          A.    Okay.
 8          Q.    And then if you turn to the next page
 9  there's a heading, "Mismanagement and Executive
10  Incompetence"?
11          A.    Yes.
12          Q.    And then there are allegations under
13  there, management's actions having caused
14  tremendous damage to shareholders.
15                Do you see that?
16          A.    Yes.  Yes, I do.
17          Q.    It references to bloated expense
18  structure and underperforming executives and
19  excessive lifestyles.
20                Were you aware of any of these
21  allegations when you --
22          A.    No.
23          Q.    -- purchased --
24          A.    No.
25          Q.    Turn to the next page, there's some
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 73 of 87   PageID #: 15077

```
 1                M. Ziesman

 2  bullets.

 3            There are allegations about the company

 4  consistently overreaching its spending, acting in

 5  a self-interested manner.

 6            Do you see there are a number of

 7  allegations here?

 8       A.    Yes.

 9       Q.    And then there's a heading on "Lack of

10  Operational Experience and Institutional

11  Credentials."

12            Do you see that?

13       A.    Yes.

14       Q.    In the last paragraph on the page

15  there's a statement that, "In our view, Miller's

16  CEO, Scott Boruff, has proven unsuitable to lead

17  the Company."

18            Do you see that?

19       A.    Yes, I do.

20       Q.    And at the end of that paragraph there

21  are references to "seriously deficient in its

22  leadership abilities" --

23            THE REPORTER:  I'm sorry?

24       Q.    There's a reference to serious

25  deficiencies in leadership abilities.
```

```
 1                   M. Ziesman
 2              Do you see that?
 3      A.    Yes.
 4      Q.    And if you turn to the next page
 5  there's a heading, "Excessive Management
 6  Compensation Misaligned with the Executives' or
 7  the Company's Performance."
 8      A.    Uh-huh.  Yes.
 9      Q.    Under that there's a reference to
10  "chronic missteps and general lack of strategic
11  vision."
12              Do you see those references?
13      A.    No, but I'm sure they're there.
14      Q.    There are a number of --
15      A.    Yes.
16      Q.    -- allegations in this document about
17  the company.  We won't go through all of them.
18              Would -- if you had been aware of this
19  when you invested would you have read this letter
20  and considered it?
21              MS. POSNER:  Objection.
22      A.    Obviously.
23      Q.    If you had read this letter would you
24  have purchased the Series C stock that you
25  purchased?
```

```
 1                M. Ziesman
 2                MS. POSNER:  Objection.
 3       A.    If I had read this letter I probably
 4  would have backed away.
 5       Q.    In this letter at the top of page 11
 6  there's a bullet point that begins, "Why did the
 7  Company enter into a consulting agreement with
 8  William Weakley."
 9                Do you see that?
10       A.    Yes.
11       Q.    Do you know who William Weakley is?
12       A.    No, sir.
13       Q.    Do you know who Martin Weakley is?
14       A.    No.
15       Q.    Are you aware that Martin Weakley is
16  one of the three plaintiffs in this case?
17       A.    I've seen the name, yes.
18       Q.    By the way, do you know any of the
19  members of management of Miller Energy?
20       A.    No.
21       Q.    Have you ever met anyone from Miller
22  Energy?
23       A.    No.
24       Q.    Do you know who Kenneth Martin is?
25       A.    No more than just the name.
```

```
 1                M. Ziesman
 2        Q.    You're aware he is one of the three
 3   plaintiffs in this case?
 4        A.    Yeah.
 5        Q.    There's a reference in that bullet
 6   point we were looking at in Exhibit 17 on page 11
 7   to a relative of Mr. Weakley in the third line.
 8             Do you see that?
 9        A.    Boruff?
10        Q.    In the third line there is a
11   reference -- or there's a question, "Did a relative
12   of Mr. Weakley lend Mr. Boruff over  $1.25 million
13   in June 2013 to make a required  principal payment
14   on his mansion in Knoxville,  Tennessee?"
15             Do you see that?
16        A.    Yes.
17        Q.    Were you aware that the relative
18   mentioned there is one of the plaintiffs in this
19   case?
20             MS. POSNER:  Outside of your
21        conversations with counsel.
22        A.    No.
23        Q.    Did you know that your lawyers
24   represent him, too?
25        A.    No.
```

```
 1                   M. Ziesman
 2        Q.    Did you sign a waiver of conflict of
 3   interest?
 4        A.    No.
 5        Q.    You are aware that Mr. Martin Weakley
 6   and Kenneth Martin are seeking to be substituted
 7   out of this case, right?
 8        A.    Yes.
 9        Q.    And that you and Mr. Eric Montague are
10   seeking to be substituted in as new plaintiffs?
11        A.    Yes.
12        Q.    Were you aware if Martin Weakley and
13   Kenneth Martin are related to each other?
14              MS. POSNER:  Outside of your
15         conversations with counsel.
16        A.    No.
17        Q.    Do you know why they want out of this
18   case?
19              MS. POSNER:  Outside of your
20         conversations with counsel.
21        A.    No.
22        Q.    Do you know anything about Martin
23   Weakley's job?
24              MS. POSNER:  Outside of your
25         conversations with counsel.
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 78 of 87   PageID #: 15082

```
 1                    M. Ziesman
 2      A.    No.
 3      Q.    Do you know anything about Kenneth
 4 Martin's job?
 5      A.    No.
 6      Q.    Do you know anything about their family
 7 situations that might be interfering with their
 8 ability to serve as plaintiffs in this case?
 9            MS. POSNER:  Outside of your
10       conversations with counsel.
11      A.    No.
12      Q.    Do you know anything about their work
13 situations that might be interfering with their
14 ability to serve as plaintiffs in this case?
15            MS. POSNER:  Outside of your
16       conversations with counsel.
17      A.    No.
18      Q.    Did you know that William Weakley was
19 the father-in-law of Kenneth Martin and that an
20 entity owned by Kenneth Martin is the one who made
21 the loan to Scott Boruff?
22            MS. POSNER:  Outside of your
23       conversations with counsel.
24      A.    Not at the time, no.
25      Q.    Do you know anything about the loan
```

```
 1              M. Ziesman
 2  extended by the plaintiff in this case to Miller
 3  Energy's CEO?
 4       A.   No.
 5       Q.   Do you know when it was extended?
 6       A.   I didn't.
 7       Q.   Do you know whether it was
 8  collateralized?
 9       A.   No.
10       Q.   Do you know if any -- what kind of due
11  diligence was done on the loan?
12       A.   No.
13       Q.   Do you know how it came to be that
14  Kenneth Martin loaned money to Scott Boruff?
15       A.   No.
16       Q.   Do you recall that oil prices declined
17  precipitously at the end of 2014, right?
18       A.   I do.
19       Q.   And did you suffer losses in several
20  of your stocks at that time?
21       A.   Yes.
22       Q.   Why do you think KPMG is responsible
23  for your losses?
24       A.   Because there were facts that they
25  should have brought forward; they didn't.  They
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 80 of 87   PageID #: 15084

```
 1                    M. Ziesman
 2  said everything was fine in paradise and it wasn't.
 3       Q.    Where did KPMG make these statements?
 4       A.    Well, they certified the records.
 5             In other words, they passed on them.
 6       Q.    Did you ever consider selling your
 7  shares of Miller Energy Series C stock?
 8       A.    I don't know what my --
 9             First of all, there wasn't much time
10  between June when I bought it and what was it, the
11  following October I think is when it stopped
12  trading.
13             So it was a limited time period, but to
14  say did I -- what I'd do in that time period, I
15  can't honestly say whether I seriously considered
16  it or thought it would come back or what.  I don't
17  know.
18       Q.    Did you sell any of your other oil and
19  gas stocks?
20       A.    I'm sure I did.  I'm sure I probably
21  bought some.
22       Q.    How did the price of oil affect or
23  change in the price of oil affect your decisions
24  in investing in oil and gas stocks?
25       A.    Well, it definitely took me away from
```

Case 3:16-cv-00121-TAV-DCP   Document 169-11   Filed 06/29/20   Page 81 of 87   PageID #: 15085

```
 1              M. Ziesman
 2  getting further involved at that point in time
 3  because that -- as you said, that was a disastrous
 4  come down.
 5       Q.   You're not blaming KPMG for the decline
 6  of oil prices, are you?
 7       A.   I hadn't thought about that yet.
 8            Yeah, I think it's possible.
 9            MR. BALLARD:  All right.  Let's take a
10       short break.
11            THE WITNESS:  Okay.
12            THE VIDEOGRAPHER:  We're going off the
13       video record.  The time is 10:57 a.m.
14            (Recess taken.)
15            THE VIDEOGRAPHER:  We're back on the
16       video record at 11:07 a.m.
17            MR. BALLARD:  Thank you, Mr. Ziesman.
18       I don't have any more questions at this
19       point.
20            THE WITNESS:  Excellent.
21            MS. POSNER:  I'm just going to have a
22       couple of questions on redirect.
23  EXAMINATION BY
24  MS. POSNER:
25       Q.   At any point in time prior to when you
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1              M. Ziesman
 2  purchased Miller Energy's securities did you have
 3  any reason to believe that Miller Energy's financial
 4  statements were inaccurate in any way?
 5      A.    No.
 6      Q.    At any point in time prior to when you
 7  purchased Miller Energy securities did you have any
 8  reason to believe that the valuation of Miller
 9  Energy's Alaskan assets were inaccurate in any way?
10      A.    No.
11      Q.    Would you have purchased Miller Energy
12  securities if you had known that its financial
13  statements were false?
14            MR. BALLARD:  Objection to form.
15      A.    No.
16      Q.    Would you have purchased Miller Energy
17  securities if you knew that its financial
18  statements were fraudulent?
19            MR. BALLARD:  Objection to form.
20      A.    No.
21      Q.    Did you in purchasing the Miller Energy
22  Series C preferred stock rely on the price of the
23  Miller Energy preferred stock when making an
24  investment?
25            MR. BALLARD:  Objection to form.
```

```
 1              M. Ziesman
 2      A.    Yeah, I did.
 3            Price is the -- the price is the name
 4  of the game, so to speak.
 5      Q.    Earlier today Mr. Ballard asked you some
 6  questions about how you first found out about the
 7  litigation, I just want to clarify that with you.
 8            When you first found out about the
 9  litigation did you find out about it through a
10  notice that Mr. --
11      A.    Ball.
12      Q.    -- Mr. Ball published when he filed the
13  lawsuit?
14      A.    Yeah.
15            MS. POSNER:  I have no further
16        questions at this time.
17            MR. BALLARD:  We're done.
18            MS. POSNER:  All right.
19            THE VIDEOGRAPHER:  This concludes the
20        video deposition of Martin Ziesman consisting
21        of two video media disks.
22            The time is 11:09 a.m. and we're going
23        off the video record.
24            MS. POSNER:  We'll review and sign.
25            (Time noted:  11:09 a.m.)
```

```
 1
 2                A C K N O W L E D G E M E N T
 3
 4               I, MARTIN ZIESMAN, hereby certify
 5     that I have read the transcript of my testimony
 6     taken under oath in my deposition of April 16,
 7     2019; that the transcript is a true, complete
 8     and correct record of my testimony, and that
 9     the answers on the record as given by me are
10     true and correct.
11
12            _____
13                 MARTIN ZIESMAN
14
15     Subscribed and sworn to before me
16     on this the 26   day of APRL        , 2019.
17
18     _____     June 7, 2019
19     Notary Public               My Commission Expires:
20
21                          Kleibys A. Peralve
22                          Notary Public
                            State of Florida
                            My Commission Expires 6/7/19
23                          Commission No. FF 233002
24
25
```

REPORTERS CENTRAL, LLC * 212-594-3582

```
 1

 2                    C E R T I F I C A T E

 3

 4

 5              I, DONALD R. DePEW, Registered

 6   Professional Reporter, Certified Realtime Reporter,

 7   Florida Professional Reporter and a Notary Public

 8   within and for the State of Florida, do hereby

 9   certify:

10              That MARTIN ZIESMAN, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by the witness.

14              I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18              IN WITNESS WHEREOF, I have hereunto

19   set my hand this 22nd day of April, 2018.

20

21

22              _____

23                   DONALD R. DePEW,  RPR, CRR

24

25
```

```
 1
 2   April 16, 2019
 3   -------------------- I N D E X --------------------
 4   WITNESS                  EXAMINATION BY         PAGE
 5   MARTIN ZIESMAN           Mr. Ballard            6-81
 6                            Ms. Posner             81-83
 7
 8                       E X H I B I T S
 9   EXHIBIT #                                FOR IDENT.
10   Exhibit 39,   Copy of multipage brokerage      26
11                 account, bearing Bates stamp
12                 Nos. MillerEnergy-KPMG-MZ-000001
13                 through MillerEnergy-KPMG-MZ-000015
14   Exhibit 40,   Multipage document entitled      29
15                 Carolyn K. Ziesman Revocable
16                 Trust, bearing Bates stamp Nos.
17                 MillerEnergy-KPMG-MZ-000016
18                 through MillerEnergy-KPMG-MZ-000041
19   Exhibit 41    Seven-page Energy Prospectus      30
20                 Group document, bearing Bates
21                 stamp Nos.
22                 MillerEnergy-KPMG-MZ-000042 through
23                 MillerEnergy-KPMG-MZ-000048
24
25
```