UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LEWIS COSBY, ERIC MONTAGUE, and MARTIN ZIESMAN, as co-trustee for the Carolyn K. Ziesman Revocable Trust, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:16-CV-121-TAV-DCP |
| KPMG, LLP, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Exclude the Reports and Testimony of Chad Coffman [Doc. 126]. The parties appeared before the undersigned for a motion hearing on December 10, 2019. Attorneys Laura Posner, Alan Dreschel, and Gordan Ball appeared on behalf of Plaintiffs. Attorneys Gregory Ballard, Allyson Riemma, and Paul Davidson appeared on behalf of Defendant. Accordingly, for the reasons further explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion [**Doc. 126**].

## I.    BACKGROUND

The Court will first review the pleadings in this case and then turn to the challenged expert's opinions.

### A.    Pleadings

The instant matter is a securities action, whereby Plaintiffs allege claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 ("Section 10") and Section 11 of the

Securities Act ("Section 11"). Plaintiffs' Section 10 claim alleges that Defendant fraudulently concealed material information about Miller Energy Resources, Inc., ("Miller Energy"), which caused Miller Energy to misstate and omit material facts in its financial reports.[1] With respect to the Section 11 claim, Plaintiffs allege that the offering documents for the securities were materially misleading.

The Complaint [Doc. 1] in this matter was filed on March 14, 2016, and on September 15, 2017, Plaintiffs filed a Second Amended Class Action Complaint ("Amended Complaint") [Doc. 59]. The Amended Complaint states that Miller Energy was an independent exploration and production company that explored for, developed, and operated oil and gas wells in south-central Alaska and Tennessee. [*Id.* at ¶ 22]. Plaintiffs represent a class of individuals who purchased Miller Energy stock. [*Id.* at ¶¶ 14-16].[2] Defendant is an accounting firm that Miller Energy retained as its independent auditor on February 1, 2011. [*Id.* at ¶ 18].

In late 2009, Miller Energy purchased oil and gas assets in Alaska ("Alaska Assets"). [*Id.* at ¶ 1]. The Amended Complaint alleges that Miller Energy falsified its financials to overstate the value of the Alaska Assets. [*Id.*]. The Amended Complaint states that the overstatement of the Alaska Assets was the single most important event in Miller Energy's history, transforming it from a penny-stock company trading on the pink sheets to one traded on the New York Stock Exchange ("NYSE"). [*Id.*].

As mentioned above, on February 1, 2011, Miller Energy hired Defendant as its independent auditor. [*Id.* at ¶ 63]. With respect to Plaintiffs' Section 10 claim, they allege that

---

[1] Plaintiffs also alleged a claim under Section 10 for scheme liability, but this claim was dismissed by the District Judge [Doc. 76].

[2] The Court permitted Plaintiffs Eric Montague and Martin Ziesman, as co-trustee for the Carolyn K. Ziesman Revocable Trust, to be substituted as named Plaintiffs in this action.

2

Defendant issued audit reports containing unqualified opinions on Miller Energy's annual financial statements for fiscal years 2011 through 2014, which were included in Miller Energy's Form 10-K filings that contained materially inflated asset values for Miller Energy's oil and gas properties. [*Id.* at ¶ 73]. In addition, Defendant provided review services related to Miller Energy's quarterly financial statements beginning in the third quarter of 2011, and Defendant recorded the value of the Alaska Assets as substantially the same as the $480 million value initially reported by Miller Energy following the acquisitions of those assets in December 2009. [*Id.* at ¶ 74]. The Amended Complaint alleges that Defendant knowingly and recklessly abdicated its responsibilities in connection with its audits of Miller Energy's financial statements for fiscal years 2011 through 2014 and that had Defendant conducted its audits in compliance with Generally Accepted Auditing Standards ("GAAS") and the standards articulated by the Public Company Account Oversight Board ("PCAOB"), it would have discovered Miller Energy's fraud. [*Id.* at ¶ 75]. The Amended Complaint alleges that by issuing clean opinions for the 2011-2014 fiscal years, Defendant knowingly and recklessly disregarded significant material weaknesses in Miller Energy's internal controls, specifically, internal controls relating to the way Miller Energy valued the Alaska Assets. [*Id.*].

The Amended Complaint alleges that from August 29, 2011, to October 1, 2015, ("Class Period") Defendant repeatedly and materially violated GAAS in each of its audits and failed to properly plan and perform its audits to obtain reasonable assurance that Miller Energy's financial statements were free of material misstatements. [*Id.* at ¶ 81]. In addition, the Amended Complaint alleges that Defendant failed to properly assess the risk associated with the Miller Energy engagement. [*Id.* at ¶ 83]. The Amended Complaint states that despite a number of significant risks, Defendant assigned the Miller Energy engagement an overall risk grade of "medium," in its

initial evaluation, and this designation was not reevaluated and changed to "high" until after Defendant issued its first unqualified opinion on Miller Energy's 2011 fiscal year financial statements. [*Id.* at ¶ 99].

Further, the Amended Complaint alleges that Defendant (1) failed to ensure adequate personnel management, competency, and proficiency on the Miller Energy engagement, *see* [*id.* at ¶¶ 100-103]; (2) failed to properly plan the Miller Energy audits, *see* [*id.* at ¶¶ 104-106]; (3) failed to adequately assess whether Miller Energy's valuation of the Alaska Assets conformed with Generally Accepted Accounting Principles ("GAAP"), *see* [*id.* at ¶¶ 107-118]; (4) failed to obtain sufficient competent evidence regarding the assumptions on which Miller Energy's valuation of the Alaska Assets was based, *see* [*id.* at ¶¶ 119-136]; (5) failed to exercise due professional care and professional skepticism in connection with the Miller Energy audits, *see* [*id.* at ¶¶ 137-149]; (6) failed to properly supervise its engagement team, *see* [*id.* at ¶¶ 150-151]; (7) lacked independence, *see* [*id.* at ¶¶ 152-169]; and (8) failed to perform an adequate audit, thereby concealing Miller Energy's fraud from investors, *see* [*id.* at ¶¶ 170-175].

The Amended Complaint further states that Defendant made false and misleading statements in connection with Miller Energy's Form 10-K/A and Form 10-K. [*Id.* at ¶¶ 182-188]. Such false and misleading statements were also incorporated into Miller Energy's September 6, 2012 Registration Statement, which became effective on September 18, 2012, and into various prospectus supplements as follows:

| | Registration Statement dated September 6, 2012 | Prospectus supplement dated February 13, 2013 | Prospectus supplement dated May 7, 2013 | Prospectus supplement dated June 27, 2013 | Prospectus supplement dated September 25, 2013 | Prospectus supplement dated October 17, 2013 | Prospectus supplement dated August 20, 2014 |
|---|---|---|---|---|---|---|---|
| KPMG's August 29, 2011 Report | x | x | x | x | x | x | x |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KPMG's July 16, 2012 Reports | x | x | x | x | x | x | x |
| KPMG's July 15, 2013 Reports | | | | | x | x | x |
| KPMG's July 15, 2014 Reports | | | | | | | x |

[*Id.* at ¶ 189]. The Amended Complaint states that beginning in December 2013, and through the time Miller Energy filed for bankruptcy, the truth that Miller Energy was a fraud, and the risks concealed by that fraud, including Defendant's participation in it, leaked out, were revealed, and materialized. [*Id.* at ¶ 198]. Based on the above allegations, Plaintiffs allege violations of Section 10.

With respect to the Section 11 claim, the Amended Complaint alleges that during the Class Period, Miller Energy conducted six securities offerings ("Offerings"). [*Id.* at ¶ 284]. On or about September 6, 2012, Miller Energy filed a Form S-3 registration statement and prospectus using a "shelf" registration ("Shelf Registration Statement"). [*Id.* at ¶ 285]. Under the Shelf Registration Statement, Miller Energy would offer for sale securities using future prospectus supplements, which would form part of the registration statement for those offerings. [*Id.*]. As mentioned above, the Shelf Registration Statement became effective on September 18, 2012.[3]

The Amended Complaint states that during the Class Period, the Offerings were conducted pursuant to the September 6, 2012 Shelf Registration Statement, as follows:

| Date | Series | Price | Shares | Proceeds |
|---|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | 625,000 | $14,312,500 |
| May 7, 2013 | Series C | $22.25 | 500,000 | $11,125,000 |

---

[3] The Court will refer to the Shelf Registration Statement and the prospectus supplements, collectively as the "Offering Documents."

| June 27, 2013 | Series C | $21.50 | 335,000 | $7,202,500 |
|---|---|---|---|---|
| Sep. 25, 2013 | Series D | $25.00 | 1,000,000 | $25,000,000 |
| Oct. 17, 2013 | Series D | $23.95-$24.38 | 70,448 | $1,701,000 |
| Aug. 20, 2014 | Series D | $24.50 | 750,000 | $18,375,000 |

[*Id.* at ¶ 286]. The Amended Complaint alleges that each offering was marketed and sold to the public through the materially misstated Shelf Registration Statement and each respective prospectus supplement. [*Id.* at ¶¶ 287-292]. Further, the Amended Complaint states that the financial information incorporated by reference into the Offering Documents, including the internal control-related representations and unqualified audit reports, contained untrue statements of material fact or omitted to disclose material facts required to be stated therein or necessary to make the statements therein not misleading. [*Id.* at ¶ 293].

Plaintiffs have moved to certify two classes in this case:

> (1) All persons or entities who purchased or otherwise acquired Miller Energy common stock, Miller Energy 10.75% Series C Cumulative Redeemable Preferred Stock (the "Series C Preferred Stock") or Miller Energy 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock (the "Series D Preferred Stock") between August 29, 2011 and October 1, 2015 (the "Class Period"), inclusive, and who were damaged thereby (the "Section 10 Class"); and

> (2) All persons and entities who purchased or otherwise acquired Miller Energy Series C Preferred Stock or Series D Preferred Stock pursuant to or traceable to the Offering Documents and were damaged thereby (the "Section 11 Class").[4]

In support of Plaintiffs' Motion for Class certification [Doc. 107], they have retained Chad Coffman. Specifically, in their Motion for Class Certification, Plaintiffs have invoked the fraud

---

[4] The Court will refer to the Series C and Series D Preferred Stock, collectively as the "Preferred Stock," "Preferred Securities," or "Preferred Shares." The Court will refer to the common stock, Series C Preferred Stock, and Series D Preferred Stock, collectively as the "Securities," unless otherwise noted. Finally, the Court will refer to the Section 10 and Section 11 classes, collectively as the "Classes."

6

on the market presumption pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic* presumption"), which is "based on the premise that market professionals generally consider most publicly announced material statements about companies, thereby effecting stock market prices." *In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 2017). In order to rely on the *Basic* presumption, among other requirements, Plaintiffs must establish that the market for the Miller Energy Securities was efficient.

In the instant matter, Chad Coffman opines that the market for the Miller Energy's Securities was efficient and that damages for both Classes can be calculated on a class-wide basis. Defendant has challenged Chad Coffman's opinions pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Pharma., Inc.*, 509 U.S. 579, 589 (1993).

The Court will now turn to Chad Coffman's opinions.

B.     **Chad Coffman's Opinions**

Chad Coffman ("Coffman") is the President of Global Economic Group, which is a Chicago-based firm that specializes in the application of economics, finance, statistics, and evaluation principles to questions that arise in a variety of contexts, including litigation. [Doc. 121 at ¶ 1]. He has a bachelor's degree in Economics with Honors from Knox College and a Master of Public Policy from the University of Chicago. [*Id.* at ¶ 4]. He is a Chartered Financial Analysist. [*Id.*].

As mentioned above, Plaintiffs retained Coffman to provide an opinion on whether the markets for the Miller Energy's Securities were efficient from August 29, 2011, through July 30, 2015 ("Analysis Period"). [*Id.* at ¶ 1]. In addition, Plaintiffs retained Coffman to provide an opinion on whether calculating damages in this matter is subject to a common methodology under

7

Section 10(b). [*Id.* at ¶ 2]. Finally, Plaintiffs asked Coffman to explain and demonstrate the method for computing statutory damages under Section 11 related to the Offerings. [*Id.*].

Coffman's expert report is dated March 15, 2019 ("Initial Report"); however, Coffman submitted a Corrected Expert Report ("Corrected Report") on April 19, 2019. [Doc. 121]. In his Corrected Report, he explains that during his deposition, he was asked a number of questions and was shown a number of exhibits that suggested there were inadvertent errors in his Initial Report. [*Id.* at ¶ i]. He explains that he corrected his inadvertent errors, but such errors did not impact the conclusions to be drawn from his Initial Report or change any of his original opinions. [*Id.*].

Coffman summarizes his opinions in this case as follows:

> After analyzing Miller Energy's Securities during the Analysis Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the markets for Miller Energy Securities were efficient during the Analysis Period. I have also formed the opinion that damages can be calculated for the two proposed Classes on a class-wide basis.

[*Id.* at ¶ 7]. With respect to his opinion that the market for the Miller Energy Securities was efficient, Coffman relied on the factors articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D. N.J. 1989) ("*Cammer* Factors"), which include the following: (1) average weekly trading volume, (2) analyst coverage, (3) market makers, (4) SEC Form S-3 eligibility, and (5) price reaction to unexpected information. [*Id.* at ¶ 20]. He states that he also relied on a number of other factors that courts have utilized beyond the *Cammer* Factors, including: (1) market capitalization, (2) bid-ask spread, (3) the fraction of shares held by institutional investors, and (4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and (5) options trading. [*Id.* at ¶ 23]. The first three factors are referred to as the "*Krogman* Factors," pursuant to *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tx. 2001).

8

Coffman opines that each factor that he considered supports the conclusion that the market for the Miller Energy Securities was efficient throughout the Analysis Period. [*Id.* at ¶ 24]. Coffman supports his conclusion as follows:

> First, the average weekly trading volume of all Miller Energy Securities during the Analysis Period far exceeded benchmarks that courts have established, and each of the Miller Energy Securities had an average weekly trading volume that exceeded the average security traded on the New York Stock Exchange ("NYSE") and the NASDAQ Exchange ("NASDAQ").

> Second, there were a substantial number of securities analysts following and reporting on Miller Energy.

> Third, Miller Energy Securities were actively traded on the New York Stock Exchange, fulfilling the *Cammer* factor regarding market makers.

> Fourth, Miller Energy filed multiple SEC Forms S-3 during the Analysis Period, met the important eligibility criteria, and was apparently eligible to file a Form S-3 throughout the majority of the Analysis Period.

> Fifth, over most of the Analysis Period, prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the market capitalization of the Miller Energy Common Stock (or the Miller Energy Securities collectively) was in the mid-quartile range of all common stocks trading on the NYSE and NASDAQ combined.

> Sixth, over most of the Analysis Period, prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, Miller Energy Securities had low bid-ask spreads relative to other exchange-traded common stocks.

> Seventh, institutions, which are considered generally to be well-informed investors, held, on average, over 30% of the public float of Miller Energy Common Stock

> Eighth, there is no evidence of consistent autocorrelation during the Analysis Period.

> Ninth, there was active trading in Miller Energy options throughout the Analysis Period.

> Finally, there was a strong cause-and-effect relationship between new [Miller Energy]-specific information and the market prices of Miller Energy Securities during the Analysis Period.

[*Id.* at ¶ 26]. He concludes, "My analyses of all of these factors support the conclusion that Miller Energy Securities traded in open, developed, and efficient markets throughout the Analysis Period." [*Id.*].

With respect to *Cammer* Factor 5 (price reaction to new information), Coffman utilized event studies. [*Id.* at ¶ 48]. Coffman explains that an "event study is a well-accepted statistical method utilized to isolate the impact of information on market prices" and that "academics use event studies as one tool for evaluating the efficient market hypothesis in the first place." [*Id.*]. Coffman explains as follows:

> To analyze cause and effect, I performed event studies to determine whether there is scientific evidence that the market prices of Miller Energy Securities react to new information. For Miller Energy Common Stock, consistent with what I have done for other market efficiency analyses, I have evaluated whether Miller Energy Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Miller Energy-related news. I also analyzed the extent to which large price movements in Miller Energy Common Stock on dates other than earnings announcements could be explained by newly released information. Based on the analyses I performed, which explicitly controls for the broader market as well as the price of oil, I find that there is a clear cause-and-effect relationship between new public information about Miller Energy and the market price of Miller Energy Common Stock.

> To analyze Miller Energy Preferred Securities, I also undertook an event study approach, however, the nature of the Preferred Securities (which are senior to the Common Stock in the capital structure) suggests that the Preferred Securities would not regularly react to quarterly earnings announcements unless the solvency of the firm was called into question. There were only three earnings announcements after the Preferred Securities were consistently trading well below their par value, and the Common Stock did not react significantly to these events,

10

therefore it is unsurprising that the Preferred Securities did not either.

Therefore, to analyze cause and effect for the Preferred Securities, from the time that the Preferred Securities first traded substantially below par value, I analyzed whether the Preferred Securities reacted to firm-specific events that clearly updated the market regarding the ability of the Company to continue paying dividends or for the securities to continue trading on the exchange.

[*Id.* at ¶¶ 50-52].

Specifically, with respect to the common stock event study, he utilized a regression model over a period of time to observe the typical relationship between the market price of the relevant security and broad market factors. [*Id.* at ¶ 53]. He explains that he evaluated the relationship between Miller Energy's common stock daily returns (percentage change in price) controlling for the S&P Total Return ("Market Index") and NYMEX WTI Light Sweet Crude Oil Futures ("NYMEX Oil Index"). [*Id.*].[5] He chose the NYMEX Oil Index instead of an index of peer companies because Miller Energy's communications to the market clearly identified the price of oil as a critical factor in its ability to generate cash flows. [*Id.*]. Further, for each trading day, Coffman constructed a regression model using data from the prior 120 days trading days. [*Id.* at ¶ 54]. He used a rolling estimation window, explaining that it allows for the relations between Miller Energy common stock, industry and market factors, as well as firm-specific volatility to update over time. [*Id.*]. He states that the model indicates that there is a positive correlation between Miller Energy common stock and the control variables, which simply means that the movement of the Market Index and NYMEX Oil Index explains the price movements of Miller Energy common stock. [*Id.* at ¶ 55].

---

[5] As explained below, *infra* Part IV, section B(1)(iii), Coffman actually relied on the ICE WTI Light Sweet Crude Oil Futures Index.

Coffman further explains that with respect to his regression model for common stock, he also examined the standard deviation of errors, or the metric for how much randomness remains in the price movement. [*Id.* at ¶ 56]. He states that he also examined the price response of Miller Energy's common stock to seventeen (17) earnings announcements that occurred during the Analysis Period. [*Id.* at ¶ 58]. He found that of the seventeen-regular quarterly earnings Miller Energy issued during the Analysis Period, three (3) resulted in statistically significant price movements above the 95% confidence level. [*Id.* at ¶ 61]. He then compared those results against the 316 days during the Analysis Period where there was no Miller Energy-related news, analyst reports published, or filings by the Securities Exchange Commission ("SEC") that were issued. [*Id.* at ¶ 62]. He explains as follows:

> Of these 316 days, there were fourteen statistically significant price movements. Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level on 17.65% of the earnings announcements, but when compared to days with no Miller Energy-related news, I observed statistically significant reactions 4.43% of the time. For days with no news, the fact that I observed only fourteen days with significant movements is consistent with what I would expect to observe by randomness alone. This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Miller Energy Common Stock.

> Furthermore, on the 316 days with no news, the average change in price of Miller Energy Common Stock was 2.52% after controlling for the broad market and the price of oil, while the average change in Miller Energy Common Stock on earnings dates was 4.16%. In other words, the average magnitude of stock price movement on earnings announcement days was about 1.7 times higher than on dates with no news. Again, this demonstrates that on days when important Company-specific information is released to the market, the stock price moves much more than on days where there is no Company-specific news. This provides further evidence of a cause-and-effect relationship between the Company-specific news and changes in the price of Miller Energy Common Stock, and thus an efficient market.

12

[*Id.* at ¶¶ 62-63]. He states that the daily trading volume also tended to be much higher when important Miller Energy-specific news was released to the market and that there is a strong cause-and-effect relationship between new Miller Energy-specific news and rapid changes in the price of Miller Energy common stock. [*Id.* at ¶ 65]. He concludes, "The event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Miller Energy Common Stock." [*Id.* at ¶ 67].

As mentioned above, Coffman also conducted an event study for Preferred Securities. [*Id.* at ¶ 51]. Coffman states that the market prices for the Preferred Securities would trade based upon the present value of the expected dividend payments, which has specific implications for what to expect from an event study. [*Id.* at ¶ 74]. Coffman states that in particular, from the time of the issuance of each of the Preferred Securities to the time where the market prices substantially fall below the par value (which indicates an increased risk of default), the market price would be driven primarily by changes in the time value of money (i.e., the applicable discount rate) and that market prices would not be expected to be sensitive to all the factors that impact the common stock. [*Id.*]. Coffman states that as a result, the volatility of the Preferred Securities would be expected to be low relative to the common stock and that the market price would not be expected to respond to events like earnings announcements or other news that does not fundamentally impact the perceived chance of default. [*Id.*]. Coffman states that on October 15, 2014, the market prices of the Preferred Securities fell to a new low that was substantially below par value, so he constructed two different fixed estimation windows for the Preferred Securities: one prior to October 15, 2014, and another for October 15, 2014, to the end of the Analysis Period. [*Id.* at ¶ 76]. In order to test for cause and effect, Coffman evaluated the price movements of the Preferred Securities in the post-October 15, 2014 period when there was news that was clearly related to the ability of Miller

13

Energy to continue paying preferred stock dividends or remain listed on the NYSE.  [*Id.* at ¶ 78].

Coffman states that his results show that the news events are associated with far greater incidence of statistical significance, stock price movements, and trading volume.  [*Id.* at ¶ 80].  He concludes that such findings provide scientific evidence of a cause and effect relationship between new news events and changes in the market price of the Preferred Securities.  [*Id.*].

　　　　With respect to damages, Coffman states that these can be calculated on a class-wide basis. [*Id.* at ¶ 98].  Specifically, with respect to Section 10 damages, he explains that the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method, which measures damages as the artificial inflation per share at the time of the purchase less the artificial inflation at the time of the sale.  [*Id.* at ¶ 99].  He states that the methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the Section 10 Class and can be measured class-wide.  [*Id.* at ¶ 100].  He states that the most common methodology to quantify artificial inflation is to perform an event study that measures price reaction to disclosures that revealed the relevant truth concealed by the alleged material omissions/misrepresentations.  [*Id.*].  Damages would then be calculated formulaically based upon the information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). [*Id.*].  With respect to damages under Section 11, Coffman explains that they are calculated based on a statutorily defined formula.  [*Id.* at ¶ 101].

　　　　Finally, Coffman issued a Rebuttal Report [Doc. 142-1] in response to Defendant's expert, Mukarram Attari, Ph.D. ("Dr. Attari"), which the Court has also reviewed and considered.

## II. POSITIONS OF THE PARTIES

Defendant moves [Doc. 126] to exclude Coffman's opinions that the market for Miller Energy Securities was efficient and that damages can be determined on a class-wide basis. With respect to Coffman's first opinion (i.e., the market was efficient), Defendant asserts that Coffman's data and analysis do not support his conclusions. Defendant states that in order to determine market efficiency, Coffman conducted an event study, but the data that he relied on does not support his conclusions that the market was efficient for both the common stock and the Preferred Stock. Further, Defendant asserts that Coffman's results fail to establish that Defendant's alleged misrepresentations impacted the price of the Miller Energy Securities. Defendant argues that in Coffman's Initial Report, he did not express any opinions on price impact. Defendant states that Coffman included an opinion on price impact in his Corrected Report, but this opinion should be excluded because it was provided after his deposition.

In addition, Defendant argues that Coffman's methodologies are unreliable. For instance, Defendant states that his method for identifying news days, no news days, and market days has a high known rate of error. Defendant states that Coffman did not control for market reactions caused by other Miller Energy events or disclosures and that he failed to correctly control for the price of oil. Defendant suggests that Coffman's opinions were prepared solely for litigation.

Further, Defendant submits that Coffman's event study for the Preferred Stock is unreliable. Defendant argues that Coffman incorrectly computed the returns on the Preferred Stock and that the methodology for the event study is biased.

Finally, Defendant asserts that Coffman's methodology for computing class-wide damages is also unreliable. Defendant states that Coffman's methodology does not provide a mechanism for determining which investors in the Section 11 Class suffered damages. In addition, Defendant

argues that Coffman's methodology for the Section 10 Class does not provide a mechanism for separating low-risk and high-risk investors.   In support of the arguments above, Defendant relies on its expert, Dr. Attari.

Plaintiffs respond [Doc. 150] that Coffman is qualified to render his opinions and that numerous courts have relied on them.  Plaintiffs state that Coffman's market efficiency opinions are relevant and reliable.  Plaintiffs submit that Defendant has not challenged Coffman's opinions regarding *Cammer* Factors 1 through 4.  Plaintiffs state that Defendant challenges *Cammer* Factor 5, but courts have held that when *Cammer* Factors 1 through 4 are satisfied, there is sufficient evidence to support a finding that the market for the stock was efficient during the class period. Plaintiffs state that Coffman's common stock event study is reliable and that Defendant's own expert conceded that Miller Energy's common stock reacted to material news events.  Plaintiffs argue that the type of study Coffman conducted has been accepted and endorsed in the academic literature.  Plaintiffs state that any issues regarding the factual support for Coffman's opinions are proper for cross examination.

Similarly, Plaintiffs argue that Coffman's market efficiency opinions and methodology for analyzing the market for Miller Energy Preferred Stock are relevant and reliable.  Again, Plaintiffs assert that Coffman's analysis of *Cammer* Factors 1 through 4 are unrefuted.  Plaintiffs state that the time period and events analyzed in Coffman's Preferred Stock event study are reliable.  Finally, with respect to Coffman's opinions on damages, Plaintiffs submit that damages under Section 11 are statutory and that under Section 10, it is not necessary to distinguish between high-risk and low-risk investors in Coffman's model.

Defendant maintains [Doc. 159] that Coffman's data and analysis do not support his conclusions.  Defendant states that with respect to Coffman's analysis of the common stock, courts

have held that *Cammer* Factor 5, the cause and effect relationship, is the most important factor, and expert reports are routinely excluded where the expert's event study does not establish market efficiency under *Cammer* Factor 5. Further, Defendant asserts that the data and results do not support Coffman's conclusions regarding the efficiency of the market with respect to the Preferred Stock. Defendant states that Coffman incorrectly computed returns on the Preferred Stock and that his methodology is biased. Finally, Defendant maintains that Coffman's opinions on damages are unreliable and that an evidentiary hearing may be helpful.[6]

## III.     STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[6] As mentioned above, the Court held a motion hearing on December 10, 2019, but no party brought any expert witnesses to testify. In any event, the Court is satisfied that the record is sufficient. The instant Motion, along with Plaintiffs' Motion for Class Certification, which the Court considered contemporaneously, is over 5,000 pages, and includes expert reports, expert depositions, and expert rebuttal reports from both parties.

17

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). The Rule 702 inquiry is "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party

offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id.* at 592–93. "Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller,* 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at

19

840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## IV.    ANALYSIS

In the instant Motion, Defendant makes three primary arguments: (1) the data and analysis do not support Coffman's conclusions; (2) his methodology with respect to the event studies is unreliable; and (3) his methodology regarding damages is unreliable.  The Court will address these arguments separately.

### A.    Coffman's Data and Analysis

Defendant argues that the data and results do not support Coffman's conclusions on the efficiency of the market for the common stock or the Preferred Stock.  Further, Defendant argues that Coffman failed to establish that Defendant's alleged misrepresentations impacted the price of the Securities.

Defendant's challenge to Coffman's opinion relates to Coffman's application of *Cammer* Factor 5—that is, the cause and effect relationship.  As an initial matter, Plaintiffs argue that any alleged issues with *Cammer* Factor 5 is not a basis to exclude Coffman's opinions.  On the other hand, Defendant asserts that courts routinely exclude expert testimony where the expert's event study does not establish market efficiency.  Both parties cite cases in support of their respective positions.

For instance, Defendant relies on *In re Fed. Home Loan Mortg. Corp. Sec. Litig. ("Freddie Mac")*, wherein the court denied a motion for class certification when plaintiffs were unable to establish that the market was efficient, and therefore, the fraud on the market presumption of collective reliance did not apply.  281 F.R.D. 174, 182 (S.D.N.Y. 2012).  In so finding, the court noted that plaintiff's expert's opinions were flawed, including his two event studies.  *Id.* at 181.  The court referred to *Cammer* Factor 5 as the "most important *Cammer* factor."  *Id.*  Later, the

court explained that the "*Cammer* factors are intended to be an analytical tool, not a checklist." *Id.* The court found that the "less important *Cammer* factors support a finding of efficiency," but such factors "cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price." *Id.* at 181-82. The court noted, "This is the crucial factor—the sine qua non of efficiency [because] [i]t speaks to the 'essence' of the efficient market hypothesis, and it is the foundation of the fraud on the market theory." *Id.* at 182. The court stated that plaintiff's expert's study responded to material news 28% of the time, which is insufficient to satisfy plaintiff's burden of proving *Cammer's* cause-and-effect factor." *Id.* The court found, "The other *Cammer* and *Krogman* factors do not directly address the question of efficiency. Without evidence of the prompt effect of unexpected news on market price, the market cannot be called efficient." *Id.*

Defendant also cites to *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, where the court excluded plaintiffs' expert and denied class certification. No. 4:08CV0160, 2018 WL 3861840, at *17 (N.D. Ohio Aug. 14, 2018). With respect to plaintiffs' expert, the court excluded him, in part, because his opinions were based on a single-date, last day of the putative class period event study to assess market efficiency over a 330-day class period, which the court found to be unreliable. *Id.* at *2. The plaintiffs' expert admitted that his use of a single date for his event study had no support in the law or logic and was rejected by the authorities on which he relied. *Id.* The court also reasoned that market efficiency across a lengthy class period cannot be based on a lone stock price. *Id.* Further, the expert conceded the following: (1) a single stock price reaction could not possibly demonstrate that the stock traded in an efficient market months earlier, (2) his event study did not prove market efficiency for the duration of the class period, and (3) he had previously never used a single-date event study. *Id.* at *3-4.

21

Further, in *Ohio Pub. Employees Ret. Sys.,* with respect to plaintiffs' request for class certification, defendants only disputed *Cammer* Factor 5. *Id.* at *16. The court noted that other courts have referred to *Cammer* Factor 5 as the "most important" factor—the "sine qua non of [market] efficiency." *Id.* (citing *Freddie Mac*, 281 F.R.D. at 178) (other citations omitted). The court stated that plaintiffs' expert even agreed that the fifth factor is the most important factor and the most convincing way to demonstrate market efficiency. *Id.* at *17. The court found, "The structural factors are not enough, alone, to establish market efficiency." *Id.* The court stated that the plaintiffs' expert witness's single-date event study, by his own admission, does not prove market efficiency and that his other tests suffered from numerous fundamental designs flaws. *Id.* The court concluded that plaintiffs could not establish market efficiency. *Id.*

As Plaintiffs point out, however, other courts have held that *Cammer* Factor 5, while important, is not dispositive. For example, Plaintiffs cite to *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, wherein the court stated as follows:

> While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier,* it has not required their use or held that any one of them is dispositive. A substantially similar approach has been taken by the Courts of Appeals for the First, Third, Fourth, Fifth, and Eleventh Circuits. The vast majority of courts have used the *Cammer* factors as "an analytical tool rather than as a checklist." Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that "it *would be helpful* to a plaintiff seeking to allege an efficient market...."
>
> In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification. While defendants have managed to find one case that states that *Cammer* 5 is dispositive— the *Freddie Mac* case involving preferred shares—the court's reasoning for adopting such a rule is tethered to its factual context. Different contexts require courts to place greater importance on some factors than on others. No other court has adopted a per se rule that any one factor is dispositive. At the same

22

time, courts have found market efficiency in the absence of an event study or where the event study was not definitive.

Requiring a plaintiff to submit proof of market reactions—and to do so with an event study—ignores Supreme Court precedent as well as practical considerations. Event studies test for a degree of efficiency that may not be required. *Halliburton II* makes clear that no specific degree of efficiency is mandated to invoke the *Basic* presumption.

310 F.R.D. 69, 83–84 (S.D. N.Y. 2015) (other citations omitted). The court concluded as follows:

[I]n the ordinary case of a high-volume stock followed by a large number of analysts and traded on a national exchange, whether a plaintiff can satisfy *Cammer* 5 is not dispositive. Nor is an event study always necessary. Not even the *Cammer* court said that an *event study* was required to satisfy the fifth factor, and defendants have not cited to any controlling authority that holds that an event study is the only means to satisfy *Cammer* 5. In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it. The exception, and this was also made clear in *Halliburton II,* is when defendants present evidence of lack of price impact or that the market was inefficient. In those cases, an event study or other rebuttal evidence is required and class certification becomes a battle of competing expert studies.

*Id.* at 86; *see also Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786 ADM/TNL, 2016 WL 4098741, at *10 (D. Minn. July 28, 2016) (recognizing that courts are split on whether *Cammer* Factor 5 is dispositive but finding that the "weight of authority on this issue favors [p]laintiffs" and that "[m]any courts have found market efficiency without *Cammer* factor five").

The undersigned notes that the instant Motion before the Court is a *Daubert* motion, and thus, whether *Cammer* Factor 5 is dispositive of the market efficiency issue depends on how the expert analyzed market efficiency in total. Further, the Court agrees with the court in *Barclays* in that "[d]ifferent contexts require courts to place greater importance on some factors than others." *Id.* at 86. Thus, in the context of a *Daubert* motion, the Court finds it more important to determine

how an expert reached his/her conclusions as opposed to determining whether case law dictates one factor's supremacy over another. *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 655 (S.D. Ohio 2017) (finding that the court need not resolve the dispute as to whether the fifth *Cammer* factor is necessary).[7]

With respect to *Cammer* Factor 5, and as mentioned above, Defendant argues that the data and results do not support Coffman's conclusions on the efficiency of the market with respect to the common stock or the Preferred Stock. Further, Defendant argues that Coffman failed to establish that Defendant's alleged misrepresentations impacted the price of the securities. The Court will address these arguments separately.

### 1. Coffman's Data and Analysis of the Common Stock

As mentioned above, in order to study the cause and effect relationship between Miller Energy's disclosures and stock price, Coffman utilized an event study, which he describes as a "well-accepted statistical method utilized to isolate the impact of information on market prices." [Doc. 121 at 31]; *see also Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1151 (N.D. Ohio Sept. 4, 2013) (referring to an event study as "a generally accepted

---

[7] Defendant states that Coffman testified that he does not have an opinion on whether the markets were efficient without an event study showing a cause-and-effect relationship, citing to Coffman's deposition testimony. [Doc. 127 at 11]. The Court does not construe Coffman's testimony as Defendant has suggested. During Coffman's deposition, Defendant asked Coffman certain hypotheticals regarding statistically significance price movements in response to earnings announcements. [Doc. 138-2 at 38-40]. For instance, Defendant asked Coffman if he found zero out of seventeen (17) earnings releases led to price movements, would Coffman have concluded that there was no cause and effect relationship, and therefore, no market efficiency. [*Id.* at 39]. Coffman answered that such would not provide evidence of market efficiency, but he would look into the reasons for such findings. [*Id.* at 40]. Taken as a whole, the Court does not construe this testimony to mean that without an event study, Coffman has no opinion on market efficiency. Further, in Coffman's Corrected Report, he states, "However, since there is no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient." [Doc. 121 at ¶ 22].

24

technique for measuring how a security's price reacts to new, unexpected information about the issuing company"). With respect to the common stock, Coffman evaluated whether it reacted to earnings announcements in a manner that is significantly different from how the stock moved on days with no Miller Energy-related news. [Doc. 121 at ¶ 50]. He also analyzed the extent to which large price movements in Miller Energy's common stock on dates other than earnings announcements could be explained by newly released information. [*Id.*]. According to his study, he identified seventeen (17) regular quarterly earnings announcements Miller Energy issued during the Analysis Period, three (3) of which resulted in statistically significant price movements above the 95% confidence level. [*Id.* at ¶ 61]. He then compared these results against the 316 days during the Analysis Period when there was no Miller-Energy-related news, analyst reports published, or SEC filings issued. [*Id.* at ¶ 62]. He states that of these 316 days, there were fourteen (14) statistically significant price movements. [*Id.*]. Therefore, he explains that during the Analysis Period, there was a statistically significant price reaction at the 95% confidence level on 17.65% of the earnings announcements, but when compared to days with no Miller Energy-related news, he observed statistically significant reactions 4.43% of the time. [*Id.*]. He explained the 4.43% was expected based on randomness alone. [*Id.*]. He concludes that such findings are powerful scientific evidence of cause-and-effect relationship between new publicly released information concerning Miller Energy and the changes in the price of the common stock. [*Id.*]. He also notes that the average magnitude of stock price movement on earnings announcement days was about 1.7 times higher than on dates with no news. [*Id.* at ¶ 63]. Coffman concludes that his event study demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Miller Energy common stock. [*Id.* at ¶ 67].

Defendant argues that the data and analysis do not support Coffman's conclusion that the market is efficient. Defendant explains that Coffman supports his conclusions by relying upon three (3) earnings announcements out of seventeen (17), which is 17.65%. Defendant states that such a low percentage cannot show a cause and effect relationship.

Plaintiffs respond that such criticisms go to the weight of the opinion and not to its admissibility. Plaintiffs argue that there is no 50% threshold requirement and that the academic literature, along with Defendant's expert, admitted that a 50% threshold does not exist. Plaintiffs argue that it is no surprise that a company's stock price may not move in response to an earnings release given that earnings releases do not provide new, material information. Defendant agrees that the 50% threshold is not a requirement in every case but argues that courts regularly reject event studies where less than 50% of the news days cause a statistically significant price reaction.

The Court notes that Defendant has cited cases for the proposition that an insufficient number of news days followed by a market reaction does not establish market efficiency. *See Freddie Mac*, 281 F.R.D. at 174 (expert's showing that series Z responded to material news 28% of the time is insufficient to satisfy plaintiff's burden of proving *Cammer's* cause and effect relationship); *George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("Even assuming that the methodology was proper, showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency . . .To state the obvious, seven out of 16 is less than 50%"); *but see Beaver*, 2016 WL 4098741 (finding that the stocks traded on an efficient market, even though Coffman's event study did not support *Cammer* Factor 5). In the instant matter, however, Defendant simply disagrees with Coffman's conclusions. "Under *Daubert*, a disagreement with the expert's conclusion is not grounds for exclusion." *North v. Ford Motor Co.*, 505 F. Supp. 2d

1113, 1117 (D. Utah 2007); *see also Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 831 (N.D. Ohio 2011) ("The important thing is not that experts reach the right *conclusion, but that they reach it via a sound methodology.*") (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675 (6th Cir. 2010)) (emphasis in *Buck*). The Court finds Defendant's argument goes to the weight of Coffman's opinion as opposed to its admissibility. Accordingly, the Court finds Defendant's argument not well taken.

### 2. Coffman's Data and Analysis of the Preferred Stock

As mentioned above, Coffman also utilized an event study with respect to the Preferred Stock. Coffman explains that due to the nature of preferred securities, he did not expect the Preferred Stock to regularly react to quarterly earnings announcements until the solvency of the firm was called into question. [Doc. 121 at ¶ 51]. Coffman states that there were only three (3) earnings announcements after the Preferred Stock consistently traded well below its par value, and it is unsurprising that the Preferred Stock did not react significantly to these events. [*Id.*]. Coffman states, therefore, in order to determine the cause and effect for the Preferred Stock, from the time that the Preferred Securities first traded substantially below par, he analyzed whether the Preferred Stock reacted to firm-specific events that clearly updated the market regarding the ability of Miller Energy to continue paying dividends or for the securities to continue trading on the exchange. [*Id.* at ¶ 52].

Coffman states that as of October 15, 2014, the market prices of the Preferred Stock fell to a new low that was substantially below par value, which signaled that the markets saw a greater probability that Miller Energy might default and that the value of the Preferred Stock would depend on, to a great extent, the perceived value of Miller Energy's assets, rather than just the promise to pay. [*Id.* at ¶ 75]. From that point forward, Coffman concludes that that market prices of the

Preferred Stock would be expected to be much more correlated with the factors that impact common stock. [*Id.*]. Therefore, he construed two different fixed estimation windows for the Preferred Stock: one prior to October 15, 2014, and another for October 15, 2014, to the extended Analysis Period of July 31, 2015. [*Id.* at ¶ 76 & n. 106]. Coffman's models show that the volatility of the Preferred Stock is very low during the pre-October 15, 2014 period and are more commensurate with the common stock after October 15, 2014, which he opines is consistent with market efficiency. [*Id.* at ¶ 77].

To test for cause and effect, Coffman evaluated the price movements of the Preferred Stock during the post-October 15, 2014 period when there was news that was related to the ability of Miller Energy to continue paying preferred stock dividends or remain listed on the NYSE. [*Id.* at ¶ 78]. He then compared the event study results on these days with the results for days with no news, SEC filings, or analysis reports. [*Id.* at ¶ 79]. He concludes that that his analysis shows that the news events are associated with a far greater incidence of statistical significance, stock price movements, and trading volume, which provides scientific evidence of a cause and effect relationship between new events and changes in the market price of the Preferred Securities. [*Id.* at ¶ 80].

In his Rebuttal Report, Coffman further explains that for non-convertible debt-like securities (Series D Preferred Stock) or for convertible debt-like securities where the common stock price is below where conversion to common would be profitable (Series C Preferred Stock), investors in preferred shares would, unlike common shareholders, not receive any higher expected cash flows from a positive earnings surprise. [Doc. 142-1 at ¶ 12]. Coffman explains that this flows directly from the basic valuation principle that all securities are valued based upon the expected future cash flows to those security-holders, discounted at the appropriate rate. [*Id.*]. He

states that the Miller Energy Preferred Stock is entitled to the payment of preferred dividends and eventually the redemption value, but common stockholders are entitled to residual earnings over and above what is necessary to service debt and preferred securities. [*Id.*]. Coffman concludes that as a result, all else being equal, an additional dollar of earnings at the margin would have no influence on the market value of Preferred Stock. [*Id.*]. Coffman states that a negative earnings surprise, as long as it was not sufficiently large to call into question the payment of preferred dividends, would not lower the expected cash flows to preferred shareholders. [*Id.*]. Coffman concludes as follows:

> However, this economic logic changes once the market begins to question whether there will be enough resources to continue paying preferred dividends. A clear signal of this market concern occurs when preferred shares start trading substantially below their redemption value, because it reflects the market's belief that the cash available to satisfy preferred dividends and redemption of the preferred shares is more uncertain. In those circumstances, the availability of cash flows to pay preferred dividends is more closely tied to the short-term financial prospects of the firm. As such, one would expect greater sensitivity to earnings announcements. This is precisely the logic and rationale for (1) considering different events before and after the preferred securities started trading below their redemption value and (2) why I did not consider earnings announcements prior to October 15, 2014 as a meaningful or statistically powerful set of dates to consider. Therefore, Dr. Attari's analysis of the earnings announcements and whether they did not cause a statistically significant price movement for the preferred shares is neither surprising nor informative as to whether there was a cause and effect relationship for Miller Energy Preferred Securities. Moreover, Dr. Attari admits that "the information relevant to investors in Miller Energy's common stock and the preferred stock was different" and that investors in the Preferred Securities need information besides earnings announcements to evaluate the debt component of the preferred securities.

[*Id.* at ¶ 13].

Defendant asserts that the data from the event study does not support Coffman's conclusion that the market for the Preferred Stock was efficient. Defendant states that Coffman found that

there are no statistically significant movements in the prices of the Preferred Stock in response to the three (3) earnings announcements, which does not support his conclusion that there is a cause and effect relationship between Miller Energy's earnings announcements and the price of the Preferred Stock. In addition, Defendant asserts that Coffman tested the statistical significance of the price movements prior to October 15, 2014, but excluded this data from his event study. Defendant states that its expert reviewed Coffman's backup data and found that zero (0) out of eleven (11) earnings announcements were followed by a statistically significant change in price. Finally, Defendant states that the indirect markers do not establish efficiency.

Plaintiffs argue that Coffman explained why he conducted his analysis in a certain manner. Specifically, Plaintiffs state that as of October 15, 2014, the market price of the Preferred Securities fell to a level that was substantially below par value, which is when one would expect a price reaction to earnings announcements for the Preferred Securities due to the concern that Miller Energy may not have the resources to continue to pay the preferred dividends. Plaintiffs state that Dr. Attari acknowledged that the information relevant to investors in Miller Energy's common stock and the Preferred Stock is different. Plaintiffs state that academic research demonstrates that there is no expectation in the first instance that securities react to earnings releases all or even half of the time. Plaintiffs maintain that numerous cases make clear that modifying the *Cammer* Factors for securities with debt like components, like the Preferred Securities here, is entirely appropriate. Further, Plaintiffs state that Coffman determined which news events to test by reference to clearly identified and objective criteria that followed naturally from the differences in the Preferred Stock and in the common stock and the type of news that would be expected to affect each. Plaintiffs contend that Defendant's argument is not a basis upon which to exclude Coffman's testimony.

In the instant matter, Defendant criticizes Coffman for only studying post-October 15, 2014 events. In addition, Defendant argues that even assuming this is correct, zero (0) out of three (3) earnings announcements affected the price of the Preferred Securities. The Court finds these criticisms go to the weight of Coffman's opinions. Coffman explains why he chose October 15, 2014, as his starting point. Specifically, he states that the market prices fell to a new low that was substantially below par value, which signaled that Miller Energy may default. He states that prior to this date, the market price for the Preferred Securities would not be expected to respond to earnings events because they do not fundamentally impact the perceived chance of default. *See In re Countrywide Fin. Corp. Sec. Litigation*, 273 F.R.D. 586, 615 (C.D. Cal. 2009) ("Until the financial situation becomes severe enough that the issuer is likely to default, there is relatively little effect on debt price."). Defendant also argues that Coffman's analysis shows that out of the three (3) earnings announcements, zero (0) impacted the price of the Preferred Securities. In his findings, however, Coffman also relied on news that was clearly related to the ability of Miller Energy to continue paying preferred stock dividends or for its securities to continue trading on the NYSE, as opposed to only considering Miller Energy's earnings announcements. The Court finds that Defendant's criticisms go to the weight of Coffman's opinions, but they are not a basis to exclude him as an expert.

Finally, Defendant argues that Coffman's own analysis of the indirect indicators of market efficiency (i.e., the other *Cammer* and *Krogman* Factors) demonstrates that the market for the Preferred Stock was not efficient. Specifically, Defendant states that Coffman's report is deficient as follows: (1) it presents no evidence of any analysts covering Miller Energy's Preferred Stock; (2) it presents no evidence of the existence of more than one market maker; (3) it presents no evidence of institutional investors holding the Preferred Stock; (4) it fails to analyze the market

capitalization of the Preferred Stock on its own, and instead, lumps it together with the Miller Energy common stock; (5) it states that Miller Energy was ineligible to file a Form S-3 at the beginning and for several months at the end of the proposed Class Period; and (6) it does not analyze that the bid-ask spreads for the Preferred Stock was above average at the end of the proposed Class Period.

As an initial matter, the Court finds the above arguments are more helpful in weighing the decision on whether this action should be certified as a class action and whether Plaintiffs have established that the *Basic* presumption applies, as opposed to excluding Coffman's report. In any event, Coffman discusses the above factors. With respect to analyst coverage, he states that the analyst reports covering the common stock also provide relevant information for investors in the Preferred Stock and that several analysts addressed the Preferred Stock directly, such as "Turning the Corner: Kitchen Sink of a Quarter Could Mark a Bottom, New Strategy in Place," MLV & Co., LLC, December 10, 2014. [Doc. 121 at ¶ 35 n. 43]. He continues, "Even those reports that do not specifically mention the Preferred Shares directly provide relevant information to investors of the Preferred Shares since the value of Preferred Shares are related to the value of the common shares." [*Id.*]. With respect to market makers, he explains that the Preferred Stock traded on the NYSE throughout the Analysis Period and that the minimum requirements to be listed and remain in good standing virtually guarantee a liquid market for that security. [*Id.* at ¶¶ 42-43]. Thus, he concludes, the number of market makers itself is not a particularly relevant metric in this case. [*Id.* at ¶ 42].

Further, with respect to institutional investors, Coffman explains that the data available for the Preferred Stock was limited. [*Id.* at ¶ 90 n. 122]. He states that according to the SEC, institutional investment managers must use Form 13F for reports with respect to accounts holding

Section 13(f) securities.  [*Id.*].  He states that for all quarterly lists starting in the third calendar quarter of 2012 (when the Series C Preferred Stock began trading) and ending at the end of the Analysis Period, the Preferred Securities were not labelled as Section 13F securities, meaning institutions were not required to report their holdings of the Preferred Securities.  [*Id.*].  Coffman states that this is not uncommon for preferred securities in general, explaining that only 85 of the 17,395 securities identified as Section 13F securities were preferred securities in the list for the second quarter of 2015.  [*Id.*].  Coffman opines that the substantial level of institutional ownership of Miller Energy common stock during the Analysis Period coupled with the high trading volume support a conclusion of market efficiency, but he does not offer an opinion on this factor with respect to the Preferred Stock due to the limited data.  [*Id.* at ¶ 90].  In his Rebuttal Report, Coffman names several institutions that voluntarily reported holding Preferred Stock.  [Doc. 142-1 at ¶ 35].  Coffman states that "the limited data available on institutional holdings of Miller Energy Preferred Securities does not suggest market inefficiency."  [*Id.*].

In addition, with respect to market capitalization, Coffman states that it makes sense to consider the market capitalization of Miller Energy as a whole for the Preferred Stock because the overall size of Miller Energy affects things such as the amount of news and analyst coverage.  [Doc. 121 at ¶ 84].  He states that Exhibits 13-C and 13-D show the market capitalization of the Preferred Stock, respectively, over the Analysis Period, while Exhibit 14 shows that when factoring in the Preferred Stock, Miller Energy's combined market capitalization fell between the 16th and 41st percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Analysis Period.  [*Id.*].  Coffman concludes, "Given that the market capitalization of Miller Energy Common Stock and Miller Energy as a whole was in the mid-quartile range relative

33

to other publicly traded companies, this factor is supportive of market efficiency for the Miller Energy Securities." [*Id.* at ¶ 85].

With respect to Miller Energy's ineligibility to file a Form S-3, Coffman opines that Miller Energy was S-3 eligible throughout the vast majority of the Analysis Period. [*Id.* at ¶ 46]. He acknowledges that at the start of the Analysis Period, Miller Energy was not eligible because it was not timely in filing its 10-K for the fiscal year end April 30, 2010, per a letter from the SEC. [*Id.* at ¶ 46 n. 55]. He states that Miller Energy was S-3 eligible up until nearly the end of the Analysis Period on July 14, 2015, when Miller Energy filed another NT 10-K. [*Id.*].

Finally, with respect to the bid-ask spreads, Coffman discusses the above average bid-ask spreads at the end of the proposed Class Period. He states that with respect to the Series C Preferred Stock, the time-weighted average percentage bid-ask spread in each month was between 0.2452% and 8.5394%. [*Id.* at ¶ 88]. He states that prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the Series C Preferred Stock had a bid-ask spread at or around 0.76%, the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ. [*Id.*]. He acknowledges that the bid-ask spread jumped past the average for the last eight months, and he attributes the jump to the falling market price of the Series C Preferred Stock prior to Miller Energy's delisting and bankruptcy. [*Id.*]. Otherwise, he concludes that the Series C Preferred Stock was low during the Analysis Period, and therefore, the bid-ask spread supports efficiency. [*Id.*].

Similarly, with respect to the Series D Preferred Stock, Coffman notes that prior to the market prices falling substantially, the Series D Preferred Stock had a bid-ask spread at or around 0.76%, the average bid ask spread of those 100 common stocks trading on the NYSE and

34

NASDAQ. [*Id.* at ¶ 89]. Coffman states that the bid-ask spread jumped past the average near the end of the Analysis Period for the same reasons as above. [*Id.*].

Again, Coffman addressed Defendant's alleged deficiencies in his Corrected Report, and Defendant's criticisms are more proper for the Court to weigh in determining whether Plaintiffs are entitled to rely on the *Basic* presumption. Accordingly, Defendant's arguments are not well taken at this time.

### 3. Coffman's Results Regarding Defendant's Alleged Misrepresentations

Defendant asserts that in Coffman's Initial Report, he did not express an opinion on whether Defendant's alleged misrepresentations impacted the price of Miller Energy's Securities. Defendant states that in his Corrected Report, Coffman included a novel opinion on the topic, finding that there was a statistically significant price movement in response to one (1) of the four (4) audit opinions issued by Defendant on Miller Energy's year-end financial results. Defendant argues that Coffman's new opinion on price impact should be excluded because it was not included in his Initial Report but was later added in response to questions asked during his deposition. Defendant argues that even if Coffman's opinion is allowed, it should nevertheless be excluded because it is unscientific and unreliable. Defendant states Coffman concedes that at least three (3) of the four (4) audit opinions did not cause any price increase of Miller Energy's common stock. In addition, Defendant states that in the one instance where there was an increase in the stock price following the release of an audit opinion, Coffman failed to analyze whether it was caused by other Miller Energy disclosures.

Plaintiffs do not address Defendant's argument that Coffman's opinion is a new opinion and should be stricken. Plaintiffs, however, assert that Dr. Attari did not criticize Coffman's use of an event study or his methodology of the price impact. Plaintiffs argue that Defendant concedes

35

that the first false and misleading audit report preceded a significantly statistical increase of the share price by 60%. Plaintiffs state that Defendant simply questions whether the misstatement alone caused the share price to increase.

During Coffman's deposition, the following exchange occurred:

> Q. Do you have any evidence that KPMG's audit opinions caused artificial inflation in the stock price?
>
> A. I wasn't asked to evaluate that.
>
> Q. You have no opinion on that topic.
>
> A. That's correct, I have not evaluated that. I mean, I've seen plaintiffs' complaint. I understand the economic logic of what their allegations are, but I, as a matter of fact, have not evaluated whether it's the case or not.

[Doc. 133-1 at 214]. In his Corrected Report, Coffman states that he performed additional analysis on the movements of Miller Energy's common stock to information concerning the original reporting of Miller Energy's FY 2011 financial information, which would have subsumed and provided information about earnings in Q4 2011 prior to August 30, 2011. [Doc. 121 at ¶ vi]. Coffman continues that such analysis sheds light on whether there is any evidence that the release of any of Defendant's audit reports impacted the market price of the Miller Energy Securities. [*Id.*]. Coffman acknowledges that such analysis was not the subject of his Initial Report and is irrelevant to the question of whether the market is efficient, but he states that the question was raised during his deposition. [*Id.*]. He concludes that the prices of Miller Energy securities were impacted by Defendant's audit reports. [*Id.*]. Coffman's analysis shows that out of four audit opinions used by Defendant on Miller Energy's year-end financial results, there was a statistically significant price movement in response to one audit opinion. [*Id.* at 76] (Exhibit 7).

As mentioned above, Defendant has requested that the Court strike this opinion because it was not part of Coffman's Initial Report. Plaintiffs do not respond to this argument. Pursuant to Rule 26(e), an expert may supplement information included in a report and information given during an expert's deposition. *See* Fed. R. Civ. P. 26(e)(2). The Rule does not allow an expert to provide a new opinion. *Jermano v. Graco Children's Prod., Inc.*, No. 13-CV-10610, 2015 WL 1737548, at *4 (E.D. Mich. Apr. 16, 2015) ("To be sure, Rule 26(e)(2) places limits on supplementation by an expert, and supplementation may not be used for strategic advantage. For instance, a party may not use the supplementation process to introduce entirely new expert opinions that could have been provided prior to the expert's report and deposition."). As demonstrated above, Coffman acknowledged during his deposition that he did not form an opinion on price impact. Accordingly, given that this is a new opinion and Plaintiffs do not respond to Defendant's argument, the Court **STRIKES** the above opinion from Coffman's Corrected Report.

### B.     Coffman's Methodologies

Defendant states that Coffman's methodologies with respect to the event studies are unreliable. Defendant describes a number of alleged errors with respect to Coffman's opinions that pertain to both the common and the Preferred Stock. In addition, Defendant describes a number of alleged errors that affect Coffman's analysis with respect to only the Preferred Stock. The Court will address Defendant's arguments separately.

### 1.     Coffman's Methodology for Analyzing Market Efficiency of the Miller Energy Securities

Defendant argues that there are four issues with Coffman's methodology for analyzing market efficiency as it pertains to the Miller Energy Securities. First, Defendant states that Coffman's methodology for identifying news days, no news days, and market dates has a high known rate of error. Second, Defendant states that Coffman failed to control for market reactions

37

caused by other Miller Energy events or disclosures. Third, Defendant argues that Coffman's methodology for controlling the price of oil is incorrect. Finally, Defendant states that Coffman's report was prepared solely for this litigation.

### i. Coffman's Methodology for Identifying News Days, No News Days, and Market Dates

Defendant argues that Coffman's Initial Report incorrectly identified the date of Miller Energy's earnings announcements for the fourth quarter of 2013. Defendant states that correcting the date changed the statistical significance. Defendant explains that failing to identify the correct market date changed the number of statistically significant events—the most critical results on which Coffman purports to base his ultimate conclusion about the presence of a cause and effect relationship. In addition, Defendant states that nine (9) of the seventeen (17) earnings announcements had the incorrect time for the release of the announcement in Coffman's Initial Report. Defendant states "[t]hat the corrected times for eight of the earnings announcements did not alter the market date was a matter of luck" and cannot contribute to the reliability of the methodology. [Doc. 127 at 18]. Defendant further argues that Coffman missed two news days that were alleged in the Amended Complaint.

Plaintiffs respond that Defendant's arguments are irrelevant because they pertain to Coffman's Initial Report and not his Corrected Report.

In Coffman's Corrected Report, he states as follows:

> First, in my initial report, I made an inadvertent error in identifying the date upon which the market would have first reacted to Miller Energy's release of Q4 2013 earnings. I erroneously relied upon the timing of a Dow Jones Newswires publication of a "Correction" to the earnings report instead of the timing of the original earnings report. This inadvertent error caused me to analyze July 17, 2013 as the market date for the Q4 2013 earnings announcement, instead of July 16, 2013. I have confirmed that the market date for the other

38

16 earnings announcements I analyzed was correct. I have made this correction in my analysis of all Miller Energy Securities.

Second, there are two days upon which Plaintiffs assert that news impacted the market price of Miller Energy that were inaccurately classified as "no news" days in my analysis (the *StreetSweeper* report issued after market hours on December 23, 2013 that would have impacted the market on December 24, 2013, and a *Reuters* article issued after market hours on October 13, 2014, that would have impacted the market on October 14, 2014). I have made this correction in my analysis of all Miller Energy Securities.

As demonstrated within this Corrected Expert Report, while correction of these inadvertent errors changes certain numbers and calculations contained within the report, it does not impact in any way the ultimate conclusions to be drawn from the analysis or the opinions I have offered in this case. In addition, the errors do not indicate that the methodology used in my report, which is standard and regularly accepted by Courts throughout the country, is inadequate in any way.

[Doc. 121 at ¶¶ ii-iv]. Further, in Coffman's Rebuttal Report, he acknowledges that he made mistakes in his Initial Report. Specifically, Coffman states as follows:

Despite Defendant's attempt to characterize my methodology as unreliable and containing many errors, the reality is that, out of many thousands of calculations and assessments, I made two errors in my Initial Report that impacted my calculations. Neither was an error in the general methodology I employed to analyze market efficiency. Instead, one error involved assigning an incorrect market date to a single Miller Energy earnings announcement, and the other was the inadvertent exclusion of two sources cited in the Complaint when assessing which days during the Analysis Period contained news. I readily admitted to the inadvertent errors, corrected them in a new report, and empirically demonstrated that my ultimate conclusions and opinions were unaffected by the errors. My overall methodology was unaltered. While I strive for perfection, that does not always occur.

[Doc. 142-1 at ¶ 2]. Given the above explanation, and Coffman's opinion that the errors did not affect his ultimate conclusions, the Court finds Defendant's arguments not well taken at this time.

### ii. Market Reactions Caused by Other Miller Energy Events and Disclosures

Defendant argues that even in Coffman's Corrected Report, he did not analyze whether the observed price changes were reactions to other Miller Energy events or disclosures that occurred around the same dates as the earnings releases he purportedly studied. Defendant argues that Coffman admitted that he did not do any work to analyze whether the price changes he observed on market dates were reactions to other news events in the two or three days leading up to the earnings releases. Defendant asserts that Coffman's analysis skews the event study towards a conclusion that there was a cause and effect relationship.

Plaintiffs respond, in a footnote, that Coffman testified that for the days on which he found there was a statistically significant price reaction to earnings releases, he did review the news surrounding those announcements for "clearly new material news that would be expected to move the market." [Doc. 150 at 22 n. 13]. In addition, Plaintiffs explain that Coffman also stated that the control defense counsel was suggesting during the deposition was not economically appropriate and that the conclusions defense counsel was trying to draw regarding the two or three-day price reactions were inaccurate. [*Id.*]. Defendant replied that Coffman's Corrected Report does not reflect this analysis and that such bald assertions that he performed a test, unsupported by any evidence, or backup data or reports, cannot be credited.

During Coffman's deposition, the following exchange occurred:

> Q.   For the three events for which you found an earnings release was followed by a statistically significant price movement at the 95 percent confidence level, what, if anything, did you do to make sure that the price movement you observed was the market date response to the earnings release you were studying rather than a market date plus 1 carryover effect from a news event the day before?
>
> A.   Well, I reviewed the news around these earnings announcements, and I don't remember all the details, but I

40

don't recall, on the day prior to any of those dates, there being what I would consider clearly new material news that would be expected to move the market, but without looking back at my backup, I don't know for sure, but I certainly would have looked at that.

[Doc. 133-2 at 108].

The Court finds Defendant's criticism goes to the weight of Coffman's opinion, rather than to its admissibility. Coffman testified that he would have looked at other events but could not recall the specifics during his deposition. This does not affect the admissibility of his opinion, and Defendant may cross examine Coffman on whether he reviewed any events and if so, what specific events.

### iii. Coffman's Methodology for Controlling the Price of Oil

Defendant asserts that Coffman's methodology for controlling the impact of changes in the price of oil is incorrect. Defendant explains that Coffman's methodology required him to control for the impact of changes in the price of oil, but Coffman mistakenly downloaded and used data from the wrong oil price index, rendering all of his analysis unreliable. Specifically, Defendant submits that Coffman states that he used the NYMEX WTI Light Sweet Crude Oil Futures Index ("NYMEX Oil Index") obtained from the S&P Capital IQ. However, Coffman actually used a different index, the ICE WTI Light Sweet Crude Oil Futures Index ("ICE Oil Index"). According to Dr. Attari, there is a price difference on 29% of the days (325 days) in the Analysis Period between the oil prices used by Coffman and the NYMEX Oil Index. In addition, Defendant argues that Coffman incorrectly calculated the return of his oil price index for multiple dates in his event study. Defendant states that oil prices are based on futures contracts where the price of oil varies by day depending not only on the variation of the price of oil but also upon the maturity date of the futures contract included in the index. Defendant submits that to correctly calculate the return

41

on the oil price index on any given day, Coffman should have identified the futures contract on that date and calculated the percentage change in price of the same futures contract on that particular date. Defendant claims that this is not the methodology that Coffman used. Instead, Coffman simply divided the index level on each date by the prior date, even on the dates when the futures contract used in the index changed.

Plaintiffs respond that Coffman's use of a different index does not render the entire event study methodology unreliable. Plaintiffs argue that Dr. Attari agrees that (1) there are no substantive differences in the economic meaning or value of the two indices, (2) both indices are meant to track the market price of the same underlying commodity—that is oil, and (3) both indices are constructed by referencing prices for short term futures contracts covering oil. In addition, Plaintiffs state that Coffman performed the same test using the NYMEX Oil Index and found that it had no impact on the conclusions he reached and reported using the ICE Oil Index. Further, Plaintiffs state that Coffman's report makes clear that he conducted a robustness check on a third index, the Dow Jones U.S. Exploration and Production Industry Index, which similarly had no impact on his results. Finally, with respect to the computation of the oil price index, Plaintiffs argue that Defendant provides no legal or academic authority for their assertion that Coffman incorrectly calculated the return and that Dr. Attari has used the same method in another case. Further, Plaintiffs state that Coffman demonstrated that even if he used Dr. Attari's suggested method, it would not have impacted his conclusion.

As mentioned above, Coffman acknowledged that in his Initial Report, he cited the wrong index. Specifically, in Coffman's Initial Report, he claims that he relied on the NYMEX Oil Index, but he actually downloaded and relied on the ICE Oil Index. Dr. Attari states that "both the NYMEX and ICE futures contracts are designed to track the price of West Texas Intermediate oil

42

on the maturity date of the contract." [Doc. 129-1 at ¶ 38]. Dr. Attari opines, "Because the market for the NYMEX future contracts is more liquid than the market for the ICE WTI Light Sweet Crude Oil Futures Index, and as Mr. Coffman observes, Miller Energy's delivery prices were indexed to the NYMEX WTI prices, the NYMEX WTI Light Sweet Crude Oil Futures Index is the better index to use." [*Id.*]. Dr. Attari states that while the two future index price series are similar, they are not the same. [*Id.* at ¶ 39]. For example, he states that Coffman did not have price data on October 20 and 21, 2011, for his oil price index, but prices were available for the NYMEX Oil Index. [*Id.*]. As shown in Dr. Attari's Table 3, the ICE Oil Index that Coffman relied on differs from the NYMEX Oil Index on 29% of days or 325 days out of the 1,108 days during the Analysis Period. [*Id.*].

The experts agree that both indexes are used to track the market price of the same underlying commodity, West Texas Intermediate Oil, and that they are both constructed using reference prices for short term futures contracts covering the same commodity. [Doc. 142-1 at ¶ 40]. The difference, according to both experts, is that the NYMEX Oil Index tracks futures contracts from the New York Mercantile Exchange, while the ICE Oil Futures Index tracks futures contracts from the Intercontinental Exchange. [*Id.*]. Coffman states, "[S]ince both of these indices are meant to generally track the same underlying commodity, the prices are highly consistent, as shown in the chart below. The correlation coefficient between the indices is over 97%." [*Id.*]. Coffman continues that using the NYMEX index had no impact on his conclusions. [*Id.* at ¶ 41]. Coffman concludes, "More specifically, for the news days I analyzed, the use of the NYMEX Oil Futures Index does not change the proportion of days that are significant, changes the average absolute return by .05% and .11% for the Series C Preferred Stock and Series D Preferred Stock respectively, and does not impact the average volume of shares traded. All of the comparisons

against the 'no news' days remain statistically significant at or above the 95% significance level." [*Id.*].

The Court does not find that Coffman's use of the ICE Oil Index, as opposed to the NYMEX Oil Index, is a basis for excluding the report. Both experts acknowledge that the indexes trace the same underlying commodity, West Texas Intermediate Oil, and they are both constructed using reference prices for short term futures contracts covering the same commodity. They simply use different exchanges to track the futures price. As Coffman states, the prices are highly consistent. Further, there is no evidence before the Court that reliance on one index, as opposed to the other index, is wrong. Defendant may cross examine Coffman on why the NYMEX Oil Index is better to utilize than the ICE Oil Index and the price difference on 29% of days during the Analysis Period.

As mentioned above, Defendant also argues that Coffman incorrectly calculated the return on his oil price index for multiple days in his event study. Defendant states that the correct method to calculate the return on the oil price index is to identify the futures contract on that date and calculate the percentage change in the price of the same futures contract on that particular date. Defendant argues that Coffman simply divided the index level on each date by the prior date, even on dates when the futures contract used in the index changed.

Plaintiffs argue that Defendant fails to provide any legal or academic authority for its assertions. In addition, Plaintiffs state that Dr. Attari previously used the same type of index when performing an event study in a case for which he was providing expert testimony. Plaintiffs argue that Coffman demonstrated that even if he used Dr. Attari's suggested method, it would not impact his (Coffman's) conclusions.

44

Specifically, Dr. Attari states that Coffman incorrectly calculated the return on the oil price index on numerous dates because Coffman failed "to account for the necessary rolling forward of futures contracts as they mature." [Doc. 129-1 at ¶ 40]. Dr. Attari describes Coffman's alleged error as "fundamental," explaining that "[n]o qualified expert in the field would accept Mr. Coffman's methodology on this point." [*Id.*]. Dr. Attari states that "[r]eturns on an industry index or an index of peer companies can often be obtained from a data provider or can be computed in a fashion similar to that used to compute the return on the broad market index"—that is, "by dividing the index level on one day by its level on the previous day, minus one." [*Id.* at ¶ 41 & n. 37]. Dr. Attari states that, with respect to futures contracts, the calculation is different because "it requires taking into account changes in the futures contract used to compile the index." [*Id.* at ¶ 41]. Dr. Attari states that the index Coffman used contains contracts that expire every month, and therefore, the contract used in the index changes at least once a month. [*Id.* at ¶ 43].

Dr. Attari explains that for most days, it is acceptable to calculate the percentage change in the futures price index by dividing the futures index level on the day by the futures index level on the previous trading day. [*Id.* at ¶ 44]. Dr. Attari continues that on other days, this calculation poses problems, explaining as follows:

> Doing so causes errors on days where the futures contract whose price is reflected in the index is not the same as the futures contract whose price is reflected in the index on the previous day. Care must be exercised to ensure that the price used is for the same futures contract on both days that are used to calculate the percentage changes of the index. On any given day, to calculate the return on the Oil Price Index correctly, Mr. Coffman needed to first identify the futures contract used on that day to construct the Oil Price Index and then calculate the percentage change in price of that futures contract on the day. Instead, Mr. Coffman calculated the percentage change on the Oil Price Index without controlling for the relevant futures contract.

> Mr. Coffman has computed the return on the Oil Price Index by simply dividing the index level each day by its level on the prior day, even on the dates when the contract used in the index changed. Thus, the return on the Oil Price Index computed by Mr. Coffman is incorrect each time the futures contract whose price is used in the index changes.

[*Id.* at ¶¶ 44-45]. Dr. Attari concludes that the impact of incorrectly calculating the return of the ICE Oil Futures Index was 55 days out of 1,106. [*Id.* at 97] (Table 3).

In his Rebuttal Report, Coffman states that "[f]inancial economist regularly use third-party price indices to control for market or industry factors without dissecting all of the construction techniques if there are better ways to construct the series." [Doc. 142-1 at ¶ 44]. Coffman states that he relied on a price index constructed by a reputable party that is intended to track the market price of WTI Oil. [*Id.*]. Coffman concludes that Dr. Attari's criticism is a matter of statistical judgment and does not reflect an error in Coffman's methodology. [*Id.*]. Further, Coffman explains:

> Nevertheless, I demonstrate that even if I had undertaken the procedure suggested by Dr. Attari, my conclusion of a cause and effect relationship between new news and changes in the market price of Miller Energy Preferred Securities is not impacted. (see Rebuttal Exhibit 9 and Rebuttal Exhibit 10). More specifically, for the news days I analyze, the use of the procedure suggested by Dr. Attari does not change the proportion of days that are significant and does not impact the average volume of shares traded. I analyzed both the raw returns I originally used and the dividend adjusted returns using Dr. Attari's proposed methodology for both the Series C and Series D Preferred Stock. Rebuttal Exhibit 9 and Rebuttal Exhibit 10 show that the use of Dr. Attari's proposed method changes the average absolute return by an inconsequential 0.01% and 0.10%, respectively, when analyzing the dividend adjusted returns for Miller Energy Series C and Series D Preferred Stock. All of the comparisons against the "no news" days remain statistically significant at or above the 95% significance level for the Miller Energy Preferred Securities. My conclusion that there is scientific evidence of a cause and effect relationship is not sensitive to my use of the WTI Oil index with or without the alterations to the index suggested by Dr. Attari.

[*Id.* at ¶¶ 44-45].

In Dr. Attari's Rebuttal Report, he explains that he is not criticizing Coffman's reliance on a price index constructed by a third party. [Doc. 159-1 at ¶¶ 15-16]. Dr. Attari states:

> Not every price index is designed for computing or can be used to compute returns (in this instance, the percentage change in price) simply by dividing the index level on a day by the level on the previous day. As I explain in the Attari report, the futures contract whose price is used in the ICE and NYMEX WTI Light Sweet Crude Oil Futures Indexes changed periodically and the returns that Mr. Coffman purports to compute on those days are not returns at all. They are simply the percentage difference in the price between two **different** securities (in this instance, future contracts with different maturities) across the two days.

[*Id.* at ¶ 16] (Emphasis in original).

The Court has considered the parties' arguments and finds that Defendant's challenge to Coffman's opinion is not a basis for exclusion. Dr. Attari acknowledges that for most days, the percentage change in the futures price index can be computed by dividing the futures index level on the day by the futures index level on the previous trading day. Dr. Attari criticizes Coffman's opinions because on fifty-five (55) days out of 1,106 (using the ICE Oil Index), Coffman allegedly used the wrong futures contract to calculate the returns. Coffman disagrees, stating that the third-party price index controls for market or industry factors without having to dissect all of the construction techniques. Plaintiffs argued at the December 10 hearing that Defendant has not provided any authority for its argument.

While the experts disagree as to whether Coffman used the correct future contracts in his calculations, the Sixth Circuit has cautioned that relying on incorrect data, or even missing data, is not a basis to exclude an opinion, unless there is a significant error in application. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citing *Quiet Tech. DC–8, Inc. v. Hurel–*

*Dubois UK Ltd.,* 326 F.3d 1333, 1343–44 (11th Cir. 2003)) (explaining that where the appellant was not arguing that it was improper to conduct a study using the certain aerodynamic data that the expert employed, but rather the specific numbers the expert used were wrong, the alleged flaws in the expert's analysis "are of a character that impugn the accuracy of his results, not the general scientific validity of his methods"); *Stuckey v. Online Res. Corp.,* No. 2:08-CV-1188, 2012 WL 1808943, at *6 (S.D. Ohio May 17, 2012) (explaining that the parties' disagreement about the specific numbers to input in a formula is an improper basis upon which to exclude expert testimony) (citing *Quick Tech.*, 326 F.3d at 1345); *see also Noffsinger v. Valspar Corp.*, No. 09 C 916, 2013 WL 12340487, at *3 (N.D. Ill. Jan. 4, 2013) ("Similarly, Mr. Marscher criticizes Dr. Mostovoy's calculations as "without value" and describes a number of problems with the assumptions made by Dr. Mostovoy and the formulas used in his calculations . . . These are all criticisms of Dr. Mostovoy's methodology that the jury can consider when deciding the "credibility and accuracy" of Dr. Mostovoy's testimony."). Here, as previously mentioned, Dr. Attari acknowledges that for most days, one only need to divide the futures index level on the day by the futures index level on the previous trading day.

Further, Coffman's opines that even if he uses Dr. Attari's proposed method of calculating the returns, the average absolute return is inconsequential, citing Exhibits 9 and 10 in his Rebuttal Report for support. *See also Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-CV-1755, 2015 WL 6082122, at *6 (N.D. Ohio Sept. 30, 2015) ("When the selection of certain data in an expert's analysis is challenged, but the expert provides a rationale supported by the record, the issue of whether the expert's conclusions are accurate or defensible goes to the weight of the evidence, not its admissibility.") (citing *In re Scrap Metal,* 527 F.3d at 530–31).

Finally, the Court also notes that Defendant does not explain the actual impact of the changed output values, other than stating that it serves as the backup data that forms the basis of the event study. Stated in a different way, Defendant only argues that Coffman did not supply a fully, corrected version of his report, so that in-and-of-itself results in a significant methodological error rendering the Corrected Report unreliable. The issue for Defendant, however, is that it insists that Coffman's methodology is wrong and points to incorrectly computed returns, but Defendant does not argue that such alleged incorrections produce inconsistent results. Accordingly, the Court finds Defendant's argument not well taken.

### iv. Coffman's Report

Defendant asserts that the errors in Coffman's event study expose him as a quintessential expert for hire. Plaintiffs respond that Coffman's work has grown naturally and directly out of his research and decades of experience and is supported by the academic literature and widely accepted by courts in the securities litigation context.

A court may exclude an expert if his/her opinion was prepared solely for litigation. *Newell Rubbermaid, Inc., v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). "[A] proposed expert's opinion is not prepared solely for litigation when the expert is "testify[ing] about matters growing naturally and directly out of research [he] ha[s] conducted independent of litigation." *Banks v. Bosch Rexroth Corp.,* No. CIV.A. 5:12-345-DCR, 2014 WL 1364763, at *3 (E.D. Ky. Apr. 7, 2014) (quoting *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)). "Therefore, if a witness has 'extensive familiarity' with the subject to which he is seeking to offer an opinion, it will be admissible even if it was prepared only for litigation." *Id.* (citing *Johnson*, 484 F.3d at 434).

As mentioned above, Defendant argues that Coffman's errors expose him as a quintessential expert for hire. The Court disagrees. Coffman has extensive familiarity with the subject matter he intends to testify. As described in his Corrected Report, he holds a bachelor's degree in Economics with honors from Knox College and a Master's of Public Policy from the University of Chicago. [Doc. 121 at ¶ 4]. For over twelve years, he was responsible for conducting and managing analysis in a wide variety of areas, including securities valuation and damages, labor discrimination, and antitrust. [*Id.* at ¶ 5]. Accordingly, the Court does not find that he is the quintessential expert for hire.

### 2. Coffman's Methodology for Analyzing Market Efficiency for the Preferred Stock

Defendant asserts that there are three errors in Coffman's event study as it relates to the Preferred Stock. First, Defendant states that Coffman incorrectly computed the returns on the Preferred Stock. In addition, Defendant contends that Coffman's methodology for the event study of the Preferred Stock is biased. Finally, Defendant argues that Coffman's autocorrelation analysis supports the conclusion that the market for the Preferred Stock was inefficient.

The Court will address these arguments in turn.

### i. Coffman's Computation of the Returns

Defendant asserts that Coffman incorrectly calculated the returns by ignoring the dividend payments investors received. Defendant states that such resulted in lower returns for the Preferred Stock, which affected the coefficients for the regression models in Exhibits 5-C and 5-D. Defendant submits that Coffman then used the coefficients to calculate the abnormal returns and abnormal dollar changes in Exhibits 9 and 11, which affected the statistical significance of the event days in Exhibits 10 and 12.

Plaintiffs assert that Dr. Attari admitted during his deposition that he did not check to determine whether using the dividend payments in the analysis would change the outcome of the cause and effect test. Plaintiffs argue had Dr. Attari actually tested his hypothesis, he would have recognized that adjusting for dividend payments has no effect on the results of the analysis or Coffman's conclusion that the event study supported the existence of efficient markets.

Defendant replies that Coffman conceded that he incorrectly computed the returns of the Preferred Stock because he excluded dividends. Defendant states that Coffman attributed the error to a member of his staff who manually replaced the dividend-adjusted returns within a spreadsheet and failed to realize the manual calculations erroneously and inadvertently eliminated the dividend adjustments. Defendant argues that this error resulted in lower returns for the Preferred Stock, which affected the coefficients for the regression models in Exhibits 5-C and 5-D. Defendant explains that Coffman then used these coefficients to calculate the abnormal returns and abnormal dollar changes on the event days in Exhibits 9 and 11, which affected the statistical significance of the event days in those exhibits and in Exhibits 10 and 12. Defendant states that despite this fundamental flaw, Coffman has not produced corrected copies of Exhibits 5-C, 5-D, 9, and 11. Defendant argues that as explained in Dr. Attari's report, the above issues impact the entire event study.

Specifically, Dr. Attari states that Coffman incorrectly computed returns for the Preferred Stock by failing to take into consideration the dividends paid on those securities. [Doc. 129-1 at ¶ 30]. Dr. Attari describes Coffman's mistake as a "fundamental error." [*Id.*]. Dr. Attari explains, "Investors earn a return from holding a security in the form of price appreciation and dividend payments that they receive" but "Coffman ignores the dividend payments on the Series C and

51

Series D Preferred Stock when he computes the returns for these two securities." [*Id.*]. Dr. Attari states as follows:

> While there are only a few days on which the correctly computed returns of the Series C and Series D Preferred Stock are different from the returns Mr. Coffman uses, the differences on these days are large. For each of the ex-dividend dates, the percentage change in price in Mr. Coffman's study is always lower than the correct return because Mr. Coffman incorrectly ignores the dividend payment. The average difference between the return and the percentage price change is 2.81% for the Series C Preferred Stock and 2.77% for the Series D Preferred Stock. These errors can be expected to affect Mr. Coffman's estimates of the coefficients from the regression models in Exhibits 5-C and 5-D which he uses to calculate the Abnormal Return and Abnormal Dollar Change on the event days in Exhibits 9 and 11. These errors can also be expected to affect the standard deviation of errors from the regression model in Exhibits 6-C and 6-D and consequently the t-statistic and significance level on Mr. Coffman's event days in Exhibits 9 and 11. Many of the numbers reported in Exhibits 10 and 12 are also likely to be affected because they are based on the estimates of Abnormal Returns for the event days and days with no news. Finally, many of the numbers reported in Exhibits 17-C and 17-D are also likely to be affected because they are based on the estimates of Abnormal Returns during Mr. Coffman's Analysis Period.

[*Id.* at ¶ 32].

In his Rebuttal Report, Coffman acknowledges that adjusting for dividend payments is appropriate and was his intention. [Doc. 142-1 at ¶ 37].[8] Coffman states that Dr. Attari does not suggest that the incorporation of dividend adjustments impacts his (Coffman's) analysis in a meaningful way. [*Id.* at ¶ 38]. Coffman states that for the Series C Preferred Stock, the incorporation of dividend adjusted returns does not change the proportion of news days with significant returns, changes the average absolute return for those days by a negligible 0.02%, and

---

[8] Coffman further explains that in the process of handling data, a member of his staff manually replaced the dividend-adjusted within a spreadsheet and failed to realize the elimination of the dividend adjustment. [Doc. 142-1 at ¶ 37 n 83.].

does not affect the volume. [*Id.*]. With respect to the Series D Preferred Stock, Coffman states that there is no change whatsoever to the proportion of news days with significant returns, or the volume, and the average absolute abnormal return changes by 0.02%. [*Id.*]. Coffman states, "The statistical tests of whether the news days have a greater proportion of statistically significant returns and whether the average absolute returns are higher on news days relative to "no news" days remains statistically significant at far greater than the 99% confidence level, affirming [his] conclusion that the markets for Miller Energy Securities were efficient." [*Id.*]. Coffman concludes that Dr. Attari's criticism "has no substantive influence either on [Coffman's] specific conclusion that there is evidence of a cause and effect relationship or [Coffman's] ultimate conclusion that Miller Energy Preferred Securities traded in efficient markets." [*Id.* at ¶ 39].

As noted above, Coffman concedes that he inadvertently excluded dividend payments, but the Court does not find this error results in the exclusion of his opinion. The Court finds the Sixth Circuit Court of Appeals' decision in *In re Scrap Metal Antitrust Litigation* instructive. 527 F.3d at 517. In that case, the Sixth Circuit Court of Appeals addressed whether the district court abused its discretion in admitting expert testimony. *Id.* at 528. The Court noted that defendant did not challenge the reliability of the method, but instead, challenged the reliability of plaintiff's expert's testimony because the expert used an inaccurate price index and alterations to the prices. *Id.* Stated in a different way, the defendant contended that the expert "used erroneous data and necessarily produced an erroneous conclusion; in sum, 'garbage in, garbage out." *Id.* The Sixth Circuit disagreed with defendant's argument, calling it "unpersuasive because it fundamentally confuses the credibility and accuracy of [the expert's] opinion with its reliability." *Id.* at 529. The Sixth Circuit explained that an error in the data or missing data go to the weight of the opinion and not to its admissibility. *Id.* (citing *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1343-44) (finding appellant's

argument that the specific numbers the expert used were wrong, and therefore, such flaws impugn the results is better addressed by cross examination rather than exclusion).

The Sixth Circuit further commented that this "is not to say that a significant error in application will never to go the admissibility, as opposed to the weight of the evidence." *Id.* The Court continued, however, that "rejection of the expert testimony is the exception, rather than the rule" and that "we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* (other quotations omitted).

In the instant matter, Defendant argues that Coffman's opinion is unreliable because he did not take into account dividend payments. For similar reasons as explained in *In re Scrap Metal Litigation*, the Court finds Defendant's argument goes to the weight of Coffman's opinion and does not constitute a basis to exclude his opinion. *Trollinger v. Tyson Foods, Inc.,* No. 4:02-CV-23, 2008 WL 305032, at *10 (E.D. Tenn. Jan. 31, 2008) (explaining that the expert has drawn conclusions as to how that data should be interpreted and that defendants' "opportunity to argue how and to what extent [the expert's] analysis and conclusions are incorrect is provided through cross-examination and the presentation of their own expert and evidence at trial").

Furthermore, in this case, Coffman states that he reviewed his results and concluded that the exclusion of dividend payments did not affect his ultimate conclusions. As previously described, Coffman states that incorporating dividends does not change the proportion of news days with significant returns, it changes the average absolute return by 0.02%, and does not affect the volume. Dr. Attari acknowledged during his deposition that he did not check to see whether Coffman's outcome for the Preferred Stock would be impacted if dividends were taken into account but simply noted that the numbers Coffman uses in various exhibits would be affected. [Doc. 143-2 at 158]. In Dr. Attari's Rebuttal Report [Doc. 159-1], he discusses the affected

exhibits, but he does not explain how the exhibits affect Coffman's ultimate results. Accordingly, the Court declines to exclude Coffman's opinion on such grounds.

**ii. Coffman's Methodology for the Preferred Stock**

Defendant asserts that Coffman's event studies for the Preferred Stock were limited to the time period after October 15, 2014. Defendant argues that such a limitation is without a legitimate basis. In addition, Defendant asserts that instead of using earnings announcements, as Coffman did with the study of the common stock, Coffman deviated from his usual methodology and analyzed price movements in response to news that was clearly related to the ability of Miller Energy to continuing paying Preferred Stock dividends or remain listed on the NYSE. Defendant states that Coffman explains that his methodology was selected because the Preferred Stock is driven primarily by changes in the time value of money, but Defendants argue that this explanation is unsupported by basic economics, accepted statistical methodology, and Coffman's own dates. Defendant argues that the entire methodology employed by Coffman (comparing earnings releases with no news days) is not supported by the scientific literature.

Plaintiffs maintain that the events analyzed in the Preferred Stock event study are reliable. Plaintiffs argue that Coffman explained why he chose October 15, 2014—that is, the market price of the Preferred Stock fell to a level that was substantially below par value which is when one would expect price reaction to earnings announcements for the Preferred Stock due to the concern that Miller Energy may not have the resources to continue to pay the preferred dividends. Thus, Plaintiffs state that Coffman constructed two different fixed estimation windows for his event study and did not include events prior to October 15, 2014. Plaintiffs state that cases make clear that modifying the *Cammer* factors, for securities with debt like components, such as preferred securities, is entirely appropriate. In addition, Plaintiffs argue that Coffman determined which

news events to test by reference to clearly identified and objective criteria that follow naturally from the differences in preferred and common stocks and the type of news that would be expected to affect each.

The Court has already addressed this argument above. *See supra* Part IV, section A(2). Accordingly, for the same reasons as above, the Court finds Defendant's arguments go to the weight of Coffman's opinions, rather than to their admissibility.

### iii. Coffman's Autocorrelation Analysis

Defendant asserts that Coffman's autocorrelation analysis is unreliable and refutes his conclusion that the market for the Preferred Stock was efficient. Defendant states that Coffman ran the simplest possible autocorrelation analysis, which only tests whether the abnormal rates for the Preferred Stock can be predicted using the abnormal return rate from the day before (i.e., weak-form efficiency). Defendant states that Coffman's test actually provides evidence against weak-form efficiency and that a market that is not weak-form efficient by definition cannot be a semi-strong form efficient. Defendant states that Coffman did no work to determine if abnormal returns from two or three days beforehand can predict the return on a market date. Further, Defendant states that the results of Coffman's autocorrelation analysis show that the returns for Preferred Stock are correlated at a statistically significant level. Defendant submits that this is evidence that the market for the Preferred Stock was inefficient.

Plaintiffs maintain that Coffman's autocorrelation test is reliable. Plaintiffs point to Dr. Attari's deposition, wherein he testified that he was not suggesting Coffman relied on an invalid test but simply called it limited. Plaintiffs state that countless courts have recognized the validity of the autocorrelation methodology that Coffman employed, and Dr. Attari actually relied on the same method in another case. Plaintiffs note that Coffman concluded that some autocorrelation is

56

entirely consistent with an efficient market and that only systematic autocorrelation of the sort that

suggests arbitrage opportunities indicates an inefficient market.

As an initial matter, the Court notes that there are three general forms of efficient capital

markets hypothesis:

> First is the weak form, which asserts simply that the current share
> price in an efficient market reflects all information about past share
> prices. If the weak form of the hypothesis accurately describes a
> market, it is impossible to predict future prices using only past
> prices. Second, the semi-strong form, which asserts that a share
> price in an efficient market reflects all public information
> concerning the security (including but not limited to past share
> prices). Third, the strong form, which asserts that all relevant
> information, public and private, is reflected in the price of securities
> in an efficient market. The strong form has been widely discredited.

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 78 (S.D.N.Y. 2015)

(quoting *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 98 n. 148 (S.D. N.Y. 2009)) (other

citations omitted). "[M]any courts have presumed that plaintiffs must establish the semi-strong

form." *Id.* (other citations omitted).

Autocorrelation "generally refers to the correlation between two observations of the same

series at different dates." *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d

1143, 1160 (N.D. Ohio 2013) (citation omitted). "A security exhibits autocorrelation if the change

in price of the security on a given day provides an indication of what the change in price for the

security will be on the following day." *Id.* (quoting *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196,

213 (E.D. Pa. 2008)). "The presence of autocorrelation in a security's price may indicate that a

security trades in an inefficient market." *Id.* (citing *DVI*, 249 F.R.D. at 213).

In the present matter, Coffman states that a "well-accepted methodology to test for the

existence of autocorrelation is to run a regression analysis that tests whether, on average, the

abnormal return from the previous day has a statistically significant effect on the abnormal return

today." [Doc. 121 at ¶ 93] (citing William H. Greene, Econometric Analysis, Prentice Hall, Sixth Edition, 2008, Chapter, p. 644). Coffman continues, "If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation." [*Id.*]. Coffman conducted a regression analysis on the common stock and the Preferred Stock. [*Id.* at ¶¶ 94-96]. With respect to the common stock and the Series C Preferred Stock, Coffman found that the coefficients during the Analysis Period are not statistically significant at the 95% confidence level, and therefore, support the conclusion that the common stock and the Series C Preferred Stock traded in an efficient market. [*Id.* at ¶¶ 94-95]. With respect to the Series D Preferred Stock, Coffman explained as follows:

> While I did find statistically significant autocorrelation for Series D Preferred Stock across the Analysis Period, the quarterly autocorrelation analysis demonstrates that there is no consistent pattern that would suggest an arbitrage opportunity because the sign of the autocorrelation coefficient is not even consistently the same sign. In other words, in order to profit from autocorrelation, the direction of the autocorrelation needs to be consistent. In this case, the sign changes from quarter to quarter. Therefore, the statistical evidence is inconsistent with the presence of systematic autocorrelation that would allow a trader to consistently profit.

[*Id.* at ¶ 96]. Coffman concludes, "Therefore, my analysis of this factor for Miller Energy Series D Preferred Stock is consistent with market efficiency." [*Id.*].

Dr. Attari opines that the "absence of autocorrelations in returns may rule out violations of weak-form efficiency; however, they cannot help establish that the market meets the semi-strong form efficiency thresholds that courts require for class certification purposes." [Doc. 129-1 at ¶ 161]. Dr. Attari explains that "[r]esearchers have developed a number of tests for detecting violations of weak-form efficiency" and that the "simplest, least sophisticated of these tests involves regressing returns on a security on the prior day's return on the security." [*Id.* at ¶ 162]. Dr. Attari states that there are three problems with Coffman's autocorrelation opinions: (1) his

58

analysis cannot help establish semi-strong form efficiency, (2) Coffman's autocorrelation analysis checks for a very limited form of predictability and the results only inform about the type of predictably that Coffman analyzes, and (3) Coffman's results show that the Series D Preferred Stock were autocorrelated at a highly statistically significant level over the full Analysis Period and that the Series C Preferred Stock was autocorrelated at a highly statistically significant level for several of the quarterly sub-periods. [*Id.* at ¶¶ 164-65]. During his deposition, Dr. Attari explained that if Coffman's test is for autocorrelations, "then it's invalid because it only tests for a very limited form of autocorrelations." [Doc. 143-2 at 86].[9] Dr. Attari acknowledged that he had relied on the same test in another case to determine that the market was inefficient. [*Id.* at 87-88]. Dr. Attari testified, however, that the regular reversal of the autocorrelation coefficient from negative to positive could be consistent with the ability for an arbitrage opportunity. [*Id.* at 93].

In the present matter, the Court does not find Coffman's autocorrelation test (i.e., testing whether abnormal returns can be predicted using the abnormal return from the day before) is a basis to exclude his opinion. *See Plumbers & Pipefitters Nat. Pension Fund,* 967 F. Supp. 2d at 1160 (explaining autocorrelation as "the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day") (other citations omitted). Dr. Attari states that Coffman's analysis does not test whether using the abnormal returns for the past two trading days or the past week allows the return on a trading day to be predicted, but Defendant cites no authority that autocorrelation must be tested as Dr. Attari has proposed. Whether Coffman's analysis supports market efficiency is an issue for this Court in determining whether the *Basic* presumption applies during class certification.

---

[9] Plaintiffs state in their brief that Dr. Attari testified that he was not suggesting that Coffman's test was actually invalid. [Doc. 150 at 28]. During his deposition, Dr. Attari refers to Coffman's test as limited, but then he describes the test as "invalid*."* [Doc. 143-2 at 86].

Further, Defendant argues that Coffman's analysis shows that the Preferred Stock correlated at statistically significant levels, which therefore shows the market was inefficient. In essence, Defendant disputes the meaning of Coffman's results. As mentioned above, however, "Under *Daubert*, a disagreement with the expert's conclusion is not grounds for exclusion." *North*, 505 F. Supp. 2d at 1117. The Court will consider these arguments in its analysis for determining whether class certification is appropriate.

Finally, Defendant asserts that Coffman has not checked whether the results of his autocorrection analysis are impacted by the errors relating to his calculations as described in Part IV, section B(1)(iii)("Coffman's Methodology for Controlling the Price of Oil") and (2)(i) ("Coffman's Computation of the Return"). Defendant simply insists that Coffman did not update the affected exhibits and that the numbers Coffman relied on were incorrect. For similar reasons as stated in these sections, the Court finds Defendant's argument is not a basis for exclusion.

## C. Coffman's Opinions on Damages

Defendant argues that Coffman's damages methodologies with respect to the Section 11 and the Section 10 Classes are unreliable. The Court will address Defendant's arguments separately.

### 1. Section 11 Damages

First, Defendant argues that Coffman's opinion that damages for the proposed Section 11 Class can be calculated on a class wide basis because the statutory formula renders the knowledge of individual circumstances of each proposed class member irrelevant is wrong. Defendant states that in this case, there were multiple offerings for the Preferred Stock at different initial offering prices, only some of which are at issue, and therefore, there is no way to calculate any investor's potential damages without knowing which offering the investors' shares originated. Defendant

60

relies on Dr. Attari's opinion in support of its argument. Thus, Defendant asserts that Coffman's methodology provides no mechanism to calculate whether investors in the Section 11 class were actually damaged, and if so, by how much.

Plaintiffs argue that Defendant's position is incorrect, citing the Report and Recommendation in *Gaynor v. Miller*, No. 3:15-cv-545, TAV-DCP, 2018 WL 3751606 (E.D. Tenn. Aug. 6, 2018).[10] Further, Plaintiffs state that Dr. Attari does not dispute the statutory damages formula set forth in Coffman's Corrected Report or that the statutory formula can be easily utilized on a class wide basis. Plaintiffs state that instead, Dr. Attari's criticism is focused on members' ability to trace their offerings.

In Coffman's Corrected Report, he states that Section 11 damages can be calculated using the statutory formula. [Doc. 121 at ¶ 101]. Further, Coffman states that Section 11 allows Defendant to offset some or all of these damages if it can prove that financial losses under the statutory formula were not caused by the false statements or omissions. [*Id.* at ¶ 103]. Dr. Attari disagrees with Coffman, explaining that there are issues with a member's ability to trace the purchase security to a specific offering. [Doc. 129-1 at ¶ 75].

The Court finds that Coffman's reliance on the statutory framework for damages does not make his opinion unreliable. Defendant's criticism is better suited in determining whether the Section 11 Class should be certified. Accordingly, Defendant's argument is not well taken at this time.

---

[10] The undersigned notes that the Report and Recommendation was not adjudicated because the parties in *Gaynor* attempted mediation following entry of the Report and Recommendation. Later, the case was remanded. *Gaynor v. Miller,* No. 3:15-cv-545-TAV-DCP [Doc. 185] (E.D. Tenn. Dec. 6, 2019).

### 2. Section 10 Damages

Defendant asserts that Coffman's methodology pertaining to the Section 10 damages is not capable of distinguishing between high and low-risk investors. Defendant argues that such is required given that Plaintiffs are pursuing damages based on a materialization of the risk theory. Defendant states that as such, any damages calculation must take into account the fact that potential class members have different risk tolerances. Defendant submits that although damages for the low-risk investors could theoretically be calculated using an out-of-pocket approach, damages for the high-risk investors could not. Defendant states that there is also no way to distinguish between the two classes of investors without individual discovery of each class member, making class wide damages calculation impossible. Defendant relies on the Fifth Circuit's decision in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), stating that the Court excluded Coffman's testimony in that case for the same reason.

Plaintiffs state that they are not required to distinguish between high-risk and low-risk investors. Plaintiffs claim that they are unaware of any securities fraud case in which a plaintiff sought out-of-pocket, non-consequential damages in which a court held that damages could not be determined on a class wide basis. Plaintiffs argue that Dr. Attari admits that if his opinion is based on a misunderstanding of the law regarding the calculation of damages, he has no criticism of Coffman's opinion regarding the calculation of Section 10 damages.

In his Corrected Report, Coffman opines that damages under Section 10 can be calculated on a class wide basis. [Doc. 121 at ¶ 98]. He explains as follows:

> Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private

Securities Litigation Reform Act of 1995's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).

The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the Section 10(b) Class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the Section 10(b) Class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).

[*Id.* at ¶¶ 99-100].

Dr. Attari disagrees with Coffman's method, explaining that Plaintiffs have alleged a materialization of the risk theory, meaning that damages depend on the risk tolerance of the investors in the proposed class. [Doc. 129-1 at ¶ 207]. Dr. Attari states that with respect to those members with higher risk tolerances, who might still have invested had the risk been disclosed at least at lower prices, damages cannot be calculated using Coffman's method. [*Id.*]. Dr. Attari explains, "If such investors, who would have bought the securities at a lower price, receive a compensation based on the full price decline, they would clearly be receiving a windfall profit." [*Id.*]. He concludes that there is no way to know which members of the proposed class were high or low risk investors. [*Id.*].

Similar to the above finding, the Court finds that Defendant's criticisms are better suited for analyzing class certification as opposed to a *Daubert* challenge. In determining whether damages can be calculated on a class wide basis, Coffman utilized the out-of-pocket losses

measure. This is a "model-driven-calculation, which calculates the damages as the difference between the 'inflated' price at which Plaintiffs bought their stock . . . and the 'true' price, meaning the theoretical price that the . . . stock would have traded for had the relevant information been disclosed." *Ludlow*, 800 F.3d at 683. Coffman's method to calculate Section 10(b) damages has been approved in a number of cases. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (noting that that out-of-pocket damages are the traditional form of Section 10(b) damages); *Rowe v. Marietta*, 172 F.3d 49 (6th Cir. 1999) ("The out-of-pocket measures is favored method of computing damages in a securities fraud case."); *see also Rougier v. Applied Optoelectronics, Inc.,* No. 4:17-CV-02399, 2019 WL 6111303, at *16 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (distinguishing the district court's decision in *Ludlow* because the pre-explosion subclass did not seek out-of-pocket damages based on the artificial information of the stock price, but instead, sought consequential damages). Accordingly, the Court finds that Coffman's failure to separate between high-risk and low-risk investors goes to the weight of his opinion and not to its admissibility.

## V. CONCLUSION

Accordingly, for the reasons further explained above, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Exclude the Reports and Testimony of Chad Coffman [**Doc. 126**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

64