UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LEWIS COSBY, ERIC MONTAGUE, and        )
MARTIN ZIESMAN, as co-trustee for the   )
Carolyn K. Ziesman Revocable Trust, on behalf )
of themselves and all others similarly situated,  )
                                        )
                Plaintiffs,             )
v.                                      )        No. 3:16-CV-121-TAV-DCP
                                        )
KPMG, LLP,                              )
                                        )
                Defendant.              )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 109] of the District Judge.

Now before the Court is Plaintiffs' Motion to Certify the Classes, Appoint Class Representatives, and Appoint Class Counsel [Doc. 107]. The parties appeared before the undersigned for a motion hearing on December 10, 2019. Attorneys Laura Posner, Alan Dreschel, and Gordan Ball appeared on behalf of Plaintiffs. Attorneys Gregory Ballard, Allyson Riemma, and Paul Davidson appeared on behalf of Defendant. Accordingly, for the reasons further explained below, the Court **RECOMMENDS** the Plaintiffs' Motion [**Doc. 107**] be **GRANTED**.

## I.     BACKGROUND

The instant matter is a securities action, whereby Plaintiffs allege claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 ("Section 10") and Section 11 of the Securities Act ("Section 11"). Plaintiffs' Section 10 claim alleges that Defendant fraudulently concealed material information about Miller Energy Resources, Inc., ("Miller Energy"), which

1

caused Miller Energy to misstate and omit material facts in its financial reports.[1]  With respect to the Section 11 claim, Plaintiffs allege that the offering documents for the securities were materially misleading.

The Complaint [Doc. 1] in this matter was filed on March 14, 2016, and on September 15, 2017, Plaintiffs filed a Second Amended Class Action Complaint ("Amended Complaint") [Doc. 59].  The Amended Complaint states that Miller Energy was an independent exploration and production company that explored for, developed, and operated oil and gas wells in south-central Alaska and Tennessee.  [*Id.* at ¶ 22].  Plaintiffs represent a class of individuals who purchased Miller Energy stock.  [*Id.* at ¶¶ 14-16].[2]  Defendant is an accounting firm that Miller Energy retained as its independent auditor on February 1, 2011.  [*Id.* at ¶ 18].

In late 2009, Miller Energy purchased oil and gas assets in Alaska ("Alaska Assets").  [*Id.* at ¶ 1].  The Amended Complaint alleges that Miller Energy falsified its financials to overstate the value of the Alaska Assets.  [*Id.*].  The Amended Complaint states that the overstatement of the Alaska Assets was the single most important event in Miller Energy's history, transforming it from a penny-stock company trading on the pink sheets to one traded on the New York Stock Exchange ("NYSE").  [*Id.*].

As mentioned above, on February 1, 2011, Miller Energy hired Defendant as its independent auditor.  [*Id.* at ¶ 63].  With respect to Plaintiffs' Section 10 claim, they allege that Defendant issued audit reports containing unqualified opinions on Miller Energy's annual financial statements for fiscal years 2011 through 2014, which were included in Miller Energy's Form 10-

---

[1] Plaintiffs also alleged a claim under Section 10 for scheme liability, but this claim was dismissed by the District Judge [Doc. 76].

[2] The Court permitted Plaintiffs Eric Montague and Martin Ziesman, as co-trustee for the Carolyn K. Ziesman Revocable Trust, to be substituted as named Plaintiffs in this action.

2

K filings that contained materially inflated asset values for Miller Energy's oil and gas properties. [*Id.* at ¶ 73]. In addition, Defendant provided review services related to Miller Energy's quarterly financial statements beginning in the third quarter of 2011, and Defendant recorded the value of the Alaska Assets as substantially the same as the $480 million value initially reported by Miller Energy following the acquisitions of those assets in December 2009. [*Id.* at ¶ 74]. The Amended Complaint alleges that Defendant knowingly and recklessly abdicated its responsibilities in connection with its audits of Miller Energy's financial statements for fiscal years 2011 through 2014 and that had Defendant conducted its audits in compliance with Generally Accepted Auditing Standards ("GAAS") and the standards articulated by the Public Company Account Oversight Board ("PCAOB"), it would have discovered Miller Energy's fraud. [*Id.* at ¶ 75]. The Amended Complaint alleges that by issuing clean opinions for the 2011-2014 fiscal years, Defendant knowingly and recklessly disregarded significant material weaknesses in Miller Energy's internal controls, specifically, internal controls relating to the way Miller Energy valued the Alaska Assets. [*Id.*].

The Amended Complaint alleges that from August 29, 2011, to October 1, 2015, ("Class Period") Defendant repeatedly and materially violated GAAS in each of its audits and failed to properly plan and perform its audits to obtain reasonable assurance that Miller Energy's financial statements were free of material misstatements. [*Id.* at ¶ 81]. In addition, the Amended Complaint alleges that Defendant failed to properly assess the risk associated with the Miller Energy engagement. [*Id.* at ¶ 83]. The Amended Complaint states that despite a number of significant risks, Defendant assigned the Miller Energy engagement an overall risk grade of "medium," in its initial evaluation, and this designation was not reevaluated and changed to "high" until after

3

Defendant issued its first unqualified opinion on Miller Energy's 2011 fiscal year financial statements. [*Id.* at ¶ 99].

Further, the Amended Complaint alleges that Defendant (1) failed to ensure adequate personnel management, competency, and proficiency on the Miller Energy engagement, *see* [*id.* at ¶¶ 100-103]; (2) failed to properly plan the Miller Energy audits, *see* [*id.* at ¶¶ 104-106]; (3) failed to adequately assess whether Miller Energy's valuation of the Alaska Assets conformed with Generally Accepted Accounting Principles ("GAAP"), *see* [*id.* at ¶¶ 107-118]; (4) failed to obtain sufficient competent evidence regarding the assumptions on which Miller Energy's valuation of the Alaska Assets was based, *see* [*id.* at ¶¶ 119-136]; (5) failed to exercise due professional care and professional skepticism in connection with the Miller Energy audits, *see* [*id.* at ¶¶ 137-149]; (6) failed to properly supervise its engagement team, *see* [*id.* at ¶¶ 150-151]; (7) lacked independence, *see* [*id.* at ¶¶ 152-169]; and (8) failed to perform an adequate audit, thereby concealing Miller Energy's fraud from investors, *see* [*id.* at ¶¶ 170-175].

The Amended Complaint further states that Defendant made false and misleading statements in connection with Miller Energy's Form 10-K/A and Form 10-K. [*Id.* at ¶¶ 182-188]. Such false and misleading statements were also incorporated into Miller Energy's September 6, 2012 Registration Statement, which became effective on September 18, 2012, and into various prospectus supplements as follows:

4

| | Registration Statement dated September 6, 2012 | Prospectus supplement dated February 13, 2013 | Prospectus supplement dated May 7, 2013 | Prospectus supplement dated June 27, 2013 | Prospectus supplement dated September 25, 2013 | Prospectus supplement dated October 17, 2013 | Prospectus supplement dated August 20, 2014 |
|---|---|---|---|---|---|---|---|
| KPMG's August 29, 2011 Report | x | x | x | x | x | x | x |
| KPMG's July 16, 2012 Reports | x | x | x | x | x | x | x |
| KPMG's July 15, 2013 Reports | | | | | x | x | x |
| KPMG's July 15, 2014 Reports | | | | | | | x |

[*Id.* at ¶ 189]. The Amended Complaint states that beginning in December 2013, and through the time Miller Energy filed for bankruptcy, the truth that Miller Energy was a fraud, and the risks concealed by that fraud, including Defendant's participation in it, leaked out, were revealed, and materialized. [*Id.* at ¶ 198]. Based on the above allegations, Plaintiffs allege violations of Section 10.

With respect to the Section 11 claim, the Amended Complaint alleges that during the Class Period, Miller Energy conducted six securities offerings ("Offerings"). [*Id.* at ¶ 284]. On or about September 6, 2012, Miller Energy filed a Form S-3 registration statement and prospectus using a "shelf" registration ("Shelf Registration Statement"). [*Id.* at ¶ 285]. Under the Shelf Registration Statement, Miller Energy would offer for sale securities using future prospectus supplements,

which would form part of the registration statement for those offerings. [*Id.*].  As mentioned above, the Shelf Registration Statement became effective on September 18, 2012.[3]

The Amended Complaint states that during the Class Period, the Offerings were conducted pursuant to the September 6, 2012 Shelf Registration Statement, as follows:

| Date | Series | Price | Shares | Proceeds |
|---|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | 625,000 | $14,312,500 |
| May 7, 2013 | Series C | $22.25 | 500,000 | $11,125,000 |
| June 27, 2013 | Series C | $21.50 | 335,000 | $7,202,500 |
| Sep. 25, 2013 | Series D | $25.00 | 1,000,000 | $25,000,000 |
| Oct. 17, 2013 | Series D | $23.95-$24.38 | 70,448 | $1,701,000 |
| Aug. 20, 2014 | Series D | $24.50 | 750,000 | $18,375,000 |

[*Id.* at ¶ 286].  The Amended Complaint alleges that each offering was marketed and sold to the public through the materially misstated Shelf Registration Statement and each respective prospectus supplement.  [*Id.* at ¶¶ 287-292].  Further, the Amended Complaint states that the financial information incorporated by reference into the Offering Documents, including the internal control-related representations and unqualified audit reports, contained untrue statements of material fact or omitted to disclose material facts required to be stated therein or necessary to make the statements therein not misleading.  [*Id.* at ¶ 293].

## II.    POSITIONS OF THE PARTIES

Plaintiffs move the Court pursuant to Federal Rule of Civil Procedure 23 to certify the following classes:

> 1.  All persons or entities who purchased or otherwise acquired Miller Energy common stock, Miller Energy 10.75% Series C Cumulative Redeemable Preferred Stock (the "Series C Preferred Stock") or Miller Energy 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock

---

[3] The Court will refer to the Shelf Registration Statement and the prospectus supplements, collectively as the "Offering Documents."

6

(the "Series D Preferred Stock") between August 29, 2011, and October 1, 2015 (the "Class Period"), inclusive, and who were damaged thereby (the "Section 10(b) Class");

2. All persons or entities who purchased or otherwise acquired Miller Energy Series C Preferred stock or Series D Preferred Stock pursuant to or traceable to the Offering Documents and were damaged thereby (the "Section 11 Class").[4]

Excluded from the Classes are the following: Defendant, the Officers, Directors, Partners, and affiliates of Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendant has or had a controlling interest. In addition, Plaintiffs seek an order appointing Lewis Cosby, Eric Montague, and Martin Ziesman, as Co-Trustee for the Carolyn K. Ziesman Trust, as Class Representatives. Finally, Plaintiffs request that the law firms of Gordon Ball PLLC and Cohen Milstein Sellers & Toll PLLC (collectively, "Class Counsel") be appointed as Class Counsel.

Plaintiffs assert that the Classes meet the requirements of Rule 23(a). First, they state that the Classes are numerous because Miller Energy was actively traded on the NYSE during the Class Period and that the average trading volume was 2,140,764 shares per week. Second, Plaintiffs contend that common questions of law and fact exist in the Classes, arguing that Defendant made uniform misrepresentations and omissions to the investing public. With respect to typicality, Plaintiffs assert that the proposed Class Representatives are typical of, if not virtually identical to, the claims of the members of the proposed Classes. Specifically, Plaintiffs claim that the proposed Class Representatives' claims arise from the same events, invoke the same legal theories, are

---

[4] The Court will refer to the Series C and Series D Preferred Stock, collectively as the "Preferred Stock," "Preferred Securities," or "Preferred Shares." The Court will refer to the common stock, Series C Preferred Stock, and Series D Preferred Stock, collectively as the "Securities" unless otherwise noted. Finally, the Court will refer to the Section 10 and Section 11 classes, collectively as the "Classes."

7

subject to the same defenses, and will use the same evidence to establish the members' claims. Finally, Plaintiffs argue that the proposed Class Representatives will fairly and adequately protect the interests of the Classes. Plaintiffs explain that the proposed Class Representatives sustained their losses as a result of the same material misrepresentations and omissions contained and repeated in Miller Energy's financial statements, audit opinions, and in the Offering Documents.

With respect to Rule 23(b)(3), Plaintiffs state that common questions of law and fact predominate over any individual questions and a class action is superior to other available methods for adjudicating the controversy. Plaintiffs argue that they only need to show a material misstatement or omission to establish their prima facie case under Section 11, and therefore, such elements can be proven by common evidence. Plaintiffs further argue that they will also rely on common evidence with respect to their Section 10 Class because they are entitled to a presumption of reliance pursuant to *Basic, Inc., v. Levinson*, 485 U.S. 224 (1998) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Plaintiffs argue that a class action is the superior method for resolving this case and that Class Counsel has experience in litigating similar cases.

Defendant responds [Doc. 129] that the Classes do not meet all the requirements set forth in Rule 23. With respect to the Section 10 Class, Defendant states that it cannot be certified as a class for four main reasons. First, Defendant argues that individual issues of reliance will overwhelm common issues and that neither the *Basic* presumption, nor the *Affiliated Ute* presumption, is applicable. Second, Defendant argues that individual issues of damages will overwhelm the common issues, arguing that Plaintiffs rely on a materialization of the risk theory and that there is no way to know who falls into each risk category without obtaining information from each person. Third, Defendant states that issues of timeliness will overwhelm common issues because the Section 10 claims are barred if they are brought more than two (2) years after the

discovery of the pertinent facts. Defendant contends that there were red flags showing that Plaintiffs should have been aware of Miller Energy's financial circumstances. Finally, Defendant states that the proposed Class Representatives' claims are not typical, stating that all three of the proposed Class Representatives purchased stock after at least one of the events that allegedly revealed the truth. Defendant argues that in order to maintain the fraud on the market presumption, a plaintiff must have traded the stock between the time that the misrepresentations were made and when the truth was revealed.

In addition, Defendant contends that class certification of the Section 11 Class must be denied. First, Defendant argues that Plaintiff Ziesman's claims are not typical. Second, Defendant argues that Plaintiffs have not established numerosity. Third, Defendant submits that individual issues of reliance, damages, and timeliness will overwhelm common issues. Further, Defendant asserts that the Class Representatives and Class Counsel are not adequate. Finally, Defendant argues that no class of Series D purchasers may be certified because none of the proposed Class Representatives purchased the Series D Preferred Stock.

Plaintiffs filed a Reply [Doc. 141], maintaining that both Classes should be certified. With respect to the Section 10 Class, Plaintiffs argue that Defendant concedes that they have met the numerosity, commonality, adequacy, and superiority requirements. Further, Plaintiffs argue that common issues do not predominate and that they are entitled to rely on the presumptions established in *Basic* and *Affiliated Ute*. Plaintiffs assert that they have also established typicality and that Defendant does not dispute that the proposed Class Representatives allege that they purchased securities at prices artificially inflated by fraud, making their claims based on the same legal theories and facts as the proposed class.

In addition, Plaintiffs assert that they have established that the Section 11 class should be certified. First, Plaintiffs argue that they have established that the proposed class is numerous, citing to the millions of shares sold. Second, Plaintiffs argue that their claims are typical and that Defendant's argument that Plaintiff Ziesman cannot trace his Series C Preferred Stock is incorrect because courts nationwide have held that tracing is not a bar to certifying a Section 11 case. In addition, Plaintiffs state that Plaintiff Ziesman is not the only proposed representative in the Section 11 class and that Plaintiff Cosby also seeks to be a representative. Finally, Plaintiffs state that Section 11 damages can be calculated on a class wide basis pursuant to the statutory formula.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 governs class actions. In pertinent part, Rule 23 directs that a class may be certified for litigation of claims where:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Once plaintiffs have satisfied each of the four prerequisites of Rule 23(a), they must then establish that the proposed class action meets at least one of the three categories set forth in Rule 23(b). *In re Nw. Airlines Corp. Antitrust Litig.*, 208 F.R.D. 175, 216 (E.D. Mich. 2002). Here, Plaintiffs move pursuant to Rule 23(b)(3), which provides:

> (1) [Omitted];
>
> (2) [Omitted]; or

10

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).[5]

In addition to the above requirements, Plaintiffs must show the existence of an ascertainable class. *Avio, Inc. v. Alfoccino, Inc.,* 311 F.R.D. 434, 440 (E.D. Mich. 2015). This means that "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (quoting 5 James W. Moore et al., Moore's Federal Practice § 23.21[1] (Matthew Bender 3d ed. 1997)). The Sixth Circuit has made clear that the proposed class "must be susceptible of [a] precise definition." *Id.* (other citations omitted).

"The party seeking the class certification bears the burden of proof." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). Some courts have observed that "suits alleging violations of the securities laws,

---

[5] Because Plaintiffs move for class certification pursuant to Rule 23(b)(3), the Court has omitted the other statutory provisions.

particularly those brought pursuant to Sections 11 and 12(a)(2), are especially amendable to class action resolution." *Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.,* 277 F.R.D. 97, 101 (S.D.N.Y. 2011). Before certifying a class, however, a district court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met. *In re Am. Med. Sys. Inc.*, 75 F.3d at 1078-79 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 162 (1982)). This "rigorous analysis" may well "entail some overlap with the merits of the plaintiff's underlying claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "The district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based upon the particular facts of the case, [will] not be overturned absent a showing of abuse of discretion." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

With the above guidance in mind, the Court will now turn to the facts of the present matter.

## IV.     ANALYSIS

The Court has considered the parties' arguments, including the oral arguments at the December 10 hearing. Accordingly, for the reasons set forth below, the Court **RECOMMENDS** that Plaintiffs' Motion [**Doc. 107**] be **GRANTED**.

As mentioned above, Plaintiffs have moved to certify two classes: the Section 10 Class and the Section 11 Class. Defendant has opposed certification of both Classes and asserts that no class of the Series D Preferred Stock may be certified. The Court will address these arguments separately.

### A.     The Section 10 Class

As mentioned above, Plaintiffs have defined their proposed Section 10 Class as all persons or entities who purchased or otherwise acquired Miller Energy common stock, Miller Energy, Series C Preferred Stock, or Series D Preferred Stock between August 29, 2011, and October 1,

2015, inclusive, and who were damaged thereby. The Court will first address the Rule 23(a) requirements and then turn to the Rule 23(b)(3) requirements.

### 1. Rule 23(a)

Pursuant to Rule 23(a), Plaintiffs must establish the following: (1) the proposed class is numerous, (2) the class shares common questions of law and fact, (3) the proposed Class Representatives' claims are typical of the other class members, and (4) the proposed Class Representatives will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). The Court will address these requirements separately.

### i. Numerosity

Plaintiffs assert that the exact number of class members is currently unknown, but they estimate that there are thousands of members in the Section 10 Class. Plaintiffs state that the Miller Energy Securities were actively traded on the NYSE during the Class Period and that the common stock's average trading volume was approximately 2,140,174 shares per week and that the average weekly turnover was 4.88%. Further, Plaintiffs state that according to Miller Energy's documents filed with the Securities Exchange Commission ("SEC"), more than 6.21 million Series C and Series D Preferred Shares were sold in the Offerings during the Class Period. Plaintiffs argue that such shows that there are at least thousands of investors that are part of the Section 10 Class. Plaintiffs state that given the size of the proposed class, individual joinder is impractical and logistically impossible. Plaintiffs state that such is true given that the members of the Section 10 Class are located throughout the country.

Defendant did not respond to Plaintiffs' argument in its brief. During the oral argument, however, Defendant argued that while it did not respond, Plaintiffs are still required to show that they meet all requirements under Rule 23.

Pursuant to Rule 23(a)(1), Plaintiffs must establish that their class is so numerous that joinder of all members is impracticable. While there is no strict numerical test, substantial numbers usually satisfy the numerosity requirement. *In re Am. Med. Sys. Inc.*, 75 F.3d at 1079 (citing *Senter*, 532 F.2d at 522). The "exact number of class members need not be pleaded or proved," but "impracticability of joinder must be positively shown and cannot be speculative." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2011). "Apart from class size, other case-specific factors that courts should consider in determining whether joinder is impracticable include: the judicial economy, the geographical dispersion of class members, the ease of identifying putative class members, and the practicality with which individual putative class members could sue on their own." *Cannon v. GunnAllen Fin., Inc.,* No. 3:06-0804, 2008 WL 4279858 (M.D. Tenn. Sept. 15, 2008) (citing Alba Conte & Herbert Newberg, 1 Newberg on Class Actions § 3:6 (4th ed. 2003)). "Numerosity is generally assumed to have been met in class action suits involving nationally traded securities." *Burges v. Bancorpsouth, Inc.*, No. 3:14-cv-1564, 2017 WL 2772122, at *2 (M.D. Tenn. June 26, 2017).

The Court finds that Plaintiffs have established numerosity. Here, the Miller Energy Securities were traded on the NYSE during the Class Period. The average trading volume for the common stock was over 2 million shares per week. [Doc. 121 at ¶ 29]. Further, with respect to the Preferred Shares, Plaintiffs state that according to Miller Energy's documents, 6.21 million shares were sold. Accordingly, Plaintiffs have established that the class is so numerous that joinder is impractical.

### ii. Commonality

Plaintiffs assert that they have established the existence of common questions of law or fact. Plaintiffs argue that Defendant made uniform misrepresentations to the investing public. For

14

example, Plaintiffs list eight questions, which they assert are common among the Class: (1) whether Defendant violated federal securities laws, (2) whether and to what extent Miller Energy's financial statements during the proposed Class Period, and incorporated in the Offering Documents, failed to comply with GAAP, (3) whether the value of the Alaska Assets was fraudulently overstated during the proposed Class Period and in the Offering Documents, (4) whether statements (or omissions) made by Defendant to the investing public misrepresented (or omitted to state) material facts about the business, operations, and management of Miller Energy, (5) whether Defendant's audits of Miller Energy's financial statements, and incorporated into the Offering Documents, were conducted in accordance with GAAS and the standards of the PCAOB, (6) whether Defendant abandoned its duty of independence as Miller Energy's auditor, (7) whether Defendant acted with scienter, and (8) to what extent the members of the Section 10 Class have sustained damages and the proper measure of damages. Plaintiffs state that the answers to these common questions will drive the resolution of this lawsuit. Defendant does not respond to Plaintiffs' argument.

As mentioned above, Rule 23(a)(2) requires Plaintiffs to establish that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is "qualitative rather than quantative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1080 (quoting Newberg & Alba Conte, Newberg on Class Actions § 3.10 at 3-50 (3d ed. 1992)); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 359 (explaining that under Rule 23(a)(2), a single common issue will suffice).

The Court finds that Plaintiffs have demonstrated commonality. Plaintiffs have listed eight common questions, and the Court notes that Defendant has not challenged Plaintiffs' argument.

Accordingly, the Court finds Plaintiffs have established that there are common questions of law and fact with respect to the class members.

### iii.     Typicality

Plaintiffs assert that the proposed Class Representatives' claims are typical of, if not virtually identical to, the claims of the members of the class. Plaintiffs assert that it is irrelevant which Miller Energy security each of the proposed Class Representatives purchased because all of the claims arise from the very same false and misleading statements and omissions by Defendant, which were incorporated into Miller Energy's Forms 10-K and 10-Q and the Offering Documents. Plaintiffs argue that the proposed Class Representatives include purchasers of Miller Energy common stock and Preferred Stock who suffered losses after purchasing the Miller Energy Securities at artificially inflated prices and that the Class Representatives and the members share identical interests in holding Defendant accountable and maximizing their recovery.

Defendant argues that the claims of the three proposed Class Representatives are not typical. Specifically, Defendant states that all three bought stock after at least one of the events, as alleged in the Amended Complaint, revealed the truth. Defendant states that in order to invoke the fraud on the market presumption, a plaintiff must have traded the stock between the time the misrepresentations were made and when the truth was revealed. In addition, Defendant states that Plaintiff Cosby is not typical for another reason. Defendant explains that because of the timing of his purchase and sale of his stock, he is uniquely ill-suited to prove loss causation. Further, Defendant states that Plaintiffs Montague and Ziesman are not typical for another reason—that is, they admitted that they did not read Miller Energy's Form 10-K or Defendant's audit opinion and acknowledged that had they read those materials, they would have learned of the facts and circumstances that likely would have caused them not to purchase the securities.

16

Plaintiffs reply that typicality requires nothing more than showing that the proposed Class Representatives purchased Miller Energy securities at prices artificially inflated by fraud and that their claims are based on the same legal theories and facts. With respect to Plaintiff Cosby, Plaintiffs state that differences in the timing of his stock purchases do not make his claims atypical because Plaintiffs have alleged a common scheme of misrepresentation. Further, with respect to Plaintiffs Ziesman and Montague, Plaintiffs state that Defendant is essentially arguing that their reliance is not justified because they did not read Defendant's audit reports prior to investing. Plaintiffs state that such is inconsistent with the *Basic* presumption of reliance and that whether their inaction was justified goes to the merits of the case and not to class certification.

"A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Beattie v. Century Tel., Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *In re Am. Med. Sys. Inc.*, 75 F.3d at 1082). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interest of the class members." *In re Am. Med. Sys. Inc.*, 75 F.3d at 1082. "[F]or the district court to conclude that the typicality requirement is satisfied, "a representative's claims need not always involve the same facts or law, provided there is a common element of fact or law." *Beattie,* 511 F.3d at 561 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082).

As mentioned above, Defendant argues that the timing of the proposed Class Representatives' purchases defeats typicality. For example, Defendant states that Plaintiff Cosby purchased shares on October 27, 2014, and sold on December 5, 2014. [Doc. 132-7 at ¶ 3]. Defendant states that the Complaint alleges five events or disclosures that allegedly revealed the

concealed risk prior to Plaintiff Cosby buying his shares. [Doc. 59 at ¶¶ 199-214]. Defendant states that the last date that Plaintiff Montague purchased shares was on August 1, 2014. [Doc. 132-2 at 3], which was after four of the events alleged in the Amended Complaint. [Doc. 59 at ¶¶ 199-212]. Finally, Defendant states that Plaintiff Ziesman made his only purchase on June 4, 2014, [Doc. 132-3 at 4], which was after three of the alleged events in the Complaint. [Doc. 59 at ¶¶ 199-208].

The Middle District of Tennessee has recently addressed a similar argument. In *Weiner v. Tivity Health, Inc.*, No. 3:17-CV-01469, 2020 WL 467783, at *3 (M.D. Tenn. Jan. 29, 2020), defendant argued that lead plaintiff's claims were atypical because he purchased stock on several occasions both before and after the alleged truth of defendant's fraud was revealed. *Id*. at *3. The court noted that defendant's "argument must be rejected for both legal and factual reasons." *Id*. With respect to the legal reasons, the court explained, "Legally, purchasing a stock after a corrective disclosure that deflates the stock price may not even be relevant to the typicality inquiry because 'a party may believe a stock to be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it.'" *Id*. (quoting *Ross v. Abercrombie & Fitch Co.,* 257 F.R.D. 435, 446 (S.D. Ohio 2009)) (citation omitted). The court continued, "At a minimum, a proposed class representative 'is [not] as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a post-disclosure purchase of the defendant's company stock,' and this is 'particularly so after the stock price has been corrected by the market's assimilation of new information." *Id*. (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005). The court further explained:

> The fraud on the market theory presumes that in efficient markets all material information, including disclosures of past frauds, will be reflected in the security's price. An investor who purchases a security after the disclosure of adverse information still relies on the

18

> fact that the newly released information will be absorbed by the market and therefore reflected in the post-disclosure price. This later purchase does not undercut or diminish the argument that the same investor may have purchased the security pre-disclosure relying on the fact that all information available at the time was reflected in the then current price.

*Id.* at *4 (quoting *In re DVI Inc. Sec. Litig.,* 249 F.R.D. 196, 204 (E.D. Pa. 2008)).

The court also addressed the cases that defendant cited in support of its position. *Id.* at *4. The court found that such cases, including *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131 (S.D. N.Y 2007) (the case that Defendant relies on here), is "against 'the weight of authority.'" *Id.* (quoting *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009)). Accordingly, the Court finds the above authority persuasive, rendering Defendant's argument not well taken.

Defendant also asserts that Plaintiff Cosby cannot establish loss causation because he sold his stock before any losses. Loss causation is simply the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emp. Ret. Sys. V. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016). The Supreme Court has held, however, that a plaintiff does not need to prove loss causation at the class certification stage in order to invoke *Basic's* presumption of reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). In *Halliburton I*, the Court explained that loss causation "addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." *Id.*; *see also Weiner,* 2020 WL 467783, at *4 ("Plaintiffs must prove that portion of the price fall that they seek in damages is directly attributable to the misrepresentation, so that they do not recover a windfall, [but] they do not need to prove it at the certification stage.") (quoting *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687-88 (5th Cir. 2015)). Thus, it is not necessary at this point that Plaintiff Cosby be able to establish loss causation.

19

Finally, Defendant argues that Plaintiffs Montague and Ziesman admitted that they did not read Miller Energy's Form 10-K or Defendant's audit opinions and that had they read those materials, they would have learned of the facts and circumstances. Plaintiff Montague, however, also testified that he had never heard any allegation that Miller Energy made poor decisions and that he was unaware that the Alaska Assets were overvalued. [Doc. 142-3 at 7-8]. In addition, Plaintiff Ziesman testified that he based his decision to purchase on the price target and that he believed Miller Energy had sufficient funds to operate its expenses due to the prices. [Doc. 142-4 at 7-9]. The Court finds Defendant's arguments are better reserved for the merits of this case and not a basis to preclude the class action.

Accordingly, the Court finds that the proposed Class Representatives have established typicality by showing that that they purchased Miller Energy Securities at prices artificially inflated by the alleged fraud and that their claims are based on the same legal theories and facts as other members.

### iv. Adequacy

Plaintiffs assert that the proposed Class Representatives will fairly and adequately protect the interests of the class. Plaintiffs state that the proposed Class Representatives sustained their losses as a result of the same material misrepresentations and omissions contained and repeated in Miller Energy's financial statements, Defendant's audit opinions, and the Offering Documents. Defendant does not respond to Plaintiffs' argument.

A court may not certify a class unless it finds that the representative parties "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court considers two criteria for determining whether the representation of the class will be adequate: (1) The representative must have common interests with unnamed members of the class, and (2) it must

appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter*, 532 F.2d at 525 (citing *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973)). "The adequacy of representation requirement 'overlaps with the typicality requirement because a class representative has no incentive to pursue the claims of the other class members absent typical claims.'" *Isabel v. Velsicol*, No. 04-2297 DV, 2006 WL 1745053, at *7 (W.D. Tenn. June 20, 2006) (citing *In re Am Med. Sys., Inc.*, 75 F.3d at 1083).

Defendant does not dispute that the proposed Class Representatives share common interests with other class members, and for the reasons explained above, *see supra* Part IV, section A(1)(ii)-(iii) ("Commonality and Typicality"), the Court finds the proposed Class Representatives share common interests with the other class members. Further, the proposed Class Representatives filed a Joint Declaration, stating, in part, as follows:

> We will take an active role in and monitor the litigation for the best interests of the Classes. We will vigorously pursue the claims against [Defendant] to obtain the maximum possible recovery for the Classes.
>
> We understand that we owe a duty to all members of the proposed Classes to provide fair and adequate representation. We intend to work with one another and with our chosen counsel to protect the interests of all members of the Classes, and to vigorously prosecute the claims brought forth in this action on behalf of the Classes.
>
> We are committed to actively overseeing the effective and efficient prosecution of this action by, among other things, reviewing pleadings, participating in litigation decisions, monitoring counsel, and attending hearings and depositions as necessary. We take the obligations owed by class representatives seriously, will actively monitor our counsel and the litigation, prosecute the action in the best interest of the Classes, and otherwise fulfill the duties we will assume if appointed as Class representatives.

21

[Doc. 107-1 at 2-5]. Based on the above statements, and no evidence in the record to suggest otherwise, the Court finds that the proposed Class Representatives will fairly and adequately protect the interests of the Class.

### 2. Rule 23(b)(3)

Pursuant to the requirements of Rule 23(b)(3), Plaintiffs must show that questions of law and fact common to class members predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). In addition, Plaintiffs must show that the class action is superior to the other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The Court will address these requirements separately.

### i. Predominance

Plaintiffs state that the claims of the Section 10 Class can be proven by common evidence. Acknowledging their requirement to show that they relied on a misleading statement, Plaintiffs invoke the *Basic* and *Affiliated Ute*. Defendant disagrees and argues that individual issues of reliance, damage, and timeliness, will overwhelm common issues. Defendant states that Plaintiffs are not entitled to any presumptions, and even if they were, such presumptions have been rebutted.

The Court will first address whether individual issues of reliance predominate, and then, the Court will turn to damages and timeliness.

### a. Individual Issues of Reliance

As an initial matter, in order to establish a violation of Section 10, Plaintiffs must show the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

22

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (other quotations omitted).

Because courts recognized that the fourth element (i.e., reliance) would preclude all class actions alleging violations of Section 10, the Supreme Court has recognized the *Basic* presumption and the *Affiliated Ute* presumption, "each of which allows a plaintiff to establish a 'rebuttable presumption of reliance,' without the need for individual information about each plaintiff." *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 493 (M.D. Tenn. 2019). The Court will start with the *Basic* presumption.

The Supreme Court explained the *Basic* presumption, or the fraud on the market assumption, as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc,* 485 U.S. at, 241–42 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–1161 (CA3 1986)). The Court held, however, that this presumption is rebuttable. *Id.* at 250. As stated *in Halliburton Co. v. Erica P. John Inc.*, ("*Halliburton II*"), in order "to invoke the *Basic* presumption, a plaintiff must prove (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." 573 U.S. 258, 277-78 (2014)

Defendant argues that the fraud on the market presumption does not apply because Plaintiffs have not proven that the stock traded in an efficient market. In addition, Defendant states

even if Plaintiffs could establish the presumption, it has rebutted the presumption. With respect to the former argument, Defendant asserts that Plaintiffs rely on their expert Chad Coffman ("Coffman") to establish that the market was efficient. Defendant argues that Coffman's report and opinions do not satisfy the minimum requirements of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). Defendant states that without Coffman's report and testimony, Plaintiffs have no basis for invoking the fraud on the market presumption.[6]

In order to determine whether the market was efficient, courts utilize five factors, known as the *Cammer* Factors, *see Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989), which include as follows: (1) whether there was a large average weekly trading volume during the class period; (2) whether a significant number of securities analysts followed the company's stock during the class period; (3) whether the company's stock had market makers; (4) whether the company was entitled to file an S-3 Registration Statement; and (5) whether empirical facts showed a cause and effect relationship between unexpected corporate events or financial releases and immediate response in the stock price. *See also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (considering the *Cammer* Factors to determine whether the market was efficient). Courts have also considered other factors, including (1) market capitalization of the company; (2) the bid-ask spread of the stock; and (3) institutional ownership. These three factors are known as the *Krogman* Factors pursuant to *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tx. 2001). Courts explain that the above factors "are generally deemed to be an analytical tool rather than a checklist." *Weiner,* 334 F.R.D. at 133 (citing *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D.

---

[6] Contemporaneously with the instant Report and Recommendation, the Court has denied Defendant's Motion to Exclude.

69, 83 (S.D. N.Y. 2015); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 520 (D. Minn. 2015); *Angley v. UTi Worldwide Inc.,* 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018)).

The Court will now turn to each of these factors.

**(1)     Average Weekly Trading Volume**

With respect to *Cammer* Factor One, Plaintiffs rely on their expert, Coffman, who states, "The average weekly trading volume for Miller Energy Common stock during the Analysis Period was 5.04% of shares outstanding, compared to 2.36% for the NYSE and NASDAQ.  [Doc. 121 at ¶ 29].  Coffman states that "the average weekly trading volume during the Analysis Period was 2.24 million shares," which supports the conclusion that the market for this security was efficient throughout the Analysis Period."  [*Id.*].  Coffman also states that with respect to the Preferred Stock, the average weekly turnover as a percentage of shares outstanding was 5.16% for the Series C Preferred Stock and 7.93% for Series D Preferred Stock.  [*Id.* at ¶ 30].  Defendant's expert, Mukarram Attari, Ph.D. ("Dr. Attari") does not dispute that the average weekly trading volume for the Miller Energy Securities exceeded the standards.  *See* [Doc. 143-2 at 25].  Accordingly, the Court finds that this factor weighs in favor of finding that the market for the Miller Energy Securities was efficient.

**(2)     Securities Analysts**

With respect to the second factor, "*Cammer* recognizes that a stock covered by a "significant number of analysts" is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors."  *Barclays PLC*, 310 F.R.D. at 79.

In support of their argument that this factor weighs in favor of finding market efficiency, Plaintiffs rely on Coffman, who opines, "During the Analysis Period, there was continuous analyst

coverage for Miller Energy." [Doc. 121 at ¶ 35]. Coffman states that "there were at least 158 equity analyst reports issued during the Analysis Period and . . . 15 separate firms that had equity analysts issue reports on Miller Energy, including major firms such as Brean Capital, SunTrust Robinson Humphrey, and Imperial Capital." [*Id.*]. Coffman also states that the analyst reports covering the common stock provide relevant information for the Preferred Shares. [*Id.* at ¶ 35, n. 43]. Coffman cites an analyst report relating to the Preferred Shares directly, "Turning the Corner: Kitchen Sink of a Quarter Could Mark A Bottom, New Strategy in Place," MLV & Co. LLC, December 10, 2014. [*Id.*]. Coffman concludes, "The extensive coverage of Miller Energy by securities analysts supports the conclusion that all Miller Energy Securities traded in efficient markets throughout the Analysis Period. [*Id.* at ¶ 35].

In its Response, Defendant does not dispute the above; however, in its Motion to Exclude the Reports and Testimony of Chad Coffman ("Motion to Exclude"), Defendant argues that Coffman did not present evidence of analyst coverage with respect to the Preferred Stock. As mentioned above, Coffman cites an article and states that the "[a]nalyst reports covering Miller Energy Common Stock also provide relevant information for investors in the Preferred Shares". [Doc. 121 at ¶ 35 n. 43]. Accordingly, the Court finds this factor weighs in favor of finding that the market is efficient for the Miller Energy Securities.

### (3) Market Makers

The court in *Cammer* explained, "The existence of market makers and arbitrageurs would ensure competition of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." 711 F. Supp. at 1286-87; *but see Krogman*, 202 F.R.D. at 476 (stating that the mere number of market makers, "without more is essentially meaningless") (citing *O'Neil v. Appel*, 165 F.R.D.

479 (W.D. Mich. 1996)).[7]  "Nevertheless, this factor can provide reasonable guidance in determining whether the *Basic* presumption applies."  *Barclays* PLC, 310 F.R.D. at 79.

Plaintiffs state that there were 73 market makers for the common stock during the Class Period.  In addition, Plaintiffs state that while Bloomberg does not provide market-maker information for the Preferred Stock, both the Series C and Series D Preferred Stock also traded on the NYSE throughout the relevant time period.  Plaintiffs state that the presence of such large numbers of sophisticated professional investors is yet another indicator of market efficiency.

Defendant does not argue this factor in its Response, but states in its Motion to Exclude that Plaintiffs do not present evidence of the existence of more than one market maker for the Series C and Series D Preferred Stock, the minimum required by NYSE.

With respect to the common stock, there does not appear to be a dispute that *Cammer* Factor 3 supports a finding of efficiency.  *See* [Doc. 143-2 at 61] (Dr. Attari's Deposition) (stating that he does not dispute that the common stock meets the standard under *Cammer* Factor 3).  While Dr. Attari disputes the evidence of market makers for the Preferred Securities, the parties do not dispute that the Preferred Securities traded on the NYSE.  Dr. Attari testifies that the purpose of *Cammer* Factor 3 is "[t]o test whether there were a number of market makers, so that you would have a market that was orderly and liquid."  [Doc. 143-2 at 62]; *see also* [*id.* at 65-66] (Dr. Attari identifying a market maker for the Series C Preferred Shares and explaining that Plaintiff Ziesman's purchases of the Series C Preferred Shares were quickly executed, meaning that the market was liquid).  As Coffman explains, "The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billons of shares traded each day."  [Doc. 121 at

---

[7] In *O'Neil,* the court noted that what is important is "the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so." 165 F.R.D. at 502.

¶ 42]; *see also Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 654 (S.D. Ohio 2017) (explaining that transactions on the NYSE go through a designated market maker and such has been found to satisfy this factor) (citing *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012)). Accordingly, the Court finds that given the above, this factor weighs in favor of finding that the market was efficient for the Miller Energy Securities.

      **(4)      S-3 Registration Statement**

"The SEC permits a company to file Form S–3 when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information." *Barclays PLC*, 310 F.R.D. at 79. The court in *Cammer* emphasized this factor because the Form S-3 is "*predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the marketplace*." *Cammer*, 711 F. Supp. at 1284 (citing SEC Securities Act Release No. 6333, 46 Fed. Reg. 41,902 (1981)) (emphasis in *Cammer*); *see also Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1163 (N.D. Ohio 2013) ("Given the likelihood that firms filing S–3 forms are actively traded and widely followed, courts consider this factor "extremely important in market efficiency determinations.") (quoting *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 268 (D. Mass. 2006)).

Plaintiffs state that Miller Energy filed two Form S-3s: one on September 6, 2012, and one on October 5, 2012. In addition, Plaintiffs state that Miller Energy was eligible to do so throughout the majority of the proposed Class Period, citing to Coffman's Corrected Report. Coffman states, "Other than at the start and towards the end of the Analysis Period, I have no reason to believe that Miller Energy was not S-3 eligible throughout the vast majority of the Analysis Period." [Doc.

121 at ¶ 46].  He further explains, "Miller Energy was not timely in filing their 10-K for the FYE April 30, 2010, per a letter from the SEC. . . . As required by the SEC, one has to be timely with their SEC filings for 12 months in order to be S-3 eligible.  Once Miller Energy had become eligible, I have found no further evidence that [it was] not S-3 eligible up until nearly the end of the Analysis Period on July 14, 2015, when Miller Energy filed another NT 10-K."  [*Id.* at ¶ 46 n. 55].

Defendant does not dispute this factor in its Response, but in its Motion to Exclude, Defendant argues that Miller Energy was ineligible to file a Form S-3 Statement at the beginning and at the end of the Analysis Period.  As mentioned above, Coffman explains that Miller Energy did not act in a timely manner with the filing of the 10-K Form, which explains why Miller Energy was not eligible at the beginning of the Analysis Period.  Further, Coffman explains that Miller Energy was eligible throughout the vast majority of the Analysis Period, *see Burns*, 967 F. Supp. 2d at 1163 (explaining that the company remained eligible to file an S-3 during the class period), and Defendant has not cited to any evidence showing that this factor weighs in favor of finding that the market was inefficient.  Accordingly, while the Court has considered that Miller Energy was not eligible to file the Form S-3 during the last two weeks of the Analysis Period, the Court finds this factor weighs in favor of finding market efficiency for the Miller Energy Securities.

### (5)    Price Reaction of Stock to New Information

In order to satisfy the Fifth *Cammer* Factor, Plaintiffs must demonstrate "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1287.  Plaintiffs offer Coffman's event study to support their argument that they have satisfied the Fifth *Cammer* Factor.

Specifically, Plaintiffs argue that using an event study, Coffman found a statistically

significant cause and effect relationship between the news about Miller Energy and the changes in the market price for both the Preferred Stock and the common stock. Plaintiffs submit that Coffman's event study shows that Miller Energy's share prices reacted rapidly to new and unexpected information, and therefore, this factor decisively indicates that the Miller Energy Securities traded in an efficient market.

Defendant has not specifically responded to this argument in its Response [Doc. 129], but it asserts that the market was not efficient for the Miller Energy Securities. Defendant states that Plaintiffs rely on Coffman's opinion, but Coffman's report and opinions do not satisfy the requirements of *Daubert v. Merrell Doe Pharms.*, 509 U.S. 579 (1993). Defendant argues that Coffman's opinions cannot be credited for the reasons set forth in its Motion to Exclude.

Plaintiffs reply that they have demonstrated this factor through Coffman's event study. Plaintiffs state that Coffman empirically demonstrated that once the Preferred Securities first traded substantially below par value, they reacted in a statistically significant way to firm-specific events that updated the market regarding the ability of Miller Energy to continue paying dividends or stay listed on the NYSE. Plaintiffs state that Dr. Attari does not dispute Coffman's findings, but instead, argues that Coffman should have analyzed how Preferred Securities moved in response to earnings releases. Plaintiffs insist Dr. Attari is wrong because there is no reason to expect the Preferred Securities to move in response to earnings releases absent concern about Miller Energy's liquidity, solvency, ability to pay dividends, or ability to continue trading on an exchange. Plaintiffs argue that there are a number of reasons why the Preferred Securities would not be expected to react to earnings releases, including that they did not provide any new or material information. Plaintiffs submit that academic research demonstrates that there is no expectation in the first instance that equity securities react to earnings releases all or even half of the time.

30

As previously mentioned, Defendant's Response did not set forth the specific reasons for finding that the Fifth *Cammer* Factor supports inefficiency of the market. The Court notes, however, that this factor was heavily disputed by the parties in the briefing on Defendant's Motion to Exclude.[8] The Court has already addressed Defendant's challenges to Coffman's opinions, finding that such challenges do not affect the admissibility of Coffman's opinions. The Court will not repeat the entirety of its *Daubert* analysis herein; however, the Court will address a few arguments that pertain to the class certification issues.

For instance, in Defendant's Motion to Exclude, Defendant takes issue with Coffman's data and analysis of the common stock. Specifically, Coffman evaluated whether the common stock reacted to earnings announcements in a manner that is significantly different from how the stock moved on days with no Miller Energy-related news. [Doc. 121 at ¶ 50]. He also analyzed the extent to which large price movements in Miller Energy's common stock on dates other than earnings announcements could be explained by newly released information. [*Id.*]. According to his study, he identified seventeen (17) regular quarterly earnings that Miller Energy issued during

---

[8] The Court notes that the parties also disputed in the filings related to Defendant's Motion to Exclude whether establishing *Cammer* Factor Five is necessary in order to establish market efficiency. In the Memorandum and Order on Defendant's Motion to Exclude, the Court noted several courts have found that *Cammer* Factor Five is necessary, while other courts have found otherwise. It appears that most courts utilize the *Cammer* Factors as analytical tools as opposed to a checklist. *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 133 (M.D. Tenn. 2020) ("Indeed, the Sixth Circuit has not mandated use of those factors, and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist. "); *see also Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 385 (N.D. Ga. 2019) ("Accordingly, district courts around the country routinely find market efficiency regardless of the fifth *Cammer* factor.") (collecting cases); *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *10–11 (D. Minn. July 28, 2016) (holding plaintiffs satisfied their burden of establishing defendant's stock traded in an efficient market where all of the *Cammer* and *Krogman* factors weighed in favor of market efficiency except the Fifth *Cammer* Factor, reasoning that requiring all the *Cammer* factors to be met would change the factors into a "requirement" or "necessity" which "has not been explicitly endorsed by the courts").

31

the Analysis Period, three (3) of which resulted in statistically significant price movements above the 95% confidence level. [*Id.* at ¶ 61]. He then compared these results against the 316 days during the Analysis Period when there was no Miller Energy-related news, analyst reports published, or SEC filings issued. [*Id.* at ¶ 62]. He states that of these 316 days, there were fourteen (14) statistically significant price movements. [*Id.*]. Therefore, he explains that during the Analysis Period, there was a statistically significant price reaction at the 95% confidence level on 17.65% of the earnings announcements, but when compared to days with no Miller Energy-related news, he observed statistically significant reactions 4.43% of the time. [*Id.*]. He explains that the 4.43% was expected based on randomness alone. [*Id.*]. He concludes that such findings are powerful scientific evidence of a cause and effect relationship between new, publicly released information concerning Miller Energy and the changes in the price of the common stock. [*Id.*]. He also notes that the average magnitude of stock price movement on earnings announcement days was about 1.7 times higher than on dates with no news. [*Id.* at ¶ 63]. Coffman concludes that his event study demonstrates a clear cause and effect relationship between new material news and changes in the market price of Miller Energy common stock. [*Id.* at ¶ 67].

In its Motion to Exclude, Defendant argued that the data and analysis do not support Coffman's conclusion that the market is efficient. Defendant explained that Coffman supports his conclusions by relying upon three (3) earnings announcements out of seventeen (17), which is 17.65%. Defendant stated that such a low percentage cannot show a cause and effect relationship, citing cases where courts found an insufficient number of news days followed by a market reaction does not establish market efficiency. *See Freddie Mac*, 281 F.R.D. 174, 180 (S.D. N.Y. 2012) (expert's showing that series Z responded to material news 28% of the time is insufficient to satisfy plaintiff's burden of proving *Cammer's* cause and effect relationship); *George v. China Auto. Sys.,*

*Inc.*, No. 11 CIV. 7533 KBF, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("Even assuming that the methodology was proper, showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency . . . To state the obvious, seven out of 16 is less than 50%").

The Court notes, however, that other courts have found that plaintiffs satisfied this factor at less than 50%. For instance, in *Angley v. UTi Worldwide Inc.,*, the court found that plaintiffs had satisfied *Cammer* Factor Five based on their expert's event study, which found the number of significant abnormal returns on news days was 4/36 or 11.1% versus those on no-news days, which was 5/194 or 2.6%. 311 F. Supp. 3d 1117, 1123 (C.D. Cal. 2018). The defendants argued that the event study was unreliable and flawed because it showed that the stock had a statistically significant excess return on only 11.1% of news days, which defendants contended was insufficient to support a finding of market efficiency. *Id.* The court disagreed and ultimately found that plaintiffs had established *Cammer* Factor Five. *Id.* at 1126.

Similarly, while the Court agrees that the percentage is not high, the Court does not find that the percentage supports a finding against market efficiency. As Coffman explains in his Rebuttal Expert Report:

> Defendant makes note of that fact that I found that less than 50% of the earnings announcements had a statistically significant price movement, but this is an irrelevant threshold . . . Indeed, there are numerous reasons why many earnings announcements may not be statistically significant that are entirely consistent with market efficiency. For example, as mentioned in my Report and as Dr. Attari testified, the information released may have been largely consistent with expectations, there may have been a mix of positive and negative information, or the market may be focused largely on other factors . . . The financial economics literature is clear that there is no theoretical or mathematical reason to believe that the fraction of news days associated with statistically significant returns should exceed fifty percent in an efficiency market (*See* Tabak, David. "What We Should Expect When Testing for Price Response to News

33

in Securities Litigation." *NERA Economic Consulting*, 2016 pp. 1-17). Dr. Attari further acknowledges that he does not know of, and has not calculated, an appropriate threshold and admits that should a threshold be calculated, it may even be less than fifty percent . . . The fact that less than fifty percent of earnings announcements were associated with statistically significant price movements for Miller Energy Common Stock does not impact my finding that there was a cause and effect relationship between new news and Miller Energy Common Stock.

[Doc. 142-1 at ¶ 7 n. 16]. Thus, while the Court finds the above numbers are not a strong showing in Plaintiffs' favor, the Court finds that they nevertheless weigh in favor of finding market efficiency.

In its Motion to Exclude, Defendant also argued that the data from Coffman's event study does not support his conclusions that the market for the Preferred Stock was efficient. Defendant stated that Coffman found that there were no statistically significant movements in the prices of the Preferred Stock in response to the three (3) earnings announcements, which does not support his conclusion that there is a cause and effect relationship between Miller Energy's earnings announcements and the price of the Preferred Stock. In addition, Defendant asserted that Coffman tested the statistical significance of the price movements prior to October 15, 2014, but excluded this data from his event study. Defendant states that Dr. Attari reviewed Coffman's backup data and found that zero (0) out of eleven (11) earnings announcements were followed by a statistically significant change in price.

As explained in the undersigned's Memorandum and Order on Defendant's Motion to Exclude, Coffman explained why he chose October 15, 2014, as his starting date. Specifically, Coffman opines that the market prices fell to a new low that was substantially below par value, which signaled that Miller Energy may default. He states that prior to this date, the market price for the Preferred Securities would not be expected to respond to earnings events because they do

34

not fundamentally impact the perceived chance of default. Courts recognize that with respect to preferred securities, there may be little effect on the price until there are signs of the company defaulting. *See In re Countrywide Fin. Corp. Sec. Litigation*, 273 F.R.D. 586, 615 (C.D. Cal. 2009) ("Until the financial situation becomes severe enough that the issuer is likely to default, there is relatively little effect on debt price."). Dr. Attari even acknowledged during his deposition that information pertaining to revenue, earnings, and profitability are important to preferred shareholders but not to the same degree as holders of common stock. [Doc. 143-2 at 136]. Thus, the Court finds Coffman's start date of October 15, 2014, appropriate under these facts.

Defendant also raises issues with Coffman's conclusion that the Preferred Stock operated in an efficient market. Defendant states that according to Coffman, out of three (3) earnings announcements, zero (0) impacted the price of the Preferred Securities. Thus, Defendant states that Coffman's analysis does not support the conclusion that the Preferred Securities operated in an efficient market. As Coffman noted, however, he also looked at news that was related to the ability of Miller Energy to continue paying preferred stock dividends or remain listed on the NYSE. [Doc. 121 at ¶ 78]. Coffman considered announcements of the intent to continue to pay or suspend the dividend, disclosure of a "Wells Notice" associated with Miller Energy's valuation of the Alaska Assets, the warning that there was substantial doubt about Miller Energy's ability to continue as a going concern, and the delisting of the Preferred Securities from the NYSE. [*Id.*]. Coffman states that for example, on May 6, 2015, Miller Energy announced that its Board of Directors voted to defer quarterly payments of dividends for the Series C and Series D Preferred Stocks. [*Id.*]. Coffman found that "[i]n response, the market price of Miller Energy Series C Preferred Stock decreased 34.89% compared to the predicted return of 0.17% and that Miller Energy Series D Preferred Stock also decreased 28.40% compared to the predicted return of

0.27%." [*Id.*]. Thus, while the Court has considered the earnings announcements, especially in light of Coffman's observation that after October 15, the Preferred Securities would react similar to the common stock with respect to certain news (i.e., earnings announcements), the Court has also considered that the Preferred Securities reacted to news that affected the ability of Miller Energy to continue to pay dividends. Accordingly, the Court finds Defendant's arguments not well taken.

Further, Defendant argues that with respect to Coffman's event studies, he did not analyze whether the observed price changes were reactions to other Miller Energy events or disclosures that occurred around the same dates as the earnings releases that Coffman studied. Coffman testified that he looked at other events but could not recall specifics during his deposition. Defendant, however, has not pointed the Court to any other evidence showing that the other events or disclosures caused the price changes. *See* [Doc. 127 at 19-2; Doc. 159 at 16] ("Defendant's Motion to Exclude" and "Defendant's Reply Brief to its Motion to Exclude").

Further, Defendant criticizes Coffman because he relied on the ICE Oil Index, although his Initial Report cites to the NYMEX Oil Index. The Court has addressed Defendant's criticism in its Memorandum and Order on Defendant's Motion to Exclude. As the Court previously explained, Dr. Attari acknowledges that "both the NYMEX and ICE futures contracts are designed to track the price of West Texas Intermediate oil on the maturity date of the contract." [Doc. 129-1 at ¶ 38]. The Court also noted that after Coffman's error was brought to his attention, he explained, "[S]ince both of these indices are meant to generally track the same underlying commodity, the prices are highly consistent . . . The correlation coefficient between the indices is over 97%." [Doc. 142-1 at ¶ 40]. Coffman continues that using the NYMEX index had no impact on his conclusions. [*Id.* at ¶ 41]. Coffman concludes, "More specifically, for the news days I

36

analyze, the use of the NYMEX Oil Futures Index does not change the proportion of days that are significant, changes the average absolute return by 0.05% and 0.11% for the Series C Preferred Stock and Series D Preferred Stock respectively, and does not impact the average volume of shares traded. All of the comparisons against the 'no news' days remain statistically significant at or above the 95% significance level." [*Id.*].

Finally, the Court notes that in explaining his use of an oil price index instead of an index of industry peers, Coffman states as follows:

> Nevertheless, I performed robustness checks to make sure that my ultimate conclusions are not sensitive to the choice of an oil price index instead of an index industry of peers. In particular, I considered whether my conclusions were sensitive to (1) use of an industry index instead of an oil price index or (2) inclusion of an industry index in addition to the oil price index. The industry index I considered was the Dow Jones US Exploration and Production Index, which Miller Energy compares itself against in its 10-Ks in 2012, 2013, and 2014. However, several companies included in the Dow Jones US Exploration and Production Index follow a different business model than Miller Energy. For instance, several firms operated refineries, fueling centers, and processing plants while Miller Energy was solely focused on oil and natural gas exploration and production. I, nonetheless, found that performing these robustness checks did not materially alter the results or conclusions I make throughout this report.

[Doc. 121 at ¶ 53 n. 63]. Accordingly, the Court finds Defendant's argument not well taken.

Defendant also challenged Coffman's calculation for the returns with respect to the oil price index for multiple days in Coffman's event study. As explained in the Court's Memorandum and Order, the experts dispute how to calculate returns on futures contracts. Dr. Attari opines that the impact of incorrectly calculating the return of the ICE Oil Futures Index was 55 days out of 1,105. [Doc. 129-1 at 97]. As Coffman explains, however, that even if he had undertaken the procedure suggested by Dr. Attari, Coffman's conclusion of a cause and effect relationship between new news and changes in the market price of Miller Energy Preferred Securities is not

impacted. [Doc. 142-1 at ¶ 45]. Coffman states that "the use of Dr. Attari's proposed method changes the average absolute return by an inconsequential 0.01% and 0.10%, respectively, when analyzing the dividend adjusted returns for Miller Energy Series C and Series D Preferred Stock. All of the comparisons against the "no news" days remain statistically significant at or above the 95% significance level for the Miller Energy Preferred Securities." [*Id.*]. Accordingly, the Court does not find Defendant's criticism affects Coffman's event study.

Defendant also states that Coffman incorrectly computed the returns of the Preferred Stock by excluding dividend payments. As the Court explained in the Memorandum and Order with respect to Defendant's Motion to Exclude, Coffman revisited his analysis and found that the incorporation of dividend adjusted returns with respect to the Series C Preferred Stock did not change the portion of news day with significant returns, changed the average absolute abnormal return for those days by a negligible 0.02%, and did not affect the volume. [Doc. 142-1 at ¶ 38]. With respect to the Series D Preferred Stock, Coffman states that there was no change whatsoever to the proportion of news days with significant returns, or the volume, and the average absolute abnormal return changed by 0.02%. [*Id.*]. Dr. Attari has not suggested that the inclusion of the dividend adjustments impacts Coffman's analysis. Thus, the Court finds Defendant's argument not well taken.

Accordingly, the Court has reviewed the event study in this case, and for the reasons explained above and in the Court's Memorandum and Order on Defendant's Motion to Exclude, the Court finds Coffman's analysis supports a finding that Plaintiffs have established the Fifth *Cammer* Factor.

38

### (6) Market Capitalization

"The markets for companies with higher market capitalizations . . . are more likely to be efficient." *Barclays PLC*, 310 F.R.D. at 81. Plaintiffs state that the market capitalization for Miller Energy common stock was $0.2 billion on April 30, 2013, and $0.4 billion on January 31, 2014, a period in which at least 26% of the firms traded on the NYSE and NASDAQ had lower market capitalization. Plaintiffs state that according to Coffman's opinion, it is most logical to consider market capitalization of Miller Energy as a whole for the Series C and Series D Preferred Stock because the size of the firm affects factors like analyst coverage and the amount of news. [Doc. 121 at ¶ 84]. Coffman opines, "[W]hen factoring in the Preferred Stocks, Miller Energy's combined market capitalization fell between the 16th and 41st percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Analysis Period." [*Id.*]. Coffman concludes, "Given that the market capitalization [of the] Miller Energy Common Stock and Miller Energy as a whole was in the mid-quartile range relative to other publicly traded companies, this factor is supportive of market efficiency for the Miller Energy Securities." [*Id.* at ¶ 85].

In its Motion to Exclude, Defendant generally criticizes Coffman for not analyzing market capitalization of the Preferred Stock separately. As Coffman explains, however, "The purpose of analyzing a company's market capitalization is not to see whether a particular security of a company is well capitalized, but to see whether the company as a whole is well capitalized. [Doc. 142-1 at ¶ 33]; *see Krogman*, 202 F.R.D at 478 (noting that market capitalization is an indicator of market efficiency "because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."). Accordingly, the Court finds this factor weighs in favor of market efficiency.

(7)     **Bid-Ask Spread**

As explained in *Krogman*, "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman,* 202 F.R.D. at 478. "A large bid-ask spread is indictive of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.*

In the instant matter, Plaintiffs rely on Coffman's opinions that the bid-ask spread was low for the Miller Energy Securities. [Doc. 121 at ¶¶ 87-89]. With respect to the common stock, Coffman states that "the time-weighted average percentage bid-ask spread for Miller Energy Common Stock in each month was between 0.1535% and 1.7477%." [*Id.* at ¶ 87]. Coffman explains, "Prior to the market prices of Miller Energy Securities substantially falling ahead of its ultimate delisting and bankruptcy, the bid-ask spread was below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in December 2014." [*Id.*]. Coffman continues that in December 2014, Miller Energy Common Stock had a monthly average bid-ask spread of 0.8115%, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-spread of 0.76%." [*Id.*]. Coffman opines, "Although this spread is larger than the average of the 100 other common stocks, it is a relatively small difference, and is due particularly to the price of the common stock substantially falling ahead of the [Miller Energy's] bankruptcy." [*Id.*].

With respect to the Series C Preferred Shares, Coffman states that "the time-weighted average percentage bid-ask spread for Miller Energy Series C Preferred Stock in each month was between 0.2452% and 8.5394%." [*Id.* at ¶ 88]. Prior to Miller Energy's delisting and bankruptcy, the bid-ask spread was about 0.76%, the average bid ask spread of those 100 common stocks trading on the NYSE and NASDAQ. [*Id.*]. Similar to the common stock, Coffman states that the

bid-ask spread jumped past that average for the last eight months due to the falling market price of the Series C Preferred Stock. [*Id.*]. Coffman's findings with respect to the Series D Preferred Stock is similar to the Series C Preferred Stock, except "the time-weighted average percentage bid-ask spread . . . in each month was between 0.3192% and 8.0119%. [*Id.* at ¶ 89]. Coffman concludes that the Miller Energy's Securities' bid-ask spreads support a finding of efficiency. [*Id.* at ¶¶ 87-89].

Defendant does not dispute this factor in its Response but argues in its Motion to Exclude that Coffman does not analyze that the bid-ask spreads for the Preferred Securities were above average at the end of the proposed Class Period. In his Rebuttal Report, Coffman states, "The increase in the bid-ask spreads of Miller Energy Preferred Securities were driven by declines in price, not because the markets generally became less efficient. As the prices of the Preferred Securities fell to low-levels, the bid-ask spreads as a percentage of the shares' prices increased because price level is an important determinant of bid-ask spread." [Doc. 142-1 at ¶ 34]. Accordingly, given the above, the Court finds this factor weighs in favor of market efficiency with respect to the Miller Energy Securities.

### (8) Institutional Ownership

A large number of institutional owners demonstrates an efficient market. *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014). As Coffman explains in his Corrected Report, "Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for stocks that they own. These investors include mutual funds, pension funds, investment banks and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios." [Doc. 121 at ¶ 90].

Plaintiffs argue that the high level of institutional ownership coupled with high trading volumes support a conclusion of marking efficiency. Specifically, in Coffman's Corrected Report, he states that 181 institutions reported owning Miller Energy Common Stock during the Analysis Period, holding, on average, over 30% of the public float. [*Id.*]. Coffman concludes, "This substantial level of institutional ownership of Miller Energy Common Stock during the Analysis Period coupled with high trading volume further supports a conclusion of market efficiency." [*Id.*]. With respect to the Preferred Securities, Coffman states that institutions held them, but the data is limited. [*Id.* at ¶ 90 n. 122]. Coffman explains that the SEC publishes a list of Section 13F securities quarterly, but for all quarterly lists starting in the third calendar quarter of 2012 and at the end of the Analysis Period, the Preferred Securities were not labeled as Section 13F securities, and therefore, institutions were not required to report their holdings of the Preferred Securities. [*Id.*]. Coffman states that this is not uncommon for preferred securities in general, explaining that only 85 of the 17,395 securities identified as 13-F securities were preferred securities in the list for the second quarter of 2015. [*Id.*].

The parties do not dispute that the number of institutional investors in the common stock support efficiency. *See* [Doc. 143-2 at 83] (Dr. Attari Deposition) ("There were a number of institutional owners in the common stock over the class period."). With respect to the Preferred Securities, the data is simply not available. [*Id.* at 84] (Dr. Attari Deposition) (explaining that he had also tried to obtain the information, but it was not available). The Court notes, however, that in Coffman's Rebuttal Expert Report, he names several institutions that purchased the Preferred Stock. Specifically, he states that reporting institutions that held Miller Energy Series C Preferred Stock included Brick Asset Management Inc., Crow Point Partners, LLC, Quadrant Capital Group, Spirit of America Management Corp., Scholtz & Co LLC, Swiss-Asia Financial Services Pte Ltd

and Theme/Value Investments.  [Doc. 142-1 at ¶ 35].  With respect to the Series D Preferred Stock, Coffman names Wells Fargo and Co., Spirit of America Management Corp., Sun Life Financial Inc., and Teachers Insurance & Annuity of America.  [*Id.*].  Coffman concludes, "Therefore, the limited data available on institutional holdings of Miller Energy Preferred Securities does not suggest market inefficiency.  At worst, the limited amount of data on the institutional holdings of the Miller Energy Preferred Securities renders this factor agnostic regarding this efficiency factor." [*Id.*].  Accordingly, the Court finds this factor weighs in favor of finding that the market was efficient for the Common Stock.  With respect to the Preferred Stock, the available data is limited, so this factor is neutral.[9]

**(9)        Autocorrelation**

Autocorrelation "generally refers to the correlation between two observations of the same series at different dates."  *Burns*, 967 F. Supp. 2d at 1160 (citation omitted).  "A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day."  *Id.* (quoting *In re DVI, Inc. Sec. Litig.,* 249 F.R.D. 196, 213 (E.D. Pa. 2008)); *see also Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 356 (C.D. Cal. 2015) ("The more likely past price movement is to predict future price movement, the less efficient a market is likely to be because an efficient market incorporates information quickly into the first day's price, whereas an inefficient market would not fully digest

---

[9] As noted in *Petrie v. Electronic Game Card, Inc.*, "[F]ew courts have explained how to evaluate how many institutional investors constitutes a 'large' number."  308 F.R.D. 335, 357 (C.D. Cal. 2015). While Coffman has identified several institutional investors with respect to the Preferred Securities, there is simply no information on the exact number of the institutional investors or how many shares of Preferred Securities that they held.  *See id.* (finding market efficiency when institutional investors held between 10.9% and 33.4% of defendant's outstanding stock); *see also Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012) (finding that 70 to 140 institutional investors who held between 8 to 20 million shares out of 28 million outstanding shares weighed in favor of finding market efficiency).

43

the information until later."). "The presence of autocorrelation in a security's price may indicate that a security trades in an inefficient market." *Burns*, 967 F. Supp. 2d at 1160 (citing *DVI,* 249 F.R.D. at 213).

Plaintiffs assert that Coffman found no evidence of autocorrelation for either the common stock or the Preferred Stock, and therefore, this factor supports the conclusion that the Miller Energy Securities traded in an efficient market. In order to determine the existence of autocorrelation, Coffman conducted a regression analysis, which tests whether on average the abnormal return from the previous day has a statistically significant effect on the abnormal return today. [Doc. 121 at ¶ 93]. Coffman explains that if the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation. [*Id.*]. With respect to the common stock, Coffman states that the coefficient for the Analysis Period is not statistically significant at the 95% confidence level. [*Id.* at ¶ 94]. He makes similar findings with respect to the Series C Preferred Stock. [*Id.* at ¶ 95]. Finally, with respect to the Series D Preferred Stock, Coffman states as follows:

> While I did find statistically significant autocorrelation for Series D Preferred Stock across the Analysis Period, the quarterly autocorrelation analysis demonstrates that there is no consistent pattern that would suggest an arbitrage opportunity because the sign of the autocorrelation coefficient is not even consistently the same sign. In other words, in order to profit from autocorrelation, the direction of the autocorrelation needs to be consistent. In this case, the sign changes from quarter to quarter. Therefore, the statistical evidence is inconsistent with the presence of systematic autocorrelations that would allow a trader to consistently profit.

[*Id.* at ¶ 96]. Coffman concludes that his autocorrelation analysis supports a finding of market efficiency with respect to the Miller Energy Securities. [*Id.* at ¶¶ 94-96].

Defendant did not dispute this factor in its Response, but Defendant argued in its Motion to Exclude that this factor weighs in support of finding that the market for the Preferred Stock was

44

inefficient. Defendant relied on Dr. Attari's opinion that Coffman ran the least sophisticated test. [Doc. 129-1 at ¶ 161]. Dr. Attari states that there are three problems with Coffman's autocorrelation opinions: (1) his analysis cannot help establish semi-strong form efficiency, (2) Coffman's autocorrelation analysis checks for a very limited form of predictability and the results only inform about the type of predictably that Coffman analyzes, and (3) Coffman's results show that the Series D Preferred Stock were autocorrelated at a highly statistically significant level over the full Analysis Period and that the Series C Preferred Stock was autocorrelated at a highly statistically significant level for several of the quarterly sub-periods. [*Id.* at ¶¶ 164-65].

The Court has considered Coffman's explanation for his calculations and finds Coffman's explanation well-reasoned. Coffman states as follows:

> First, while a simple test, the test I perform is a standard method to assess autocorrelation. In fact, Dr. Attari has testified previously that my method is the "most common" test for autocorrelation. It is especially relevant to the context of market efficiency, because it is the one factor that tests for whether there is a systematic bias in the movement of returns. For example, if a stock regularly responded only partially to news, it would yield consistent positive autocorrelation under my test. Likewise, if the market consistently overreacted, that would induce systematic negative autocorrelation. While Dr. Attari speculates that there could be more complex ways in which the stock is autocorrelated, he does not provide any such evidence. In other words, if yesterday's stock price movement is not a consistent predictor of today's price movement, there is no *a priori* reason to believe that there is a relationship with multiple prior days.

[Doc. 142-1 at ¶ 25]; *see also Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("The autocorrelation analysis tests for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates.").

Further, Defendant argues that the results of Coffman's autocorrelation analysis show that the returns for the Series D Preferred Stock are correlated at a highly statistically significant level, evidencing that the markets for these securities were not efficient. However, as Coffman explains

45

with respect to the Series D Preferred Stock, there was no consistent pattern that would suggest an arbitrage opportunity because the sign of the autocorrelation coefficient is not even consistently the same sign. [Doc. 121 at ¶ 96]. Coffman states that "in order to profit from autocorrelation, the direction of the autocorrelation needs to be consistent," but here, "the sign changes from quarter to quarter." [*Id.*]. Dr. Attari acknowledged that the autocorrelation coefficient switched from negative to positive and back throughout the Class Period for both the Series C and Series D Preferred Stock. [Doc. 143-2 at 92-93]. Contrary to Coffman, however, Dr. Attari surmised that some sort of complex arbitrage opportunity could take place where the autocorrelation coefficient reverses regularly, but he admitted he could not explain it because he had not "done the work for it." [*Id.*]. Accordingly, the Court finds Defendant's arguments not well taken.

The Court has weighed the relevant factors as discussed above, and the Court finds that Plaintiffs have established that the market for the Miller Energy Securities was efficient. However, as noted above, Defendant may present evidence to rebut this presumption.

Specifically, Defendant argues that even if Plaintiffs have established the fraud on the market presumption, it has successfully rebutted the presumption. In *Basic*, the Supreme Court explained that "any showing that severs the link between the alleged misrepresentation and  . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance" because "the basis for finding that the fraud had been transmitted through market price would be gone." 485 U.S. at 248. In explaining the rebuttable presumption, the Supreme Court later clarified, "Price impact is thus an essential precondition for any Rule 10b-5 class action. While *Basic* allows plaintiffs to establish that precondition indirectly, it does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not

apply." *Halliburton II*, 572 U.S. at 282. "Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient." *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *13 (N.D. Ohio Aug. 14, 2018) (quoting *Aranaz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 672 (S.D. Fla. 2014)) (emphasis in original).

Defendant argues that it has rebutted the *Basic* presumption in several ways. First, Defendant states that the evidence shows that its alleged misrepresentations did not artificially inflate the price of Miller Energy's Securities. Second, Defendant states that out of the sixteen (16) events and disclosures that Plaintiffs alleged leaked out the truth, the two that are most closely tied to the allegation that the Alaska Assets were overvalued were not followed by statistically significant price declines. Finally, Defendant states that the evidence from the proposed Class Representatives and Lead Plaintiffs shows that they would have bought the stock even if they knew that the price was tainted by fraud.

Plaintiffs state that Defendant's challenge fails in two key respects. First, Plaintiffs state that Defendant focuses exclusively on price impact at the time of the misrepresentation and ignores the price impact at the time of the corrective disclosures. Plaintiffs argue that Defendant's argument distorts the relevant legal standard because price impact is demonstrated either through evidence that a stock's price rose in a statistically significant manner after a misrepresentation or that it declined in a statistically significant manner after a corrective disclosure.

Second, Plaintiffs submit that Defendant offers no evidence of a lack of price impact. Plaintiffs argue that they have alleged that the stock price fell in response to numerous corrective disclosures, and Dr. Attari's report fails to address the price impact of the corrective disclosures.

Plaintiffs state that Dr. Attari concedes that he did not conduct a negative causation analysis and has no opinion on whether Miller Energy's share price fell in response to the alleged corrective disclosures. Plaintiffs assert that Defendant has acknowledged that its first false and misleading audit report preceded a statistically significant increase of nearly 60% in the share price. Plaintiffs argue that while it is not their burden to show price impact, Coffman demonstrated that Defendant's first audit report did cause significant price inflation.

As mentioned above, Defendant argues that any alleged misrepresentation did not artificially inflate the price of the Miller Energy Securities, and therefore, there is a lack of price impact.[10] Defendant relies on Coffman's testimony, wherein the following exchanged occurred:

> Q. You understand that [P]laintiffs' theory in this case is that KPMG's audit opinions helped artificially inflate the price of Miller Energy securities?
>
> A. That's my understanding of their claim, yes.

---

[10] The parties argue in footnotes whether price maintenance theory is viable. *See* [Doc. 129 at 14 n. 5] and [Doc. 141 at 21 n. 17]. "Price maintenance theory" is the "theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price." *Willis v. Big Lots, Inc.,* 242 F. Supp. 3d 634, 656 (S.D. Ohio 2017). While some courts have rejected this this theory, *see Ohio Pub. Employees Ret. Sys.*, 2018 WL 3861840, ("Lead Plaintiff cannot meaningfully argue that the misrepresentations artificially maintained the price of the stock until risks materialized, as that argument proves too much at the class certification stage, where OPERS has the burden of persuasion as an evidentiary matter others have approved it."), others have approved it. *See Willis*, 242 F. Supp. 3d 634 (finding that the price maintenance theory "is consistent with the Supreme Court's discussions on price impact").

More recently, however, the Sixth Circuit Court of Appeals declined a defendant's petition to appeal the district court's interlocutory order certifying a class action. *In re CoreCivic, Inc.*, No. 19-0504, 2019 WL 4197586, at *1 (6th Cir. Aug. 23, 2019). In doing so, the Court stated that while defendant challenges the framework applied by the district court as it relates to the *Basic* presumption and "the legal standard for rebutting the presumption of reliance when plaintiffs are proceeding under a price maintenance theory, case law supports the legal standard the district court applied." *Id.* (citing *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mort., Corp.*, 830 F.3d 376, 385 (6th Cir. 2016)).

Q. And in Exhibit 7, and in our discussion today on Miller Energy's common stock, you evaluated whether there was a statistically significant price movement in response to the disclosure on Miller Energy's year-end results for each of those years ending April 30, 2011, '12, '13, and '14; correct?

A. Yes.

Q. And in each instance, you found no statistically significant increase in the price of the common stock; right?

Ms. Posner: Objection.

A. Based on what you've shown me, I believe that's correct.

Q. Well, in two instances there was a movement but it was down, not up; right?

A. Correct.

[Doc. 133-1 at 213-24]. Coffman further testified that he was not asked to review whether Defendant's audit reports artificially inflated the price of Miller Energy's common stock.[11]

The Court has considered Defendant's argument regarding the lack of price impact but finds that Defendant has not successfully rebutted the *Basic* presumption on this ground. As one court explained, "To successfully rebut the fraud-on-the-market presumption, however, a defendant cannot simply show that a price did not rise after a misrepresentation." *Burges v. Bancorpsouth, Inc.,* No. 3:14-CV-1564, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017)

---

[11] The Court notes that in Coffman's Corrected Report, Coffman states that he performed additional analysis on the movements of Miller Energy's common stock to information concerning the original reporting of Miller Energy's FY 2011 financial information. [Doc. 121 at ¶ vi]. He concludes that the prices of Miller Energy securities were impacted by Defendant's audit reports, explaining that out of four (4) audit opinions, there was a statistically significant price movement in response to one audit opinion. [*Id.* at 76] (Exhibit 7). In the Court's Memorandum and Order on Defendant's Motion to Exclude the Reports and Testimony of Chad Coffman [Doc. 126], however, the undersigned struck this opinion because it was a new opinion that Coffman acknowledged was not subject of his Initial Report.

49

(citing *Willis v. Big Lots, Inc.,* 242 F. Supp. 3d 634, 657 (S.D. Ohio 2017)). Price impact can be shown "through evidence that the price was affected either at the time of the misrepresentation *or* at the time after a corrective disclosure." *Id.* (citing *Willis,* 242 F. Supp. 3d at 657) (other citations omitted) (Emphasis in *Burges*). "So the fact that there was no stock price increase when the statements were made does not suggest a lack of price impact." *Id.* (quoting *Willis,* 242 F. Supp. 3d at 657). Therefore, "in order to rebut the presumption for class certification purposes, [d]efendants must show that the misrepresentation did not in fact affect the stock price; but 'affecting the stock price' can occur at the time the misrepresentation is made or at the time the corrective disclosure is given." *Id.* (citing *Willis,* 242 F. Supp. 3d at 657).[12] Accordingly, the Court finds that the lack of price increase after the release of Defendant's audit opinions does not rebut the *Basic* presumption.

Defendant, however, also argues that Plaintiffs have alleged sixteen (16) events and disclosures that leaked the truth and that only two (2) of these are tied to alleged overvaluation of the Alaska Assets. Defendant states that these two (2) events were not followed by statistically significant price declines, according to Coffman. Specifically, Defendant refers to the Amended Complaint that alleges on December 10, 2014, Miller Energy announced a $265.3 million impairment charge on the Alaska Assets and that on March 13, 2015, Miller Energy announced another $149.1 million impairment charge on the Alaska Assets. [Doc. 59 at ¶¶ 213, 222]. Coffman testified that according to his event study, there was not a statistically significant reaction to the price of the common stock after the December 10 or the March 13 impairment

---

[12] The Court further notes that Dr. Attari acknowledged a price increase after Defendant's first audit opinion was released, but Dr. Attari could not determine whether the increase was statistically significant because he had not "done the work," and he had not formed an opinion as to what actually caused the price increase. [Doc. 143-2 at 161-62].

50

announcements. [Doc. 133-1 at 253-54]. While the Court agrees that these disclosures are tied closely to the overvaluation of the Alaska Assets, Defendant does not mention the other fourteen (14) disclosures. Further, Dr. Attari testified that he did not offer an opinion on negative causation. [Doc. 143-2 at 115]. Accordingly, the Court does not find that this argument rebuts the *Basic* presumption.

Finally, Defendant argues that evidence shows that the proposed Class Representatives testified that they would have purchased the stock even if they had been aware that the price was tainted by fraud. For instance, Defendant states that Plaintiff Montague purchased shares after four (4) of the events and disclosures that leaked the truth and caused the price to decline. As the Supreme Court stated in *Halliburton II*, "[I]f a defendant could show that . . . a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." 573 U.S. at 269. The Court, however, does not find that Defendant's challenge successfully rebuts the *Basic* presumption, "*Basic* is very clear that the way to rebut the presumption is to show that the investor would have paid the same price." *Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 432 (7th Cir. 2015). The fact that Plaintiff Montague purchased stock after only four disclosures does not show that he was aware that the price that he purchased such stock was tainted by fraud.[13] *See In re Computer Scis. Corp. Sec. Litig.,* 288 F.R.D. 112, 124 (E.D. Va. 2012) ("Post-disclosure purchases are consistent with the fraud-on-the-market theory and may be entirely rational and indeed a sound investment where

_____

[13] Defendant also argues that Kenneth Martin's and Martin Weakley's trading patterns severs the link between the alleged misrepresentation and the stock purchases. As mentioned above, however, the Court has allowed these Plaintiffs to withdraw as Lead Plaintiffs. Further, for the same reasons as above, the Court does not find Kenneth Martin's and Martin Weakley's trading patterns meets Defendant's burden to successfully rebut the *Basic* presumption.

51

the stock is traded in an efficient market."). Accordingly, the Court finds Defendant has not successfully rebutted the *Basic* presumption.

Plaintiffs also rely on the *Affiliated Ute* presumption. In *Affiliated Ute Citizens of Utah*, 406 U.S. at 153, the Supreme Court held that for claims alleging Section 10b-5 violations "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id.* at 153. The Court held, "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 154.

Plaintiffs state that their Amended Complaint alleges that Defendant made material omissions, citing ¶¶ 7, 22, 134, and 156. Defendant disagrees that the presumption is applicable, arguing that the presumption is only available in cases primarily involving failures to disclose. Defendant argues that here, Plaintiffs' claims are not based on omissions but on alleged affirmative misstatements.

As mentioned above, Plaintiffs rely on ¶¶ 7 and 134[14] in support of their argument. Specifically, those paragraphs provide as follows:

> 7. Specifically, after an extensive investigation, including review of KPMG's Miller Energy audit workpapers and other internal documents, the SEC found, among other things, that: (1) KPMG's valuation of the Alaska Assets at an "inflated value of $480 million . . .violated generally accepted accounting principles ("GAAP") and overstated the fair value of the assets by hundreds of millions of dollars"; (2) KPMG "failed to comply with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), chiefly with respect to the procedures relating to the oil and gas properties that contained the overstated asset values"; (3) KPMG "failed to obtain sufficient competent evidence regarding the impact of the opening balances of the Alaska Assets, despite knowing that

---

[14] The Court has omitted Plaintiffs' citations to ¶¶ 22 and 156. Paragraph 22 simply describes Miller Energy, and ¶ 156 discusses AICPA ET (Ethics) Section 101. It is not clear to the Court why Plaintiffs cited these paragraphs in support of their argument.

no proper fair value assessment had been performed by management"; (4) KPMG "failed to appropriately consider the facts leading to Miller Energy's acquisition of the Alaska Assets, including the multiple offers received for those assets and the "abandonment" of the assets by the prior owner" in valuing the Alaska Assets; (5) KPMG "failed to sufficiently review certain forecasted costs associated with the estimation of the fair value of the Alaska Assets, which were understated, and to detect that certain fixed assets were double counted in the company's valuation"; (6) KPMG "failed to properly assess the risks associated with accepting Miller Energy as a client and to properly staff the audit"; (7) KPMG "overlooked evidence that indicated a possible overvaluation of the Alaska Assets"; (8) KPMG "failed to exercise the requisite degree of due professional care and skepticism" in auditing Miller Energy"; and (9) even after KPMG management and national office personnel became aware of the unusual and highly material valuation of the Alaska Assets, KPMG failed to "take sufficient action to determine that an appropriate response was taken by the engagement team regarding the risk of overvaluation of the Alaska Assets."

134. KPMG also had insufficient competent evidence to support the $110 million valuation of the fixed assets. As discussed *supra*, KPMG knew that the insurance broker was not a valuation specialist and that the insurance report was not sufficient evidential matter to support the value of the fixed assets.

In the instant matter, Plaintiffs have alleged omissions and representations. [Doc. 59 at ¶ 7]. "Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance with regard to alleged omissions." *Burges v. Bancorpsouth, Inc.*, No. 3:14-CV-1564, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (citing *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D. N.Y. 2014)). Accordingly, the Court finds that for purposes of class certification, Plaintiffs are entitle to the *Affiliated Ute* presumption as to its failure to disclose claims. *See Burges*, 2017 WL 2772122, at *10.

### b. Individual Issues of Damages

In addition to the above, Defendant asserts that Plaintiffs cannot establish predominance because individual issues of damages will overwhelm common issues. Relying on *Comcast Corp. v. Behrend*, 529 U.S. 27 (2013), Defendant argues Plaintiffs must show that their damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Further, Defendant argues that given that Plaintiffs have relied on a materialization of the risk theory, Plaintiffs' proposed calculation (i.e., the standard out of pocket measurement) is inapplicable. Defendant states that Plaintiffs must show that the damages' model can distinguish between high-risk and low-risk investors. Defendant states that Coffman does not distinguish between such investors, and therefore, Coffman's approach cannot be employed. Defendant states that Coffman's damages methodology was recently rejected by the Court of the Appeals for the Fifth Circuit in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).

Plaintiffs dispute that they are required to demonstrate that damages are capable of measurement on a class wide basis at class certification. Plaintiffs state that nevertheless, they have demonstrated that damages can be calculated on a class wide basis by utilizing the out of pocket methodology that is regularly utilized and approved in similar cases.

The Court notes that in *Comcast*, the Supreme Court reviewed whether certification was appropriate pursuant to Rule 23(b)(3) with respect to a class of more than two million current and former Comcast subscribers who sought damages. 569 U.S. at 29. The plaintiffs filed a class-action antitrust suit, claiming that Comcast and its subsidiaries engaged in unlawful "swap agreements," wherein Comcast acquired competitor cable providers and swapped their own systems outside the region for competitor systems located in the region (e.g., Comcast obtained Adelphia Communications in the Philadelphia region, along with its subscribers, and Comcast sold

54

Adelphia Communications its systems in Florida and California). *Id.* The plaintiffs alleged that this clustering scheme "harmed subscribers in the Philadelphia cluster by eliminating competition and holding prices for cable services at competitive levels." *Id.* at 30. The plaintiffs relied on four theories of antitrust impact, but the District Court only certified the theory relating to reduced overbuilding competition. *Id.* at 31-32. The plaintiffs' expert calculated a certain amount of damages but acknowledged that his "model did not isolate damages resulting from any one theory of antitrust impact." *Id.*

The Supreme Court held that the class action was improperly certified under Rule 23(b)(3). *Id.* at 34. The Court explained that the Court of Appeals erred when it refused to entertain Comcast's arguments against the damages' model simply because such arguments would also be pertinent to the merits determination. *Id.* The Court explained, "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class." *Id.* at 35. The Court stated that any model supporting damages must be consistent with liability. *Id.* (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

The Court further explained that the reasoning behind the District Court and Court of Appeals' decision was incorrect because it saw no need for plaintiffs to tie each theory of antitrust impact to a calculation of damages because such would involve considerations of the merits. *Id.* The Court observed that this reasoning "flatly contradicts" cases requiring inquiry into the merits of the claim." *Id.* (citing *Wal-Mart*, 564 U.S. at 351). The Court reasoned, "Under that logic, at the class-certification stage *any* method of measurement is acceptable so long as it can be applied class wide, no matter how arbitrary the measurements may be." *Id.* at 36 (Emphasis in original).

The Court concluded that there was "no question that the model failed to measure damages resulting from the particular antitrust injury on which [plaintiffs'] liability" was premised.  *Id.*

Since the ruling in *Comcast*, a number of courts have analyzed the decision in context of securities actions.  For instance, in *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, the court explained, "*Comcast* was an antitrust case where the regression model used to calculate damages did not measure damages attributable to the surviving theory of liability."  312 F.R.D. 332, 350 (S.D. N.Y. 2015).  The court continued, "*Comcast* does not mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a class wide basis." *Id.*  (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015)).

In any event, Plaintiffs state that they intend to rely on the out-of-pocket methodology.  In his Corrected Report, Coffman opines that damages under Section 10 can be calculated on a class wide basis.  [Doc. 121 at ¶ 98].  He explains as follows:

> Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).
>
> The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the Section 10(b) Class and can be measured class-wide.  In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the Section 10(b) Class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (*i.e.*, the investor's purchase and sale

56

history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).

[*Id.* at ¶¶ 99-100]. As the Middle District of Tennessee recently recognized, "Use of the out-of-pocket damages model in securities case is hardly new or novel – it "is the standard measurement of damages in Section 10(b) securities cases." *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (quoting *City of Miami Gen. Emp. & Sanitation Emp. Ret. Tr. v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018)) (collecting cases). "Comcast did not change this or render the model improper." *Id.*; s*ee also City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.,* No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."), *leave to appeal denied*, No. 18-80148, 2019 WL 2193335 (9th Cir. Jan. 24, 2019).

The Court finds Defendant's reliance on the *Ludlow* decision unpersuasive. Specifically, the case involved securities litigation surrounding the Deepwater Horizon event. *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2014 WL 2112823, at *11 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015). The plaintiffs attempted to certify two classes: a pre-explosion class and a post-explosion class. *Id.* at *1. The district court declined to certify the pre-explosion class finding that Coffman's damages methodology failed to measure the class-wide injury caused by defendants' alleged fraud. *Id.* at *10. The defendants argued that the proper type of damages to be recovered by investors in securities fraud cases is out-of-pocket damages. *Id.* The plaintiffs argued that the post-explosion stock price declines may be recovered

as consequential damages from the alleged process safety fraud. *Id.* at *11. The district court noted that while the Fifth Circuit has approved consequential damages in a Section 10(b) context, the plaintiffs' model interjected individualized inquiries with respect to damages. *Id.* The district court explained that plaintiffs' theory of damages is based on being deprived of the opportunity to avoid the increased risk by devesting prior to the explosion. *Id.* The district court reasoned that the causal link between the alleged misstatements and the claimed losses "withstand[] scrutiny only if [d]efendants' misrepresentations induced a transaction-i.e., if a particular investor would not have purchased the security had he known the true state of BP's process safety programs." *Id.* The district court concluded that the plaintiffs' "articulation of consequential damages is antithetical to the 'fraud on the market' theory which enables class wide resolution of their clams." *Id.* at *12.

The Fifth Circuit agreed with the district court's decision and explained why the materialization of the risk theory was not entitled to the *Basic* presumption. *Ludlow*, 800 F.3d at 691. The Court explained as follows:

> Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based on *price and price alone*. That is, if an investor makes investment decisions based upon price, he or she necessarily buys any particular stock in reliance upon all of the information or misinformation incorporated into its price. But plaintiffs' own model asserts that they relied on something other than price: risk. By claiming that class members may have divested themselves of BP stock if they had known about the true risk of an accident in the Gulf—as distinguished from that risk's impact on BP's stock *price*—the plaintiffs are arguing that their investment decisions were based substantially upon factors other than price. The plaintiff's argument thus undercuts one of the rationales for the *Basic* presumption of reliance.

*Id.*

In the instant matter, Plaintiffs are not seeking consequential damages. Instead, Plaintiffs

rely on the out-of-pocket methodology as prescribed in the statute—that is, the artificial inflation

per share at the time of purchase less the artificial inflation at the time of the sale. Plaintiffs' theory

stems from Defendants' misstatements and omissions that affected the price. *See Rougier v.

Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *17 (S.D. Tex. Nov. 13,

2019) ("Thus, unlike the plaintiffs in *BP I*, the [p]laintiffs here have satisfied their burden to

demonstrate a damages model that calculates artificial inflation, the but for price."), *report and

recommendation adopted,* No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

Further, as the Seventh Circuit explained:

> Although "materialization of risk" runs like a mantra through the
> parties' briefs, we do not think that it has any significance .... If a
> firm that is losing money says "we expect to lose $100 million next
> quarter" when the managers actually expect the loss to be $200
> million, that statement will keep the price higher than it ought to be,
> and when the next quarterly results show the real $200 million loss
> the price will adjust .... The parties are wont to call the bad outcome
> (the $200 million loss) a "materialization of the risk" that the loss
> would exceed $100 million .... [but] [t]he phrase adds nothing to the
> analysis .... [T]he fraud lies in an intentionally false or misleading
> statement, and the loss is realized when the truth turns out to be
> worse than the statement implied.

*Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010). Accordingly, the Court finds

Defendant's argument not well taken.

### c. Individual Issues of Timeliness

Defendant asserts that individual issues relating to timeliness will overwhelm common

issues. Defendant states that a Section 10(b) claim is time barred if brought more than two years

after discovery of the pertinent facts. Defendant submits that the two-year period does not begin

to run until a plaintiff discovered or a reasonably diligent plaintiff would have discovered the facts

constituting the violation. Defendant argues that the relevant facts, including the facts on which

59

Plaintiffs base their contention that Defendant acted with scienter, were known or discoverable by a reasonably diligent plaintiff before March 14, 2014, two years prior to the filing of the present action. Defendant states that the Amended Complaint alleges a number of red flags. Defendant contends that while all Plaintiffs had at least constructive notice, which is a common issue that can be proven on a class-wide basis, actual knowledge is an individual issue. Defendant states that here, the allegations are based on red flags, all of which were publicly disclosed long ago, and therefore, there is a question as to whether each individual potential class member had actual knowledge of facts and circumstances prior to March 14, 2014, barring the member's claim.

Plaintiffs argue that affirmative defenses alone do not compel a finding that individual issues predominate. Plaintiffs further state that the statute of limitations defense based on public information is subject to generalized proof. In addition, Plaintiffs state that there is no evidence that investors were put on notice of Defendant's fraud prior to the end of the Class Period.

"[A]n affirmative defense, standing alone, does not a compel a finding that common liabilities issues do not predominate." *In re HCA Holdings, Inc.*, No. 14-0511, 2015 WL 10575861, at *2 (6th Cir. Feb. 26, 2015). Defendant argues that Plaintiffs' scienter allegations against Defendant are based on facts and circumstances that were publicly disclosed and a matter of public record. In addition, Defendant points to the Amended Complaint, which alleges a number of publicly known red flags. The Court acknowledges that there is some public information, if known by investors, which may preclude relief on Plaintiffs' claims; however, the Court finds that Defendant has not sufficiently shown that any investor actually had knowledge of this information. *See id.* (affirming district court's decision that while some public information was available, defendants failed to show that any investor actually had knowledge of this information). In addition, Defendant argues that Plaintiff Cosby had actual knowledge of the premature filing of

the Form 10-K without Defendant's consent in 2011 because he read about it in the local press at the time.  The Court agrees with Plaintiffs, however, that such reveals nothing about Defendant's alleged fraud.  Plaintiff Cosby testified that he relied on Defendant's audit opinions to purchase shares.  [Doc. 132-1 at 51].  Defendant further argues that Kenneth Martin ("Martin") had actual knowledge that Scott Boruff ("Boruff"), the Executive Chairman of Miller Energy's Board of Directors, purchased an expensive home because Martin lent Boruff the money to purchase the house.[15]  Again, this does not show that Martin had actual knowledge of Defendant's alleged fraud. Accordingly, the Court finds Defendant's argument not well taken.

### ii.    Superiority

Plaintiffs argue that a class action is superior to alternative methods of resolving this dispute for several reason.  First, Plaintiffs argue that they are unaware of any class member who would prefer to control the prosecution of his/her claim individually, likely because doing so would be prohibitively expensive.  Second, Plaintiffs state that no individual claims have been asserted against Defendant for its violation of the securities laws in connection with Miller Energy.  Third, Plaintiffs state that geographical dispersion of the members of the classes means that it is desirable that their claims be litigated in a single forum.  Finally, Plaintiffs state that this case presents no unusual difficulties in maintaining the class action or providing notice of the classes.  Plaintiffs submit that judicial economy and the best interests of the classes favor class certification because the alternative would burden the judiciary and deprive the classes of any practical means of seeking recourse.

---

[15] As mentioned above, the Court allowed Kenneth Martin to withdraw as a named Plaintiff in this case.

A class action is superior in circumstances "where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individuals suits for damages, [and thus] aggrieved persons may be without any effective redress unless they may employ the class-action device." *Young*, 693 F.3d at 545 (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)). A class action is not the superior method of adjudication if a court must make individual inquiries. *Id.* In situations where class members are unaware of a violation of the law, and thus are unlikely to file individual suits, a class action may be superior to properly vindicate rights. *Id.*

As an initial matter, the Court notes that Defendant does not respond to this argument. The Court has considered Plaintiffs' argument and finds that they have established superiority. As Plaintiffs have argued, there is no evidence that any class member would prefer to control the prosecution of his or her claim individually, and the Court is not aware of any individual claims that have been asserted against Defendant at this time. Further Plaintiffs state that the members are geographically dispersed, and there is no evidence that maintaining the class action will be unusually difficult. Accordingly, the Court finds that Plaintiffs have established predominance.

**B.    Section 11 Class**

With respect to the Section 11 Class, Plaintiffs move to certify all persons or entities who purchased or otherwise acquired Miller Energy Series C Preferred Stock or Series D Preferred Stock pursuant to or traceable to the Offering Documents and were damaged thereby. The Court will now turn to the class certification requirements in Rule 23.

**1.    Rule 23(a)**

As mentioned above, Plaintiffs must establish the following four requirements under Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are

questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses in the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The Court will address these elements separately.

### i.     Numerosity

Plaintiffs assert that the Section 11 Class is so numerous that joinder is impractical. Plaintiffs argue that according to SEC documents, more than 6.21 million Series C and Series D Preferred Shares were sold in the Offerings during the Class Period. Plaintiffs also state that the average weekly turnover as a percentage of shares outstanding for the Series C and Series D Preferred Stock during the Class Period was 5.16% and 7.93% shares per week respectively. Plaintiffs assert that such turnover demonstrates that there are thousands of investors who are part of the Section 11 Class.

Defendant disputes numerosity stating that Plaintiffs have not offered evidence of the "thousands" of class members. Defendant states that Plaintiffs' only argument is the average weekly turnover rate, but Defendant claims that this argument undermines Plaintiffs' position. Defendant states that the more frequently the Preferred Stock traded and turned over, the less likely that there are purchasers who either bought in these two Offerings at issue or who can trace their shares to those Offerings. Defendant states that there are two groups in the Section 11 class—those who purchased in certain initial public offerings or those who can trace to such offerings and who were damaged thereby. Defendant argues that Plaintiffs presented no evidence that any of the original purchasers are members of the proposed Class—that is, members who purchased directly in the Offerings in question.

The Court agrees with Plaintiffs that Defendant's argument is merely a tracing argument. As mentioned above, more than 6.21 million of Series C and Series D Preferred Shares were sold in the Offerings during the Class Period, and the average weekly turnover as a percentage of shares outstanding was 5.16% and 7.93%, respectively. *Burges v. Bancorpsouth, Inc.*, No. 3:14-cv-1564, 2017 WL 2772122, at *2 (M.D. Tenn. June 26, 2017). ("Numerosity is generally assumed to have been met in class action suits involving nationally traded securities."). Accordingly, the Court finds that Plaintiffs have established numerosity with respect to their Section 11 Class.

### ii. Commonality

Plaintiffs rely on the same argument that they made with respect to the Section 10 Class. *See supra* Part IV, section A(1)(ii). Specifically, Plaintiffs state that Defendant made uniform misrepresentations to the investing public and that the misrepresentations and omissions artificially inflated the price of the Miller Energy Securities and injured each member. Plaintiffs list the same common questions of law and fact. *See supra* Part IV, section A(1)(ii).

Defendant does respond to Plaintiffs' argument that commonality has been established. Accordingly, for the same reasons discussed above, the Court finds that Plaintiffs have established that there are questions of law and fact that are common to the class.

### iii. Typicality

With respect to the typicality requirement, Plaintiffs rely on the same argument advanced for their Section 10 Class. Defendant argues that Plaintiff Ziesman is the only proposed representative for the Section 11 Class, and his claims are not typical. Defendant states that Plaintiff Ziesman is not a member of the Section 11 Class because he did not purchase any Preferred Stock in any of the Offerings. Defendant states that he purchased his Series C Preferred Stock in the open market on June 4, 2014, and that he admitted he cannot trace his shares to the

Offerings in this case. Defendant states that Coffman and Dr. Attari also agreed that the shares that Plaintiff Ziesman purchased were not purchased in any offering and cannot be traced to the Offerings at issue in the Section 11 claim. Plaintiffs reply that tracing questions are not appropriate at the class certification stage.

While the Court has considered Defendant's argument, the undersigned notes that many courts hold that "tracing is a merits issue that the court need not consider at the class certification stage." *Wallace v. IntraLinks*, 302 F.R.D. 310, 319 (S.D. N.Y. 2014) (citing *In re Smart Technologies, Inc. Shareholder Litig.*, 295 F.R.D. 50, 61-62 (S.D. N.Y. 2013)); *see also In re Cobalt Int'l Energy, Inc. v. Securities Litigation*, No. 14-cv-3428, 2017 WL 260823, at *5 (S.D. Tex. June 15, 2017). The Court further notes that "[t]ypicality generally presents a low burden that is easily satisfied." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 627 (N.D. Ala. 2009). The typicality requirement simply requires that "other members of the class . . . have the same or similar grievances as the plaintiff." *E. Maine Baptist Church v. Union Planters Bank, N.A.*, 244 F.R.D. 538, 549 (E.D. Mo. 2007) (*citing Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) (other citations omitted). In *Alpern,* the named plaintiff asserted claims arising from the purchase of certain securities as part of the defendant's dividend reinvestment plan ("DRIP"), but also sought to represent a class of plaintiffs who had purchased securities on the open market. The district court found that the plaintiff's claims were not typical of the class claims, noting that "Alpern did not make any UtiliCorp stock purchases on the open market." *Alpern* at 1540. In overruling the district court, the Eighth Circuit held that the named plaintiff's participation in the DRIP did not render his claims atypical of a class including open market purchasers. The Court explained that because the named representative's claim invoked the same legal theory—securities fraud by making knowing misleading statements or omissions—the named plaintiff's claims were

65

typical of the class as both challenged the defendant's course of conduct under the securities laws. *Id.* Here, Plaintiff Ziesman's claims are typical because they arise out of the same event that gives rise to the claims of other class members—that is, Defendant's alleged misstatements and omissions. Therefore, the Court finds such is sufficient to establish typicality. *See also In re Marsh & McLennan Co., Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) ("Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct.").

Further, Defendant also asserts that even if Plaintiff Ziesman were a member of the proposed Section 11 class, his claim would not be typical because he must establish reliance, and the other members do not. Specifically, Defendant argues that Plaintiff Ziesman is subject to 15 U.S.C. § 77k(a) because he purchased his Series C Preferred Shares on June 4, 2014, and the effective date of the Registration Statement at issue was September 18, 2012.

The parties agree that with respect to Section 11 claims, Plaintiffs generally do not have to establish reliance; however, pursuant to 15 U.S.C. § 77k(a):

> If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

As Plaintiffs pointed out in their Reply, "[A] filing, including a quarterly or annual report that may constitute an 'earning statement' for purposes of Section 11, must include the requisite

66

material disclosures and be prepared in accordance with generally accepted accounting principles."

*In re WorldCom, Inc. Sec. Litig.*, ("*WorldCom*") 219 F.R.D. 267, 289 (S.D.N.Y. 2003). The court in *WorldCom* concluded:

> An earning statement that violates the SEC filing requirements should not be considered an "earning statement" for purposes of Section 11, and should not function in a Section 11 claim to shift to the plaintiff the burden of proving reliance. It would be illogical indeed if any filing—no matter how inaccurate or misleading, and despite its perpetuation of the very misrepresentations at stake in the Section 11 claim—were sufficient to shift the burden to the plaintiffs to establish reliance on the Registration Statement. Whether a filing is sufficient to shift the burden must depend on whether it meets the requirement for earning statements imposed by the SEC rules and regulations.

*Id.* at 293-94; *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 622 (C.D. Cal. 2009) (discussing *WorldCom* and agreeing "with the essence of this reasoning").

Accordingly, the Court finds Defendant's arguments not well taken at this time, and for the reasons stated above, *supra* Part IV, section A(1)(iii), the Court finds that Plaintiffs have established typicality with respect to the Section 11 Class.

### iv. Adequacy

Defendant claims that the proposed Class Representatives and Class Counsel are not adequate. Defendant states that the only proposed Class Representative for the Section 11 Claim is Plaintiff Ziesman, who did not apply for appointment in compliance with the statutory requirements for doing so. Thus, Defendant argues that Plaintiff Ziesman is not authorized to bring claims on behalf of purchasers of the Preferred Stock and that his chosen counsel is also inadequate for complying with the statutory requirements for appointing Plaintiff Ziesman.

Plaintiffs state that Plaintiff Ziesman is not the only proposed representative for the Section 11 claim and that Plaintiffs Cosby and Montague also seek to represent the Section 11 Class.

Plaintiffs argue that the proposed representatives sustained losses because the same alleged material misrepresentations and omissions contained and repeated in Miller Energy's financial statements, Defendant's audit opinions, and the Offering Documents. Further, Plaintiffs argue that adding, withdrawing, and substituting class representatives is a customary feature of class action practice and that there is no reason why the added class representative, like Plaintiff Ziesman, cannot represent the Section 11 Class, even though he was not initially appointed as a Lead Plaintiff.

As mentioned above, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement contains two criteria: "(1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976) (citing *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973)).

With respect to Plaintiff Ziesman not seeking appointment, the Court does not find this to be fatal to the adequacy requirement. A similar argument was addressed by the Court in *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003). In that case, the defendants argued that several of the named plaintiffs were inadequate because they were not selected as a lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 286. The court disagreed explaining, "The PLSRA does not prohibit the addition of named plaintiffs to aid the Lead Plaintiff in representing the class." *Id.* The court reasoned that prudence dictated that named plaintiffs be added to assist in representing the bondholders since the other plaintiff did not purchase several of the notes." *Id.* Thus, the court held, "Although the lead plaintiff must otherwise satisfy the requirements of Rule 23, nothing in the text of the PSLRA indicates that

68

every named plaintiff who satisfies the requirements of Rule 23 must also satisfy the criteria established under the PSLRA for appointment as lead plaintiff and actually be appointed as a lead plaintiff. Appointment of a lead plaintiff and certification of the class occur at two different stages of the litigation, and are to be reviewed under the separate standards that govern each process." *Id.*

In the instant matter, the Court finds that reasoning in *In re WorldCom, Inc. Sec. Litig.*, persuasive, and the Court does not find Plaintiff Ziesman or Class Counsel to be inadequate for not applying for appointment under the PSLRA. Accordingly, for the same reason as stated above, *see supra* Part IV, section A(1)(iv), the Court finds that Plaintiffs have established the adequacy requirement.

### 2. Rule 23(b)(3)

As mentioned above, pursuant to Rule 23(b)(3), Plaintiffs must show that questions of law and fact common to class members predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). Plaintiffs must also show that the class action is superior to the other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The Court will address these requirements in turn.

### i. Predominance

Defendant asserts that common questions of law and fact do not predominate for three primary reasons. Specifically, Defendant argues that individual issues of reliance, damages, and timeliness will overwhelm common issues. The Court will address these separately.

### a. Individual Issues of Reliance

Defendant asserts that individual issues of reliance will overwhelm common issues. Defendant explains that anyone who purchased between December 11, 2013, (the date when Miller Energy had disclosed earning statements covering over twelve months beginning after the effective date of the registration statement) and March 29, 2016, (the date the price of the securities declined to zero) will have to prove reliance in order to recover under Section 11, citing to 15 U.S.C §§ 77(k)(a)(5). Defendant further states that the *Basic* presumption and the *Affiliated Ute* presumption do not apply.

The Court has already addressed a similar argument above, *see* supra Part IV, section B(1)(iii) ("Typicality"). Accordingly, for the same reasons, the Court finds Defendant's argument not well taken.

### b. Individual Issues of Damages

Defendant asserts that individual issues of damages will overwhelm common issues. Specifically, Defendant asserts that there were several offerings of the Series C Preferred Stock at different offering prices and that the Section 11 Class includes investors who purchased their shares in or traceable to only two of those offerings. Defendant states that with respect to the Series D Preferred Stock, there were multiple offerings at different initial offering prices. Defendant submits that the Section 11 Class includes investors who purchased their shares in or traceable to only three of these offerings. Thus, Defendant states that there is no way to calculate damages on a class-wide basis because in order to apply the statutory formula, it is necessary to know the price at which the security was offered to the public. Defendant argues that the same holds true for the after-market purchasers.

The Court agrees with Plaintiffs that Defendant's argument amounts to a tracing issue.  A number of courts have held that the difficulties with tracing do not defeat class certification.  *See Freeland v. Iridum World Commc'ns, Ltd.*, 233 F.R.D. 40, 45-46 (D.D.C. 2006) ("[A]ny difficulty by individual class members in tracing their particular aftermarket-purchased shares to the Registration Statement is a secondary issue to be resolved after the predominant issue of Defendant Underwriters' liability has been decided.  It would be inappropriate to foreclose such Plaintiffs' resort to the class action format simply because some of their cases may be difficult to prove."); *United Food and Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, (W.D. Okla. 2012) ("Difficulties in tracing do not, however, automatically exclude from a class those who obtained their stock through an aftermarket purchase . . . Aftermarket purchasers have standing to pursue their claims if they can prove the securities they purchased were sold in the offering covered by the challenged registration statement."); *In re Colbalt Int'l Energy, Inc., Sec. Litig.*, 2017 WL 2608243, at *5 ("[T]he requirement that each [p]laintiff must ultimately show that he purchased his shares of Cobalt stock in connection with a public offering does not preclude class certification."); *Beaver Cty. Empl. Ret. Fund*, 2016 WL 4098741, at *13 ("Plaintiffs recognize that tracing is complicated, if not impossible, and that they may ultimately be unable to craft a methodology for determining whether a security purchased in the aftermarket was purchased pursuant to the allegedly defective December 2012 public offering.  However, as other courts have noted, tracing is a merits issue that should not be considered at this stage." *In re Smart Tech., Inc., S'holder Litig.*, 295 F.R.D. 50, 61-62 (S.D. N.Y. 2013) ("But tracing is a merits issue that the court need not consider at the class certification stage."); *In re Direct Gen. Corp. Sec. Litig.*, No. 3:05-cv-0077, 2006 WL 2265472, at *3 (M.D. Tenn. Aug. 8, 2006) ("[F]or purposes of class certification, the common question of whether the registration statements were materially

misleading predominates over any secondary tracing issues that might be encountered later in the litigation.").

Here, Plaintiffs have relied on the statutory formula for calculating damages. *In re Oppenheimer Rochester Funds Group Sec. Litig.*, 318 F.R.D. 435, 447 (D. Col. 2015) (noting that the "calculation of damages is common to the Class as well") (citing 15 U.S.C. § 77k(e)); *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08-CV-8781, 2013 WL 6389093, at *5 (S.D. N.Y. Dec. 27, 2013) ("[S]ection 11(e) of the Securities Act sets out the proper method for calculating damages in this case."). Accordingly, the Court finds Defendant's argument not well taken.

### c.   Individual Issues of Timeliness

Defendant asserts that individual issues of timeliness will overwhelm common issues. Defendant argues that a Section 11 claim must be brought "one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." [Doc. 129 at 32] (citing 15 U.S.C. § 77m). Defendant states that each member of the proposed class who was aware of the facts and circumstances giving rise to the claim prior to March 14, 2015, is barred from recovery under Section 11. Defendant states that such cannot be resolved on a class-wide basis.

As mentioned above, "[A]n affirmative defense, standing alone, does not compel a finding that common liability issues do not predominate." *In re HCA Holdings, Inc.,* 2015 WL 10575861, at *2. Defendant does not provide any evidence of this affirmative defense but simply argues that it precludes class certification. The Court disagrees and finds Defendant's argument not well taken.

### ii.     Superiority

Plaintiffs argue that they have established superiority for the same reasons that they articulated for their Section 10 Class.  Defendant does not challenge superiority.  Accordingly, for the same reasons, *supra* Part IV, section A(2)(ii). ("Superiority"), the Court finds Plaintiffs have satisfied superiority.

### C.     Series D Preferred Shares

Defendant asserts that a class of purchasers of Series D Preferred Stock may not be certified because none of the three proposed Class Representatives purchased the Series D Preferred Stock.  Defendant states that Plaintiffs Cosby and Montague purchased common stock and that Plaintiff Ziesman purchased the Series C Preferred Stock.  Defendant argues that Coffman admitted that the Series C and Series D Preferred Stock were different securities with different characteristics that traded at different prices.  Defendant argues that none of the Class Representatives have standing to sue on behalf of the Series D Preferred Stock purchasers.  Defendant also states in a footnote that the Court previously held that the question of whether Plaintiffs may pursue claims on behalf of purchasers of the Preferred Stock was "premature."  [Doc. 129 at 38 n. 33].  Defendant states that in the Memorandum and Order on its motion to dismiss, the Court granted the parties leave to refile the motion to dismiss the Section 11 claim after the class certification had been raised or ruled on by the Court.  Defendant states that it reserves the right to file such motion after the Court decides the motion for class certification.  [*Id.*].

Plaintiffs respond that the Class Representatives do not need to have had purchased a specific security to represent the interests of the purchasers of that security, citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 162 (2d Cir. 2012).

During the oral argument in this case, Plaintiffs maintained that the clear standard or

bedrock principle is that a plaintiff must have purchased from the same registration statement and need not have purchased each of the securities at issue. Defendant disagreed, arguing that *NECA-IBEW Health & Welfare Fund* created a circuit split and that such cases were confined to mortgage backed securities.[16]

The parties frame their issue as one of standing (i.e., whether the named Plaintiffs have standing to sue on behalf of the Series D Preferred Stock purchasers). The Court finds that this issue is better addressed through dispositive motion practice as opposed to an issue for class certification. *In re Carrier IQ, Inc.,* 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (explaining that courts have the discretion to defer questions of standing until after class certification).[17] Accordingly, Defendant's argument is not well taken at this time.

---

[16] While Plaintiffs cite to *NECA-IBEW Health & Welfare Fund* for the position that named plaintiffs are not required to have purchased a specific security to represent the interests of the purchasers of that security, the undersigned notes that the Second Circuit's decision has been criticized. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1229 (C.D. Cal. 2013) ("The Court again rejects the reasoning of the Second Circuit's recent decision on class standing."); *Oklahoma Law Enf't Ret. Sys. v. Adeptus Health Inc.,* No. 4:17-CV-00449, 2018 WL 4352836, at *6 (E.D. Tex. Sept. 12, 2018) ("However, several courts since this decision have declined to follow the class standing doctrine.") (collecting cases). While Defendant argued at the hearing that *NECA-IBEW Health & Welfare Fund* created a circuit split, the parties did not sufficiently brief this issue in their filings.

[17] The Court notes that deferring such a consideration does not defeat the adequacy or typicality requirements. As explained above, the adequacy element requires that the representative have *common* interests, not exact interests, with the unnamed members of the class. *See* Fed. R. Civ. P. 23(a)(4) (Emphasis added). The typicality element requires that the named plaintiffs' claims arise out of the claims of other claims members or if the claims are based on the same legal theory. Fed. R. Civ. P. 23(a)(3). *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98CIV.4318(HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly certified classes where the class representatives had not invested in all of the subject securities.").

### D.   Appointment of Class Counsel and Class Representatives

Plaintiffs move that the Court appoint Gordan Ball PLLC and Cohen Milstein Sellers & Toll PLLC as their Class Counsel.  Plaintiffs state that the factors articulated in Rule 23(g)(1) factor the appointment of Gordan Ball PLLC and Cohen Milstein Sellers & Toll PLLC. Specifically, Plaintiffs state that Gordan Ball has served as lead or co-counsel for plaintiffs in dozens of antitrust, consumer, and product liability class actions across the United States.  [Doc. 107-3 at 2-12].  In addition, Plaintiffs state that Cohen Milstein Sellers & Toll PLLC has extensive securities litigation experience and successfully prosecuted numerous securities fraud class actions on behalf of injured investors recovering billions for investors.  [Doc. 40-3],

Rule 23(g)(1)(A) provides as follows:

> Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:
>
> (A) must consider:
>
> (i)    the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii)   counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii)  counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

The Court has reviewed the experience of Class Counsel in addition to the work performed in the instant matter, and the Court finds Plaintiffs' argument well taken.  Class Counsel has been involved in this matter since the lawsuit's infancy and has litigated numerous motions, including

a motion to dismiss, a *Daubert* motion, and the instant Motion.  Further, Class Counsel's resumes establish the necessary qualifications and experience for handling this action.  The Court is confident that Class Counsel is knowledgeable to litigate this action and maintains the necessary resources to do so.  Accordingly, the Court finds Plaintiffs' argument that Class Counsel be appointed well taken.

Further, Plaintiffs also move the Court to appoint Lewis Cosby, Eric Montague, and Martin Ziesman as Class Representatives in this action.  Accordingly, for the reasons stated above, the Court finds that they have met the necessary Rule 23 requirements, and the Court will recommend that they be approved as Class Representatives.

## V.     CONCLUSION

Accordingly, for the reasons explained above, the Court **RECOMMENDS**[18] that Plaintiffs' Motion to Certify the Classes, Appoint Class Representatives, and Appoint Class Counsel [**Doc. 107**] be **GRANTED**.

Respectfully submitted,

Debra C. Poplin
Debra C. Poplin
United States Magistrate Judge

---

[18] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2).  Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b).  Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985).  "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'"  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

76