UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| LEWIS COSBY, ERIC MONTAGUE, and MARTIN ZIESMAN, as Co-Trustee for the Carolyn K. Ziesman Revocable Trust, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> KPMG, LLP, <br><br> Defendant. | ) ) ) ) ) ) ) ) No. 3:16-CV-121-TAV-DCP ) ) ) ) ) |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 287] of referral by United States District Judge Thomas A. Varlan.

This matter is before the Court on Lead Plaintiffs' and Class Representatives' Unopposed Motion for Order Authorizing Distribution of Net Settlement [Doc. 281] and Lead Plaintiff's Response [Doc. 284]. For the reasons explained below, the Court **RECOMMENDS** that the District Judge **GRANT** the unopposed motion [**Doc. 281**] and that he enter the proposed order [Doc. 281-1].

I.  BACKGROUND

This action was brought on behalf of investors of Miller Energy Resources, Inc., against KMPG, LLP, an accounting firm, for violations of the Securities Exchange Act of 1934 [*See* Doc. 59]. On May 7, 2021, the District Judge certified this case as a class action, appointed class representatives, and appointed Attorney Gordon Ball as Lead Counsel and Cohen Milstein Sellers & Toll, PLLC as Co-Lead Counsel [Doc. 211]. Following the parties' joint status report indicating that they may resolve this matter [Doc. 223], Judge Varlan referred the case for a judicially hosted

1

Case 3:16-cv-00121-TAV-DCP    Document 288    Filed 07/19/23    Page 1 of 10
PageID #: 22471

settlement conference with United States Magistrate Judge Christopher Steger [Doc. 225]. On December 7, 2021, Judge Steger filed a report stating that the case had settled [Doc. 232].

On March 11, 2022, the parties filed a Stipulation and Agreement of Settlement ("Stipulation") [Doc. 236], setting forth the terms of the parties' agreement to settle this matter for $35,000,000.[1] In the parties' Stipulation, they explained that Co-Lead Counsel would later apply to the Court for a Settlement Class Distribution Order, requesting the approval of "the Claims Administrator's administrative determinations concerning the acceptance and rejection of the claims . . . and approving any fees and expenses not previously applied for" [*Id*. ¶ 14]. On June 23, 2022, Judge Varlan entered an Order Preliminarily Approving Proposed Settlement and Providing for Notice [Doc. 237], and he conducted a final fairness hearing on June 30, 2022 [Doc. 262]. Following the final fairness hearing, Judge Varlan entered an Order Approving Plan of Allocation of Net Settlement Fund [Doc. 266]. Specifically, Judge Varlan concluded:

> 5. The Court hereby finds and concludes that the formula for the calculation of the claims of Claimants as set forth in the Plan of Allocation available to Settlement Class Members provides a fair and reasonable basis upon which to allocate the proceeds of the Net Settlement Fund among Settlement Class Members with due consideration having been given to administrative convenience and necessity.
>
> 6. The Court hereby finds and concludes that the Plan of Allocation is, in all respects, fair and reasonable to the Settlement Class. Accordingly, the Court hereby approves the Plan of Allocation proposed by Lead Plaintiffs and Class Representatives.

[*Id*. ¶¶ 5–6].

---

[1] This Report and Recommendation incorporates by reference the definitions in the Stipulation [Doc. 236].

Plaintiffs have now moved for an order authorizing the distribution of the Net Settlement Fund [Doc. 281] following the claims administration process. Lead Plaintiff Lewis Cosby has filed a Letter [Doc. 284] in response to the motion. Co-Lead Counsel responded to the Letter [Doc. 285], and Lead Plaintiff Lewis Cosby replied [Doc. 286].

## II. ANALYSIS

The undersigned has reviewed the proposed plan for distribution of the Net Settlement Fund. Judge Varlan has already approved the plan of allocation finding it "in all respects, fair and reasonable to the Settlement Class" [Doc. 266]. *See Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2006 WL 2382718, at *17 (E.D. Pa. Aug. 14, 2006) ("Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." (citation omitted)); *In re Aetna Inc.*, No. CIV. A. MDL 1219, 2001 WL 20928, at *12 (E.D. Pa. Jan. 4, 2001) ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable." (citing *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)). The plan for distribution largely comports with the parties' Stipulation [Doc. 236] and Judge Varlan's approval thereof [Doc. 266].

In support of their plan for distribution, Plaintiffs filed the Declaration of Alexander Villanova ("Villanova"), the Senior Project Manager employed by Epiq Class Action & Claims Solutions, Inc. ("Epiq"), who explains in detail how Epiq processed the claims and the distribution plan for the Net Settlement Fund [Doc. 283]. Villanova states that "each Settlement Class member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Proof of Claim postmarked no later than August 18, 2022" [*Id.* ¶ 5]. Epiq, however, processed all claims received through June 1, 2023 [*Id.*].

3

Case 3:16-cv-00121-TAV-DCP   Document 288   Filed 07/19/23   Page 3 of 10
PageID #: 22473

Villanova explains how Epiq processed the proofs of claim received via paper [*see id.* ¶¶ 7–9], via web [*see id.* ¶¶ 10–11], and proofs received electronically [*see id.* ¶¶ 12–16]. In addition, he explains what happened when a claim was deficient or disputed [*Id.* ¶¶ 18–24].

In summary, Epiq processed 5,987 Proofs of Claim received through June 1, 2023, and determined that 2,349 claims were acceptable [*Id.* ¶ 31]. Out of the 3,638 other Proofs of Claim, Villanova provides the following chart:

| Summary of Rejected Proofs of Claim | |
|---|---|
| Reason for Rejection | Number of Claim Forms |
| No Eligible Purchases/Acquisitions During the Class Period | 661 |
| Proof of Claim Did Not Result in a Recognized Loss | 1,881 |
| Deficient Proof of Claim Never Cured | 87 |
| Duplicate Proof of Claim | 56 |
| Withdrawn Proof of Claim | 953 |

[*Id.* ¶ 32]. Villanova includes a list of the Proofs of Claim submitted, and Epiq's intended disposition is contained in the Administrator's Report [*See* Doc. 283-2 pp. 3–23 ("Timely Eligible Claims"); *id.* at 24–29 ("Late But Otherwise Eligible Claims"); and *id.* at 30–69 ("Rejected Claims")]. Epiq has determined that the Proofs of Claim identified for acceptance represent total Recognized Losses of $87,543.894.18, and that "each Authorized Claimant shall be allocated a pro rata share of the Net Settlement Fund based on his, her, or its Recognized Loss in comparison to the total Recognized Losses of All Authorized Claimants" [Doc. 283 ¶ 34].

Epiq has incurred $311,469.56 in fees and expenses on behalf of the Class [*Id.* ¶ 35]. It has already been paid $160,894.68 of this amount [*Id.*]. Epiq requests payment of its outstanding fees and expenses in the amount of $150,574.88 [*Id.*]. "To the extent there are remaining funds and Epiq and Co-Lead Counsel determine its feasible to conduct another distribution . . . [its] fees and expenses will be paid from the remaining funds at that time" [*Id.*].

4

Epiq further intends to implement the distribution plan ("Distribution Plan") as follows: "Epiq will distribute 100% of the available balance of the Net Settlement Fund after deducting any Notice and Administration Costs, Taxes, and Tax Expenses to Authorized Claimants who would receive at least $10.00 based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants" [*Id*. at ¶ 36(a)].[2] Authorized Claimants have ninety days to deposit their check [*Id*. ¶ 36(b)]. Epiq further states:

> Consistent with the Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants negotiate their distribution checks, any balance remaining in the Net Settlement Fund at least nine months after the initial distribution of such funds shall be re-distributed on a pro rata basis to Settlement Class Members who have cashed their initial distributions in an equitable and economical manner, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution. These redistributions shall be repeated until the balance in the Net Settlement Fund is no longer economical to distribute. Any balance that still remains in the Net Settlement Fund after redistribution(s) which not feasible or economical to reallocate, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund, shall be contributed to the Institute for Law & Economic Policy ("ILEP"), a not-for-profit public policy research and educational foundation whose mission is to preserve, study and enhance investor and consumer access to the civil justice system.

[*Id*. ¶ 36(d)].

On June 28, 2023, Lead Plaintiff Lewis F. Cosby, III ("Plaintiff Cosby") filed a Letter, stating that he agreed with the motion, except to "paragraph 7 regarding the *cy pres* payment to the . . . ILEP" [Doc. 284 p. 1]. For grounds, Plaintiff Cosby states that "[o]ver the years, it has become apparent to [him] that many of the shareholders . . . were from East Tennessee and the State of Tennessee [*Id*. at 1]. Arguing that the first line of defense for shareholders is the audit

---

[2] There are approximately thirty (30) accepted claims that are less than $10.00 [Doc. 283-2 pp. 1–29].

committee, he proposes that the Neel Corporate Governance Center ("Neel Center") at the University of Tennessee be provided the *cy pres* funds [*Id*. at 2]. Plaintiff Cosby explains that the Neel Center "was founded in 2003 following the wake of corporate scandals that proceeded Sarbanes-Oxley" [*Id*.]. In addition, he states that "[t]he Center's research and speakers' series include[] Auditing & Risk Management and Corporate Governance" and that a professor from the Neel Center met and assisted him prior to filing this case [*Id*.]. In full disclosure, he adds, he graduated from the University of Tennessee's accounting program in 1972 but that his hope is for the *cy pres* "funds [to] benefit the geographical area of many of the shareholders that were affected by this fraud" [*Id*. at 2].

Co-Lead Counsel filed a response to the Letter [Doc. 285], accusing Plaintiff Cosby of filing it at the request of Attorney Gordan Ball.[3] Co-Lead Counsel explains that the mission and work of ILEP "is directly tied to investor protection and securities class action law" [*Id*. ¶ 3]. Co-Lead Counsel states, "ILEP organizes symposia, co-sponsored by law schools across the country and attended by academics, jurists, and practitioners, in which leading legal experts and professors present papers on class actions, securities law, corporate governance, and consumer protection issues" [*Id*.]. According to Co-Lead Counsel, "Papers are presented at these symposia and then published in prestigious law reviews and have been cited by many courts, including the U.S. Supreme Court in securities cases . . ." [*Id*. (citations omitted)]. In addition, Co-Lead Counsel submits that "[m]ore than 15 federal courts have approved *cy pres* donations to ILEP in securities fraud class actions" [*Id*. ¶ 4 (citations omitted)]. Arguing that "[t]he settlement in this securities class action was reached on behalf of a nationwide class of investors[,]" Co-Lead Counsel states

---

[3] Co-Lead Counsel includes citations to articles regarding Attorney Ball's alleged use of *cy pres* distributions to the University of Tennessee [Doc. 285 ¶ 5].

that it "has no direct connection to the State of Tennessee or the University of Tennessee, Knoxville" [*Id*.].

Plaintiff Cosby takes "great offense" to Co-Lead Counsel's accusations, claiming that he did not file his June 28 Letter at the request of Attorney Ball [Doc. 286]. With respect to his request that the recipient of the *cy pres* funds be distributed to the Neel Center, he states that "[t]he class has benefited from [his] work reviewing every document that has been submitted in this case through the eyes of someone who was a graduate of the UTK Accounting program" and that prior to filing suit, he received assistance from a professor at the Neel Center [*Id*. at 2]. Plaintiff Cosby concludes that the "class members of [the] investors did benefit from UT" [*Id*.].

As an initial matter, the Court notes that any *cy pres* distribution in this matter will be *de minimis*. Villanova explains that Epiq will distribute 100% of the available balance of the Net Settlement Fund, after deducting expenses, to the Authorized Claimants who have a claim of $10.00 or more [Doc. 283 ¶ 36(a)]. If any Authorized Claimant does not cash his/her check, Epiq intends on "re-distribut[ing] on a pro rata basis to Settlement Class Members who have cashed their initial distributions in an equitable and economical manner, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution" [*Id*. ¶ 36(d)]. This method will "be repeated until the balance in the Net Settlement Fund is no longer economical to distribute" [*Id*.]. It is only then that the amount will be distributed to an organization [*Id*.]. *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1004 (N.D. Ohio 2016) (finding the *cy pres* distribution to be *de minimis* when "the marginal cost of making an additional pro rata distribution to the class members exceeds the amount available" (citation omitted)). In such cases, identifying a *cy pres* recipient is not necessary but certainly "best practice." *Id*.; *see also BankAmerica Corp. Sec. Litig.,* 775 F.3d 1060, 1066 (8th Cir. 2015) ("[U]nless the amount of

funds to be distributed *cy pres* is de minimis, the district court should make a *cy pres* proposal publicly available and allow class members to object or suggest alternative recipients before the court selects a *cy pres* recipient.").

In any event, "[t]he court's choice among distribution options should be guided by the objectives of the underlying statute and the interests of the silent class members." *Rosser v. A & S Contracting, Inc.*, No. 2:15-CV-00711, 2017 WL 666121, at *1 (S.D. Ohio Feb. 17, 2017); *see also Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) ("*Cy pres* distributions must account for the nature of the plaintiff's lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity."). "The final choice of a recipient, however, remains within this Court's discretion." *In re Polyurethane Foam Antitrust Litig.*, 178 F. Supp. 3d 621, 624 (N.D. Ohio 2016) (citation omitted).

The Court recommends that any available *cy pres* funds be distributed to the ILEP. First, the Court must consider the objectives of the underlying statute. "The purposes of the federal securities laws are broad, including the protection of investors, and the promotion of ethical standards of honesty and fair dealing in the profession." *Dooner v. NMI Ltd.*, 725 F. Supp. 153, 157–58 (S.D. N.Y. 1989) (internal citation omitted). The ILEP serves these purposes. According to Villanova's Declaration, ILEP "is a not-for-profit policy research and educational foundation whose mission is to preserve, study and enhance investor and consumer access to the civil justice system" [Doc. 283 ¶ 36(d)]. *See also Thomas v. Magnachip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 3879193, at *6 (N.D. Cal. July 18, 2016) (concluding that ILEP was a proper recipient of any *cy pres* funds in a securities class action because the distribution bore "a substantial nexus to the interests of the class members" (citation omitted)); *In re Paracelsus Corp. Sec. Litig.*, No. CIV.A. H-96-3464, 2007 WL 433281, at *2 (S.D. Tex. Feb. 6, 2007) ("The unclaimed funds

are to be distributed to the Institute of Law and Economic Policy, which will spend the money in a way that may indirectly and prospectively benefit the class members in the aggregate.").

According to Plaintiff Cosby, the Neel Center "was founded in 2003 following the wake of corporate scandals that proceeded [the] Sarbanes-Oxley [Act]" [Doc. 284 p. 2].[4] Plaintiff Cosby states that the Neel "Center's research and speakers' series include[] Auditing & Risk Management and Corporate Governance" [*Id.*]. Even so, Plaintiff Cosby does not sufficiently explain the purpose or mission of the Neel Center and how receiving the *cy pres* funds would advance the objectives of the Securities Exchange Act.

Plaintiff Cosby also states that many of the shareholders were from East Tennessee and generally the State of Tennessee. But as Co-Lead Counsel points out, "The settlement in this securities class action was reached on behalf of a nationwide class of investors and has no direct connection to the State of Tennessee or the University of Tennessee, Knoxville" [Doc. 285 p. 2]. "In determining an appropriate recipient, "geographic scope should be a consideration in the selection[.]" *Rosser*, 2017 WL 666121, at *2 (citing *In re Polyurethane Foam Antitrust Litig.,* 178 F. Supp. 3d at 625). The Court has been presented with no evidence or argument that investors nationwide would benefit from a distribution of the *cy pres* funds to the Neel Center. *Cf. Nachshin*, 663 F.3d at 1040 ("The *cy pres* distribution also fails to target the plaintiff class, because it does not account for the broad geographic distribution of the class.").

The Court has also considered that a professor from the Neel Center assisted Plaintiff Cosby prior to filing the lawsuit. But without more, the undersigned fails to see how this assistance should translate to the Neel Center receiving a *cy pres* distribution. While Plaintiff Cosby argues

---

[4] This assumes, but does not find, that the statements in Plaintiff Cosby's Letters [Docs. 284 & 286] are accurate.

that the class members benefited from his work in this matter and that he graduated from the University of Tennessee, this is not a proper consideration. *Nachshin*, 663 F.3d 1034, 1039 (setting forth the appropriate guideposts courts should consider in determining a *cy pres* recipient in order to "remedy the concerns" that such funds were going to favored charities or alma maters).[5]

### III. CONCLUSION

For the reasons explained above, the Court **RECOMMENDS**[6] that the District Judge **GRANT** Lead Plaintiffs' and Class Representatives' Unopposed Motion for Order Authorizing Distribution of Net Settlement [**Doc. 281**] and that he enter the proposed order [Doc. 281-1].

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[5] Co-Lead Counsel acknowledges that Attorney Laura H. Posner "serves as a voluntary and uncompensated officer for ILEP" but submits that "[n]either Ms. Posner nor Cohen Milstein gets any personal or financial benefit from their involvement with ILEP" [Doc. 285 p. 2 n.1]. According to Lead Counsel, "[M]any of the most prominent plaintiffs-side securities class action law firms are involved with ILEP because of its mission to preserve, study, and enhance investor and consumer access to the civil justice system" [*Id.*]. Given that the ILEP serves the interests of the silent class members and Attorney Posner is only a volunteer for the organization, the Court does not find that Attorney Posner's participation in ILEP creates an appearance of impropriety. *Nachshin*, 663 F.3d at 1039 ("When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court.").

[6] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).